# Pennsylvania Skill Games

# Fed.R.Civ.P 19

# Motion for Joinder

# EXHIBIT 5

# MANUFACTURING AND DISTRIBUTION AGREEMENT

THIS MANUFACTURING AND DISTRIBUTION AGREEMENT ("Agreement") is entered into effective as of December 23, 2014 ("Effective Date") by and among MDM Ventures DBA Miele Manufacturing (Distributor"), and Pace-O-Matic Inc. ("Manufacturer"). Manufacturer and Distributor are sometimes each referred to herein as a "party" and collectively as the "parties."

## RECITALS

WHEREAS, Manufacturer is the manufacturer of Pennsylvania compliant Skill Based Software (defined below), to be used for entertainment purposes: and

WHEREAS, the Software (defined below) owned by Manufacturer, a Logic Module (defined below), and a Terminal (defined below); and

WHEREAS, Distributor desires to facilitate the distribution of the software and terminals in the Territory (defined below), subject to the terms and conditions of this Agreement;

NOW, THEREFORE, in consideration of the mutual promises and covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## SECTION 1
## DEFINITIONS

1.1     Brand means a name, trade name, design, or symbol associated with the Manufacturer's proprietary software program that identifies the entity, organization, distributor, or products being promoted.

1.2     Fill System means the proprietary revenue generation refill system developed by Manufacturer to permit Operators and/or Location Owners to access plays on the Software on a fee basis.

1.3     Fill(s) means the extended play authorizations for the Software sold by Manufacturer in the Territory.

1.4     Logic Module(s) means a mother board which consists of the Software and dongle or security key or chip or any other component upon which makes the Promotional system operate.

1.5     Not Used

1.6     Not Used

1.7     Location Owner(s) means any owner or manager of a Site.

1.8     Operator(s) means a person or entity that licenses the Software and owns or leases the Terminals at a Site.

1 | P a g e

**EXHIBIT**

**5**

CONFIDENTIAL

POM 000720

1.9    Not Used

1.10    Terminal means a device which operates in conjunction with the Software and Logic Module for the use in the Territory.

1.11    Site means a location which the terminal is placed and operated.

1.12    Software means Manufacturer's proprietary software programs ("Program" or "Programs") designed for any Brand herein, as updated or replaced during the Term (as defined below), including all manuals and other end user documentation, if any, prepared by Manufacturer.

1.13    Not Used.

1.14    Territory means the State of Pennsylvania.

## SECTION 2
## DISTRIBUTION RIGHTS AND LIMITATIONS

2.1    Appointment. Manufacturer hereby appoints Distributor as a Distributor of the Software in the Territory, subject to the terms and conditions hereof.  Distributor accepts this appointment and agrees to use its commercially reasonable efforts to market the Software in the Territory by (i) selling the Terminals (as defined in 1.3 and as set forth in Paragraph 3.1 herein) or Logic Modules to Operators for placement in Sites, (ii) licensing the use of the Software (as set forth in Paragraph 3.2 herein and subject to Paragraph 2.6 herein), and (iii) causing Operators or Location Owners to purchase Fills from Manufacturer.  Distributor may act as an Operator in the Territory with written approval from the Manufacturer.

2.2    Fill System.  Manufacturer shall host and maintain a website for the Fill System and shall sell Fills to the Operators at prices set forth in Paragraph 3.3 herein. Manufacturer shall provide access of the Fill System to Distributor and allow Distributor access to view all Fills sold, in real time, for the Promotional System.  Manufacturer will provide customer support to Operators and Location Owners necessary to operate the Software in the Territory.

2.3    Limitations.

(a)    No rights or license to manufacture or modify the Software are granted to Distributor pursuant to this Agreement except Distributor may request Manufacturer to change the Brand associated with the Program.  Cost associated with the requested change shall be agreed by both parties before changes are made.  Distributor acknowledges that the Operators and Location Owners are only receiving a limited license to use the Software.

(b)    During the term and for a period of 18 months after this Agreement is terminated, as a result of a Distributor default, or expires, Distributor (and any owner, officer or

2 | P a g e

POM 000721

affiliate therof) shall not directly or indirectly, place distribute, market or sell in the Territory any devices that have overlapping functionality of the Software..

(c)    Notwithstanding anything contained in this Agreement to the contrary, if this Agreement is terminated or expires, Distributor shall be permitted to continue to sell and market the and License the Software within the Territory, and Manufacturer agrees to continue to support, maintain, and supply Software and Fills to Distributor and its Operators unless prohibited by law. In the event this Agreement is terminated or the term expires and is not renewed, Distributor shall continue to (i) purchase Fills for its own Terminals and (ii) continue to receive commissions on Fills for any Software in use prior to the effective date of termination at the price set forth on Exhibit A.

