13336212

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

POM OF PENNSYLVANIA, LLC t/d/b/a
PACE-O-MATIC, and SAVVY DOG
SYSTEMS, LLC

CIVIL ACTION NO. 18-CV-00722-PLD
CONSOLIDATED

Plaintiffs,

v.

PENNSYLVANIA SKILL GAMES, LLC,        The Honorable Patricia L. Dodge

Defendant.

### RESPONSE IN OPPOSITION TO MOTION FOR LEAVE OF COURT TO AMEND COMPLAINT

AND NOW COMES Pace-O-Matic, Inc. and Miele Manufacturing, Inc., by and through their undersigned counsel pursuant and in opposition to the Motion for Leave to Amend Complaint respond as follows:

### INTRODUCTION

Pennsylvania Skill Games, LLC ("PSG") seeks to amend its claims against Pace-O-Matic, Inc. ("Pace") and Miele Manufacturing, Inc. ("Miele") to add claims of "tortious interference with contract" and "civil conspiracy."

PSG claims that Pace and Miele had neither privilege nor justification to increase "fill" prices on legal skill games machines sold to PSG, and therefore, Pace and Miele have allegedly interfered with unnamed, unquantified, and anonymous alleged contractual relations of PSG— and they have committed "civil conspiracy" in doing so.

For the reasons set forth herein, PSG's motion should be denied because: (1) PSG has failed to assert facts that would survive a motion to dismiss; (2) amendment would be futile; and

13336212

(3) PSG's proposed amendment is dilatory, in bad faith, would create undue prejudice to Pace and Miele, and is being done for an improper purpose/delay.

## HOW FILLS WORK

Pace and Miele sell electronic gaming machines under their Pennsylvania Skill brand that feature software created solely by Pace. These machines are sold to operators who then place games in locations, e.g., bars and restaurants. Neither Pace nor Miele know where operators place games before or after they are sold unless an operator discloses that information after the fact.

In addition to purchasing physical gaming machines, operators must also purchase software "fills." Fills are essentially new licenses to use the machines. Fills are also consumable, meaning the machines have a limited number of plays for each fill, which are based on the earnings of the machine.

Once the earnings of the machine have reached a set number, an operator must contact Miele and purchase a new fill license. Upon payment, the operator receives a code, which must be manually entered into the Pace machine for play to continue. Without this code, the terminal cannot be played. This manual process is required because machines or their locations are not tracked by Pace or Miele, nor are they connected to the Internet.

Simply put, a fill is a license sold exclusively by Pace and Miele, and they are the property of Pace and Miele until sold.

Operators who purchase machines and fills then come to financial arrangements with locations, e.g., the bars or restaurants where the games are actually played by consumers to determine a split of the revenues for each machine.

13336212

## PSG'S CLAIMS REGARDING FILL PRICES

PSG alleges in its Proposed Amended Complaint that neither Pace nor Miele had any right to increase fill prices and that Pace and Miele need to assert some independent basis for the price change, such as increased cost, market conditions, or other factors that apply to every other operator in Pennsylvania. (See, ECF Document 70.1, ¶ 72, "Proposed Amended Complaint," a true and correct copy of which is attached hereto as Exhibit A).

It is vital to note that the ability of PSG to purchase fills from Pace or Miele is originally based in a 2015 document called an "Equipment Purchase Agreement," a true and correct copy of which is attached as Exhibit B. The PSG Complaint[1] specifically alleges only one "contract" related to the purchase of fills and equipment, and that is the EPA. Even taking PSG's other claims in its current complaint to the extreme, including the series of undefined "oral contracts," none relate to equipment/fill purchases or pricing. Therefore, the only "contract" PSG can rely upon to make any claim related to fill prices is the EPA.

To be clear, however, it is PSG's position that the EPA has long been terminated, abandoned, and unenforceable. At best, the EPA sets initial pricing for machines and fills at the beginning of the relationship, and no "contract" alleged or otherwise in the existing complaint relates to any issues outside of Beaver County. However, even assuming the EPA is still in effect, it specifically states that "[p]rices for software plays are subject to change in the future." As a result, PSG had the expressly contractual right, even if the EPA were still in effect, to change the fills price.

