**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

POM OF PENNSYLVANIA, LLC, t/d/b/a PACE-O-MATIC, and SAVVY DOG SYSTEMS, LLC,

              Plaintiffs/Counterclaim Defendants,

              v.

PENNSYLVANIA SKILL GAMES, LLC,

              Defendant/Counterclaim Plaintiff.

CIVIL ACTION NO. 2:18-CV-00722-PLD

CONSOLIDATED

The Honorable Patricia L. Dodge

## <u>MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT</u>

Pursuant to F.R.C.P. 56 and LCvR 56B.1, POM of Pennsylvania, LLC, ("POM"), Savvy Dog Systems, LLC ("Savvy Dog"), Pace-O-Matic, Inc. ("Pace") and Miele Manufacturing, Inc. ("Miele") (together, the "POM Parties"), move his Honorable Court to enter Summary Judgment on all counts brought by or against these parties, or in the alternative, for partial summary judgment, and in support files this Memorandum.

## <u>INTRODUCTION</u>

The POM Parties and Pennsylvania Skill Games, LLC ("PSG") have filed affirmative and counter claims against each other, all of which revolve around two central issues:

a.     Whether POM and Savvy Dog, or PSG hold the right to use the common-law trademark/service mark for the words "PENNSYLVANIA SKILL" and the stylized words "PENNSYLVANIA SKILL" (the "Marks"): and

b.     The parties' rights and obligations, if any, under a May 20, 2015 Equipment Purchase Agreement ("EPA") and related claims of "verbal agreements" alleged by PSG related to the aforementioned trademarks and rights regarding operations in Beaver County, Pennsylvania.

The specific claims and the relief sought is set forth in the Motion for Summary Judgment filed concurrently with this Memorandum, and the contents of which are incorporated herein.

## SUMMARY OF FACTS

All material facts are stated in the companion Concise Statement of Material Facts ("CSF") and related Appendix Exhibits ("Ex. _"). The following is a brief narrative to aid the Court.

In 2007, Pace began considering Pennsylvania as a market and created in 2012 what it believed to be a skill game that complied with Pennsylvania law. Pace settled on the name Pennsylvania Skill for this game in 2012. [CSF ¶ 4]. This name paralleled the monikers Pace actively used in other markets.

Pace sought to obtain clarity on whether a game is "legal" by obtaining judicial rulings on legality. Pace and Attorney Wayne DeLuca agreed to put a Pennsylvania Skill game with software version 402.44 into a location and organized a "controlled pickup" with the state police. [CSF ¶ 15]. Pace sent a terminal containing the 402.44 software to Attorney DeLuca in Pittsburgh for the controlled pickup. [CSF ¶¶ 15, 20]. Prior to this time, Pace sold games in Pennsylvania containing the 402.44 software. [CSF ¶¶ 13, 14]. The 402.44 software in all these games Pennsylvania conspicuously featured the words PENNSYLVANIA SKILL. Id.

Subsequent to all this, Attorney DeLuca asked a client, Albert Unis, III ("AU3"), to collect a terminal containing Pace software and put it in a bar. [CSF ¶ 22]. Literally, AU3's only involvement was to "pick up a game and put it in a bar."[CSF ¶ 22.]. AU3 signed a receipt for the game under his own name, picked up the machine, and put it in the American Italian Club in Ambridge, Pennsylvania, where he turned the game on for the first time. [CSF ¶ 23]. The state police picked up the game on November 9, 2013, Pace filed an action to recover impounded property, and the Court of Common Pleas of Beaver County issued a ruling on December 23, 2014

2

(the "Beaver County Ruling") stating that the Pace software was predominantly a game of skill. [CSF ¶¶ 23, 24]. AU3 had no involvement in the litigation involving the Beaver County Ruling. [CSF ¶ 22].

Prior to January 12, 2015, Pace created a name and artwork to brand the new Pennsylvania product. [CSF ¶ 11]. These efforts resulted in the final "stylized form" of the PENNSYLVANIA SKILL mark on January 12, 2015. [Id.]. Prior versions of artwork featuring PENNSYLVANIA SKILL were created as early as January 23, 2014. [Id.]. The first discussions regarding a name for the game occurred in September 2012. [Id.]. The words PENNSYLVANIA SKILL were used in conjunction with software builds in 2013 and appeared on software sold in the Commonwealth in 2013.  [CSF ¶¶ 7, 26].

Sometime on January 14, 2015, after the Beaver County Decision, Ryan Wood ("Wood") of Pace had discussions with AU3 about selling Pace machines. [CSF ¶ 27]. AU3 had a business called Aliquippa Industrial Park, Inc. ("AIP") through which AU3 distributed dart boards, billiard tables, and other coin-operated machines in Western Pennsylvania. [CSF ¶ 27]. Wood submitted an email that culminated in a term sheet between Pace and an amorphous "entity" called Albert Unis and Affiliates ("AUA"[1]). [CSF ¶ 29]. This document (the "AUA Document") was executed on January 29, 2015 and required AUA to purchase 25 machines up front and then after a period of three months, AUA would be required to purchase 10 machines per month from that point forward. [CSF ¶ 28]. Subsequent to the AUA Document, AU3 on his own behalf and/or on behalf of AIP, began negotiating a separate written contract to benefit his son Albert Unis, IV ("AU4") who was just out of high school. PSG's attorney, William Rodgers, drafted a contract that was

---

[1] There is no precise definition of what an "affiliate" is. AU3 stated that anyone he designated, known or unknown, at any time, was an affiliate and would be bound by the term sheet. Further, he defines an affiliate as other game operators, whether competitors or not, who work in Beaver County. Apparently, anyone can be an Albert Unis Affiliate, whether they want to or not.

entitled an "EPA." [CSF ¶ 41]. The parties then negotiated the terms for several months until the EPA was finally executed in May 2015. [Id.].

PSG claims that a "verbal agreement" occurred with Pace in or about 2012 or 2013 that contained a number of terms for which there is no evidence of record. [Ex. B, at ¶ 16 (PSG Counterclaim); and Ex. C, at ¶ 16; Exs. N and O, Answer No. 1]. There is no evidence suggesting an actual or potential discussion between Pace and anyone affiliated with PSG- at any time or for any reason- until 2015. [CSF ¶ 27].

In fact, PSG did not exist until months after the first interaction between Pace and AU3. The EPA was drafted and signed in May 2015. Weeks before execution, AU4 organized a company called Pennsylvania Skill Games, LLC. [CSF ¶ 37]. Pace provided PSG with marketing materials and sold machines and fills under the initial special pricing set forth in the EPA. [CSF ¶ 76]. By early 2018, the relationship began to sour. PSG filed a trademark application for the word and stylized PENNSYLVANIA SKILL mark on the United States Patent and Trademark Office's Principal Register. [CSF ¶ 68]. Pace filed suit after being threatened with a draft complaint by PSG and after learning about the attempt by PSG to trademark the PENNSYLVANIA SKILL marks.

Since that time PSG has placed the marks on games that are neither manufactured by the POM Parties, nor do they contain Pace software. [CSF ¶ 60]. To the contrary, PSG is putting the marks on what are believed to be illegal or unadjudicated games. [CSF ¶¶ 60, 79].

PSG also has made claims in the public domain that it actively participate in litigating the legality of Pace's software, that it jointly developed the games with Pace, and is laying some ownership or other claims for the successes of the POM Parties. [CSF ¶ 88].

## SUMMARY OF ARGUMENT

The POM Parties have expended substantial resources to create, brand and market software compliant with Pennsylvania law. It had significantly progressed that venture for years before ever hearing of PSG or anyone associated with it.

PSG is a minor operator of electronic games that offers a mishmash of jukeboxes, pool tables, dart boards, and fireworks. When it could not succeed as a legitimate operator of skill games despite the opportunities presented, it took the POM Parties' artwork, filed an unlawful/fraudulent trademark application, and made unbelievable claims to take credit for the work of the POM Parties for the sole purpose of extracting money. It seeks enforcement of an agreement that lacks consideration, has long since terminated, and is entirely unenforceable.

