**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

---

POM OF PENNSYLVANIA, LLC, t/d/b/a
PACE-O-MATIC, and SAVVY DOG
SYSTEMS, LLC,

      Plaintiffs,

      v.

PENNSYLVANIA SKILL GAMES, LLC,

      Defendant.

---

PENNSYLVANIA SKILL GAMES, LLC,

      Plaintiff,

      v.

PACE-O-MATIC, INC. and MIELE MAN-
UFACTURING, INC.

      Defendants.

---

CIVIL ACTION NUMBER:
2:18-cv-00722-PLD

The Hon. Patricia L. Dodge

**PENNSYLVANIA SKILL GAMES'
MEMORANDUM IN OPPOSITION TO
POM MOTION FOR SUMMARY
JUDGMENT**

**PENNSYLVANIA SKILL GAMES' MEMORANDUM IN OPPOSITION
TO POM MOTION FOR SUMMARY JUDGMENT**

## <u>INTRODUCTION</u>

There is only one central issue, not two:

> **Whether it is proper for this Honorable Court to dismiss the entire case, as a matter of law, depriving Pennsylvania Skill Games of a trial, when all issues are grounded upon the relationship dispute between and among the interested parties.**

The POM Parties knowingly signed and filed a coordinated joint motion for summary judgment for the entire case, when there are certainly triable issues of fact. The summary judgment motion, with more than 70 exhibits and a 40% increase in briefing allotment, is nothing but an overreaching attempt to conduct a paper trial.

To eliminate the volume of factual noise that diverts the issue to be resolved, a cogent summary time framework is provided for the Court's convenience.  This framework may be helpful when this Court reviews the depositions of Albert Unis, III and Albert Unis, IV, which, themselves, ostensibly burst the bubble of the motion for summary judgment.[1]  The dates are critically important, because certain facts asserted by the POM Parties gloss over timing logistics; that is, how the events really happened by natural progression.

| Date | Event | Responsive Concise Statement ("RCS") |
|---|---|---|
| 2009/2010 | "Pennsylvania Skill Games" is used by Albert Unis, III in commerce so that people relate his sourced games as being "legal" games, when other vendors "hide" because of the risk of prosecution.  Albert Unis is the senior user of the mark.  Albert's intention was always to give the business to his son, Albert Unis, IV, seeding the relationship with Pace for skill games. | ¶¶8, 11, 15, 16, 29 (all references here are with the inclusions by reference therein) |
| To 2012 | Albert Unis III contacted his attorney, Wayne DeLuca, Esq. to get in touch with Pace-O-Matic. | ¶15 |
| 2012 | Conversations begin with Pace via Wayne DeLuca.  At this time, Albert Unis, III did not have a different attorney and understood that Wayne DeLuca was acting for his interests. | ¶15 |
| through 11/19/13 | Albert Unis, being the only person in the discussion with knowledge of the streets, specifically selects one of his account locations, AIC, because of its unique well-known social-political status, puts his operations into legal play, and manages the account's natural trepidation to get involved, to a successful "controlled pickup." | ¶15 |
| 11/19/13 | "Controlled pickup" of the Pace machine at the Unis AIC customer location occurs. | ¶15 |
| 12/23/14 | Beaver County Case ruling entered, software version 402.44 | ¶15 |
| 1/29/15 | The non-integrated January Agreement is signed, which was intended to document the existing and continuing verbal agreement between the parties; the document was supplied by Pace and named, "PA Distributor Agreement.doc" comporting with the | ¶28 |

[1] The volume of exhibits provided to this Court are daunting.  The undersigned has and is responding in accordance with the applicable rules, and it is presupposed that the Court will duly review all filings.  That said, the undersigned will suggest that, if this Court starts with a review of three depositions, being the 2019 and 2020 depositions of Albert Unis, III, and the 2019 Deposition of Albert Unis, IV, Exhibits R, Z and S, respectively, there is a significant volume of testimony that ostensibly identifies genuine triable issues of fact on every issue presented.

