## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| POM OF PENNSYLVANIA, LLC, t/d/b/a PACE-O-MATIC, and SAVVY DOG SYSTEMS, LLC, | ) ) ) ) | |
| Plaintiffs/ Counterclaim Defendants, | ) ) | Civil Action No. 2:18-722 |
| vs. | ) ) | |
| PENNSYLVANIA SKILL GAMES, LLC, | ) ) | |
| Defendant/ Counterclaim Plaintiff. | ) ) | |
| PENNSYLVANIA SKILL GAMES, LLC, | ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| PACE-O-MATIC, INC. and MIELE MANUFACTURING, INC., | ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION[1]

### I.    Relevant Background

POM of Pennsylvania, LLC, t/d/b/a Pace-O-Matic, and Savvy Dog Systems, LLC (collectively "POM Parties"), commenced this action against Pennsylvania Skill Games, LLC ("PSG") in May 2018, asserting claims of trademark infringement, breach of contract, and declaratory relief (ECF No. 1). In the applicable complaint, the POM Parties allege that PSG's use of "PENNSYLVANIA SKILL" and its stylized form (collectively "Marks") violated Section 43(a) of the Lanham Act, 15 U.S.C. § 1125 *et seq.*, Pennsylvania's Unfair Trade Practices and

---

[1] In accordance with the provisions of Section 636(c)(1) of Title 28, United States Code, I, the parties voluntarily consented to having a United States Magistrate Judge conduct all proceedings in this case.

Consumer Protection Law, 73 Pa. Stat. and Cons. Stat. Ann. § 201-1 *et seq.* and the Pennsylvania

Trademark Act, 54 Pa. Stat. and Cons. Stat Ann. § 1101, *et seq.*  They also allege that PSG engaged

in common law trademark infringement and common law unfair trade competition (ECF No. 29).

They also seek a determination of the validity and enforceability of the Equipment Purchase

Agreement ("EPA"), alternatively pleading theories of breach of contract and quantum meruit/

unjust enrichment (*id.*)

PSG subsequently commenced an action by filing a Complaint against Pace-O-Matic, Inc.

and Miele Manufacturing, Inc. ("Miele") at Civil Action No. 2:18-cv-941, which it later amended

(ECF No. 87; Civ. A. No. 2:18-cv-941).  PSG also asserts an interest in "PENNSYLVANIA

SKILL" and its stylized form.  It makes claims for false designation of origin and false advertising

under Section 43(a) of the Lanham Act as well as common law trademark infringement and

common law unfair trade competition (Civ. A. No. 2:18-cv-941 at ECF No. 1).  PSG further

pleaded claims for breach of contract, interference with contractual and prospective business

relations, and civil conspiracy[2] (ECF No. 87; Civ. A. No. 2:18-cv-941 at ECF No. 1).

The two cases were consolidated in August 2018 (Civ. A. No. 2:18-cv-941 at ECF No. 1).

The consolidated actions proceeded through motions practice and discovery (ECF No. 93).

Presently before the Court is the POM Parties' motion for summary judgment[3] (ECF No.

122).  Following PSG's response to the POM Parties' Concise Statement of Material Facts, the

POM Parties moved to strike for failure to comply with Local Rule of Civil Procedure 56(c) (ECF

No. 137).  The Court granted the POM Parties' motion in part (ECF No. 146), after which PSG

---

[2] In its Counterclaim, PSG pleads similarly many of these claims: violations of Section 43(a) of the Lanham Act for false designation of origin and false advertising, common law trademark infringement, breach of contract, and common law unfair trade competition (ECF No.30).

[3] The POM Parties moved for summary judgment on all trademark and unfair competition, copyright, contract, and commercial claims as well the count for declaratory judgment (ECF No. 123).  There are no copyright claims in either the POM Parties' Amended Complaint or PSG's Amended Complaint. The Court also notes that the POM Parties have made no arguments as to PSG's false advertising claim or their own claim for quantum meruit/ unjust enrichment.

supplemented its responsive concise statement of material facts (ECF No. 147). The POM Parties replied thereafter (ECF No. 148). The matter is now ripe for disposition.

## II.    Facts[4]

This case arises from an ownership dispute over the Marks following the erosion of a business relationship between the POM Parties and PSG. Each party is involved in the skill game business in Pennsylvania. Pace-O-Matic designs skill games (ECF No. 122-16 at 63-64). Miele is Pace O-Matic's exclusive distributor[5] (*id.* at 63). PSG is an operator (*id.* at 28-29). As an operator, PSG "place[s] machines, purchase[s] machines, [and] negotiate[s] machines for locations" (*id.*) Savvy Dog sometimes does business as Pace-O-Matic (ECF No. 122-41).

In 2007, Pace-O-Matic began developing a skill game for Pennsylvania (ECF No. 122-16 at 26-27). It labeled this project "Pennsylvania Skill Game," which Michael Pace, its owner, described as a "generic" name (*id.*) He had hoped that prior to the game going to market he would be able to "come up with a better name" (*id.* at 27).

Pace-O-Matic sold its first games in Pennsylvania in 2012[6] (*id.* at 30-31). Later that year, its employees began brainstorming possible names for its Pennsylvania skill game (ECF No. 122-9). "Pennsylvania Skill" was not among the original twenty-four names proposed (*id.*) Even so, its employees did use various forms of "Pennsylvania Skill" in internal emails to identify the software it was creating specifically for the Pennsylvania market (ECF No. 122-10).

---

[4] The parties are reminded that the purpose of concise statements of material facts is to determine whether there is an issue of material fact. It is not a place to argue legal conclusions or move to strike. *See* Fed. R. Civ. P. 56; LCvR 56. The facts here are derived almost entirely from the record given that the parties seemingly dispute almost every issue of fact.

[5] Despite Miele being described as the exclusive distributor, there are times Pace-O-Matic sold directly to PSG (ECF No. 124-1 at 95).

[6] The games were not shipped until September 2013, and there is no reference to "Pennsylvania Skill" anywhere on the invoice (ECF No. 122-11). An unstylized "Pennsylvania Skill" does appear on the play screen, however (ECF No. 122-63).

Because Pace-O-Matic wanted a determination as to whether its newly developed software (402.44) was legal, Wayne V. DeLuca, Esq. approached Albert Unis III ("Unis III") on behalf of Pace-O-Matic to see whether he might be willing to engage in a "friendly pickup" (ECF No. 122-12).  Attorney DeLuca had previously represented Unis III (ECF No. 122-24 at 48-49).[7]  In fact, he knew from his prior representation that Unis III was a vendor of games in Beaver County (*id.*)  Unis III agreed to assist (ECF Nos. 122-22 at 94, 110; 135-19).

Unis III then inquired and was given permission to place the game in the American Italian Club in Ambridge, Pennsylvania (ECF No. 122-22).  After securing the necessary permits, he took the game to the American Italian Club, and turned it on (ECF Nos. 122-22 at 94, 109-110; 135-19).  Unis III testified that he was willing to do so after a conversation with Ryan Wood ("Wood"), the Account Executive for Pace-O-Matic (ECF Nos. 122-22 at 98; 122-28 at 7).  According to Unis III, Wood advised him that in turn, Pace-O-Matic would pay for any litigation expenses that resulted from determining whether Pace-O-Matic's software was legal (ECF Nos. 122-22 at 98).  Wood denies that PSG helped Pace-O-Matic enter the market in Pennsylvania (ECF No. 122-28 at 25-26).

