# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

POM OF PENNSYLVANIA, LLC, t/d/b/a
PACE-O-MATIC, and SAVVY DOG
SYSTEMS, LLC,

        Plaintiffs,
        v.

PENNSYLVANIA SKILL GAMES, LLC,

        Defendant.

PENNSYLVANIA SKILL GAMES, LLC,

        Plaintiff,
        v.

PACE-O-MATIC, INC. and MIELE MAN-
UFACTURING, INC.

        Defendants.

CIVIL ACTION NUMBER:
2:18-cv-00722-PLD

The Hon. Patricia L. Dodge

**PENNSYLVANIA SKILL GAMES'
MEMORANDUM IN SUPPORT OF ITS
MOTION *IN LIMINE***

A.    **POM Proffered Expert Rebuttal Witness, William Krieger.** The POM Parties' proffered rebuttal expert, William Krieger, is not qualified and has provided this Court with unsupported methodologies and assessments. At deposition, Mr. Krieger did not know the "if-once-known-never-forgotten" answer to the easiest and most straight-forward question regarding trademarks ever presented, particularly to a proffered expert witness in a trademark case: "*How long does a trademark last?*" Among other such basic things—including not ever having been an expert witness in a trademark case—and multiple failures to apply correct protocol, a Daubert Hearing is requested to exclude his intended rebuttal.[1]

---

[1] Pennsylvania Skill Games' Expert Report is set forth at ECF Nos. 172, 184 and 202 (unredacted) ("**CONSOR Expert Report**"); Mr. Krieger's Expert Report is set forth at ECF 188 (unredacted) ("**Krieger Rebuttal Report**").

Under Rule 702 of the Federal Rules of Evidence, "expert testimony must be both reliable and relevant." *Umana-Fowler v. NCL* (Bah.) Ltd., 49 F. Supp. 3d 1120, 1121 (S.D. Fla. 2014) (citing *United States v. Frazier,* 387 F.3d 1244, 1260 (11th Cir. 2004)). The party offering the evidence has the burden to show that: 1) the expert is qualified due to having knowledge, skill, experience, training or education in the field of said testimony; 2) such testimony will assist the trier of fact to understand evidence or determine a fact in issue; 3) the testimony is based on sufficient facts or data; 4) the testimony is the product of reliable principles and methods; and, 5) the witness reliably applies the principles and methods to the facts of the case.  Fed. R. Evid. 702; Fed. R. Evid.  104(a); *see also Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 588 (1993).

As the Supreme Court framed it in *Kumho Tire,* "[T]he objective of that requirement is to ensure the reliability and relevancy of expert testimony.  It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael,* 526 U.S. at 152 (1999).  The question of whether an expert's testimony is reliable depends on the facts and circumstances of the particular case. *Id.* at 158. The party offering the expert testimony bears the burden. *Frazier,* 387 F.3d at 1260.  Expert testimony "can be both powerful and quite misleading because of the difficulty in evaluating it." *Daubert,* 509 U.S. at 595 (*quoting* Jack B. Weinstein, RULE 702 OF THE FEDERAL RULES OF EVIDENCE IS SOUND; IT SHOULD NOT BE AMENDED, 138 F.R.D. 631, 632 (1991)). "Indeed, no other kind of witness is free to opine about a complicated matter without any firsthand knowledge of the facts in the case, and based upon otherwise inadmissible hearsay if the facts or data are 'of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject.'" *Frazier,* 387 F.3d at 1260 (*citing* FED. R. EVID. 703).

