# Exhibit "1"

122

Q.    All right.  I will direct your attention --
direct your attention, please, to -- all right.  So in
65 you say "the licensing transactions" -- no.  I'm
sorry, in 64 at the end.  I've highlighted the

WILLIAM G. KRIEGER                                        45

45

in 2017, where the damage period that we've -- we're -- we've been talking about extends to 2015.

So to be fair, I included some 2015 and 2016 numbers based off an estimate of -- of the actual activity in '17, '18 and '19.

Q.    So if you didn't include those -- those licensing fees, those fees paid to Savvy Dog -- I'm sorr -- yeah, fees paid to Savvy Dog, where would have been in the real wor -- world the source of those funds?

A.    I'm -- I'm not sure I understand your question.

46



A.      So the license fee percentage is I'm looking at the license income from operators for '17, '18, and '19 as a percentage of the intellectual property license fee paid to Savvy Dog in the same year.  The average of those three years is 62 percent.  So I then use that 62 percent and apply it to the license fee income from the operators for '15 and '16 to calculate what the intellectual property license fee would be related to those two years.

Q.      And who are the operators?

A.      Who are the operators?

Q.      Yes.

your testimony?

A.     Well, what I'm saying is is that by definition in terms of the definition of fair market value under IRS Rule 5960, it's -- you know, they are all related parties and so we have to be cautious when we're dealing with related parties which is why the IRS audits transfer pricing issues to ensure that transfer pricing occurring between entities is done on a fair market value basis.

So I'm acknowledging that these are related parties, but also noting that by definition subject to IRS scrutiny those amounts have to be at fair market value.

Q.     So did you do a valuation of fair market value?

A.     No, of -- well, no, I didn't do a valuation, per se.  I'm looking at the value of the fees that were actually paid as a -- as a measure to use to determine what the value -- ultimately the value of the mark would be.

49



definition of fair market value that does not rely upon

IRS laws or regulation?

A.    Well, generally speaking, when we're talking

about fair market value, we're making reference to IRS

Rule 5960.

Q.    Excuse me, I'm not asking you -- my precise

question is in your training is there a definition of

fair market -- I'm sorry, arm's length transaction that

does not rely upon IRS laws or regs?

WILLIAM G. KRIEGER                                          145







148

Q.    All right.  And you -- you would also say that --
your hypothetical negotiation for a lump sum, how does
that interplay with the actual agreement signed by the
parties?

A.    What actual agreement signed by the parties?

Q.    The EPA -- the EPA in your report.

A.    And I don't -- I don't know what you mean.  You'd
have to --

Q.    Well --

A.    You'd have to show me --

Q.    Well, you're coming up -- you're coming up with
exactly something that if it were -- you know, if there
was going to be a -- a one-time fee of some sort then,
you know, that would have been negotiated.

      That wasn't the deal; right?  I mean, that --
that specifically did not get included in an agreement
everybody signed and you're coming up with just what
appears to be your own -- you know, your -- okay.  So

154

A.    Why would who accept a transaction --



Q.    Now, did you read the EPA?  Did you review the entire EPA?

A.    Yes.

Q.    Okay.  Do you recall a -- a clause with Pace to -- and Miele to assist Pennsylvania Skill Games with Pennsylvania Skill Games marketing?

A.    I somewhat recall that, but you'd have to put it in front of me for -- you know, to see what the language looks like.

Q.    Okay.  And before I put that up, I want to make sure that you point me to wherever your metrics are for determining the $50,000.

WILLIAM G. KRIEGER                                          25

25

A.    That is correct.

Q.    Okay.  Can you describe any differences between a patent and a trademark?

            MR. NEISER:  I would object to conclusion of law, but go ahead.

A.    Generally a patent is related to some aspect of technology that's protected and a trademark relates to a name, symbol, mark or device that's intended to differentiate one company's product from others.

26



Q.      Okay.  Are you a member of any licensing oriented societies?

A.      I am not.

Q.      What did you do to prepare for this deposition?

A.      Reviewed my report, reviewed Mr. Anderson's report, reviewed -- or re-reviewed some of the deposition testimony in the matter and a variety of the documents that had been produced and that are indicated in my report and in his.

Q.      And you were present, if I recall, for Mr. Anderson's deposition?

A.      I was.

Q.      All right.  Let's -- let's start to review your report.  Now, in -- on Page 1 of your report -- it's on