IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

POM OF PENNSYLVANIA, LLC,
trading and doing business as
PACE-O-MATIC,
              Plaintiff,        Civil Action
    vs.                         No. 18-722

PENNSYLVANIA SKILL GAMES, LLC,

              Defendant.

                  - - -


    Transcript of Motions Hearing on November 9, 2022,
United States District Court, Pittsburgh, PA,
before Mag. Judge Patricia L. Dodge.


 APPEARANCES:

  For the Plaintiff:      SPILMAN THOMAS & BATTLE, PLLC
                          Julian E. Neiser, Esquire
                          Jonathan Deasy, Esquire
                          301 Grant Street, Suite 3440
                          One Oxford Centre
                          Pittsburgh, PA  15219


  For the Defendant:      TECHNOLOGY & ENTREPRENEURIAL
                          VENTURES LAW GROUP
                          Gregg R. Zegarelli, Esquire
                          2585 Washington Road, Suite 134
                          Summerfield Commons Office Park
                          Pittsburgh, PA  15241

  Court Reporter:         Veronica R. Trettel, RMR, CRR
                          U.S. Courthouse
                          700 Grant Street
                          Suite 5300
                          Pittsburgh, Pennsylvania 15219


    Proceedings recorded by mechanical stenography;
transcript produced by computer-aided transcription.

P-R-O-C-E-E-D-I-N-G-S

Wednesday Morning, November 9, 2022

(In Open Court)

THE COURT:  Please be seated everyone.  All right. Thank you all for being here this morning.  We are scheduled to have argument on the various motions in limine that have been filed by the parties.

I want to explain at the outset that you've all done a good job of briefing those motions.  So I don't expect that we will be holding argument on each of them.  There are various ones that I feel I understand your positions.  You don't need argument.  I'm going to have targeted questions that I'll ask you about various motions.  All right.

The first question to both of you, Mr. Neiser, Mr. Zegarelli, each of you have asked for a Daubert hearing as I understand.  Are you actually requesting a Daubert hearing, in other words, an evidentiary hearing on whether the respective experts can testify?

Mr. Neiser, I'll start with you.

MR. NEISER:  Thank you, Your Honor.  So, Your Honor, we asked for a Daubert hearing -- first, Your Honor, by way of introduction, this is Jonathan Deasy.  He's with our firm. He'll be assisting me today.

THE COURT:  Good morning.

MR. DEASY:  Good morning.

MR. NEISER: Consistent with the Western District rules, we have an opportunity to address certain motions, and I would like to give Mr. Deasy the opportunity to do so, and I can interject if there are any issues that I need to interject on.

THE COURT: I'm very happy to hear that and he's welcome to do so.

MR. NEISER: Thank you, Your Honor. Good morning, Mr. Zegarelli and Mr. Unis.

We requested a Daubert hearing, but based on the papers and the arguments in front of the Court, that is at the forefront of our mind. I think that we can address some of the issues based on the oral argument. We are very close to trial and I believe that the arguments in front of the Court and perhaps what we can accomplish today together may not require an actual hearing itself.

THE COURT: Okay. Just so you know, Mr. Neiser, I don't believe I'm going to be requesting argument on the expert motions because I think each of you have done a very good job of explaining what those issues are.

MR. NEISER: Thank you, Your Honor.

THE COURT: But certainly, before we conclude today, if either party believes that an evidentiary hearing is required, we can certainly schedule one. We'll just have to do it quickly.

4

MR. NEISER:  Yes, Your Honor.  I would defer to the Court.

THE COURT:  Okay.  Thank you, Mr. Neiser.

Mr. Zegarelli, good morning to you.

MR. ZEGARELLI:  Good morning, Your Honor.  If it pleases the Court, I would like to introduce Mr. Albert Unis.

MR. UNIS:  Good morning.

THE COURT:  Good morning.

MR. ZEGARELLI:  Your Honor, as stated by Mr. Neiser, we can also in this regard defer to the Court, if the Court has reviewed the documents, if the Court doesn't feel the Court needs an evidentiary hearing and the Court feels that the briefings were sufficient for a determination, we'll defer to the Court as well.

THE COURT:  All right.  I don't believe that I do.  Like I said, before we leave here today, if anyone revisits that issue or wants to talk about it further and feels that for whatever reason you do need one, I'm happy to accommodate you.  We'll just have to get that scheduled relatively quickly, but I appreciate both of your input into that.

All right.  The first matter I wanted to discuss was the motion by the POM parties to limit or exclude testimony relating to Attorney Cline.

Mr. Zegarelli, on that score, what is the anticipated scope of the testimony of Mr. Cline?

MR. ZEGARELLI:  Yes, Your Honor.  Mr. Cline, he is -- in addition to an attorney, he apparently is one of the team decisionmakers.

We would expect to ask Mr. Cline issues, for example, with regard to the letter of -- I'm not sure how quite to categorize that letter, but is it an abandonment letter, is it a determination letter, obviously that letter.  Mr. Cline is entitled and we don't challenge -- I'm sorry, we don't dispute that Mr. Cline has the right to assert, where proper, an attorney-client privilege.  But he does, we believe, have knowledge over conduct policies.  He does have knowledge over reorganization issues which are also at issue.  He has knowledge over operations.  He has knowledge over the change as we have addressed earlier, over the pricing differential change.  He was part of that.

But basically, Your Honor, we believe that Mr. Cline is, quite frankly, a proper trial witness.  We do believe he has a right to assert client privilege, but what we don't believe is proper is for there to be an abstract exclusion of his testimony without the opportunity to set forth a foundation and to let him make whatever objections he feels that he's entitled to make.

THE COURT:  Let me ask you this.  One of the things that you mentioned he might be testifying about is conduct policies.  What are conduct policies?

6

MR. ZEGARELLI:  Right, Your Honor.  There are certain policies, and I believe I have the testimony of Mr. Stahl with me here today, Your Honor, where the -- from what we understand, the staff would report either to Mr. Wood or to Mr. Cline with regard to the conduct of operators, and that's the gist of it.

THE COURT:  Okay.  And reorganization issues, I assume that relates to related entities to POM.

MR. ZEGARELLI:  That's right, Your Honor.

THE COURT:  And operations, what are we talking about there?

MR. ZEGARELLI:  The relationship between or among Pace, POM of Pennsylvania, Savvy Dog, Mr. Miele, that is pretty much all the parties, and we believe he is -- I mean, he may have mental impressions, properly protectable mental impressions.  He's entitled to assert that privilege.

But there are operational facts that we believe he knows he can testify to, his letter that he wrote, that are just, you know, proper evidence for the jury to hear to the extent there's not a proper objection.

To the extent there's not a proper objection, he's a vice president like any other vice president with knowledge of facts.

THE COURT:  With respect to the letter -- and I believe I'm aware of the letter that you are referencing.

We'll just call it the "letter," since we can't identify it otherwise sitting here this morning.

Why wouldn't an explanation of why he used certain words, he said something a certain way, why wouldn't that be either subject to the attorney-client privilege or the work product privilege?

MR. ZEGARELLI:  Well, some of it might be, Your Honor, and I don't dispute that some of it might be depending on what he says.  He may say, "I used that language because a client directed me to use that language."  And that wouldn't be privileged, and he would have written a letter based on a direction of a client, not a privileged issue.

So I don't presuppose, Your Honor, that he should be entitled to just an abstract, general he doesn't have to testify.  He can testify.  He can assert his privileges.

We have asked for the opportunity to do a trial deposition since he's out of the jurisdiction, and Mr. Neiser had offered trial depositions, and we think that we are going to do one next week of a party who is not available, and I would ask for that opportunity, and if he makes the objections, I respect that.  Maybe they have to be reviewed, maybe they don't, but I would just like the opportunity to build that foundation.

THE COURT:  And do you disagree that the letter speaks for itself?

8

MR. ZEGARELLI:  That's a good question, Your Honor.  That's a good question, Your Honor.  I think Mr. Unis, the recipient of the letter can testify as to his understanding of what the letter indicates to him because he received a notice and I don't think that's hearsay.  I think that's probably within the realm of what he understood the letter to mean.

But it is a critical letter in the case -- it really is a critical letter in this case because that letter is much of the dichotomy of the beginning of the problems that we're addressing at trial.

So if it does speak for itself, and it may to some extent speak for itself, I don't think even that fact would eliminate Mr. Cline's testimony at trial on an abstract basis without giving PSG the opportunity to develop a foundation.

THE COURT:  Okay.  Thank you.

Mr. Neiser, I know in your motion, you said evidence related to Mr. Cline should be excluded.  Was there specific evidence to which you were referring?

MR. NEISER:  I don't think -- I think we used it as more of a generic term, Your Honor.  It was primarily to exclude or restrict his testimony.  I don't think he should be a trial witness at all.

THE COURT:  Expound, please.

MR. NEISER:  Well, Your Honor, first, on the basis that Mr. Zegarelli just provided -- I'm going to go down the

list, and I think this will hopefully touch on some of the other issues and help us confine them and refine them.

But with respect to the reorganization of the entities, I'm not sure how Mr. Cline is going to be helpful for that.  They are just -- they are LLCs and we have a separate motion in limine, as the Court is aware, with respect to excluding evidence of the reorganization and the different, we'll call them the POM entities, and as the Court may recall, this was before the Court.  It was one of the first motions that was filed when new counsel came in and that motion was denied.

And I understand there's a theory that all of these entities were created for conspiratorial purposes and other nefarious reasons, and I don't believe that that's in front of the Court.  I don't believe that's part of the trial, and I think that the existence of these entities and the organization, they are just LLCs.  The party witnesses can explain and give context to that without aid of bringing in their in-house counsel.

So the pricing differential, for example, that Mr. Zegarelli mentioned, that also was before the Court and it was dismissed at summary judgment.

And the questions of privilege and asking Mr. Cline questions that we may encounter repeated privilege objections is the equivalent of putting the witness on the stand and they

just keep pleading the fifth.

So that would be prejudicial to us because there's no need to ask Mr. Cline because, as the Court noted, the letter does speak for itself, and I realize that may not be a proper pleading response, it may not be a proper discovery response, but the reference to the contents of the letter and any variance from it is something that Mr. Zegarelli already admits his own client can tell us what it means to him.  If his own client can tell him what it means to him, the jury can tell what it means.  It's plain language.

With respect to the contents of the letter and the significance of it, the significance of it does speak for itself in the actual language used, but as we all know as lawyers, our clients tell us what to do, and if we have a corporate rep or a fact witness who essentially was deposed as a corporate rep and they are sitting here as an officer of the court and they can explain and lay the foundation of why they wanted this letter written in a certain way and what they were trying to communicate, we can do that without Mr. Cline coming to the stand.  He just so happened to be the person that wrote it because he's their legal counsel and that's the role that he provides.

As far as Mr. Cline's mental impressions or anything that goes along with that or the operative facts that relate to the letter being sent out, I can't see how Mr. Cline's

testimony would be required to do so.

I think what that would put us in the position to do is either we would be prejudiced by the fact that we would be raising a privilege objection, one, and number two, for us to even rehabilitate the witness to the extent it would even happen, we would be getting very close to opening the door on waiving privilege, and I don't think it's a necessary thing that we have to do considering all the other things that we have to deal with in the case.

THE COURT:  Okay.  Thank you.  One question, Mr. Neiser.  Is Mr. Cline under your control?  In other words, would you produce him for a trial deposition or at trial?

MR. NEISER:  Yes, Your Honor, as a matter of fact, he's --

THE COURT:  No need for a subpoena.

MR. NEISER:  Excuse me, Your Honor?

THE COURT:  No need for a subpoena.

MR. NEISER:  No need for a subpoena.  Mr. Cline is on the cell phone right now, and my understanding is he will be participating fully and will be present in the courtroom.

THE COURT:  Thank you very much.

MR. NEISER:  Thank you.

THE COURT:  One thing I'd like both counsel to think about is assuming Mr. Cline does testify, we may want to prepare something to advise the jury about the attorney-client

privilege and if, in fact, he testifies and he invokes that privilege on behalf of his client, that the jury would be instructed on what that means and what it doesn't mean.

So I'd like counsel to think about that and think about whether you can agree on something that we can look at at a final pretrial conference or at any time before trial and see if there is a way that makes sure there is no confusion, no prejudice or any other negative issue that the jury might infer if someone invokes the attorney-client privilege.  All right?

MR. NEISER:  Thank you, Your Honor.

THE COURT:  Okay.  All right, I'm next going to turn -- and we have had a bit of a reference to it already -- the POM motion about limiting or excluding testimony or evidence about non-POM parties.

And, Mr. Zegarelli, let me ask you.  It seems like your position is that the jury has to know about that entire reorganization.  Is that your position?

MR. ZEGARELLI:  I think the answer to that, Your Honor, is "yes" because to do otherwise would -- I think that's a slippery slope as a matter of evidence.

We will assert at trial or present the evidence for the Court that after the relationship, I'll call it became "strained," that the reorganization was put into place and the reorganization had the impact of taking what used to be POM --

13

and I don't really call them, by the way, non-POM related parties.  I think that's a mischaracterization euphemism that's favorable to POM that I don't really agree with.  I think they are POM parties.  They are related POM parties.  They are under control, management.  That entire division moved around the intellectual property rights.  You've got now 12 or more of these entities.  Somehow they're sharing rights.  All sort of moved from Pace-O-Matic, who we signed a contract with, which is the seminal document at issue, all of those rights moved into all of these entities.

