IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


POM of PENNSYLVANIA, LLC,
et al.,

                    Plaintiffs,    Civil Action No. 18-722
        vs.

PENNSYLVANIA SKILL GAMES,
LLC,

                    Defendant.

                                - - -


Transcript of Pretrial Conference on November 21, 2022,
United States District Court, Pittsburgh, Pennsylvania,
BEFORE:  Judge Patricia L. Dodge, Magistrate Judge.


APPEARANCES:

For the Plaintiffs:    Julian E. Neiser, Esquire
                       Jonathan Deasy, Esquire
                       SPILMAN, THOMAS & BATTLE, PLLC
                       301 Grant Street
                       Suite 3440
                       One Oxford Centre
                       Pittsburgh, Pennsylvania 15219

For the Defendant:    Gregg R. Zegarelli, Esquire
                       Technology & Entrepreneurial Ventures
                       Law Group
                       2585 Washington Road, Suite 134
                       Summerfield Commons Office Park
                       Pittsburgh, Pennsylvania 15241

Court Reporter:    Sharon Siatkowski, RMR, CRR, CBC, CRI
                   700 Grant Street, Ste. 6260
                   Pittsburgh, Pennsylvania 15219


Proceedings recorded by mechanical stenography;
transcript produced by computer-aided transcription.

P R O C E E D I N G S

- - -

(1:19 p.m.)

THE COURT:  Good afternoon, everyone.  We are here this afternoon for what was scheduled to be our final pretrial conference in the matter of POM of Pennsylvania, et al., vs. Pennsylvania Skill Games at docket 18-722.

I had a discussion off the record with counsel about the need to postpone the trial itself, but we agreed that there are a number of issues that still can be addressed today.  And we will have our final, final pretrial conference at some point after we know when trial is actually going to be scheduled.

Would counsel identify themselves for the record, please?

MR. NEISER:  Good afternoon, Your Honor.  Julian Neiser on behalf of the plaintiffs.  I'm joined by Jonathan Deasy from our office, D-E-A-S-Y.

THE COURT:  Good afternoon.

MR. NEISER:  Good afternoon, Your Honor.

MR. ZEGARELLI:  Good afternoon, Your Honor.  Greg Zegarelli representing Pennsylvania Skill Games, LLC.

THE COURT:  Good afternoon.

All right.  I'm going to address certain issues today.  As I mentioned, I will have a couple of questions for counsel as we move along.

There's one request that I have with respect to our ultimate jury selection.  There's no rush on this, of course, but I would like counsel to confer about preparing a brief paragraph, several sentences, to be read to the jury about what this case is about.  I certainly prefer you agreeing to what that is rather than me making a statement that you may or may not agree to.

So sometime before the ultimate trial, and we'll put a schedule out for when that is, if you could talk among yourselves and come up with just a brief summary of what the case is about.  Typically, I read a version of that before we pick the jury, and then again after we pick the jury, just so they have an understanding about what they're going to hear, all right?

I anticipate, but I am open to other thoughts, that we would select eight jurors.  I'm sure everyone knows all eight, if no one would fall off for some reason, an illness or whatever, would determine the case.  There are no alternates.  So eight seemed to me to be an appropriate number given the length of the trial.  But if any of the counsel have different views on that, I'm happy to hear about that, Mr. Neiser and Mr. Deasy.

MR. NEISER:  We agree with that.  We were going to request that.

THE COURT:  Mr. Zegarelli.

MR. ZEGARELLI:  I have no objection to that.  I would ask if I could at least talk to my client about it.

THE COURT:  Of course.  We have some time before we have to worry about it.  Absolutely.  We'll talk about it again.  But I expect that, once we schedule the trial, I'll schedule a call with all of you before the final pretrial statement, and we can talk about those issues.  We just need enough advanced notice so we have enough jurors -- prospective jurors to select from.

I believe at one point we talked about the order of which party would go first and I think I'm going to go with what might be the most obvious order, which is, since the POM Parties filed their complaint first, POM would go first in terms of its claim, followed by the defense on that claim, and then the counterclaim of PSG.

Any objections to that?

MR. NEISER:  So, Your Honor, we would go first.  We would put our case-in-chief in.  Pennsylvania Skill Games would go second and we essentially would do rebuttal.

THE COURT:  Exactly.  You each have a chance for rebuttal on the respective claims.

MR. NEISER:  So it would be plaintiff, defendant, plaintiff, defendant or plaintiff, defendant, plaintiff?

THE COURT:  I'll have to think about that, Mr. Neiser.

MR. NEISER:  Thank you.  Mr. Zegarelli's claims are

counterclaims to ours, and he also has affirmative claims.  So whichever way the Court of course would do it.  But in our mind, we could probably just do -- we'd do our case-in-chief, they'd put on their case-in-chief, and then we defend their case-in-chief as a rebuttal.

THE COURT:  Okay.  Thank you for that.

Mr. Zegarelli, any additional thoughts on that?

MR. ZEGARELLI:  No additional thoughts on that.

THE COURT:  We'll make sure we all understand which way we're going to do that, before the trial.

I mentioned, when we were here for oral argument, that I anticipated putting the parties on the clock.  I'm still anticipating doing that.  That may vary, just depending on any revision to the length of the trial, or the number of witnesses.

But right now, I am anticipating putting you on the clock, and we talked about a two-week trial.  Each side would have 24 hours within that 2-week period, excluding from the 10 trial days, the first day, and the last day.  The first day being, I would expect, primarily reserved for jury selection and openings.

I'm going to ask you to limit your openings to an hour each, just to make sure that I'm not encroaching on someone's trial time.  Probably the last day would be reserved for closings, jury instructions, and matters like that.

Just as a reminder, your hours include both your

direct and your cross.  I'm not including your openings or your closings.

If sidebars are unnecessary for some reason because we've already discussed something in great length, I might take that against someone's time, but we'll decide that as we go along.

That's the general parameter.  And if we decide there's a different trial length or you believe you can do it in shorter or longer or need more time, we can adjust that time as necessary.

Very briefly, just so you know, we like to give each side a conference room, somewhere here in the courthouse, if we're able to.  We'll work on that between now and the new trial date.  I find it just a little bit more convenient for you to have a place to leave all of your things and go and meet with witnesses.  So we will do our best there.

Mr. Neiser, can you give me, at least as you know it right now, your anticipated number of witnesses in your case-in-chief?

MR. NEISER:  Your Honor, I expect to call seven witnesses in our case-in-chief.  I think I need to count again.  But approximately seven or eight, and that would be in addition to any designations that we would read.

THE COURT:  And I have some questions about the designation that we'll get to.

MR. NEISER:  Yes, Your Honor.  Thank you.

THE COURT:  Mr. Zegarelli, from Pennsylvania Skill Games' standpoint, what is your current estimate, understanding that these things can be somewhat fluid?

MR. ZEGARELLI:  I apologize, Your Honor.  I should really take a look at my pretrial statement.  If I could defer on a response until I have a chance to look at that?

The pretrial statement did, if I recall from our last meeting, set forth the anticipated witnesses.  But I think last time, when we were here a couple of weeks ago, I think we had a look at that crossover between the two.  The only difference is some of my witnesses, Your Honor, include the third-party competitors.  But if I recall, the Court seemed to think there were more, but some of those were duplicative.

THE COURT:  That's fine.  We can certainly talk about this again.  I just wanted to get a rough estimate.  If you're not able to do that today, that's fine.

