IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WESTERN PENNSYLVANIA

| | |
|---|---|
| POM OF PENNSYLVANIA, LLC, t/d/b/a PACE-O-MATIC, and SAVVY DOG SYSTEMS, LLC, | CIVIL ACTION NO. 2:18-CV-00722-PLD <br><br> CONSOLIDATED |
| Plaintiffs/Counterclaim Defendants, | The Honorable Patricia L. Dodge |
| v. | |
| PENNSYLVANIA SKILL GAMES, LLC, | |
| Defendant/Counterclaim Plaintiff. | |

## POM PARTIES' TRIAL BRIEF

In accordance with this Court's Chamber Procedures, Plaintiffs and Counterclaim Defendants POM of Pennsylvania, LLC ("POM"), Savvy Dog Systems, LLC ("Savvy Dog"), Pace-O-Matic, Inc. ("Pace"), and Miele Manufacturing, Inc. ("Miele") (together, the "POM Parties"), by and through their undersigned counsel, hereby submit the following trial brief, the purpose of which is to provide a roadmap of the controlling law on discrete issues remaining at this time:

**I.       Trademark Claims**

   a.   Trademark Ownership and "Use in Commerce"

As stated by the Supreme Court, "[t]he Lanham Act was intended to make 'actionable the deceptive and misleading use of marks' and 'to protect persons engaged in ... commerce against unfair competition.'" Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 767-68 (1992). To state a claim under § 43(a) of the Lanham Act, a plaintiff must show: (1) it has a valid and legally protectable mark; (2) it owns the mark; and (3) the defendant's use of the mark to identify

goods or services causes a likelihood of confusion as to the origin of the goods or services. Parks LLC v. Tyson Foods, Inc., 863 F.3d 220, 226 (3d Cir. 2017) (citations omitted). In the Third Circuit, a plaintiff can only establish ownership of an unregistered mark "if it shows prior **use** of the mark 'in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark.'" Lucent Information Management, Inc. v. Lucent Technologies, Inc., 186 F.3d 311, 315 (3d Cir. 1999) (quoting Blue Bell, Inc. v. Farah Mfg. Co., Inc., 508 F.2d 1260, 1266 (5th Cir. 1975) (emphasis added); See also Kars 4 Kids Inc. v. America Can!, 8 F.4th 209, 219 (3d Cir. 2021) ("[t]o determine rightful ownership of an unregistered mark, courts generally apply '[t]he first use test ... taking account of the well-established common law principle of first-in-time, first-in-right that rewards actual and continuous use in commerce as between market competitors.").

"Use in commerce," commerce being that "which may lawfully be regulated by Congress," is defined under the Lanham Act as the "the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark." 15 U.S.C. § 1127; See Two Pesos, Inc., 505 U.S. at 767-68 ("[t]he general principles qualifying a mark for registration under § 2 of the Lanham Act are for the most part applicable in determining whether an unregistered mark is entitled to protection under § 43(a)."). Stated further, a mark is deemed to be "used in commerce" in connection with "goods" when placed on their associated containers or displays and then sold or transported in commerce. Id.; But see 2 McCarthy on Trademarks and Unfair Competition § 16:22.50 (5th ed.) ("The modern common law rule for ownership and priority has no requirement that a designation be physically 'affixed' to the product to be entitled to protection under the common law of 'trademarks.'"). A mark may also be used in connection with "services" when used or displayed on advertising materials for said services, which are

2

rendered in commerce. Id. Ultimately, it is the transportation of the item with the mark on it rather than the general scope of the business which is determinative under the statute. Laurel Capital Group, Inc. v. BT Financial Corp., 45 F.Supp.2d 469, 478 (W.D. Pa. 1999) (citing Blazon, Inc. v. DeLuxe Game Corp., 268 F.Supp. 416 (S.D.N.Y. 1965).

   b.  Likelihood of Confusion and the Lapp Factors

In Interpace Corp. v. Lapp, Inc., the Third Circuit set out the following ten factors to be considered in the likelihood of confusion analysis: (1) the similarity of the parties' marks; (2) the strength of the plaintiff's mark; (3) the price of the goods or services and other factors indicative of the care and attention expected of customers when making a purchase; (4) the evidence of actual confusion; (5) the length of time the defendant has used the mark without actual confusion; (6) the defendant's intent in adopting the mark; (7) whether the goods or services, though not competing, are marketed using the same channels of trade and advertised using the same media; (8) the extent to which the targets of the parties' sales efforts are the same; (9) the relationship of the parties' goods and services in the minds of consumers because of the similarity of function; (10) other facts suggesting that the consuming public may expect the plaintiff to manufacture a product in the defendant's market or that it is likely to expand into that market. 721 F.2d 460, 463 (3d Cir. 1983) (citations omitted). Application of the Lapp factors is a "qualitative inquiry" depending on the facts of a particular case. A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198, 215 (3d Cir. 2000). Indeed, "not all factors will be relevant in all cases" and "may properly be accorded different weights depending on the particular factual setting." Id.

