IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

- - - - -

POM OF PENNSYLVANIA,      )
LLC. t/d/b/a              )
PACE-O-MATIC, and SAVVY   )
DOG SYSTEMS, LLC,         ) Civil Action
                         ) No. 2:18-cv-00722-PLD
          Plaintiffs,    )
                         )
          vs.            )
                         )
PENNSYLVANIA SKILL        )
GAMES, LLC,              )
                         )
          Deponent.     )
                         )
_____  )
                         )
                         )
PENNSYLVANIA SKILL        )
GAMES, LLC.,             )
                         )
     Plaintiff,         )
                         )
          vs.            )
                         )
PACE-O-MATIC, INC., and  )
MIELE MANUFACTURING,     )
INC.,                    )

     Deponent.

- - - - -

DEPOSITION OF WAYNE V. DeLUCA,

- - - - -

Friday
July 10, 2020

- - - - -

ELECTRONIC DISTRIBUTION, FORWARDING OR
REPRODUCTION OF THIS TRANSCRIPT IS PROHIBITED
WITHOUT AUTHORIZATION FROM THE CERTIFYING AGENCY

DEPOSITION OF WAYNE V. DeLUCA, a witness herein, called by the Plaintiffs for examination, taken pursuant to the Federal Rules of Civil Procedure, by and before Diane G. Galvin, a Certified Professional Reporter and Notary Public in and for the Commonwealth of Pennsylvania, at Regus, Foster Plaza 5, 651 Holiday Drive, Pittsburgh, Pennsylvania, 15220, on Friday, July 10, 2020, at 9:53 a.m.

- - - - -

COUNSEL PRESENT:

For the Plaintiff/Defendant Pennsylvania Skill Games, LLC:

    Technology & Entrepreneurial Ventures Law Group, PC
    by:  GREGG R. ZEGARELLI, ESQUIRE
    2585 Washington Road, Suite 134
    Summerfield Commons Office Park
    Pittsburgh, Pennsylvania 15241

For the Defendants/Plaintiffs Pom of Pennsylvania, Pace-O-Matic and Savvy Dog Systems, LLC:

    Spilman Thomas & Battle, PLLC
    by:  JULIAN E. NEISER, ESQUIRE
    301 Grant Street, Suite 3440
    Pittsburgh, Pennsylvania 15219

3

For the Defendants/Plaintiffs Pom of
Pennsylvania, Pace-O-Matic and Savvy Dog Systems,
LLC:

        Pace-O-Matic General Counsel
        by:  GREGORY CLINE, ESQUIRE (Via Telephone.)
        3450 Corporate Way
        Duluth, Georgia 30096


ALSO PRESENT:

Albert Unis

                    - - - - -

4

I N D E X

- - - - -

WITNESS:  WAYNE V. DELUCA


E X A M I N A T I O N:                      PAGE


BY MR. ZEGARELLI:                              5

BY MR. NEISER:                                99


E X H I B I T S:                            PAGE


DELUCA EXHIBIT A                               9

DELUCA EXHIBIT B.1, B.2 and B.3              15

DELUCA EXHIBIT C                              17

DELUCA EXHIBIT D                              24

DELUCA EXHIBIT E                              37

DELUCA EXHIBIT F                              41

DELUCA EXHIBIT G                              54

DELUCA EXHIBIT H                              61

DELUCA EXHIBIT I                              62

DELUCA EXHIBIT J                              71

DELUCA EXHIBIT K                              73

DELUCA EXHIBIT L                              74

DELUCA EXHIBIT M                              75

DELUCA EXHIBIT N                              98

P R O C E E D I N G S

(9:53 o'clock a.m.)

WAYNE V. DeLUCA,

the deponent, having been first duly sworn, was

deposed and testified as follows:

EXAMINATION

BY MR. ZEGARELLI:

Q.    Would you state your name for the record, please?

A.    Wayne DeLuca, D-E-L-U-C-A.

Q.    And what is your residence, Mr. DeLuca?

A.    1129 Bay Hill Drive, Gibsonia, PA 15044.

Q.    And Mr. DeLuca, have you been deposed before?

A.    Yeah, about 30 years ago.

Q.    And you're still a licensed attorney if I understand it?

A.    Active license.

Q.    I'll still, just for the sake of formalities, you're not on any drugs or medication that might affect your truthful testimony today; is that right?

A.    No.

Q.    I mean, maybe I ask that in a negative. You're not on any drugs or medication?

A.    None.

Q.    And if you have any questions, certainly if you need a clarification about a question or you need to consult with counsel -- we'll get to that in a minute -- please let me know, and we'll clarify the question.  We'll let you confer as necessary and appropriate.

If you need to take a break, kindly let me know.  If you can let me know ahead of time so I can finish my line of thought in questioning, and then we can take a break to accommodate you if that's necessary.

You do have the right to designate any part of the production that you might have today as confidential or attorney's eyes only under the Federal Protective Order.  So you can certainly do that.

MR. NEISER:  If I may.

MR. ZEGARELLI:  Sure.

MR. NEISER:  What I would like to do is --

THE WITNESS:  Did you put your name on the record?

MR. NEISER:  Well, that's what I was about to do.  First, I want to introduce

myself.  My name is Julian Neiser.  I am counsel for Pace-O-Matic, POM of Pennsylvania, Savvy Dog Systems, and Miele Manufacturing, and I'm sorry I said it that fast.

I have been asked to enter an appearance and represent Mr. DeLuca today as Mr. DeLuca was our past counsel and there may be matters often attorney/client privilege and work product that we may need to raise throughout the deposition, and I am happy to do that representation of Mr. DeLuca -- or accept that representation of Mr. DeLuca.

With respect to any of the documents that would be in the pile of reports from Mr. Farley, if we can agree to make them confidential.  That would be wonderful.  With respect to any of the public record documents, there's no need to have any designation on it whatsoever.  And then for the rest of them, we can just deal with them on a one-by-one basis.

MR. ZEGARELLI:  Okay.

MR. NEISER:  That's all.

MR. ZEGARELLI:  And now that you said that and mentioned your item --

MR. NEISER:  Thank you.  I was just

going to say --

MR. ZEGARELLI:   -- I'll say my name for the record.   Gregg Zegarelli representing Pennsylvania Skill Games, LLC.   We also have another attorney present, if I understand, on a call.

Mr. Cline, would you identify yourself and your representation for the record, please.

MR. NEISER:   Mr. Cline may not be available right now.   He may be --

MR. CLINE:   Oh, I'm sorry.   It's a little hard to hear.   This is Greg Cline.   I'm general counsel for Pace-O-Matic and its affiliated companies.

MR. UNIS:   I'm Albert Unis, President of Pennsylvania Skill Games.

MR. ZEGARELLI:   And Mr. Cline, did you identify who you represent?

MR. CLINE:   I am general counsel of Pace-O-Matic and its affiliated companies.

MR. ZEGARELLI:   Okay.   And those affiliated companies with be whom with regard to this litigation?

MR. NEISER:   Greg, did you hear

that?  He wants to know with respect to this litigation what other affiliated companies, and the other companies on the caption are POM of Pennsylvania LLC and Savvy Dog Systems.

MR. CLINE:  Yes, POM of Pennsylvania, LLC, and Savvy Dog Systems as well.

MR. ZEGARELLI:  And Miele Manufacturing?

MR. CLINE:  No, I am not -- I am not representing Miele Manufacturing.

MR. ZEGARELLI:  Okay.  Thank you.

I would also like to interpose an objection that Mr. DeLuca had represented parties or individuals that are also related to the litigation, being the Unis family in some regard, be it Albert Unis, III or others, and we may have to interpose a privilege or confidentiality objection along the way as well.

MR. NEISER:  Fair enough.

(DeLuca Exhibit A was marked for identification.)

BY MR. ZEGARELLI:

Q.   Mr. DeLuca, there's a document in front of you I've already marked and identified it for identification purposes as Exhibit A.  If you

10

could take a look at that document.  It is a four-page document, and the one that's marked, the only difference might be is that the Certificate of Service on Page 3 has been filled in.

Have you seen that document before?

A.    I have.

Q.    And I'll direct your attention to Page 2 of that document.  Have you -- did you bring documents with you today?

A.    I did.

Q.    And can you, in an itemized way, identify what you brought with you today and we'll -- maybe we'll start by seeing what you have, and then we'll see if we need to mark it, or how to mark it for identification purposes.

A.    All right.  I turned the documents over to Mr. Neiser, so he has the documents, except for I've retained all the expert reports from Nick Farley & Associates for various pieces of equipment that Pace-O-Matic made.

Q.    Okay.

A.    So the March 26th report, a January 15th report, a January 3rd report.  And these deal with different pieces of equipment that I was

11

representing in various hearings.

MR. NEISER:  Then the pile next to you?

THE WITNESS:  The pile next to me is the decision of Judge Knafelc in Beaver County on a case captioned Pace-O-Matic, Inc, Equipment Terminal ID Number 142613, Docket Number Beaver County 965 of 2013.  I brought a copy of the Opinion and the hearing transcript.

MR. ZEGARELLI:  Okay.

MR. NEISER:  And then the folder next to you.

MR. ZEGARELLI:  Now, excuse me. Just as we go through these for the record, all right, so you've identified, Mr. DeLuca, some Nick Farley reports.  I understand those to be draft report; is that correct?

THE WITNESS:  No.

MR. NEISER:  They're finals.

MR. ZEGARELLI:  Those are all finals.

MR. NEISER:  You can have those.

MR. ZEGARELLI:  Okay.

MR. NEISER:  And I think we produced --

MR. ZEGARELLI:  I think there was one produced.

MR. NEISER:  I thought there were a couple of them.  But here they are.

MR. ZEGARELLI:  Okay.  All right.

BY MR. ZEGARELLI:

Q.   So you've brought with you, if you don't mind counting them, you brought how many reports?

A.   Well, some of these are duplicates.  A March 26th report.  I'm just going to give you the equipment number, 402.52 PEN, 1736.

MR. NEISER:  Slower, Wayne, if you don't mind.

BY MR. ZEGARELLI:

Q.   Okay.

A.   17361 and 17364.  These are reports by Nick Farley & Associates.  We had asked for an opinion on the legality of these three pieces of information.

The second report from Nick Farley & Associates dated January 3, 2018, on the Pennsylvania Skill Game 402.49 PEN 1565. That is also a final report.

And a March 25, 2014 report from Nick Farley & Associates on Pennsylvania Skill

Edition System 402.44 PEN, P-E-N.

So those are the expert reports that I have, and I believe they've all been produced prior.

Q.   Okay.  And with regard to the ones you're holding in your right hand, are they duplicates?

A.   These are duplicates.

Q.   Okay.  So those --

A.   They're just mine.

Q.   Put those aside.  Those are duplicates.

MR. NEISER:  If they're duplicates, give them here.  We'll just put them off to the side, so we don't get confused.

BY MR. ZEGARELLI:

Q.   And Mr. DeLuca, are we permitted to keep these copies that's the set that you -- that's still in front of you?

MR. NEISER:  Absolutely.

MR. ZEGARELLI:  Okay.  So we can keep those for the record then.  That makes it a little easier.

MR. NEISER:  And the court reporter is going to hold all the exhibits.  Is that how we're doing this?

MR. ZEGARELLI:  I think so, yeah.

And then we'll make copies -- she'll make copies.

BY MR. ZEGARELLI:

Q.   I do see on -- I do see some notes and some numbers on the January 3rd version.  Are they your notes?

A.   Yeah, this was just my file number.

Q.   Okay.  Fair enough.  And can you push that forward, if you don't mind, just so we can get it on the list of what you brought with you today.

All right.  So you've already identified this.  This is the Order, and this is the transcript.  And is there anything in this file folder?

A.   Oh, yeah.  This is just my Curriculum Vitae. That's all.

Q.   Okay.  And let's --

MR. NEISER:  Gregg, one more thing. In that folder over there, I think is his working file for -- I don't know if it's that one, or if it's the other one.  Let me see.

THE WITNESS:  This is just --

MR. NEISER:  Not these.  These are the -- no, no that.  If you want them --

MR. ZEGARELLI:  while you're looking at them, can we mark the three Farley

15

reports as a group.  Can we do Exhibit B.1, B.2, and B.3 for these three Farley reports?

MR. NEISER:  You can do it any way you want.  It's perfectly fine.

MR. ZEGARELLI:  So we'll do B.1, and it has a cover letter of March 25, 2014.  Exhibit B.2 has a cover letter of January 3, 2018.  B.3 has a cover letter of March 26, 2019.

(DeLuca Exhibits B.1, B.2, and B.3 were marked for identification.)

BY MR. ZEGARELLI:

Q.   Now, let's see if the document that you brought that's a memorandum and an Opinion, I believe we may not need this as this has been produced.  It's a public record first, but it's been produced by multiple people multiple times.

MR. NEISER:  I just wanted to make sure you had what he brought, that's all.

MR. ZEGARELLI:  Okay.  All right.

So we can give this one back to you.  We may refer to it by some other means at some other point.

MR. NEISER:  And then in here is the Pleading File and the Original Signature and

16

the Retention Agreement with Pace-O-Matic on December 2, 2011.  And if you can just flip the page, it's -- I mean, it's a Retention Letter. Retainer letters are producible and not -- and discoverable if you want it.  And then this is just his research and background and the pleadings.

MR. ZEGARELLI:  And this is all -- that whole file is with regard to the Beaver case?

MR. NEISER:  It is indeed.

THE WITNESS:  Beaver, Beaver, Beaver.  There's a receipt in here from Albert when he picked up the game.  He picked up the game that later went to lit- -- this is all litigation.

MR. NEISER:  And that was produced, I think, at POM 1.

MR. ZEGARELLI:  Right.  We have that.

THE WITNESS:  We got it.

MR. ZEGARELLI:  Although we don't have the Retention Letter, so I'll probably take a copy of that, and we can identify that.

MR. NEISER:  Got it.

17

MR. ZEGARELLI:  At least for the moment.  So if you could untether that and I'll make a quick copy of it.

THE WITNESS:  I would like the original.

MR. ZEGARELLI:  Sure.  We'll keep a copy.

We can mark the Retention Letter. It's a two-page exhibit dated December 2, 2011. We'll mark that as Exhibit C.

(DeLuca Exhibit C was marked for identification.)

BY MR. ZEGARELLI:

Q.   Now, Mr. DeLuca, we have marked for identification Exhibit C.  It is a letter dated December 2, 2011.  And for the record, can you testify as to the date on or which you actually wrote that letter and signed that letter?

A.   This letter would have probably been written on December 2, 2011, and it was a Retention Letter with Pace-O-Matic.  It was addressed to Mark Jefferson, who at that time was their attorney.

Q.   Can you testify that your signature was placed on there on or about December 2, 2011?

A.    Yeah.

Q.    Okay.

A.    Well, yeah, yeah.  And then it was counter-signed and returned.

Q.    Now, Mr. DeLuca, I think you indicated informally that you're retired?  In fact, let's back up.  Let's back up for a second.

You did have a number of privilege objections.  So do we just want to put those on the record at this time.

MR. NEISER:  Let's do.  Instead of me interspersing a longwinded objection and breaking the flow of the deposition, Mr. DeLuca has indicated by Exhibit C, the Retention Letter, was counsel for Pace-O-Matic, Inc. during various times over the past nine years, and including involvement in the negotiation and drafting of a contract that forms the basis of a portion of this lawsuit.

We want to place a blanket privilege objection as to attorney/client privilege and work product, including mental impression as Mr. DeLuca was retained for the purposes of providing legal advice to Pace-O-Matic, Inc.

19

And with that said, we will just make generic or basic privilege objection going forward that follows the same form and substance of what I just placed on the record.

MR. ZEGARELLI:  Okay.  And you also retrained some expert reports, which you're claiming a privilege too.  Do you --

MR. NEISER:  Sure.  I can list that if you don't mind.  Mr. DeLuca brought in a series of documents this morning, none of which I reviewed or went through this morning as it was a subpoena to a third party, and I wanted to maintain impartiality and did not want to influence the witness's testimony.

As stated earlier, I am representing Mr. DeLuca at this deposition.  I was provided the opportunity to review the file, which I did for the very first time in my entire life, and I noted a number of documents that would fall within the attorney/client and work product privileges, to include mental impressions and notes that provide a chronology of the file, and as well as mental impressions and notes with respect to the Beaver County litigation.

Other than that, any non-privileged

20

document has been placed on the table and is available for opposing counsel to review.

I have offered to duplicate all the documents that we have withheld for privilege and to provide a privilege log by Wednesday of next week if that is acceptable to opposing counsel, and then we can have a discussion as to whether or not a motion is required or if we can come to some consensus on the documents.

MR. ZEGARELLI:  Fair enough.

MR. NEISER:  Thank you, sir.

MR. ZEGARELLI:  That's very acceptable.  Thank you.

MR. NEISER:  And I understand Mr. Zegarelli has placed an objection on the record with respect to his client also using Mr. DeLuca, which we'll -- I'm sure we'll talk about, and I understand that.

MR. ZEGARELLI:  Okay.  Very good.

BY MR. ZEGARELLI:

Q.    Mr. DeLuca, are you currently employed?

A.    I retired.

Q.    And when did you retire?

A.    December 31st.

Q.    Of 2019?

A.    Yes.

Q.    And does that mean you're not currently employed?

A.    I'm not currently employed.

Q.    Now, do you still provide professional services, although not an employee?

A.    Occasionally, I'll get a call from a client. If the file is not in storage -- if the file is in storage, I'll get it, and I'll maybe give them some advice as to strategies or next step.  But most of those cases have been referred out to other lawyers.

Q.    Are you currently providing any professional services today, as of today, for any of the parties in this litigation without compensation?

A.    No.

Q.    And when I say that, I don't mean obviously this minute.  I mean, from time to time, do any of the parties call you for advice?

A.    No.

Q.    When was the last time with or without compensation, you provided advice in any regard to any of the parties?  So they are Pace-O-Matic?

A.    Yeah, I think there as a letter.  Let me see.

22

I communicated with Pace-O-Matic in July of 2018, July 27, 2018.

Q.    July 27, 2018?

A.    That's correct.

Q.    And when you say you communicated with them, to the extent not privileged what -- and I haven't seen the -- you appear to be looking at a document -- to the extent it's not privileged, what was the nature of that communication?

A.    Concerning a Right of First Refusal Agreement with Albert Unis.

THE WITNESS:  That's not privileged.

MR. NEISER:  No, Gregg, this is what we talked about outside.  Those are the same documents.

MR. ZEGARELLI:  Okay.  So that's --

MR. NEISER:  It was just a fax to them with this -- it's the same documents we talked about outside.

MR. ZEGARELLI:  Okay.  So are we going to duplicate all but the one page?  Because I think we've -- you produced a set of pages that replicate what you're holding in your hand but with redaction.

MR. NEISER:  That's correct.

MR. ZEGARELLI:  And I think we talked outside about --

MR. NEISER:  There are a couple of them that we can copy, but there's one in there that I don't want to.

MR. ZEGARELLI:  Right.  So at least if we can get the -- since the witness is testifying to it, if we can get the documents that are acceptable or not privileged, I'll just make a copy of it, and we'll have the witness --

MR. NEISER:  I'm going to do this with just -- we'll reserve all right -- I don't think that they're material.  I don't think that they would fall under privilege, but I'm going to put at least an objection on the record to privilege.  But once I give them to you, it doesn't really -- here one second.

MR. ZEGARELLI:  I think you can call it back under the Protective Order.

MR. NEISER:  Yeah, exactly.  I was just going to say we can take it -- it's not material, and I don't want to hold up your deposition.

MR. ZEGARELLI:  while you're

WAYNE DeLUCA                                                24

24

looking for that, Julian, I'll just put on the record that POM Bates POM 2, Bates POM 3 were redacted, and I believe that --

MR. NEISER:  You're getting them right now.

MR. ZEGARELLI:  -- we may be getting them right now.  In fact, let's see. POM 7 was redacted, POM 8 was redacted, and it looks like there's a separate interposed page after POM 8 that is probably POM 9, but because it's entirely redacted the Bates number is not showing.

MR. NEISER:  Here.

MR. ZEGARELLI:  Thank you, sir.

BY MR. ZEGARELLI:

Q.   We're going to mark for identification Exhibit D, which are documents we just discussed, which is an exhibit.  We'll make it a group exhibit of 12 pages.

