IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


- - - - -


Pennsylvania Skill          )
Games, LLC,                 )
                            )
 Plaintiff/Counterclaim     )
 Defendant.                 )
                            ) Civil Action
          vs.               ) No. 2:20-cv-01177-PLD
                            )
Action Skill Games,         )
LLC,                        )
 Defendant/Counterclaim     )
 Plaintiff,                 )
                            )
       and                  )
                            )
POM OF PENNSYLVANIA,        )
LLC AND SAVVY DOG           )
SYSTEMS, LLC,               )
                            )
       Intervenors.         )
                            )
                            )


- - - - -


DEPOSITION OF WAYNE V. DeLUCA, ESQUIRE


- - - - -


Monday
May 24, 2021


- - - - -

ELECTRONIC DISTRIBUTION, FORWARDING OR
REPRODUCTION OF THIS TRANSCRIPT IS PROHIBITED
WITHOUT AUTHORIZATION FROM THE CERTIFYING AGENCY

DEPOSITION OF WAYNE V. DeLUCA, ESQUIRE

a witness herein, called by the Plaintiffs for

examination, taken pursuant to the Federal Rules

of Civil Procedure, by and before

Diane G. Galvin, a Certified Professional

Reporter and Notary Public in and for the

Commonwealth of Pennsylvania, via Zoom

Videoconference on Monday, May 24, 2021, at

9:00 a.m.

- - - - -

COUNSEL PRESENT:

For the Plaintiff/Counterclaim Defendant
Pennsylvania Skill Games, LLC:

        Technology & Entrepreneurial Ventures Law
        Group, PC
        by:  GREGG R. ZEGARELLI, ESQUIRE
        2585 Washington Road
        Suite 134
        Summerfield Commons Office Park
        Pittsburgh, Pennsylvania 15241


For the Intervenors, POM of Pennsylvania and
Savvy Dog Systems, LLC:

        Spilman Thomas & Battle, PLLC
        by:  JULIAN E. NEISER, ESQUIRE
        301 Grant Street, Suite 3440
        Pittsburgh, Pennsylvania 15219

For the Defendants/Counterclaim Plaintiff Action
Skill Games, LLC:

        Webb Law Firm, PC
        by:  ANTHONY W. BROOKS, ESQUIRE
        420 Fort Duquesne Boulevard
        Suite 1200
        Pittsburgh, Pennsylvania 15222


ALSO PRESENT:

Albert Unis

4

INDEX

WAYNE V. DeLUCA, ESQUIRE

ATTORNEY                        PAGE

**BY MR. ZEGARELLI:**                    5

**BY MR. BROOKS:**                       68

**BY MR. NEISER:**                       87


E X H I B I T S


**EXHIBIT   DESCRIPTION                          PAGE**

**1**      Subpoena                            5

**2**      Confidential Documents              8

**3**      Attorney's Eyes Only Documents      8

**4.1**    First Amended Answer                61

**4.2**    Amended Complaint                   61

**4.3**    Internet Domain Name                63

**5**      Sticker                             73

**6**      ASG Agreement                       77

**7**      Exhibit 2 to Exhibit 4.2            81

**8**      Transcript                          84

**9**      PA Skill Sticker                    89

**10**     Subpoena                            74

P R O C E E D I N G S

(9:00 o'clock a.m.)

WAYNE V. DELUCA, ESQUIRE

the deponent, having been first duly sworn, was

deposed and testified as follows:

EXAMINATION

BY MR. ZEGARELLI:

Q.   Good morning, Mr. DeLuca.  I am Gregg Zegarelli.  I represent Pennsylvania Skill Games, LLC in an action against Action Skill Games, LLC for which there is an intervenor, POM of Pennsylvania, LLC and Savvy Dog Systems.

You are here today pursuant to a subpoena, and I'm going the put that on my screen for a moment here.  Give me one second.

(DeLuca Exhibit No. 1 was marked for identification.)

BY MR. ZEGARELLI:

Q.   In fact, in the meantime, Mr. DeLuca, could you state and spell your name for the record as well as your home address for the record, please?

A.   Wayne DeLuca, W-A-Y-N-E, D-e-L-U-C-A; 1129 Bay Hill Drive, Gibsonia, PA 15044.

Q.   Mr. DeLuca, are you able to see my screen?

A.   Yes.

Q.    On your screen?

A.    Yes.

Q.    And you'll see it's a subpoena in this action?

A.    Yes.

Q.    Okay.  And there's a Proof of Service.  Have you seen this document before absent the Proof of Service, of course?

A.    Absent the Proof of Service, I have seen the document.

Q.    Okay.  Now, Mr. DeLuca, there is a request for production.  I'll direct your attention. It's on my screen.  I've also e-mailed it to you, to produce documents and things related to transactions, proposed transactions, communications, or regarding any of the following combination of Pennsylvania Skill Games, Action Skills Games, Albert -- Alby Unis, Lou Minutello and/or Frank Gubser.  Do you see that?

A.    Yes.

Q.    And it says "for the period of production is and from January 1, 2017."  Do you see that?

A.    Yes.

Q.    Okay.  Now again, I'll say for the record that you did produce documents which I've

forwarded to you as Exhibit 2.  I will refer to those in a minute.

MR. BROOKS:  Gregg, real quick, before we go forward and I guess Julian as well -- and Mr. DeLuca, by the way, for the record, I'm Anthony Brooks.  I represent the defendants in this matter, and I'm with the Webb Law Firm.

Can we make an agreement that all objections except for form are reserved going forward just so we're not sort of -- and privileged of course?

MR. ZEGARELLI:  I'm sorry, Tony. You cut out on me.  What did you ask?

MR. BROOKS:  Sure.  I asked can we get an agreement that all objections except for the form and privilege are reserved?

MR. ZEGARELLI:  I have no objection to that.  Julian?

MR. GRAY:  I have no objection to that.

MR. BROOKS:  Okay.  Thanks, guys.

MR. ZEGARELLI:  And by the way, it's a good point, Tony.  Why don't we identify ourselves for the record?  You have already done

it.  Julian, if you could do so as well.  Julian.

MR. NEISER:  I'm sorry.  Julian Neiser on behalf of POM of Pennsylvania, LLC and Savvy Dog Systems, LLC.

Good morning, Wayne.  It's good to see you again.

THE WITNESS:  Nice to talk with you.  I'm not seeing you on the screen, but nice to talk with you.

MR. NEISER:  Well, I'm doing you a tremendous favor by not showing my face.

THE WITNESS:  Oh, okay.

(DeLuca Exhibit Nos. 2 and 3 were marked for identification.)

BY MR. ZEGARELLI:

Q.    So Mr. DeLuca, with regard to the request that was made, have you at a minimum produced those documents that are responsive to the request made in the subpoena?

A.    Yes.

Q.    And to my understanding, you haven't withheld anything?

A.    No.

Q.    Now, with regard to Exhibit 2, Exhibit 2, and I will put that on my screen in a moment.  If

you could look at Exhibit 2, that is what we understand to be your production.  So I'll get that on the screen.  I did e-mail it to you and counsel.  If you could take a look at that document?

A.    I don't see it.

Q.    You should have it as an e-mail, but I'm going to put it on my screen in a second.

Can you confirm if you received the e-mail?

A.    No, I have not.

Q.    It might be too large.

A.    Here it is.  Here it is.

Q.    Okay, great.

A.    Yeah, that's the letter to James Gorman.

Q.    Yep.  That's where it starts.  Thank you.

A.    All right.  I have it in front of me.

Q.    All right.  You can see -- and again, I'm e-mailing these documents to you so that you could look at them as you see fit to look at them at your convenience on your own machine.  But I do have them on my screen.

You'll notice that they have been Bates stamped.

A.    Yes.

Q.    Okay.  And they begin with number, Bates DeLuca 0001.

A.    Right.

Q.    And they end with?

A.    0089.

Q.    Let's just make sure, 0089, correct.

All right.  Now, if you can take a moment at least, look through this document and confirm that this document reflects the documents that you deposited as your production?

A.    Yeah, I believe it is, but let me just go through it.  Yeah, this looks like it.  I was a little concerned because in my file, I have a memorandum of law in support of Petition for Return of Seized Property, but I do not have the Petition in my file.  And I think someone checked the docket in Beaver County, and they couldn't find it.

Q.    All right.  But if I understand, you produced what you had in your file?

A.    That's right.

Q.    And it is here?

A.    That is right.

Q.    So just for clarity of the record, Exhibit 2 represents the documents you dropped off for

production in response to the subpoena?

A.   Right.  Correct.  Right.

Q.   Let's go through these documents if you would, and I would like to -- let me back up a second.  You are an attorney currently licensed?

A.   I am no longer licensed, but I'm no longer -- I gave up my license.

Q.   And you were licensed for how many years?

A.   47.

Q.   And from what year to what year were you a licensed attorney?

A.   I graduated from law school -- '69 through, I guess, last year, 2016 -- no, 2021, I'm sorry. I have my secretary wife here giving me the dates.

Q.   Okay.  So not to belabor the general rules of depositions, many of which you've taken, please confirm for the record that you are not under any drugs or medication that might affect your testimony or recollection today?

A.   I am not.

Q.   And you know, of course, if you need to take a break or we need to stop for any reason, please let me know.  Try to give me some notice to let me finish my line of questioning, and we'll try

12

to take a break to accommodate you.  Is that okay?

A.    That's fine.

Q.    If you have -- if you don't understand a question, of course, ask me to clarify it.  If you do not ask me to clarify it, I will proceed with the understanding that you understood it, okay?

A.    Agreed.

Q.    Are you represented here today for this deposition?

A.    I am not.

Q.    Now, with regard to Bates number -- and all the Bates numbers will refer to the DeLuca numbers unless I say otherwise.

A.    All right.

Q.    And if you would, Mr. DeLuca, all of the documents have been identified as attorneys' eyes only?

A.    Right.

Q.    But some of these don't look like they're properly identified.  In fact, now that I think about it, Albert, you will have to disconnect at certain points in there are attorneys' eyes only information.  You are not on the e-mail list,

so -- just so you're aware of that Alby, okay?

A.   When you say "Mr. Unis," you're talking about Alby, not his father?

Q.   That's right, although I -- let me make sure he's still online.

MR. ZEGARELLI:  Yes, Albert, just so you know, I may hit a --

BY MR. ZEGARELLI:

Q.   We can give you a few minutes, Mr. DeLuca, to go through the whole file and pull out what you think would be attorneys' eyes only, but I'll try to manage it as we go through it if possible.

A.   Okay.

Q.   So the first document, can you explain what this document is, Mr. DeLuca?

A.   Yeah, this is a document that I received from an expert that I used periodically in gaming cases.

MR. ZEGARELLI:  Let's go off-the-record for one second.  I'd like to discuss these attorneys' eyes only.  One second please.

(Whereupon, a brief recess was held.)

BY MR. ZEGARELLI:

Q.   Mr. DeLuca, with regard to your production of -- let me start over again.

We have created while we were offline two exhibits from Mr. DeLuca's original production.  We created an Exhibit 2, which will be marked confidential but not attorneys' eyes only, notwithstanding the designation on the document, and we have extracted from that, production, a new Exhibit 3, which is attorneys' eyes only.  And counsel has confirmed the redesignations for each of those respective exhibits.  Again, Exhibit 2 is confidential.  Exhibit 3 is attorneys' eyes only.  And both of those exhibits are the complete production of Mr. DeLuca's production pursuant to the subpoena.

Okay.  Mr. DeLuca, if we can go through your production, and let's just talk about what you produced.

A.   Okay.

Q.   All right.  So the first document is -- appears to be a letter unsigned, dated March 5, 2021, to a Mr. Gorman.  Can you explain this document, please?

A.   Yeah.  Mr. Gorman contacted me.  He's a lawyer in Philadelphia, and he wanted -- I

believe he might -- I think he represents Pace-O-Matic now.  That firm represents Pace-O-Matic.  And he wanted some documents, specifically the ones that you see attached to my letter, the report, a location agreement, and then the pleadings that were filed in Beaver County with the exception of the Petition. He went to Beaver County.  He couldn't find the Petition, and I don't have it in the file.  And those are the documents that were sent to Jim Gorman on March 5th.

Q.    Just so I understand your testimony, this letter of March 5th was related to certain documents, and I'm not clear on what documents -- the other documents you produced to which this particular letter relates.  Is there a -- can you identify the documents that were included by their Bates numbers?

          And you could probably, Mr. DeLuca, use -- you don't necessarily for your own use have to use the extracted two exhibits.  You could use the original Exhibit 2 to review it since, from your perspective, all you need to do is identify the Bates numbers.

A.    Yeah, you can just put them on the screen.

The Bates Number 0002 that you're flipping -- they're on my screen now.

So it was the report, it was an e-mail, a location agreement that was DeLuca 0015 and -16, and then the pleadings that were filed in Beaver County absent the actual Petition, which no one can seem to find.

Q.    And do you know under what circumstances Mr. Gorman represents Pace-O-Matic?

A.    Understand what circumstances?

Q.    In other words, what's his role, if you have an understanding of it?

A.    I think he's counsel for them. Tom Haverstick -- that name rings a bell, but I think Gorman works in his office, because that's who I dealt with, Attorney Haverstick.

Q.    Now, Mr. DeLuca, with regard to Exhibit 14, the other documents -- some of those documents were deleted as attorneys' eyes only and not -- should have been produced as withdrawn as privileged.

With regard to exhibit -- I'm sorry Bates Number 14, can you describe this document and why it was produced?

A.    Wait a minute.  What's the document.  I'm

having trouble finding it.  I have it produced.

Q.    Okay.  Number 14.

A.    Is there's a Bates stamp number on it?

Q.    Yes, 14.

A.    14.  Hold on.  Let me get the rest of the packet here.  Oh, I got it.  It's an e-mail from F&L Vending -- from F&L Vending to me.

Q.    Okay.  And what does it regard?

A.    It references a location agreement, which is Number 15 and 16.

Q.    Do you have an understanding of who is FLVending@comcast.net?

A.    F&L Vending is Frank Gubser's vending company in Pittsburgh, the general Pittsburgh area.  The gentleman's name is Frank Gubser, G-U-B-S-E-R.

Q.    And do you have an understanding of whether he's related to Action Skill?

A.    I think he is.  I think he is.  In fact, I think he introduced me to the Action Skill individual, Lou Minutello.

Q.    And why did he introduce you to Lou Minutello?

A.    I think he -- they wanted to show me a game and see if I could give them an opinion as to

whether it was Pennsylvania legal.

Q.   Okay.  So let me back up a second before we talk about them asking you about a game.  Have you talked to anybody about this particular deposition?

A.   No, other than producing those documents for the Webb Law Firm, but we didn't really talk about it.  I just handed them documents.

Q.   Okay.

A.   I haven't talked to anyone about this.  In fact, I had to dig this file out of a box downstairs.

Q.   Okay.  So to confirm, you haven't talked to any other counsel with regard to this deposition?

A.   I don't believe so.

Q.   Is there anything I can do to help you recall whether or not you did?

A.   Yeah.  You can refresh my recollection.  Please feel free.

Q.   I don't --

A.   I know I talked to Julian, but that was a long time ago.

Q.   Long time being what?

A.   Well, over a year ago, and a deposition was not scheduled.  I was -- Gregg, as you recall, I

was deposed on this, what, a year and a half ago, two years ago.

Q.   Right.  And you said the deposition was not scheduled, but you talked to Julian about it. Can you explain your recollection of that?

A.   I can't recall what the conversation was about.  I think it was about the Pace-O-Matic game.

Q.   Was it with regard to the Pennsylvania Skill Games matter or some other issue?

A.   I think it was about the PA Skill Games.

Q.   Now, are you a partner, or do you derive income in any way from any skill game operation?

A.   I am not a partner, nor do I derive any income from PA Skill Games.

Q.   Or from any other vending -- skill game vendings?

A.   No.

Q.   And that would be --

A.   Other than fees that I charge representing various vendors across Pennsylvania and across the country.  Other than that, no.  I don't profit from the operation of the games.

Q.   Okay.  So you mentioned that you seem to recall that Mr. Gubser introduced you to

Lou Minutello about a game.  Can you describe that in more detail, please?

A.    Yeah.  Frank asked me to look at a game that Lou had created.  And if my recollection is correct, they delivered the game to my office.  And after looking at the game and the workings of the game, I think my recollection is that I told them this game would not be PA legal under the guidelines at the time.

          MR. BROOKS:  I'm just going to step in and lodge an objection.  You know, I don't represent Mr. DeLuca, so I guess I can't instruct him not to answer, but I just -- to this line of questioning, I'm just going to lodge a privilege objection and, you know, I may have to claw some of it back after thinking about it further.

BY MR. ZEGARELLI:

Q.    And was that a Pace-O-Matic game?

A.    No.

Q.    Give me one second, please.

          Are you familiar with a game called Rusty?

A.    I didn't hear you, Gregg.

Q.    Are you familiar with a game called Blosky?

A.    Blosky with a B?

Q.    Right.

A.    No.

Q.    Okay.  And is wvdel@pghlaw.com an e-mail address you used at the time?

A.    Yes, it is.

Q.    Okay.

A.    Yes, it was.

Q.    And Denise Belschner, who is she?

A.    She was one of my secretaries.

Q.    And that's at the Eddy firm?

A.    Yes.

Q.    Now, can you describe -- I'm going to direct your attention to Bates Number 15.  It's on my screen.  Do you so that, Mr. DeLuca?

A.    Yeah, the location agreement?

Q.    Right.  Okay.  And can you describe what that location agreement -- can you describe what you recollect the purposes of this location agreement?

A.    Yeah, this was a location -- this was an agreement that the vendors would use with their locations so they would have an exclusivity in putting the coin-operated equipment in a location, like a bar, for example.

Q.    Okay.  And who is Barracuda Enterprises

WAYNE V. DeLUCA                                    22

22

being the name that appears?

A.    Barracuda was introduced to me, I think, through Frank.  I'm not sure, but I really never represented them or had any input with them other than them sending me this location agreement and me giving them some suggestions on what would probably make this a better agreement.

Q.    Okay.  And you mentioned representing -- I think you mentioned representing skill game manufacturers throughout the Commonwealth.  Do you recall that?

A.    Skill game vendors, yes.

Q.    Skill game vendors, okay.  And a skill game vendor, does that also include manufacturers of skills games?

A.    Well, I represented -- Gregg, I represented a manufacturer.  That would be Pace-O-Matic.  Then I represented the distributor of Pace-O-Matic in Pennsylvania.  And then I represented vendors that placed the equipment in bars throughout -- most of my clients were in Western Pennsylvania.  I didn't get out to Harrisburg.  There were other lawyers that did them out there.

Q.    So if we could go back a bit because over

some of the time period -- in 2016, were you representing any manufacturers?

