IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


POM of PENNSYLVANIA, LLC,
et al.,

                    Plaintiffs,    Civil Action No. 18-722
          vs.

PENNSYLVANIA SKILL GAMES,
LLC,

                    Defendant.

                              - - -


Transcript of Excerpt of Jury Trial on February 13, 2023,
United States District Court, Pittsburgh, Pennsylvania,
BEFORE:  Judge Patricia L. Dodge, Magistrate Judge.


APPEARANCES:

For the Plaintiffs:       Julian E. Neiser, Esquire
                          Jonathan Deasy, Esquire
                          SPILMAN, THOMAS & BATTLE, PLLC
                          301 Grant Street
                          Suite 3440
                          One Oxford Centre
                          Pittsburgh, Pennsylvania 15219

For the Defendant:        Gregg R. Zegarelli, Esquire
                          Technology & Entrepreneurial Ventures
                          Law Group
                          2585 Washington Road, Suite 134
                          Summerfield Commons Office Park
                          Pittsburgh, Pennsylvania 15241

Court Reporter:           Sharon Siatkowski, RMR, CRR, CBC, CRI
                          700 Grant Street, Ste. 6260
                          Pittsburgh, Pennsylvania 15219


Proceedings recorded by mechanical stenography;
transcript produced by computer-aided transcription.

P R O C E E D I N G S

- - -

(Jury present.)

THE COURT:  Ladies and gentlemen, you can be seated. Thank you.

Ladies and gentlemen, I hope you had a nice break at lunchtime.  We are now ready to proceed with the opening statements of the parties.  We'll be starting with Mr. Neiser, who is counsel for the POM parties.

Mr. Neiser, are you prepared to proceed.

MR. NEISER:  Yes, Your Honor.  May it please the Court, opposing counsel, Mr. Unis.

Of course, the jury, good afternoon.  This Court has explained that this is a business dispute regarding a contract and a trademark.  More specifically, as you will hear, this is a case about a contract involving electronic skill games and a trademark called "Pennsylvania Skill."

Through evidence and testimony, you will hear, and we will establish, three things in this trial:  One, that Pace-O-Matic conceives, created, developed, refined, marketed, advertised and built both the gaming software involved in this case and all forms of the trademark Pennsylvania Skill.

It then gave those rights to POM of Pennsylvania and Savvy Dog.  And I'll explain who all of the parties are in just a few moments.

Number two, we will establish through evidence and testimony that the defendant, Pennsylvania Skill Games, LLC, infringed on the trademarks by claiming them as its own and putting it on products that are not ours.

And, number three, it is the defendant and not us who is in breach of the contract.

Now, before we get into the details on the case, I'd like to introduce the team. First, my name is Julian Neiser. I'm an attorney with the law firm of Spilman Thomas & Battle, and my office is located here in Downtown Pittsburgh.

Seated at counsel table with me Michael Pace. He will be here on behalf of Pace-O-Matic Inc., POM of Pennsylvania, LLC, and Savvy Dog Systems LLC.

The gentleman to his left is Louis Miele. Mr. Miele is the president and owner of Miele Manufacturing Inc.

At the end of the table, though not a lawyer -- and I think he thanks his lucky stars that he's not -- is A.J. Simeone. And A.J. is an exhibit technician. His job is to help me get the exhibits in and out of here as quickly as possible so we can make the most efficient use of everybody's time.

And seated in the back of the courtroom is Jonathan Deasy. He is a colleague of mine. Mr. Deasy will be assisting me from time to time throughout the trial.

Now, one of the best ways I can introduce the parties is through this machine right here.

This isn't just a game.  It's a skill game, meaning that players can earn money if they win and the outcome of the game is primarily determined by the skill of the player and not by chance.

The evidence will show that, by way of introduction to Pace-O-Matic, that Pace-O-Matic created the software that powers this machine.  The evidence will also show that this logo, this brand that you see here, also was created by Pace-O-Matic.

The construction of this machine, the manufacturing, the assembly, was done by Miele Manufacturing Inc.  As a matter of fact, the evidence will show that there are 20,000, approximately 20,000, of these machines that have been sold in the Commonwealth of Pennsylvania since 2013.

Pace transferred its intellectual property rights to an intellectual property holding company called Savvy Dog, and that's why Savvy Dog is in the lawsuit.  They hold the patents and trademarks of Pace.

And Pace created POM of Pennsylvania because, as the evidence will show, the business expanded, and they created state-specific companies to control their operations.

So Pace is software and design, Miele is manufacturing, Savvy Dog is a business that holds the intellectual property rights, and POM of Pennsylvania is just a state operating company.

Now, let's talk about how we got here.

We cannot talk about this case without discussing who Michael Pace is. Mr. Pace is a self-made man. He taught himself how to program computers and how to use electronics on his own. For those old enough to remember, he taught himself electronics through a correspondence course. He has six patents, I believe. He also started numerous audio intellect gaming companies. Interestingly, he's never graduated from high school.

Around 2000, Mr. Pace created the company called Pace-O-Matic. They're based in Georgia. The purpose of Pace-O-Matic is to create skill games that are still exciting to play. And they focus on creating skill games for specific state markets. He initially focused on Georgia, Florida, and South Carolina, close to where Pace's offices were.

But soon they focused on Ohio. They created a game there, as the evidence will show, called Ohio Skill. And you will hear evidence and testimony that using a naming convention such as the state name followed by "Skill" is a very typical thing, for Pace-O-Matic at least. And they do this to distinguish their products from competitors, which is very important.

In 2009, you will hear evidence that Pace began programming a software for the Pennsylvania market -- a software game for the Pennsylvania market.

And from 2009 to about 2013, they had worked on and

refined a Pennsylvania-specific product.

You will also hear evidence and testimony that in 2012 Pace-O-Matic programmed the name "Pennsylvania Skill" into the gaming software.  That was their brand, and it was visible on the game when the game was turned on.

Now, there are two critical time periods in this case.  Two very critical times in this case.  The first is in the summer to the fall of 2013.  The evidence will show that, at that time, in the summer of 2013, Pace had what it believed to be a completed game for the Pennsylvania market.  They assembled the game, they load it up with software, they programmed into the software the name "Pennsylvania Skill" that would be displayed when the game was played, and they shipped it from Atlanta to Pennsylvania.

Why?  I'm about to explain a process to you that may sound foreign, but this is the process in Pennsylvania if you want to have a game determined as a game of skill.

You will hear that, after the game was shipped to Pennsylvania, there was a meeting in Harrisburg with Mr. Pace; a gentleman named Ryan Wood -- who you will hear about and testify live here in this trial -- who is the salesperson for Pace; a Pennsylvania State Police officer, or trooper, named Rick Goodling; and an attorney named Wayne DeLuca.  Mr. Goodling will testify live in trial.  Mr. DeLuca, unfortunately, due to his health, will not be present, but you will hear his testimony

because it was recorded in a deposition.

The purpose of that meeting was to audition that game for Trooper Goodling and make a determination whether or not another step should be taken to get approval from a court that this game could be sold in Pennsylvania.

And based on that meeting and based on that audition, a decision was made to see if a court would agree that it is a game of skill and not a game of chance.

Now, even though the Commonwealth of Pennsylvania has many agencies and departments and bureaucracy, there is no department that you can take a game to that they can approve it as a legalized skill game, or a skill game.

So what has to be done is a controlled pickup -- or a friendly pickup. What this involves is placing the game into a bar, or what we'll call a location, calling the state police, telling them that the game is there, they come and pick it up, and then you start a lawsuit to get the game back. And if the game is a game of skill, determined after a trial -- much like this one -- and after expert testimony, you get the game back, and hopefully you get a court order that says this is a game of skill and not chance.

Attorney DeLuca, who is a gaming lawyer, took the game, that initial game that we talked about that was auditioned by the Pennsylvania State Police, he considered a bunch of different counties in Western Pennsylvania, and he determined

that Beaver County was the most appropriate and likely jurisdiction to get a favorable ruling.

So he found an operator, which is a company that buys the games and places them into bars, restaurants, grocery stores, gas stations, those are locations.  That operator put the game into a location, Attorney DeLuca called the state police, the state police called the liquor control enforcement, they picked up the game, and they started a lawsuit to get the game back.  And this happened, as the evidence will show, in the fall of 2013.

Pace, as you will hear, paid all of the legal fees for this litigation.  They supplied all of the witnesses, and they paid for an expert to testify.

Now, this is in the fall of 2013.  While Pace is waiting for a court to make a ruling -- and the evidence will show it took longer than expected because of the death of an expert witness and some other things -- they were prepared for success or failure.  And the evidence will show that, during the interim, November of 2013 until December of 2014, the evidence will show that Pace created a design brand for Pennsylvania Skill prior to the decision from the Court which featured this -- these words, "Pennsylvania Skill," that Liberty Bell, and the Constitution background, the image you see all around this box.

Number two, during that time period, from

November 2013 until December of 2014, Pace hired Miele Manufacturing as its exclusive distributor.  The evidence will show that Miele had the capacity, facilities, experience, and the location in the middle of the state to -- that made him the logical choice.  In fact, the evidence will show he was the only choice.

Number three, Pace staff, just like Mr. Ryan Wood -- who I mentioned a few minutes ago -- were visiting operators all over the Commonwealth.  You will hear that he was going door to door, meeting with companies that buy games just like this one to explain about the Pennsylvania Skill game and what they hoped would be a successful court decision.

So by the time the Court decision came down in December of 2014, Pace was ready to go and they were ready to enter the Pennsylvania market.

Mr. Wood will tell you that he vividly recalls receiving a fax from Attorney Wayne DeLuca on December 24, 2014, where they announced that they were successful in Beaver County and they got a decision from the Court and they determined that the -- this is from the order -- the Pennsylvania Skill game was a game of skill and not chance.

He vividly remembers, as the evidence will show, that that was the -- the only thing that was discussed was the next step in selling the game and what steps needed to be taken because there was an appeal period.  Nothing else.

About a week later, though, the evidence will show that Attorney DeLuca called Mr. Wood and said, Hey, we have a potential customer here. I'd like for you to give him a call and see if you can do business with him.

As the evidence will show, that person was Albert Unis III, the father of Albert Unis IV, who is the owner of Pennsylvania Skill Games, LLC.

You will hear from Mr. Wood and several other witnesses that this is the first time they learned who the operator was who put the game in the bar. What you will also hear is, during that controlled pickup process, that there is no risk of an arrest, fine, or any other harm for anybody who puts out a game in a controlled pickup. They just put the game out, and there's no risk with it whatsoever. That's why it's called a "friendly pickup."

Mr. Wood will testify he has no recollection of meeting Albert Unis III before that time. Mr. Wood will testify that Mr. Unis did not quite know how the system worked and he needed a little bit of explanation because this game, you don't just buy -- as the witnesses will tell -- and put it out and it makes money. You have to put software plays into it. And the software plays are what makes a Pace software program work. That's the heart of it. That's how everyone makes money on it.

Ultimately, Mr. Wood will testify that Attorney DeLuca made a request, because Albert Unis III had placed the game in

the bar in Beaver County, that he should receive some special pricing, and Mr. Wood will tell you he was happy to do that.

So they talked. And the evidence will show, not by Mr. Wood or just by Mr. Wood, by several witnesses, that Mr. Unis made numerous representations that he would buy hundreds of the games. Hundreds of them.

There was another meeting, and then, ultimately, there was an agreement that was drafted. That agreement was between Pace-O-Matic, Miele Manufacturing, and a group called the Albert Unis and Affiliates. They're not in this lawsuit. And we'll discuss that document later.

But this is the important part for you to understand. This document contained what was called a "right of first refusal." The testimony from our side will say that this was based upon a performance requirement, meaning that there needed to be so many machines purchased in exchange for the right of first refusal.

But you will learn that the language in that agreement changed over time to the contract that will be at issue in this case.

Shortly after that, the Unises went down to Georgia, on or about February 5, 2015, and they were introduced to Michael Pace. Mr. Pace will testify -- he will sit on that stand right there, and he will tell you that was the first time he ever heard of them and the first time he had ever met them.

And I say "them," I mean Albert Unis the father and Albert Unis the son.

They even took a photograph together in the lobby of what was then a completed Pennsylvania Skill game.  Mind you, this is February 2, 2015.

The Unises picked up some games.  They went back to Pennsylvania.  And the evidence will show they entered into a second contract that was negotiated over the next few months.  This contract also contained a right of first refusal.  As you will see, through evidence and testimony, that there were drafts in this agreement that were written.  And you will see that the first versions of this agreement were between Pace-O-Matic, Miele, and yet another company called Aliquippa Industrial Park.

