IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


POM of PENNSYLVANIA, LLC,
et al.,

                    Plaintiffs,    Civil Action No. 18-722
        vs.

PENNSYLVANIA SKILL GAMES,
LLC,

                    Defendant.

                          - - -


Transcript of Jury Trial on February 14, 2023, United
States District Court, Pittsburgh, Pennsylvania,
BEFORE:  Judge Patricia L. Dodge, Magistrate Judge.


APPEARANCES:

For the Plaintiffs:      Julian E. Neiser, Esquire
                         Jonathan Deasy, Esquire
                         SPILMAN, THOMAS & BATTLE, PLLC
                         301 Grant Street
                         Suite 3440
                         One Oxford Centre
                         Pittsburgh, Pennsylvania 15219

For the Defendant:       Gregg R. Zegarelli, Esquire
                         Technology & Entrepreneurial Ventures
                         Law Group
                         2585 Washington Road, Suite 134
                         Summerfield Commons Office Park
                         Pittsburgh, Pennsylvania 15241

Court Reporter:          Sharon Siatkowski, RMR, CRR, CBC, CRI
                         700 Grant Street, Ste. 6260
                         Pittsburgh, Pennsylvania 15219


Proceedings recorded by mechanical stenography;
transcript produced by computer-aided transcription.

P R O C E E D I N G S

- - -

(Whereupon, the following discussion was held in chambers.)

THE COURT:  Just so everyone knows, we received notice that a juror may be a little bit late this morning.  So as soon as that person gets here, we'll get started.  What I heard is that she would be here right at 9:00.  As soon as she gets here, we'll get started.

Anything on your minds this morning?

MR. NEISER:  Not from us, Your Honor.

MR. ZEGARELLI:  No, Your Honor.

THE COURT:  Okay.  Just a couple of very brief things.

I did get your designations last night.  Just as a reminder -- and you wouldn't know this, but I don't get immediate notification of filings.  That's why I had asked you to send it to Ms. Hopkinson, so it's fine.

MR. ZEGARELLI:  I did this morning, Your Honor, I realized that.  I apologize.

THE COURT:  No, it's okay.  I did know that it came in.  I did look at it last night.  Just, you know, so just to make sure that I get your things promptly.  It's fine.  But just -- if there is anything that either of you are going to file after hours, if you can send a copy or at least alert us that you filed something, either way is fine.  I don't want to

inconvenience you at night.  But --

MR. ZEGARELLI:  Your Honor, and I apologize.  In the fog of war yesterday, you did offer me an extension for the admissions.  I seem to recall that being Thursday.

THE COURT:  I don't know that we had a specific date.

MR. ZEGARELLI:  Was that when you were --

MR. NEISER:  As you --

MR. ZEGARELLI:  I didn't look over the transcript yet.

MR. NEISER:  It's -- if you want to do it, it doesn't really matter to us.  I don't particularly need it in my case-in-chief.  We're flexible as your schedule.

MR. ZEGARELLI:  Okay.  Fair enough.

THE COURT:  Well, then, I suggest the two of you try and work out what is an appropriate deadline.  If you can't, let me know, but it doesn't sound like there's any urgency to that.

Just a reminder to everyone that we want to start promptly.  So I expect everyone to be ready to go when I tell the jurors we're going to be back.  Just make sure we take care of that.

With respect to Mr. DeLuca, we do need to go through the designations -- the counter designations.

When would be a good time to do that?  I'm going to suggest either at the end of the day today or first thing in the morning.  But I know that you want to read that in, and I just don't think we're going to be able to do that today.

MR. NEISER:  No, you're right. I fully understand and expect it.  I would ask for tomorrow morning.

THE COURT:  Any issue with that?

MR. ZEGARELLI:  No.

THE COURT:  Okay.  Then, I suggest that we meet a little bit earlier than 8:30 just so that we have sufficient time.  Let's do that at 8:00.  I have gone through them all. There are several designations that either overlap or are the same as POM's.  So I think it's more any objections that there are to the counter designations that aren't already designated.

MR. NEISER:  Yes, Your Honor.

THE COURT:  I'll be prepared to do that tomorrow morning.

MR. ZEGARELLI:  Fair enough.  8:00.

THE COURT:  I would suggest, in terms of reading that in, that all of the designations and counter designations be read by the same person rather than splitting that up, because sometimes if there are designations immediately before or after, counter designations, it gets a little bit disjointed.

Is there any objection to doing it that way?

MR. ZEGARELLI:  No.

MR. NEISER:  None from us, Your Honor.

THE COURT:  The other thing that we'll have to do is figure out the allotment of time with respect to the designations and counter designations.  I'd like you to talk

about that and see if you reach agreement on that once we know what's in or not.  Otherwise, we'll have to just designate some percentage to both parties, or both sides.

MR. NEISER:  Sure.

THE COURT:  That was all.  That was all I had on my mind this morning.  You have some extra time.

(Off-the-record discussion.)

(Whereupon, the in chambers proceeding concluded.)

(Pause as the jury enters courtroom.)

THE COURT:  Good morning, everyone.  Please be seated. Good morning, ladies and gentlemen.  Thank you for your patience this morning, and Happy Valentine's Day.

Are we ready to proceed, Mr. Neiser?

MR. NEISER:  We are, Your Honor.  We'll continue the examination of Michael Pace.

THE COURT:  Mr. Pace, step forward and take the witness stand, please.

MICHAEL PACE, witness herein, having been previously worn, was examined and testified as follows:

THE COURT:  Mr. Pace, just as a reminder, you're still under oath this morning.

THE WITNESS:  Yes, ma'am, Your Honor, I understand.

DIRECT EXAMINATION CONTINUED

BY MR. NEISER:

Q.   Good morning, Mr. Pace.  How are you doing today?

A.    Wonderful.  Happy Valentine's Day.

Q.    And to you, sir.

Let's pick up where we left off yesterday.

And, A.J., could you put Exhibit 25 up, please?

Just as a reminder, we are at February of 2015, and you received an email from Ryan Wood introducing Albert Unis to you.  Do you recall that, sir?

A.    Yes, sir.

Q.    Okay.  Take that down.

We talked about meeting with the Unises in your lobby at Pace-O-Matic in Georgia.  Do you recall that?

A.    Yes.

Q.    Do you remember your next encounter with either Albert or Albie Unis?

A.    It was the first time I ever met him.  It was either the 4th or 5th.  I think it was the 4th of February, two days later.

Q.    Let's talk about after you met with them at Pace-O-Matic.  After the meeting, let's say from the next day on, do you recall speaking with him after that?

A.    I'm sure I did.

Q.    Okay.  Do you recall visiting either of the Unises up in Pennsylvania?

A.    Yes, I do.

Q.    What do you recall, sir?

A.    They had purchased some equipment from us up front and were complaining that the machines were not earning or it wasn't working very well for them.  So I made at least three trips to Pittsburgh to go see their route and see what the problem was.

Q.    Okay.  What did you observe, sir?

A.    In all three cases, the machines were in places either turned off or mixed with competitors' machines, or in one case, there was one of our machines sitting between two real dart boards, where a person who is playing it would have their back to somebody throwing darts.

Q.    So, are you saying that they placed one of the Pennsylvania Skill Pace-O-Matic machines between two steel tipped dart boards in the impact zone?

A.    Absolutely.

Q.    Did you have a sense, sir, when speaking to -- let's be very clear.  During these three meetings that you mentioned, are you meeting with Albert Unis III or Albert Unis IV?

A.    All of our dealings were with Albert Unis III.

Q.    Okay.

A.    A couple of times, we got a chance to meet his son.

Q.    And these visits, going out to the various routes, who was taking you on those visits?

A.    I was going with Albert Unis III.

Q.    Was there anybody else from Pace-O-Matic who was with you?

A.    Once it was our compliance officer, Bob Hawk, who was a former FBI, he was born in Beaver Falls, 28 years with the Cleveland bureau.  He worked for us in compliance and is, today, still one of my closest friends.

Q.    Understood.  Did you have any understanding as to whether Mr. Unis III understood how your skill games worked?

A.    It didn't seem like he did.

Q.    Why do you say that, sir?

A.    Because he had a route of machines -- of competitors' machines that was in these bars and taverns, and our machine will not compete with a lot of that equipment.

Q.    Okay.

A.    It just won't do it.

We were very conservative in our design to make sure it was compliant, and the only way you're going to get that type of game to work is not to mix it with other type of equipment.

Q.    Understood.  Would that explain why at least early on there was some difficulty making money off of the machines?

A.    Absolutely.

Q.    Okay.

MR. NEISER:  Can we, please, put up Exhibit 76?  Or at least show the witness 76.  I'm sorry.

BY MR. NEISER:

Q.    Sir, we're showing you a document that's been marked for identification purposes as Exhibit 76.  Do you recognize it?

A.    Yes, I do.

Q.    What is it?

A.    It's an email I sent to our exclusive distributor from Pennsylvania, Lou Miele at Miele Manufacturing, and I was -- my wife and I were at our farm in Ohio, which is really not an active farm; it was 40 acres near Uhrichsville.  We were going to drive over and see our distributor, see if we could help. And it says, I would -- also, if I'm going that way and driving through Pittsburgh, I'm going to stop off and see Albert again.

I think that was probably our -- my third trip to see him.

Q.    Let's look at the last -- I'm sorry.

Is that a true and correct copy of your email, sir?

A.    Yes, sir, it is.

Q.    Is it true and accurate and complete as of the date that you sent on 11/3/2015?

A.    Yes.

Q.    Does it appear to be modified in any way?

A.    No, sir.

MR. NEISER:  Your Honor, at this time we offer Exhibit 76 into evidence.

MR. ZEGARELLI:  No objection.

THE COURT:  Thank you.  Exhibit 76 is admitted.

BY MR. NEISER:

Q.    The second to last sentence, it states, We are

flexible, but out for three days and two nights.  It's probably the practical limit.  Business comes first and Albert Unis is a must for this trip.

Why did you say that, sir?

A.    The part about being out for three days and two nights --

Q.    Not so much --

A.    -- is because we had dogs.  Albert still -- they just made this initial order that we sold the games basically at cost.  We weren't looking to do business with them.  They were looking to do business with us.  And they weren't trying very hard to get their games to work.

Q.    Understood.

A.    And it was kind of giving us a black eye.  So people were wondering why Albert's games weren't running.  I went back and saw him again.

MR. NEISER:  Could we have 37, please?

BY MR. NEISER:

Q.    Sir, I'm showing you a document that's been marked for identification purposes as Exhibit 37.  Do you see it?

A.    Yes, sir.

Q.    Do you recognize it?

A.    I do.

Q.    Is it a true and correct copy of your email dated five -- June 5, 2016?

A.   Yes, sir, it is.

Q.   Can you confirm that it is a complete string of that email?

A.   It is.

Q.   Okay.

MR. NEISER:  Your Honor, we offer Exhibit 37 into evidence.

MR. ZEGARELLI:  No objection.

THE COURT:  Exhibit 37 is admitted.

MR. NEISER:  Your Honor --

THE COURT:  Yes, go ahead.

MR. NEISER:  I'm sorry to interrupt you, Your Honor.

THE COURT:  You did not.  Thank you.

MR. NEISER:  I'm sorry.  Do we need instruction on redaction?

THE COURT:  Yes, I plan to do that.

MR. NEISER:  Thank you, Your Honor.

THE COURT:  Ladies and gentlemen, you'll see that there is a portion of this email that is blacked out.  That's sometimes called a "redaction."  You're not to concern yourself with that redaction.  That simply means that for purposes discussed with counsel outside of your presence, there has been an understanding that that part of the document shall not be viewed by you.  So please don't concern yourself with that, but that is called a redaction.

MR. NEISER:   Thank you, Your Honor.

BY MR. NEISER:

Q.   Mr. Pace?

A.   Yes, sir.

Q.   Let's just go through this very briefly.  You note in the email that you called Albert Unis on Sunday and talked to him for 93 minutes.

Do you see that?

A.   Yes.

Q.   Do you recall that conversation?

A.   Yes.

Q.   What do you recall from it?

A.   That he -- originally he was not interested in putting games into convenience stores, and neither were we.  We start out these projects going into the bars first to get a good foothold before even you consider putting games into the convenience stores.

Q.   Okay.

A.   And he expressed some interest in it.

Q.   Okay.  Now, the next sentence says, Albert said that someone was putting different types of skill games in the convenience stores in Beaver County and elsewhere.

Do you see that there, sir?

A.   Yes, sir, I do.

Q.   Okay.  And I believe the third to the last sentence

states, Albert said that he wants our better skill game software and wants to place his games in the convenience stores.

Do you see that?

A. Yes, sir.

Q. Do you recall what that was about?

A. I don't know what the better skill games software. Evidently, he was talking about an upgrade or revision in the software, he wanted later to release.

Q. Okay. So he wanted a later release of the software, to your recollection?

A. Yes, sir.

Q. Your software?

A. Yes.

Q. Okay. And you said -- you told Albert that you would investigate and get back to him ASAP. This is a problem that must be resolved immediately.

Do you see that?

A. Yes, I do.

Q. What was the problem that must be resolved immediately?

A. Well, it was impossible to have a short phone call with him. So it was 93 minutes. And somewhere we were talking about the countertops, and he made the reference that he thought he had an exclusive, which I reminded him he did not have an exclusive. He opted out of it in the beginning. And that

was -- that's just something we had to talk about, because certainly he does not have an exclusive.

Q.    Understood.

So that was the problem that needed to be resolved, his misunderstanding?

A.    Absolutely, because we don't want him telling people that he has that.

Q.    Okay.  During that 93 minutes with Mr. Unis.  Strike that.  I'm sorry.  I can't do that.

During that 93-minute phone call with Mr. Unis, did he mention a trademark to you?

A.    No.

Q.    Did he mention any prior agreements that he had reached with you?

A.    No.

Q.    Are you familiar with a document called "Equipment Purchase Agreement"?

A.    Yes, sir, I am.

MR. NEISER:  Can we put up 5, please?  I'm sorry, 6.

BY MR. NEISER:

Q.    Sir, I'm showing you a document that's been marked for identification purposes as Exhibit 6.

Do you recognize it?

A.    Yes, I do.

Q.    What is it?

A.   That is the Equipment Purchase Agreement that we had done with Albert's son, because Albert said he was going to transfer stuff to his son because he might have some background problems, and he really wanted to help his son get started in the business.

Q.   Okay.  Let's go to the last -- take a look at the last page.

Is that your signature there on behalf of Pace-O-Matic?

A.   Yes, sir, it is.

Q.   Okay.

MR. NEISER:  Your Honor, we offer Exhibit 6 into evidence.

THE COURT:  Is there any objection?

MR. ZEGARELLI:  No objection.

THE COURT:  Exhibit 6 is admitted.

BY MR. NEISER:

Q.   Sir, look at -- I'll put this up on the screen.  And we're going back and forth between a few documents.

A.J., could I have the first paragraph enlarged?

So let's start with the date.  What's the effective date or the entry date of this agreement based on the document?

A.   It's May 20th of 2015.

Q.   Okay.  Can we take that down and put 37 back up?  So, could we highlight the date on that, please?

So, that email that we just talked about with the 93-minute phone call with Mr. Unis, that occurred approximately one year after the Equipment Purchase Agreement?

A.    Yes, sir.

MR. NEISER:  Okay.  Let's go back to Exhibit 6, please.

MR. SIMEONE:  Side by side?

MR. NEISER:  No, no.  Thank you.

BY MR. NEISER:

Q.    So that previous conversation, the 93-minute conversation with Mr. Unis was approximately a year after the entry of the Equipment Purchase Agreement.

Did he mention the Equipment Purchase Agreement in his phone call with you?

A.    I don't know.

Q.    Now, let's take this down for one moment.

I'd like to show you a series of documents, but I'd like to do them one at a time.

I'd like to do from 17 through 20, please.  Let's do 17 first.

Sir, do you see this document?

A.    Yes.

Q.    Do you recognize it?

A.    Can we go back to the beginning, please?

Q.    Yes, sir.

A.    Yes, I do.

Q.    What is it?

A.    It's an agreement between Pace-O-Matic and POM of Pennsylvania.

Q.    Is that a true and correct copy of that document?

A.    Yes, sir, it is.

MR. NEISER:  Your Honor, we offer Exhibit 17 into evidence.

THE COURT:  Is there any objection?

MR. ZEGARELLI:  No objection.

THE COURT:  Exhibit 17 is admitted.

MR. NEISER:  Exhibit 18, A.J., please.

BY MR. NEISER:

Q.    Sir, I'm showing you a document marked for identification purposes as Exhibit 18.

Do you see it?

A.    Yes, I do.

Q.    What is it?

A.    It was where we consolidated our intellectual property into Savvy Dog Systems so it could be licensed appropriately to each respective state.

Q.    Is it a true and correct copy of the document, sir?

A.    It looks like it.

Q.    And it's called, it's an Intellectual Property Fee Agreement between Savvy Dog Systems LLC and POM of Pennsylvania,

LLC; is that correct?

A.    Yes, sir.

Q.    Okay.

MR. NEISER:  Your Honor, we offer Exhibit 18 into evidence.

MR. ZEGARELLI:  No objection.

THE COURT:  Exhibit 18 is admitted.

MR. NEISER:  19, sir.

BY MR. NEISER:

Q.    Sir, do you recognize this document?

A.    Yes, I do.

Q.    Is it a true and correct copy of that document?

A.    It looks like it.

Q.    And by the way, what's the date of that document?

A.    It's the first of January, 2017.

Q.    Thank you.

Is this a true and correct copy of the Intellectual Property Assignment from Pace-O-Matic to Savvy Dog Systems LLC?

A.    Yes.

MR. NEISER:  Your Honor, we offer Exhibit 19 into evidence.

MR. ZEGARELLI:  No objection.

THE COURT:  Exhibit 19 is admitted.

MR. NEISER:  Thank you, Your Honor.

And 20, A.J.  Is that 20?  I see.  I'm sorry.

BY MR. NEISER:

Q.    Sir, I'm showing you a document marked for identification purposes as Exhibit 20.

Do you recognize it?

A.    Yes, I do.

Q.    Okay.  Is this a true and correct copy of the Intellectual Property Assignment from you to Pace-O-Matic dated January 1, 2017?

A.    Yes, it is.

MR. NEISER:  Your Honor, we offer Exhibit 20 into evidence.

MR. ZEGARELLI:  No objection.

THE COURT:  Thank you.  Exhibit 20 is admitted.

MR. NEISER:  We can take it down, A.J.

BY MR. NEISER:

Q.    What was your intent through these four agreements that we just showed you?

A.    We have meetings periodically with our accounting team and our legal team to examine the structure of our companies and how they're set up and how to improve their flow.  We were starting to run into a problem with Pace-O-Matic owning the intellectual property, or me owning it.  So one of those documents was to transfer what rights I had in patents or IP of any sort to the company so it could be in one place.

And then the problem we were running into is in

different states there was different rules and laws, and there were different tax structures as well.  So when our income is coming from different states, it's like, wow, how much from this one, how much from that one, and how to allocate it.  So our legal team came up with a normal plan that most companies our size do, which is to transfer all of the intellectual property.

We first had a third party ascertain the value, and we sold it to this -- to Savvy Dog so that Savvy Dog could be the holder of all of the intellectual property, which is the copyrights, the trademarks, the marks, the patents and all of that, so that all that intellectual property can then be licensed appropriately to the particular POM of any one state.

Q.   Would that include the Pennsylvania Skill trademark?

A.   Yes.  Once we changed -- Savvy Dog, we did a licensing arrangement between it and POM of Pennsylvania.

Q.   Understood.

So I believe that during PSG's opening yesterday, there was some suggestion that these assignments were done because of this lawsuit.  True or false?

A.   That's false.

Q.   Let me ask you, has Pace, POM or Savvy Dog taken any steps with their business organization or structure in a result of the claims made by PSG?

A.   No.

Q.   As a matter of fact, sir, do you recall the date of

those agreements?

A.    They were at least a year before we ever really had a problem with dealing with Pennsylvania Skill Games, LLC.

Q.    So to be clear, it's your testimony that those agreements were entered into long before you even thought that there was a real issue with these guys?

A.    Yes.  And once there was, the lawsuits came from the new entities that had the rights.  If we had stayed in Pace-O-Matic, then we might have been hiding something.  But we approached it from the suit with the entity that owned this particular right that we had a problem with.

Q.    Understood.

Let me ask you something, sir.  What harm occurs to POM, Pace or Savvy Dog by the fact that PSG tried to register that trademark with the United States Patent and Trademark Office and they used that mark with competitor products?

MR. ZEGARELLI:  Speculative, Your Honor.

MR. NEISER:  Your Honor, I think the witness can testify what harm has occurred as a result.

MR. ZEGARELLI:  That's a different question.

THE COURT:  Yeah, I think that is a different question.

Can you ask that question?

MR. NEISER:  I certainly can.

BY MR. NEISER:

Q.    What harm has POM, Pace-O-Matic and Savvy Dog suffered as a result of Pennsylvania Skill registering its trademarks and -- or the Pennsylvania Skill trademark and putting it on competitor software?

MR. ZEGARELLI:  Lack of foundation, Your Honor.

THE COURT:  Overruled.

THE WITNESS:  The -- Pace-O-Matic and its related companies spends a great deal of money and time to develop its products and do it correctly.  We do -- we spend a great deal of money and time protecting those products and our good name, and there's a great deal of goodwill that's associated with this trademark, and it needs to only be affixed to machines that we can certify comply correctly.  And when someone else puts our trademark on their product and it's not a Pace-O-Matic product, it is very similar to ordering Heinz ketchup and having them giving you a bottle with Hunt's in it.

BY MR. NEISER:

Q.    I think we all understand that, sir.

A.    Yeah.  I mean --

Q.    Sir, had you known -- let me ask this.  Remember the Equipment Purchase Agreement that we discussed earlier?

A.    Yes.

Q.    Okay.

MR. NEISER:  Let's put up Exhibit 5 and go to paragraph 4, please.  Sorry.  Exhibit 6 and go to paragraph 4.

I'm sorry.  Second page, numbered paragraph 4, please.

BY MR. NEISER:

Q.    Do you see the word "first refusal" -- sorry -- the phrase "right of first refusal" appears in that paragraph?

A.    Yes.

Q.    Did you have an understanding as to how that right of first refusal would work in the Equipment Purchase Agreement?

A.    Absolutely.

Q.    Tell me how it would work.

A.    A right of first refusal means that if a location calls the factory, calls Pace-O-Matic, and asked for our machine, then we refer that lead to Pennsylvania Skill Games, LLC.

Q.    Okay.  Did you have an understanding that Pace or Miele had an obligation to keep all competitors out of Beaver County for Pennsylvania Skill Games, LLC?

A.    No.

Q.    Would you ever agree to something like that?

A.    Of course not.

Q.    Why?

A.    We had offered something similar to that up front, and they refused to do the deal.

Q.    Why?

A.    I guess they didn't want an exclusive on the county.

Q.    What were the terms?

A.    The same as all of our exclusives we've ever given. You must purchase, with a hard PO, one game per every thousand people in that county.  We're not just going to just lock it out and not have anybody do anything.  In this case, there was 168,000 people in Beaver County.  When we looked at it, I said, you need to place a hard PO for 168 games, and you need to give me at least cash for half of it.

Q.    To the best of your knowledge, sir, does "exclusive" the word appear anywhere in this agreement?

A.    No, it does not.

Q.    And is it true that this agreement does not contain a performance requirement to buy so many machines?

MR. ZEGARELLI:  Objection, leading.

THE COURT:  Sustained.

BY MR. NEISER:

Q.    Sir, is there a performance requirement in this agreement?

A.    I don't think so.

MR. NEISER:  Let's look at -- could you take the enlargement down, A.J., please?  Number 6, please.

BY MR. NEISER:

Q.    This is Section 6 of Exhibit 6, and it states:  Seller will support buyer with previously agreed marketing efforts.

Do you see that?

A.    Yes.

Q.    What does that mean?

A.    When -- when we sell games, either through distribution or directly, in this case, which is rare, the operators then take those games and they take them to bars that they know that you have contracts with or not, and they show the game to the owner of the bar, and they try to work a deal out to put the game in the bar.  What we do is provide an ad slick that gives some of the reasons why this is a good game, and it has our trademark on it and our company name, and that is to make sure that the operator does not get confused the facts when he's trying to sell our machine to bars.  That is what that means, the ad slicks, which we furnished.

Q.    Is that the extent of what your understanding was for that paragraph?

A.    Yes, it is.

Q.    I think there was also some mention in the opening statement yesterday that -- I think, for lack of a better term, Pennsylvania Skill Game and the Unises are claiming your success in Pennsylvania as a result of them; is that correct?

A.    That's what they claim.

Q.    But is it correct?

A.    Of course not.

Q.    Explain to us why.

A.    They bought the 25 games up front.  I think they paid for them.  I'm not sure.  But they had extremely dismal

performance. In fact, certainly the worst performing operator I've ever dealt with in 40 years of my existence in the game business.

Q. Okay.

A. I don't believe they meant to have success with these products.

Q. Okay. Sir, you're saying that even though -- well, actually, do you believe -- or did Pace, POM, and Miele open its operations and run its operations in Pennsylvania independent of any activities by Pennsylvania Skill Games?

A. Absolutely.

MR. NEISER: No further questions. We pass the witness.

THE COURT: Thank you, Mr. Neiser.

DMR. NEISER: Thank you, Your Honor.

THE COURT: Mr. Zegarelli, would you like to cross-examine Mr. Pace?

MR. ZEGARELLI: I would, Your Honor. Thank you. Although I believe I have to take my computer to the stand. So bear with me, if you don't mind.

THE COURT: Take your time, Mr. Zegarelli.

MR. NEISER: Your Honor, may I consult with Mr. Deasy while Mr. Zegarelli's getting ready?