2.4    <u>Due Diligence Information</u>.    Distributor agrees to provide information to Manufacturer from time to time regarding its activities in the Territory including, but not limited to, activities regarding legal compliance, sales projections, lobbying activities and business plans.    Distributor shall promptly complete any due diligence questionnaires prepared by Manufacturer. Manufacturer agrees to provide information to Distributor upon Distributors request regarding all Fills sold, Terminal Id's and/or license number of any terminals that have the Software, relating to commissions earned commissions, and any other pertinent financial information in order to reconcile accounting.

2.5    <u>Changes</u>. Manufacturer reserves the right to (i) replace or modify the Software to address legal compliance or market acceptability issues, and (ii) add technology upgrades to the Software. Distributor will cooperate with Manufacturer to implement such changes.

2.6    <u>License</u>.

(a)    Distributor has a license, or has permission to all rights and title to the Brand or trade names of the Software.

(b)    Manufacturer owns all right and title to any trademarks and trade name associated with the Software, exclusive of the Distributor Marks ("Manufacturer Marks"). During the Term and subject to the terms and conditions of this Agreement, Manufacturer grants to Distributor a limited, non-transferable, non-exclusive, royalty-free right and license to use, but not to register, the trademarks and trade names associated with the Software and/or the Terminals, and subject to Manufacturer's right to specify the method or manner in which Distributor may utilize the Manufacturer Marks. Except as permitted under this Agreement, Distributor will not display or use the Manufacturer Marks nor permit the Marks to be displayed or used by any third party other than Operators or Location Owners.

(c)    Distributor acknowledges and agrees that: (i) the Software contains trade secrets and other valuable proprietary information of Manufacturer, and (ii) Manufacturer owns all right, title and interest in the Software, the Fill System, the Manufacturer Marks, and all patents, inventions, copyrights, know-how and trade secrets relating to the design, manufacture, operation and/or service of the Software and Fill System (collectively, the "Manufacturer

POM 000722

Intellectual Property"). The use by Distributor of the Manufacturer Intellectual Property is authorized only for the purposes specifically set forth in this Agreement. Distributor will not, and will not permit a third party to, copy, distribute, reproduce, incorporate, use or allow access to the Software, or alter, modify, prepare derivative works of, decompile, reverse engineer, disassemble, or otherwise attempt to derive source code from the Software or Fill System. Distributor shall inform Operators and Location Owners of the restrictions contained in this Section.

2.7    Not Used

## SECTION 3
## SPECIFICATION AND INITIAL PRICES

3.1    Terminals. The terminals, if purchased through Manufacturer, will be either Flex 1, Spartan, or Countertop style cabinets and shall include a Logic Module, LCD monitor, bill acceptor, printer, and any other necessary part for the Software to operate. Any additional specifications will be set forth in the order form and must be mutually agreed to by the Manufacturer and Distributor.

3.2    Software. The Software will be the most recent version of the Pennsylvania compliant skill based software but may change from time to time as set forth in paragraph 2.3 herein.. Manufacturer may update the Software from time to time, but is not required to do so. The Software shall be in the English language. This Agreement shall continue to the benefit of Distributor for any updated or future Software. For purposes of clarity, should Manufacturer be required to change or modify the Software to comply with changes in laws or pursuant to an agreement with state officials, this Agreement shall remain in full force and effect unless otherwise terminated as provided for herein.

3.3    Prices. The initial prices to be charged by Manufacturer to Distributor and by Distributor to Operators for a Terminal and Logic Module in the Territory as well as pricing to be charged by Manufacturer to Distributor for Fills in the Territory are as set forth on Exhibit A of this Agreement. In the instance where a Fill is not sold but instead a percentage is charged for the use of the Software, both parties agree that the percentage to be charged shall be equal to the pricing structure as set forth on Exhibit A of this Agreement. Manufacturer may change such prices from time to time based upon Manufacturer's sole discretion. All Fills will be purchased directly from Manufacturer.

## SECTION 3
## PARTICIPATION IN SALES AND REVENUE

4.1    Not Used

4.2    Sales to Distributor's Customers. Distributor shall be entitled to purchase Logic Modules from Manufacturer to be used in the assembly of terminals at prices set forth on Exhibit A of this Agreement.