Pace and Miele recognize that leave to amend is to be granted liberally. However, amendments that would be futile or lack cause should not be granted. For the reasons set forth

---

[1] ECF Document No. 1, 2:18-cv-941. This is the complaint that was filed in a separate action and was consolidated into the present matter. For all intents and purposes, this complaint is identical to the counterclaim alleged by PSG.

13336212

herein, PSG cannot meet its obligations under F.R.C.P. 15, and this case needs to end in its current form and be scrutinized on its merits at summary judgment and trial.

## LEGAL STANDARD

Amendment of the pleadings is permitted under F.R.C.P. 15 (a) (2) with leave of court. Indeed, the rule says that the "court should freely give leave when justice so requires." Id. However, the standard for amendment of the pleadings is not absolute. In fact, this Honorable Court has full discretion in this matter.

The Rule 15(a) standard that amendment should be freely given when justice so requires "encompasses a broad range of equitable factors, including a party's delay in seeking leave to amend and any prejudice to the opposing party." Arthur v. Maersk, Inc., 434 F.3d 196, 203 (3d Cir. 2006). A court can deny amendment where there is "undue delay, bad faith, dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment [or] futility of amendment[.]" Lorenz v. CSX Corp., 1 F.3d 1406, 1413 (3d Cir. 1993). When considering whether an amendment would be futile, the Court of Appeals for the Third Circuit applies the same legal standard as for Rule 12(b)(6) motions to dismiss. In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1434 (3d Cir. 1997).

Though PSG combined its proposed amendment of interference with contract into a single count, interference with existing and prospective contractual relations are two distinct causes of action. Simon Prop. Grp., Inc. v. Palombaro, 682 F. Supp. 2d 508, 511–12 (W.D. Pa. 2010)

Under Pennsylvania law, the elements of a claim for tortious interference with *existing* contractual relations are: (1) the existence of a contractual relation between the claimant and a

4

13336212

third party; (2) purposeful action by the opposing party specifically intended to harm the existing relation; (3) the absence of privilege to do so; and (4) resulting damages. See Reading Radio, Inc. v. Fink, 833 A.2d 199, 211 (Pa.Super.Ct.2003).

Tortious interference with *prospective* contractual relations requires a showing of the existence of prospective contracts. Alvord–Polk, Inc. v. F. Schumacher & Co., 37 F.3d 996, 1014 (3d Cir.1994). The Court of Appeals for the Third Circuit has held that the Pennsylvania Supreme Court mandates that there be an objectively reasonable probability that the contract will come into existence. Schulman v. J.P. Morgan Inv. Management, Inc., 35 F.3d 799, 808 (3d Cir.1994).

Notably, in Pennsylvania, a party is not liable for tortious interference with contract for "merely making a third party's performance of his contract with another party more expensive or burdensome." Gemini Physical Therapy & Rehab., Inc. v. State Farm Mut. Auto. Ins. Co., 40 F.3d 63, 66 (3d Cir.1994); Acumed LLC v. Advanced Surgical Servs., Inc., 561 F.3d 199, 212 (3d Cir. 2009).

## THE PROPOSED AMENDMENT BY PSG FAILS TO STATE A CLAIM

The original claim filed by PSG against Pace and Miele includes a claim in Count IV for "breach of contract." As noted above, this claim was filed on July 18, 2018 at 2:18-cv-941 and was consolidated into the present action on August 27, 2018.

PSG's breach of contract claim in the original complaint ¶¶ 16 through 29 alleges a myriad of "oral contracts" and claims:

- Pace, Miele, and PSG would "jointly develop" legalized skill games;

- PSG would assist Pace and Miele in the "design and manufacture" of electronic video game machines;

5

13336212

- The parties, pursuant to some "oral" agreement, would advertise and market these games using the PENNSYLVANIA SKILL trademark, which also would be jointly developed into a stylized mark;

- That PSG would have an "exclusive" right to advertise, market, and promote and operate the electronic video game machines and be granted an exclusive right to advertise, market, and promote, and operate the electronic video games in Beaver County, Pennsylvania.

- That PSG and Pace "jointly designed and developed the electronic video game machines, including a stylized form of the PENNSYLVANIA SKILL trademark for use in connection with the advertisement, marketing, and promotion, and operation, of the electronic video game machines.