PSG's claims are untethered from any fact established in the record, and its conduct has been both predatory and intentional. Not only should judgment be entered against it on all counts, all attorney fees, statutory damages, and related costs should be assessed.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against the party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Kotlinski v. Mortg. America, Inc., 40 F.Supp 2d 298, 299 (W.D. Pa. 1998) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548 (1986)). When considering summary judgment, facts must be examined in a light most favorable to the non-moving party. Id.

5

The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Landan v. Wal-Mart Real Estate Bus. Tr., No. 12c-v-26, 2015 WL 1491257, *1 (W.D. Pa. Mar. 31, 2015). The dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Kotlinski at 299. A fact is material when it might affect the outcome of the suit under the governing law. Id. When the movant does not bear the burden of proof on the claim, the movant's initial burden may be met by demonstrating the lack of record evidence to support the non-moving party's claim. Landan at *1. When the moving party has carried its burden under Rule 56, the non-moving party must do more than simply show some metaphysical doubt as to the material facts. Odyssey Contracting, Corp. v. Hercules Painting Co. Inc., No. 17-cv-1255, 2019 WL 7629228, *2 (W.D. Pa. Mar. 28, 2019).

The non-moving party "must present affirmative evidence in order to defeat a properly supported motion" … "and cannot simply reassert factually unsupported allegations." Landan at *1 (citing Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cr. 1989)). Nor can the non-moving party rely upon conclusory allegations in its pleadings or briefs. Id. (citing Harter v. GAF Corp., 967 F.2d 846, 852 (3d Cir. 1992)). Mere conjecture or speculation by the nonmoving party will not provide a basis upon to deny a motion for summary judgment. Id. (citing Robertson v. Allied Signal, Inc., 914 F.2d 360, 382-89 n. 12 (3d Cir. 1990)). The non-moving party must respond by pointing to sufficient cognizable evidence to create material issues of fact concerning every element as to which the it will bear the burden of proof at trial. Odyssey at *2.

## ARGUMENT

**I.      TRADEMARKS AND UNFAIR COMPETITION**

POM and Savvy Dog must first clarify the difference between a trade name and trademark:

> The terms "trade name" and "commercial name" include individual names and surnames, firm names and trade names used by manufacturers, industrialists, merchants, agriculturists, and others to identify their

6

> businesses, vocations, or occupations; the names or titles lawfully adopted and used by persons, firms, associations, corporations, companies, unions, and any manufacturing, industrial, commercial, agricultural, or other organizations engaged in trade or commerce and capable of suing and being sued in a court of law.
>
> The term "trade-mark" includes any word, name, symbol, or device or any combination thereof adopted and used by a manufacturer or merchant to identify his goods and distinguish them from those manufactured or sold by others.

15 U.S.C. § 1127.

The Trademark Act creates a line between *trade name* use and *trademark* use, as trade names do not qualify for registration. Application of Pennsylvania Fashion Factory, Inc., 588 F.2d 1343, 1345 (C.C.P.A. 1978). At best, PSG owns a *trade name*. It does not own a *trademark*. The issue here is how the trademark is related to "Providing the use of electronic gaming machines featuring games of skill and which provide monetary prizes," and leasing of same which are the types and classes of goods at issue[2]. Thus, any effort by PSG to conflate the concepts of trade name and business entity name with the concepts of trademarks should be resisted.

There is no question on this issue, as PSG has admitted that "Pennsylvania Skill Games" is not a trademark, nor was it ever intended to be one. [CSF ¶ 32]. It is, instead, a trade name. AU3, a corporate designee of PSG admitted point blank that "[Pennsylvania Skill Games] wasn't a trademark, it was a name that ran under the other three or so operating companies that they said we ran under." [CSF ¶ 32]. He specifically admitted, "It wasn't a trademark, it was a word that we used and it was representing our company and it was just a word. And it was also used with other words, so it wasn't something that was all of that important as -- wasn't that important to me."

---

[2] In addition to registration of the marks under Classes 28 and 41, which both parties sought, POM and Savvy Dog also added a Class 9 description for the game software, which PSG did not.

7

[Id.].[3] Based on this admission alone, any issues related to trademark ownership should fall in favor of the POM Parties.

With that clarification and dispositive admission by PSG, the POM Parties specifically address the Counts of the parties' respective Amended Complaint and Counterclaim.

### A.    Count One - False Designation of Origin 15 U.S.C. § 1125 *et seq.*

For their first trademark-related claim, POM and Savvy Dog allege that PSG falsely used the marks in violation of Section 43(a) of the Lanham Act, which prohibits use of a mark in connection with goods or services in commerce, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person. 15 U.S.C. § 1125(a).

To prove a cause of action under 15 U.S.C. § 1125(a)(1)(A), "the plaintiff must demonstrate that: (1) it has a valid and legally protectable mark; (2) it owns the mark; and (3) the defendant's use of the mark to identify goods or services causes a likelihood of confusion." A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198, 210–11 (3d Cir. 2000). The POM Parties takes these elements in turn and will discuss the infringing conduct of PSG.

### 1.    Legally Protected Marks and Ownership[4].

The first two elements of establishing POM and Savvy Dog's claim under § 1125(a) (the validity of the marks at issue and ownership of same) will be addressed together.

---

[3] AU3 claims he "assigned" or "gave" all rights and goodwill to his son's business, Pennsylvania Skill Games, LLC. [Ex. Z, 14:1–16:24]. Therefore, he can only assign what he has, and he admits he did not have a trademark.

[4] Neither party has registered the PENNSYLVANIA SKILL mark on the Principal Register, which is *prima facie* evidence of validity. 15 U.S.C.A. § 1057(b); 15 U.S.C.A. § 1115(a). Neither party holds a statutory presumption of trademark protection or ownership. PSG's registration on the Supplemental Register does not provide any statutory presumption. E.T. Browne Drug Co. v. Cococare Products, Inc., 538 F.3d 185, 87 U.S.P.Q.2d 1655 (3d Cir. 2008).

       *a.*      *The trademark at issue is protectable under the law as either distinctive or suggestive.*

Because a nonregistered mark has no presumption of validity, the burden of proving that it is suggestive or descriptive lies with the moving parties. See Technical Publishing Co. v. Lebhar-Friedman, Inc., 729 F.2d 1136 (7th Cir.1984); A.J. Canfield Co. v. Honickman, 808 F.2d 291, 297 (3d Cir. 1986). The parties agree, "the PENNSYLVANIA SKILL trademark is distinctive to the public and the electronic video game machine industry." [Ex. B, PSG's Answer, at ¶¶ 19 and 24; Ex. B, PSG's Counterclaim, at ¶12; and Ex. C, PSG's Complaint, ¶ 12].  The issue of whether the Marks are protectable is not before this Court, as both parties have agreed that the Marks are protectable and distinctive. [Id.].

Courts must weigh the protectability of the questioned marks based upon their distinctiveness. Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768 (1992). The Third Circuit created a four-part test to tell if a mark is inherently distinctive and automatically protected under the Lanham Act:  (1) arbitrary (or fanciful) terms, which bear no logical or suggestive relation to the actual characteristics of the goods; (2) suggestive terms, which suggest rather than describe the characteristics of the goods; (3) descriptive terms, which describe a characteristic or ingredient of the article to which it refers; and (4) generic terms, which function as the common descriptive name of a product class. See Gideons Int'l, Inc. v. Gideon 300 Ministries, Inc., 94 F.Supp.2d 566, 578 (E.D. Pa. 1999).

---

Importantly, PSG's supplemental registration does not imply the right to exclusive use of the mark. Additionally, PSG could not establish the requisite five years of continued usage, and asserted a first use in commerce of June 1, 2015. (See  Ser. No. 87856441: Office Action dated February 26, 2019). [Ex. P].

Descriptive marks, on the other hand, are not inherently descriptive, but may acquire protection if the mark has *acquired secondary meaning associating the term with the claimant.* Two Pesos, 505 U.S. at 768; Canfield, 808 F.2d at 292–93, 296; Berner, 987 F.2d at 979.

A descriptive mark can be protected if a party proves consumers identify the term with the claimant." Scott Paper Co. v. Scott's Liquid Gold, Inc., 589 F.2d 1225, 1228 (3d Cir. 1978). The distinction between suggestive and descriptive may also dictate different standards for determining its scope of geographic protection. A.J. Canfield Co. v. Honickman, 808 F.2d 291, 297 (3d Cir. 1986)[5].