| | | |
|---|---|---|
| | master distributor relationship averred by Pennsylvania Skill Games.  Miele is a named party by virtue of the authorized signature by Pace, by the physical hand of Daniel Warren (he testified to his authority). | |
| 5/20/15 | The non-integrated Purchase Equipment Agreement is signed by Pennsylvania Skill Games LLC as successor to Albert Unis III, on the one hand, and Pace and Miele, on the other hand.  Pennsylvania Skill Games LLC was signed by the physical hand of Albert Unis, IV.  Miele and Pace sign the document by the physical hands of Michael Pace himself and Louis Miele himself, respectively.<br><br>Both Albert Unis, III and Albert Unis, IV testified that Pace was permitted to use the "Pennsylvania Skill" by permissive right (license) if Pace complied with the Equipment Purchase Agreement.<br><br>As indicated in the notices from Dan Warren, the "Unis draft has no performance targets...need for exclusivity" that was specifically rejected by the Pennsylvania Skill Games because, in 2015, Unis already had a successful business and was not willing to risk giving exclusivity to Pace (not to deal with other game vendors) with Pace's unproven new computer game. | ¶¶11, 15, 29 |
| | At this point, there are no issues and the parties proceed exactly in accordance withe Equipment Purchase Agreement. | ¶8    (noting AU3.19 P125:L15– P126:L4) |
| c.3/16 | Still early in the relationship the Pennsylvania Skill Games opening rollout causes buzz and now competitors are trying to enter into the exclusive Beaver County market.  Pennsylvania Skill Games notified Pace, Daniel Warren, of machines violating the exclusive of the Equipment Purchase Agreement and Daniel Warren has them removed in compliance. | ¶¶8, 29 |
| 11/2016 | Daniel Warren, CFO of Pace, also became the CFO of Pennsylvania Skill Games with appurtenant fiduciary responsibilities to Pennsylvania Skill Games, "mentoring" Albert Unis III, in accordance with The Relationship Agreement through the Equipment Purchase Agreement. | ¶36 |
| c.2/14/17 | Pennsylvania Skill Games' competitors in the street are now seeing Pace machines in the locations, and start to call Miele for machines for their locations.  This condition was exactly the condition intended to give Albert his competitive advantage in Beaver County.  However, Pennsylvania Skill Games discovers that Pace and Miele are violating the exclusive by issuing machines and fills to Pennsylvania Skill Games competitor, MAC Vending ("MacDaniels"), a name provided to Pace in confidence during The Relationship Agreement.  Pace and Miele are not complying with the exclusive. At the same time, unbeknownst to Pennsylvania Skill | ¶¶8,   15,   29 Cease and Desist Ex. 21.5 |

|  |  |  |
|---|---|---|
|  | Games, clandestinely and without advance notice, Pace now began reorganizing its operations by spinning off and spinning out assets and liabilities. After contact from Pennsylvania Skill Games, Pace and Miele avoid and delay, so Pennsylvania Skill Games sends a direct cease and desist direct to MAC Vending. |  |
| c.2/14/18 | Pennsylvania Skill Games discovers that Pace and Miele are now violating the Equipment Purchase Agreement exclusive by issuing machines and equipment to ProATM. | ¶¶8, 15, 29; Ex. 21.1–21.4 |
| 2/6/18–2/26/18 | Regarding ProATM, there are a series of four letters, a Cease and Desist by Pennsylvania Skill Games to ProATM because Pace and Miele are now not responsive. ProATM's written response that enforcement against ProATM would subject Pennsylvania Skill Games to a tortious interference claim. Now, for the first time ever, Pace sent a letter by B. Greg Cline, Esq. (now by a purported successor of Pace) which has so many "any," "may" and "or" clauses, playing it from every side not knowing which side might work, that it is incoherent to determine what is the fact actually asserted.[2] Nevertheless, notably, and irrespective of validity of the arguments, Mr. Cline's letter acknowledges the admitted effectiveness of the Equipment Purchase Agreement, closing with, "*My client requests...that you comply with the terms of the Equipment Purchase Agreement...*"; admitting that it is not a termination letter, but with the claim to continue obligations under the Equipment Purchase Agreement. This letter was responded to by counsel for Pennsylvania Skill Games, and the amount paid to clear the question notwithstanding continued objection. | ¶¶8, 67 |
| 3/30/18 | Now seeing the intentional violation by Pace and Miele assisting Pennsylvania Skill Games competition by circumvention, Pennsylvania Skill Games files for federal registration of the word mark and logo mark. | Ex. 19.1–3 |
| 4/17/18 | Daniel Warren tells Albert Unis, IV "As of today your account is clean" by text message. [Bates 1456] | Ex. 10 |
| 5/2/2018 | Because Miele and Pace did not remove the offending machines and/or stop filling the offending machines, and after having direct notice of the identity of the offending vendors, Pennsylvania Skill Games, by legal counsel, sent the good faith communication to those parties on May 2, 2018, providing a copy of proposed Complaint to be filed in court. | Ex. 19.1 |

---

[2] Mr. Cline's letter: "We have determined that your client did not have any terminals at the Aliquippa location before ProATM placed the terminals at issue in your letter over a year ago. As a result, this location was obviously a place where your client opted not to place terminals at, even though it had the opportunity to do so for several years. Therefore, under the letter of the right of first refusal, ProATM placement at that location is proper because PSG had given up the Aliquippa location." This is perhaps the most nonsensical illogical statement ever written regarding a right of first refusal. "*We are not giving you the right to refuse, because the thing we must offer to you first, you have already impliedly refused without us checking with you first, because you don't already have the very thing that you would be offered to take.*" This is clearly bad faith and reserved as a jury question.