On November 19, 2013, this game was seized by agents of the Pennsylvania Bureau of Liquor Control Enforcement (ECF No. 122-14).  Pace-O-Matic timely petitioned for its return (*id.*)  The Honorable Harry Knafelc of the Court of Common Pleas of Beaver County ultimately granted Pace-O-Matic's petition, finding that the games on the machine were games of skill rather than games of chance (*id.*)  As a result, it was not considered a gambling device per se and not

---

[7] Indeed, at various times relevant here, Attorney DeLuca represented and advocated for the interests of Unis III, Pace-O-Matic, and Miele (ECF Nos. 122-16 at 30-31; 122-24 at 31-32, 48-49).

considered unlawful under Pennsylvania law (*id.*)  The Memorandum Opinion and Order calls the system "Pennsylvania Skill game"[8] (*id.* at 10-14).

Following the game's adjudication, Attorney DeLuca asked Michael Pace to consider doing business with Unis III (ECF No. 122-16 at 33).  He also encouraged Michael Pace to give Unis III a discount (ECF No. 122-28 at 11-12).

In January 2015, Pace-O-Matic began designing a stylized logo for "PA Skill" (ECF No. 122-13 at 4-5).  For compliance purposes, it planned to place "Pennsylvania Skill" along with version "SKL 402.44 PEN" on every display (*id.*)  Around the same time, Pace-O-Matic and Miele entered into an agreement with Albert Unis and Affiliates ("AUA"), Unis III's business, for the sale of terminals to be placed in Beaver County (ECF No. 135-10 at 7).  As part of the agreement, Unis III agreed to "[p]urchase 25 Terminals with [the] first order and a minimum of 10 terminals per month three months after delivery of the first order" (*id.*)  Pace-O-Matic and Miele also agreed "not [to] sell terminals in Beaver County unless AUA refused to place terminals in the location in question" and to "support AUA with agreed upon marketing efforts" (*id.*)  Despite operating as AUA for purposes of the January 2015 agreement, Unis III had previously used "PA Skill Games" in other agreements dating as far back as 2010 (ECF No. 135-19).

On January 14, 2015, Wood sent Unis III the following email,

> Our agreement with you is to give you all the freedom you want for your locations. I will honor our deal and even take it one step further and give you the "First right of refusal" in Beaver County.  Meaning if a location/ operator calls us about machines I will call you first to make sure you have the inventory to service that account or plan to buy it to take care of that account. . . . My goal is for you to be as successful as possible because we do not make any money unless you do.  I ordered Countertops today and they should be here by next week.  I look forward to doing an enormous amount of business with you.  Finally, I want to mention that

---

[8] Attorney DeLuca testified, "I heard of Pennsylvania Skill before Albert Unis got involved. When we -- that was -- when we first -- when this game was first marketed, you know, PA Legal, PA Skill Game, that's a very generic term in the gaming industry" (ECF No. 122-24 at 102).

5

I have not offered any deal such as yours to anyone else in the state and do not plan too [sic]. Please keep this between us.

(ECF Nos. 122-15). In an internal email, Wood described Unis III as "the customer in Beaver County who is putting out all the machines" (ECF No. 135-34).

Pace-O-Matic and Miele entered into an Equipment Purchase Agreement with PSG on May 20, 2015 (ECF No. 122-32). PSG is a business owned by Albert Unis IV ("Unis IV"), Unis III's son (ECF No. 122-22 at 19-20). The EPA provides:

> This Equipment Purchase Agreement ("Agreement") is entered into on this 20th day of May, 2015, by and between Pace-O-Matic, Inc. and Miele Manufacturing (hereinafter collectively referred to as ("Seller")) and Pennsylvania Skill Games, LLC ("Buyer").
>
> Whereas, Seller is a manufacturer of software, electronic components and hardware for Pennsylvania compliant skill games; and
>
> Whereas, Seller has successfully litigated the legality of the Pennsylvania skill game ("Compliant Terminals") in the Beaver County Court of Common Pleas docket number MD-965-2013 (In re Pace-O-Matic, Inc. Equipment Terminal ID no. 142613); and
>
> Whereas, Buyer specifically seeks to purchase only Compliant Terminals or Hardware Components that contain the above referenced skill games and software plays which were the subject of the above-referenced litigation; and
>
> Whereas, Seller desires to sell Compliant Terminals or Hardware Components and software plays to Buyer; and
>
> Whereas, Buyer desires to purchase Compliant Terminals or Hardware Components and software plays from Seller.
>
> NOW THEREFORE, in consideration of the mutual promises, covenants and conditions contained in this Agreement, the parties agree as follows:
>
> Payment and Terms
>
> 1. Subject to the terms and conditions of this Agreement the Seller shall sell, transfer, and assign the Buyer Compliant Terminals and/or Hardware Components at a mutually agreeable price. The initial prices at the time of the effective date of this Agreement is as follows:

6

• A. Flex1 Compliant Terminal complete $2,495,00
• B. HD Compliant Hardware Component complete $995.00

Prices are subject to change due to changes in material costs of the Compliant Terminals and Compliant Hardware Components[.]

2. Seller will sell software plays to Buyer at an initial cost of $1,250.00 for a "full or 1.0" set of software plays and $675.00 for a "1/2 or .5" set of software plays. Prices for software plays are subject to change in the future.

3. Seller will use all reasonable efforts to make sure Buyer has access to software plays for its Compliant Terminals and Hardware components as long as Seller is in the market.

4. Seller grants to Buyer a "Right of First Refusal" relating to the placement of Compliant Terminals or Hardware Components and selling sets of software plays in Beaver County, Pennsylvania. If Buyer opts not to place Compliant Terminals in certain Beaver County locations then Seller, through another vendor, may place the above described Compliant Terminals in those locations. Seller agrees not to sell the other vendor Compliant Terminals at prices lower than the Buyer pays. Seller also agrees to make sure that the other vendor does not offer sets of software plays to the location at prices below the market price at that time.

5. Seller expressly agrees not to indemnify and hold harmless the Buyer from any and all claims, causes of action, complaints or prosecutions arising from or related to the Compliant Terminals or Hardware Components.

6. Seller will support Buyer with previously agreed marketing efforts.

7. Buyer may assign its rights and obligations under this Agreement with the written consent of Seller which shall not be unreasonably withheld.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date above written.

(ECF No. 122-32). The EPA does not expressly grant Pace-O-Matic or Miele the right to assign any rights or obligations under the EPA (*id.*)

As of this time, PSG had agreed to place 200 compliant terminals in Beaver County by the end of 2015 (ECF No. 124-2 at 28-29). PSG was to become the lead operator of Pace-O-Matic Games in Beaver County (*id.* at 131). After the agreement was signed, however, it became

7

apparent to Pace-O-Matic that PSG did not have the financial resources to become the lead operator in Beaver County (*id.* at 32-33).

Despite the language in the EPA, Louis Miele, President of Miele, testified that Miele has never asked its vendors where they planned to place their terminals (ECF Nos. 122-17 at 24-25, 59-60; 122-33 at 203-05). The reason being, he explained, is that this information is confidential (*id.*) Furthermore, doing so, President Miele opined would "put [him] out of business" (ECF No. 122-17 at 24-25). That said, he later testified that he had always intended to comply with the EPA (ECF No. 122-33 at 57). Although Miele does not ask its operators or vendors where they placed their games, if the operators properly registered their devices, that information is available through RouteBoost (ECF No. 122-33 at 206-07). Account Executive Wood similarly testified that Pace-O-Matic has never asked where its games are being placed (ECF No. 122-28 at 22). As a result, other businesses in Beaver County began purchasing Pace-O-Matic terminals and placing them in Beaver County[9] (ECF No. 122-43 at 22, 45-46).