An expert opinion should be excluded if it's not "helpful" to the jury. An opinion is not helpful to the jury if the average layperson is "capable of understanding an issue without the aid of an expert." *United States v. Navedo-Ramirez,* 781 F.3d 563, 568 (1st Cir. 2015) (*citing United States v. Salimonu,* 182 F.3d 63, 74 (1st Cir. 1999)) ("any person could readily appreciate their impact" unaided by expert testimony). "Because of the powerful and potentially misleading effect of expert evidence, . . .sometimes expert opinions that otherwise meet the admissibility require-ments may still be excluded by applying Rule 403." *Frazier,* 387 F.3d at 1263. "The judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses." *Id.* (internal quotation omitted); *see also United States v. Stevens,* 935 F.2d 1380, 1399 (3d Cir. 1991).  Accordingly, Pennsylvania Skill Games moves this Court to preclude or limit the testimony of William Krieger, POM's expert, under *Daubert* and *Kumho Tire,* and rules 702, 401, 402, and 403 of the Federal Rules of Evidence.  PSG respectfully requests a Daubert hearing to the extent necessary for the Court to determine the admissibility of Mr. Krieger's testimony.

Notwithstanding the hundreds of millions of dollars at issue, Mr. Krieger even went so far simply to speculate that the POM Parties' damages is $50,000, based upon his speculation that the parties should have negotiated that amount in a contract, while at deposition stating that he "would need to think about" *(ex-report)* this speculative agreement's attributes—such as sublicensing rights and exclusivity—for any such speculative arrangement and how those attributes would af-fect that speculated agreement.  In this and his other ungrounded speculations, he renders abso-lutely no value to a jury, who can speculate better than he can as to all the ungrounded facts that do not exist and what human beings are capable of and free to do in their life at any time.

Following are the salient points regarding the errors in Mr. Krieger's analysis and report:

3

- **Unjust Enrichment.**  The total unjust enrichment damages for the time period June 6, 2016 – December 31, 2021 is **$211,857,647.37**,[2] being the sum of the POM Parties' gross profits earned in the state of Pennsylvania for the above timeframe. [CONSOR Report, Exhibit 2, at Fig. 1]    For unjust enrichment damages calculations, Mr. Krieger was obligated to present expenses applicable to the CONSOR calculation and failed to do so.  Indeed, Mr. Krieger—not having any trademark credentials—incorrectly testified that the burden was on PSG, which it is not; to wit; § 35 (15 U.S.C. § 1117), states, "*In assessing profits the <u>plaintiff shall be required to prove defendant's sales</u> only; defendant must prove all elements of cost or deduction claimed.*"  Moreover, Mr. Krieger analysis incorrectly evenly divided Savvy Dog's licensing income by the number of intellectual property assets of Savvy Dog, and he failed correctly to identify Pace and Miele being the entities who were unjustly enriched misleading himself to mislabel profits and expenses.

- **Lost Profits.**  The total lost profits for the time period June 6, 2016–December 31, 2021 is **$10,330,965**, or alternatively **$9,234,185** if the jury is inclined to limit the scope of data only to Beaver County. [CONSOR Expert Report, p. 4, Alternative Calculation]   Mr. Krieger claims the EPA [ECF 135-9] was "abandoned" (not breached) in 2018, although accepting the CONSOR lost profits methodology and analysis up to 2018 for $594,767. Mr. Krieger failing to bring down the calculation to 2021 is estopped from any challenge for the period after 2018 by which the significant differential was calculated by CONSOR. Mr. Krieger speculates, without analysis or support, that PSG could not increase its revenues, and misapplied the Compound Annual Growth Rate (CAGR). Mr. Krieger failed to perform analysis or meaningful analysis of the relationship between the actual business as operated by PSG relative to the specific factual market or operational conditions.  Mr. Krieger failed to examine the revenues and expenses in PSG's financial statements.  Mr. Krieger failed to acknowledge the discounts applicable to PSG, exposing Mr. Krieger's misunderstanding of the valuation of lost profits.

- **Reasonable Royalty.**  The total reasonable royalty damages for the time period January 1, 2015 – December 31, 2021 is **$7,534,661.96**. [CONSOR Expert Report, p. 4]  This damages figure is the sum of Defendants' machine and fill sales multiplied by a royalty rate of 2.0%. [*Id.;* CONSOR Report, Exhibit 10, Fig. 7]  Mr. Krieger—*who did not even know how long a trademark lasts for a trademark case* and never testified in a trademark case— incorrectly opined regarding the correlation between royalty rates and the trademark recognition.  Moreover, without necessary experience, he opined that CONSOR's trademark references are "outdated" without accounting for trademark royalty rates that have been generally steady over time.  Unlike the deep credentials of CONSOR, <u>Mr. Krieger's Report fails to identify instances of his participation in an actual "real-world" licensing negotiation, fails to show prior valuations of trademarks, fails to show experience giving learned lectures or hosting seminars surrounding contemporary intellectual property topics, fails to show publications involving trademarks or other forms of intellectual property, and fails to show involvement with renowned intellectual property organizations</u>.