Having said that, Your Honor, so the simple answer or the basic answer to the question is drawing for the jury the connection between what was originally Pace and somehow, all the sudden, you know, POM and Savvy Dog are filing lawsuits.

So somewhere along the line I think we know that the jury gets to hear how that happened because it just wouldn't make sense otherwise in the matter of evidence.

I mean, if Pace would have filed a lawsuit in its own name, maybe there's a harder question, but they didn't.  So they sued in Savvy Dog.  They sued in POM of Pennsylvania.  They made it relevant by doing so or we assert that they made it relevant.

Now, the question is all the tangential ones, right, the ones that are not parties per se, and our position on that is that is all part of the modus operandi, the mens rea which

14

is certainly all part of this case, why do people do things.

I think if I were a juror and, you know, so now you got evidence that there's this constrained issue with regard to rights and maybe, you know, all of these things, then all of a sudden, the company what used to be one company is now 15 companies, right, and all of those rights that were in one little organization that we signed a contract with are now part of all of these entities, I think if I were a juror, I would think to myself, you know, there was -- and we cited some case law for you that, you know, that ex post facto act is you can draw an inference that that reorganization, which is not just one little piece, but a big issue, they didn't just draw rights into one entity, they get into multiple entities, that that's relevant for the jury to hear.

THE COURT:  On what claim or claims?

MR. ZEGARELLI:  I think it would relate to the trademark claim because the intellectual property rights have moved around.  Certainly it relates to the trademark claims.

THE COURT:  It didn't move around to any of these other entities, though, correct?

MR. ZEGARELLI:  Well, I think, Your Honor, that there are rights with regard to the word -- okay, so if the issue is the Pennsylvania Skill Games mark, if that's the focused branding, that branding is used by many of the entities.

And the truth of the matter is, Your Honor, if for

some reason -- for example, so if we show, okay, this is the reorganization.  You know, did you reorganize?  This is the reorganization.  And we show -- we can say, just, quite simply, are all of the rights that were in POM, are there any licenses that were -- I'm sorry, in Pace-O-Matic, that we signed a contract with, are they anywhere else, and if the witness says, no, they're only in that, then that's the testimony.

If the witness says, Oh, yeah, these rights are sublicensed in POM of Ohio or POM of this company, they all use the brand because it's added value, right -- I mean, this Pennsylvania case has added quite a bit of value generally -- then I think the jury gets to hear that, Your Honor.

So our position is it's more -- so there might be two tiers to it I think.  The parties clearly, we think it has to be explained because somehow they became proper parties by filing a lawsuit, and then you have the non parties, not the not related -- I don't call them not related.  I would say they're not parties.  And we think those are proper evidence and relevant for the jury to draw inferences as to that particular circumstance because it's the whole truth.

THE COURT:  But those entities aren't parties here.  You're not seeking claims against them.  So they're not -- even if one of those other entities, so Ohio, wherever, were somehow getting value out of the trademark, they're not a

16

party here.

MR. ZEGARELLI:  Oh, there's no question, Your Honor, we did -- as you know, we did try to join them as parties. That was denied, respectfully.

So we don't assert that.  They're not parties.  We know they're not parties.  But I don't think, Your Honor, that they need to be parties for it to be proper evidence of a whole truth circumstance placed before the jury.

THE COURT:  Your response to POM's motion seemed to suggest that much of this relevance related to alterego, hiding of assets, so on and so forth.

Is that where you are going with that in part because it seems to me if it was, that's a post-verdict issue, not a trial issue.

MR. ZEGARELLI:  Your Honor, interestingly, I don't recall making that argument.  Maybe I have to look at my brief again.

THE COURT:  That's fine.

MR. ZEGARELLI:  But, Your Honor, the plaintiff claims -- we understand the claims of the plaintiff.  We understand who the parties are, who the parties aren't.

So certainly, Your Honor, absolutely correct, our position is that the whole truth of the reorganization allows us to present the reorganization as it is and for the testimony to come out as it is and for the jury to draw

inferences.

There's a different inference, perhaps, by a reorganization that moves it to one company versus an inference that the reorganization moved it to 15 companies, and I think that's a proper inference, but that's -- but that goes to the current claims and the current parties, Your Honor.

THE COURT:  In your breach of contract claim, you mentioned before, and you are correct, that Pace-O-Matic is a party to that contract, not POM of Pennsylvania, correct?

MR. ZEGARELLI:  Well, you know, Your Honor, I think --

THE COURT:  I'm talking about the contract as it existed when it was signed.

MR. ZEGARELLI:  Yes, Your Honor.

THE COURT:  Who are the parties to that contract.

MR. ZEGARELLI:  Absolutely right, Your Honor.  I mean the parties of -- that preceded the reorganization.  The parties are Pennsylvania Skill Games, LLC; Miele Manufacturing; and Pace-O-Matic, Inc.  And -- that's correct.  Those are the parties to that action.

Now, in the letter from Mr. Cline, Mr. Cline had asserted he wrote the letter on behalf of -- Mr. Cline's letter, if you look at the introduction of the first sentence I think, I think he said we are the successor in interest to

Pace-O-Matic.

So when you asked me, you know, who is the right guy pretty much, that's a little bit of a shell game. I think we would assert Pace-O-Matic is who we signed the contract with, and to the extent they rightfully or legally moved rights around, they're part of that, but Mr. Cline had indicated by admission that POM of Pennsylvania is a successor in interest apparently on the claims associated with the breach of contract.

THE COURT: And is that going to be your position at trial? In other words, when you argue to the jury who your breach of contract claim is against, who is that going to be? We can put Miele aside.

MR. ZEGARELLI: The breach of contract would be, Your Honor, Pace-O-Matic, but I have to think through the "if then" clause for, you know, if the jury determines this, then this. If the jury determines this, than that.

I think I have to think through that a little more carefully, Your Honor, because I think our position is that Pace-O-Matic should be the only entity that we're dealing with in this regard.

The reorganization happened. So Pace-O-Matic's position is, oh, those rights, they will assert, you know, they assert they lawfully moved rights around. We disagree. But if that's accepted by the jury, then I think we would say

if the rights moved, the liability moved.  And so I think it's an "if then" for a jury instruction, quite frankly, Your Honor.

THE COURT:  All right.  Thank you.  Mr. Neiser, is there anything you would like to add to this discussion that you haven't briefed or what you would like to reiterate?

MR. NEISER:  Yes, Your Honor.  And I do understand the position of counsel, and this is part of the earlier argument that we had.  This is one of the exhibits that we attached, the reorganizational chart.

THE COURT:  Is that CCCC?

MR. NEISER:  I believe it is.  It's Exhibit 11 from the filing I believe.  For the record, it's --

THE COURT:  That's all right, Mr. Neiser.  It was attached to your brief, I know.  Don't worry about that.

MR. NEISER:  Yes, Your Honor.  215-2 was the docket, as my eyes fail as time goes by.

So what we have is this big organization chart that references entities that have nothing to do with the other POM entities.

There's this Bison Amusements and different Miele Manufacturing entities have nothing to do with this, and I understand that that may be the -- the problem with the argument of the whole truth, it also means it's irrelevant, and this is the reason why we believe this should be a five-

day case and the Pennsylvania Skill Games wants it to be a ten-day case.

Moving the rights -- as far as explaining the parties, it's very simple. Pace-O-Matic is a Georgia corporation. POM of Pennsylvania is a Pennsylvania operating company. Savvy Dog Systems is an IP holding company. That's it. We don't need to go through the Gambino crime family to figure out who is the boss of them because what that infers, not only is it irrelevant, but even if the Court were to determine it were relevant, we would get into a 403 territory, and not just the prejudice, cumulative testimony, confusing the issues, waste of time.

So I think our evidentiary basis to exclude this is proper, especially considering the Court's prior rulings because what I'm hearing from opposing counsel, with all due respect, and I appreciate the argument, is a fishing expedition, okay, at trial.

So asking the questions of whether or not rights have been moved around to these entities, what we have had -- I've been living with this case for four years, Your Honor. We have had 30 depositions. We have had I don't even know how many requests for production of documents. If we don't have it now, we don't have it at all.

So the question of the contract is a very narrow one, which is something else we need to probably talk at the end

21

and we'll need to talk at the final status conference, but the contract is really narrow.  It is what it is.  It's not a very good contract I don't think for anybody, but it's not, you know, a 25 page license agreement with Microsoft.

So the question of rights and who is using what, that's defined.  We all know who is who.  We have the pleadings.  We have the parties.

I think Mr. Zegarelli mentioned that Pace may not have been a party of one of the claims.  It is a party.  It's on the caption.  I mean, there's no entity involved in the claim that is not at the table and can't be asked.

Where we need to stop, and you are correct about the allegations about the alterego and hiding assets and shifting rights and things like that, is it has nothing to do with the case.

The question is did we breach a contract with them?  Did they induce us into the contract?  Did we have, you know, contractual defenses?

And with respect to the trademark, I think the only testimony and the only evidence in this case is that the trademark license is held by an entity called Savvy Dog.  It's pretty much that simple.

THE COURT:  Excuse me for interrupting.  Is POM of Pennsylvania the successor in interest?

MR. NEISER:  It is.

THE COURT:  To Pace?

MR. NEISER:  It is.

THE COURT:  Are there documents to that affect?

MR. NEISER:  Yes.  And this may be something we discuss later as well just as a teaser, but the question of modus operandi and mens rea and motive, I'm not trying to mix terms of art between criminal and civil, but they really -- that's where we border on the irrelevant and the cumulative and the confusing of the issues.

The reason we filed seven motions, and some of them are a little bit wider than I would want, is because I have been living with this case for four years.  I am concerned about the parameters of what's going to be put in front of the jury, and it's not that I'm trying to unfairly exclude evidence, but I'm just really trying to focus on what we have because we have a lot of stuff going on here as it is.

To your point also, Your Honor, about some of these inquiries being post trial, essentially this is discovery in aid of execution.  This is what it is.  Or it's hinting at a fraudulent conveyance, even by inference.  That isn't before the Court.  It's breach of contract and a trademark claim and that's it.

If there are issues with respect to transferring assets or the like, which I know it didn't happen, but for evidentiary purposes, that's something that we have to address

later on, and I think we have so much field to plow on the claims because there are these oral claims and other factual issues, that if we start getting into what these other entities may or may not have done, not only is it prejudicial to our client because it makes us look like we did something that we didn't, but there's no evidence of record -- like if I were to ask for an offer of proof, for example, I don't think that there's anything out there other than the prospect of a fishing expedition under the guise of finding the whole truth that would really matter.

THE COURT:  Okay.  Thank you.  All right.  I next want to turn to POM's motion about limiting or excluding testimony and evidence about Miele Manufacturing.

By the way, am I pronouncing that correctly?

MR. NEISER:  You are, Your Honor.  Thank you.

THE COURT:  All right.  Mr. Zegarelli, was there something you wanted to say?  I saw you stand up.

MR. ZEGARELLI:  No, Your Honor.  I was just standing to pick up a document.

THE COURT:  I know it's a little tough in this courtroom to see and look around people.  So I understand that.

So, Mr. Neiser, I'm trying to understand what your position is on this.  So is it your position that Miele affiliated entities should not be discussed at all, and the

parties' involvement and what might be relevant is limited to the breach of contract, obviously Miele is a party to that, and the trademark or are all of the entities relevant, but we're limited to Beaver County, if my question makes any sense?

MR. NEISER:  It does, Your Honor.  Respectfully, I think it's just Beaver County and it's just Miele Manufacturing because he's the only one who is involved.

We believe --

THE COURT:  The trademark claim, however, goes beyond Beaver County, does it not?

MR. NEISER:  It does.

THE COURT:  So Miele's conduct in other parts of Pennsylvania could be relevant to some issue.

MR. NEISER:  It could, but the concern here, Your Honor, is this:  Miele Manufacturing is the distributor of the Pace-designed games, with the Pace software, and we contend under the flag of the Pennsylvania Skill trademark, and it has done so since the inception.  They build the machines.  They put them out.  They sell them to the operators.

We believe that Pennsylvania Skill Games will attempt to offer testimony that Miele is a competitor.  That he's a bad actor out in the marketplace, which really has nothing to do with the price of tea in China, unless it relates to Beaver County, and we think that's fair.

So if they want to offer any testimony or evidence regarding Miele's business operations or any entity related to Miele in Beaver County, that's fair.  We don't begrudge that. I couldn't possibly make that argument with a straight face.

Where we do have an issue is trying to convert the issues at issue in the case and in the pleadings to a statewide conspiracy to cause harm to Pennsylvania Skill Games under a few things that may not be immediately apparent in the prior papers, but will probably at trial; claims that Miele usurped rights in Lawrence County, for example, which is not part of this litigation, but I think that Pennsylvania Skill Games is going to try elicit that; that Pennsylvania Skill Games has some right as a master distributor, which the Court may recall from our arguments and motions when they were trying to depose Mr. Cline and the Court issued a limiting instruction, a limiting order, and then we had to have a -- and I understand this goes to modus operandi and mens rea and this bad act that allegedly happened throughout the Commonwealth, but it has nothing to do with our case, and if it did have to do with our case, the pleadings should have been amended, we had plenty of discovery on the issue, and I'm not trying to make this more complicated than it is, but if they want to attack Miele's business operations and what Miele is doing as the distributor of the games in Pennsylvania, then it's fair game to go after them if they are doing so in Beaver

County.  It's fair game if it involves providing the machines or the fills or whatever it is or actually operating or distributing games in Beaver County.