MR. ZEGARELLI:  Thank you, Your Honor.

THE COURT:  When we get together the next time, if there is any witness that requires some special accommodation for some reason -- they have a hearing issue, they have difficulty getting in and out of the courthouse -- you can let me know that.  And also, if there are any witnesses that you anticipate will be testifying remotely.  In other words, they'll be live but they'll be somewhere other than in this courtroom,

just so that we can make the necessary arrangements.  And I just want to mention that that includes making sure the witness at their end has the capacity to appear remotely.  But again, some of these things are things that we'll address again.

I did review the deposition designations.  I have not made rulings on them yet.  I do have some questions, some preliminary questions about them, that might assist me.

Mr. Neiser, I know that you've identified, I believe, eight potential witnesses by designation.  I want to run through the list and just make sure I understand why they can testify by designation.

So you've identified Mr. Unis -- am I pronouncing that correctly, Unis?

MR. NEISER:  Yes.

THE COURT:  Okay.  You've identified both Mr. Unis III and Mr. Unis IV, and I know that Mr. Zegarelli has made certain objections with respect to those witnesses.

Can you advise me about why you take the position that you can use their depositions?

MR. NEISER:  Yes, Your Honor.  They were both 30(b)(6) witnesses.  And under -- I believe under Rule 32, I can use them for any purpose that I should see fit.

The purpose, if I may make an offer of proof, is merely to avoid a Rule 50 issue because I have to meet my burden.  I think I can meet my burden without those witnesses or

their testimony, but their testimony that I have designated is very specific, and I think very discrete, as to issues related to the trademark itself, and matters that I would need in my case-in-chief.

As a matter of strategy tactics, whatever we want to call it, I haven't made a decision as to whether or not I would call either of those witnesses, as of on cross, during my case.

In the event that I would not call them as an adverse witness in my case, under Rule 32, I made sure I gave full candor and disclosure to opposing counsel, because I may not want to call them and have them, you know, do their thing during my case, especially because they were 30(b)(6) designees.

THE COURT:  Were they 30(b)(6) witnesses for the defendant?

MR. NEISER:  Yes, Your Honor.

THE COURT:  Okay.

MR. NEISER:  Yes, Your Honor.

THE COURT:  Just making sure I know whose 30(b)(6) witness they were, because I know there were several different entities that have been mentioned throughout this case, in addition to Pennsylvania Skill Games.

MR. NEISER:  No, Your Honor.  They were obviously -- I'm sorry.  They were both 30(b)(6) designees for Pennsylvania Skill Games, LLC.

THE COURT:  Thank you, Mr. Neiser.

And Mr. Zegarelli, I'm going to give you a chance to respond to all, but I'll go first through the list, first with Mr. Neiser.

There was a James McDanel.  Why are you able to use his deposition in lieu of calling him?

MR. NEISER:  Well, I could call him, Your Honor.  It's just that he's a third-party witness.  As we found out, I think he's one of the witnesses who is -- let's just say he's not cooperative at this point, and he's not very motivated to show up in court.

So some of the third-party witnesses, just to meet the Court's deadline and for designation purposes, I identified them.  I have a very, very narrow usage for all of the third parties, whether that be Mr. McDanel, Brett Mayes.  Everybody other than Jeff Mayle, M-A-Y-L-E.

For the Court, there's a Miele, there's a Millay, and there's a Mayle.  This is the M-A-Y-L-E, and he is the president of Blue Sky Games.  He's a separate animal.

The rest, Your Honor, and I can go by name, I -- they could testify, but there's no reason why I could not have them here to testify.  I wanted to meet the deadline to provide a designation in the event that they didn't show up.

And number two, again for Rule 50 purposes, the designations as an offer of proof is that those witnesses associate the trademark with our client, not Pennsylvania Skill

Games, LLC.  That's entirely the purpose of them.

But they certainly can be here.  I did issue subpoenas on all of them.  Mr. Zegarelli issued subpoenas.  We cross-noticed them, and I believe they've all been served.

So if the Court needs me to not do it that way and wants me to call them in the case and as live testimony, I'm happy to do it.

THE COURT:  No.  I guess my question was more tailored towards Rule 32 and why you can use their depositions as opposed to, in other words, if they were unavailable, if they were more than 100 miles from the courthouse.

MR. NEISER:  It was just as a matter of caution, in the event -- for rule -- let me rephrase.  I'm sorry, Your Honor.  For Rule 32 purposes, the designations were made as a matter of caution and prudence, in the event that they were unavailable.

THE COURT:  So that's both McDanel, Mangerie, Bigrigg, and Mayes?

MR. NEISER:  Mayes, yes, Your Honor.

THE COURT:  And then there is a Jeffrey Mayle who, I think, is a different issue because he testified in a related, but not this, case.

MR. NEISER:  Correct, Your Honor.

THE COURT:  And why can you use the deposition in this case?

MR. NEISER:  Sure.  I think for Rule 32 purposes -- well, if the Court recalls, there was a companion -- not a companion, but a related action, styled as Pennsylvania Skill Games, LLC vs. Action Skill Games.  The claims in that case involve an alleged license agreement and breach of contract against Action Skill Games.

Within that contract and license agreement, the underlying issue was the ability of Pennsylvania Skill Games, LLC to license the trademark Pennsylvania Skill, and to allow Action Skill Games to use it, in exchange for compensation.  The claims that Pennsylvania Skill Games, LLC made were a breach of contract, and a failure to pay those fees, or some contract amount.

We intervened in that case, because we believe that we would be interested in the outcome.  The Court granted our intervention.  The case proceeded through discovery, and one of the primary issues, if not the primary issue, was ownership of the trademark Pennsylvania Skill Games.  Mr. Zegarelli was counsel for the plaintiff in that case, Pennsylvania Skill Games, LLC.

Jeffrey Mayle, who is the owner of Blue Sky Games, was a fact witness in that case, who was deposed, and Mr. Zegarelli called that witness.  I appeared.  The witness was directed.  He was crossed.  Both parties had the same motive and opportunity to develop testimony involving an issue that is directly related

to this case, and directly related in that case.

Essentially, Your Honor, the deposition of Mr. Mayle was done the same way that a deposition would be done of that witness in this case. Identical.

Therefore, the designations of Mr. Mayle would fall under the auspices of Rule 32; he's a Florida resident, he is unavailable. Identical counsel, identical issues at issue, and the identical opportunity, and ability, and motivation, to develop testimony with the same witness.

THE COURT: All right. Thank you.

MR. NEISER: Thank you.

THE COURT: Mr. Zegarelli, if you have any comments on anything that Mr. Neiser has argued, I'm happy to hear from you on that, at this time.

MR. ZEGARELLI: Yes, Your Honor. To work backwards, with regard to Mr. Mayle, I understand that's the third transcript designation, that was a different case, Your Honor, different parties. Quite frankly, Your Honor, I don't think it meets the rule. Notwithstanding what Mr. Neiser had indicated, nevertheless, that deposition doesn't meet the standards set forth in the rule. So the objection is based on the standards set forth in the rule.

And I can tell you that the deposition was not adducing the same information that would be adduced if Mr. Mayle is brought up here to testify live. It certainly could be done

if Mr. Mayle decided to do so for any reason.