While no individual Lapp factor is determinative, "the single most important factor in determining likelihood of confusion is mark similarity." Sabinsa Corp. v. Creative Compounds,

LLC, 609 F.3d 175, 182 (3d Cir. 2010) (quoting A & H Sportswear, 237 F.3d at 216); Checkpoint Sys., Inc. v. Check Point Software Techs., Inc., 269 F.3d 270, 297 (3d Cir. 2001). Accordingly, "[i]f products are directly competing, and the marks are clearly very similar, a district judge should feel free to consider only the similarity of the marks themselves." A & H Sportswear, 237 F.3d at 214; see Villanova University v. Villanova Alumni Educational Foundation, Inc., 123 F. Supp. 3d 293, 306 (E.D. Pa. 2000) (finding the parties to be directly competing with each other by offering similar services and engaging in similar activities). In analyzing mark similarity, "[t]he proper test is not a side-by-side comparison but, rather, whether the labels create the same overall impression when viewed separately." Sabinsa Corp., 609 F.3d at 183 (citations omitted). However, "if buyers typically see the two products side-by-side," such comparison may be appropriate. McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC, 511 F.3d 350, 359 (3d Cir. 2007). Lastly, "marks need not be identical, only confusingly similar." Fisons Horticulture, Inc. v. Vigoro Indus., Inc., 30 F.3d 466, 477 (3d Cir. 1994)). **A defendant therefore cannot avoid a likelihood of confusion by adding a descriptive term to the plaintiff's mark**. Id. (emphasis added).

    c.    <u>Multiple Marks</u>

There is little doubt that a product or service can be identified by more than one protectable trademark. 5 McCarthy on Trademarks § 7:2; See SportFuel, Inc. v. PepsiCo, Inc., 932 F.3d 589, 596 (7th Cir. 2019) ("Product packaging can include more than one source indicator. We look to multiple factors in how a defendant employs a challenged term or phrase to determine whether it serves as a source indicator and therefore is used as a trademark."); Kelly-Brown v. Winfrey, 717 F.3d 295, 310 (2d Cir. 2013) ("A slogan is used in conjunction with a previously existing trademark does not mean that the slogan does not also function as a mark, for

4

a product can bear more than one trademark."); Old Dutch Foods, Inc. v. Dan Dee Pretzel & Potato Chip Co., 477 F.2d 150, 154 (6th Cir. 1973) ("[T]he fact that a product bears more than one mark does not mean that each cannot be a valid trademark. In fact, not infrequently products have more than one trademark imprinted thereon."); Carter–Wallace, Inc. v. Procter & Gamble Co., 434 F.2d 794, 800 (9th Cir. 1970) ("A product can bear more than one trademark.").

Although this principle is not expressly found in the Third Circuit's jurisprudence, at least one court in this Circuit has considered the protectability of word mark separate and apart from a registered composite mark consisting of the combination of the word *and* design. SNA, Inc. v. Array, 51 F.Supp.2d 542, 548 (E.D. Pa. 1999) ("[t]he the question at issue in this case is whether plaintiffs have a protectable common law trademark interest in the unregistered mark 'Seawind' and, if so, whether defendants have infringed upon that interest by their various uses."). In considering a similar question, the Ninth Circuit addressed the issue as follows:

> BLACK & WHITE Scotch whiskey is identified by both the words BLACK & WHITE and a picture of two dogs—a white Westie and a black Scottie. Since these two marks independently identify and distinguish the product source, the company can prevent confusingly similar use of BLACK & WHITE alone, even though defendant does not use an image of the dog.

Fleischmann Distilling Corp. v. Maier Brewing Co., 314 F.2d 149 (9th Cir. 1963). Ultimately, the issue is whether the designation in question creates a commercial impression separate and distinct from all other packaging or advertising material. Any disparities between the two marks therefore may be trumped by their similarities and potential for confusion. See Alliance Bank v. New Century Bank, 742 F.Supp.2d 532, 557 (E.D. Pa. 2010); Blumenfeld Dev. Corp. v. Carnival Cruise Lines, Inc., 669 F.Supp. 1297, 1320 (E.D. Pa. 1987) ("When the dominant portions of two marks sound the same when spoken by consumers, there is likely to be confusion. Any differences in the design of the marks does not dispel this confusion.").

d.  Abandonment

Under the Lanham Act, when a trademark owner discontinues use of its mark with the intention of never resuming use, the owner abandons its rights in the mark. 15 U.S.C. § 1127. In order to establish abandonment under the Lanham Act, "it is necessary to show not only acts indicating a practical abandonment, but an actual intent to abandon." Marshak v. Treadwell, 240 F.3d 184, 198 (3rd Cir. 2001). Still, "[n]onuse for three consecutive years shall be prima facie evidence of abandonment." 15 U.S.C. § 1127; See Marshak, 240 F.3d at 198 ("[a]s the statute indicates, however, the requisite intent 'may be inferred from the circumstances.'").