A.   I'm going to step out.

(DeLuca Exhibit D was marked for identification.)

(Whereupon, a brief recess was held.)

BY MR. ZEGARELLI:

WAYNE DeLUCA

**Q.** Back on the record. Okay, Exhibit D is a document of 12 pages.

Mr. DeLuca, when you say that you spoke or communicated at least with Pace-O-Matic on or about July 27, 2017 -- you referenced some pages, and we've made copies of what appears to be a fax from you. Does this embody the documents related to the conversation that you referenced?

**A.** Yeah. Yes.

**Q.** Now, before we go through these documents, I'd like to at least go through your background a bit and some terms of representation. If we go back to 2010, and I'm just picking from your engage letter, the year 2011, so I'm going to go slightly before that date. Can you, for the record, indicate where you were employed? And perhaps it's one or more places as of 1/1 -- January 1, 2010, and then bring it forward to current if you don't mind.

**A.** Well, we had an unincorporated association, Eddy, DeLuca, Gravina & Townsend. That's where I was located. We were in the Manor Building, 564 Forbes Avenue down in Downtown Pittsburgh.

**Q.** And if you can bring that forward. We're

WAYNE DeLUCA

26

going to start -- if that's true as of 1/1/2010, I'd like you to go forward to current and tell me when that situation changed.  So you had an unincorporated association.

A.    Yeah.

Q.    You were an employee or a partner?

A.    No.  No.  It's an unincorporated association.  We all are members.

Q.    Okay.

A.    Okay.  We all had our own practice.

Q.    I understand.

A.    And then in December -- I had a night office in Sewickley.  And in December of -- December 19th, I moved there -- no, I'm sorry. It was a year or two before that I moved to Sewickley full time and then just did some night stuff.  And then December 31st, I was out.

Q.    Okay.  So if you don't mind stopping there. So we started with 1/1/2010.  You testified you were with the unincorporated association group of Eddy, DeLuca, Gravina & Townsend.  And was that the -- as of 1/1/2010 was that the only place you were --

A.    Yeah --

Q.    -- you were associated to practice law?

WAYNE DeLUCA                                    27

27

A.     Yeah.   I was there over 20 years.

Q.     And just for the record, we're talking about you've been a lawyer for years, and you were practicing --

A.     47.

Q.     47 years, congratulations.   So you were an attorney as of 1/1/2010.   You were with the law firm -- I'll call it Eddy and DeLuca.   And did you also have the night office in Sewickley at that time or --

A.     Yeah.

Q.     -- did that start a little later?

A.     No, I had a night office in Sewickley.

Q.     Okay.   So even as of 1/1/2010, you were performing legal services in the Manor Building Penthouse, Downtown with Eddy and DeLuca, and you also had a night office in Sewickley?

A.     That's correct.

Q.     The night office in Sewickley, did that have a different designation for legal services?

A.     No.

Q.     So if you were rendering services from the Sewickley office, would you still be using Eddy DeLuca letterhead?

A.     Yes.

**Q.** Now, is there a point in time moving forward to current that that particular scenario changed?

**A.** Yeah. I'm trying to remember. It was -- I can't remember the exact date, but at some point in time when -- I think it was maybe December of 2019, where then I went to Wayne V. DeLuca, Attorney at Law. I was done with the downtown office. I think that was the date.

**Q.** So your testimony, if I understand it is sometime around December of 2019, you began doing business a Wayne B. DeLuca?

**A.** V.

**Q.** V, I'm sorry. V as in Victor?

**A.** Correct.

**Q.** That is what the V stands for Victor?

**A.** Vincent.

**Q.** Vincent. Wayne Vincent DeLuca. So Wayne V. DeLuca stopped practice at the Downtown Manor Building Penthouse with the firm of Eddy & DeLuca, and you were still practicing at that time in Sewickley?

**A.** Yeah. Now, that wasn't a firm. It was an unincorporated association.

**Q.** Okay.

**A.** But I was there.

WAYNE DeLUCA

29

29

Q.   But at least when you say -- you say it's not a firm, and maybe that's a conclusion of some sort, but there is letterhead that says Eddy, DeLuca, Gravina & Townsend?

A.   Yeah.  It also says an unincorporated association.

Q.   Yes, yes, yes.  Whether it's a law firm or not, I think, is a little bit of a different issue.

A.   Okay.

Q.   Okay.  So as of December 2019, and you can't recall the exact date at that time?

A.   No, I can't.

Q.   You begin doing business as Wayne V. DeLuca. And did that change at some point in time?

A.   No.

Q.   So then as of today, you still practice law as Wayne V. DeLuca?

A.   Well, I'm retired, but I'm not -- I'm not really practicing.  I'm not active.  I have an active license, but I notified all my clients December 1, 2019, that, you know, I was going -- terminating my -- closing my office and terminating my practice.

Q.   Okay.

MR. NEISER:  Terminate with extreme prejudice.

BY MR. ZEGARELLI:

Q.    Now, did you represent any entity that you understand is an affiliate of Pace-O-Matic during the period of time from December 2, 2011, through December 1, 2019?

A.    I represented Pace-O-Matic, and I think Pace-O-Matic of Pennsylvania.  I don't know whether I -- I don't know if I was their lawyer, Pace-O-Matic in Pennsylvania, but I represented Pace-O-Matic.  They were out of Atlanta at the time.

Q.    And was there a scope of representation that -- just to be clear, you represented Pace-O-Matic, Inc., and Pace-O-Matic of Pennsylvania from the period of time December 2, 2011 -- and I don't know the exact date that Pace-O-Matic of Pennsylvania was formed by the way.

A.    Yeah.

Q.    But you represented them generally consistently through the period of time of December 2, 2011, through December 1, 2019?

A.    Right.

WAYNE DeLUCA                                             31

31

**Q.** Did you sign a separate engagement letter for Pace-O-Matic of Pennsylvania when you began any representation of them?

**A.** Not that I recall.

**Q.** Now, did you ever represent an entity with Miele as the first word, such as Miele Manufacturing, Miele, Inc., any of those entities?

**A.** Yes.

**Q.** And do you have an engagement letter for those entities?

**A.** Boy, that was back in 2009.

**Q.** Okay.

**A.** I went, and I looked for the Miele file. There was really nothing in it.

**Q.** So do you recall the entity itself that you represented?

**A.** I think it was Miele Amusement, Inc.

**Q.** And did you continue to represent Miele Amusement, Inc. through the term of approximately 2009 through December 1, 2019?

**A.** No. They retained other counsel about -- I'm going to say three or four years ago. And the work that I did for them was sporadic.

**Q.** So when you say sporadic from Miele, does

32

that mean the work that was in 2009 or the work

that was sometime after 2009?

A.    In 2009 we were involved in litigation.

Q.    And so when you say sporadic it's other than

the litigation?

A.    Yeah.  The litigation was pretty intense.

Q.    Do you recall the nature of the ligation?

A.    Yes, very well.

Q.    I mean, just contract case?  What type of

case?

A.    There was a -- I'll just give you some

history on this.  There was some bad publicity

when Ernie Preate got -- saying that he was in

bed with certain big-time operators, that he had

actually received money for them.  As a result of

that, Mr. Preate said I'm not, and he had -- they

had a massive raid on -- in Williamsport, in

Pittsburgh, and Johnstown and in Erie.  They went

in and seized -- oh, and in -- not Williamsport,

Lewisburg.  The AG's office did a massive raid in

these five locations.  And I was retained to

represent the vendors in Williamsport and

Lewistown -- Lewistown or Lewisburg, I forget.

Q.    Okay.  Just for the record, Ernie Preate was

an elected official?

WAYNE DeLUCA                                               33

33

A.    He was the Attorney General.

Q.    Okay.  The Attorney General.  So the Attorney General was being accused of something.  How does that relate to Mr. Miele and the vendors you represented?

A.    Well, as a result of that, the Attorney General then had this big raid.  I guess the inference was that, hey, I'm not in bed with these guys.  I'm going to prosecute these guys, and that's what he did.

Q.    All right.  So after that particular legal proceeding, after that, there was sporadic work for the Miele firm?

A.    Yes, sporadic, very sporadic.

Q.    When you say sporadic, I mean, that's such a general word.  Do you recall once, twice, once a year?

A.    No, they -- no, they -- no, they would contact me.  It would be Miele, the son, would contact me -- some advice about this piece of equipment or that piece of equipment or what's the temperature in Pennsylvania of these games being out there, any prosecution in other parts of the state, what investigative agencies or police agencies are pushing this type of

WAYNE DeLUCA

34

investigation.

Miele wasn't involved in any other litigation other than the original case in 2009.

Q.    Okay.  Do you recall the last time you performed any services for a Miele entity?

A.    I really can't remember.  I mean, on a retraining basis, no.  Mostly it's just phone calls.

Q.    Okay.  So you can't --

A.    I don't even charge them for that stuff, you know.

Q.    So if you had a -- if you could make an educated recollection of the last time you actually charged for services for one of the Miele entities, do you recall --

A.    Probably be 2010 for the litigation.

Q.    And apart for that, it's a call here and there you don't really charge?

A.    Call here and there.  Lou was also very active in PAMMA, Pennsylvania Music Vendors Association, and he was the president for a while.  And he would call me about different PAMMA matters.

Q.    Okay.  And for the record, PAMMA is?

A.    Pennsylvania Music Vendors Association of

Pennsylvania.  And I represent them -- I did represent them.

Q.    And you said that Lou was the son.  Is there a father Lou, and a son Lou?

A.    Yeah, Lou Senior who is now deceased.

Q.    So Lou Senior is deceased.  Lou Junior is --

A.    That's correct.

Q.    So again for the record, when you mentioned Lou would call you from time to time, that was Junior?

A.    That was the Junior.

Q.    Were there any other practices you had other than the Eddy relationship downtown in the Manor Building and the night office which you've identified as a night office in Sewickley?  Any other services?

A.    (Witness shaking head.)

Q.    Those are the two offices.

A.    None.

Q.    Now, in the Sewickley office, was that a discrete office that you maintained, or was it an office share arrangement of some sort?

A.    No, it was -- I rented space from the Amato Firm.

Q.    Okay.  And the Amato Firm, is there a more

WAYNE DeLUCA

36

discrete or more precise name for the Amato Firm?

A.    Amato & Start.

Q.    Start, S-T-A-R-T?

A.    S-T-A-R-T.

Q.    Did they rent office space to any other --

A.    No.

Q.    -- attorneys that you know of?

A.    No.

Q.    And are you familiar with the person William Rodgers, an attorney?

A.    Yes.

Q.    And do you have any recollection of what firm he was with?

A.    He was there.  He was with Amato & Start. No longer there.

Q.    Okay.  So if I use the term skill games, do you have a familiarity with that term?

A.    Yes.

Q.    And what's your familiarity with that term?

A.    My familiarity was when I got involved in the gaming business.  We would defend these machines indicating they were games of skill and not chance, that the outcome was determined predominantly by skill and not chance.  And that was the argument we made to Judge Knafelc in

37

Beaver County successfully.

Q.    Okay.  Now, I'm going to mark an Exhibit E.

(DeLuca Exhibit E was marked for identification.)

BY MR. ZEGARELLI:

Q.    Now, Mr. DeLuca, I've marked for identification an Exhibit E, which I can represent to you we printed that today.  And if you look at the lower right corner -- I'm sorry, the lower-left corner, you'll see a designation https://www.mielemfg.com/legal-team.  And we pulled this document from that website being, I'll call it, Miele Manufacturing dot com, mielemfg.com.

Now, is that -- it appears to be your picture in the middle of that exhibit.  Can you confirm that?

A.    That is my picture.

Q.    Okay.  And you'll also see at the top of the page it indicates legal team, and then a straight line and then it says again, Mielemfg.  And you'll see that it has a pictorial representation of the word Pennsylvania Skill in the upper left corner, and what I think is a menu represented in this -- you'll see the word MCM Elements on the

right-hand side.  So I'll ask you does this --
and below it does say Miele Manufacturing, Inc.
All rights reserved 2020, and it also has
Pace-O-Matic with a registered trademark in
Pennsylvania Skill with a registered trademark
symbol.

Are you part of today the legal
team?  Or do you have an understanding of who is
the entity of which you're part of the legal team
today?

A.    I am not a legal team.

Q.    Okay.

A.    I am not on the legal team.  In fact, I've
never seen this document until right now.

Q.    Okay.  So as you've testified here today,
are you on the legal team of Pace-O-Matic Inc.?

A.    I am not.

MR. NEISER:  Object to the form.  I
don't even know what the legal team is.  It's
just a printout from a -- I'm on it, and I'm
going to object to my picture because I look fat,
and I object to the fact that Matt Haverstick is
way more handsome than me.

But the characterization that there
is a legal team, or he has some connection to

Miele Manufacturing, Inc. by virtue of a picture on a website, I'm going to object to.

                    MR. ZEGARELLI:  Okay.

BY MR. ZEGARELLI:

Q.   Okay.  So in looking at this document -- at least if I understand your testimony, your testimony is you don't have knowledge of why your picture is on this page?

A.   No.  I have never seen this page before.

Q.   Now, do you recall getting a headshot, but do you recall giving a headshot picture of yourself to anyone for purposes of publicity such as this?

A.   Yeah, obviously, or they wouldn't have gotten it.

Q.   Okay.  Although, you know, I can tell you, you could probably pull a picture off the website if that's the way you wanted to do it.  But the question was whether you gave it and you said "obviously," because it's on there, although --

A.   Like I said, I've never seen this document. I recall this picture being taken.  And obviously, someone requested it.  Maybe it was Miele Manufacturing.

Q.   Okay.

WAYNE DeLUCA                                                    40

40

A.    Probably because they're on here.

Q.    Now, have you ever seen the pictorial representation in the upper left-hand corner such as it is on that exhibit of the word Pennsylvania Skill?

A.    Yeah, I've seen this several times.

Q.    Okay.  Now, do you have an understanding of, at any point, where either Miele Manufacturing, actually any entity that begins with Miele, and a Pace-O-Matic or POM entity began calling themselves as a nickname Pennsylvania Skill or Pennsylvania Skill Games?

A.    They've been -- I think Miele and Pace-O-Matic have been using Pennsylvania Skill for a long time.  I just can't --

Q.    As a company name?

A.    Not as a company name, just as a tag, so to speak.  But I can't remember when that happened.

Q.    Okay.

A.    Obviously, it would have happened sometime after the Knafelc Decision in Beaver County, which was in 2014.

Q.    Now, I will mark a document --

A.    I think this was your packet that you gave me.

Q.    I'm going to mark for identification a group of pages that were produced --

A.    Hold on one second.

MR. NEISER:  Let's keep the numbered exhibit -- the lettered exhibits off to the side so that we don't walk away with anything for the court reporter.  If you could just put them right here on this pile.  I just don't want to -- because the court reporter will snap our necks.  You know how that works.

(Off the record.)

BY MR. ZEGARELLI:

Q.    So I am going to mark for identification a group of documents that were produced by Pace-O-Matic, and they are sequentially represented by POM Bates 1 through 15.  And I can say for the report that the upper right-hand corner there appears to be a fax designation sequentially 2 of 16 through 16 of 16.  And it may just be that 1 of 16 was the cover page that was produced at some other point or not necessarily in order, and which we have now in Exhibit D as in David.

(DeLuca Exhibit F was marked for identification.)

42

BY MR. ZEGARELLI:

Q.   So Mr. DeLuca, I've placed before you Exhibit F, and I will direct your attention as well to Exhibit D.  And I'll ask you to see if you can identify the redacted pages for the record, meaning that the page we have, we have now in Exhibit D is one of the redacted pages in Exhibit F.

MR. NEISER:  Are they the documents that we produced?

MR. ZEGARELLI:  You produced POM 1 through 15.  There are a number of redacted pages which I think at least to some extent --

MR. NEISER:  I can assist with that.

MR. ZEGARELLI:  Let's do it.

MR. NEISER:  Can you hand me the unredacted ones.

Thank you.

MR. ZEGARELLI:  Or I can read off the POM Bates that's redacted, and you tell me what page of Exhibit D.

Well, you do it whatever way you think is easier for you.

MR. NEISER:  I don't know.  Tell

you what, maybe, if you want, you go through this, and then I would be happy to, when you go to each document, look at this, and I'll tell you what Bates number that is.  Does that work for you?  That way I don't screw up your flow with it --

MR. ZEGARELLI:  Well, that's fine.

MR. NEISER:  -- in sequence on the -- or do you want me to just -- here, how about this.  If you give me two seconds, I'll just write them on the thing.

MR. ZEGARELLI:  Okay.  Well, you probably ought not to write them on the exhibits. We'll just -- is that the original exhibit?

MR. NEISER:  Yeah.

MR. ZEGARELLI:  I don't think you ought to write on the original exhibit.

THE WITNESS:  Do you want to write it on the redacted page?

MR. ZEGARELLI:  Is that an exhibit, too?  I'd prefer not to have any writing on the exhibits themselves.

MR. NEISER:  Let's do this. Well --

MR. ZEGARELLI:  How about we just

WAYNE DeLUCA                                    44

44

go through it and then we'll just --

          MR. NEISER:  Yeah, then I'll tell you -- I'll call them out when I see them.  I would just be trying to make it easier for you because I have the actual here.  And these are not state secrets.  This is easy.  I just wanted to -- I don't want to screw up your transcript.

          THE WITNESS:  Which exhibit are you referring to?

BY MR. ZEGARELLI:

Q.    So why don't we take Exhibit D.

A.    Got it.

Q.    And let's work off of Exhibit D.

A.    Got it.

Q.    Because that's the one you recall sending sometime around July -- looks like from the first page July 27 of '18.  And it does appear that they could be coordinated pages.  So let's just take Exhibit D.

          So the document that you sent, I don't see any indicator of how many pages were sent as part of this fax transmission.

A.    It is not marked how many pages.

Q.    Okay.  So if we go to the first -- I'll say the second physical page of Exhibit D, can you

WAYNE DeLUCA                                                45

45

identify the document and describe what its purpose is or was.

A.    This was a receipt for a piece of Pace-O-Matic equipment, Terminal ID 42613, that was in my office, and it was picked up by Albert Unis on October 1, 2013.

Q.    Okay.  So can you, for the record -- do you recall the circumstances surrounding --

A.    Yes.

            MR. NEISER:  Can I interject one thing -- not to interrupt you.  For clarity purposes because we have multiple Albert Unises. There's Albert Unis, III, Wayne, how do you want to refer to him?  Do you want to call him senior, or do you want to call him Albert?  We've been calling the dad Albert and Alby, Alby.

            THE WITNESS:  Albert.  We'll just call him Albert.

BY MR. ZEGARELLI:

Q.    Or you can just call him the Third.  So we'll call him Albert for now.  Unless otherwise designated, Albert means Albert, III.

A.    So the -- after the fact, the second page was a receipt for a piece of equipment that was in my office that was picked up by Albert for

WAYNE DeLUCA                                    46

46

some reasons that I discussed with the State Police to see if we could get a determination to see if the piece of equipment was legal.

Q.    Okay.

A.    That was an agreement that I worked out with the Pennsylvania State Police Vice Department in Harrisburg.  There was some question as to the legality, so the Vice Commander -- I said, well, why don't we just -- give me the piece of equipment.  I'll put it out on location, and Albert Unis put it out on location for me.

And then it was a -- you know, then it was -- he called, and he said, we going to seize it.  No arrests.  They seized the equipment.  I filed a Petition for Return of Seized Property, and that's how we ended up in front of Judge Knafelc.

Q.    And how did you communicate with Mr. Unis, I'll call him Mr. Unis, Albert Unis, III, to accomplish this pick up for which the second physical page is a receipt?

A.    Either we met in Sewickley or a phone call.

Q.    And do you have an understanding of why it was Albert Unis, III, who received it and not any

412-338-1058          snyderreporting@gmail.com          412-980-8228

other person in the world who received that?