A.    2016, I may have been represented Pace-O-Matic.

Q.    Any distributors?

A.    Miele Distributing in Williamsport.

Q.    All right.  Any vendors.

A.    Oh, yeah.  Lots of vendors.  I can't tell you how many.

Q.    Who do you recall representing as vendors in 2016?

A.    Well, Frank Gubser would be one.  Man, there were just so many.  There was a guy in Williamsport.  There was a guy in Johnstown.  Lou George's Vending, I represented.  Just trying to think of the ones off the top of my head.  There were several vendors that I represented.  Dale Lazar.  He was a vendor that I represented.

Q.    These are all 2016?

A.    Yeah, all 2016.  I didn't represent Warner Coin in Erie, but I spoke with them a lot because they're Warner Coin's brother was an attorney up there, and he was trying to get information on what was legal and what wasn't legal.

Q.   Now, you didn't mention -- you did not mention Pennsylvania Skill Games.  Did you represent Pennsylvania Skill Games in 2016?

A.   PA Skill Games, PA Skill Games.

Q.   LLC, and/or the Unises?

A.   I represented the Unises.  I represented Albert for a long time, Albert Senior.  He would go -- we go all the way back to when they made fireworks legal.  He was the first one I was able to get licensed in Pennsylvania, Albert Senior. And then I, you know, consulted him on the vending business.

Q.   And can you?

A.   And I can't give you the exact year, though. I just don't remember.

Q.   All right.  So I'm specifically talking about skill games and 2016.  So the precise question is Pennsylvania Skill Games or the Unises, either Unis, in 2016 with regard to skill game?

A.   I can't recall, Gregg.  I really can't.

Q.   Now, I noticed in your production, you have an engagement letter?

A.   Which number?

Q.   87 through 88.

A.    Yeah, that was with Action Skills.

Q.    Okay.  Now, do you have a similar letter for Pennsylvania Skill Games or the Unises?

A.    I may.  I don't have it here and I -- I don't -- because a lot of those supportive files have been since destroyed.  I don't recall having -- I may have.  I usually got, you know, letters with all my clients.

Q.    And this is while you were with the Eddy firm?

A.    Yes.  But we all kept our own files.  In other words, there wasn't a central repository.  So if I don't have it, no one down there would have it.

Q.    So you mentioned a number of vendors that you represented.  Do you have engagement letters for any such vendors in 2016?

A.    I may have.  I'm sure I did, but -- I always tried to get engagement letters with vendors.

Q.    So you didn't produce any, but you think you may have some?

A.    Not that.  I may have had some, past, because a lot of these files have been destroyed.

Q.    Okay.  So when you looked through your documents to produce for the subpoena, you didn't

see any such documents?

A.    No, but I was limited to Action Skill Games file. I didn't go through all my other vendor files because that wasn't part of the production.

Q.    Do you have a client file or customer file for Pennsylvania Skill Games and/or the Unises?

A.    I may have one on PA Skill. I'm not sure. And I had a file on the Unises, but that was an old file because it went all the way back to the fireworks license that I got for him.

If you want to give me two minutes, I can look at my closed files downstairs and see if I have them.

Q.    All right. Do you want to take a break for two minutes?

A.    Yeah, I'll go downstairs.

MR. NEISER:    Was this part of the subpoena?

MR. ZEGARELLI:    It was not part of the subpoena.

THE WITNESS:    It was not part of it.

MR. NEISER:    Then, you know -- I mean, I understand the request, but at the same time, I really don't to sit here and wait and

look for documents that weren't subpoenaed.

THE WITNESS:  Well, they weren't subpoenaed, I can tell you that.

MR. ZEGARELLI:  Well, if he's looking for -- I think he's asking for PA Skill Games or the Unises, which were subpoenaed.

MR. BROOKS:  Yeah, they were.  They were.

MR. NEISER:  If they were, they were.  But if they're not, then I was just going to place an objection and just, you know -- you know what I'm trying to say.

MR. ZEGARELLI:  Yeah.  I mean, we can -- we can --

BY MR. ZEGARELLI:

Q.   I mean, when you say take a break for two minutes to go down and look at them, it's a relatively easy task to see if you have Pennsylvania Skill Games --

A.   Yeah.

Q.   -- in your files?

A.   Yeah.

Q.   And is there a reason you didn't do that for the subpoena?

A.   I was limited -- I thought the subpoena was

28

limited to Action Skill Games.

Q.   All right.  Then let's just take a break and just tell us when you're back online, Mr. DeLuca. We'll give you five minutes.

A.   It will only take five minutes.  Let me go downstairs into my closed files.

Q.   Thank you.

(Whereupon, a brief recess was held.)

(Off the record.)

BY MR. ZEGARELLI:

Q.   Back on the record?

A.   Yes.  You had asked me about files on Albert Unis or PA Skill.  I don't have the PA Skill.  I had a file on Albert Unis.  It was from 2005, but it's since been destroyed.

Q.   Thank you.

Okay.  Earlier you testified that Mr. Gubser -- you seem to recollect Mr. Gubser introduced you to Mr. Minutello for the purpose of reviewing a game.  Do you recollect that that game was a Blue Sky game?

A.   It may have been a Blue Sky game now that you say that.  It may have been.  I'm not absolutely sure.

29

Q.    And you indicated that you didn't think that game would be legal in PA?

A.    Yeah, that was my opinion.

Q.    Okay.  Now, do you have a recollection of whether or not you represented any manufacturers in 2017?

A.    The only manufacture I would have represented would have been Pace-O-Matic, and I can't recall -- I think that file still may be open.

Q.    When you say it's an "open file," what does that mean?

A.    That means I haven't closed it or destroyed it.

Q.    When you say it's an "open file" and you haven't closed it, what is the implication of that being opened and not closed?

A.    That means I haven't physically closed the file, Gregg.

Q.    But I mean -- I don't know --

A.    Am I doing any work for Pace-O-Matic, no.

Q.    Okay.

A.    None at all.

Q.    I mean, work -- when you say a file is open, it tends to imply, you know, it's open because

it's an ongoing project.  Are you saying it's --

A.   It's open because I'm too lazy to close it out.  I'm closing these out periodically.  You have to hold these files for six to eight years.  So as the years go by, then I move them pursuant to the ethics rules.  I move them, and then I shred them.

Q.   So you're saying that there's an ethics rule to say keep the files for six to eight years?

A.   I think it's six to eight years.  And if the file is closed and there are no open issues under the ethics rule, then you can, you know, shred the file.  You just can't throw them out.  You have to shred them and keep a record of the files that have been shredded, which I have done.

Q.   So apparently, you've got all your open files for any work you did in 2021?

A.   2021, I didn't --

Q.   I thought you indicated --

A.   I wasn't -- in 2021, I was done.

Q.   I'm sorry.  I thought you had testified that 2020, you had your license and were active in 2021.  Did I misunderstand?

A.   Yes.

Q.   Okay.  You had your license in 2021,

correct?

A.    2020.

Q.    Oh, 2020.  Okay.  So all of your files from 2020, did -- anybody you worked on in 2020 would still be an open file if I understand your testimony?

A.    Some of them may be still downstairs. That's correct.

Q.    And do you have a recollection of whether or not you represented Pennsylvania Skill Games, LLC in 2017?

A.    I may have.  I don't have any specific recollection.

Q.    Do you have any --

A.    Hold on for a second.  Hold on for one minute; one second.

        Are you talking about Action Skill or PA Skill?

Q.    Pennsylvania Skill Games, LLC.

A.    I don't recall.

Q.    So let's just make sure that the testimony is clear.  In 2016 you did not produce any documents of representation of Pennsylvania Skill Games, LLC, nor did you produce any documents for 2016, '17, '18, '19 and '20 for Pennsylvania

Skill Games, LLC; is that correct?

A.    Well, you saw what I produced to James Gorman.  That was it, and then what I brought down to the Webb Law Firm.

Q.    Okay.  But --

A.    Let me look at one other thing.  This is an old, old, old file.  This is old.

No, this is -- this deals with Pace-O-Matic and expert reports.  No, I don't -- no, I don't.

Q.    All right.  So you mentioned with Gorman, but again with regard to Pennsylvania Skill Games, LLC, you did not produce any documents for Pennsylvania Skill Games, LLC, in response to the subpoena?

A.    No.

Q.    Is that correct?

A.    That's correct.  Did you get a copy of everything that I produced?

Q.    Yes.

A.    Okay.

Q.    And so it's clear, there's nothing produced from 2016 for Pennsylvania Skill Games, LLC?

MR. NEISER:  Object.  Asked and answered.

WAYNE V. DeLUCA                                33

BY MR. ZEGARELLI:

Q.   So the subpoena, we did not have an understanding at the time -- the subpoena I think asked for 2017.  I want to make sure that you don't have any documents.  If I understand what you went downstairs to look for, you don't have any other Pennsylvania Skill Game documents from 2016?

A.   Well, in the two minutes that I was downstairs, I didn't see it.  And usually, I'd have an index card on it, but I didn't see it.

Q.   Now you know, don't you, that Pennsylvania Skill Games, LLC, is owned by -- or is related to Albert Unis?

A.   I've been told that, yes.

Q.   And who told you that?

A.   I just -- I don't know who told me, but I had heard that.  Maybe Albert told me.  I'm not sure.

Q.   Albert the IV or Albert III?

A.   Albert III.  I never met with Albert IV, I don't believe, who is known as Alby, right?

Q.   That's the nickname he uses, yeah.

A.   Yeah.  Yeah.  I just had someone check all my files.  Nothing on Action.  I have -- I have

the Action Skill Game file up here, but that's all I really have.

Q.   And when you say you "have the Action Skill Games file up here," those are the documents --

A.   In front of me.

Q.   -- those are the documents that you produced --

A.   In front of me.

Q.   But those are the documents you produced, if I understand it?

A.   That's correct.

Q.   Okay.  Bear with me, Mr. DeLuca.  I'm scrolling down through your file.

A.   Okay.

Q.   It's on the screen, by the way.

A.   I see it.

Q.   Mr. DeLuca, with regard to DeLuca Bates Number 60, what is this document?

A.   This was from Jeff Mayle about the registration of Blue Sky Games, LLC.

Q.   I'm sorry?

A.   In Florida.

Q.   Do you have an understanding of why this document is in your file?

A.   Jeff probably sent it to me.  Maybe I asked

35

him.  I just wanted to make sure that they were incorporated somewhere.  That's just a guess on my part.

Q.   Why was it important for you to know that they were incorporated somewhere?

A.   Because I did a -- later on, you will see other documents that we got -- that exclusive distributor agreement between Blue Sky and Action Skill Games, Lou Minutello's firm, but I wanted to make sure that they were, you know, a viable LLC before I drafted the documents.

Q.   And do you have a recollection if this came to you in 2015 or sometime other than that?  I see a date at the bottom of 2015?

A.   I don't know when I got it.  I don't have a specific recollection.  That's probably when I got it.

I don't have any -- I'm looking at -- hold it -- Gregg, don't scroll it anymore. I'm looking at it on the scene.  Yeah, it looks like I got it in 2015.

Q.   Well, that was the date apparently this document was filed with his signature.  My question is do you recall when you received it from him?

A.    No.

Q.    Now, as to DeLuca 61, part of which we have redacted as privileged, can you describe this e-mail?

A.    It was an e-mail from one of my secretaries to Lou Minutello, which the bottom part of the e-mail was to Jeff Mayle, to F&L Vending, requesting some changes in the exclusivity agreement.  Down at the bottom, you'll see some requested changes.

Q.    Okay.  And is Mr. Mayle, to your understanding, an attorney?

A.    No, I don't believe he is.

Q.    So you were dealing with Mr. Mayle.  Is there a reason why you weren't dealing with an attorney for Mr. Mayle?

A.    No, I dealt with Mr. Mayle.

Q.    And Mr. Mayle, if I understand the prior document being Bates 60, he is an authorized person for Blue Sky Games, LLC?

A.    That was my understanding at the time.

Q.    Now, did you represent Blue Sky Games?

A.    No, I don't think I did, Gregg.

Q.    Did you ever represent Blue Sky Games at any time?

A.    I don't believe so.

Q.    Now, we did not receive a signed copy of any document, but you'll see in DeLuca 62, it appears to indicate that there is an attached signed agreement.

Do you see that?  It's also on your screen?

A.    Yeah.

Q.    Or on my screen?

A.    Yeah, I see it.

Q.    Okay.  So is there a signed version of this agreement in existence to your knowledge?

A.    Which agreement?

Q.    All right.  So do you see DeLuca 62?

A.    Yeah, I'm looking at it.

Q.    All right.  Do you see a reference that says "Laurie, attached is the signed agreement."  Do you see that text?

A.    Yes.

Q.    Okay.  So the e-mail appears to have an attachment to it.  We don't have a copy of that attachment.  Do you have a copy of the attachment?

A.    This is from Lou to Laurie Cahill, cc'd to Gubser.  It's a distributor agreement.  Let me

38

just see if I have it.  I don't think I do but let me just take one second.

MR. NEISER:  Wayne, you might want to keep your voice up because the court reporter may or may not be able to hear you.

THE WITNESS:  Okay.  I do not have a signed agreement.

BY MR. ZEGARELLI:

Q.   Pardon me?

A.   I do not have a signed agreement.

Q.   And for the record, with regard to the recipients, who is Laurie Cahill?

A.   Well, that was sent by Lou.  I don't know who Laurie Cahill is.  I can't recall who she is.

Q.   Do you know who --

A.   I can tell it's an e-mail from Minutello to Laurie Cahill dated February 7th.

Q.   DeLuca 62?

A.   I'm looking at DeLuca 62.  It's an e-mail from Louie Minutello to Laurie Cahill copied to Janet Thomas and Frank Gubser, and it was a distributor agreement.  Attached is the signed agreement.  Call or e-mail, blah, blah, blah, blah, blah.

So obviously, there was a signed

39

agreement that went out.  I just don't have it in my file.

Q.    Okay.  But do you know who Laurie Cahill is or M. Janet Thomas?

A.    Janet Thomas was my secretary.

Q.    Okay.  So M. Janet Thomas is your secretary. Laurie Cahill, do you have a recollection -- I think you said you don't?

A.    Yeah, let me look at it.  Laurie Cahill. See, that's signed -- I think she worked for Minutello, I think.

Q.    She might have worked as well for Blue Sky Games?

A.    I don't know about that.  But from the e-mail, DeLuca 62, from Lou to Laurie Cahill, copied to Thomas and Gubser, distributor agreement.

         I can't say for sure, Gregg.

Q.    Okay.  So moving onto 63.  I think it's 63.

A.    Got it.

Q.    Same people.  Looks like there's a copy in the file.

A.    Yes.  That's when we sent out the signed agreement.

Q.    And if I understand it, these attachments,

40

they weren't -- you didn't physically mail them in the U.S. Postal Service, for example. It was all transmitted by electronic mail?

A.   I believe so.

Q.   Now, Mr. DeLuca, I'm directing your attention to DeLuca 14.

A.   All right.

Q.   For the record pghlaw.com, who controlled that domain? Is that an Eddy, DeLuca, Gravina & Townsend domain?

A.   Are you talking about wvdel@pghlaw.com?

Q.   Right. In other words, is pghlaw.com --

A.   That was mine.

Q.   Okay. I'm sorry. So pghlaw.com was a Wayne DeLuca domain? It was not a domain for Eddy, DeLuca, Gravina & Townsend?

A.   Correct. Correct.

Q.   Do you happen to recall what the Eddy, DeLuca, Gravina & Townsend website is, if any?

A.   I have no recollection, but I think -- I think everybody had their own website. That's my recollection, but I'm not sure.

Q.   You set up your own e-mail address?

A.   None of -- none of -- none of my work would have been in the firm's files. Mine was always

41

kept separate.  Everybody kept their work separate.

Q.   You shared office space?

A.   Yeah.

Q.   Did you do joint conflict of interest checks?

A.   Yes, but no one in my office did any work in the gaming area, none.

Q.   Now, I'll just direct your attention to DeLuca 75.

A.   All right.

Q.   Now, do you see this www.pghlaw.com as part of the letterhead and not necessarily related to you individually?

A.   When are you referring to again, Gregg.  I'm sorry.

Q.   I'm not sure if you can see my cursor, but look on the right-hand side of this --

A.   I'm looking at it, yeah.

Q.   Do you see fax (412) 281-3537?

A.   That's my fax.

Q.   All right.  Is it also the fax used by the law firm?

A.   Yeah, I think so.  I think.  I'm not sure. I think so.

42

Q.   And do you see www.pghlaw.com?

A.   That was mine.

Q.   And, for example, Steven Townsend, did he use the same letterhead for the firm?

A.   I think so.  I'm not sure, but I think so. Back then, I think so.  We only had letterhead because we -- we were, as you see the asterisk, we were an unincorporated association just to make that clear.

Q.   I understand.  All I'm trying to determine is, these four individuals that are shown on the left, Eddy, DeLuca, Gravina and Townsend being the four named partners of the firm, on the right-hand side, all four of you would share the fax number and pghlaw.com; isn't that right?

A.   We shared the phone number and the fax number, but I'm not sure about that www.pghlaw.com.  Probably, but I'm not sure.

Q.   Okay.  With regard to your production of 79.

A.   79.

Q.   That is an e-mail, and you describe it.  It may relate to the next page.  I'm not sure, but you can take a look at those two pages and testify accordingly.

A.   I have the hard copies here.  79 was an

43

e-mail to Lou Minutello apparently about a citation, "finish line citation."  Maybe one of the locations was cited.  That's the only thing I can think of.

COURT REPORTER:  I'm sorry, Mr. DeLuca.  I couldn't hear the end of your answer.

THE WITNESS:  Yeah, I think that that e-mail was concerning a citation, possibly an LCB citation against one of Lou's locations. That's just an educated guess.

I'm looking at the next document, 80.  This is just a property record.  When the Pennsylvania State Police seize items, so obviously they seized those four items.  And I can't read from what location, but I see it was a liquor control enforcement officer card at the top.  And they were obviously in one of Lou Minutello's locations and seized a couple -- three VGTs and some documents on keeping accounts for the VGTs.

BY MR. ZEGARELLI:

Q.   So the first question really though is -- are Bates Numbers 79 and Bates Number 80, are they related to each other?  In other words,

Number 80 is an attachment to 79?

A.   I'm going to guess it is.  I just -- I just can't see when the people wrote that.  I can't make out the location on it.  But I'm going to guess they're related.

Q.   Okay.  So if I understand it, in 2017, March of 2017, Lou Minutello sent you an e-mail, subject line:  Finish Line Citation.  Do you recall the circumstances that -- the reason why he was contacting you?

A.   I don't know.  Maybe he wanted me to give some assistance or handle that citation for that location.  It would be not unusual -- it would be not unusual for a vendor who was servicing different bars and clubs, if they got cited by the LCB, they would ask me to intervene and represent their location.  That may be what this is.

          MR. BROOKS:  I'll lodge a privilege objection as well.