In the last draft of the agreement, however, which were drafted by counsel and negotiated within the parties, Pace found out and Miele found out, that there was a company called Pennsylvania Skill Games, LLC, which was created on May 11th of 2015.  So we have controlled pickup, lawsuit, decision, meeting, months later, creation of Pennsylvania Skill Games LLC.

The witnesses from Pace will testify that because this was a business name, there wasn't much concern about a conflict with the trademark Pennsylvania Skill, Pennsylvania Skill Games, Pennsylvania Skill.  And at the end of the case, the learned judge will instruct you on the law and the difference between a business name and a trademark.

Now, the contract I mentioned that they signed also contained a right of first refusal. We will not describe our position on that in detail in this opening statement. It will be too long, it will be too tedious. However, we're confident the evidence will show that this right of first refusal is very limited in scope and amounts to giving somebody a sales lead and nothing more.

The contract also mentions marketing efforts. Our clients will testify that the meaning of this provision is exactly what it sounds like. It's for marketing.

The parties signed the contract, and they were on their way.

A few years later, the relationship soured; probably towards the end of 2017. In our understanding, as the evidence will show, was that because the parties disagreed on how to interpret that equipment purchase agreement. I'll repeat. The parties had disagreed on how to interpret the equipment purchase agreement.

We will show you that Pennsylvania Skill Games, LLC, sent a letter to us in the spring of 2018 threatening a lawsuit, including a draft of a lawsuit that they were going to file. And then for the first time, we found that Pennsylvania Skill Games had applied with the United States Patent and Trademark Office for a trademark of that with this artwork, (pointing), and they claimed it was theirs.

That draft lawsuit, as the evidence will show, and these trademark filings, which we did not know about, we will demonstrate that was the first time that anybody in this case had discussed a trademark at all.

As the evidence will show, the defendant is claiming a prior use of the words "Pennsylvania Skill Games," which was used in the past, apparently, with a phone number and images like a pool table or darts to identify their business.

Ladies and gentlemen, the evidence will also show that Pennsylvania Skill Games, LLC, is using a graphic similar to that one, if not the exact one, and one that even has a software version of a Pace-O-Matic software version, the version that was in that Beaver County case I mentioned, on the machines that contained non-Pace software.  That means it looks like a Pace game, but it isn't.

Soon, we will begin calling witnesses and showing you the evidence.  We will demonstrate through the testimony of other operators, competitors, through employees of our companies, and even competitors regarding our trademark claim. And we will prove to you by a preponderance of the evidence, meaning it's more likely than not, that, one, purchasers of skill games associate the Pennsylvania Skill brand with Pace, which transferred its rights to those trademarks to POM of Pennsylvania and Savvy Dog.

Two, that Pace created a Pennsylvania Skill mark

independently and without any involvement of Pennsylvania Skill Games, LLC. And through our client's efforts, funding, expenditures, time over years, the Pennsylvania Skill mark has acquired secondary meaning in the marketplace that is associated with our client's products.

And finally, with respect to the equipment purchase agreement that you will hear plenty about, one, Pennsylvania Skill Games is in breach of the contract by failing to pay for its equipment and dealing with us in bad faith.

Number two, there is no violation of Pace, POM of Pennsylvania, or Miele of the right of first refusal or any other part of the contract.

And, number three, Pennsylvania Skill Games, LLC, received exactly what they negotiated for and what they were supposed to get in exchange for the contract. And any failure that they had are the result of them not taking advantage of a commercial head start and commercial discounted pricing that they were given.

At the end of this case, we will ask you for a verdict in our client's favor, that there is no breach of contract by us, that they are the ones in breach of contract, that POM of Pennsylvania and Savvy Dog own the trademark, and that Pennsylvania Skill Games has willfully and intentionally infringed on it. We will start hearing from witnesses soon and you will see that this is a case of reaping what you sow.

Thank you.

THE COURT:  Thank you, Mr. Neiser.

MR. NEISER:  Thank you, Your Honor.

THE COURT:  Mr. Zegarelli, are you prepared to proceed?

MR. ZEGARELLI:  Thank you.  May it please the Court, good afternoon, Your Honor.  Good afternoon, Mr. Neiser, Mr. Deasy.  Most of all, members of the jury, good afternoon. If you don't mind, I will move this.

I had a long opening statement written, but after that opening statement, I'll just go through some notes.

So Mr. Neiser had indicated in the opening that there were -- there are now approximately 20,000 of these machines in Pennsylvania.  20,000.  Now as Jesus said, when he made the parable of mustard seed, biggest bush from the smallest seed, 20,000 starts somewhere.  Now, the question is how does it start, and where does it start?

And I'll suggest to you that the evidence will show that it started with the Beaver County case that Mr. Neiser had indicated.

So to back up, there's a Beaver County case, which of course is in Beaver County.  It only affects one jurisdiction, being Beaver.  It is not throughout the state.

Now, how did that case occur?  And it relates back to Mr. Unis III, who has been in the game -- the evidence will

show, Mr. Unis III is in the gaming business for many, many years.  And so you understand what a skill game is, it's more a commonly accessible manner.  You go into a movie theater and you see one of those crane arms -- right? -- you're doing this sort of thing, the crane drops.  That's a more rudimentary form of a skill game.  It takes some skill.

Now, sometimes those skill games give prizes, and sometimes they don't.  And sometimes whether they do give a prize or they don't give a prize is a function of the law.  In other words, different states regulate, you know, must a skill game give a prize every time?  Can it not give a prize every time?  That sort of thing.

Mr. Unis III sometimes -- I might refer to him as Albert -- and the son, the president of Pennsylvania Skill Games, LLC, as Albie.  So you may hear "Albert" and "Albie" through the testimony at some point.  Albert is the father, III, who is also in court, and Albie is the son.

Albert wanted to get a skill game in Pennsylvania. One that had the newer technology.  And the evidence is going to show -- and you know from your cell phones that the technology is starting to change quite a bit.  You had higher bandwidth, better technology screens, that sort of thing.  That all sort of occurred around 2013, if you think about it, you know, ten years ago, when the phones started to becoming very powerful.  Well, the same thing happened in gaming.

So there's new games coming in a new way.  Mr. Pace, respectfully, is a brilliant man.  Nobody disputes that.  Very brilliant.  And in that regard, there were better games. Mr. Unis III wants to get a game put into Pennsylvania. Mr. Unis III wants a legal game.  Why does he want a legal game? Or let's say determined to be legal.

The reason why is he was -- as you'll see from the testimony, he was going to give the business to his son.  So it's one thing to be in the gaming industry for yourself; another thing if you're giving it to your son.

At that time -- Mr. Neiser mentioned Mr. DeLuca, who is an attorney.  Mr. DeLuca happened to be at the time Mr. Unis III's attorney.  They were doing business together. Mr. DeLuca ultimately became the attorney for Pace-O-Matic, but he was the attorney for Mr. Unis.  Why Mr. DeLuca changed is -- may be able to determine from testimony and evidence as we proceed.

The Beaver County case was critical because Mr. Unis would not sell the games in Pennsylvania without it being determined to be legal.  It was a without which not.  Not legal, he's not going to sell it.  Okay?

That's not true for Pace-O-Matic.  They will show you documents where they actually sold games irrespective of the legality of the decision.  So it wasn't important to Pace such as it was to Mr. Unis.  Why that's important is because that

lawsuit became the grounding from no games to 20,000 games.  And we will show you that that is all through the advertisement of that game.  So that growth is based on that first case.  It was a very important case.

There was some talk about who paid the bill on the lawsuit.  And I'll suggest to you, that was the least of the issues, who paid the bill for the lawyer on the lawsuit.  It was a seizure.  It was a petition.  No expert was in that case.  In fact, I think there were no witnesses.  But the key to that case was where was it seized?  Okay.

So remember, this controlled pickup is where the police go in, on a plan -- coordinated plan, and they take the machine.  By taking the machine, it ultimately goes to court and they figure out whether or not it's a legal machine.  The location of that was Mr. Unis' location, American Italian Club, and he picked that location for a very specific reason because in Beaver County -- and he will testify to this -- in Beaver County, that's where all of the lawyers, judges, politicians, went to that club.  And he picked that specifically for that purpose, because that was an excellent location.

But where Mr. Neiser had indicated that it was sort of like, oh, we want to open up somewhere in Pennsylvania, the issue is that you simply cannot avoid that this was in Mr. Unis' location.  He handled that controlled pickup with his account of many years.  He was the one that coordinated it to get done.

Again, that -- that pickup was critical.

Moreover, Mr. Neiser mentioned Mr. Goodling, Officer Goodling.  At that time, Officer Goodling was a member of the state police, Pennsylvania State Police.  You will see him in this courtroom testifying not of the state police, but now as an employee of Pace-O-Matic.  So Mr. DeLuca was the attorney for Mr. Unis, became the attorney for Pace-O-Matic.  Mr. Goodling, officer -- state police officer, working for the state police, became an employee, and you'll see him testify and he'll testify to it, became an employee of Pace-O-Matic.

So again, 20,000 machines.

Now, there's a date that I'd like you to keep in mind, if you would.  Critical date.  May 2nd of 2018.  That date -- and how do you remember that date?  Judge Dodge mentioned the -- relying on your memory to the extent you can, how do you remember that day?  May -- May Day.  May Day.  18, that's how old you are when you become an adult.  If you remember May of '18, in fact, it would be more specific, May 2nd of '18, that's an anchor point.

Like most stories, you have a climax and after the climax.  May 2nd of '18, I'll suggest to you, is the climax. It's a break point.

That is the date Mr. Neiser had indicated that Pennsylvania Skill Games sent a letter to Pace-O-Matic and Miele and said you're breaching the agreement.  At that point -- so

that's our date.  May 2, 2018.  Everything that occurred after May 2nd of 2018 is post-claim.  In other words, you're going to see a lot of -- I think you're going to see a lot of testimony dealing with things that happened.  And in your own mind, I would suggest to you did that happen to lead up to a problem?  Or did that happen after people knew there was a problem?  I would say when Pace knew there was a problem and there was going to be an issue in court.

So, what happened May 2nd of 2018?  There's a letter sent to Pace.  We're going to sue.  And I'll back up in a minute.  At that point then, all of a sudden things got really complicated.  At that point, then all of a sudden, Pennsylvania Skill Games, there's starting to be letters going out to bars.  There's starting to be all sorts of things that happened after that date.  So again, there were mailings that went out where the Pace-O-Matic and Miele tried to change different terms and conditions of relationships, all that sort of thing, you'll see.

Now, leading up to May 2nd, what happened?  Well, here's what happened.  Mr. Neiser had indicated there was a right of first refusal.  The right of first refusal says, before we're going to sell to somebody else, another operator for a location, we're going to give you the ability to take it first.  Because it was so early in the relationship, right?  It was so -- that was what it took to open up the Pennsylvania market.  We're going to give you that opportunity.

Well, lo and behold, approximately one year later, maybe not even, all of a sudden, Mr. Unis, Albie Unis, starts to see competitive games.  Now, keep in mind, it's one thing that's very tough to get over is a written agreement and a signature, signed by Mr. Miele, signed by Mr. Pace.  Adult grown men -- three adult grown men signed a document.  It says the word "agreement" at the top.  And it says we're going to call you first before we sell to anybody else.  All of a sudden, we start seeing the evidence that they're selling to somebody else.

And that is what led to the claim, because at that point, then, it was, okay, you know, you're selling to other people.  And you'll see evidence, the first time that occurred, Pace-O-Matic made some adjustments.  And then after that, they didn't.

Now, Mr. Neiser mentioned that Miele had the capacity to build machines.  So just so you understand, what is this -- this skill game machine consists of the computer with the screen, and your boards, your hardware, that sort of thing, (indicating), Pace makes the software that operates the screen; right?  Not -- not even the screen, of course.  Just like on the computer, somebody makes the software for the screen.  And then Mr. Miele puts it in a box.

We'll show you evidence that Mr. Miele, in the early days, was -- well, frankly, early, when the relationship began, Mr. Unis was helping to make boxes because there was not

sufficient capacity to make the boxes in that fledgling time. So when you see 20,000 machines now, it's easy to look back and say, wow, this is gonna -- but it wasn't like that in the beginning.

Now, you heard also some talk about a performance requirement and, you know, if there were going to be all these games being purchased. Well, when you look at the agreement, it's not in there.