THE COURT: Yes, Mr. Neiser.

Mr. Zegarelli, are you ready to get started?

MR. ZEGARELLI:  I am, Your Honor.  I apologize.

CROSS-EXAMINATION

BY MR. ZEGARELLI:

Q.   Mr. Pace, do you recall testimony yesterday with regard to Mr. Goodling?

A.   Yes.

Q.   Okay.  And you testified, did you not, that Mr. Goodling --

MR. ZEGARELLI:  Your Honor, perhaps a break?  I apologize.  But apparently the signal is not coming through.  There was an issue this morning as well, Your Honor.  I'm not quite sure why it's not showing up.  I'm hearing it connect on my computer.

THE COURT:  Are there some questions that you can ask without the use of that?  And, if not, I understand.  But is there another line of inquiry?  And then we can take a break?  If that is not acceptable, please let me know.

MR. ZEGARELLI:  No, we can try to do it that way, Your Honor.

BY MR. ZEGARELLI:

Q.   Okay.  Mr. Pace, you had indicated that you had -- I think you said you won an award three times for chess playing?

A.   I think that's correct.

Q.   Okay.  And I think you testified as well, didn't you, didn't you make a -- and pardon the reference to addiction, but

something about nicotine and if you have a cigarette, you do it -- you're not trying to get the low nicotine; you're trying to get the high nicotine?

A.    It was probably a bad analogy, but, yes, I did.

Q.    Okay.  And it's your goal, isn't it, to get it as close to the game, to get it as close to a regulated gambling machine as you can without crossing the line legally?

A.    No, our games are not gambling.

Q.    I didn't say that.  Is your goal with the nicotine example to get the games as close as you can without it being a regulated game?

A.    I don't look at it that way, no.

Q.    Okay.  But, nevertheless, is it one of your goals to have the device itself as close to a gambling device as you can without necessarily passing the law?

A.    No.

Q.    Okay.  What is your goal, then, when you used the nicotine example?

A.    Our goal is to create a product which is as competitive and earns the best that it can and be compliant --

Q.    Okay.

A.    -- with the law.

Q.    Right.  And wouldn't that be as entertaining as possible?

A.    Not necessarily.

Q.    Okay.  So you don't try to make entertaining games as possible?

A.    I've been designing games that people play for money for more than 40 years, and there's a lot of things we still learn.  And what works in one decade doesn't necessarily work in the next decade.

Q.    Okay.

A.    So it is trial and error.  We try different things to see if they work and whatever ones, and certain regions of the country things work different.  So the idea is to be scientific about it and try to create a game people like to play and is compliant.

Q.    Now, you testified yesterday, did you not, that Mr. Goodling had indicated that he believed he was looking for a skill game in Pennsylvania?  I can --

A.    Something close to that.  He was surprised to see that somebody was showing him a game that he agreed very likely could be a skill game, a game of skill.

Q.    Now, at the time you met with Mr. Goodling, how many Pennsylvania Skill-branded machines were distributed throughout this commonwealth?

A.    I think 16.

Q.    Okay.  And are there -- did you produce evidence of the 16 that you're claiming right now?

A.    I don't know.

Q.   Okay.  I think Mr. Goodling -- I'm reading your testimony.  I can't put it on the screen for you.  I'll quote it, though -- and he said:  I think I'm looking at first skill game I've ever seen for Pennsylvania.

That's the exact line.

So you think there were 16.  And the 16, did they have the bell-branded designation on them?

A.   No, that hadn't -- our art department had not developed that yet.

Q.   Okay.  Now, at the time those 16 were distributed, they were distributed -- and if I understand your testimony -- those 16 games were distributed at the time that you met with Mr. Goodling?

A.   I don't know if they were still running, but we had sold ten through our previous vice president of sales, and then we had an order, we had someone who had bought, I think it was six, over on the East Coast somewhere, near Philadelphia.

Q.   Okay.  And so it's your testimony that they did not contain the bell-branded logo that was shown on the device?

A.   That would be hard to do being as it hadn't been invented yet.

Q.   Very good.  Okay.  And did they say the words "Pennsylvania Skill" on the machines?

A.   Yes, they did.

Q.   And how did they show that word?

A.   I don't know.

Q.   Okay.  Now, it goes without saying that if you had games with Pennsylvania Skill that were in the Commonwealth of Pennsylvania, prior to the ruling in Beaver County as the legality --

MR. NEISER:  Object to relevance, Your Honor.

THE COURT:  Let's hear the whole question first.

MR. ZEGARELLI:  Okay.

BY MR. ZEGARELLI:

Q.   You had -- I think you testified that you had distributed games with the name Pennsylvania Skill but without the bell logo through the Commonwealth of Pennsylvania.

My question to you is, therefore, you were selling the games without having the benefit of the Beaver County ruling?

MR. NEISER:  Object to relevance, Your Honor, and ask to approach if we need to.

THE COURT:  Sustained.

BY MR. ZEGARELLI:

Q.   Your attorney yesterday had indicated that there were -- that there are 20,000 machines in Pennsylvania at this time; is that right?

A.   Evidently.

Q.   Okay.  And if one of those machines makes a dollar a day, that's 20,000; ten dollars a day, 200,000; $100 a day, that's 2 million a day; is that right?  Is my math right?

MR. NEISER:  Objection to speculation --

THE COURT:  You have to lay a foundation.  Sustained.

MR. NEISER:  -- and relevance.

BY MR. ZEGARELLI:

Q.  Now, I think you testified that Mr. Unis was leaving the business to his son but that there was some issue over his son's background.  Is that what you testified to?

A.  No.  My -- we originally had a relationship -- well, we only ever dealt with the dad.  But the dad -- we had a term sheet where we had sold him some games that had a continual requirement for purchasing.  And when we had met again, Albert Unis III, the dad, said that he had some potential problems with his background and he was trying to help his son get started in the business.  So -- who had not been in the game business, and would appreciate if we would do the deal with Pennsylvania Skill Games, LLC, which was his son, evidently.

Q.  Okay.  And the deal was what, as you understood it?

A.  What deal?

Q.  The deal you just testified to.  Do the deal with his son --

A.  It is the -- the Equipment Purchase Agreement.

Q.  Okay.  And that -- that's been very little time in the testimony.  So let's go to that.

MR. ZEGARELLI:  Is it possible you could put up --

JUROR:  It look likes it was coming from this screen,

sorry.

MR. ZEGARELLI:  Your Honor, I think we're going to have to at least take a five-minute break and figure out if we have to call the tech.

THE COURT:  Mr. Neiser, just out of courtesy, would you be willing to put the Equipment Purchase Agreement up?

MR. NEISER:  If the Court requests, yes.

THE COURT:  I'm only requesting it at this point because we seem to have a technical issue and I know that we're trying to move things along.

MR. NEISER:  Yes, Your Honor.  And I'd be happy to extend Mr. Zegarelli any courtesy.

THE COURT:  Thank you.

MR. NEISER:  Please do so.

MR. SIMEONE:  May I?

THE COURT:  Of course.

Thank you, Mr. Neiser.

MR. NEISER:  Of course, Your Honor, thank you.

MR. ZEGARELLI:  I apologize for that.

BY MR. ZEGARELLI:

Q.   Now, do you see Section 3?

MR. NEISER:  Go ahead, A.J.

MR. ZEGARELLI:  Section 3.

THE COURT:  Paragraph 3, are you referencing?

BY MR. ZEGARELLI:

Q.    Paragraph 3:  Seller will use all reasonable efforts to make sure buyer has access to the software plays for its compliant terminals and hardware components as long as seller is in the market.

A.    Yes, sir.

Q.    Is Pace-O-Matic still in the market of Pennsylvania?

A.    Yes, we are.

Q.    Okay.  And have you made the buyer -- what have you done to make sure buyer has had access to software plays for its compliant terminals as long as you're in the market?

Do you see those words "make sure"?

A.    Yes, sir.

Q.    Okay.  How did you make sure?

A.    For the period that this was in effect, we did.

Q.    Tell me how you did so.

A.    If he called and wanted a fill, we'd sell it to him.

Q.    Okay.  Would you sell it to him now?

A.    I'm not sure.

Q.    Okay.

MR. ZEGARELLI:  Could you go to the next page, please?  I'm sorry.  Back up, please.

BY MR. ZEGARELLI:

Q.    Now, I think you testified yesterday that you testified in the Beaver County case; correct?

A.    Yes, sir, I did.

Q.    Okay.  And it's true, isn't it, that, if I understand Mr. DeLuca's testimony, if I understand it, there was no expert witness that testified in that case; is that correct?

A.    There were two experts other than myself who testified in that case.

Q.    Okay.  And did Mr. DeLuca put up an expert?

A.    Yes, he did.

Q.    Okay.  And Mr. DeLuca, we'll read his testimony in tomorrow.  Do you know the expert's name?

A.    I believe I was one of the experts.

Q.    Oh, I see.

A.    And the other one was Mr. Nick Farley of Farley and Associates.

Q.    Okay.  Now, do you have an understanding that Mr. Unis III was asked to testify?

A.    I never heard that before in my life.

Q.    And the case was successful, was it not?

A.    Yes, it was.

Q.    Okay.  Now, that case was based upon a controlled pickup; correct?

A.    Yes.

Q.    Okay.  And "controlled pickup" is the correct name, is it not?  I think you referred to it at times as "friendly pickup."  But the correct name is "controlled pickup"; isn't that right?

A.    I think they're interchangeable.

Q.    Do you -- do you have an understanding that one is the official term and one is not?

A.    I've never known of the term ever being applied to anything other than what we do.

Q.    My question is, do you have an understanding that "controlled pickup" is an official term -- or one or the other is the official term and the alternate not?

A.    No, I don't.

Q.    Okay.  Now, I think you testified yesterday, when looking at the website, I think there was a lot of time spent looking at a website.  Do you recall the website and the picture of you?  I think you were wearing a hat next to Mr. Unis IV.

A.    I do.

Q.    I think you testified emphatically that you -- if somebody had suggested that you met the Unises before February, that would be a lie, is that what you testified to?

A.    No.

Q.    What did you testify to, if you recall?

A.    I testified to the fact that he said he met me at a trade show, and I said I meet thousands of people at trade shows.  He may have met me.  I don't ever remember meeting him, and we certainly never had an agreement to develop him a skill game, which is what it says, which is a lie.

Q.    What was the name of the location that the machine was

placed into?

A.    I think it was the American Italian Club in Aliquippa, Pennsylvania.

Q.    Okay.  And who was the owner or who was the caretaker at that particular location for purposes of placing the game?

A.    My understanding is Albert Unis III, the father, had the contract on all of the machines that were in the place.

Q.    Okay.  And how many visits -- if you hadn't met Mr. Unis prior to February, you had not gone to that location ever; isn't that right?

A.    I went there one time with him.

Q.    And when did you do that?  Was that before -- that was obviously after February, isn't that right?

A.    Yeah, it was after they had purchased some minimal equipment, and it was not performing for some reason.

Q.    Okay.  That was after the controlled pickup?

A.    A long time after the controlled pickup.

Q.    Okay.  Yesterday, your testimony was -- you were asked a question, and if there -- if -- and if there is any inference in a sentence on the website that you were celebrating or commemorating a moment, would that be correct?

No, sir.

So that was a suggestion they were celebrating the completion of the game because they were a participant.  Would that be true or false?

And you said that's a lie.

Do you remember that testimony?

A.    What you just said was a little confusing.  Please, repeat it.

Q.    Sure.

Question: So that was a suggestion that they were there, celebrating the completion of the game because they were a participant.  Would that be true or false?

That's a lie.

That's what you said.

A.    We were not celebrating.

Q.    Okay.  Let me ask you this, sir.  Did you ever visit the location for purposes of placement of the controlled pickup?

A.    No.

Q.    Okay.  And you did your part, if I understand it, by testifying, but you had to be in a location, did you not, for the controlled pickup?

A.    It could have been any location with any operator in Pennsylvania.

Q.    But it wasn't?

A.    That's correct.

Q.    It was with the Unises' Pennsylvania Skill Games; isn't that right?

MR. NEISER:  Objection; assuming facts not in evidence, and it's mischaracterization.

THE COURT:  Sustained.

BY MR. ZEGARELLI:

Q.    It was with the Unises at that time doing business as Pennsylvania Skill Games; isn't that right?

A.    No.

Q.    Okay.  So when the controlled pickup occurred, who was -- who did that controlled pickup?

A.    Our lawyer, Wayne DeLuca, Esquire --

Q.    Okay.

A.    -- had given --

Q.    Did Mr. --

THE COURT:  I don't think he's done, Mr. Zegarelli. Let's let him finish.  Go ahead.

THE WITNESS:  Was looking for someone to place the game somewhere near his office, which was in Sewickley, at least his country office.  I know he had one here in town as well. And for whatever reason, he was a criminal trial lawyer, he -- he found Albert Unis to place the game somewhere, who happened to place it in that bar.

BY MR. ZEGARELLI:

Q.    Okay.  So Mr. DeLuca, he -- is he a lawyer for PAMMA at the time, Pennsylvania Association of Amusement and Music Machine Manufacturers?

A.    I think so.  He had always been associated with them for a long, long time.

Q.    Mr. DeLuca, as such, as the attorney for that organization, he had many clients and contacts; isn't that right?

A.    Yes, sir.

Q.    Okay.  And he did not have an office in Beaver; isn't that right?

A.    I believe that's correct.

Q.    Okay.  And the case was not in Philadelphia; is that right?

A.    That's correct.

Q.    It's not in Harrisburg; is that right?

A.    That's correct.

Q.    It's not in Pittsburgh; is that correct?

A.    That's correct.

Q.    Okay.  It's in Beaver?

A.    Yes, sir.

Q.    Okay  and the Unises are in Beaver?

Now --

THE COURT:  Did you answer?

THE WITNESS:  I guess they're -- at least some of their operations are in Beaver County, or were.

MR. ZEGARELLI:  Can you put the EPA back up, please?  Next page.

THE WITNESS:  Yes, sir.

Q.    Now, I'll direct your attention to paragraph 6 -- or

Section 6.  Seller will support buyer with previously agreed marketing efforts?

A.    Yes.

Q.    And I think you testified that the metes and bounds of that are supplying some cards of some sort?

A.    No.  We have to make sure that the operators who end up with the product and go to place it into the locations, which are bars and other places the game might run, do not misrepresent our product to the location.  So we prepare ad slicks which show the games are on the machine, show -- tell certain information about the product that we think is important to make sure they don't misrepresent it, and it helps give the operators a tool to go sell our machines.  They haven't got to remember all of the features; it's on an ad slick.  It's done all of time in our industry.  When a product comes out, the manufacturer provides an ad slick for it.

Q.    And it says, though, seller is Pace-O-Matic and Miele collectively, if I understand, but seller will support buyer. It doesn't say the buyer will follow seller; isn't that right?

A.    Excuse me?

Q.    In other words, what you just testified to implies that the buyer would use certain materials that you give them for all of the things that you just testified, but that's not what it says.  It says:  Seller will support buyer.

Do you see that?

A.    Yes, the buyer is the operator.

Q.    I understand that.  And you would support the buyer?

A.    Yes.

Q.    The buyer was not -- did not agree to support you?

A.    I don't understand what you're trying to say.

Q.    Okay.  Just move on.  Section 4, please.

That's your signature at the bottom, is it not?

A.    That is my signature.

Q.    Okay.  And are you familiar with Mr. Miele's signature?

A.    No, but I assume that's his.

Q.    Okay.  And the language is that the seller grants the buyer the right of first refusal.

Do you see that language?

A.    Yes, sir.

Q.    Okay.  And it says, If buyer opts -- and I'll direct your attention to the second sentence -- If buyer opts not to place compliant terminals in certain Beaver County locations then seller, through another vendor, may place the above-described compliant terminals in those locations.

How many times did you give, if at all, Pennsylvania Skill Games, LLC, the option to place a terminal in a location?

A.    We're not in the field.  We don't have that information unless a location calls us directly and wants our product.  There are no leads to furnish them.

Q.    Okay.  So is that a "never"?

A.    Yeah, that's a never.

Q.    Okay.  So your testimony is that you've never given Pennsylvania Skill Games the option to place a terminal in Beaver County.

And if I understand your testimony, Mr. Pace, to be clear with your testimony, Mr. Pace, you are not -- you cannot provide the option, because if I understand it, you say that you don't know where operators are going to put the machines?

A.    We have no control over where an operator puts a machine.

Q.    Okay.  Now, how many pages, if you know, is your current operator agreement?

A.    I don't know.

Q.    Okay.  Would you say more than ten?

A.    I don't know.  We have a big company.  We have a lot of -- a lot of people.  I don't know that I've seen a recent one.

Q.    Okay.  And at the time of the EPA, how many pages was your operator agreement if you had one?

MR. NEISER:  Your Honor, we're going to object to relevance.

THE COURT:  Overruled.

Q.    Did you have an operator agreement at the time of the EPA?

A.    Is the operator agreement between the operator and the location?

Q.    I'm asking you, sir, do you have an understanding of an operator agreement?  We can put one online.  In fact, I'll reference it.  You can leave it off screen.

A.    Yeah, there are two forms of operator agreements that I know of.

Q.    Okay.

A.    There's one between the distributor and possibly the manufacturer also, and then there's one between the operator and the location where they place the machines.  We don't get into that part of the business.

Q.    Okay.

MR. ZEGARELLI:  Can you put up, if you don't mind, for the witness to at least look at it, and that would be item number -- Trial Index Number 95.

THE COURT:  Mr. Zegarelli, let me suggest that perhaps we do take a break; so you can have your technology operational.

MR. ZEGARELLI:  Thank you, Your Honor.

THE COURT:  All right.  Ladies and gentlemen, we'll take our morning break at this point, and we will be back at approximately 11:00.

(Pause as the jury exits courtroom.)

(Whereupon, a recess was taken.)

(Pause as the jury enters courtroom.)

THE CLERK:  Court is back in session.

THE COURT:  Please be seated, everyone.

MR. ZEGARELLI:  Thank you, Your Honor.  I appreciate it.

THE COURT:  Of course.

MR. ZEGARELLI:  Thank you.

Q.   Based on having available -- okay.  Mr. Pace?

A.   Yes, sir.

Q.   I'm going to have to back up a bit here now that I have the technology on the screen.

I presented to you some testimony that you gave yesterday referencing where you testified, That's a lie.

Do you see the testimony on your screen?

A.   Yes.

Q.   Okay.  Now you see that you confirm, I never heard of him, being Albert Unis III, until February of 2015.

That's correct?

A.   That's correct.

Q.   Okay.  And your attorney said, "If" -- and I mean if -- "there was a time that he assisted you in the lawsuit in any way, how would you rate that on the truth meter?"

Do you see that testimony -- that question?  In line number 10 through 12?

A.   Okay.  So what's the question?

Q.   Do you see the testimony?

A.   Yes, sir.

Q.   Okay.  And you said, That's a lie.

Is that what you said?

A.   Yes, sir.

Q.   Okay.  But then you -- then it goes on -- right? -- and it says, Question:  So did he have any involvement in the controlled pickup, other than, let's say, anonymously putting the game out into the location in Beaver County?

Do you see that question?

A.   Yes, sir.

Q.   Do you see your answer, That is the only thing he did?

A.   Yes.

Q.   Okay.  Very good.

Now, before we took a break, I asked you about --

MR. NEISER:  Your Honor, this hasn't been offered into evidence.

MR. ZEGARELLI:  I'm sorry, Your Honor.

THE COURT:  Yes, you need to take that down until it's authenticated and admitted.

Q.   Mr. Pace, do you see the document on the screen?

A.   Yes.

Q.   Okay.  Pennsylvania Operator Agreement?

A.   Yep.

Q.   Are you familiar with this document?

A.   No.

Q.    Okay.  Do you have an understanding as to whether or not you're referenced in this document?

A.    Well, I saw a date of 2019 on it.  I was president of my company for a long time, but primarily I did engineering, and when it came to sales.  And setting up distributors or even fielding phone calls from operators, it usually wasn't me.

Q.    Okay.  So are you saying you can't -- have you ever seen this document before?

A.    I don't think I have.

Q.    Okay.  And you aren't able to say -- you aren't able to testify with regard to this document?

A.    I could testify for what it says in it, if I'm reading it.

Q.    Well, do you have an understanding of what this document is and what it does as it relates to your capacity as president of Pace-O-Matic?

MR. NEISER:  Asked and answered, Judge.

THE COURT:  Let's move on.

MR. ZEGARELLI:  Okay.

MR. NEISER:  Your Honor, to let Mr. Zegarelli know, I can see his screen.

MR. ZEGARELLI:  You can see the screen.  Thank you.

THE COURT:  Thank you, Mr. Neiser.

MR. NEISER:  Of course.

MR. ZEGARELLI:  Every time I go blank.

BY MR. ZEGARELLI:

Q.   Okay.  So before we took the break, I think you had testified that you had never given an opportunity to Pennsylvania Skill Games as it relates to placing a terminal in locations, and I think your testimony was, Mr. Pace, that you don't control where operators place games; is that right?

A.   We do not control where operators place games.

Q.   Okay.  And are you saying that you're unable to know where operators place games?

A.   Yeah, operators are very secretive about where they place their games, and generally, no one knows where they are.

Q.   Okay.  But isn't it true that you can simply ask?

A.   Oh, I'm sure we could ask.

Q.   Okay.  Isn't it true that you could actually require it as a term of purchasing your software?

MR. NEISER:  Speculation, Judge.

THE COURT:  Overruled.

THE WITNESS:  We could.

Q.   Okay.  But you don't?

A.   There's no need to do so.

Q.   Well, you would need to do so if you had agreed to do so.

A.   We did not enter into an exclusive.

Q.   Okay.  Did you enter into a right of first refusal?

A.   Yes.

Q.   Okay.  And do you have the ability to ask operators where their machines will be placed?

A.   No.

Q.   You can't ask?

A.   Operators that buy 20, 30, 100 machines at a time.  I mean, a bunch of them out there, they're all competing over locations.  It's not our job to ask operators where they're going to place their machine.  And where they place them initially is not necessarily where they end up.

Q.   Okay.  But can't you simply in the agreement say that you are not permitted to put into Beaver County?

A.   We could have done that.

Q.   But you didn't do that?

A.   We didn't need to do that.

Q.   Why didn't you need to do that if it indicates that you would give Pennsylvania Skill Games the option to place first?

MR. NEISER:  Objection; mischaracterizes the document.

THE COURT:  Overruled.

THE WITNESS:  We were not required to keep people out of Beaver County.

Q.   I didn't say whether you were required to keep people out of Beaver County.  The question is whether or not you flushed out some option to give to Pennsylvania Skill Games as you've agreed in the Equipment Purchase Agreement?

A.    I don't believe that's what that says.

Q.    Well, tell me --

A.    It said, Buyer opts not to place compliant terminals in certain Beaver County locations.

No one went to Beaver County for a long period of time, and at some point, they could have bought machines, Pennsylvania Skill Games, LLC, and placed them in locations. But the fact that they had not placed them in there, they're refusing to place them in there.

Q.    Let me see if I understand your testimony. Is your testimony something to the effect of, you're not going to give Pennsylvania Skill Games the option to place a machine somewhere, because they don't already have that somewhere that you would give them the option to place it into?

A.    I don't understand what you said.

Q.    Well, it sounds like to me you're saying because they don't have the thing, you won't offer the thing to them on an option.

A.    I don't know how that would happen, but no one outside of Pennsylvania Skill Games did any business in Beaver County, which they did very limited amount of. They quit buying machines, made it clear they were not going to put them in any more locations. And there was a lead, it was that Mike Boodram lead. He did call, and I did call Albert Unis III about it, about convenience stores, even though he had indicated he did

not wish to go to convenience stores.

Q.   If I understand your testimony, you never gave the option to Pennsylvania Skill Games, the ability to place games into Beaver County for which another vendor had taken an opportunity.  And you're saying it's because Pennsylvania Skill Games decided not to place any games in Beaver County?

MR. NEISER:  Objection, Your Honor.  Vague, compound, misleading.

THE COURT:  Could you rephrase the question, Mr. Zegarelli?

BY MR. ZEGARELLI:

Q.   And it's true, isn't it, that you never gave Pennsylvania Skill Games the option to place games into Beaver County locations where another vendor that has your games placed the games?

A.   Please repeat that.

Q.   You never gave Pennsylvania Skill Games the option -- do you see the word "opt"?

A.   Yes.

Q.   Okay.  So you never gave Pennsylvania Skill Games the option to place a game in a location where you gave another operator the ability to place it into that location?

A.   We don't control where operators place games in locations.

Q.   Could you control it?

A.    If we -- if we had given or sold an exclusive, we would have to.  But we did not.

Q.    So your argument -- your testimony, as I understand it, right of first refusal, doesn't trigger that obligation even though it has the word "option"?

MR. NEISER:  Objection; mischaracterizes.  It doesn't say that.

THE COURT:  You can answer, Mr. Pace.

THE WITNESS:  This says:  If buyer opts not to place compliant terminals in certain Beaver County locations, then seller, through another vendor, may place the above-described compliant terminals.

The seller is us, and we did not place that terminal in that location.  I'm not even aware if there's any other operators who ever placed games in Beaver County.

Q.    So you're not aware of any other operators with Pace-O-Matic games in Beaver County.  Is that your testimony?

A.    That is.  I'm not involved with the placing of games or sales or marketing or whatever products.  I help design the equipment that we do.  I was president of the company for most of its history.  That's been passed off the last couple of years.  And I can't get involved with everything.  We have a big company.