4 | P a g e

4.3    Commission for Sales of Fills to Distributor's Customers. Distributor shall be entitled to a commission on fill revenue sold by Manufacturer to Distributor's customers/Operators at prices set forth on Exhibit A, Paragraph C of this Agreement, net of merchant fees (e.g., credit card fees), if any, incurred by the manufacturer. The Distributor's commission rate for the current pricing structure, as of the Effective Date, is as set forth on Exhibit A, Paragraph E of this Agreement. In the event that Manufacturer and Distributor collectively alter the pricing structure of Fills to Operators, the parties agree that the Distributor's commissions on sales of Fills as set forth on Exhibit A, Paragraph E of this Agreement shall be adjusted to reflect such changes but will remain at the initial % rate unless otherwise mutually agreed upon, in writing, by the parties.

4.4    Not Used

4.5    Calculation. On the following schedule, Manufacturer shall (i) pay to Distributor the appropriate commission, as set forth in Paragraphs 4.3 and 4.4 herein, invoiced for the sales of Fills to Distributor's customers  and provide to Distributor a reconciliation of the commission earned and deductions therefrom:

(a)    For sales invoiced by Manufacturer during the Days 1-15 of each month, Manufacturer shall pay by Day 20 of that month; and

(b)    For sales invoiced by Manufacturer during Days 16 through the last Day of each month, Manufacturer shall pay by Day 5 of the Following month.

**SECTION 4**
**TERM AND TERMINATION**

5 | P a g e

POM 000724

4.1     Term. Subject to this Section 5.1 and Section 5.2 below, the initial term of this Agreement shall be for a period of three years (3) years ("Term"). This Agreement shall automatically renew for successive thirty-six (36) month periods, not to exceed five (5) such successive periods ("Successive Terms"), unless the Distributor gives sixty (60) days prior written notice of its intent to terminate at the end of the then-existing Term or Successive Term. Notwithstanding the foregoing, either party shall have the right after one year to terminate this Agreement for cause should the other party breach any covenant, representation or warranty made herein. Prior to a termination on a for-cause basis, the non-breaching party will provide the breaching party with written notice that the breaching party is not in compliance with this Agreement and such breaching party shall have 60 days following its receipt of such notice to cure the alleged default to the satisfaction of the non-breaching party.

4.2     Other Termination. Either party may terminate this Agreement or suspend its performance under this Agreement if a statutory change, judicial interpretation, or law enforcement action prohibits the use, license, or sale of the Software in the Territory.

4.3     Effect of Termination. Upon the effective date of termination of this Agreement, this Agreement shall be null and void and become of no further force and effect; however, the termination of this Agreement shall not relieve any party hereto of any obligations arising under Sections 6 and 7 herein which, together with this Section 5, shall survive such termination. Further, any amounts owed by one party to the other as of such termination or expiration shall be paid as and when due.

## SECTION 5
## ADDITIONAL OBLIGATIONS, DISCLAIMERS AND LIMITATION OF DAMAGES

5.1     Compliance with Laws. Each party shall comply with all applicable statutes, laws, rules, regulations, licenses, certificates and authorizations of any governmental body or authority in the performance of its obligations under this Agreement.

5.2     Taxes. Each party shall be responsible for payment of their respective tax obligations which may arise or be imposed as the result of its performance under this Agreement or as the result of the receipt of any compensation or other funds under this Agreement or in connection with the transactions contemplated hereby.

5.3     Confidentiality. During the Term and for a period of five years after termination or expiration of this Agreement, each party (i) will treat the other party's Confidential Information (as defined in this Paragraph 6.3) with strict confidence and the highest degree of care (but no less than the care that it treats its own Confidential Information), (ii) will not disclose such Confidential Information to any third party, and (iii) will not use the Confidential Information except as permitted by this Agreement or as may be ordered by a court of competent jurisdiction. "Confidential Information" means any non-public knowledge, information, intellectual property and materials respecting a party, including but not limited to financial projections, pricing, sales, product specification data, product introduction, distribution plans, trade secrets, legal strategies and proprietary technology. Confidential Information shall not include information that (i) is known to the receiving party at the time of disclosure by the

6 | P a g e

POM 000725

disclosing party as evidenced by written records of the receiving party, (ii) has become publicly known through no wrongful act or violation of this Agreement by the receiving party, (iii) has been rightfully received from a third party authorized to make such disclosure without restriction, or (iv) has been approved for release by written authorization of the owner of the Confidential Information or (v) is generally known information within the industry by those who participate, work, or practice within the industry gained through experience whether or not related from the experience arising under this Agreement. Notwithstanding the time period set forth above in this Section, the parties shall comply with the restrictions set forth in this Section with regard to trade secrets for so long as such information remains a trade secret under applicable law. Neither party shall issue any press release or other public announcement concerning this Agreement or the business relationship between the parties.