The actual text of the Breach of Contract count IV states:

64.    By selling, transferring, and assigning to Pennsylvania Skill Games electronic video game machines that do not contain the skill games and software plays determined to be legal in the Beaver County Criminal Case and which instead contain games of chance and software plays which are not in compliance with Pennsylvania law, and specifically 18 Pa. C.S. § 5513, Pace-O-Matic and Miele Manufacturing, and upon information and belief based upon the averments of its Complaint, POM of Pennsylvania, have materially breached the terms and conditions of the Equipment Purchase Agreement.

65.    By selling, transferring, and assigning electronic video game machines to other vendors for distribution in Beaver County, without first giving notice to Pennsylvania Skill Games of their intention to sell, transfer, and assign the same and without providing Pennsylvania Skill Games an opportunity to exercise its Right of First Refusal, Pace-O-Matic and Miele Manufacturing, and upon information and belief based upon the averments of its Complaint, POM of Pennsylvania, have materially breached the terms and conditions of the Equipment Purchase Agreement.

66.    As a direct and proximate result of Pace-O-Matic's and Miele Manufacturing's, and upon information and belief based upon the averments of its Complaint, POM of Pennsylvania's, material breaches of the terms and conditions of the Equipment Purchase Agreement, Pennsylvania Skill Games has suffered irreparable harm and damages.

6

13336212

Indeed, other than the alleged "oral" contracts regarding "joint" development of the electronic gaming machines/software and related stylized logo, the entirety of PSG's breach of contract claim regarding equipment and fill purchases is based upon the EPA[2].

Returning to the proposed amendment, PSG's allegations focus on a claim that the fill increase is based upon "retaliatory, interference, and harassment reasons collateral to the breach of existing obligations set forth in Count IV." Exhibit A, ¶ 73). No actual supporting facts are alleged.

PSG goes on to allege a mishmash of conclusory statements to try and meet the base pleading requirements. PSG offers some theory of a "scheme" to interfere with unknown and unstated business operations to "force the submission of Plaintiff from continuing to assert Plaintiff's rightful claims in this action." (Exhibit B, ¶ 83). In doing so, Plaintiff fails to actually allege facts that assert an actionable claim, to include existing or actual prospective business interests with which Pace and Miele have interfered. If Plaintiff actually had a business relationship that was interfered with, it should have alleged facts that detail this alleged interference—otherwise, with less than a month to go in finalizing discovery, PSG will be permitted to go on yet another fishing expedition.

Notably, the *proposed amendment does not contain a single factual assertion that an actual contractual relationship was terminated or lost or that legally compensable damages exist*. PSG also fails to allege a single fact that explains how any of the alleged conduct, even if taken as true, would be collateral to the underlying EPA. The proposed amendment is exactly the type of conclusory statement to which Iqbal and Twombly stand opposed.

---

[2] To be clear, Pace, Miele, POM of Pennsylvania, LLC and Savvy Dog, LLC refute all of PSG's allegations regarding these "oral contracts."

7

13336212

PSG also seems to allege that neither Pace nor Miele can increase fill prices without PSG's permission. This is an incredible assertion that lacks any factual merit within the EPA.

The text of the EPA related to equipment sales and fill prices states, verbatim:

### Payment and Terms

1.  Subject to the terms and conditions of this Agreement the Seller shall sell, transfer, and assign the Buyer Compliant Terminals and/or Hardware Components at a mutually agreeable price. The initial prices at the time of the effective date of this Agreement is as follows:

    *   A. Flex1 Compliant Terminal complete          $2,495.00
    *   B. HD Compliant Hardware Component complete   $995.00

    Prices are subject to change due to changes in material costs of the Compliant Terminals and Compliant Hardware Components

2.  Seller will sell software plays to Buyer at an initial cost of $1,250.00 for a "full or 1.0" set of software plays and $675.00 for a "1/2 or .5" set of software plays. Prices for software plays are subject to change in the future.

As stated above, the EPA is the only document at issue that relates to the sales of machines and fills, which was signed in 2015. No price increase to PSG has occurred in the past five years. Conversely, there is no allegation that any other agreement on the subject exists or that the terms of the EPA grant PSG a lifetime price lock. ***Even assuming that it still is binding, the EPA under its own terms allows for pricing changes: "[p]rices for software plays are subject to change in the future."*** There are no other contracts related to fills alleged by any party to this litigation, nor does PSG have any other rights other than what appears in the EPA.