POM and Savvy Dog meet the burden for both an arbitrary or suggestive mark, because the term PENNSYLVANIA SKILL along with the stylized form requires imagination, thought, or perception to reach a conclusion regarding the nature of the goods. This is known as the "imagination test" (citing Canfield, 808 F.2d at 297; Stix Products, Inc. v. United Merchants & Manufacturers, Inc., 295 F.Supp. 479, 488 (S.D.N.Y. 1968); and Dranoff–Perlstein Ass. v. Sklar, 967 F.2d 852, 858 (3d Cir. 1992)). This is contrasted with a "descriptive" term, which conveys an immediate idea of the ingredients, qualities or characteristics of the goods." Id.

Even if this Court does not find a suggestive mark, the Marks are descriptive and have developed secondary meaning.  Factors considered in this determination include: (1) extent of sales and advertising leading to buyer association; (2) length of use; (3) exclusivity of use; (4) fact of copying; (5) customer surveys; (6) customer testimony; (7) use of mark in trade journals; (9) size

---

[5] The Third Circuit uses two tests to distinguish suggestive marks from descriptive marks. First, under the "imagination test," "[a] term is suggestive if it requires imagination, thought or perception to reach a conclusion as to the nature of goods;" whereas, "[a] terms is descriptive if it forthwith conveys an immediate idea of the ingredients, qualities or characteristics of the goods." Id. (citing Canfield, 808 F.2d at 297; Stix Products, Inc. v. United Merchants & Manufacturers, Inc., 295 F.Supp. 479, 488 (S.D.N.Y. 1968); and Dranoff–Perlstein Ass. v. Sklar, 967 F.2d 852, 858 (3d Cir. 1992)). Second, under the "likely to use" test, the court considers "whether sellers of similar products [or services] are likely to use, or actually do use, the term in connection with their goods." Gideons, 94 F.Supp.2d at 579 (quoting Dranoff–Perlstein Ass. v. Sklar, 967 F.2d 852, 858 (3d Cir.1992)).

of company, (9) number of sales; (10) number of customers; and (11) actual confusion." Tillery v. Leonard & Sciolla, LLP, 521 F.Supp.2d 346, 349 (E.D. Pa. 2007).

A comparison of the facts related to these elements warrants summary judgment in favor of POM and Savvy Dog. First, PSG does not—or at least it should not—"sell" any products with the PENNSYLVANIA SKILL mark. To the extent it does, it is believed that PSG has sold some games to third parties, a claim that it denies [Ex. CC, Miele 2020 Dep. 108:21–110:20]. For purposes of summary judgment, we must take PSG's assertion as true that it does not sell skill games. PSG places games in locations after purchasing them from the POM Parties.

The POM Parties have achieved market penetration to establish a significant risk of a real likelihood of confusion among consumers. It advertises to its customers via email, the Internet, and other means. [CSF ¶ 89]. They boast 215 operators in Pennsylvania. [Ex. JJJ, ¶ 10]. PSG has produced no record evidence to establish anything remotely close to the market penetration and awareness of the POM Parties. The extent of its own advertising is a few thousand dollars of local newspaper and radio and there is no evidence of any advertising activity since 2017 and a total amount spent of less than $4,000.[6] [CSF ¶ 77, Ex. RR, and EX. SS].

Where a descriptive term has come to be identified with a single source of a product or service, it has acquired secondary meaning, and competitors should not be allowed a "free ride" on the goodwill that source has created through its effort and investment. A capsule definition of secondary meaning is:

> When a particular business has used words *publici juris* for so long or so exclusively or when it has promoted its product to such an extent that the words do not register their literal meaning on the public mind but are instantly associated with one enterprise, such words have attained a secondary meaning. That is to say, a secondary meaning exists when in addition to their literal, dictionary meaning, words connote to the public a product from a unique source.

---

[6] To include radio spots for marketing outside of Beaver County and for the family fireworks business. [CSF ¶ 77, Ex. SS, POM 071; POM 000958-959]. These represent the entirety of PSG's advertising in the Commonwealth.

1 McCarthy, supra, § 11:9, at 455–56 (quoting Charcoal Steak House, Inc. v. Staley, 263 N.C. 199, 139 S.E.2d 185 (1964)). In order for secondary meaning to exist, "it is not necessary for the public to be aware of the name of the [source].... It is sufficient if the public is aware that the product [or service] comes from a single, though anonymous, source." Union Carbide Corp., 531 F.2d at 380. Dranoff-Perlstein Assocs. v. Sklar, 967 F.2d 852, 858–59 (3d Cir. 1992). POM and Savvy Dog have exceeded their burdens to demonstrate either a suggestive mark or a descriptive mark that has achieved secondary meaning because of their efforts. [CSF ¶¶ 13, 14, 26, 34]. They also can prove a prior use in commerce in conjunction with the relevant classes of goods stated in the trademark applications.

PSG took the depositions of several competing operators, some of whom have been working regionally for decades in the coin-operated machine business. They associated Pace and/or Miele directly with the stylized form of the PENNSYLVANIA SKILL mark and the corresponding Pace game that the POM parties collectively sell. [CSF ¶ 90]. Pace and Miele have advertised their products. [CSF ¶ 89]. They have built a distribution operation that covers the entire Commonwealth. POM and Savvy Dog have filed litigation to enforce its mark, above and beyond this suit.[7] In all, the PENNSYLVANIA SKILL mark is "suggestive" and is automatically protectable, and this Court should grant summary judgment in favor of the POM Parties as a result.

> b.    *PSG has not produced sufficient evidence to support its affirmative claim that it owns the trademark or that the POM Parties engaged in false advertising.*

PSG is claiming a first use in commerce by virtue of its trade name usage that was affiliated with dart boards, Megatouch machines, and other classes of goods that are distinguishable from the gaming machines at issue in this case. This first actual use in commerce must be "deliberate

---

[7] POM of Pennsylvania, LLC et al. v. Paskillvending.com, 4:19-cv-00529 (USDC MD PA).

and continuous, not sporadic, casual or transitory." La Societe Anonyme des Parfums le Galion v. Jean Patou, Inc., 495 F.2d 1265, 1272 (2d Cir. 1974) (Friendly, Cir. J.). The right to use a mark exclusively is akin to a monopoly derived from "its appropriation and subsequent use in the marketplace. The user who first appropriates the mark obtains an enforceable right to exclude others from use, as long as the initial appropriation and use are accompanied by an intention to continue exploiting the mark commercially." Id. It is axiomatic that if there is "no trade—no trademark." Id, at 1274; Lucent Info. Mgmt., Inc. v. Lucent Techs., Inc., 186 F.3d 311, 319 (3d Cir. 1999).

PSG's two location agreements show usage of the trade name "Pennsylvania Skill" in 2010 two private clubs and in an unrelated class of goods. [CSF ¶ 30]. However, the president of the American Italian Club (one of the locations mentioned in the contract) had never heard of a business called "Pennsylvania Skill Games." [Ex. UU, Deposition of Daniel David, 10:6-8]. He also did not recall ever seeing the name "Pennsylvania Skill" on any machines at his club. (Ex. UU, 12:2-5). In fact, the only machines that he recalled either AU3 or AU4 placing in his location were dart boards, juke boxes, and gambling devices. [Ex. UU, 10:6-14, 18:17-24]. Another witness could not recall if "Pennsylvania Skill" was the mark claimed by POM and Savvy Dog, or the one claimed by PSG. [Ex. TT, Deposition of Robert Santia, April 25, 2019, 16:16-17:-6]. These contracts, even assuming all facts in favor of PSG, are insufficient to create a material issue of fact and only show a trade name usage. Considering that these contracts are literally one half the "proof" PSG has offered to show use of a trademark in commerce, these documents are insufficient to create a genuine issue of material fact.