| | | |
|---|---|---|
| 5/23/2018 | While Pennsylvania Skill Games understood the matter was under consideration in good faith, unbeknownst to Pennsylvania Skill Games, Pace-O-Matic filed a Complaint in Beaver County 2018-10675, never served, discovered or identified in discovery, but found recently by the undersigned in preparing this response. | Ex. 19.2–3 |
| 6/1/18 | The POM Parties then filed this federal action, 2:18-cv-00722 | |
| 6/7/18 | Miele/Pace conducted an operator "summit" for the first time requiring a set of "new" documents for signature. Pennsylvania Skill Games was not notified of this meeting. | Ex. 12.1–2 |
| 7/18/18 | Pennsylvania Skill Games files this federal action 2:18-cv-00941 | |
| 7/28/18 | Pennsylvania Skill Games is sent the "summit" package by postal service because it was not invited to the "summit" on July 25, 2018 as indicated on the package postmark. | Ex. 12.1–2 |
| 10/1/18 | Email from *mieleamusements.com* following up on signing the new terms and conditions. | Ex. 12.1–2 |
| 10/15/19 | Registration of word mark by Pennsylvania Skill Games LLC | Ex. 13 |

The framework above isolates several critical seminal facts, if not clearly assured, certainly genuine issues of material fact for trial: a) the (non-integrated) Equipment Purchase Agreement is the continuum of a series of oral discussions; b) the continuum was initiated by Albert Unis, III and finally transferred as always intended to his son, Albert Unis, IV; c) Pennsylvania Skill Games, LLC is the ultimate successor in interest to Albert Unis, III; d) Pennsylvania Skill Games is the senior user of the designation; e) the referenced cease and desists indicate that Pace and Miele intentionally refused to make good faith resolutions to the problem in which they knowingly participated with the competitors of Pennsylvania Skill Games; f) there are no "problem" or cure notices, written or otherwise, prior to the referenced Cline letter, which is after the fact; g) irrespective of objections, Daniel Warren, CFO, confirmed that the Pennsylvania Skill Games account "is clean"; and h) only after the lawsuits by the POM Parties did "new" terms and conditions appear.

5

Albert Unis, III had the exclusive rights in Beaver County.  The Agreement was for him to have a significant competitive advantage in Beaver County, by having his vending competitors come through him as "affiliates" for the skill games, or, otherwise, his competitor's customers who wanted the skill game more than the relationship with his competition would defect to Unis; to wit, his testimony, cited at RCS ¶¶8, 15, 18, 29:

> **Q I asked you the names of what is the "and affiliates?"**
>
> **A I did not -- there's no end of "the affiliates." It continues to go on as affiliates are chosen, and the people that I mentioned to him were the people -- there was only probably three vendors in Beaver County, and I mentioned -- I mentioned them to Mike Pace, and I talked to him about it, and it was all the vendors in Beaver County. And it was one that did business under a name Marsico, one that did business under another name -- his name was McDaniels -- another person that did business under, Tri-State Vending. Those are the only vendors in Beaver County. There's only three or four vendors in the whole county. There was only -- at the time, there was only three or four vendors. I mentioned them all to them, and we had discussions about them continuously as I was involved with it, and – and when I was not involved with it anymore, I can't answer for my son, so.**
>
> **Q So because you said earlier that you transferred every aspect of your business to your son --**
>
> **A Yes.**

*Id.*; Deposition of Albert Unis, III, October 20, 2020, P26:L8–P27:L6.  However, once those competitors started seeing the Pace machines seeded by Pennsylvania Skill Games, and not wanting to contact their competitor (Unis/Pennsylvania Skill Games), they contacted Pace/Miele directly, and Pace/Miele, now seeing the volume available by the competitive vendors, circumvented the Equipment Purchase Agreement and sold direct, to the tune of over 400 machines.  By going direct, Pace and Miele speedily circumvented the exact gem condition that was suppose to be for Pennsylvania Skill Game's benefit: competitive advantage.

6

And to make sure it is not lost for the noise of 73 exhibits, Albert Unis specifically identified the competitive vendors in Beaver County early in the relationship. *Id.,* at P24:L21–24.