During this period, Attorney DeLuca represented PSG and sought to ensure Pace-O-Matic was complying with PSG's right of first refusal (ECF Nos. 124-3 at 91; 135-18). Additionally, when Pace-O-Matic discovered that a customer in Ohio had games placed in Beaver County, it had them removed (ECF No. 124-3 at 74-75).

Between 2015 and 2018, PSG placed over fifty orders with Miele and its enterprise expanded not only into Beaver County but also Lawrence County as well (ECF Nos. 122-67; *see* 135-38).

---

[9] Both James McDanel and Michael Mangerie testified in their respective depositions that they purchased skill games directly from Miele and placed them in Beaver County (ECF Nos. 122-77 at 13, 34; 122-78 at 14-15, 23-25).

In March 2016, PSG registered the domain pennsylvaniaskillgames.com (ECF No. 122-31).  In 2017, PSG paid for radio and print advertising for "Pennsylvania Skill" (ECF Nos. 122-54; 122-55).

On February 14, 2018, Greg Cline, the General Counsel of POM of Pennsylvania d/b/a Pace-O-Matic, the successor-in-interest to Pace-O-Matic, Inc., wrote to PSG as follows:

> Please note, that any "Right of First Refusal" that your client may have with Pace-O-Matic has either been abandoned or already defined [sic] due to the prior marketing inactivity by your client or ended due to the substantial amount of arrearage that your client owes to my client.
>
> The parties did agree to an [EPA] on May 20, 2015, which did contain a right of first refusal to place Pace-O-Matic's Pennsylvania Skill terminals in Beaver County.  However, that right of first refusal was based on the implicit promise that PSG would be the lead distributor in Beaver County.  Simply put, your client has failed to live up to that promise.  As a result, paragraph 4 of the [EPA] states that if your client "opts not to place Compliant Terminals in certain Beaver County locations, then Seller, through another vendor, may place the above described Compliant Terminals in those locations." As has been discussed by my client with your client on several occasions, Pace-O-Matic has been disappointed by PSG's failure to become the lead distributor in Beaver County and been diligent in placing Pennsylvania Skill terminals in locations since PSG was given this opportunity in 2015.  We have investigated whether this particular location (Giles Plaza News) was a site that did not have any skill games in place before ProATM, LLC solicited their business.  We have determined that your client did not have any terminals at the Aliquippa location before ProATM placed the terminals at issue in your letter over a year ago.  As a result, this location was obviously a place where your client opted to not place terminals at, even though it had the opportunity to do so for several years.  Therefore, under the letter of the right of first refusal, ProATM placement at that location is proper because PSG had given up the Aliquippa location.

(ECF No. 122-35).  After specifying that PSG owed the POM Parties more than $8,000, Attorney Cline concluded his letter by stating: "My client requests that . . . you comply with the terms of the Equipment Purchase Agreement both with respect to the right of first refusal and payment to Pace-O-Matic for equipment purchased" (*id.*)

Counsel for PSG responded to Mr. Cline's letter by providing a check for the amount due (ECF No. 135-23). A month later, Daniel Warren responded on behalf of Pace-O-Matic that "the account is clean," specifically noting that PSG owed Pace "$0" (ECF No. 135-12).

On May 30, 2018, PSG filed trademark applications in the US Patent Office for the Word Mark, serial No. 87856441, and for the combination mark and design (Stylized Mark), serial No. 87856442, claiming a first use in commerce of the Marks as of June 1, 2015 (ECF Nos. 122-50; 135-15). The stylized mark is described as:

> The color(s) red, white, blue, black, brown, beige, and copper is/are claimed as a feature of the mark. The mark consists of [t]he word "Pennsylvania" begins in a lower left portion of the mark, and continues to an upper right portion of the mark. The lettering appears three dimensional, with white letters having black visible sides appearing against a red background. The word "Skill" appears in a lower right portion of the mark. The lettering appears three dimensional, with red lettering having white visible sides appearing over a black background. A cracked copper colored bell appears in the upper left portion of the mark, suspended from a brown wooden frame. The background is beige colored paper. A top border is blue with white stars. A bottom border has red and white stripes.

(ECF No. 122-50 at 17).

Three months later, Savvy Dog, doing business as Pace-O-Matic, signed and filed two trademark applications with the United States Patent and Trademark Office with knowledge of PSG's claims and prior filings of record (ECF Nos. 122-51; 122-52). Serial No. 87941545 is for the word mark "PENNSYLVANIA SKILL" and Serial No. 87941440 is for the stylized mark (ECF No. 122-51). It describes the stylized mark as follows:

> The mark consists of the word "Pennsylvania" which begins in the lower left portion of the mark, and continues to an upper right portion of the mark. The lettering appears three dimensional. The word "Skill" appears in the lower right portion of the mark. The lettering appears three dimensional. A cracked bell appears in the upper left portion of the mark, suspended from a wooden frame. The top border has stars. The bottom border has stripes.

(ECF No. 122-52). Savvy Dog asserted a first use date of 2013 (*id.*)

10

In October, the POM Parties sent its operators its "Terms and Conditions & Authorizations" for the use of its Mark "Pennsylvania Skill" (ECF No. 135-14).

In June 2019, Mr. Cline of Pace-O-Matic told Miele to raise PSG's prices by almost 60% (ECF No. 122-33 at 61-67).

The PSP began seizing games in 2020 under the auspices that they are illegal (ECF No. 135-26; 135-27).  On February 10, 2020, Pace-O-Matic refused to sell machines to PSG (ECF No. 135-31).  Unis IV testified that when Pace-O-Matic stopped selling to PSG, PSG was conducting business in Lawrence and Beaver counties (ECF No. 122-23 at 253).

PSG has submitted sworn affidavits from three individuals who associate "Pennsylvania Skill Games" with PSG, each of whom stated that they saw or played a skill game with that branding in 2011 (ECF No. 135-16).[10]  On the other hand, Robert McDanel of GMR Games/ Tri-State Vending, first became familiar with "Pennsylvania Skill" or "Pennsylvania Skill Games" in 2016 through Miele (ECF No. 122-79 at 9, 33-34, 42-45).  Richard Bigrig, President of GMR Games, believed the manufacturer of Pennsylvania Skill was Miele (ECF No. 122-79 at 41-43).  Robert McDaniel of MAC Vending purchased Pennsylvania Skill machines from the POM Parties and had not heard of Unis III or Unis IV (ECF Nos. 123-69 at 33-34).

III.    **Standard of Review**

The Federal Rules of Civil Procedure provide that summary judgment must be granted if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

---

[10] Unis IV testified that "Pennsylvania Skill" was first used on a Pace-O-Matic game (ECF No. 122-23 at 177).

The moving party bears the initial burden of identifying evidence which shows the lack of a genuine issue of material fact. *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Id.* An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court of Appeals has held that "where the movant bears the burden of proof at trial and the motion does not establish the absence of a genuine factual issue, the district court should deny summary judgment even if no opposing evidentiary matter is presented." *Nat'l State Bank v. Fed. Rsrv. Bank of New York*, 979 F.2d 1579, 1582 (3d Cir. 1992).

In following this directive, a court must take the facts in the light most favorable to the non-moving party and must draw all reasonable inferences and resolve all doubts in that party's favor. *Hugh v. Butler Cty. Fam. YMCA*, 418 F.3d 265, 267 (3d Cir. 2005); *Doe v. Cty. of Centre, Pa.*, 242 F.3d 437, 446 (3d Cir. 2001).