---

[2] This extent of this amount exposes the size of this case in terms of money being made by the POM Parties in this slot machine-like, casino-like, business environment.  CONSOR® is one of the few experts who have the long and deep credentials to perform these analyses at this level, and PSG has tenaciously endured the cost to aid the Court.

4

Mr. Krieger even used the limited-life *Georgia-Pacific* factors (based upon a patent case) speculating to a trademark negotiation—which he has no experience doing—to assume an ungrounded speculative licensing fee of $50,000—which is simply ungrounded speculation regarding what free human beings, with individual lives and priorities would do as a failed matter of purported science, being no better than the jury. Mr. Krieger's reasonable royalty analysis is groundless, flawed and speculative.

Mr. Krieger's rebuttal methodological inconsistencies and lack of knowledge regarding the issues in the case expose his lack of basic intellectual property concepts.

B.    **Emails, Failure of Integrity.**[3]    The POM Parties have identified a number of emails in their joint Pretrial Statement. [Exhibit A to PSG Motion - POM Parties Pretrial, Exhs. 1, 40, 42]  PSG cannot cross-examine an email, and therein lies the issue.  In the context of emails being used at trial for any purpose, it is yet unclear exactly which witness the POM Parties will be present in-person at trial.[4]  Although emails are properly admissible as admissions against the interests of the authoring party per Fed. R. Evid. 801(d)(2), emails cannot competently testify and be cross-examined in support of the authoring party based upon application of Fed. R. Evid. 803 (hearsay rules).  For emails to be used without authoring supporting testimony at trial for cross-examination, the author or custodian would need to testify—even if then potentially admissible—that the proffered email is the final and complete thread of the subject of the conversation by all parties to any portion of the email thread for the business record to have integrity; that is, there must be testimony in the record, that the record is a business record and that it contains the metes

---

[3] At the last meet and confer meeting, it was discussed whether this issue should be presented to this Court by an objection to specific exhibits, both counsel for the parties intending to meet and confer regarding preparing and stipulating to joint trial exhibits.  However, with due respect for this Court's time in light of the trial schedule, and the complex or unsettled nature of the issue, the undersigned presents the question at this time.  The undersigned is willing to defer or withdraw the objection if a future stipulation is achieved between counsel.

[4] At the meet and confer meetings, the POM Parties vacillate as to who will appear for the "Will Call" list, sometimes representing "everyone" on that list will appear, and sometimes representing everyone who is an employee will appear, for which Ryan Wood and Daniel Warren, key witnesses—and no longer employees, although apparently still related—are out of the jurisdiction "might refuse to appear."  Notwithstanding that Counsel for the POM Parties, in their joint Pretrial Statement, have identified Ryan Wood and Daniel Warren as "care of" by representation of counsel for the POM Parties, the POM Parties refuse to stipulate that those persons will actually be made to appear.  The presented email issue is a function of testimony to be presented by the plaintiff at trial.

and bounds of the conversation on which it purports to testify and otherwise qualifies. Taking a tax return at face value for a jury is one thing, but a conversation is an entirely different thing. Accordingly, the referenced emails for which there is not any reply or clear closure of the conversation purported by all parties thereto, the emails must be excluded for use by the POM Parties. Emails are *conversational*, unlike, *e.g.,* a tax return business record. For example, the custodian would need to testify that there were no replies by any of the parties to the extent that the record is referenced, such that the jury can rely upon the specific business record as having integrity for the subject on which it would testify and but for which would induce prejudice to the party against whom it would be proffered. Without that testimony, the record does not have integrity, whether or not authentic.