Other than that, I can't see why any other evidence or testimony about Miele's business operations elsewhere in the state, unless they are narrowly confined, would remotely be relevant.

THE COURT:  I know that there is an unfair competition claim asserted by PSG, and is it your position that as it relates to Miele -- and I'm putting aside Beaver County for a moment -- that that unfair competition claim is limited to the use of the trademark when distributing games, the machines in other parts of Pennsylvania?

In other words, would that be limited to Beaver County or if the unfair competition is you are unfairly using our trademark and that trademark is on machines that are being distributed in places other than Beaver County, what is your position about whether that is fair game in terms of evidence.

MR. NEISER:  So, Your Honor, one, I don't really quite comprehend the unfair competition claim.  As I understand their unfair competition claim, it's that we're using the mark without their permission I believe.

But with respect to the contract, it relates only to Beaver County because there is no other restriction by either side throughout the Commonwealth.

THE COURT:  Yeah, I've looked at PSG's complaint and the counterclaim, and there's particular paragraphs obviously that refer to unfair competition, and the way I look at that is that it's the use of the trademark and disseminating perhaps misleading information about their association with the trademark without PSG's permission.

Is that your understanding of the unfair competition claim as it relates to Miele?

MR. NEISER:  Generally speaking, yes, Your Honor. That also ties in with the motion regarding the legality of the games and the compliant terminals which --

THE COURT:  We'll definitely get to that.

MR. NEISER:  We'll definitely be discussing that.

THE COURT:  One question I have, and certainly I'm going to be asking Mr. Zegarelli this same question.  This relates to the contract.  I'm moving to that for a moment.

There seems to be an allegation that there is a most favored nation clause in the contract.  What is your position on that?

MR. NEISER:  Your Honor, two things, and this was something I was going to raise with the Court towards the end. I think we need a ruling as to whether or not the contract is ambiguous or not.

I didn't think it before, but as we went through and -- and Mr. Zegarelli and I have done I think yeoman's work

on the exhibit.  We've met and conferred numerous times to try and agree on everything that we can agree and the process has been very productive.

THE COURT:  And I want you to know, all of you, that I very much appreciate that.

MR. NEISER:  Thank you, Your Honor.  And Mr. Zegarelli has been extremely prompt.  We've been able to really get to that, to the meat of the thing.

But as I understand where we do have differences, and they're small, but I think they're important for the Court, is the question of what -- I think that they believe that that agreement gives them rights that aren't in the agreement. That they give them statewide rights.  They give them rights for preferred pricing, and that most -- the paragraph that relates -- and I can show the Court specifically what we're talking about if that's helpful, and we brought extra copies of the contract and whatnot.

THE COURT:  I have it here.  So thank you very much. I've got it up here.

MR. NEISER:  Of course.  But the most favored nations clause isn't what I think -- well, that's for the jury to decide.

Our view of it is this:  The parties I believe agreed that if a location, which is the bar or restaurant, the place that would actually have the game, or somebody else told us

that they were going to put a game in Beaver County, or they called us to purchase a machine specifically for a location, that that's when that right of first refusal may kick in; meaning, we would contact them, the Pennsylvania Skill Games, and we would let them know.

That has morphed into nobody can ever put any games in Beaver County no matter, no matter when, and as a result of that, we've been damaged even if we do absolutely nothing; meaning, Beaver County is theirs, they own it to the exclusion of all others, forever, without any exchange of consideration.

So our view of it, it isn't the most favored nations clause as interpreted by other cases and how I understand it to be. What it is is simply if somebody calls us and they say we're going to put a gym in Beaver County, we say no, we have an agreement with the Pennsylvania Skill Games, and then we'll contact Pennsylvania Skill Games, and then if they decide that they don't want to put the location, the terminal in that location, we can do so, but we just can't give that vendor for that location in Beaver County better pricing than what they're paying.

What their -- I don't want to put words in their mouth, but my understanding, that their interpretation is nobody in the Commonwealth can get better pricing than them ever for any game. That there are rights in that agreement that transcend Beaver County that connect through the entire

Commonwealth.  That we have to approve all versions of the software through them before we do -- upgrade any software or change it, and on top of that, that right of first -- it's paragraph 4 in the complaint, the right of first refusal, there's language that says in certain locations, if the buyer elects to not to place games in certain locations, it doesn't define them.  Okay.

Then the next sentence says that the vendor cannot have pricing I think that's better than them.  I think their interpretation is that means no vendor can have, no operator can have better pricing than them.  That those rights transcend Beaver County and it's just a whole statewide thing. I can't understand how that can possibly be an interpretation, and I'm not sure if it's an ambiguity that the Court needs to resolve, which then triggers parol evidence, which will then trigger a whole lot of other things that you are going to hear about later whenever we talk about exhibits regarding draft agreements and other parol evidence that probably should be excluded, especially because this is a sale of goods for more than $500 and the Statute of Frauds kicks in.

So I'm not at this point sure that I'm answering your question.

THE COURT:  You have.  And you've provided some other information which will be helpful.  Thank you.

MR. NEISER:  Thank you.  Is that it for now?

THE COURT:  Yes.

Mr. Zegarelli, I'm happy to hear from you on this issue.  Let me first ask you are you bringing a breach of contract claim based upon a most favored nation concept?

MR. ZEGARELLI:  I think so, yes, Your Honor.

THE COURT:  Where is that pleaded?

MR. ZEGARELLI:  The favorable pricing --

THE COURT:  Well, I don't expect you to have that necessarily at your fingertips, but I didn't see it pleaded and I don't see a damage claim that is based upon that concept.  The damages, as I saw it, was more on the right of first refusal.

So I'm just trying to get at if this is a claim, where is it and what are the damages?  Perhaps they don't have to be calculated by an expert, but I don't see anything in your expert report that relates to a most favored nation concept.

MR. ZEGARELLI:  I would have to -- if you grant me the time, I'll look through the document.  There is language with regard to the fact that -- it may not be called that, but I do recall, and I do have the pleadings with me, Your Honor, that there's language that they had breached the provisions of the EPA.

Now, whether or not a breach of contract claim, as pleadings go, was insufficient to notice on every term and

32

condition, maybe that's a broader question I have to consider, but certainly breach of contract -- I'm sorry, the EPA was attached.  There's clearly a breach of contract action.

I don't think that under the federal standards you have to necessarily identify every breach, but I can say certainly that the sales to competitive vendors breached the agreement and, in fact, that was the reason for -- Your Honor might not recall.

The way the case got started was, prior counsel sent a demand letter for breaching of the exclusive right of first refusal, most favored nation with a suggested county case and said, you know, if you want to look at this, call me and we'll talk about it.  But then POM of Pennsylvania, perhaps a predecessor or the predecessor, we don't know if all 17 are predecessor or successors or only one is a successor, but POM then filed the lawsuit.

So I would assert that the rules don't require necessarily that claim to be isolated such that it sort of has to be pleaded separately.  There's a breach of contract action.  The breach of contract was asserted.

If at any time in discovery that needed to get clear, that certainly could have been flushed out or a motion for a more specific pleading could have been flushed out, but our position is, Your Honor, that it is sufficiently pled for the purpose of notifying that the most favored nation is at issue

33

in this litigation.

THE COURT:   What are the damages and where could I find that information?

MR. ZEGARELLI:   I think those damages, Your Honor, are part of the calculation of our expert.

THE COURT:   Okay.

MR. ZEGARELLI:   Our expert actually calculated the fact that -- and Your Honor will recall that we did try to amend the pleading to, with regard to a cause of action of raising our prices, being PSG's prices.

There are other people who have paid much less for fills than Mr. Unis and PSG and that was built into our expert report, Your Honor.

THE COURT:   Okay.  I'll have to take a look at that. It looked to me like it would say right of first refusal claim as it relates to the breach of contract.

So are you alleging there are separate damages as it relates to the most favored nation?

MR. ZEGARELLI:   I think, Your Honor, that what -- that the cause of action that occurred violated all of that, and so they really aren't discrete or separately discrete concepts.

I mean, PSG -- the goal of PSG was to, let's call it, quote, unquote, "own Beaver County," okay.  They're from Beaver County.  They wanted to own Beaver County.  But that

doesn't mean they can't sell it anywhere else, et cetera, but that's where they wanted the specific exclusivity because they have competitors in that area, and exactly what was not supposed to happen happened, which is -- and I get -- and I'll just speculate to make a point, if you don't mind, Your Honor.

Competitive operator that was supposed to be under the PSG's thumb by this deal, called up Pace and said, "We want to buy 50 machines.  Pace says, "Well, you got to go through Albert."  And then they say, "There's no way we're going through them.  They are our competitor.  If you don't want the sale, then you don't want the sale, but we're not going to buy it through our competitor," and I mean, then basically just said we'll take the deal.  That's the gist of it.

So the most favored nation, the exclusivity, the, you know, the loss of, you know, charging less was all part of this.  It's just all part of the same breach.  It's just different attributes to that same breach.  Now, you know, it's contested.  That's a trial fact, what the jury will believe, but clearly that's what our assertion is, that they just all combined because they all happened at the same time.  They were just all conjoined.

So that's our position on that, Your Honor.

THE COURT:  Whatever damages are in your expert report for breach of contract are the damages that you are

claiming regardless of what theory you are operating under --

MR. ZEGARELLI:  Yes.

THE COURT:  -- in the breach of contract action.

MR. ZEGARELLI:  I don't -- other than maybe I would argue there's a good faith implied covenant, implied covenant of guide faith in every contract, that may be a theory.  I don't think these are different theories.  I mean, a theory is the cause of action is a breach of contract.  How did you do that?  You do this, this, and this, which we will prove at trial.  We fit -- all of that is already built into our expert report and our expert will testify it to that because that's what we have the invoices for, all of those sales in Beaver County at the price that they sold in Beaver County that was less than we were paying.  So that's just -- that's all part of our calculation.

THE COURT:  And I take it affiliates of Miele aren't really a relevant issue here.

MR. ZEGARELLI:  Well, that's a good question, Your Honor, and if you recall from the motion to dismiss, there will be testimony regarding what was meant by the word "affiliates" and that word has implications based on the January agreement.

The Court may recall, there's the May agreement that was signed by PSG.  There was also an earlier January agreement that was -- that came out right after the Beaver

County court case, right?  That was 2014, 2015, January.  So the court case comes out late November.  In fact, December.

January, there's a January agreement.  That agreement was signed, if I recall, Albert Unis & Affiliates.  It, ultimately, four months later got signed as Pennsylvania Skill Games.  So that word "affiliates" will be the subject of testimony, maybe contentious testimony, but it will be the subject of testimony.  Now, on the issue of Miele --

THE COURT:  If I can stop you just for a moment.

MR. ZEGARELLI:  Sure.

THE COURT:  So you are moving into Miele affiliates, which is what my question was.

MR. ZEGARELLI:  Yes.  So now, Miele & affiliates, it is similar to -- in a way, it is similar to all these successor in interest to Pace.  Right?

Miele does business -- and if I can be candid, Your Honor, it is, from our perspective, as a claimed injured party, very -- you know, it's injurious for us to hear that, you know, all of these sort of corporate moves are allowed to be done in a way that sort of avoids the question.  So it's the more complicated you make the problem, the more likely things become irrelevant and you get to splice them away.  So that's true for Pace, but it's also true for Miele.

We have testimony -- and, in fact, I have it here if you want it from Mr. Stahl.  There's Miele Manufacturing as an

entity, which is a distributor.  Then there's Miele Amusements, same guy, two different companies, that is a competitive operator.

So once again, you know, so Pace and POM and Savvy Dog and that whole, you know, that whole party group will say, Oh, well, you know, like this is the only party.  Right?  And they try to splice it and dice it.

But the truth of the matter is there's Miele Amusements and there's Miele Manufacturing, and the fact that one is an operator, a competitive operator and one is a distributor, both of which are injuring PSG, that's relevant we believe for the jury.

Whether -- it is just evidence of what is going on, and it is, you know, simply not fair, Your Honor, to say that because you are splicing it and dicing it like I'm making one party into two entities, one is a party, one is not a party, therefore, I get to escape a conversation for the jury?  We just don't think that's fair, Your Honor.

So the Miele affiliates are relevant because if -- because we presume Mr. Miele on the stand when we asked Mr. Miele, you know, timing is an issue, you know, now, before, but do you control both of those entities?  And we think the answer is yeah, he controls them both.

So it's not really fair to say, Well, Miele Amusements, who is an operator and a competitive operator, and

the human being that controls that entity, that does human being things from a competitive advantage perspective is kind of a carveout as a human being because now it's in that entity and it's not Miele Manufacturing who took the distributorship by Pace's actions, you know, together, to take that distributorship from what should have been PSG.