I don't think it sounds like there is any issue with regard to the third-party witnesses, which leads to the Unises. The matter of law raised by Mr. Neiser, I think I would need to research that standard with the 30(b)(6) because it seems to me that, at least based on what I researched, that exception was not apparent to me.  And it still seems somewhat confusing to have, irrespective of designation, to have the same subject matter that's being testified to live being read by designation into the record with the witness sitting in the room at the same time.  I think that just breeds a lot of, just frankly, confusion, technical confusion, substantive confusion.

So if there was a basis to designate testimony, I have not -- I would like the opportunity to perhaps respond to that, after having researched it because it does not, in my view, appear to be a fair rendition of how testimony would be adduced, at a trial, in front of a jury.

THE COURT:  I do think, though, that with respect to a party, you can use the deposition of the opposing party for any reason.  So if, and you certainly can research it, but if they are viewed as a party, or a managing agent, or director, or so forth, of a party, I'm leaving 30(b)(6) aside so you can take a look at that, then that deposition can be used for any reason, even if that person is here, even if that person has testified or is going to be testifying.

MR. ZEGARELLI:  Your Honor, in the brief, we did brief the fact that, for example, I think it was cited by Judge McVary, who had indicated that the evidence stresses the in-person testimony over a deposition from a witness that's actually in the room.  And it still has to meet your judgment in terms of what might lead to a confusing -- confusing testimony in front of the jury on the same subject, different ways, when read, when not read.  And certainly, impeachment is fine, which it seems to me it ends up effectively being.  But again, I would leave to that --

THE COURT:  We'll have another opportunity to talk about it if you want to do any further research on that.  So thank you for that.

MR. NEISER:  If I may --

THE COURT:  Yes.

MR. NEISER:  -- just to make the record clear?  What we're citing to specifically is Rule 32(a)(3):  An adverse party may use for any purpose of the deposition of a party or anyone who, when deposed, was the party's director, officer, managing agent, or designee under Rule 30(b)(6).

And also -- and I apologize.  My laptop's acting up on me.  But it's 32(a), I believe should be 8:  A deposition taken in an earlier action, if lawfully taken, if required, a deposition in any state or federal court action involving the same subject matter between the same parties may be used in a

later action.

THE COURT: All right. Well then, we'll have a further discussion about deposition designations, and some of this may go away if the witnesses are going to be here testifying live. So we'll take that as it comes.

Mr. Zegarelli, I think you've also identified several people that you would intend to use deposition designations of. I'm going to defer on Mr. Cline, because I have a ruling on that, when we get to the motions in limine. There were four others, a Robert Hawk, Daniel Miser, Norman Stahl, and possibly Dale Lazar.

What is the basis for using their designations as opposed to them appearing live?

MR. ZEGARELLI: Mr. Lazar, he is local. At the point I designated Mr. Lazar, Mr. Neiser had indicated to me that perhaps he was out of town or not subject to subpoena. So I wasn't sure if I was going to get a subpoena. But he is local.

And after the pretrial statements were submitted, and the designations, we actually -- he was in town, we did subpoena him, he then did call and say he wouldn't be in town on the trial date. We're now moving the trial date, and therefore, he, I'll say, may or should be available. I understood that he was leaving sometime next week and was supposed to be, I think, in Florida for approximately a month. So it may be moot with regard to Mr. Lazar. He may be present, and we have subpoenaed

him, Your Honor.

The other witnesses, Your Honor, I believe, one witness was the designee for MCM Elements which was deposed. He is out of state. MCM Elements is out of state. And that's -- and Mr. Stahl was the former -- the second person was Mr. Stahl.

THE COURT: Mr. Hawk.

MR. ZEGARELLI: Mr. Hawk is a consultant out of the jurisdiction for Pace-O-Matic. He is out of the jurisdiction. I think it was Mr. Mayes, Your Honor. Mr. Mayes worked for -- I'm sorry. Miser, Your Honor. I apologize. Mr. Miser works for MCM elements. MCM Elements used to be owned by Mr. Mayle and Mr. Miser, and is now owned by Pace-O-Matic. But nevertheless, MCM Elements, as well as Mr. Miser, are out of the jurisdiction.

And Mr. Stahl is a former employee of Pace-O-Matic. He is also out of the jurisdiction.

THE COURT: Thank you. As I mentioned, we'll loop back around to these witnesses as we get closer to trial.

And as I mentioned, before we went on the record, I understand that because we're postponing for at least several months, some of these designations or the need for designations may change, one way or the other, between now and then. And certainly, we'll give parties a further opportunity to make amended designations, if there is a witness that now becomes unavailable for some reason at the time of trial.

I know that we reached out to the parties about the exhibit list. And I thank you for giving me a rough draft that just identifies all of the exhibits.

Certainly, before trial, especially so we can keep track of what's admitted, I would like a final list. We can put a date out for that later, that identifies whether the exhibit is one that is joint, whether it is an exhibit of Pennsylvania Skill Games, or whether it's the exhibit of one or more of the POM Parties. So if you can work on doing that at some point before trial, that would be very helpful to all of us, so that we can keep good track of the exhibits.

I assume, at this point, we don't need to talk about specific objections to exhibits. But if there is something that anyone wants to bring to my attention now, we can certainly do that. It seems to me that you're working hard on these exhibits, as I understand, and we may not need to reach any definitive ruling on them now. But I welcome any argument that anyone wants to make in particular.

MR. NEISER: None from us, Your Honor. Mr. Zegarelli and I have been working diligently to get through the exhibit list and we're going to continue to do so.

THE COURT: Thank you. Mr. Zegarelli?

MR. ZEGARELLI: Nothing further.

THE COURT: We'll loop back around to that when it's necessary. But thank you for your efforts in making it an

easier process for us, rather than having Exhibits AAA and so forth. It makes it easier for the jury as well. So I appreciate that.

There are also some other issues that I wanted to address today, the first of which is my rulings on the various motions in limine that have been filed. I will note there will be something on the record about this on the docket, but I am going to put my decisions on the record, just so the parties know what they are now.

I'm going to start with Pennsylvania Skill Games' motions in limine. One motion was filed. It has four separate motions within it, and I'm going to address those first.

All of these were filed at ECF No. 205. The first motion was PSG's request to exclude emails. I am denying that without prejudice. The issues related to authentication and admissibility of any email that either party or any party seeks to introduce will be addressed at trial, or immediately before trial, rather than having any blanket ruling at this point.

So, Mr. Zegarelli, you remain free to object to any email for any purpose, as does Mr. Neiser and Mr. Deasy. But I'm not issuing any blanket ruling about emails now.

The second motion in limine, that was raised by Pennsylvania Skill Games, relates to its request to exclude certain invoices on the grounds of relevance. I'm also denying that motion without prejudice. I will note that in its

response -- in their response, the POM Parties did articulate the relevance of the specific invoice that was identified, specifically when the game was first sold and used in interstate commerce.  So assuming a proper foundation is laid for one or more of these invoices, I will address the issue at that time and draw up my own conclusion about whether it should be admitted or not.  But the motion is denied without prejudice at this time.

The next PSG motion was a motion to exclude testimony or evidence as to the compliance officers and the compliance reports.  I'll note that, during our oral argument, we had a fair amount of discussion about this, and I asked if the parties could agree that certain redactions to these exhibits might obviate the need for a full ruling on this motion.

Have you discussed possible redaction?