## II.  Breach of Contract Claims

a.  Parol Evidence

The Parol Evidence Rule bars admission of oral testimony which purports to explain or vary the terms of an integrated written agreement. Brimich v. Jencka, 757 A.2d 388, 400 (Pa. Super. 2000). "Where the parties to an agreement adopt a writing as the final and complete expression of their agreement, . . . [a]lleged prior or contemporaneous oral representations or agreements concerning subjects that are specifically dealt with in the written contract are merged in or superseded by that contract." McGuire v. Schneider, Inc., 534 A.2d 115, 117 (Pa. Super. 1997). "Where the parties, without any fraud or mistake, have deliberately put their engagements in writing, the law declares the writing to be not only the best, but the only evidence of their agreement." Yocca v. Pittsburgh Steelers Sports, Inc., 854 A.2d 425 (Pa 2004). All preliminary negotiations, conversations and verbal agreements are merged in and superseded by subsequent written contract. . . and unless fraud, accident or mistake, be averred, the writing constitutes the agreement between the parties, and its terms and agreements cannot be added to nor subtracted

6

from by parol evidence." Id.; citing Gianni v. Russel & Co., 126 A. 791, 792 (Pa. 1924) (citations omitted).

For the parol evidence rule to apply, there must be a writing representing the "entire contract between the parties." Gianni at 792. If the writing appears to be a contract complete within itself, with terms that import a complete legal obligation with clarity as to the extent of the parties' engagement, it is presumed the writing represents the entirety of the agreement. Id. Once a written agreement has been established, evidence of previous oral or written agreements is inadmissible to explain or very the terms of the contract. Yocca at 437.

Exceptions to the parol evidence rule exist in cases where the writing is ambiguous, or where a party alleges fraud, accident, or a mistake. Id. In such cases, parol evidence *may* be introduced to vary a writing intended to be the parties' entire contract. Id. In matters where a contract is ambiguous, "parol evidence is admissible **to explain or clarify or resolve** the ambiguity…" Id.; See also Estate of Herr, 161 A.2d 32 (Pa. 1960), Waldman v. Shoemaker, 80 A.2d 776 (Pa. 1951).

b.   Statute of Frauds

The parties to this case have formed a valid and written, though not fully integrated, contract which they memorialized in writing in the EPA. If, however, this honorable court determines that there was a preceding oral agreement between the parties, the terms of which, were not incorporated into the EPA, this honorable court should find that the unincorporated terms of that agreement are unenforceable, as it does not comply with the Statute of Frauds, as the goods in question are priced over $500.

"A contract is formed when the parties to (1) reach a mutual understanding, (2) exchange consideration, and (3) delineate the terms of their bargain with sufficient clarity. Consideration

7

consists of a benefit to the promisor or a detriment to the promisee." Weavertown Transp. Leasing, Inc. v. Moran, 834 A.2d 1169, 1172 (Pa. Super. 2003). Contracts for the sale of goods for the price of $500 or more must be evidenced in writing. Under the Uniform Commercial Code:

> **(a)** Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this subsection beyond the quantity of goods shown in such writing.

13 Pa. Stat. and Cons. Stat. Ann. § 2201 (West).

No writings related to any prior communication between the parties has been drafted or signed. Neither party alleges that there is an oral contract with a determined number of terminals. Therefore, under the Statute of Frauds, no enforceable prior agreement exists.

      c.      <u>Fraudulent Inducement</u>

The elements of fraudulent inducement are: (1) a representation; (2) material to the transaction; (3) made falsely, with knowledge of its falsity or recklessness as to its truth; (4) with the intent of misleading another; (5) justifiable reliance on the misrepresentation; and (6) an injury proximately caused by the reliance. Eigen v. Textron Lycoming Reciprocating Engine Division, 874 A.2d 1179, 1185 (Pa. Super. 2005) (Citations Omitted). A misrepresentation is material if the party would not have entered into the agreement but for the misrepresentation. Id. at 1188. To be justifiable, reliance upon the representation of another must be reasonable. Id. at 1189. A party claiming fraud in the inducement must also prove the resulting injury was proximately caused by the reliance. Id. at 1190.