A.    Well, here was his signature right here on the receipt.  I know.  I was there when he picked it up.

Q.    Right.  So we know he picked it up.  Do you know why it was that he picked it up?

A.    Why?

Q.    Why?

A.    Because he was going to place it in a bar for eventual seizure so we could get into court.

Q.    Okay.  So how did you communicate, if you recall, with Albert Unis?  Was it one meeting?

A.    No, we met -- we met a couple of times.

Q.    Okay.

A.    And talked on the phone.

Q.    Okay.

A.    Coordinating where the equipment is, where it should go, and when the State Police were going to pick it up.

Q.    How did Albert, if you know, how did Albert Unis know to pick up the equipment or what was the conversation you had --

A.    I either called him or met him in Sewickley.

Q.    Okay.  And if you know, why was he involved? What was in it for him, if you know?

WAYNE DeLUCA                                                  48

48

A.    There was really nothing in it for him.  I needed to place the equipment in Beaver County because I wanted to have it seized by the State Police so we could get an opinion.

Albert was a vendor, an operator in Beaver County.  And because I had known him in the past, we communicated, and he said, yeah, I'll pick it up, and I'll place it in a bar.

Q.    Okay.

A.    Once he placed it in the bar, I notified the State Police.  I went out with the State Police.  They seized it, and that culminated in the litigation.

Q.    Okay.  Now, at the time of this receipt on October 1, 2013, did you represent, or were you the attorney for Albert Unis or any company that he was affiliated with?

A.    I represented Albert Unis years ago in the fireworks case.  He was the first licensed person to get a license to sell fireworks in Pennsylvania.  He was the very first one.  And we were successful in getting him that license, and he said -- you know, did a -- set up a store.  So I represented him on that, and we would talk occasionally.  But I can't remember representing

him on much other than that, other than, you know, he would call me, and we would see each other every once in a while.

Q.   Now, did you call Mr. Unis with regard to the pickup or contact him first, or he contacted you first?

A.   I contacted him.

Q.   And why did you contact him -- or did you contact anyone other than him?

A.   No, I contacted him.

Q.   Only him?

A.   Only him.

Q.   And why did you contact only him?

A.   Well, I explained to Albert that this would be a test case.  I had assurances from the State Police that no one was going to get arrested.  It was just going to be a controlled buy, so to speak.  And Albert said -- because I knew him.  I said, Albert, the piece of equipment is here.  Just come pick it up.  He signed a receipt.  I said, where are you going to put it?  And I think it was the Italian Club; I'm not sure.  And then the State Police called me, and they said, where is it?  I said it's in the Italian Club.  Leave it in there for a couple

days.  I said I'd like to see if there's any play on the piece of equipment.

Q.    And why did you call only Albert Unis?  In fact, when you and I spoke on the phone to schedule this particular deposition, I think you had indicated to me that you called multiple vendors.  Was I -- was I misunderstood?

A.    I called some vendors in other jurisdictions, but Albert was the only vendor I called in Beaver County.

Q.    Okay.  And is there a reason you contacted him other than -- you know, why did you call Albert for Beaver County?

A.    Because I knew him, and I knew he was an operator in Beaver County, and I knew that he would do the right thing, pick the equipment up and place it for me.  And he wasn't involved after that.

Q.    And were you aware at the time that Albert Unis was doing business with a designation of Pennsylvania Skill?

A.    I did not at the time.

Q.    And are you aware that there's a contract with the American Italian Club with an entity being Mr. Unis' called Pennsylvania Skill?

A.    No.  You mean the location agreement?

Q.    The location agreement.

A.    No, I've never even seen any location agreements.

Q.    Now, are you aware -- and you can look at the documents that you provided -- are you aware at some point later after the controlled pickup that there was a written document to be entered into by Pace-O-Matic, Miele Manufacturing, and the Unises with regard to operating Pace-O-Matic machines in Beaver County?

A.    Yeah, there was a -- there was a document prepared, I think by Bill Rodgers.

Q.    And if you take a look at the physical pages that are included in the exhibit you just sent; can you authenticate those documents as being a party to those communications?

A.    I'll refer to the e-mail date of February 10 to Danny Warren of Pace-O-Matic.  Yeah, that was my e-mail.  But this was an agreement that was being circulated between Pace-O-Matic and Albert Unis, and some language was questioned on the language.

Q.    And this is an e-mail from you to Danny Warren at Pace-O-Matic copying Lou Miele?

A.    Right.

MR. NEISER:  It should be POM 2.

MR. ZEGARELLI:  I'm sorry.

MR. NEISER:  It should be POM 2. That was -- in the event it was redacted -- I'm just calling out the Bates number of that document.

MR. ZEGARELLI:  Oh, I see what you mean.

MR. NEISER:  Yep.

MR. ZEGARELLI:  Thank you.

MR. NEISER:  Of course.

BY MR. ZEGARELLI:

Q.    And the next document?

A.    The next document was from Bill Rodgers to me.  Bill Rodgers was the attorney in Jim Amato's office.  And this was the agreement that Bill Rodgers had prepared, and he had sent it to me so Albert could review it.

Q.    Okay.  And when you say that your recollection is that Bill Rodgers prepared it, are you saying that he prepared the very first initial draft, or are you saying that he prepared the document in the sense of that document represented an iteration or a revised version?

A.   No, he prepared it.  I made a few changes and then go deeper in.  This is, I think, the final agreement.

Q.   Let's be a little more clear about it.  Are you saying -- when you say Bill Rodgers prepared it, are you saying that Bill Rodgers prepared one of the many versions of the argument, or are you saying he prepared the first one that ultimately got revised from time to time after his first draft of it?

A.   Well, at that point in time, Bill Rodgers was representing the Unises.  I was not -- I -- there was a -- I felt uncomfortable representing the Unises and representing Pace-O-Matic. Pace-O-Matic has been a longstanding client.  So at that point in time, I contacted Bill Rodgers, and I asked him if he would be interested in representing Albert Unis in this, and that's how Bill Rodgers got into this.

Q.   Okay.

A.   Because I wanted total separation between myself and the Unises.  I wanted to -- so any conflict, that's why I did it.

Q.   Okay.  So you're representing Pace-O-Matic. He is representing the Unises.

A.    Right.

Q.    But the question still gets back to is it your understanding that Bill Rodgers created the very first draft of the argument that ultimately got signed, or are you saying that he just prepared the document that was that particular iteration on March 11, 2015?

A.    He prepared this original document.

Q.    So I understand your testimony, he's the one, according to you, that prepared the very first draft of the document that ultimately got revised and ultimately signed?

A.    Yes, to my recollection.  Let me just look at this quickly.

Q.    Sure.

(Whereupon, a brief recess was held.)

(DeLuca Exhibit G was marked for identification.)

BY MR. ZEGARELLI:

Q.    So having looked through those documents -- and, in fact, I will show you -- I'll mark as -- for identification, I'll mark as Exhibit G a document.  It was provided to us in Pennsylvania Skill Games by William Rodgers.

WAYNE DeLUCA                                                55

55

I'll state for the record that there are some redacted impressions, and again, we'll produce this, and with the objection of privilege, there are some notations on some of the typed text that we believe are Mr. Rodgers. I was unable to redact those minor notations, but there is some text at the upper right-hand corner of Exhibit G.  And I will include this in the list for your review, Mr. DeLuca, so you can review that as well.

MR. NEISER:  I'm going to place a privilege objection to this exhibit.  I don't know how you guys got it, but this was an e-mail that was strictly between the client.  It was an e-mail from Danny Pace -- or, I'm sorry, Danny Warren to Wayne DeLuca, who was their counsel, cc to Ryan Wood and Michael Pace, both of whom are employees of Pace-O-Matic.

So I'm not quite sure how this document got into Bill Rodgers' possession or your possession.  I did not produce it.  I produced it as a redacted copy before and these -- this is a clearly privileged document.

But you guys got it, so let's talk about it.

MR. ZEGARELLI:  Okay.  Do you want to identify it as one of the POMs?

MR. NEISER:  Sure.

MR. ZEGARELLI:  Just so we know which one it correlates to.

MR. NEISER:  Yeah.  It would be POM 9.

BY MR. ZEGARELLI:

Q.    And while Mr. DeLuca is looking at the documents, the last question was whether or not Mr. Rodgers created the very first draft of the document.  And I will direct his attention to Exhibit G toward -- or some period after Point 9, if that helps refresh his recollection.

A.    I'm reading it.  The only thing I can surmise is perhaps they had a form document that they set up.  But when I'm looking at Exhibit D, this kind of refreshes my recollection, this series of e-mails.

At this point in time, Albert was being represented by Bill Rodgers, and there was an e-mail on the third page of the document for me to Danny Warren, indicating Albert Unis contacted me and wanted the following changes to the attached argument.  If acceptable, will sign

and send back.  I will get Albert Unis to sign.
That was February 10.

Then I get an e-mail from
Bill Rodgers dated March 11th right after that.
Let me know your thoughts before you transmit to
your client.  So I guess Bill Rodgers must have
sent me some suggested changes.

Q.   And so we still have the question that
you're currently refreshing your recollection
regarding who created the very first draft?

MR. NEISER:  I'm going to object to
asked and answered.  This isn't a refreshing of a
recollection.  He stated already that
Bill Rodgers drafted the first draft.

MR. ZEGARELLI:  Okay.  And I'm
showing him a document to help him refresh his
recollection.

MR. NEISER:  He didn't say that he
needed to have his recollection refreshed.

MR. ZEGARELLI:  Okay.  Well, he can
still look at the document, and the objection is
noted for the record.

THE WITNESS:  The only thing I can
say is when I look at the last e-mail, this was
from Danny Warren to Bill Rodgers or -- I was

just cc'd, that they're going to sign the agreement and forward it.  So I'm sure I had some input, but I believe that the argument was drafted by Bill Rodgers and then modified by Bill Rodgers.

Q.   So do you have an understanding of in Exhibit G what was intended or meant with the statement, "Wayne, we will draft an argument from shells we have at Pace"?

A.   It looks like Pace had a shell argument that they used around the country.  That's what that means.  I assume that's what it means.

Q.   Okay.  And isn't it true that document itself, it became the first draft?

          MR. NEISER:  Object to form.

          THE WITNESS:  I'm not sure.

          MR. ZEGARELLI:  Okay.

          MR. NEISER:  I will tell you, and I will produce this e-mail that I have that Attorney Zazatacki (phonetic) previously said that we would stipulate that Bill Rodgers had drafted the first draft of the argument.  And I'm still looking for it because it's an older e-mail, but there were revisions that were made by both parties after the fact.

MR. ZEGARELLI:  Okay.  And to the extent my prior counsel gave that stipulation, I would indicate, unfortunately, I'd have to retract it.  If we needed to discuss it with the court, we'd have to, but that just is not our position at this time.

MR. NEISER:  Okay.

BY MR. ZEGARELLI:

Q.    Okay.  And Mr. DeLuca, just again from an authentication perspective, can you authenticate all of the documents --

A.    In Exhibit D?

Q.    -- in Exhibit D, yes?

A.    A February 10 e-mail, 2015, I can authenticate.  The e-mail from Bill Rodgers to me on March 11th, I can authenticate.  There's an e-mail dated April 27, 2015, from Bill Rodgers to me; I can authenticate that.  Then there was an e-mail April 30th to Danny Warren that I was cc'd on; I can authenticate that.  And then there's an e-mail from Danny Warren to Bill Rodgers which I was copied on.  I assume that took place.  I don't know.  And then a later e-mail April 30th. Now, Bill Rodgers is dealing with Danny Warren. He's just copying me.  I kind of was out of the

60

picture.  That was a document that was being prepared primarily by Bill Rodgers and reviewed by Pace-O-Matic.

Q.   And you're referring to -- so if I understand, have you just authenticated everything or were there exceptions?

A.   I can't authenticate the -- well, yes.  It was -- yeah, it was copied to me.  I can authenticate these e-mails.

Q.   And do you have any recollection at any time where there were performance requirements in a drafted version of the agreement?

        MR. NEISER:  Object to privilege, work product.

BY MR. ZEGARELLI:

Q.   What I'm doing while you're taking a look at those, Mr. DeLuca, I'm going to mark as Exhibit H another document.

        MR. NEISER:  What was he supposed to look at?  Was there something you wanted him to look at?

        MR. ZEGARELLI:  I just wanted him to look and see if -- well, first of all, he authenticated all of Exhibit D.

        THE WITNESS:  Yeah.

MR. NEISER:  Yeah, he did.

BY MR. ZEGARELLI:

Q.    The question that was placed before him was whether or not he recalls whether there was one draft, or any of the drafts had performance requirements in it.

A.    I don't recall.

Q.    And I'm going to mark a document of four pages, which is Exhibit H.

(DeLuca Exhibit H was marked for identification.)

MR. NEISER:  This is H, Greg?

MR. ZEGARELLI:  It is.

MR. NEISER:  Thank you.

And I assume this was not produced before?

MR. ZEGARELLI:  Yeah, that was part of the attorney's file, but that one was -- that was obviously not privileged.

MR. NEISER:  Okay.

BY MR. ZEGARELLI:

Q.    And so the question is, do you recall any drafts with performance standards that were part of a draft?

A.    I don't recall anything other than what's in

62

this agreement that's attached to Exhibit H.

Q.    Do you recall, and can you authenticate the e-mail that's dated March 12, 2015, which is identified at least as Bill Rodgers at sewickleylaw.com to Wayne DeLuca, RE: Pace-O-Matic Agreement?

A.    Yeah.

Q.    Now, do you recall at any time when Pennsylvania Skill Games, LLC, the defendant in this particular case, plaintiff in the consolidated case, do you recall when that entity sent any cease and desist letters to anyone in Beaver County with regard to a violation of an exclusive right of first refusal?

A.    I'm not sure, but I think there was something sent out, but I'm not sure.

Q.    Do you recall --

A.    I don't think it came for my office, no.

Q.    Okay.  And your recollection is you weren't representing, at least at that point, Pennsylvania Skill Games, LLC, with regard to it. So you recall a cease and desist situation?

A.    I have some recollection of that.

            (DeLuca Exhibit I was marked for identification.)

63

BY MR. ZEGARELLI:

Q.    Now, I don't see that you brought with you any communications.  I will show you a document I'll mark as Exhibit I, and you'll see, Mr. DeLuca, that you're cc'd on the letter.

A.    Uh-huh.

Q.    Now, you didn't produce that letter, so is there some -- have you destroyed, deleted any documents as part of, you know, prior to today?

A.    I produced everything that I had.

Q.    Pardon me?  I'm sorry?

A.    I produced everything that I had.

Q.    Okay.

A.    And I didn't see this one in there, Rodger's letter.

Q.    Now, I seem to recall again when we were scheduling this call that you had indicated that -- you had indicated that some documents were destroyed.  Did I misunderstand?

A.    Yeah, I probably -- I can't say for sure that I retained all the documents.  I think I retained most of what I had, but there may be some stuff that I don't have.

Q.    So do you have --

A.    I'm not sure.  I know I don't have this,

64

Exhibit I.

Q.    And do you recall receiving it at the time -- on or about the time --

A.    Yeah, I do recall receiving it.

Q.    You said you do recall receiving it?

A.    I recall receiving a copy.

Q.    I see.  And you don't have a copy, okay.  So could you at least for the record indicate what you sort of recall happening to documents that were not retained in some regard or what your policy is for document retention, destruction?

A.    I've retained all my files when I closed my office for a period of seven years, okay?  Now, some of these files -- I don't -- I don't recall this letter in my file, and it should have been in there, but I don't have it.  So --

            And on the Pace-O-Matic stuff, nothing was destroyed.  I just don't have this letter.

Q.    So the Pace-O-Matic file that you seem to have brought doesn't -- other than the Beaver Court case does not seem to have many documents quite frankly?

A.    No, it has it -- it has all these correspondence there.

Q.   Oh.  All right.  Well, maybe we need to --
okay.

MR. NEISER:  These are his notes,
okay?  And these are all his mental impressions
and notes that he has, and his billing
statements, which would be privileged.

And then here you have -- these are
duplicates.  And then we have the drafts that
were part of the litigation, and that's all we
have.

THE WITNESS:  Well, you have all my
communications behind your computer.

MR. NEISER:  What's this?

THE WITNESS:  All my e-mails,
letters.

MR. ZEGARELLI:  You missed one.

MR. NEISER:  Thank you.  This was
part of that -- that isn't all of it.  What these
were, were the reports that related to the draft
expert reports.

THE WITNESS:  What's the date of
those letters?  They're back in February.  That's
every correspondence that I -- I didn't destroy
anything.

MR. NEISER:  Here's Bill,

66

Nick Farley.  These are testing reports.

THE WITNESS:  All the communications are in there.  I was just looking for this particular one.

MR. NEISER:  No, I understand.  I was under the impression that these were all related to --

THE WITNESS:  No, that was my whole correspondence file.

MR. NEISER:  See, most of these -- none of these are actually -- these relate to your client or this case, other things that has to do with legalized gaming, and it was in Philadelphia.

THE WITNESS:  These are all by date.

MR. NEISER:  February 22nd.  We can do this one by one.  I don't know if any of this has any bearing on anything that we're talking about here today, but this is draft reports -- it says draft report, letter of Farley for billing draft reports.

THE WITNESS:  They're by dates, so I was just looking to see if -- I don't have this letter in my file, February 14, 2017.

67

BY MR. ZEGARELLI:

Q.    And are these --

A.    90 percent of that is about expert reports.

Q.    My primary line of questioning at this point is whether or not documents have been destroyed in some regard.  I think Mr. DeLuca had indicated on the phone, perhaps at the point of retiring, some documents were destroyed.  There is a document we have.  He appears to have been copied.  It wasn't -- it's not in the file today, so I'm trying to correlate --

MR. NEISER:  Go right ahead.  I mean, I'm just saying that that -- I have a correspondence file.  As I reviewed it this morning for the first time, it looked as if the majority of it related to the litigation or things that has nothing to do with this.  For example, here's a letter from the City of Philadelphia to Matt Haverstick about seizing the Pennsylvania Skill Games.  If you want it, you can have it.  It's not a problem.

MR. ZEGARELLI:  Yeah, we'll probably take that, a copy.

MR. NEISER:  Sure.  Do you want me to spend some time and go through this?

MR. ZEGARELLI:  I don't necessarily know if we need to ask the witness about it.

MR. NEISER:  I mean, these are really far afield.  But if you want them, you can have them.  I just don't want to give them --

MR. ZEGARELLI:  Unless they're privileged.

MR. NEISER:  That's what I'm trying to avoid doing, and when I looked through these this morning, because it's the first time I got the chance to look at them, these apparent -- these look like drafts of reports.  There's a copy of the Complaint in this case.  I don't know if you want that.  But these go into drafts, and these are things that I don't necessarily think should be privileged.  We have the file reports.

MR. ZEGARELLI:  Here's the more overriding issue, Julian, is I'm just trying to get to a point where I get some testimony on the record whether or not Mr. DeLuca is sure that everything that ever existed is here, or whether or not some of that may have been destroyed as part of a retirement or movement --

MR. NEISER:  I understand.

MR. ZEGARELLI:  -- of the files.

MR. NEISER: I understand. No. I mean, it's a fair question. I'm not trying to interfere with that. I'm just trying to -- if you're asking the question as to why -- if it's being questioned based on the fact that he doesn't have this particular letter that he was copied on by a third party on something that really doesn't have anything to do with anything, I'm not quite sure what to tell you.

I'm just saying that I have a correspondence file here, and I'm looking through it. I don't see it in there, and I don't want to just hand over the entire correspondence file because there's some things in here that would be privileged.

So what I'm saying is if you would like me to, I'm happy to spend the next half hour, do a detailed review of this thing and then you can copy it, or I can do what I offered before and say I'll provide you with a privilege log and copies and anything that's not privileged. It's up to you. I'm happy to do whatever you would like me to do.

MR. ZEGARELLI: Well, I would say it this way. I would say since the witness

70

produced it, we probably ought to reproduce it. Whether or not there's privileges in it is a different issue for you to make a judgment on and log it appropriately.  But I don't -- it doesn't appear I need those documents, or those documents are responsive for purposes of --

MR. NEISER:  Yeah, that's right.

MR. ZEGARELLI:  -- the question I'm asking right now.

MR. NEISER:  Correct.

THE WITNESS:  They're not.

BY MR. ZEGARELLI:

Q.   So all I really want to know, Mr. DeLuca, at this point is whether or not somebody --

A.   I don't have a copy of this.  It's not in my file.

Q.   So by implication -- so you seem to recall the circumstances relating to that letter.  You don't have a copy of the letter.  You appear to have been copied on the letter.  So is it possible that certain documents were in a file that somehow got destroyed or weren't retained as part of a move or a retirement?