BY MR. ZEGARELLI:

Q.   So Mr. DeLuca, in DeLuca 81, April 4, 2017, if I'm reading that correctly, can you describe this e-mail?

A.   That was an e-mail from my staff to

45

Lou Minutello requesting some additional retainer fee.

Q.   And do you have a recollection that that retainer was to address the e-mail at -- the subject of the e-mail at DeLuca 79 and 80?

A.   It may have been, plus other things.  I'm not sure, Gregg.

Q.   Do you have an understanding of -- when you say "plus other things," what does that mean?

A.   Well, if Lou had a problem in another location, and this was not unusual.  A vendor would call me and say something like, look, the LCB was in.  Do you know this agent?  Could you contact him for me?  I'm not saying that happened, but those would be the types of things that I would try to address.

Q.   And do you have a recollection of whether you received $1,000 to proceed with what you just testified to?

A.   Yes, I did.  But I only -- I only -- the bill was adjusted down to $400, and that's what they paid.

Q.   And DeLuca 81 appears to relate to DeLuca 82; is that right?

A.   Yeah.

46

Q.   Okay.  Do you have the understanding that Exhibit -- Bates 82 is the attachment of Bates 81?

A.   That's my recollection.  Yeah.

Q.   Now you'll notice in Bates 83, it indicates after you sign, sent to Blue Sky Games for signature.  Send Mr. DeLuca the fully executed original for his file.

A.   Right.

Q.   Now, can you describe that please?

A.   Well, there must have been a distribution agreement between Blue Sky and Lou that was sent to me.  I think we made some revisions.  And then my instructions were to Lou is sign it and sent it then to Blue Sky.

Q.   And we did not, to my recollection, receive any signed version of an agreement.  Is it your testimony that you do not have a copy, a signed copy of that agreement?

A.   I do not have -- I do not have a signed copy.  I don't -- I can't remember, Gregg, whether it was signed or not.  I don't think it was.

Q.   There is some writing at the top of DeLuca 84.  Do you see that writing up in the right-hand

47

corner?

A.    Yeah.

Q.    It's on my screen as well.

A.    Yeah.  It says Blue Sky subfile.

Q.    Okay.  Is that your write?

A.    That is my writing.

Q.    And a subfile is a file within a file if I recall when I do such things?

A.    Yes.

Q.    Okay.  Do you have a Blue Sky subfile?

A.    It's not an Action Skill Games file.  I know that, but I did some other work for Blue Sky with other vendors, and it could be in one -- it could have been in one of those files.

Q.    So just to clarify the testimony, you did represent Blue Sky Games at a certain point?

A.    Yes, I did some consulting work with Blue Sky.

Q.    Okay.  Now Mr. DeLuca, have you -- is it your practice representing many vendors to have conflict of interest waivers?

A.    I represent a lot of vendors, and I didn't do conflict of interest because if, in fact, I represented Vendor A that was going to go into a location that was Vendor B's, then I would tell

them I can't do it because I'm not going to do a location agreement that puts me in a conflict situation.  But is there a written document on that, no.  That was all handled --

Because I had represented a lot of vendors, Gregg, and everybody had -- interestingly enough, all the vendors had their own territory, and it was very, very infrequently where one vendor could go into a bar knowing there was another vendor there and trying to take that location.  That was very, very unusual, except for John Duffy Conley.  He changed the game.

Q.   I don't know what that means, Wayne.  Who is John Duffy Conley and --

A.   John Duffy Conley was a vendor who was the first vendor that would go into locations and offer them money if they would get rid of their present vendor and let him get the account.  And that kind of changed the whole business.

Q.   Okay.  And when did that occur?

A.   Geez, I don't recall.  2015.  I'm not sure.

Q.   So now I'm trying to put together your testimony.  In 2015 -- you don't have conflict of interest.  Vendors didn't enter each other's

territory.

A.    Right.

Q.    John Duffy, was he part of some company?

A.    Yeah.  He had his -- he had his own vending company.

Q.    What was the vending company's name?

A.    I can't recall because I didn't represent him.  I can't recall.

Q.    But I guess when he changed the game, that affected your representation of the other side of the transaction, right, the people that were already there?

A.    Well, yeah.  Yeah, he -- as I say, he was the first vendor that would offer money to bars and clubs to replace the vendor with his company.  That had never happened before at home.

Q.    Did it ever happen to any of your clients?

A.    Did they lose locations as a result of Conley doing that?  I'm sure there was some that changed.  I can't tell you how many or who my clients were, but I'm sure it happened.

Q.    So if I understand it, you've got a Blue Sky subfile.

A.    I have a note here Blue Sky subfile.  I don't know if it still exists or not.

Q.    Do you have any understanding of what Page 85 is, or I should say Bates 85?

A.    Looks like Page 2 of another document.

Q.    Right.  Can you place it with a document of some sort?

A.    No, I was looking at that.  I can't.  I'm sure it was in -- let me just look at it a second.

Probably part of a location agreement, you know, an agreement signed between the vendor and the bars.

Q.    Do you know who AB is?  You'll see it's crossed out Albert A. Colbert with an AB.  Do you have an understanding of what that represents being the original name is crossed out?

A.    I don't know.  I don't know.  I can't remember.

You know what this is?  This doesn't really deal with location.  This is like an agreement for someone that was setting up a business because Albert Colbert was a body shop, now that I recall, so I don't know what -- I don't even know what this is doing in here.

Q.    Does the Webb Firm still have the physical file that was duplicated here?

A.    I don't know the answer to that.

            MR. BROOKS:   That I don't know.   I
would have to check on that.

BY MR. ZEGARELLI:

Q.    I'm just -- Mr. DeLuca, do you have an
understanding of whether or not this page is sort
of out of order somewhere?

A.    Yeah, I believe it's out of order.   This
really deals that -- this deals with a body shop
that I represented many years ago.   I don't know
what -- I don't even know why it's in here.
Probably misfiled.

Q.    Okay.  And again, if we go down to
DeLuca 86, it appears to be another e-mail.

A.    Right.

Q.    And it's again asking for a signature for
your file.  Is that the gist of it?

A.    Yes.  And that was to Lou Minutello.  It was
after you get it signed, I wanted a copy for my
file.

Q.    Now, it looks like in DeLuca 86 that it is
missing part of the message because if you'll
note it has a thread and then it -- but it
doesn't actually have the message to which the --

A.    Right.

Q.    -- additional thread relates?

A.    Yeah, and I couldn't locate it.  I don't --
what I produced is everything that I have.

Q.    Do you have an iPhone, or did you have an
iPhone in 2016, in January?

A.    Yes.

Q.    Okay.  Now, did you pull these documents and
produce them yourself, or did somebody help you?

A.    I did it.  I don't have the staff anymore
since I retired, so I just did it myself.

Q.    So you don't recall another page between
what was produced as 84 and 85 with some portion
of a text that was sent from an iPhone?

A.    Don't recall.

Q.    You just did this last week, correct?

A.    Yeah, when I went through the file and
dropped the documents off to Webb Law Firm.

Q.    So you don't recall whether or not --

A.    And then I, you know, sent the letter to
James Gorman.

Q.    Okay.  Do you have an understanding of what
this X is above the word "sent from my iPhone,"
upper left-hand corner?

A.    Not at all.

Q.    Just so the testimony is clear, you don't

recall there being any page that has text that precedes sent from my iPhone other than the X?

A.   Right.  I don't know.  I couldn't -- I didn't see it anywhere.  I went through the documents.  This is all I could find.

Q.   Okay.  And when you say "all you could find," just to get clarity on the record, you don't know of any page or information that was redacted or is not included that precedes "sent from my iPhone"?

A.   Not that I'm aware of, Gregg.

Q.   Now, Mr. DeLuca, I'll direct your attention again to DeLuca 87 and 88.  Do you recognize that document?

A.   Yeah, 87 was a letter of representation to Action Skill Games.

Q.   Right.  Now, do you recall what you were engaged to do at that time?

A.   Pardon me?

Q.   Do you recall what you were engaged to do at that time?

         MR. BROOKS:  Objection.  Privilege to this line of questioning.  Again, I can't instruct him not to answer.  And instead of me -- anytime -- how about anytime we're going to talk

about correspondence between Mr. Minutello, Action Skill Games and Mr. DeLuca, I'd just like to reserve a privilege objection, and if we have to claw it back later, we will.

MR. ZEGARELLI:  Okay.  Fair enough.

BY MR. ZEGARELLI:

Q.    So, Mr. DeLuca, I really don't want to know the legal advice.  I just want to know what they engaged you to do.

A.    For legal advice.

Q.    But is there a particular event or circumstance?

A.    I -- I can't recall.  I can't recall.

Q.    Now, with regard to Action Skill, is January 21, 2016, when you began representation of Action Skill Games?

A.    I would think so.  I probably had some communications or conversations prior to that, but that's the engagement letter.

Q.    Okay.  So let's go down now to an e-mail that appears to have been printed, and you can correct me if I'm wrong here, Mr. DeLuca.  But it appears to be printed on May 12, 2017, in the lower right-hand corner, and it appears to have been somewhat informalized, but it carries --

A.    Okay.

Q.    So do you see in 89 the word "termination" at the upper left-hand corner?

A.    Yes.

Q.    Can you describe what's going on with this letter?

A.    Well, Lou Minutello terminated my services and asked that I send everything to Paul Namey at Flaherty & O'Hara, which I did.

Q.    And is this when you terminated representation of Action Skill?

A.    It looks like they terminated me.

Q.    Okay.  Let me say it differently.  Is it your recollection that this is when the representation of Action Skill terminated?

A.    Yes, 5/12/2017.

Q.    Do you recall why they terminated you?

A.    I can't recall.  I think there was -- I think they requested an opinion on a piece of equipment that I could not give because I did not think it was legal.  But that -- I had pieces of equipment delivered to my office all the time asking for opinions, and I would give an opinion -- look, I played the game.  I had my engineer look at it.  It's legal.  It would be

56

okay in Pennsylvania, or it would be okay in Kentucky or whatever.  And I think what happened here was the opinion was that it wouldn't be legal in Pennsylvania.  That's my recollection, and I don't think that that was the opinion that they wanted, and they terminated my services.

Q.  Was that a Blue Sky game?

A.  I can't remember.  It was a game that Lou brought to my office.  I know that.

Q.  Was it a Pace-O-Matic game?

A.  It was not a Pace-O-Matic game. Pace-O-Matic was declared legal in Beaver County, and it's the game of preference now.

MR. ZEGARELLI:  I'm going to ask my client, Albert Unis, to jump off while we talk about the attorneys' eyes only documents.

THE WITNESS:  Hey Gregg, I'm going to step out for one second, okay?

MR. ZEGARELLI:  All right.  Let's take five minutes.

THE WITNESS:  All right.

(Whereupon, a brief recess was held.)

Q.  All right, Mr. DeLuca, I'm going to put on the screen Exhibit 3.

Okay.  Mr. DeLuca, that should have also been available for you to download.

A.    The Exclusive Distribution Agreement?

Q.    Right.  Yeah.  My client is off the line, I believe, at this point, okay.

A.    I got it.

Q.    So you can you describe this document?  And we're talking about Bates Number 57 through 59.

A.    All right.  Hold on.  Let me just look here.  It looks like this is the agreement, the exclusivity between Action Skill Games and Blue Sky Games.

Q.    Okay.  And I think you testified you did not have a signed version of this agreement; is that correct?

A.    Right.  I'm looking at the signature page, and it's black -- blank, I'm sorry.  I'm not sure if it was ever signed.

Q.    And is this -- you testified earlier -- we had pulled out these documents because they're attorneys' eyes only, but there were e-mails that reference an exclusives distributorship agreement or a distributorship agreement.  Is this the document to which they referred?

A.    I believe it is.

WAYNE V. DeLUCA                                58

58

Q.    Now, I'm going to direct your attention down to the Section 1, the first section identified as Exclusive Distributorship, and this is between, or drafted to be between Action Skill Games and Blue Sky Games, LLC.

A.    Right.

Q.    Now, it says with the sole exception -- and I'm referring to Section 1, Exclusive Distributorship, it says "with the sole exception of Beaver County, Pennsylvania."  Do you see that?

A.    Where is that?

Q.    Section 1, Exclusive Distributorship.

A.    Yeah.  Yeah, with the sole exception of Beaver County, okay.

Q.    Do you have an understanding of why there was a sole exception of Beaver County?

A.    Yeah, Albert Unis' firm was going to be the sole distributor in Beaver County.

Q.    Now, at this time, were you representing Pennsylvania Skill Games, LLC?

A.    Yeah, I believe so.

Q.    So this is in 2016?

A.    Wait a minute.  Let me look at something here.  Hold on Gregg.  Go down to the signature

page.

Q.    (Scrolling.)

A.    Okay.  All right.  Okay.

Q.    Now, do you have a recollection of why there was -- other than the fact that it was -- I think you testified to -- did you testify that it was Unis or Pennsylvania Skill Games?  Is that a meaningful distinction in any case?

A.    Yeah, it was Albert Unis wanted that exclusivity in Beaver County.

        MR. NEISER:  Wayne, did you say Albert or Alby?  I'm sorry.  I couldn't hear you.  Sorry.

        THE WITNESS:  Albert.

BY MR. ZEGARELLI:

Q.    When you say "Albert," do you mean the father?

A.    The father.  I never dealt with Alby at all.  I only dealt with Albert.

Q.    Okay.  And to go down to 65, or DeLuca 65, can you describe this document?

A.    Partnership Agreement.  Yeah, this is a partnership agreement between Action Skill Games and Barracuda Enterprises, Inc. of South Carolina.

Q.    Is Barracuda a manufacturer?

A.    I think they were.  I'm not positive, but I think they were.

Q.    Can you recall if they were an operator?

A.    They weren't -- they wouldn't be an operator.

Q.    And they were not a venue?

A.    Vendor, no, they weren't a vendor either.

Q.    No venue, or a location?

A.    No.

Q.    Is there any other category then?  So it appears that they wouldn't be a manufacturer by process of elimination.

A.    I think they were a manufacturer, Gregg.

Q.    Now, do you have an understanding of this attachment, being DeLuca 74, what is it?  What's it meant to do?

A.    If they were going to sign a location, you know, some bars are sole proprietorships, some are partnerships, some are corporations, so I gave them the three types of signatures that they should use depending on how the location, or bar, or club was set up, whether it was a sole prop, partnership or corporation.

Q.    Okay.  Now we see again something called an

61

Exclusive Distribution Agreement unsigned.  Is there a reason why it was produced twice?

A.    I don't -- I don't recall that.

Q.    7- -- specifically 76 through 78.

A.    Yeah, it's the same agreement.

Q.    Okay.  That was really the question.  I didn't check the words, but it appears --

A.    I did.  It's the same thing.

And to clarify that, if you look at the signature page, I have Blue Sky Games, LLC is a manufacturer.

MR. ZEGARELLI:  Okay.  Let me get my client back online.

(Off the record.)

(DeLuca Exhibit Nos. 4.1 and 4.2 were marked for identification.)

BY MR. ZEGARELLI:

Q.    I'm getting another exhibit.  One second, please.

Mr. DeLuca, can you download those two, or I e-mailed them to you.  But the two exhibits, 4.1 and 4.2.

A.    Wait a minute.  I have my daughter-in-law who is going to do it for me here.

Q.    All right, Mr. DeLuca.  Are you ready?

62

A.    Yeah, I think so.

Q.    So --

A.    I'm looking at a Complaint -- the First Amended Answer.

Q.    Right.  So on my screen is the First Amended Answer.  In the averment -- I'm not suggesting you've seen this document before, but what we're trying to -- what we need to find out from you is the truth or what you recall based upon the averment made by Action Skill.

Action Skill indicated in Paragraph 47, sometime in 2016 -- in any event, well, before the execution of the license agreement, which I can represent to you was on May 15, 2018.  Wayne DeLuca was counsel for PSG.  He contacted, apparently, Action and on behalf of PSG, in your capacity as PSG's attorney, Pennsylvania Skill Games, requested Action to modify its marks.

And then you apparently -- you reviewed what they did in 2016 and approved it as not infringing the Pennsylvania Skill marks.  And, you know, do you recall any circumstances in 2016 that would be a basis for that averment?

A.    I don't recall.

Q.    You can't say that it occurred, or it didn't

63

occur?

A.   Well, obviously, it's in the pleading, but I can't recall the specific facts around it.

Q.   Okay.  So in 2016, were you representing Pennsylvania Skill Games?

A.   It appears I was based on Paragraph 47.

Q.   Well, that's not really what I'm asking you whether or not -- you know, based on what they have averred.  I'm asking you did you represent Pennsylvania Skill Games in 2016?

A.   I'm not absolutely sure about that date, Gregg.

Q.   When you -- so you're saying maybe you did, maybe you didn't?

A.   That's correct.  I'm not sure.

Q.   Okay.  And in 2016, you represented Action Skill, isn't that right, from your prior testimony?

A.   Yeah.

Q.   Now, do you recall a circumstance where on behalf of Pennsylvania Skill Games, you would have permitted for Pennsylvania Skill Games the use of a trademark by Action Skill Games?

A.   I don't understand the question.

Q.   Do you recall a circumstance where in 2016,

you're apparently -- definitely representing Action Skill Games. If I understand your testimony, you're not sure if you were representing Pennsylvania Skill Games. Do you recall circumstances where, as attorney for Pennsylvania Skill Games, you asked Action Skill Games to modify their marks and said their marks were okay?

A.   I can't recall that. I really can't.

Q.   Okay.

A.   I know there was a conversation about marks, but I can't recall the specifics.

Q.   Conversations with whom?

A.   Between Action Skill and PSG.

Q.   And how do you know that?

A.   I just have recollection. I can recall there being some conversations about it.

Q.   In 2016. Do you recall the marks?

A.   No, I don't. Something about skill. I know it was about PA Skill.

Q.   Do you recall ever giving permission to Action Skill Games to use a modified version of a trademark?

A.   No.

Q.   And based on your production, you didn't

65

produce any documents related to permission for uses of trademarks, if I understand the production?

A.   No, I did not.

Q.   And Mr. DeLuca, do you render or have you rendered opinions -- let me ask it this way.  Do you maintain a malpractice insurance policy?

A.   Yeah.  A tail since I'm no longer licensed.

Q.   Okay.  And does the tail include, or do you include any special riders for intellectual property?

A.   Don't know that, Gregg.

Q.   Did the Gravina firm, the Eddy, Gravina firm, did they pay the malpractice insurance, or is that something you handled individually?

A.   It was handled individually.

MR. ZEGARELLI:  Okay.  A five-minute break to talk to my client, and I may be just about done, Mr. DeLuca.

THE WITNESS:  Thank you.

MR. ZEGARELLI:  Thank you.

(Whereupon, a brief recess was held.)

BY MR. ZEGARELLI:

Q.   Mr. DeLuca, I'd like to -- I have a few more

66

questions.  I want to direct your attention down to DeLuca 80.  Do you see that on my screen?