Now, these are grown men. And the issue is if you think you have a term and condition in your agreement that says you've got to buy so many boxes in a certain period of time, it would be in the agreement. I'll suggest that to you. And the evidence will suggest that it's not in the agreement because it wasn't a requirement.

Also, we would like to -- we would like to show the Megatouches, how we use them.

Albie, would you turn on the Megatouch?

Talk about the mark. And I will -- we don't have control over the screen from the desk. So I have to go over here to try to do it.

And while he -- he's sort of getting that ready. So you heard some things about the creation of that framework. Now, I am going to put on the screen -- Mr. Neiser had indicated that there was something called an "equipment purchase agreement."

Now, you'll notice the signature:  Pennsylvania Skill Games, LLC.  Now, it's sort of tough to say you have any problem with anybody using a name when it's in the contract.

Now, the reason why it's in the contract is because Pennsylvania Skill Games, LLC, which was just created because Mr. Unis had given the business to his son and his son wanted the business and the business was formed as part of this agreement, and it was well known..

For those of you old enough to remember.  It shows just -- so this is the game that we will have evidence existed since 2010.  And, in fact, that's the reason why his name is what it is, Pennsylvania Skill Games, because he was using the name since 2010.  These machines, these Megatouches, were skill games, rudimentary.  Now we're talking 2010.  That's 13 years ago now.  They haven't been used.  These machines haven't been used.  I'll move on while he does that.

Now, Mr. Neiser had indicated that the relationship soured, and that's really interesting.  Because you -- I would ask that you look for evidence of that.  So it's easy to say, well, the relationship soured.  But now I would ask you to look for evidence that the relationship soured.  In other words, we got -- Pennsylvania Skill Games got to a point where you had to send a letter.

So Pennsylvania Skill Games was being used -- that was my mistake over there, a little red mark.

Now, in the agreement, the equipment purchase agreement, the right of first refusal was for -- was for Beaver County. Why Beaver County? Well, that's, of course, because the lawsuit was in Beaver and the Unises are located in the Beaver area. Mr. Unis wanted to give a legal business, legal game business to his son. He didn't want his son to be traveling all over the state. And so the exclusive right of first refusal was modestly set for Beaver. Not overreaching. It just had to be complied with.

That logo and --

MR. NEISER: Well, objection, Your Honor.

Please take it down.

Can we approach, please?

THE COURT: Sure.

(Whereupon, sidebar conference held:)

MR. NEISER: Mr. Zegarelli sent me a copy of that last night, and I looked back and said do not and agree with him posting that demonstrative. Is a distortion of what the marks look like, it's a distortion of the evidence, and it's incomplete. It should be taken down.

Here is what I'm saying --

THE COURT: Let me perhaps make this simpler. You objected to that?

MR. NEISER: I said absolutely not.

THE COURT: You didn't raise that. You didn't raise

it this morning, and I included the picture of the game --

MR. NEISER:  No, no.

THE COURT:  The point is there was an objection to it that had to be raised and resolved.  Without resolving it ---we're not going to resolve it now, so you have to take it down.

MR. ZEGARELLI:  I took it down.

(Whereupon, sidebar conference concluded.)

THE COURT:  Proceed.

MR. ZEGARELLI:  Thank you, Your Honor.

When Mr. Neiser raised some issue about Mr. Unis having non-Pace software in conjunction with Pennsylvania -- the Pennsylvania Skill branding.  Now, I'll point out to you this branding -- well, let me back up for a second.

Throughout this case, you're going to hear a couple of terms that you should really sort of understand.  The first one would be the manufacturing.  Pace-O-Matic makes the technology that operates the screen.  The second would be a term called "operator."  Now, that's an important term.  The operator is like the middle person.  The operator is the person that takes these boxes and puts them into a bar -- 7-Eleven, bar, restaurant, wherever it goes.  But the operator's kind of the boots in the field.

The location or venue is the place where the machine goes.  So if the machine is in a -- you know, a little bar, that's the location.  The operator is the person who puts it

there.  And then you have the manufacturer.

This branding is used with a game for which Pennsylvania Skill Games is not the manufacturer.  Pennsylvania Skill Games is the operator and the branding related to the operator.

So in this particular case, given the huge volume, from 0 to 20,000, you look at it and you think that the name is the manufacturing.  But the evidence will show that the traditional usage is the operator's branding that goes on the machines, not the manufacturing name.

Also, there was some discussion Mr. Neiser raised about having machines that -- you know, having other parties' machines.  And I'll suggest to you when Pace was coming into the market, give or take 2000 -- again, we're looking at 2013 or so. That agreement is dated 2015 from the Beaver County case that was in 2014.  So around this time, Pennsylvania Skill Games had these Megatouches out.  And there was no way for an unproven new game in Pennsylvania, Pennsylvania Skill Games was going to give up their lifeblood, business of preexisting other manufacturer games.

The issue, as we see it, ladies and gentlemen of the jury, is -- and I would ask you to pay close attention to it, again, with the date of 5/2/18 -- when they -- when the letter came suggesting the lawsuit for the breach of contract and trademark problems, after that many, many issues arose.  And you

just -- just keep in -- in your mind when the testimony's given, that the thing that you're testing for after 5/2/18 or before it.

I just want to make sure I -- I just want to make sure I -- I address all of the issues raised by Mr. Neiser in his opening.

Okay.  I think I did address everything that was raised by Mr. Neiser.

Before the date of 5/2 of '18 -- oh, I did.  The reason why it took me a moment, I did miss one important issue: The assignment.  And perhaps that's the most important one.

Sometime in -- so we have our date of 5/2 of '18. Sometime around 2016, 2017, Pace-O-Matic transferred all sorts of rights to newly create a business.  Those transfers just happened to coincide in time, which you'll see by the invoices, happened to coincide with the same time that Pace and Mr. Miele, Miele Manufacturing Inc., were selling to competitors of Pennsylvania Skill Games.

So at the same time that the right of first refusal, we assert -- and we think the evidence will show -- the same time that that breach was occurring and knowingly, we would suggest to you, that there was a transfer of interest.

Now, let me show you, briefly, what the pleadings looked like.

Let's do it this way.  Sometimes Mohammed goes to the

mountain.

Okay.  You will see the two lawsuits.  And it's -- maybe it is tough to see, isn't it?

I'm going to try to make it a little larger.

Now, you'll see this case, one of the two cases, if you can make that out, is Pennsylvania Skill Games, LLC, versus Pace-O-Matic and Miele Manufacturing Inc.  And you'll see that's a perfect match on the agreement, on the equipment purchase agreement.  Three parties to the equipment purchase agreement: Pennsylvania Skill Games, LLC; Pace-O-Matic, Inc.; Miele Manufacturing.  The Pennsylvania Skill Games case matches exactly the agreement that the three adult men entered into on behalf of their respective companies.

Now -- and there are no counterclaims in that case, by the way.  So the defendants, Miele Manufacturing and Pace-O-Matic, do not have claims in the case or counterclaims in the case.

Now, with regard to the case that was filed -- and it might be reasonable for all of you to say to yourself, well, why does the -- why do the POM parties get to go first?  Well -- like, how do they make that decision?

Well, they happened to have filed first.  After they got the letter that said that they were going to get sued, they then filed a suit in Beaver County.  Didn't tell anyone.  And then they filed this in federal court.  We find out about the

Beaver County case during the -- during this particular litigation. It was just, in fact, less than a year ago, the evidence will show, it was finally withdrawn.

But POM of Pennsylvania -- now, to make things a little more confusing, it's not even POM of Pennsylvania. It's POM of Pennsylvania trading and doing business as Pace-O-Matic. So now you've got Pace-O-Matic, Inc., who is a proper party on the PSG -- I call them PSG, Pennsylvania Skill Games case. Here you've got POM of Pennsylvania, LLC, trading and doing business as Pace-O-Matic -- that sounds a whole heck of a lot like Pace-O-Matic, Inc. -- and you've got Savvy Dog. And who are they? They're transferees. And Mr. Pace will testify as to those transfers when he gives evidence.

So, Pennsylvania Skill Games has counterclaims against those two entities -- even though they sort of came out of the blue, from our perspective -- and claims against Pace-O-Matic and Miele Manufacturing, Inc., who are actually the parties to the original agreement by their signature.

So in close, in close, what I would like the jury to consider, to recap, what you do from a trademark perspective in the confines of your internal operations has no bearing on the trademark. A trademark has to be used in commerce, such as it was, such as it has been. It has to be used in commerce.

So if there's evidence that's sort of, you know, in a back room somehow. It's not in use in commerce. That doesn't

give a reputation of anything.  It's in a back room.  So that's immaterial from our perspective.

I'd like you to listen carefully to what -- how many machines existed in Pennsylvania in the early days of 2000- -- January 1st of 2015, let's say, to 20,000 now.  So what caused it to get that way?

I'd like you to consider the fact that these games had been in use.  I'd like you to consider the fact that there were assignments made; why those occurred and what would be the business purpose at the exact time of the claimed breaches.

I'd like you to listen for and consider how close the brands are to each other in light of the relationship.  And the actual terms and conditions of the agreement will be addressed as the evidence is adduced.

And so we will ask you at the end of the case first to distinguish probably who's right and who's wrong in a general manner and then also with regard to the two cases with different parties, you know, which parties have done what.  So you'll have to, in some ways -- there are four POM Parties.  There's Pace-O-Matic, Inc.  There's Savvy Dog Systems.  There is Miele Manufacturing.  And then there's POM of Pennsylvania that trades and does business as.  So if you ever see TDBA, it's trading and does business as, or DBA, doing business as.  There's POM of Pennsylvania that trades and does business as Pace-O-Matic.

So there's four of those entities.  You have to keep

those entities straight, and then just have Pennsylvania Skill Games on the other side.

And so I appreciate your time and your attention. Thank you.

THE COURT:  Thank you, Mr. Zegarelli.

MR. ZEGARELLI:  Thank you, Your Honor.

THE COURT:  Ladies and gentlemen, we're going to take our afternoon recess now for 15 minutes.  So we will see you back here at five minutes after 3:00.

(Jury exits.)

(Whereupon, a recess was taken.)

THE COURT:  All right.  Ladies and gentlemen, we're about to start hearing the testimony and evidence in the claims by POM of Pennsylvania and Savvy Dog against Pennsylvania Skill Games.

Mr. Neiser, are you prepared to proceed?

MR. NEISER:  We are, Your Honor.  Plaintiffs call Michael Pace.

THE COURT:  All right.  Mr. Pace, will you step forward to be sworn.

THE WITNESS:  Yes, ma'am, Your Honor.

MICHAEL PACE, a witness herein, having been first duly sworn, was examined and testified as follows:

THE COURT:  Mr. Pace, you can feel free to pull that microphone towards you once you're comfortable.

THE WITNESS:  Thank you.  Testing.

MR. NEISER:  May I proceed?

THE COURT:  You may, Mr. Neiser.

DIRECT EXAMINATION

BY MR. NEISER:

Q.    Good afternoon, Mr. Pace.  How are you doing?

A.    Doing wonderful.

Q.    Would you mind stating and spelling your name for the jury?

A.    Michael R. Pace, M-I-C-H-A-E-L, R., P-A-C-E.

Q.    How old are you, sir?

A.    65.

Q.    Where did you grow up?

A.    Atlanta, Georgia.

Q.    Could you please briefly describe your educational background?

A.    Well, in grammar school -- we didn't have middle schools yet when I grew up in Atlanta city schools.  We had elementary, went through seven, and then eight through 12 in high school.

I grew up with my mother in a little apartment she had, and I had two brothers and a sister.  As you hit 12, you move in with dad.  That's the way it works.  So when you're younger.  And I went to elementary school, and I didn't really -- I didn't do a lot of sports, but I ended up reading

the Encyclopedia Britannica end to end like in over a three-year period. I think it helped a great deal. Get a little exposure to a lot of things.

But I went on to high school. I was terribly bored. I did really well in science and mathematics and maybe some other things. But I -- we actually had a computer, a big one, a IBM370 that ran the Atlanta public school system.

So at the time, I guess I was in 11th grade, I did some big science fair projects that won me a few things, but I got to work on an IBM370 mainframe, first at the school, and then the school let me just go downtown to the computer center. They wouldn't suspend me. They wouldn't expel me. They just kind of let me do whatever I wanted to do.