Q.    Well, you were president and CEO at the time you put your name on this; isn't that correct?

A.    That's correct.  I was not involved with sales.

Q.    Okay.  But you agreed to it?

A.    Yes, I did.

Q.    Okay.  And I think at some point you identified Miele Manufacturing as your distributor; is that right?

A.    Yes, they are exclusive distributor of the product for Pennsylvania.

Q.    And that is not Miele Amusements, if I understand your testimony?

A.    Is that a question?

Q.    That is a question.

A.    Are you asking if it is Miele Amusements?

Q.    I want to be specific.  Is it Miele Manufacturing or Miele Amusements?

A.    I believe that it's Miele Manufacturing.

Q.    Okay.

A.    That should be evident by whatever's on the document.

Q.    Okay.  Was Pennsylvania Skill Games ever your distributor in Beaver County?

A.    No.

Q.    Okay.  Were you ever notified or was it ever brought to your attention that there were competitors of Pennsylvania Skill Games in Beaver County placing Pace-O-Matic games into Beaver County?

A.    I believe at some point the agreement with

Pennsylvania Skill Games was in default and stopped, and maybe people put in after that, but I'm not aware.

Q.   Now, with regard to this default you've testified to, can you be more specific?

A.   I think you'd have to talk to our legal department.

Q.   I'm asking you.

A.   It's my understanding that, at some point, the lack of performance and other reasons that I'm not a lawyer, that agreement was terminated.  But I'm still unaware of any other operator ever placing games in Beaver County.

Q.   Now, Mr. Pace, do you see any performance requirements in the Equipment Purchase Agreement?  Is it stated anywhere?

A.   I -- I don't see any, no.

Q.   Okay.  And you signed this document; is that correct?

A.   Yes, sir.

Q.   Okay.

THE COURT:  Would you take that down, please?

MR. ZEGARELLI:  I'm sorry, Your Honor.

BY MR. ZEGARELLI:

Q.   Mr. Pace, do you see on your screen a letter from a law firm that says "Dinsmore"?

A.   Yes.

Q.   And do you see it addressed to Pace-O-Matic?

A.   Yes, I do.

Q.   On May 2, 2018, were you the president of

Pace-O-Matic?

A.    I was.

Q.    Okay.  And are you familiar with this letter?

A.    No.

Q.    Were you informed at any time that there was a complaint intended to be filed against Pace-O-Matic with regard to breach of the right of first refusal as well as trademark issues?

A.    I heard that there was.

Q.    Okay.  What did you hear?  All of that?

A.    We had regular meetings on all sorts of issues and -- and topics, and I know at some point I'd heard that our relationship was not going well.

MR. NEISER:  Your Honor, I object to hearsay.

THE COURT:  Sustained.

BY MR. ZEGARELLI:

Q.    Now, do you have a recollection of filing a lawsuit -- let me back up.

The letter or the -- when you indicated that you were told some things about the relationship, was that on or about May 2, 2018?

A.    I don't know what the time was, but it wouldn't have been far off from that.

Q.    Okay.  Now, for the record, I think the issue is it doesn't stick.  The attribute.

THE CLERK:  Are you trying to show it?

MR. ZEGARELLI:  Not yet.

BY MR. ZEGARELLI:

Q.   Mr. Pace, have you seen or did you participate in filing a lawsuit against POM of Pennsylvania, LLC, doing business as Pace-O-Matic -- no Savvy Dog -- POM of Pennsylvania, LLC, doing business as Pace-O-Matic, against Pennsylvania Skill Games in the Court of Common Pleas of Beaver County Pennsylvania?

A.   I was not involved with it.

Q.   Okay.  Who at your organization had authority to take such actions as file lawsuits?

A.   In what year?  2018?

Q.   Yes.

A.   I don't know.  I'd have to find out.  We had a lot of different lawyers.

Q.   Is there a group of people, just so we can -- we can transfer the testimony to that person during the week.

A.   It's really sort of a committee that we had at the time.  I was buried working on some high-tech stuff that I had to do for security reasons, and the guy that I had basically running the business was Lee Wesson, and he was working with Ryan Wood, who was vice president of sales, and Danny Warren, who was director of finance -- I think that was his title -- at some point it was VP, but I'm not sure when.

Q.    And also, there's a Mr. Cline, if I understand, in-house counsel?

A.    Greg Cline was involved, yes.

Q.    Okay.  He was in-house counsel, nevertheless; isn't that right?

A.    Sir?

Q.    In-house counsel?

A.    He was, one of them.

Q.    Now, if I recall your testimony, you said you had visited Pennsylvania to observe the placement of equipment; is that right?

A.    With respect to what?

Q.    The games.

A.    Yes.

Q.    Okay.  I think you said they were placed, I think you said, at one point, between dart boards, something like that?

A.    Yes, sir.

Q.    Okay.  Now, isn't it true that, after coming to Pennsylvania, you developed something called -- and released something called "rapid skill"?

MR. NEISER:  Objection, Your Honor, relevance, and if we need to, I'd like to approach.

THE COURT:  Let's approach, then.

(Whereupon, sidebar conference held:)

MR. NEISER:  Your Honor, we object to the relevance.

We believe that he's going to elicit testimony regarding another version of the Pennsylvania Skill Pace-O-Matic software that's not at issue, not in the case, and has nothing to do with any of the damages or the claims alleged.

MR. ZEGARELLI:  I think that --

THE COURT:  Keep your voice down.  We don't want the jury to hear.

MR. ZEGARELLI:  He -- the witness testified as to the cause of what was affecting the relationship, but, in fact, the change is diversioning indicates there was participation in -- that it was not the location but the actual gaming to be improved, and there will be more testimony in this regard throughout the week.

THE COURT:  What does the improvement of the game have to do with this case?

MR. ZEGARELLI:  Well, the improvement of the game is because -- the problem was not the dart board location.  The problem was the game had issues.

THE COURT:  But what relevance, if the game had -- what relevance is that to your defenses?

MR. ZEGARELLI:  Because he's saying that, in fact, the relationship -- he had testified that PSG was not a good operator.  In fact, he said, I think, something like the worst operator.  I believe I have the ability to show that it wasn't through their operation quality but because the game was the

problem.

MR. NEISER:  Your Honor, that's not even at issue.

MR. ZEGARELLI:  It is at issue.  He testified --

MR. NEISER:  Whether or not -- this is a different version of the game.  It's a different software version.  That's all it is.

So the testimony and the fact that he's going after is it's a slightly different version of the game.  There's no claim in here that says that the games themselves caused them any harm.  It's the violation of Equipment Purchase Agreement, period.  That's it.

MR. ZEGARELLI:  There's testimony in the record from you making it relevant saying that the issue is that it's an operator issue.  It's not an operator issue --

THE COURT:  Well, you can reinforce that by asking him if that testimony's accurate.

MR. ZEGARELLI:  But how do I dispute?  I mean, what am I going to say?  He's going to say, yeah, it's accurate.

THE COURT:  That's his testimony, I understand.

But I guess you get to cross-examine him with facts that tend to make that a lie.  The issue is it is not the performance of the operator.  It's the game, and the game made changes -- and made changes to the game --

MR. NEISER:  But his testimony was based on we terminated the contract or did not want to go forward with the

contract at some point because there are issues, not because of any other issues.

Is your client contending there's some issue about the games?

MR. ZEGARELLI:  My client is contending it is not their fault that there were problems that he testified to.  He testified to problems because of placement of the games, they were the worst operator we had.

It's not true.  But I can't -- if I just say -- if I ask him to repeat the testimony, it's not true, I can't do anything about it.

MR. NEISER:  Your Honor, the question is whether or not the software itself or the game itself is relevant to a claim, and it's not.

MR. ZEGARELLI:  It is if it caused the problems between it and the relationship with the party.  We're not -- now, every single thing gets spliced and diced.  We're not talking about legality anymore.  Now we're talking about the versions of the game and the changes and whether they're the cause.  We're not talking about legality.

THE COURT:  We're not going to discuss the different versions.

MR. NEISER:  Thank you.

THE COURT:  If you want to ask him whether your client took the position that there were issues, you can do that, but

we are not going to go through various versions of the software.

MR. ZEGARELLI:  It's not even that I've gotten to a point where I can claim it's repetitive.  It's simply, I can't even ask him a question about --

THE COURT:  I just said you could ask him whether your clients took a different position about what issues were between them.

MR. NEISER:  This will definitely go to versioning.  This will go to different parts of the game making it of --

MR. ZEGARELLI:  He doesn't get free punches.

MR. NEISER:  That's not what we're suggesting.  What we're suggesting is exactly what the Court just said.

THE COURT:  Which is what?

MR. NEISER:  Which is that the versioning is not at issue in getting into -- the versioning has nothing to do with any of the claims.

THE COURT:  Well, what you can ask him is whether your clients took a different issue with respect to issues that may have existed -- let me finish before you make faces at me.

MR. ZEGARELLI:  I'm sorry.

THE COURT:  I'm trying to give you every courtesy.  I would appreciate the same courtesy.

MR. ZEGARELLI:  I apologize, Your Honor.

THE COURT:  You can ask him if they took a different approach to what the issues were, and you can generally ask him

about software, not versions of software, because then we are stepping into a thicket that we're not going to step into.  So you can ask him if they took a different position -- and I take it you're talking about the dart board issue?

MR. ZEGARELLI:  I mean, that wasn't the cause, Your Honor.

THE COURT:  So your clients, I assume, would say there was a problem with the software?

MR. ZEGARELLI:  They would.

THE COURT:  That's as far as we need to go.

MR. ZEGARELLI:  We'll leave it to their testimony.

MR. NEISER:  Thank you, Your Honor.

   (Whereupon, sidebar conference concluded.)

THE COURT:  Let's ask a new question, Mr. Zegarelli, based upon our discussion.

BY MR. ZEGARELLI:

Q.   Mr. Pace, do you have an understanding that Pennsylvania Skill Games took a different position or did not agree with the cause for the relationship breaking down?

A.   I don't know that.

Q.   Mr. Pace, can you identify any writings that identified -- or document the testimony that you gave with regards to the reason why the relationship broke down?

A.   Say that again, please.

Q.   Sure.  I think you testified that you think the

relationship broke down because -- I think you said something about these operators of Pennsylvania Skill Games put a machine between dart boards, something like that?  Do you recall that testimony?

A.   Yes.

Q.   Okay.  Do you have any documents at all that indicate that is a problem?  In other words, you sent them a notice or you sent them an email or something, hey, here's how to correct it?

A.   No, I made personal trips and calls with the Albert Sr.

Q.   So the answer's no?

A.   I don't know that.

Q.   As you sit here today, you don't know whether there's any emails that indicate that they were not placing -- I mean, I think you testified they were the worst operator.  Didn't you testify to that?

A.   They were.

Q.   Okay.  And do you have any documents in good faith, for example, that said, here's what you need to do or anything like that?

A.   The fact that they put the equipment where they did and the fact that they were going to buy hundreds of machines and develop in the county and they didn't and they weren't buying fills, which means their machines were not in locations

that were earning money -- that's pretty clear.

Q. Could it have been --

A. Then they tried to steal our trademark by applying their own name.

Q. Excuse me. Is any of that in writing, sir?

A. The trademark thing certainly is.

Q. Okay. Where is it in writing?

A. I believe that's what the original lawsuit was about.

Q. Okay. The original lawsuit. And that was a lawsuit that got filed after you were notified that Pennsylvania Skill Games had a claim against you?

A. I think so.

Q. Okay. So there's no documents that you know of that preceded the lawsuit?

A. In a negative way?

Q. Yes.

A. Okay, because we have tons of emails.

Q. Well, just point to any of them. Tell me what you recall about those emails, and we'll certainly try to find them and --

A. I think the actions speak for itself. I mean, the fact that they did not order more equipment like they were supposed to, the fact that they put the games into places where they really didn't try to make them earn should be enough.

Q. I'll take that as a "no," sir.

A.   Okay.

Q.   Now, Mr. Pace, there's a document marked for identification as Exhibit 26.  Are you familiar with this email?

A.   Yes.

Q.   Okay.  I'd like to introduce Exhibit 26.

THE COURT:  Is there any objection?

MR. NEISER:  No objection, Your Honor.

THE COURT:  Exhibit 26 is admitted.

BY MR. ZEGARELLI:

Q.   Now, you see the language, Mr. Pace, and first of all I'll point out the date, January 14th of 2015.  Do you see that?

A.   Yes, yes.

Q.   Okay.  And that is approximately how long after the Beaver County case was ruled upon?

A.   About three weeks, a little more.

Q.   And -- well it's really more -- okay.  I mean, it was December 24th of 2014?

A.   It was December 23rd is when the ruling was.

Q.   Okay.  Well, I'm not sure it's a material difference. I do think it's the 24th, but that's fine.

A.   Okay.

Q.   In any case, do you see the language "first right of refusal," meaning if a location or operator calls us about machines, I will first make sure -- make sure -- you have the inventory to service the account or plan to buy it to take care

of that account.

Do you see that language?

A.   Yes.

Q.   Okay.  And you'll note that that language says "if a location or an operator calls."  Do you see that?

A.   Yes.

Q.   Okay.  When we talk about a location, we're talking about the actual place or venue where a machine lands; is that right?

A.   Yes.

Q.   And an operator is the person who purchases from you and/or Mr. Miele and then places it into the location; isn't that right?

A.   That's correct.

Q.   Okay.  Now, what did you do to make sure about the inventory?

A.   Well, first of all, this sales agreement, whatever you want to call it, was modified for Albert Unis and associates when we met with him the first time on February 4th, and then that agreement was replaced by the Equipment Purchase Agreement in May with Albert Unis IV, is what I understand.  All of these agreements don't survive.

Q.   Okay.  And a mere -- a mere -- what? -- approximately 20 days or so after the Beaver County case was ruled upon, you were already selling games to the Unises; is that right?

A.   They demanded it.  They wanted to buy games.

Q.   All right.  That was the deal; right?  I think you testified to the deal.

MR. NEISER:  Objection; vague.

THE COURT:  Could you rephrase that?  I'm not sure what deal you're talking about, Mr. Zegarelli, just to be clear.

MR. ZEGARELLI:  I'll withdraw that.

MR. NEISER:  Your Honor, does the witness need water?

THE COURT:  He has a water bottle there, I believe.

THE WITNESS:  I'm fine.

THE COURT:  Unless it's empty.

BY MR. ZEGARELLI:

Q.   Now, I'm going to put on the screen the documents presented to you earlier, such as the EPA; not much time was spent on it.  First document is already admitted.  It is Exhibit 18.  I think you testified that you're familiar with this document; is that right?

A.   I know what it does.

Q.   Okay.  And it is, if I understand it, an intellectual property fee agreement, and it's between Savvy Dog and POM of Pennsylvania; is that right?

A.   Yes, sir.

Q.   Okay.  And it was authenticated, and yet I don't recall you being shown the signatures.

Now, you're signing on behalf of POM of Pennsylvania;

is that right?

A.    Yes, sir.

Q.    Okay.  And the agreement is between you and Savvy Dog Systems; is that right?

A.    It's between POM of Pennsylvania and Savvy Dog Systems.

Q.    Correct.  Who signed on behalf of Savvy Dog Systems?

A.    My wife.

Q.    Okay.  Fair enough.

A.    Karmin Pace.

Q.    And you'd call that, if you understand the terms, an arm's-length transaction?

MR. NEISER:  Objection to relevance, Judge.

THE COURT:  What's the relevance?

MR. ZEGARELLI:  It's an agreement that purports to be an intellectual property fee agreement, Your Honor.

THE COURT:  I understand.  What's the relevance of the arm's length?

MR. ZEGARELLI:  Because it may not be an enforceable or proper agreement or have legal merit if it is simply a husband and a wife transferring rights for -- I'm not sure there's any consideration stated in this one, Your Honor.

MR. NEISER:  Your Honor, I don't think right now in the trial is the time to be discussing the enforceability of agreements.

But I don't think it's relevant because the witness has authenticated it.  It is in evidence.  The document is what it is and what it purports to be, and he can testify to that.

And I think it's irrelevant to try and unwind the transaction and discuss whether or not basic contract principles have been followed.

THE COURT:  I think that there is sufficient testimony about is this a document signed by Mr. Pace and a document signed by his wife.  So let's move on.

MR. NEISER:  Thank you, Your Honor.

BY MR. ZEGARELLI:

Q.  Mr. Pace, this document is not notarized, is it?

A.  I don't see a notarization.

Q.  On the screen is Exhibit 17.  Do you see that, sir?

A.  Yes, sir.

Q.  And this is an agreement purporting to be between Pace-O-Matic, a Wyoming corporation, POM of Pennsylvania, a Wyoming limited liability company.  Do you see that?

A.  Yes, I do.

Q.  Okay.  It was not displayed earlier.  And that is signed by you again, POM of Pennsylvania and Pace-O-Matic.  Is that the signature of Daniel Warren?

A.  Yes, it is.

Q.  Okay.  And Daniel Warren was the vice president of finance?

A.    At that time, evidently.

Q.    And that's vice president of finance of Pace-O-Matic?

A.    Yes.

Q.    Okay.  And that document is -- that document is not notarized either, is it?

A.    I don't see a notary on what you're showing me.

MR. NEISER:  Your Honor, I'm going to object if we have a continued line on whether the documents are notarized.  I think that is irrelevant to any legal effect whatsoever.

MR. ZEGARELLI:  I ask for some leeway.

THE COURT:  Overruled.

BY MR. ZEGARELLI:

Q.    The fourth document is an intellectual property assignment agreement, and it is Exhibit 19.  Do you see that?

A.    Yes.

Q.    Dated the 1st day of January, 2017.  Do you see that?

A.    Yes.

Q.    Okay.  Now this documented is notarized; is that correct?

A.    I see a notary, Janis Bagwell.

Q.    That's a Georgia notary; correct?

A.    Yes.

Q.    Okay.  And this is signed by you.  That's your signature?

A.    Yes, it is.

Q.    And that's Ms. Karmin Pace, your wife, if I understand it?

A.    My best friend, yep.

Q.    Okay.  And the fourth document, again, January 1st, 2017, Exhibit 20.  And this document is signed by you on behalf of yourself and Pace-O-Matic by a Guy Wesson, and I think that means executive vice president?

A.    Yeah, that was Lee Wesson, Guy Lee Wesson.

Q.    Again, these two documents, being 19 and 20, they were both notarized for the 17th day of January; is that right? Another Georgia notarization?

A.    Yes.

Q.    So if I understand it, Exhibit 18, Savvy Dog transferred to POM of Pennsylvania, is not notarized, dated January 1st, 2017.

Exhibit 17, Pace-O-Matic to POM of Pennsylvania, dated January 1st of '17, not notarized.

Exhibit 20, Pace-O-Matic -- sorry.  You to Pace-O-Matic, 1st day of January, 2017, is notarized.

Exhibit 19, Pace-O-Matic to Savvy Dog, 1st day of January, again, 2017, is notarized.

Did I restate those four agreements correctly, sir?

A.    I'm not sure.

Q.    Do you want me to go through them again?

A.    Yes, please.

Q.    Okay.  We can -- let's start with number 20.

A.    Okay.

MR. NEISER:  Your Honor, if I may shortcut this? We'll stipulate to what the documents say whether notarized or not so we don't have to endure that again.

THE COURT:  Is that all right?

MR. ZEGARELLI:  I'll be moving right on to why I'll say these are relevant, as soon as I get the witness to say that this is the status of the four documents.

BY MR. ZEGARELLI:

Q.    There are two notarized; two unnotarized?

A.    Yes.

Q.    Okay.  All dated the 17th of January.  I'm sorry.  The first day of January 2017?

A.    I think they're all set for the 1st of January, 2017.

Q.    Can we confirm it?

A.    I believe -- yeah, all of documents were.  But there was a notary that was the 17th; that's what I'm thinking of.

Q.    All right.  On Exhibit 18, I'm sorry, Exhibit 20?

A.    Yep.

Q.    There's notarizations for the 1st day of January, 2017.

Do you see that?

A.    Yes.

Okay.  Everything is January 1st, 2017.

Q.    Very good.

A.    Perfect.

Q.    Now, I will place on the screen Exhibit 108.

MR. ZEGARELLI:  Your Honor, I am going to show the witness documents from the Corporation Bureau of State of Wyoming.  They are Exhibit 108, and I move their admission.

MR. NEISER:  Objection for every reason possible, Your Honor.  Relevance, lack of foundation, hearsay, mostly relevance.

And, Your Honor, I'd like to also state, this goes back to the corporate organization dichotomy, if you will.

MR. ZEGARELLI:  Two documents --

MR. NEISER:  Could we have sidebar, Your Honor, if we're go doing this?

THE COURT:  Let me hear from Mr. Zegarelli first.

MR. ZEGARELLI:  Two documents, Your Honor: Certificate of Organization for Savvy Dog; Certificate of Organization for POM of Pennsylvania.  I have the certified records from the State; so they are certified for judicial notice purposes.  I think they're authenticated by that fact, Your Honor, and they're proper to show to the witness and to the jury.  I'm not showing any of -- any other companies.

THE COURT:  Does that satisfy your concerns, Mr. Neiser?

MR. NEISER:  At least partially.  The relevance is

still at issue.  But if the Court's inclined, we'll just wait to hear.

THE COURT:  Your objection, then, is overruled.

MR. NEISER:  Thank you, Your Honor.

BY MR. ZEGARELLI:

Q.   I think you testified -- Mr. Pace, I'm going to back up again.  Exhibit 18 -- I'm sorry.  Exhibit 20 and 21 are notarized.  So it's safe to say that a notary public notarized the signatures on that date.

Exhibit 18 and 17 are not notarized.

Now, --

THE COURT:  Mr. Zegarelli, if I can interrupt you just for a moment.  I think you said Exhibits 20 and 21.  I believe it's 19 and 20 that you meant to reference.

MR. ZEGARELLI: That would be correct, Your Honor. Thank you.

BY MR. ZEGARELLI:

Q.   These are certified records from the State of Wyoming. POM of Pennsylvania, LLC, which is a party to the agreement set -- transfer agreement set forth.

You'll note the Articles of Corporation for POM of Pennsylvania.  Do you see the date in the upper right-hand corner, 9/7 of 2017?  Do you see that?

A.   Yes, sir.

Q.   So, the documents that I showed you that you signed,

the company that was signing the document didn't exist.

Do you see that?

A.    Is that a question?

Q.    Do you assert it did exist when it didn't exist?

A.    I don't know.  Our legal team puts these things together, and they bring them to me to sign, and I've not read any one of them.

Q.    Okay.

A.    I believe they were done, constructed correctly, but I have a pretty good lawyers.

Q.    Okay.  So as you'll see here from the certified record, POM of Pennsylvania, LLC, did not become created until September 7th of 2017, which is about nine months after the date set forth in the assignment of the transfer -- in the assignment of rights that you purport transferred the rights to allow POM of Pennsylvania to file the lawsuit that you filed.  And I'll suggest to you that that is ineffective legal.

MR. NEISER:  Objection.  Argumentative, Your Honor.

MR. ZEGARELLI:  I'll withdraw that.

THE COURT:  Sustained.

BY MR. ZEGARELLI:

Q.    Now, you said you had a pretty good legal team.  And it's true, isn't it, that Mr. Goodling is now employed by Pennsylvania Skill Games?

A.    I know he works for us.  I'm not sure it's

Pennsylvania Skill Games.  But that would make sense.

Q.    Okay.  And he was formally a Pennsylvania state police officer?

A.    Wait a minute.  Not Pennsylvania Skill Games.  POM of Pennsylvania.

Q.    POM of Pennsylvania.

A.    And then what?

Q.    Is Mr. Goodling engaged by POM of Pennsylvania or Pace-O-Matic?

A.    I don't know.

Q.    Okay.  And it's true, you also -- he was a -- Mr. Goodling was a former state police officer; is that correct?

A.    Yes, sir, he was.

Q.    Okay.  And is it true that on your team is former state police commissioner Mr. Noonan?

A.    Frank Noonan, yes, I believe he's a director.

Q.    And he was a former Pennsylvania State Police Commissioner?

A.    He was head of the Pennsylvania state troopers, yes.

Q.    And Frank Fina is a former Pennsylvania state prosecutor?

A.    Yes, he is.

Q.    Okay.  Now, you testified to some emails, and the question to you was, so that you could authenticate it, "Is it a complete thread of email?"

Do you recall that testimony?

A.   No.

Q.   Okay.

A.   Please be clearer.

Q.   In other words -- I'll have to find the testimony for you where when you were asked whether or not the emails to which you testified were a complete thread, you indicated it was.

A.   Okay.  If you say so, I believe you.

Q.   All right.  So are you saying that you --

A.   If I said that they were complete, then let's go along with them being complete.

Q.   Okay.  We'll just go with that.

Now, if there are -- are you the custodian of email at your organization?

A.   No.

Q.   Okay.  So, in other words, if there are -- if you are one of, for example, five people on an email thread, you don't manage or you don't have personal knowledge of whether the other people in that thread communicated without including you in the thread?

A.   They can communicate at any time without me being included in a thread.

Q.   Okay.  So you don't have personal knowledge that every thread of email to which you are a party is a complete thread?

MR. NEISER:  Your Honor, I'm going to object.  This is

like a hypothetical or something vague.  If there's a specific email, I'm sure he could answer the question.  But --

THE COURT:  I think the witness has testified that if he's not copied on an email, he would not know about it.

If it there is a specific email you'd like to show him, please feel free to do that, Mr. Zegarelli.

MR. ZEGARELLI:  Okay.

BY MR. ZEGARELLI:

Q.   I think yesterday you had identified some emails that were in August of 2012.

Do you recall those emails?

A.   Yes.

Q.   Okay.  And do you recall any emails from approximately December of 2012 with regard to the adoption of Pennsylvania Skill Games' logo?

A.   If that's what I said, then, yes.  But I don't know the date.

Q.   Okay.  Now, do you have any emails where you actually say, we are going -- this is what we adopt?  In other words, this is the name or the logo that we are adopting?  I've seen none of those emails.  Do you have any of those emails, to your knowledge?