5.4    Cooperation on Legal and Regulatory Matters.    Distributor may defend itself, and may agree to defend Operators, with respect to legal actions relating to or arising out of the legality of the Software in the Territory. Manufacturer will keep Distributor informed of all such matters on a regular basis and cooperate with Distributor in any legal action or regulatory activity regarding the Software.

5.5    No Other License or Warranties.    Nothing herein shall be construed as granting to Distributor any right or license to use or practice any trade secrets, know-how, copyrights, inventions, patents or other intellectual property rights in the Terminals, the Software or the Fill system, except as expressly provided herein.    USE OF THE TERMINALS AND THE SOFTWARE IS AT THE OPERATOR'S SOLE RISK. MANUFACTURER, ITS OFFICERS, DIRECTORS, EMPLOYEES, CONTRACTORS, AGENTS, AFFILIATES, AND ASSIGNS (COLLECTIVELY, "MANUFACTURER ENTITIES") DO NOT REPRESENT THAT THE SOFTWARE, THE TERMINALS OR THE FILL SYSTEM ARE APPROPRIATE OR LEGAL FOR USE IN ANY STATE. EXCEPT FOR MANUFACTURER'S EXPRESS WRITTEN WARRANTY STATMEMENT, IF ANY, THE TERMINALS AND THE SOFTWARE ARE PROVIDED "AS IS" AND THE MANUFACTURER ENTITIES EXPRESSLY DISCLAIM ALL WARRANTIES OF ANY KIND, WHETHER EXPRESS OR IMPLIED, RELATING TO THE SOFTWARE, THE TERMINALS AND THE FILL SYSTEM, OR THE ACCURACY, TIMELINESS, COMPLETENESS, OR ADEQUACY OF THE SOFTWARE, THE TERMINALS OR THE FILL SYSTEM, INCLUDING THE IMPLIED WARRANTIES OF TITLE, MERCHANTABILITY, SATISFACTORY QUALITY, FITNESS FOR A PARTICULAR PURPOSE AND NON-INFRINGEMENT.

5.6    Additional Territory.    The parties agree to discuss the expansion of the Territory from time to time.

### SECTION 7
### GENERAL PROVISIONS

7.1    Independent Contractors; No Association.    No partnership, joint venture or agency relationship is created nor shall a partnership, joint venture or agency relationship be deemed to exist between the parties hereto. Distributor is not authorized to act for, incur debt for or make any representations or warranties on behalf of Manufacturer. Distributor shall not

7 | P a g e

represent itself to the public as an agent or representative of Manufacturer. Manufacturer is not authorized to act for, incur debt for or make any representations or warranties on behalf of Distributor. Manufacturer shall not represent itself to the public as an agent or representative of Distributor.

7.2   Assignment. This Agreement and the duties, rights and obligations arising hereunder may be assigned by a party hereto only with the prior written consent of the other party which consent may not be unreasonably withheld; provided, however, Manufacturer may assign this Agreement without obtaining any consents to a subsidiary of Manufacturer or an affiliate of Manufacturer under common ownership.

7.3   Entire Agreement. This Agreement sets forth the entire agreement and understanding among the parties hereto with respect to the subject matter hereof and supersedes and cancels any and all prior agreements and understandings, written or oral, among the parties hereto with respect to the subject matter.

7.4   Recitals. Each of the statements set forth in the Recitals to this Agreement are hereby incorporated into this Agreement as if set forth fully herein as a valid and binding representation of the party or parties to whom it relates.

7.5   Amendment. No amendment or modification of this Agreement, including this Section 7.5, shall be valid unless made in writing and signed by the parties hereto. No term or condition of this Agreement shall be deemed to have been waived except by written instrument of the party charged with such waiver.

7.6   Representation and Warranty. Except as specifically set forth herein, each of Distributor and Manufacturer warrants and represents to the other that its execution and performance of this Agreement does not violate or conflict with any other contract or other agreement to which it is a party or otherwise bound and that the officer of each party executing this Agreement below is authorized to bind his company to this Agreement.

7.7   Counterparts. This Agreement may be executed simultaneously in one or more counterparts, each of which shall be deemed to be an original, but all of which together constitute one and the same instrument. The delivery of an executed counterpart copy of this Agreement by facsimile or email shall be deemed to be the equivalent of the delivery of an original executed copy thereof.