Considering that a motion for leave to amend considers claims under a F.R.C.P. 12(b)(6) standard, PSG has failed to state a claim for which relief can be granted. The EPA expressly states that prices are subject to change, and confers no right on PSG to control those amounts. No other allegation in the proposed amendment changes this reality.

13336212

PSG alleges that, "The averred actions by Defendants are not commercially or legally justified, are not grounded on fair or appropriate commercial basis, and are not part of any general price increase necessitated by a commercially reasonable basis." (Ex. B., ¶ 82).

What PSG fails to mention is that a fill price of $2,000 is in line with fill pricing in Pennsylvania. Attached as Exhibit C is a copy of the 2018 loyalty partner program for fill prices. PSG has this document in its possession, and indeed, discussed it at a recent deposition as its own exhibit (it even bears PSG's Bates number). The fill levels and pricing arrangements set forth in Exhibit C are for operators who participate in the loyalty program, have signed the terms and conditions for operators, and have not had any violations within the past year. It is submitted that PSG has not signed the terms and conditions and, if it had, would have had several violations that have occurred and continue to occur. Therefore, the fill prices by Pace and Miele are not only permissible under the EPA, they are in line with the standards.  Further, PSG has no right to say what is or is not commercially reasonable for Pace or Miele, nor can it make baseless allegations without establishing an affirmative factual basis to recover.

Pace and Miele recognize that PSG need not prove its case at this point. But PSG does need to allege facts sufficient for this Court to assess whether cause exists to amend, considering all well-pleaded allegations as true. To recover on a tortious intentional interference with existing or prospective contractual relationships claim in Pennsylvania, a plaintiff must prove that the defendant was not privileged or justified in interfering with its contracts: "While some jurisdictions consider a justification for a defendant's interference to be an affirmative defense, **Pennsylvania courts require the plaintiff, as part of his *prima facie* case, to show that the defendant's conduct was not justified.**" <u>Triffin v. Janssen</u>, 426 Pa.Super. 57, 626 A.2d 571,

9

13336212

574 n. 3 (1993)(emphasis supplied); Silver v. Mendel, 894 F.2d 598, 602 n. 6 (3d Cir.1990); Acumed LLC v. Advanced Surgical Servs., Inc., 561 F.3d 199, 214 (3d Cir. 2009).

Considering the case law, and taking all well-pleaded allegations as true, PSG cannot meet its threshold prima facie case because it has not made a single factual allegation that neither Pace nor Miele were justified, even taking PSG's well-pleaded allegations as true. To the contrary, Exhibits B and C demonstrate the opposite. PSG cannot make bald accusations and tell this Court that such claims are good enough considering that Pennsylvania law requires an affirmative showing that Pace and Miele's conduct was not justified. (See, Triffin, supra.)

PSG also pleaded directly into the primary exceptions to interference with existing or prospective tortious interference with contract. In determining whether there is a *prospective* contractual relationship in a tortious interference case, Pennsylvania courts have considered whether the evidence supports a finding that there was an objectively "reasonable likelihood or probability" that the contemplated contract would have materialized absent the defendant's interference. See Glenn v. Point Park Coll., 441 Pa. 474, 272 A.2d 895, 898–99 (1971); Kachmar v. SunGard Data Sys., Inc., 109 F.3d 173, 184 (3d Cir.1997). A "reasonable likelihood" of occurrence is something less than a contractual right but more than a mere hope that there will be a future contract. Phillips v. Selig, 959 A.2d 420, 428 (Pa.Super.Ct.2008). Furthermore, a plaintiff must base its claim that there was a prospective contractual relationship on something other than an existing or current relationship. Id. at 429. Acumed LLC v. Advanced Surgical Servs., Inc., 561 F.3d 199, 213 (3d Cir. 2009).

The proposed amendment by PSG, even if taken as true, does not allege a single likely or existing contract that would/will be lost or a specific existing opportunity lost or legal damages related to any alleged interference. The closest PSG gets to alleging facts related to existing

10

13336212

contractual relationships is this vague claim with no facts, which, respectfully is not enough under the federal pleading standards[3]:

> Plaintiff has existing business relationships and expectancies with the probability of future economic benefit for the Plaintiff with its customers and prospective customers, regarding which the aforesaid actions by Defendants have interfered, as averred.