The other "proof" offered by PSG are three affidavits purporting to show use of the name "Pennsylvania Skill Games" in 2011. [CSF ¶ 33, Exs. KK, MM and III]. These affidavits were

completed by acquaintances of AU4.[8] In each instance, AU4 delivered nearly completed affidavits, already filled out, except for the names and addresses of the affiants. [CSF ¶ 91] (Ex. JJ 18:6-8; Ex. LL, 11:9–12:6; and Ex. VV, 12:13-16). AU4 provided the photographs of the Megatouch machines that allegedly depicted the trade name "Pennsylvania Skill Games." [Id.). The date of 2011 was an estimate of when two witnesses recalled seeing the game. [Ex. JJ, 32:16–19; Ex. LL, 14:10–12]. One Witness refers to Megatouch machines as "skill games." [Ex. JJ, 18:20–19:24]. Another witness referred to darts, pool, driving games, and Megatouch as all "skill games.[9]" [Ex. LL, 19:10–25]. The name "Pennsylvania Skill Games" only appeared on the video display of the Megatouch machines when someone was playing them and was not visible on the game console's exterior any other time. [CSF ¶ 33, Ex. LL, 19:10–20:4 and 21:14–22:4; Ex. JJ, 18:20–19:24]. When one witness was asked about a logo or graphic that was on the exterior of the machine that represented "Pennsylvania Skill Games," he was actually referring to the stylized PENNSYLVANIA SKILL mark that was *not* used by PSG on its machines. [Ex. LL, 27:6–7]. Another confirmed the logo was the "one with the Constitution." [Ex. VV, 29:15-18].

The above paragraph represents the entirety of PSG's evidence that it "owns" the PENNSYLVANIA SKILL marks through a first use in commece. The evidence *might*, at best, support issues concerning the trade *name* "Pennsylvania Skill Games," but it offers PSG *no* support that it owns the PENNSYLVANIA SKILL trade*mark*, stylized or otherwise. This evidence hardly supports anything more than a transitory use of a trade name, not a trademark.

---

[8] For one witness, the affidavit apparently was notarized after the document was signed and while the witness was not present, Ex. LL, 23:10-12, showing that the affidavits are self-serving documents prepared for a specific and limited purpose by PSG and/or its counsel and not prepared based on information recounted independently by the affiants.

[9] Notably, PSG's trademark applications identify the class of goods as "Providing the use of electronic gaming machines featuring games of skill and which provide monetary prizes" and related leasing  [Ex. OO]. There is no evidence of record go suggest that Megatouch machines or any of the "skill" games cited to by PSG meet this definition and class of goods.

14

It is extremely telling that in PSG's own trademark applications, it claimed a use in commerce of the Marks as of June 1, 2015. [CSF ¶ 68].  If it were so confident in its ability to demonstrate an independent usage, apart from the work of Pace, it would have done so—and provided proof to the trademark office. It did not. In fact, AU4 submitted exhibits containing Pace's own marketing materials and included a document with a date of May 1, 2015 featuring the email address, "albert@pennsylvaniaskillgames.com." [CSF ¶ 39; Ex. OO]. However, the aforementioned email address and domain wasn't created until March 2, 2016. [CSF ¶ 39]. Therefore, at least one of the exhibits submitted in connection with PSG's trademark applications was fraudulent at worst, grossly inaccurate at best. The rest of the trademark applications contain news articles and other information where PSG takes credit for litigating the Beaver County case and developing games with Pace, both of which assertions are pure fabrications.

PSG claims that the right of the POM Parties to use the mark PENNSYLVANIA SKILL was included as part of the "verbal agreement" AU3 allegedly reached with Pace sometime in 2012 or 2013, which also apparently was assigned to PSG. [Ex. N, PSG's Ans. to POM's First Set of Interrogatories, No. 1]. PSG made incredible claims that AU3 verbally agreed with Pace to jointly develop games with Pace, develop a stylized logo, and advertise the games using the trademark, and several other "terms" that ultimately became memorialized in the EPA. [Ex. N, at 3; and Ex. O, at 1]. There is no proof any of this occurred or any agreement exists other than AU3's own testimony.

Conversely, the POM Parties can meet any burden to demonstrate ownership. Pace targeted the Pennsylvania market around 2007 and began programming and other work to create games that were legal under Pennsylvania law as early as 2010. [CSF ¶¶ 3 and 5; Ex. L, 24:25–25:25 and 29:2–25]. It created marketing materials and stylized logos using both the word and stylized mark

from 2014 to early January 2015. [CSF ¶ 11; Ex. F and Ex. I]. It sold the first game bearing the word mark PENNSYLVANIA SKILL in September 2013. [CSF ¶ 7, Ex. G]. It litigated (without any assistance from PSG or AU3 or AU4) the legality of the software. [CSF, ¶¶ 22, 24; Ex. J]. It created the stylized mark and the marketing materials used by PSG. [CSF ¶ 76]. They have become synonymous with legalized skill gaming in Pennsylvania. These operations have been continuous and systemic since 2013. [CSF ¶ 7]. PSG does not have a single fingerprint on any of these milestones and achievements.

PSG also has an affirmative claim for trademark infringement against the POM Parties, which require it to affirmatively demonstrate its right to the marks. There is an absence of proof by PSG to establish any right under the mark. For the same reasons, PSG's claims that the POM Parties engaged in false advertising by selling games that are not compliant with Pennsylvania law, PSG equally fails. This argument is set forth more fully in section III A below, which describes how there is no genuine issue of material fact in favor of PSG that suggests the POM Parties have sold PSG games that are illegal in Pennsylvania.

2. **Likely to Create Confusion**

To advance its claim under § 1125(a), the movants must also demonstrate that PSG's use of the Marks are likely to create confusion. Here, confusion exists because PSG operates illegal, non-Pace software on cabinets that bear the PENNSYLVANIA SKILL stylized mark and has gone so far as to display a version of Pace software on these illegal/adjudicated games. [CSF ¶¶ 55-60]. Said otherwise, PSG is passing off illegal games as those created by Pace by labeling them with both the PENNSYLVANIA SKILL mark and the Pace software version number that was the subject of the Beaver County litigation. [Id., Ex. L, 50:22–51:14, Ex. S, 91:9–19]. As The POM Parties have analyzed the photographs provided by PSG and confirm that several of these machines bearing the PENNSYLVANIA SKILL marks are running illegal or unadjudicated software. PSG

16

has gone so far as to label some machines with the 402.44 software designation, which is the Pace software that was the subject of the Beaver County Case, even though those machines are not made by Pace, nor do they contain Pace software. [CSF ¶¶ 59, 60]. Pace employee Christopher O'Bier provided a declaration at Ex. JJJ, ¶ 9 stating that eight machines in operation by PSG feature the 402.44 designation, but the machines are not running Pace software and are instead running software from Pace competitors.

PSG's acts undoubtedly create confusion and a false designation of origin.[10] These facts are uncontroverted, dispositive proof of unfair competition, violation of the Unfair Trade Practices and Consumer Protection Law, false designation of origin, infringement, violation of the Pennsylvania Trademark Act, and common law trademark infringement. Ex. CCC, which are photos provided by PSG and are an unequivocal admission, warrant summary judgment against PSG[11].

Determining "confusion" can involve the ten non-exhaustive factors announced in Interpace Corp. v. Lapp, Inc., 721 F.2d 460 (3d Cir.1983) known as the Lapp test:

> (1) the degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of the owner's mark; (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time the defendant has used the mark without evidence of actual confusion arising; (5) the intent of the defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media; (8) the extent to which the targets of the parties' sales efforts are the same; (9) the relationship of the goods in the minds of consumers because of the similarity of function; (10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that he is likely to expand into that market.

---

[10] Indeed, not only does this unauthorized use create confusion, but PSG is potentially associating the POM Parties (without the POM Parties' consent) with illegal operations.

[11] PSG crudely added the word "Games" on the graphics applied to the machines. Ex. CCC. Slightly modifying the mark not only establishes that PSG knows what it is doing is wrong and the result is confusingly similar to POM and Savvy Dog's marks.

While the Lapp test may be used to determine likelihood of confusion among competing goods and noncompeting goods, "a district judge should feel free to consider only the similarity of the marks themselves" when the marks are "clearly very similar." A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198, 213, 214 (3d Cir. 2000). The Third Circuit in A&H stated that, "if products are directly competing, and the marks are clearly very similar, a district judge should feel free to consider only the similarity of the marks themselves. Id. at 214.