**INCORPORATION BY REFERENCE OF RESPONSIVE CONCISE STATEMENT**

Pennsylvania Skill Games hereby incorporates, by this reference, its Responsive Concise Statement ("**RCS**") filed in conjunction with this Memorandum in Opposition as if restated herein. Because of the volume of supportive citations set forth in the CSR, Pennsylvania Skill Games may, at times, for the convenience of the Court only, provide direct citations.  Any direct citations are not in derogation of the complete citations set forth in the RCS.  Certain terms used herein are defined in the RCS.

## I.    STANDARD OF REVIEW

The standard of review for a summary judgment is presumably well-known to this Court; to wit, a summary judgment is appropriate only if:

> **"[T]he movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.' Fed. R. Civ. P. 56(a).  We view the evidence in the light most favorable to the non-moving party. *See Melrose, Inc. v. City of Pittsburgh,* 613 F.3d 380, 387 (3d Cir. 2010). A fact is material if—taken as true— it would affect the outcome of the case under governing law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). And a factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.***

*M.S. by and through Hall v. Susquehanna Township School District,* 969 F.3d 120 (2020).  The issue of material fact required by Rule 56(c) to be present to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.  *Anderson v. Liberty*

*Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), *citing, In First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, at 288–289, 88 S.Ct. 1575, at 1592, 20 L.Ed.2d 569. A summary judgment may not be granted where the moving parties' submissions had not *foreclosed the possibility* of the existence of certain facts from which "it would be open to a jury ... to infer from the circumstances" that there had been a meeting of the minds. *Id., citing, Adickes v. S.H. Kress & Co.,* 398 U.S. 144 at 158–159, 90 S.Ct. 1598 at 1608, 1609, 26 L.Ed.2d 142 (1970) (emphasis added). "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson,* at U.S. 250.

## ARGUMENT IN OPPOSITION

As set forth in the Introduction, the issues in this dispute all converge into the grounding of the voluntary agreement assented-to by the parties. The POM Parties start their motion with a fictional divide; that is, setting forth "two" issues to try to separate inseparable questions, by fictionalizing that the assented-to relationship of the parties does not exist. But that relationship does exist, it grounds everything in the dispute, and the evidence of it is simply overwhelming. Indeed, the evidence of it is so overwhelming that it is beyond all argument and signed filings: there are clearly genuine triable facts presented and reserved for the jury.

## I.   TRADEMARKS AND UNFAIR COMPETITION

The POM Parties start with the concept of a trade name versus a trademark. The POM Parties side-step the real statement of the law that a trade name and trademark are not mutually exclusive.

It is not the suggested pejorative of a "conflation," but, rather, it is well-settled that a designation may function as both a trade name and a trademark or service mark. *In re Walker Process Equip, Inc.,* 233 F.2d 329, 332, 110 USPQ 41, 43 (C.C.P.A) 1956; *Id.*

RCS ¶11 clearly provides a factual basis that the mark was used as a trademark to distinguish Albert Unis, who had legal skill games from other vendors who run illegal machines. The mark in question is not Albert Unis' legal name, he did not sign the January Agreement using that name, and he did not sign the receipt of the controlled pickup using that name. RCS ¶¶8, 11, 15; *see,* MCCARTHY ON TRADEMARKS, §9.16. Moreover, the "splash screens" on the initial computer screen represented in the affidavits and the related deponents clearly demonstrate a use by Albert Unis of a bubbly serif fonting since at least as early as 2010, and without any appurtenant legal entity designation, but only the brand. RCS ¶11. The mark was used at least as early as 2010 by Albert Unis in a bubbly serif font formative, copied into the refreshed version. *Id.* RCS ¶¶9, 11.

The bubbly serif font formatives are similar:





    A. False Designation

        1. Legally Protected Interest

            a. *Protectible Interests.*

The POM Parties conflate a number of trademark law issues and concepts. *First,* at P.9 of the POM Memorandum, they start by admitting that the abstract marks (in the plural, presumably

the word and stylized formative) are protectible and distinctive, and then by some slight of argument move to some claim that only Pennsylvania Skill Games' use is descriptive. The mark is the mark. A descriptive mark that is not inherently distinctive may become distinctive after commercial use, but the mark is the mark. Ex. 13