## IV.     Discussion

### A.     False Designation of Origin[11] in Violation of the Lanham Act

The POM Parties allege that PSG falsely used the POM Parties' Marks in violation of Section 43(a) of the Lanham Act (ECF No. 29 ¶¶ 25-43). PSG's counterclaim states that it owns the Marks (Civ. A. No. 2:18-cv-941 at ECF No. 1).

The Lanham Act reads in relevant part:

---

[11] As already stated, the POM Parties have not moved for summary judgment on PSG's false advertising claim. A false advertising claim is subsumed by a claim for false designation where the claim depends on the association between the company and the mark. *Parks LLC v. Tyson Foods, Inc.*, 863 F.3d 220, 226 (3d Cir. 2017) (As the Third Circuit remarked, "[plaintiff's] false advertising claim fails because it is essentially a false association claim in

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(A). "This provision is "the foremost federal vehicle for the assertion of . . . infringement of . . . unregistered marks, names, and trade dress[.]" *Parks LLC v. Tyson Foods, Inc.*, 863 F.3d 220, 226 (3d Cir. 2017) (quoting 5 McCarthy on Trademarks § 27:9).

To state a false designation or false assertion claim, a plaintiff has the burden of proving (1) it has a valid and legally protectable mark; (2) it owns the mark; and (3) the defendant's use of the mark to identify goods or services causes a likelihood of confusion as to the origin of the goods or services. *Id.* at 230. "Even when those elements are satisfied, relief is limited in scope to where 'market penetration is significant enough to pose the real likelihood of confusion among the consumers in that area.'" *Id.* (quoting *Charles Jacquin Et Cie, Inc. v. Destileria Serralles, Inc.*, 921 F.2d 467, 472 (3d Cir. 1990)).

1.      Valid and Legally Protectable Mark

The POM Parties have failed to meet their burden to establish that they had a valid and legally protectable mark and that they own these marks. The first element is satisfied when, "the mark at issue is federally registered and has become incontest[a]ble" or it is by its nature distinctive. *PB Brands, LLC v. Patel Shah Indian Grocery*, 331 F. App'x 975, 979 (3d Cir. 2009) (quoting *Commerce Nat'l Ins. Servs., Inc. v. Commerce Ins. Agency, Inc.*, 214 F.3d 432, 438 (3d

---

disguise"). PSG's false advertising claim is based on the POM Parties purportedly selling illegal software (Civ. A. No. 2:18-cv-941 at ECF No. 1). As such, this claim is not subsumed within PSG's claim for false designation.

Cir. 2000)).  Where, as here, a mark has not been federally registered, the Court must determine whether the mark is distinctive.  *Parks LLC*, 863 F.3d at 230-31.

A mark is inherently distinctive if it "may be fairly characterized as arbitrary, fanciful, or suggestive."  *Maduka v. Tropical Nats. Ltd.*, 409 F. Supp. 3d 337, 352 (E.D. Pa. 2019) (*Commerce Nat'l Serv.*, 214 F.3d at 438 n.5).  "Such inherently distinctive marks include ones that are arbitrary or fanciful, such as APPLE for computers or SHELL for gasoline . . . as well as ones that are suggestive of a product's function but not descriptive such as PENGUIN for freezers or SAMSON for weight training machines."  *Parks LLC*, 863 F.3d at 231.  "A mark is 'suggestive' if it 'requires consumer imagination, thought, or perception to determine what the product is.'"  *Id.* (quoting *A & H Sportswear, Inc. v. Victoria's Secret Stores*, 237 F.3d 198, 221-22 (3d Cir. 2000)).  Another example of a suggestive trademark is "COPPERTONE."  *A & H Sportswear, Inc.*, 237 F.3d at 221.

"On the other hand, a mark is 'descriptive' if it 'convey[s] an immediate idea of the ingredients, qualities[,] or characteristics of the goods.'"  *Maduka*, 409 F. Supp. 3d at 352 (quoting *A & H Sportswear, Inc.*, 237 F.3d at 221-22).  One example is "Security Center."  *A & H Sportswear, Inc.*, 237 F.3d at 221.  Accordingly, "[i]f the mental leap between the word and the product's attributes is not almost instantaneous, this strongly indicates suggestiveness, not direct descriptiveness.'"  *Id.* (quoting McCarthy on Trademarks and Unfair Competition § 11:67 (5th ed.)).

The phrase "Pennsylvania Skill" is descriptive.[12]  It describes the type of game that the person is playing or can play.  When a mark is "descriptive," it can receive protection only with

---

[12] The POM Parties argue that their Marks are arbitrary or suggestive, but in making their argument they rely on the stylized Mark only (ECF No. 123 at 10).  It is the Court's understanding that both the POM Parties and PSG are pursing claims under the Lanham Act for both Marks.  Having found that the POM Parties have failed to meet their burden as to "Pennsylvania Skill," the Court takes no position whether the stylized form should be classified differently.

proof that the mark has achieved some "secondary meaning." *Flynn v. Health Advocate, Inc.*, 169 F. App'x 99, 101 (3d Cir. 2006).  The evidentiary burden to establish a secondary meaning is greater.  *Id.* at 101.  A "'[s]econdary meaning exists when the mark 'is interpreted by the consuming public to be not only an identification of the product or services, *but also a representation of the origin of those products or services*.'"  *Id.* at *1 (quoting *Commerce Nat'l Ins. Servs, Inc.*, 214 F.3d at 438) (emphasis added).  A plaintiff bears the burden of proving that the Marks have a secondary meaning.  *See Giannone v. Giannone*, 429 F. Supp. 3d 34, 39 (E.D. Pa. 2019).

The Third Circuit has set forth the following non-exhaustive factors for determining secondary meaning:

> (1) the extent of sales and advertising leading to buyer association; (2) length of use; (3) exclusivity of use; (4) the fact of copying; (5) customer surveys; (6) customer testimony; (7) the use of the mark in trade journals; (8) the size of the company; (9) the number of sales; (10) the number of customers; and, (11) actual confusion.

*Parks LLC*, 863 F.3d at 231 (quoting *Commerce Nat'l Ins. Servs, Inc.*, 214 F.3d at 438).  These are known as the *Commerce* or *Commerce National* factors.

### a.   Extent of Advertising

The POM Parties' sales and advertising efforts did not rise to the level of leading to buyer association.  The POM Parties have neither provided the amount they spent in advertising or their extent of sales.  This is problematic because "[s]econdary meaning is generally 'established through extensive advertising which creates in the minds of consumers an association between the mark and the provider of the [products or] services advertised under the mark.'"  *Parks LLC*, 863 F.3d at 231.  A mark used for an extensive time period in a prominent advertising campaign can also be sufficient.  *See id.* The POM Parties have identified no facts in the record that establishes

such advertising.  Instead, the POM Parties have only identified a handful of buyers who associate "Pennsylvania Skill" with the POM Parties.  For these reasons, for purposes of their motion, this factor weighs against a finding of a secondary meaning.

### b.  Length and Exclusivity of Use

Despite their use of "Pennsylvania Skill" intermittently internally since 2012 and publicly since 2015, there are facts of record that suggest that the POM Parties' use has not been exclusive. As the record reflects, PSG used the same Mark and at least five other companies used "Pennsylvania Skill" (ECF No. 122-22 at 47).  Even President Pace admitted that "Pennsylvania Skill" is quite a generic name.  This evidence undermines their claim of the Mark's exclusivity, as does the fact that the POM Parties have not "cited to any evidence to attempt to quantify how widespread the name was known over those years."  *Parks LLC*, 863 F.3d at 232.  This factor similarly weighs against finding a secondary meaning.