Whether a particular record qualifies for the so-called "business records" exception to the hearsay rule is Federal Rule 803(6), which hinges upon the content and preparation of the record. Anthony J. Dreyer, WHEN THE POSTMAN BEEPS TWICE: THE ADMISSIBILITY OF ELECTRONIC MAIL UNDER THE BUSINESS RECORDS EXCEPTION OF THE FEDERAL RULES OF EVIDENCE, 64 Fordham L. Rev. 2285, 2326 (1996). The rationale for the exception is that business records are reliable due to the qualities of regularity of record-keeping, the fact that they are relied upon in business, and the fact that employees have a duty and incentive to produce reliable records. Advisory Committee's Note, 56 F.R.D. 183, 308 (1973) ("The element of unusual reliability of business records is said variously to be supplied by systematic checking, by regularity and continuity which produce habits of precision, by actual experience of business in relying upon them, or by a duty to make an accurate record as part of a continuing job or occupation."). The condition suggested by the undersigned is simply that, if the email is presented by a custodian, that evidence be excluded unless the testimony indicates that the email is the complete asserted record, which implicates that all

replies have been produced and the "business record" is complete.  The question is not necessarily a matter that the email, or portion of the thread, is "authentic," but that the record as provided has integrity for the subject or matter presented.  Assuming that the all documents have been produced, the matter is straight-forward, however, where there is an email without replies, it is a different matter for the custodian.  *See, In re: Oil Spill by the Oil Rig "Deepwater Horizon",* 87 Fed. R. Evid. Serv. (Callaghan) 492, 2012 WL 37373 (E.D. La. Jan. 11, 2012), at *15 (regularly receiving email as part of daily business activities, if this was sufficient to invoke the business records exception, then all physical mail would likewise would be a "business record....This cannot be the right result."); *see, e.g., Langon v. Dept. of Health and Human Servs.,* 959 F.2d 1053, 1060, 295 U.S. App. D.C. 49 (D.C. Cir. 1992) (declining to admit memorandum); *U.S. v. Strother,* 49 F.3d 869, 875 (2d Cir. 1995), cert. denied, 522 U.S. 1118, 118 S. Ct. 1058, 140 L. Ed. 2d 120 (1998) (declining introduction of a memorandum drafted in response to unusual or isolated event); *Standard Oil Co. of Cal. v. Moore,* 251 F.2d 188, 215 (9th Cir. 1958), *cert. denied,* 356 U.S. 975, 78 S. Ct. 1139, 2 L. Ed. 2d 1148 (1958) (not admitting memoranda and letters where company procedure appeared "nonexisten[t]," many of them were "casual and informal in nature," and many were "written as a result of the exercise of individual judgment and discretion"). Finally, many emails (including many of the informal conversations carried on in the email strings at issue) are essentially substitutes for telephone calls. Telephone calls are routinely made but are not admissible as "business records" because—among other reasons—their individual content does not demonstrate the requisite regularity.  In summary, the business records exception does not supply a rule that would render admissible all emails found on a defendant's computer server. *In re: Oil Spill* at *17; U.S. v. Blechman,* 657 F.3d 1052, 1065 (10th Cir. 2011) (email "double," "inner hearsay," "outer hearsay").

A custodian or qualified witness must attest that the trial condition has been fulfilled—which certainly requires an email-by-email inquiry.  Moreover, PSG is always permitted under the rule to argue that the particular email should be excluded due to concerns of lack of trustworthiness, based on the information source underlying the email content or the circumstances under which the email was sent and received.  Clearly, there is no across-the-board rule that all emails are admissible as business records.  *In re: Oil Spill* at *13 (it is not enough to say that as a general business matter, most companies receive and send emails as part of their business model).

C.      The POM Parties have set forth certain invoices that suggest sales by Pace-O-Matic within the Commonwealth.  [Exhibit B to PSG Motion - POM Pretrial Statement, Ex. 14]  Although interesting, these invoices are irrelevant, because they are not probative of any precise issue in this case, being use of the trademark at issue.  The purported recipient of these invoices is not identified on the POM Parties witness list.  To the extent that the POM Parties seek to introduce these records under a hearsay exception, Pennsylvania Skill Games requests this Court to deny that request in advance of trial on the basis of relevance.