THE COURT:  So you'll acknowledge, I assume, though, that your unfair competition claim goes to the use of the trademark?

MR. ZEGARELLI:  Certainly, it does go to the use of the trademark, Your Honor.

THE COURT:  And that your breach of contract claim is only against Miele Manufacturing?

MR. ZEGARELLI:  It's against Miele Manufacturing, Your Honor, but the evidence -- so just to be clear, yes, we acknowledge who the party is.  But as a matter of testimony to go before the jury, we believe it's relevant that Miele Manufacturing as a distributor also distributes to Miele Amusements, who is controlled by the same entity and, you know, there's still that competition.

So when a jury is making inferences -- you know, human beings don't work in little packages like that, right? I mean, if a human being is competing with you, if they're competing with you in Lackawanna County, you know, they -- that -- you can infer that there is -- that fact is relevant

or can be -- it is relevant for the jury that that fact makes this fact more or less likely, because if you weren't a competitor in Lackawanna County -- if I'm saying that correctly -- you may or may not do things as averred for Beaver County.

THE COURT:  All right.  I understand your position.  I think we have exhausted this issue.  So thank you.

All right, there was a motion filed by POM about limiting evidence relating to the trademarks.  Mr. Neiser --

MR. NEISER:  Yes, Your Honor.

THE COURT:  -- are you going to speak to that or --

MR. NEISER:  Do you want to do it or me?

(OFF-THE-RECORD DISCUSSION)

THE COURT:  As I understand it, your motion is narrow.  In other words, either party or any of the parties can use the applications, things that were submitted, admissions made in there and so forth.  It's just that the jury is not going to be told that by filing an application or by having a registration or anything of the sort, that this means that one party or the other owns the trademark.  That's up to the jury to decide.

MR. NEISER:  That's correct, Your Honor.

THE COURT:  Okay.

MR. NEISER:  I think that I don't really need to say anything else.  I mean, we have state trademark registration.

We recognize the limitation of it, and I recognize we have -- this is why we are here and we are in Federal Court.

So can Mr. Zegarelli say we have filed registrations? Sure.  Here's the registrations.  Can we say we filed, you know, opposing ones and we have moved for cancellation and opposition, and we also filed a state registration for the trademark that gives us the rights under the state law that you will instruct them on at the end of trial?  Yes.

What I don't want to do, and I don't think would be accurate, is to say -- because we do have two trademarks.  We have the word mark and we have the stylized mark.  As I understand the Court's ruling in summary judgment, which I believe is binding on the parties, as law in the case, is that it's merely descriptive.  It's just -- it's the words.

Pennsylvania Skills filed on the supplemental registry and -- on the register, I'm sorry, and it has really no legal significance as far as we're concerned.

What I think would be prejudicial to both sides, would be to say we own the trademark by virtue of registration.  This isn't that kind of case.  So it isn't like we have competing, you know, I filed a mark.  It is sitting on the principal register.  I can use that as prima facie proof of ownership.  Neither party has that.  Because even though the registration was done, the opposition was filed or -- I'm sorry, I'm using improper terminology.  An application was

filed.  That does mean that there's registration.

THE COURT:  Okay.

MR. NEISER:  And that's the only thing I'm trying to prevent the jury from hearing.  I mean, if we want to share the application, sure, but we can't say that we own the thing.

THE COURT:  I'm curious about your answer to this question.  Is it possible that the jury could conclude that neither of the parties who claimed to own the trademarks do?

MR. NEISER:  We were talking about that yesterday, Mr. Deasy and I.

THE COURT:  I overheard you.

MR. NEISER:  Okay.  I'm sure you did.  There's a disturbance in the force.  No.  I think -- I mean, I guess they could, but, you know, it's an interesting question because nobody else has intervened.  We're the only parties here who are going to lay the facts and the foundation.

You know, here, let me back up for one second, Your Honor.  I don't know, and that why I was sitting in Mr. Deasy's office saying, you know, it's kind of interesting, I wonder if they can do nothing and not award this to anybody because --

THE COURT:  For instance, if there was no secondary meaning.

MR. NEISER:  If they found there was no secondary meaning, and that's going to be incumbent upon us to put the

testimony in.  Great.  But, sure, they could find that.  They could say this is -- we're going to draw it even, neither one of you own it, you are both dummies, and there's no ruling, which we're going to have to talk about in the jury instructions.

But practically speaking, I can't see how that happens because there's only two parties here.  I'm not sure if the Court is going to, you know, what instructions you'll choose in the end.  I guess they can, but I think the prospect of that is really, really low.

THE COURT:  All right.  Thank you.  Appreciate that answer.

All right, Mr. Zegarelli, happy to hear from you on this issue.

MR. ZEGARELLI:  Your Honor, I'm not quite sure that I understand exactly the relief being requested.  We do not or certainly I do not, as counsel, intend to set forth legal statements that are not properly the law.

So I mean, to the extent that a supplemental registry registration, which PSG owns, it is fully registered on the supplemental, it's not an application, you know, whatever rights are pertinent to that or whatever legal inferences can be drawn, I mean, I think those are proper instructions with regard to, you know, this is the way the law works and, you know, you can find what facts you are going to find.

I'm not quite sure.  I seem to recall there being something in the motion that said that there's some concern I'm going to do something in my opening statement.  I'm not sure I said that at any time, that something is going to be part of my opening statement.  So I think that's just speculation.

So, Your Honor, I mean, to the extent there's an order saying we're not allowed to make statements of applicable law that are not accurate, I mean, certainly we concede that is sort of self-evident in this context.  But, you know, those -- that registration does say that it met the standard on the -- from the Federal Government that a descriptive mark is capable of registration.  I mean, that's part of the standard.  So I mean, that's proper.  That's proper legal standard, duly accepted.

So in short, to the extent the order is seeking the obvious, we're not going to say things that aren't legally proper.  I mean, that's, you know, I can consent to that.

To the extent it's saying that we're not allowed to say things about -- in a trademark case no less, we're not able to say what the circumstances are with regard to an actual trademark registration at the patent trademark office, I think you can't pull that from a trademark case.

THE COURT:  Let me ask you the same question I asked Mr. Neiser.  Is it possible a jury could find that no one here

owns a trademark?

MR. ZEGARELLI:  I don't think we would instruct it that way unless we're somehow constrained to do so.  But, you know, I suppose to the extent the jury is free to make a decision such as that, then I guess the jury can make that decision, but I don't think Mr. Neiser and I, either of us would necessarily instruct that way, at least that's my understanding so far.

THE COURT:  No.  And speaking of instructions, it seems to me that there really isn't necessarily a dispute here that can't be resolved by the parties agreeing on what the jury would be told about evidence that is submitted relating to the trademark issue because certainly no one is going to be able to put in evidence that they own it, just that here's why we think we own it for all the various reasons that there are.

And if an application, a registration, whatever it happens to be is put in front of the jury, I think the solution here could be making sure they are instructed on what that means or doesn't mean.  It doesn't mean that by law, because of this document, you own the trademark.

It's just -- you know, so I think this issue can be resolved through just careful wording on what I would tell the jury either when the evidence is presented or in instructions at the end.

So I think both of you -- well, all parties will be

free to put in evidence to demonstrate why they believe they own the marks.  I think we just have to be careful about the jury not concluding because you applied or because you have a registration, or whatever else the evidence is, that we're telling them that that document or that evidence is conclusive proof of it.

So I think we can resolve that issue.  We can certainly talk about it further at our pretrial conference, but it's something for counsel to think about, about can you agree on what we might tell the jury and when should we tell them that?

We can tell them that multiple times during the trial so that no one feels prejudiced by the fact that this evidence is being presented.  So I think that's an issue we can resolve.

MR. ZEGARELLI:  Thank you, Your Honor.

THE COURT:  Mr. Zegarelli, while you are standing, I'm going to move to your motion about excluding the references to compliance reports, compliance officers.

I want to make sure I understand what your position is.  I'm also going to have some questions for POM on that regard, but I'm not sure I truly understand compliance officers and compliance reports.

So, Mr. Zegarelli, if you can illuminate that a bit and then, Mr. Neiser, I'm going to ask you the same thing.

MR. ZEGARELLI:  Sure.  I do have some samples from Mr. Goodling -- and, Your Honor, thank you for taking a look at this document.

This document -- and I'll paraphrase it generally for you, Your Honor.  So this document is a document prepared by Mr. Miele or Pace and there are these people called compliance officers.  These compliance officers are paid for -- I'm not sure I'm really clear at this point, but I believe it's Miele, but it's a little gray I think because of the way it's presented, but these compliance officers wear badges, and what they do is and they're employed by Miele, and they go into your local 7-Eleven and they see machines, and if those machines are, for example, not a Pace game, they will then, you know, write up a report, being the reports you have.

So you see it says in the ones I gave you -- and these names, by the way, Your Honor, have changed.  They have gone from gambling, gaming, compliance reports, different reports have different names, and some of those names changed after discovery.  We just received another one recently.

So if you show a jury this -- let me back up.

So the compliance officers go in, and these are former -- I think in every case, former Pennsylvania state police officers.  So I call their demeanor assertive.  They are trained for that.  They go in, they are wearing a badge. Oh, those games over there, do you understand they're not Pace

games?  Yes, I do.  Do you understand they were not adjudicated to be legal?  Now, maybe they say they're legal, maybe they say they're not adjudicated to be legal, which -- and then now the poor guy at the 7-Eleven has the bejesus scared out of him or her or, you know, so that's what happens.

Then they go back.  Now, of course now my client is getting calls, like I got this guy in here.  He's saying, you know, these games -- so then what happens is they go back and they write up these reports.

Now, to some extent, these reports are reflections of somebody -- you know, they are reflections, of the compliance officer, the badge compliance officer.

So to some extent I understand the report, nature of it from a hearsay document perspective.  On the other hand, these are self-serving litigation based reports named unlawful gaming reports, right.

So if you show this to a jury, you know, from a badge guy that's a former police officer testifying, you know, it's -- I think that's like a police report saying murder report, right?  It's just like you're already guilty by the title itself.

So what we're asking for is some accomodation from an evidentiary perspective that somehow these are, I don't know, redacted, or somehow cleansed in a manner that will not be prejudicial when seen by the jury as if these officers, you

48

know, the truth of their assertion, that, yeah, because some non attorney, non judge, non police officer, you know, paid, employed with a badge on, goes in and says, "Well, those aren't Pace games, therefore, they're unadjudicated," that doesn't, you know -- what does that mean?  What does that mean?

So the fact that the game was there, it's okay. Right?  That is a fair report, but all of the stuff about, you know, what it says in here, you know, what's illegal, what's unadjudicated, the title itself, that just -- we think that's prejudicial for the jury for Pace to use it.

THE COURT:  So from your perspective, to make sure I understand, there could be testimony by someone who goes in to a 7-Eleven, wherever, and comes back and reports that there were noncompliant machines, illegal -- I'm going to use those words even though they do not necessarily mean the same thing -- that the testimony itself if somehow narrowed in terms of not getting into this is officer, or something along those lines, that the evidence that there might be a machine in a particular location that has certain software, or whatever, that testimony is all right, as long as it is characterized in some way that you don't feel is unduly prejudicial to your client.  Is that your position?

MR. ZEGARELLI:  Okay.  So first of all, on the report itself, so we think some of the titling, et cetera, is just

49

litigation preparation, self-serving, prejudicial.

As to the testimony, Your Honor, you know, it's a little tricky with begging the question of a hidden premise. I mean, as soon as somebody says, you know, I went into the store and I'm reporting back that it's not compliant.  Right?  Now, they hidden premise is this word "compliance," right, because it's a self-serving word that really isn't a fair word anyway without some foundation because compliant with what?  And, you know, so PSG would say how can we not be in compliance because the EPA doesn't have anything to do with -- it doesn't talk about compliance, and all this compliance stuff that you are raising didn't occur until after the litigation began because what happened is after the litigation began, then, you know, Pace and Miele, they send out new terms and conditions to operators.

They then say sign these new terms and conditions. Pennsylvania Skill Games says I already have my contract. Right?  I'm not a new operator.  I've got a contract.  Why would I waive and give up rights to sign a new operating agreement?  Right?

So Pennsylvania Skill Games doesn't sign the operating agreement, to which then Pace is not happy and says, Well, if you don't sign it, now we're not going to give the most favorite nation, now you are not allowed to put a Blue Sky machine next to a Pace game.  Meanwhile, PSG says we have

always had competitive machines together.  So now you are telling us that's not compliant, but that's not part of what we ever did.  Right?  You can do that to the new guys, right, they're coming in new.  We're grandfathered.  We're one of the originals.

So there's the report issue and how it is named and how it is framed and then there's the actual testimony issue, which I think there needs to be a proper foundation for what compliance means and how they even -- what does that even mean, just like -- and where is it sourced and give me all the terms and conditions and, you know, just tell me all about what you mean about this word "compliance."  So when this compliance officer goes out and reports compliance with regard to PSG, I need a foundation for where the source of all of that review occurred.

THE COURT:  So there's really two different kinds of compliance here that I'm hearing.  One is what the terms of the equipment agreement is where the word "compliant" is used throughout, you will supply compliant terminals and so forth.