MR. NEISER:  Yes.  For our side, Your Honor, yes. Mr. Zegarelli and I spoke about it again briefly this morning. I need to send him what I think the markup would be.  I think I understand the objection.  I am going to actually send him what I have in mind.  I wanted to do it over last week, I just ran out of time.  And then he and I can confer about that.

THE COURT:  That's fine.  So let me give you, at least, my preliminary assessment that I'm granting in part, and denying in part, the motion filed by Pennsylvania Skill Games.

As I mentioned, we did have a discussion about this

during oral argument.  I was provided a sample report for my review.  And at this point, I find that, assuming the parties can agree on appropriate redactions, these reports and their content may be admissible, assuming a proper foundation is laid, and assuming that as redacted, the report would not be unfairly prejudicial or confusing to the jury.

So if there are relevant facts, observations, discussions, about the role of the compliance officers, that may be introduced with a proper foundation.  However, PSG is not precluded from asserting whatever objections Mr. Zegarelli may find are appropriate at that time to that evidence.

I do want to stress, though, that they can't be offered for the purpose of the legality of the games under Pennsylvania law, and I'm going to address legality again a little bit further.  But I am certainly going to allow, with the proper foundation, assuming that they are relevant, some evidence about those, assuming all of that occurs in advance.  So assuming there is a relevance objection, I'll deal with it.

Mr. Zegarelli, these reports are not going to come in without some redactions.  If the parties can agree on them, fine.  If not, I will determine what may or may not come in, assuming the evidence is admissible.

Any questions about that?

MR. ZEGARELLI:  No, Your Honor.

THE COURT:  All right.  There were motions made with

respect to both experts, and I'm going to deal first with Pennsylvania Skill Games' request to exclude the POM Parties' expert witness, Mr. Krieger. I am denying that motion to exclude Mr. Krieger. I'll note that we confirmed during our oral argument that neither party requested an evidentiary hearing about either expert.

I've reviewed the parties' briefs as it relates to Mr. Krieger. I've reviewed his CV and his expert report. Based on that review, based on my review of Rule 702 and Daubert and its progeny, I find that Pennsylvania Skill Games has failed to show that he is not qualified to testify as an expert.

I further find that the critiques made by Pennsylvania Skill Games to his anticipated testimony go to the weight of his testimony, not to the methodology.

With respect to the unjust enrichment claim, whether he made certain deductions or other -- applied other expenses to the total amount sought by Pennsylvania Skill Games is a subject for cross-examination, as is his attribution of Savvy Dog's licensing income by the number of intellectual property assets of Savvy Dog.

With respect to lost profits, Mr. Krieger uses a certain cut-off date for his calculations. That cut-off date is subject to a factual dispute, and certainly Pennsylvania Skill Games is free to cross-examine Mr. Krieger on his analysis of the business and the financial statements.

Finally, with respect to reasonable royalty damages, Mr. Krieger's critique of Mr. Anderson's sampling of comparative royalty agreements and alternative valuation is a proper subject for cross-examination and not a basis for exclusion of his testimony. Therefore, in addition to finding that Mr. Krieger is certainly an expert in his field, the other arguments go to the weight of his testimony as opposed to his qualifications and methodology.

That concludes my summary of rulings with respect to the motions in limine presented by Pennsylvania Skill Games.

Is there any comment, objection, or anything else that counsel wanted to address regarding my rulings before I move on?

MR. NEISER:  None from the plaintiffs, Your Honor.

MR. ZEGARELLI:  Nothing from PSG, Your Honor.  Thank you.

THE COURT:  All right.  Then I'm next turning to the motions in limine that were filed by the POM Parties.

The first one that I'm going to address is one that was filed at ECF No. 213.  It relates to the testimony of Mr. Anderson on the subject of unjust enrichment damages or disgorgement.  I am denying that motion.

As I did with Mr. Krieger, I reviewed the record, including the briefs of the parties, Mr. Anderson's qualifications in his CV and his expert report, I've applied the standards of Daubert and its progeny, as well as the

requirements of Federal Rule of Evidence 702, and find that the POM Parties failed to show that he is not qualified to testify as an expert.

I also find that the critiques offered by the POM Parties as to his anticipated testimony go to the weight of his testimony, and not the methodology that he employed.

The argument that Mr. Anderson fails to prove that the profits are attributable to the mark is a subject for cross-examination. The other arguments that POM has raised are not related, in my view, to methodology, but rather related to the threshold issue of liability, which I will address at a later point on my decision on one of POM's other motions, and that specifically will be addressed through bifurcation.

Finally, the POM Parties' argument that Mr. Anderson employed the wrong time frame for his unjust enrichment analysis is denied without prejudice following a finding of liability by the jury on the specific trademarks.

Next, I am moving to the motion in limine at ECF 217 that was filed by the POM Parties, to limit or exclude testimony and evidence related to Attorney Cline.

I'll note during oral argument that the POM Parties clarified that they weren't seeking to exclude evidence related to Mr. Cline, as much as his testimony itself. I'm denying that motion, but I want to set forth at this time several parameters for the parties' consideration when we get to trial.

First of all, Mr. Cline's testimony will be limited to testimony as a fact witness. I want to remind the parties that I have already ruled on other topics -- on certain topics of testimony in my orders of February 9th of 2021, and April 20th of 2021, and have already ruled that the subject of that testimony was previously foreclosed.

I also anticipate that, out of the presence of the jury, an offer of proof may be solicited in order to minimize the possibility of multiple objections based on matters that could be subject to the attorney-client privilege, or possibly a work product privilege.

I would also expect that if Mr. Cline is called to testify, if Pennsylvania Skill Games is the party calling Mr. Cline, that they would be mindful of avoiding questions that are likely to require the assertion of the attorney-client privilege.

I know when we talked before, we talked about the possibility that the parties could reach some agreement on some statement to read to the jury about that, as it relates to Mr. Cline. You may or may not have had the opportunity to do that, but I would welcome the parties agreeing, if you can -- and if you can't, I understand -- on some instruction to be given to the jury, about why there may be objections based on attorney-client privilege. I don't know if you've gotten anywhere on that. If you haven't, you have some extra time to

do that.

MR. NEISER:  Thank you, Your Honor.  We've drafted it. We just haven't exchanged it.

THE COURT:  Thank you.  All right.  I'm going to move to the next motion in limine that was filed by the POM Parties, and that is at ECF No. 209.  It's a motion to limit testimony and evidence relating to the ownership of trademarks.  As revealed at the oral argument, this motion is intended, as I understand it, to be very narrow in its scope.  And given the narrowness of its scope, it will be granted.

So I want to note for the parties that, no party may use any trademark application as prima facie proof of ownership of the Pennsylvania Skill word or design mark, nor may any party claim an ownership right to any Pennsylvania Skill mark, because of its registration on the supplemental registry.

We also talked at oral argument about coming up with something to tell the jury about that.  And certainly, if the parties have not already agreed on that, we can address that the next time we talk.

All right.  Moving next to the POM Parties' motion in limine to limit or exclude testimony and evidence related to non-POM parties.  This motion is granted in part, and denied in part.  I find that the organization and relationship between and among various POM corporate entities that are not parties in these consolidated actions are not relevant to the claims and

damages sought in this action, and that includes claims and counterclaims.  As previously discussed in my order denying joinder, those parties and entities are not necessary parties to this action.