d. <u>Damages</u>

There are three elements necessary to prove a breach of contract: (1) the existence of a contract, including its essential terms, (2) a breach of the contract; and, (3) resultant damages. <u>412 N. Front. St. Associates, LP v. Spector Gadon & Rosen, P.C.</u>, 151 A.3d 646, 657 (Pa. Super. 2016) (citations omitted). Damages for a breach of contract should place the aggrieved party in "as nearly as possible in the same position it would have occupied had there been no breach." <u>Ely v. Susquehanna Aquacultures, Inc.</u>, 130 A.3d 6, 10 (Pa. Super. 2016). An aggrieved party can recover all damages if (1) they were such as would naturally and ordinarily result from the breach, (2) they were reasonably foreseeable and within the contemplation of the parties at the time they entered a contract, and (3) they can be proved with reasonable certainty. <u>Id</u>. The measure of damages for breach of contract is compensation for the loss sustained. <u>Helpin v. Trustees of University of Pennsylvania</u>, 10 A.3d 267, 270 (Pa. 2010). An aggrieved party cannot recover anything more than what will compensate him. <u>Id</u>. Lost future earnings, if proven, can be properly included in an award for damages, though they cannot be proven with mathematical precision and exactness. <u>Id</u>. The law does not permit a damages award based on speculation and instead requires a reasonable basis to support any award. <u>Id</u>.

e. <u>Consideration</u>

"Consideration confers a benefit upon the promisor or causes a detriment to the promisee and must be an act, forbearance, or return promise **bargained for and given in exchange for the original promise**." <u>Blackmon v. Iverson</u>, 324 F. Supp.2d 602, 611 (E.D. Pa. 2003) (emphasis added). Accordingly, "[p]ast consideration is insufficient to support a subsequent promise," because it is not given in exchange for the promise. <u>Id.</u>

On the issue of "past consideration," Blackmon is particularly instructive. There, the self-proclaimed "surrogate father" of the basketball player Allen Iverson sought to enforce an alleged oral contract for 25% of the royalties generated by Iverson's trademarked nickname, "The Answer." Id. at 604. The plaintiff came up with the nickname "The Answer" in July of 1994, and the "father" discussed the commercial applications of the nickname. Id. at 605. At the end of this initial conversation, Iverson allegedly promised to give the plaintiff 25% of all proceeds generated in connection with the term "the Answer." Id. The two discussed marketing applications of the nickname over the course of the next six years. Id. The plaintiff went so far as to hire a graphic designer to design logos bearing the nickname, whereas Iverson allegedly repeated his promise numerous times during this timeframe. Id. Ultimately however, the court found the alleged contract lacked consideration and ruled in favor of Iverson as a matter of law. Id. at 612.

Dated:  February 12, 2023

Respectfully submitted,

SPILMAN THOMAS & BATTLE, PLLC

By: /s/ Jonathan A. Deasy
    Jonathan A. Deasy
    Pa. Id. No. 327496
    One Oxford Centre, Suite 3440
    301 Grant Street
    Pittsburgh, PA  15219
    T:  (412) 325-3306
    F:  (412) 325-3324
    E:  jdeasy@spilmanlaw.com

**Attorneys for Pace-O-Matic, Inc., Miele Manufacturing, Inc., POM of Pennsylvania, LLC, and Savvy Dog Systems, LLC**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| POM OF PENNSYLVANIA, LLC, t/d/b/a PACE-O-MATIC, and SAVVY DOG SYSTEMS, LLC, | CIVIL ACTION NO. 2:18-CV-00722-PLD CONSOLIDATED |
| Plaintiffs/Counterclaim Defendants, | The Honorable Patricia L. Dodge |
| v. | |
| PENNSYLVANIA SKILL GAMES, LLC, | |
| Defendant/Counterclaim Plaintiff. | |

### CERTIFICATE OF SERVICE

I, Jonathan A. Deasy, counsel for POM of Pennsylvania, LLC t/d/b/a Pace-O-Matic, Savvy Dog Systems, LLC, Pace-O-Matic, Inc. and Miele Manufacturing, Inc., do hereby certify that on the 12th day of February, 2023, I served the foregoing **POM Parties' Trial Brief** to counsel of record via the Court's CM/ECF System:

Via email to mailroom.grz@zegarelli.com

Gregg R. Zegarelli, Esquire
Technology & Entrepreneurial
Ventures Law Group, P.C.
2585 Washington Road, Suite 134
Summerfield Commons Office Park
Pittsburgh, PA  15241-2565

**Counsel for Pennsylvania Skill Games, LLC**

SPILMAN THOMAS & BATTLE, PLLC

By: /s/ Jonathan A. Deasy
    Jonathan A. Deasy