A.   I don't recall destroying any documents out of that Pace-O-Matic file.

Q.   Okay.

A.   I don't recall destroying any documents.  Of course, I could be -- I just don't remember.  I don't remember.

          And I recall seeing this letter, but it's not in my correspondence packet.

Q.   Now, at that time you were counsel -- that being February 14, 2017, if I understand your earlier testimony, you were counsel for Pace-O-Matic at that time?

A.   Yes.

Q.   Now, do you recall a term and condition -- do you recall that at some point in time Pace-O-Matic, Inc., Miele Manufacturing and Pennsylvania Skill Games, LLC, entered into an agreement for -- also known as a purchase agreement or the equipment purchase agreement?

A.   Yeah, placement agreement, yeah.  There was an agreement.

Q.   And do you recall at that time that there was a term and condition regarding -- I'll mark as Exhibit J PSG29 and 30.

          (DeLuca Exhibit J was marked for identification.)

          THE WITNESS:  Okay.  I've looked at

Exhibit J.  It's titled Equipment Purchase Agreement signed by Pace-O-Matic, Miele Manufacturing and Pennsylvania Skill Games, LLC.

MR. ZEGARELLI:  Let's take a two-minute break.  I just -- I want to get these document -- they sort of got --

MR. NEISER:  You got it.

MR. ZEGARELLI:  They got out of sync, and I want to just get this back into sync.

MR. NEISER:  No worries.

(Whereupon, a brief recess was held.)

BY MR. ZEGARELLI:

Q.   So in front of you, Mr. DeLuca, is Exhibit J, which, if you look at the top has Equipment Purchasing Argument identified.  You have seen this document before?

A.   Yes.

Q.   And I'll direct your attention to the second page, and Exhibit J for the record is a two-page exhibit.  And you'll see Exhibit -- I'm sorry, Number 4?

A.   Right.

Q.   And you'll see the reference to seller

grants to buyer right of first refusal.  Do you see that sentence?

A.    Yes.

Q.    Now, do you have some understanding of what that sentence means or was intended to mean?

MR. NEISER:  I'm going to object to the form.  I'm going to object to calling for a legal opinion and a legal conclusion, and I'm going to object on the basis of privilege, and I'm going to instruct the witness that he should not answer the question.

MR. ZEGARELLI:  Okay.  We'll move on.  I'll mark for identification Exhibit K.

(DeLuca Exhibit K was marked for identification.)

BY MR. ZEGARELLI:

Q.    Mr. DeLuca, do you recall seeing this document before?

A.    No.  I don't believe I ever saw this document.

Q.    So you'll note at the top it identifies a agreement by Pace-O-Matic, Inc., and Miele Manufacturing collectively.  And do you have any understanding of whether Pace-O-Matic and Miele Manufacturing are -- one entity can

WAYNE DeLUCA                                    74

74

sign for the other?

A.    No.

Q.    You don't have an understanding or?

A.    I don't believe they are.

Q.    Do you have any understanding of the substance of an argument on or about January 29, 2015, with regard to the placement of terminals in the Beaver County, Pennsylvania, by Albert Unis and "affiliates"?

A.    No.  I've never seen this document.  No.

Q.    Nor do you have an understanding of the content of it?

A.    No.

Q.    Now, do you recall or know a gentleman named Mike Boodram?

A.    Mike Boodram?  No, I do not.

Q.    And do you recall any situations where -- I'm going to show you an e-mail from -- I'll mark it for identification as Exhibit L.

         (DeLuca Exhibit L was marked for identification.)

BY MR. ZEGARELLI:

Q.    And Exhibit L for the record is also POM 410 provided by -- provided to us by Pace-O-Matic.

A.    Yeah, okay.  I read it.

WAYNE DeLUCA                                          75

Q.   So you read it.  Does that help refresh your recollection about the gentleman named Mike Boodram?

A.   I don't recall.  I -- even having read this, I don't recall talking to a Mike Boodram.  I really don't have any recollection at all.

Q.   Do you have any recollection of talking to someone with regard to the content that's identified in the exhibit itself?

A.   No, I don't.  You know, after -- this equipment purchase argument was entered into, Mr. Unis was being represented by another lawyer. So I don't recall.  I don't recall -- I've never seen this until today, so I don't know.  But I don't know who Mike Boodram is.

Q.   And you don't recall the circumstances --

A.   No.

Q.   -- that are reflected by the letter?

A.   No.

Q.   Or by the e-mail I should say.

A.   No.

Q.   Mr. DeLuca, I am going to mark as Exhibit M as in Mary -- we're going to try to staple this.

          (DeLuca Exhibit M was marked for identification.)

BY MR. ZEGARELLI:

Q.    Can you identify that document?

A.    Yes.  This is a report prepared by Nick Farley & Associates addressed to me dated March 25, 2014, wherein we had requested an opinion from him on PA Skill Game 402.44 PEN, P-E-N, Pennsylvania.

Q.    Now, is it correct that this document, being Exhibit M -- and if you don't mind, the way these were produced to us -- and perhaps Julian you can indicate it as well -- the way these were produced, if you look at the end, there is a -- there are three pages, and it wasn't quite clear if those three pages are part of the report, being numbers -- POM numbers --

                MR. NEISER:  They may just be -- I think that's accidental.  I believe that's accidental.

                MR. ZEGARELLI:  So you don't believe they're part --

                MR. NEISER:  I don't believe that they are.

                MR. ZEGARELLI:  Mr. DeLuca, you can cross-check the exhibit against the document you brought, and you tell us what --

MR. NEISER:  He would have much more familiarity with it than I did, but I don't believe that it is part of the report.

MR. ZEGARELLI:  And we're referencing as part of the report POM 702 to POM 704.  We were not clear as recipients of this production whether or not those three pages were part of it.

THE WITNESS:  It's not a part. It's not part of the report.

MR. ZEGARELLI:  Okay, good.  Then let's remove it -- if you don't mind, we're going to remove it from the exhibit.

MR. NEISER:  That works for me.

THE WITNESS:  How about you remove it?

MR. ZEGARELLI:  Sure.

BY MR. ZEGARELLI:

Q.   So the report at this point in Exhibit M is POM 676 through POM 701.

Now, I'd like you to confirm, if you can, if that report is the final version of the report that you used in the Beaver County case?

A.   I believe it is.

WAYNE DeLUCA                                                78

78

**Q.**    And the Beaver County case is the Beaver County case we've indicated earlier that there's a memorandum opinion and order dated December 23, 2014.  You called that the Beaver County case?  Is that acceptable?

**A.**    Sure.  Wait, what was the date of this?

MR. NEISER:  December 22, 2014?

THE WITNESS:  December 23, 2014.  This report is dated after that.  Oh, no, I'm sorry.  No, that's good.  Go ahead.

BY MR. ZEGARELLI:

**Q.**    Is that the final?

**A.**    Yep.

**Q.**    Now, that particular report, if I understand it, is applicable for a particular version of the software; is that correct?

**A.**    That's correct.

**Q.**    And what version of the software is that for?

**A.**    402.44 PEN.  That's for Pennsylvania.

**Q.**    Now, is it your understanding that that case and that report were applicable -- purpose I'll state it a different way, the ruling upon which -- the ruling that was based upon that report was only for that particular version of the software,

WAYNE DeLUCA

or was it intended to include other versions of the software?

A.   I have to look at the Opinion because I think he refers to that in there before I give you the answer on it.

He doesn't make reference to the software number in his -- in Judge Knafelc's opinion, so I really can't answer that question.

Q.   Okay.

A.   But the dates would indicate that I had this opinion prior to going into court.

Q.   You had the, I'll call it the Nick Farley opinion prior to going into court?

A.   Yeah, that's correct.

Q.   Or at least prior to the order?

A.   Yes.  Yes.

Q.   And I'd have to look at it, but I think that the court case was prior to the expert report, the Nick Farley report, but it precedes the order?

A.   Yeah.  I think the report -- I think I put it into evidence.  I don't think I had anyone from Farley's office up, you know.  Mike Pace from Pace-O-Matic was my witness.

Q.   Now, were you the only attorney for

412-338-1058         snyderreporting@gmail.com         412-980-8228

Pace-O-Matic?

A.    At the hearing?

Q.    At the hearing?

A.    Yes.

Q.    On or about that date?

A.    Yes.

Q.    Now, in your term as counsel for Pace-O-Matic, was the Beaver case as we've identified it, applicable for example, to software versions 49, 52, 54, 57, 59?  That is, what was originally version .44 in the court case, there have been a number of versions thereafter.

MR. NEISER:  I'm going to object to a legal opinion.  It's a legal conclusion, and I'm going to object to the extent that it would involve any privileged discussion with our client.  If you're asking him to make a determination of legality of different versions of the software, he cannot do that.

You can go by what's in the reports, but he can't render a legal opinion here today.

MR. ZEGARELLI:  Well, I'm not asking him to render a legal opinion here today.

WAYNE DeLUCA                                          81

what I asked him was as attorney for the company during his tenure as attorney for the company, did the company take the position one way or the other whether or not any of the further versions were within the scope of the order.

MR. NEISER:  If it's based upon a non-privileged communication, he can answer.  But if it's a privilege communication from the client to him, he can't answer.

So if you can answer without disclosing a conversation with a client, feel free.

THE WITNESS:  I can answer it this way.  There was only one software package in front of Judge Knafelc, just one, and that was the one that he decided, just that one software package.

BY MR. ZEGARELLI:

Q.    And that was .44?

A.    You know, I can't say for sure, but I'm -- my guess is it probably was.

Q.    Okay.

A.    Because if you look at his Opinion, the date of his Opinion, and you look at the date of the report, this report was sometime before.

WAYNE DeLUCA                                              82

82

Q.    So the first issue is, do you have an understanding whether the Opinion itself references -- and I think you testified that it doesn't, but for clarity -- the Opinion itself, does it reference a specific version?

A.    No.

Q.    .44 or .59?

A.    No, it doesn't.

Q.    All right.  There was an expert report. That expert report, if I'm understanding it, only deals with .44 version?

A.    That's correct.

Q.    And that was the expert report that you entered in the case?

A.    I believe so.

Q.    Now, are you aware that Pace-O-Matic has taken the position that some software products are illegal or adjudicated?

A.    I don't know what Pace-O-Matic's position is.

Q.    And you don't know what it is -- you never knew what it is, or you don't understand what the current position is?

A.    Well, I -- I'm limited to this piece of equipment, this piece of software.  If

Pace-O-Matic has made decisions on other software, I'm not aware of that.

Q.    Okay.

A.    I know there were other conversations, but this is the one I was familiar with, the one in front of Judge Knafelc.

Q.    All right.  At any time during your tenure as counsel, did you ever tell a third party that they were manufacturing illegal software?

A.    That Pace-O-Matic was --

Q.    No, did you for -- as counsel for Pace-O-Matic, ever tell a third party that they were --

A.    They meaning Pace-O-Matic?

Q.    No, they being the third party or -- I mean, if that third-party manufacturer or a third-party operator, third-party user, any third party, was using illegal software?  And it might be Pace-O-Matic software; it might not be Pace-O-Matic software.  I just want to know if Pace-O-Matic.

A.    I may have.  I don't recall, but I may have.

Q.    And would that be in your file preserved if you did, or is that something that working for Pace-O-Matic it would be reserved or kept with

84

Pace-O-Matic files?

A.    It's not in my file.

Q.    Would it be customary for you if you took a position such as a cease and desist letter or some communication with a third party, would that be in your file or is it somehow retained?  In other words, do you work on their computer system and save files on their system?

A.    I don't know.  I can't answer that.

Q.    Let me say it this way.  Did you ever store files on the Pace-O-Matic computers contemporaneously with creating them and saving them?

A.    No.

Q.    So if it occurred that you did send out any correspondence to a third party with regard to the legal -- or unadjudicated software, it would either be on your local -- in your local file and/or something you would have sent to them as a copy by e-mail --

A.    Yeah.

Q.    -- or something like that?

A.    Yes.

Q.    Would that have gone by e-mail or -- with something like that your communication would then

85

go by --

A.    E-mail or letter.

Q.    And did you have a habit of one or the other?

A.    If I was writing an Opinion in the gaming industry, not just for this -- clients, that would be a letter.

Q.    Okay.  And if you were sending a cease and desist letter telling somebody to --

A.    That would be a letter, not an e-mail.

Q.    Now, do you have any understanding of the term unadjudicated software, not illegal per se, but the term unadjudicated?

A.    I have an idea.

Q.    What's your idea?

A.    I'm not a -- I'm not a --

              MR. NEISER:  I'm going to object to him rendering a legal opinion.

BY MR. ZEGARELLI:

Q.    Well, if you understand the term and you can answer.

A.    Ask the question again.

Q.    Do you have an understanding of the term unadjudicated software?

A.    My understanding is it's a piece of software

for this game, or any other game, that has not

been to court to test its validity.

Q.    Okay.  When you say that, does that mean any

different .44 -- so .44 was in the court case?

A.    That's correct.

            MR. NEISER:  Objection.

BY MR. ZEGARELLI:

Q.    Do you mean it as .45 or .46?

            MR. NEISER:  Object.  I'm sorry.

Go ahead and finish your question.

BY MR. ZEGARELLI:

Q.    Does it mean a third-party software?

            MR. NEISER:  I'm going to object to

the form.  I'm going to object that it's vague,

and Number 2, it's a legal conclusion, and it's a

legal Opinion, and it's an improper question for

him to answer.

BY MR. ZEGARELLI:

Q.    Okay.  So if you -- if you --

            MR. ZEGARELLI:  Why don't we read

back the response of unadjudicated software.

BY MR. ZEGARELLI:

Q.    Has version, Pace-O-Matic version 59 been to

court to test its validity?

A.    59.

Q.    59?

A.    I don't believe so.

Q.    Now, are you familiar with the term compliance officers?

A.    Yes.

Q.    Do you know, and more specifically, compliance officers at one of the parties in this particular case?  Well, you said yes, but I want to make sure it's compliance officers for purposes of --

A.    Well, the question is kind of vague.

Q.    Okay.  Let me back up.  I thought I had represented the right version.

Do you have an understanding whether version -- Pace-O-Matic software version .49 has been adjudicated?

A.    I don't know.  I don't know.

Q.    .52?

A.    Don't know.  I only adjudicated this version.

Q.    Okay.

A.    Just 44.

Q.    So to understand that, for example, Version .49 is not a piece of software that has been to court?

WAYNE DeLUCA                                        88

88

A.    I'm not aware of that.  I'm not aware of that.  Any up- -- based on my knowledge, I'm not aware of any other software that's been to court.  It could have been.  I don't know.

Q.    Okay.  So back to compliance officers.  So are you familiar with compliance officers by any of Pace-O-Matic, Miele Manufacturing, POM of Pennsylvania, any of the Savvy Dog, any of those entities?

A.    Miele has a compliance officer.

Q.    Does Pace-O-Matic have compliance officers or officer?

A.    I don't know.

Q.    So it's your understanding that the compliance -- I think you said it in the singular, has a compliance officer.  So you understand that Miele Manufacturing has at least one compliance officer?

A.    To my understanding.

Q.    And do you know what those -- what that or those compliance officers do, what their role is?

A.    No, I do not.

Q.    In what context do you know they have compliance officers?

A.    I was advised by Lou Miele they had a

compliance officer.

Q.   Do you know what the compliance is that their officer is for?

A.   Not really.

Q.   Okay.

A.   I can surmise, but that would just be a guess.

MR. NEISER:  Let's not do that.

THE WITNESS:  No.

BY MR. ZEGARELLI:

Q.   I mean, if you have an educated basis or a basis to make a --

A.   Not really.

Q.   Do you know who hires compliance officers?

A.   Who hires?  I know Miele hired their compliance officer.  I don't know if anyone else has.

Q.   Okay.  Now, I don't know if you ultimately indicated, do you have an engagement letter with the Miele, with any of the Miele entities, any entity with Miele as the first word?

A.   I looked through the Miele file, and since I don't represent them, a lot of that stuff has been disposed of.  I don't recall if I had a written agreement with them or not.  I do not

90

recall.

Q.    Now, do you recall a time when Pace-O-Matic, sometime after the agreement that's reflected by Exhibit J, formed a number of POM, "POM" related companies?

A.    Not aware of that.

Q.    At any point in time during your representation of Pace-O-Matic, were there any other attorneys, one or more, representing Pace-O-Matic as well?

A.    Only their in-house counsel.

Q.    Who is the in-house counsel?

A.    He was just on the phone.  Greg, what is his last name?

Q.    Might it be Mr. Cline?

A.    Yeah.

Q.    Greg Cline?

A.    Yeah.

Q.    And you would call Greg Cline in-house counsel?

A.    Yeah.

Q.    And your understanding of in-house counsel would be an employee of Pace-O-Matic?

A.    That's my understanding.  I don't know what his relationship was, but I -- I surmised that he

was their in-house counsel.

Q.   Was there a specification of roles between you and Mr. Cline as to what you did versus what he did?

A.   Not really.  Nothing written.  Nothing like that.

Q.   Is it you did whatever was asked of you, and you sort of presupposed Greg Cline does everything but what you do?

A.   Yeah.  My -- I was limited to handling this case and some inquiries only in Pennsylvania, but only in Pennsylvania.

Q.   Inquiries regarding laws application to skill gaming?

A.   Somebody may call me saying, hey, does this Judge Knafelc Opinion, does it have statewide jurisdiction, you know, that kind of stuff.  And I had communication with the State Police also.

Q.   Do you ever recall having the question does the Opinion relate to different companies or different software versions?

A.   No, it was limited to this piece of equipment, the seized equipment.  Because it was a Petition for Return of Seized Property, so it was only that piece.

Q.   Were you involved at all with the creation of any terms and conditions that were asked of operators to be signed at some point during your tenure?

A.   Prepared by who and signed by who?  I don't understand.

Q.   A set of terms and conditions such as a loyalty program or, you know, terms and conditions that all operators or some operators were required to sign?

A.   I didn't draft that document, but I assume one was -- I think one was out there.

Q.   And do you have an understanding of who drafted it?  First, the understanding is, was it a Pace-O-Matic or a Miele document?

A.   I'm not so sure.  I don't know who drafted it.  I either got it from Lou Miele or Pace-O-Matic.  And I remember I looked at it.

Q.   And that's not in the file either that you produced.  So what can we surmise by the fact that document hasn't been produced either?

A.   I thought it was in the file.  I thought it was.

          MR. NEISER:  You can't surmise anything.  You can ask him what happened to it.

93

MR. ZEGARELLI:  Okay.

BY MR. ZEGARELLI:

Q.    If you know, what happened to it?

A.    I know I just saw it.  Hand me that other folder.  That's it.

I know I saw it.  I just can't put my hands on it, but I know I had it.

MR. NEISER:  I'm not sure.

THE WITNESS:  I know I've seen it. It was a -- I think a 10- or 12-page document.

BY MR. ZEGARELLI:

Q.    Do you have any -- a 10- to 12-page document, terms and conditions that operators were required to sign?

A.    Yeah, it was a location agreement, but that was pretty sophisticated.

Q.    And the location agreement -- what's just generally your understanding of the location agreement?

A.    The location agreement is when a vendor puts a piece of equipment in a bar or restaurant or club.  He signs what's called a location agreement giving them an exclusive in there for 24 months or 48 months, and that they would provide sufficient space and they would provide

94

the electric, and the terms of collections of moneys and how the revenues would be split.  It just a pretty common document that some vendors use; some vendors don't use.  Some vendors just, it's a handshake with the bar owner.  Alby will tell you that.

Q.   And is there a document, terms and conditions that operators are required to sign?

A.   It depends on the vendor.  Some vendors don't have anything.  Some just have a two- or three-page operation agreement.

Q.   Now, this would be --

A.   On the Miele equipment --

Q.   Well --

A.   -- there was a document.  There was a -- there was some sort of a document.  I think it was about a 10- or 12-page document.

Q.   This would be for a document identified as terms and conditions, and it would be between the operator and Mr. Miele -- I'm sorry, not Mr. Miele, Miele Manufacturing and/or Pace?

A.   Yes.

Q.   And you recall seeing such a document?

A.   I do.  I have seen that document.

Q.   Okay.  But is there a different one that's

WAYNE DeLUCA                                                    95

                                                               95

perhaps two pages?