A.    Yeah.

Q.    And are you familiar with the -- what appears to be the agent, Jerry Botchie?

A.    Well, I don't know him personally, but I dealt with him -- most of these liquor enforcement agents in the Western District of Pennsylvania.  I just don't -- can't recall who he is.  But he was the agent that did the seizure and seized these four pieces of equipment.

Q.    Okay.  And --

A.    Two pieces of equipment, one and two, and then the rest are documents.

Q.    Okay.  So for one and two, do you know who the manufacturer is of those two machines?

A.    Not from this document.

Q.    Do you know from some other reason?

A.    I don't know, Gregg.  There were several manufacturers.  I can't tell whose game he got.

Q.    Okay.

A.    I can't tell from this document.

Q.    But irrespective of this document, do you know who the manufacturer was for Games 1 and 2?

A.    I don't.

67

Q.    Can you confirm whether or not Jerry Botchie currently works for Pace-O-Matic?

A.    Jerry Botchie, no, I can't.

Q.    All right.

A.    You mean the former agent, LCB agent?

Q.    Right.

A.    No, I can't confirm that.

                (DeLuca Exhibit No. 4.3 was marked for identification.)

BY MR. ZEGARELLI:

Q.    I have another document that is able for you to download.  I'll put it on my screen.

A.    Oh, it's going to be on the screen?

Q.    It's going to be on the screen in one minute.

                Now there was some testimony earlier about pghlaw.com, and there is an archive that tracks websites at certain domain names.

A.    Uh-huh.

Q.    And can you testify that in 2016 the Eddy, DeLuca, Gravina, Townsend website looked similar to as represented here in the archive?

A.    Keep paging through.  I know there was a -- I know there was a website that Steve Townsend created but -- I know there was -- they took a

picture of me to put it in there.

Q.   Are you familiar with this gentleman to the left?

A.   Steve Townsend.

Q.   So Steve Townsend used this website as well as you did?

A.   I guess he used it.  I -- I -- I never used the website.

Q.   Can you testify as to 2016 whether or not this archived document reflects generally the website at that time?

A.   Cannot.

        MR. ZEGARELLI:  Okay.  No further questions at this time.

                - - - - -

                EXAMINATION

BY MR. BROOKS:

Q.   I have a few questions, Mr. DeLuca.  And again, I'm Attorney Tony Brooks, and I represent the Defendant, Action Skill Games.

        Couple questions to start.  When did you start working in the skill gaming business or providing, I guess, legal services in that business?

A.   Oh, it's been a long time.  I'm going to say

69

maybe 15 or 20 years ago.

Q.    15, 20 years, okay.

A.    I can't remember the exact date.

Q.    Okay.  When was the first time you heard the term Pennsylvania Skill Games or a variation thereof?

A.    I heard it first from Pace-O-Matic.  I can't remember the exact date, but I heard it from Pace-O-Matic.

Q.    Okay.

A.    And I saw it on some of their equipment.  We were at a tradeshow, and I was a speaker, and I saw Pace-O-Matic Games with PA Legal or PA Skill on them.

Q.    Okay.  Do you know about what year that was?

A.    I can't -- I can't tell you, Tony.

Q.    How long did you represent the Unises or Pennsylvania Skill Games, LLC, in connection with skill games?

A.    Not that long a period of time.  Maybe a year or two.

Q.    A year or two?

A.    I represented the father on other issues, but on -- I think about a year.  That's just an estimate.  I'm not sure.

Q.   And do you know about the time frame that you would have represented the Unises or Pennsylvania Skill Games, LLC in the connection with skill games?

A.   I'm going to guess, maybe 2015, 2016.  I looked at my -- unfortunately, that Unis file has been destroyed, but apparently, I had some work with Albert Unis as far back as 2005, but I think it was all dealing with the fireworks legislation originally.

Q.   Outside of the business name, Pennsylvania Skill Games, LLC, are you aware of the Unises or Pennsylvania Skill Games, LLC using the phrase Pennsylvania Skill Games as a trademark?

            MR. ZEGARELLI:  I'm going to object.

            THE WITNESS:  Go ahead.

            MR. BROOKS:  Well, I think we reserved all objections, except to form, so I think that's what Gregg was doing, Mr. DeLuca, so you can answer.

            THE WITNESS:  Give me the question again.

            MR. BROOKS:  Sure.

BY MR. BROOKS:

WAYNE V. DeLUCA                              71

71

Q.    Are you aware of the Unises, or Pennsylvania Skill Games, LLC using the phrase Pennsylvania Skill Games?

A.    Yes.

Q.    In what context are you aware of them using that phrase?

A.    I think they used to put a placard on their equipment saying PA Skill or PA Legal or something like that.

Q.    Are you aware of them ever using that sticker outside of Beaver County, Pennsylvania?

A.    I'm not aware of that.

Q.    Do you know if they ever controlled anybody else using that name outside of -- or controlled the use of others using that name outside of Beaver County, Pennsylvania?

A.    I don't know.

Q.    We talked -- we talked a little bit before the break about discussions that may have went on between Pennsylvania Skill Games, LLC and Action Skill Games, LLC concerning trademarks.  Do you remember that conversation?

A.    Yeah.

Q.    And I think you said you didn't remember the substance of the conversation?

A.    I do -- I did not remember the substance of it.

Q.    Okay.

A.    But I think there was some controversy between the two entities using the term.

Q.    Okay.  Do you know what -- do you know what trademarks were being discussed in those conversations?

A.    Not really.

Q.    Not really, okay.

A.    I don't do any trademark work, so I don't remember what they were talking about.  You know, I don't even think I was privy to any conversations between them.

Q.    Do you know whether it involved the use of stickers on skill game machines?

A.    That came up, the use of stickers.

Q.    Okay.

A.    Pace-O-Matic.  I think that was a conversation between Pace-O-Matic and Albert Unis or Alby Unis.

Q.    And when you say "a conversation between Albert Unis and Pace-O-Matic," what conversation are you referring to?

A.    I wasn't privy to the conversation, but I

heard there was a conversation.

Q.    Concerning what?

A.    The use of PA Skill.

          (DeLuca Exhibit No. 5 was marked for identification.)

BY MR. BROOKS:

Q.    I'm going to pull up an exhibit, and this is the file that was sent to you, Mr. DeLuca, titled PA Games and Skill sticker.  I'm going to share my screen.  Can you see that up on your screen?

A.    Yeah.

Q.    Have you ever seen this sticker before?

A.    Yes.

Q.    Mr. DeLuca, where did you see this sticker?

A.    I think I've seen it at some tradeshows.  I think I've seen it on some -- sometimes I've seen it on some pieces of equipment.

Q.    Do you know whose sticker this is?

A.    I do not know.  I don't know who created it.

Q.    Do you recall ever approving this sticker for somebody?

A.    No.  No, I never approved a sticker.

Q.    Okay.  So this sticker doesn't refresh your recollection as to the substance of any of the conversations between Action Skill Games and

Pennsylvania Skill Games in 2016, correct?

A.    It does not.

Q.    Okay.  I'll put that down now.  This one --
I am going to share another one.  This is more of
a formality.

(DeLuca Exhibit No. 10 was marked
for identification.)

BY MR. BROOKS:

Q.    Do you see the document that I have up there
on the screen, Mr. DeLuca?

A.    The subpoena.

Q.    Yes.

A.    Yes.

Q.    And I'll represent to you this was a
subpoena from Action Skill Games.

A.    Right.

Q.    Do you recall receiving this subpoena?

A.    Yes.

Q.    And there is a list of requested documents
that I have up on the screen now, Paragraphs 1
through 4?

A.    Yes.

Q.    Did you search for documents that were
identified in this subpoena?

A.    Yes.

Q.    We if could bring up revised Exhibit 2 that Mr. Zegarelli was using earlier.  I have a couple questions about that.

A.    What was the Bates number on that?

Q.    Well, it was all the documents that you produced that did not include the attorneys' eyes only information.

A.    Okay.

Q.    And I will tell you the Bates number in a second.  So if you look at DeLuca 17, and it is your Memorandum of Law in Support of Petition for Return of Seize Property.  Do you see that?

A.    Yes.

Q.    In the first line, it says:  "This post-seizure hearing involves a Pace-O-Matic, Inc., Pennsylvania Skill video game machine." And then it identifies the terminal ID.  And then if you go down under Section B, Description of the Games in the Pennsylvania Skill Game, and then it says:  "The Pennsylvania Skill game seized in this case."

       Why did you refer to the terminal that was at issue here as the Pennsylvania Skill Games?

A.    Because I felt that was the argument, that

76

it was a skill -- the result of the game was predominantly the result of use of skill and not chance, so I used "skill" as much as I can.

Q.   Okay.  But you called it the Pennsylvania Skill Game.  Is there any meaning behind that term?

A.   Other than I'm saying that that game, terminal ID, was a PA skill game.

Q.   So were you using it in a descriptive sense?

A.   Yes.

Q.   Let me put that down.

          MR. ZEGARELLI:  I'll frame an objection just to the extent that "use" is meant to use a term of art and not a layman's term.

BY MR. BROOKS:

Q.   Mr. DeLuca, are you aware of the term -- let me rephrase it.  In your years of practice in the skill game industry, are you aware of the phrase Pennsylvania Skill Game being used by anybody other than Pace-O-Matic or the Unises?

A.   I -- I don't specifically, but there was always talk about other manufacturers just building games and sticking a PA Skill sticker on them.  I can't remember who those were, but there were other people out there that were building

WAYNE V. DeLUCA                                          77

77

games similar to the Pace-O-Matic game -- not exactly the same as the Pace-O-Matic and just sticking stickers this game is PA legal, or it's a PA skill game.  Yeah, there were other manufacturers out there.

Q.    Are you aware of whether other manufacturers actually did that?

A.    My recollection is that there were some manufacturers that did do that, but I can't recall specifically who they were.

Q.    Do you know about what time frame that would have been?

A.    Well, after -- after the decision came down in 2016, everybody wanted to get into the game, obviously, and they were putting games out and putting stickers on that they were legal.  Some of them -- most of them weren't, but they were putting the stickers on them because I examined some of those games.

              (DeLuca Exhibit No. 6 was marked for identification.)

BY MR. BROOKS:

Q.    So I'm going to share another document.  I don't know what we're up to.

              So if you could take a moment to

look at this agreement and let me know if you recognize this document?  I can scroll down if you could -- just tell me when.

A.   Is this in my packet, this document?

Q.   It was not.

A.   Okay.  Let me look at it.

          Do you want to scroll down?

Q.   Tell me when to stop.

A.   Okay.  Go ahead scroll.

          MR. BROOKS:  And Gregg and Julian, just -- you know, I just want to actually mark this section of the transcript attorneys' eyes only as to -- I guess as to intervenors since PSG and Action Skill are obviously the parties to this agreement, but I'm not sure -- actually, you know what, never mind.  We don't need it because it was -- it would be in the Complaint.

          MR. NEISER:  Yeah, I was going to say it's on the docket.

          MR. BROOKS:  Yep.  Yep.

          THE WITNESS:  Not on the signature page.

          Okay.

BY MR. BROOKS:

Q.   Have you ever seen this document,

Mr. DeLuca?

A.    I'm not sure whether I've ever seen this document before.  Let me just look in my file here.  This is the stuff I already sent you.  Did you get this out of the stuff that I produced?

Q.    No, we did not.

A.    I don't think I've ever seen this before.

Q.    Okay.  So you don't have any understanding of the contacts of this agreement?

A.    No.  What's the origin of this agreement?

MR. ZEGARELLI:  I'll object to the testimony at this point.  The witness has never seen this document.

MR. BROOKS:  Yes.  How do I phrase this?

BY MR. BROOKS:

Q.    Has either Action Skill Games, LLC or Pennsylvania Skill Games, LLC ever conveyed the existence of this agreement to you?

A.    Don't know.

Q.    I'm going to take this one down then.

I'd like to pull up a document that Mr. Zegarelli uploaded to the chat labeled Amended Complaint.  I think this will be Exhibit 8.

I'm going to now share my screen. That's probably the easiest. Do you see this Complaint that I have up there, Mr. DeLuca?

A.   I see it.

Q.   I'm going to scroll -- actually, I'm going to scroll up here. See Paragraph 3 there?

A.   Yep.

Q.   It says Plaintiff is the owner of the trademark Pennsylvania Skill Games as well as formatives thereof, including Pennsylvania Skill and PA Skill, collectively the mark.

During your representation of the Unises, or Pennsylvania Skill Games, LLC, were you ever aware that they were claiming ownership of the mark Pennsylvania Skill Games or formatives thereof?

A.   Not until the litigation surfaced. That's when it first came up to me because I always thought PA Skill was Pace-O-Matic's tag.

MR. ZEGARELLI:  I'll object to the extent it calls for a legal conclusion, but go ahead.

MR. BROOKS:  Well, you know what, Gregg, I thought the exhibits might have been on this, but they're not, so I'm going to have to

get us another exhibit.

MR. ZEGARELLI:  What do you need, Tony?

MR. BROOKS:  The exhibits to the Complaint.  Do you have them handy?

MR. ZEGARELLI:  I might be able to get them.  Do you need any one in particular?

MR. BROOKS:  The declaration of Mr. Grochanin with the photos.

MR. ZEGARELLI:  I don't them in front of me, but I think it's Exhibit 2 to the Amended Complaint.  Exhibit 3 is the registration.  Exhibit 4 is the license.

MR. BROOKS:  Yep, I think I have -- I have it here.  I have it as Exhibit 2.

MR. ZEGARELLI:  You got it?

MR. BROOKS:  I will upload that.

MR. ZEGARELLI:  And I'll object to the extent, Tony, you asked a question with regard to a timing that may have been during his representation, and I may have to claw that testimony back.

MR. BROOKS:  Fair enough.  Okay.  Sorry about that.

(DeLuca Exhibit No. 7 was marked

for identification.)

BY MR. BROOKS:

Q.    So I just saved to the chat, and I will share my screen.  So I'll represent to you, Mr. DeLuca, this was Exhibit 2 to the Complaint that we were just looking at.

A.    Yes.

Q.    So scroll down to the exhibit Affidavit of a Person, John Grochanin.  Do you know who John Grochanin is?

A.    Do not.

Q.    And then I will scroll through the attachments to the declaration here, or Affidavit, which are a series of photos.  Do any of these photos look familiar to you?

A.    These specific photos do not, but I was at a couple tradeshows where there were banners saying PA Skill Games.  But not these specific ones.

Q.    So did you ever see Pennsylvania Skill Games used in this manner in the form shown in these photos?

A.    Not in this form.

Q.    Do you know who would have been using Pennsylvania Skill Games in this particular form?

          MR. ZEGARELLI:  Object to form.

THE WITNESS:  Don't know.  I do not know.

BY MR. BROOKS:

Q.    So I'm going to stop my share.

A.    Can we go back to the picture one more time?

Q.    Sure.

A.    Okay.  I just wanted to see who the manufacturer was.  I guess it was Aurora, who I don't know.  That's all I wanted to see.

Q.    Okay.  All right.

Mr. DeLuca, we talked a little bit today about manufacturers, distributors, and vendors.  Is there a difference between a distributor and a vendor?

A.    Yeah.  A distributor normally does not put games in locations.  He distributes the games to the vendors, the various machine vendors around the state, and the vendor has the contact with the bar or the club.

Q.    And then just the distributor is that typically a distinct entity from the manufacturer as well?

A.    Yes.  At least in my experience, it is.

(DeLuca Exhibit No. 8 was marked for identification.)

BY MR. BROOKS:

Q.    I'm going to pull up another exhibit, and it is the file labeled DeLuca, Wayne full.  Do you recognize this document, Mr. DeLuca?

A.    Looks like the cover sheet of an earlier deposition I gave.

Q.    You know, and I can give you time to look through it, but tell me when to stop scrolling.

A.    Hold on.  I'm just seeing who the parties were.

MR. ZEGARELLI:  Excuse me, Tony. Is this marked as an exhibit just for reference?

MR. BROOKS:  Yes.

THE WITNESS:  I had asked for a copy of this transcript from -- not you Gregg, and not you, and they sent me everything but the transcript.  They set me all the exhibits, but I never did get a copy of this transcript.  But I remember being deposed.  Gregg, that was out in what, Holiday Park -- out your way, Gregg.

MR. ZEGARELLI:  I'll let you finish up the testimony on that, Wayne.

THE WITNESS:  Go ahead.  You can scroll through it.

MR. BROOKS:  I thought we had

85

forwarded you --

MR. ZEGARELLI:  There it is.  By the way -- excuse me.  It's indicated on Page 2 there.

THE WITNESS:  Okay.

MR. ZEGARELLI:  Foster Plaza.

THE WITNESS:  Yeah, I remember being out there giving that deposition.

Okay.  Do you want to continue to scroll through or -- you don't want me to read this thing, do you?

BY MR. BROOKS:

Q.   Well, no.  I'd prefer you didn't.

A.   I don't have to.

Q.   But I'm going to scroll down to the signature page.  So the signature page isn't -- you didn't sign this upon reviewing and signing this transcript at the time that it occurred?

A.   Do I recall signing it?

Q.   Yeah.

A.   No.

Q.   You don't, okay.  Do you have any reason to believe that any of the testimony that you gave in this transcript is not true and accurate to the best of your recollection?

86

A.    Well, at the time that I gave it, it would be true and accurate.

Q.    Okay.

A.    I certainly wouldn't misrepresent anything. I just never saw the transcript -- I was supposed to get a copy of this transcript, but I never got it.

Q.    Yeah, I thought we had forwarded it to you through a link.  Perhaps you didn't.

A.    I didn't get it.  I got all the exhibits you were going to send me but not this.

Q.    Well, we'll certainly look into that and forward it if we didn't.  So I'd like to look at Page 101 here.

A.    Okay.

Q.    Here it looks like you were asked:

      When did you first hear the name Pennsylvania Skill, and you testified that:  I heard of Pennsylvania Skill before Albert Unis got involved.  When we -- that was -- when we first -- when this game was first marketed, you know, PA Legal, PA Skill Game, that's a very generic term in the gaming industry.

A.    Right.

Q.    As you sit here today, do you still believe

that's an accurate answer to that question?

A.   Yes.

Q.   Go to the next page, 102 -- I'm sorry 103.
You were asked:  Was there any discussion with
Mr. Rodgers about a trademark or allowing
Pace-O-Matic to use a trademark that allegedly
was owned by either of the Unises, or
Pennsylvania Skill Games, LLC?  My first question
is who was Mr. Rodgers?

A.   Mr. Rodgers was an attorney that practiced
with Jim Amato in Sewickley.

Q.   And your answer to this question was:  I
have no recollection of that conversation.

A.   Right.

Q.   Is that answer still accurate?

A.   I believe it is accurate.

          MR. BROOKS:  I have no further
questions.

          MR. ZEGARELLI:  Julian?

          MR. NEISER:  Just give me one
second, please.  Give me literally one minute.
Thanks.