So I'd show up, take tests, and, you know, I do really well in it or not very well. So then I flunked the 12th grade, but I could use a computer another year. But I was -- I read a couple of hundred books out of my high school library, all of them nonfiction. I really wanted to learn as much as I could. And I finally -- well, I was going to flunk 12th grade again, and I said, Well, this is getting old. We rode the bus back then, that's how we got to school, in the morning and the afternoon, and I had ended up being the chess champion of the high school system in Georgia, I think three years in a row, the number one board. So the principal of the high school said if I win one more, he'd get me out of high school because you

couldn't take a GED back then.  So I won first place again, and they let me take my GED.

But that was about it.  I didn't really want to ask my father for money to go to college, so I just took off working.

Q.   Understood.  And tell us, briefly, sir, your work history.

A.   Well, my ninth grade summer, I work at McDonald's.

Q.   Besides McDonald's?

A.   I think that was the only time I worked for somebody else.  Well, actually, I worked for a repair shop for amplifiers for rock bands right after high school, and I designed and built laser systems for -- for -- laser shows for bands.  I did one on Stone Mountain in Georgia and on -- at Six Flags Over Georgia in the summertime.

I went on to design high-power RF amplifiers.  Oh, I forgot.  I took a correspondence course in the ninth and tenth grade in electronic technology that I used as a basis to teach myself engineering, both hardware analog, hardware digital, and I've got about 90,000 hours of programming and writing operating systems.

So I don't know.  I went out and designed RF amplifiers, vacuum tubes in them.  I don't know if anybody even remembers those now, but I could design those, and I built high-power bipolar transistor amplifiers for rock bands.  And I built a few recording studios, some of which are still used

today.

I got into building embedded processor design, which is where you take a microprocessor, design it on a board.

And then I briefly got into designing arithmetic logic units for mainframe computers, but that was just like one of those fascinating things where the art is just gone today because of the microprocessors.

So I had -- I got into the energy management business in 1980, digital controls. I was digitally controlling air conditioners. There was a big energy crisis going on at the time. And on the side, I had built this countertop video game that had poker, blackjack, and craps, but they didn't pay off. You just got 10,000 points and played it. I didn't know what I had. The energy crisis was over with in 1981. I had a guy who liked what I was doing, and he gave me $100,000 to do the energy management.

I said, Well, I think that's about busted.

He said, What do you got left?

I said, About 15,000.

He said, Well, what are you going to do?

I said, I think I'm going to start in the game business.

And that's what I did. I took the countertop game and sold it instead, did some other things, and it took off. It was the world's first video game that sat on a bar top.

And I designed the computer board.  I wrote the operating system.  I wrote the drivers.  I wrote the games.  And I had a partner I brought in to do sales and run the business. That was very successful.  That was over with in '86.  And I started U.S. Games.

I did some more countertop stuff.  And then I designed a machine called the Pot-O-Gold, and it was, like, one of the most successful games ever as class III, which was a full-blown gambling device.  I sold them to Indian reservations.  It was the world's first class II device.  Did really, really well with it.  And sold my company in '96.  I moved to Colorado and then to Wyoming because they have a noncompete.  And then the whole thing -- they didn't pay me all of the money from the sales; so I had to go back to work.  So, in 2000, I started Pace-O-Matic.

Q.    Before we get to starting Pace-O-Matic, do you hold any patents?

A.    Yes, sir.

Q.    How many?

A.    Six.

Q.    Okay.  So let's go to the 2000 time period and starting Pace-O-Matic.  Could you please tell us why you started Pace-O-Matic?

A.    I needed to go back to work.  I wasn't getting paid for selling my company anymore.  I said, Well, I can go back and compete.  So I'm going to get back into what I know well.  And I

started out designing -- I had about a quarter million machines there on the Indian reservations and elsewhere that I designed. So I said, There's no need to design all new games.  I can just make new software that makes all of those machines wherever they are compliant, because most of them were in places they shouldn't be.

The tribes, when they got through with them or worn down, they'd sell them to somebody.  They'd go put them in a state where they shouldn't be.  But I said, Well, I can make software that makes them compliant.

I got back into the Indian gaming for a little bit. And then we just had -- we had kind of a blowup at a trade show in 2003.  I said, All right, well -- and I was still living in Wyoming.  I said, I've got to move back -- I've got to punt. I've got to go back to Atlanta, start over, and do this right.

So I did.  I didn't want to go back to Georgia, but I did.

And I built the company.  Built it up.  We built -- got into skill game business in a big way.  So I would look at different states and see what the law -- what the law was and build the best earning compliant device that I could.  And I got pretty good at it.

We did some stuff in Georgia, South Carolina, Florida, Alabama, and then we -- somebody called me from Ohio, and I forgot how the thing got going, but I put games into Ohio.  And

that game started out as Ohio Skill, and our distributor is Ohio Skill Games and we later changed the name of the game to Tic Tac Fruit.

Q. Why did you change the name, sir?

A. Well, because whenever we start a project, we -- when I'm working on it and there's a splash screen or whatever we call the group of games, it's the name of the device. It's not always the name of the board that's in it, but you need some way of referring to a product. It may have different game names in it in a particular state.

So if I did a sweepstakes game in Chicago, I called it Illinois Sweeps, until we ended up with a better name, which we did. I think today it's called Products Direct Sweepstakes.

Q. Okay.

A. So when we started in Ohio -- and even the ones in Georgia, it would be Georgia Skill, or if it was an Indian game, it would be a class II or a class III device. The idea is, at the time I'm creating it and building it, I'm not -- I don't necessarily feel creative about coming up with a name right then for the game.

Q. Okay.

A. In Ohio, Ohio Skill ended up -- we looked at different other names, and we ended up with Tic Tac Fruit, like I was saying.

And after Ohio, we came to Pennsylvania. We

started -- that was 2008, and we got distracted and went to New York instead. I had somebody that said, Hey, I'll buy 200 games and put them there if you do the New York project. So I designed a whole new one for New York.

And then we did pretty -- we did some games in Hawaii. We went back to South Carolina again. We still had stuff running in Ohio.

And the old platform that I was on was getting very worn out. It was getting very obsolete. So we had been working on a high-resolution platform that I didn't have time to program. I had engineers working for me who copied my game designs and the patent stuff that makes them legal, and we're putting them on a high-resolution board. And we finally -- when we came back to Pennsylvania -- I guess it was 2013 -- we had that product, now finished for Pennsylvania, but we called it Pennsylvania Skill, and we had several meetings to try to figure out the better name. We still have some list of it. But nobody ever really -- we couldn't get a consensus or people that were jumping up and down wanting a better name -- another game. So it just stuck with Pennsylvania Skill.

Q. Understood.

MR. NEISER: A.J., could we have 38A, please?

THE COURT: Let's not publish it to the jury.

MR. NEISER: No, I pushed the button, Your Honor. I'm sorry.

THE COURT:  Thank you.

BY MR. NEISER:

Q.    This is exhibit -- sir, I'm going to show you a document marked for identification purposes as Exhibit 38A.  It is at Bates number POM 002294 to 2296.

Do you recognize this document, sir?

A.    Yes, sir.

MR. NEISER:  Okay.  A.J., can you scroll through so Mr. Pace can see the entire document.  Let's go back to the top, please.

BY MR. NEISER:

Q.    Mr. Pace, did you receive this email chain?

A.    Yes, sir, I did.

Q.    Do you recognize it?

A.    Yes, I do.

Q.    Okay.  Can you confirm that is a true and accurate copy of that email chain and is an entire copy of the email chain?

A.    It appears to be so, yes.

Q.    Does it appear to be modified or altered in any way?

A.    No, sir.

MR. NEISER:  Your Honor, at this time, we offer Exhibit 38 alpha into evidence.

THE COURT:  Is there any objection?

MR. ZEGARELLI:  No, Your Honor.

THE COURT:  All right.  Exhibit 38A is admitted and can be published to the jury when you're ready, Mr. Neiser.

MR. NEISER:  Thank you, Your Honor.

A.J., can we go to POM 296, please -- 2296.  I'm sorry.

BY MR. NEISER:

Q.  So, Mr. Pace, can you read that?

A.  Yes, sir.

Q.  Okay.  I'm not sure that the jury can read that small print.  So can we enlarge it just a hair for them, please?  Maybe a little bit more, please.  Okay.

So that's fine for right now.

Sir, what's the date of this email?

A.  December 19, 2012.

Q.  Okay.  And you were copied on this message, are you not?

A.  Yes, sir.

Q.  Okay.

MR. NEISER:  Let's scroll down to the next paragraph down, "as a note" -- "as a side note."  Thank you.

BY MR. NEISER:

Q.  What did you understand this paragraph to mean, sir?

A.  "As a side note, the labeling for South Carolina builds will now be South Carolina Skill.  We'll be renaming the PA build to Pennsylvania Skill.  I will be sending out an email

for the release of our other titles tomorrow."

Q.    Okay.

MR. NEISER:  So, A.J., can you remove the callout?

BY MR. NEISER:

Q.    Would it be is that fair to say, then, that, at least by December 19, 2012, internally, Pace was calling the game "Pennsylvania Skill"?

A.    Yeah.  And we -- it was called Pennsylvania Skill on my platform.  But they were copying that platform to a high-resolution mode because I just didn't have enough pixels on the screen.  It was a board I designed in 1990, and it was 512 by 256 pixels.  So we were working on stuff that was 1KX768.

Q.    So is it your testimony, sir, that it could have been called Pennsylvania Skill before December 19, 2012?

A.    It absolutely was.  They were just now putting it on the -- the Edge Platform is what we called it.

Q.    Okay.  Now, you had mentioned earlier there were some other names internally that were being discussed for the Pennsylvania product.  Is that correct, sir?

A.    We do that for most every state.  And have done it at least ten times.

Q.    Thank you, sir.  Let the record show that I did not screw it up.

Sir, do you recognize this document?

A.    Yes, sir.

Q.   Generally speaking, sir, without describing the contents, what is it?

A.   It's an email.

Q.   Do you remember getting this email?

A.   Yes, sir.

Q.   And you, indeed, are copied on it, are you not?

A.   I am.

Q.   What's the date of the email?

A.   August 10th of 2012.

Q.   Now, let's scroll down, please.  Is there another page?  Thank you.  Scroll back to the top, please.

Sir, can you confirm that this is a complete email string of this message, please?

A.   Yes, sir.

Q.   Okay.  Is it a true and accurate copy of the email?

A.   Yes, sir.

MR. NEISER:  Your Honor, we offer into evidence 2A.

THE COURT:  Is there any objection?

MR. ZEGARELLI:  No objection, Your Honor.

THE COURT:  All right.  Then Exhibit 2A is admitted.

MR. NEISER:  Thank you, Your Honor.

Your Honor, may I assume that I can publish to the jury upon admission?

THE COURT:  You may.

MR. NEISER:  Thank you.

BY MR. NEISER:

Q.   So, sir, I note in the first -- or the second and third lines of this email message, it discusses Pirate's Prize and Icy Hot Keno.  Do you see that there, sir?

A.   Yes, sir.

Q.   What are those?

A.   Well, the ice -- the Pirate's Prize was an eight-up style game, which is one that I invented that has 3X3 grid where you touch a spot in the 3X3 grid and make it a wild card.  That's something I invented in 2004.  And that was one of those type of skill games.

Q.   Understood.

A.   Icy Hot Keno is a Keno game, but we had actually come up with a way -- and it wasn't just me on that.  I had some help from my engineering team, that we came up with a way of adding skill to a Keno game.  We believed that it could be marketed in Ohio and Pennsylvania, and that's what it means.  We never did put it in Pennsylvania.

Q.   Who are some of the programmers at Pace with whom you worked at the time?

A.   I did all of the programming on the original platform, which was about 80 hours a week for a long period of time.  Glen Carter was our star programmer on the Edge Platform, and he's still with us today.  He was doing it then.  So I would say he's the system architect, really, of the Edge system.

Q.    So would Mr. Carter be able to give testimony and maybe pin down some very specific dates with respect to the programming of the Pennsylvania games?

A.    Yes, sir.

Q.    Okay.  2B, please.

Sir, I'm showing you a document -- showing you a document marked for identification purposes as Exhibit 2B.  This is the Bates range POM 00440 -- sorry.  One second, please.  Yeah, POM 000440 to 441.  Do you recognize this email?

A.    Yes.

Q.    What is it?

A.    It's Erik Guenther; it's from him.  He was our project manager over the Edge group at the time, which would be sort of like a vice president of engineering.  He just never made it to that level.  And he has some names, because we're still in the process of trying to come up with a better name for Pennsylvania on the Edge Platform than Pennsylvania Skill.  Again, it was just kind of a generic name, the placeholder that we never got away from but -- and here, we're trying to.