A.   I wouldn't be involved with it.

Q.   Okay.  So you can't testify that you have knowledge of any such emails?

A.    I might be able to testify to it.  It depends upon its importance and what I was doing at the time.

Q.    Okay.

A.    I don't look at all my emails.  I get about a hundred a day.  If I'm engineering, people know to call me if they need me.

Q.    Well, you testified, I think, that you were going to keep the name Pennsylvania Skill until something better came along.  Isn't that what you said yesterday?

A.    It was -- Pennsylvania Skill was a generic name that I applied to the product in 2008 as a placeholder, saying that I have a skill game that I'm designing and developing for the State of Pennsylvania.  Because at the time, I don't feel creative about coming up with a name.  It is a placeholder until we have -- I generally try to get people to throw a bunch of names out, let's all vote on it and talk about it and see if we can't find something better.

Q.    You didn't find anything better, did you?

A.    Evidently, we never changed it.  I know we had some lists of some stuff and we talked about, but I don't think anything on those lists ever like gotcha ya kind of thing. Nothing on it was anything, and I guess just we moved on with the generic name.  It was getting used, so that's what happened.

Q.    So are you saying that the trademark infringement claim that you've asserted in the litigation is not valid?

A.    I didn't say that at all.

Q.    Okay.  Tell me what you said.  I thought you said it was generic.

A.    It was -- it was where our company does it, the way I do it, is I give it what I feel is sort of a generic name for our company's use that says it's Pennsylvania and it's skill.

Q.    Okay.  And you --

A.    That became -- that became the mark and the brand for our games.

Q.    Okay.  So it's not generic?

A.    Not once it's used and out there, no, it's not.

Q.    Okay.  And when was it first used and out there?  When can you testify that it was used and out there?

A.    I couldn't tell you right this second.

Q.    Okay.

A.    Well, I know that I had a game that we did ship to Pennsylvania in 2008 with Pennsylvania Skill on it.

Q.    What evidence do you have of that, sir?  We have seen no such evidence.  And your attorney can bring it up on redirect, but we have no such evidence of that.

A.    I don't think there is any evidence of it.  It went to a lawyer in Pittsburgh.  But it wasn't Wayne DeLuca.

Q.    I'm going to show the witness Exhibit 3, which I don't believe has been admitted.

Do you see Exhibit 3, sir?

A.    I see an email.

Q.    Okay.  And you're a party to that email; is that right?

A.    It appears I was copied on it.

THE COURT:  Sorry, Mr. Pace.

Is that the entire document?

MR. ZEGARELLI:  The entire exhibit, Your Honor.  I believe it came out of an attorney's file.

THE COURT:  Well, I wasn't asking that.  I just want Mr. Pace to be able to review the entire document.

MR. ZEGARELLI:  I'm sorry.

THE WITNESS:  Thank you.

Okay.

BY MR. ZEGARELLI:

Q.    You recognize it?

A.    I think so.

Q.    Okay.

MR. ZEGARELLI:  I'd like to admit Exhibit 3.

MR. NEISER:  We have no objection, Your Honor.

THE COURT:  All right.  Exhibit 3 is admitted.

BY MR. ZEGARELLI:

Q.    Now, it's true, isn't it, that on or about May 26th you, Albert, and Danny Warren, Pace-O-Matic vice president, went through the draft, the Equipment Purchase Agreement?

A.   That's not correct.

Q.   Okay.  Can you describe --

A.   I was not -- I was not involved with the negotiation of that agreement.  Being CC'd on it is a pretty normal procedure.  It doesn't mean that I was involved with it.

Q.   Okay.  And we can read the email, at least, that says, Good morning, Michael, Albert, and I -- I being Danny Warren, the author -- went through the draft last week in Ohio.

Do you see that?

A.   Yes.

Q.   Okay.  I've placed on your screen, Mr. Pace, Exhibit 212.

MR. NEISER:  Your Honor, I'm going to make the same relevance objection that we made earlier when we were looking at that other screen.

MR. ZEGARELLI:  The other screen, Counsel, is what exhibit?

MR. NEISER:  I don't recall.  It's the one that we had discussed at sidebar regarding rapid skill.

MR. ZEGARELLI:  No, that's not -- that -- let me put up what was admitted for -- to represent version 402.44.

MR. NEISER:  Exhibit 28, Your Honor.

MR. ZEGARELLI:  Right.  Exhibit 28.

THE COURT:  Mr. Zegarelli, while you're working on that, how much more time do you anticipate that you'll need with

Mr. Pace?

MR. ZEGARELLI:  Actually, I am almost finished with him, Your Honor, thank you.

THE COURT:  Okay.

BY MR. ZEGARELLI:

Q.  Now, before I put back on the screen Exhibit 28, which was purported to be version 402.44, you'll note that I put another version on your screen, which also purports to be 204.44.  Do you see that in the lower right-hand corner, sir?

MR. NEISER:  Objection, Your Honor, relevance.

THE COURT:  Let's have a sidebar, please.

(Whereupon, sidebar conference held:)

THE COURT:  I just want to make sure I understand the purpose of showing this exhibit.  It indicates what?

MR. ZEGARELLI:  Represent 402.44.  It's not true.  I have a different --

THE COURT:  I don't understand.

MR. ZEGARELLI:  There's testimony related to the exhibit that was omitted.  There's another exhibit that does not comport with the testimony that was given for the original exhibit.  They both purport to be 402.44.  It's not like one is a different version than the other.  They both are indicated as 402.44.  I think he has to explain why there are two different screens for the same version, and that version is the version that was ruled upon.

MR. NEISER: Judge, the testimony from the witness was that that screen in Exhibit 28 is what, to his recollection, the screen from the controlled pickup and the use of the mark appeared at that point in time.

I believe Mr. Zegarelli is going to attempt to elicit testimony that there were two versions of 402.44 out there which constitute some nonconform, noncompliant illegal misrepresentation or otherwise. I know that's what it is.

And we're objecting to the relevance for the same issue that we've talked about repeatedly about the versioning and the legality and all of that other stuff. There is no claim regarding any failure of conforming goods or otherwise.

MR. ZEGARELLI: The witness might be lying or might be mistaken.

THE COURT: Why does it matter?

MR. ZEGARELLI: It matters because he gave testimony with regard to one screen that's not accurate relative to another screen that bears the same identification. I don't know why that -- I can't cross-examine the witness on his prior testimony. He said 402.44.

THE COURT: Cross-examination also has to be relevant.

MR. NEISER: Right.

MR. ZEGARELLI: But he testified that 402.44 as looking one way, and I have another 402.44 that looks a different way.

THE COURT:  What difference does it make?

MR. ZEGARELLI:  It makes a difference because he's not presenting the correct version of the screen.

THE COURT:  And that relates to your claims how?

MR. ZEGARELLI:  It relates to his evidence, everything -- I didn't bring in any evidence.  I'm cross-examining his evidence.

THE COURT:  I understand.

MR. NEISER:  Our position is simply that he represented that that's what the screen looked like at the time on the game.  And that's it.

MR. ZEGARELLI:  I will -- he's got to justify why a different screen looks the same.

THE COURT:  Why does he have to justify that?

MR. ZEGARELLI:  Because -- because if he says one screen looks one way and there's a different screen with the same identification, he may have been saying, yes, yes, yes, or not even understood that there's a difference between two screens.

MR. NEISER:  It was offered for the purpose of showing the usage of Pennsylvania Skill at the top, not the 402.44.

MR. ZEGARELLI:  But he might not know what version he's looking at that both bear 402.44 until he sees both versions, and he can confirm or deny why there are two versions with -- that bear the same number.  He testified 402.44 was the

build number.

MR. NEISER:  It's about the usage.  The testimony was based on the usage of the mark in a specific point in time and what the screen looked like at that time.

MR. ZEGARELLI:  Right.  If the screen doesn't look like that at that time, that's what it says in the other 402.44, which one of those is an imposter apparently.

MR. NEISER:  Imposter, okay.

THE COURT:  You don't have a claim that -- about compliant, noncompliant terminals; correct?

MR. ZEGARELLI:  402.44 is the version ruled on, Your Honor.  So it's not even -- that's not -- I'm not sure that's --

THE COURT:  You are not claiming you are seeking damages for noncompliant terminals, as we have reviewed many times; correct?

MR. ZEGARELLI:  I'm not -- that's -- what you've just indicated --

THE COURT:  Well --

MR. ZEGARELLI:  -- you've ruled upon, I understand.  But that's not what I'm trying to elicit from the witness at this time.  Mr. Neiser introduced evidence of a screenshot which the witness said represented a certain version pursuant to what it looked like at a certain time.  There happens to be another version equally identified that looks different.  And I think he at least needs to say, no, that's not right or because of this

or whatever.

THE COURT:  Do you have any objection if he shows him the two and asks him if they're the same or different, the screenshot?

MR. NEISER:  The screenshot.  But if we're going to start discussing that -- I know -- I believe that Mr. Zegarelli will attempt to get evidence that there's a version of software that says 402.44, but it's not running 402.44 under the hood, and I believe that's where he's going.  And that is my concern.

MR. ZEGARELLI:  We're not there.  First of all, you're speculating, and you're speculating with what's not before us.

MR. NEISER:  For good reason.

Your Honor, two, I don't know where the photo came from.  I don't know where it was taken.  I don't know any of those things.

MR. ZEGARELLI:  He can authenticate or not authenticate.  If it doesn't look like anything he's ever seen before, that's fine.

MR. NEISER:  Keep it down a little bit, too.

THE COURT:  You can show him both and ask if he recognizes both and ask him if they are different or the same, as they look.

MR. NEISER:  As they appear.

THE COURT:  As they appear.  We're not going to get into software versions.

All right.

MR. NEISER:  Thank you.

(Whereupon, sidebar conference concluded.)

MR. ZEGARELLI:  We are going to show this for identification purposes first --

THE COURT:  Yes.

MR. ZEGARELLI:  -- or I was going to move for its admission.

BY MR. ZEGARELLI:

Q.   And, Mr. Pace, do you recall yesterday testifying to Exhibit 28 as representing version 402.44?

A.   Is that what it says?  It's awful small.  That's what it looks like, 402.44.

Q.   I'm going to show you another screen that is also identified as 402.44.

A.   That's correct.

Q.   Okay.  And they are different?

A.   They look different to me.

Q.   Okay.

MR. ZEGARELLI:  I'll move for the admission of -- I believe it was 212.

MR. NEISER:  Your Honor, we do object to the admissibility of the exhibit for the reasons we talked about at sidebar.  I won't belabor from there.

THE COURT:  I actually don't believe a foundation has

been laid other than the fact that Mr. Pace looked at it.  He can identify it as something he's seen before.  So you'd have to establish that foundation.

BY MR. ZEGARELLI:

Q.  Mr. Pace, is the document, 212, is that something you've seen before?

A.  I don't see a 212.  I'm sorry.

Q.  I'll put that back up for you.  Does this screen that bears 402.44, does this picture accurately represent a version of 402.44 known to you?

A.  It looks like one of the screens that we have for version 402.44, yes.

MR. ZEGARELLI:  I move for the admission of Exhibit 212.

THE COURT:  If that's 212.

BY MR. ZEGARELLI:

Q.  That's Exhibit 212.

A.  Okay.

MR. NEISER:  We do object, Your Honor.  If you want to admit it, you can admit it.  But we object to it.

THE COURT:  It's admitted.

Mr. Zegarelli, I think you said you were close to being finished.  I don't want to rush you.  I just want to make sure that, if you're not close, we can take a break.  If you are, we'll try and continue.

BY MR. ZEGARELLI:

Q.    I will just put the two versions on the screen.  This is version 212.  Exhibit 212 and Exhibit 28 are both identified in the document as -- I'm sorry -- on the screen as 402.44.  And the witness has indicated that they are different.

A.    I believe both of those screens are both versions of 402.44.

Q.    Two different versions with the same number?

A.    There's a sub- version difference at that point.

Q.    Okay.  And do you have an understanding of which of those two versions were brought in the Beaver County case which was -- regarded 402.44?

A.    No.

Q.    Okay.  What version are you on today, as you sit here, sir?

A.    I don't know.  I don't currently program anymore.  I wish I did.  But I'm not on that platform programming.  I'm on other stuff.

Q.    Is it any version above 402?

A.    I didn't do any of the programming on that platform. I designed the games and the patents are applied and the other features.  Originally I designed it on a -- on a platform that became obsolete.

MR. ZEGARELLI:  No further questions, Your Honor.

THE COURT:  Thank you, Mr. Zegarelli.

Ladies and gentlemen, we're going to take our lunch break now.  We'll come back at 1:45.  Thank you for your patience and remember don't discuss the case while we're on break.  We're adjourned.

(Pause as the jury exits courtroom.)

(Whereupon, the lunch recess was had.)

(Pause as the jury enters courtroom.)

THE COURT:  Please be seated, everyone.  Good afternoon.

Mr. Neiser, do you wish to conduct any redirect?

MR. NEISER:  Very, very brief one, Your Honor.

THE COURT:  All right.

Mr. Pace, could you please resume the witness stand for us, please?

THE WITNESS:  Yes, ma'am, Your Honor.

REDIRECT EXAMINATION

BY MR. NEISER:

Q.  Mr. Pace, when did you first learn that Pennsylvania Skill Games, LLC, was using the name Pennsylvania Skill Games, LLC?

A.  At the time we did the Equipment Purchase Agreement is when they formed it, or shortly after, in May of 2015.

Q.  Very good.  Thank you.  And not before then?

A.  No, sir.

Q.  And, to be clear, there could be games from other

competitors, other operators of Pennsylvania Skill Games, that are located in Beaver, but to be clear, is it your testimony that you maybe just don't know where they are?

A.   Yeah, it's very possible.  We don't know where the operators put their games.

Q.   Okay.  I think there was some question about distribution or being a distributor.  Did you have an opportunity to observe Albert Unis III's operations and his route when you visited Pennsylvania those two or three times?

A.   I never dealt with Albert Unis IV.

Q.   I mean the third, sir.

A.   Oh, the third.

Q.   Yes, sir.

A.   He was a fireworks guy, and he did have a route of games, but what he had, there's no way that we would have considered him to be a distributor for Pennsylvania at all.

Q.   And to be clear, he never was a distributor for Pace-O-Matic; is that correct?

A.   No, he was not.

Q.   Or POM of Pennsylvania?

A.   Or POM of Pennsylvania.

MR. NEISER:  No further questions, Your Honor.

THE COURT:  Thank you.

Mr. Pace, you may step down.

THE WITNESS:  Thank you, Your Honor.

MR. NEISER:  Your Honor, is Mr. Pace excused?

THE COURT:  He is excused.

(Witness excused.)

MR. NEISER:  Thank you, Your Honor.

Your Honor, we call Glen Carter.

THE COURT:  All right.  We'll get Mr. Carter to come in, and we'll have him sworn in.

MR. NEISER:  Thank you, Your Honor.

May I have just a quick moment talking to Mr. Zegarelli.

THE COURT:  That's fine.

Mr. Carter, you can step forward to be sworn, please.

GLEN CARTER, a witness herein, having been first duly sworn, was examined and testified as follows:

THE COURT:  Mr. Carter, you may take the witness stand.

Mr. Carter, feel free to adjust the microphone if it's not in the right place for you.

MR. NEISER:  May I proceed, Your Honor.

THE COURT:  Yes, you may, Mr. Neiser

DIRECT EXAMINATION

BY MR. NEISER:

Q.   Mr. Carter, introduce yourself, please.

A.   My name is Glen Carter.

Q.   Where do you live, sir?

A.    In Cumming, Georgia.

Q.    What do you do for a living?

A.    I write software for Pace-O-Matic.

Q.    For how long have you done that?

A.    I started at Pace-O-Matic in March of 2009.

Q.    Can you briefly describe your educational background?

A.    I have a bachelor's degree in music and art from Jacksonville State University in Alabama.  I have a certificate from the Chubba Institute for software development, and I have a master's degree in technology management from Southern Tech, in Marietta, Georgia.

Q.    Understood.  What was your role when you first started working at Pace-O-Matic?

A.    I was a senior software developer.

Q.    Can you generally describe the work that you were doing?

A.    I was building a gaming system for Pace-O-Matic that would hopefully one day replace the legacy system that was in place at the time.

Q.    Just so we understand, what was the legacy system that you had in place at the time?

A.    It was the Platinum Plus.

Q.    Okay.

A.    That had been developed prior to me coming to Michael.

Q.    So why did you need to change it?

A.    There was a belief and a desire to create a system that would render higher resolution graphics.

Q.    Okay.

A.    Which is the way the industry was trending at the time and still is.

Q.    Was there an aim for this new software platform?

A.    Not initially, but it eventually became what we called the "Edge system."

Q.    Okay.  So if we see reference to the Edge platform or Edge system, that's what it refers to?

A.    Correct.

Q.    Okay.  So when did you first start working on a product or a software program specifically for Pennsylvania market?

A.    It was in early 2012.

Q.    Okay.

A.    Excuse me.  Let me -- let me correct that.  We started on a skill product in early 2012.  It eventually became the software for Pennsylvania later in 2012.

Q.    Understood.  What were -- were you working on the skill program as of 2009 through 2012?  Or -- I'm trying to understand that.

A.    Initially, it was not skill.  We weren't sure what market it would go into; if it would be skill or not.  So it was made to be fairly generic where it could go into different

markets depending on what, you know, the industry required at the time.

Q.    Understood.  So if there were different requirements for different markets, would it be fair to say that Pace was trying to develop a software to fit each market?

A.    Correct.  It was made to be very configureable.

Q.    Okay.

A.    And adjustable and flexible so they could potentially accommodate a lot of different markets.

Q.    Did you write this code from scratch, or were you working off of existing work product?

A.    My product, the Edge System, was written from scratch.

Q.    Who wrote it?

A.    Myself and a couple of other people.

Q.    Okay.  Can you tell us approximately how many lines of code are involved in a work like that?

A.    If you -- if you were to count not just the source code but also the animation scripts, the XML, configuration files, it would be well over half a million.

Q.    Okay.  Who all was involved at Pace-O-Matic in the development of the software code itself?

A.    Initially, it was myself and a gentleman named Bill Close.

Q.    Okay.

A.    And then others came on over the years.

Q.    Anybody named Unis involved in the process?

A.    No.

Q.    To be clear outside of this lawsuit, have you even heard of anybody called Unis?

A.    Never.

Q.    Was there any need for Pace-O-Matic to consult with anybody outside of Pace-O-Matic to develop its software program?

A.    Not at all.  We -- we had the in-house expertise to do that, including myself and also Michael.

Q.    Okay.  Sir, I'm going to show you a document marked for identification purposes as Exhibit 54A.  Do you see that screen?

A.    I see it.

MR. NEISER:  Could you show him the next page, A.J.? Let's go back to the top.

BY MR. NEISER:

Q.    Without describing its contents, what are we looking at, sir?

A.    This is the Pennsylvania Skill configuration file for the Pennsylvania build.  It is a file comparison within the Eclipse platform integrated development environment that we use to develop code with -- write code.

Q.    Eclipse is where you do the code work?

A.    Yes.  It's a code editor primarily and does a lot of other things, including file comparisons between versions.

Q.   Okay.  Can you tell us, sir, whether or not these images represent true and accurate copies of that screen?

A.   They do.

Q.   And you have personal knowledge of that?

A.   Well, yes.  I work in this platform every day and have for 20 years.

Q.   Okay.

A.   And, in fact, I created the file we're looking at.

MR. NEISER:  Your Honor, we offer Exhibit 54A into evidence.

THE COURT:  Any objection?

MR. ZEGARELLI:  Relevance, Your Honor.

THE COURT:  Exhibit 54A is admitted.

MR. NEISER:  Thank you, Your Honor.

BY MR. NEISER:

Q.   Okay.  So, Mr. Carter, we have a lot of stuff on the screen.  There are computer things.  Some things that we're going to talk about; some things that we won't.  But would you be able to direct us to -- here, let's look at this.

MR. NEISER:  A.J., on right hand of side, there are two screens side by side.  Can you enlarge the right-hand side, please?  Sorry for the false start on the question.

MR. SIMEONE:  Just --

MR. NEISER:  Just the right side.  The right side window, please.

BY MR. NEISER:

Q.    What are we looking at here, sir?

A.    Okay.  That is version 4053 of the Pennsylvania Skill configuration file that I believe was the initial version of that file that was checked in the first time.

Q.    I notice that there's some text on there that says, "Pen skill config," and beneath that, it says, "Menu title, Pennsylvania Skill."

Do you see that there, sir?

A.    Yes.

Q.    What's that mean?

A.    Well, penskillconfig is the name of the file, so dot JAVA file, meaning it's a Java source file.  And the Pennsylvania Skill, if you look to left of that, you see the menu title, "Pennsylvania Skill" is the value of the "Menu" title.  So in other words, that's what displays on the game "select menu" screen.

Q.    Okay.

MR. NEISER:  Zoom back out, please, A.J.  Can you zoom into the last three lines at the bottom of the document, please.

BY MR. NEISER:

Q.    What are we looking at there, sir?

A.    Well, those few lines are the initial versions of that file.  The bottommost line is the first one checked in, the 4053 version that I referenced.  That was checked in on February 7th,

2013, at 11:17 a.m.

Q.    Is that date of -- when you say checked in on February the 7th, 2013, are you saying that the information that appeared on the right-hand side of the screen we just looked at would have been checked in on that date?

A.    Correct.

Q.    So would it be fair to say that if the computer -- if the game were turned on, as of at least February 7, 2013, "Pennsylvania Skill" would be displayed at the top of the screen?

A.    Absolutely.

MR. NEISER:  Could I see Exhibit 28, please?

BY MR. NEISER:

Q.    Is that what it would look like, sir?

A.    Yes.

Q.    Thank you.

MR. NEISER:  38 Bravo, please.

BY MR. NEISER:

Q.    Sir, I'm showing you a document that's been marked for identification purposes as Exhibit 38 Bravo, or B.

MR. NEISER:  A.J., would you, please, scroll through when you get a second.

There it is.

BY MR. NEISER:

Q.    Sir, did you have a chance to see that document?

A.    Yes, sir.

Q.    Do you recognize it?

A.    I do.

Q.    Are you a recipient on the document?

A.    Yes.  I'm the first recipient in the list.

Q.    Do you believe this is a fair and accurate depiction of the entire email string?

A.    Yes.

Q.    And it's a email dated 12/19/2012?

A.    Yes.

MR. NEISER:  Your Honor, we offer Exhibit 38B into evidence.

THE COURT:  Is there any objection?

MR. ZEGARELLI:  No.

THE COURT:  Exhibit 38B is admitted.

MR. NEISER:  Can we please zoom in on PA-pen-skill.

BY MR. NEISER:

Q.    Sir, can you tell us what they're talking about here?

A.    Well, in the context of the email, it was a list of current projects that were ongoing on that date.  And this particular section is about Pennsylvania Skill, and some of the recent items that were being addressed, and it lists the Pennsylvania Skill text at the top of the "Game Select" screen, a note about the games, all games being included.  Then it has a hands counter that's turned off.  It has follow me -- the

"Follow Me" game, next puzzle preview features in there, and also progressive in the pay tables.

Q.   Understood.  And these are all features of the Pennsylvania game?

A.   Yes.

Q.   And it's true to say that this is what was being discussed and accurately reflects what would be depicted on the game as of 12/19/2012?

A.   Yes, and what features are included with the game.

MR. NEISER:  No further questions, Your Honor.

THE COURT:  Mr. Zegarelli, would you like to cross-examine?

MR. ZEGARELLI:  Yes, Your Honor.

CROSS-EXAMINATION

BY MR. ZEGARELLI:

Q.   Sir, there was a build number on the exhibit that was just admitted.  Did you see that, 404, version 404?

A.   Yes, sir.

Q.   It was not 402?

A.   Correct.

Q.   Okay.  And 402.44, that version is the version that was -- do you have an understanding that the version 402.44 was the version that was picked up in a controlled pickup in Beaver County, Pennsylvania?

A.   402.44?

Q.    Yes.

A.    Yes, I believe that's correct.

Q.    And the version that you showed on the screen was 404?

A.    Oh, was it 404?  Now that I think about it.  It was 402.  Yeah, whatever version -- it was headed dot 44 on the end.

Q.    It was 404?

A.    Okay.  You said 402 initially though, it was picked up.

Q.    402.44 was picked up.  The version on your screen was 404.

A.    Okay.  Correct.

Q.    Thank you.  No further question.

MR. NEISSER:  Brief redirect.

Can we have Exhibit 28, please?  A.J., could you please zoom in on last line on the screen?

REDIRECT EXAMINATION

BY MR. NEISSER:

Q.    Sir, what's software version is that?

A.    That's 402.44.

Q.    Not 404, 402?

A.    Correct.

Q.    No further questions.

THE COURT:  All right. Mr. Carter, thank you very much.  You may step down and you are excused.

(Witness excused.)

MR. NEISER:  Your Honor, we call Ryan Wood.

THE COURT:  All right.  Let's get Mr. Wood and bring him in to be sworn.

THE CLERK:  Sir, stand and raise your right hand.

RYAN WOOD, a witness herein, having been first duly sworn, was examined and testified as follows:

THE COURT:  Mr. Wood, you may take the witness stand, please.

THE WITNESS:  Thank you.

THE COURT:  Also feel free to adjust that microphone somewhere that's convenient for you.

MR. NEISER:  One second.

THE COURT:  Yes.

MR. NEISER:  May I proceed, Your Honor?

THE COURT:  You may.

DIRECT EXAMINATION

BY MR. NEISER:

Q.  Mr. Wood, how are you today?

A.  I'm good.  Yourself?

Q.  I love the pink tie.

A.  It's Valentine's.

Q.  It is Valentine's.

Introduce yourself, please.