7.8   Severability. The invalidity or non-enforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision.

7.9   Notices and Other Communications. Notice by any party under this Agreement shall be in writing and (i) personally delivered, (ii) given by overnight courier, or (iii) email, addressed to the other party at its address given herein (or at any such other address as may be communicated to the notifying party in writing) and shall be deemed to have been served when delivered or, if delivery is not accomplished by reason of some fault of the addressee, when tendered.

8 | P a g e

CONFIDENTIAL

POM 000727

7.10    Governing Law and Jurisdiction.    This Agreement shall be interpreted and construed under, and governed by, the substantive and procedural laws of the State of Georgia without regard to the principles of conflicts of laws.

7.11    Venue. The parties agree that any disputes arising under this Agreement shall be subject to the exclusive jurisdiction of the federal and state courts located in Gwinnett County, Georgia and the parties hereby consent to personal jurisdiction and venue of such courts.

7.12    Manufacturer Representations:    Manufacturer hereby represents and warrants to Distributor as follows, both as of the Date of this Agreement and as of the Effective Date:

(a)    Manufacturer is the owner and has the entire right, title, and interest to license the Software;

(b)    Manufacturer has the sole right to grant licenses of the Software in the Territory during the Term;

(c)    The Software is free and clear of any and all financial or legal encumbrances;

(e)    Manufacturer has all necessary power and authority to enter into and to perform its obligations under this Agreement, and to transfer the interests and grant the rights transferred and granted to Distributor contemplated herein without the consent of any other person or entity;

(f)    This Agreement has been duly authorized, executed, and delivered by an authorized officer of Manufacturer and;

(g)    Neither Manufacturer's distribution and/or use of the Software, nor any programs or content created or provided by Manufacturer to Distributor  pursuant to this Agreement will in any way constitute an infringement or other violation of any copyright, trade secret, trademark, patent, invention, proprietary information, non-disclosure, or any other intellectual property right of any person.

IN WITNESS WHEREOF, this Agreement has been duly executed by the parties as of the Effective Date.

9 | P a g e

CONFIDENTIAL

POM 000728

**PACE-O-MATIC INC.**

By: _____

Title: _____VP  Finance_____

Address: ___4150   Blue  Ridge  Ind  Pk___

___Norcross  ,  GA    30071___

_____

Phone: _____

Email: _____

**MDM VENTURES**

By: _____

Title: _____

Address: _____

_____

_____

Phone: _____

Email: _____

\

**10** | P a g e

POM 000729

CONFIDENTIAL

## EXHIBIT A

### PRICING AND PAYMENT TERMS

**The initial prices to be charged to Distributor and Operators in the Territory from the date of this Agreement are as follows:**

A.   **Logic Module pricing for-Distributor Purchases from Manufacturer:**

    A.  Logic Module- $900.00
    B.  Wiring Harness- $90.00

B.   **Terminal Pricing- Operator Purchases from Distributor:**

    1. Flex 1- no less than $2,595.00
    2. Spartan- no less than $2,395.00
    3. Counter Top- no less than $2,595.00
    4. Logic Module- no less than $995.00

C.   **Fill Pricing- Operator Purchases from Manufacturer**

    $160.00   for a  .1 Fill
    $800.00 for a   .5 Fill
    $1,500.00 for a 1.0 Fill

E.   **Commissions- Distributor Commissions paid by Manufacturer for Sales of**

    **Fills to Distributor's Customers/Operators**

    $28.80   for a  .1 Fill
    $144.00    for a  .5 Fill
    $270.00 for a 1.0 Fill

Fill commission to Distributor is intended to be approximately 18% of the Market Fill Price ("Fill Pricing – Operator Purchases from Manufacturer, initial price of $1,500 for a full (1.0) fill), and shall be adjusted based upon increases or decreases in the Market Fill Price. The Distributor commission will also be adjusted based upon special pricing for operators based upon mutual written agreement.

11 | P a g e

POM 000730

Payment Terms. For Logic Modules, the customer must prepay and customer is responsible for all shipping costs. For Fills, payment must be made by credit card at time of purchase. For all products, the customer bears the risk of loss once the product leaves Manufacturer's warehouse. Any insuring of the products will be at customer's expense. All payments (except credit card payments) must be made by wire transfer or by check delivered by overnight mail.

12 | P a g e

CONFIDENTIAL

POM 000731