(Exhibit B, ¶ 75).

Finally, PSG fails to plead any facts that get past the reality that making performance of a contract more expensive or burdensome is not actionable in Pennsylvania. As the Third Circuit noted, a party is not liable for tortious interference contract for "merely making a third party's performance of his contract with another party more expensive or burdensome." Gemini Physical Therapy & Rehab., Inc. v. State Farm Mut. Auto. Ins. Co., 40 F.3d 63, 66 (3d Cir.1994); Acumed LLC v. Advanced Surgical Servs., Inc., 561 F.3d 199, 212 (3d Cir. 2009).

A review of the proposed amended complaint demonstrates that PSG is specifically alleging that performance would be more expensive or burdensome.

## PSG'S CIVIL CONSPIRACY COUNT FAILS TO STATE A CLAIM

For similar reasons to the alleged interference with contract claim, the proposed civil conspiracy claim must not be permitted to move forward.

PSG's claim for alleged civil conspiracy is also a stream of meaningless legal conclusions without any actual factual averments. See, Exhibit A, ¶¶ 88-91.

---

[3] "To survive a motion to dismiss [under Rule 12(b)(6) ], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007)). Legal conclusions couched as factual allegations or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to an assumption of truth. Iqbal, 129 S.Ct. at 1940 (citing Twombly, 550 U.S. at 555, 127 S.Ct. 1955).

13336212

To establish civil conspiracy, it must be shown that: (1) two or more persons combined or agreed with intent to do an unlawful act; or (2) to do an otherwise lawful act by unlawful means. See Landau v. Western Pennsylvania National Bank, 445 Pa. 217, 282 A.2d 335 (1971); Fife v. Great Atlantic and Pacific Tea Co., 356 Pa. 265, 52 A.2d 24 (1947); Bausbach v. Reiff, 244 Pa. 559, 91 A. 224 (1914); Baker v. Rangos, 229 Pa.Super. 333, 324 A.2d 498 (1974). Proof of malice, i. e., an intent to injure, is essential in proof of a conspiracy. Miller v. Post Publishing Co., 266 Pa. 533, 110 A. 265 (1920); Miller v. Harvey, 215 Pa. 103, 64 A.2d 330 (1906); Irvine v. Elliott, 206 Pa. 152, 55 A.2d 859 (1903). This unlawful intent must be absent justification. The test was stated in Rosenblum v. Rosenblum, 320 Pa. 103, 108-09, 181 A. 583, 585 (1935):

> Assume that what is done is intentional, and that it is calculated to do harm to others. Then comes the question, Was it done with or without "just cause or excuse"? If it was bona fide done in the use of a man's own property * * * such legal justification would * * * exist not the less because what was done might seem to others to be selfish or unreasonable. * * * But such legal justification would not exist when the act was merely done with the intention of causing temporal harm, without reference to one's own lawful gain, or the lawful enjoyment of one's own rights.

Therefore, unless PSG can make a factual allegation that Miele and Pace cannot increase prices to sell their own property for their own gain and interest, and that the increase was purely done to harm PSG, then the claim cannot lie.

Regarding the first element of civil conspiracy, e.g., the performance of an unlawful act, even considering all facts in the light most favorable to PSG, Pace and Miele are apparently being accused of doing something unlawful with their own property, e.g., increasing prices. However, there are no facts or legal theory alleged whereby Pace and/or Miele cannot increase their prices. The EPA specifically states that the fill pricing can change. Pace and Miele have the right to charge whatever rate they choose or is appropriate. Furthermore, the pricing change still

12

13336212

keeps PSG's fill price is in line with other operators, to the extent that matters. (See, Exhibit C). Therefore, the fills are the "property" of both Pace and Miele until such a time that they are licensed to PSG and under conditions that Pace and Miele set. Therefore, Pace and Miele are acting within their lawful right to do something, which destroys the element of civil conspiracy, e.g., two people combined to agree to intentionally do an unlawful thing.