This Court can compare the artwork on a legitimate Pace logo bearing the correct stylized mark with an adulterated version created by PSG that was placed on an illegal game. Exhibit CCC are photographs provided by PSG that displays every single machine it operates in the Commonwealth of Pennsylvania. At Bates Number POM 004719, the Court will see two images. The top one is numbered 4.2 and the bottom is numbered 5.1. The 4.2 image is a legal Pace machine bearing the unadulterated PENNSYLVANIA SKILL stylized mark created by Pace. The 5.2 image is an adulterated version running illegal or adjudicated software. [See also, Ex. JJJ ¶¶ 5, 6]. It is apparent from their face how these two versions are confusingly similar due to PSG's attempts to infringe the trademarks and engage in unfair competition. Additionally, the state police were equally confused, as they recently confiscated games that contained both the Pace software and illegal software. [CSF ¶ 93]. Finally, other operators have expressly stated that they associate the PENNSYLVANIA SKILL mark with the POM Parties, not PSG. [CSF ¶ 90].

**B.      Count Two - Pennsylvania Unfair Trade Practices and Consumer Protection Law 73 P.S. § 201-1 *et seq*.**

PSG has violated the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL") due to its unfair competition, the registration and adulteration of POM and Savvy Dog's marks, and misrepresentation of its role in the development of the Pace machines and related

18

software. It is unlawful for anyone to use unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. 73 P.S. § 201-2(4)(i)–(iii).

PSG purposefully and unlawfully used (and continue to use) the Marks on illegal machines. PSG does so intentionally to benefit its business.  It has made claims regarding its rights related to the Marks and the development of the software and games. As a result, the POM Parties should be afforded both injunctive relief and attorney fees for each violation.

### C.    Count Three - Common Law Trademark Infringement

The POM Parties also assert a common-law trademark infringement claim against PSG, which follows the same tests as the Lanham Act. Giannone v. Giannone, 429 F. Supp.3d 34, 39 (E.D. Pa. 2019) and Pennsylvania State Univ. v. University Orthopedics, Ltd., 706 A.2d 863, 870 (Pa. Super. Ct. 1998)). False designation of origin claims are recognized as the equivalent of a claim for trademark infringement for unregistered marks. See Giannone, 429 F. Supp.3d at 41.

### D.    State Trademark (Count VI)

POM and Savvy Dog assert a state trademark claim against PSG for infringement and unfair competition under Pennsylvania's Trademark Act, which are identical to the corresponding federal claims under the Lanham Act. Scott Fetzer Co. v. Gehring, 288 F.Supp.2d 696, 703 (E.D. Pa. 2003). Thus, by asserting a right to the Marks, PSG violated PA's Trademark Act 54 Pa.C.S.A. § 1101 *et seq*, to the same extent that it violated the Lanham Act. As a result, the POM Parties rely primarily on the analysis set forth above for this claim.

Savvy Dog filed for and obtained a state trademark registration for PENNSYLVANIA SKILL as both a word mark and stylized mark. [CSF ¶ 71]. As such, Savvy Dog has the right to exclude PSG from use of the Marks within Pennsylvania. Additionally, Savvy Dog has the right to obtain both injunctive relief and recovery of attorney fees for any violation of Savvy Dog's

trademark rights under Pennsylvania law, including treble damages based upon disgorgement of profits, attorney fees, and injunctive relief.  54 Pa.C.S.A. § 1125(a).

## II.    COPYRIGHT RIGHTS

Pace created the stylized PENNSYLVANIA SKILL mark. There is no disputed fact on this point. The creation was done by Pace and on behalf of Pace. As such, Pace, and now POM and Savvy Dog, have common law copyrights in the artwork. By pilfering the aforementioned artwork, PSG has attempted to register the stylized mark with artwork it does not own. Because PSG does not own the artwork, it cannot obtain a trademark on it.

## III.    CONTRACT CLAIMS

In addition to the trademark claims discussed above, the parties also assert competing breach of contract claims. The POM Parties deal with these claims in turn.

### A.    PSG'S ASSERTIONS THAT THE POM PARTIES BREACHED THE EPA MUST FAIL.

PSG's breach of contract claims against the POM Parties consist of two arguments: (1) that the POM Parties sold games that are not compliant with Pennsylvania law; and (2) a breach of the EPA occurred in regards to sales of machines and fills in Beaver County. [Ex. B, PSG Counterclaim, at ¶¶ 63–66; and Ex. C, PSG Complaint, at ¶¶ 63–66].

As the EPA involves the sale of goods (Pennsylvania Skill games), Pennsylvania's Uniform Commercial Code, 13 Pa.C.S.A. § 2101 *et seq.*, also governs the EPA. See 13 Pa.C.S.A. §§ 2102 & 2105(a) (defining "goods" as all things movable at the time of identification to the contract for sale—in addition to the standard elements of breach of contract. Giannone v. Giannone, 429 F. Supp.3d 34, 39 (E.D. Pa. 2019).

20

This Court should grant summary judgment in the POM Parties' favor on PSG's breach of contact claims for three reasons. First, no contract exists between PSG, and POM of Pennsylvania or Savvy Dog. Second, PSG cannot prove the existence of an enforceable contract that is supported by adequate consideration and contains sufficiently definite material terms, which can be ruled upon as a matter of law. Third, PSG cannot establish a breach of the EPA (or the existence of any other "verbal" agreement). To the extent PSG's breach of contract claims survive, PSG's damages must be limited to claims prior to February 14, 2018, when the POM Parties terminated the EPA or earlier.

1. **PSG's breach of contract claims against POM of Pennsylvania and Savvy Dog fail as a matter of law because no such contract exists.**

PSG asserts identical breach of contract claims in its counterclaim and affirmative complaint, except that it sued POM of Pennsylvania and Savvy Dog in its counterclaim, and Miele and Pace in the affirmative complaint. [Ex. B, PSG Counterclaim, at ¶¶ 63–66; and Ex. C, PSG Complaint, at ¶¶ 63–66]. Between its complaint and its counterclaim, PSG seeks to hold all POM Parties liable for breaching the EPA. But, POM of Pennsylvania and Savvy Dog are not parties to the EPA. [Ex. BB]. "It is well established under Pennsylvania law that one cannot be liable for a breach of contract unless one is a party to that contract." Quandry Sols. Inc. v. Verifone Inc., CIV.A.07-097, 2009 WL 997041, at *7 (E.D. Pa. Apr. 13, 2009). For this reason alone, PSG's breach of contract claims against POM of Pennsylvania and Savvy Dog fail as a matter of law.

2. **The EPA is not a valid and enforceable contract.**

To prove that the EPA is a valid and enforceable contract, PSG must show: (1) the manifestation of an intent of the parties to be bound by the terms of the EPA; (2) sufficiently definite terms; and (3) adequate consideration. See Giannone, 429 F. Supp.3d at 39 (citing Johnston the Florist, Inc. v. TEDCO Const. Corp., 441 Pa.Super. 281, 657 A.2d 511, 516 (1995)).

PSG cannot carry its burden because the EPA does not contain sufficiently definite terms and the agreement is not supported by adequate consideration.[12]

PSG has made incredible claims about its rights under the EPA, to include a lifetime "exclusive" contract to place gaming machines in Beaver Count—to the exclusion of all others. [E.g. Ex. Z, AU3 2020 Dep. 69:5–14; and Ex. S, AU4 2019 Dep. 110:7–111:17]. To determine these rights, if any, PSG must identify what it promised the POM Parties in exchange for these extraordinary rights. PSG must also point to specific language delineating this right. Doing either is impossible, however, because the EPA lacks sufficiently definite material terms regarding the parties' rights and obligations to one another.

a.    The EPA lacks the requisite definite terms to be enforceable.

"Under Pennsylvania law, 'in order for there to be an enforceable contract, the nature and extent of its obligation must be certain; the parties themselves must agree upon the material and necessary details of the bargain.'" Quandry Sols., 2009 WL 997041, at *12 (quoting Lombardo v. Gasparini Excavating Co., 385 Pa. 388, 123 A.2d 663, 666 (Pa. 1956)). "[W]here ... there is no agreement or even a discussion as to any of the essential terms of an alleged bargain, such as time or manner of performance, or price or consideration, the 'agreement' is too indefinite for a party to reasonably believe that it could be enforceable in an action at law." Ecore Int'l, Inc. v. Downey, 343 F.Supp.3d 459, 489 (E.D. Pa. 2018). "Without concrete details, the alleged [agreement] between the parties lacks essential terms for enforcement, or at the very least, fails to define the obligations of the parties with sufficient certainty. Quandry Sols., 2009 WL 997041, at *13.