It is true that a descriptive mark may become distinctive by commercial use, but that is immaterial to the question of whether the POM Parties are using the mark by license (that is, a conditional permissive contractual right) from Pennsylvania Skill Games as an incident to the Equipment Purchase Agreement. The testimony is replete that the agreement was that Pace and Miele could use Pennsylvania Skill Games' designation only as long as Pace and Miele complied with the Equipment Purchase Agreement. RCS ¶11. *Second,* the POM Parties conflate the two marks, priority of use and the distinction in the federal *registration* standards versus the common law standards. Pennsylvania Skill Games was using the word mark since at least as early as 2010. RCS ¶11. It is the senior user of the word mark, and the POM Parties cannot get close to that date, either by some form of "internal use" that occurred after conversations with Albert Unis or by virtue of the revised formative. RCS ¶11. The POM Parties mislead the Court by omitting the grounding premise; to wit: Before the jury gets to infringement, it must make the grounding determination that Pace and Miele (and/or some or all of its improper assignees) are independent owners or are they merely conditional permitted users by some agreement. *Third,* even if we put aside the fact that the testimony was that Pace and Miele would advertise throughout the state and Pennsylvania Skill Games would place games in the street, by introducing relative advertising and the POM Parties' hubristic "boasting" of illegal vendors, the POM Parties avoid the entire concept of "reverse confusion," which is where the infringer spends so much money on advertising that the relevant market starts to associate the brand with the infringer. *See,* MCCARTHY §23.10. But,

10

even this begs the question of contractual rights and duties. *Fourth,* it is improbable to the point of a *fait accompli* that an injunction could not be ultimately sustained against Pennsylvania Skill Games in use of the designation as a word mark or as used above, because it is the senior user, either way, and whether the two renditions are factually similar (with bubbly serif fonting) begs the question back into the infringement claim, which begs the question back to the Equipment Purchase Agreement. RCS ¶¶8, 11. The POM Parties are diverting around the issue that must be gone through: these parties are conjoined by assent by the Equipment Purchase Agreement.

### b. Insufficient Evidence.

In this section, respectfully, the POM Parties are simply in irrational and frivolous denial of the facts of record. There were two written "location agreements" produced, but that is clearly not evidence of the use of the mark. Indeed, the POM Parties deposed and cross-examined three of the affiants who associated the mark with Pennsylvania Skill Games to the dates set forth in their respective affidavits. RCS ¶11. The POM Parties use some form of the "negative evidence of one" implies "no positive evidence of all." It simply does not follow logically, and it contradicts the testimony and the evidence presented. *Id.* For example, when shown the two versions of the stylized design, Curtis Martin testified that he thought they were the same. ¶11, Martin Dep. P26:L19. Moreover, the challenge to the affidavits is nullified by the cross-examination of the witnesses. The affidavits were acquired because the POM Parties' position was that there was no evidence of the 2010 usage, which Albert Unis, III, knew existed because he was the one that coded the words as the splash screen into the computer devices. Albert Unis, IV, simply obtained the affidavits to satisfy the POM challenge. The real issue was the respective dates and pictures that the affiant could recall, which were blank to allow the witness to complete those critical fields. The undersigned can represent that the undersigned never communicated with those affiants prior

11

to their respective depositions. *Id.* The jury is entitled to hear the testimony of the three deponents, which is more than sufficient, because the jury would be entitled to hear the question on the testimony of only either Albert Unis, III or Albert Unis, IV. The POM Parties argue themselves out of court by raising more factual issues than they resolved, and vitriol is unpersuasive.

On P.15 of POM Memorandum, the POM Parties suggest that it is "extremely telling" regarding the specimens used at the U.S. Trademark Office. *First,* drawing contrary to the very inference that the Court is required to use (being in favor of Pennsylvania Skill Games), the POM Parties suggest that the fact that Pennsylvania Skill Games used the refreshed logo in the trademark registration application implies something, and it does: It implies that Pennsylvania Skill Games asserts its ownership in accordance with the claims it makes and expects that a jury will ultimately find in its favor. RCS ¶11. *Second,* there is a reference to an email. The specimen submitted must show the mark represented as required by the USPTO in the application: to wit, "The substitute (or new, or originally submitted), was/were in use in commerce at least as early as the filing date of the application." The pejorative inference is incorrect. The significant contributions made to the Beaver County case, apparently disputed as material facts by the POM Parties, are set forth in RCS ¶15, noting that the POM Parties posit that "There is no proof any of this occurred or any agreement exists other than AU3's own testimony"...which is sufficient, of course, not forgetting about the two signed agreements, the latter of which were personally signed by the hands of Louis Miele and Michael Pace in their own self-interest, *at that time.* RCS ¶8.

2.  Likely to Create Confusion

Certainly, this assertion begs the question of the entire case, and Pennsylvania Skill Games incorporates by this reference the prior responses.