### c.  Evidence of Copying

The record is unclear whether PSG or the POM Parties first used the phrase "Pennsylvania Skill" and which party brought it to the business venture.  As the nonmoving party, PSG is entitled to all reasonable inferences on this issue. Thus, the Court cannot conclude based on the record that PSG copied the POM Parties.  This factor also cuts against a finding of a secondary meaning.

### d.  Customer Surveys, Testimony, and Trade Journals

In *Parks LLC v. Tyson Foods, Inc.*, the Third Circuit described two surveys typically used in trademark litigation to demonstrate the likelihood of confusion, the *Ever-Ready* and the *Squirt* surveys.  *See Park LLC*, 863 F.3d at 232-33.  It is not clear from the record that the POM Parties employed either methodology.  It is also problematic that the POM Parties did not provide customer testimony surveys or data relating to the size of its client base to support its secondary

16

meaning claims. *See Flynn*, 169 F. App'x at 102 (only a few customer affidavits along with thank you notes does not create a genuine issue for trial). *See also Park LLC*, 863 F.3d at 135 ("Establishing that two marks are similar does not necessarily lead to any valid conclusion about whether either of the two has secondary meaning"). The POM Parties have also offered no evidence about trade journal publications. These factors similarly weigh against the POM Parties' contention that they are entitled to summary judgment in their favor.

### e. Size of the Company and Number of Sales and Customers

As for this factor, the Third Circuit recently wrote,

> The size of a company, its total sales, and the size of its customer base can also be probative of secondary meaning because the jury is entitled to draw the logical inference that '[t]he larger a company and the greater its sales, the greater the number of people who have been exposed to [the] symbol used as a trademark, and the greater the number of people who may associate [that] symbol with a company or source with which they should be familiarized.

*Parks LLC*, 863 F.3d at 235 (quoting 2 McCarthy on Trademarks § 15:49). The POM Parties assert that they have 215 operators in Pennsylvania, but this fact, without further context, is not probative of the question.[13] *See Parks LLC*, 863 F.3d at 235 (raw numbers without context are not probative). There is also no evidence in the record setting forth number of sales and the size of the companies. Given these shortcomings, these factors cut against a finding of secondary meaning.

### f. Actual Confusion

At first blush, there appears to be some confusion about "Pennsylvania Skill" given the conflicting testimony and affidavits. *But see id.* (Declarations from friendly sources might be "self-serving and of little probative value"). Even so, the POM Parties have pointed to no evidence

---

[13] In support of this fact, the POM Parties reference Exhibit JJJ, which was to be filed under seal. Upon review of the record, it does not appear to have been filed. As already stated, though, this fact without context is insufficient.

that any customers were *actually* confused. At best, this factor slightly supports a secondary meaning.

### g. Conclusion about Secondary Meaning

Weighing these factors on summary judgment, the Court is not persuaded that the POM Parties have put forth sufficient evidence at this time to establish that "Pennsylvania Skill" acquired a secondary meaning.

### 2. Ownership of Mark

To satisfy the second element of a Section 43(a) claim, "[a] plaintiff must establish secondary meaning in a mark *at the time and place* that the defendant began use of the mark." *King of Prussia Dental Assocs., Ltd v. King of Prussia Dental Care, LLC*, Civ. A. No. 19-1688, 2019 WL 2240492, at *10 (E.D. Pa. May 23, 2019) (quoting *Commerce Nat'l Ins. Servs., Inc.*, 214 F.3d 432 at 438) (emphasis added). *See Commerce Nat'l Ins. Servs, Inc.*, 214 F.3d at 438 (quoting *Ford Motor Co. v. Summit Motor Prods.*, 930 F.2d 277, 292 (3d Cir. 1991) ("With respect to ownership of an unregistered mark, the first party to adopt a mark can assert ownership so long as it continuously uses the mark in commerce"). In general, the more descriptive a term, the greater the evidentiary burden to establish secondary meaning. *Id.*

The POM Parties have not submitted sufficient evidence that the Mark acquired a secondary meaning before their joint venture with PSG nor have they proffered sufficient evidence on summary judgment to show that the Mark had a meaning separate from their venture with PSG. *See Engage Healthcare Comms., LLC v. Intellisphere, LLC*, Civ. A. No. 12-787, 2018 WL 10339218, at *11-12 (D.N.J. Nov. 29, 2018) (explaining the difference between secondary meaning and first use date). Thus, the record evidence does not establish that the POM Parties own the Mark.

18

The Court does not reach the third factor, likelihood of confusion. This is because the POM Parties have not demonstrated that they have a valid and legally protectable mark or ownership of that mark. As a result, the Court cannot and does not reach the third factor.

For these reasons, the POM Parties have not shown that they are entitled to summary judgment in their favor with respect to the Lanham Act claims.[14]

B.    Pennsylvania's Unfair Trade Practices and Consumer Protection Law, Common Law Trademark Infringement and Unfair Competition, and Pennsylvania Trademark Act Claims

The standards for proving a claim under the Pennsylvania Unfair Trade Practices and Consumer Protection Law, common law trademark infringement, common law unfair competition, and the Pennsylvania Trademark Act are substantially similar as those that apply to the Lanham Act. *See King of Prussia Dental Assocs., Ltd.*, 2019 WL 2240492, at *8-*13; *Scott Fetzer Co. v. Gehring*, 288 F. Supp. 2d 696, 703 (E.D. Pa. 2003). Thus, the POM Parties' motion for summary judgment on these counts is denied for the reasons discussed in Section (IV)(A).

C.    Contract Claims[15]

The POM Parties also seek judgment in their favor on their declaratory judgment claim as well as the pending breach of contract claims. The POM Parties argue that (1) no contract existed between PSG and POM of Pennsylvania or Savvy Dog; (2) PSG cannot prove the existence of an enforceable contract that is supported by adequate consideration and contains sufficiently definite material terms; and (3) the POM Parties did not breach the EPA by selling non-Compliant Terminals or by failing to act in accordance with the right of first refusal (ECF No. 123 at 20-21).

---

[14] It is worth noting that at trial, the *Commerce* factors will likely turn on the credibility of each party's evidence and whether there was an agreement as to the usage of the Marks. *See Giannone*, 429 F. Supp. 3d at 39. Credibility cannot be assessed by the Court when resolving a summary judgment motion. *Id.* at 37 ("In cases that turn on credibility determinations, summary judgment is inappropriate").

[15] In Count IV of the Complaint, ECF No. 29 at Civ. A. No. 18-722, the POM Parties seek a declaratory judgment determining the rights and obligations with respect to the Marks and the validity and enforceability of the EPA. (*Id.* ¶ 56).

Alternatively, they seek an award of $4,490 for PSG's breach of the EPA (*id.* at 33).  The Court addresses each of these arguments in turn.

        1.       PSG's Contract Claim against POM of Pennsylvania and Savvy Dog

As a review of the agreement confirms, neither Savvy Dog nor POM of Pennsylvania are parties to the EPA.  They are not identified as either the "Seller" or the "Buyer" or otherwise referenced in any way.  Neither signed the agreement.  As a result, the POM Parties assert that they cannot be held liable for any alleged breach of the EPA.