D.      The POM Parties use the term "compliance" and have instituted "badged" "Compliance Officers" who write up self-serving internal so-titled "Compliance Reports."  Although this Court might wait and see how the POM Parties would seek to use this information, evidence presented by them in this regard would be prejudicial and confusing for a jury, such as the police calling themselves, "Murderer Catchers" with "Murderer Sheet" intake reports to present to a jury.  PSG requests that this Court exclude evidence (or redact where it serves justice), if proffered by the POM Parties, such that it would confuse the jury in this regard.  If a jury is shown a "Compliance Report" from "Compliance Officers" being a self-serving construct by the POM Parties, it will tend to prejudice the jury.  Moreover, such "Compliance Reports" use self-serving opinions

and phraseology that suggests that Pennsylvania Skill Games has used games that are illegal, but this self-serving fact has not been finally adjudicated.  It is a convenient self-serving position for the POM Parties to assert that any game "not finally adjudicated to be legal" is thereby in any regard, "illegal" which is contrary to presumptions as a matter of law.  Accordingly, PSG requests that this Court exclude all evidence that is nominated to assert that PSG has been adjudicated to operate illegal games.

In a related matter, in their voluminous Motion to Dismiss, the POM Parties presented to this Court a volume of information regarding PSG's "compliance."  However, without this Court's control over the evidence presented, this assertion by PSG will confuse the jury, because of timing post-litigation.  *See* ECF 135, pgs. 2–5 (timeline).  The Lead Case was filed when PSG sent an advance copy of a lawsuit pleading, and the POM Parties filed the Lead Case, after which they created, in unison, all sorts of unilateral self-serving "clean up" "new terms and conditions," post litigation, that confounded the EPA [ECF 135-9].  Pennsylvania Skill Games does not want continually to be objecting at trial over questions that confuse the timing, and a jury will become confused in hearing labels such as "PSG was 'written up in a compliance report'" and "failed to comply" with new self-serving post-litigation terms.  PSG requests that this evidence regarding post-litigation communication regarding "compliance" be excluded, because it was *ex post facto*.  However, PSG does not waive the right to use the "Compliance Reports" in some form as justice requires for impeachment and rebuttal purposes.[5]  PSG raises this issue for the Court's convenience and early consideration understanding that the Court may prefer to see how evidence is adduced at trial.

---

[5] The POM Parties significantly increased prices on PSG in violation of the EPA and have claimed that PSG does not receive "favored nation pricing" and refused to continue to sell PSG hardware because PSG refused to sign the post-litigation "new terms" that confound PSG's benefits as set forth in the EPA, which is part of the damages.

Respectfully submitted,

s/Gregg R. Zegarelli
Gregg R. Zegarelli, Esq.
Pa. I.D. #52717

TECHNOLOGY & ENTREPRENEURIAL
 VENTURES LAW GROUP, P.C.
2585 Washington Road, Suite 134
Summerfield Commons Office Park
Pittsburgh, PA 15241-2565, USA
 v.412.833.0600 f.412.833.0601
mailroom.grz@zegarelli.com

## CERTIFICATE OF SERVICE

I hereby certify my belief that a true and correct copy of the foregoing Motion to Compel was served upon the following counsel via the Court's CM/ECF System on the date set forth below:

September 30, 2022

Julian E. Neiser, Esq.
jneiser@spilmanlaw.com
James C. Walls , III
jwalls3@spilmanlaw.com
SPILMAN THOMAS & BATTLE, PLLC

Respectfully submitted,

s/Gregg R. Zegarelli
Gregg R. Zegarelli, Esq.
Pa. I.D. #52717

TECHNOLOGY & ENTREPRENEURIAL
 VENTURES LAW GROUP, P.C.
2585 Washington Road, Suite 134
Summerfield Commons Office Park
Pittsburgh, PA 15241-2565, USA
 v.412.833.0600 f.412.833.0601
mailroom.grz@zegarelli.com