What you're raising I think, and at least in the example that we're looking at, is that there was another terminal with another kind of game placed in the same location as a Pennsylvania Skill Games and perhaps that isn't compliant with something.  Are there different compliances?

MR. ZEGARELLI:  No.  I'm so glad you raised that.

Absolutely.  I'm very glad you raised that, Your Honor, because that's a really important point because I know we're going to get to the compliant as it relates to the EPA.

This is just simply a unilateral sort of -- the word "compliant" is attached to a different standard.  Right?  So you've got the compliant and the EPA, which it's all through all the pleadings, the Crimes Code standard, right, that's all through the pleadings.  Okay?  So you've got that and the EPA and you are absolutely right.

This term "compliance" is -- and this is where we get to the code of conduct.  That's kind of the issue because now what we are talking about is just Pace and Miele after the litigation began, they start sending out these compliance officers to find out if operators aren't complying.  Aren't complying with what?  Aren't complying with codes of conduct and all of these ex post facto rules that we don't think belong to us to anyway.  So that foundation, Your Honor, has to be laid and properly set.

THE COURT:  All right.  Thank you.

Mr. Neiser.

MR. NEISER:  Thank you, Your Honor.

So, and this has been a problem for some time on the difference between what is a compliant terminal and compliance.

So here's -- I'll give you background how this works

52

in 30 seconds or less.  We have former state police officers who work for Pace-O-Matic.  They are employed by Pace-O-Matic, and whether or not the terms or the titles or the reports have changed have nothing to do with his client.  It has to do with how the operations are in the state because we have to lobby the legislature.  We're litigating with the Commonwealth throughout the Commonwealth, and as you are aware from our filings, about the legality of the games, and we also have terms and conditions and agreements with other operators, and in all candor, PSG has never signed it.

So we're not going to be coming in here and raising the issue that they are in breach of the terms and conditions that they did not sign.  We're just not going to do it.  I made that clear.  I have no intention of doing it.

There are no locations who are parties to this lawsuit.  This is not a class action lawsuit by 7-Elevens because a few of our Pennsylvania state police officers, including a Rick Goodling who will be testifying live here.  Mr. Goodling was there on the controlled pickup that was involved.  I mean, he's a former state police officer, and he is going to be able to testify live and lay the foundation that we're talking about.

Those compliance officers go out to enforce the terms and conditions and determine whether or not the terms and conditions by other operators are in compliance with the

53

contract.  That's what they're there to do.  They're not rent-a-cops that go out there and say, you know, but what they do in that enforcement is they look at the types of games that are being operated.  It's our business model.  Our entire business model is on legalized gaming.

So what they do is they make observations.  They don't have any enforcement ability.  They can't shut down the location, confiscate equipment.  This isn't the Pinkertons.

But what is interesting from this report and the purpose, the evidentiary purpose for it is if you'll note, Your Honor, the narrative and the identification of the machines.  They all have what are called TIDs, terminal IDs.  It allows you to track the origin and ownership of the machines.

In the narrative from the compliance officer -- and we can call them whatever you want.  I mean if we need to -- if the Court feels that it's prejudicial, we can call it just "report," and redact.  There's always ways to do this.

But the purpose of the document is on 9-17-2019, I entered the above bar, which is in Leeper, Pennsylvania, north.  Okay.  I noted two PA Skills/Pace-O-Matic games.  They were labeled PA Skill, with the only difference in the header being the color and the word "game."  I'm sorry, I missed the sentence before.  A Blue Sky game and a Gracie game.  Blue Sky and Gracie are competitors to Pace-O-Matic.  Based on our

understanding, they have never been adjudicated to be legal in the Commonwealth of Pennsylvania.

So what we have are machines -- and this is what the narrative suggests -- owned by PSG that bear the trademark and bear the PA Skill name, but they contained software that isn't Pace software, which goes to our unfair competition claim.

THE COURT:  Okay.  I understand that.

MR. NEISER:  Yes.  So, and the statement on 9-25-19, he searched the TIDs and verified the PA Skill Games to be operated by PA Skill Games Vending/Albi Unis.

So in some of the other reports that we get on these compliance reports, or whatever you want to call them, are targeting by PSG of known locations where Pennsylvania Skill branded games, containing our software, put out by our operators are having their locations interfered with.  So when we get reports of that, we send people out to check it out.

So, but what I haven't seen in the pleadings or in the damages reports, or anything that would tie together the elements of any claim that would be litigated is how that's a breach, what's the cause of action and what are the damages, which I think is a recurring theme.

So there are limited purposes and uses for these reports, and they really go to our unfair competition claim and, you know, also, Your Honor, part of their claim is that they were unable to conduct unfettered business in Beaver

County under what they call an exclusive contract which doesn't appear in the contract under most favorite nation, which isn't in the pleadings and isn't in the contract, under the guise that they are one of the originals and they have rights that transcend everybody else which doesn't appear anywhere.

So I think what we have is a confused usage based upon -- I mean, I'm not a mind reader. I can't figure out some of the claims that they are making and what they are going to bring in front of you, which is why we filed some of these motions, but I will offer this.

If, for example, this Court deems that this would be a relevant document, and I think that -- I can't see how it would not be a relevant documents or documents like this, we'd be happy to redact unlawful gaming or gambling at the top and just call it report. I mean, that may cure it. But I think the statements within that report, especially they're business records. We're going to have the director of compliance here live to testify. I think the substance of it is relevant and it would be admissible.

THE COURT: That would be in terms of your unfair competition claim that from your standpoint, PSG is using the Pennsylvania Skill name and putting that on machines that don't have your software in it.

MR. NEISER: Yes, Your Honor.

THE COURT:  Okay.  All right.  What about timing?  Does it matter that this was in 2019 as opposed to before the lawsuit was brought?  Is that an issue here from either counsel's standpoint?

MR. NEISER:  I'll go first since I'm still standing, Your Honor.  I don't think it does.  The timing of the reports -- I understand the argument and the suggestion that this is something we just fabricated because, you know, we had this dispute with Pennsylvania Skill Games, but, you know, the reality is the compliance after we've received this decision in Beaver County and all the things that flowed after that, okay, because the Court is aware, we were -- we had sold games in the eastern part of the state before the pick-up, controlled pick-up and before the Beaver County decision, and it really -- I mean, I guess -- I mean, it would be fair game for them to make the argument that we were just picking on them.  I guess.  I mean, I'm sure that potentially could be relevant, but I don't think the timing of it has anything to do with anything.

THE COURT:  It's more a subject of cross-examination.

MR. NEISER:  It's a -- thank you, Your Honor, thank you.  What I said in 20 words, you said in five.  But where I think it's going to become important from an evidentiary standpoint is to show -- you know, they're complaining about Beaver County and their inability to put locations out in

Beaver County when they only bought like 60 to 70 or 80 machines, and now they're in Leeper and all of these other different locations.

So I think it's also important for the jury to understand where these guys are operating and how they are doing it.

THE COURT:  All right.  Thank you.

Mr. Zegarelli, from a timing standpoint, do you contend that because -- let's just take the sample that we're looking at -- this is in 2019, somehow it's not relevant or the timing itself is an issue?

MR. ZEGARELLI:  We do think it's -- it's not evidence the case rises to a cause of action, because it is post litigation, and the text itself -- and this is one of many, Your Honor.  So, you know, this is for the purpose of giving an example of how the labeling of it in and of itself.  To the extent it would be introduced as an exception to hearsay as a business record, we want to make sure that somehow gets filtered from a fair perspective, but some of the language deals with issues that are, quite frankly, post litigation, codes of conduct that post litigation, and so I think to some extent it is irrelevant on that basis.  I think it is not a proper exception to hearsay or certainly as -- because it is post litigation, so time is irrelevant, plus the way it is labeled and framed and, in some cases, the language is just

self-serving litigation, post-litigation language.

THE COURT:   Well, that seems to me, the latter point is subject of cross-examination, but aren't both parties seeking damages not stopping when the lawsuit was filed but up to this very day?

MR. ZEGARELLI:   That's a fair point, Your Honor, and to the extent that there are facts set forth in the document, you know, we get that part of it.  Right?  Like if somebody went in after the fact and observed a fact, that is fair.

What prompted the motion, Your Honor, was a more basic issue that -- and keep in mind, Mr. Neiser has now represented -- and I think I put it in my latest filing -- that he's now stipulated that many of these people are going to show to testify, when earlier we weren't -- I wasn't quite sure -- okay, he's shaking his head.

MR. NEISER:   No.

MR. ZEGARELLI:   We can address that separately.

THE COURT:   Just so everyone knows, once we're done with argument, we will talk a little bit about trial issues. So we'll save that for now.

But I don't think Mr. Neiser, from his head shaking, intends to bring in a lot of these folks.  But what I'm hearing from both of you is this sounds like an issue that we may be able to resolve by eliminating certain language, having people testify about the facts and not legal conclusions or

something else.

So what I would suggest for now is that the parties talk about this and see if you can come up with a solution that works for everyone in terms of how we can characterize the reports, the people doing it, eliminate facts from something else, and if you can't resolve it, we'll re-address it when we get together at the pretrial conference.  Does that work for everyone?

MR. ZEGARELLI:  Thank you, Your Honor.

MR. NEISER:  Yes, Your Honor.

THE COURT:  I want to go off the record for just a moment.

(OFF-THE-RECORD DISCUSSION)

THE COURT:  I think an interesting issue to me, and we have alluded to it throughout our argument today, was raised by POM in its motion regarding the legality of the software.  I have some of my own thoughts about this and some questions, but, Mr. Neiser, since it is your motion, why don't we start with you.

And let me ask an initial question, which is:  If you are seeking to prove that PSG unlawfully used the Pennsylvania Skill mark in conjunction with illegal or unauthorized games, how can we exclude evidence about legality?  And if my question wasn't clear, I'm happy to clarify it for you.

MR. NEISER:  Your Honor, I think it's a fair

question.  I think it's, you know, my job to explain why that may not make any difference.

So we're talking about purity of our mark and the software that we're developing.  This -- contrary to what PSG suggests, we are operate throughout the state and are attempting to be good citizens operating legal games.  Okay.  That's our overview.

We have hired the compliance officers to try and police our own operators.  We lobby.  We testify in front of the legislature.  We've been involved in God knows how many lawsuits similar to the Beaver County litigation and attempt to do things the right way.

It would be very easy, and as the Court is going to hear Michael Pace testify on the first day of trial, I believe, that we have a history of operating gaming machines in multiple jurisdictions, some of which would be legal in Pennsylvania.  Some of which would not be legal in Pennsylvania.

The Court has probably seen a million of these types of games, and when I refer to "these types of games," I mean ones that run the gambit of being a slot machine to our devices.

So when we make an unfair competition claim against PSG related to how they put -- what software they put in the machines, it is because, one, in defense of our -- their

contract claim, we do, indeed, have a fraudulent inducement of an affirmative defense, and we also have a counter breach of contract claim that we filed, not only for an accounts receivable, but also for a breach of duty of good faith and fair dealings.

What this Court will also hear, we had a companion case in front of the Court involving a company called Action Skill Games, which this Court also had jurisdiction over, and we offered some deposition transcripts from that testimony that all parties were present for and had the same motivation and opportunity to cross-examine the witness.

What we've learned is that while they were doing a deal with us, they were also doing a deal with other operators to compete with us in Beaver County.

So our unfair competition claim has zero to do with the legality of our software. It has everything to do with preserving the purity of the brand and that the brand, the Pennsylvania Skill logo that we created, the mark that we created a secondary meaning in the market, all those things go with it, contains our software.

This would be the equivalent of buying the Gucci handbag in New York, but it's not a Gucci handbag. It just says "Gucci handbag." And by PSG going out into the hinterlands and placing machines that do not have our software -- we have admissions in that deposition transcript

by a Mr. Mayle, M-A-Y-L-E, where he specifically states that they were taking our gaming terminals, changing out the computer software boards and putting Blue Sky software in, which is a competing software.

So that's really what it is, Your Honor.  It's preserving the brand.  It's like, you know, branding this iPhone, but it has some kind of cheap knockoff inside of it.

With respect to the --

THE COURT:  I'm sorry to interrupt you.  So it doesn't matter what is in there.  In other words, it's not that what is in there is illegal.  It's that it is not your software.

MR. NEISER:  Correct, Your Honor.

THE COURT:  Okay.  Thank you.

MR. NEISER:  Because I'm not opening the door to what's legal or not illegal or what's adjudicated or not adjudicated.  I don't think that has anything to do with the lawsuit.

I know that PSG may disagree with that, but the Court made I think the best observation earlier in argument and asked questions about where are those damages in the report?  Where is the allegation in the pleading?

We understand that they have an allegation throughout the complaint about compliant terminals and the desire to buy compliant terminals, but, Your Honor, I think it's just a

63

smear.  That's what it is.  It's a smear because it's one way to push buttons on an opposing party in litigation.  There isn't a single scrap of evidence, there isn't a single number, dollar sign related to damages that related to the compliant terminals.

May I approach, Your Honor?

THE COURT:  Yes.  Thank you.