With respect to the claims at issue, these entities -- and I'm putting aside any party who is named or is on either caption -- these entities are not alleged to be parties to the equipment purchase agreement, nor is Pennsylvania Skill Games seeking damages related to their alleged wrongful use of any trademark.  Therefore, any evidence or testimony relating to the conduct of a POM entity that is not a party in these consolidated actions or the overall organization or reorganization will be excluded.

To be clear, this does not foreclose Pennsylvania Skill Games from addressing the reorganization as it relates to Pace-O-Matic and POM of Pennsylvania.  However, the limitation is addressing the reorganization, with respect to the named parties in the suit, and the relationship between each other.

The POM Parties had also asked about the exclusion of exhibits, that I believe were formerly identified as Exhibits CCC and DDD, and I'm not able to determine at this time whether there is possible relevance, as to those exhibits.  So it will depend on their proposed use at trial.  And certainly, POM is free to reassert its objection in those exhibits at that time.

Mr. Neiser, you're looking confused at this point.

MR. NEISER:  No, I'm not looking confused.  Mr. Deasy was about to open his laptop and I just --

THE COURT:  I was hoping I hadn't used the wrong exhibit numbers.

MR. NEISER:  I think that may be the case, Your Honor, but that's something we can address later.  I just wanted to keep our focus here.

THE COURT:  That's fine.

MR. NEISER:  Thank you, Your Honor.

THE COURT:  I do have a couple of questions later, about who are the appropriate parties to certain of the claims, but I'm going to defer that at this point, and I'll ask you about that a little bit later.

I'm next turning to the motion in limine by the POM Parties to limit or exclude testimony and evidence relating to Miele Manufacturing.  That motion is granted in part, and denied in part.

I find that evidence relating to Miele Manufacturing, Inc.'s activities, as a competitor outside of Beaver County, are irrelevant for purposes of issues relating to the equipment purchase agreement, which is limited to Beaver County.  Thus, Pennsylvania Skill Games will be precluded from offering testimony or evidence about Miele Manufacturing and its actions outside of Beaver County, for the purpose of establishing liability on the breach of contract claim.  To be clear, this

includes Miele-related entities, not just Miele Manufacturing, Inc.

However, with respect to the trademark claim, or unfair competition claim, as it relates to the use of the mark without permission, that claim being that of Pennsylvania Skill Games, I will not geographically limit to Beaver County any evidence or testimony as to relevant conduct of Miele Manufacturing, Inc.

All right. I want to turn next to the motion in limine at ECF 207 that was asserted by the POM parties to exclude evidence and testimony regarding various issues relating to the Pace software. I am granting that motion, and I want to explain the basis for that. I find the issue of the legality of the software is irrelevant for the claims and counterclaims that have been asserted in this action.

First, I considered the parties' arguments as to whether expert testimony would be necessary to determine the legality of the games. I find that an expert would be required if it was necessary to determine the legality of the games. There has been no testimony, expert testimony offered by Pennsylvania Skill Games, who alleges that the games were not compliant, and it would be their burden to do so.

But putting that issue aside, I find that as the claims are stated, the issue of legality is not relevant to those claims. All of the claims sought by Pennsylvania Skill

Games, with respect to its breach of contract claim, arise out of alleged breach of the right of first refusal, not a breach of the contract by selling non-compliant terminals.  Indeed, the plain language of the equipment purchase agreement would not give a right of first refusal to Pennsylvania Skill Games for a non-compliant terminal, given that the EPA only envisions compliant terminals.

Thus, even if one of the POM Parties supplied a non-compliant terminal, Pennsylvania Skill Games does not allege that it has been harmed in connection with the breach of contract claim as a result.  And as we know, the existence of damages or harm is an essential element of a breach of contract claim, and without damages, there can be no breach of contract that is actionable.

With respect to the trademark-related claims, PSG is not seeking damages for the use of the mark with non-compliant games; rather, it's seeking disgorgement of all of the profits for the wrongful use of its trademark, regardless of the legality of the game.

For those reasons, I find that the legality of the terminals of software is irrelevant to the issues at hand, and therefore, evidence related to the legality of the terminals under Pennsylvania law to support such a claim, will be excluded.

All right.  The final motion that was asserted by the

POM Parties is at ECF 211, and relates to excluding the jury for determining accounting profits or, in the alternative, seeks bifurcation.  That motion will be granted in part, and denied in part.

I'll note, as the parties know, that Federal Rule of Civil Procedure 42(b) provides that, the Court may, for convenience, to avoid prejudice, or to expedite or economize, a trial, may order a separate trial of one or more claims, cross-claims, or issues.  That decision is made by the Court on a case-by-case basis.

I find here that bifurcation would be an appropriate solution.  Therefore, I'm going to bifurcate the trial into a liability phase and a damage phase.  I've reached this conclusion by balancing a number of factors, including the orderly and expeditious conducting of this trial, avoidance of prejudice to any party, and a consideration of the evidence that would be presented during a liability phase, and during the damages phase of the trial.

I will note, initially, that both parties acknowledge that it's possible that -- acknowledged during oral argument, that it may be possible that neither party may prevail on its trademark claim.

I'll note that, as far as I have been able to determine from my review of the pretrial statements and associated materials, only Pennsylvania Skill Games is seeking

money damages from the jury or otherwise.

Thus, a decision that either, neither party owns the trademarks or that a POM party owns the trademark at issue would obviate the need for expert testimony on the issue of unjust enrichment and disgorgement, which are the subject of a lot of dispute between the parties.

It also appears to me, after careful consideration and review of the parties' pretrial statements and my background with this case, that not much would overlap between a liability phase and a bifurcation -- a liability phase and a damage phase, and there would be little evidence that would overlap.

The parties' damage calculations appear to be heavily, if not completely, centered on their experts, who are only testifying about damages. The expert damage calculations are heavily disputed, and I expect that there will be a fair amount of time meant to -- that will be needed to present this evidence.

The parties have also told me over time, that much of the financial information that will be necessary for the jury to consider is highly sensitive. And I'll note, there have been multiple requests and motions made and granted to seal various financial information.

So if we bifurcate the two phases, that is going to facilitate the protection of that information, until such time that it's required, and then we can discuss further protection

of that information, while it is being presented to the jury.

I'll also note in passing that Rule 611 of the Federal Rules of Evidence also allows the Court to exercise a reasonable control over the process, including the order of presenting evidence in order to facilitate the efficient presentation of that evidence.

Therefore, considering liability alone, without having heard any damages evidence, I believe the jury can be fair to all parties, and render a verdict based on the evidence, by first hearing liability, and then hearing damages.  I'm convinced, in this case, bifurcation is fair to both parties.

Obviously, the same jury will sit for both stages, and one will proceed immediately after the other.  So we're not going to have a bifurcated trial where we have some significant gap between the liability phase and the damage phase.  So I have determined that we will bifurcate the case in that fashion.

Before I continue, are there any comments, argument, objections that any of the parties would like to make?

MR. NEISER:  Yes, Your Honor.  From plaintiffs' side, just to be clear on the bifurcation, is the Court bifurcating the entire case, all matters and all damages?  Or is it limited -- our motion was very limited to the unjust enrichment, disgorgement, whatever have you, the large number.

THE COURT:  Right.

MR. NEISER:  I'm not sure, is the Court saying that

that is going to be bifurcated, or are all damages going to be bifurcated?

THE COURT:  All damages.  That's why your motion was granted in part, and denied in part.