A.    No, the one I saw was multiple pages.

Q.    Okay.

A.    The location agreements I'm talking about are agreements that Alby and his dad used, and other vendors, where they would go into a bar, place equipment, and get a location agreement for a period of time.

Q.    And the one you're referring to, though, if I understand what your testimony is, an agreement between the operator and the location?

A.    That's right.

Q.    I'm asking if you know of an agreement between the operator and either a Miele Company or a Pace-O-Matic company?

A.    There is an agreement.

Q.    And did you participate in such an agreement?

A.    Did I participate how?

Q.    Participate in drafting such an agreement?

A.    No, I did not.

Q.    You've seen such an agreement?

A.    I have seen it.

Q.    Do you recall how you've seen it or where?

A.    I don't know.  I don't know how, but I know

WAYNE DeLUCA 96

96

I saw it.

Q.   Okay.

A.   It may have been sent to me to take a look at for some input.

Q.   Okay.   And that document is not produced so --

A.   I'll see if I can find it and I'll give it to you.

Q.   Okay.   It might be that there's a file that has not been produced.

A.   Yeah.

Q.   Now, when you represented Pace-O-Matic, were there certain specific people that you worked with commonly?

A.   Ryan Wood.

Q.   Okay.   He was, as a general rule, your primary contact?

A.   Yes.   He was Pace-O-Matic's man in Pennsylvania and other states.

Q.   And do you have an understanding of his title?

A.   He was like marketing -- some sort of a marketing title I think he had.   I'm not absolutely sure.

Q.   Did you work with Michael Pace at any time?

WAYNE DeLUCA

A.    I worked with Michael Pace because he was my lead witness in the Beaver County case, and we had several conversations about the litigation, trial preparation, testimony, things like that.

Q.    After that, after the Beaver County case?

A.    Before.  And we may have had a couple conversations after.  Nothing substantial, but most of the stuff was all pretrial.

Q.    And what about Daniel Warren?

A.    I've talked to Danny Warren several times, many times.

Q.    And about equal with Ryan Wood or less or more generally speaking?

A.    No, most of my communication was with Ryan Wood.

Q.    Do you have a recollection of conversations with Danny Warren, and did they have a certain subject?

A.    I had conversations with Danny Warren. Obviously, a lot of the conversations, even with Ryan, were about the litigation.

Q.    Okay.  After the litigation?

A.    And the impact of that case statewide as the case of -- you know, statewide.

            MR. ZEGARELLI:  I'll mark this as

98

Exhibit N.

(DeLuca Exhibit N was marked for identification.)

MR. NEISER:  Do you have a Bates version of this somewhere?  I know it's been produced.  Don't worry about it.  It doesn't matter.

BY MR. ZEGARELLI:

Q.    Mr. DeLuca, have you ever seen this document before?

A.    No.

Q.    So you can testify that you didn't participate in the drafting of this document?

A.    I don't know when it was drafted, but I know I didn't participate in it.

Q.    I'm sorry.  I didn't quite catch the --

A.    I don't know when it was put together, when this was drafted, but I didn't have any input on this.

Q.    Okay.  You seem to recall seeing it, but you didn't have --

A.    No, I don't recall seeing it.

Q.    Oh, okay.  Thank you.

MR. ZEGARELLI:  Let's take a five minutes break.

MR. NEISER:  You got it, Greg. Whatever you need.

(Whereupon, a brief recess was held.)

MR. ZEGARELLI:  Mr. DeLuca, thank you.  No further questions at this time.

EXAMINATION

BY MR. NEISER:

Q.    Mr. DeLuca, I just have a couple quick questions for you.  Were you ever an employee of Pace-O-Matic.

A.    No.

Q.    Tell me the extent to which, if at all, either Albert or Alby Unis was involved in the litigation, we'll call it the Beaver County litigation, that Judge Knafelc -- Knafelc?

A.    Knafelc.

Q.    Issued the Opinion on.

A.    Albert's sole role was to get the machine moved from my office to one of his locations. Other than that, he didn't play a role in it.

Q.    He had no involvement in the litigation whatsoever?

A.    No.

Q.    Did he ever consult with you, or did you

WAYNE DeLUCA                                          100

ever consult with him about the litigation?

A.    No.  I only consulted with the technicians that developed the game, Mike Pace and the guys that did the algorithms on the outcomes.

Q.    And you said that Albert Unis had no involvement.  Would the same be true for Alby Unis?

A.    Right.

Q.    Do you recall at any time Albert or Alby Unis providing you any documents for your consideration in the litigation?

A.    I do not.

Q.    So if anybody made the assertion that the Unises, either one of them, or the entity Pennsylvania Skill Games, LLC, had any role or involvement in the litigation whatsoever, that would be a misstatement?

A.    I believe that would be -- well, his involvement was he was the vendor that was willing to take the equipment and put it on location.  After that, there was no involvement. My involvement was with the technicians that designed the game, Mike Pace himself.  I'm not aware of him having any involvement.

Q.    And then we discussed Exhibit J, which is an

WAYNE DeLUCA                                          101

101

equipment purchase agreement.   Are you aware of any other agreements that were made between Albert Unis, Alby Unis, or Pennsylvania Skill Games and Pace-O-Matic?

A.    None.

Q.    Are you aware of any other oral agreements or oral arrangements between Albert Unis, Alby Unis, Pennsylvania Skill Games and Miele Manufacturing?

A.    No.

Q.    When did you first hear the name Pennsylvania Skill?

A.    I heard of Pennsylvania Skill before Albert Unis got involved.   When we -- that was -- when we first -- when this game was first marketed, you know, PA Legal, PA Skill Game, that's a very generic term in the gaming industry.

Q.    And did you hear about it from Albert Unis or Alby Unis or Pennsylvania Skill, or did you hear about it from some other source?

A.    I don't know when I first heard it.   My guess is it probably came from Pace-O-Matic?

Q.    I want to read something to you and tell me if this is a true statement or not.

Pace-O-Matic, with the assistance of Pennsylvania Skill Games, successfully litigated the legality of electronic video game machines in the Beaver County criminal case and obtained a return of the electronic video game machine.

A.    I've already answered that.  Unis' involvement was picking the game up from my office, placing it in one of his locations. Other than that, it was just myself, Al Torrence was the DA that prosecuted the case.  And Unises, they weren't witnesses.  It was the technical people, Mike Pace.

And the Commonwealth produced an expert witness regarding the game, but he worked with the PA Lottery Commission, and he really had absolutely no knowledge of the table-top game like this.

Q.    Did Mr. Rodgers, Attorney Bill Rodgers, ever say to you during the negotiation of Exhibit J, the equipment purchase agreement, that Pennsylvania Skill Games, LLC, or either of the Unises would be assigning or giving permission to use a trademark called Pennsylvania Skill?

A.    I think there's a reference that they can

assign this document to someone.

Q.   Well, was about the act --

A.   That was all I know about it.  That's the only knowledge I have.

Q.   Was there any discussion with Mr. Rodgers about a trademark or allowing Pace-O-Matic to use a trademark that allegedly was owned by either of the Unises or Pennsylvania Skill Games, LLC?

A.   I have no recollection of that conversation.

        MR. NEISER:  Mr. DeLuca, thank you. No other questions for the witness.

        MR. ZEGARELLI:  Nothing further.

        MR. NEISER:  We will read.

        (Signature not waived.)

        (There being no further questions, the deposition concluded at 12:34 p.m.)

                -----

104

DEPOSITION ERRATA SHEET


CASE CAPTION:  POM of PENNSYLVANIA, et al
                          vs.
                PENNSYLVANIA SKILL GAMES

        DECLARATION UNDER PENALTY OF PERJURY

   I declare under penalty of perjury  that I have

read the entire transcript of my Deposition taken

in the captioned matter or the same has been read

to me, and the same is true and accurate, save

and except for changes and/or corrections, if

any, as indicated by me on the DEPOSITION ERRATA

SHEET hereof, with the understanding that I offer

these changes as if still under oath.  In all

other respects the transcript is true and

correct.






                    _____
                        Wayne V. DeLuca


Subscribed and sworn to before me this

_____ day of _____, 2020


_____
          Notary Public

105

DEPOSITION ERRATA SHEET

Page No.        Line No.      Change to:


Reason for change:

Page No.        Line No.      Change to:


Reason for change:

Page No.        Line No.      Change to:


Reason for change:

Page No.        Line No.      Change to:


Reason for change:

Page No.        Line No.      Change to:


Reason for change:

Page No.        Line No.      Change to:


Reason for change:

Page No.        Line No.      Change to:


Reason for change:


SIGNATURE:                              DATE:
          Wayne V. DeLuca

Case 2:18-cv-00722-PLD   Document 320   Filed 02/14/23   Page 106 of 131

WAYNE DeLUCA                                           106

106

DEPOSITION ERRATA SHEET

Page No.         Line No.        Change to:


Reason for change:

Page No.         Line No.        Change to:


Reason for change:

Page No.         Line No.        Change to:


Reason for change:

Page No.         Line No.        Change to:


Reason for change:

Page No.         Line No.        Change to:


Reason for change:

Page No.         Line No.        Change to:


Reason for change:

Page No.         Line No.        Change to:


Reason for change:


SIGNATURE:                           DATE:
          Wayne V. DeLuca


412-338-1058      snyderreporting@gmail.com      412-980-8228

107

COMMONWEALTH OF PENNSYLVANIA)
COUNTY OF ALLEGHENY          )

     I, Diane G. Galvin, a notary public in and for the Commonwealth of Pennsylvania, do hereby certify that the witness, Wayne V. DeLuca was by me first duly sworn to testify the truth, the whole truth, and nothing but the truth; that the foregoing deposition was taken at the time and place stated herein; and that the said deposition was recorded stenographically by me and then reduced to typewriting under my direction, and constitutes a true record of the testimony given by said witness, all to the best of my skill and ability.

     I further certify that the inspection, reading and signing of said deposition were not waived by counsel for the respective parties and by the witness and if after 30 days the transcript has not been signed by said witness that the witness received notification and has failed to respond and the deposition may then be used as though signed.

     I further certify that I am not a relative, or employee of either counsel, and that I am in no way interested, directly or indirectly, in this action.

     IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office this 22nd day of July, 2020.

          S/DIANE G. GALVIN

          -------------------------------


          -------------------------------

WAYNE DeLUCA                                                    108

**1**

**1** 16:18 25:19 29:22 30:7,24 31:21 41:16,20 42:11 45:6 48:15

**1/1** 25:18

**1/1/2010** 26:1,19,22 27:7,14

**10** 1:22 2:9 51:18 57:2 59:14 93:10,12 94:17

**11** 54:7

**1129** 5:12

**11th** 57:4 59:16

**12** 24:19 25:2 62:3

**12:34** 103:16

**12-page** 93:10,12 94:17

**134** 2:17

**14** 66:25 71:8

**142613** 11:7

**15** 4:13 41:16 42:12

**15044** 5:12

**15219** 2:24

**15220** 2:9

**15241** 2:18

**1565** 12:22

**15th** 10:23

**16** 41:19,20

**17** 4:14

**1736** 12:11

**17361** 12:16

**17364** 12:16

**18** 44:17

**19th** 26:14

**2**

**2** 10:8 16:2 17:9,16,20,25 24:2 30:6,18,24 41:19 52:2,4 86:15

**2:18-cv-00722-PLD** 1:5

**20** 27:1

**2009** 31:12,21 32:1,2,3 34:3

**2010** 25:14,19 34:16

**2011** 16:2 17:9,16,20,25 25:15 30:6,18,24

**2013** 11:8 45:6 48:15

**2014** 12:24 15:6 40:22 76:5 78:4,7,8

**2015** 54:7 59:14,17 62:3 74:7

**2017** 25:5 66:25 71:8

**2018** 12:21 15:8 22:2,3

**2019** 15:9 20:25 28:6,10 29:11,22 30:7,24 31:21

**2020** 1:22 2:9 38:3 104:22 107:17

**22** 78:7

**22nd** 66:17 107:17

**23** 78:4,8

**24** 4:15 93:24

**25** 12:24 15:6 76:5

**2585** 2:17

**26** 15:9

**26th** 10:23 12:10

**27** 22:2,3 25:5 44:17 59:17

**29** 74:7

**3**

**3** 10:4 12:21 15:8 24:2

**30** 5:15 71:22 107:11

**30096** 3:4

**301** 2:23

**30th** 59:19,23

**31st** 20:24 26:17

**3440** 2:23

**3450** 3:4

**37** 4:16

**3rd** 10:24 14:4

**4**

**4** 72:23

**402.44** 13:1 76:6 78:20

**402.49** 12:22

**402.52** 12:11

**41** 4:17

**410** 74:23

**42613** 45:4

**44** 80:11 81:19 82:7,11 86:4 87:22

**45** 86:8

**46** 86:8

**47** 27:5,6

**48** 93:24

**49** 80:10 87:16,24

**5**

**5** 2:8 4:7

**52** 80:10 87:18

**54** 4:18 80:10

**564** 25:24

**57** 80:10

WAYNE DeLUCA                                                     109

**59** 80:10 82:7 86:23,25 87:1

---
**6**
---

**61** 4:19

**62** 4:20

**651** 2:8

**676** 77:20

---
**7**
---

**7** 24:8

**701** 77:20

**702** 77:5

**704** 77:6

**71** 4:21

**73** 4:22

**74** 4:23

**75** 4:24

---
**8**
---

**8** 24:8,10

---
**9**
---

**9** 4:12 24:10 56:7,13

**9:53** 2:10 5:2

**90** 67:3

**965** 11:8

**98** 4:25

**99** 4:8

---
**A**
---

**a.m** 2:10 5:2

**ability** 107:8

**absolutely** 13:18 96:24 102:17

**accept** 7:11

**acceptable** 20:6,13 23:10 56:25 78:5

**accidental** 76:17,18

**accommodate** 6:12

**accomplish** 46:21

**according** 54:10

**accurate** 104:9

**accused** 33:3

**act** 103:2

**action** 1:5 107:15

**active** 5:18 29:20,21 34:20

**actual** 44:5

**actually** 17:17 32:15 34:14 40:9 66:11

**addressed** 17:21 76:4

**adjudicated** 82:18 87:16,19

**advice** 18:24 21:10,19,22 33:20

**advised** 88:25

**affect** 5:21

**affiliate** 30:5

**affiliated** 8:15,21,23 9:2 48:17

**affiliates** 74:9

**affixed** 107:17

**afield** 68:4

**against** 76:24

**agencies** 33:24,25

**AGENCY** 1:25

**ago** 5:15 31:23 48:18

**agreement** 16:1 22:11 46:6 51:1,2,20 52:17 53:3 58:2 60:12 62:1,6 71:16,17,18,19 72:2 73:22 89:25 90:3 93:15,17,19,20,23

94:11 95:7,10,13,16,18,20 ,22 101:1 102:21

**agreements** 51:4 95:4,5 101:2,6

**AG's** 32:20

**ahead** 6:9 67:12 78:10 86:10

**al** 102:10 104:3

**Albert** 3:7 8:16 9:16 16:13 22:11 45:6,12,13,15,16,17 ,18,21,22,25 46:12,20,25 47:12,20,21 48:5,16,18 49:14,18,19 50:3,9,13,20 51:22 52:19 53:18 56:20,23 57:1 74:9 99:14 100:5,9 101:3,7,14,19

**Albert's** 99:19

**Alby** 45:16 94:5 95:5 99:14 100:7,10 101:3,8,20

**algorithms** 100:4

**allegedly** 103:7

**ALLEGHENY** 107:1

**allowing** 103:6

**already** 9:24 14:10 57:13 102:7

**am** 7:1,10 8:20 9:9 19:15 38:11,13,17 41:13 75:22 107:14

**Amato** 35:23,25 36:1,2,14

**Amato's** 52:16

**American** 50:24

**Amusement** 31:18,20

WAYNE DeLUCA

110

**and/or** 84:19 94:21 104:10

**answer** 73:11 79:5,8 81:7,9,10,13 84:9 85:21 86:17

**answered** 57:12 102:7

**anybody** 100:13

**anyone** 39:12 49:9 62:12 79:22 89:16

**anything** 14:12 41:6 61:25 65:24 66:19 69:8,21 92:25 94:10

**apart** 34:17

**apparent** 68:11

**appear** 22:7 44:17 70:5,19

**appearance** 7:6

**appears** 25:6 37:15 41:18 67:9

**applicable** 78:15,22 80:9

**application** 91:13

**appropriate** 6:7

**appropriately** 70:4

**approximately** 31:20

**April** 59:17,19,23

**argument** 36:25 53:7 54:4 56:25 58:3,8,10,22 72:17 74:6 75:11

**arrangement** 35:22

**arrangements** 101:7

**arrested** 49:17

**arrests** 46:15

**aside** 13:10

**assertion** 100:13

**assign** 103:1

**assigning** 102:23

**assist** 42:14

**assistance** 102:1

**associated** 26:25

**Associates** 10:20 12:17,21,25 76:4

**association** 25:21 26:4,8,20 28:23 29:6 34:21,25

**assume** 58:12 59:22 61:15 92:11

**assurances** 49:15

**Atlanta** 30:12

**attached** 56:25 62:1

**attention** 10:8 42:3 56:12 72:20

**attorney** 5:16 8:5 17:23 27:7 28:7 33:1,2,3,6 36:10 48:16 52:16 58:20 79:25 81:1,2 102:19

**attorney/client** 7:8 18:21 19:20

**attorneys** 36:7 90:9

**attorney's** 6:15 61:18

**authenticate** 51:16 59:10,15,16,18,20 60:7,9 62:2

**authenticated** 60:5,24

**authentication** 59:10

**AUTHORIZATION** 1:25

**available** 8:11 20:2

**Avenue** 25:24

**avoid** 68:9

**aware** 50:19,23 51:5,6 82:16 83:2 88:1,3 90:6 100:24

101:1,6

**away** 41:6

---

B

**B.1** 4:13 15:1,5,10

**B.2** 4:13 15:1,7,10

**B.3** 4:13 15:2,8,10

**background** 16:6 25:12

**bad** 32:12

**bar** 47:9 48:8,10 93:21 94:5 95:6

**based** 69:5 78:24 81:6 88:2

**basic** 19:2

**basis** 7:20 18:18 34:7 73:9 89:11,12

**Bates** 24:2,11 41:16 42:21 43:4 52:6 98:4

**Battle** 2:22

**Bay** 5:12

**bearing** 66:19

**Beaver** 11:5,8 16:10,12,13 19:24 37:1 40:21 48:2,6 50:10,13,15 51:11 62:13 64:22 74:8 77:23 78:1,2,5 80:8 97:2,5 99:15 102:4

**became** 58:14

**bed** 32:14 33:8

**begin** 29:14

**begins** 40:9

**behind** 65:12

**believe** 13:3 15:15 24:3 55:5 58:3 73:19 74:4 76:17,20,21 77:3,25

WAYNE DeLUCA                                                      111

82:15 87:2 100:18

**best** 107:8

**big-time** 32:14

**Bill** 51:13
52:15,16,18,21
53:5,6,11,16,19
54:3 55:20 56:21
57:4,6,14,25
58:4,5,21
59:15,17,21,24 60:2
62:4 65:25 102:19

**billing** 65:5 66:21

**bit** 25:13 29:8

**blanket** 18:20

**Boodram** 74:15,16
75:3,5,15

**Boy** 31:12

**break** 6:8,11 72:6
98:25

**breaking** 18:13

**brief** 24:23 54:16
72:12 99:3

**bring** 10:9 25:19,25

**brought** 10:13 11:8
12:7,8 14:9
15:14,19 19:9 63:2
64:21 76:25

**Building** 25:23 27:15
28:19 35:14

**business** 28:11 29:14
36:21 50:20

**buy** 49:18

**buyer** 73:1

---
C
---

**caption** 9:3 104:3

**captioned** 11:6 104:8

**case** 11:6 16:10
32:9,10 34:3 48:19
49:15 62:10,11

64:22 66:12 68:13
77:24 78:1,2,5,21
79:18 80:8,12 82:14
86:4 87:8 91:11
97:2,5,23,24
102:4,11 104:3