                 - - - - -

               EXAMINATION

BY MR. NEISER:

Q.    Mr. DeLuca, this is Julian Neiser.  You may remember me.  I'm counsel for -- in this litigation for POM of Pennsylvania, LLC and Savvy Dog Systems, LLC.  And I also represent Pace-O-Matic, Inc.

You mentioned seeing the Pennsylvania Skill name or mark in conjunction with electronic skill games at a tradeshow.  Do you recall saying that?

A.    Yes.

Q.    And do you recall when that tradeshow was?

A.    No, I don't have any recollection of that, but I remember the game was there.  And it had Pennsylvania Skill or approved legal of Pennsylvania Skill, something like that.

Q.    Sure.

A.    I can't remember the exact -- but it was early on that was on that.

Q.    When you say "early on," what do you mean by that?

A.    I think it was before -- when Albert said that he was the one that started that.

Q.    Repeat that again for me, please.

A.    I believe that that PA Skill was put on that game before Albert Unis said that that was his

WAYNE V. DeLUCA                                      89

89

idea to put it on.

(DeLuca Exhibit No. 9 was marked for identification.)

BY MR. NEISER:

Q.   Right.  So I just tried to update, and I uploaded a file, and I don't know if I can share my screen or not because, of course, I didn't opt into that, but maybe one of you guys could put it up and rotate the view if I cannot.  Oh, actually, I can.  Here.  I got it.  It's right here.  Can you see my screen, Wayne?

A.   Yes.

Q.   Give me one second.  I'm going to rotate this thing.  Now do you see it?

A.   Yeah.

Q.   Is that what you saw on the machine that you just referenced?

A.   Yeah, it was -- kind of looked like that. I'm not saying that it exactly, but it said PA Skill.  I remember PA Skill or PA Legal.  But it was something like that that was a placard of the front of the games.

Q.   Got it.  And to the best of your recollection, that placard that was on the front of the games came from Pace-O-Matic?

A.    Yes.

Q.    And to make it even more specific, that placard that was on the front of the games did not come from any of the Unises or Pennsylvania Skill, LLC?

A.    No, it came from Pace-O-Matic.

Q.    Got it.  Hey, I have a question for you just to put -- trying to figure out the timing on the tradeshow.  Do you remember the controlled pick-up of the game that led to the Beaver County litigation?

A.    Yes.

Q.    And to be clear, the Beaver County litigation was the litigation in which you submitted the Memorandum of Law that we previously discussed as an exhibit in this deposition today?

A.    That's correct.

Q.    And would it also be fair to say that Albert Unis, the father, picked up the game from you and placed it in a location for the controlled pick up?

A.    Right.  He came to my office, picked -- this is after I had an agreement with the State Police.

Q.    Yep.

A.    He picked up the game, took it to an Italian Club, I believe in Aliquippa or Ambridge, and then they -- the enforcement agency called me, and I said well, let it in for a couple days.  I want to see if the game is profitable or not so I could tell the manufacturer.

Q.    Yep.

A.    And I met them there, and they picked -- they seized the game, and that was the game wherein I filed the Petition for the Return of Seized Property.

Q.    Got it.  And that was the game in which you were referring to it as the Pennsylvania Skill Game in your papers?

A.    Yeah.  Yes.

Q.    At that time -- so was that tradeshow that you referenced where you saw the Pace game, the legalized skill -- the skill game from Pace-O-Matic, was that tradeshow before or after that first meeting with Mr. Unis?

A.    I cannot remember, Julian.

Q.    Do you recall any discussions between any of the Unises, Albert or Alby, with Pace-O-Matic prior to the time that you provided Mr. Unis with

the game for the controlled pick-up?

A.    I can't specifically remember, but I'm sure there were conversations about where the piece of equipment would be, how it would be picked up because the vendors were concerned if they got involved, they would be arrested, and I assured them that they would not be arrested.  And it was -- and Albert Unis, when I gave them that assurance, he came and picked the game up.

Q.    Okay.  But do you recall any direct conversation between Pace-O-Matic and Mr. Unis prior to that time?

A.    I don't recall them, but I think there were some.  But I don't -- I don't recall.  I don't recall the conversations, but I think there were some.

Q.    Okay.  So it's your testimony -- were you present during any of those discussions?

A.    I don't think I was ever present when Mr. Unis and the Pace-O-Matic reps were present.

Q.    As you sit here today, you can't tell me that those conversations actually occurred or have a date for those conversations?

A.    I can't -- give me one second.  Let me just look at one other thing.

No, I can't give you a date on that.

Q.    Okay.    Do you recall any conversations around that time between any of the Unises, either Albert or Alby, and Pace-O-Matic related to trademarks?

A.    I do not.

MR. NEISER:  No other questions.

MR. ZEGARELLI:  Just a few, Mr. DeLuca.

- - - - -

EXAMINATION

BY MR. ZEGARELLI:

Q.    When did you begin to represent Pace-O-Matic?

A.    Oh, man.  I can't remember.  It's been a while since I represented them.  Wait a minute. I'm going to get you a date.

Go ahead, Gregg.  I'll get that. But go ahead.  Do you have any other questions?

Q.    Do you still represent Pace-O-Matic today?

A.    No.

Q.    When did you -- when did the relationship for attorney and client end with Pace-O-Matic?

A.    I think about two years ago, approximately

two years ago.  It was as a meeting where I indicated that I was going to retire and move on.

Q.  So is it fair to say sometime around May of 2019?

A.  I think it was earlier than that.  I really do.  I'm not absolutely sure, though.  I think it was earlier than that.  I'm not sure, Gregg, to answer your question.

Q.  And when is the last time you received any compensation from Pace-O-Matic or POM of Pennsylvania or Miele Manufacturing for any purpose?

A.  I can't answer that.  I don't have any recollection.  I'd have to go back through all of my billing records.

Q.  Do you have a recollection of being paid by Pace-O-Matic at any time after the date that you're thinking sometime, give or take 2019, when the separation or termination occurred?

A.  No.  No.  I don't believe there was any payment.

Q.  To be more specific, you don't recall being paid for the last deposition, or time, or services related to the last deposition in the POM case?

A.    I don't think I -- I don't think I requested a fee on that, Gregg.

Q.    Were you paid any irrespective of a request for payment?

A.    I don't think so.

Q.    And if you did get paid, is it -- do you have a mechanism of accounting for -- to track who pays you?

A.    Yeah, I'd have to go back through my financial records for that year and see if I received any money from Pace-O-Matic.

Q.    At least as you sit here, you can't recall being paid at any time after the termination of --

A.    No.  No, I cannot.

Q.    Do you recall what the tradeshow was that you attended, the name of the tradeshow?

A.    I can't remember.  I know there were multiple manufacturers there.  Different types of equipment, not just these types of skill games.  There were people that manufactured bill acceptors, people that manufactured high-end screens for certain games, and a lot of different manufacturers.

Q.    What city was it in?

A.   I can't recall.  It may have been Philadelphia, but I'm not sure, Gregg.  I'm just not sure.

Q.   I think we're hanging tight for your daughter-is-law?

A.   Give me a second.

Q.   Sure.

            (Off the record.)

BY MR. ZEGARELLI:

Q.   Back on.

A.   My estimate is I think I started representing them in around 2005, but that's just from my recollection.

Q.   You represented.  So if I understand your testimony, you represented Pace-O-Matic beginning sometime in 2005?

A.   That's my recollection.  I'm not sure.  I would have to get out that file and go through the whole file.

Q.   Do you recall why you were engaged in 2005?

A.   I don't remember.  Looks like I had a Pace-O-Matic file that was ultimately -- I'm sorry.  It was in 2012.

Q.   Okay.

A.   It was opened up because of the challenge to

the game, which I believe culminated in the Beaver County litigation.

Q.    Okay.  So if I understand the time frame of representing Pace-O-Matic began in 2012 to approximately 2019?

A.    Yes.  That's probably right.

            MR. ZEGARELLI:  Okay.  No further questions.

            Tony?

            MR. BROOKS:  No questions for me.

            MR. ZEGARELLI:  Julian?

            MR. NEISER:  None for me.  Thank you, Mr. DeLuca.

            THE WITNESS:  Thank you.

            (Signature not waived.)

            (There being no further questions, the deposition concluded at 12:34 p.m.)

                      -----

98

DEPOSITION ERRATA SHEET


DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have

read the entire transcript of my Deposition taken

in the captioned matter or the same has been read

to me, and the same is true and accurate, save

and except for changes and/or corrections, if

any, as indicated by me on the DEPOSITION ERRATA

SHEET hereof, with the understanding that I offer

these changes as if still under oath.  In all

other respects the transcript is true and

correct.




_____
                    Wayne V. DeLuca, Esquire


Subscribed and sworn to before me this

_____ day of _____, 2021.


_____
            Notary Public

99

                    DEPOSITION ERRATA SHEET

Page No.          Line No.        Change to:


Reason for change:

Page No.          Line No.        Change to:


Reason for change:

Page No.          Line No.        Change to:


Reason for change:

Page No.          Line No.        Change to:


Reason for change:

Page No.          Line No.        Change to:


Reason for change:

Page No.          Line No.        Change to:


Reason for change:

Page No.          Line No.        Change to:


Reason for change:


SIGNATURE:                          DATE:
          Wayne V. DeLuca, Esquire

100

DEPOSITION ERRATA SHEET

Page No.          Line No.          Change to:


Reason for change:

Page No.          Line No.          Change to:


Reason for change:

Page No.          Line No.          Change to:


Reason for change:

Page No.          Line No.          Change to:


Reason for change:

Page No.          Line No.          Change to:


Reason for change:

Page No.          Line No.          Change to:


Reason for change:

Page No.          Line No.          Change to:


Reason for change:


SIGNATURE:                              DATE:
          Wayne V. DeLuca, Esquire

101

COMMONWEALTH OF PENNSYLVANIA)
COUNTY OF ALLEGHENY          )

     I, Diane G. Galvin, a notary public in and for the Commonwealth of Pennsylvania, do hereby certify that the witness, Wayne V. DeLuca, Esquire, was by me first duly sworn to testify the truth, the whole truth, and nothing but the truth; that the foregoing deposition was taken at the time and place stated herein; and that the said deposition was recorded stenographically by me and then reduced to typewriting under my direction, and constitutes a true record of the testimony given by said witness, all to the best of my skill and ability.

     I further certify that the inspection, reading and signing of said deposition were not waived by counsel for the respective parties and by the witness and if after 30 days the transcript has not been signed by said witness that the witness received notification and has failed to respond and the deposition may then be used as though signed.

     I further certify that I am not a relative, or employee of either counsel, and that I am in no way interested, directly or indirectly, in this action.

     IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office this 2nd day of June, 2021.

--------------------------------
Diane G. Galvin

WAYNE V. DeLUCA                                    102

## $

**$1,000** 45:18

**$400** 45:21

## 0

**0001** 10:2

**0002** 16:1

**0015** 16:4

**0089** 10:5,6

## 1

**1** 4:10 5:16 6:22 58:2,8,13 66:24 74:20

**10** 4:21 74:6

**101** 86:14

**102** 87:3

**103** 87:3

**1129** 5:23

**12** 54:23

**12:34** 97:17

**1200** 3:4

**134** 2:17

**14** 16:17,23 17:2,4,5 40:6

**15** 17:10 21:13 62:14 69:1,2

**15044** 5:23

**15219** 2:23

**15222** 3:4

**15241** 2:18

**16** 16:5 17:10

**17** 31:25 75:10

**18** 31:25

**19** 31:25

## 2

**2** 4:11 7:1 8:13,24 9:1 14:5 50:3 66:24 81:15 85:3

**2:20-cv-01177-PLD** 1:7

**20** 31:25 69:1,2

**2005** 28:16 70:8 96:12,16,20

**2012** 96:23 97:4

**2015** 35:13,14,21 48:22,24 70:5

**2016** 11:13 23:1,3,11,19,20 24:3,17,19 25:17 31:22,25 32:23 33:8 52:5 54:15 58:23 62:12,20,23 63:4,10,16,25 64:18 67:20 68:9 70:5 74:1 77:14

**2017** 6:22 29:6 31:11 33:4 44:6,7,22 54:23

**2018** 62:14

**2019** 94:4,18 97:5

**2020** 30:22 31:2,3,4

**2021** 1:20 2:8 11:13 14:22 30:17,18,20,23,25 98:19 101:17

**21** 54:15

**24** 1:20 2:8

**2585** 2:16

**281-3537** 41:20

**2nd** 101:17

## 3

**3** 4:12 8:13 14:9 56:25 80:6

**30** 101:11

## 4

**301** 2:22

**3440** 2:22

## 4

**4** 44:22 74:21

**4.1** 4:13 61:15,22

**4.2** 4:14,18 61:15,22

**4.3** 4:15 67:8

**412** 41:20

**420** 3:3

**47** 11:9 62:12 63:6

## 5

**5** 4:4,10,16 14:21 73:4

**5/12/2017** 55:16

**57** 57:8

**59** 57:8

**5th** 15:11,13

## 6

**6** 4:17 77:20

**60** 34:18 36:19

**61** 4:13,14 36:2

**62** 37:3,14 38:18,19 39:15

**63** 4:15 39:19

**65** 59:20

**68** 4:5

**69** 11:12

## 7

**7** 4:18 61:4 81:25

**73** 4:16

**74** 4:21 60:16

**75** 41:10

**76** 61:4

WAYNE V. DeLUCA

103

**77** 4:17

**78** 61:4

**79** 42:19,20,25 43:24 44:1 45:5

**7th** 38:17

---

8

**8** 4:11,12,19 79:25 83:24

**80** 43:13,24 44:1 45:5 66:2

**81** 4:18 44:22 45:23 46:3

**82** 45:24 46:2

**83** 46:5

**84** 4:19 46:25 52:12

**85** 50:2 52:12

**86** 51:14,21

**87** 4:6 24:25 53:13,15

**88** 24:25 53:13

**89** 4:20 55:2

---

9

**9** 4:20 89:2

**9:00** 2:9 5:2

---

A

**a.m** 2:9 5:2

**AB** 50:12,13

**ability** 101:8

**able** 5:24 24:9 38:5 67:11 81:6

**absent** 6:7,9 16:6

**absolutely** 28:25 63:11 94:6

**acceptors** 95:22

**accommodate** 12:1

**accordingly** 42:24

**account** 48:19

**accounting** 95:7

**accounts** 43:20

**accurate** 85:24 86:2 87:1,15,16 98:7

**across** 19:21

**action** 1:7,8 3:1 5:10 6:4,17 17:18,20 25:1 26:2 28:1 31:17 33:25 34:1,3 35:8 47:11 53:16 54:2,14,16 55:11,15 57:11 58:4 59:23 62:10,11,16,18 63:17,23 64:2,6,14,22 68:20 71:20 73:25 74:15 78:14 79:17 101:15

**active** 30:22

**actual** 16:6

**actually** 51:24 77:7 78:11,15 80:5 89:10 92:22

**additional** 45:1 52:1

**address** 5:21 21:4 40:23 45:4,16

**adjusted** 45:21

**advice** 54:8,10

**affect** 11:19

**affected** 49:10

**Affidavit** 82:8,14

**affixed** 101:17

**against** 5:10 43:10

**agency** 1:23 91:4

**agent** 45:13 66:5,10 67:5

**agents** 66:8

**ago** 18:22,24 19:1,2 51:10 69:1 93:25 94:1

**Agreed** 12:9

**agreement** 4:17 7:9,16 15:5 16:4 17:9 21:15,17,19,21 22:5,7 35:8 36:9 37:5,12,13,17,25 38:7,10,22,23 39:1,17,24 46:12,17,19 48:2 50:10,20 57:3,10,14,22,23 59:22,23 61:1,5 62:13 78:1,15 79:9,10,19 90:24

**ahead** 70:17 78:9 80:22 84:23 93:19,20

**Albert** 3:7 6:18 12:23 13:6 24:7,10 28:14,15 33:14,18,20,21 50:13,21 56:15 58:18 59:9,12,14,16,19 70:8 72:20,23 86:19 88:21,25 90:20 91:24 92:8 93:5

**Alby** 6:18 13:1,3 33:22 59:12,18 72:21 91:24 93:5

**Aliquippa** 91:3

**allegedly** 87:6

**ALLEGHENY** 101:1

**allowing** 87:5

**already** 7:25 49:12 79:4

**am** 5:8 11:6,21 12:12 19:14 29:21 74:4 101:14

WAYNE V. DeLUCA

104

**Amato** 87:11

**Ambridge** 91:3

**Amended** 4:13,14 62:4,5 79:24 81:12

**and/or** 6:19 24:5 26:6 98:8

**answer** 4:13 20:13 43:7 51:1 53:24 62:4,6 70:21 87:1,12,15 94:8,13

**answered** 32:25

**Anthony** 3:3 7:6

**anybody** 18:4 31:4 71:13 76:19

**anymore** 35:19 52:9

**anyone** 18:10

**anything** 8:22 18:16 86:4

**anytime** 53:25

**anywhere** 53:4

**apparently** 30:16 35:22 43:1 62:16,19 64:1 70:7

**appears** 14:21 22:1 37:3,20 45:23 51:14 54:21,23,24 60:12 61:7 63:6 66:5

**approved** 62:20 73:22 88:14

**approving** 73:20

**approximately** 93:25 97:5

**April** 44:22

**archive** 67:17,22

**archived** 68:10

**area** 17:15 41:8

**argument** 75:25

**arrested** 92:6,7

**art** 76:14

**ASG** 4:17

**assistance** 44:12

**association** 42:8

**assurance** 92:9

**assured** 92:6

**asterisk** 42:7

**attached** 15:4 37:4,17 38:22

**attachment** 37:21,22,23 44:1 46:2 60:16

**attachments** 39:25 82:13

**attended** 95:17

**attention** 6:12 21:13 40:6 41:9 53:12 58:1 66:1

**attorney** 4:3 11:5,11 16:16 23:23 36:12,16 62:17 64:5 68:19 87:10 93:24

**attorneys** 12:18,24 13:11,21 14:6,9,13 16:19 56:16 57:21 75:6 78:12

**Attorney's** 4:12

**Aurora** 83:8

**AUTHORIZATION** 1:23

**authorized** 36:19

**available** 57:2

**averment** 62:6,10,23

**averred** 63:9

**aware** 13:1 53:11 70:12 71:1,5,10,12 76:16,18 77:6 80:14

---
B
---

**banners** 82:17

**bar** 21:24 48:9 60:22 83:19

**Barracuda** 21:25 22:2 59:24 60:1

**bars** 22:21 44:15 49:14 50:11 60:19

**based** 62:9 63:6,8 64:25

**basis** 62:23

**Bates** 9:24 10:1 12:13,14 15:18,24 16:1,23 17:3 21:13 34:17 36:19 43:24 46:2,5 50:2 57:8 75:4,9

**Battle** 2:21

**Bay** 5:23

**Bear** 34:12

**Beaver** 10:17 15:7,8 16:6 56:12 58:10,15,17,19 59:10 71:11,16 90:10,13 97:2

**begin** 10:1 93:14

**beginning** 96:15

**behalf** 8:3 62:16 63:21

**behind** 76:5

**belabor** 11:16

**believe** 10:11 15:1 18:15 33:22 36:13 37:1 40:4 51:8 57:5,25 58:22 85:23 86:25 87:16 88:24 91:3 94:20 97:1

**bell** 16:14

**Belschner** 21:8

**best** 85:25 89:23 101:8

WAYNE V. DeLUCA

**better** 22:7

**bill** 45:21 95:21

**billing** 94:15

**bit** 22:25 71:18
  83:11

**black** 57:17

**blah** 38:23,24

**blank** 57:17

**Blosky** 20:24,25

**Blue** 28:22,23 34:20
  35:8 36:20,22,24
  39:13 46:6,12,15
  47:4,10,12,16,18
  49:22,24 56:7 57:11
  58:5 61:10

**body** 50:21 51:9

**Botchie** 66:5 67:1,3

**bottom** 35:14 36:6,9

**Boulevard** 3:3

**box** 18:11

**break** 11:23 12:1
  26:14 27:16 28:2
  65:18 71:19

**brief** 13:23 28:8
  56:22 65:22

**bring** 75:1

**Brooks** 3:3 4:5
  7:3,6,15,22 20:10
  27:7 44:19 51:2
  53:22 68:17,19
  70:18,24,25 73:6
  74:8 76:15 77:22
  78:10,20,24
  79:14,16 80:23
  81:4,8,14,17,23
  82:2 83:3
  84:1,13,25 85:12
  87:17 97:10