Q.    Sir, before we get into the contents of it, let's make sure we put this into evidence first.  So let's talk about one thing.  What is the date of the email, please?

A.    August 28 of 2012.

Q.    You were a recipient of that email, were you not?

A.    Yes.

Q.   Do you remember receiving this email?

A.   Yes, I do.

Q.   Does this email accurately depict the entire email string on this subject?

A.   I don't know that I've seen the bottom, but --

Q.   Let's scroll to the bottom, please.

A.   Okay.  Yes, that's the complete email.

Q.   Okay.  And to the best of your knowledge, it's true and accurate?

A.   Yes.

MR. NEISER:  Your Honor, we offer Exhibit 2B into evidence.

THE COURT:  Is there any objection?

MR. ZEGARELLI:  No, Your Honor.

THE COURT:  Exhibit 2B is admitted.

MR. NEISER:  So briefly, sir -- A.J., if we can enlarge this slightly, please.

BY MR. NEISER:

Q.   Would it be fair to say that you had more than a few named choices as of 8/28/2012 for the Pennsylvania game?

A.   Oh, we had a bunch of names.

Q.   Did you like any of them?

A.   You know, I remember us having several meetings on it and talking about them and just nothing hit anybody like, wow, that's the right one to go with.  So that's why we kept coming

up with the list.

Q.  Are you sure you didn't like Paceslyvania Skill?

A.  I can tell you in most cases where the state will come up with one or two lists and we'll find something.  I don't want to find a name that I, alone, like.  I want something that the group likes because it's going to be better received when it gets into the public.

Q.  And scroll down just a hair, Mr. Simeone.

And under the category of no bad ideas, is it true that Cheese Steak Skill was one of the names that was kicked around?

A.  I think he's joking.  I think he's running out of names is what's going on.

Q.  Understood.  Sir, you mentioned that there were several names about the game around that time.  Is that what you said?  Or several meetings about the name around that time?

A.  Yes, sir.

Q.  And then what decision was finally made?

A.  We didn't find one.  I know we had several meetings on it, but it just wasn't a big thing.

Q.  Okay.

A.  Pennsylvania Skill just grew on us and we did it, even though I always looked at it as a generic name.  But it needed something.

Q.  Understood.

A.    But evidently we had more important things to do.  We had a lot going on.

Q.    Got it.  Okay.  So let's get into some topics about the Pennsylvania market, if that's okay with you.

A.    That's perfect.

Q.    So, regardless of the name of the game, did you believe that you had a product that was ready for consideration in the Pennsylvania market?

A.    Yes, sir.

Q.    Okay.  And approximately, when -- with the understanding that software's never done, approximately when do you think that you had a game completed and ready for the Pennsylvania market?

A.    It would have been the fall of 2013.

Q.    Okay.  So do you know what it takes to have a game determined as a game of skill in Pennsylvania?

A.    Yes.

Q.    Please tell us about it.

A.    Different states work different ways.  So we have to look at not only the statutes, but at the case law, and I spent a lot of time with lawyers.  We have our own legal team, plus we have to talk to lawyers that are on the ground in a certain state, to make sure how it's being enforced, how it's being read, and whatever, because if I build -- if I design and build a game that's too conservative, it won't earn money.

Q.    What do you mean by that?

A.    I think the best is an analogy I gave a judge in South Carolina one time.  I think it's the best way to do this.  He said, is that basically, if I was a cigarette manufacturer and we were legally bound to 20 milligrams of nicotine per cigarette, if I made 10 milligrams of nicotine in my cigarettes, I'm going out of business.  It is my job to figure out how in the world to engineer, how to build, and put 19.5 milligrams of nicotine in each cigarette and hope my competitors don't figure out how to do 19.7.

Q.    Okay.

A.    If that makes sense.  It is that we -- we need to make -- you want a game that earns the best that it can and be compliant.

Q.    Understood.

A.    In the State of Pennsylvania, there is no cash prohibition on a pure game of skill, and the best analogy is a dart board.  If you have a conventional dart board with paper and cork and steel tipped arrows, whatever, any bar or any place can charge a fee for someone to throw a dart and pay reward if it hits the bull's eye.  If I charge people from 20 feet back -- I'm not sure how darts are played, but if you charge people ten dollars each, any bull's eye, you can pay them 100 cash.  That's legal to do.  Some states it's not.  As long as your game has enough skill in it and a lack of chance, then you really have a

game of skill and not a game of chance, and it's not regulated, and you can pay cash on it, and it's legal to do so.

Q.    What we're talking about here are electronic skill games; is that fair to say?

A.    That's correct.

Q.    Electronic skill games are entirely different than darts.  Would that be fair?

A.    Yes, they are.

Q.    So with respect to the legalization of the skill games, electronic skill games in Pennsylvania --

A.    Yes.

Q.    -- what process do you have to go through to get it legalized?

A.    Well, because the software -- and there are things hidden inside the code that, even though I designed it to where all of the information you need to determine it's a skill game, you can glean by playing the game.  But you've got to be an expert to do so.  If you put the games out, they get mixed up with games which are not compliant with the law, and cops pick them up, and we wish to avoid that, especially if we're going to sell a lot of them, which we need to do to help pay for engineering.

So there is no clearinghouse in Pennsylvania, or most states, to where you can take your game to and say, hey, this is a legal game of skill.  Can you give us a certification on it?

You can't take it to the Pennsylvania Gaming Commission.  That's for games of chance, not for games of skill.  There is no clearinghouse in Pennsylvania for games of skill.

Q.    And what do you do?

A.    We've done this before, we know how to do it.  We had the lawyer in the state, who -- I guess he was part of the Pennsylvania coin-op association for -- or PAMMA for -- God, I met him I think in 1982 in Hershey.  Wayne DeLuca, who is now retired.  I hope he's doing okay.  We found him first.  He's -- I said, How would you like to do this?  Because some states we put the games out and let them get picked up and then we go to court and prove it.

Q.    Okay.

A.    He didn't like that idea.  No, we're not going to do that in Pennsylvania.  You want my help, we're going to do it my way.

I said, Fine.

He set up an appointment for us to go talk to the state police.  The state police had one person on their team that they had determined or trained to be their game expert to know the difference between a game of chance and a game of skill.  His name was Rick Goodling.  I think he was Corporal Goodling.  Very sharp guy.  We took the game to him.  I gave an hour-and-a-half speech about how the game worked and why it did what it did.

And he said, I think I'm looking at first skill game I've ever seen for Pennsylvania.

But the only way to do this from here is -- to get the game adjudicated is to go to court, make sure that a judge of the right caliber can tell us that this game is legal so we can avoid problems going forward.  Or certainly minimize them.

Q.    Who else was in that meeting with you, sir?

A.    I had Wayne DeLuca, and I had Ryan Wood, who was my vice president of sales -- or soon to be.

Q.    What was Mr. Woods' function with respect to the Commonwealth of Pennsylvania?

A.    Ryan had not been with us long, but he had a lot going for him.  I believed in him.  We really let Ryan as -- just take on Pennsylvania and help us to push this game.  And he found our distributor, and he helped coordinate these things because I have a lot of hats I've got to wear, job titles, I can't do it all.

Q.    Understood, sir.  Let's frame the time period.  Could you tell us approximately when you met with Trooper Goodling, Attorney DeLuca, and Ryan Wood?

A.    It would had to have been summer to fall of 2013.

Q.    Understood.

A.    Somewhere in that period.

Q.    So quick question, sir.  How did the game get to Pennsylvania?

Well, let me ask it a different way.  Was the game manufactured in Pennsylvania?

A.    No.

Q.    Where was it manufactured?

A.    In Norcross, Georgia.

Q.    Okay.  And when it's manufactured, would it be fair to say that the software's programmed into the game?

A.    Yes.  The software can be changed later, if you need to.  But that's -- and it was shipped from our factory -- where our old address was in Atlanta -- to -- I don't know.  I think it was shipped to Wayne DeLuca or -- no.  I take that back.  I think it was shipped straight to the labs -- I mean to the Pennsylvania police.

Q.    Okay.

A.    Because we already had one at DeLuca's.

(Court reporter clarification.)

THE WITNESS:  I'm sorry.  I think the game actually got shipped directly to the state police in Harrisburg because we already had a countertop game of it in DeLuca's office, who was our lawyer in Sewickley.

BY MR. NEISER:

Q.    Understood.

So after the meeting with Trooper Goodling, Ryan Wood, Attorney DeLuca and yourself, tell us what you did next.

A.    I think we left for that day.  We came back about two

weeks later.

Q.    Okay.

A.    Expecting maybe the state police to say, Hey, it's a great game.  Go put it out.

But they're not going to do that politically.

Q.    Okay.

A.    So Corporal Goodling said, "Well, why don't we arrange for a friendly pickup," which was exactly what we wanted.  Or a discussion took place between our lawyer and Goodling, and that's what they came up with.

Q.    Okay.  So --

A.    Which is what we wanted.

Q.    Understood.

Now, during my opening, I mentioned the controlled or friendly pickup.  Would you please describe to us what all is involved in a friendly or controlled pickup?

A.    Well, I'll make the difference between an unfriendly pickup and a friendly pickup.

Q.    Well, let's just talk about the friendly kind.

A.    Okay.  A friendly pickup is where you know that no one's going to get charged with a crime.  There's no risk to the license of a -- of a bar or wherever it's picked up.  They're basically -- you're basically putting it somewhere, where it's used in commerce, and telling the state police where it is so they can go pick it up.

When they do pick it up, you get a citation or a ticket that says, "Hey, this is contraband, and we're going to keep it."  Then you sue to get it back.

Q.  Okay.

A.  And that is how it's done.  That is the only way that we can prove that our games are legal outside of just having one picked up randomly, which isn't near as nice as a controlled pickup.

Q.  Understood.

So tell us, sir, did that controlled pickup happen with respect to the Pace game in Pennsylvania?

A.  Yes, sir.

Q.  What do you know about it?

A.  Well, our lawyer, his office was in Sewickley, Wayne DeLuca.  He said he will find someone to place the game somewhere close to his office, because that's where he lived, where he wouldn't have to travel so far, and then we'd tell the police.

And I -- one of his prior clients or clients was Albert Unis III that we found out later on.  But we'd certainly never heard of him at that point.  The lawyer gave the game to Albert, evidently, who put it into a club, told the -- told the lawyer where it was so that he could instruct the state police where to go and get it.

Q.  Okay.  If I were to show you a photograph of a game,

would you be able to tell us and confirm whether that photograph is an accurate depiction of what that game from the controlled pickup would have looked like?

A.   Yes, sir.

MR. NEISER:  A.J., can we have 28, please?

BY MR. NEISER:

Q.   Sir, I'm showing you an image that's been marked for identification purposes as Exhibit 28.  Do you recognize it?

A.   Yes, sir.

Q.   Without describing the contents too much, what is it?

A.   It's an early version -- actually, it's the 402.44. So this would have been one of the first releases of the Pennsylvania Skill software.

Q.   Okay.  Sir, can you confirm for us whether or not this is an accurate depiction of what the screen on the game from the controlled pickup would have looked like?

A.   Yes, this is correct.

Q.   Okay.  And that's what the screen would have looked like when it was manufactured in Atlanta and shipped across state lines into Pennsylvania?

A.   That's correct.

MR. NEISER:  Your Honor, we offer Exhibit 28 into evidence.

THE COURT:  Is there any objection?

MR. ZEGARELLI: No objection.

THE COURT: All right. Exhibit 28 is admitted.

BY MR. NEISER:

Q. Okay. So let's look at the top center of that screen, sir. What does it say?

A. Pennsylvania Skill.

Q. Okay. And on the right-hand side, there's -- looks like a tornado of sorts or something like that with Pace-O-Matic. What's that?

A. That's a glorified "on" button.

Q. Ah.

A. It's part of our logo -- was our logo at the time. It changes every few years.

Q. Understood.

MR. NEISER: And then, A.J., could you please enlarge the very last line of text at the bottom.

Yes, sir, all the way to the end.

Well, that's not very clear, but we'll work with it.

THE WITNESS: Yep.

BY MR. NEISER:

Q. Mr. Pace, there's some characters on the right-hand side. It says "SKL402.44 pen." What is that?

A. That's a notation that I had created years earlier so we could keep track of our different products, the technologies involved, and where they were designed to operate. In this case, the "SKL" means it's a skill device, meant to be a

dominant skill doctrine device, more than just some skill.  And the "402" is the version number.  The ".44" is the build number of that version.  And the "P-E-N" is how one of the engineers, I guess it was probably Glen Carter, wanted to abbreviate Pennsylvania.