A.  My name is Ryan Wood.  I am from Cumming, Georgia.

Q.  Okay.  Is that where you live now?

A.    I am.    I do.

Q.    Okay.    What do you do for a living?

A.    Well, other than raise five daughters under the age of 12, I am a sales consultant for Pace-O-Matic.

Q.    Great.

Have you ever been a full-time employee for Pace-O-Matic?

A.    I was.    I was a full-time employee from early 2013 to August of '21.

Q.    Okay.    Can you briefly describe your educational background?

A.    Sure.    I went to high school -- outside of Atlanta at South Gwinnett High School.    I went to college at Florida State University, achieved a bachelor degree there.    And started my career after that.

Q.    How did you start your career?

A.    I was in the golf business.    I worked for a company called Reynolds Plantation in -- on Lake Oconee in Georgia.

Q.    So let's talk about your work with Pace-O-Matic.

A.    Sure.

Q.    Tell us -- you said you started in 2013?

A.    Yes, January 2013.

Q.    Describe your roles and responsibilities at that time.

A.    I was hired as an account executive, and my roles and responsibilities were to interact with operators, which are our

customers, and build markets, create markets for Pace-O-Matic to put their software into.

Q.    Okay.  What all is involved in that process, sir?

A.    So a lot.  There's -- there's a legal process.  There is a political process that I was involved with.  And there's the educational process of branding and putting all -- putting all your efforts into educating all of your customers within that state or jurisdiction, as we called it.

Q.    Okay.  Do you recall being involved in a process called a "controlled" or "friendly pickup" regarding Pace software in Pennsylvania?

A.    Absolutely, yes.

Q.    What do you remember?

A.    Well, a lot.  We -- I started this project here in Pennsylvania in 2013.  Basically it was my initial goal when I first started working with Pace-O-Matic.  And I was introduced to an attorney by the name of Wayne DeLuca.  He and I worked together diligently to -- I provided him our game, brought it from Atlanta to his office, right down the street, and he would -- he took a look at it and was impressed and thought we had a good chance of getting it legalized in the State of Pennsylvania.  Well, it didn't stop there.  We then took it to Harrisburg, did demonstrations for PLCB.  And it -- that came about, and they said that they would do a controlled pickup, is what you're talking about, a friendly pickup, not -- what that

meant to me and what it meant to them was no one would be charged criminally. The machine would be seized, and we would go to court on the merits of the machine.

Q. Great. Thank you.

A. Sure.

Q. You mentioned a meeting in Harrisburg. I believe that's what you said. I don't want to mischaracterize it.

A. Yes.

Q. Who was involved in that meeting?

A. Corporal Goodling was the main attendant -- attendee from the state side. He had a couple of guys in his gaming unit sitting along. Mr. Pace was with me at the initial meeting, along with Robert Hawk, who was our -- over compliance of Pace-O-Matic at the time. And Wayne DeLuca was there. I believe that's it.

Q. Okay. And as a result of that meeting, did Pace-O-Matic or did yourself take any action?

A. Yes. We returned the machine back to Wayne, as it was, as we demoed it there, and it was his responsibility to find someone to place it out in the location.

Q. Okay. Now, to be clear, before we move on from that point, this game that we're talking about, where was it manufactured?

A. Atlanta.

Q. Where was it assembled?

A.   Atlanta, or Duluth, Georgia.  Right outside Atlanta.

Q.   So it was transported across state lines into Pennsylvania?

A.   That's correct.

Q.   All right.  So let's pick right back up where we were a second ago.

Mr. DeLuca has this game in his possession, and he needed an operator to put it out in Beaver County; is that fair?

A.   That is fair.

Q.   Could you please give us an idea of what dates approximately this occurred?

A.   Absolutely.  I believe our demonstration was sometime in the summer of 2013, and I know -- I think the machine was picked up in October of '13.  So the game was probably taken back to his office sometime in September, before -- you know, I know it took him around a month to find somebody to put it out.

Q.   Okay.  Do you know one way or the other if attorney DeLuca was considering other counties besides Beaver?

A.   I really don't know that answer.  The only -- the only thing that I knew of that it was close to his Sewickley office.

Q.   Understood.

A.   And that's why he chose that.

Q.   Okay.  Did it really matter who put the game out?

A.   No, not at all.

Q.   Did the controlled pickup actually happen?

A. Yes.

Q. Did anybody get charged?

A. No.

Q. Was there any fines?

A. Huh-uh.

Q. Nobody went to jail?

A. No one went to jail. And that was important for --

Q. What do you mean?

A. That was important for Pace. I mean, that was -- that was something we made very clear, that we wanted to happen.

Q. Understood.

A. For sure.

Q. To be very, very clear, sir, at the time of the controlled pickup, did you have any idea who the operator was who put the game out?

A. I did not. I asked and was told that they wanted to remain anonymous.

Q. Okay. Were you involved in the litigation in Beaver County?

A. I was along with Michael, we, you know, yes, I helped find expert witnesses and those kind of things. As far as involved in the trial, I was not. And I did not testify. I attended and that was it.

Q. You were there for the whole trial?

A. I was.

Q.    Were any of the Unises there?

A.    No, they were not.

Q.    Did they testify?

A.    No.

Q.    Were they consulted?

A.    No.  I didn't know who they were.  I do now.  So they were not there.

Q.    Okay.  So if they weren't there and they didn't testify, would it be fair to say they weren't needed?

A.    That's correct.

Q.    All right.  When did we get the Beaver County decision?

A.    It was a Merry Christmas.  It was December the 24th, 2014.

Q.    Okay.  Do you recall receiving some form of notice about the decision being handed down?

A.    I do.

Q.    What do you recall?

A.    It was vivid.  I received a fax at the Pace-O-Matic office and simultaneous a call from Wayne DeLuca.

Q.    What did you and Wayne talk about?

A.    We were ecstatic.  It was a good day.  Just talking about moving forward.  We, you know, my work -- I mean, I have been working for two years on this project, but my work really started then, you know, laying out a business plan, making sure

I'm touching all of the operators, making sure they understand the outcome of the court case, making sure we have marketing materials, you know, all of that stuff.

Q.    When you say "touching all of operators," what do you mean by that?

A.    Literally going -- going door-to-door at this point and letting them know, showing them, letting them play the machine, letting them Pennsylvania Skills as much as they can to understand it.  Because I can teach them, but they have to teach their locations.

Q.    Why?

A.    Because this is not a game of chance.  So it's -- it's very different than other things that are out in the marketplace.

Q.    Okay.  So you have to educate the operators to be able to educate the locations?

A.    Sure.

Q.    And the more games that go out, does that increase the market awareness and penetration?

A.    Absolutely.  I mean, if one -- if one bar or restaurant gets it in town, the next one, you know, wants it, and they need to know how to play it and, yes, so it's a snowball effect.

Q.    Okay.  I want to just distinguish one thing.

A.    Sure.

Q.   One second, please.

What's an operator?

A.   A coin machine operator is someone who has a nucleus of locations.  It could be 25, it could be 500.  They operate your pool tables, your jukeboxes, all of -- all your kids' games in certain locations.  They operate all of those things.  They collect the money.  They pay the locations out.  They are responsible for the taxes and things.  They have trucks.  They have, you know, it's a real business.

Q.   And the same would be said for electronic skill games?

A.   Yeah, absolutely.

Q.   Okay.  So what's the difference between an operator and the location?

A.   Location is ABC restaurant, your Applebee's or something like that.  An operator has 50 of those, or like I said, you know, hundreds of.  They travel around and maintain the machines, collect the money out of them, pay the location, meaning pay the Applebee's their percentage, and they take theirs.

Q.   Understood.

A.   Yep.

Q.   So when you said you were working between the date of the controlled pickup and the date of the decision and then you worked in the market after the decision, were you focusing on any specific region or county?

A.   No.

Q.   It was the entire commonwealth?

A.   Yes.

Q.   Do you recall the first time you heard of Albert Unis III?

A.   Yes.  It was early January of 2015.

Q.   How did you find out about him?

A.   Wayne DeLuca.

Q.   Tell me about that.

A.   Wayne called and said, I want to introduce you to the gentleman who put the game out and the location where it was picked up.

And I cannot recall if he called me or if I called him, but Wayne also said that, you know, he'd do -- do him a solid, give him good pricing to get him started.  But we had several conversations leading up to that.

Q.   So you ultimately spoke to Mr. Unis?

A.   I did.

Q.   Do you recall what you discussed?

A.   Yeah, I did.

Q.   What did you talk about?

A.   It was -- it started out fairly adversarial, actually. I was trying to explain our business model.  Our business model is -- is unique compared to, I think, what he was used to.

Q.   Okay.

A.   And, you know, we had certain percentages that -- you know, the operator and the location split their percentages.  We took some of the percentage on the ongoing revenue, and he had -- he did not understand that.  We had rules in place because Pennsylvania Skill was the only adjudicated game in Pennsylvania.

Q.   Understood.

A.   You know, we had -- we had rules in place that he wasn't quite aware of because I had never spoken to him.

Q.   Okay.  There was a bit of a learning curve.  Would that be fair?

A.   Yes, uh-huh.

Q.   Do you recall discussing any, let's say, points for a deal or an agreement involving Mr. Unis and Pace-O-Matic?

A.   Uh-huh.  Yes.  Yes, I do.

Q.   And the court reporter, though she has many powers, she cannot pick up "uh-huhs" or nods of the head.

A.   I understand.  My apologies.

Q.   No, that's quite all right.

MR. NEISER:  Let's put up 26, please.

BY MR. NEISER:

Q.   Okay.  Do you remember sending this email?

A.   Yes.  I've seen it.

Q.   And I'll say for the record, this is Exhibit 26.  It's already in evidence, and we discussed it a little bit ago.  This

is an email from you dated January 14, 2015, and it's addressed to a mom Unis.  Who is mom Unis?

A.    That was the email that Albert Sr. gave me.

Q.    Okay.  And, to be clear, in the subject line, it says "Pace-O-Matic/Albert Unis Agreement."  Are we talking about Albert Unis III or IV?

A.    The father, the III.

Q.    You know, I note something.  There are some attachments to this email.

Do you see that?

A.    I do.

Q.    Okay.  And is it your testimony that those attachments were sent with this email?

A.    Yes.

Q.    Okay.

MR. NEISER:  Let's zoom in on the first paragraph, please.  Okay.

BY MR. NEISER:

Q.    Before we get started, did Mr. Unis make any representations to you about the type of business that he was planning on doing?

A.    Oh, quite a bit.

Q.    Tell us what he said.

A.    That he has relationships with all of the bars and restaurants in Beaver County, he's grown up here his whole life,

that he would have no problems putting hundreds and hundreds of machines out in a matter of months.

Q. Really?

A. That's correct.

Q. Is that why you sent this email?

A. That is -- that is why I sent this email.

Q. Okay. So I want to be clear.

THE COURT: Just excuse me just a moment.

Would you like some water? Do you need a break?

JUROR: No.

MR. NEISER: May I proceed, Your Honor?

THE COURT: Let's at least wait for Ms. Kim. I know she was going to get water.

MR. NEISER: Very good. Thank you.

Mr. Wood, you okay, have enough water?

THE WITNESS: Absolutely.

MR. NEISER: Okay. Thank you.

THE COURT: You can go ahead, Mr. Neiser.

MR. NEISER: Thank you.

BY MR. NEISER:

Q. So I believe you just said that you sent this email as -- based on representations for Mr. Unis about the level of business he was going to do in Beaver County; is that fair?

A. Yes.

Q. Okay. Now, let me ask you this: What was -- was

this -- I'm not going to put your words in your mouth.  What was the purpose of you sending him this email?

A.   This was after I spoke to him; then spoke to Wayne on several accounts.  Things had settled down.  This was starting the negotiation for just some points that he wanted.  He had a lot of things that he wanted, and I was trying to document those to start a dialogue.

Q.   Okay.  So would it be fair to say that this is a recitation of what -- partially of what Mr. Unis was asking for?

A.   Sure.

Q.   Okay.  And did you have an understanding as to how many machines he said he was going to buy in exchange for any type of deal?

A.   Yeah.  He continued to say hundreds and hundreds, you know, until he exhausted all of the accounts in Beaver County.  Or all of the ones that he knew about.

Q.   Fair enough.  Is there a price incentive in this email?

A.   Yes.

Q.   Okay.  Is that where you mentioned the fill credit on machines worth $1,000 in earnings to help you with placement fees?  Is that what that is?

A.   Yes.

Q.   Was there also an equipment discount?

A.   Yes.

MR. NEISER:  Now, I'd like to focus in on the fourth sentence, A.J.  Meaning if -- if you need to just highlight it, that's fine.

BY MR. NEISER:

Q.    Do you see that sentence, sir?

A.    Yes, sir.

Q.    Do you recall what you meant by that?

A.    Yeah.

Q.    Can you tell us what it is?

A.    Yeah, if -- as he was buying all of these machines, his request was, I don't want some -- somebody putting machines in my backyard if I'm buying hundreds and hundreds of machines.

So I told him that, absolutely, if a location called me, that I would give him a, you know, sales lead and made sure that he had the inventory or he's bought the inventory to service that account.

Q.    From that -- from this point forward, negotiations began to create a formal contract.  Would that be fair?

A.    Yes.  This was prior to me even meeting Albert.

Q.    Really?

A.    Yeah.

Q.    Okay.

MR. NEISER:  Let's zoom back out.  Can we go to the first attachment, A.J.?

BY MR. NEISER:

Q.    And I want to confirm, this was sent to the email directed by the Unises; is that correct?

A.    Uh-huh.

Q.    Yes?

A.    Yes.  Sorry.

Q.    And that's an email address that you commonly used to send communications to them?

A.    That was the only email I had at the time.

Q.    Understood.

MR. NEISER:  So let's look at the first attachment, please.  Zoom in a little bit.  Thank you.

BY MR. NEISER:

Q.    What is that?

A.    That is our countertop product that Pace-O-Matic created.

Q.    Okay.  And this was sent to -- that's one of the attachments, it says "Countertop.PMG."  Would that be fair?

A.    Yes.

MR. NEISER:  Okay.  Next one, A.J.  Zoom in on that.

BY MR. NEISER:

Q.    What's that?

A.    That's our smaller stand-up cabinet called the Spartan.  It's a little lower profile than our larger cabinet.

Q.    Okay.  And that was one of the attachments you sent to him?

A.    Yes.

Q.    Okay.  You may not know this, but there was a version of the Spartan cabinet that was in the courtroom earlier in the case.

MR. NEISER:  Next attachment, please.  Enlarge.

BY MR. NEISER:

Q.    What's that?

A.    That's our larger unit.  It can be used as a sit-down or a stand-up cabinet.  Specs from the side, it's our Flex I cabinet, Pace-O-Matic Flex I.

Q.    I want to -- say that one more time slightly slower.

A.    Sure.  It's our larger cabinet that can be used as a sit-down or a stand-up cabinet.  It's our Flex I cabinet that Pace-O-Matic created.

Q.    Okay.  And then I really want you to look at the next one.  What's that?

A.    That's the flyer that we created.

Q.    So you're saying that, in the first communication with the Unises, you sent them a copy of that?

A.    I did, along with many other operators in the state.

Q.    Understood.  So what was this used for?

A.    For operators to see our games.  And it was important because of -- this industry, people try to copy things and do things they shouldn't.  So I wanted to make sure they knew exactly which games were on our platform.

Q.   Did you receive a response from Mr. Unis saying, Hey, that's our name?

A.   No.

Q.   He didn't object to it?

A.   He did not.

Q.   From that time, early in 2015 -- actually, here, let me ask you this.

MR. NEISER:  We can take that down.

Or I can take it down.

BY MR. NEISER:

Q.   Sir, what was your next interaction with Mr. Unis subsequent to this email?

A.   I had some more dialogue with our attorney, Wayne DeLuca, who was obviously speaking with Albert as well, and we had -- we set a meeting in the Sewickley office.  I was there. This was -- would have been mid to late January, if I recall.  I was there.  Mr. Miele was there.  Albert was there.  Wayne DeLuca was there.  And I believe Albert had someone with him.  I don't recall who that was.

Q.   What was discussed?

A.   It was basically we rehashed what was discussed on the phone, and we explained our business model so he would understand it, walked him through all of the credits and all of the advantages he had as far as pricing.  The meeting was cordial and, in fact, so much so that Lou and I, Lou Miele and I

rode around Beaver County with Albert Unis after -- after meeting.

Q.   To be clear, it was the father, not the son?

A.   The father.

Q.   Was the son involved at all?

A.   No.

Q.   During that conversation -- that meeting, were there any conversations regarding a trademark?

A.   No.

Q.   Was there any conversations about the use of the name "Pennsylvania Skill"?

A.   No.

Q.   Did at any time Mr. Unis said, Hey, I met Michael Pace three years earlier at a trade show, and he was going to jointly develop a software program with me?

MR. ZEGARELLI:  Leading.

THE WITNESS:  No, he did not.

THE COURT:  I'm sorry.

MR. ZEGARELLI:  Objection; leading.

THE COURT:  Sustained.

MR. NEISER:  I'll move on, Your Honor.

BY MR. NEISER:

Q.   During that meeting, was there any conversation involving any prior agreements with Mr. Unis?

A.   No.

Q.    Was there any discussion of an exclusive deal?

A.    No.  No.

Q.    Not in that meeting?

A.    Not in that meeting.

Q.    When you went on the road with Mr. Unis, did he tell you any more or give you any more detail about the amount of business that he was going to do with Pace-O-Matic?

A.    Yes.  That was the purpose of our field trip -- I'd like to call it that.  We drove around for a couple of hours, and he pointed out and said how he knew this, you know, location and who owned this location.  In fact, we even stopped in three or four locations where he was running other equipment.

So, yes, he -- over and over, he continued to say how he knew everybody in Beaver County and this was not going to be an issue to put out hundreds and hundreds of pieces of equipment.

Q.    Understood.

MR. NEISER:  Let's look at Exhibit 36, please.

BY MR. NEISER:

Q.    Sir, I'm showing you a document marked for identification purposes as Exhibit 36.  Do you recognize it?

A.    I do.

Q.    Did you author this email?

A.    I did.

Q.    And what's the date on it?

A.   The 29th of January, 2015.

Q.   Okay.  And can you confirm for us whether or not this is a complete email screen?  Is that a complete email?

A.   Yes.

Q.   Okay.  Thank you.

MR. NEISER:  Your Honor, we offer 36 into evidence.

THE COURT:  Any objection?

MR. ZEGARELLI:  No objection.

THE COURT:  Exhibit 36 is admitted.

BY MR. NEISER:

Q.   Okay.  So let's zoom in on the top half that says, Prices and fill price, A.J.  Thank you, sir.

All right.  First off, what's the purpose of this email?

A.   It was to give Danny Warren some bullet points as to what Albert and I discussed.  So he could form a draft of an agreement.

Q.   Okay.  Why did you have to give it to Danny Warren?

A.   I wasn't -- at that time, I was not authorized to make any agreements in Pace-O-Matic.

Q.   Understood.

So Mr. Warren would have been?

A.   Yes.

Q.   And this is why you're providing this information to him?

A.    Sure.

Q.    And so why did you list the prices and the fill price there?

A.    Because they were discounted from what the rest of the marketplace was.

Q.    Okay.  Was he supposed to receive a better price than anyone in Pennsylvania or just in that particular market?

A.    Just in that particular market.

Q.    You know, and I have to apologize for this, but, sir, nobody's explained how a fill works.  Can you tell us in maybe 30 seconds or less?

A.    Oh, should have asked Michael that now.

No, a license fee is like what I like to call it, or fill.  So basically, it's a tool that we used to make sure the operate's successful before we make money.  What I say is, they earn a certain amount of money, and then the machine basically goes idle, and they have to refill it, kind of like a gas tank, drive further, refill it.  When we -- our revenue is the fill dollars that come in.

Q.    Understood.

A.    Yep.

Q.    So the machine needs to be replenished from time to time?

A.    Yes.

Q.    It can run out of plays?

A.    That's correct.

MR. NEISER:  Zoom out, please, A.J.  Let's zoom into performance.

BY MR. NEISER:

Q.    Now, where did you get these points from, by the way?  You're writing this information and email.  Where did this come from?

A.    This came from Albert, actually.  Albert, I think if you notice in -- it might be in this email, maybe the one before, but was needing financing and was approved for 25.  So that's where -- that's where I got the 25 from.  But there was no right of first refusal or anything without performance.

Q.    Okay.  So that was your understanding of at least the beginnings of a --

A.    Yes.  This was basically minimums, which I didn't include that, but that's kind of what he was discussing.

Q.    So you're saying, if you want to -- if you want something, you have to buy something in exchange for it; right?

A.    Sure.

Q.    As a matter of fact, let put 26 back up, please.

MR. NEISER:  Actually, A.J., do you have that laser pointer?  This might make it a little faster and easier.  Let's zoom into the first paragraph, please.  A little bit bigger, please, for those of us that are ocularly impaired.

BY MR. NEISER:

Q.   Okay.  So it doesn't work as advertised.

So it says, finally, I want to mention -- let's see here.  Lou Miele will be sending your invoice to you and Firestone as soon as we get a hold of Peter (Firestone).

Do you see that, sir?

A.   I do.

Q.   Is that the financing you're talking about?

A.   Yes.

Q.   Good.

MR. NEISER:  You can take it down, A.J.  Let's go back to the last Exhibit 36.  And highlight Restrictions.

BY MR. NEISER:

Q.   Now, let's look at the very first one.  It says, No sales into Beaver County unless Albert Unis and affiliates refuse to place machines.

Do you see that?

A.   Uh-huh.

Q.   Yes?

A.   Yes.

Q.   Okay.  Did that language change over time?

A.   Yes.

Q.   Okay.  And below that it says, Miele Manufacturing and POM will commit to marketing efforts coordinating through Albert.

Do you see that?

A.    I do.

Q.    Do you have a recollection of what marketing efforts meant?

A.    Yeah.  They wanted our -- our marketing material to provide to their locations.  To take it one step further, we offered or are going to help them by actually attending some of their location meetings to educate them on the brand, educate them on the game.  Everything we did with every other operator.

Q.    Understood.

So there's more to it than just selling a piece of equipment or fill?

A.    Absolutely.

Q.    Because as you're developing the relationships with the operator, they're developing relationships with locations; is that fair?

A.    That's correct.

Q.    And is developing -- how important is developing relationships with locations to developing the overall brand in the market?

A.    It's very important.  So if -- so a lot of operators have actually contractual agreements with their locations.

Q.    Understood.

A.    So they have to build their credibility to achieve those.

Q.    Understood.

MR. NEISER:  Exhibit 5, please.

BY MR. NEISER:

Q.   Sir, I'm showing you a document that's been marked for identification purposes as Exhibit 5.

Do you see that?

A.   I do.

Q.   What is it?

A.   This was the first, I guess, executed agreement from Albert and Pace-O-Matic, between Albert and Pace-O-Matic.

Q.   Do you believe this is a true and accurate copy of that document?

A.   I do.

Q.   Do you have any reason to disbelieve it's a true and accurate copy of the document?

A.   Do I have a reason to --

Q.   Yeah, disbelieve.

A.   No, I do not.

Q.   Okay.

MR. NEISER:  We offer Exhibit 5, Your Honor.

THE COURT:  Any objection?

MR. ZEGARELLI:  No objection.

THE COURT:  Exhibit 5 is admitted.

BY MR. NEISER:

Q.   So let's talk about this for a second.

A.   Sure.

Q.   First paragraph, please.

This is an agreement effective January 29, 2015, between Pace-O-Matic, Inc., and Miele and Albert Unis and affiliates.

Do you see that?

A.   I do.

Q.   What is an Albert Unis affiliate?

A.   Albert III.

Q.   It's Albert III?

A.   Albert Unis III, yes, is all I knew.

Q.   Okay.  And the third "whereas" or the second "whereas" says, Whereas POM is selling terminals to AUA to place in Beaver County, Pennsylvania, under the following terms.

Do you see that there, sir?

A.   I do.

Q.   Zoom back out, please, A.J. and zoom in on the four bullet points.

I'd like to talk about these bullet points, sir.  I noticed we talk about fills and equipment and then we talk about some other things.

Can you please describe these four bullet points and how they work together?

A.   Sure.

Q.   Tell us about that.

A.   The first one is the pricing that, you know, Wayne

DeLuca had asked us to provide.  Albert, that one correlates with the fill pricing as well.  It's a discounted or a rebated fill price that Wayne, you know, instructed us to do for Albert.

Q.   Sir, just is that why it says, AUA help in legal matter?  Is that what it is?

A.   Yes.

Q.   Is it your testimony those first two bullet points go together?

A.   Yeah.

Q.   Okay.  And what is the reason why you put those two bullet points in there?

A.   Well, two reasons.  They deal with pricing and they came from Wayne, saying make sure to give this gentleman good pricing.

Q.   So is it your testimony that Wayne asked for that to be there because he helped put the game out?

A.   Yes.

Q.   Okay.  What about the second two bullet points?

A.   Those came from Albert and I.

Q.   So you're saying the first two came from Wayne, the second two came from Albert?

A.   Yes.

Q.   Okay.  So tell us about the first bullet point.  The AUA commits to purchase 25 terminals.  Please review that.

A.   Yeah, just like the exhibit we viewed previously.  It

was the 25 games and the continue to purchase games month after month after month as a minimum.  And then for that he wanted, AUA wanted a right of first refusal.

Q.    Okay.  And the language that's included in this agreement as of that date says, POM agrees to not sell terminals in Beaver County unless AUA refuses to place terminals in the location in question.

Do you see that there?

A.    I do.

Q.    Sir, did that language change over time?

A.    Yes.

Q.    Okay.

MR. NEISER:  Zoom back out, A.J.  And then let's zoom in on Other.

BY MR. NEISER:

Q.    Actually, let's go through both.  The first one says, POM will commit to support AUA with an agreed upon marketing efforts.

Do you see that?