The second element similarly fails, which requires a showing that two or more people agree to do something lawful by unlawful means. PSG makes no factual averment sufficient to suggest otherwise. Importantly, "[p]roof of malice, i.e., an intent to injure, is essential in proof of a conspiracy." Thompson Coal Co. v. Pike Coal Co., 488 Pa. 198, 412 A.2d 466, 472 (1979). "Malice requires ... that the sole purpose of the conspiracy was to injure the plaintiff," and that this intent was without justification. Doltz v. Harris & Assoc., 280 F.Supp.2d 377, 389 (E.D.Pa.2003) (emphasis added). As malice can only be found when the sole purpose of the conspiracy is to injure the plaintiff, a showing that a person acted for professional reasons, and not solely to injure the plaintiff, negates a finding of malice. See Bro–Tech Corp. v. Thermax, Inc., 651 F.Supp.2d 378, 419 (E.D.Pa.2009); Thompson Coal Co., 412 A.2d at 472 (noting that the intent to injure must be without justification, which cannot exist when an act is merely done "with the intention of causing temporal harm, without reference to one's own lawful gain, or the lawful enjoyment of one's own rights") (quoting Rosenblum v. Rosenblum, 320 Pa. 103, 181 A. 583, 585 (1935)). See also, Synthes, Inc. v. Emerge Med., Inc., 25 F. Supp. 3d 617, 735–36 (E.D. Pa. 2014).

It should be noted that PSG has ultimately become a competitor of Pace and POM of Pennsylvania. Indeed, PSG is acting contrary to the interest of Pace and Miele, yet demands to be treated with all deference and care.

13

13336212

**PREJUDICE**

PSG claims that no undue prejudice will result by the proposed amendment. That is incorrect. This proposed amendment will certainly cause undue delay and will further delay proceedings, which in turn increases costs.

PSG is raising entirely new issues that will undoubtedly expand discovery beyond where it already is, which is prejudicial to Pace and Miele. The discovery deadline ends on October 15, 2020. Plaintiff claims that there is time for additional discovery to address the issues in the Motion to Amend, but that is impossible. Since new counsel entered his appearance in February, the deposition count (just from PSG) is going to reach 16 witnesses, with 12 of those witnesses being deposed or preliminarily scheduled (subject to objections) since June. In that time, PSG also has issued two additional sets for production of documents, an extensive set of requests for admissions, an extensive set of interrogatories, and is re-deposing principal witnesses under the guise of 30(b)(6) depositions that should have been done years ago (also, subject to objections). By raising the issues in this Motion, Pace and Miele will need to engage in additional discovery to find out what relationships allegedly were interfered with, how they were interfered with, and the "reputation" of PSG for stability (Proposed Amendment, Ex. B, ¶ 81).

The needless proliferation of this case should cease and the parties move forward to a ruling on the merits on issues and claims that have been before this court for years. The current motion, just like the previous Motion for Joinder, is baseless, borderline frivolous, is being posed to harass and unduly burden Pace and Miele  and does not warrant an amendment of the pleadings under the rules or the law.

14

13336212

WHEREFORE, Pace-O-Matic, Inc. and Miele Manufacturing, Inc. respectfully request

that this Honorable Court deny Pennsylvania Skill Games, LLC's Motion to Amend.


Respectfully submitted,

SPILMAN THOMAS & BATTLE, PLLC

By:/s/ Julian E. Neiser
    Julian E. Neiser
    Pa. Id. No. 87306

    T: 412-325-1116
    F: 412-325-3324
    E: jneiser@spilmanlaw.com

    One Oxford Centre, Suite 3440
    301 Grant Street
    Pittsburgh, PA  15219

    **Attorneys for Pace-O-Matic, Inc. and
    Miele Manufacturing, Inc.**

13336212

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing **Response in Opposition**

was served upon the undersigned counsel of record this 14th day of September, 2020 via the

Court's CM/ECF System:


Via email to <u>mailroom.grz@zegarelli.com</u>

Gregg R. Zegarelli, Esquire
Zegarelli Technology & Entrepreneurial
    Ventures Law Group, P.C.
2585 Washington Road, Suite 134
Summerfield Commons Office Park
Pittsburgh, PA  15241

**Counsel for Plaintiff Pennsylvania Skill
Games LLC**


                                        SPILMAN THOMAS & BATTLE, PLLC

                                        /s/ Julian E. Neiser
                                        Julian E. Neiser