---

[12] The EPA does not contain the language pursuant to the Uniform Written Obligations Act that the parties intent to be legally bound. 33 P.S. § 6. As such, the sufficiency of consideration to support the obligations and rights alleged under the EPA is fairly challenged here. Because it is a sale of goods worth more than $500, no aspect of the EPA can be based on a "verbal agreement." 13 Pa.C.S.A. § 2201.

Here, the EPA lacks any definite material terms that would allow PSG to enforce the agreement. The introductory clauses indicate the parties entered into the EPA to buy and sell terminals and software fills at "initial prices" subject to change in the future. [CSF ¶¶ 44,-46 Ex. BB at ¶¶ 1–2].

The agreement fails to state any obligations by PSG to perform other than buying at a discount, the term, or any consideration performed by PSG. The POM Parties also agreed to use all "reasonable efforts to make sure" POM had access to software fills as long as POM was in the market, but that condition only relates to <u>access</u> to purchase fills and does not extend to any other term, including price. [Ex. BB, at ¶ 3]. The POM Parties agreed to support PSG with "previously agreed marketing efforts[,]" but does not elaborate on the substance of those marketing efforts or explain the extent of POM's agreed support[13]. [<u>Id</u>. at ¶6].

These vague and indefinite terms demonstrate that no enforceable agreement existed. References to future sales at a "mutually agreeable price" and "reasonable" efforts demonstrate that the EPA is in reality an unenforceable agreement to agree. <u>See</u> <u>myService Force, Inc. v. Am. Home Shield</u>, CIV.A. 10-6793, 2013 WL 180287, at *16 (E.D. Pa. Jan. 17, 2013) ("An agreement to agree is incapable of enforcement, especially when it is stipulated that the proposed compact shall be mutually agreeable."). An enforceable agreement relating to the sale of goods must include definite terms relating the price, quantity, and duration of the parties' agreement. Yet, these material terms are either entirely absent or indefinite. While a missing term may be read into a contract under certain circumstances, the Court may not write "a contract for the parties when they themselves have failed to agree to essential terms." <u>Lackner</u>, 892 A.2d at 32.

---

[13] To the extent course of conduct establishes the extent of the "marketing" efforts, they involved Pace providing marketing materials for sales, [CSF ¶ ¶ 76, 77], but that would be the extent of it. No evidence of record suggests otherwise.

The indefinite material terms regarding pricing, duration, and quantity, render the entire EPA unenforceable. This includes the purported Right of First Refusal in that agreement. The EPA[14] provides:

> [Pace and Miele] grants [PSG] a "Right of First Refusal" relating to the placement of Compliant Terminals or hardware Components and selling sets of software plays in Beaver County, Pennsylvania. If [PSG] opts not to place Complaint Terminals in **certain** Beaver County locations, then [POM], through another vendor, may place the above described Complaint Terminals in those locations.

[EPA, ¶ 4 (emphasis added)]. The Right of First Refusal is ancillary to the purpose of the EPA: to sell equipment. As the EPA is unenforceable, so too is the "Right of First Refusal."

Even if the EPA is found to contain definite material terms, the Right of First Refusal is nevertheless indefinite and fatally flawed. The Right of First Refusal does not explain how the parties intended for it to function, nor does it define the "certain" locations subject to the Right of First Refusal, any obligation on PSG, or enforcement against Pace or Miele. Operators, like PSG, are particularly secretive about their locations,[15] POM has no way of knowing where an operator intends to place machines at the time of sale. [CSF ¶¶ 51, 52]. Furthermore, none of the POM Parties have a mechanical method to tracking the Pennsylvania Skill game terminal or the motherboard that contain the Pennsylvania Skill game software. [CSF ¶ 52]. Operators frequently place terminals in multiple counties and it would be impossible for any party to know otherwise[16]. It is also impossible for any of the POM Parties to determine where "fills" are being sold, e.g., a

---

[14] It is the contention of the POM Parties that PSG is the drafter of the contract and any ambiguities should be resolved in favor of the POM Parties.

[15] Pace propounded interrogatories to PSG expressly asking for the locations of all machines that PSG operates. This was required because Pace cannot determine the location of any operator's games. In fact, PSG refused to provide the locations of the machines unless the locations were placed in "escrow" and only would provide photographs of the machines—without locations. While PSG claims this unilateral restriction was to avoid business interruptions, it also relied upon the maxim that operator locations are "sacrosanct."

[16] PSG readily admits it has machines in other counties. [CSF ¶ 86].

fill is sold to an operator without any ability for any party to know the location of the machine being "filled" unless that location is being disclosed. [CSF 50-52].

PSG deposed a number of operators. Each one testified that machines were "drop shipped" to the operators' warehouse, and the operators then placed them in locations. [CSF ¶ 94]. Conversely, there was no testimony to suggest any of the POM Parties delivered to locations.

PSG contends that the Right of First Refusal obligates POM to police the Beaver County market and provide PSG with leads on locations, and to not sell fills to operators with games in Beaver County. There is simply no evidence showing that the POM Parties ever agreed accept an affirmative responsibility to police the Beaver County market. The plain language of the EPA certainly does create such an affirmative obligation, nor is it reasonable to infer such a term—especially considering the lack of consideration by PSG. PSG has failed to establish the existence of any oral or other agreement to impose such an obligation on any of the POM Parties.

In sum, the EPA lacks sufficient definite terms to be enforceable. It contains none of the definite material terms necessary to form an agreement related to the sale of equipment. Furthermore, the Right of First Refusal is nonsensical because it restricts the POM Parties from placing games, which they do not do. As a result, the EPA is unenforceable.

3.   **The EPA lacks adequate consideration because PSG has no obligations in exchange for any rights, and the alleged consideration is based upon past performance, which is insufficient.**

The questions for this Court are: What did PSG give up or promise to do in exchange for the incredible promises and benefits it allegedly was to receive? Assuming the "right of first refusal" is valid, what consideration did PSG provide in exchange?

It would be one thing if PSG were trying to use the EPA simply to command a lifetime price lock for fills. But PSG claims that the EPA, and the allegedly related "verbal agreements" from the past (that never actually happened) encapsulate a host of other rights and obligations—

25

all based on  fantastical claims of which PSG has produced no evidence to support [Ex. N, Interrogatory Nos. 1 and 3; and Ex. O, Interrogatory No. 1]. Let there be no question. PSG is attempting to take credit for every aspect of the work done by the POM Parties and it is demanding a corresponding payment. It deserves nothing.

As PSG touts, the POM parties receive no benefits under the EPA except the ability to sell machines to PSG. [Ex. R, 127:8–128:23; and Ex. S, 112:5–19]. On the other hand, PSG argues the POM Parties are forever obligated to sell Pennsylvania Skill games and fills, to support PSG with undefined "advertising," and to abide by the ambiguous Right of First Refusal. [Ex. N, Interrogatory Nos. 1 and 3; and Ex. O, Interrogatory No. 1]. What's more, according to PSG, the POM Parties can apparently do nothing about it because the EPA has no term and the POM Parties cannot terminate the EPA for PSG's nonperformance. In short, PSG defeats its own position by inextricably claiming that, at the same time PSG has every term in its favor and no substantial obligation, POM has no term in its favor, all of the obligations, and absolutely no escape hatch.

> a.    *The law related to consideration defeats PSG's attempts to impose unilateral obligations on the POM Parties.*

Fortunately, the law does not allow such *carte blanche* unilateral and illusory contracts. "Consideration confers a benefit upon the promisor or causes a detriment to the promisee and must be an act, forbearance, or return promise *bargained for and given in exchange for the original promise*." Blackmon v. Iverson, 324 F. Supp.2d 602, 611 (E.D. Pa. 2003) (emphasis added). "Past consideration is insufficient to support a subsequent promise," because it is not given in exchange for the promise. Id. For the EPA to be valid and enforceable, PSG must have promised to do something that induced the POM Parties to agree to be bound by the terms within the written agreement **when the parties formed the agreement**.