This issue of "illegal/unadjudicated" keeps coming up as part of the post-litigation unilateral angle of the POM Parties, as set forth in the table above.  The manner in which the POM Parties press this issue into the marketplace is a fraudulent practice; it is clever, but fraudulent. *First,* the POM Parties use the words "illegal/unadjudicated" in a combined form to imply that they are categorically the same.  Any game that has not been determined to be illegal is by default "legal" until finally proven otherwise; however, an "unadjudicated" game is any game that has not been finally adjudicated in court.  Pace puts "badges" (yes, badges, RCS ¶50) on its retired Pennsylvania State Police, who then enter establishments as "Compliance Officers" and, scaring the unfortunate clerk, suggest that competitor games are "illegal/unadjudicated" or have a potential "compliance" issue with Pace.  There is a lot of money at issue.  Ex. 1.  If there is a "compliance" issue with some vendors on Miele/Pace's new terms and conditions, it is not a compliance issue with Pennsylvania Skill Games, who preceded all of whatever that is, and has a superior first-in agreement with Pace and Miele, noting that there should be no Pace/Miele competitors with Pennsylvania Skill Games (although there could be outside of the Beaver exclusive).

By virtue of the first-in Equipment Purchase Agreement, Pennsylvania Skill Games is not subject to the post-litigation standards imposed by Pace or Miele on other vendors.

**Q. There's also an operator code of conduct, is there not?**

**A. Yeah.**

**Q. And that operator code of conduct was provided by Miele to Pennsylvania Skill Games, LLC, was it not?**

**A. Yeah.**

**Q. Did you ever sign one?**

**A. No. Why would I have to?**

RCS ¶8; Deposition of Albert Unis, IV, P80:L15–23.  Moreover, it has been determined that Miele,

himself commingles games with other brands.  Ex. 1; RCS 60.

After applying legal factors that are not applicable to this case posture, the POM Parties use words like "legitimate Pace logo" at P.18 of their joint Memorandum, which simply beg the question that is in dispute, as set forth previously.

B.  Unfair Trade Practices

This assertion begs the question of the entire case, and Pennsylvania Skill Games incorporates by this reference the prior responses.

C.  Common Law Infringement

This assertion begs the question of the entire case, and Pennsylvania Skill Games incorporates by this reference the prior responses.

D.  State Trademark (Count IV)

This assertion begs the question of the entire case, and Pennsylvania Skill Games incorporates by this reference the prior responses.  The registration of a state trademark is simply the codification of the common law, which is at issue as set forth above.  The filings were made in bad faith with knowledge of the prior federal filings by Pennsylvania Skill Games.

In conclusion, summary judgment in trademark cases is disfavored due to the factual nature of the applicable legal framework, specifically, the likelihood of confusion analysis.  *See, Steak Umm Co. v. Steak 'Em Up, Inc.,* Civ. A. No. 09-2857, 2011 WL 3679155, at *3 (E.D. Pa. Aug. 23, 2011); *see also Country Floors, Inc. v. P'ship of Gepner & Ford,* 930 F.2d 1056, 1062-63 (3d Cir. 1991) (noting that summary judgment is the "exception" in trademark cases); *Entrepreneur Media, Inc. v. Smith,* 279 F.3d 1135, 1140 (9th Cir. 2002) ("Because of the intensely factual nature of trademark disputes, summary judgment is generally disfavored in the trademark arena.").  But, we are beyond that issue, because the case requires a contract interpretation in the first-step.

## II.    COPYRIGHT RIGHTS

This is a frivolous inclusion and the motion for summary judgment was not permitted to be signed with this inclusion.  First, there is ostensibly no copyright count in the pleadings for which the Court can grant summary judgment, and, as a matter of law, a copyright may only be claimed for resolution after having registered the copyright. *Fourth Estate Public Benefit Corporation v. Wall-Street.com, LLC,* 139 S.Ct. 881203 L.Ed.2d 147 (2019).  Moreover, on the facts themselves, the POM Parties would need to disclaim the "canned art" for not having created it, as well as the substantially similar bubbly serif font formative created by Albert Unis, III, leaving nothing to claim.  Irrespectively, it is a frivolous inclusion.

## III.    CONTRACT CLAIMS

As a preface, to use the POM Parties' words, it is "telling"—if anything is "telling"—that the POM Parties should try to escape their obligations under the Equipment Purchase Agreement in the manner below and in light of the evidence, and Pennsylvania Skill Games believes that a jury will be inflamed for the POM Parties having tried to do so.

A.  The Assertion that PSG's Assertions Must Fail

1.  No Contract Exists

If the assertion by the POM Parties is cognizable at all, it appears that that are taking the position that POM and Savvy Dog are not parties to the Equipment Purchase Agreement. Unfortunately for them, the letter from Attorney Cline indicates a claim of succession of interest in the preface of the letter, written on Pace-O-Matic stationery.  RCS ¶66.  The propriety of the assignment of any interest to POM or to Savvy is a fact question to be determined under the Equipment Purchase Agreement, §7, as well as success liability arising from the reorganization. In playing it

15

from every angle, Mr. Cline has admitted the factual dispute of successor liability.  Whether or not new companies can or should have been joined, the current parties are subject to such liability as the facts bear out at trial. *Id.*

Moreover, this does not account for the denial of stopping fills as a result of ProATM or MAC Vending cease and desist letters, which brought the matter to the direct attention of the POM Parties.