That said, there is confusion in the record about whether one or both have an interest in the agreement.  Only parties that have an interest in a contract can sue for its enforcement.  *See Moore v. Mulligan Mining, Inc.*, Civ. A. No. 1497 WDA 2018, 2019 WL 5212398, at *6 (Pa. Super. Ct. Oct. 16, 2019) ("Before a party is entitled to recover on a lease or contract, the burden is on him to show that he has an interest therein").  In their Amended Complaint, both POM of Pennsylvania and Savvy Dog seek enforcement of the EPA (ECF No. 29 ¶ 61).

Further, Mr. Cline, counsel for one or all of the POM Parties, described POM of Pennsylvania as an entity that does business as Pace-O-Matic and that is a successor-in-interest to Pace-O-Matic, Inc. (ECF No. 122-35).  There is also evidence in the record suggesting that Savvy Dog does business as Pace-O-Matic (ECF No. 122-41).  The Court further notes that one of the Marks in dispute in this case is "Pennsylvania Skill," which was transferred to Savvy Dog in 2017 for $5.00 (ECF No. 122-59 at 2).

Although a party who is not a signatory to a contract typically cannot be held liable for any breach, there are exceptions to the rule , including when an entity is a successor in interest or where a de facto merger occurred.  *See Fizzano Bros Concrete Prods., Inc. v. XLN, Inc.*, 42 A.3d 951, 969 (Pa. 2012); *Darbeh v. QBE Specialty Ins. Co.*, Civ. A No. 19-05706, 2020 WL 950905, at *3

(E.D. Pa. Feb. 26, 2020); *Donohue v. Custom Mgmt. Corp.*, 634 F. Supp. 1190, 1201 (W.D. Pa. 1986) ("It is a general rule in contract law that no person can be sued for breach of contract unless he is a party to the contract"). Here, there is evidence to suggest that POM of Pennsylvania and Savvy Dog had some interest in the contract. Construing all facts in favor of the nonmoving party as it must, the Court denies summary judgment on this issue.

    2.  Existence of a Contract

  The POM Parties contend that the EPA does not constitute a valid and enforceable contract (ECF No. 123 at 21-29). "An enforceable contract has three elements: (1) a manifestation of an intent to be bound by the terms of the agreement, (2) sufficiently defined terms, and (3) an agreement supported by adequate consideration." *Ruggiero v. Nocenti*, __ F. Supp. 3d __, 2021 WL 3754599, at *5 (E.D. Pa. Aug. 25, 2021) (citing *Legendary Art, LLC v. Godard*, 888 F. Supp. 2d 577, 582 (E.D. Pa. 2012)). "The question of whether an undisputed set of facts establishes a contract is typically one of law, but where the facts are in dispute, the question is for the [trier of fact] to decide." *Id.* (quoting *Legendary Art, LLC*, 888 F. Supp. 2d at 582). "'The burden of proving the existence of a contract lies with the party relying on its existence.'" *Teva Pharm. Indus., Ltd. v. UnitedHealthcare Servs., Inc.*, Civ. A. No. 16-4870, 2018 WL 1898911, at *11 (E.D. Pa. Apr. 20, 2018) (quoting *Guzzi v. Morano*, Civ. A. No. 10-1112, 2013 WL 4042511, at *10 (E.D. Pa. Aug. 8, 2013)).

  Here, the POM Parties challenge only the second and third elements, contending that the EPA does not include sufficiently defined terms and is not supported by adequate consideration. (ECF No. 123).

### a.  Definiteness

The POM Parties contend that the EPA lacks the requisite definite terms to be enforceable (ECF No. 123).  When some terms are left open, a court may consider the conduct of the parties to determine whether there was a contract.  *Bethlehem Steel Corp. v. Litton Indus., Inc.*, 488 A.2d 581 (Pa. 1985); *Fleming Steel Co. v. Jacobs Eng'g Grp., Inc.*, 373 F. Supp. 3d 567, 584 (W.D. Pa. 2019).  Said differently, a contract need not state every term and "[w]here an essential term is missing or not clearly expressed, the court may infer the parties' intent from other evidence and impose a term consistent with it.'"  *Nicholas v. Hoffman*, 158 A.3d 675, 694 (Pa. Super. Ct. 2017). *See* 13 Pa. Stat. and Cons. Stat. Ann. § 2311 (Pennsylvania's Statute of Frauds).

Pennsylvania has adopted the Restatement (Second) of Contracts to determine whether an agreement includes sufficiently definite terms.[16]  *Fleming Steel Co.*, 373 F. Supp. 3d at 589-90. The Restatement (Second) provides as follows:

> (1) Even though a manifestation of intention is intended to be understood as an offer, it cannot be accepted so as to form a contract unless the terms of the contract are reasonably certain.

> (2) The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy.

> (3) The fact that one or more terms of a proposed bargain are left open or uncertain may show that a manifestation of intention is not intended to be understood as an offer or as an acceptance.

*Id.* (quoting Restatement (Second) of Contracts § 33 (1981)).  Thus, ambiguity alone does not render a contract unenforceable.  *Teva Pharm. Indus., Ltd.*, 2018 WL 1898911, at *11.

Moreover, an "agreement will be considered sufficiently definite if the parties reach an agreement and if there is an appropriate basis upon which the court can fashion a remedy."  *EBC,*

---

[16] "Whether terms are sufficiently definite is a question of law."  *Teva Pharma Indus., Ltd.*, 2018 WL 1898911, at *11.  "'The burden of proving the existence of a contract lies with the party relying on its existence.'"  *Id.* (quoting *Guzzi*, 2013 WL 4042511, at *10).

*Inc. v. Clark Bldg. Sys.*, Civ. A. No. 05-CV-01549, 2007 WL 4563518, at *4 (W.D. Pa. Dec. 21, 2007). Thus, even where an "agreement omits an essential term, such as price, [it] does not negate contract formation so long as the parties otherwise manifested their mutual assent to the agreement and the terms of that agreement were sufficiently definite." *Ruggiero*, 2021 WL 3754599, at *5.

The EPA expressly provides that Pace-O-Matic and Miele, the "Seller," is a manufacturer of software, electronic components, and hardware for Pennsylvania compliant skill games and wishes to sell to PSG, the "Buyer," "Complaint Terminals or Hardware Components and software plays." Further, it states that PSG desires to purchase these products from Pace-O-Matic and Miele. It provides that the Seller will sell these products at a "mutually agreeable price," and specifies the amount of the initial prices at the effective date of the agreement. Prices are noted to be subject to change. The Seller also agrees to use reasonable efforts to make sure that the Buyer has access to software plays as long as the Seller is in the market, and grants to Buyer a "Right of First Refusal" about placement of these products in Beaver County. In addition, the Seller agrees not to sell to other vendors at a price lower than what the Buyer pays.

For years after the EPA was executed, the parties engaged in a business relationship. Now that the parties' business relationship has eroded, the POM Parties contend that no contract ever existed and do so by challenging the EPA's definiteness (ECF No. 123). The Court finds, however, that the EPA adequately describes the respective rights and obligations of the parties. The Seller agreed to sell certain products to the Buyer at prices that were initially identified but subject to change.

Much of the POM Parties' argument centers on the purported ambiguity of the right of first refusal (*id.* at 24-25). The POM Parties clearly granted PSG a "Right of First Refusal" regarding placement of Compliant Terminals, Hardware Components, and software plays in Beaver County.

As the contract provides, if PSG opted not to place Compliant Terminals in certain Beaver County locations, only then may the POM Parties sell to another vendor.