MR. NEISER:  Judge, if you turn the page, I've handed you an unmarked exhibit, and this I'll represent to you is a transcript of Albert Unis, IV from April of 2019.  He was sitting as corporate designee.  This starts on page 91, line 4, and the previous testimony was that Pace or Miele went out of compliance and put him at risk, and I ask, How did he put you at risk?  He had changed the software multiple times from the original court case, saying it's the same product that won the court case and puts me in jeopardy.

We can stop there.  There hasn't been any proof, allegation, dollar sign, any damages amount that says how that putting him in jeopardy has anything to do with this lawsuit.  But here's the crux of it though.  I hate that word.  I can't believe I just said it.

If you go to the bottom of the page on 91, at line 23:  If Pace-O-Matic offered you tomorrow a jump drive to convert all of your games back to 44, would you want that?

44, Your Honor, is the software version that was the

subject of the Beaver County decision.

Turn the page, he says:  It makes it impossible to operate when you have other operators in your County.  And you can read that, yourself, Your Honor.

But at the bottom of the page on 22, I ask him again:  Yes or no?  Answer:  I would not want to do it because it puts me at a disadvantage.  It would put me out of business like it was doing.

So -- and it goes on.  So the point is the evidence of record is that not only were they given the opportunity, they could, he was asked the question if you wanted to retrograde it so he could make it a compliant terminal, they refused to do so.  Okay?  That's what the evidence is going to be.

So, and why am I giving you this detour?  Because when you look at their argument of that the games are not compliant, not only have they not articulated damages or how it relates to a cause of action other than asserting it, this is a sale of goods.  It is governed by the Uniform Commercial Code.

If it wasn't compliant, they have to seasonably reject it and let us know and give an opportunity to cure it.  They did not do that.  In fact, as you heard from the testimony, they knowingly proceeded, they were given the opportunity, and if given the opportunity to retrograde, they

would not accept it.  So that's one.

Number two, as the Court noted in our motion to withdraw the expert report of Nick Farley, which you granted, and you noted in your opinion that -- because we do not have the burden of proof to establish legality, which is why we withdrew that expert report and which is why it was granted, that the Court noted that PSG did not elect to follow that particular strategy.  They have not since elected to follow that particular strategy.

So what we're left with is a prospect whereby PSG is going to stand in front of a jury and seek a verdict that says that our games are not compliant with state law.  They're out of compliance, with no evidence that we would need to articulate or have knowledge of or notice of prior to that happening.

What I received on Monday, and Mr. Zegarelli and I in exchanging our exhibits, is a video, and I can send this to the Court, I can show it to the Court, but it looks like video game play where they misname our game to begin with, and they put game play side-by-side to say that it's illegal, that the game has changed.  But there isn't anything in the pleadings or any argument, nothing of record that shows how the differences in game play actually damaged them.  That's one.

Number two, I don't know how they're going to be able to put that evidence in without an expert.  Okay?  They didn't

provide an expert report.  There's a million guys out there who could create an expert report, and, in fact, they hired Nick Farley themselves to try and put a competing product in the marketplace years ago.  So they had the opportunity to do so.

Getting back to the evidentiary issue, the expert issue, is -- without aid of expert testimony on a scientific, technical or otherwise complex subject that's outside the ken of the ordinary lay juror, they can't bring that testimony in.

Rule 701, even if Mr. Unis has been an operator for years, and I think he does that, among other things, he can't do that.  It's rational perception based upon the witness' own observation, which is fine, except for there's a limitation under 701.  The advisory committee notes and all the cases are pretty clear on this; it's limited and it stops at the door of scientific, technical or specialized knowledge.  You can't have lay witness testimony on something like this.

THE COURT:  So you can have testimony that it's different.  In other words, if you saw this video that you've alluded to side-by-side, there's something different about it.

MR. NEISER:  Sure.

THE COURT:  So a lay person could testify this works a little bit differently than the way this works or this runs a little bit differently.

MR. NEISER:  I think so, Your Honor.  I think I would

question the relevance of that at that point.  I mean, what is about the difference database -- okay, let's start with the breach of contract claim.  What is it about that difference that resulted in a breach of the contract and damages?  Where are the damages?  There is none.  If there is none, there is none.  That means the claim fails.

On the trademark claim, there's allegation like they don't want to associate with the game, they don't want to associate with the fact that the software may or may not be compliant -- but they can make that argument, but to go to actually establish that, you have to have expert testimony.

The way these cases are litigated, Your Honor, throughout the Commonwealth -- and I don't even think that issue of legality is in front of the Court.  I don't even know that this Court can make a ruling or a jury could render a verdict.  It's a conclusion of law because the impoundment actions are done as a bench trial.  There's an expert from our side.  There's an expert on the Commonwealth's side.

We have provided citations to other cases where this has occurred, and it's extensive experts, technical testimony and an analysis of whether or not it is predominantly a game of skill and not chance.

So one, it's not part of the case.  I mean, they can claim that it's a lack of a compliant terminal is they're aggrieved by it, they have a complaint about it, but

converting that over four years of litigation, 30 depositions, God knows how many document productions and two reset expert deadlines, without providing expert testimony I think is where it needs to stop.

What they're really trying to do is put our entire business operation at risk and saying, Hey, we're going to raise this issue and, you know, we will call artillery on the village to save it.  But in doing so, that takes us so far beyond this lawsuit, it goes right to the heart of our entire business and it's really something that should not be put out in court.  It just shouldn't.

THE COURT:  What from your client's standpoint does "compliant" in the contract mean?

MR. NEISER:  Well, to be honest, I don't know that I can give an answer to that and I'll tell you why.  This contract, this agreement, doesn't really define it.  Okay?  It's not a defined term.  This is why we have this case in the first place.

We all know as lawyers, "Boy, I wish I could have drafted that contract," and when the lawsuit happens, "Boy, I'm glad I didn't draft that contract."

So I think the testimony that will come in -- and I can't say -- if you were to ask my client today what they believe a compliant terminal --

THE COURT:  Well, it's defined, correct?

MR. NEISER:  Yeah, it's defined as a compliant terminal, but, I mean, our view of the world is that all of the software that we've put out and the terminals themselves -- the terminal is a piece of machinery.  Okay?  Then we have the software on top of it and we have the fills that go into it.

You know, our view, and we believe it has been successful throughout all of our litigation and the other issues in the Commonwealth, including in Beaver County, is that they're all compliant with state law.  Okay.

Now, again, I don't want to bind my client.  I'm not saying -- this is me making argument, but I believe in offer of proof they were asked what a "compliant terminal" would mean when they entered into this contract because it's compliant with state law.  Okay?

But there's -- our issue is that there hasn't been any evidence, especially expert evidence, to show that it's not compliant with state law, one, and number two, even if it wasn't, which we obviously would argue against, there's been no -- there's no real claim for it.  It's just a poke in the eye.  There's no damages for it.  There's no actual claim about it.

So where I think the line between us providing equipment under an equipment purchase agreement, which is what this is, it's a sale of goods, where there's liability or

where we have to litigate the differences or the harm to Pennsylvania Skill Games that they claim is if the fact that what we sold them caused them harm, and to date, I'm unaware of and see no evidence of record that what we sold them caused them harm and, in fact, the opportunity to correct the issue that they've raised, they've refused.

So when we look at it as a commercial contract and as a sale of goods, I can't see how, based on what you're seeing and what is in the record just in front of you, how we can open the door, let them unfettered without any restriction stand in front of a jury and say it's illegal, let alone get to a decision as to whether or not the software is illegal.

THE COURT: That's part of my concern because if legality is an issue, that is an issue that would have to be determined outside the presence of a jury and, you know, if we have to determine it, if I conclude we do, we will, but if we don't have to, it makes things a little bit more streamline.

MR. NEISER: Well, I don't think you have to, Your Honor. And we reserve rights in our motion that if the Court is inclined to do so and go into this -- I mean, we're talking a completely different trial.

THE COURT: Yeah, how would we do that from your perspective if we had to do that? Is it a trial within a trial? Would we first have to have a trial on legality? Would you need experts?

MR. NEISER:  Absolutely.  There's no way for us not to because for you to make a determination under Pennsylvania law, you would -- well, one, if I want to unpack the entire thing, I think we would need to have the Commonwealth maybe perhaps involved.  We would have to have a completely separate proceeding.  There definitely would have to be experts -- Your Honor, with all due respect, I can't see how because of the technical nature of this, because what you have to analyze is whether or not under the game -- with using that game and under the game play, under each software or in the software version, is the outcome predominately determined by the skill of the player as opposed to a game of chance.

Now, what PSG is trying to suggest is if you ignore elements of the game, and you try and parse them and separate them, which you cannot do, or you elect to play the game differently, you have options to play the game, you can -- there's a follow-me function, without getting too far into the weeds, and the follow-me function is basically like the old Simon game.  They put up dots, colors, it makes a noise, and you follow each one, and it becomes progressively harder, and over time you've actually made it easier to get the skill element easier for the player.  That's the skill element.

If you choose to avoid that and you want to go into a different part of the game play, you can do that, because that's the player's option.

If you elect as a player to stay as a game of skill and use the follow-me function, which is integral to the game itself, that's how we -- it's a skill game.  That's my understanding.

To analyze the predominant skill over chance requires scientific testing.  We have an expert that we have used in other cases to do this analysis.  The Commonwealth always has an expert.  And, by the way, they always lose.

So we're very, very comfortable in the position that we're in.  Otherwise we wouldn't be -- we have 20,000 machines out there and 250 operators.  We're confident in our position.  But we shouldn't be litigating it here.

Now, to answer your question:  How would we do that?  I think they have to bring in an expert, one.  They have the burden, establish that it's not legal, and then we would come in behind them with our opposing expert, and there would be a determination whether or not the game is predominantly a game of skill and not chance.

While we can do that -- this is the Jurassic Park line.  You spent so much time thinking about whether you should do something or could do something and you never stopped to think about whether you should.  This ain't the case for it.  This is not the case.  Because they haven't articulated any damages and they haven't articulated a cause of action that's related to it.

And with respect to the trademark claim, Your Honor, what you are going to -- this association and that they don't want to be -- they didn't want to lend their name to our software because they're claiming that it's now no longer compliant with state law, first off, what you are going to see is no mention of a trademark by PSG until they filed the trademark application in 2018 and threatened us with a lawsuit. There's no record. It's all oral testimony.

There's no contract like this equipment purchase agreement that says compliant terminals. There is nothing like that.

Our argument is just a tall tale and they're saying it's an oral agreement and we can all beat each other up over it at trial.

But, until this lawsuit was filed and until that trademark application was filed, we had no idea that they even had called themselves Pennsylvania Skill or whatever they claim to be.

So for us now to say that the compliant terminals, whatever they want to call it, is invoked under the unfair competition of the trademark claim itself really is far afield because there is no agreement as to parameters or usage or anything like that that's in writing.

As a matter of fact, the oral testimony is -- I don't even know what that's going to be.

So when I reconciled this question of legality, which I mean, I don't even know how this Court could even make that ruling, to be quite honest, I'm reconciling it in all fairness to opposing counsel and in all candor to the Court and how it ties in on an evidentiary basis and on the claims that are at issue in the complaint and it's just not there.

If there's any other questions that I can answer or any additional briefing that needs to be done, I'm happy to do it, Your Honor, but I really think that the compliant terminal is a complete red herring and it was done for advocacy purposes to maybe try to put the screws to us at trial.

But if we're talking a material issue, that is going to impact, you know, our business, these operations, the employment of hundreds of people, all those things that go with it, I think we would need to stop the presses, conduct a completely different trial and bring this thing from ground zero.

THE COURT:  All right.  Thank you.  I appreciate that explanation.

MR. NEISER:  Thank you, Your Honor.

THE COURT:  Mr. Zegarelli, I'm happy to hear from you as well.

MR. ZEGARELLI:  Thank you, Your Honor.

So I'd like to at least read into the record the references to the Crimes Code.  We have ECF 1 and I did cite

to a number of references in the response to the motion, but there's also paragraphs 15, 16, 25, 26; and ECF 29, paragraphs 36, 7, 88; ECF 30, paragraphs 16, 22, 26, 31, 34, 35, 36, 41; and we can't forget in ECF 30, POM's affirmative defense that POM of Pennsylvania, it's the fifth affirmative defense in document 30, POM of Pennsylvania and Savvy Dog's claims are barred.  Software plays which are not compliant with Pennsylvania law, including but not limited to 18, 5513, which is the Crimes Code issue.  So, again, that's POM's fifth affirmative defense.

So they raised that all through this case, if anything is raised, it is the issue of the Crimes Code as part of the phraseology of compliant terminals in this litigation.

Now, issues were raised and it sounds really complicated, but, again, I'm going to suggest that this Court is equipped to make the determination, I mean that's what this Court does, what is within the bounds of the law and what is not within the bounds of the law.

You mentioned a trial within a trial.  I think the hidden premise, Your Honor, is that you need an expert.  I said that in my response to the brief.

I think it's been very successful for Pace and POM and Savvy and that whole group to date, other than this Court so the far, to just say, Oh, you need an expert.  Then, of course, what they do is they hire an expert, and if you look

at the expert, which they've withdrawn, okay, and as I said in my brief, they withdrew that expert because that expert did nothing more than what a high school student could do and maybe even a grade school student, and that is watch the game play, write down the attributes and then report.  And then say because of this, not having any credentials whatsoever in mental, physical acuity, things that we call skill, right, it's more than just the game has a push button there.  You have to attach the act to mental acuity, physical acuity, speed, all sorts of things.  Right?