MR. NEISER:  Understood, Your Honor.  So even though we didn't ask for it, you're going to bifurcate --

THE COURT:  Yes.  I've determined that I think bifurcation is appropriate.

MR. NEISER:  Thank you, Your Honor.

MR. ZEGARELLI:  Your Honor, the only question I have, perhaps I just have to look at the record, was with regard to Mr. Cline, you did identify two orders.  I don't want to get snagged into an undistributed middle where --  well, on the one hand, I do understand that Mr. Cline would be testifying as a fact witness.  So I understand that much.  I will have to look at those orders to see if I'm constrained from asking him something as a fact witness that's within the scope of those orders.

So my only caveat, that I don't quite understand yet is, I don't recall whether those orders dealt with testimony in terms of scope.  And I would have to look at, you know, to whatever extent those orders also dealt with fact witness type of testimony, and then to digest how that gets managed.

THE COURT:  I understand.  You can reserve your right if you have any further argument you would like to make, to seek

clarification.  That's absolutely fine.

MR. ZEGARELLI:  Thank you, Your Honor.

THE COURT:  I wanted to talk about a couple of other issues, as I mentioned before.

Based upon my reading of the Lanham Act, it appears fairly clear to me that disgorgement of profits -- whether you call it disgorgement, unjust enrichment -- disgorgement of all profits is an equitable remedy; and therefore, there is no right to a jury trial on that claim.

Do the parties agree with my interpretation of the Lanham Act?

MR. NEISER:  I agree, Your Honor.

MR. ZEGARELLI:  Your Honor, as to the Lanham Act alone, the equitable remedy, I do think that is the best reading of the existence of the law.

THE COURT:  Okay.  And one of the things I wanted to seek clarification of, particularly from you, Mr. Zegarelli, because I think when we discussed this during oral argument you suggested that, because you have a common law claim that also seeks unjust enrichment, that somehow one would be decided by the jury and the other would be decided by the Court.  I want to make sure I understand what your position is on that.

MR. ZEGARELLI:  I think you understand what I said correctly, Your Honor.  And I do understand that you've got a system of law where you've got, you know, state and federal, and

I do understand the federal is an equitable remedy.  And I recall speaking on that point that, if the state doesn't require it or set it for as an equitable remedy, then perhaps that would allow it to go to the jury.  I'm not sure, quite frankly, Your Honor, how you manage the issue, but I did raise it.  There's that state and federal system of the trademark damages.

THE COURT:  Would the measure of damages be the same?  In other words, on your common law claim, are you still not seeking disgorgement of profits?  In other words, you don't have another damage theory on that, that is different from the Lanham Act?

MR. ZEGARELLI:  Well, I think -- if I understand the point, Your Honor, is, does the state and the federal match with regard to how they calculate?  And I can say that I did look into that, and I did not find something, at least on the research that I did, that said it was actually yes or a no.

THE COURT:  We'll have to resolve that issue because I don't think we can have the Court determining disgorgement and the jury also considering the same thing.

MR. ZEGARELLI:  I understand.

THE COURT:  So I'd like to talk about that further, before we get to trial.

MR. ZEGARELLI:  Understood.  Thank you.

THE COURT:  I mentioned that, in passing, the general topic of the parties have asserted any number of claims which is

your right to do.  It would be helpful for me to know sometime before the actual trial, whether any of those claims are subsumed into each other, whether you're not going to be asserting certain of those claims, or asking the jury to make a determination on some of those claims, which I think would streamline things a bit.

I'm not suggesting that you need to do it, but I think if you have essentially the same claim under federal law and state common law, you might want to consider whether you're going to be asking the jury to make a decision on both.  And that goes beyond what I've just said about the Lanham Act damages being the same as perhaps a common law remedy.

Mr. Neiser, on the subject of money damages or statutory damages, are the POM Parties on their trademark claim under the Lanham Act seeking statutory damages or no monetary damages at all?

MR. NEISER:  We're seeking statutory damages only, Your Honor, under the Pennsylvania trademark claims, which are, for all purposes, identical to the federal counterpart.  They are obviously junior in value in weight.  But as I have been going through the jury instructions, I found that nobody even talks about a state trademark jury instruction.  So we are seeking pure statutory damages, Your Honor.

But under the state Trademark Act and under the Unfair Trade Practices Consumer Protection Act, we're entitled to

punitive damages.  So there would be a request for that.

And primarily, though, Your Honor, we're seeking injunctive relief, declaratory relief, and the ruling that we own the trademark.  So we're not going -- I don't believe -- at least at this point, I don't believe that we're going to be asking the jury to give us a damages award on the trademark.

THE COURT:  Okay.  Thank you for that.  And on the Unfair Trade Practices and Consumer Protection Law claim, are the POM parties consumers?

MR. NEISER:  I believe we are, Your Honor.  That's one of the claims that may go the way of the dodo bird, for lack of a better term.  When we discussed that statute and whether we should bring it, there's the catch-all clause.  And my reading of the Unfair Trade Practices and Consumer Protection Law, it allows for claims between businesses operating in the Commonwealth of Pennsylvania from engaging in unfair competition with each other.  That would include, for example, hiring an employee who has a noncompete agreement, knowingly.  It's in addition to interference of contract.  So it's a codified general statutory provision that is the equivalent of the unfair trade -- unfair competition.

THE COURT:  Okay.

MR. NEISER:  But, Your Honor, I think it would be duplicative of -- to just address your previous comment.  We have Lanham Act claims that allege unfair competition.  We also

have a common law claim for unfair competition.  The practicalities of them, I think, are a distinction without a difference.  And to take it one step further, that would include the Trade Practices Act.

So I think that we may be able to do away with some of these to narrow it a little bit, but I don't think it's the practical reality or the burden on the jury or the Court would be any different.

THE COURT:  No, I understand.  And I appreciate it's something worth considering --

MR. NEISER:  Sure.

THE COURT:  -- just to streamline issues.  If they're duplicative of each other, there may not or there may be a need to pursue them separately.  And I'll leave that up to the parties, for now, to think about.

MR. NEISER:  Sure.  It's not a matter -- I don't believe that, even with the recent Supreme Court decision -- Pennsylvania Supreme Court decisions under the unfair trade practices law, I don't believe we're entitled to monetary damages through that statute.  What I do think are available are the injunctive relief, perhaps via award of attorneys' fees, but those are duplicative.  I don't think it rises to the level of election of remedies issue, but we'll definitely consider.  If I can make it easier and talk less in front of a jury, I'll do that.

THE COURT: Yeah. I think the goal here is the parties should fairly present any claim that they want to, but keep in mind the simplicity, to the extent that we can achieve it, of the issues that are presented to the jury for their consideration and what the verdict slip might look like.

MR. NEISER: Yes, Your Honor. It's funny you say that because -- we all know this -- when we did the verdict slip, and if it starts looking like a confused road map, then nobody's well served. Point taken, Your Honor.

THE COURT: We want to make sure the jury understands your claims, the counterclaims, the defense's, and reaches a verdict that's fair to everyone. So the more that we can streamline this case, the better.

MR. NEISER: Thank you, Your Honor.

THE COURT: I have a question or two for you, Mr. Zegarelli, just so I understand where you may be going. And if you need additional time to think about this, I understand that as well.

So in your breach of contract claim, let's say this case went to the jury tomorrow -- I realize we haven't had any evidence to that effect -- who are the parties that you would be seeking a breach from?