**cases** 21:11

**catch** 98:16

**cc** 55:17

**cc'd** 58:1 59:19 63:5

**cease** 62:12,22 84:4
85:8

**certain** 32:14 70:21
96:13 97:17

**certainly** 6:2,17

**Certificate** 10:4

**Certified** 2:5

**certify** 107:4,9,14

**CERTIFYING** 1:25

**chance** 36:23,24
68:11

**change** 29:15
105:2,4,5,7,8,10,11
,13,14,16,17,19,20,
22
106:2,4,5,7,8,10,11
,13,14,16,17,19,20,
22

**changed** 26:3 28:2

**changes** 53:1 56:24
57:7 104:10,13

**characterization**
38:24

**charge** 34:10,18

**charged** 34:14

**chronology** 19:22

**circulated** 51:21

**circumstances** 45:8
70:18 75:16

**City** 67:18

**Civil** 1:5 2:4

**claiming** 19:7

**clarification** 6:3

**clarify** 6:6

**clarity** 45:11 82:4

**clear** 30:15 53:4
76:13 77:6

**clearly** 55:23

**client** 20:16 21:7
53:15 55:14 57:6
66:12 80:18 81:8,11

**clients** 29:21 85:6

**Cline** 3:3
8:7,10,12,13,18,20
9:5,9 90:15,17,19
91:3,8

**closed** 64:12

**closing** 29:23

**club** 49:22,25 50:24
93:22

**collections** 94:1

**collectively** 73:23

**com** 37:13

**Commander** 46:9

**Commission** 102:16

**common** 94:3

**commonly** 96:14

**Commons** 2:18

**Commonwealth** 2:7
102:14 107:1,3

**communicate** 46:19
47:11

**communicated** 22:1,5
25:4 48:7

**communication** 22:9
81:7,8 84:5,25

WAYNE DeLUCA                                                112

91:18 97:14

**communications** 51:17 63:3 65:12 66:3

**companies** 8:15,21,23 9:2,3 90:5 91:20

**company** 40:16,17 48:16 81:1,2,3 95:14,15

**compensation** 21:15,22

**Complaint** 68:13

**compliance** 87:4,7,9 88:5,6,10,11,15,16, 18,21,24 89:1,2,14,16

**computer** 65:12 84:7

**computers** 84:11

**Concerning** 22:10

**concluded** 103:16

**conclusion** 29:2 73:8 80:15 86:15

**condition** 71:12,21

**conditions** 92:2,7,9 93:13 94:8,19

**confer** 6:6

**confidential** 6:15 7:16

**confidentiality** 9:17

**confirm** 37:17 77:21

**conflict** 53:23

**confused** 13:13

**congratulations** 27:6

**connection** 38:25

**consensus** 20:9

**consideration** 100:11

**consistently** 30:23

**consolidated** 62:11

**constitutes** 107:7

**consult** 6:4 99:25 100:1

**consulted** 100:2

**contact** 33:19,20 49:5,8,9,13 96:17

**contacted** 49:5,7,10 50:11 53:16 56:24

**contemporaneously** 84:12

**content** 74:12 75:8

**context** 88:23

**continue** 31:19

**contract** 18:18 32:9 50:23

**controlled** 49:17 51:7

**conversation** 25:8 47:22 81:11 103:9

**conversations** 83:4 97:3,7,16,19,20

**coordinated** 44:18

**Coordinating** 47:17

**copied** 59:22 60:8 67:10 69:7 70:20

**copies** 13:16 14:1 25:6 69:21

**copy** 11:8 16:24 17:3,7 23:5,11 55:22 64:6,7 67:23 68:13 69:19 70:15,19 84:20

**copying** 51:25 59:25

**corner** 37:9,10,24 40:3 41:18 55:7

**Corporate** 3:4

**correct** 11:17 22:4 23:1 27:18 28:14 35:7 70:10 76:8

78:16,17 79:14 82:12 86:5 104:15

**corrections** 104:10

**correlate** 67:11

**correlates** 56:5

**correspondence** 64:25 65:23 66:9 67:14 69:11,13 71:6 84:16

**counsel** 2:13 3:3 6:4 7:1,7 8:14,20 18:15 20:2,6 31:22 55:17 59:2 71:7,9 80:7 83:8,11 90:11,12,20,22 91:1 107:10,14

**counter-signed** 18:4

**counting** 12:8

**country** 58:11

**County** 11:5,8 19:24 37:1 40:21 48:2,6 50:10,13,15 51:11 62:13 74:8 77:23 78:1,2,5 97:2,5 99:15 102:4 107:1

**couple** 12:4 23:4 47:13 49:25 97:6 99:9

**course** 52:12 71:3

**court** 1:1 13:22 41:7,9 47:10 59:5 64:22 79:11,13,18 80:11 86:2,4,24 87:25 88:3

**cover** 15:6,7,8 41:20

**created** 54:3 56:11 57:10

**creating** 84:12

**creation** 92:1

**criminal** 102:4

**cross-check** 76:24

WAYNE DeLUCA

113

**culminated** 48:12

**current** 25:20 26:2 28:2 82:23

**currently** 20:21 21:2,4,13 57:9

**Curriculum** 14:14

**customary** 84:3

---
D
---

**DA** 102:11

**dad** 45:16 95:5

**Daniel** 97:9

**Danny** 51:19,25 55:15,16 56:23 57:25 59:19,21,24 97:10,17,19

**date** 17:17 25:16 28:4,8 29:12 30:19 51:18 65:21 66:16 78:6 80:5 81:23,24 105:24 106:24

**dated** 12:21 17:9,15 57:4 59:17 62:3 76:4 78:3,9

**dates** 66:23 79:10

**David** 41:23

**day** 104:22 107:17

**days** 50:1 107:11

**deal** 7:20 10:24

**dealing** 59:24

**deals** 82:11

**deceased** 35:5,6

**December** 16:2 17:9,16,20,25 20:24 26:12,13,14,17 28:5,10 29:11,22 30:6,7,18,24 31:21 78:4,7,8

**decided** 81:16

**decision** 11:5 40:21

**decisions** 83:1

**DECLARATION** 104:5

**declare** 104:6

**deeper** 53:2

**defend** 36:21

**defendant** 62:9

**Defendants/ Plaintiffs** 2:20 3:1

**deleted** 63:8

**deluca** 1:19 2:1 4:3,12,13,14,15,16, 17,18,19,20,21,22,2 3,24,25 5:3

**DeLuca** 5:10,11,13 7:6,7,11,12 9:13,20,23 11:15 13:15 15:10 17:11,14 18:5,13,23 19:9,16 20:17,21 24:21 25:3,22 26:21 27:8,16,24 28:6,11,17,18,20 29:4,14,18 37:3,6 41:24 42:2 54:18 55:9,16 56:9 59:9 60:17 61:10 62:5,24 63:5 67:6 68:20 70:13 71:23 72:15 73:14,17 74:20 75:22,24 76:23 98:2,9 99:5,9 103:10 104:19 105:24 106:24 107:4

**D-E-L-U-C-A** 5:10

**Department** 46:7

**depends** 94:9

**deponent** 1:9,17 5:4

**deposed** 5:5,13

**deposition** 1:19 2:1 7:10 18:13 19:16

23:24 50:5 103:16 104:1,7,11 105:1 106:1 107:5,6,10,12

**describe** 45:1

**designate** 6:13

**designated** 45:22

**designation** 7:18 27:20 37:10 41:18 50:20

**designed** 100:23

**desist** 62:12,22 84:4 85:9

**destroy** 65:23

**destroyed** 63:8,19 64:18 67:5,8 68:22 70:22

**destroying** 70:24 71:2

**destruction** 64:11

**detailed** 69:18

**determination** 46:3 80:19

**determined** 36:23

**developed** 100:3

**Diane** 2:5 107:3

**difference** 10:3

**different** 10:25 27:20 29:8 34:22 70:3 78:23 80:19 86:4 91:20,21 94:25

**direct** 10:8 42:3 56:12 72:20

**direction** 107:7

**directly** 107:15

**disclosing** 81:11

**discoverable** 16:5

**discrete** 35:21 36:1

**discuss** 59:4

WAYNE DeLUCA                                         114

**discussed** 24:17 46:1
  100:25

**discussion** 20:7
  80:17 103:5

**disposed** 89:24

**DISTRIBUTION** 1:24

**DISTRICT** 1:1

**Docket** 11:7

**document** 9:23
  10:1,2,6,9 15:13
  20:1 22:8 25:2
  37:12 38:14 39:5,21
  40:23 43:3 44:20
  45:1 51:8,12
  52:7,14,15,24
  54:6,8,11,24
  55:20,23
  56:12,16,22
  57:16,21 58:13
  60:1,18 61:8 63:3
  64:11 67:9 72:7,18
  73:18,20 74:10
  76:2,8,24
  92:11,15,21
  93:10,13
  94:3,7,15,16,17,18,
  23,24 96:5 98:9,13
  103:1

**documents** 7:14,17
  10:10,17,18
  19:10,19 20:4,9
  22:16,19 23:9 24:17
  25:8,11 41:14 42:9
  51:6,16 54:21 56:10
  59:11 63:9,18,21
  64:9,23 67:5,8
  70:5,21,24 71:2
  100:10

**Dog** 1:5 2:21 3:1 7:2
  9:4,6 88:8

**done** 28:7

**dot** 37:13

**downtown** 25:24 27:16

28:7,18 35:13

**draft** 11:17 52:23
  53:10 54:4,11 56:11
  57:10,14 58:8,14,22
  61:5,24 65:19
  66:20,21,22 92:11

**drafted** 57:14
  58:4,22 60:12
  92:14,16 98:14,18

**drafting** 18:17 95:20
  98:13

**drafts** 61:5,23 65:8
  68:12,14

**Drive** 2:8 5:12

**drugs** 5:20,25

**Duluth** 3:4

**duly** 5:4 107:4

**duplicate** 20:3 22:22

**duplicates** 12:9
  13:6,7,10,11 65:8

**during** 18:15 30:5
  81:2 83:7 90:7 92:3
  102:20

—————————
            E
—————————
**earlier** 19:15 71:9
  78:2

**easier** 13:21 42:24
  44:4

**easy** 44:6

**Eddy** 25:22 26:21
  27:8,16,23 28:19
  29:3 35:13

**Edition** 13:1

**educated** 34:13 89:11

**either** 40:8 46:23
  47:23 84:18
  92:17,19,21 95:14
  99:14 100:14 102:22
  103:7 107:14

**elected** 32:25

**electric** 94:1

**electronic** 1:24
  102:3,5

**Elements** 37:25

**else** 89:16

**e-mail** 51:18,20,24
  55:13,15 56:22
  57:3,24 58:19,24
  59:14,15,17,19,21,2
  3 62:3 74:18 75:20
  84:20,24 85:2,10

**e-mails** 56:19 60:9
  65:14

**embody** 25:7

**employed** 20:21
  21:3,4 25:17

**employee** 21:6 26:6
  90:23 99:10 107:14

**employees** 55:18

**engage** 25:15

**engagement** 31:1,10
  89:19

**enter** 7:5

**entered** 51:8 71:15
  75:11 82:14

**entire** 19:18 69:13
  104:7

**entirely** 24:11

**entities** 31:8,11
  34:15 88:9 89:20

**entity** 30:4 31:5,16
  34:5 38:9 40:9,10
  50:24 62:11 73:25
  89:21 100:14

**Entrepreneurial** 2:16

**equal** 97:12

**equipment** 10:21,25
  11:6 12:11 33:21

WAYNE DeLUCA

115

45:4,24 46:3,11,16 47:17,21 48:2 49:19 50:2,16 71:17 72:1,17 75:11 82:25 91:23 93:21 94:13 95:7 100:20 101:1 102:21

**Erie** 32:18

**Ernie** 32:13,24

**ERRATA** 104:1,11 105:1 106:1

**ESQUIRE** 2:17,23 3:3

**et** 104:3

**event** 52:5

**eventual** 47:10

**everything** 60:6 63:10,12 68:21 91:9

**evidence** 79:22

**exact** 28:4 29:12 30:18

**exactly** 23:21

**examination** 2:3 5:6 99:7

**example** 67:18 80:9 87:23

**except** 10:18 104:10

**exceptions** 60:6

**exclusive** 62:14 93:23

**excuse** 11:13

**exhibit** 4:12,13,14,15,16,17 ,18,19,20,21,22,23, 24,25 9:20,25 15:1,7 17:9,10,11,15 18:14 24:17,18,19,21 25:1 37:2,3,7,16 40:4 41:5,23,24 42:3,4,7,8,22

43:14,17,20 44:8,11,13,19,25 51:15 54:18,23 55:8,12 56:13,17 58:7 59:12,13 60:17,24 61:9,10 62:1,24 63:4 64:1 71:22,23 72:1,16,21,22 73:13,14 74:19,20,23 75:9,22,24 76:9,24 77:13,19 90:4 98:1,2 100:25 102:20

**exhibits** 13:23 15:10 41:5 43:13,22

**existed** 68:21

**expert** 10:19 13:2 19:6 65:20 67:3 79:18 82:9,10,13 102:15

**explained** 49:14

**extent** 22:6,8 42:13 59:2 80:16 99:13

**extreme** 30:1

**eyes** 6:15

---

F

**fact** 18:6 24:7 38:13,22 45:23 50:4 54:22 58:25 69:5 92:20

**failed** 107:12

**fair** 9:19 14:7 20:10 69:2

**fall** 19:20 23:15

**familiar** 36:9 83:5 87:3 88:6

**familiarity** 36:17,19,20 77:2

**family** 9:15

**Farley** 7:15 10:20 11:16 12:17,21,25 14:25 15:2 66:1,21 76:4 79:12,19

**Farley's** 79:23

**fast** 7:4

**fat** 38:21

**father** 35:4

**fax** 22:18 25:7 41:18 44:22

**February** 51:18 57:2 59:14 65:22 66:17,25 71:8

**Federal** 2:3 6:16

**feel** 81:11

**felt** 53:13

**file** 14:6,13,19 15:25 16:9 19:17,22 21:8 31:14 61:18 64:15,20 66:9,25 67:10,14 68:16 69:11,13 70:16,21,25 83:23 84:2,6,18 89:22 92:19,22 96:9

**filed** 46:16

**files** 64:12,14 68:25 84:1,8,11

**filled** 10:4

**final** 12:23 53:3 77:22 78:12

**finals** 11:19,21

**fine** 15:4 43:7

**finish** 6:10 86:10

**fireworks** 48:19,20

**firm** 27:8 28:19,22 29:2,7 33:13 35:24,25 36:1,13

**first** 5:4 6:25 15:16 19:18 22:10 31:6

44:16,24 48:19,21 49:5,6 52:22 53:8,9 54:4,11 56:11 57:10,14 58:14,22 60:23 62:14 67:15 68:10 73:1 82:1 89:21 92:14 101:11,15,22 107:4

**five** 32:21 98:24

**flip** 16:2

**flow** 18:13 43:5

**folder** 11:11 14:13,18 93:5

**Forbes** 25:24

**foregoing** 107:5

**forget** 32:23

**form** 19:3 38:18 56:16 58:15 73:7 86:14

**formalities** 5:20

**formed** 30:19 90:4

**forms** 18:18

**forward** 14:8 19:3 25:19,25 26:2 28:1 58:2

**FORWARDING** 1:24

**Foster** 2:8

**four-page** 10:2

**frankly** 64:23

**free** 81:12

**Friday** 1:21 2:9

**front** 9:23 13:17 46:18 72:15 81:15 83:6

**full** 26:16

---
G
---

**Galvin** 2:5 107:3,18

**game** 12:22 16:14,15

76:6 86:1 100:3,23 101:15,16 102:3,5,8,15,17

**games** 1:8,12 2:15 8:4,17 33:22 36:16,22 40:12 54:25 62:9,21 67:20 71:15 72:3 100:15 101:4,8 102:2,22 103:8 104:4

**gaming** 36:21 66:13 85:5 91:14 101:17

**general** 3:3 8:14,20 33:1,2,3,7,16 96:16

**generally** 30:22 93:18 97:13

**generic** 19:2 101:17

**gentleman** 74:14 75:2

**Georgia** 3:4

**gets** 54:2

**getting** 24:4,7 39:10 48:22

**Gibsonia** 5:12

**given** 107:7

**giving** 39:11 93:23 102:23

**gone** 84:24

**gotten** 39:15

**Grant** 2:23

**grants** 73:1

**Gravina** 25:22 26:21 29:4

**Greg** 8:13,25 61:12 90:13,17,19 91:8 99:1

**Gregg** 2:17 8:3 14:17 22:14

**GREGORY** 3:3

**group** 2:16 15:1

24:18 26:20 41:1,14

**guess** 33:7 57:6 81:21 89:7 101:23

**guys** 33:9 55:13,24 100:3

---
H
---

**habit** 85:3

**half** 69:17

**hand** 13:6 22:24 42:17 69:13 93:4 107:17

**handling** 91:10

**hands** 93:7

**handshake** 94:5

**handsome** 38:23

**happened** 40:18,20 92:25 93:3

**happy** 7:10 43:2 69:17,22

**hard** 8:13

**Harrisburg** 46:8

**haven't** 22:7

**Haverstick** 38:22 67:19

**having** 5:4 54:21 75:4 91:19 100:24

**head** 35:17

**headshot** 39:10,11

**hear** 8:13,25 101:11,19,21

**heard** 101:13,22

**hearing** 11:9 80:2,3

**hearings** 11:1

**held** 24:24 54:17 72:13 99:4

**help** 57:16 75:1

**helps** 56:14

**hereby** 107:3

**herein** 2:2 107:6

**hereof** 104:12

**here's** 65:25 67:18 68:17

**hereunto** 107:16

**he's** 54:9 59:25

**hey** 33:8 91:15

**Hill** 5:12

**hired** 89:15

**hires** 89:14,15

**history** 32:12

**hold** 13:23 23:23 41:3

**holding** 13:6 22:24

**Holiday** 2:8

**hour** 69:18

**https://www.mielemfg.com/legal-team** 37:11

I

**I'd** 25:12 26:2 43:21 50:1 59:3 77:21 79:17

**ID** 11:7 45:4

**idea** 85:14,15

**identification** 9:21,25 10:16 15:11 17:12,15 24:16,22 37:4,7 41:1,13,25 54:19,23 61:11 62:25 71:24 73:13,15 74:19,21 75:25 98:3

**identified** 9:24 11:15 14:11 35:15 62:4 72:17 75:9

80:9 94:18

**identifies** 73:21

**identify** 8:7,19 10:12 16:24 42:5 45:1 56:2 76:2

**III** 9:16 45:13,22 46:20,25

**I'll** 5:19 8:2 10:8 16:23 17:2 21:7,9 23:10 24:1 27:8 32:11 37:13 38:1 42:4 43:3,10 44:2,3,24 46:11,20 48:8 51:18 54:22,23 55:1 63:4 69:20 71:21 72:20 73:13 74:18 78:22 79:12 96:7 97:25

**illegal** 82:18 83:9,18 85:12

**I'm** 7:3 8:12,13,16 12:10 20:17 21:4 23:12,15 24:20 25:14,15 26:14 28:3,13 29:19,20 31:23 32:16 33:8,9 37:2,9 38:20 39:2 41:1 49:22 52:3,5 55:11,15,19 56:15,17 57:11,15 58:2,16,22 60:16,17 61:8 62:15,16 63:11,25 67:11,13 68:8,18 69:2,3,9,10,11,16,17,22 70:8 72:22 73:6,7,8,10 74:18 78:9 80:14,16,24 81:20 82:10,24 83:2 85:16,17 86:9,13,14 88:1,2 92:16 93:8 94:20 95:4,13 96:23 98:16 100:23