**brother** 23:22

**brought** 32:4 56:9

**B's** 47:25

**building** 76:23,25

**business** 24:12 48:20
  50:21 68:23,24
  70:11

---

C

---

**Cahill** 37:24
  38:12,14,17,20
  39:3,7,9,15

**capacity** 62:17

**captioned** 98:6

**card** 33:11 43:17

**Carolina** 59:25

**carries** 54:25

**case** 59:8 75:21
  94:25

**cases** 13:18

**category** 60:11

**cc'd** 37:24

**central** 25:12

**certain** 12:24 15:13
  47:16 67:18 95:23

**certainly** 86:4,12

**Certified** 2:5

**certify** 101:4,9,14

**CERTIFYING** 1:23

**challenge** 96:25

**chance** 76:3

**change**
  99:2,4,5,7,8,10,11,
  13,14,16,17,19,20,2
  2
  100:2,4,5,7,8,10,11
  ,13,14,16,17,19,20,
  22

**changed** 48:12,20
  49:9,20

**changes** 36:8,10
  98:8,11

**charge** 19:20

**chat** 79:23 82:3

**check** 33:24 51:3
  61:7

**checked** 10:16

**checks** 41:6

**circumstance** 54:12
  63:20,25

**circumstances**
  16:8,10 44:9 62:22
  64:5

**citation** 43:2,9,10
  44:8,12

**cited** 43:3 44:15

**city** 95:25

**Civil** 1:7 2:4

**claiming** 80:14

**clarify** 12:5,6 47:15
  61:9

**clarity** 10:24 53:7

**claw** 20:15 54:4
  81:21

**clear** 15:14 31:22
  32:22 42:9 52:25
  90:13

**client** 26:5 56:15
  57:4 61:13 65:18
  93:24

**clients** 22:21 25:8
  49:17,21

**close** 30:2

**closed** 26:12 28:6
  29:13,16,17,18
  30:11

**closing** 30:3

**club** 60:23 83:19

WAYNE V. DeLUCA

91:3

**clubs** 44:15 49:15

**Coin** 23:21

**coin-operated** 21:23

**Coin's** 23:22

**Colbert** 50:13,21

**collectively** 80:11

**combination** 6:17

**Commons** 2:17

**Commonwealth** 2:7 22:10 101:1,3

**communications** 6:16 54:18

**company** 17:14 49:3,5,15

**company's** 49:6

**compensation** 94:10

**Complaint** 4:14 62:3 78:17 79:24 80:3 81:5,12 82:5

**complete** 14:14

**concerned** 10:13 92:5

**concerning** 43:9 71:21 73:2

**concluded** 97:17

**conclusion** 80:21

**confidential** 4:11 14:6,12

**confirm** 9:9 10:9 11:18 18:13 67:1,7

**confirmed** 14:10

**conflict** 41:5 47:21,23 48:2,24

**conjunction** 88:7

**Conley** 48:12,15,16 49:19

**connection** 69:18

70:3

**constitutes** 101:7

**consulted** 24:11

**consulting** 47:17

**contact** 45:14 83:18

**contacted** 14:24 62:15

**contacting** 44:10

**contacts** 79:9

**context** 71:5

**continue** 85:9

**control** 43:17

**controlled** 40:8 71:13,14 90:9,22 92:1

**controversy** 72:4

**convenience** 9:21

**conversation** 19:6 64:11 71:22,25 72:20,22,23,25 73:1 87:13 92:11

**conversations** 54:18 64:13,17 72:8,14 73:25 92:3,15,22,23 93:3

**conveyed** 79:18

**copied** 38:20 39:16

**copies** 42:25

**copy** 32:18 37:2,21,22 39:21 46:18,19,21 51:19 84:15,18 86:6

**corner** 47:1 52:23 54:24 55:3

**corporation** 60:24

**corporations** 60:20

**correct** 10:6 11:2 20:5 31:1,8

32:1,17,18 34:11 40:17 52:15 54:22 57:15 63:15 74:1 90:18 98:13

**corrections** 98:8

**correctly** 44:23

**correspondence** 54:1

**counsel** 2:12 9:4 14:10 16:13 18:14 62:15 88:2 101:10,14

**country** 19:22

**County** 10:17 15:7,8 16:6 56:12 58:10,15,17,19 59:10 71:11,16 90:10,13 97:2 101:1

**couple** 43:19 68:21 75:2 82:17 91:5

**course** 6:8 7:12 11:22 12:5 89:7

**court** 1:1 38:4 43:5

**cover** 84:5

**created** 14:3,5 20:4 67:25 73:19

**crossed** 50:13,15

**culminated** 97:1

**currently** 11:5 67:2

**cursor** 41:17

**customer** 26:5

**cut** 7:14

---

D

**Dale** 23:17

**date** 35:14,22 63:11 69:3,8 92:23 93:1,18 94:17 99:24 100:24

**dated** 14:21 38:17

**dates** 11:15

**daughter-in-law** 61:23

**daughter-is-law** 96:5

**day** 98:19 101:17

**days** 91:5 101:11

**deal** 50:19

**dealing** 36:14,15 70:9

**deals** 32:8 51:9

**dealt** 16:16 36:17 59:18,19 66:7

**decision** 77:13

**declaration** 81:8 82:13 98:3

**declare** 98:4

**declared** 56:12

**Defendant** 1:6 2:13 68:20

**Defendant/ Counterclaim** 1:9

**defendants** 7:7

**Defendants/ Counterclaim** 3:1

**definitely** 64:1

**deleted** 16:19

**delivered** 20:5 55:22

**deluca** 1:17 2:1 4:2

**DeLuca** 5:8,16,19,22,24 6:11 7:5 8:13,16 10:2 12:14,17 13:9,15 14:1,16 15:19 16:4,17 20:12 21:14 28:3 34:12,17 36:2 37:3,14 38:18,19 39:15 40:5,6,9,15,16,19 41:10 42:12 43:6

44:22 45:5,23 46:7,24 47:19 51:5,14,21 53:12,13 54:2,7,22 56:24 57:1 59:20 60:16 61:15,20,25 62:15 65:5,19,25 66:2 67:8,21 68:18 70:20 73:4,8,14 74:6,10 75:10 76:16 77:20 79:1 80:3 81:25 82:5 83:11,24 84:3,4 88:1 89:2 93:10 97:13 98:16 99:24 100:24 101:4

**D-e-L-U-C-A** 5:22

**DELUCA** 5:3

**DeLuca's** 14:4,15

**Denise** 21:8

**depending** 60:22

**deponent** 5:4

**deposed** 5:5 19:1 84:19

**deposited** 10:10

**deposition** 1:17 2:1 12:11 18:5,14,24 19:3 84:6 85:8 90:17 94:23,24 97:17 98:1,5,9 99:1 100:1 101:5,6,10,12

**depositions** 11:17

**derive** 19:12,14

**describe** 16:23 20:1 21:12,16,17 36:3 42:21 44:23 46:10 55:5 57:7 59:21

**Description** 4:9 75:18

**descriptive** 76:9

**designation** 14:7

**destroyed** 25:6,23

28:16 29:13 70:7

**detail** 20:2

**determine** 42:10

**Diane** 2:5 101:3,21

**difference** 83:13

**different** 44:15 95:19,23

**differently** 55:13

**dig** 18:11

**direct** 6:12 21:12 41:9 53:12 58:1 66:1 92:10

**directing** 40:5

**direction** 101:7

**directly** 101:15

**disconnect** 12:23

**discuss** 13:21

**discussed** 72:7 90:16

**discussion** 87:4

**discussions** 71:19 91:23 92:18

**distinct** 83:21

**distinction** 59:8

**distributes** 83:16

**Distributing** 23:6

**distribution** 1:22 46:11 57:3 61:1

**distributor** 22:18 35:8 37:25 38:22 39:16 58:19 83:14,15,20

**distributors** 23:5 83:12

**distributorship** 57:22,23 58:3,9,13

**District** 1:1 66:8

**docket** 10:17 78:19

WAYNE V. DeLUCA

108

**document** 6:7,10 9:5 10:8,9 13:14,15,16 14:8,20,23 16:23,25 34:18,24 35:23 36:19 37:3 43:12 48:3 50:3,4 53:14 57:7,24 59:21 62:7 66:17,22,23 67:11 68:10 74:9 77:23 78:2,4,25 79:3,13,22 84:4

**documents** 4:11,12 6:14,25 8:18 9:19 10:9,25 11:3 12:18 15:3,10,14,15,17 16:18 18:6,8 25:25 26:1 27:1 31:23,24 32:13 33:5,7 34:4,6,9 35:7,11 43:20 52:7,17 53:5 56:16 57:20 65:1 66:14 74:19,23 75:5

**Dog** 1:12 2:20 5:12 8:4 88:4

**domain** 4:15 40:9,10,15 67:18

**done** 7:25 30:15,20 65:19

**download** 57:2 61:20 67:12

**downstairs** 18:12 26:12,16 28:6 31:7 33:6,10

**drafted** 35:11 58:4

**Drive** 5:23

**dropped** 10:25 52:17

**drugs** 11:19

**Duffy** 48:12,15,16 49:3

**duly** 5:4 101:4

**duplicated** 50:25

**Duquesne** 3:3

**during** 80:12 81:20 92:18

---

E

**earlier** 28:18 57:19 67:17 75:2 84:5 94:5,7

**early** 88:18,19

**easiest** 80:2

**easy** 27:18

**Eddy** 21:10 25:9 40:9,16,18 42:12 65:13 67:20

**educated** 43:11

**eight** 30:4,9,10

**either** 24:19 60:8 79:17 87:7 93:5 101:14

**electronic** 1:22 40:3 88:8

**elimination** 60:13

**else** 71:14

**e-mail** 9:3,7,10 12:25 16:4 17:6 21:3 36:4,5,7 37:20 38:16,19,23 39:15 40:23 42:21 43:1,9 44:7,24,25 45:4,5 51:14 54:20

**e-mailed** 6:13 61:21

**e-mailing** 9:19

**e-mails** 57:21

**employee** 101:14

**enforcement** 43:17 66:8 91:4

**engaged** 53:18,20 54:9 96:20

**engagement** 24:23 25:16,19 54:19

**engineer** 55:25

**enter** 48:25

**Enterprises** 21:25 59:24

**entire** 98:5

**entities** 72:5

**entity** 83:21

**Entrepreneurial** 2:15

**equipment** 21:23 22:20 55:20,22 66:11,13 69:11 71:8 73:17 92:4 95:20

**Erie** 23:21

**ERRATA** 98:1,9 99:1 100:1

**Esquire** 1:17 2:1,16,22 3:3 4:2 5:3 98:16 99:24 100:24 101:4

**estimate** 69:25 96:11

**ethics** 30:6,8,12

**event** 54:11 62:12

**everybody** 40:21 41:1 48:6 77:14

**everything** 32:19 52:3 55:8 84:16

**exact** 24:14 69:3,8 88:17

**exactly** 77:2 89:19

**examination** 2:3 5:6 68:16 87:24 93:12

**examined** 77:18

**example** 21:24 40:2 42:3

**except** 7:10,16 48:12 70:19 98:8

**exception** 15:7 58:7,9,14,17

**exclusive** 35:7 57:3 58:3,8,13 61:1

**exclusives** 57:22

**exclusivity** 21:22 36:8 57:11 59:10

**excuse** 84:11 85:3

**executed** 46:7

**execution** 62:13

**exhibit** 4:9,18 5:16 7:1 8:13,24 9:1 14:5,9 16:17,22 46:2 56:25 61:15,18 67:8 73:4,7 74:6 77:20 79:24 81:1,15,25 82:8 83:24 84:2,12 89:2 90:16

**Exhibit 2** 4:18 10:24 14:12 15:22 75:1 81:11 82:5

**Exhibit 3** 14:13 81:12

**Exhibit 4** 81:13

**exhibits** 14:4,12,14 15:21 61:22 80:24 81:4 84:17 86:10

**existence** 37:12 79:19

**exists** 49:25

**experience** 83:23

**expert** 13:17 32:9

**explain** 13:14 14:22 19:5

**extent** 76:13 80:21 81:19

**extracted** 14:8 15:21

**eyes** 4:12 12:18,24 13:11,21 14:6,10,13 16:19 56:16 57:21 75:6 78:12

---
F
---

**F&L** 17:7,13 36:7

**face** 8:11

**fact** 5:19 12:22 17:19 18:11 47:23 59:5

**facts** 63:3

**failed** 101:12

**fair** 54:5 81:23 90:19 94:3

**familiar** 20:21,24 66:4 68:2 82:15

**father** 13:3 59:17,18 69:23 90:20

**favor** 8:11

**fax** 41:20,21,22 42:15,16

**February** 38:17

**Federal** 2:3

**fee** 45:2 95:2

**feel** 18:19

**fees** 19:20

**felt** 75:25

**figure** 90:8

**file** 10:13,16,20 13:10 15:9 18:11 26:3,5,8,9 28:15 29:9,11,15,19,24 30:11,13 31:5 32:7 34:1,4,13,24 39:2,22 46:8 47:7,11 50:25 51:17,20 52:16 70:6 73:8 79:3 84:3 89:6 96:18,19,22

**filed** 15:6 16:5 35:23 91:11

**files** 25:5,11,23 26:4,12 27:21

28:6,13 30:4,9,14,17 31:3 33:25 40:25 47:14

**financial** 95:10

**finding** 17:1

**fine** 12:3

**finish** 11:25 43:2 44:8 84:21

**fireworks** 24:9 26:10 70:9

**firm** 3:2 7:8 15:2 18:7 21:10 25:10 32:4 35:9 41:23 42:4,13 50:24 52:17 58:18 65:13,14

**firm's** 40:25

**first** 4:13 5:4 13:14 14:20 24:9 43:23 48:17 49:14 58:2 62:3,5 69:4,7 75:14 80:18 86:17,21 87:8 91:21 101:4

**fit** 9:20

**five** 28:4,5 56:20

**five-minute** 65:18

**Flaherty** 55:9

**flipping** 16:1

**Florida** 34:22

**FLVending@comcast.ne t** 17:12

**foregoing** 101:5

**form** 7:10,17 70:19 82:20,22,24,25

**formality** 74:5

**formatives** 80:10,16

**former** 67:5

**Fort** 3:3

**forward** 7:4,11 86:13

WAYNE V. DeLUCA

110

**forwarded** 7:1 85:1 86:8

**FORWARDING** 1:22

**Foster** 85:6

**frame** 70:1 76:12 77:11 97:3

**Frank** 6:19 17:13,15 20:3 22:3 23:12 38:21

**free** 18:19

**front** 9:17 34:5,8 81:11 89:22,24 90:3

**full** 84:3

**fully** 46:7

---
G
---

**Galvin** 2:5 101:3,21

**game** 17:24 18:3 19:8,13,16 20:1,3,5,6,7,8,18,2 1,24 22:9,12,13 24:20 28:21,22,23 29:2 33:7 34:1 48:13 49:9 55:24 56:7,8,10,11,13 66:20 72:16 75:16,19,20 76:1,5,7,8,18,19 77:1,3,4,14 86:21,22 88:13,25 90:10,20 91:2,6,10,13,15,18, 19 92:1,9 97:1

**games** 1:5,8 2:14 3:1 5:10,11 6:17,18 19:10,11,15,23 22:15 24:2,3,4,17,18 25:3 26:2,6 27:6,19 28:1 31:10,19,24 32:1,13,14,23 33:13 34:4,20 35:9 36:20,22,24 39:13

46:6 47:11,16 53:16 54:2,16 57:11,12 58:4,5,21 59:7,23 61:10 62:18 63:5,10,21,22,23 64:2,4,6,7,22 66:24 68:20 69:5,13,18,19 70:3,4,12,13,14 71:2,3,20,21 73:9,25 74:1,15 75:19,24 76:23 77:1,15,19 79:17,18 80:9,13,15 82:18,19,24 83:16 87:8 88:8 89:22,25 90:3 95:20,23

**gaming** 13:17 41:8 68:22 86:23

**Geez** 48:22

**general** 11:16 17:14

**generally** 68:10

**generic** 86:23

**gentleman** 68:2

**gentleman's** 17:15

**George's** 23:15

**getting** 61:18

**Gibsonia** 5:23

**gist** 51:17

**given** 101:8

**giving** 11:14 22:6 64:21 85:8

**Gorman** 9:15 14:22,24 15:11 16:9,15 32:3,11 52:20

**graduated** 11:12

**Grant** 2:22

**Gravina** 40:9,16,19 42:12 65:13 67:21

**GRAY** 7:20

**great** 9:14

**Gregg** 2:16 5:9 7:3 18:25 20:23 22:16 24:21 29:19 35:19 36:23 39:18 41:15 45:7 46:21 48:6 53:11 56:17 58:25 60:14 63:12 65:12 66:19 70:20 78:10 80:24 84:15,19,20 93:19 94:7 95:2 96:2