Q.  Understood.  We'll get back to that software version in a moment, so thank you for that.

So as I understand your testimony, controlled pickup happens.  Was there a lawsuit that followed?

A.  I'm sorry?

Q.  After the controlled pickup occurred, was there a lawsuit?

A.  Yeah.  That's how you prove your game's legal and how you get your game back, which isn't as important, but proving that the game is a game of skill.

Q.  Okay.  And did you file that lawsuit?  Did Pace-O-Matic file that lawsuit?

A.  I certainly did.

Q.  Did you testify in that case?

A.  I did.

Q.  Did you pay for legal fees?

A.  I did.

Q.  Did you hire an expert for that case?

A.  Yes.  And he also tested the game in his lab in Ohio.

Q.  Understood.

And what was the software version in the game that was subject to the Beaver County Common Pleas Court case?

A.   402.44.

Q.   Okay.  Now, earlier you mentioned a gentleman named Albert Unis III, did you not?

A.   Yes.  Yep.

Q.   Did you have any idea who Albert Unis III was at any time during the time period we're talking about?

A.   No.  I never heard of him until February of 2015.

Q.   Okay.  So if I were to tell you that -- well, let me ask you this.  If there was a claim that he assisted you in the lawsuit in any way, how would you rate that on the truth meter?

A.   That's a lie.

Q.   So did he have any involvement in the controlled pickup, other than, let's say, anonymously putting the game out into the location in Beaver County?

A.   That is the only thing that he did.

Q.   Okay.  Did Attorney DeLuca advise you at any time the identity of the operator?

A.   No.

Q.   Or, I mean, to be more specific, at the time that the game was put out?

A.   No.

Q.   So, let's talk about the time period from the controlled pickup until you receive an actual decision from the

Court of Common Pleas of Beaver County.  What is Pace doing in anticipation, if at all, for winning this court case -- or losing the court case for that matter?

A.    Well, we had -- the software had finally gotten ready, so it was waiting to go through the process of being tried.  But there were still some cleanup.  And all -- all software undergoes constant evolution.  I mean, as anybody that knows that has a PC, you've got to update it from time to time whether you like it or not.  And if you don't use your PC or computer in, what, like three months and you turn it on, the first thing it wants to do is upload; right?  Is upgrade.

We use operating systems that we do not write.  We use computer boards that we buy that are consumer electronics, because we can't -- I really can't design and build a computer board anymore that's going to work for more than about five years before you can't get the parts --

Q.    Okay.

A.    -- or I would.  It's -- it's better for us just all the way around to buy these consumer electronic boards.  But then they have to -- we run Linux as the operating system.  It's a lot better than a Microsoft product, but still the thing ends up -- you've got bug fixes.  You've got some sort of update to it.  Security stuff that has to go.  Plus, our games -- at all times we're adding games to our library of certain technologies; so -- and we're fixing bugs and doing whatever else

enhancements. And occasionally adding features to the games that we feel add more skill to them to even increase our argument.

So anytime that we're forced to upgrade -- or periodically anyway, we update the software, it comes with all those things in it.

Q. Okay. From a business perspective, what was Pace doing in anticipation of winning or losing that decision?

A. Well, we needed to finish the logo and the brand for Pennsylvania Skill, being as that's what was written into the court order was Pennsylvania Skill, and now we've got the name. I mean, it's just -- we're not going to change it at this point. So we did.

We had our art department create several different what I would call a logo, but it's really a mark or a trademark that we put on there so that we could identify our machines and distinguish them between our stuff and somebody else's.

Q. Understood.

MR. NEISER: So, A.J., Exhibit 4, please.

BY MR. NEISER:

Q. Sir, do you recognize this document?

MR. NEISER: And could you scroll down, please, for Mr. Pace.

THE WITNESS: Yes, I know that very well.

BY MR. NEISER:

Q.    What is it?

A.    That's our -- our win in Beaver County.  That was Judge Knafelc.  I always get that screwed up.

Q.    Knafelc.

A.    Knafelc.  Okay.  Nice guy.

He wrote this order, and it was very well done.

Q.    Understood.  It's Western Pennsylvania.  There are lots of consonants in our names.

Is this a true and accurate copy, to the best of your recollection, of the facts and the order that you received?

A.    Yes, sir.

MR. NEISER:   Your Honor, we'd offer Exhibit 4 into evidence.

MR. ZEGARELLI:  No objection, Your Honor.

THE COURT:  Thank you.

Exhibit 4 is admitted.

MR. NEISER:  So, first, let's go to the first page, if you don't mind, A.J.

BY MR. NEISER:

Q.    And it's a fax cover sheet, and it's dated 12/24/14.

Do you see that there, sir?

A.    Yes, I do.

Q.    Okay.  Do you recall receiving this fax?

A.    I did receive it.

Q.    Okay.  What was your reaction?

A.    Wahoo!  It was great.  I was at my farm in Ohio when it happened for Christmas.

MR. NEISER:  Go to the last page, A.J., please.

BY MR. NEISER:

Q.    And I'll read this aloud for you.  This -- and this is the order of court from Exhibit 4:  It is hereby ordered and decreed that petitioner's motion for return of property pursuant to Pennsylvania Rule of Criminal Procedure 588 is granted.  The Commonwealth is ordered to return the Pennsylvania Skill game to Pace-O-Matic, Inc.

Did I read that correctly, sir?

A.    Yes.

Q.    Did the Commonwealth appeal that decision?

A.    No, they didn't.

Q.    So you just mentioned that, during the time between the controlled pickup and receiving that order in December of 2014, I believe you mentioned some marketing materials.  Do you recall that, sir?

A.    I'm sorry.  Give me the dates again.

Q.    Between the controlled pickup until the date of the Beaver County decision, you said that there was -- marketing materials were being prepared at Pace.

A.    Sure.

Q.    Okay.  If I showed you a copy of those marketing materials, would you be able to identify them?

A.    Absolutely.

MR. NEISER:  Can I have Exhibit 55, A.J.?

BY MR. NEISER:

Q.    Do you recognize this, sir?

A.    Yes.

Q.    Is there another page?

Do you recognize that, sir?

A.    Absolutely.

Q.    And I want you to -- as you are looking at these, I'd like you to take a look at the dates on the file directory next to them.  Okay.

It's your testimony you recognize all of those images?

A.    Yes, sir.

Q.    To the best of your recollection, do you recall seeing those images at or near the time depicted in the file directory?

A.    That would be correct.

MR. NEISER:  Your Honor, we offer Exhibit 55 in evidence.

THE COURT:  Is there any objection?

MR. ZEGARELLI:  No objection, Your Honor.

THE COURT:  All right.  Thank you.  Exhibit 55 is admitted.

BY MR. NEISER:

Q.    Sir, let's talk about this image here.

MR. NEISER:  Actually, let's go to the very bottom, if

you don't mind, A.J.  The very bottom of the exhibit.  Is there another page?  Two pages.

BY MR. NEISER:

Q.    And this has a date of 1/23/2014, sir?

Do you see that there?

A.    Yes.

Q.    Is it your testimony -- I want to be perfectly clear here -- that, as of that date, that particular flyer, that artwork was completed?

A.    That's correct.

Q.    Okay.  Let's go up to the very first page.

A.    We thought our trial was going to be a lot sooner than it was.

Q.    Before we go on with the exhibit, tell us why the trial took a little bit longer than what you thought.

A.    Well, it took a year, and this -- this material here was prepared in January of '14 because we thought we were going to trial in February of '14.

Q.    Okay.

A.    And then we thought we were going to in April, and then we thought we were going in September.  It got delayed, I think, four times.  I forget for what reason.  But the final delay was the expert for the state died of a heart attack.

Q.    All right.

A.    Two weeks before the trial.  It was terrible.

Q.   Understood.

A.   I knew him but -- then we finally got to court.

Q.   Understood.

MR. NEISER:  So, A.J., can we put that back up, please, and look at the first page.

BY MR. NEISER:

Q.   So the first -- we're going to look at dates first. So as of 12/15, 2014, which, I think, is a week before the Beaver County decision came down, is it your testimony that's your recollection of when -- at least when that coaster was created?

A.   Say that again.  I'm sorry.

Q.   It's your testimony that, as of 12/15/2014 --

A.   Yes.

Q.   -- the image behind it, that was the -- a date upon which at least that coaster was created?

A.   Yes.

Q.   Okay.

MR. NEISER:  Can we take down the dates, please?  And can we enlarge the coaster itself?

BY MR. NEISER:

Q.   Sir, let's look at the top, let's say, one-quarter of that coaster.  Do you know who created that graphic, at least which company created it?

A.   Yeah, we did that in-house in our art department.

They had several different samples, and that was the one we liked.

Q.  Did anybody from outside of Pace-O-Matic contribute to the artwork?

A.  No, sir.

Q.  Did anybody from outside of Pace-O-Matic suggest the artwork?

A.  No.

Q.  Did anybody from outside of Pace-O-Matic give you the name Pennsylvania Skill to use?

A.  No.

MR. NEISER:  We can take this down, A.J.  Sorry, I can do that.

BY MR. NEISER:

Q.  You said that you were present during the trial in the Beaver County decision?

A.  I was.

Q.  Was Mr. Unis there?

A.  No, sir.

Q.  Was Mr. Unis's son there?

A.  No, sir.

Q.  And to be absolutely clear, you had neither heard of nor met either one of them at that time?

A.  No.

Q.  If there was any suggestion that you had met Mr. Unis

at a trade show years earlier, what would you say to that?

A.    I meet a lot of people at trade shows, but I would have remembered Albert.  We certainly didn't have any deal.

Q.    Okay.

MR. NEISER:  Exhibit 25, please.

BY MR. NEISER:

Q.    Sir, I'm going show you a document that's been marked for identification purposes as Exhibit 25.  Do you recognize this?

A.    I do.

Q.    What is it?

A.    It's an email.

Q.    How do you recognize it?

A.    Because --

Q.    What do you remember about it?

A.    -- this was the first time we'd ever heard of Albert Unis.

Q.    And is it correct, sir, that you are copied on this email message?

A.    Yes, sir, I am.

Q.    And what is the date of it?

A.    February 2, 2015.

Q.    Can you tell us whether or not this is a true and accurate and complete copy of the email?

A.    That is the complete email.

MR. NEISER:  Your Honor, we offer Exhibit 25 into evidence.

MR. ZEGARELLI:  No objection.

THE COURT:  Exhibit 25 is admitted.

MR. NEISER:  Thank you, A.J.

BY MR. NEISER:

Q.   So it appears this is an email from Ryan Wood, Monday, February 2, 2015.  Can we agree to that, sir?

A.   Yes, sir.

Q.   Okay.  Now, let's talk about this more a moment.  Is it your testimony, again, that prior to this time, you had never heard of either one of the Unises?

A.   I've never heard of them, no, sir.

Q.   Okay.  And I believe the second paragraph is directed to you.  And there's a statement that Albert is the customer in Beaver County who is putting out all the machines.

A.   Yes, sir.

Q.   What is your understanding of that sentence?

A.   Ryan told me he talked to Albert, and Albert -- we normally wouldn't sell to somebody like that.  We would do it all through our distributor.  But our lawyer asked us if we would do some deal for him to put stuff in Beaver County.  So he convinced Ryan that he would put out hundreds of machines and saturate the county in no time, that he was a big operator there.

Q. Understood. So would it be fair to say that this is your first introduction to Mr. Unis?

A. Yes, sir.

Q. Did you end up meeting the Unises that week, the week of February 2nd?

A. Yes, sir.

Q. Do you recall that meeting?

A. I do.

Q. Tell us about it. Tell us what your remember.

A. I know they were late. They got -- it was in the evening. We were going to do dinner, but it was too late. And we talked about the games. I know that -- I mean, we never dealt with Albert Jr. We always dealt with his dad. And he expressed -- he said that he wanted to do -- he wanted to know what it would take to have an exclusive on the County of Beaver.

Q. Okay.

A. And we had never done an exclusive anywhere except one time in Ohio, and it was a mistake, and it was probably unenforceable because we had a deal already with our distributor for the exclusive on the whole state. We would have to carve out a county and somehow protect him from other people. But I said that comes at a cost up front of buying one game for every thousand people, just the same way we did it in Ohio.

So we looked it up, it was 168,000 people in Beaver County. I said, If we're even going to begin talking about an

exclusive where we don't sell to anyone else in Beaver County, you'll have to give us a hard PO for 168 games and put up the cash for at least half of it.