A.    I do.

Q.    What's that mean?

A.    Similar to the last exhibit.  He wanted all of the help he could get educating his locations on our product.

Q.    Did he discuss a trademark with you?

A.    He did not.

Q.   Did he tell you that marketing efforts meant a trademark?

A.   He did not.

Q.   Did he mention that marketing efforts meant he would let you use a trademark up until the point where you couldn't use a trademark?

A.   No.

Q.   Did the words "trademark" ever even come out of his mouth?

A.   Never.

Q.   And then, below that it says, POM agrees to discuss increased fill rebates (discounts) to AUA once AUA has purchased 100 terminals from POM.

     Do you see that?

A.   Yes.

Q.   Why is that there?

A.   The more machines he buys, the better deal he gets.

Q.   Would it be fair to say you contemplated that he was going to buy even more machines than what was in the agreement?

A.   Absolutely.

Q.   So let's zoom back out.  Where it says, a minimum of ten terminals -- highlight the third bullet point.

     I want to make sure I understand your testimony fully here.

     This reference to a minimum of ten terminals per month

three months after delivery of the first order, was there an end point on purchasing the ten terminals?

A.    No.  Again, minimum is the keyword.  This was just documented to where there was terminals going out to Albert.

Q.    So if he wanted to keep his agreement going, he had to keep buying equipment?

A.    Correct.

MR. NEISER:  Take it down.  Exhibit 6, please.

BY MR. NEISER:

Q.    Okay.  Now, let's go through this just briefly.  First off, after that Exhibit 5, that agreement with Albert Unis and affiliates -- I'm going to take this down for one second -- was there any other involvement or inaction with Mr. Unis or his son?

A.    Not as far as to the agreement, no.

Q.    Okay.  Do you recall the Unises going down to Georgia?

A.    I do.

Q.    What do you recall from that?

A.    I remember Albert calling me fairly randomly and saying he was coming down to offer a payment and pick up some equipment and that he would be in Atlanta at some point.  He gave a date.  I don't remember the date.  I believe there's an email.

Q.    Do you recall sending an email to Mr. Pace and Mr. Warren telling them that Albert would be coming down to

Georgia?

A.    I do.

Q.    Do you recall that email saying that this is the operator who will be putting out all of the machines?

MR. NEISER:  Actually, Exhibit 25.  Thank you.  Zoom in on the second paragraph.

BY MR. NEISER:

Q.    Do you remember sending that email?

A.    I do.

Q.    When you say, "Who is putting out all of the machines," what do you mean there?

A.    Who is -- who is putting out all of the machines, who is covering Beaver County, what he described he was going to do.

Q.    Okay.  Is this a representation to you that you agreed that he would get an exclusive deal in Beaver County?

A.    Absolutely not.

Q.    Okay.  We can take that down.

Did you meet with Mr. Unis and his son when they came down to Georgia that -- for that week?

A.    Yeah.  Excuse me.  Yes, briefly.

Q.    What did you discuss?

A.    Nothing as far as the agreement, to my knowledge.  I think it was more of an introductory, just -- I met Albert.  Obviously he wanted to meet Michael and Danny.

Q.    Okay.

A.   That was it.

Q.   And was there a discussion of a trademark?

A.   No.

Q.   A discussion of an exclusive?

A.   No.

Q.   Do you recall the next time you talked with him?  When I say "them," I mean either one of the Unises.

A.   Not vividly.  I mean, Albert would call me with a question on a software or something or -- but I was -- I was basically out of it as far as -- as far as dealing.  They didn't really -- there was not much dialogue between us.

Q.   Okay.  Did anybody at Pace-O-Matic take over working with the Unises from that point?

A.   Yeah.  Danny Warren, who was over in accounting, which was needed, and Michael stepped in and helped where he could as well.

Q.   Okay.  Do you recall seeing any advertising by Pace-O-Matic for the Pennsylvania Skill game?

A.   Quite a bit.

Q.   Did you receive calls from operators as a result of those advertisements?

A.   Absolutely.

Q.   Were those advertisements local, regional, national? What were they?

A.   All of the above.  They were local.  They were in the

State of Pennsylvania.  They were -- and they were national as well.

Q.   Okay.

MR. NEISER:  Let's put Exhibit 6 up, please.

BY MR. NEISER:

Q.   First, before I enlarge this, were you involved in the negotiations related to this agreement?

A.   Not really, no.

Q.   When you say "not really," what do you mean?  Let's make sure we're clear.

A.   I got us up to the January point, and then I let Danny and Michael and legal handle this agreement.

Q.   Understood.

Let's go down to -- well, first off, let's look at the third paragraph.

MR. NEISER:  No, I'm sorry.  Third -- the second "whereas."  I'm sorry, A.J.

BY MR. NEISER:

Q.   So at the point of this agreement, it says, "Seller" -- and that is Pace-O-Matic and Miele -- "has successfully litigated the legality of the Pennsylvania Skill game compliant terminals in the Beaver County Court of Common Pleas."  Do you see that?

A.   I do.

Q.   The litigation had been over and done for about six

months at that point?

A.    That's correct.

Q.    Okay.  And it doesn't say that the buyer successfully litigated.  It says seller successfully litigated; is that correct?

A.    That's correct.

Q.    Now we can go down to numbered paragraph 1 and see A and B.

Sir, did that represent a discount from your rack rate or list prices?

A.    It does, and it's actually a deeper discount than what I suggested previously.  But, yes, it is a discounted rate.

Q.    You're saying that in this agreement, they actually got better equipment and -- or hardware prices than the January 29th agreement?

A.    Yes.

MR. NEISER:  Could I see Exhibit 5, please?  First let's look at this.  Let's see.  Flex I, terminal complete, 2495.  Let's see Exhibit 5.

Zoom in on the second bullet point -- or the first one, I'm sorry.

BY MR. NEISER:

Q.    2,600.  They got better pricing than the previous agreement; is that correct?

A.    Yes.

Q.   Okay.

MR. NEISER:   Let's take it down and go to paragraph 4 of the Equipment Purchase Agreement.  Let's zoom in on that, please, A.J.

BY MR. NEISER:

Q.   Now, let's get to the meat of this thing.  This is called a "right of first refusal," is it not?

A.   It is.

Q.   All right.

MR. NEISER:  And can we highlight that "if buyer opts," sentence, A.J., please?

That's close enough for government work.

Can we keep that up on the screen, and then pull up Exhibit 5, please.  I want to do a top/bottom just like you did on the last one, if you don't mind.  I'd like for you to highlight, if you don't mind, the bottom bullet point, please.

I would like for you to highlight on the bottom bullet point everything from "POM" to "AUA refuses."

BY MR. NEISER:

Q.   Do you see that there, sir?

A.   I do.

Q.   So the bottom is the January 29, 2015, agreement and the top is the May 2015 agreement; is that correct?

A.   It is.

Q.   And the language of the right of first refusal is

different, is it not?

A.   Very much so.

Q.   Very much so.  So it goes in January -- I want to make sure I'm doing this right -- POM agrees to not sell terminals in Beaver County unless AUA refuses to -- if buyer opts not to place compliant terminals in certain Beaver County locations, then seller, through another vendor, may place the above described compliant terminals in those in locations.

Do you see that?

A.   I do.

Q.   They're different, aren't they?

A.   Very.

Q.   Sir, was there a performance requirement in the Equipment Purchase Agreement?

A.   No.  No, there was not, and that's why the language is much different.

Q.   How is that supposed to function in the real world?

A.   You have -- you have plenty of time to cover all of the locations that you can.

Q.   Okay.

A.   And if you can't, then obviously those locations don't want to do business with you, and we have got to sell games into the -- into the county.

Q.   And, well, let's see how this would work if -- if it happened.  It says if buyer opts not to place compliant

terminals.  I'm trying to figure out how this mechanically could work.  Is this -- are you relying on a phone call from somebody?  How is this supposed to work for you?

A.   It's -- it's tough.  But, you know, if -- if AUA was to go and say we're working on this location and the location called and wanted to try to buy equipment, obviously we would not allow it to happen.

Q.   Okay.

A.   But, yeah.  It's --

Q.   Let me ask you this.  Let's go back to -- I'm not asking you a very good question, sir.

Exhibit 26.

MR. NEISER:  You don't need to enlarge that, A.J.

BY MR. NEISER:

Q.   There's a reference about a location or operator calling us about machines.  Do you see that there?

A.   I do.

Q.   And then when we look at the Equipment Purchase Agreement and that right of first refusal there and it talks about opt not to place terminals, how does that, work, though?

A.   Meaning if a location -- if a location wants -- wants Pennsylvania Skill Games and they call us, we would provide Albert a sales lead.

Q.   Understood.  And that's how the Equipment Purchase Agreement was supposed to work?

A.    Yes.

Q.    Okay.  Let's take that down.

MR. PACE:  Your Honor, can I use the restroom?

THE COURT:  Of course.  Why don't we take our afternoon break if it's a good point for you, Mr. Neiser.

MR. NEISER:  Yes.

THE COURT:  Ladies and gentlemen, we'll see you back here in 15 minutes at ten minutes after.

(Pause as the jury exits courtroom.)

(Whereupon, a recess was taken.)

(Pause as the jury enters courtroom.)

THE COURT:  Please be seated, everyone.

MR. NEISER:  May I proceed, Your Honor?

THE COURT:  You may, Mr. Neiser.

MR. NEISER:  Thank you, Your Honor.

BY MR. NEISER:

Q.    Sir, we just talked about the Equipment Purchase Agreement and how the right of first refusal would work.

To your recollection, did we ever receive a call from a location to give a sales lead Pennsylvania Skill Games, LLC?

A.    I did not, personally.  No, that would have been handled by Mr. Miele.

Q.    I'd like to show you a document marked for identification purposes as Exhibit 39.  Do you see that there, sir?

MR. NEISER:  Can we scroll through it, please?

BY MR. NEISER:

Q.  Is it up on your screen?

A.  Yes, it is.

MR. NEISER:  Have you gone through the entire document, A.J.?  Do it briefly.

BY MR. NEISER:

Q.  Sir, do you recognize this document?

A.  I do.

Q.  It's a series of documents.  I don't know if it's one continuous one or several, but do you recognize them?

A.  I do.

Q.  How do you recognize them?

A.  It's Pace-O-Matic sales invoice to an operator out of Pottsville, Pennsylvania, for -- I believe it was 25 machines.

Q.  Are these invoices true and accurate, to the best of your recollection?

A.  They are.

Q.  Do you remember being the salesperson who was involved in this transaction?

A.  I was.

MR. NEISER:  Your Honor, we offer Exhibit 28 into evidence.

THE COURT:  Is that 39?

MR. NEISER:  Oh, I'm sorry, Your Honor.  Exhibit 39.

Thank you.

MR. ZEGARELLI:  No objection.

THE COURT:  Exhibit 39 is admitted.

MR. NEISER:  Okay.

Your Honor, does the jury need instruction on the redacted, or are we good from earlier.

THE COURT:  Ladies and gentlemen, I want to remind you when you see black areas that appear at various points on the invoices, that represents, again, a redaction, which just means certain information has been hidden from view for reasons that you don't need to be concerned about.

MR. NEISER:  Thank you, Your Honor.

BY MR. NEISER:

Q.  What are we looking at here?

A.  A Pace-O-Matic sales invoice for 25 cabinets.

Q.  Do you know what type of games were on them?

A.  Pennsylvania Skill.

Q.  What's the date?

A.  This ship date is -- looks to be September 16, 2013.

Q.  Okay.  Do you know if these games were actually put out on the street at that time?

A.  I know for an absolute fact that they were not.

Q.  Really?  Why not?

A.  Because they were in a warehouse until the court decision came out.

Q.    Then why did you sell the game before you had a court decision?

A.    Well, unfortunately for me and this customer, we were thinking the process was going to be a little quicker.  Again, we started it in June of '13, and, unfortunately, it didn't finish until December of '14.  So we sat on these.

Q.    Okay.  Understood.  So is it your testimony that, as of sometime in September of 2013, Pace had sold, across state lines, complete gaming terminals with the Pennsylvania software on them?

A.    Yes.

Q.    Would you be able to recognize what the screen would have looked like on that particular model and that particular version of software if I showed it to you?

A.    Yes.

MR. NEISER:  Can you put up 28, please?

BY MR. NEISER:

Q.    Is that what it would have looked like?

A.    That would be it.

Q.    You're sure?

A.    I'm positive.

Q.    We looked at the Equipment Purchase Agreement, and I believe it is the Unises had a company called Pennsylvania Skill Games, LLC.

Do you recall that?

A.   I do.

Q.   Approximately, when was the first time you heard of a business called Pennsylvania Skill Games, LLC?

A.   It was after the document was executed sometime after May 20th.  Whenever that was executed, it was after that is when I first heard about.

Q.   Okay.  So after the Beaver County decision, can you please describe Pace's marketing efforts to build the brand in Pennsylvania and elsewhere?

A.   They're extensive.  Not only do we market to the entire State of Pennsylvania, as stated before, we marketed to the entire United States.  We attended trade shows, multiple trade shows every year with Pennsylvania Skill product, and our idea was to show what we've done in Pennsylvania and take it to other states.  So we actually had the Pennsylvania Skill everywhere, nationally, locally, and statewide here.  Magazines, newspapers, every -- every operator was given a promotional kit, which had Pennsylvania Skill, you know, coasters, you know, bottle openers, all of the things that you see at bars and restaurants that advertise.

Q.   And based upon that -- those marketing and advertising efforts, did you receive contacts and maybe sales leads from operators that then wanted to buy your game?

A.   Yes.

Q.   To buy specifically your game?

A.    Correct.

MR. NEISER:  No further questions, Your Honor.

THE COURT:  Thank you, Mr. Neiser.

MR. NEISER:  Thank you, Your Honor.

THE COURT:  Mr. Zegarelli, cross-examination?

MR. ZEGARELLI:  Thank you, Your Honor.

I'd like to ask the court reporter to read back the testimony that I marked during the break approximately 112, please.

MR. NEISER:  Your Honor, is this impeachment?  I think it's improper impeachment.  We haven't asked him a question yet.

THE COURT:  Yeah, I think we'll reserve judgment on that, Mr. Zegarelli, until I understand the purpose of that.

MR. ZEGARELLI:  Okay.

                    CROSS-EXAMINATION

BY MR. ZEGARELLI:

    Q.    Mr. Wood, do you recall testimony where you had indicated that you had operators -- do you recall testimony where you had testified that the relationship with -- a telephone call or a conversation between you and Albert Unis III started out adversarial and you had indicated that there were certain splits between the operator and the locations, splitting the percentages?

You said, We took some percentage on the ongoing revenue and he didn't understand that.  We had -- we had rules

in place because Pennsylvania Skill is the only adjudicated game in Pennsylvania.

Do you remember that testimony?

A.   I do.

Q.   Okay.  And the rules that you're referring to, are they written anywhere?

A.   As far as on -- yes, I'm sure they're written somewhere.  I don't know that they were written on the agreement that we were discussing at time of that testimony.

Q.   Okay.  And where are they written, even if not in the agreement?

A.   I'm not exactly sure the exact document.  But I know that they were -- they were written down and distributed to the operators.

Q.   Okay.  And that gets me to the second part of the testimony.  You said, when you were talking about your email at Exhibit 26, which is the one that had the grid on it and some pictures attached, you said -- and I think you -- the question is, So you're saying in the first communication with the Unises, you sent them a copy of that.

You said, I did, along with many other operators in the state.

How many operators were in the state at the time of your email in Exhibit 26?  In the State of Pennsylvania?

A.   How many operators?

Q. Yes.

A. That I knew of?

Q. Yes.

A. We were members of the PAMMA association, which is the operator association here in Pennsylvania. I don't know exactly how many members that they had, but those were really the operators that I knew of at the time. So I would say 40 or 50 is the ones that I knew of.

Q. So are you saying, though, that -- isn't it true that only Pennsylvania Skill Games, LLC, was -- at the time you wrote that, your email, was the only operator for which you had actual orders for placement? So not all of the operators might exist in some organization called PAMMA. Operators that you had for Pennsylvania Skill-branded games with Pace-O-Matic software in Pennsylvania?

A. Well, they were all customers of mine.

Q. I'm not saying are they customers.

How many operators -- at the time you wrote your email on January 14, 2015, how many operators had, at that point, placed orders for Pennsylvania Skill-branded Pace-O-Matic games?

A. To my recollection, at least four.

Q. Okay. Who were they?

A. They were Dell Greeny. Greeny and Sons, I believe, is his company name. Or Frank Greeny. They were PA Games. John Bancheck was the owner of the company. I cannot think of the

company's name right now.  And I believe Mac Vending and also -- well, I don't know if it was before then.  So those are four that I know of.

Q.   Okay.  So would it surprise you -- now, we did see some invoices with regard to PA Games, and that was Exhibit 39.  But we have not seen any documentation with regard to any other orders that you're testifying to now.

A.   That's fair, because they were put on hold until we had the successful case, because we weren't going to build and ship games at -- knowing that we were going to not be successful or be successful in the court.

Q.   Okay.  And when was the first time, for example, you had a sale to Mac Vending since they were -- I think you testified they would have been on hold.  When did you first sell to Mac Vending after the court case?

MR. NEISER:  Object to relevance, Judge.

THE COURT:  Overruled.

THE WITNESS:  So I'm not sure.  So Mr. Miele was in control of all sales.  He distributed the games.  He was our master distributor out of Williamsport, Pennsylvania.  So he took orders or put orders aside until we were successful.

BY MR. ZEGARELLI:

Q.   So are you saying that Mr. Miele would have the information that you don't recall right now?

A.   I'm not sure if he'll have it or not.  He'll have when

he shipped games out.  That's all I know.

Q.    Okay.  And the only invoices we have are the PA Game invoices, and let me make sure I understand that testimony.  So if I understand it -- and first time I've heard it in five years of litigation, but -- it might be longer than that -- but if I understand it, you were waiting for the Beaver County case to come down, and that came down on December 24th of 2014; is that true?

A.    Yes.

Q.    Okay.  Now, you had already made certain sales of games before that came down; isn't that right?

A.    I only collected money from PA Games.

Q.    Okay.  PA Games.  That was before the order came down; isn't that right?

A.    Yes.

Q.    So you did do sales before the order came down?

A.    That one, yes.

Q.    Okay.  But that is one.  Now, you said something about there being a warehouse, something about a warehouse because you were concerned about the order coming down.  Explain that more fully, if you can.

A.    It was just a warehouse that he owned, that he stored his games in, because he could not put them out in the marketplace --

Q.    And he --

A.    -- because I told him not to.

Q.    Okay.  And do you have any documentation whatsoever that indicates either he could not put those games out or that you permitted him ultimately to put those games out?  We haven't seen any of that documentation.

MR. NEISER:  Objection; relevance, Judge.

THE COURT:  You can answer.

THE WITNESS:  I don't have any documents saying that.

BY MR. ZEGARELLI:

Q.    Okay.  I think you testified something -- and I heard it before and I'm still trying to understand it -- that the right of first refusal would not apply if a time period passed where you didn't actually have or you didn't already acquire the thing that you would otherwise have a right of first refusal to get.  Do you understand that question?

A.    Not really.

Q.    Okay.  Let me say this:  Do we agree the right of first refusal is the right to refuse something?

MR. NEISER:  Objection; legal conclusion.

THE COURT:  Sustained.

MR. ZEGARELLI:  Okay.

THE COURT:  He can testify about his understanding, not the legal understanding.

MR. ZEGARELLI:  Thank you, Your Honor.

BY MR. ZEGARELLI:

Q.    Do you have an understanding of what a right of first refusal is?

A.    The right of first refusal and my two emails that were not agreements and what ultimately became an agreement was to provide Albert Unis with sales leads into Beaver County as we got them.

Q.    Okay.  It doesn't say sales leads, does it?

A.    It doesn't.

Q.    Okay.  It says right of first refusal, doesn't it?

A.    That's correct.

Q.    And, to your knowledge, did you ever present the opportunity to refuse an opportunity to Mr. Unis for Pennsylvania Skill Games, LLC?

A.    No.

Q.    Okay.  Now, if I understand it, it's your responsibility to deal with operators?

A.    It's -- it's collective -- I dealt with operators. Mr. Miele dealt with operators more than I did.  His sales team dealt with operators.  A lot of people dealt with the operators that -- they are customers.

Q.    Okay.  And I'll put on the screen Exhibit 5.  Are you familiar with the letterhead?

A.    Yes.

Q.    Okay.  And it's Pace-O-Matic's letterhead, isn't it?

A.    It is.

Q.   Okay.  It doesn't say the word "agreement" at the top. It says "Pace-O-Matic"; isn't that right?

A.   Yes, that's Pace-O-Matic's letterhead.

Q.   Okay.  Are you familiar with Danny Warren's signature?

A.   Yes.

Q.   Is that it?

A.   Yes.

Q.   Okay.  And do you recall -- it's true, isn't it, I should say, that this agreement, it preceded the Equipment Purchase Agreement that occurred in May; is that correct?

A.   Yes, this was January 29th.

Q.   Okay.  And the May Equipment Purchase Agreement omits to have any minimum purchases; isn't that right?

A.   That's correct.

Q.   Okay.  Do you have an understanding of why?

A.   The only -- the only thing that I heard was Albert wanted it out of there due to financing reasons.

Q.   Financing reasons?

A.   And that's why the -- and that's why the language changed on the right of first refusal on the second agreement.

Q.   Now, do you have a recollection of how much -- how many machines were purchased in the first five months of 2015, dollarwise?

A.   I know the order was 25 machines.  I don't know any more than that.

Q.   And do you understand that in the Equipment Purchase Agreement it says, Pace-O-Matic and Miele collectively.  Do you have that understanding of the Equipment Purchase Agreement?  I can put it on --

A.   Yes, three parties.  It was Miele, Pace-O-Matic, and Albert.

Q.   Would it surprise you that there was $150,000 -- I should say $140,000 of purchases in the first five months of -- immediately after December 24th and the first five months of 2015?

A.   It would surprise me that it was paid for.  I'm trying to do the math in my head with the fills added to the equipment. But if that's what you're telling me that was done then --

Q.   You --

A.   I don't have it -- I don't have it in front of me, no.

Q.   You don't have any reason to dispute it?

MR. NEISER:  Objection; speculation, Judge.

BY MR. ZEGARELLI:

Q.   Do you have a reason to dispute it?

A.   I don't at this point.

Q.   Okay.  Do you have any understanding of why a right of first refusal was asked for and granted to the extent it's in these documents to Pennsylvania Skill Games?

A.   Yeah.  Albert said that he was going to buy hundreds and hundreds of machines, and he didn't want anybody coming in

and taking his accounts before he got equipment in them.

Q.   Okay.  And hundreds and hundreds of machines.  Now, is that anywhere stated in the Equipment Purchase Agreement?

A.   No.

Q.   Okay.  Do you have an understanding that Mac Vending, who you mentioned earlier, I think you said they were on hold -- do you have an understanding they were a competitor of Mr. Unis and Pennsylvania Skill Games, LLC?

A.   All operators compete with each other.

Q.   Unless there's a right of first refusal; correct?

MR. NEISER:  Objection; legal conclusion.

THE COURT:  Sustained.

MR. ZEGARELLI:  Okay.

BY MR. ZEGARELLI:

Q.   Would you say that, from an operator's perspective, a right of first refusal gives competitive advantage?

A.   Initially, but really, the competitive advantage that he had was his pricing.  That was significant.

Q.   The pricing?

A.   Uh-huh.

Q.   Okay.  But the pricing becomes a function of sales; correct?

A.   Sure.

Q.   Okay.  Sales becomes a function of the right of first refusal; correct?

A.    Not necessarily, no.

Q.    Not necessarily, but perhaps possibly?

A.    Not -- not to my understanding, no, it doesn't.

Q.    All right.  So let me see if I understand.  The right of first refusal, you called it a lead, but that does not give value even at that level to the operator?  In other words, weren't you supplying them with some valuable service?

A.    Sure, yes.

Q.    Okay.  And it would be for the jury to decide whether it's a lead or right of first refusal or something more or less.  That's a fact question.

Now, if an operator that wanted to place games into Beaver County, if they sent you a letter, they didn't call you on the telephone, would you consider that part of right of first refusal?

A.    No.

Q.    Okay.  So it has to be a phone call?

A.    No.  I -- so the operator, if they want to operate in Beaver County, when this agreement was signed, then I would respond whether it was in writing or a phone call.

Q.    When you say "respond," what do you mean by that?

A.    A form of communication.  I would answer them.

Q.    Okay.  So whether they called you or walked into your office or sent you a letter, you would respond equally?

A.    Sure.

Q.    Okay.  And how would you respond to comply with the right of first refusal that was stated in the Equipment Purchase Agreement?

A.    If they -- if -- many of these locations have other operators if -- this didn't happen, but I will give you an example as to what I know of it, is if -- if a location wants to deal with another operator, then they are allowed to do that, not at the obviously -- and we are not to sell at the discounted rate that AUA got.

Q.    I didn't understand that answer.

If an operator wants to place machines, whether they walk or call or send you a letter, they want to place machines into Beaver County, what do you do?

MR. NEISER:  Let's make sure it's clear.  We have one exhibit up in front of the witness, and I don't know if we're talking about the Equipment Purchase Agreement or Exhibit 5.

MR. ZEGARELLI:  I'll put up the agreement.

MR. NEISER:  Thank you.  Sorry to interrupt.

THE COURT:  Let's put that agreement up.

BY MR. ZEGARELLI:

Q.    How do you respond?

A.    If you can scroll down to the --

Q.    Sure.

A.    So it says, that if a buyer opts not to place compliant terminals, meaning he hasn't put terminals in these

locations, then we cannot sell them for a cheaper price.

Q.    Let me see if I understand what you just said.

Did you just say that if -- if an operator wants to place games into Beaver County and they call you, they walk in, they send you a letter, is it your obligation, as you understand it, to say to them, hey, we got to run this through Pennsylvania Skill Games first to see if they want the opportunity, see if they opt in?