Blackmon v. Iverson, is directly on point. There, the self-proclaimed "surrogate father" of the basketball player Allen Iverson sought to enforce an alleged oral contract for 25% of the royalties generated by Iverson's trademarked nickname, "The Answer." Id, at 604. The plaintiff came up with the nickname "The Answer" in July of 1994, and the "father" discussed the commercial applications of the nickname. Id. at 605. At the end of this initial conversation, Iverson allegedly promised to give the plaintiff 25% of all proceeds generated in connection with the term "the Answer." Id. The two discussed marketing applications of the nickname over the course of the next six years. Id. The plaintiff went so far as to hire a graphic designer to design logos bearing the nickname. Id. Iverson allegedly repeated his promise numerous times during this timeframe. Id. The court found the alleged contract lacked consideration and ruled in favor of Iverson as a matter of law. Id., at 612.

None of the actions by Plaintiff were taken at Mr. Iverson's request in exchange for the promise of a royalty interest at the time the alleged contract was created. Id, at 612. The plaintiff's suggestion of the nickname and its marketing potential were made before Iverson's alleged promise, and therefore constituted past consideration. Id. The plaintiff's assistance to Iverson's family took place well before Iverson's promise, which constituted past consideration. Id. Third, Iverson's request for plaintiff's move to Philadelphia took place well after the alleged promise and was not done in exchange for Iverson's alleged promise. Id. Because Iverson did not request the plaintiff take any action in exchange for promising a royalty interest, the agreement lacked consideration and was unenforceable. Id. at 611. It was nothing more than a gratuitous and unenforceable promise.

Here, the Right of First Refusal in the EPA is nothing more than an unenforceable term sheet related to future sales. PSG cannot identify any promise it made in exchange for the rights it

27

claims under the EPA. Instead, AU3 and AU4 insist that the POM Parties entered into the EPA because PSG already satisfied the POM Parties' expectations. [Ex. S, AU4 2019 Dep. 111:18–113:6 and 115:15–16:13]. Even if PSG could identify specific actions it took at the POM Parties' requests, such prior actions would constitute past performance incapable of supplying the necessary consideration to enforce the EPA and would constitute inadmissible parol evidence.

Like the case of Blackmon, "[i]t is difficult to analyze the [PSG's] alleged contract because [PSG] describes various promises that were [allegedly] made by the [POM Parties] at various times." Id. AU4 contends that POM entered into the EPA with PSG because AU4 and AU3 already satisfied a preexisting performance requirement under a convoluted theory that a January 2015 "agreement" between Pace and a generic entity called "Albert Unis and Affiliates" was subsequently "assigned to PSG." [Ex. S, 115:15–116:13]. However, this notion is insufficient to bind the POM Parties. AU3 is not a party to the EPA and has no stake in PSG. [See Ex. S, 19:14–21, and 20:16–18][17]. Any claims that "Albert Unis and Affiliates" has any rights under the EPA or any contract flowed between that "entity" and PSG is too remote to be enforceable. Furthermore, this theory is fundamentally flawed because it does not address the central question: What did PSG agree to do for the POM Parties in exchange for the rights it seeks to enforce under the EPA? By AU4's own admission, PSG promised to do *nothing* in exchange. [Ex. S, 111:18–113:6; 115:15–116:13].

The POM Parties are not suggesting a dispute exists over an "oral" agreement. In fact, Count IV of the PSG Complaint expressly alleges breach of the EPA only, as does PSG's answers to interrogatories [Exs. N and O, Answer No. 1]. To the contrary, to the extent there is any contract at all, the EPA serves that role. There are no other contracts, oral or otherwise, for any other issue

---

[17] POM asserted the affirmative defense that PSG lacks standing. AU3 should have been the proper party in this matter if PSG wanted to rely on contract rights asserted by AU3.

or requirement than the EPA, and it is unenforceable, lacks in consideration, and is otherwise terminated/abandoned.  To be clear, summary judgment is appropriate against PSG because it has failed to establish the existence of an oral agreement, enforceable or otherwise, through any admissible evidence.

Like Blackmon, AU3's promises made after the formation of the alleged 2013 "oral agreement" were not made in exchange for the EPA executed years later and cannot serve as consideration for that agreement[18]. To the extent that the alleged 2013 PSG verbal agreement ever existed (which the POM Parties deny), the consideration asserted by PSG occurred long before the EPA was executed and PSG admits that the terms were all incorporated into the EPA [Exs. N and O, Answer No. 1]. Therefore, AU3's performance in 2013, or any other past performance, cannot serve as consideration for the May 20, 2015 EPA.

### 4.    **No Breach of the EPA Occurred.**

The POM Parties seek summary judgment on PSG's breach of contract claim. PSG alleges the POM Parties breached the EPA by: (1) selling non-Compliant Terminals as the term is defined under the EPA; and (2) breaching the Right of First Refusal. PSG cannot offer facts to support either of these alleged breaches. No issue of material fact exists and the POM Parties are entitled to judgment as a matter of law with respect to PSG's breach of contract claims.

*a.    There is no evidence that the POM Parties sold PSG non-compliant games.*

PSG alleges in Count IV that Pace and Miele sold games that are not legal under Pennsylvania law. [Ex. B, PSG Counterclaim, at ¶ 64; Ex. C, PSG Complaint, at ¶ 64].

---

[18] PSG also claims that the "seminal" act of placing the first game in the American Italian Club is sufficient consideration. Not only is this past consideration, it was a risk-free venture. [CSF ¶ 21].

PSG has produced *no* documents or any other evidence that suggests the POM Parties' games and software are not compliant with Pennsylvania law. Conversely, the POM Parties filed an expert report [Ex. YY], produced documents regarding the analysis and opinions of a third party for subsequent versions of the software sold, and produced a corporate designee to testify on these issues.

PSG has represented to counsel and this Court that its only anticipated expert testimony/reports relate to "damages." The previous expert disclosure deadline in this matter came and went without any disclosure from PSG, but the POM Parties filed a substantive report on the legality of the machines and software. [Ex. YY, ECF No. 44–1]. Uncontradicted evidence continue to support the contention that the machines and software at issue are legal under Pennsylvania law, and any "changes" are aesthetic. [Id.]. Further, PSG has not produced any evidence to suggest it has been harmed by these allegedly "non-compliant" games, even if they existed.

PSG's entire claim is that subsequent versions of Pace software from 402.44, the version at issue in the Beaver County Case, render the software illegal or that the predominant skill factor has been removed. These allegations unsupported. PSG has offered neither testimony nor evidence to suggest that subsequent versions of the same software materially change the skill element. No machine sold to PSG is illegal under Pennsylvania law.

In fact, AU4 was offered an opportunity to revert his terminals to the original 402.44 software. [Ex. S, 92:10–25]. He expressly rejected this offer. [Id]. PSG does not appear to have any expert witness to testify on the subject, and because of the technical nature, an expert must be provided. See Kemmerer v. State Farm Ins. Co.'s, CIV.A. 01-5445, 2004 WL 87017, at *3 (E.D. Pa. Jan. 19, 2004) ("In a case involving complex issues of causation not readily apparent to the fact finder, plaintiff must present admissible expert testimony to carry her burden."). As such, the

damage element is lacking or is too speculative to survive summary judgment. Based on the foregoing, there is no genuine issue of material fact to support the claim in Count IV of both the Counterclaim and PSG Complaint that the POM Parties breached the EPA by not selling "compliant" terminals[19].

### b.      POM did not breach the Right of First Refusal.

PSG alleges a breach of the EPA due to an alleged breach of the "right of first refusal" by selling, distributing, transferring, and assigning machines to other vendors for distribution in Beaver County without giving notice to PSG. [Ex. B, PSG Counterclaim, at ¶ 65; and Ex. C, PSG Complaint, at ¶ 65]. However, even assuming the EPA is enforceable, it creates no such obligation. As stated above, the POM Parties have no idea where machines are placed after they are sold, and there is no obligation on Pace or Miele to police the market for PSG. Practically speaking, if PSG were correct, then the POM Parties would be unable to sell any hardware or fills, to anyone, without first determining where the machines would be located after the sale. That is an impossible standard. Not only that, it re-raises the question: What did PSG do in exchange for such an incredible right and corresponding obligation to Pace and Miele?