### 2.  The EPA is not Valid

The POM Parties suggest that the Equipment Purchase Agreement is not valid, after being handled by respective legal counsel for both parties, drafted in writing, modified by the parties to their satisfactory embodiment, and signed by Michael Pace, personally, himself, and Louis Miele, personally, himself.  It was satisfactory enough on that date, early on, when Pennsylvania Skill Games was needed to seed the locations.  The apparently disputed reference about a "lifetime" "exclusive" or "lock" are simply argumentative expositions of the genuine facts at issue for trial, noting, for example, the reference in the Equipment Purchase Agreement to "as long as Seller is in the market."  RCA ¶¶8, 15, 66.  Playing righteous indignation is not persuasive.

On the facts, the assertions are frivolous.  B. Greg Cline, counsel for the Pace, Savvy and POM, specifically acknowledged the Equipment Purchase Agreement, to wit: "**My client requests that you...comply with the terms of the Equipment Purchase Agreement.**"  Although Pennsylvania Skill Games obviously disputes for trial whether it was ever not in compliance, Mr. Cline's letter admits the contractual framework for compliance.  Mr. Miele also testified that the Equipment Purchase Agreement is effective, it is only that no one will volunteer for him their intended location, and he apparently cannot ask or approve the would-be vendor on that condition.  RCS ¶66.  If that is true, it is for the jury.

16

a.   *The EPA has requisite definite terms*

Pennsylvania Skill Games incorporates by this reference the prior responses.  RCS ¶¶8, 15, 66; AU3.20 Dep. P37:L2–6.  There are a few specific factual disputes regarding trial determinations that can be pointed out: The POM Parties seem to be asserting some "mechanical" limitation that prevents them from satisfying the "make sure" provisions of §§3 and 4 and implied required good faith of the Equipment Purchase Agreement.  As indicated above, Albert Unis told Michael Pace the names of the competitors.  RCS ¶66.  Therefore, when those customers approached for fills, and the Miele/Pace operator seeing the vendor request, all they needed to do was ask if the terminal for which the fill was requested was located in Beaver County.  The POM Parties could have simply added a provision into their new operator agreements to exclude Beaver County.  These are simply tried and true methods of making sure there is compliance with or without a "mechanical method."  The fact that operators might violate terms and conditions of an operator agreement is not an excuse to implement processes otherwise to satisfy the Equipment Purchase Agreement.  Furthermore, Pace represented that it simply could turn off fills, which it can do.  RCS ¶8.  MCM Elements, owned by Mr. Miele for many years and now owned by Pace (presumably to allow Mr. Miele to avoid being discovered to have competitive operator confidential information) provides operator tracking that keeps location data where games exist.  RCS ¶50.  The POM Parties' statement about secretive locations is not responsive to the issue, because a first-step would simply be to ensure that the operator agrees not to enter Beaver County, relying then upon their "boastful" compliance team to determine if an operator is violating that agreement by entering Beaver County.  Everything is difficult for the unwilling, or the breaching party.  Michael Pace and Louis Miele, are adults, and signed exactly the Cline-confirmed document they are bound to honor.  Every contract has an implied covenant of good faith, which is for the jury.

17

### 3.  The EPA lacks adequate consideration

Pennsylvania Skill Games incorporates by this reference the prior responses.  RCS ¶¶8, 15, 66.  There is a significant volume of testimony on this point regarding the Cline-confirmed agreement.

#### a.  *The law related to consideration*

Pennsylvania Skill Games incorporates by this reference the prior responses.  RCS ¶¶8, 15, 66.  There is a significant volume of testimony on this point regarding the Client-confirmed agreement.  The POM Parties are changing the testimony that is a factual issues: there are not three agreements, but one oral "verbal" agreement documented two times, the Equipment Purchase Agreement being that latter documentation that culminated the intended transition from Albert Unis to his son and for which Daniel Warren was a fiduciary as part of The Relationship Oral Agreement, evidenced at RCS ¶36.  The purchase of 25 terminals identified in the January Agreement was already satisfied; therefore, no additional game purchases were required.  RCS ¶8.

### 4.  No Breach of the EPA

#### a.  *Evidence of non-compliant games*

Pace Games have been seized.  RCS ¶¶2, 26, 27.  Pace games have been changed beyond the 402.44 that was adjudicated by Beaver County.  What was then a 3-game is now a 13-game version with "slap losses" allowing the player to sit and slap the loss, which maximizes revenue but is not compliant.  RCS ¶¶1, 2, 42.