To the extent any word or phrase could be construed as indefinite, the parties' course of dealings and course of performance can be used as a gap filler. *See Comm. Supply Corp. v. Iron Bow Techs., LLC*, Civ. A. No. 18-1374, 2021 WL 1176070, at *10 (W.D. Pa. Mar. 29, 2021). *See also* 13 Pa. Stat. and Cons. Stat. Ann. § 1303(d) ("A course of performance or course of dealing between the parties or usage of trade in the vocation or trade in which they are engaged or of which they are or should be aware is relevant in ascertaining the meaning of the parties' agreement, may give particular meaning to specific terms of the agreement and may supplement or qualify the terms of the agreement").

There are additional facts in the record to support a conclusion that based on the course of performance and prior course of dealings these words had a specific meaning to the parties. In correspondence to Unis III, Wood defined the term to mean "if a location/ operator calls us about machines I will call you first to make sure you have the inventory to service that account or plan to buy it to take care of that account" (ECF No. 122-15). Consistent therewith, when Pace-O-Matic learned that a customer in Ohio had games placed in Beaver County, it had them removed (ECF No. 124-3 at 74-74).

Furthermore, it is immaterial to the analysis that the POM Parties may have made a promise that they now assert they cannot keep.

For these reasons, the Court finds that the EPA was sufficiently definite.

> b.    *Consideration*

The Court similarly finds the POM Parties' argument about lack of consideration to be unavailing. "Consideration is 'an act, forbearance, or return promise bargained for and given in

24

exchange for the original promise.'" *See Ecore Int'l, Inc. v. Downey*, 343 F. Supp. 3d 459, 491 (E.D. Pa. 2018) (quoting *Mucci v. Home Depot*, Civ. A. No. 00-4946, 2001 WL 1609851, at *3 (E.D. Pa. Dec. 18, 2001); *City of Riviera Beach Gen. Emps. Ret. Sys. v. Myllan N.V.*, Civ. 2:15-cv-821, 2016 WL 4367549, at *12 (W.D. Pa. May 10, 2016) (quoting *Estate of Beck*, 414 A.2d 65, 68 (Pa. 1980)) ("Consideration is a bargained for exchange, evidenced by a benefit to the promisee and a detriment to the promisor"). Thus, "as long as the person receives something of value in exchange for her own promise or detriment, the courts will not inquire into the adequacy of the consideration." *Romero v. Allstate Ins. Co.*, 1 F. Supp. 3d 319, 404 (E.D. Pa. 2014).

Here, PSG agreed to buy terminals at a discounted rate and the POM Parties agree to sell them to PSG. As part of their agreement, each received something of value in exchange for the promise. The POM Parties promised to sell its products to PSG for which they would be compensated; in turn, PSG received these products and promised to pay the POM Parties for them. There was adequate consideration for the EPA.

### 3.    Breach of Contract

#### a.    *Purported Breach of EPA by POM Parties*

The POM Parties also contend that even if a valid and enforceable contract existed, they did not breach the right of first refusal provision or sell non-compliant terminals as defined in the EPA (ECF No. 123 at 29-33). As for the right of first refusal, the EPA expressly provides that:

> Seller grants to Buyer a "Right of First Refusal" relating to the placement of Compliant Terminals or Hardware Components and selling sets of software plays in Beaver County, Pennsylvania. If Buyer opts not to place Compliant Terminals in certain Beaver County locations then Seller, through another vendor, may place the above described Compliant Terminals in those locations. Seller agrees not to sell the other vendor Compliant Terminals at prices lower than the Buyer pays. Seller also agrees to make sure that the other vendor does not offer sets of software plays to the location at prices below the market price at that time.

(ECF No. 122-32 ¶ 4).

Lou Miele testified that when he entered into the agreement, he was concerned that he would be unable to comply with the right of first refusal.  There is also some evidence of record that this right may not have been honored.  While the POM Parties presented some evidence that it was impossible for them to track the placement of machines by operators and that they did not ship machines to actual locations, the fact remains that they agreed to give PSG the right of first refusal.  They expressly agreed to notify PSG if another vendor wanted to place a terminal in Beaver County and to give PSG the opportunity to place one there instead.  If the POM Parties were concerned about their inability to do so, they nonetheless agreed to grant a right of first refusal to PSG.  Whether they breached this obligation cannot be determined at the summary judgment stage.

Similarly, as for non-compliant games, given the PSP's seizure of terminals citing their possible illegality, there is an issue of disputed fact about whether the terminals were compliant. (*See* ECF Nos. 135-26; 135-27).

b.      *PSG's Purported Breach of the EPA*

Without citing the summary judgment record, the POM Parties assert that PSG breached the contract by failing to pay Invoice No. 19918 and that $4,490 is due (ECF No. 123 at 33).  In February 14, 2018, Mr. Cline informed PSG that it owed the POM Parties more than $8,000 (ECF No. 122-35).  After PSG provided them with a check, Daniel Warren confirmed on behalf of Pace-O-Matic that no amount was due (ECF No. 135-12).  As a result, summary judgment will be denied on this issue.

For these reasons, the POM Parties have failed to demonstrate they are entitled to a declaratory judgment to the effect that they did not breach the EPA with respect to the breach of

26

contract claims asserted by PSG both in its counterclaim and in the consolidated action. Nor are they entitled to summary judgment on their alternative claim for breach of contract in the amount of $4,490. *See Stein v. Matheson*, __ F. Supp. 3d __, 2021 WL 1979508, at *12 (E.D. Pa. May 17, 2021) (internal citation and quotation omitted) ("[C]ourts consistently have treated inquiries into the materiality of a given breach as fact questions rather than questions of law to be decided from the bench"). As a result, summary judgment on the breach of contract claims is not warranted here.

      D.     <u>PSG's Civil Conspiracy and Interference with Contractual and Prospective Business Relations Claims</u>

The remaining basis for the POM Parties' motion is that PSG's tortious interference and civil conspiracy claims against Pace-O-Matic and Miele are barred by the gist of the action doctrine (ECF No. 123 at 33-35). Under Pennsylvania law, tort claims are barred under the gist of the action doctrine: "(1) where the tort claim 'aris[es] solely from a contract between the parties'; (2) where 'the duties allegedly breached were created and grounded in the contract itself'; (3) where 'the liability stems from a contract'; or (4) where the tort claim 'essentially duplicates a breach of contract claim or the success of which is wholly dependent on the terms of a contract.'" *Bruno v. Erie Ins. Co.*, 106 A.3d 48, 67 (Pa. 2014) (quoting *eToll Inc. v. Elias/Savion Adver.*, 811 A.2d 10, 19 (Pa. Super. Ct. 2002)). Under this doctrine, "to be construed as a tort action, the [tortious] wrong ascribed to the defendant must be the gist of the action with the contract being collateral." *Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 103 (3d Cir. 2001) (quoting *Redevelopment Auth. of Cambria Cty. v. Int'l Ins. Co.*, 685 A.2d 581, 590 (Pa. Super. Ct. 1996) (en banc)).

"As a practical matter, the doctrine precludes plaintiffs from re-casting ordinary breach of contract claims into tort claims." *eToll, Inc. v. Elias/ Savion Advert., Inc.*, 811 A.2d 10, 14 (Pa. Super. Ct. 2002). In *Bruno v. Erie Insurance*, the Supreme Court of Pennsylvania explained that:

> If the facts of a particular claim establish that the duty breached is one created by the parties by the terms of their contract—i.e., a specific promise to do something that a party would not ordinarily have been obligated to do but for the existence of the contract—then the claim is to be viewed as one for breach of contract. . . . If, however, the facts establish that the claim involves the defendant's violation of a broader social duty owed to all individuals, which is imposed by the law of torts and, hence, exists regardless of the contract, then it must be regarded as a tort. . . .