Okay.  That's that issue if you need an expert.  We suggest to you, Your Honor, you don't need an expert.  People sit in casinos all day long and they're not experts and they play the game and they know how to play the game.

Assuming for a moment that this is a gambling device.  Okay?  If you just assume that for a minute, then it's no different than everybody that doesn't have any training going in and clicking a button.  Right?

Now, what we suggest, Your Honor, is if you want to find that out, Mr. Unis is very willing to come here on an evidentiary hearing and he will play the game.  We'll bring up a machine.  We'll bring up two machines.  A .44, the original machine, and we'll bring up a machine, it's a -- I think it's .63 now.  We'll bring those two machines in and we'll do an evidentiary hearing, Your Honor.

In the Beaver County case, Your Honor, at page -- and I'll cite 207-2, ECF 207-2, at page 10 of 14.  The Beaver County Court said every puzzle is winnable.  Not correct anymore.  The new games, every puzzle isn't winnable.

Now, Mr. Neiser alluded to, Oh, optional game play.  And, you know, I have to say, I had a little difficult -- a bit of a difficult time having the deponent, who will be here I understand, which is great, but had a difficult time for him to separate the optional provisions just to simply admit that certain parts of the game play are optional.  Right?

So you've got a mandatory piece and then you've got optional pieces.  The twist of it now is that the true difficult, let's say, part is in the optional part.  It wasn't like that before.  It was in the mandatory part.

So before in the mandatory part of the game, every puzzle was winnable.  Now in the mandatory part of the game, every puzzle isn't winnable, and you can do what are called slap losses, right, like you do in a casino.  You just sit back and you slap the loss.  No mental effort needed.  Okay?

So this hidden premise has been extremely successful for Pace in the past because you get governmental entities, the DAs don't have the technical acuity to kind of know that you don't really need an expert.

We'll suggest to you, we don't think you need an expert.  We'll bring the games up.  You know what, Your Honor,

if you determine watching the game play that a jury and you can't know whether or not it's a predominant skill or not, then you can rule on it.  But we'll be glad to bring up in an evidentiary hearing, we can do it as part of the status conference, if that's fair timing, we'll bring them up.  You can play it.  You can ask Mr. Unis to play it.  They can bring in their expert, their internal programmer guy to play it. You can ask any questions you want.  You are going to find the games are fundamentally different.

So this Court is equipped to make the determination. It's all through the pleadings, legally compliant with the Crimes Code.  You know, you can take judicial notice, Your Honor, that, you know, we have a -- if I may, I can give you a citation where games were seized under the Crimes Code. Shall I?

THE COURT:  That's fine.

MR. NEISER:  Is there a Bates number on this?

MR. ZEGARELLI:  Pardon me?

MR. NEISER:  Is there a Bates number on this?

MR. ZEGARELLI:  No.  In fact, I just found it.  Just in researching, we just found it.  In fact, we were trying to find out this answer as a matter of a right to know act, which was denied us, until such time as it actually became -- the information became released after we had tried to get the information when it was apparently still sealed under an

investigation.

But in any case, so these games are getting seized. So they are different now than they were, and we think this -- we shouldn't have to wait around to determine, you know, is, you know, Pace in breach of their agreement with us because they are selling us noncompliant terminals because we have to wait for somebody else to do it or the government to do it their way.

We here now. We think the Court is equipped to make a determination. We can bring it up at an evidentiary hearing. You can look. But, again, our position is, the whole expert thing, you don't need it. That was just, you know, that's just clever litigating.

THE COURT: A couple questions. First of all, assuming this would have to be determined, is it PSG's burden to show that they're not legal or not compliant, if we want to use that term?

MR. ZEGARELLI: I think -- and I said this in the brief. I think that if we are -- okay, two ways to go: You need an expert. You don't need an expert.

If we don't need an expert, then we would show -- we would bring out -- and perhaps for the jury to determine -- the facts associated with the differential in gaming. Is there a winner every time perhaps, right, where Dot 44 there's a winner every time. Dot 63, there's not a winner every time

in the mandatory part of the game.  Right?  So you can't slap loss like in the first.  Different game.

All right.  If you don't need an expert, we would then have to prove as a fact that certain facts exist.  We don't think the jury is equipped to determine whether or not -- I mean, we understand that there will be certain fact finding that ultimately goes back to your care and your decision.

It would be our burden if we're going to prove compliant means illegal and, you know, and there are certain facts and we assert that.  We let the jury determine the facts.  You determine whether those facts ultimately are not in compliance with Pennsylvania law.

THE COURT:  And why does it matter?  In other words, what claim would it go to if you proved and I determined that those games are not legal?

MR. ZEGARELLI:  Well, first of all, not only is it in breach of the contract and the representations made to us at the time, so now we're getting games that aren't compliant, so the continuing obligations were breached during the period of time --

THE COURT:  With what harm?

MR. ZEGARELLI:  Well, the harm is in the actual machines themselves were not compliant with the law.  They're getting seized.  They're in jeopardy of getting seized as you

see and, therefore, on an injunctive relief claim and as a matter of our trademark, right, they're putting illegal games out with our trademark and that was never agreed to.

If you read the EPA, they were supposed -- the EPA, it's in one of the final sections, Your Honor, says they will submit -- they will support PSG marketing efforts. It didn't say PSG is going to support Pace's marketing efforts. They're going to support our marketing efforts. It's our name, our brand. Always was.

The problem is the lawsuit occurred. Games get released with our name. Now all the games are with our name. All the people in the -- exactly as planned, everybody recognizes this game with our name, but at this time, they're friendly. All well and good. Then they breached the agreement. Right? And then it becomes, Uh-oh, what do we now? We can't change the name because the name is too embedded. It's too valuable. So this is our story.

But the point is it is a continued breached of our trademark with games that are not in compliance with Pennsylvania law, in violation of the EPA.

THE COURT: And there are no money damages that you are seeking as a result of the alleged illegality?

MR. ZEGARELLI: Well, to the extent that the damages for that breach are embodied into the reasonable royalty unjust enrichment, then, yeah, that's embodied in, but we

don't have a discrete amount of money for that particular assertion of fact.

THE COURT:  So with respect to any claim that would go to the jury, because you mentioned injunctive relief before, there would not be a need, perhaps, to determine the issue of legality.

MR. ZEGARELLI:  To the extent it's only injunctive relief, then that would be a bench issue.  To the extent it's a legal issue or a factfinding issue, that's a jury question, Your Honor.

THE COURT:  Anything else you wanted to address on this issue?

MR. ZEGARELLI:  No thank you, Your Honor.

THE COURT:  All right.  Anything further on this issue from you, Mr. Neiser?

MR. NEISER:  Briefly, Your Honor.

THE COURT:  Of course.  That's fine.

MR. NEISER:  This is an important issue.  I mean, this is -- the way the expert testimony works in this -- and the idea that this not an expert case is just stunning to me.

There's a case in the Third Circuit where somebody claimed that Doritos were an inherently dangerous product. The Court may be aware of it.

THE COURT:  I am.

MR. NEISER:  You are.  The guy from Pitt sucks on the

Doritos basically and says, Ah, I think they're dangerous. They're strict liability.  Junk science.  Okay?

The same would be true if you were to say let's bring the folks from Pittsburgh from the casino over here and have them play the game.

What Mr. Zegarelli does not understand, and I know he wants things to be true that are not, is that you cannot separate pieces of the game play.  You can't do it in the vacuum.  And to say that we can have a lay witness come in here and just separate them just because they sit at a VFW and they slap on a machine is absurd, and it's inherently technical or specialized knowledge because what the Court analyzed is and the Court analyzed in that Beaver County decision and every other one in the Commonwealth is way beyond just the human factors.

The Court asked the right question on the damages. What I heard was no, there are no monetary damages.  There are certainly none in the expert report and there's certainly none on the record.

The question of the seizures -- and I have never seen this country garden six pack -- and actually, Kenton Hatch -- I believe we moved to reopen discovery because we filed an affidavit from Kenton Hatch because Mr. Unis walked into his store and I think -- well, I don't want to get too far afield, but I think that's the one where he represented that he was a

Pace employee at the time.  So I'm not quite sure what this is, but there's been testimony already in this case about Mr. Unis having a couple games seized, and we deposed him on this.

He was unable to articulate during that deposition -- I'm making an offer of proof -- whether or not it was our -- whose machine it was, what software was involved, and whether or not the machines were picked up not because of the software that we put in our machines, but what was in the software and the games sitting next to it, which is why compliance is important because when we put out our legal games and we put our games out there that have the Liberty Bell and it says "Pennsylvania Skill" on it and it is setting next to a game that isn't one of ours and the State Police come in, they are not grabbing this one or this one and leaving that one, they are taking them all.  That's how it works.  And then an impoundment.

So this has been a subject of this case.  We had a second deposition, a second 30B(6) because PSG on their website said we have four brand-new newly adjudicated games on their website and it wasn't adjudicated games.  It was just some claim that he was putting on his website that he went and got his games picked up from the State Police.  No damages.  No loss.  The location paid the legal fees and there was no harm to them.  In fact, they used it as a benefit to market

themselves.

So when we look at those alleged seizures, they're hypotheticals, they're hypotheticals, and they aren't connected to money damages, okay, and the money damages is what we're here for.  Or not.

Two other points, Your Honor.  I'm not trying to belabor this, but this really gets to the meat of why we need to talk about the contract later on as well, but I will -- there is no evidence of record other than a few statements from Mr. Unis or his dad about this agreement on the trademark and the provisions.  There isn't a smoke signal, a fax, an e-mail or text or anything that even remotely memorializes or references that.  Okay?

So I'm sitting here, and I'll be very excited to hear it at trial because I'm unaware of it at this point what the terms of this "using the trademark" actually mean.

I think the evidence is going to show what's in that transcript that I just gave you that we were talking about the retrograde of the software.  Right before that, Mr. Unis testified that we created the logo itself, the trademark itself on their behalf.  But there are no terms that were attached to it.

So I don't know what provisions they're talking about when they say that the legality of the games relate to the trademark in some way.  I'm just unaware of them because I

don't have anything in my record.  We have gone through all of the exhibits for trial and, again, I have lived with this thing for four years and it doesn't exist.

And just to tie this off, I think this is why we may need a ruling on the ambiguity of the contract.  I heard opposing counsel mention that, something about seller will support buyer with previously-agreed marketing efforts in the contract.

How we can read into that the legality of the games with respect to a trademark that isn't mentioned at all in this document is beyond me.

So these are part of these terms that we just -- I mean, I'm sure they are a subject for cross.  I'm sure we'll get into it at trial, but this is another example of why we may need a ruling from the Court on whether or not the contract is ambiguous itself because there are certain terms in here that are being interpreted in a way that they conflate their actual text, let's just say.

THE COURT:  Do you have a position on ambiguity?  And if you need time to think about that, I understand.  I'll ask Mr. Zegarelli the same thing.  We'll make a decision about whether there needs to be some further ruling on that, but I don't want either of you to answer if you are not prepared to do that today.

MR. NEISER:  Your Honor, in all candor, I've given it

a whole lot of thought and I'm really not sure, which is why if that's the case, I'm wondering about whether or not it, in fact, is.

I mean, I am fine with it going in at this point, and I would like the opportunity to think of it, but just for decision purposes, you know, take it as it is and let the witnesses hear what everybody discussed, but then we're getting into parol evidence.

What I'm understanding, and especially what I heard in oral argument today, the discussions back and forth on trying to agree on the exhibits is, you know, this question of affiliates and who is an affiliate and how -- I think Pennsylvania Skill Games may argue that like all operators needed to work for them, and you are going to hear testimony at trial that they believe that anybody who operates in Beaver County is their affiliate.  Things that are just incredible.

So -- and I know that's trial testimony.  It may not be subject for exclusion pretrial, but what it does get us back to under, you know, Rule 1 of the Federal Rules, the inexpensive and speedy justice that we're trying to accomplish here, I just don't want it to turn into a mess, and that's why I raise the issue because the more I hear about, and we get into the weeds on what's going to be presented at trial and how far it deviates from the actual pleadings and the expert reports and the evidence of record, the more concerned I am.

THE COURT:  I understand.

Mr. Zegarelli, do you have a position you want to articulate today about the contract and whether it is ambiguous and would require or at least we would permit parol evidence with respect to that?

MR. ZEGARELLI:  Well, Your Honor, so certainly it's for this Court to control the evidence, and I don't start with any presupposition that this case won't play out extremely neatly in the process.

With regard to the language will be testified to. It's not integrated agreement.  I don't think anybody is asserting it is, and the testimony from the Unises will be what they meant, what they intended with the language that was used in the agreement.  And by the way, there are notes from the attorneys that have been discovered, some of which is redacted during the contract negotiation as to what was in and what was out and why.

So I just feel that's a fair trial question and that's a fair jury question to determine who they believe for what position somebody took, who signed the contract with certain language.

I mean, I don't think -- I wouldn't say this contract is any fundamentally different than a lot of contracts that just get litigated, where people testify and the jury has to figure out who they believe with regard to what testimony.