MR. ZEGARELLI: Well, certainly -- again, this rests on the question of whether or not the actors have somehow moved to the POM of Pennsylvania entity and the Savvy Dog entity. We

certainly, as indicated in the original complaint, certainly looking for Pace-O-Matic and Miele Manufacturing.

THE COURT:  Right.

MR. ZEGARELLI:  Whether there is a conditional question that places liability also on POM of Pennsylvania and Savvy Dog, even if that comes through the counterclaim, that I think is -- I think there needs to be a decision first, because from our perspective, we entered into a contract with Pace-O-Matic and Miele Manufacturing.  And only lo and behold, through whatever happened out of our view, all of a sudden it's Savvy Dog and POM of Pennsylvania.

So it's tough, on the one hand, to say the thing you dispute is also the thing you're going to say is liable to you, when you dispute the premise of it.  So I think there would need to be a finding of fact in between that, somehow.  Either the liability moved, or the jointly and severally liable, or something of that nature.

THE COURT:  I've seen, at least, POM of Pennsylvania refer to itself as a successor in interest to Pace-O-Matic.

Do you take that position?

MR. ZEGARELLI:  We don't take the position that POM of Pennsylvania is a successor in interest.

THE COURT:  So what is your view of, if you're able to tell me now, how the contract claim might go against POM of Pennsylvania and Savvy Dog, since they're not named parties to

the contract?

MR. ZEGARELLI:  Right.  As much as I can tell you, Your Honor, our position is, we shook hands with Pace-O-Matic and Miele Manufacturing.  That is who has a duty to us, under the terms and conditions of the EPA.

To the extent that POM of Pennsylvania -- well, to the extent Miele Manufacturing and/or Pace-O-Matic successfully created a successor in interest, and I'm not quite sure there is a joint or several liability, that sort of thing, then we would, through that act, if you say -- if you find that -- we don't want to get caught in a position, Your Honor, where somewhere there's a finding that the rights are actually in POM of Pennsylvania, but we can't enforce them because we've taken the position that only Pace-O-Matic is liable to us.  So that's the difficulty I'm having, answering the question definitively, because I think there needs to be a determination in the middle, one way or the other.

THE COURT:  Is it possible that if you prevail on the breach of contract, Pace-O-Matic would be liable up to a certain time period, and then it would be POM of Pennsylvania thereafter, or is that the kind of claim you're asserting, or is --

MR. ZEGARELLI:  The best I would be able to say at this time, Your Honor, is we believe that Pace-O-Matic is responsible for all of the damages and response -- everything

that happened, and Miele Manufacturing, who we signed the contract with. And to any extent that that is not true, if they have been succeeded properly and legally, then we would follow that trail, that we dispute that that was permissible.

THE COURT: So some of the answer to this might depend on the evidence that's presented at trial?

MR. ZEGARELLI: I think so, Your Honor.

THE COURT: And the same question with respect to the trademark violations. I'm just lumping them all together for purposes of our discussion. Who, if this case were going to the jury tomorrow, would you argue are the appropriate parties? I realize this, to some degree, is not a completely fair question because we haven't had the evidence presented yet. But who do you intend to seek recovery from, as we sit here today?

MR. ZEGARELLI: Well, if I was granted leave, I'd amend for conspiracy. I think I -- we sort of went down that road at one point, Your Honor, because I do think that there are several parties acting in unison on a common theme or scheme to do all of the things that are asserted from that perspective.

But with regard to the trademark, I think all of them are -- because it may be that the use of the trademark flowed, let's say, from the contract, the breach of contract, but the other parties are still using it and asserting use of it, in violation of, what we think is a violation of our trademark. So I think they're all actors in that regard.

THE COURT:  All right.  Thank you.

One question for both of you.  We talked a little bit last time about whether ambiguity is an open issue here, and I asked that you consider that before we got together today.

Have we reached some consensus on ambiguity or clarity?

MR. NEISER:  Your Honor, I think we've reached consensus that we mutually disagree.  So our position is, that there are only two aspects of the equipment purchase agreement that would be ambiguous, and would be subject to parol evidence.

As the Court's aware, this is not an integrated agreement by definition.  Maybe by interpretation.  Maybe by application.  But there are lacks of complete integration clause that any of us in this room here would put on a contract like this.  And we do have the affirmative defense of fraudulent inducement, and that relates to consideration.

And I believe that there's -- there are two ambiguities in the equipment purchase agreement that would require either leave to explore at trial via parol evidence, or a ruling from this Court, and I don't even know what rulings you would give other than to say, guys, have at it, bring in parol evidence to define this.

But I believe that it's Section 6 of the equipment purchase agreement and it is language that says, the parties will -- can I see it?  I can go by memory, but I don't want to

screw this up on the record.

This is at Bates Number PSG 29 through 30.  This is on PSG 30, Article 6, seller will support buyer with previously agreed marking efforts.

Your Honor, for the life of me -- if the Court would like a copy, I can approach and give you a copy.

THE COURT:  That's all right.  I have one up here.

MR. NEISER:  Thank you.  So sitting here today, I have no idea what that means.  I can't see how the Court would know what it means.  And I definitely don't think the jury would understand what it means.

I think that the question of what are previously agreed marketing efforts, it is a factual dispute.  One, our view of the world is that it means we're going to provide you with marketing materials, and we're going to help you sell by giving you pieces of paper that you can take out into the hinterland and try and put -- buy these games and place them into locations.

I believe PSG's view of the world is that within that paragraph is everything.  Previously agreed marketing efforts are licensing a trademark, and all kinds of rights that I really don't know, and I respectfully don't understand at all.  So that's one.

Number two is considering.  Right of first refusal in Section 4 at PSG 30 is something that exists on an island, if

you will.  There's no reference to consideration.  Even though we have it's an equipment purchase agreement, and I know that this is all in dispute.  I'm not trying to argue the case.  I'm trying to give the perspective as to why we may need some parol evidence as to the consideration supporting the agreement.

When we buy equipment or we buy software fills, they're at an enumerated price on their agreed-upon terms.  But there's no requirement to buy so many of them or the term, the period, none of the language that one would expect from an agreement.  And the right of first refusal, if you believe the arguments of Pennsylvania Skill Games, you know, isn't supported by any exchange of equal value, present or future exchange of equal value.

So in that regard, Your Honor, I believe that parol evidence may be necessary to resolve those two ambiguities in the agreement.  They're missing or they're just ambiguous terms.

However, I do also recognize that one of the claims that Pennsylvania Skill Games has made, is the existence of oral agreements and oral contracts, which go to some of these issues.  So this really may be much ado about nothing.  But I wanted to be -- to give the Court a sense of what was discussed, at least what's going on in our minds.  Whether or not it's correct is a completely different story.  And in the end, I don't know that it's going to matter because there will be testimony as to what this contract meant to certain people at certain times.

I just think we can't bring in parol evidence to, for example, bring in all the drafts of the agreement from beginning to end. I think that would be inappropriate, especially considering the seller will support buyer with previously agreed marketing efforts. In the draft agreements that were circulated by and between the parties, that is a term that never changed. So parol evidence wouldn't even serve to clarify or crystallize the issue for a jury.

Again, I really do think it may be much ado about nothing in the end. However, if we are going to limit parol evidence with respect to the interpretation of the contract itself, those are the only two issues that I think that we need to address.

THE COURT: Thank you. Mr. Zegarelli.