**impact** 97:23

**impartiality** 19:13

**implication** 70:17

**impression** 18:23 66:6

**impressions** 19:21,23 55:2 65:4

**improper** 86:16

**Inc** 1:15,16 11:6 18:15,25 30:16 31:7,18,20 38:2,16 39:1 71:14 73:22

**include** 19:21 55:8 79:1

**included** 51:15

**including** 18:16,22

**indeed** 16:11

**indicate** 25:17 59:3 64:8 76:11 79:10

**indicated** 18:5,14 50:6 63:17,18 67:6 78:2 89:19 104:11

**indicates** 37:20

**indicating** 36:22 56:23

**indicator** 44:21

**indirectly** 107:15

**individuals** 9:14

**industry** 85:6 101:18

**inference** 33:8

**influence** 19:14

**informally** 18:6

**information** 12:19

**in-house** 90:11,12,19,22 91:1

**initial** 52:23

**input** 58:3 96:4 98:18

WAYNE DeLUCA                                                    118

inquiries 91:11,13

inspection 107:9

Instead 18:11

instruct 73:10

intended 58:7 73:5
  79:1

intense 32:6

interested 53:17
  107:15

interfere 69:3

interject 45:10

interpose 9:12,17

interposed 24:9

interrupt 45:11

interspersing 18:12

introduce 6:25

investigation 34:1

investigative 33:24

involve 80:17

involved 32:3 34:2
  36:20 47:24 50:17
  92:1 99:14 101:14

involvement 18:17
  99:22
  100:6,16,19,21,22,2
  4 102:8

isn't 57:12 58:13
  65:18

issue 29:9 68:18
  70:3 82:1

Issued 99:18

Italian 49:22,25
  50:24

item 7:24

itemized 10:12

iteration 52:25 54:7

it's 8:12 14:19,20

15:4,16 16:3 17:9
22:8,19 23:22 24:11
25:18 26:7 29:1,7
32:4 34:7,17 38:19
39:20 49:24 58:23
67:10,21 68:10
69:2,4,22 70:15
71:6 72:1 77:9,10
80:15 81:6,8 84:2
85:25 86:14,15,16
87:9 88:14 94:5
98:5

I've 9:24 10:19 37:6
  38:13 39:21 40:6
  42:2 51:3 64:12
  71:25 74:10 75:13
  93:9 97:10 102:7

---
J
---
January 10:23,24
  12:21 14:4 15:8
  25:19 74:7

Jefferson 17:22

Jim 52:16

Johnstown 32:18

Judge 11:5 36:25
  46:18 79:7 81:15
  83:6 91:16 99:16

judgment 70:3

Julian 2:23 7:1 24:1
  68:18 76:10

July 1:22 2:9 22:2,3
  25:5 44:16,17
  107:17

Junior 35:6,10,11

jurisdiction 91:17

jurisdictions 50:9

---
K
---
kindly 6:8

Knafelc 11:5 36:25
  40:21 46:18 81:15

83:6 91:16 99:16,17

Knafelc's 79:7

knew 49:19 50:14,15
  82:22

knowledge 39:7 88:2
  102:17 103:4

known 48:6 71:16

---
L
---
language 51:22,23

last 21:21 34:4,13
  56:10 57:24 90:14

later 16:15 27:12
  51:7 59:23

law 2:16 26:25 27:7
  28:7 29:7,17

laws 91:13

lawsuit 18:19

lawyer 27:3 30:10
  75:12

lawyers 21:12

lead 97:2

least 17:1 23:7,16
  25:4,12 29:1 39:6
  42:13 62:4,20 64:8
  79:15 88:17

Leave 49:25

left-hand 40:3

legal 18:24 27:15,20
  33:11 37:20
  38:7,9,11,13,16,19,
  25 46:4 73:8
  80:15,22,25 84:17
  85:18 86:15,16
  101:16

legality 12:18 46:9
  80:19 102:3

legalized 66:13

less 97:12

WAYNE DeLUCA                                    119

**let's** 14:16 15:13 18:6,7,11 24:7 41:4 42:16 43:23 44:13,18 53:4 55:24 72:5 77:12 89:8 98:24

**letter** 15:6,7,8 16:3,23 17:8,15,18,19,21 18:14 21:24 25:15 31:1,10 63:5,7,15 64:15,19 66:21,25 67:18 69:6 70:18,19,20 71:5 75:18 84:4 85:2,7,9,10 89:19

**lettered** 41:5

**letterhead** 27:24 29:3

**letters** 16:4 62:12 65:15,22

**Lewisburg** 32:20,23

**Lewistown** 32:23

**license** 5:18 29:21 48:20,22

**licensed** 5:16 48:19

**life** 19:19

**ligation** 32:7

**limited** 82:24 91:10,22

**line** 6:10 37:21 67:4 105:2,5,8,11,14,17, 20 106:2,5,8,11,14,17, 20

**list** 14:9 19:8 55:9

**lit** 16:15

**litigated** 102:3

**litigation** 8:24 9:2,15 16:16 19:24 21:15 32:3,5,6

34:3,16 48:13 65:9 67:16 97:3,21,22 99:15,16,22 100:1,11,16

**little** 8:13 13:21 27:12 29:8 53:4

**LLC** 1:4,5,8,12 2:15,21 3:2 8:4 9:4,6 62:9,21 71:15 72:4 100:15 102:22 103:8

**local** 84:18

**located** 25:23

**location** 46:11,12 51:1,2,3 93:15,17,18,20,22 95:4,7,11 100:21

**locations** 32:21 99:20 102:9

**log** 20:5 69:21 70:4

**long** 40:15

**longer** 36:15

**longstanding** 53:15

**longwinded** 18:12

**lot** 89:23 97:20

**Lottery** 102:16

**Lou** 34:19 35:3,4,5,6,9 51:25 88:25 92:17

**lower** 37:9

**lower-left** 37:10

**loyalty** 92:8

_____
        M
_____

**machine** 99:19 102:6

**machines** 36:22 51:11 102:4

**maintain** 19:13

**maintained** 35:21

**majority** 67:16

**man** 96:18

**Manor** 25:23 27:15 28:19 35:13

**manufacturer** 83:16

**manufacturing** 1:16 7:3 9:8,10 31:7 37:13 38:2 39:1,24 40:8 51:9 71:14 72:3 73:23,25 83:9 88:7,17 94:21 101:9

**March** 10:23 12:10,24 15:6,8 54:7 57:4 59:16 62:3 76:5

**mark** 10:15,16 14:25 17:8,10,22 24:16 37:2 40:23 41:1,13 54:22,23 60:17 61:8 63:4 71:21 73:13 74:18 75:22 97:25

**marked** 9:20,24 10:2 15:11 17:11,14 24:21 37:3,6 41:24 44:23 54:18 61:10 62:24 71:23 73:14 74:20 75:24 98:2

**marketed** 101:16

**marketing** 96:22,23

**Mary** 75:23

**massive** 32:17,20

**material** 23:14,23

**Matt** 38:22 67:19

**matter** 98:7 104:8

**matters** 7:8 34:23

**may** 6:18 7:7,9 8:10,11 9:16 15:15,22 24:6 41:20 63:22 68:22 76:16 83:22 91:15 96:3 97:6 107:12

**maybe** 5:24 10:14

WAYNE DeLUCA

120

21:9 28:5 29:2 39:23 43:1 65:1

MCM 37:25

mean 5:24 16:3 21:2,17,18 32:1,9 33:15 34:6 51:1 52:9 67:13 68:3 69:2 73:5 83:15 86:3,8,12 89:11

meaning 42:6 83:14

means 15:22 45:22 58:12 73:5

meant 58:7

medication 5:21,25

meeting 47:12

members 26:8

memorandum 15:14 78:3

mental 18:22 19:21,23 65:4

mentioned 7:24 35:8

menu 37:24

met 46:23 47:13,23

Michael 55:17 96:25 97:1

middle 37:16

Miele 1:16 7:3 9:8,10 31:6,7,14,18,19,25 33:4,13,19 34:2,5,15 37:13 38:2 39:1,24 40:8,9,13 51:9,25 71:14 72:3 73:23,25 88:7,10,17,25 89:15,20,21,22 92:15,17 94:13,20,21 95:14 101:9

Mielemfg 37:21

mielemfg.com 37:14

Mike 74:15,16 75:3,5,15 79:23 100:3,23 102:13

mind 12:8,13 14:8 19:9 25:20 26:18 76:9 77:12

mine 13:9

minor 55:6

minute 6:5 21:18

minutes 98:25

missed 65:16

misstatement 100:17

misunderstand 63:19

misunderstood 50:7

modified 58:4

moment 17:2

money 32:15

moneys 94:2

months 93:24

morning 19:10,11 67:15 68:10

Mostly 34:7

motion 20:8

move 70:23 73:12

moved 26:14,15 99:20

movement 68:23

moving 28:1

multiple 15:17 45:12 50:6 95:2

Music 34:20,25

myself 7:1 53:22 102:10

---

N

nature 22:9 32:7

necessarily 41:22

68:1,15

necessary 6:7,12

necks 41:10

negative 5:24

negotiation 18:17 102:20

Neiser 2:23 4:8 6:18,20,24 7:1,22,25 8:10,25 9:19 10:18 11:2,11,19,22,24 12:3,12 13:11,18,22 14:17,22 15:3,18,24 16:11,17,25 18:11 19:8 20:11,14 22:14,18 23:1,4,12,21 24:4,13 30:1 38:18 41:4 42:9,14,17,25 43:8,15,23 44:2 45:10 52:2,4,10,12 55:11 56:3,6 57:11,18 58:15,18 59:7 60:13,19 61:1,12,14,20 65:3,13,17,25 66:5,10,17 67:12,24 68:3,8,24 69:1 70:7,10 72:8,11 73:6 76:16,21 77:1,14 78:7 80:14 81:6 85:17 86:6,9,13 89:8 92:24 93:8 98:4 99:1,8 103:10,13

Nick 10:20 11:16 12:17,21,25 66:1 76:4 79:12,19

nickname 40:11

night 26:12,16 27:9,13,17,19 35:14,15

nine 18:16

WAYNE DeLUCA

121

**none** 6:1 19:10 35:19 66:11 101:5

**non-privileged** 19:25 81:7

**Nor** 74:11

**notary** 2:6 104:24 107:3

**notations** 55:4,6

**note** 73:21

**noted** 19:19 57:22

**notes** 14:3,5 19:22,23 65:3,5

**nothing** 31:15 48:1 64:18 67:17 91:5 97:7 103:12 107:5

**notification** 107:12

**notified** 29:21 48:10

———— O ————

**oath** 104:13

**object** 38:18,21,22 39:2 57:11 58:15 60:13 73:6,7,9 80:14,16 85:17 86:9,13,14

**objection** 9:13,18 18:12,21 19:2 20:15 23:16 55:3,12 57:21 86:6

**objections** 18:9

**obtained** 102:5

**obviously** 21:17 39:14,20,23 40:20 61:19 97:20

**occasionally** 21:7 48:25

**occurred** 84:15

**o'clock** 5:2

**October** 45:6 48:15

**offer** 104:12

**offered** 20:3 69:19

**office** 2:18 26:12 27:9,13,17,19,23 28:8 29:23 32:20 35:14,15,20,21,22 36:5 45:5,25 52:17 62:18 64:13 79:23 99:20 102:9 107:17

**officer** 88:10,12,16,18 89:1,3,16

**officers** 87:4,7,9 88:5,6,11,21,24 89:14

**offices** 35:18

**official** 32:25

**oh** 8:12 14:14 32:19 52:8 65:1 78:9 98:23

**okay** 7:21 8:22 9:11 10:22 11:10,23 12:5,15 13:5,8,19 14:7,16 15:20 18:2 19:5 20:19 22:17,21 25:1 26:9,10,18 27:14 28:24 29:10,11,25 31:13 32:24 33:2 34:4,9,24 35:25 36:16 37:2,19 38:12,15 39:3,5,16,25 40:7,19 43:12 44:24 45:7 46:5 47:11,14,16,24 48:9,14 50:11 52:20 53:20,24 56:1 57:15,20 58:13,17 59:1,7,9 61:20 62:19 63:13 64:7,13 65:2,4 71:1,25 73:12 74:25 77:11 79:9 81:22 83:3

85:8 86:3,19 87:12,21 88:5 89:5,18 93:1 94:25 95:3 96:2,5,9,16 97:22 98:20,23

**older** 58:23

**one-by-one** 7:20

**ones** 13:5 42:18

**operating** 51:10

**operation** 94:11

**operator** 48:5 50:15 83:17 94:20 95:11,14

**operators** 32:14 92:3,9 93:13 94:8

**opinion** 11:9 12:18 15:14 48:4 73:8 76:6 78:3 79:3,8,11,13 80:15,22,25 81:23,24 82:2,4 85:5,18 86:16 91:16,20 99:18

**opportunity** 19:17

**opposing** 20:2,6

**oral** 101:6,7

**order** 6:16 14:11 23:20 41:22 78:3 79:15,20 81:5

**original** 15:25 17:5 34:3 43:14,17 54:8

**originally** 80:11

**others** 9:16

**otherwise** 45:21

**ought** 43:13,17 70:1

**outcome** 36:23

**outcomes** 100:4

**outside** 22:15,20 23:3

WAYNE DeLUCA

122

**overriding** 68:18

**owned** 103:7

**owner** 94:5

---

P

**p.m** 103:16

**PA** 5:12 76:6 101:16
102:16

**Pace** 55:15,17
58:9,10 79:23 94:21
96:25 97:1 100:3,23
102:13

**Pace-O-Matic** 1:4,15
2:21 3:1,3 7:2
8:14,21 10:21 11:6
16:1 17:21 18:15,25
21:23 22:1 25:4
30:5,8,9,11,12,16,1
9 31:2 38:4,16
40:10,14 41:15 45:4
51:9,10,19,21,25
53:14,15,24 55:18
60:3 62:6 64:17,20
70:25 71:10,14 72:2
73:22,24 74:24
79:24 80:1,8 82:16
83:1,10,12,14,19,20
,21,25 84:1,11
86:23 87:15 88:7,11
90:2,8,10,23
92:15,18 95:15
96:12 99:11
101:4,23 102:1
103:6

**Pace-O-Matic's** 82:19
96:18

**package** 81:14,17

**packet** 40:24 71:6

**page** 4:5,10 10:4,8
16:3 22:22 24:9
37:20 39:8,9 41:20
42:6,22 43:19
44:17,25 45:23

46:22 56:22 72:21
105:2,5,8,11,14,17,
20
106:2,5,8,11,14,17,
20

**pages** 22:23 24:19
25:2,6 41:2
42:5,7,12
44:18,21,23 51:14
61:9 76:13,14 77:7
95:1,2

**PAMMA** 34:20,23,24

**Pardon** 63:11

**Park** 2:18

**participate**
95:17,19,20
98:13,15

**particular** 28:2
33:11 50:5 54:6
62:10 66:4 69:6
78:14,15,25 87:8

**parties** 9:13
21:15,19,23 58:25
87:7 107:10

**partner** 26:6

**party** 19:12 51:17
69:7 83:8,12,15,17
84:5,16

**past** 7:7 18:16 48:7

**PC** 2:16

**PEN** 12:11,22 13:1
76:6 78:20

**P-E-N** 13:1 76:7

**penalty** 104:5,6

**Pennsylvania**
1:1,3,8,12
2:7,9,14,18,21,24
3:1 7:2 8:4,17
9:4,6 12:22,25
30:9,11,17,19 31:2
33:22 34:20,25 35:1
37:23 38:5

40:4,11,12,14 46:7
48:21 50:21,25
54:25 62:9,21 67:20
71:15 72:3 74:8
76:7 78:20 88:8
91:11,12 96:19
100:15
101:3,8,12,13,20
102:2,22,24 103:8
104:3,4 107:1,3

**Penthouse** 27:16
28:19

**people** 15:17 96:13
102:13

**per** 85:12

**percent** 67:3

**perfectly** 15:4

**performance** 60:11
61:5,23

**performed** 34:5

**performing** 27:15

**perhaps** 25:18 56:16
67:7 76:10 95:1

**period** 30:6,17,23
56:13 64:13 95:8

**perjury** 104:5,6

**permission** 102:23

**permitted** 13:15

**person** 36:9 47:1
48:19

**perspective** 59:10

**Petition** 46:16 91:24

**Philadelphia** 66:14
67:19

**phone** 34:7 46:23
47:15 50:4 67:7
90:13

**phonetic** 58:20

**physical** 44:25 46:22

WAYNE DeLUCA                                    123

51:14

**pick** 46:21 47:19,21 48:8 49:20 50:16

**picked** 16:14 45:5,25 47:3,5,6

**picking** 25:14 102:8

**pickup** 49:5 51:7

**pictorial** 37:22 40:2

**picture** 37:16,18 38:21 39:1,8,11,17,22 60:1

**piece** 33:20,21 45:3,24 46:3,10 49:19 50:2 82:24,25 85:25 87:24 91:22,25 93:21

**pieces** 10:20,25 12:18

**pile** 7:14 11:2,4 41:8

**Pittsburgh** 2:8,18,24 25:24 32:18

**placed** 17:25 19:4 20:1,15 42:2 48:10 61:3

**placement** 71:18 74:7

**places** 25:18

**placing** 102:9

**plaintiff** 1:13 62:10

**Plaintiff/Defendant** 2:14

**Plaintiffs** 1:6 2:2

**play** 50:1 99:21

**Plaza** 2:8

**Pleading** 15:25

**pleadings** 16:7

**please** 5:9 6:5 8:9

**PLLC** 2:22

**point** 15:23 28:1,4 29:15 40:8 41:21 51:7 53:11,16 56:13,20 62:20 67:4,7 68:19 70:14 71:13 77:19 90:7 92:3

**police** 33:25 46:2,7 47:18 48:4,11 49:16,23 91:18

**policy** 64:11

**Pom** 1:3 2:20 3:1 7:2 9:3,5 16:18 24:2,8,10 40:10 41:16 42:11,21 52:2,4 56:7 74:23 76:15 77:5,20 88:7 90:4 104:3

**POMs** 56:2

**portion** 18:18

**position** 59:6 81:3 82:17,19,23 84:4

**possession** 55:20,21

**possible** 70:21

**practice** 26:10,25 28:18 29:17,24

**practices** 35:12

**practicing** 27:4 28:20 29:20

**Preate** 32:13,16,24

**precedes** 79:19

**precise** 36:1

**predominantly** 36:24

**prefer** 43:21

**prejudice** 30:2

**preparation** 97:4

**prepared** 51:13 52:18,21,22,23 53:1,5,6,8

54:6,8,10 60:2 76:3 92:5

**present** 2:13 3:6 8:5

**preserved** 83:23

**president** 8:17 34:21

**presupposed** 91:8

**pretrial** 97:8

**pretty** 32:6 93:16 94:3

**previously** 58:20

**primarily** 60:2

**primary** 67:4 96:17

**printed** 37:8

**printout** 38:20

**prior** 13:4 59:2 63:9 79:11,13,15,18

**privilege** 7:8 9:17 18:8,21,22 19:2,7 20:4,5 23:15,17 55:4,12 60:13 69:20 73:9 81:8

**privileged** 22:6,8,13 23:10 55:23 61:19 65:6 68:7,16 69:15,22 80:17

**privileges** 19:21 70:2

**probably** 16:23 17:19 24:10 34:16 39:17 40:1 43:13 63:20 67:23 70:1 81:21 101:23

**problem** 67:21

**Procedure** 2:4

**proceeding** 33:12

**produce** 55:3,21 58:19 63:7

**produced** 11:25 12:2 13:4 15:16,17 16:17

WAYNE DeLUCA

124

22:23 41:2,14,21 42:10,11 55:22 61:15 63:10,12 70:1 76:10,12 92:20,21 96:5,10 98:6 102:14

**producible** 16:4

**product** 7:9 18:22 19:21 60:14

**production** 6:14 77:7

**products** 82:17

**professional** 2:5 21:5,13

**program** 92:8

**PROHIBITED** 1:24

**Property** 46:17 91:24

**prosecute** 33:9

**prosecuted** 102:11

**prosecution** 33:23

**Protective** 6:16 23:20

**provide** 19:22 20:5 21:5 69:20 93:25

**provided** 19:17 21:22 51:6 54:24 74:24

**providing** 18:24 21:13 100:10

**PSG29** 71:22

**public** 2:6 7:17 15:16 104:24 107:3

**publicity** 32:12 39:12

**pull** 39:17

**pulled** 37:12

**purchase** 71:16,17 72:1 75:11 101:1 102:21

**Purchasing** 72:17

**purpose** 45:2 78:22

**purposes** 9:25 10:16 18:24 39:12 45:12 70:6 87:10

**pursuant** 2:3

**push** 14:7

**pushing** 33:25

**puts** 93:20

---

Q

**question** 6:3,6 39:19 46:8 54:2 56:10 57:8 61:3,22 69:2,4 70:8 73:11 79:8 85:22 86:10,16 87:11 91:19

**questioned** 51:22 69:5

**questioning** 6:11 67:4

**questions** 6:2 99:6,10 103:11,15

**quick** 17:3 99:9

**quickly** 54:14

**quite** 55:19 64:23 69:9 76:13 98:16

---

R

**raid** 32:17,20 33:7

**raise** 7:9

**RE** 62:5

**reading** 56:15 107:10

**really** 23:18 29:20 31:15 34:6,18 48:1 68:4 69:8 70:13 75:6 79:8 89:4,13 91:5 102:16

**reason** 50:11 105:4,7,10,13,16,19 ,22 106:4,7,10,13,16,19

,22

**reasons** 46:1

**recall** 29:12 31:4,16 32:7 33:16 34:4,15 39:10,11,22 44:15 45:8 47:12 61:7,22,25 62:2,8,11,17,22 63:16 64:2,4,5,6,9,14 70:17,24 71:2,5,12,13,20 73:17 74:14,17 75:4,5,13,16 83:22 89:24 90:1,2 91:19 94:23 95:24 98:20,22 100:9