**Grochanin** 81:9 82:9,10

**Group** 2:15

**Gubser** 6:19 17:15 19:25 23:12 28:19 37:25 38:21 39:16

**G-U-B-S-E-R** 17:16

**Gubser's** 17:13

**guess** 7:4 11:13 20:12 35:2 43:11 44:2,5 49:9 68:7,23 70:5 78:13 83:8

**guidelines** 20:9

**guy** 23:13,14

**guys** 7:22 89:8

---
H
---

**half** 19:1

**hand** 101:17

**handed** 18:8

**handle** 44:12

**handled** 48:4 65:15,16

**handy** 81:5

**hanging** 96:4

**happen** 40:18 49:17

**happened** 45:15 49:16,21 56:2

**hard** 42:25

**Harrisburg** 22:23

**haven't** 8:21 18:10,13 29:13,16,18

**Haverstick** 16:14,16

**having** 5:4 17:1 25:7

**head** 23:16

**hear** 20:23 38:5 43:6 59:12 86:17

**heard** 33:18 69:4,7,8 73:1 86:19

**hearing** 75:15

**held** 13:24 28:9 56:23 65:23

**help** 18:16 52:8

**hereby** 101:4

**herein** 2:2 101:6

**hereof** 98:10

**hereunto** 101:16

**he's** 13:5 14:24 16:13 17:18 27:4,5

**Hey** 56:17 90:7

**high-end** 95:22

**Hill** 5:23

**hit** 13:7

**hold** 17:5 30:4 31:15 35:19 57:9 58:25 84:9

**Holiday** 84:20

**home** 5:21 49:16

---
                I
---

**I'd** 13:20 33:10 54:2 65:25 79:22 85:13 86:13 94:14 95:9

**ID** 75:17 76:8

**idea** 89:1

**identification** 5:17

8:14 61:16 67:9 73:5 74:7 77:21 82:1 83:25 89:3

**identified** 12:18,22 58:2 74:24

**identifies** 75:17

**identify** 7:24 15:17,24

**III** 33:20,21

**I'll** 6:12,24 9:2 13:11 26:16 41:9 44:19 53:12 67:12 74:3,14 76:12 79:11 80:20 81:18 82:4 84:21 93:19

**I'm** 5:14 7:6,7,13 8:2,8,10 9:7,18 11:6,13 15:14 16:22,25 20:10,14 21:12 22:3 24:16 25:18 26:7 27:12 28:24 30:2,3,21 33:18 34:12,21 35:18,20 37:15 38:19 40:5,14,22 41:15,17,19,24 42:5,10,17,18,22 43:5,12 44:2,4,23 45:6,14 48:1,22,23 49:19,21 50:6 51:5 53:11 54:22 56:14,17,24 57:16,17 58:1,8 59:12 60:2 61:18 62:3,6 63:7,9,11,15 65:8 68:19,25 69:25 70:5,15 71:12 73:7,9 76:7 77:23 78:15 79:2,21 80:1,5,25 83:4 84:2,9 85:15 87:3 88:2 89:13,19 92:2 93:18 94:6,7 96:2,17,22

**implication** 29:16

**imply** 29:25

**important** 35:4

**Inc** 59:24 75:16 88:5

**include** 22:14 65:9,10 75:6

**included** 15:17 53:9

**including** 80:10

**income** 19:13,15

**incorporated** 35:2,5

**index** 33:11

**indicate** 37:4

**indicated** 29:1 30:19 62:11 85:3 94:2 98:9

**indicates** 46:5

**indirectly** 101:15

**individual** 17:21

**individually** 41:14 65:15,16

**individuals** 42:11

**industry** 76:18 86:23

**informalized** 54:25

**information** 12:25 23:24 53:8 75:7

**infrequently** 48:8

**infringing** 62:21

**input** 22:4

**inspection** 101:9

**instead** 53:24

**instruct** 20:12 53:24

**instructions** 46:14

**insurance** 65:7,14

**intellectual** 65:10

**interest** 41:5 47:21,23 48:25

WAYNE V. DeLUCA

112

**interested** 101:15

**interestingly** 48:7

**Internet** 4:15

**intervene** 44:16

**intervenor** 5:11

**intervenors** 1:14
2:20 78:13

**introduce** 17:22

**introduced** 17:20
19:25 22:2 28:20

**involved** 72:15 86:20
92:6

**involves** 75:15

**iPhone** 52:4,5,13,22
53:2,10

**irrespective** 66:23
95:3

**isn't** 42:15 63:17
85:16

**issue** 19:10 75:23

**issues** 30:11 69:23

**Italian** 91:2

**items** 43:14,15

**IV** 33:20,21

**I've** 6:13,25 33:15
73:15,16 79:2,7

---
J
---

**James** 9:15 32:3
52:20

**Janet** 38:21 39:4,5,6

**January** 6:22 52:5
54:15

**Jeff** 34:19,25 36:7

**Jerry** 66:5 67:1,3

**Jim** 15:11 87:11

**John** 48:12,15,16

49:3 82:9

**Johnstown** 23:14

**joint** 41:5

**Julian** 2:22 7:4,19
8:1,2 18:21 19:4
78:10 87:19 88:1
91:22 97:11

**jump** 56:15

**June** 101:17

---
K
---

**Kentucky** 56:2

**knowledge** 37:12

**known** 33:22

---
L
---

**labeled** 79:23 84:3

**large** 9:12

**last** 11:13 52:15
94:9,23,24

**later** 35:6 54:4

**Laurie** 37:17,24
38:12,14,17,20
39:3,7,9,15

**law** 2:15 3:2 7:8
10:14 11:12 18:7
32:4 41:23 52:17
75:11 90:15

**lawyer** 14:25

**lawyers** 22:23

**layman's** 76:14

**Lazar** 23:18

**lazy** 30:2

**LCB** 43:10 44:16
45:13 67:5

**least** 10:8 83:23
95:12

**led** 90:10

**left-hand** 52:23 55:3

**legal** 18:1 20:8
23:24,25 24:9 29:2
54:8,10 55:21,25
56:4,12 68:23 69:13
71:8 77:3,16 80:21
86:22 88:14 89:20

**legalized** 91:19

**legislation** 70:9

**let's** 10:6 11:3
13:19 14:17 28:2
31:21 54:20 56:19

**letter** 9:15 14:21
15:5,13,16 24:23
25:2 52:19 53:15
54:19 55:6

**letterhead** 41:13
42:4,6

**letters** 25:8,16,19

**license** 11:7 26:10
30:22,25 62:13
81:13

**licensed** 11:5,6,8,11
24:10 65:8

**limited** 26:2 27:25
28:1

**line** 11:25 20:13
43:2 44:8 53:23
57:4 75:14
99:2,5,8,11,14,17,20
100:2,5,8,11,14,17,20

**link** 86:9

**liquor** 43:17 66:7

**list** 12:25 74:19

**literally** 87:21

**litigation** 80:17
88:3 90:11,14 97:2

**little** 10:13 71:18

83:11

**LLC** 1:5,9,12,13
2:14,20 3:1
5:10,11,12 8:3,4
24:5 31:10,19,24
32:1,13,14,23 33:13
34:20 35:11 36:20
58:5,21 61:10 69:18
70:3,12,13
71:2,20,21 79:17,18
80:13 87:8 88:3,4
90:5

**locate** 52:2

**location** 15:5 16:4
17:9
21:15,17,18,20,24
22:5 43:16
44:4,13,17 45:11
47:25 48:2,11
50:9,19 60:9,18,22
90:21

**locations** 21:22
43:3,10,19 48:17
49:18 83:16

**lodge** 20:11,14 44:19

**long** 18:22,23 24:7
68:25 69:17,20

**longer** 11:6,7 65:8

**lose** 49:18

**lot** 23:21 25:5,23
47:22 48:5 95:23

**Lots** 23:8

**Lou** 6:18 17:21,23
20:1,4 23:14 35:9
36:6 37:24 38:13
39:15 43:1,19 44:7
45:1,10 46:12,14
51:18 55:7 56:8

**Louie** 38:20

**Lou's** 43:10

**lower** 54:24

---
M
---

**machine** 9:21 75:16
83:17 89:16

**machines** 66:16 72:16

**mail** 40:1,3

**maintain** 65:7

**malpractice** 65:7,14

**man** 23:12 93:16

**manage** 13:12

**manner** 82:20

**manufacture** 29:7

**manufactured**
95:21,22

**manufacturer** 22:17
60:1,12,14 61:11
66:16,24 83:8,21
91:7

**manufacturers**
22:10,14 23:2 29:5
66:20 76:22
77:5,6,9 83:12
95:19,24

**Manufacturing** 94:11

**March** 14:21 15:11,13
44:6

**mark** 78:11 80:11,15
88:7

**marked** 5:16 8:14
14:6 61:16 67:8
73:4 74:6 77:20
81:25 83:24 84:12
89:2

**marketed** 86:21

**marks** 62:18,21
64:7,11,18

**matter** 7:7 19:10
98:6

**may** 1:20 2:8 13:7
20:15 23:3

25:4,7,18,21,22
26:7 28:23,24 29:9
31:7,12 38:5 42:22
44:17 45:6 54:23
62:14 65:18 71:19
81:20,21 88:1 94:3
96:1 101:12

**maybe** 33:18 34:25
43:2 44:11 63:13,14
69:1,20 70:5 89:8

**Mayle** 34:19
36:7,11,14,16,17,18

**mean** 26:24 27:13,16
29:12,20,24 45:9
59:16 67:5 88:19

**meaning** 76:5

**meaningful** 59:8

**means** 29:13,18 48:14

**meant** 60:17 76:13

**meantime** 5:19

**mechanism** 95:7

**medication** 11:19

**meeting** 91:21 94:1

**memorandum** 10:14
75:11 90:15

**mention** 24:1,2

**mentioned** 19:24
22:8,9 25:15 32:11
88:6

**message** 51:22,24

**met** 33:21 91:9

**Miele** 23:6 94:11

**mind** 78:16

**mine** 40:13,25 42:2

**minimum** 8:17

**minute** 7:2 16:25
31:16 58:24 61:23
67:15 87:21 93:17

**Minutello** 6:18

17:21,23 20:1 28:20
36:6 38:16,20 39:11
43:1 44:7 45:1
51:18 54:1 55:7

**Minutello's** 35:9
43:19

**minutes** 13:9
26:11,15 27:17
28:4,5 33:9 56:20

**misfiled** 51:12

**misrepresent** 86:4

**missing** 51:22

**misunderstand** 30:23

**modified** 64:22

**modify** 62:18 64:7

**moment** 5:15 8:25
10:8 77:25

**Monday** 1:20 2:8

**money** 48:18 49:14
95:11

**morning** 5:8 8:5

**move** 30:5,6 94:2

**moving** 39:19

**multiple** 95:19

**myself** 52:10

———— N ————

**Namey** 55:8

**necessarily** 15:20
41:13

**Neiser** 2:22 4:6
8:2,3,10 26:17,23
27:9 32:24 38:3
59:11 78:18
87:20,25 88:1 89:4
93:8 97:12

**nice** 8:7,8

**nickname** 33:23

**none** 29:23 40:24

41:8 97:12

**nor** 19:14 31:24

**normally** 83:15

**Nos** 8:13 61:15

**notary** 2:6 98:21
101:3

**note** 49:24 51:23

**nothing** 32:22 33:25
101:5

**notice** 9:23 11:24
46:5

**noticed** 24:22

**notification** 101:12

**notwithstanding** 14:7

———— O ————

**oath** 98:11

**object** 32:24 70:16
79:11 80:20 81:18
82:25

**objection** 7:18,20
20:11,15 27:11
44:20 53:22 54:3
76:13

**objections** 7:10,16
70:19

**obviously** 38:25
43:15,18 63:2 77:15
78:14

**occur** 48:21 63:1

**occurred** 62:25 85:18
92:22 94:19

**o'clock** 5:2

**offer** 48:18 49:14
98:10

**office** 2:17 16:15
20:5 41:3,7 55:22
56:9 90:23 101:17

**officer** 43:17

**offline** 14:4

**off-the-record** 13:20

**Oh** 8:12 17:6 23:8
31:3 67:13 68:25
89:9 93:16

**O'Hara** 55:9

**okay** 6:6,11,24 7:22
8:12 9:14 10:1
11:16 12:2,8
13:1,13 14:16,19
17:2,8 18:2,9,13
19:24 21:3,6,16,25
22:8,13 25:2,24
28:18 29:4,22 30:25
31:3 32:5,21
34:12,14 36:11
37:11,20 38:6
39:3,6,19 40:14
42:19 44:6 46:1
47:5,10,19 48:21
51:13 52:7,21 53:6
54:5,20 55:1,13
56:1,18 57:1,5,13
58:15 59:3,20 60:25
61:6,12 63:4,16
64:8,10 65:9,17
66:12,15,21 68:13
69:2,4,10,15
72:3,6,10,18 73:23
74:3 75:8 76:4
78:6,9,23 79:8
81:23 83:7,10
85:5,9,22 86:3,15
92:10,17 93:3 96:24
97:3,7

**old** 26:9 32:7

**ones** 15:4 23:16
82:18

**ongoing** 30:1

**online** 13:5 28:3
61:13

**onto** 39:19

**open**

**29:**10,11,15,24,25 30:2,11,16 31:5

**opened** 29:17 96:25

**operation** 19:13,23

**operator** 60:4,6

**opinion** 17:25 29:3 55:19,24 56:3,5

**opinions** 55:23 65:6

**opt** 89:7

**order** 51:7,8

**origin** 79:10

**original** 14:4 15:22 46:8 50:15

**originally** 70:10

**others** 71:15

**other's** 48:25

**otherwise** 12:15

**ourselves** 7:25

**outside** 70:11 71:11,14,15

**owned** 33:13 87:7

**owner** 80:8

**ownership** 80:14

---

P

**p.m** 97:17

**PA** 4:20 5:23 19:11,15 20:8 24:4 26:7 27:5 28:14,15 29:2 31:18 64:20 69:13 71:8 73:3,9 76:8,23 77:3,4 80:11,19 82:18 86:22 88:24 89:19,20

**Pace** 91:18

**Pace-O-Matic** 15:2,3 16:9 19:7 20:18 22:17,19 23:4

**29:**8,21 32:9 56:10,11,12 67:2 69:7,9,13 72:19,20,23 75:15 76:20 77:1,2 87:6 88:5 89:25 90:6 91:20,24 92:11,20 93:5,15,21,24 94:10,17 95:11 96:15,22 97:4

**Pace-O-Matic's** 80:19

**packet** 17:6 78:4

**page** 4:3,9 42:22 50:1,3 51:6 52:11 53:1,8 57:16 59:1 61:10 78:22 85:3,16 86:14 87:3 99:2,5,8,11,14,17,20 100:2,5,8,11,14,17,20

**pages** 42:23

**paging** 67:23

**paid** 45:22 94:16,23 95:3,6,13

**papers** 91:15

**Paragraph** 62:11 63:6 80:6

**Paragraphs** 74:20

**Pardon** 38:9 53:19

**Park** 2:17 84:20

**particular** 15:16 18:4 54:11 81:7 82:24

**parties** 78:14 84:9 101:10

**partner** 19:12,14

**partners** 42:13

**partnership** 59:22,23 60:24

**partnerships** 60:20

**past** 25:22

**Paul** 55:8

**pay** 65:14

**payment** 94:21 95:4

**pays** 95:8

**PC** 2:15 3:2

**penalty** 98:3,4

**Pennsylvania** 1:1,4,12 2:7,14,18,20,23 3:4 5:9,12 6:17 8:3 18:1 19:9,21 22:19,22 24:2,3,10,18 25:3 26:6 27:19 31:10,19,23,25 32:12,14,23 33:7,12 43:14 56:1,4 58:10,21 59:7 62:17,21 63:5,10,21,22 64:4,6 66:9 69:5,18 70:3,11,13,14 71:1,2,11,16,20 74:1 75:16,19,20,23 76:4,19 79:18 80:9,10,13,15 82:19,24 86:18,19 87:8 88:3,7,14,15 90:4 91:14 94:11 101:1,3

**people** 39:21 44:3 49:11 76:25 95:21,22

**Perhaps** 86:9

**period** 6:21 23:1 69:20

**periodically** 13:17 30:3

**perjury** 98:3,4

**permission** 64:21

permitted 63:22

person 36:20 82:9

personally 66:6

perspective 15:23

Petition 10:14,16 15:7,9 16:6 75:11 91:11

pghlaw.com 40:8,12,14 42:15 67:17

Philadelphia 14:25 96:2

phone 42:16

photos 81:9 82:14,15,16,21

phrase 70:13 71:2,6 76:18 79:14

physical 50:24

physically 29:18 40:1

pick 90:22

picked 90:20,23 91:2,9 92:4,9

pick-up 90:10 92:1

picture 68:1 83:5

piece 55:19 92:3

pieces 55:21 66:11,13 73:17

Pittsburgh 2:18,23 3:4 17:14

placard 71:7 89:21,24 90:3

placed 22:20 90:21

Plaintiff 1:10 3:1 80:8

Plaintiff/ Counterclaim 1:6

2:13

Plaintiffs 2:2

played 55:24

Plaza 85:6

pleading 63:2

pleadings 15:6 16:5

please 5:21 11:18,23 13:22 14:23 18:19 20:2,20 46:10 61:19 87:21 88:23

PLLC 2:21

plus 45:6,9

point 7:24 47:16 57:5 79:12

points 12:24

Police 43:14 90:25

policy 65:7

POM 1:12 2:20 5:11 8:3 88:3 94:10,25

portion 52:12

positive 60:2

possible 13:12

possibly 43:9

Postal 40:2

post-seizure 75:15

practice 47:20 76:17

practiced 87:10

precedes 53:2,9

precise 24:17

predominantly 76:2

prefer 85:13

preference 56:13

present 2:12 3:6 48:19 92:18,19,20

previously 90:16

printed 54:21,23

prior 36:18 54:18 63:17 91:25 92:12

privilege 7:17 20:14 44:19 53:22 54:3

privileged 7:12 16:21 36:3

privy 72:13,25

probably 15:19 22:7 34:25 35:16 42:18 50:9 51:12 54:17 80:2 97:6

problem 45:10

Procedure 2:4

proceed 12:6 45:18

process 60:13

produce 6:14,25 25:20,25 31:22,24 32:13 52:8 65:1

produced 8:17 10:20 14:18 15:15 16:20,24 17:1 32:2,19,22 34:7,9 52:3,12 61:2 75:6 79:5

producing 18:6

production 6:12,21 9:2 10:10 11:1 14:1,5,9,14,15,17 24:22 26:4 42:19 64:25 65:3

Professional 2:5

profit 19:23

profitable 91:6

PROHIBITED 1:23

project 30:1

Proof 6:6,7,9

prop 60:23

properly 12:22

property 10:15 43:13

65:11 75:12 91:12

**proposed** 6:15

**proprietorships** 60:19

**provided** 91:25

**providing** 68:23

**PSG** 62:15,16 64:14 78:13

**PSG's** 62:17

**public** 2:6 98:21 101:3

**pull** 13:10 52:7 73:7 79:22 84:2

**pulled** 57:20

**purpose** 28:20 94:12

**purposes** 21:18

**pursuant** 2:3 5:13 14:15 30:5

**puts** 48:2

**putting** 21:23 77:15,16,18

---
Q
---

**question** 12:5 24:18 35:24 43:23 61:6 63:24 70:22 81:19 87:1,8,12 90:7 94:8

**questioning** 11:25 20:14 53:23

**questions** 66:1 68:14,18,21 75:3 87:18 93:8,20 97:8,10,16

**quick** 7:3

---
R
---

**reading** 44:23 101:10

**ready** 61:25

**real** 7:3

**really** 18:7 22:3 24:21 26:25 34:2 43:23 50:19 51:9 54:7 61:6 63:7 64:9 72:9,10 94:5

**reason** 11:23 27:23 36:15 44:9 61:2 66:18 85:22 99:4,7,10,13,16,19, 22 100:4,7,10,13,16,19 ,22

**recall** 18:17,25 19:6,25 22:11 23:10 24:21 25:6 29:9 31:20 35:24 38:14 40:18 44:9 47:8 48:22 49:7,8 50:22 52:11,14,18 53:1,17,20 54:13 55:17,18 60:4 61:3 62:9,22,24 63:3,20,25 64:5,9,12,16,18,21 66:9 73:20 74:17 77:10 85:19 88:9,11 91:23 92:10,13,14,15 93:3 94:22 95:12,16 96:1,20