Q.   What did he said?

A.   He said, No way.

I said, Okay.  That's the end of the exclusive talk. That was it.

Q.   During that meeting, did you reach any agreement with either Albert Unis III or Albert Unis IV?

A.   I don't think we reached any agreement at that meeting.  They just wanted to come see the factory and make sure we were real, and I guess we wanted to make sure they were real. And the dad wanted me to -- wanted a picture of me and his son by the game in our comfort zone.  So I obliged him.  I let him take a picture of me.

MR. NEISER:  Can we have Exhibit 203, please.

BY MR. NEISER:

Q.   Sir, I'm going to show you a document that's been marked for identification purposes as Exhibit 203.  Do you see that?

A.   Yes, sir.

Q.   Have you had an opportunity to review the website for Pennsylvania Skill Games, LLC?  Or at least this page of that website?

A.   Yes.  Yes.

Q.   Do you recall looking at that page from the website and reading the text and seeing the pictures?

A.   I do.

Q.   Okay.  Does this appear to be a true and accurate copy of the web page that you looked at?

A.   It does.

Q.   And does that look like the photograph on the bottom of you and Mr. Unis IV?

A.   That is the photograph.

MR. NEISER:  Your Honor, we offer Exhibit 203 into evidence.

MR. ZEGARELLI:  No objection.

THE COURT:  All right.  Exhibit 203 is admitted.

MR. NEISER:  Can I have a moment, Your Honor, please?

THE COURT:  Yes, of course.

(Brief pause in the proceedings.)

MR. NEISER:  Your Honor, can we have just a five-second sidebar?

THE COURT:  Yes.

(Whereupon, sidebar conference held:)

MR. NEISER:  And, Your Honor, A.J. pointed out to me, that website has the word "legal" and "legalized" on there twice.  I don't want to create a problem concerning the discussion this morning.  He can redact it if you want to.

MR. ZEGARELLI:  It's in.

MR. NEISER:  I don't think it needs to be.

THE COURT:  I don't think it needs to be.  I mean, what is the main purpose the photo?  Are you going to have him talk --

MR. NEISER:  We're going to talk about the photo and talk about some of the representations in there, but the legality of it isn't part of it.  It's how he refers to our client and refers to the dealings and, of course, to the photograph.  It has nothing to do with legalization.

THE COURT:  I don't think we need to redact unless --

MR. ZEGARELLI:  I don't think we need to redact, Your Honor.

MR. NEISER:  Okay.

MR. ZEGARELLI:  Well, if it become an issue -- I wasn't planning on --

MR. NEISER:  I apologize for not catching that before we tendered it.

THE COURT:  That's fine.

(Whereupon, sidebar conference concluded.)

MR. NEISER:  Okay.  Let's zoom into the photograph and the caption to the right, please.

BY MR. NEISER:

Q.  Mr. Pace, is this the photograph you were just referring to?

A.  Yes, sir.

Q.    And who is that young man to -- sitting to your right on that photograph?

A.    That's Albie, or Albert Unis IV.

Q.    And are you saying that this is the first time you met Mr. Unis?

A.    That -- I had not known him more than an hour before that picture was taken.

Q.    Okay.  Now, what are you guys standing next to?  What is that, that device?

A.    That is one of our Pennsylvania Skill Games.

Q.    Okay.  Now, I see, it looks like an illuminated background that says Pennsylvania Skill, if I can make that out; is that correct?

A.    It's a bad photograph, I agree.  But yes, it says Pennsylvania Skill.

Q.    And is that the same logo -- put up Exhibit 55, please, A.J. -- that we see there at the top of the coaster?

A.    Yes, sir.

Q.    Let's go back to 203, A.J.  And enlarge the photograph and the text.  Thank you very much.

Sir, would it be fair to say you had a completed game with completed branding present at that meeting with the Unises on February 5th, or thereabouts, 2015?

A.    The game was finished, the logo was finished, the trademark was finished, copyrights are intact.  It's all done.

Q.   So I want to read the caption, it says:  Mike Pace, left, pictured with Albert Unis, right, after the successful development of Pennsylvania Skill Games.

Do you see that there, sir?

A.   Yes, sir.

Q.   Do you agree with that sentence?

A.   No.

Q.   Why?

A.   Because it wasn't right after.  Successful development -- the game's been developed a year and a half before that.

Q.   And if there is any inference in that sentence that you were celebrating or commemorating a moment, would that be correct?

A.   No, sir.

Q.   Okay.  At any time did Albert Unis IV or Albert Unis III have any involvement in the creation of the Pennsylvania game?

A.   No.

Q.   So that was a suggestion that they were there and celebrating the completion of the game because they were a participant, would that be true or false?

A.   That's a lie.

Q.   Let's zoom back out.  So let's look at the very top of this -- the text on the web page.  If we can isolate that and

enlarge, A.J.  Not that.  The actual text, please.  Thank you.

So let's start with the first sentence here.  How long have you been in the gaming industry?

A.   I started programming computers in '74 and I designed and built my first game computer and operating system in 1980. I don't know, 40 -- going on 50 years, I guess.

Q.   Do you ever go to trade shows?

A.   I do.

Q.   Do you ever go to national gaming events for other gaming operators and creators?

A.   Nowadays, we only go to the national events.  There's one in the spring and one in the fall.

Q.   Had you ever heard of Albert Unis at any of these events that you went to as a leader in the industry of legalized skill gaming?

A.   No, and that is unlikely.

Q.   And next:  His company sought to develop a unique company skill game and elected to do business with Mike Pace of Georgia.

Is that true or false?

A.   That is false.

Q.   So let's look at the next sentence.  Pace is known to be the best designer in the gaming industry in the country.  Can we agree to that, at least?

A.   That is somehow self-serving, but yes.

Q.    And then it says:  Once Pennsylvania Skill Games were designed, Albert opened the market for legal skill games.

Do you see that?

A.    Yes, sir.

Q.    Is that a true statement?

A.    No.  It doesn't make any sense.  We've been doing skill games for a long, long time.  We have a lot of states going on at any one time.

Q.    And as you said, they had nothing to do with the development of the game, did they?

A.    They had nothing to do with development of my products.

Q.    Now here:  It wasn't easy, but after the courts ruled in his favor, Unis prevailed and put the first legalized skill game in the American Italian Club in Aliquippa, PA.

A.    I think that's the location where the test game was put that was picked up.  I don't know that a game ever went back into it.

Q.    And are you aware of any court's ruling in Mr. Unis' favor?

A.    I'm not.

Q.    And in fact, that legal decision that we just looked at a few minutes ago, did it even reference the Unises or their company in any way?

A.    No.

Q.   And then it says:  Since that time, his games can be seen throughout Western Pennsylvania.

Do you have knowledge, sitting here today, as to whether or not Albert or Albie Unis actually make games or program or develop games?

A.   If that's talking about operating games, they may be operating games.  Not this game.

Q.   Okay.  Let's take it down, please.

MR. NEISER:  Your Honor, I'm about to start a new line.  I didn't know because of the time whether you wanted me to just keep going or if I should stop.

THE COURT:  Will the new line be completed in the next 15 minutes?

MR. NEISER:  I'm not sure if it will, Your Honor.

THE COURT:  All right.  Why don't we take our daily recess at this point.

MR. NEISER:  Thank you, Your Honor.

THE COURT:  Ladies and gentlemen, I want to remind you that you're not to discuss this case among yourselves or conduct any research or discuss it with anyone else.

On behalf of the parties and counsel and myself, I want to thank you for your attention today.  And we're going to recess at this time.  We'll see you back here to start sharp at 9:00 a.m. tomorrow.  So thank you.

Court is adjourned.

(Jury exits.)

(In chambers.)

THE COURT:  I don't want to keep you long.  I know everybody has work to do.  What are we thinking for tomorrow?

MR. NEISER:  Michael Pace, followed by -- this is for discussion, let's put asterisk next to it.  Deposition designation of Wayne DeLuca.  Again, we'll talk about that.

Glen Carter.  Ryan Wood.  And if I can do it, Chris O'Bier.

THE COURT:  Okay.

MR. NEISER:  I don't think I will.  But I want to give at least advance notice because that will be a -- I'm going in that sequence, one way or the other.  If we don't get it in all, we'll shuffle to the following day.

THE COURT:  Give me the sequence.  We'll talk about Mr. DeLuca.  You had DeLuca.

MR. NEISER:  Finish Pace, DeLuca, Carter, Wood, O'Bier.

THE COURT:  Okay.  Thank you.

MR. NEISER:  Thank you.

THE COURT:  So I know that Mr. Zegarelli, you were asked to prepare counter designations, and where are we with that?  That might affect the order.

MR. NEISER:  Yes, Your Honor.

THE COURT:  I recognize it may go out of order.  But I

think I said I'd like to have them today because, of course, I have to look at them and rule on them.

MR. ZEGARELLI:  I intended to have them to you.  I thought it was by end of day.

THE COURT:  It is.

MR. ZEGARELLI:  Then I'll comply.

THE COURT:  When you say end of day, give me a sense when you think I might have them.

MR. ZEGARELLI:  Well --

THE COURT:  I'm not going to strictly hold you to it, but I -- since I'll need to look at them.

MR. ZEGARELLI:  I understand.

THE COURT:  And Mr. Neiser will need to look at them too.  And if I have to flip the order, we may have to do that.  If we don't, we don't.

MR. ZEGARELLI:  By the time I get home, all of that situated, I'm going to say 8:30.

THE COURT:  Okay.  Will you email them to Ms. Hopkinson when you send them to Mr. Neiser?  That way, she can get them to me.  And just depending on what they are and how voluminous they are, I'll do my best to look at them.  If I'm not able to do that before we get started tomorrow, I promise you I'll do them as quickly as I can.  I certainly want both of you to proceed in the order that you would prefer.  Sometimes we can, sometimes we can't.

MR. ZEGARELLI:  Okay.

MR. NEISER:  Your Honor, it's not going to move the needle for me.

THE COURT:  Okay.

MR. NEISER:  Whatever we need to do, I know we're all busy trying to get this.  So it's not a problem.

THE COURT:  The other three witnesses you mentioned are live witnesses?

MR. NEISER:  They are.

THE COURT:  All right.  Just as a reminder, if -- when you have designations, if you can give them to me as well.

MR. NEISER:  Yes.

THE COURT:  So I can follow along with that just in the event that there's an issue.

MR. NEISER:  May I ask a quick question about that?  I want to make sure I'm doing this the way that you want to do.  What I planned on doing was putting Mr. Deasy on the stand, I'm going to read; he's going to answer.

THE COURT:  Yes.  That's fine.

MR. NEISER:  Understood.  I assume the Court will be giving an instruction to the jury what we're doing.

THE COURT:  I will.

MR. NEISER:  I don't think -- I don't believe there are any exhibits that go with those.  We have a binder for the Court with just the designations.  Do you prefer mini or full?

THE COURT:  I don't care.  I want to make sure I have a copy so that if something is read incorrectly, there's an objection, somebody is reading something that wasn't designated, I don't have to guess about what that is.  That's all.

MR. NEISER:  Thank you.

THE COURT:  I'll explain to the jury what Mr. Deasy is doing, what his role is, you know, why he is reading them, so on and so forth.  They'll have an instruction about that.

MR. NEISER:  Thank you.

THE COURT:  As a reminder, with any other designations where there are exhibits, you'll need to link up the deposition exhibit with what the exhibit is in the case -- so if they're referencing deposition Exhibit 2; it's some other exhibit in this case -- so you'll need to make sure that whoever is reading that reads the right exhibit.  So there's not confusion about whether it's a deposition exhibit or a trial exhibit.  It needs to be a trial exhibit.

MR. NEISER:  Yep.  Done.

THE COURT:  Okay.  Request for admissions, do you want an opportunity to redo yours?  We talked about this this morning.

MR. ZEGARELLI:  I think I would like the opportunity to do that.

THE COURT:  Mr. Neiser, any sense of when you plan on reading in the various designations?

MR. NEISER:  I'll work around Mr. Zegarelli.

THE COURT:  Let's make sure that we can regroup about this at the end of tomorrow, but it doesn't sound like you're going to get there by the end of tomorrow.

MR. NEISER:  Oh, I wouldn't have done it then.  But I -- I'll work around Mr. Zegarelli.