A.    They would have opted in by putting games into this location already.

Q.    AH, okay.  So you have to have the thing to get the option to get the thing.

MR. NEISER:  Objection, vague, Your Honor.

MR. ZEGARELLI:  I don't think that's --

THE COURT:  Do you understand the question?

THE WITNESS:  Not really.

MR. ZEGARELLI:  Okay, Your Honor.

BY MR. ZEGARELLI:

Q.    If I understand your testimony, if they don't already have the location, then they must have given it up so that you no longer need to give them the option to have it.

A.    No, that's not necessarily true.  However, as an operator, you -- your job is to put equipment into your locations.  If you haven't done that over an immense amount of time, then it would lead anyone to believe that you're not

putting machines in there.

Q.   Okay.  So we have a new concept now, "an immense amount of time."

How do you -- now, is some immense amount of time identified in the Equipment Purchase Agreement?  Whatever you meant by immense amount of time, is that written down anywhere?

A.   No.

Q.   Okay.  But back to the formula of a right of first refusal.  If I understand it, what you're saying is, let me see if I characterize it correctly -- we don't have to offer it to you if you don't already have it and you don't already have it because you didn't get it for an immense amount of time.

MR. NEISER:  Objection; mischaracterization, and it's vague.

THE COURT:  Do you understand the question?  If so, you can answer it.  If not, Mr. Zegarelli will ask you another question.

THE WITNESS:  Yeah, ask me another question, please.

BY MR. ZEGARELLI:

Q.   I don't think I have to ask you another question on that, but thank you.  I think we've accomplished what we needed to.  Thank you.

Now, you mentioned at some point snowball effect.  Do you recall that language, "snowball effect"?

A.   Earlier today?

Q.    Yes.

A.    Yes.

Q.    Okay.  And the snowball effect is that when a location, for example, sees, let's call it a better game, they tell their operator we'd like to get that game, and that operator then needs to go get the game, and one operator sees another operator's and it snowballs.

A.    Okay.

Q.    Okay.  And isn't that exactly what Pennsylvania Skill Games was bargaining for, that they would have the benefit of that snowball effect with the right of first refusal?

A.    I was referring to the snowball effect when an operator puts out machines and other people see them.  That's -- that's what I was referring to; not what you're describing.

Q.    All right.  Okay.  Let me -- maybe I just need to be a little more precise right now.

Let's say Pennsylvania Skill Games puts a new release superior Pace game into bars.  Isn't it -- isn't it true that bars, other bars, will want the later and greater technologies in their bars as well and they'll start making phone calls to get those games?  Isn't that the way it works?

A.    I don't know.  If it's better software, maybe.  But still, I don't understand your question as far as -- are you talking about a different software than our Pennsylvania Skill, or are you talking about our Pennsylvania Skill?  I'm kind of

confused what you're talking about.  You said "superior."

Q.   Okay.  If snowball effect, somebody sees something new, they want it for their own establishment.

A.   Sure.

Q.   They want to go buy it.

A.   Sure.

Q.   Okay.  And if I want to buy it -- let's say I'm a bar. I see this Pace game at a bar down the road.  My customers say, Why don't you have that Pace game at your bar?

I say, Well -- they say Joe's -- Joe's got the Pace game.  Why don't you have the Pace game?

So what does the location do?  It calls you or it calls its operator; correct?

A.   That's correct.

Q.   Tries to get the game.

A.   Yeah.

Q.   Okay.  And if it tries to get the game and it calls its operator, who is not Pennsylvania Skill Games, what does their operator naturally do?

MR. NEISER:  Objection; speculation.

THE COURT:  Sustained.

BY MR. ZEGARELLI:

Q.   Okay.  Do you have any experience with what operators do if they want to purchase a game from you?  You have an operator call you up and say -- you have an experience with

operator calling you up saying something like, you know, we saw this good game, we'd like to get it?

A.    Sure.    That's -- that's our business.

Q.    Okay.    If there's a right of first refusal, don't you need to say stop and let's check and give the option first to Pennsylvania Skill Games and comply with our agreement in good faith?

A.    So -- I -- I wouldn't be the one that they call.    I want to make sure that's clear on the record.    Pace-O-Matic did not take the orders from -- after Miele Manufacturing was our master distributor.

Q.    Okay.

MR. ZEGARELLI:    May I ask, is 119 -- I think 119A is admitted.    Is it possible to confirm that?

THE COURT:    I don't believe it is.

MR. NEISER:    I don't believe it is.

MR. ZEGARELLI:    You don't believe it is?

MR. NEISER:    No, sir.

MR. ZEGARELLI:    All right.

BY MR. ZEGARELLI:

Q.    Mr. Wood, first of all, in this email, I'll tell you that there is a portion of it at the top that actually was the forward as part of the litigation.    So I'd ask you to disregard that.    You'll see down below that initial header, do you see your name --

A.    Yeah.

Q.    -- from Ryan Wood?

Do you recognize this email?  Is that your email address, sir?

A.    That is my email address.

Q.    Okay.

MR. ZEGARELLI:  And this has already been identified as Exhibit 119A.  And I'd move it in.

MR. NEISER:  We have no objection, Your Honor.

THE COURT:  All right.

MR. NEISER:  There's one -- is the attachment to this email on there?

MR. ZEGARELLI:  The attachment is.

MR. NEISER:  Very good.  No objection.

THE COURT:  All right.  Then Exhibit 119A is admitted.

By MR. ZEGARELLI:

Q.    Again, the top portion was a forward.

Now, Mr. Wood, do you see the language, Rough draft of MOU?

A.    Yes.

Q.    Okay.  And that's dated January 30, 2015.

Do you see that?

A.    Yes.

Q.    Okay.  And it says, Games are starting assembly next week.

Do you see that?

A.    Yes.

Q.    Okay.  And that's January 30, 2015; correct?

A.    Uh-huh.

Q.    Okay.  And I'm going to direct your attention, do you see that attachment?

A.    PA Distributor Agreement.

Q.    Yes.

Do you see what it's called?

A.    PA Distributor Agreement?

Q.    Uh-huh, okay.

And that document is Exhibit 5, would you say?  Although this is not in signed form.  But would you say that's the reasonable equivalent on your letterhead of Exhibit 5?

MR. NEISER:  Your Honor, I want to be very cautious about this, that it's vague.  Unless he has a side by side --

MR. ZEGARELLI:  Do you need it to be placed side by side?

MR. NEISER:  Well, if you have an executed copy of it.  We can refer to the executed version.  I just don't want the witness guessing.

THE COURT:  Would you be able to show him the final version just to make sure that we're looking at the same document or knowing that we're not?

MR. ZEGARELLI:  Thank you, Your Honor.

THE COURT:  Thank you.

BY MR. ZEGARELLI:

Q.   I'll be with you in one second, please, Mr. Wood.  I'm going to put on the screen Exhibit 119A, as best it will display on my computer.

A.   Okay.

MR. NEISER:  If it's easier, I can give him a paper copy.  Okay.

BY MR. ZEGARELLI:

Q.   In fact, it appears there are some changes to it if you compare the two.  It appears the version in the distributor doc, I will say it appears to be more favorable to Pennsylvania Skill Games based on pricing.  Pricing looks like it went down from 800 and also has language that was not in the first document regarding help in legal matters.

Do you see that, sir?

A.   The legal matters is in which document, you're saying? Is it -- executed or nonexecuted?

Q.   Nonexecuted version that was part of the email that said, PA distributor doc as it related to Pennsylvania Skill -- I'm sorry -- Albert Unis and affiliates.

The version ultimately signed has new references to help in legal matters.

Do you see that?

A.   Yes.

Q.    Okay.  So they are slightly different, but would you say that they are effectively working from the same document?

A.    Yes.

Q.    Okay.  Back on the screen is Exhibit 25, already admitted.  Now, the language putting out all of the machines, do you see that?  That's your language?

A.    Uh-huh.  Yes.

Q.    You're telling Monika, if I understand it, please communicate with me on anything you need to complete this order?  Do you see that?

A.    I do.

Q.    Anything you need.

MR. ZEGARELLI:  No further questions.

THE COURT:  Mr. Neiser, anything further?

MR. NEISER:  Just very briefly, Your Honor.  Can I do it from counsel table?

THE COURT:  You can, if that's convenient for you.

MR. NEISER:  Thank you, Your Honor.

MR. ZEGARELLI:  May I stand?

THE COURT:  You may stand.  You may go back or stand, whatever you prefer.

MR. ZEGARELLI:  I'll just stand for a moment.

THE COURT:  All right.  That's fine.

REDIRECT EXAMINATION

BY MR. NEISER:

Q.    You mentioned in Exhibit 119 Alpha that there's an MOU.  Do you know what MOU is -- an MOU is?

A.    Mutual of understanding.

Q.    Memorandum --

A.    Memorandum -- yep -- of understanding.

Q.    And the file name was called distribution agreement doc; is that correct?

A.    That's correct.

Q.    Was there ever a distribution agreement?

A.    No.

Q.    It's just what the file name was called; right?

A.    That's correct.

Q.    And the attachment, if I remember correctly, was kind of, sort of, like Exhibit 5, the AUA and affiliates document?

A.    Sure.

Q.    And nowhere in that document does it say "distribution"?

A.    That's correct.

Q.    Okay.  And one other question.  On Exhibit 5, that references a number of machines to be purchased and, I think, some overtime.  Is my memory correct?

A.    Yes.  It's five --

Q.    Let me ask you this.  Was it a dollar amount or numbers of machines?

A.    Numbers of machines.

Q.    So $140,000 in Pace-O-Matic parlance means how many games?

A.    $2,500 with $1,000 fill on them.

Q.    Don't ask me to do math, sir.  That's why I'm a lawyer.

A.    I'm usually good at math.  Not on the stand, apparently.

Q.    Whatever it is, it's -- the agreement and the discussion was regarding volume, not amount?

A.    Correct.

MR. NEISER:  No other questions, Judge.

THE WITNESS:  Yeah.

MR. ZEGARELLI:  None, Your Honor.

THE COURT:  You may sit down now, if you would like to, Mr. Zegarelli.  I know we kind of trapped you back there.

MR. NEISER:  Your Honor, is Mr. Wood excused?

THE COURT:  Mr. Wood, you may step down and you are excused.  Thank you.

(Witness excused.)

MR. NEISER:  Your Honor, we have -- we can start with Mr. O'Bier unless you want to end.  We're going pretty quickly, and I can do him quickly in the morning as well.

THE COURT:  Let's start with Mr. O'Bier.

MR. NEISER:  Very well, Your Honor.  I might need a slight pause because we're retrieving a binder from down below.

THE COURT:  That's fine.  Ladies and gentlemen, if you want to stand up for a little bit and take a stretch break, you're certainly welcome to do that.

(Brief pause in the proceedings.)

MR. NEISER:  We're ready to go.

THE COURT:  All right.  Let's bring in Mr. O'Bier.

THE CLERK:  Sir, please stand and raise your right hand.

CHRIS O'BIER, a witness herein, having been first duly sworn, was examined and testified as follows:

THE CLERK:  Thank you.

THE COURT:  Please take a seat, Mr. O'Bier.

Feel free to adjust that microphone if you need to.

MR. NEISER:  May I proceed, Your Honor?

THE COURT:  You may.

DIRECT EXAMINATION

BY MR. NEISER:

Q.    Good afternoon, Mr. O'Bier.

A.    Good afternoon.

Q.    How are you doing today?

A.    I'm doing well.

Q.    Introduce yourself to the Court and jury.

A.    My name is Chris O'Bier.

Q.    What do you do for a living?

A.    I'm the VP of customer service at Pace-O-Matic.

Q.   What does that mean?

A.   I run the customer service, the sales, and RMA departments that we field calls for any issues, technical, software, repair and return hardware, that kind of stuff.

Q.   How long have you been working for Pace-O-Matic?

A.   A little over 17 years.

Q.   Could you please describe your educational background since high school?

A.   After high school, I went into the Army.  And then in the last couple of years, I went to Georgia State College.

Q.   Understood.  What did you do in the Army?

A.   Infantry.

Q.   Did you deploy?

A.   I did.

Q.   Thank you for your service.

A.   Thank you for your service.

Q.   Thank you.  So let's talk, what was your first role at Pace-O-Matic?

A.   I worked in the warehouse in production.

Q.   And what all did that involve?

A.   It was assembling, testing, shipping and receiving terminals, and loading software, that kind of stuff.

Q.   So what all is involved in loading software into a machine?

A.   At that point, it was a little bit older technology so

it was copying, like, EPROMS, so the actual game software on to chips and installing it on boards.

Q.   And then what was your next role at Pace?

A.   A little bit of customer service and then software testing.

Q.   Tell us about the type of software testing you would do.

A.   We would take either the next game you wanted to make, a new version, and just test it top to bottom and check for anything that didn't work properly, anything we didn't want, made sure everything worked correctly.

Q.   Okay.  Do you remember working on a project involving Pennsylvania?

A.   I do.

Q.   What do you recall?

A.   I remember coming out of the Ohio software, we picked a game set that we thought we'd like to go with that worked well and made a version with three of those games.

Q.   Okay.

A.   And just began testing it.

Q.   Understood.  What's all involved in testing?  Just so we have an understanding.

A.   Making sure all of the pieces of the game work. There's printers, monitors, so all that stuff has to work well with the software, different drivers, different firmware

versions. And in the software, there's different functionality, options to set, how it plays, how it pays, all of that stuff, making sure it's all exactly what we want.

Q. Okay. And one thing I'd like for you to do is the court reporter, especially at the end of the day -- if you can keep your pace at a medium pace, if you will, that will be very helpful.

A. I will try.

Q. Thank you. I understand.

So do you ever consider feedback from operators in the development of the games?

A. In the -- sure, once a game is out there, it needs to work well for the operator. We don't operate, they do. So they tell us, you know, this would be a better feature, this wouldn't, and we take that feedback into account.

Q. Is that a common thing?

A. Yes.

Q. Do you recall ever getting any feedback directly from the Unises or Pennsylvania Skill Games, LLC?

A. I do not.

Q. Do you recall any other operators making claims that they've developed software with Pace-O-Matic?

A. No.

Q. Were you involved in the controlled pickup in this case?

A.   Just in the fact that I would have assembled and tested and shipped the game.

Q.   Okay.  So you actually touched this first machine that was used in the controlled pickup?

A.   Yes.

Q.   If I were to show you a picture of it, would you be able to confirm exactly what it looked like?

A.   Yes.

MR. NEISER:  Can I see Exhibit 28?

MR. SIMEONE:  I think we need switched over.

MR. NEISER:  Sorry.  Success.

BY MR. NEISER:

Q.   I'm showing you Exhibit 28.  Do you see that, sir?

A.   I do.

Q.   Is that what the game would have looked like?

A.   Yes.

Q.   Did you ever see artwork that was used to brand the Pennsylvania Skill game?

A.   I did.

MR. NEISER:  55, please.

BY MR. NEISER:

Q.   I'm showing you a document that's been marked -- actually, admitted into evidence as Exhibit 55.  And I'll represent to you, sir, that there's a screen capture with a date of 12/ -- thank you, A.J. -- 12/15/2014.  Does that date, based

on your recollection, appear to be accurate as to when that artwork was being used within Pace-O-Matic?

A.   Yes.  Really, it would have been a little bit before with the -- you know, the beginning stages of creating that artwork.

Q.   Before that?

A.   To get all of the ideas and pieces together onto this, it would have taken a little bit before that, however long the artist took.

Q.   There's an art department and some folks working on that down in Pace's office?

A.   Yes.

Q.   Was that logo ever put on any T-shirts or anything like that, to best of your knowledge?

A.   It was put on a lot of things.  I can't say exactly what.

Q.   Sir -- I'm sorry.  I was looking at time because I want to make sure we can go through this with you.

Let me ask you a question.  Based on your experience at Pace and your knowledge of the software, can you tell the difference, based on looking at a screen, the difference between Pace software and non-Pace software?

A.   Yes, I can.

Q.   You can?

A.   Yes.

MR. NEISER:  Let's pull up Exhibit 48, please.

BY MR. NEISER:

Q.  I'd like to briefly scroll through this and tell me if you recognize -- forget my letter that's attached to it, but the rest of it that's in there?

A.  What do you want me to do?

Q.  I want you to look and tell me if you recall seeing this document.

A.  Oh, yes.

MR. NEISER:  Okay.  I'd like to go back to the first page.

BY MR. NEISER:

Q.  I'll represent to you, sir, these are documents produced in discovery in this case.  For the record, it's Bates Number POM 4716 to POM 4754 that were provided by Pennsylvania Skill Games.

MR. NEISER:  Your Honor, we offer Exhibit 48.

THE COURT:  Is there any objection?

MR. ZEGARELLI:  No objection.

THE COURT:  All right.  Exhibit 48 is admitted.

MR. NEISER:  Okay.  Let's go to the second page, A.J.

So I don't think we'll need to enlarge these very much because, if not, it will take some time.

BY MR. NEISER:

Q.  Sir, I'll make a representation to you that these

documents were produced to me and they represent photographs of all of the games in operation by Pennsylvania Skill Games. And you've reviewed this list before, have you not?

A.   I have.

Q.   And you've reviewed all of the photographs, have you not?

A.   I have.

Q.   Great. So this may take a little bit of time, so I want us to move forward very quickly. Okay? I would like for you to tell me, when we look at these photographs, whether or not they are Pace software. Okay?

A.   Okay.

Q.   Are those two games?

A.   They are not.

Q.   Next page?

A.   They are not.

Q.   Next page?

MR. ZEGARELLI: Excuse me. Just for the record, can you identify the decimal? I think there's decimals under each one.

MR. NEISER: I would love to. Go to the first page, please.

BY MR. NEISER:

Q.   I'll just call them out and you give me the answer.

A.   Yes or no. Yes for Pace-O-Matic, no for not.

Q.   Yes.   Outstanding.   1.1?

A.   No.

Q.   2.1?

A.   No.

Q.   2.2?

A.   No.

Q.   3.1?

A.   No.

Q.   3.2?

A.   Yes.

Q.   4.1?

A.   Yes.

Q.   4.2?

A.   Yes.

Q.   5.1?

A.   No.

Q.   Whoa.  Let's go back.  Do you know what kind of software that is?

A.   I believe I do.  I can't say 100 percent.

Q.   What is it?

A.   I believe it's a Big Daddy Games.

Q.   Big Daddy Games.  Okay.  Let's look at the top of the screen.  It says Pennsylvania Skill, but it says "Games" underneath it.

A.   It does.

Q.    Is that the brand that Pace uses or POM uses or Savvy Dog uses?

A.    It is not.

Q.    What's different?

A.    The games on it.

Q.    So you're saying it says Pennsylvania Skill Games but inside is a different type of software?

A.    Yes.

Q.    Are you sure?

A.    Positive.

Q.    And it says, SKL402.44pen.  What does that mean?

A.    That's the version build of the -- Pace-O-Matic's Pennsylvania Skill game.

Q.    So you're telling me it's not only the entire brand and it's not a Pace game, but it has a Pace software version on it?

A.    Correct.

Q.    Huh.

MR. NEISER:  Okay.  Take it down.  That was 5.1, yes?  Okay.

BY MR. NEISER:

Q.    5.2?

A.    No.

Q.    So, again, it says Pennsylvania Skill with the Liberty Bell but it's not a Pace game?

A.   Correct.

Q.   5.3?

A.   No.

Q.   Next.  6.1?

A.   No.

Q.   Again, same thing, SKL402.44, Pennsylvania Skill Games, not a Pace product?

A.   Correct.

Q.   7.1?

A.   No.

Q.   7.2?

A.   No.

Q.   Again, same thing, it's different -- different guts but it looks like Pennsylvania Skill?

A.   Correct.

Q.   8.1?

A.   Yes.

Q.   8.2?

A.   Yes.

Q.   8.3?

A.   Yes.

Q.   8.4?

A.   Yes.

Q.   8.5?

A.   Yes.

Q.   8.6?

A.   Yes.

Q.   8.7?

A.   Yes.

Q.   8.8?

A.   Yes.

Q.   8.9?

A.   No.

Q.   Now that says something completely different.  It doesn't have your branding on it; is that fair?

A.   Yes.

Q.   Next, 8.10?

A.   No.

Q.   It's not.  8.11?

A.   No.

Q.   8.12?

A.   No.

Q.   8.13?

A.   No.

Q.   8.14?

A.   No.

Q.   8.15?

A.   No.

Q.   9.1?

A.   No.

Q.    Now, this one is interesting.

MR. NEISER:  Let's zoom in on this, A.J.

BY MR. NEISER:

Q.    Okay.  What do you see here, sir?

A.    Pennsylvania Skill Games on the artwork and the software.

Q.    Okay.  And what type of software is it running?

A.    The Big Daddy Games.

Q.    Okay.

MR. NEISER:  A.J., if you don't mind, there's a -- it's right in the middle on the screen in the top, it says Pennsylvania Skill Games.  Can you enlarge that, please.

BY MR. NEISER:

Q.    Do we put that on any of our software?

A.    We do not.  Not looking like that, anyway.

MR. NEISER:  And zoom out.

BY MR. NEISER:

Q.    Okay.  How about 9.2?

A.    Yes.

Q.    Okay.  9.3?

A.    No.

Q.    Okay.  And that's another example it looks like --

MR. NEISER:  Oh, as a matter of fact, let's enlarge that one.

BY MR. NEISER:

Q.    That looks like the artwork that is on our games, is it not?

A.    That is a Pace-O-Matic header.

Q.    Okay.  It doesn't say "Games" on it and doesn't say 402.44?

A.    Correct.

Q.    And what kind of software is on it?

A.    That's Blue Sky.

Q.    Okay.  9.4?

A.    No.

Q.    9.5?

A.    Yes.

Q.    10.1?

A.    No.

Q.    Again, it's not our software, it says 402.44, and it has the Pennsylvania Skill Games; is that correct?

A.    That's correct.

Q.    Next, 11.1?

A.    No.

Q.    Header, it has Pennsylvania Skill, and it has different software on it?

A.    Correct.

Q.    11.2?

A.    No.

Q.    Again, our header, different game?

A.    Correct.

Q.    Next, 11.3?

A.    No.

Q.    11.4?

A.    No.

Q.    12.1?

A.    No.

Q.    12.2?

A.    No.

Q.    12.3?

A.    No.

Q.    13.1?

A.    No.

Q.    13.2?

A.    No.

Q.    13.3?

A.    No.

Q.    14.1?

A.    No.

Q.    14.2?

A.    No.

Q.    We only have a few more.  15.1?

A.    No.

Q.    16.1?

A.    No.

Q.   16.2?

A.   No.

Q.   16.3?

A.   No.

Q.   17.1?

A.   No.

Q.   17.2?

A.   No.

Q.   18.1?

A.   No.

Q.   18.2?

A.   No.

Q.   18.3?

A.   No.

Q.   19.1?

A.   No.

Q.   19.2?

A.   So 19.2, the left one and the middle one are not Pace-O-Matic.  The right one is.

Q.   Okay.  Next?

A.   The bottom left is; the right two are not.

Q.   But you can't see the headers on those; right?

A.   Correct.

Q.   Next, 19.4?

A.   No.

Q.    20.1?

A.    The left is not.  I cannot see the left -- the middle one with the reflection on the screen.  And the right one is not.

Q.    Okay.  That's fine.  19.4.  Sorry.  We did that already.  20.2?

A.    The left two are; the right one is not.

Q.    Okay.  20.3?

A.    The left one is; the right two are not.

Q.    Keep going.  21.1?

A.    So the far left one is, the next one -- it's hard to tell.  I believe it is, though.  The far right one is not.  The number with the number 2.

Q.    Okay.  Fine.  Let's go to the next one.  21.2.  If you can't tell because of the reflection, that's fine.

A.    The right one looks like it's off.  And the left one, it's a pretty bad reflection, but I would say is.

Q.    Okay.  Next, 22.1?

A.    Yes.

Q.    22.2, I don't think you can tell.  Can you tell anything from that?

A.    That digit is significant.  I would say yes.

Q.    Why?

A.    That's the terminal ID, so we call it the security number.  It's unique to every -- every security device which you

have to have to run the software.

Q.   And why did you say that was significant?

A.   Because I can look that number up and relate it back to our game.

Q.   Did you look the number up?

A.   I did.

Q.   What did it tell you?

A.   Just that it was our game.  I can't remember the specifics.

Q.   Okay.

A.   But I get a lot of information if I were to look.

Q.   That's what we call terminal ID.

A.   Yes.

Q.   Next.  23.1?

A.   Yes.

Q.   23.2?

A.   Yes.

Q.   24.1?

A.   Yes.

Q.   25.1?

A.   Yes.

Q.   25.2?

A.   Yes.

Q.   26.1?

A.   Yes.

Q.   26.2?

A.   Yes.

Q.   I want to ask you a question about 26.2.

Why is the logo on the header and on the screen?

A.   Just part of brand recognition.

Q.   Okay.  27.1?

A.   Yes.

Q.   I think we're almost there.  27.2?

A.   Yes.

Q.   How about the one on the right?

A.   Yes.

Q.   Okay.  27.3?

A.   They look like they're both off.  I can't tell.

Q.   Okay.  27.4?

A.   No, to both.

Q.   27.5?

A.   No to all of them.

Q.   Next.  Thank God.

MR. NEISER:  Your Honor, I would like to mark a paper version of that exact same exhibit.  That was exhibit what?

MR. SIMEONE:  48.

THE COURT:  48.

MR. NEISER:  Your Honor, I'd like to mark this as Exhibit 48A, and I would like to make a demonstrative of this.