If PSG had an "exclusive" as it suggests, PSG bore an implied duty to utilize its best efforts to promote Pennsylvania Skill games in Beaver County. See 3 Pa.C.S.A. § 2306(b). "A lawful agreement by either the seller or the buyer for exclusive dealing in the kind of goods concerned imposes unless otherwise agreed an obligation by the seller to use best efforts to supply the goods

---

[19] PSG's breach of contract claim related to nonconforming terminals also fails because PSG inspected the goods, accepted the goods, and did not attempt to revoke the nonconforming goods or notify the POM Parties of the defect. Under Pennsylvania's Uniform Commercial Code a buyer that accepts nonconforming goods may only recover damages if the buyer notifies the seller of the defect within a reasonable time of acceptance. See 13 Pa.C.S.A. § 2714(a); see also Vanalt Elec. Const. Inc. v. Selco Mfg. Corp., 233 Fed.Appx. 105, 111 (3d Cir. 2007) ("[R]easonable notice [under 13 Pa.C.S.A. § 2607] is a precondition to the buyer's recovery for the breach."). Here, PSG accepted the terminals. PSG did not provide the POM Parties with notice of a defect prior to filing suit. Therefore, PSG is barred from recovering damages resulting for nonconforming goods.

and by the buyer to use best efforts to promote their sale." 13 Pa.C.S.A. § 2306(b). PSG did not utilize its best efforts to promote Pennsylvania Skill games in the Beaver County area and instead sought only to <u>exclude</u> operators from placing Pennsylvania Skill games. After executing the EPA, PSG went on to be in the bottom 10 to 15% of POM operators [Ex. X, Wood Dep. 102:7–9]. PSG did very little to solicit new locations. PSG did not budget for advertising and had no formal marketing plan. [<u>CSF 77</u>]. Rather, PSG relies on "'on the street' hard work in venue acquisition." [<u>Id</u>].

Specifically, PSG relied on its compliance officer, Marvin Harris, to make sales calls and distribute advertising material provided by the POM Parties. [CSF ¶ 84]. AU3 claimed that Marvin Harris went to "every location." [<u>Id</u>]. Also, Marvin Harris passed out advertisements bearing Miele Manufacturing and Pace-O-Matic's names to "all" the locations in Beaver County. [<u>Id.</u>] But, Mr. Harris tells a different story. Mr. Harris only visited approximately 10 to 15 locations on behalf of the Unis family. [CSF ¶ 85]. Clearly, PSG did not expend much effort in securing additional locations to place Pace-O-Matic's Pennsylvania Skill game.

To the extent that PSG proves the enforceability of the EPA and further proves that the POM Parties breached that agreement, PSG's recovery must be limited to damages arising between May 20, 2015 and February 13, 2018 in Beaver County. [CSF 66; Ex. EE]. On February 13, 2018, the POM Parties terminated the EPA. [<u>Id.</u>]. PSG did not object to the termination of the EPA. As such, PSG is not entitled to recover any damages incurred beyond that termination. The POM Parties also asserted in pleadings as early as August 20, 2018 that the EPA is unenforceable and of no effect.

IV.    **PSG BREACHED ITS CONTRACT WITH PACE AND MIELE**

Pace and Miele have asserted a failure to pay invoice 19918 in the amount of $4,490. PSG has never provided proof of payment. As such, a breach has occurred.

Additionally, inherent in any contract is a duty of good faith and fair dealings. By virtue of the conduct set forth above in Counts I through VI, PSG has breached that duty, committed first breach, and otherwise has acted in a way that makes enforcement of the EPA unconscionable.

V.    **DECLARATORY JUDGMENT**

In conjunction with the relief sought in the attached Motion for Summary Judgment and Proposed Order of Court, the POM Parties seek a declaration consistent with the relief sought in their Amended Complaint and Counterclaims.

VI.    **COMMERCIAL TORT CLAIMS**

PSG is claiming Interference with Contract and Civil Conspiracy against Pace and Miele. The POM Parties filed a motion to dismiss [ECF Nos. 89-90]. To the extent appropriate, Pace and Miele incorporate those filings by reference.

The EPA plainly states that software fill prices are subject to change. [CSF ¶ 44]. PSG enjoyed the same pricing from May 1, 2015 until June 2020 for its software fills despite engaging in predatory behavior and unfair competition, primarily because of this litigation. The fill prices were changed in June 2020, the prices charged are consistent with other operators in similar circumstances, and Pace and Miele have every right to make such a price increase. [Ex. UUU]. As discussed supra, the EPA was terminated in 2018. [CSF ¶ 66]. Therefore, there is no contractual basis for PSG 's claims of a lifetime price guarantee. Moreover, PSG's tort claims are based upon contractual rights and are barred by the gist of the action doctrine. If PSG has a right

33

to a fixed price, forever, then it has to be based on a contractual right. If there is a breach of the contract, then there cannot be a tort claim.

A party is not liable for tortious interference with contract for "merely making a third party's performance of his contract with another party more expensive or burdensome." Gemini Physical Therapy & Rehab., Inc. v. State Farm Mut. Auto. Ins. Co., 40 F.3d 63, 66 (3d Cir.1994). PSG is seeking recovery for all fills purchased at the increased price, whether or not it lost any business. During PSG's deposition on the subject, PSG could not quantify any damages, nor could it identify more than one prospective contract that allegedly was "interfered" with and three machines that were allegedly removed due to the increased fill prices. [Ex. SSS, 76:3-23]. PSG said it took about 40 games out of locations on its own accord. [Id. at 77:6-78:12; 79:2-10].

Pace and Miele have produced documents to demonstrate that other operators have experienced fill increases for behavior similar to PSG's, to include co-mingling illegal games. [CSF ¶ 87]. Additionally, the amounts charged to PSG for software fills are in line with tiers offered under the Miele loyalty program. (CSF ¶ 87, Ex. UUU). Further, Attorney Cline[20] testified that the fill increase was based upon a decision by Pace because of concerns regarding PSG's conduct, which is a common reason for fill prices to increase. [Ex. UUU]. Therefore, Pace and Miele have a legitimate, privileged right to increase the fill prices.

Conversely, PSG has failed to meet its burden to establish a right to a lifetime fill price. PSG also has failed to establish malice, which is an essential element for a civil conspiracy claim. Doltz v. Harris & Assoc., 280 F.Supp.2d 377, 389 (E.D.Pa.2003). PSG's interpretation of the EPA is unreasonable and its claims here are baseless.

---

[20] A final transcript of Attorney Cline is not completed. Pace and Miele reserve the right, with leave of Court, to amend their Appendix and add Attorney Cline's testimony.

Between this evidence and the contractual rights to increase fill prices, plus the fact that the EPA was terminated, PSG's claims for interference and civil conspiracy must fail as both a matter of law and due to no remaining genuine issue of fact.  As such, Pace and Miele have every privilege and justification to act as they did, which defeats PSG's claims as a matter of law.

## CONCLUSION

Based upon the foregoing, POM seeks the relief sought in its Motion for Summary Judgment and set forth in the attached proposed order of Court.

Respectfully submitted,

SPILMAN THOMAS & BATTLE, PLLC

By:/s/ Julian E. Neiser
    Julian E. Neiser
    Pa. Id. No. 87306

    T:  412-325-1116
    F:  412-325-3324
    E:  jneiser@spilmanlaw.com

    One Oxford Centre, Suite 3440
    301 Grant Street
    Pittsburgh, PA  15219

    **Attorneys for Pace-O-Matic, Inc. and Miele Manufacturing, Inc.**

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

PENNSYLVANIA SKILL GAMES LLC,     CIVIL ACTION NO. 2:20-cv-01177-PLD

        Plaintiff,

                           The Honorable Patricia L. Dodge

     v.

ACTION SKILL GAMES, LLC,

        Defendant.

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing **POM's Memorandum in Support of Summary Judgment** was served upon the undersigned counsel of record this 24th day of February, 2021 via the Court's CM/ECF System:

Via email to mailroom.grz@zegarelli.com

     Gregg R. Zegarelli, Esquire
     Zegarelli Technology & Entrepreneurial
     Ventures Law Group, P.C.
     2585 Washington Road, Suite 134
     Summerfield Commons Office Park
     Pittsburgh, PA  15241

     **Counsel for Plaintiff Pennsylvania
     Skill Games LLC**

              SPILMAN THOMAS & BATTLE, PLLC

              /s/ Julian E. Neiser
              Julian E. Neiser