#### b.  *POM's breach the exclusive/right of first refusal*

Pennsylvania Skill Games incorporates by this reference the prior responses.  RCS ¶¶8, 15, 66.  There is a significant volume of testimony on this point regarding the Cline-confirmed agreement.

18

## IV.    PSG BREACHED IS CONTRACT WITH PACE AND MIELE

*First,* Invoice 19918 for $4,490 was paid.  It is clearly bad faith for "Pace and Miele" to assert that "PSG has never provided proof of payment" as the grounds for a claimed breach without any referential details.  *Second,* Daniel Warren issued an admissive statement that the Pennsylvania Skill Games account "is clean" as of April 17, 2018, and this document was provided by Pennsylvania Skill Games to the POM Parties (but not the other way around) at Bates PSG 1456.

This is a frivolous inclusion and the motion for summary judgment was not permitted to be signed with this inclusion.

## V.    DECLARATORY JUDGMENT

This is a frivolous inclusion and the motion for summary judgment was not permitted to be signed with this inclusion.   It is ungrounded by reference or argument.

## VI.    COMMERCIAL TORT CLAIMS

Regarding the "commercial tort claims," Pennsylvania Skill Games reiterates, and hereby incorporates by this reference, the filings and arguments raised in its Motion for Leave to Amend [ECF 70], Reply Brief [ECF 75], Motion for Reconsideration [ECF 77], Sur-Reply [ECF 84], Response in Opposition of Motion to Dismiss [ECF 92].  The POM Parties rehash the same law that was the abstract basis for their joint prior motion practice.  However, Pennsylvania Skill Games proffered three Pennsylvania Skill Games account identities regarding whom Pennsylvania Skill Games lost business as a result of the tortious actions of the POM Parties.  RCS ¶66.  The POM Parties only deposed one of the three accounts, being Devinder Kumar, who testified that the

tortious price increase caused him to eliminate Pennsylvania Skill Games machines.  This corroborates the testimony of Albert Unis, III.  RCS ¶66.

> **Q Of the four -- and those four machines, what did you do; did you call Mr. Unis and say, "Get these other four out of here, I am not paying the price increase"?**
>
> **A Yes.**

Kumar Dep. P21:L18–P22:2.  Moreover, the deponent testified that he moved to Banilla games which are on a "one and done" system by which the location does not have to make continued fill payments; therefore, there is no recovery of the account.  Even more so, the price increase for what was a happy growing customer caused the customer to investigate other opportunities for other locations.  RCS ¶66.

Therefore, what was a claim in the paper filings is now supported by the cross-examined testimony of Mr. Kumar and Mr. Unis, III.  Accordingly, it is now a grounded question for the jury.

**CONCLUSION**

The motion for summary judgment is ungrounded for the reasons set forth above.  There is no prejudice in denying the motion for summary judgment, but there is prejudice to grant it.  As stated by the U.S. Supreme Court: The moving parties' submissions had not foreclosed the possibility of the existence of certain facts from which "it would be open to a jury ... to infer from the circumstances" that there had been a meeting of the minds. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970),Id., at 158–159, 90 S.Ct., at 1608, 1609.  Pennsylvania Skill Games prays for the right to bring the dispute to the jury for vindication of its rights.

Respectfully submitted,

s/Gregg R. Zegarelli
Gregg R. Zegarelli, Esq.
Pa. I.D. #52717

TECHNOLOGY & ENTREPRENEURIAL
 VENTURES LAW GROUP, P.C.
2585 Washington Road, Suite 134
Summerfield Commons Office Park
Pittsburgh, PA 15241-2565, USA
 v.412.833.0600 f.412.833.0601
mailroom.grz@zegarelli.com

21

## CERTIFICATE OF SERVICE

I hereby certify my belief that a true and correct copy of the foregoing Motion to Compel was served upon the following counsel via the Court's CM/ECF System on the date set forth below:

March 24, 2021

Julian E. Neiser, Esq.
jneiser@spilmanlaw.com
James C. Walls , III
jwalls3@spilmanlaw.com
SPILMAN THOMAS & BATTLE, PLLC

Respectfully submitted,

s/Gregg R. Zegarelli
Gregg R. Zegarelli, Esq.
Pa. I.D. #52717

TECHNOLOGY & ENTREPRENEURIAL
 VENTURES LAW GROUP, P.C.
2585 Washington Road, Suite 134
Summerfield Commons Office Park
Pittsburgh, PA 15241-2565, USA
 v.412.833.0600 f.412.833.0601
mailroom.grz@zegarelli.com