*Bruno v. Erie Ins. Co.*, 106 A.3d 48, 68 (Pa. 2014); *see Crum & Forster Indem. Co. v. Sidelines Tree Serv., LLC*, Civ. A. No. 2:20-1030, 2021 WL 3816593 (W.D. Pa. Aug. 26, 2021).

PSG's tortious interference and civil conspiracy claims hinge on the breach of its contractual relationship with Pace-O-Matic and Miele (ECF Nos. 70; 75; 77; 84; 92; 135 at 19-20). As PSG alleges in the Amended Complaint, the price of computer play fills was increased for reasons "collateral to the breach of existing obligations" (ECF 87, ¶ 73). Thus, PSG's claims are based on a decision by Pace-O-Matic and Miele in 2020 to change the terms of their relationship by raising the prices charged to PSG (ECF No. 124-6 at 70-71). Although the POM Parties contend that the EPA was terminated in 2018, this action nonetheless sounds in contract. If the EPA was still in effect in 2020, then PSG's remedy is to assert a claim under the EPA.

If the EPA was, in fact, terminated in 2018, the parties subsequently entered into a series of agreements in which the POM Parties sold play fills to PSG and PSG agreed to pay the POM Parties for these products. In either event, these claims are based on the contractual relationship between the parties. Consequently, this does not impact a duty owed to the society at large. Thus, PSG's civil conspiracy and tortious interference claims are contract claims that are merely masking as tort claims. *See Alpart v. Gen. Land Ptnrs, Inc.*, 574 F. Supp. 2d 491, 506 n.18 (E.D. Pa. 2008)

(applying gist of action doctrine to a civil conspiracy claim and tortious interference claim); *Mr. Sandless Franchise, LLC v. Karen Cesaroni LLC*, 498 F. Supp. 3d 725, 737 (E.D. Pa. 2020) (applying the gist of the action doctrine on a civil conspiracy claim).

Even if the gist of the action doctrine did not apply, PSG's civil conspiracy and tortious interference claims fail on the merits. A claim for civil conspiracy exists where "1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; 2) an overt act done in pursuance of the common purpose; and 3) actual legal damage." *Goldstein v. Phillip Morris, Inc.*, 854 A.2d 585, 590 (Pa. Super. Ct. 2004) (citing *McKeeman v. Corestates Bank, N.A.*, 751 A.2d 655, 660 (Pa. Super. Ct. 2000)). A claim for civil conspiracy lies only where there is some underlying actionable violation. *Higgins v. Frank Bonin Funeral Parlor*, Civ. A. No. 3:14-cv-581, 2015 U.S. Dist. LEXIS 178517, at *18 n.2 (M.D. Pa. Feb. 12, 2015).

Here, PSG argues that Pace-O-Matic and Miele conspired to raise the prices charged to PSG for retaliatory purposes. However, PSG has not identified any law or other actionable violation that prohibits the POM Parties from doing so, even if that was their motive. Thus, it has failed to meet one of the requisite elements of a conspiracy claim. *See Hopkins v. Keefe Commissary Net. Sales*, Civ. A. No. 07-745, 2007 WL 2080480, at *5 (W.D. Pa. July 12, 2007). In contrast, the POM Parties have pointed to evidence to suggest that the price increase was in line with similarly situated operators (ECF No. 122-82). Thus, PSG has failed to put forth sufficient evidence to overcome summary judgment on its civil conspiracy claim.

Similarly, PSG's tortious interference claim is without merit. A claim for interference with contractual and prospective business relations or tortious interference requires: "(1) the existence of a contractual relationship between the complainant and a third party; (2) an intent on the part of

the defendant to harm the plaintiff by interfering with that contractual relationship; (3) the absence

of privilege or justification on the part of the defendant; and (4) the occasioning of actual damages

as a result of defendant's conduct." *Canfield v. Statoil USA Onshore Props.*, Civ. A. No. 3:16-

0085, 2017 U.S. Dist. LEXIS 40870, at *75 (M.D. Pa. Mar. 22, 2017) (quoting *Phillips v. Selig*,

959 A.2d 420, 429 (Pa. Super. Ct. 2008)). "To recover on a tortious intentional interference with

existing or prospective contractual relationships claim in Pennsylvania, *a plaintiff* must prove that

the defendant was not privileged or justified in interfering with its contracts." *Audi of Am., Inc. v.*

*Bronsberg & Hughes Pontiac, Inc.*, 321 F. Supp. 3d 503, 518 (M.D. Pa. 2018) (quoting *Acumed*

*LLC v. Adv. Surgical Servs., Inc.*, 561 F.3d 199, 214 (3d Cir. 2009)) (emphasis added).

Additionally, "in determining whether a defendant's conduct was without privilege or

justification, the sole dispute is whether the conduct is 'improper.'" *Id.* (internal citation and

quotation omitted). "[G]enerally, conduct that is sanctioned by the rules of the game which society

has adopted is privileged." *Id.* (internal citation and quotation omitted). Pennsylvania has adopted

Section 767 of Restatement (Second) of Torts to determine whether conduct is improper. *Id.* It

provides:

> In determining whether an actor's conduct in intentionally interfering with an existing contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors:
>> (a) The nature of the actor's conduct,
>> (b) The actor's motive,
>> (c) The interests of the other with which the actor's conduct interferes,
>> (d) The interests sought to be advanced by the actor,
>> (e) The proximity or remoteness of the actor's conduct to the interference and
>> (f) The relations between the parties.

*Id.* (quoting Restatement (Second) of Torts § 767 (1979)). Interpreting this provision, "the Third

Circuit has summarized, '[o]ur cases accord substantial deference to defendants whose conduct,

30

despite its conflict with plaintiff's interest, protects an existing legitimate business concern.'" *Id.* at 518-19 (quoting *Windsor Sec., Inc. v. Hartford Life Ins. Co.*, 986 F.2d 655, 665 (3d Cir. 1993)).

PSG has not met its burden of adducing sufficient evidence from which a reasonable factfinder could find in its favor on its tortious interference claim. PSG has not identified any facts in the record suggesting the price increase was intentionally done in order to impair PSG's third party contractual relationships or that Pace-O-Matic and Miele did not have a justification for raising prices, even if that justification was because of the deterioration of the parties' relationship. Indeed, a party's conduct is not tortious simply because it does not wish to engage in a contractual relationship with another or raises its prices. *See Chrysler Credit Corp. v. B.J.M., Jr., Inc.*, 834 F. Supp. 813 (E.D. Pa. 1993) (the unilateral refusal to do business with a party does not constitute tortious interference). Consequently, without more, the mere fact that a price increase may have impacted PSG's contractual relationships with its own customers or potential customers is insufficient as a matter of law to support its intentional interference claim.

For these reasons, summary judgment will be granted as to both claims and they will be dismissed with prejudice.

V.      **Conclusion**

For these reasons, the POM Parties' motion for summary judgment will be granted only with respect to PSG's claims for civil conspiracy and interference with contractual and prospective relations. Their motion otherwise will be denied.

An appropriate order will follow.

BY THE COURT:

Dated: September 29, 2021

s/Patricia L. Dodge
PATRICIA L. DODGE
United States Magistrate Judge