So I don't have a position other than it's a trial question.  Witnesses can testify to it.  This Court will control that process in a neat and organized orderly way and the jury will make the determination of those facts.

THE COURT:  Well, I will certainly give that some further thought myself.

There's one other issue I want to talk about that was raised in one of the motions in limine.  Is everybody else still okay with proceeding?  I'm especially concerned about you.

THE COURT REPORTER:  I'm okay.  Thank you.

THE COURT:  All right.  Then there was, as I mentioned, one other motion I wanted to discuss today and then there's a few other issues that we can talk about off the record.

This relates to the accounting profits and whether that is an issue that should be determined by the jury, whether there should be bifurcation.

In the time that we have left, Mr. Neiser, if you want to address what those accounting profits go to.  In other words, is that an unjust enrichment claim?  Is there some other claim that it goes to?  Why shouldn't it go to the jury?  Would it make sense to bifurcate?

MR. NEISER:  Thank you, Your Honor.  We believe it's an equitable remedy.  I don't believe it's something that the

jury should hear.  We cite to the Kars 4 Kids versus America case.  A District Court in New Jersey considered the exact same issue in 2019 and found disgorgement to be an equitable remedy.  I don't care what we call it.

The practical effect is they're claiming that because they claim if they're successful at trial on this trademark, that all the profits, everything that Miele, POM, Pace, Savvy Dog have made needs to be disgorged and given to them.  So that's $211 million dollars and rising, and change.

So the Kars 4 Kids case, they found that to be an equitable remedy.  The Third Circuit left that decision undisturbed.  The 6th, 9th and 11th Circuits have also agreed with that.  I mean, the jury doesn't determine it.  And it requires you to, or whoever makes that award, to weigh nonexclusive factors, inadequacy of the other remedies, willfulness, all kinds of other factors, and I expect us to have a jury instruction on whether or not the violation was willful.  So we'll have a jury instruction on the willfulness, which I think would be informative.

But first on the accounting issue, the reason -- and, Your Honor, I appreciate Mr. Zegarelli's argument on this. It's well taken that we are taking one particular issue and segregating it from the jury.  Unique.  It's been done.  We found other work product in this district where that exact same thing has happened.

But, so what we have here is -- and, again, the essence of this trademark claim based upon oral recitations, who do you believe?  Us or them?  Okay.

One, we believe it would be inherently prejudicial to put our entire profits -- and we're making money on this, on the business that we're operating through a lot of work, a lot of investment and time and lobbying and staffing, programmers, all of these things that go with it.  To put that in front of a jury and say, "Look at all of the money they're making," goes to, you know, let's -- without a punitive damages claim, okay, to say, Hey, there's enough to give them some, okay, which I think isn't -- unless you get to a verdict and you establish the right to it, the ability to stand in an opening and say we're going to put $211 million -- you are going to hear from our expert and he's going to tell you that we should be given all their profits in the amount of $211 million dollars seems to be -- is troubling to me and it seems like it would be unfairly prejudicial.

But, if they prove that they own the trademark and it is in the nature of an equitable remedy, I don't see what the harm is in having the Court make that determination.

So, but if you also look at the accounting issues, they're too complex.  You know, to be entitled to a disgorgement of profits, they first have to establish ownership and sales attributable to the mark.  This is part of

the issue that we have cross issues about the experts.

Their version of what is attributable to the mark as we have briefed is everything.  All things that you have done within the Commonwealth of Pennsylvania belong to us and it's because of the trademark.

Mr. Krieger from Gleason, his position is no, none of them are attributable to the mark.  You didn't establish that they are attributable to the mark.  And this notion that all they have to do is prove our sales while is true as a later element, it doesn't get them -- allow them to circumvent their obligation to show that the sales are actually attributable to the mark, for example.

What's interesting about this case on the trademark is it's not as if we're both iPhone case salespeople and we have a competing product.  Okay?  They don't make product.  We are the only ones that make the product.  We're the only ones who actually make the software.

We're not out there saying this imitation Gucci purse is the same as your Gucci purse, and they just look the same and we're just confusing consumers.  It isn't that I'm not going to buy this shirt because I want to buy this shirt because it looks the same or it has similar branding.

They have to establish ownership first.  They have to establish that -- for example, when we sell parts for one of the machines, like a bill collector or something like that,

how is that attributable to the trademark itself?  Maybe it is.  Maybe it isn't.  But they made no effort whatsoever to delineate that.  All they did was they said, Okay, all the profits you made, take them.  You don't even need an expert for that.

I'm sorry, I'm talking fast.  I apologize.  I train myself.  Sometimes I lose myself.

THE COURT REPORTER:  It's okay.  You're fine.

MR. NEISER:  So when you look at how the damages are analyzed and they're calculated, there is no calculation.  It is not done with a scalpel, it is done with a cleaver.

Now, if they were able to put all of our profits in front of a jury without first establishing the ownership and any attribution to the mark, we would definitely -- I mean we would submit that that would be confusing to the jury and it would be unfairly prejudicial, especially considering that the remedy of bifurcation, which we can ask for at any time, gives us a fairly elegant and simple way to extract those damages from the jury's analysis.

Now, their claim is that these unjust enrichment damages are not a claim for disgorgement of profits; it's an evaluation of our unjust enrichment from use of the mark.  And they're claiming unjust enrichment is merely a measure or a method of measuring monetary damages available to them.

But, Your Honor, they are still the exact same.  One,

94

if you call it an unjust enrichment, when I first saw that, I thought, okay, I understand what this is.  This is an equitable remedy.  That's how we all recognize it and that's how it's being treated.  You know, are they retaining it as a benefit but conferred, that is unjustly retained by the other side and it would be unjust for them to maintain it without just compensation.

Now, if this were a very narrow type of thing, perhaps we could articulate and dance between the raindrops, but it's not.  It's everything.  So we have to assume for motion in limine and evidentiary purposes that there is no distinction between a disgorgement of profit, unfair competition or I think that they may be claiming it's part of a lost profits analysis.

So the only case that they cite is this Newark Ground versus Sauer case, which is distinguishable because it was under the Ohio Trade Secret Misappropriation Act, which has an express statutory scheme for calculating damages caused by misappropriation.  This is not that.  Okay.

What they're simply saying is that we let you use the name.  We didn't have an agreement.  There's nothing in writing.  We didn't really tell you that you couldn't use it or how you could use it, but now we don't like you.  So, therefore, we want all of your profits.

That's truly the path this is going on.

So, and to be clear, Your Honor, I understand how it could be a little bit unwieldy because it's not linear in the case, but because we're going to have plaintiff, defense, rebuttal, I'm assuming we're going to do it that way because we have counterclaims or they have counterclaims against us, I don't necessarily think that it's that disjointed, and I think when we consider all of the other factors, including time, because what will happen, Your Honor, if they don't win on their trademark claim and they're not able to establish those specific elements and convince the jury that they actually own it, let alone a willful violation that would trigger disgorgement of profits, we don't even need to waste any time on it.  We don't need to spend any time on it.

So I know I am being a little bit longwinded at this point, Your Honor, but that's essentially where we are going with this.

THE COURT:  Thank you.  I understand that.  And I'm assuming you are saying, looking at your very last comment, that this issue could be bifurcated depending on the result on the trademark.

MR. NEISER:  Absolutely, Your Honor.  Especially if we do it in front of the Court, we don't even need to schedule it at the end, hypothetically, because -- you know, COVID did some bad things and some nice things, and I think that -- just I'm thinking about other cases, let's say we do post trials,

which I'm sure there's going to be post trials no matter what, and if the Court wanted to conduct bifurcation -- wanted to bifurcate this specific issue, we could do it in a separate hearing without burdening the jury.  Their expert is in California.  I'm cognizant of that.  We can have him beam in via Zoom and we conduct the hearing remotely if the Court would be so inclined.

THE COURT:  So I think both parties, if I'm not mistaken, filed various sealed documents because they had financial information in them.

So that may be another consideration that we all have to think about in terms of how that evidence is going to be presented since the parties, it seems like, believe that that information shouldn't be public.

MR. NEISER:  The Court is wise as always, and I had something written down that I forgot to reference, and that was one of the issues, and I think both parties are trying to be sensitive to each other's confidential information.

I also acknowledge that you lose a little bit of control of that once you have a jury trial and there are certain things that come out.

I know that I would not like our profits, especially the details, we would have to get into the details with our fact witnesses as well, to be out in the sunshine.  We have nothing to hide.  It's just that it's not anybody's business,

and to be honest with you, I don't really want to put Mr. Unis' business and his profits and the money he's making out in the sunshine either because it's none of anybody's business either.

THE COURT:  All right, thank you.

Mr. Zegarelli.

MR. ZEGARELLI:  I don't think -- although we did raise it in our pretrial statement, I don't think Mr. Unis is concerned at this juncture about the -- necessarily about the confidentiality of those issues because -- and, quite frankly, and we talked about complications of the case, I think the case gets a lot more complicated to try to bifurcate it, particularly when the witnesses -- there's a lot of damage witnesses that will be testifying to not only what happened in the marketplace, but also the pricing and the cost.  So a lot of that is going to be built in.

So to try to bifurcate it, I think it would be very, very difficult.  Particularly, too, it seems like up to three formulas, only one of those is suggested to be bifurcated.

Your Honor, I have to say that you say $211 million and I have to tell you, the first time my client came to me and told me the amount, I said, Come on.  Right?  It's just -- and it bears out because that is how much money these -- whether they are gaming, gambling, whatever they are, they are literally money printing machines.  People sit there all day

long and they play them just like at the casino.  They generate an extreme amount of money.

The most convincing argument, which I think is a bad one because it's rhetorical, is $211 million dollars is a really big number.  But to me, that's a demurrer.  That's just that -- it can't be more of, you know, the more things we do, the more companies we create, the more subsidiaries, the more we get off the hook, and this is just like one of those.

It's the more money we make, the more extreme the number, so I want you in your own biased, prejudiced mind to say $211 million, it sounds like a lot of money and, therefore, I conclude that the jury shouldn't hear a number that's a proper number.  If it was 50,000 is it okay?  Is it one million is it okay?  Is it two million?  Is it five?  Like, where does that break point occur where you go into rhetoric mode and it's just like, well, that number sounds like too much money.  So we got to keep it away from the jury.

So that's my concern.  I think it complicates it.  I think it becomes incredibly more difficult to litigate.  I think it burns more of the Court's time.  I just -- and I just don't think there's really -- other than a bias or a prejudice it's kind of built into the theory, I just don't think there's a basis for it.

THE COURT:  Are you seeking the -- I'm going to call it disgorgement just for the purposes of our discussion today,

are you seeking that with respect to your claim under the Lanham Act?

MR. ZEGARELLI:  I think the remedy would be federal or state.  I mean, it could be a state rule or it could be a federal rule.  It's a proper measure of damages.

THE COURT:  I'm sorry, let me ask the question a different way because I'm sure it was confusing.  So what claim do those damages relate to?

MR. ZEGARELLI:  I think those damages relate to the trademark.  The fact that -- and you're talking about the unjust enrichment?

THE COURT:  I am.

MR. ZEGARELLI:  Okay.  Keep in mind, Your Honor, that what you used to be Pennsylvania Skill Games name and trademark was then used by POM and Miele and Pace, and now it's gotten to a point where they actually sort of call themselves it.  It's like not only now it's sort of like a brand, but it's actually on the website as if that's how they call themselves.  So it's a pervasive issue.

So the amount of money for that goes to the fact that they are using the brand for just a widespread use of value and that's what is calculated within the damage report.

THE COURT:  And is that, again, the statutory claim or claims?  Is that where you are seeking those damages or is there some other claim in the alternative that you are seeking

them?

MR. ZEGARELLI:  It would certainly be the Lanham Act claim.  So that's absolutely true.  And that measure of damages we would also assert is -- so it's a use of the trademark.  Whether or not that's solely the Lanham Act or the Lanham Act as well as the Pennsylvania common law, we would just assert that it's generally the trademark claims.

THE COURT:  Okay.  But it's the same damages under either theory, correct?

MR. ZEGARELLI:  Right.

THE COURT:  Okay.  All right.  Anything further on this motion?

MR. NEISER:  One other thing, Your Honor.  This raises one other question that doesn't come up very often, but election of remedies.  So one of the other complicating factors for this measure of damages is I believe they're asking for it in addition to this, plus this, plus this.  But the more I'm looking at it, the more I'm wondering whether or not they need to pick a measure on which damages they are actually going to recover.

THE COURT:  I think that's something we can talk about further.  Absolutely.  All right.  I appreciate your arguments today.  It was very helpful to me.  We will issue rulings on some motions perhaps in advance.  At the latest, you will get them at our pretrial conference.  So at least

that you'll have I think two weeks to know what may be excluded or what may not be.  It is possible we would issue something in advance on some of them.  I just can't tell you that yet.  But at the latest, I'll rule on them at the pretrial conference and put something on the record.

At this point I'd like to go off the record.

(The hearing concluded at 12:04 p.m.)

C E R T I F I C A T E

I, VERONICA R. TRETTEL, RMR, CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled case.

_\s\ Veronica R. Trettel____          11/29/2022_____
VERONICA R. TRETTEL, RMR, CRR          Date of Certification
Official Court Reporter