MR. ZEGARELLI: Thank you, Your Honor. So the two issues, consideration, that was addressed in the motion to dismiss. You know, the Court could probably look at the agreement itself and see mutual duties and that seems to be -- without minimizing it, failure of consideration or absence of consideration for this case in this context, for me, is I think evident. It's sort of like a Hail Mary pass, quite frankly, Your Honor. And I'll put that one aside.

The issue of the support, the marketing efforts, that really is a big deal because that goes to the marketing and the marketing goes to the trademark. And where Mr. Neiser and I

seem to go in a circle on it is, under parol evidence, I understand if you have a zip-locked integrated agreement and there's a bunch of documents in the file and it's a zipped-up agreement, you can look at it and you can say, okay, do we need parol evidence to explain -- without contradicting, you know, but to explain the terms.  And you can have your notes and that sort of thing identify, you know, why these terms are what they are.

But here we have a flip.  So my concern is not the parol evidence as it related to two areas.  My concern is the negative implication it creates because if you say, okay, we're going to allow parol evidence -- first of all, we have pled that this is a series of incremental discussions and agreements orally and that you can't really say sort of -- it's a broader question of first you had, you know, a whole systemic issue because you started with the location for the controlled pickup. You started with putting that in.  Then everybody waited it out. Then immediately, the decision comes in in December 24th, something like, and then immediately January 15th, the parties have the January agreement, which then moved to the May agreement.  Now, the May agreement happened to be the last iteration, but it doesn't deal in any -- it has no language with regard to finality, and it's a continuum, as I said in my response to the motion to dismiss.

So to say this point or this point allows parol

evidence, my response to that is, we've got all sorts of emails that say what different provisions mean.

Now, I don't know if Mr. Neiser's witnesses say something that my clients agree with, I'm not sure it matters. Then it really is a moot point. But if they say something that contradicts my client's testimony, and there's evidence even for the jury to say, oh, well, they asked for this, you know, one of the parties asked for it, it was crossed out and never made it into the document, and somebody testifies why, I think that can create a reasonable inference for the jury to say, we think that person's lying about, you know, or we think that person's telling the truth.

So from our perspective, Your Honor, it's not about those two issues. It's simply about the fact that this document, such as others and emails, all just document the agreement generally. And a lot of documents tend to explain what the parties meant, and we would show that.

So to assert that certain documents -- it's almost like a motion in limine in a sense that certain documents shouldn't come in because, you know, it's been consistent through the term that -- it's either in dispute or it's not. If it's a disputed issue, then I think we should be able to create the testimony with the evidence to support it. You know, okay, you think this? Why do you think this way? And the jury can hear it. Maybe there's a document that supports it.

So it's really the negative implication.  If you say, okay, yeah, you need parol evidence, or it's sort of implied, oh, okay, then you've probably excluded parol evidence for the other one.  And that's what concerns me, because there are many provisions in here that there are documents, emails, that support why the parties did what they did.

THE COURT:  Mr. Neiser, anything further that you want to address on this subject?

MR. NEISER:  Just briefly.  Mr. Zegarelli's right, this is the last iteration.  And that's the reason why I only have two questions about ambiguity.  I'm not quite sure what documents or emails he's talking about.  It's not really for today's argument.

My consideration, my concern is that these are not -- if we're going to go back through and rip apart every single term of this agreement, then we don't have an agreement.  And if we're going to go back through and look at what was crossed out and what wasn't crossed out, then we don't have an agreement.

What I'm talking about specifically are things that I don't know how a jury's going to understand what on earth they mean.  But there are other parts that we do understand.  We understand who the parties are.  We understand what is being bought and sold.  We understand about assignment.  Those are things that we can glean from the agreement what they are.  But those two particular issues that I've raised, they're just not

in there and there's no way to know.

So I'm just trying to, if I can head off wasting everybody's time at trial, I'd like to do that.  Or if we have to be prepared to go through chapter and verse and pull up every single email and iteration of the agreement, I'm happy to do that as well.

THE COURT:  I think what I'm hearing is that you don't require a ruling at this point because I don't know how I could do it, frankly, at this point.  But we may have to take up the issue, either prior to trial or as evidence comes up.

Certainly, if there is an argument from Pennsylvania Skill Games that there were a series of agreements -- which I know that is one of the arguments -- that's to me a separate issue than can the jury understand what is meant in the equipment purchase agreement itself, and are we going to go back and allow the jury to hear that this particular item was taken out or included?  That to me is sort of classic parol evidence, but I can't really make that determination right now because I haven't seen that evidence.

So my suggestion, for now, is that we continue to address this as we can, prior to the trial.  If there are specific exhibits that you may want to bring to my attention before trial, that relate to some of the things that you've talked about, Mr. Zegarelli, I can make a ruling on those, or defer ruling if I'm not sure yet based upon how the evidence is

going to come.

But I don't think, at this point, I can reach some blanket ruling about ambiguity. But I promise you I will do my best to give you clear instructions on what may or may not be admissible. But I certainly welcome hearing from you about evidence you intend to present that relate to the contract claim, or any other claim for that matter, so that we can at least have some clarity before we go into trial. I think that's the best we can do at this point.

MR. NEISER: Your Honor, that's all we were trying to do.

THE COURT: I think that covers my list of agenda items for today, given that we're not proceeding as originally planned. Are there other matters that anyone wanted to raise?

MR. NEISER: One thing, Your Honor. And I want to thank the Court for its compassion and understanding. These are unique circumstances, of course. But because we are moving the case, and right now we are two weeks out, we were ready to go do our thing, what's the Court's view on locking the case down as it sits and we're preserved? There are certain things that we are ready to do or not do in a couple of weeks. Now we're going to be moving the trial a couple of months.

Are we to expect, for example, new orders with respect to any additional motions in limine or anything? Or can we consider those matters to be closed at this point? Maybe

perhaps consider deposition designations at a later point, in case that needs to change based upon witness availability?

But other pretrial matters, can we consider those to be, for the most part, within reason, shut down at this point, we're locked into what case we have right now?  We're just deferring the actual adjudication of it.

THE COURT:  Yes.  I think anything that was due to be performed or done or filed in my pretrial order that has already been done, that was your deadline for doing that.

As you mentioned and as I mentioned earlier, deposition designations may change with the passage of time, due to availability or unavailability of witnesses.

I'm going to issue a revised schedule for matters that weren't yet ripe.  In other words, your final jury instructions, your voir dire, your verdict slip, anything that has already been ordered and has been taken care of, as far as I'm concerned, is concluded.  So whatever motions in limine you've made are the motions in limine that you've made.  If somebody wants to file a motion and seek a change in that, you'll have to give me a good reason why you weren't able to get it in in a timely fashion.  So anything that has already passed on this schedule has passed as far as I'm concerned.

Does that answer your question?

MR. NEISER:  Yes, Your Honor.  Thank you.

THE COURT:  Mr. Zegarelli, anything further from you?

MR. ZEGARELLI:  Nothing further.  Thank you so much.

THE COURT:  Thank you.  We're going to go off the record at this point.

(Off-the-record discussion.)

(Proceedings concluded at 2:43 p.m.)

- - -


C E R T I F I C A T E


I, SHARON SIATKOWSKI, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

s/Sharon Siatkowski
SHARON SIATKOWSKI, RMR, CRR, CBC, CRI
Official Court Reporter