**recalls** 61:4

**receipt** 16:13 45:3,24 46:22 47:3 48:14 49:21

**received** 32:15 46:25 47:1 107:12

**receiving** 64:2,4,5,6

**recess** 24:23 54:16 72:12 99:3

**recipients** 77:6

**recollection** 34:13 36:12 52:21 54:13 56:14,18 57:9,13,17,19 60:10 62:19,23 75:2,6,7 97:16 103:9

**record** 5:8 6:23 7:17 8:3,8 11:14 13:20 15:16 17:16 18:10 19:4 20:16 23:16 24:2 25:1,17 27:2 32:24 34:24 35:8 41:11 42:6 45:7 55:1 57:22 64:8 68:20 72:21 74:23 107:7

**recorded** 107:6

**redact** 55:6

**redacted** 24:3,8,11 42:5,7,12,21 43:19 52:5 55:2,22

**redaction** 22:25

**reduced** 107:7

**refer** 15:22 45:14 51:18

**reference** 72:25 79:6 82:5 102:25

**referenced** 25:5,9

**references** 82:3

**referencing** 77:5

**referred** 21:11

**referring** 44:9 60:4 95:9

**refers** 79:4

**reflected** 75:18 90:3

**refresh** 56:14 57:16 75:1

**refreshed** 57:19

**refreshes** 56:18

**refreshing** 57:9,12

**refusal** 22:10 62:14 73:1

**regard** 8:23 9:15 13:5 16:9 21:22 49:4 51:10 62:13,21 64:10 67:6 74:7 75:8 84:16

**regarding** 57:10 71:21 91:13 102:15

**registered** 38:4,5

**Regus** 2:7

**relate** 33:4 66:11 91:20

**related** 9:14 25:8

65:19 66:7 67:16 90:4

**relating** 70:18

**relationship** 35:13 90:25

**relative** 107:14

**remember** 28:3,4 34:6 40:18 48:25 71:3,4 92:18

**remove** 77:12,13,15

**render** 80:22,25

**rendering** 27:22 85:18

**rent** 36:5

**rented** 35:23

**replicate** 22:24

**report** 10:23,24 11:17 12:10,20,23,24 41:17 66:21 76:3,14 77:3,5,10,19,22,23 78:9,14,22,24 79:18,19,21 81:25 82:9,10,13

**reporter** 2:6 13:22 41:7,9

**reports** 7:14 10:19 11:16 12:8,16 13:2 15:1,2 19:6 65:19,20 66:1,20,22 67:3 68:12,16 80:22

**represent** 7:6 8:19 30:4 31:5,19 32:22 35:1,2 37:8 48:15 89:23

**representation** 7:11,12 8:8 25:13 30:14 31:3 37:22 40:3 90:8

**represented** 9:13 30:8,11,15,22 31:17

33:5 37:24 41:16 48:18,24 52:25 56:21 75:12 87:13 96:12

**representing** 8:3 9:10 11:1 19:16 48:25 53:12,13,14,18,24,25 62:20 90:9

**reproduce** 70:1

**REPRODUCTION** 1:24

**requested** 39:23 76:5

**required** 20:8 92:10 93:14 94:8

**requirements** 60:11 61:6

**research** 16:6

**reserve** 23:13

**reserved** 38:3 83:25

**residence** 5:11

**respect** 7:13,17 9:1 19:24 20:16

**respective** 107:10

**respects** 104:14

**respond** 107:12

**response** 86:21

**responsive** 70:6

**rest** 7:19

**restaurant** 93:21

**result** 32:15 33:6

**retained** 10:19 18:23 31:22 32:21 63:21,22 64:10,12 70:22 84:6

**Retainer** 16:4

**retention** 16:1,3,23 17:8,20 18:14 64:11

**retire** 20:23

WAYNE DeLUCA                                    126

**retired** 18:6 20:22 29:19

**retirement** 68:23 70:23

**retiring** 67:7

**retract** 59:4

**retrained** 19:6

**retraining** 34:7

**return** 46:16 91:24 102:5

**returned** 18:4

**revenues** 94:2

**review** 19:17 20:2 52:19 55:9,10 69:18

**reviewed** 19:11 60:2 67:14

**revised** 52:25 53:9 54:12

**revisions** 58:24

**right-hand** 38:1 41:17 55:7

**rights** 38:3

**Road** 2:17

**Rodgers** 36:10 51:13 52:15,16,18,21 53:5,6,11,16,19 54:3,25 55:5,20 56:11,21 57:4,6,14,25 58:4,5,21 59:15,17,21,24 60:2 62:4 102:19 103:5

**Rodger's** 63:14

**role** 88:21 99:19,21 100:15

**roles** 91:2

**rule** 96:16

**Rules** 2:3

**ruling** 78:23,24

**Ryan** 55:17 96:15 97:12,15,21

───────── S ─────────

**S/DIANE** 107:18

**sake** 5:19

**save** 84:8 104:9

**saving** 84:12

**Savvy** 1:4 2:21 3:1 7:2 9:4,6 88:8

**saw** 73:19 93:4,6 95:2 96:1

**scenario** 28:2

**schedule** 50:5

**scheduling** 63:17

**scope** 30:14 81:5

**screw** 43:5 44:7

**se** 85:12

**seal** 107:17

**second** 12:20 18:7 23:18 41:3 44:25 45:23 46:21 72:21

**seconds** 43:10

**secrets** 44:6

**seeing** 10:14 71:5 73:17 94:23 98:20,22

**seem** 63:16 64:20,22 70:17 98:20

**seen** 10:6 22:7 38:14 39:9,21 40:2,6 51:3 72:18 74:10 75:14 93:9 94:24 95:22,23,24 98:9

**seize** 46:15

**seized** 32:19 46:15,17 48:3,12

91:23,24

**seizing** 67:19

**seizure** 47:10

**sell** 48:20

**seller** 72:25

**send** 57:1 84:15

**sending** 44:15 85:8

**senior** 35:5,6 45:14

**sense** 52:24

**sent** 44:20,22 51:15 52:18 57:7 62:12,16 84:19 96:3

**sentence** 73:2,5

**separate** 24:9 31:1

**separation** 53:21

**sequence** 43:8

**sequentially** 41:15,19

**series** 19:10 56:19

**Service** 10:4

**services** 21:6,14 27:15,20,22 34:5,14 35:16

**seven** 64:13

**several** 40:6 97:3,10

**Sewickley** 26:13,16 27:9,13,17,19,23 28:21 35:15,20 46:23 47:23

**sewickleylaw.com** 62:5

**shaking** 35:17

**share** 35:22

**SHEET** 104:1,12 105:1 106:1

**shell** 58:10

**she'll** 14:1

WAYNE DeLUCA                                              127

**shells** 58:9

**showing** 24:12 57:16

**sign** 31:1 56:25 57:1
  58:1 74:1 92:10
  93:14 94:8

**signature** 15:25
  17:24 47:2 103:14
  105:24 106:24

**signed** 17:18 49:20
  54:5,12 72:2 92:3,5
  107:11,13

**signing** 107:10

**signs** 93:22

**singular** 88:16

**sir** 20:11 24:14

**situation** 26:3 62:22

**situations** 74:17

**skill** 1:8,12 2:14
  8:4,17 12:22,25
  36:16,22,24 37:23
  38:5 40:5,11,12,14
  50:21,25 54:25
  62:9,21 67:20 71:15
  72:3 76:6 91:14
  100:15
  101:3,8,12,13,16,20
  102:2,22,24 103:8
  104:4 107:8

**slightly** 25:16

**Slower** 12:12

**snap** 41:9

**software** 78:16,18,25
  79:2,7 80:10,20
  81:14,16 82:17,25
  83:2,9,18,19,20
  84:17 85:12,24,25
  86:12,21 87:15,24
  88:3 91:21

**sole** 99:19

**somebody** 70:14 85:9

91:15

**somehow** 70:22 84:6

**someone** 39:23 75:8
  103:1

**sometime** 28:10 32:2
  40:20 44:16 81:25
  90:3

**somewhere** 98:5

**son** 33:19 35:3,4

**sophisticated** 93:16

**sorry** 7:3 8:12 26:14
  28:13 37:9 52:3
  55:15 63:11 72:23
  78:10 86:9 94:20
  98:16

**sort** 29:3 35:22 64:9
  72:7 91:8 94:16
  96:22

**source** 101:21

**space** 35:23 36:5
  93:25

**speak** 40:18 49:18

**speaking** 97:13

**specific** 82:5 96:13

**specifically** 87:6

**specification** 91:2

**spend** 67:25 69:17

**Spilman** 2:22

**split** 94:2

**spoke** 25:4 50:4

**sporadic** 31:24,25
  32:4 33:12,14,15

**standards** 61:23

**stands** 28:15

**staple** 75:23

**start** 10:14 26:1
  27:12 36:2,3,14

**S-T-A-R-T** 36:3,4

**started** 26:19

**state** 5:8 33:24 44:6
  46:2,7 47:18
  48:4,11 49:16,23
  55:1 78:23 91:18

**stated** 19:15 57:13
  107:6

**statement** 58:8
  101:25

**statements** 65:6

**states** 1:1 96:19

**statewide** 91:16
  97:23,24

**stenographically**
  107:6

**step** 21:10 24:20

**stipulate** 58:21

**stipulation** 59:2

**stopped** 28:18

**stopping** 26:18

**storage** 21:8,9

**store** 48:23 84:10

**straight** 37:20

**strategies** 21:10

**Street** 2:23

**strictly** 55:14

**stuff** 26:17 34:10
  63:23 64:17 89:23
  91:17 97:8

**subject** 97:18

**subpoena** 19:12

**Subscribed** 104:21

**substance** 19:3 74:6

**substantial** 97:7

**successful** 48:22

**successfully** 37:1

WAYNE DeLUCA                                                    128

102:2

**sufficient** 93:25

**suggested** 57:7

**Suite** 2:17,23

**Summerfield** 2:18

**supposed** 60:19

**sure** 6:19 15:19 17:6 19:8 20:17 49:23 54:15 55:19 56:3 58:2,16 62:15,16 63:20,25 67:24 68:20 69:9 77:17 78:6 81:20 87:9 92:16 93:8 96:24

**surmise** 56:16 89:6 92:20,24

**surmised** 90:25

**surrounding** 45:8

**sworn** 5:4 104:21 107:4

**symbol** 38:6

**sync** 72:10

**system** 13:1 84:7,8

**Systems** 1:5 2:21 3:1 7:3 9:4,6

---
T
---

**t/d/b/a** 1:4

**table** 20:1

**table-top** 102:17

**tag** 40:17

**taking** 60:16

**talk** 20:17 48:24 55:24

**talked** 22:15,20 23:3 47:15 97:10

**talking** 27:2 66:19 75:5,7 95:4

**team** 37:20 38:8,9,11,13,16,19, 25

**technical** 102:12

**technicians** 100:2,22

**Technology** 2:16

**Telephone** 3:3

**temperature** 33:22

**tenure** 81:2 83:7 92:4

**term** 31:20 36:16,17,19 71:12,21 80:7 85:12,13,20,23 87:3 101:17

**Terminal** 11:7 45:4

**terminals** 74:8

**Terminate** 30:1

**terminating** 29:23,24

**terms** 25:13 92:2,7,8 93:13 94:1,7,19

**test** 49:15 86:2,24

**testified** 5:5 26:19 38:15 82:3

**testify** 17:17,24 98:12 107:4

**testifying** 23:9

**testimony** 5:22 19:14 28:9 39:6,7 54:9 68:19 71:9 95:10 97:4 107:7

**testing** 66:1

**text** 55:5,7

**thank** 7:25 9:11 20:11,13 24:14 42:19 52:11 61:14 65:17 98:23 99:5 103:10

**that's** 6:12,24 7:22

10:2 13:16 14:15 15:14,19 20:12 22:4,12,17 23:1 25:22 26:1 27:18 29:2 33:10,15 35:7 39:18 42:21 43:7 44:15 46:17 53:18,23 58:11,12 62:1,3 65:9,22 68:8 69:21 70:7 75:8 76:17 78:10,17,20 79:14 82:12 86:5 88:3 90:3,24 92:19 93:5 94:25 95:12 101:17 103:3

**themselves** 40:11 43:22

**thereafter** 80:13

**there's** 7:18 9:23 16:13 23:5 24:9 45:13 50:1,23 59:16,20 68:12 69:14 70:2 78:3 96:9 102:25

**they're** 11:19 13:9,11 23:14 40:1 58:1 65:22 66:23 68:6 70:11 76:20

**they've** 13:3 40:13

**third** 19:12 45:20 56:22 69:7 83:8,12,15,17 84:5,16

**third-party** 83:16,17 86:12

**Thomas** 2:22

**thoughts** 57:5

**three-page** 94:11

**throughout** 7:9

**title** 96:21,23

**titled** 72:1

**today** 5:22 6:15 7:6

WAYNE DeLUCA

129

10:10,13 14:9 21:14 29:17 37:8 38:7,10,15 63:9 66:20 67:10 75:14 80:23,25

**top** 37:19 72:16 73:21

**Torrence** 102:10

**total** 53:21

**toward** 56:13

**Townsend** 25:22 26:21 29:4

**trademark** 38:4,5 102:24 103:6,7

**transcript** 1:24 11:9 14:12 44:7 104:7,14 107:11

**transmission** 44:22

**transmit** 57:5

**trial** 97:4

**true** 26:1 58:13 100:6 101:25 104:9,14 107:7

**truth** 107:4,5

**truthful** 5:21

**try** 75:23

**trying** 28:3 44:4 67:11 68:8,18 69:2,3

**turned** 10:17

**twice** 33:16

**two-minute** 72:6

**two-page** 17:9 72:22

**type** 32:9 33:25

**typed** 55:5

**typewriting** 107:7

---

U

---

**Uh-huh** 63:6

**ultimately** 53:8 54:4,11,12 89:18

**unable** 55:6

**unadjudicated** 84:17 85:12,13,24 86:21

**uncomfortable** 53:13

**understand** 5:17 8:5 11:16 20:14,18 26:11 28:9 30:5 39:6 54:9 60:5 66:5 68:24 69:1 71:8 78:14 82:22 85:20 87:23 88:17 92:6 95:10

**understanding** 38:8 40:7 46:24 54:3 58:6 73:4,24 74:3,5,11 78:21 82:2,10 85:11,23,25 87:14 88:14,19 90:22,24 92:13,14 93:18 96:20 104:12

**unfortunately** 59:3

**unincorporated** 25:21 26:4,7,20 28:23 29:5

**Unis** 3:7 8:16 9:15,16 22:11 45:6,13 46:12,19,20,25 47:12,21 48:16,18 49:4 50:3,20,25 51:22 53:18 56:23 57:1 74:9 75:12 99:14 100:5,7,10 101:3,7,8,14,19,20 102:7

**Unises** 45:12 51:10 53:12,14,22,25 100:14 102:11,23 103:8

**UNITED** 1:1

**Unless** 45:21 68:6

**unredacted** 42:18

**untether** 17:2

**upon** 78:23,24 81:6

**upper** 37:23 40:3 41:17 55:7

**user** 83:17

---

V

---

**vague** 86:14 87:11

**validity** 86:2,24

**various** 10:20 11:1 18:15

**vendor** 48:5 50:9 93:20 94:9 100:19

**vendors** 32:22 33:4 34:20,25 50:7,8 94:3,4,9 95:6

**Ventures** 2:16

**version** 14:4 52:25 60:12 77:22 78:15,18,25 80:11 82:5,11 86:23 87:13,15,20,24 98:5

**versions** 53:7 79:1 80:10,12,19 81:4 91:21

**versus** 91:3

**Via** 3:3

**Vice** 46:7,9

**Victor** 28:13,15

**video** 102:3,5

**Vincent** 28:16,17

**violation** 62:13

**virtue** 39:1

**Vitae** 14:14

**vs** 1:7,14 104:3

WAYNE DeLUCA

130

---
### W
---

**Wait** 78:6

**waived** 103:14 107:10

**walk** 41:6

**Warren** 51:19,25 55:16 56:23 57:25 59:19,21,24 97:9,10,17,19

**Washington** 2:17

**wasn't** 28:22 34:2 50:17 67:10 76:13

**Wayne** 1:19 2:1 4:3 5:3,10 12:12 28:6,11,17,18 29:14,18 45:13 55:16 58:8 62:5 104:19 105:24 106:24 107:4

**website** 37:12 39:2,17

**we'd** 59:5

**Wednesday** 20:5

**week** 20:6

**we'll** 6:4,5,6 10:13,14,15 13:12 14:1 15:5 17:6,10 20:17 23:11,13 24:18 43:14 44:1 45:17,21 55:3 67:22 73:12 99:15

**we're** 13:24 24:16 25:25 27:2 66:19 75:23 77:4,12

**WESTERN** 1:1

**we've** 22:23 25:6 45:15 78:2 80:8

**whatever** 42:23 69:23 91:7 99:2

**whatsoever** 7:19 99:23 100:16

**wherein** 76:5

**WHEREOF** 107:16

**Whereupon** 24:23 54:16 72:12 99:3

**whether** 20:7 29:7 30:10 39:19 56:10 61:4 67:5 68:20,21 70:2,14 73:24 77:7 81:4 82:2 87:15

**whole** 16:9 66:8 107:5

**whom** 8:23 55:18

**William** 36:10 54:25

**Williamsport** 32:17,19,22

**willing** 100:20

**withheld** 20:4

**witness** 2:2 4:3 6:22 11:4,18 14:21 16:12,21 17:4 22:12 23:8,11 35:17 43:18 44:8 45:17 57:23 58:16 60:25 65:11,14,21 66:2,8,15,23 68:2 69:25 70:11 71:25 73:10 77:9,15 78:8 79:24 81:13 89:9 93:9 97:2 102:15 103:11 107:4,8,11,12,16

**witnesses** 102:12

**witness's** 19:14

**wonderful** 7:16

**Wood** 55:17 96:15 97:12,15

**work** 7:8 18:22 19:20 31:24 32:1 33:12 43:4 44:13 60:14 84:7 96:25

**worked** 46:6 96:13

97:1 102:15

**working** 14:18 83:24

**works** 41:10 77:14

**world** 47:1

**worries** 72:11

**worry** 98:6

**write** 43:11,13,17,18

**writing** 43:21 85:5

**written** 17:19 51:8 89:25 91:5

**wrote** 17:18

---
### Y
---

**Yep** 52:10 78:13

**you'll** 37:10,19,22,25 63:4 72:22,25 73:21

**yourself** 8:8 39:12

**you've** 11:15 12:7 14:10 27:3 35:14 38:15 95:22,24

---
### Z
---

**Zazatacki** 58:20

**Zegarelli** 2:17 4:7 5:7 6:19 7:21,23 8:2,3,18,22 9:7,11,22 11:10,13,20,23 12:1,5,6,14 13:14,19,25 14:2,24 15:5,12,20 16:8,19,22 17:1,6,13 19:5 20:10,12,15,19,20 22:17,21 23:2,7,19,25 24:6,14,15,25 30:3 37:5 39:3,4 41:12 42:1,11,16,20 43:7,12,16,20,25 44:10 45:19

52:3,8,11,13 54:20
56:1,4,8 57:15,20
58:17 59:1,8
60:15,22
61:2,13,17,21 63:1
65:16 67:1,22
68:1,6,17,25 69:24
70:8,12 72:5,9,14
73:12,16 74:22
76:1,19,23
77:4,11,17,18 78:11
80:24 81:18 85:19
86:7,11,18,20,22
89:10 93:1,2,11
97:25 98:8,24 99:5
103:12