**receive** 37:2 46:16

**received** 9:9 13:16 35:24 45:18 94:9 95:11 101:12

**receiving** 74:17

**recess** 13:23 28:8 56:22 65:22

**recipients** 38:12

**recognize** 53:13 78:2 84:4

**recollect** 21:18 28:19,21

**recollection** 11:20

18:18 19:5 20:4,7 29:4 31:9,13 35:12,16 39:7 40:20,22 45:3,17 46:4,16 55:14 56:4 59:4 64:16 73:24 77:8 85:25 87:13 88:12 89:24 94:14,16 96:13,17

**record** 5:20,21 6:24 7:6,25 10:24 11:18 28:10,12 30:14 38:11 40:8 43:13 53:7 61:14 96:8 101:7

**recorded** 101:6

**records** 94:15 95:10

**redacted** 36:3 53:9

**redesignations** 14:11

**reduced** 101:7

**refer** 7:1 12:14 75:22

**reference** 37:16 57:22 84:12

**referenced** 89:17 91:18

**references** 17:9

**referred** 57:24

**referring** 41:15 58:8 72:24 91:14

**reflects** 10:9 68:10

**refresh** 18:18 73:23

**regard** 8:16,24 12:13 14:1 16:17,22 17:8 18:14 19:9 24:19 32:12 34:17 38:11 42:19 54:14 81:20

**regarding** 6:16

**registration** 34:20 81:13

WAYNE V. DeLUCA

118

**relate** 42:22 45:23

**related** 6:14 15:13 17:18 33:13 41:13 43:25 44:5 65:1 93:5 94:24

**relates** 15:16 52:1

**relationship** 93:23

**relative** 101:14

**relatively** 27:18

**remember** 24:15 46:21 50:17 56:8 69:3,8 71:22,24 72:1,12 76:24 84:19 85:7 88:2,13,17 89:20 90:9 91:22 92:2 93:16 95:18 96:21

**render** 65:5

**rendered** 65:6

**Repeat** 88:23

**rephrase** 76:17

**replace** 49:15

**report** 15:5 16:3

**reporter** 2:6 38:4 43:5

**reports** 32:9

**repository** 25:12

**represent** 5:9 7:6 20:12 23:20 24:3 36:22,24 44:17 47:16,22 49:7 62:14 63:9 68:19 69:17 74:14 82:4 88:4 93:14,21

**representation** 31:23 49:10 53:15 54:15 55:11,15 80:12 81:21

**represented** 12:10 22:4,16,18,20 23:3,15,17,18 24:6

25:16 29:5,8 31:10 47:24 48:5 51:10 63:16 67:22 69:23 70:2 93:17 96:14,15

**representing** 19:20 22:8,9 23:2,10 47:20 58:20 63:4 64:1,4 96:12 97:4

**represents** 10:25 15:1,2 16:9 50:14

**REPRODUCTION** 1:23

**reps** 92:20

**request** 6:11 8:16,19 26:24 95:3

**requested** 36:10 55:19 62:18 74:19 95:1

**requesting** 36:8 45:1

**reserve** 54:3

**reserved** 7:10,17 70:19

**respective** 14:11 101:10

**respects** 98:12

**respond** 101:12

**response** 11:1 32:14

**responsive** 8:18

**rest** 17:5 66:14

**result** 49:18 76:1,2

**retainer** 45:1,4

**retire** 94:2

**retired** 52:10

**Return** 10:15 75:12 91:11

**review** 15:22

**reviewed** 62:20

**reviewing** 28:21 85:17

**revised** 75:1

**revisions** 46:13

**rid** 48:18

**riders** 65:10

**right-hand** 41:18 42:14 46:25 54:24

**rings** 16:14

**Road** 2:16

**Rodgers** 87:5,9,10

**role** 16:11

**rotate** 89:9,13

**rule** 30:8,12

**rules** 2:3 11:16 30:6

**Rusty** 20:22

---
S
---

**save** 98:7

**saved** 82:3

**Savvy** 1:12 2:20 5:12 8:4 88:3

**saw** 32:2 69:11,13 86:5 89:16 91:18

**scene** 35:20

**scheduled** 18:25 19:4

**school** 11:12

**screen** 5:14,24 6:1,13 8:8,25 9:3,8,22 15:25 16:2 21:14 34:15 37:7,9 47:3 56:25 62:5 66:2 67:12,13,14 73:10 74:10,20 80:1 82:4 89:7,11

**screens** 95:23

**scroll** 35:19 78:2,7,9 80:5,6 82:8,12 84:24 85:10,15

WAYNE V. DeLUCA                                                119

**scrolling** 34:13 59:2 84:8

**seal** 101:17

**search** 74:23

**second** 5:15 9:8 11:5 13:20,21 18:2 20:20 31:15,16 38:2 50:8 56:18 61:18 75:10 87:21 89:13 92:24 96:6

**secretaries** 21:9 36:5

**secretary** 11:14 39:5,6

**section** 58:2,8,13 75:18 78:12

**seeing** 8:8 84:9 88:6

**seem** 16:7 19:24 28:19

**seen** 6:7,9 62:7 73:12,15,16 78:25 79:2,7,13

**seize** 43:14 75:12

**seized** 10:15 43:15,19 66:11 75:21 91:10,12

**seizure** 66:10

**send** 46:7 55:8 86:11

**sending** 22:5

**Senior** 24:7,10

**sense** 76:9

**sent** 15:10 34:25 38:13 39:23 44:7 46:6,12,14 52:13,19,22 53:2,9 73:8 79:4 84:16

**separate** 41:1,2

**separation** 94:19

**series** 82:14

**Service** 6:6,8,9 40:2

**services** 55:7 56:6 68:23 94:24

**servicing** 44:14

**setting** 50:20

**several** 23:17 66:19

**Sewickley** 87:11

**share** 42:14 73:9 74:4 77:23 80:1 82:4 83:4 89:6

**shared** 41:3 42:16

**sheet** 84:5 98:1,10 99:1 100:1

**shop** 50:21 51:9

**showing** 8:11

**shown** 42:11 82:20

**shred** 30:7,12,14

**shredded** 30:15

**sign** 46:6,14 60:18 85:17

**signature** 35:23 46:7 51:16 57:16 58:25 61:10 78:21 85:16 97:15 99:24 100:24

**signatures** 60:21

**signed** 37:2,4,11,17 38:7,10,22,25 39:10,23 46:17,18,20,22 50:10 51:19 57:14,18 101:11,13

**signing** 85:17,19 101:10

**similar** 25:2 67:21 77:1

**sit** 26:25 86:25 92:21 95:12

**situation** 48:3

**six** 30:4,9,10

**skill** 1:4,8 2:14 3:1 4:20 5:9,10 6:17 17:18,20 19:9,11,13,15,16 22:9,12,13 24:2,3,4,17,18,19 25:3 26:2,6,7 27:5,19 28:1,14,15 31:10,17,18,19,23 32:1,12,14,23 33:7,13 34:1,3 35:9 47:11 53:16 54:2,14,16 55:11,15 57:11 58:4,21 59:7,23 62:10,11,17,21 63:5,10,17,21,22,23 64:2,4,6,14,19,20,2 2 68:20,22 69:5,13,18,19 70:3,4,12,13,14 71:2,3,8,20,21 72:16 73:3,9,25 74:1,15 75:16,19,20,23 76:1,2,3,5,8,18,19, 23 77:4 78:14 79:17,18 80:9,10,11,13,15,19 82:18,19,24 86:18,19,22 87:8 88:7,8,14,15,24 89:20 90:5 91:14,19 95:20 101:8

**skills** 6:18 22:15 25:1

**Sky** 28:22,23 34:20 35:8 36:20,22,24 39:13 46:6,12,15 47:4,10,12,16,18 49:22,24 56:7 57:12 58:5 61:10

**sole** 58:7,9,14,17,19 60:19,23

**somebody** 52:8 73:21

**someone** 10:16 33:24 50:20

**sometime** 35:13 62:12 94:3,18 96:16

**somewhat** 54:25

**somewhere** 35:2,5 51:7

**sorry** 7:13 8:2 11:13 16:22 30:21 34:21 40:14 41:16 43:5 57:17 59:12,13 81:24 87:3 96:23

**sort** 7:11 50:5 51:6

**South** 59:24

**space** 41:3

**speaker** 69:12

**special** 65:10

**specific** 31:12 35:16 63:3 82:16,18 90:2 94:22

**specifically** 15:4 24:16 61:4 76:21 77:10 92:2

**specifics** 64:12

**spell** 5:20

**Spilman** 2:21

**spoke** 23:21

**staff** 44:25 52:9

**stamp** 17:3

**stamped** 9:24

**start** 14:2 68:21,22

**started** 88:22 96:11

**starts** 9:16

**state** 5:20 43:14 83:18 90:24

**stated** 101:6

**STATES** 1:1

**stenographically** 101:6

**step** 20:10 56:18

**Steve** 67:24 68:4,5

**Steven** 42:3

**sticker** 4:16,20 71:11 73:9,12,14,18,20,22 ,23 76:23

**stickers** 72:16,17 77:3,16,18

**sticking** 76:23 77:3

**stop** 11:23 78:8 83:4 84:8

**Street** 2:22

**stuff** 79:4,5

**subfile** 47:4,7,10 49:23,24

**subject** 44:8 45:5

**submitted** 90:15

**subpoena** 4:10,21 5:14 6:3 8:19 11:1 14:15 25:25 26:18,20 27:24,25 32:15 33:2,3 74:11,15,17,24

**subpoenaed** 27:1,3,6

**Subscribed** 98:18

**substance** 71:25 72:1 73:24

**suggesting** 62:6

**suggestions** 22:6

**Suite** 2:17,22 3:4

**Summerfield** 2:17

**support** 10:14 75:11

**supportive** 25:5

**supposed** 86:5

**sure** 7:15 10:6 13:4 22:3 25:18 26:7 28:25 31:21 33:4,19 35:1,10 39:18 40:22 41:17,24 42:5,17,18,22 45:7 48:22 49:19,21 50:7 57:17 63:11,15 64:3 69:25 70:24 78:15 79:2 83:6 88:16 92:2 94:6,7 96:2,3,7,17

**surfaced** 80:17

**sworn** 5:4 98:18 101:4

**Systems** 1:13 2:20 5:12 8:4 88:4

---

T

**tag** 80:19

**tail** 65:8,9

**talk** 8:7,9 14:17 18:3,7 53:25 56:15 65:18 76:22

**talked** 18:4,10,13,21 19:4 71:18 83:11

**talking** 13:2 24:16 31:17 40:11 57:8 72:12

**task** 27:18

**Technology** 2:15

**tends** 29:25

**term** 69:5 72:5 76:6,14,16 86:23

**terminal** 75:17,22 76:8

**terminated** 55:7,10,12,15,17 56:6

**termination** 55:2 94:19 95:13

**territory** 48:8 49:1

**testified** 5:5 28:18 30:21 45:19 57:13,19 59:6 86:18

**testify** 42:24 59:6 67:20 68:9 101:4

**testimony** 11:20 15:12 31:6,21 46:18 47:15 48:24 52:25 63:18 64:3 67:16 79:12 81:22 84:22 85:23 92:17 96:15 101:8

**text** 37:18 52:13 53:1

**Thank** 9:16 28:7,17 65:20,21 97:12,14

**Thanks** 7:22 87:22

**thereof** 69:6 80:10,16

**there's** 6:6 17:3 30:8 32:22 39:21

**they're** 12:21 16:2 23:22 27:10 44:5 57:20 80:25

**Thomas** 2:21 38:21 39:4,5,6,16

**thread** 51:23 52:1

**throughout** 22:10,21

**throw** 30:13

**tight** 96:4

**titled** 73:8

**today** 5:13 11:20 12:10 83:12 86:25 90:17 92:21 93:21

**Tom** 16:14

**Tony** 7:13,24 68:19 69:16 81:3,19 84:11 97:9

**top** 23:16 43:18

46:24

**Townsend** 40:10,16,19 42:3,12 67:21,24 68:4,5

**track** 95:7

**tracks** 67:18

**trademark** 63:23 64:23 70:14 72:11 80:9 87:5,6

**trademarks** 65:2 71:21 72:7 93:6

**tradeshow** 69:12 88:8,11 90:9 91:17,20 95:16,17

**tradeshows** 73:15 82:17

**transaction** 49:11

**transactions** 6:15

**transcript** 1:23 4:19 78:12 84:15,17,18 85:18,24 86:5,6 98:5,12 101:11

**transmitted** 40:3

**tremendous** 8:11

**tried** 25:19 89:5

**trouble** 17:1

**true** 85:24 86:2 98:7,12 101:7

**truth** 62:9 101:5

**try** 11:24,25 13:12 45:16

**trying** 23:15,23 27:12 42:10 48:10,23 62:8 90:8

**twice** 61:2

**types** 45:15 60:21 95:19,20

**typewriting** 101:7

**typically** 83:21

---
U
---

**U.S** 40:2

**Uh-huh** 67:19

**ultimately** 96:22

**understand** 9:2 10:19 12:4 15:12 16:10 26:24 31:5 33:5 34:10 36:18 39:25 42:10 44:6 49:22 63:24 64:2 65:2 96:14 97:3

**understanding** 8:21 12:7 16:12 17:11,17 33:3 34:23 36:12,21 45:8 46:1 50:1,14 51:6 52:21 58:16 60:15 79:8 98:10

**understood** 12:7

**unfortunately** 70:6

**unincorporated** 42:8

**Unis** 3:7 6:18 13:2 24:19 28:14,15 33:14 56:15 58:18 59:7,9 70:6,8 72:20,21,23 86:19 88:25 90:20 91:21,25 92:8,11,20

**Unises** 24:5,6,19 25:3 26:6,8 27:6 69:17 70:2,12 71:1 76:20 80:13 87:7 90:4 91:24 93:4

**UNITED** 1:1

**unless** 12:15

**unsigned** 14:21 61:1

**unusual** 44:13,14 45:11 48:11

**update** 89:5

**upload** 81:17

WAYNE V. DeLUCA

122

**uploaded** 79:23 89:6

**upon** 62:9 85:17

**upper** 52:23 55:3

**usually** 25:7 33:10

---
V
---

**variation** 69:5

**various** 19:21 83:17

**vending** 17:7,13 19:16 23:15 24:12 36:7 49:4,6

**vendings** 19:17

**vendor** 22:14 23:18 26:3 44:14 45:11 47:24,25 48:9,10,16,17,19 49:14,15 50:11 60:8 83:14,18

**vendors** 19:21 21:21 22:12,13,20 23:7,8,10,17 25:15,17,19 47:13,20,22 48:6,7,25 83:13,17 92:5

**Ventures** 2:15

**venue** 60:7,9

**version** 37:11 46:17 57:14 64:22

**VGTs** 43:20,21

**via** 2:7

**viable** 35:10

**video** 75:16

**Videoconference** 2:8

**view** 89:9

**voice** 38:4

**vs** 1:7

---
W
---

**wait** 16:25 26:25 58:24 61:23 93:17

**waived** 97:15 101:10

**waivers** 47:21

**Warner** 23:21,22

**Washington** 2:16

**wasn't** 23:24 25:12 26:4 30:20 72:25

**Wayne** 1:17 2:1 4:2 5:3,22 8:5 38:3 40:15 48:14 59:11 62:15 84:3,22 89:11 98:16 99:24 100:24 101:4

**W-A-Y-N-E** 5:22

**Webb** 3:2 7:7 18:7 32:4 50:24 52:17

**website** 40:19,21 67:21,24 68:5,8,11

**websites** 67:18

**week** 52:15

**we'll** 11:25 28:4 86:12

**we're** 7:11 53:25 57:8 62:7 77:24 96:4

**Western** 1:1 22:22 66:8

**whatever** 56:2

**wherein** 91:11

**WHEREOF** 101:16

**Whereupon** 13:23 28:8 56:22 65:22

**whether** 17:17 18:1,17 29:5 31:9 45:17 46:22 51:6 52:18 60:23 63:8 67:1 68:9 72:15 77:6 79:2

**whole** 13:10 48:20

96:19 101:5

**whom** 64:13

**whose** 66:20 73:18

**wife** 11:14

**Williamsport** 23:6,14

**withdrawn** 16:20

**withheld** 8:22

**witness** 2:2 8:7,12 26:21 27:2 38:6 43:8 56:17,21 59:14 65:20 70:17,22 78:21 79:12 83:1 84:14,23 85:5,7 97:14 101:4,8,11,12,16

**work** 29:21,24 30:17 40:24 41:1,7 47:12,17 70:7 72:11

**worked** 31:4 39:10,12

**working** 68:22

**workings** 20:6

**works** 16:15 67:2

**write** 47:5

**writing** 46:24,25 47:6

**written** 48:3

**wrong** 54:22

**wrote** 44:3

**wvdel@pghlaw.com** 21:3 40:11

**www.pghlaw.com** 41:12 42:1,18

---
Y
---

**Yep** 9:16 78:20 80:7 81:14 91:1,8

**you'll** 6:3 9:23 36:9 37:3 46:5 50:12 51:22

WAYNE V. DeLUCA

**yourself** 52:8

**you've** 11:17 30:16
  49:22 62:7

---

Z

**Zegarelli** 2:16 4:4
  5:7,9,18 7:13,18,23
  8:15 13:6,8,19,25
  20:17 26:19
  27:4,13,15 28:11
  33:1 38:8 43:22
  44:21 51:4 54:5,6
  56:14,19 59:15
  61:12,17
  65:17,21,24 67:10
  68:13 70:15 75:2
  76:12 79:11,23
  80:20
  81:2,6,10,16,18
  82:25 84:11,21
  85:2,6 87:19
  93:9,13 96:9
  97:7,11

**Zoom** 2:7