THE COURT:  Okay.  All right.  Just a reminder, I know you both know this already, but for witnesses that are sequestered, you cannot, nor can anyone else, tell them what happened during whatever testimony there is.  That's why we sequester people.  As a belt-and-suspenders reminder, let's refrain from telling sequestered witnesses what anyone else testified to.

MR. NEISER:  Yes, Your Honor.

THE COURT:  I wanted to refocus on the issue of legality, which I know everyone has talked about at great length.  So I want to give you where I think is the most appropriate way to go here.  Of course, subject to your objections.

So we've already seen some examples of that today. The reference to the word "legal," "legality," things like that. My view is if they appear in documents, there is no need to redact them or exclude them.

I will say a couple of things, just as a reminder. Explanations as to why something isn't legal or why a witness

thinks or believes it's not legal is inadmissible because of course a lay witness cannot testify about why something is legal or not.

Of course, that does not include evidence about the Beaver County case because we know there's already been testimony about that and I'm confident, Mr. Zegarelli, you're going to have testimony about that as well.

MR. ZEGARELLI:  I will.

Your Honor, there was testimony that needs to get cross-examined at this point with regard to he said -- if you search on the record, he said, "Cops pick them up."

And that's saying cops seize.  I'm trying to figure out how to work with that testimony.

THE COURT:  Well, I think it will be limited to the Beaver County case and whatever comes out of that, because we're not getting into legality because that is already ruled upon, would require expert testimony.  And at any rate, from what I've heard, legality's not relevant to the claims asserted in this case.  With respect to the trademarks, it's my understanding, at least from your client's standpoint, Mr. Zegarelli, that you're seeking disgorgement of all profits, whether legally or illegally gotten.

With respect to the breach of contract, the right of first refusal only relates to compliant terminals.  And while you indicated earlier today that you're claiming breach for the

failure to sell compliant terminals, the damages sought on both claims -- or I'm saying both, on trademark and breach of contract -- are unrelated to whether the terminals are compliant or not.

So, in terms of seizures that do not relate to Beaver County, we're not going to get into that evidence.

MR. ZEGARELLI:  I don't understand the basis for that, Your Honor, quite frankly.  I understand that's a ruling, but I don't know why seizures -- the witness testified to cops picking them up, which is a seizure.  He didn't relate that testimony to Beaver County.

THE COURT:  What relevance is a seizure?

MR. ZEGARELLI:  While he made it, Your Honor, relevant by his testimony, and I should be able to ask him about that testimony.

THE COURT:  Why?

MR. ZEGARELLI:  Because I want to know what he means.

THE COURT:  Other than that's what he said, what issue is it relevant to is what I'm asking.  Not -- I understand he testified in a certain way.  What is that relevant to?

MR. ZEGARELLI:  It's relevant to the fact that he -- he said putting somebody's board in a machine, I think the testimony -- I mean, we'd have to grab the record, but I think his testimony was if you put, you know, person A's software with the brand, it causes seizures.  I think that's what he said.

THE COURT:  Again, what is that relevant to?  What claim or defense is that relevant to?

MR. ZEGARELLI:  Defense to the -- to the commingling and the ille- -- you know, exactly what has been brought up with regard to the claim of the POM parties indicating that PSG has placed somebody else's manufactured game with a Pennsylvania Skill branding on it.

MR. NEISER:  Your Honor, first, the context in which Mr. Pace testified today was give an example of how a controlled pickup worked, and he made a quip.  There's a difference between a friendly pickup and an unfriendly pickup.  That's it.

It had nothing to do with a seizure, and it had nothing to do with a specific instance of any conduct.  It certainly had nothing do with "them."

So it was just a side comment.  So that hardly would constitute -- I understand they're chomping at the bit to talk about seizures and whatnot.  But nobody so far has said anything about anybody running illegal -- or commingled games aren't even part of the case.  They haven't been part of the case.  I've made this clear since day one.

The reason why we're in this situation is because they -- they didn't sign terms and conditions.  It's not part of the case.  We're not going to raise it.  We will never discuss commingling.  We will not discuss them running illegal games.

MR. ZEGARELLI:  We're not talking about commingling.

MR. NEISER:  I'm not talking about it, period.

MR. ZEGARELLI:  We're not talking about commingling.

MR. NEISER:  You just mentioned it.

MR. ZEGARELLI:  We're talking about putting the game of one manufacturer under the brand of Pennsylvania Skill.

MR. NEISER:  Your Honor, and that is in the context of palming off goods.  That's it.  And all we're going to say is "not our product."  And that is precisely what Mr. Pace said today.  The transcript was very clear.  I -- I remember it when it came out of his mouth.  Because I'm like, oh, my God.  Don't say anything bad.  Don't say anything, like, that's going to, you know, run afoul of the order.

And he listened to what I told him.

And he said it was -- we don't want our brand on another competitor's product.

MR. ZEGARELLI:  Cops pick it up, seizure.  Just didn't use the word "seizure."

MR. NEISER:  You know, Judge --

MR. ZEGARELLI:  We can read -- you can read back the transcript.  I'm not making it up.

MR. NEISER:  Your Honor, I -- my position is this. Mr. Pace very clearly said -- A, he gave an example of what is a controlled pickup, what isn't a controlled pickup.  He didn't talk about seizures.  The idea that this cracks open a door for cross-examination, whatever, is absurd.  And I'm not sure what

else I can say about it.

And it has nothing to do with any claim -- there's no damages.  There's no allegation.  There's no allegation in the pleadings.  There's nothing in their expert report.  All they want to do is smear us.

MR. ZEGARELLI:  No.  No.

MR. NEISER:  That's the entire purpose of it, to make us look bad in front of the jury.  Because as we've heard a little bit today, it's a little bit tenuous on the proof.

So I don't see why a seizure -- now, if they would say, hey, your games cost us all these legal fees because we keep losing our games because we're running all of yours, that would be one thing.  And if they pled it, but they've not.

All they're trying to say is that we're -- our games were seized elsewhere.  And we're going back around and around in circles on the same issue, and I'm sorry.

MR. ZEGARELLI:  If he testified to it, Your Honor, I get a chance to test and kick the tires of that testimony.  And if I'm ordered not to kick the tires of the testimony that was actually given in the record, I feel that I -- it's an improper -- it's improper.  I mean, if he testifies to it, I get to ask him questions about his testimony.  It went to the jury. I don't know why I don't get to ask him questions.  It's just simply not fair.

MR. NEISER:  It's irrelevant, Your Honor.  It is 403,

confusing the issues, waste of time --

MR. ZEGARELLI:  And it should have been disregarded, but it --

MR. NEISER:  You could have objected, sir.

MR. ZEGARELLI:  Well, okay.  Well, if you want me to start throwing out the objections, I will start to throw out objections, if that's your issue.

MR. NEISER:  If you're threatening to make a mockery of the court by making improper objections and you want to play an objection game, please do it.

MR. ZEGARELLI:  I'm not trying to make a mockery out of the court, which is hyperbole.

I'm saying that if Mr. Pace, he's giving an answer to a question, and am I supposed to say that the -- the question wasn't irrelevant, he continued on his answer, and he said the truthful information that he wanted to give, and I want to cross-examine him.  That's all.  It's not really an irrelevant question.  It's the answer had content in it that went to the jury, and I get to ask him about that.  I get to -- I get to test that testimony in my view.

MR. NEISER:  Your Honor, it wasn't directed to any party.  It wasn't directed to any person.  It wasn't directed to anything or any event.

MR. ZEGARELLI:  But he said it.

MR. NEISER:  He said a lot of things.

MR. ZEGARELLI:  Right.  And I get to cross-examine those things.

MR. NEISER:  He said he worked at McDonald's.  Are we going to cross-examine him on chicken McNuggets?

MR. ZEGARELLI:  No.  But if I don't -- I get -- if I want to cross-examine him on something --

MR. NEISER:  Offer of proof, Judge.

MR. ZEGARELLI:  -- that is my -- what do you mean offer of proof?  It's called cross-examination.  It's your proof that you put in.  I'm -- I get the chance to cross-examine him.

THE COURT:  Well, let me maybe shortcut this by saying I've made further rulings today about this issue.  You may certainly ask questions.  And if there is an objection, I'll consider whether I'm going to sustain it or not.

I -- I would have to look to see what he actually said, and you should be clear on what he said or didn't say. And I'm not going to rule on every cross-examination question here as we sit here.

But I will say that, as I indicated several minutes ago, there are no claims or defenses in this case, as far as I see right now, that relate to the seizure of equipment or issues relating to noncompliant terminals because the damages sought do not make that distinction, between legality and illegality.

The damages sought relate to every right of first refusal that was denied from a certain date until the present,

as you told me this morning.  And the trademark damages sought relate to a disgorgement of all profits, whether it was on a -- whether the trademark was used in a legal or illegal, compliant or noncompliant terminal.

So you have not created a damages case that relies on legality or illegality.

MR. ZEGARELLI:  And you're saying monetary damages?

THE COURT:  Yes.

MR. ZEGARELLI:  Okay.  There are nonmonetary damages claims in the lawsuit.

THE COURT:  Like?

MR. ZEGARELLI:  That it's affecting the brand and the reputation of the brand that are not monetary, and it's part of the equitable relief, Your Honor.

THE COURT:  Okay.  Well, that's not going to go to the jury, anyway.

MR. ZEGARELLI:  Well, I understand that.

THE COURT:  Uh-huh.  Anything else?

MR. ZEGARELLI:  No, Your Honor.

THE COURT:  Mr. Neiser, anything else?

MR. NEISER:  No, Your Honor.

THE COURT:  Okay.  If you all want to see exactly what Mr. Pace said on that issue, I'm sure Sharon can dig that out for you, but please do it at a time that works for her and is convenient.

MR. NEISER:  We ordered transcripts.

MR. ZEGARELLI:  We have --

THE COURT:  Okay.  There you go.  Then -- oh, my.  Then Sharon is going to be busy.

MR. NEISER:  Your Honor, what time would you like us here tomorrow?

THE COURT:  I'm going to suggest 8:30.  But if you need an earlier time because there are issues -- I'm not anticipating any new issues tomorrow morning.  But if there are new issues, just give us a heads-up this evening, and we'll make it earlier.

MR. ZEGARELLI:  Thank you.

THE COURT:  So I'm here as -- much earlier.  So if we need to do something earlier, I will make myself available whenever either party says you need to see me.  So...

MR. NEISER:  Thank you.

Your Honor, we did file a motion for leave to add -- to supplement two exhibits, and that's just -- let the Court know.

THE COURT:  One was the invoices?

MR. NEISER:  The invoices.  There was a statement from Mr. Zegarelli's exhibit, and then there was an advertisement and --

THE COURT:  And you wanted to add the cover page?

MR. NEISER:  There's a cover page, and then another ad

that goes with the cover page for completeness.  They're identical -- almost identical ads.  It just puts the date on it.

THE COURT:  Is there any dispute that the two ads came from that magazine?

MR. NEISER:  I have the magazine.

MR. ZEGARELLI:  And, Your Honor, I haven't had a chance to look at his motion yet.  I think it just came in last night?

MR. NEISER:  It did.

MR. ZEGARELLI:  Yeah.  It was like 10:00.

THE COURT:  As long as the parties agree that the two ads came from that magazine, I think it makes sense to supplement with the cover.  Can certainly look at it and give me your view, if you feel differently.  So unless there's an objection, that's fine.

On the -- on invoice front, again -- and if you haven't looked at it yet, I don't want to prejudge anything here.  As I understand the issue, there are additional invoices that go within that specific exhibit.

MR. NEISER:  Yes, Your Honor.

THE COURT:  Were those invoices produced in discovery?

MR. NEISER:  No, Your Honor.  We got them late.

THE COURT:  Okay.

MR. NEISER:  Got them late.

THE COURT:  Then we'll have to see.

MR. NEISER:  Yeah.  And I understand.

THE COURT:  Okay.  Understood.

All right.  Thank you for your time today.

MR. ZEGARELLI:  Thank you.

MR. NEISER:  Thank you.

THE COURT:  And that concludes everything.

(Proceedings concluded at 4:40 p.m.)

- - -

**I N D E X**

**Proceeding**                                                    **Page**

 Opening Statement by Mr. Neiser                              2
 Opening Statement by Mr. Zegarelli                          16


**PLAINTIFF  WITNESSES**:                                       **Page**
**Michael Pace**
   Direct Examination By Mr. Neiser                          33

**C E R T I F I C A T E**

            I, SHARON SIATKOWSKI, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

s/Sharon Siatkowski
SHARON SIATKOWSKI, RMR, CRR, CBC, CRI
Official Court Reporter