MR. ZEGARELLI:  Your Honor, it's evidence.  I'm not

sure why it's --

MR. NEISER:  Your Honor, I offer -- what I'd like to do is have the witness briefly make a check mark on a paper exhibit, count how many machines or which machines have a Pennsylvania Skill logo at the top but not Pace-O-Matic software.

MR. ZEGARELLI:  Your Honor, I --

THE COURT:  Go ahead, Mr. Zegarelli.

MR. ZEGARELLI:  Your Honor, I believe the witness has testified to it.  And that should be sufficient for the evidentiary purpose.

MR. NEISER:  I just wanted to mark it up so it's easier, Your Honor.  It will only take a minute.

THE COURT:  All right.  What do you plan to do with that that you couldn't do with the exhibit that we've seen?

MR. NEISER:  Probably nothing, Your Honor.  It would just be easier for later.  That's all.  I can move on.  It doesn't matter.

THE COURT:  Let's move on.

MR. NEISER:  Okay.  That's fair.  Thank you.

BY MR. NEISER:

Q.   So, now all of those machines that you identified that have a Pennsylvania Skill header on it and you said that it did not contain Pace software, are you sure that you are correct?

A.   Positive.

Q.   Those headers at the top, the plastic things that say Pennsylvania Skill on them, how hard is it to swap those out or to change them?

A.   It take as a bit of effort.  There's usually a key that you have to turn to open a lock, and then you have to remove the header piece that holds it, and then remove the artwork, swap it back out, reinstall it, lock it back up.

Q.   So you have to intentionally do that?

A.   Correct.

Q.   It doesn't accidentally happen?

A.   Right.

Q.   Sir, are you familiar with the Pace-O-Matic website?

A.   I am.

Q.   If I were able to show you copies, would you be able to confirm that they are true and accurate?

A.   Yes.

Q.   Okay.

MR. NEISER:  Let's show him 21A.

THE COURT:  Is that the exhibit?

MR. NEISER:  I'm sorry.  That is -- let's do 201. Sorry.  Wait.  I have two different tabs.  Try 201, please. Let's flip through that, please.  As a matter of fact, it may be easier if I did this.

Your Honor, may I approach the witness?

THE COURT:  You may.

BY MR. NEISER:

Q.    Sir, I'm showing you a copy of a document that's been marked for identification purposes as Exhibit 201.  I thought it might be easier and faster to do it this way.

Can you please flip through that and tell me when you are done?

A.    Okay.

Q.    Can you confirm that that's a true and accurate copy of that website, sir?

A.    Yes, it looks to be.

Q.    The website PAskill.com?

A.    Yes.

Q.    Do you have an understanding if that's a Pace-O-Matic website or not?

A.    Yes.

Q.    Okay.

MR. NEISER:  We offer Exhibit 201.

MR. ZEGARELLI:  We do object, Your Honor.  First of all, it has not been stated this website is the complete website.  That's number one.

Number two is, if it appears to be a recent self-serving -- it doesn't have probative value from a relevance perspective, because it looks like it was quite recently created in a self-serving manner.  We don't believe it's probative to anything being addressed in this trial.

THE COURT:  Mr. Neiser.

MR. NEISER:  Your Honor, we believe it's relevant because it goes to the establishment of the secondary meaning which is an element in our trademark claim.  The witness has testified he can authenticate and he has knowledge of it being a current version of the website.

THE COURT:  Anything further?

MR. ZEGARELLI:  Only that if they could do the same thing with a version that existed either prelawsuit or it would be not, I would say, created for the purpose of this litigation or have that -- this credibility associated with it.

MR. NEISER:  Your Honor, I think credibility, one, is an issue for the jury.  Number two, Mr. Zegarelli is free to bring in a copy of that.  And, number three, it wasn't created for the purpose of this litigation.  This is a company operating in the ordinary course without regard to them or this lawsuit.

THE COURT:  Mr. Zegarelli, I'm going to admit the exhibit, but the jury should be advised that there was testimony that, as I understand it, this is the current version of the website.  This is not the version that was in effect at various matters that are involved in this lawsuit.  So you can give it the weight that you consider it is entitled to.

BY MR. NEISER:

Q.   Sir, have you ever been asked to put out different boards or put different boards in our terminals to run other

software?

A.    To run other than ours?

Q.    Yes.

A.    Other than Pace-O-Matic?  I've done the opposite.

Q.    Tell me about that.

A.    In -- in the cabinets there's really two main harness hookup configurations.  There can be other ones, but the main ones are two.  And I could take a game running someone else's software, a different board, and configure it for ours, whether it's a wiring change or adapter, harness change.

Q.    Understood.

Did you ever do any work for the Unises, take other cabinets and make them work with Pace-O-Matic boards?

A.    Yes.

Q.    Tell us about that.

A.    They would find cabinets wherever, not from us, and bring me one or two as a sample, and I would spend however much time reworking it, figuring out what needed to be changed to run our board and software, and I'd go back to them as a sample to do with however many more that they needed to do.

Q.    And did you do that for them?

A.    I did.

Q.    Did you help them do it on their own?  Like did you teach them how to do it?

A.    I would run through what I did, write up a document

saying here are the changes I made.  There's a pin out or a connector or use a different printer, because it didn't work with the software or something like that.

MR. NEISER:  Your Honor, I think -- I'm close to being done with Mr. O'Bier.  I may start a new line.  I think we're five minutes in; so I think it would take more than that, and I don't want to go past the Court's end time.

THE COURT:  All right.  Then why don't we adjourn for today.

We'll start again, ladies and gentlemen, at 9:00 tomorrow morning.  Please, make sure you're here by 8:45 so that we can get started on time.

And with that we are adjourned.

And I'll see counsel briefly in chambers.

(Pause as the jury exits courtroom.)

(In chambers.)

THE COURT:  All right.  There are a couple of things I wanted to reference.  I don't want to keep you unnecessarily. I'm sure you're both busy preparing.  A couple of things I wanted to touch on.

First of all, this is a minor issue, but I wonder if each of you could tell your respective clients not to use other judge's courtrooms for a meeting place.

MR. ZEGARELLI:  That's my fault, Your Honor.

THE COURT:  That's okay.

MR. ZEGARELLI:  I apologize.  We were chided for it, Your Honor, and we did say it wouldn't happen again.  Since our box was over there, we kind of thought we could use that courtroom.  I do apologize.  We said it wouldn't happen again, and it won't.

THE COURT:  No, I understand.  I'm sure witnesses sometimes don't understand that, and I know you have a room downstairs that may not be the biggest room.  But --

MR. ZEGARELLI:  And, Your Honor, may I give you a personal apology?  I regret that -- that I was perhaps a bit more frustrated or emotional than appropriate, and I want to give you my personal apology.

THE COURT:  I certainly appreciate that.  You don't need to do that.  I understand that emotions run high and this is stressful and hard on everyone.  So it's fine.  Please don't worry about it.

MR. ZEGARELLI:  Thank you, Your Honor.

THE COURT:  Okay.

Who are we going to see after Mr. O'Bier tomorrow?

MR. NEISER:  That's what we were just talking about, Your Honor.

THE COURT:  Okay.

MR. NEISER:  I wish I would have grabbed my laptop. If we can give me two seconds from my addled brain to go through this.

We're going to do Mr. O'Bier.

THE COURT:  And I'm assuming you're going to have some cross, Mr. Zegarelli?

MR. ZEGARELLI:  I will.  Only I don't quite frankly expect too much.

THE COURT:  Okay.  Take the time you need.

MR. NEISER:  I really wanted to finish him today, but I just didn't want to run over.  The jurors were going to start looking at the clock on me.

THE COURT:  I really wanted to go a little farther today, because we got such a late start.  And I want to come back to that, but, first, let's talk about your exhibits -- or your witnesses, sorry.

MR. NEISER:  Yes, Your Honor.  So we're going to do -- tomorrow we'll finish O'Bier.  Danny Warren.

THE COURT:  We can come back to this issue if you want to give it some thought.  There's a couple other minor things I had on my list.

MR. NEISER:  If you don't mind, Your Honor.  Actually, I'm brain-locked right now.  I can't even remember who else is left in my case.  So let me just jot them down and then --

THE COURT:  That's fine.

MR. NEISER:  I think I have to do some calls or start putting my people into play.

MR. ZEGARELLI:  There's third-party witnesses that I'm

calling, and my plan -- this is what we were talking about when the Court came in. If I can just throw it out now.

THE COURT: Of course.

MR. NEISER: What I'd like to do is arrange for them, because they have other lives and they're going to be -- my piece of them is going to be very small, the other operators, to start them Thursday morning and knock them out as quickly as I can. And then I think one of them, I can't remember, it's one of the McDanels, I think it is Bob McDanels, I told him 1:00 -- oh, Brett Mayes, that's who it is at 1:00.

So what I'd like to do is I'll email you the list of them and, like, the time slots I'd like to use, and hopefully that works for everybody, with the understanding it might run over a little bit.

MR. ZEGARELLI: The ones who I called, I did tell them that you're on your own schedule with them.

MR. NEISER: Yeah.

MR. ZEGARELLI: Probabilities are that we'd get them done in one sitting.

MR. NEISER: I'd love to.

MR. ZEGARELLI: But they're at risk that that might not occur but that that probably would work out that way because I don't quite -- I don't necessarily need them for all that much, so I think it is going to just be we knock them out.

MR. NEISER: Great. If you think that you might need

to recall, perhaps we can talk with the Court and have them go in your case if you're going to need to recall them.  I just don't want to inconvenience them again.

MR. ZEGARELLI:  No, I understand.  I'm not sure if you're calling them -- and I think we might have to talk about who's adverse and who is not and how the questioning --

MR. NEISER:  I'm going to direct all of them.  I'm not going to lead any of them.

MR. ZEGARELLI:  Okay.  Quite frankly, I think we'll probably get them all out and I'm not going to move them again.

MR. NEISER:  They're third-party witnesses, and you're trying to develop testimony.  I'm not going to make a leading objection.

MR. ZEGARELLI:  Okay.

THE COURT:  Look, I appreciate the fact you're both trying to not inconvenience third parties.  If you have to call them back, it's fine.

MR. ZEGARELLI:  Okay.

MR. NEISER:  But if it's --

THE COURT:  I'm sure you prefer not to, but, you know, for some reason, if you need to, you, of course, have that option.

MR. ZEGARELLI:  Thank you.

THE COURT:  Just while you're continuing to think about witnesses, Mr. DeLuca, we'll deal with those counter

designations tomorrow at 8:00.

Mr. Neiser, are you planning on reading in portions of Mr. Unis III and Mr. Unis IV?

MR. NEISER:  That's one thing I can't answer for you, Your Honor, and I may not.

THE COURT:  All right.

MR. NEISER:  I may not.  I may save that for rebuttal if I need to, but at that point, I've asked the question, so I may not do any of that.

THE COURT:  The only reason I was asking is that's always a good filler if we have a witness issue and you've got a deposition you have to read in.  But we do have Mr. DeLuca's read-in, which I don't anticipate will take very long.  That's certainly always an option for both of you if you're running out of witnesses on a particular day and you do have designations. I don't think any -- other than the Unises, I don't think any of the other designations are particularly lengthy.  We have Mr. Mayle --

MR. NEISER:  Mayes.  Mayle.  We have Miele, Mayes, Millay.

MR. ZEGARELLI:  Millay.

THE COURT:  One question I had for the parties to think about, and you will recall that we will have an instruction about documents relating to registration with the trademark office that we've modified slightly but giving the

jury an appropriate instruction on what that means or doesn't mean. I think there may be a state registration of some sort. Is there a similar instruction that the parties would like me to read or think is appropriate to read about that?

I'm not suggesting there's a right or wrong answer to that. I thought I would raise it now before any issue like that comes up.

MR. NEISER: Actually, Your Honor, I assumed it would be the same for both.

MR. ZEGARELLI: I actually did, too, Your Honor.

THE COURT: That's fine.

MR. ZEGARELLI: It's sort of the same rapid play, and we're not quite sure.

THE COURT: That's fine. I just wanted to make sure that that instruction goes for state or the U.S. Trade Office.

MR. NEISER: Yes, Your Honor, that's fine.

THE COURT: All right. Thank you.

One cautionary note I might say, just for everybody's consideration, it's certainly fine if you go back over someone's testimony on cross.

I think, though, the better course is rather than reading it, which then gives it to the jury twice, let's ask them if they remember what they said, and if they do, there's no need to do that; certainly, if you need to refresh their memory for some reason. But I think it's more expeditious, but more

importantly, you're not reading the same testimony twice, which we've already told them it's your memory that serves best.

So if you have to use it, that's fine, but I think let's use it when they're not agreeing with you about what they've said or they need their memory refreshed on that. If you need to go further with that, that's certainly fine.

MR. ZEGARELLI: Okay.

THE COURT: Okay. I think that was all that was on my list.

MR. ZEGARELLI: I have to say I do have one.

THE COURT: That's fine. Mr. Neiser's still thinking about his exhibits.

MR. ZEGARELLI: I don't want to interrupt that. I don't like bringing it up, Your Honor. Okay.

So we had, give or take, 27 machines shown.

THE COURT: Uh-huh.

MR. ZEGARELLI: Now, I don't think the website got published to the jury, even though admitted.

MR. NEISER: That's correct.

MR. ZEGARELLI: But the first thing right out of the box is only legal game in Pennsylvania. And so you juxtapose, you know, all of these machines and then you juxtapose a website that says "only legal game "and it's just tough for me not to say, you know, how do I address this website that uses that language. I hate to keep bringing it up.

MR. NEISER:  Your Honor, I was just following the instruction yesterday that if it was in writing that it was okay.

THE COURT:  What's your issue?  That it says it's the "only"?

MR. ZEGARELLI:  "Only," right.  So, I mean, you go through all of these machines and then you juxtapose the "only," and it just isn't, in my view, fair, because it just creates -- just the adjacency of that evidence.  Just -- it's like, "Look at all of these games with these different things," and then you go into, this is the only legal game, and I don't think it's fair.

MR. NEISER:  Your Honor, the machines and the exercise that we did with Mr. O'Bier was not -- we didn't reference compliance or commingling or any of those things.  We had him merely identify what we thought were misbranded machines. That's all.

I think the fact that one exhibit was offered through that witness -- I mean, I didn't put it in front of the jury, and I didn't even reference the contents of it.  So I don't think there is an adjacent or any type of improper conclusion that was raised because I didn't even put it in front of them. The only thing we identified for Mr. O'Bier was just misbranded product.

I understand Mr. Zegarelli's concern, but I don't

think that that's how it came in, and that wasn't the intention, and I don't think that's what happened.

THE COURT:  The magazine that was -- I don't remember what exhibit it was, but I know that you wanted the cover placed on that, and there were certain pages in there that I believe also said -- I'm not sure if it was the "only" or whether it was the first legal game.

MR. NEISER:  Yes, Your Honor.

THE COURT:  Which of those does it say?

MR. NEISER:  I think it says -- I can grab it if you want.  It's either "only" -- I think it says "only." I think -- it doesn't say first, it says "only."

THE COURT:  And that was, as I understand it, back in 2016?

MR. NEISER:  That was 2017.

THE COURT:  2017.

MR. NEISER:  But there were other ads in that time period that were run.  We do have a set of redacted ones, but based on what we discussed yesterday, I thought if it's in writing, it doesn't really matter.  It is what it says.

THE COURT:  Yeah, I think we agreed that with respect to those documents, they would not have to be redacted.

MR. NEISER:  Sure.

THE COURT:  What's the suggested cure, Mr. Zegarelli? What are you suggesting?

MR. ZEGARELLI:  I'm suggesting that I could cross-examine it, but I'm not sure.  You know, Your Honor, at this point in light of the line of rulings, I'm not quite sure how to offer a redress for it because you can't -- you know, on the one hand -- if you start redacting in a trademark case, you change the commercial impression, which is significant with regard to "only" -- you know, the difference between "only" and "first" is even quite severe because only legal game, arguably, is false.  First -- I'm not even sure -- that might be false, too.  But nevertheless, there's still a difference between those two.

I'm not sure, Your Honor, because I'm -- I'm trying to abide by the line of orders, and it's difficult.  I don't know how to -- I don't know how to address it.

THE COURT:  Well, I think prior rulings have indicated that use of the word "legal" in a document can be used.  So for example, if you have a document that has the word "legal" in it, as long as we don't get into parsing what legality means, because of the prior rulings.  So I think what I said yesterday was -- and I'm sure the record will reflect exactly what I said -- that someone's testimony about what may be legal or what they understand is legal is not admissible, but documents that use the terminology are admissible.  That's if they are otherwise admissible, of course.

Let me ask a question to both of you, and that is --

this relates to the photographs.  So putting aside the ones that said either "Pennsylvania Skill" or "Pennsylvania Skill Games," there were other machines that were not either parties'; correct?

MR. NEISER:  That's correct.

THE COURT:  What is your position -- and I'm asking both of you because I don't know the answer to this -- are those -- I'm going use the word "legal," but are those terminals legal?  They're in somebody's convenience store, I assume, somewhere.  When we say "only legal game," what about those games?

MR. NEISER:  We don't think they are.  But you're never going to see them from us again.  I got what I needed from him.  I just wanted the exhibit to be complete.  Because I didn't want to -- one, that exhibit goes for two things.  It counts all of the machines that, I believe, that they have in operation that's based on a discovery request, and I haven't heard otherwise.

So I've had a conversation with Mr. Zegarelli, you know, if I don't get an update on it, I'm assuming that is the body count.  So that's one.

And number two --

THE COURT:  How many were there?  Just so I know, approximately.

MR. NEISER:  I think there's 82.  83, there's about 80

of them.

THE COURT:  Okay.

MR. NEISER:  And of that, I believe we have between 15 and 25 we would claim to be misbranded, intentionally so.

THE COURT:  Because they say Pennsylvania Skill Games?

MR. NEISER:  They say Pennsylvania -- it looks like ours.  Whether it says games or not, our position is that would be confusingly similar.  So anything that has anything that looks like our brand, what we're claiming to be our brand, and it does not contain Pace software, we would call that mislabeled.

I'll go as far -- I'll describe how I'm going to use it.  If I use it in closing, I would use only the ones that Mr. O'Bier identified, the ones I wanted him to do the check. And I guess I should have done that the at same time.  Meh. That would list what we consider to be infringing games.  I think that's the best way to put it.  We're not going to show the other ones.

THE COURT:  Are you going to argue that other machines that Pennsylvania Skill Games may have placed somewhere that aren't in either category, they're yours or --

MR. NEISER:  Not going to mention them.

THE COURT:  You're not going to mention those at all?

MR. NEISER:  I don't think they're relevant to the case. I think it would be improper if I did.

THE COURT:  So let's go back to your concern, that the website says it's the only -- as I understand it -- the only legal game.  I don't know if it does or not.  But that's what it says.

MR. ZEGARELLI:  On the first page.

THE COURT:  Okay.  Why is that an issue?  I just want to make sure I understand.

MR. ZEGARELLI:  Your Honor, I mean, you've got testimony in the record where you've got somebody talking about the cops picking our games up, and I understand -- you know, and then you've got a website that, quite frankly, to me, is post-litigation self-serving marketing and isn't probative of anything.  I don't think it's a business record.  I think it's -- it's a marketing piece.

You have the juxtaposition of the evidence.  I just think you put all of those together and it's prejudicial.  It leaves a listener with the cops are seizing things, if they're together.  And then you've got this other little piece with "only legal game."  Then you've got this -- by the time you put it all together, it's -- it's kind of back-doored the thing that was not supposed to be in play.

MR. NEISER:  Your Honor, if it were a consumer claim and Mr. Zegarelli was representing a class of operators claiming nonconforming goods or something like that, I get it.  We're not talking about that.

THE COURT:  What is your suggested remedy?

MR. ZEGARELLI:  Your Honor, again, I mean, I would ask that you reconsider the evidentiary ruling to admit it.

But I don't have a remedy because I think the evidence that I'm challenging shouldn't be admitted, and I don't know how to remedy that particular evidence short of saying it's not probative.  And, even if it is probative, it's, you know, contrary to the orders.  But then if you try to redact, then you've changed the commercial impression.  Yeah, it's just -- it's just, you know -- it's just difficult.

THE COURT:  Is what you're requesting that I change my ruling about the admissibility of the website document?

MR. ZEGARELLI:  I think that would be my -- that's the only thing that I could ask, short of you -- I would ask that you reconsider and not admit it, first.  In the alternative, maybe just in a soft way to say -- well, either way, reconsiderations.  Or the first one's just it's not admissible, and they didn't see it yet, so it's not prejudicial.  The second is that, you know, you sort of digest it, not that you couldn't do it right now, but just consider to it and maybe talk about it tomorrow morning after you think about it.

THE COURT:  Okay.  So if it wasn't -- I will -- I will do that.  If I don't change my decision, what relief are you seeking?

MR. ZEGARELLI:  I don't think there is relief that I

can seek.  I mean, the -- a redaction for that particular website I suppose could work because, to me, that website is just a self-serving marketing piece post-litigation and not truly a business record.

So could you take that out?  I suppose.

THE COURT:  Do you have a copy of it that you can leave with me or?  Is it in the -- oh, it's in the exhibits, I think.

MR. NEISER:  It is in the exhibits, but I can give you another copy, Your Honor.

THE COURT:  All right.  Would you do that for me?

MR. NEISER:  I'd be happy to.

THE COURT:  Okay.  I'll take a look at it.  I'll consider whether I'm going to reconsider.  I'm happy to hear from each of you further tomorrow if you want to discuss it further.

MR. ZEGARELLI:  Thank you, Your Honor.

THE COURT:  Do we know any more witnesses?  Has your memory been refreshed?

MR. NEISER:  Yes, Your Honor.

THE COURT:  Or recorded recollection.

MR. NEISER:  So tomorrow on the menu is we'll finish Mr. O'Bier.  I do not expect to be more than 15 minutes with him, at the most.

Danny Warren.  Lou Miele.

MR. ZEGARELLI:  Big ones.

MR. NEISER:  And Wayne DeLuca.  And right now, our staff is marking up your file designation with a highlight to determine overlap, like we talked about earlier, same thing so the Court hears, we're marking up the file designation.  We're going to send that over to Mr. Zegarelli so he know where the overlap is.  And then we're going to take that and we'll submit to the Court, with an email to Ms. Hopkinson and Mr. Zegarelli, a highlighted version of the full transcript so you have that.  Sharon has asked for the designations themselves to be provided for her.

THE COURT:  Great.

MR. NEISER:  We're going to do that in electronic form so we don't make -- let's me make a third note -- to make it easy.  And then we'll circulate it, and hopefully -- I have told my team to -- very thin review on objections so we can just get past this and get it in.

THE COURT:  Okay.

MR. NEISER:  Because I understand that Mr. DeLuca is not available; so we're trying to be as fair as possible.

THE COURT:  That's fine.  One thing I would like you to talk about at some point before we get to that point is that we'll have to somehow divide up the time since there are designations.

So I want to do what each of you thinks is fair.  And

it sounds like you may have already talked about this or you will talk about it.

MR. NEISER:  We talked about it walking down the hallway.

THE COURT:  Okay.

MR. NEISER:  If we want to be super precise, that's why we did the overlap.  If we've already designated it, we won't take that time away from Mr. Zegarelli because we've originally done that.

THE COURT:  Understood.

MR. NEISER:  So if it looks 50/50, we'll do 50/50.  If not, we'll allocate it another way.

THE COURT:  Okay.  Yeah, if you can agree on that, that's great.  I want to be fair to both of you.  And the only -- I will say the one thing I noticed, there's some of the designations in there that I got from you yesterday, Mr. Zegarelli, that look like it's just colloquy between counsel.

MR. ZEGARELLI:  You know, I might have been a little bleary-eyed, quite frankly, last night.

THE COURT:  What?

MR. ZEGARELLI:  I went -- when I went, you know, it was, you know, 8:00, 8:35, or whatever time.  But, you know, yeah.  I do apologize.  I thought some of that -- colloquially.

THE COURT:  Colloquy.

MR. ZEGARELLI:  Colloquy -- thank you -- would have been removed.

THE COURT:  That's fine.  I mean, and there were a couple of places where I think you might have meant to go another line down.  So we can fix all of that.

MR. NEISER:  I'll try to fill the gaps if I can.

MR. ZEGARELLI:  His staff is kind of --

THE COURT:  So we'll get that finalized so you'll be ready to roll on that.

I know you both know this, but it is tricky with witnesses and time and making sure folks are here.  I do want to keep moving with this jury so that we're not having them sit.  So I'd like to keep moving and keep using all of the time that we've allotted.  If we come up with an issue, let me know that ASAP; we'll figure out what to do about it.

MR. NEISER:  And we have all of our folks who are going to testify here.  They are present.  And they're stacked.  So we're rotating them in here and -- like today, exactly how today is, is how we're going to do tomorrow and Thursday.

THE COURT:  That's fine.  It worked out efficiently and I appreciate it.  Let me go off the record.

(Off-the-record discussion.)

(Proceedings concluded at 4:55 p.m.)

- - -

**I N D E X**

**PLAINTIFF  WITNESSES**:                                    Page

**Michael Pace**

  Direct Examination Continued By Mr. Neiser           5
  Cross-Examination By Mr. Zegarelli                  27
  Redirect Examination By Mr. Neiser                  91
**GLEN CARTER**
  Direct Examination By Mr. Neiser                    93
  Cross-Examination By Mr. Zegarelli                 102
  Redirect Examination By Mr. Neisser                103
**Ryan Wood**
  Direct Examination By Mr. Neiser                   104
  Cross-Examination By Mr. Zegarelli                 147
  Redirect Examination By Mr. Neiser                 167
**Chris O'Bier**
  Direct Examination By Mr. Neiser                   170

C E R T I F I C A T E

        I, SHARON SIATKOWSKI, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

s/Sharon Siatkowski
SHARON SIATKOWSKI, RMR, CRR, CBC, CRI
Official Court Reporter