IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

POM of PENNSYLVANIA, LLC,
et al.,

                    Plaintiffs,    Civil Action No. 18-722

        vs.

PENNSYLVANIA SKILL GAMES,
LLC,

                    Defendant.

                              - - -

Transcript of Jury Trial on February 15, 2023, United States District Court, Pittsburgh, Pennsylvania, BEFORE:  Judge Patricia L. Dodge, Magistrate Judge.

APPEARANCES:

| | |
|---|---|
| For the Plaintiffs: | Julian E. Neiser, Esquire |
| | Jonathan Deasy, Esquire |
| | SPILMAN, THOMAS & BATTLE, PLLC |
| | 301 Grant Street |
| | Suite 3440 |
| | One Oxford Centre |
| | Pittsburgh, Pennsylvania 15219 |
| For the Defendant: | Gregg R. Zegarelli, Esquire |
| | Technology & Entrepreneurial Ventures Law Group |
| | 2585 Washington Road, Suite 134 |
| | Summerfield Commons Office Park |
| | Pittsburgh, Pennsylvania 15241 |
| Court Reporter: | Sharon Siatkowski, RMR, CRR, CBC, CRI |
| | 700 Grant Street, Ste. 6260 |
| | Pittsburgh, Pennsylvania 15219 |

Proceedings recorded by mechanical stenography; transcript produced by computer-aided transcription.

PROCEEDINGS

- - -

(Whereupon, the following discussion was held in chambers.)

THE COURT:  All right.  Yesterday, at the conclusion of the day, we had some discussion about Exhibit 201. Mr. Neiser, you may have already recounted this, but would you tell me what is the relevance of Exhibit 201?

MR. NEISER:  Yes, Your Honor.  If we can make an offer of proof, the relevance of Exhibit 201 is to show the usage of the brand in commerce, to show the length and extent of advertising.  I thought that we were going to be able to offer, or at least put together, a grab or a capture of each party's websites as they sit today, whenever that was, even if that was in the fall.  So we're offering it only for that purpose.

THE COURT:  All right.  I'm sorry if you had something more to say.  I didn't mean to interrupt you.

MR. NEISER:  I just wanted to add one other thing. You asked yesterday also about whether some of the ads said "first legal game" or "only legal game."  It is a mixed bag. Sometimes it says "first"; sometimes it says "only."  And it depends on when.

So some of the very early ads, some of the very early references that we discussed say "first" or "only."  And then later it became "first" or vice versa, one of the two.  I can't

say that they're all the same.

THE COURT:  Okay.

Mr. Zegarelli, I know you made some points yesterday, and they specifically related to the phrases that appear on some of the pages that this is the only skill game, only legal skill game in Pennsylvania.

MR. ZEGARELLI:  Right.

THE COURT:  So, Mr. Neiser, if this is to be admitted, those references have to be deleted with respect to "only."

MR. NEISER:  We have no problem, Your Honor.

THE COURT:  I note on the first -- I believe it's the -- first four pages at the footer, that is referenced, and it is also referenced on the first page, so that entire line should be deleted in any place that it appears.  And those are the only places I see that it appears, but you'll have to check that.

I don't think we need to advise the jury that there are redactions because they've already been, I think, thoroughly educated about redaction, and they haven't seen the document yet.

So, Mr. Zegarelli, do you have any objection to that ruling?

MR. ZEGARELLI:  Yeah -- yes, Your Honor, I do.  I mean, it's the same objection generally.  It's a trademark case. You're removing, with that redaction, a significant portion of

what the advertisement is meant to do as it relates to the brand.  So -- and you know, it's got to get redacted, and I'm going to have to cross-examine Mr. O'Bier on it and the changes on it and how those changes were made and when they were made and --

THE COURT:  Well --

MR. ZEGARELLI:  You know, somewhere along the line, somebody's got to -- you know, I objected to it.  It wasn't shown to anybody.  There was no foundation laid for it, basically.  So, I mean, at least I'm going to have to cross-examine him on everything he knows about that exhibit.

THE COURT:  Well, let me say this:  If you're going to cross-examine him about what's been redacted, I think that's improper.  You've objected specifically to the reference to, among other objections, the "only legal skill game," and I am ordering that that goes out.

Mr. O'Bier should, you know -- it's either going to be out and not referenced or in and referenced.  And, as I understand it, you thought that that particular phrase was prejudicial in light of some of the other testimony about the fact that there are other machines that were shown and are out in the marketplace.

MR. ZEGARELLI:  I think the exhibit, Your Honor, is -- he can't redact material portions of advertising in a trademark case.  That's -- so I just -- I still -- I can't accept a

redaction as an acceptable mechanism for admission of an exhibit that I still believe, as redacted, does not reflect the advertising meaning, and -- and it still needs a foundation to come in, Your Honor.

So I still have to have somebody -- perhaps I'll have to look at -- Mr. O'Bier may have said he's familiar with it, but then I have to cross-examine him about his familiarity with it. So what was removed, why it was removed, what has changed, when changed. So at least --

THE COURT: I'm not going to permit questions about what was removed from the document, just like we haven't permitted questions about other redactions. So, you know, you can't have it both ways.

MR. ZEGARELLI: I only wanted it one way, Your Honor. I'm not trying to have it both ways.

THE COURT: No, I understand.

MR. NEISER: Just for clarity, Your Honor. There's only one in the body of the document reference to "legal," I believe. In the front here, it says "the only legal skill game" there. The rest of them -- we use a program to ensure that we're capturing the entire site, and that program is called something, and it puts at the bottom of each page the document title, which appears -- it's metadata. So when you look it up, that's what it says at the top.

At the bottom, where it's referenced in the actual

document -- at the bottom, for example, of Exhibit 201, it's just data, and it describes what the document title is.  You can view the code, and it will show you; it hides in the background.  Kind of cool.  But that isn't part of the advertisement.  So that's not an accurate statement.

So we can eliminate "the only legal skill game in Pennsylvania."

As far as Mr. O'Bier, I mean, the foundation was laid.  Are you familiar with the website?  He's an employer.  He's a senior employer -- employee.  I'm sorry.  Not employer.  Employee.  He's familiar with the website, and he can say it's a true and accurate copy, which is what he did.

THE COURT:  And just to be clear, the trademark at issue is the name "Pennsylvania Skill" and the design "Pennsylvania Skill," not "the only legal skill game."  That is not part of the trademark.

MR. NEISER:  That's a great point.  Great point.

MR. ZEGARELLI:  Your Honor, I can only say respectfully, I think that's error to suggest that you can remove a material part of a trademark advertisement in a trademark case.  And I understand -- I understand your ruling, the way you're ruling.  I do just believe it's --

THE COURT:  I understand.  Your objection is preserved, and I respect that.

All right.  Let's deal with Mr. DeLuca's designations.

I read what was submitted last night.  What -- do we have objections to the counterdesignations?

MR. NEISER:  Your Honor, the only objections that we have are with respect to, as the Court pointed out, colloquy, and some of the discussions between counsel.

THE COURT:  Okay.  Let's talk about them specifically.

MR. NEISER:  Sure.  Your Honor, do you need paper?  Or of any of these --

THE COURT:  No, I have paper and a copy that was submitted last evening.  So I have both.

MR. ZEGARELLI:  Are we going to do the Action Skill depo first or the --

MR. NEISER:  I'm going to do the first -- we're going to go first in time, so that would be in our case.

MR. ZEGARELLI:  Okay.  That's the 2021 case.

MR. NEISER:  Yes.

THE COURT:  No -- oh, the Action Skill.  Sorry.

MR. NEISER:  No, of course.

THE COURT:  Let me pull that up.  All right.

MR. NEISER:  Page 6, lines 24 through page 7, 12.  I'm sorry.  Let me be clear for the record.

This is in regards to the deposition designations of attorney Wayne DeLuca under the caption in this matter.  Date of deposition is Friday, July 10, 2020.

THE COURT:  Okay.  So that's not the Action Skill.

That's the --

MR. ZEGARELLI:  PSG.

MR. NEISER:  PSG.

THE COURT:  That's the PSG.

MR. NEISER:  Yes, ma'am.

THE COURT:  Okay.  I thought you had said --

MR. NEISER:  No, ma'am.  I was --

MR. ZEGARELLI:  Actually, Your Honor, you said it correctly, initially.

THE COURT:  Okay.  Let me just get that pulled up again.

MR. NEISER:  Sure.

THE COURT:  Okay.  I'm ready.  So page 6.

MR. NEISER:  Yes.  Lines 24 to page 7, line 12.

THE COURT:  And what is your objection?  That it's colloquy?

MR. NEISER:  It's colloquy.

MR. ZEGARELLI:  I think that the -- the fact that Mr. Neiser, on behalf of -- well, I think the jury gets to hear that Mr. DeLuca added -- at a deposition had representation, had counsel of record.  I don't think you can remove counsel of record appearing for a deponent.

MR. NEISER:  Your Honor, it seems irrelevant.

THE COURT:  I'm going to allow that, and let me tell you why.  Because I think the fact that Mr. DeLuca was being

represented by you, Mr. Neiser, is something at least that the jury could take into consideration --

MR. NEISER:  Sure.

THE COURT:  -- with respect to potential bias, his -- the nature of his responses, and so forth.  So we'll leave that in.

MR. NEISER:  Understood.

MR. ZEGARELLI:  Excuse me.

Julian, are we looking for the pinkish-reddish --

MR. NEISER:  Yes.

MR. ZEGARELLI:  That's the area that we're discussing?

MR. NEISER:  Yes.

THE COURT:  I will say, though, that I don't believe, if you have an objection to the continued colloquy on the next page, that all of that is necessary.

MR. NEISER:  That's what I was going to next, Your Honor.

THE COURT:  I'm happy to hear from you on that, Mr. Zegarelli.  But on page 8, starting at line 2 through page 9 at line 6, I think others who may have been present and sitting in is not necessary.  If you want to have your appearance entered, which is lines 2 through 6 on page 8 --

MR. ZEGARELLI:  No, I think that's fine, Your Honor. I think, for the reason you said, Mr. Neiser's representation of the deponent is material to exactly what you said, a bias.

These are counsel of record appearing, counsel of record.  So I agree.

THE COURT:  All right.  Then we will take out the counterdesignations that appear on pages 8 and 9.  And I believe that should also include lines 11 through 19, because I didn't see any designations that got into attorney-client privilege.  Is there any objection to that?

MR. ZEGARELLI:  Yeah, that's okay.  That's fine, Your Honor.

THE COURT:  All right.

MR. NEISER:  Your Honor, this would be on page 6, lines 8 through 16.

THE COURT:  Page 16?

MR. NEISER:  Yes, ma'am.  Lines 8 through 16.

MR. ZEGARELLI:  Why would that not be part of the deposition?  That's --

THE COURT:  Well --

MR. NEISER:  We're testifying at that point.  I'm attempting to move the deposition along, and it's --

THE COURT:  I mean, there is a statement from the witness, but it does not appear to be in response to a question, that I can tell.

MR. ZEGARELLI:  Line 8, Your Honor?

MR. NEISER:  Your Honor, I can take it or leave it.  It's not a big deal.  I don't want to belabor it.

THE COURT:  Mr. Neiser, do you want your comment left in there?

MR. NEISER:  I'd like to take mine out.  There's no need for me to be testifying.

THE COURT:  All right.  Then we'll take out Mr. Neiser's remark and leave the rest of it in.

MR. NEISER:  That would be line 11.

No, this is one that isn't matched up, Your Honor, so let me -- and when I say "matched up," I refer to an exhibit of the deposition that is not tied to an exhibit that appears in the binders or was discussed to be introduced.  But I think we can fix this.

With respect to designation 17 -- I'm sorry -- page 17, lines 14 to 25, and 18, 1 through 3, we have no objection to the substance.

I just want to point out that Exhibit C, as I recall, is a 2011 letter from then-counsel for Pace-O-Matic to attorney DeLuca, and they're discussing potential engagement of Mr. DeLuca to assist with a Pennsylvania game.

We had not previously designated it.  So we can -- I have no problem with the letter coming in, if you want to give it a number at the end.  And you and I can do that outside.

MR. ZEGARELLI:  Okay.

THE COURT:  Okay.  And one thing, it's incomplete on page 18.  In other words, the designation only goes through

line 3.  But it should be through line 4.  I think that was the original designation.  I think I mentioned to you yesterday, Mr. Zegarelli, there might be a couple of incomplete ones.  So let's just take it through line 4.

MR. NEISER:  We tried to catch those, Your Honor.

THE COURT:  That's okay.

MR. NEISER:  We filled them in.

THE COURT:  All right.  Where are we going next?

MR. NEISER:  We are going to --

MR. ZEGARELLI:  And the blues are fine?

THE COURT:  The blues are where you both designated the same thing.

MR. NEISER:  I'm not going to go through all of them. I'm only going to go through the ones that we object to.

THE COURT:  That's absolutely fine.

MR. NEISER:  To page 24, lines 6 through 19.

MR. ZEGARELLI:  Excuse me, Julian.  Did we do page 21?

THE COURT:  There's no objection to that.  We're only doing --

MR. NEISER:  Page 21?

MR. ZEGARELLI:  21, there's a lot of red.

THE COURT:  That's your designations.

MR. ZEGARELLI:  You don't object?

MR. NEISER:  No.  I'm only talking about the things that I object to.  I think, you know -- I don't think some of it

is necessary, but I'm not going to object to it because I just -- it's not fair.

MR. ZEGARELLI:  That's fine.

THE COURT:  Page 24, is that the next one?

MR. NEISER:  Yes, Your Honor.  I'm sorry, I lost my page.  24, lines 6 through 19.  There's no real question here.

THE COURT:  Certainly, lines 6 through 14 should come out because it's just colloquy between counsel.  16 through 19 references Exhibit D.

MR. NEISER:  Exhibit D, Your Honor --

THE COURT:  And then your designation, Mr. Neiser, is marking that for identification.  And then as we go on to page 25, there is then a question and answer about Exhibit D.

MR. NEISER:  There is.

THE COURT:  So do we need 16 through 19 if we have Exhibit D marked for identification?  And the next question references it.

MR. ZEGARELLI:  May I have the exact page?

MR. NEISER:  24.

MR. ZEGARELLI:  24.

MR. NEISER:  6 through 22.  We don't need to designate 21 and 22.

MR. ZEGARELLI:  All right.

MR. NEISER:  That's our designation.  We can pull it out to avoid --

MR. ZEGARELLI:  If we -- I'm sorry.  The Exhibit D, that's -- that's staying in?  Or that goes out with the baby and the bath water?

MR. NEISER:  I think it can -- there's portions of it that can stay in.  Trial Exhibit 155, 155 is a combined exhibit.  I don't know that -- that was one of the other things, I don't know if we need to have the entire exhibit put in.

MR. ZEGARELLI:  You want to look at it and just --

MR. NEISER:  You and I can do that.  Literally, it will take five minutes.

THE COURT:  Okay.  Certainly, at a minimum, on page 24, lines 6 through 14 will come out, and the two of you should talk about whether there needs to be any identification of that exhibit.

MR. NEISER:  Okay.  Got it.

MR. ZEGARELLI:  And if it's simply the identification --

MR. NEISER:  Yeah, we don't need it.

MR. ZEGARELLI:  -- I'm not sure we need it.  If it's used -- my concern was if you remove part of it, does the exhibit leave.

THE COURT:  I understand.

All right, Mr. Neiser, where are we going next?

MR. NEISER:  Your Honor, one of the -- page 31, lines 10 through 24, on the relevance, we're talking about an

engagement letter and all -- I mean, I can take it or leave it. It's just for saving time. If it's -- if Mr. Zegarelli wants it, I guess we can do it.

MR. ZEGARELLI: This is page 30, line 4?

THE COURT: Page 31.

MR. ZEGARELLI: 31.

THE COURT: Lines 10 through 24.

MR. NEISER: Thank you.

MR. ZEGARELLI: I'd like to leave it in. It's on the point he's representing -- represented multiple of these entities.

MR. NEISER: Your Honor, if it's -- if you find that goes to credibility, I understand it. I just don't -- every second I can save for something irrelevant, I would like to do.

THE COURT: Well, let me suggest this, because in the lines immediately above that, Mr. DeLuca's asked if he ever represented Miele, and he says yes.

MR. NEISER: And that's my point, Your Honor. We cover that. I mean, he did -- the detail --

THE COURT: Does it matter to you that there was an engagement letter and he looked for it and couldn't find it? In other words, does this really go to any issue, or -- since he's already indicated that he represented Miele Manufacturing?

MR. ZEGARELLI: I think, Your Honor, that the file that he has or doesn't have is -- or would have been, certainly

if he testified, something that would be at issue.  So I'd still prefer to just leave it in.

THE COURT:  Because the file is relevant for some reason?

MR. ZEGARELLI:  Well, the file -- there's nothing in the file for somebody he represented.

THE COURT:  Okay.

MR. ZEGARELLI:  And, you know, the truth of the matter is, when I talked to him he said he had a file.  And then when we deposed him.  He said there was a flood in his office and said that, you know, documents were missing over the years, that sort of thing.  So --

THE COURT:  Well, Mr. Neiser, what I'm hearing is you don't have a significant objection to it.  I think it's, quite frankly, marginal at best.  But if you don't have a significant objection to it, we'll leave it in.  It seems to me it's just a time-eater, but if you --

MR. ZEGARELLI:  I understand.

THE COURT:  -- if you feel you're going to argue at some point that Mr. DeLuca destroyed his file, which I don't see anywhere in the depositions, nor is he going to be here.

MR. NEISER:  That's -- well, that's part of my problem, Your Honor.  I can say with probably great certainty that the vast conspiracy of not having attorneys having individual engagement letters and the just mundane details of

representation is all going to be a huge conflict of interest and unethical and illegal and swimming in a sea of paranoia. If we can avoid those things, I'd like to. I don't think it's relevant. I don't think it's fair to Mr. -- attorney DeLuca to smear him on the record when he's sick and retired.

THE COURT: Okay. What we're going to leave out is lines 10 through 15 because I don't think the engagement letter -- whether an attorney should issue an engagement letter or not may relate his professional duties but doesn't relate to an issue in this case. We'll leave the rest in.

MR. NEISER: Your Honor, I can go next to page 33, lines 15 through page 34, line 3, basis for our objection is relevance. It discusses prosecution, and it discusses Miele where the father asking for advice and what the temperature is in Pennsylvania of these games being out there and prosecution in other part of the state.

MR. ZEGARELLI: Again, it's relevant to determine who he represents and that he represented all of these parties in various matters. It's a credibility issue, from our perspective.

MR. NEISER: The next lines, Your Honor, discuss the last time he performed any services for a Miele entity. The preceding section relates to prosecution and finding information.

Honestly, Judge, I think that would fall under

attorney-client privilege because if the conversation occurred, it would be within the auspices of seeking legal advice in any form.  But I don't think it's relevant.  I don't think you even need to get there.

MR. ZEGARELLI:  I'm not sure you're the right person to assert the privilege, though, of course.

MR. NEISER:  I'm not.

MR. ZEGARELLI:  Yeah.

MR. NEISER:  Well, actually, I am.  I'm representing Miele Manufacturing; the client holds a privilege.

THE COURT:  All right.  We're going to remove lines 15 on page 33 through line 3 on page 34.  Your objection is sustained.

MR. NEISER:  Thank you, Your Honor.

On page 34, just because I think it would fall into 403 for confusing the issues, line 16 of page 34, Mr. DeLuca's response to the question of when was the last time you actually charged for services for one of the Miele entities, he states the date, probably be 2010 --

(Court reporter clarification.)

THE COURT:  Probably be 2010.

MR. NEISER:  Probably be 2010, and for the litigation, I would ask to strike "for the litigation."  It confuses the issue.

THE COURT:  That objection is overruled.

MR. NEISER:  Thank you.

Okay.  Page 37, lines 2 through 18.  It introduces the identification of an Exhibit E, which is a page from a website. It actually shows my picture on it, a picture of Matt Haverstick from the Kleinbard firm, who is doing other work for Pace-O-Matic, and a picture of Mr. DeLuca.  Relatively innocuous.  I don't see the purpose for it.  I look horrible in the photograph, so I object to that.  But I'm not quite sure --

THE COURT:  I saw your reference to that, Mr. Neiser.

MR. NEISER:  I'm sorry, Your Honor.

THE COURT:  I think there's arguable relevance to that.

MR. NEISER:  Understood.

THE COURT:  Because Mr. DeLuca's picture is in there. We could redact your picture if -- I'm just kidding.

MR. NEISER:  I know.

THE COURT:  If it really bothers you.

MR. NEISER:  It does not bother me.  They got me on a bad day.  Maybe it was a good day.  I can't really recall.

I'm trying to be quick.

THE COURT:  That's all right.  We'll take the time we need.

MR. ZEGARELLI:  I take it there's no jury problem this morning?

THE COURT:  Don't know yet.  I'm just keeping my

fingers crossed.

MR. ZEGARELLI: What are you up to, Julian, if you don't mind?  Give or take?

MR. NEISER:  Excuse me?

MR. ZEGARELLI:  What page are you at?

MR. NEISER:  I'm at 54.

MR. ZEGARELLI:  Okay, just so I can catch up.

MR. NEISER:  And I took a long look at this last night, and I made some notes here.  Page flipping is --

THE COURT:  Can I go back, just for a moment, just because I just want to make sure that both of you are okay with the extended -- not extended colloquy, on page 52, where there's -- if you look at lines 2 through 12, does anyone really need to read that?

MR. NEISER:  52, Your Honor?

THE COURT:  Uh-huh.

MR. NEISER:  Oh, this was not highlighted on mine. I'm sorry.

THE COURT:  That's all right.  It's just a conversation back and forth between the two of you about what exhibit it is, and I don't really see any reason to --

MR. NEISER:  I think we can cut them, Your Honor -- go out.

MR. ZEGARELLI:  -- Your Honor?

THE COURT:  Page 52, lines 2 through 12.

MR. ZEGARELLI:  Yes, I agree.

THE COURT:  Okay.  Then let's take that out.

MR. ZEGARELLI:  Julian, mark it, put your X through it.

MR. NEISER:  Thank you.  I need all of the help I can get.  Thank you for letting me bring my coffee in this morning, Your Honor.  I'm all the way up to 73.

THE COURT:  I'm going back to page 58; just let me make sure I understand my notes.  I believe the designation was only through line 14 on page 58, and the answer is on line 16.

MR. ZEGARELLI:  There's an interposed objection at 15, Your Honor.

THE COURT:  Right.  I can't imagine, Mr. Neiser, you want that objection ruled upon.

MR. NEISER:  I do not want that objection to be ruled upon.

THE COURT:  We don't need line 15, but we do need line 16, and I think the designation that I saw, at least -- and it may be complete, but I think in Mr. Zegarelli's, it only went through 14.  So let's just make sure the answer is read as well.

I'm sorry.  When you're ready, you were up to page 70-something, I believe.

MR. NEISER:  Yeah, let me double-check something, Your Honor, please, if you don't mind?

THE COURT:  Not at all.

MR. NEISER:  On 61, I don't think we need pages 8 through 11.

MR. ZEGARELLI:  Julian, did you -- just so I mention it, did you handle the striking of the objection on 58?

MR. NEISER:  Yes.

MR. ZEGARELLI:  Oh, okay.  Very good.  What page are we on?

THE COURT:  61.

MR. ZEGARELLI:  61.

THE COURT:  What was your --

MR. NEISER:  We're marking a document of four pages as Exhibit H.  I think we have 61, lines 3 through 11 -- 8 through 11 may not be necessary, that's all, Your Honor.  I can take it or leave it.

MR. ZEGARELLI:  And the references dates are still in the body?  I don't mind removing that language either as long as we're not throwing the baby out with the bath water, that's all.

MR. NEISER:  No, I don't think we are.

THE COURT:  There is a reference to Exhibit H at the very top of page 62.  So do we need -- are we just going to put the --

MR. NEISER:  I just -- I think the previous text was just identifying it, marking it for identification, that's all.  It's just a couple of lines.  But the actual testimony refers to the exhibit itself.  And I think that's the important --

THE COURT:  We're just taking out the marking it -- okay.  Then we'll take out lines 8 through 11 on page 61.

MR. ZEGARELLI:  If I understand when it's read in, it will have trial exhibit number, to the extent there is one?

MR. NEISER:  Yes.

THE COURT:  Mr. Neiser, where are we going now?

MR. NEISER:  73, lines 14 through 15, it's another marking for identification.  I can take it or leave it.  Actually, it's my own.

THE COURT:  Well, you can decide.  I don't think it's a big deal one way or the other.  If it's going to be shown, I think we can take that out.

MR. NEISER:  The same with page 75, lines 24 and 25.

THE COURT:  Okay.  That's fine.

MR. NEISER:  And then, Your Honor, we designated this section, and it's the Farley report, the very first Farley report.  I'd like to withdraw this.  I don't see it's relevant anymore.

THE COURT:  What page are you on?

MR. NEISER:  I'm sorry.

THE COURT:  I'm sorry, excuse me.

MR. NEISER:  I'm sorry, Judge.

THE COURT:  That's all right.  No, it's fine.

MR. NEISER:  This is page 76, lines 2 through 7.

MR. ZEGARELLI:  I would have designated it if you

didn't.

MR. NEISER:  We will withdraw ours.

THE COURT:  All right.

MR. NEISER:  I find it to be irrelevant.  I mean, the report that was provided, I mean, I can take it or leave it.

THE COURT:  What's the relevance of the report itself, as opposed to the fact that Mr. Farley was involved in the original Beaver County case?

MR. ZEGARELLI:  Only that the testimony in and of itself identifies the versioning, it's a 402.44, which remains a significant issue in the case.

THE COURT:  Well, if you can take it or leave it, then let's leave it in.

MR. NEISER:  That's fine, Judge.  Actually he says it. I thought he did.  He does actually testify to the version on page 78.  So that's what I thought.

MR. ZEGARELLI:  83, so far as I can tell.

MR. NEISER:  Excuse me?

MR. ZEGARELLI:  I'm up to page 83.  I'm trying to keep up with you.

MR. NEISER:  No, no, no, you're good.  I'm going -- all of it.

On page 86, lines 23 to 87 -- sorry -- 87, page 2, for one.  And I believe the question relates to whether later versions of the software have been tested for validity based on

prior rulings.  I think that should be stricken.

MR. ZEGARELLI:  Are we still -- Mr. Goodling is going to testify, if I understand, about compliance reports?  Although I'm not quite sure of the terminology he's going to use, but he's -- is that terminology used or not used?

MR. NEISER:  The only thing Mr. Goodling is going to say, whether or not he saw games -- I think at least in part -- that are misbranded.  He's not going to talk about whether anything is compliant or not compliant or anything like that.

MR. ZEGARELLI:  Well, misbranded is sort of a --

MR. NEISER:  Oh, they're misbranded.  I mean, that's the argument.

MR. ZEGARELLI:  Well, I'm not -- that's a legal conclusion, whether they're misbranded.

MR. NEISER:  No.

MR. ZEGARELLI:  I think the fact is whether or not a computer has a certain brand with a certain software product. Whether they're misbranded, that's --

MR. NEISER:  That's for my closing.  All I'm saying is --

MR. ZEGARELLI:  Well, you can argue it.

MR. NEISER:  I know, but I'm saying he's going to testify as to what he saw, and he also can authenticate the business records, because he would be a custodian of record and these are made in the ordinary course of business and made by

somebody with knowledge and all that other stuff.  He's not going to talk about software versions.  He is not going to talk about compliance with terms and conditions, because your client never signed a terms and conditions.  It would be very basic.

So let's go back to the original objection which is Mr. DeLuca's testimony on software versioning.  Our objection is that the questioning is whether or not Pace-O-Matic version 59 has been to court to test its validity.  It's not even irrelevant.  And that continues from page 86, 23, to 87, 2.

THE COURT:  22.

MR. NEISER:  I'm sorry.

THE COURT:  Did you mean --

MR. NEISER:  Well, his testimony -- the designation was from 22 on to page 87, line 2.

THE COURT:  Yeah, I think the designation is page 87.  I just want to make sure I understand what you're saying.  The designation is through line 22 on page 87.

MR. NEISER:  No, Judge.  I have two objections.  I'm dealing with one at a time.

THE COURT:  All right.

MR. NEISER:  Because some of this doesn't relate.  So that's why I'm doing this in pieces.

THE COURT:  My apologies.  So since I've already ruled that we're not going to talk about different versions, since PSG is seeking lost profit damages through the present time, it does

not matter which version is out there because all such damages are being sought regardless of the version. So consistent with my prior ruling, those portions are out.

MR. NEISER: With that ruling in mind, Your Honor, that designation continues to line 22, as the Court just mentioned. We would then object to lines -- page 87, line 6 through 22, because it covers the exact same subject.

THE COURT: I mean, we have my prior ruling. So unless you have some other argument, that is also going to be stricken. Unless you want your client wants to limit its damages on -- let me finish, okay. I apologize. I know we all are animated about this case.

As I understand it, your client is not limiting its damages to version 402.44 with respect to its lost profits.

MR. ZEGARELLI: Those -- those versions based upon 402.44.

THE COURT: I'm sorry. I didn't understand what you just said.

MR. ZEGARELLI: Based upon 402.44. There's a difference, Your Honor. And I think we talked about this last time.

There is a -- there is a difference between 402.44 and the versions that follow that are based on 402.44. And at the time of this testimony, Your Honor, I'm not sure if even 59, that may have been clarified as a different number. But I think

we were just trying to find out if the latest version had been verified. And I think Mr. DeLuca does testify that the only version that was actually adjudicated was 402.44, and that relates to a lot of the branding that has occurred since. In other words, it's based upon 402.44, and that's how you get, you know -- so I think there should at least be some basic framework that the version today is based upon the version 402.44. And I don't need to get into anything other than that little issue. Just --

THE COURT: Will you stipulate to that?

MR. NEISER: I'm not even quite sure what he's asking, Your Honor.

THE COURT: I know. Is the version today based upon -- I mean, I don't want to reopen the same can of worms that we've talked about multiple times. So I'm going to rule this testimony out.

If you have some further argument you want to make that is different than what has already been made, I'll give you some time to do that at some point, but as I've indicated before, with respect to the trademark, your client is seeking damages that do not relate to which version is out. They relate to all damages, all disgorgement of the use of the "Pennsylvania Skill" word, mark, or design mark from whenever it was created through the present time.

So regardless of which version is out there and

whether -- I'm not making any conclusion on this -- but whether such version is legal or not or has been adjudicated or not, the damages sought do not make a difference between versions.

MR. ZEGARELLI:  I'm not -- I would not, Your Honor, at this stage, based on your rulings, even begin to get into legality or into the details of all of the different versioning along the way.

I would ask, however, that there be one little piece of data to go to the jury that says the version today is based on the version 402.44, just so there's a connection back to the lawsuit for purposes of what's in the market today back to the original lawsuit.  And it's -- and I believe that's material to liability.  I don't need to expand upon it.  I don't need to dig into it.  I just want to create one piece of data, Your Honor, that just sets that fact for the jury to hear the version today is based on the lawsuit that occurred ten years ago.  That's all.

MR. NEISER:  Your Honor, it's not relevant.  And this falls under the -- if you give a mouse a cookie.  And I'm not inclined to even crack that seal.  We've been very clear.  I'm almost through my case with witnesses, okay, who can discuss these things.  We were told not to discuss versioning or any of those things that are with it.  So for us to even hint at something like this at this point, when I'm almost done with my case, is prejudicial.  It has -- I don't care if it's version 5

million at this point and they changed the software to look like something completely different.  It has nothing to do with the case.  Did we breach a right of first refusal in an equipment purchase agreement?  And who designed and owns the mark, who created secondary meaning -- all of those things that go with it.

So for us to even be discussing this right now, ten minutes before we're supposed to get in front of the jury, I think is insane, and that's the only way I can put it.  And I would object to us having to discuss versioning or one piece of data because that one piece of data, Your Honor, is going to turn into three extra trial days.

THE COURT:  All right.  My previously ruling stands.  So we're going to go forward with my ruling.  I don't understand why you need that evidence, and therefore, it's not going to be admitted.

All right.  I think we're done with one of the two depositions.  So let's very quickly move to the May 24, 2021, transcript.

I think there was one designation from PSG, and that started on page 54.

MR. NEISER:  Yes, Your Honor.  For the most part, I'm trying not to take -- use a surgical --

THE COURT:  Let's take out the colloquy, wherever that appears.

MR. NEISER:  56, lines 14 through 23.

THE COURT:  Yes.

MR. NEISER:  Some of these documents are attorney eyes' only; that's the other thing I wanted to point out.  We don't really care.  I just wanted to make note that on 57, this distributorship agreement between Action Skill Games and, I think, Pennsylvania and Blue Sky -- actually -- here let me back up for one second.

I don't think anything from lines 56 -- I'm sorry --

MR. ZEGARELLI:  What page?

MR. NEISER:  Page 56, line 24, through 58, lines 15.  Because it relates to an agreement between Pennsylvania Skill Games, LLC, and Action Skill Games.

THE COURT:  It's -- is it Action Skill and Blue Sky?

MR. NEISER:  Action Skill and Blue Sky, I'm sorry.  I'm sorry, Your Honor.  Action Skill and Blue Sky.

MR. ZEGARELLI:  Your Honor, the distributorship agreement, as Mr. DeLuca testified, he was drafting exclusives from Mr. Unis for Beaver County.  It's probative of what -- Mr. DeLuca's representation, first, of Mr. Unis.  And it is also probative of the fact that Mr. Unis was entering into exclusives in the marketplace.

THE COURT:  Could we simply start in this section on page 58?  And since it is attorneys' eyes only, not actually show the document but simply have the testimony about the

exclusive nature with the sole exception of Beaver County, which then eliminates issues about the document itself?  In other words, does that document need to be in evidence, especially if it's attorneys' eyes only?  If we started with 58, wouldn't that satisfy the reasons why you want that in?

MR. NEISER:  I would agree with that if the Court wants to do that or if Mr. Zegarelli agrees.

THE COURT:  And that way we wouldn't have to put it on the screen.  There wouldn't be any issue with who might be in the courtroom.

So could we start with page 58?

MR. ZEGARELLI:  Sure.

THE COURT:  Would that satisfy --

MR. ZEGARELLI:  Starting with 58 --

THE COURT:  Because I think your question essentially identifies what the document is.

MR. ZEGARELLI:  Right.  If the issue is that we are not -- we don't have to attach the document or show the document to the jury, I do think the testimony is sufficient.

THE COURT:  All right.  Then why don't we eliminate the designation between -- I think this would be page 56, line 24 through the end of page 57.  Everybody agree with that?

MR. NEISER:  That's fine, Your Honor.

MR. ZEGARELLI:  You said 56, 27 -- I'm sorry, 56?

THE COURT:  Line 24.

MR. ZEGARELLI:  24.

THE COURT:  Through the entirety of page 57 through line 25.

MR. ZEGARELLI:  Well, I would like to keep in line 57, 3, because that actually identifies the document.

THE COURT:  I'm sorry.  What line?

MR. ZEGARELLI:  57, 3.  I'm sorry.  Yes, 57, 3.

THE COURT:  Well, we've talked about eliminating the question.  So you can't just have the answer in there.  Don't we have the -- I mean, we're not going to put it on the screen.  So that's the problem with the question.  If the two of you can agree that --

MR. NEISER:  Your Honor, if I may make a suggestion?  Page 57, lines 7 through 12.

And it says -- "So can you describe this document?"  And we're talking about Bates Number 57 through 59.

MR. ZEGARELLI:  That is -- we can delete 7 through 12.

THE COURT:  I thought --

MR. NEISER:  I want to include that because that describes it.

MR. ZEGARELLI:  Oh.

THE COURT:  That satisfies your concern, I believe, that the document has not been identified.

MR. ZEGARELLI:  Well, there is an answer, and he says, "The exclusive" --

THE COURT: We're talking about the answer. We're saying leave in lines 7 through 12 on that page.

MR. ZEGARELLI: Okay.

THE COURT: And then move directly to page 58.

MR. ZEGARELLI: I still think 19 through 25 is relevant, Your Honor.

THE COURT: I don't believe they are. I mean, the exclusivity is referenced in 7 through 12. It, then, an exclusive distributorship is referenced on page 58. And then there's the sole exception of Beaver County. So I think that satisfies the jury understanding what that is. Because you get into -- you've pulled out these documents because they're attorneys' eyes only, but there were emails, blah, blah, blah. And you're referencing that that's the agreement to which the emails refer, and the emails aren't in evidence. So I think what we've talked about is sufficient.

So does that conclude any objections to the counterdesignation?

MR. NEISER: The only other thing I would like to -- just to ease the burden, page 83, lines 24 through 25, and 84, 2 through 6. They're our designation. I just want to withdraw it because there's no need to use it, and it references a DeLuca Exhibit Number 8.

THE COURT: Any objection to --

MR. ZEGARELLI: Sorry. What numbers?

THE COURT:  Page 83.

MR. ZEGARELLI:  Julian, you want to eliminate all of 83?

MR. NEISER:  No.

MR. ZEGARELLI:  What's highlighted?

MR. NEISER:  No.  8: 24, 25.

MR. ZEGARELLI:  Oh, okay.

MR. NEISER:  Yeah.

MR. ZEGARELLI:  And, again, the exhibit's in.  The reference is out.

THE COURT:  All right.  Any issues there?  Anything else, Mr. Neiser?

MR. NEISER:  No, Your Honor.

THE COURT:  All right.  Then I think we have concluded that.  And I'm sure, Mr. Neiser, you'll make those changes.

It is 9:00.  So I would like to get started.  If we need to talk about anything else, we'll make the time to do that.

Yes?  Go ahead.

MR. ZEGARELLI:  May I ask Mr. O'Bier if the current release version is still a 402 number?

THE COURT:  No.

MR. ZEGARELLI:  Okay, Your Honor.  I -- okay.  I'm sorry.  I'm sorry, Your Honor.  I can't -- how do I draw the fact that the current advertising is still relating back to the

original lawsuit, Your Honor?

THE COURT:  What difference does it make?

MR. ZEGARELLI:  It makes a difference because I think a jury wants to know the value and importance of the original lawsuit, that that lawsuit is ten years later still the lawsuit by which everybody's doing business and making money.  It's a critical issue, Your Honor.  I don't know how I can't do it. I -- it's really just -- I apologize.  It baffles me.  I can't get -- I just can't even get around why I can't even say, "Are you still on a 402 version?"  I don't understand it.

THE COURT:  Because you're seeking damages regardless of the version.

MR. ZEGARELLI:  But it's still a liability question, Your Honor.  Isn't it true that today you're still on a 402? You're not on a 403.  You're on a 402.  You're not on a 403. Why are you still on a 402?  You're still on 402 because a 402 relates to the original lawsuit.  It gets the whole thing back to the original lawsuit.  It's -- it's -- I feel it's so prejudicial I even have to get to this level of it.  But I don't know how else to suggest.  It's like given my question setup -- you know, I apologize for the frustration but --

THE COURT:  You don't need to apologize.

MR. ZEGARELLI:  But it's an important point.  The first lawsuit that my clients participated in was 402.44.  They never increased to 403.  The reason they never did that is

because they have to rely on the original lawsuit.  It's ten years later, Your Honor.

MR. NEISER:  Except for I have another ruling from last week that I --

MR. ZEGARELLI:  That's immaterial to the --

MR. NEISER:  Wait, wait, wait, wait.  I don't believe Mr. Zegarelli understands his own case, and I for one am tired of having the same discussion.  He had a chance to have an expert come in.  He had a chance to do all of this.  We took 30 depositions in this case.  We did all of these things.  It has nothing to do with anything.  So I'm not even sure why we're still talking about it.

MR. ZEGARELLI:  That's still not a good argument on the substance.

MR. NEISER:  Oh, it's the argument.

MR. ZEGARELLI:  No, it's not.  First of all, what happened in another court is not the argument.  And, you know, legality's not the argument.  Compliance is not the argument.

The only fact -- I can show you my simple six questions to Mr. O'Bier, one of which would be, you know, are you familiar with 402.44?  That's the version in the lawsuit.  Right?  Yes.  Okay.  What version are you on now?  You're on 402.65 or something like that.  You're still on a 402; right?  Yeah, right.  Why are you still on a 402?  Okay.  Because we didn't increase a number.  Okay.  Well, you're still on 402.

That's it.  That's all I need.

MR. NEISER:  No.  Absolutely not.

MR. ZEGARELLI:  You're saying no, but that's all I need.  I just need a simple framework to say ten years ago that 402 is still relevant to today.  It's not like it moved on.  Mr. Neiser says, hey, we think everything we do is based on 402.44 because that's the legal ruling.  Why I can't get that into evidence, I don't understand, Your Honor.

THE COURT:  Well, I'm sorry you don't understand it.  I think -- and I appreciate your passion about it.  Your objection is preserved.

MR. ZEGARELLI:  Okay.

THE COURT:  But I think we've had multiple discussions about this.  And with that, let's go.

MR. NEISER:  Thank you.

MR. ZEGARELLI:  And I'm allowed to ask about 402.44, I presume, just not beyond 402.44?

THE COURT:  Well, I mean, 402.44 is in evidence.  I mean, you can ask about the original lawsuit and that that related to 402.44.

If both of you need a few minutes just to get your act together and use the restroom, if you need to, or whatever, don't feel you're going to be rushed in that.  Laura will come in and make sure you're ready.

MR. NEISER:  Thank you.

MR. ZEGARELLI:  Thank you, Your Honor.

(Whereupon, in chambers session ended.)

(Pause as the jury enters courtroom.)

THE COURT:  Good morning, everyone.  Please be seated.

Good morning, Counsel.  Good morning, ladies and gentlemen.  I hope you had a very nice evening, and thank you for your patience while counsel and I discussed several legal issues this morning.  I know we're starting a little bit late.  So thank you for hanging in there with us.

Mr. Neiser, are you prepared to proceed?

MR. NEISER:  Your Honor, we are.  We're going to continue the direct testimony of Christopher O'Bier.

THE COURT:  All right.

CHRIS O'BIER, a witness herein, having been previously duly sworn, was examined and testified as follows:

THE COURT:  Mr. O'Bier, as a reminder, you're still under oath this morning.

THE WITNESS:  Yes, ma'am.

DIRECT EXAMINATION CONTINUED

BY MR. NEISER:

Q.   Good morning, Mr. O'Bier.

A.   Good morning.

Q.   How are you doing today?

A.   Doing well.

Q.   Couple quick follow-ups from yesterday.

Approximately how many employees does Pace-O-Matic have right now?

A.    In about 180 range.

Q.    And do you recall we talked about the early stages of the Pace-O-Matic software being used in Pennsylvania?  Do you recall that?

A.    Yes.

Q.    Was there some point in time in which the manufacturing and distribution of the game changed to another entity?

A.    Yes.  Pace-O-Matic would manufacture the cabinets until about March of 2015, was when Miele Manufacturing took over.

Q.    Okay.  And what happened at that point?  What was Miele's role at that point?

A.    To assemble, build, ship cabinets.

Q.    Understood.

To the best of your knowledge, was any other entity considered to be the distributor for Pace-O-Matic?

A.    No.

Q.    Thank you.

MR. NEISER:  Your Honor, no further questions.

THE COURT:  Thank you, Mr. Neiser.

MR. ZEGARELLI:  May I, Your Honor?

THE COURT:  Of course, Mr. Zegarelli.

CROSS-EXAMINATION

BY MR. ZEGARELLI:

Q.   Good morning, Mr. O'Bier.

A.   Good morning.

Q.   Mr. O'Bier, have you or did you receive feedback about game play, game modifications from Mr. Pace at any time?

A.   From whom?

Q.   From Mr. Pace.

A.   Can you -- about game play and what?

Q.   In other words, game features and functions, how the game plays, modifications of the game.  Did you ever receive that sort of input from Mr. Pace?

A.   It would go the opposite way.  I would tell him stuff.

Q.   Okay.  You would talk to Mr. Pace about that, and it would be a conversation?

A.   Sure.

Q.   Okay.  And are you saying that Mr. Pace never came to you over the 17 years of your career with thoughts for game play?

A.   Well, I don't develop or program software; so it wouldn't work that way.

Q.   I'm not asking you what would or wouldn't.  Did it ever happen?

A.   No, no.

Q.   Never?

A.   No.

Q.   Okay.  Now, are you familiar with a version of the software identified as 402.44?

A.   Yes.

Q.   Okay.  And when we talk about 402.44, what is the 402 part and what is the 44 part?

A.   So the 402 is what we call the version; the 44 is what we call the build.  So you can make a minor change increment, just the build, to differentiate what you're looking at.

Q.   Okay.  And 402.44, that was submitted in the Beaver County case, if you recall, in 2013; is that right?

A.   Right.

Q.   Okay.  And it's true, isn't it, that the splash screens on the current builds still indicate when you turn on the computer, based on 402.44?

A.   Yes.

Q.   Okay.

MR. ZEGARELLI:  No further questions.

THE COURT:  Anything further, Mr. Neiser?

MR. NEISER:  Nothing, Your Honor.  We ask that Mr. O'Bier be excused.

THE COURT:  Mr. O'Bier, thank you for your testimony.  You can step down and you are excused.

THE WITNESS:  Thank you.

(Witness excused.)

MR. NEISSER:  Your Honor, we call Danny Warren.

THE COURT:  All right.  Let's bring in Mr. Warren.

MR. NEISER:  Chris, do you mind?

THE COURT:  Mr. Warren, step right up here in front of Ms. Kim, who is going to administer an oath to you.

THE CLERK:  Sir, please raise your right hand.

DANIEL WARREN, a witness herein, having been first duly sworn, was examined and testified as follows:

THE CLERK:  Thank you.

THE COURT:  Good morning.  Mr. Warren, that microphone is adjustable if you need to bring it closer to you.

MR. NEISER:  May I proceed, Your Honor?

THE COURT:  Yes, Mr. Neiser.

DIRECT EXAMINATION

BY MR. NEISER:

Q.    Mr. Warren, good morning.  How are you?

A.    Good morning.  I'm good.

Q.    Introduce yourself to the Court and the jury.

A.    My name is Daniel Warren.  I go by Danny.

Q.    Okay.  What do you do for a living?

A.    I'm currently a consultant to Pace-O-Matic.

Q.    Could you please describe your educational background since high school?

A.    I attended Emory University in Atlanta, Georgia, and after graduating with a bachelor's degree, majoring in

accounting, that was the end of my formal college education.

Q.   Okay.  Did you work after college?

A.   In -- yes, in my senior year, what was customary, public accounting firms would come on campus and recruit from seniors.  So I was fortunate that I was able to obtain a job with Arthur Andersen & Company, which, at the time, was one of -- what was called the "Big Eight" accounting firms.  But they're basically a public accounting firm.

Q.   Then what did you do?

A.   I stayed with Arthur Andersen for approximately four years, and the first step, in my opinion, when you -- public accounting is to obtain a CPA, which is a certified public accountant.  And so after a few tries, I passed the CPA exam.  And after about four years, I realized that I would rather be working with a company to build something, then; rather than just coming in and looking more historical at their record.  So again, I was fortunate that a client I had worked at asked me to come on board as possibly a vice president of finance and basically run their accounting department.

Q.   And what company was that?

A.   The company was called Butler Shoe Corporation, and they were a mall-based retailer.  Sometimes I would say to people I was in women's shoes; somehow I got the wrong reaction. For a lot of women, they would know, growing up, if I said Butler's or Baker's, they were a popular-priced women's footwear

retailer.  When I got there, five or 600 stores around the country, basically, primarily in malls.

Q.    Understood.  At some point, did you become employed at Pace-O-Matic?

A.    Yes.

Q.    Can you tell us when you started?

A.    Approximately, sometime in 2012.  I was working on my own.  I had a small -- my company, it's just called DNW Group; those are my initials.  And I had an introduction to Pace-O-Matic from a neighbor of mine who worked as Pace-O-Matic's banker and thought highly of Pace-O-Matic.  So that's my -- my introduction to Pace-O-Matic.

Q.    Okay.  Tell us your role with Pace-O-Matic.  Over time, take us from the very beginning until the end, assuming there is an end.

A.    Oh, I'm current with Pace-O-Matic.  I started in 2012 and as more in a consultant role, that I was helping companies with their accounting, looking at their processes.  And a gentleman by the name of Dwayne Waxer had started with Pace-O-Matic in a -- I'd say an operational role a few months before I got there.

So I came on board, I started working with the accounting group at time with Michael and Michael's wife, Karmin, mainly focusing on the what you would call day-to-day accounting.  And things went well, were going well.  And the

company asked me if I would come on full-time. I had a couple of other clients at the time developing the consulting, but it gave me an -- first of all, I liked the people. I didn't understand the business, but I understand business in general, and it gave me an opportunity to be in the number one position to help build something. At the end of 2012, I came on board as a full-time; perhaps my title is vice president of finance.

Q. Understood. Mr. Warren, where do you live?

A. My primary residence is in Gainesville, Georgia.

Q. Well, thank you for bringing the Georgia weather to Pittsburgh.

A. You're welcome.

Q. We appreciate it. During your time at Pace-O-Matic, did you become familiar with a software program being developed for the Pennsylvania market?

A. Yes.

Q. Tell us what you recall.

A. As I mentioned, my primary role when I got to the company was really more in the accounting and maybe some operations. But we were a small company. So I was aware of marketing efforts because, also understand that Pace-O-Matic was in the business of developing software for various markets. Pace-O-Matic was in -- as Michael described it, to be in the beginning, there were three significant markets for revenue for Pace-O-Matic, but Pace-O-Matic was -- it was always looking to

expand into other markets, and I understood Pennsylvania was one of them.

Q.   Okay.   Were you aware of any development of a name or brand for the Pennsylvania software?

A.   Yes, to a limited degree.   As I said, my primary focus was in accounting and operations, but being in a small company, I may have sat in on some meetings there.   I was probably included on emails and stuff.   But, yes, I was aware of what was going on in Pennsylvania and looking at different things for logos, names, and what have you.

Q.   Okay.

A.   I would say on the periphery.

MR. NEISER:   Can we please put up 40A?

BY MR. NEISER:

Q.   If at any time you need a drink of water or anything -- there you go.   We have plenty more in the back.

I'd like to show you --

MR. SIMEONE:   It just needs switched over.

MR. NEISER:   Let the record reflect I did nothing wrong.

A.J., if you have a moment, do you mind scrolling through that document, please?

BY MR. NEISER:

Q.   Mr. Warren, as the exhibit rolls on the screen, take a second and look at it all the way through.

Do you recognize this document?

A.    Yes.

Q.    Are you copied on this email chain?

A.    To some degree, yes.

Q.    Do you recognize this email?

A.    I do, in reviewing it now.

Q.    Do you recall it being a true and accurate copy of the email that you received?  And take your time if you need to go through it.

A.    I believe so.

Q.    Do you believe it was modified or changed in any way?

A.    No.

MR. NEISER:  Your Honor, we offer Exhibit 40A into evidence.

THE COURT:  Mr. Zegarelli, any objection?

MR. ZEGARELLI:  No objection.

THE COURT:  Exhibit 40A is admitted.

MR. NEISER:  Sir -- A.J., let's enlarge the header on the second email starting with Eric Guenther.

BY MR. NEISER:

Q.    Sir, just so everybody's clear, this is an email screen-dated on or about January 12, 2015.  Do you see that?

A.    Yes.

Q.    Does that ring a bell as dates when you may have received this email?

A.    That sounds reasonable.

Q.    Let's zoom back out.  Let's zoom in on the first two paragraphs.  And as I understand it, this is Eric Guenther -- by the way, who is Eric Guenther?

A.    At -- Eric was at the company when I started.  I would say at the time, he -- I don't know his title, but would have been head of marketing.

Q.    Okay.  Understood.  And as I --

A.    Excuse me.  Let me rephrase it.  The graphics part of marketing.

Q.    Thank you.

A.    They're not -- he wouldn't be out selling or anything there.

Q.    Understood.

A.    It would be a support function.

Q.    Understood.  So I'd like to just make this clear.  The first paragraph, I believe there's a discussion about taking a stab at some brands and the logo and look need to be built first.

      Could you, please, recall any discussions that you had about the logo and the brand around that time?

A.    I'm not aware of any discussions that I would have had at that time.

Q.    Right.

A.    This is just being aware of what was happening.

Q.  So you were aware of what was happening at the time?

A.  Correct.

Q.  Were you able to see any of the logos or brands that were being developed at the time?

A.  Yes.

MR. NEISER:  Can we zoom back out, A.J.?  Can we go to the last page, please?

BY MR. NEISER:

Q.  Sir, is that one of the logos and brands that were being discussed at least as early as January 2015?

A.  I would say yes.  That's a brand that I'm familiar with as far as that date.

Q.  Yeah.

A.  I believe so.

Q.  And how are you familiar with that brand?  Tell us.

A.  I would be included in emails, copies of it.  I may have attended some meetings, but I wouldn't have been the primary person in the meetings, making those decisions.

MR. NEISER:  A.J., can we go up one page, please?

BY MR. NEISER:

Q.  Is that another version of the brand that was being discussed at that time?

A.  Possibly.  That looks familiar.

Q.  Okay.

MR. NEISER:  We can take it down.  I'd like to show

40B to the witness.  Let's scroll through and let Mr. Warren take a look at it.

BY MR. NEISER:

Q.  I know it's been a long time, Mr. Warren.  So take your time if you need to.

MR. NEISER:  A.J., can we scroll down, please?

BY MR. NEISER:

Q.  Sir, we just went through the document.  Do you recognize it?

A.  Yes.

Q.  Can we agree that you were copied on all of the emails in this string?

A.  Yes.

Q.  Is this a fair and accurate depiction of the entire email screen to the best of your knowledge?

A.  Yes.

MR. NEISER:  Your Honor, we offer Exhibit 40B into evidence.

THE COURT:  Any objection?

MR. ZEGARELLI:  No, Your Honor.  No objection.

THE COURT:  Thank you.  Exhibit 40B is admitted.

BY MR. NEISER:

Q.  Sir, as I understand it, tell me if I'm wrong, the purpose of the email chain was to discuss a compliant screen for Pennsylvania.  Would you agree with that or disagree with that?

A.    I believe that's accurate.

MR. NEISER:  Can we go to last page, please?

BY MR. NEISER:

Q.    Is that the compliant screen that was discussed in the email of -- string of January 12, 2015?

A.    Without pulling them up, yes.

Q.    And at the very bottom of that message, forget about the confidential and the Bates number, which, as you recall, when we put that number there, that's for the lawyers to identify each page of the documents, just for your recollection. There's text that says:  SKL402.44pen.

Do you have any knowledge of what that signifies and what that means?

A.    Yes, I have an understanding.

Q.    What is it?

A.    First, let me state what I was taught from the first day is Pace-O-Matic builds games.  And the mantra was they have to be legal, they have to be defendable, and then best earning, in that order.  And so my understanding is this is the version of software that was included on the terminal that was picked up that the court ruled in favor of Pace-O-Matic.

Q.    Very good.  Thank you, sir.  Thank you for mentioning that.  I have a few questions for you on that topic.  Do you recall a time when Pace-O-Matic participated in or discussed an event called a "controlled pickup" in Pennsylvania?

A.    Yes.

Q.    What do you recall?

A.    As I stated before, Pace-O-Matic was operating in multiple states but was also attempting to operate in new states, and I understood Pennsylvania was one of them.  My recollection started -- of this event -- was May or June of 2013, that I know that Michael and Ryan Wood, who had started, were up in Pennsylvania for a meeting that I believe -- and I may not say it correctly -- the state police there to show a game that Michael had built with the developers, and that my understanding of that meeting -- I want to use a June time frame -- I did not attend it -- but when they came back, my understanding was that someone from the state police had made a comment that I think I've seen my first legal game.  So coming back to Atlanta, everybody was happy.

We then waited for what I understand is a few months but as a follow-up -- and this would probably have been Ryan and/or Michael, but certainly Ryan, there either had a meeting or got a phone call that it had not progressed to where the state police would give us an approval.  And it was decided at that point that there could be something that was referred to me as a friendly pickup that the terminal could get picked up, and wherever that was, the person or entity would not get in trouble, and then let the court decide the legality of the game. So I would say that was in the July or August time frame of

2013.

Q.    Okay.  And to your knowledge, did that controlled pickup actually happen?

A.    Yes.

Q.    Was there any fine levied or arrest or any charges to either the operator or the location of the game?

A.    Not that I'm aware of.

Q.    Now, you mentioned a 2013 time frame.  Let me ask you something.

Do you recognize the name Albert Unis III?

A.    Today, yes.

Q.    I notice you said "today."  Why did you say that?

A.    Because you were discussing, at this point, a time frame in 2013.

Q.    Okay.  In 2013, did you know who Albert Unis III was?

A.    No.

Q.    Had you ever heard of a business named Pennsylvania Skill Games in 2013?

A.    No.

Q.    Did you participate -- are you aware whether there was a lawsuit that was filed to recover that Pace-O-Matic game that was involved in the controlled pickup?

A.    I'm not aware of that.

Q.    So you did not participate in the lawsuit?

A.    No.

Q.   Were you aware of a ruling in Pace-O-Matic's favor from the Beaver County Court of Common Pleas at some point?

A.   Around -- I believe it was right around Christmastime of 2014, I was made aware of the ruling.

Q.   Okay.  And at that time, in -- when the ruling came down in or about Christmas 2014, had you then heard of Albert Unis III?

A.   No.

Q.   How about Pennsylvania Skill Games?

A.   No.

Q.   And how about Albert Unis IV?

A.   No.

Q.   Do you recall how many employees were at Pace-O-Matic at the time that we received the ruling in the Beaver County case?

A.   I would -- if I was guessing, I -- educated guess, maybe between 20 and 30.

Q.   Understood.

And you mentioned -- I just want to skip -- change direction.  We're going to get back to that time frame in a second.

But do you have knowledge of other markets during your tenure at Pace-O-Matic that Pace operated in or served?  When I say "markets," I mean states.  You're familiar with that?

A.   Yes.

Q.    What do you recall?

A.    When I first got to Pace-O-Matic in -- as I said the summer of 2012, Michael had explained it to me that there were three significant markets that generated revenue for Pace-O-Matic.

Q.    And which markets were those?

A.    Ohio, Hawaii, and South Carolina.

Q.    Understood.

And then Pennsylvania?

A.    Not at that time frame.

Q.    Okay.  At some point, though?

A.    Way later than when I started.

Q.    Understood.

After the Pennsylvania market, can you tell us what other markets Pace may have operated in, if you recall?

MR. ZEGARELLI:  Objection.  Form.

THE COURT:  Would you rephrase the question?

MR. NEISER:  Happy to, Your Honor.

BY MR. NEISER:

Q.    Can you tell us what other markets Pace-O-Matic was operating in as of -- from 2015, let's say, to 2018?

A.    In 2015, Ohio, Illinois, Pennsylvania.  Without looking at financials, that jumps out to me as Ohio and Illinois and then Pennsylvania.

Q.    Okay.  And then after that, can you recall any?

A.    Virginia.

Q.    Okay.

A.    Texas.

Q.    Uh-huh.

A.    Kentucky, Wyoming, Utah.  That sounds --

Q.    That's fine.

A.    -- again, without looking, that sounds like it.

Q.    No, that's fine.

Did Pace's general business model change from 2015 on?

A.    I -- I would say not really.

Q.    Thank you.

Now, let's go back to the Beaver County decision.  The time period is, as you said, Christmas of 2014?

A.    That sounds right.  I think prior to Christmas.

Q.    Do you recall the first time you ever communicated with or heard of -- let me ask it more specifically.  Do you remember the first time you ever heard of anybody named Unis?

A.    It would have been sometime in January of 2015.

Q.    Can you tell us what you recall, if anything?

A.    My recollection of the initial was working with Ryan Wood, who is the primary, I'd say account exec, where he was primary in charge of developing Pennsylvania for Pace-O-Matic along with Lou Miele from the Pennsylvania side.

And Ryan had said that he was having a conference call with Albert and wanted me to sit in on it.  And I said okay.  So

I believe it was in Atlanta, probably in Ryan's office, and it was a conference call with Albert.

Q.   Do you recall what was discussed?

A.   I would tell you it was a general -- nothing jumps out at me.  It was more of a general business conversation.  Nothing jumps out at me one way or the other.  I think it was just talking about what the plans were going forward.

Q.   Was there a trademark discussed during that call?

A.   No.

Q.   Was there any prior dealings with Michael Pace discussed during that call?

A.   Can you ask that again?

Q.   Sure.

To be clear, you were only talking with Albert Unis III on this call; is that correct or not?

A.   I've always referred to Albert as the dad and Albie as the son.  So I think it's the III for Albert.

Q.   Let me use your vernacular just to make sure we're talking about the same thing.

So do you have an understanding of who was on the call with you from the other side?

A.   My recollection was Ryan had said we're having a call with Albert, and that's who was on the call.

Q.   Okay.  And to be clear, Albert means, to you, the father?

A.    Correct.

Q.    So was there any discussion or mention by Albert that he knew Michael Pace previously?

A.    No.

Q.    And was there any discussion of a previous oral agreement to do anything with Pace-O-Matic?

A.    No.

Q.    Did you have an understanding as to whether or not Mr. Unis even understood how Pace-O-Matic's system worked?

A.    I did not.

Q.    Did you take any action or did you do anything as a result of that phone call with Albert and Ryan?

A.    Without knowing the specific date of that, my answer would be no.  It was, would you sit in on this phone call?

I thought the phone call, from my recollection, went well.  And then as I understand at that time, Pace-O-Matic was operating in multiple markets.  And my role at that point, whether my title said it, was more than just doing accounting; we had other markets.  It was more of an operational one there. So a lot of my time was spent working in other markets.

Q.    Understood.

At that time, if you recall, did you have any understanding of who the operator was who put the game out in relation to the controlled pickup?

A.    My first knowledge of who the operator was, was told

it was Albert, was in January of '15.

Q.    Do you recall your next interaction with Mr. Unis? Or -- let's start with the father, Albert Unis III, otherwise known as Albert.  What was your next interaction with him, if at all?

A.    Given this is eight years ago, my -- my next interaction -- and I don't know when it would have been a one-on-one if I was dealing with Albert on the phone primarily. I remember by the end of the month that Ryan had been working on what we called the "deal points" of working with Albert, and he sent me an email outlining certain terms from his discussion with Albert.

Q.    Okay.

MR. NEISER:  Can we please pull up 36?

BY MR. NEISER:

Q.    Sir, I'm showing you a document that's been entered into evidence as Exhibit 36.

Do you recognize it?

A.    Yes.

Q.    Is that the email you received from Ryan?

A.    Yes.

Q.    Do you recall receiving this email?

A.    Yes.

Q.    What did you do about this email, if anything?

A.    At that time frame, I think the expectation was that I

was going to assist or even draft and tried to take this and put it into some form of an agreement.

Q.    Did you have an understanding at the time whether Ryan Wood had authority to enter into agreements for Pace-O-Matic, whether he could or could not?

A.    Yes.

Q.    Okay.  And let's look at Exhibit 5.

Is this the document that you created as a result of the email from Ryan?

A.    Yes.

Q.    And to be clear, it's Exhibit 5, which has already been entered into evidence.

So I have a question for you, sir.

MR. NEISER:  Let's enlarge the first two bullet points, A.J.

BY MR. NEISER:

Q.    What was the purpose of those two bullet points, sir?

A.    After Pace-O-Matic received the favorable ruling in the court system, Wayne DeLuca, who was the Pace-O-Matic attorney, had asked Pace-O-Matic, could we do, say, something special for Albert, because he was the operator who found a location to place a terminal for the friendly pickup.

Q.    Okay.  And when it refers to "AUA help in legal matters," is that what you're talking about?

A.    That specifically.

Q.   Yeah.

MR. NEISER:  Let's enlarge the next two bullet points, please.

BY MR. NEISER:

Q.   Can you give us any context to these two bullet points, please, sir?

A.   Yes.  I think the second one on this page is a pretty strong statement where it says, "We agree not to sell."  But the agreement not to sell has to tie to a performance target by the buyer.  So they go hand in hand.

Q.   Why would you need that?

A.   Because if we're going to make an agreement not to sell in a certain area, then we're relying on the person we're making the agreement -- let me back up.  Pace-O-Matic's business model is to get as many terminals or cabinets on the street to generate recurring revenue.  That's our business model.  It's our business model all over in every market.

So if someone's asking us, they're telling us they don't want us to sell to anybody else, because they were committing to be the one who would put a significant number of terminals, specifically the words that Albert used to me directly, I don't know others, is he intended to have 200 terminals out on the street before the end of the year.

And that's my -- it's is like, Okay.  That's good.

But at the end of the day, just because someone says

something, if you can put it in writing, if you're asking us to do it really strong, we won't sell, then we need a commitment in writing as far as the performance.  So that's why they go hand in hand.

Q.    Would you ever have put those two bullet points in there if there wasn't a representation that they would buy 200 games at least?

MR. ZEGARELLI:  Objection.  Speculative.

THE WITNESS:  That point --

THE COURT:  Just a moment.

THE WITNESS:  I'm sorry.

THE COURT:  I'm sorry, Mr. Zegarelli.  What was your objection?

MR. ZEGARELLI:  Speculative, Your Honor.

THE COURT:  Overruled.

THE WITNESS:  That would have gone in there not -- not because of 200 games.  What Albert said, he intended to put 200 games out, if you look at what we drafted -- because the other side of Pace-O-Matic is our goal is to set up a customer to succeed.  The more successful the customer is, the more successful we are.

So if you look at what the suggested performance target is, it wasn't -- I didn't say, and working with Ryan -- I didn't say it's 206 months.  If you look at this, it's 25 initially.  And in essence, we said to try to make it -- maybe

call it, like, a lay-up and make it easy -- is ten a month.

So if you look at this for a year, it would have been 120, which my position was, Look, he said he's going to put out 200.  This should be a no-brainer.  But they go hand in hand.  And once again, to make it easier, if you get 25 terminals in month one, the reason we said wait three months was to give you those -- give you three months to get those terminals placed where you want.  Then every month, if you are putting ten out, my opinion is you would have been honoring your performance commitment.

BY MR. NEISER:

Q.   But if you didn't have an understanding of how many machines that Mr. Unis represented that he would put out, would you even have entered into this agreement?

A.   I'm sorry.  Ask it again.

Q.   Would you have entered into this agreement without -- if you knew that the Unises could -- would not purchase the amount of machines that they said they would?

A.   Would have entered into an agreement with -- with Albert.  Would have given him preferential pricing.  But that would have been it for his involvement in putting the terminal out.  But it wouldn't -- never would have considered putting an agreement not to sell in a marketplace when our -- our goal wasn't to develop the Beaver County/Pittsburgh marketplace.  Our goal was to develop in the Commonwealth of Pennsylvania.

Q.   So you would not have included that right of first refusal?

A.   Without a commitment of -- a significant commitment, no.

Q.   Thank you.

MR. NEISER:  Decrease the enlargement.  Can we keep it up for one second, A.J.?  And can we zoom in on the other?

BY MR. NEISER:

Q.   I just want to focus on -- well, actually both of these very briefly.  What was the agreed-upon marketing efforts?

A.   Again, keep in mind, back at this time, it was the initial development rollout.  I would tell you whatever Pace-O-Matic was -- along with Miele was developing for the Commonwealth, we would make sure that Albert had that.

Q.   Give us an example of what those are.  Describe them for us.

A.   Keep in mind, we were a small company there.  As an example, I remember a book that we prepared, and it was just your typical -- of white three -- three-ring notebook.  But as an example, one section had a copy of the ruling, thinking if you're an operator who has an existing relationship with a location -- may have had that relationship for 30 years -- when you walk in and say, hey, I've got this new product for you, they would probably ask -- it's a cabinet with a video screen -- is, well, how do I know it's legal?  Well, here, let me show

you.  Here's a copy of the ruling in Beaver County.

So maybe it had a flyer.  Maybe it had other things. But specifically, in my mind, that was one of the critical things that would have been -- that I would say was included in marketing material.

Q.  Did agreed-upon marketing efforts include in any way a discussion -- here, let me ask it a different way.

Did agreed-upon marketing efforts include the ability of Pace-O-Matic to use the name Pennsylvania Skill from the Unises?

A.  Pace-O-Matic had the name Pennsylvania Skill.  There was never a discussion.

Q.  So trademarks were not discussed in any way, shape, or form with respect to agreed-upon marketing efforts?

A.  Correct.

MR. NEISER:  We can take it down.  A.J., Exhibit 25, please.

BY MR. NEISER:

Q.  Sir, I'm showing you a document that's been entered into evidence as Exhibit 25.  Do you recognize it?

A.  Yes.

Q.  Do you recall receiving this email?

A.  Yes.

Q.  Had you met Mr. Unis at this point?  Let's go back to the basics here.  What's the date of the email?

A.    February 2, 2015.

Q.    Okay.  And we've heard from other witness, but let's hear it from your mouth, who is Ryan Wood?

A.    Ryan Wood is a colleague who's an employee at Pace-O-Matic and is in charge of -- I think his title could have been account rep or account exec.  He was in charge of developing the Pennsylvania marketplace on behalf of Pace-O-Matic, working with Lou Miele as our distributor.

Q.    Understood.

And you're copied on this email message, are you not?

A.    Yes.

Q.    Good.  Let's look at the second paragraph.

I'm just curious.  Had you met either of the Unises as of February 2, 2015?

A.    No.

Q.    I believe this email's referring to a potential meeting the week of February 2nd.  Did you meet with them that week?

A.    I wouldn't have remembered the date.  It very well could have been.

Q.    Do you have an understanding as to whether or not this was the first time that the Unises would have come to Pace-O-Matic, if you know?

A.    I don't know.  It's the first time that I'm aware that they came to Pace-O-Matic.

Q.    After you did that term sheet with the bullet points on it, do you recall any other discussions or meetings with Albert Unis?

A.    Yes.

Q.    Tell me the next one.

A.    I can -- I can't tell you a specific date, but I can tell you that from the initial meeting conversations, from the date of that, it goes all the way through approximately the end of May.  So I would tell -- that's five months.

So I would say it's safe to say that certainly numerous discussions, most likely meetings, whether they were in Atlanta or -- I'm pretty confident by that point in time I was traveling to Pennsylvania.  So over a five-month period, absolutely, there were discussions and negotiations relating to this agreement.

Q.    Okay.  Well, let's talk about that.  What were you negotiating?  Tell us about the negotiations and what you were trying to negotiate.

A.    The bigger picture is we were trying to just document that we had an operator who had made a commitment, in our opinion, and certainly intention of putting 200 games out in Beaver County.  And that would have been -- for a market just starting up, that's a significant number.  So at the end of the day, we were trying to balance supporting him to do that with getting it properly documented.

Q.    Okay.  Did you have discussions with -- well, did you have discussions with Albert or Albie Unis regarding the terms of a new contract?  I'm not talking about the one that was on Exhibit 5, but an agreement after that.

A.    Was Exhibit 5 what we just looked at?

Q.    Yes, sir.

A.    Well, one of the first steps was that the documentation on the first agreement said "Albert Unis and affiliates."  And I have a CPA degree.  I'm not an attorney.  So the intention of that was, Albert had said to me fairly early on that he intended this to be a company for his son, but the company was not formed.  That's my recollection.

I said okay.  I'm just going to write this as "Albert Unis and affiliates," meaning when we get the final agreement, it may have a different company name on it.  We didn't know it at the time.  So Pennsylvania Skill Games was not formed, to my understanding, when we documented that January 29th understanding.

Q.    Was it even discussed, the name of the business?

A.    No, absolutely not.

Q.    Were the discussions about a new agreement after that term sheet, or whatever we want to call Exhibit 5?

A.    Yes, there were discussions about terms.  I would say, in general, there wasn't a big difference in the business points.  But I'll give you an example.  And, again, I will say

this:  It was -- it was at my initiative, as part of Pace-O-Matic -- I have to address that to start the market, there was a decision made that for all the operators there would be new equipment so there would be a consistent look in the field.

But because Albert had said he intended to put 200 out, I made the decision again -- and it wasn't a popular one -- that Albert could buy the -- it's called HD board, what I call the brains of -- that has the software in it, because he had access to cabinets.

So he was the only operator that was given this opportunity.  And, again, it was more tied to -- in my opinion, it wasn't tied to because of the court case.  We already agreed that.  My opinion was, if he was going to buy 200 cabinets and he had to buy them from the manufacturer -- sorry -- Lou -- that would have cost a half million dollars.  If he had access to cabinets and he could buy just the board with the games in it for a thousand, that would have saved him, I think, almost $300,000.  And I felt like that was the right decision for the customer.

So there's an example that it was not in the January agreement, but it was in the May agreement.

Q.    So you're saying you gave him a discount and a break that was worth approximately $300,000?

A.    It wasn't a discount.  It allowed him to buy a portion

of what a new cabinet would cost, allow him to -- to put that into -- he said he had access to cabinets.  So when another operator would have to pay $500,000-ish to get 200 cabinets, Albert only had to spend two -- a lot of money, but it saved him $300,000.  And, again, that was -- I would tell you that was more of what Pace-O-Matic does to help a customer there.  It was not offered to any other operator in Pennsylvania.

Q.   Is the pricing discount and the terms of Exhibit 5, did that -- well, actually, here, let's move on for a second.

MR. NEISER:  Let's put up Exhibit 6, please.

BY MR. NEISER:

Q.   Sir, I'm going to show you a document marked for identification -- sorry -- has been entered into evidence as Exhibit 6.  Do you recognize this?

A.   Yes.

Q.   How do you recognize it?

A.   This represents five months of -- five months-ish from January of '15 to May 20th of the discussions, negotiations, and what I would say the final agreement between Pace-O-Matic, Miele, and, at that time, then, it became Pennsylvania Skill Games because that company had been formed.

Q.   So -- and I'm going try to shortcut some of this because the jury has heard more than enough about this document to some points.  But I need to know your perspective on certain things, if you don't mind.

My understanding is this agreement, the effective date at least, is about 20 May 2015.  Would you agree or disagree?

A.    I would agree.

Q.    At any time prior to that date, were you aware of a Pennsylvania Skill Games, LLC?

A.    I would say, yes, that maybe an earlier -- excuse me -- possibly an earlier draft of this could have been a week, could have been a month.

Q.    Okay.

A.    But sometime after January 29th.  Because I was told that the company, whatever the company was, had not been formed.

Q.    Understood.

Did you have a reaction when you saw Pennsylvania Skill Games, LLC, inserted as a party into this agreement?

A.    I didn't.  Others had a reaction.  I didn't react to it because my -- I've done this a long time.  It was a company name.  That's what -- a lot of times there's brands out there that you don't know the company name.  So it didn't -- it didn't register with me because it was somebody's company name.

Q.    Now, let's enlarge -- well, let me ask this:  Who was the primary person at Pace-O-Matic, or persons at Pace-O-Matic, who negotiated this agreement with the other -- I'm just going to call them "the other side" for right now?

A.    I would say after the January 29th, the information from there, I would say I was the primary.

73

Q.    Who was your contact on the other side?

A.    Primary, Albert.

Q.    Did you have any discussions with his son,  Albert Unis IV?

A.    I would say -- I would say yes, but I would think -- my recollection is that if we are using the word "negotiate," it was more with Albert.  As I said, at some point in time, Albert has said, "This is for my son."

My recollection was that Albie had either just graduated high school or whatever that way, and so Albert, at some point, also asked me to help -- would I mentor him.  But the deal itself and negotiations, I would say, is Albert.

Q.    He asked you to mentor his son?

A.    Absolutely, in a positive way.  And my understanding is he also asked Lou that -- Albie's a high school -- just finishing high school.  We're talking about if you step back and say, what does one need to have a company that can buy and put out 200 games in six months, that's a company.  It's a real company.  You need employees.  You need an office, warehouse, and most important, you need capital or money, like that.

Q.    Did they have any of those things?

A.    From -- from Pennsylvania Skill, the answer is no.

Q.    You mean Pennsylvania Skill Games, LLC?

A.    Sorry.  Pennsylvania Skill Games.  The answer is, no, it was a start-up company.

MR. NEISER:  Let's enlarge third paragraph -- sorry. Second whereas, "Whereas seller has."

BY MR. NEISER:

Q.    Is there a reason why you didn't put "Buyer successfully litigated" or "Seller and buyer have successfully litigated" in that paragraph?

A.    The way that's written is accurate.

Q.    Then alternatively, if it was written another way, it would be inaccurate?

A.    Buyer had nothing to do with the legality of the game and the software and what have you.

Q.    Thank you.

MR. NEISER:  Let's take it down -- or that enlargement.

BY MR. NEISER:

Q.    Now let's skip over to the second page and look at paragraph 4.  You're familiar with this paragraph, sir?

A.    Yes.

Q.    Tell us, in your words -- here, let's set the stage for this, if you don't mind.  Give us a second.  Do you recall going through various drafts of this agreement prior to it being executed?

A.    Yes.

Q.    And who all was involved in that process?  Everybody from soup to nuts.

A.    I would say from the Pace-O-Matic side, I was primary. I would think I would have gotten Ryan and Lou, to some degree, involved in it.  But on the other side, Bill Rodgers was an attorney for Albert -- or Albert.  He was the outside attorney working on this agreement.  And I worked -- I interacted directly with him on behalf of Pace-O-Matic.

Q.    Sir, do you recall that language, that right of first refusal language, changing in the various drafts that were exchanged between the parties?

A.    They're completely different.

Q.    Tell us how.

A.    Well, in the first agreement, there was an agreement not to sell, and that tied to performance by the buyer.  This agreement doesn't have a performance target in it.  That's why this language is much -- let's call it softer.  This is not an agreement not to sell.  That tied to performance.  That's why I said, after five months, this is what we agreed to.

Q.    And would it be fair to say at some point that the folks on the Unis side wanted more than that?

A.    That would be correct.

Q.    Would it be fair to say this is meeting in the middle, perhaps?

A.    I don't know if you call it meeting in the middle, but this is what we all agreed to.

Q.    Does the word "exclusive" appear anywhere in this

agreement?

A.    No.

Q.    Did you discuss -- let's practically play this out. In the --

MR. NEISER:  A.J., can you highlight the "if buyer opts not to"?

BY MR. NEISER:

Q.    Mr. Warren, do you need water, or are you good?

A.    I'm good so far.

Q.    Aces.

Real world.  How does that work?

A.    Ask your question again.

Q.    How would that work?  How would that buyer opts not to place compliant terminals work in the real world?  What was its intention?

A.    Well, I could tell you in the beginning, there wasn't a lot of discussion about that because the goal was to get 200 games out.  And I didn't travel in the beginning up to Beaver County as Ryan and Lou did.  So I never was taken around to show all of the locations.  But the intention was, we focus on getting them all of the product they needed; they would put it out.  My understanding of that would have been, in my particular case, if somebody called down to Atlanta and I happened to take the call from a small company and they wanted to place a game in Beaver County, that we would turn that over.

Q.   And so you would have to get a phone call -- some form of contact?

A.   Right.   Pace-O-Matic doesn't know when -- when a game is sold, because the game's not connected to the Internet, Pace-O-Matic doesn't actually know where the game is.

Q.   So you would provide -- I don't want to put words in your mouth.   Sounds like you're providing a sales lead; is that correct?

A.   If somebody called and was inquiring or wanted a game, that's what I understood it meant.

Q.   Can you explain to us whether or not the intention of that clause was to keep every other operator of Pennsylvania Skill Games out of Beaver County?

A.   No, it was not.

Q.   Was there ever any discussion about an obligation by Pace-O-Matic or Miele to police the market, meaning, find operators for Pennsylvania Skill Games in Beaver County and kick them out?

A.   No.

Q.   Let's talk about the last two sentences.   I think this is pretty important because we haven't spoken about this.

MR. NEISER:   A.J., could you highlight the last two sentences of that clause on Exhibit 6?

BY MR. NEISER:

Q.   Can you briefly describe the intention of how those

sentences would work?

A.    Yes.    That -- that sentence could have been something that I wrote.    That was after a direct conversation that I had with Albert.    And during that conversation, he said, And if you are to sell to another vendor, please make sure it wouldn't be at a lower price than we got.

And I said to him, Sure, because I knew we had already given them prices lower than any other operator.

So that was me putting that in the agreement after a conversation with Albert because I didn't see where -- it was only documenting what we agreed to do anyway.

Q.    Does that relate to Beaver County only?

A.    I would say yes.

Q.    Thank you.

A.    I mean --

MR. NEISER:    Now, let's reduce that.    Let's go to number 6 and enlarge that.

BY MR. NEISER:

Q.    Here's that language again, "Previously agreed marketing efforts."

What does that mean?

A.    I believe that's sort of a generic term.    Whatever Pace-O-Matic and Miele were doing to provide marketing support to any operator to make sure, at a minimum, that Pennsylvania Skill Games received the same support.

Q.    Does it mean trademark in any way?

A.    No.

Q.    Did it mean that Pace-O-Matic could use Pennsylvania --

MR. ZEGARELLI:  Your Honor, leading.

MR. NEISER:  I'm rephrasing, Your Honor, anyway.

THE COURT:  Thank you.

BY MR. NEISER:

Q.    At this point, can you tell us whether there were any discussions from either the Unises or Pennsylvania Skill Games, LLC, that they were claiming ownership of a trademark and were permitting you to use it?

A.    Absolutely not.

Q.    So if any discussion -- like, if any claim like that were to be made, would you say it's true or false?

MR. ZEGARELLI:  Objection.  Hypothetical.

THE COURT:  Sustained.

BY MR. NEISER:

Q.    Did you intend for -- you know what?  I'm going to move on.  I think we've talked about this enough, actually.

MR. NEISER:  Let's go to number 7.  Oh, no, I'm -- not Exhibit 7.  Sorry, A.J.  Paragraph 7 of that same document.

BY MR. NEISER:

Q.    This may seem pretty innocuous, Mr. Warren, but was there a discussion at any time that would limit Pace or Miele

from assigning its rights under this agreement?

A.   I'm sorry.  Ask that again.

Q.   It says, "Buyer may assign its rights and obligations under this agreement with the written consent of seller, which shall not be unreasonably withheld." You see that there?

A.   Yes.

Q.   Was there any intention to restrict seller's ability to assign the agreement?

A.   No.

Q.   After the equipment purchase agreement is signed, did you have any other discussions with either of the Unises regarding Beaver County?

A.   My involvement was increasing, but I would characterize it as helping Pennsylvania -- Albie and Pennsylvania Skill build their business.  I actually really don't know the geography of Beaver County, but whatever they needed to do, I tried to help.

Q.   Tell us what you did.

A.   Well, in the beginning, as I said, this was -- my position was, I think Pace-O-Matic's, too, the more successful Pennsylvania Skill was as an operator, the better for Pace-O-Matic.  So there's certain things that you do for that reason.

And, again, the second part was Albert had asked me if I would mentor Albie.  And I've done this before:  I've done big

companies, and I've done start-up.  So part of my activity was to help Albie with his business.

Q.  Okay.  Can you give us examples of how you helped Albie with his business, at least with respect to Beaver County?

A.  Well, I believe they're hand in hand.  Sometime in 2015, I made numerous trips up there.  I stayed -- I stayed at the house.  I considered them friends as well as work colleagues.

I went with Albie to Huntington Bank, which was the bank that he used for his operating account, and went there because we knew it's important for Albie to start -- he had to get credit.  So he had to build credit so he could borrow money, so he could borrow money to buy terminals.  I went with Albie and think he introduced me as his financial advisor.  To me, that was a role that I took on that wouldn't normally be what I would have done for other operators at Pace-O-Matic.

Q.  Okay.  What is the DNW Group?

A.  Those are my initials.  That's -- that's, as I mentioned when I started, that was my consulting little company that -- when I was on my own.  And I've always kept that.

Q.  And did you use your DNW Group to assist Albie and Pennsylvania Skill Games in any way?

A.  Yes.

Q.  How?

A.  More so just minor.  More so, what I would say is the

accounting.  I helped him set up.  He was using QuickBooks.  I was showing him how to record things in QuickBooks -- because part of obtaining credit is people are going to ask for your financial statements; so they need to be accurate.  So that, I felt like I was doing as DNW Group there versus helping him with his equipment and getting locations.

Q.   Okay.  Did you ever submit any documents from the DNW Group in conjunction with your dealings with Pennsylvania Skill Games, LLC?

A.   I don't what you mean.

Q.   Do you recall submitting any documents where you said that you were their chief financial officer or something to that regard?

A.   I know I've heard financial advisor, but the only thing that I remember specifically was, again, getting his QuickBooks correct and then making sure they were okay so he could turn them over to his tax accountant at yearend.

Q.   Do you recall being compensated directly or individually outside of Pace-O-Matic by either the Unises or Pennsylvania Skill Games, LLC?

A.   Pennsylvania Skill.  For those five or six months for the work I did, which was -- if I did it, it was night or weekends, I got a check for either $1,000 or 1200 one time.

Q.   Would that be the extent of it?

A.   Yes.

Q.    Okay.  Was there any point in the relationship with Pennsylvania Skill Games, LLC, or the Unises, where there were problems or difficulties?

A.    Can you be more specific?

Q.    And do you recall having any meetings with the Unises at the Pace-O-Matic offices?

A.    Yes.

Q.    And what did you discuss during those meetings?

A.    I think you've got to go from a timeframe.  I mean, the relationship from January 15, I would say being more active in there, went on for at least a couple of years.

Q.    Okay.

A.    '15, '16, in '17.

Q.    Understood.

Do you recall ever trying to make or ask Pennsylvania Skill Games, LLC, to change any documents or modify their contractual agreement with Pace?

A.    No.

MR. NEISER:  No other questions, Judge.

THE COURT:  Thank you, Mr. Neiser.

I assume you want to cross-examine.  But this might be a good time for a break.

So ladies and gentlemen, we're going to take our morning break.  Thank you for your attention.  We'll see you back here in 15 minutes at 10:45.

THE CLERK:  All rise.  This Court is in recess.

(Pause as the jury exits courtroom.)

(Whereupon, a recess was taken.)

THE COURT:  Please be seated, everyone.  You can proceed whenever you're ready, Mr. Zegarelli.

MR. ZEGARELLI:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. ZEGARELLI:

Q.  Good morning, Mr. Warren.

A.  Good morning.

Q.  Mr. Warren, I'll direct your attention to Exhibit 36. It was already presented to you this morning.  I'd like to direct your attention down to a few terms in this email.

With regard to the highlighted portions, do you see those highlighted portions, sir?

A.  Yes.

Q.  Okay.  Do you have an understanding of what "negotiable" meant as it related to the parenthetical with regard to the monthly purchase?

A.  Yes.

Q.  Okay.  What's your understanding?

A.  At this point, it talked about putting ten machines out per month during this time frame, but there could be discussions that that could change.

Q.  And if we go down below, do you see the language "No

sales into Beaver County unless Albert Unis or affiliates refuse to place machines."

Do you see the words "unless" and "refuse"?

A.   Yes.

Q.   Okay.  And do you see the words "efforts coordinating through Albert"?  And do you acknowledge that it doesn't say efforts -- "Albert's efforts coordinated through Pace-O-Matic"?

A.   Yes.

Q.   Okay.  And you see the bottom, it says, "Just make it work."

Do you see that?

A.   Yes.

Q.   Okay.  Now, you said you were a small -- Pace was a small company at the time.  Now, I'd like you -- I'm not going to turn the screen on for the jury, so that I can ask you to look at a few invoices, which I'll mark for identification as -- I'll mark it as identification as Group Exhibit 275, and I'll just mention for the record that we had a trial exhibit where we were using some higher numbers and I think 275 is an available number.

Is counsel able to see the screen?  I'll turn that off.

THE COURT:  Just to make sure, before we do that.

Mr. Neiser, have you seen this exhibit before?

MR. NEISER:  If we scroll through it, I'm sure that I

have.  But just give me one second.  It will only take a second.

I need your help, Mr. Zegarelli.

MR. ZEGARELLI:  Sure.

MR. NEISER:  Can you scroll through?

MR. ZEGARELLI:  Oh, I'm so sorry.

MR. NEISER:  Sure.  You can even go faster than that.

MR. ZEGARELLI:  Okay.

MR. NEISER:  We're fine, Your Honor.  We'll save time.  We'll admit to admissibility.  Or no objection to admissibility.

THE COURT:  Thank you, Mr. Neiser.

All right, Mr. Zegarelli.  Thank you for doing that for us.

MR. ZEGARELLI:  Thank you, Your Honor.

BY MR. ZEGARELLI:

Q.  Now, Mr. Warren, at the time sometime around 2015, January, I think you testified that Pace was a small company.  Now, I'm going to scroll through these invoices.  Were you part of -- let me back up.  I've got your deposition here.  But let me back up to show you Exhibit Number 5.  Now -- so what happens, one second -- all right then.  Let's do it this way.

Now, do you see the top of Exhibit Number 5?  It says, Pace-O-Matic, Inc., and Miele Manufacturing collectively referred to POM and Albert Unis and affiliates.

Do you see that?

A.  Yes.

Q.    Okay.  And Mr. Miele did not sign this document; isn't that right?

A.    Can you bring it up again, please?

Q.    Sure.

A.    Yes.

Q.    I think you testified at your deposition you understood that you had authority to sign for Mr. Miele; correct?

A.    I believe I had time to -- authority to sign this document in this instance.  But not as a general statement.

Q.    Okay.  Fair enough, thank you.

Now, I'm going to show you, again, the exhibit marked as 275, and as I scroll through it, there are some invoices that are on Miele Manufacturing letterhead, and there are some invoices that are on Pace-O-Matic letterhead.  And I'm going to ask you if you are able to testify as to the actual invoices that are the Miele Manufacturing invoices.  And we can go through them and look at the dates.

So 114 of 2/15, and that's prior to the January signing.

THE COURT:  Mr. Zegarelli, I apologize for interrupting you.  Had you moved this in?

MR. ZEGARELLI:  I apologize, Your Honor.  I thought Mr. Neiser had stipulated to it, but I'll move it in.

THE COURT:  Thank you.  Then it is admitted.

MR. ZEGARELLI:  Thank you, Your Honor.

BY MR. ZEGARELLI:

Q.   Okay.  So, Mr. Warren, are you able to testify to the fact that a purchase was made of 16,165, with regard to PA Skill Games, Albie Unis?

And we go down, do you want to look at your screen to confirm it?  Well, let's take one at a time.

Are you able to confirm that purchase as part of the conversation?

A.   I'm not able to confirm information from Miele Manufacturing.

Q.   Okay.  And that's true even though the documents are -- there are some purchases to Miele Manufacturing, some purchases to Pace.  But your testimony is you can't talk about the Miele Manufacturing invoices, and we can have Mr. Miele do that; is that correct?

A.   Correct.

Q.   Fair enough.

Okay.  So let's just go down, then.  And you'll see that on February 5, 2015, there's a $13,400 purchase.

Do you recall that purchase?

A.   Yes.

Q.   Okay.  And again, you can't testify to the purchase on 3/10/2015 and after January, before May?

A.   Correct.

Q.    Thank you.

All right.  And as we scroll down, or try to, let me ask it this way: Are you aware of approximately $140,000 worth of purchases from Pennsylvania Skill Games for the purchase of Pace-O-Matic machines, either directly to Pace-O-Matic or to Miele Manufacturing, from the time period of January 1st through, let's say, May 31st of 2015?

A.    Of 2015?

Q.    Right.  The first period --

A.    Five months, I'm not aware of a dollar amount of that magnitude.

Q.    Okay.  All right.

Now, you testified -- I think you testified that Mr. Unis had indicated in some regard to purchase a certain number of machines per month.  Is that your testimony?

A.    Who are you referring to?

Q.    Either.

A.    I was specifically referring to Albert had said his intention was to purchase and place 200 terminals by the end of that first year.  That's what I'm aware of.

Q.    All right.  Now, when do you recall, if at all, either the Mr. Unises testing the Pace-O-Matic machine, that being the one that was approved by Beaver County court?

A.    I --

MR. NEISER:  Objection; assumes facts.

THE WITNESS:  I don't know --

THE COURT:  Objection's overruled.

You can answer if you can.

THE WITNESS:  Can you clarify what you mean by "testing"?

BY MR. ZEGARELLI:

Q.   Sure.

I agree to buy -- if you're suggesting I agree I'll buy 200 games, you would think that I would want to know what I would be buying.

So do you have an understanding of -- either the Mr. Unises tested the game in relation to the 200 machines you suggest they are to buy?

A.   I'm aware that they purchased machines starting in January of 2015 and continued to purchase, and that's what I'm aware of.

Q.   Okay.  So the purchases -- say it a different way.

You don't have any firsthand knowledge of any use of machines prior to the actual purchasing of machines?

A.   I'm sorry.  Ask it again.

Q.   In other words, they didn't try it before they bought it.  They had to buy it to try it.

A.   Like every other operator, that's correct.

Q.   Okay.  But other operators aren't necessarily first; isn't that right?

A.    I don't know what you mean by "first."

Q.    Okay.  How many operators, to your knowledge, had purchased any machines in the first two weeks of January 2015?

A.    I don't know how many, but I'm aware of operator, operators had purchased Pace-O-Matic's Pennsylvania machines prior to the trial.

Q.    Okay.  And those machines, were they used in the marketplace?

A.    Yes.

Q.    Okay.  And you know that how?

A.    Because those machines then would have required the fill to activate them and they were placed in locations.

Q.    Very good.  Thank you.

Okay.  Now, do you have -- I think you mentioned some machines that were purchased, I think you said before the Beaver lawsuit.  Was that your testimony?

A.    That's correct.

Q.    Okay.  Let's go back to January 1st to January 15th. How many other operators purchased machines after the clarity of the Beaver County decision in the first two weeks?

A.    That's a question best answered by our distributor.

Q.    Okay.  And I can represent to you, we don't have any documents in that regard, and if there are documents in that regard, they can be produced by counsel.

Okay.  What about the second two weeks of January, the

last -- latter two weeks?  Do you have any knowledge or recollection of any operators purchasing Pace-O-Matic machines, 402.44, during the month of January?

A.    I'll give you the same answer.

Q.    Okay.  Fair enough.

I think you testified something about the name "Pennsylvania Skill" because you had done these things before. I think you said something about the name of the company.

Do you recall some testimony with regard to the name of the company, Pennsylvania Skill Games, LLC?

A.    I recall my testimony.

Q.    Okay.  And is that the sort of thing like Best Buy can be a brand and it can also be the name of a company?

A.    I don't know that.

Q.    Okay.  Now, was the Beaver County ruling, as you recollect, was that important to Pace-O-Matic?

A.    Yes.

Q.    Okay.  And do you have an understanding that Michael Pace was involved in assisting with and in regard, for example, going to Pennsylvania to meet with, for example, a club to put a machine in it?  Any of that sort of involvement?

A.    Can you ask it again, please?

Q.    Yeah.

Do you have any recollection of Mr. Pace, for example, going before the lawsuit to Pennsylvania to find a place to put

a game?

A.    No.

Q.    Okay.  Did you?

A.    No.

Q.    What about Ryan Wood?

A.    No.

Q.    Anybody from your office?

A.    No.

Q.    Okay.  Fair enough.

Now, if a game isn't -- strike that.

Do you have any knowledge of concerns brought by either of the Unises with regard to the game not earning or not being sufficiently interesting to -- to satisfactorily earn?

A.    I'm aware of that concept in all of the markets with Pace-O-Matic, including Pennsylvania.

Q.    And including with Pennsylvania Skill Games, LLC?

A.    Yes.

Q.    Okay.  Fair enough.

Now, it's true, isn't it, that Pace-O-Matic doesn't make money unless operators make money?  I think you said that, a few times, perhaps.  You don't make money unless -- or operators don't make money unless you make money, right?

A.    Everybody -- I use the expression "Everyone needs to feed out of the trough" -- is that at the end of the day, it's the ultimate customer -- we could call the player.  There's a

location, there's an operator, there's a distributor, and the manufacturer.  It all goes hand in hand.

Q.    Now, you testified sort of helping out a young man who has endured at 28, as he sits there now.  So I think you testified.

Now, isn't it true that if -- if an operator doesn't put games into locations that earn, the operator doesn't make money and Pace doesn't make money?

A.    If a player -- we call them that -- doesn't enjoy playing the game, then the game doesn't make money and nobody makes money.

Q.    Okay.  But it is possible, though, for Pace to make money and particular operators not to make money; isn't that right?  Some operator may make money, but it may not be -- for example, Pace-O-Matic can make money whether or not it sells to Pennsylvania Skill Games, LLC.

MR. NEISER:  Objection; vague, Your Honor.

THE WITNESS:  Sorry.  I don't understand the question.

THE COURT:  Let's rephrase the question if we could.

BY MR. ZEGARELLI:

Q.    Okay.  Do you have an understanding of the word "refuse"?

A.    Yes.

Q.    To refuse something, you have to be offered something; correct?

MR. NEISER:  I'm going to object to vague and misleading.

THE COURT:  Could you perhaps put it in context, Mr. Zegarelli?

MR. ZEGARELLI:  Okay.

BY MR. ZEGARELLI:

Q.   Let's see.  You've got your -- to your recollection, did Pace-O-Matic ever offer to Pennsylvania Skill Games an opportunity pursuant to the right of first refusal in the Equipment Purchase Agreement?

A.   Please ask it again.

Q.   Yeah.  To your knowledge --

MR. ZEGARELLI:  Well, could you read it back, if you don't mind.

(Previous question was read back.)

THE WITNESS:  I'm not aware where anybody or anybody contacted Pace-O-Matic, which would have triggered turning over, if we called it a "lead," to Pennsylvania Skill.

BY MR. ZEGARELLI:

Q.   Okay.  That's a "no," then?

A.   No.

Q.   Okay.  Do you have an understanding on the same basis what Miele Manufacturing offered to Pennsylvania Skill Games, an opportunity pursuant to the right of first refusal in the Equipment Purchase Agreement?

A.    I can't comment about Miele.

Q.    Okay.  Now, is it any part of your position or Pace-O-Matic's position, to your knowledge, that the reason why Pace-O-Matic didn't offer -- you testified never offered -- is because Pace-O-Matic does not know where machines land or are located by operators?  Is any part of that part of your position?

A.    The statement I made is a general statement about Pace-O-Matic in every market since the machines are not connected to the Internet.  When someone purchases a machine, we do not know the location, period.

Q.    All right.  And you do not know the location, isn't it true, because you don't ask?

A.    That's not part of our business model.

Q.    Ah, okay.  It's not part of your business model.

But your model is what you make your business model; isn't that right?

A.    Our business model -- and we're based in Atlanta.  Our business model is to find a distributor who is in the current marketplace and let that distributor be our main distribution point and handle the interaction primarily with the local market, in this case with operators.  And that's what we did and have done in Pennsylvania.

Q.    So to say it a different way, Pace-O-Matic makes money either way, isn't that right, whether or not you -- somebody

puts -- if somebody buys a machine from you, from Pace-O-Matic, at that point you've made your money; isn't that right?

A.    That's -- that's not correct.

Q.    Okay.  Explain it, if you don't mind.

A.    As I stated before, Pace-O-Matic's basic business model is to get as many cabinets or terminals on the street to generate recurring software revenue.

Q.    Right.  Okay.  But -- so to put it a little differently, if you have a right of first refusal and you don't -- well, let's say you ignore the right of first refusal and you sell when you should have given a right of first refusal.  You make money either way; isn't that right?

MR. NEISER:  Objection; vague and misleading.

THE COURT:  You can answer, if you understand the question.

THE WITNESS:  Please repeat it.

MR. ZEGARELLI:  Could you read it back, please.

(Previous question was read back.)

THE WITNESS:  Let me state, Pace-O-Matic would not ignore any of its obligations that way.  But at the end of the day, if Pace-O-Matic -- first of all, Pace-O-Matic doesn't sell the terminal; the distributor does.

So when the terminal is sold, is there a profit in the sale of that?  Absolutely.  It's a one-time profit.  It's small, because our analogy is in our business, if you think about a

printer, a printer doesn't cost a lot of money, but you have to buy the ink. Or a razor blade doesn't cost that -- a razor doesn't cost as much.

So the objective to get as many terminals out is to have as little profit in the terminal. The core business is then to sell software plays, or license, to generate recurring revenue.

BY MR. ZEGARELLI:

Q. Would you look at your screen, please. And do you see the words "make sure"? Do you see those words "make sure"?

A. Correct.

Q. Okay. Let me show it to you again.

Do you see those words "make sure"? Make sure. Ensure. Guarantee. Right? We're going to -- we're going to make sure.

You see that; right?

A. That's correct.

Q. Okay. Now, you have an accounting background, if I understand?

A. Yes.

Q. You have a business background, if I understand it?

A. Yes.

Q. Okay. Now, do you have any knowledge that Pace-O-Matic implemented a policy where it simply asked operators, "Do you intend to place machines into Beaver County?"

Do you have any recollection of you ever implementing a policy like that?  Like, it's sort of a "don't ask, don't tell" sort of thing.  Did you say, "Do you intend to put any machines in Beaver County?"

A.    Pace-O-Matic has always partnered with but we rely on our distributor.  And I'm not aware of any policy of asking where machines are because, as I stated before, even if someone tells you, that doesn't mean that's where the machine ends up.

Q.    That's fine.  I mean, people -- people do things wrong all the time.

MR. NEISER:  Objection.  If there's a question -- the sidebar speech is, I think, argumentative.

THE COURT:  Let's limit to question and answer, please.  That comment is stricken.

BY MR. ZEGARELLI:

Q.    So if I understand your answer, to your knowledge, Pace-O-Matic never implemented a policy of simply asking operators, "Do you intend, plan, or are you distributing into Beaver County?"

A.    Correct.

Q.    Okay.  And when you say "correct," that means you never did?  Pace-O-Matic never did?

A.    Yes.

Q.    Thank you.

MR. ZEGARELLI:  No further questions at this time,

Your Honor.  Thank you.

THE COURT:  And thank you, Mr. Zegarelli.

MR. NEISER:  No redirect.

THE COURT:  All right.  Then, thank you for your testimony here today.  You may step down and you are excused.

(Witness excused.)

MR. NEISER:  Your Honor, we call Lou Miele.

THE COURT:  All right.

Mr. Miele, please step forward to be sworn.

THE CLERK:  Sir, please raise your right hand.

LOUIS MIELI, a witness herein, having been first duly sworn, was examined and testified as follows:

MR. NEISER:  May I proceed, Your Honor?

THE COURT:  You may.

DIRECT EXAMINATION

BY MR. NEISER:

Q.   Good morning, sir.

A.   Good morning.

Q.   Introduce yourself for the Court and the jury.

A.   My name is Louis David Miele.  I live in Williamsport, Pennsylvania.

MR. NEISER:  Your Honor, before I get started, can I consult with Mr. Deasy?  It's about scheduling.

THE COURT:  Yes, that's fine.

MR. NEISER:  Thank you, Your Honor.

BY MR. NEISER:

Q.    Mr. Miele, tell us what you do for a living.

A.    I'm the owner of Miele Manufacturing.

Q.    Okay.  How long has Miele Manufacturing been in existence?

A.    Since early 2015.

Q.    Where did you grow up?

A.    Williamsport, Pennsylvania.

Q.    And could you please briefly describe your educational background.

A.    Sure.  I went to Valley Forge Military Academy for high school and Culver Military Academy in the summers.  And then I went on to College of Boca Raton for business law for one year.  And then I returned to the family business and took up a career with my father in the family business, which is the amusement business.

Q.    What's that?

A.    It's the amusement business.

Q.    Great.  Describe your family business to us, please.

A.    Third-generation amusement business since 1935 in Williamsport, Pennsylvania.  It's been handed down through three decades -- or three generations.  We do video games, jukeboxes. For a while we were in the food vending business as well -- sold that off after my father's death -- and been doing that ever since.

Q.   Great.  How many employees does Miele Manufacturing have?

A.   Miele Manufacturing has about 100 employees right now.

Q.   And what is the purpose of Miele Manufacturing?

A.   Miele Manufacturing manufacturers primarily Pennsylvania Skill Games or Pace-O-Matic games for Pennsylvania market and other markets.  We also manufacture some other things for the amusement industry -- some jukebox stands, steel stands with sound systems on them that TouchTunes jukeboxes can get mounted on.

Q.   Okay.  So, for example, during the opening statement, we had a machine that was covered in Pennsylvania Skill graphics.  Do you recall that?

A.   Yes.  Merit Megatouch.  It's a Merit Megatouch.

Q.   No.  I mean, the one that is covered with the Pennsylvania Skill brand.

A.   Oh, yes, yes.

Q.   Okay.

A.   Sorry.

Q.   No.  Tell us what is Miele Manufacturing's role, if at all, in creating that machine?

A.   So we -- we cut the cabinets in house.  We add all of the metal components to it, doors, button panels.  We add all the internal components:  power supplies, bill accepters, printers, phone chargers, monitors, any PDU units -- power

distribution units that are required inside the cabinet.  We build the entire assembly.

Q.    What about the graphics on the outside?

A.    We manufacture the graphics in-house.  We have a complete printing department.  FastSigns, actual store.

Q.    Okay.

A.    And that's in house.

Q.    So you have an in-house sign company and about 100 manufacturing employees?

A.    Correct.

Q.    So do you participate in the advertising and marketing of the Pennsylvania Skill-branded Pace machines?

A.    Yes, sir.

Q.    Can you generally describe what your -- what you do for them?

A.    So as a distributor, it's my job to promote the brand, make brand awareness, and find new operators especially in the beginning years.  So we did advertising through trade magazines. We had a consistent ad in a trade magazine probably three, maybe even four years.  I did an ad in a -- the bar magazine for the State of Pennsylvania.  I forget the name of the exact magazine at this point.  But if you're a licensee, you pretty much get this magazine, and it has all of the licensee information in it. So we've run a Pennsylvania Skill ad in that since day one, since 2015, that would be, and continue to do so today.

We do a lot of Constant Contact, which is an email blast service. We do Constant Contact. I have -- I have an email list of 5,000 email addresses for people all over the United States that are in our industry. I got that from working with TouchTunes as a manufacturer for TouchTunes. So we use that to cross-market Pace product, Miele Manufacturing products, jukebox stands, things of those natures.

Generally at Miele Manufacturing, because we're operators, we work in the industry, if we see a problem, we'll create a fix, and we'll market that fix. So we market -- once in a while we'll market new things that are completely out of the blue. For example, Merit one time had their machines overheating, so we created a cooling system for them and sold those all over the country.

So we do -- a lot of our marketing is direct to -- our customer base is limited. It's not a public customer basis, so to speak. So Constant Contact works really well for us for that that because we're directly to them.

Q. Before I ask the next question -- excuse me. Where do you get the customer email addresses and contact information? Is there an organization or an entity that provides that?

A. Through my work with TouchTunes, I had a lot of the TouchTunes operators' email addresses because we -- let me explain how I got those.

Q. Yeah.

A.    We manufactured -- TouchTunes came to me and asked me to manufacture what they called a conversion kit at the time. TouchTunes is jukebox company -- touch screen jukebox company. When they first came out, you couldn't buy their jukeboxes.  You had to lease them from them.  And then they went into a situation where they were having a hard time getting market penetration --

(Court reporter clarification.)

THE WITNESS:  I'll start over.  Sorry.

TouchTunes had a situation where they were having a hard time getting market penetration because their jukebox, at first, you couldn't buy it, and then it was very expensive.  So they asked me to develop a conversion kit where they could take their parts and put them inside of an old jukebox, like a 45 jukebox, 45 records, or a CD jukebox.

So we designed 69 different conversion kits for jukeboxes made by many different companies that would convert them into TouchTunes digital jukeboxes.  We did this for them for seven years, and we sold thousands and thousands of conversion kits all over the country and actually the world.  So that is how I gained a lot of knowledge of operators, and that's how a lot of operators all over the world know who I am.

Q.    Do you communicate the Pennsylvania Skill brand to those operators?

A.    Yes.

Q.    In what forms?  Please, tell us.

A.    Constant contact, trade shows.

Q.    When you say Constant Contact, give us -- explain that to us?

A.    Constant Contact is an email marketing service.  So I can send an email out to a group of customers or dedicated list, get -- find out how many opened it, how many clicked on clicks that we put inside of it.  So if we have a news article I want to share with everybody, I can send it out.

Q.    Understood.  What about the machine itself?  Is the machine itself an advertising or marketing tool?

A.    Absolutely.

Q.    Tell us how.

A.    We have branded our machine because we're proud of you brand.  We have Pennsylvania Skill at the top on the header, as you've seen many examples in the last couple of days.  And then in about 2017, we decided to put a full wrap on the cabinet as well.  So there were a lot of people copying our brand.  So they were copying our header, so we decided let's go the extra step and completely wrap the front door, bottom kick plate, and two sides.  We've done that consistently since 2017.

Q.    And you said it was because there were competitors that were using a different brand.  Is that what you're saying?

A.    There were competitors that were trying to be us, trying to use Pennsylvania Skill and pretend to be Pennsylvania

Skill by Pace-O-Matic.

Q.    You were in the courtroom yesterday when Mr. O'Bier went through a number of photographs that were provided by the defendant.  Do you remember that?

A.    Yes, sir.

Q.    Are those examples of what you're talking about?

A.    Those are exactly the examples that I'm talking about.

Q.    And tell us, what -- does that create a problem for your business?

A.    It does.

Q.    Does it create a problem for POM and Pace?

A.    Yes.

Q.    And how so?

A.    Because you're -- you're misrepresenting your brand to the public and you can hurt the consumer because when they think they're playing a skill game and they're in fact playing a game of chance, where the machine's working against them.

Q.    So at the bottom line, it's not a Pace game.  Your concern is that you have a Pennsylvania Skill brand and you have a non-Pace game?

A.    For example, it was used yesterday.

Q.    Yeah.

A.    It's like putting Heinz ketchup -- what's the other brand?  I don't know the other brands.

Q.    Hunt's?

A.    Hunt's ketchup in a Heinz bottle, as many restaurants do.  It's misleading.

Q.    How many games -- you're saying that the actual machine itself and the graphics employed on it, are they a sales source for you or a source of advertising and marketing for you?

A.    Yes, because people over the last eight years have come to recognize our brand.  And I've actually had players come to me and say, Hey, you know those other games at Joe's Place?

And I'm like, Yeah, I know exactly the ones you're talking about.

And they'll tell me they're not skill games because the player gets a good sense of how the machine works and they know when the machine's working against them.

Q.    Okay.  So do you ever get sales leads as a result of the branding that's on the machines?

A.    Yes.

Q.    Can you describe any examples of that?

A.    We get a lot of leads from locations that want to buy their own machines.

Q.    Okay.

A.    That's mostly what it is.

Q.    Okay.

A.    Or people that are not operators -- have an operator background, that want to become operators.

Q.    Okay.  So you're saying that you have personal

knowledge of examples where the actual advertisement on the machine has resulted in association with your company or with Pace-O-Matic?

A.    I can't tie it directly, but building the brand brings those rewards.

Q.    Understood.  What about the advertising?  Do you ever get calls from folks because of your advertising you send out?

A.    Sometimes we do.

Q.    Yeah.

A.    Depends on how we structure the advertising.

Q.    Okay.

A.    A lot of times our advertising will be structured in a way it will announce and make the customer or whoever we send it to aware of our product and it will direct them to their local operator.

Q.    Ah, that was the question.  So are you saying that the advertising generates an interest to contact an operator to then obtain in some fashion a Pennsylvania Skill game?

A.    Yes.  It's our way of supporting our operators.

Q.    In fact, that's a common thing, isn't it?

A.    Yes.

Q.    In the opening, we discussed how many machines -- Pennsylvania Skill-branded machines there are in the Commonwealth of Pennsylvania.  Do you recall that?

A.    Yes, sir.

Q.    I think I believe I mentioned the number of 20,000. Does that sound about right to you?

A.    It sounds about right.  One thing to keep in consideration is we've been doing this for eight years and these machines don't last forever.  So a number of those machines get retired over time, and we have no way of knowing that.

Q.    Understood.  So what we're talking about is over time, approximately 20,000 have been sold?

A.    Correct.

Q.    Let's talk about the ability of Miele or Pace or anyone else for that matter, to know where a machine goes after it's sold.

Can you please tell us, sitting here today, whether you can tell where any of the Pennsylvania Skill-branded machines are actually located?

A.    I cannot tell you where any of them are located without physically seeing them.

Q.    Why?

A.    They're not connected to the Internet, and the operator location relationship is not one that neither Pace-O-Matic or Miele Manufacturing are a party to.  So it is not our responsibility to know, when an operator buys equipment from us, where they choose to use this equipment.

Q.    Is there a GPS unit in the machines?

A.    No, sir.

Q.   Are they connected to the Internet?

A.   No, sir.

Q.   Is there any other tracking or homing device that's attached to them?

A.   No, sir.

Q.   They don't have a carrier pigeon inside that flies out and will tell you where they are?

A.   Well, you got me on that one.  No, sir.

Q.   Think of that for future improvements.

Why is that?

A.   Again, I'll restate -- I'll try to give you the whole -- there's a player, as Mr. Warren described.  There's a location, which is Joe's Bar, so to speak.  There's an operator, which an amusement operator.  And then there's a distributor and manufacturer.  The relationship between the location and the operator is not -- is not a relationship that neither the distributor or the manufacturer are a party to.  They may have a contract.  They may not have a contract.  So it is -- it's not right for us to ask where they choose to use their equipment.

Q.   You know these operators better than we do.  Are you familiar with operators in general?

A.   Yes, sir.

Q.   Are these folks who want to tell people where their business operations are located?

A.   Absolutely not.

Q.    It's not that they're doing something bad.  It's just they don't like that.  Would that be fair?

A.    They feel threatened.

Q.    Why?

A.    I can give you a real good example.  TouchTunes, at one point in time in their beginning years, wanted to know information on location so they could market ads on their screens to those locations.  And they asked operators for information on locations, and there was a big hubbub about that, a big argument.  No operators wanted to give the characteristics of the location.  Is it a gay bar?  Is it a country bar?  Is it an after-hours club?  They didn't want to give that information because it's their relationship and they don't want to threaten that relationship by someone else getting their information and coming in and going over top of them.

Q.    Let's talk about that relationship.  What is generally the relationship between operator and locator -- location.  I'm sorry.  I mean, does it take time to develop?

A.    Yes.  Absolutely.  There's locations that have been working with the same operator for decades, for generations, actually.

Q.    Okay.

A.    Some locations are contracted to their operator, and some are handshakes.

Q.    Okay.  The operator and the location work out a deal

on how to split profits and how to make money off of the machines, is that fair?

A.   Yes, sir.

MR. NEISER:  103A, please.  A.J.?

MR. SIMEONE:  Is it not up on yours?

MR. NEISER:  Because I figured it out on my own.

BY MR. NEISER:

Q.   Sir, I'm showing you a document marked for identification as 103A.

MR. NEISER: A.J., could you, please, scroll through this, please?

BY MR. NEISER:

Q.   Do you recognize it?

A.   Yes, sir.

Q.   What is it?

A.   It's a packet of information that was sent out by my company to our operators because we had a software update.  And this provided them a thumb drive in order to do their software update.

Q.   Okay.

A.   And some ad slicks as well.

Q.   Is that a true and correct copy of what was sent out to operators at that time?

A.   I believe so.

MR. NEISER:  We offer 103A into evidence.

MR. ZEGARELLI:  No objection.

THE COURT:  All right.  Exhibit 103A is admitted.

BY MR. NEISER:

Q.   Hey, who designed that?

A.   The whole ad slick?

Q.   Yes.

A.   I'm not sure if it was -- most likely this was done in-house at Miele Manufacturing.

MR. NEISER:  Let's go to the next page, A.J.  Next page.  One more.  One more.  One more.  One more.  One more. Ah.

BY MR. NEISER:

Q.   I believe that's a photograph of the slick that looks like an envelope and a flash drive.  Do you see that there?

A.   That's correct.

Q.   Okay.

A.   Yes.

Q.   Explain this to me.  What is the purpose of that flash drive?

A.   We come out with an update for the software.  We send that flash drive to our customers, the operators, so they can go out on their route and update their games to the newest version of the software.

Q.   Great.

So are you telling us that that flash drive is

necessary because the machines aren't connected to the Internet; they can't update like our phones update?

A.   Absolutely.  There's no over-the-air updates.

Q.   Okay.  So for example, last night I find out that Apple has a security update.  I push a button on my phone, and it updates.

Are you saying your machines do not work that way?

A.   That is correct; our machines do not work that way.

Q.   And is that one of the flash drives that was actually used at some point in time?

A.   Yes, sir.

Q.   Okay.  Where do you get those flash drives with the software from?

A.   They're provided by Pace-O-Matic.

Q.   And where are they shipped from?

A.   Georgia.

Q.   To where?

A.   Williamsport.

Q.   And it contains the software?

A.   Yes, sir.

Q.   And that software, when the game is turned on, does it depict the name Pennsylvania Skill?

A.   Yes, sir.

Q.   Let's talk about fills for a moment.  Describe the process by which fills are done.  Let's say operator needs a

fill or location needs a fill.  Take us from A to Z.

A.    So that process has changed over the years, so I'll take you from the first stage, and then I'll take you through the second.

Q.    Please do, sir.  Thank you.

A.    When an operator needs a fill -- a fill is a license.  A fill is a bad name for it, but -- you confuse people with that.  Fill, license being one and the same.  I may use both, and I'm sorry if I do that.  It's just been embedded.

An operator needs a fill.  So they start out with a full fill on their machine.  That allows the machine to make so much money.  When that money is made, that fill level goes down.  So this being the money and this being the fill, this -- this being the fill, let me start here, full fill, 100 percent fill, machine's made no money yet.  As the machine makes money, the fill comes down.  These two are polar opposites of each other.

So as the machine hits its limit in making money, you've exhausted your fill to do that.  And you need to call the distributor, Miele Manufacturing, to order a new fill.

That is done by presenting your terminal ID number, and then we plug that into our computers, and then there's a series of numbers that they read to us, and then we give them a series of numbers back.  And that as soon as they put that on there and hit the "enter" button, that will put a new fill on their machine without being connected to the Internet.  It's an

internal process.

Q. Okay. So you're saying that somebody actually needs to pick up the phone?

A. In that process, someone needs to pick up the phone. In the new process, they do not.

Q. Tell us about the new process.

A. So I -- we developed a QR code. QR code, I'm sure you've seen them, little boxes with all of the little boxes and that square with little squares in it. We put that on the screen of the machine, and that transfers all of the information we need to us that we would ask them on the phone and kicks back the authorization numbers to them in a matter of a minute, which saves them a lot of time, especially when they're in a loud bar. Sometimes you can't hear them on the phone. It gets it right back to them within a minute. So that is the new process.

Q. And does it give the location of the machine in that process?

A. It does not.

Q. Are you providing fills to Pennsylvania Skill Games, LLC?

A. Yes, sir.

Q. To this day?

A. Yes, sir.

Q. So if they call and they want a fill today, you'll give them one?

A.    Yes, sir.

Q.    Do they buy very many fills?

A.    No, sir.

Q.    If you had a range of high to lowest performing operators in the Commonwealth of Pennsylvania, where would Pennsylvania Skill Games, LLC, fall?

A.    Scale of 1 to 10?

Q.    Yeah.

A.    Negative 10.

Q.    Why do you say that?

A.    They just don't participate.

Q.    Are you familiar with a software program called RouteBoost?

A.    Yes, sir.

Q.    How does it work?

A.    It's a route management software that I originally was -- I was the third partner in the original company which is MCM.  It is a route management company that runs on your iPhone or any phone, any IOS device.  And it allows the operator to go and do collections of any of their equipment, pool tables, jukeboxes, crane machines, skill games.

So when you do the collection, it does all of the math for you, what the splits are.  And you have to tell it all this stuff in advance, and then it does all the splits.  And then as soon as that's done, it's up in the cloud, and then the office

can see exactly what was done, what time it was done, time stamped.  The customer gets an email receipt of the collection. So if the customer's not at the location when you're doing the collection, they know it happened and exactly what should be there when you get back.

Q.    Understood.

      Does this RouteBoost information provide Miele or Pace or anybody the real-time location of any machines?

A.    No.

Q.    How many counties does Miele -- do you have an understanding of how many counties have Pennsylvania Skill Games games in them?

A.    I would imagine at this point, every county.

Q.    Do you ever have meetings with operators?

A.    Yes, sir.

Q.    Do you give incentives to operators to increase their business?

A.    Occasionally we'll do a sale on equipment.

Q.    Okay.

A.    Hardware.

Q.    So let's talk about the Unises and Pennsylvania Skill Games.

      Can we go back in time a little bit?

A.    Sure.

Q.    So can you, please, tell us the first time you

either -- you heard of Albert or Albie Unis or -- Albert or Albie Unis, let's start with that.

A.    The first time I heard of Albert Unis would have been probably the first or second week of January.

Q.    What --

A.    Of 2015.

Q.    Can you describe the circumstances for us, sir?

A.    I was down at Pace-O-Matic.  I was in a conference room with Michael, Danny, Ryan Wood.  And Ryan said, Hey, we need to call this Unis guy who put the machine in the Italian-American Club.  Mr. DeLuca wants us to call him and talk to him about getting him going with the equipment.

Q.    Got it.

So prior to that time, had you known who he was?

A.    No, sir.

Q.    Had you ever heard of him?

A.    No, sir.

Q.    Had you ever heard of his business?

A.    No, sir.

Q.    What was the name of his business, by the way?

A.    AIP.

Q.    You know I noticed in, I think it was Exhibit 275, there were invoices for AIP and for Albie Unis, PA Skill Games, something like that.

Do you recall seeing that?

A.   Yes, sir.

Q.   How do those names get entered into or get on to the invoices that we saw on the screen?

A.   Well, there's -- it's QuickBooks.

Q.   Yeah.

A.   Our accounting program.  And their account started under the company AIP.

Q.   Okay.

A.   And at another point in time, it changed to Pennsylvania -- Pennsylvania Skill Games.

Q.   Okay.

A.   So if you noticed on the one exhibit, it said Pennsylvania Skill Games, but in parenthesis it had AIP.

Q.   Yeah.

A.   Because they instructed us at a certain date that they were changing the company name --

Q.   Okay.

A.   -- to Pennsylvania Skill Games.  Unfortunately in QuickBooks, because we use QuickBooks online, when you say I start a company in 2000, I changed the name in 2005, it retroactively changes the name on all invoices.

Q.   Understood.

A.   So it's a misrepresentation of what the name actually was at that point in time.

Q.   Understood.

And to be clear, who can change the name at your office?

A.   Any of my accountant or salespeople.

Q.   Are you involved in that process?

A.   I was in the beginning.

Q.   Okay.

A.   And just to be clear, the reason you see AIP in parenthesis was a reminder to our staff that that's who this company really was.  So that lived there for a while, and then I'm sure it got taken off.

Q.   I understand.

So your first discussion with Mr. Wood, was it in relation to Albert Unis III or the IV?

A.   Referring to my discussion early January?

Q.   Yes, sir.

A.   Oh, it was Albert Unis III.

Q.   Okay.  Did you then have a discussion with Mr. Unis?

A.   Ryan Wood and myself had a phone conference with Mr. Unis.

Q.   Can you describe that phone conference with us, please?

A.   We were trying to explain to him the fill on the machine.  He was not -- he did not know what the business model was between Pace-O-Matic, the distributor, the operator, the location, and how the splits were.  And it's very hard for other

people when they hear it the first time to understand it, because there's a pot of money and Pace-O-Matic gets a license fee.  The operator has to collect that license fee and then give it to -- give a portion of that to Pace-O-Matic.  That's to buy the fill or the license.

Q.    Understood.

A.    Typically, operators aren't used to having to do that. For instance, TouchTunes, when TouchTunes came out, prior to TouchTunes coming out and putting their jukebox out, you'd go buy a CD, put it in the jukebox and whatever money was in there, you'd split with the location.  TouchTunes was the first one who started something like this.  They do a percentage back to them for music and service.  So today I think it's 22.5 percent.  It comes off of the top of whatever is in that jukebox, goes back to TouchTunes.  So when this type of thing happened in the industry, the operators in the industry looked at it like the industry leaders or the big companies are trying to get in their pockets.  So it was very aggravating to the operators.

Q.    Okay.

A.    And Mr. Unis was very aggravated when he heard and understood this, and we had to explain it to him several times.

Q.    I understand.

Did you have any meetings or any other encounters as a result of that conversation with Mr. Unis?

A.    Yes.

Q.   And explain it, please.

A.   Mr. Unis explained to us that he was operating other games at that time, and he got very agitated because, at that point in time, to my knowledge, there were only two machines --

Q.   Let's stop right there for one second, please.

I want to really focus your answer, if you don't mind. Sorry for interrupting you.

But did you have a meeting with Mr. Unis as a result?

A.   Yes.

Q.   Tell us where you met.

A.   Sewickley.

Q.   And where was that?  Whose office was it?

A.   Wayne DeLuca's office in Sewickley.

Q.   Okay.  What was discussed?

A.   We discussed how to move forward with Mr. Unis.  We explained the fill again because it is something hard to comprehend.

Q.   Okay.

A.   And how we were going to move forward and support him in the market and how many hundreds of machines that he's going -- to that he controls, all of these locations, and how he was going to put hundreds of machines in these locations.

And we were there to assure him that, Listen, we're here to be a good partner.  We appreciate what you did for Mr. DeLuca by putting that machine in there and you played a

role, a very small role, but a role with no possible damage to yourself, but we appreciate it and we're trying to show our gratitude.

And we wanted to help him in any way to become successful.

Q.   Understood.

During that meeting, do you recall any discussions regarding a trademark?

A.   No, sir.

Q.   Do you recall any discussions that leads you to have the impression that Mr. Unis was using the name "Pennsylvania Skill" or "Pennsylvania Skill Games"?

A.   Absolutely not.

Q.   Was there any reference to any prior discussions that Mr. Unis III had with Michael Pace?

A.   Absolutely not.

Q.   And to be -- just to put a fine point on it, do you have any idea who Mr. Unis was except for based on what Mr. DeLuca told you?

A.   I -- no, I had never heard of Mr. Unis up until this point.  I had never heard his name until Mr. Wood asked me to get on a call with him.

Q.   Okay.  And to be clear, Mr. Unis IV was not part of that discussion at Mr. DeLuca's office?

A.   He was not.

Q.   Did you do anything or go anywhere as a result of that meeting at attorney DeLuca's office?

A.   Yes.

Q.   Tell us what you did.

A.   Mr. Unis III, Albert Unis III, took Ryan Wood and myself in his pickup truck, and we drove around -- and I'm not familiar with Beaver County.  So I assume it was Beaver County, but I can't say for sure -- up and down the hills, Beaver County, along the river.

Q.   Excuse me, sir.  I want to caution you not to talk about what specific games or anything that you saw on the route as you discuss this, please.  Continue.

A.   Sure.  He took us in and out of probably a dozen locations, in and out.  You know, walk in the location, say hi to the bar owner, Joe, and he would tell us about the background of the location, who the owner was.  Showed us all of his machines in all of these locations, a variety of machines from gaming machines to jukeboxes to -- you know, I don't know that he had any crane machines -- but Megatouches.  The standard stuff at that point in time for the industry were in these locations.

Q.   Did you have a sense of how many different types of machines, without describing what they were, what type of game they were, that Mr. Unis was operating at that time?

A.   Hundreds.

Q.    Okay.

A.    Hundreds of machines.

Q.    And he was representing that he would also buy hundreds of machines from Pace?

A.    Yes.

Q.    Is there any question in your mind he said that?

A.    No question at all.  Because I was being told, as the manufacturer, to gear up for this big order.

Q.    He was telling you to gear up for a big order?

A.    Ryan and Danny Wood were telling me, "This guy's going to buy hundreds of machines.  We've got to gear up.  Make sure you're ready."

Q.    Okay.  At any time are you aware of any discussion or consideration of the Unises being a distributor of Pace-O-Matic product?

A.    No, sir.

Q.    Do you have an understanding as to whether or not, based upon their operation at the time, they could have even fulfilled that role?

A.    The only commercial property I ever saw of theirs was a firehouse -- fireworks warehouse that was completely packed with fireworks.  I don't -- I never saw any facility where they could have performed anything.

Q.    Okay.  So after you saw the elder Unis' locations and machines, or some of them, what did you do next?

A.    He -- this was hours.  It took hours.  And Mr. Wood had to get back to the airport because he had a flight to catch, you know.  He was driving back to PA.  So we finally instructed him that we had to -- you know, we've got to get back, we've got to get going.

Q.    Okay.

A.    So he took us to the airport.

Q.    Understood.

A.    Or took us to Ryan -- I think Ryan's car.

Q.    Understood.  What was your next interaction with Mr. Unis, if you recall?

A.    You mean other than that day?

Q.    Yes, sir.

A.    I don't -- I don't recall what the next one would have been, to be honest with you.  Probably -- I can -- I can assume it was probably phone calls about possible orders.  I know that we were -- he was working on an opening order and I was helping him get financing.

Q.    Tell us about that.

A.    So there's a company called Firestone Financial who finances equipment purchases in our industry.  I used them myself in the past.  So I reached out to Firestone Financial on Mr. Unis' behalf to try to acquire financing for him, and I think we were successful in getting that done, but it took about three months to get that done.

Part of that was because Firestone, the salesperson for Firestone, wasn't being receptive. And then later I found out is because this is all new and they didn't realize this is actually legal. So they were doing their research and due diligence on us. So it took a little while.

Q. Understood. So the long and short of it is that there was financing from the Unises' side required to purchase any machines?

A. Yeah. I think that order may have been for 15 machines.

Q. Understood. To be clear, who purchased those machines?

A. AIP.

Q. And that, again, is Mr. Unis -- the elder Unis' company?

A. Yes, sir.

Q. Did you talk with Albert Unis IV whenever you were driving around to the various locations?

A. No, I hadn't met him at that point.

MR. NEISER: Your Honor, I'm about to start a new line. We're right at noon. I didn't know if the Court wanted to have our lunch break at this point, and we can ask discuss the other matter.

THE COURT: All right. Why don't we take our lunch recess at this time, ladies and gentlemen. Thank you for your

attention here this morning.  We will be back at 1:15.

Could I see counsel at sidebar once the jury has left?

MR. NEISER:  Yes, Your Honor.

THE CLERK:  All rise.  This Court is in recess.

(Pause as the jury exits courtroom.)

(Whereupon, sidebar conference held:)

MR. NEISER:  Advertisements --

THE COURT:  Keep it down a little bit.

MR. NEISER:  I'm so sorry.

THE COURT:  I don't think they can hear us from here, but just in case.

MR. NEISER:  Sorry.  So we have -- this is the Play Meter, I believe.

THE COURT:  Is that the document that you added as the magazine design cover to a previous exhibit?

MR. NEISER:  No, this is one already in there.  It's Exhibit 215.

THE COURT:  Okay.

MR. NEISER:  It was -- we also need to discuss the previous exhibit that we provided.  It's almost identical to this.  I think it is.  It is identical.

So the problem is, and I'm --

MR. ZEGARELLI:  May I see?

MR. NEISER:  Absolutely.  I'm sorry.

We're at the same issue.  Based on the discussion this

morning, I just wanted to be clear, because we took "legal" out on the website.  Now that has "first legal" --

THE COURT:  I think we had agreed that "first legal" was appropriately in the record.

MR. NEISER:  But "only legal" we've got to get rid of?

THE COURT:  Mr. Zegarelli, is it your contention that "only legal" should be redacted?

MR. ZEGARELLI:  But, first, actually, if you're -- the "first legal" implies sort of the same thing, just in a different manner.

THE COURT:  I understand.  I think I already ruled on the "first legal."  And if I didn't, I am ruling now because we do have testimony that it was the "first legal."

MR. ZEGARELLI:  That's up to you, Your Honor.

THE COURT:  I understand.

MR. ZEGARELLI:  "First legal" implies whatever else is there was not legal.  And I'm not sure that's necessary -- I mean, it would be accurate to say it is the first game in Pennsylvania adjudicated in a county to be legal for that version.  That's -- that's probably accurate.  Everything else is, I think, objectionable.  But I respect the ruling.

THE COURT:  Mr. Neiser, I assume you're going to have your witness explain what that means.

MR. NEISER:  I sure can.  I can actually have him say something like that.  If you let me lead the witness, I'd do it.

MR. ZEGARELLI:  I don't know what's going to happen.

MR. NEISER:  Gregg, come on.

MR. ZEGARELLI:  I don't really know in this case what is -- you know, even, quite frankly, the testimony almost makes it sound like my client was doing something wrong with the stop, don't say any more, like he was using --

MR. NEISER:  I'm trying to comply with the Court's order.

MR. ZEGARELLI:  I understand, but that's the problem with the whole --

THE COURT:  I expect each of you, if your witness is about to go in a direction that we've already ruled is out, that you would stop them.

MR. NEISER:  That's what I tried to do.

MR. ZEGARELLI:  I appreciate it.  I do think, such as it was for the Boodram email, that, you know, the evidentiary rulings sort of take an unusual turn.

But, Your Honor, I respect the decision.

THE COURT:  I understand.  And you're welcome to speak out on it.  I don't want to foreclose that.

MR. NEISER:  Sure.

THE COURT:  Is there some other ad that says "only"?

MR. ZEGARELLI:  I mean -- I mean, if he wants to redact it, he can redact it.  That's -- just take out the word -- I mean, just -- just do this, take out "first legal" --

THE COURT:  Well, there's "legal" that appears throughout that.

MR. ZEGARELLI:  Can I ask my client?

THE COURT:  About what?

MR. ZEGARELLI:  What my client's opinion is?  These --

THE COURT:  I've already ruled on the "first legal."

MR. ZEGARELLI:  I'll let you --

THE COURT:  Mr. Neiser, I would suggest that you explain that, have your witness explain it, if you can.

MR. NEISER:  I can do that.  Let me make a proposal -- and I will do my very best and I understand you don't want to agree to anything.  Let me try to say -- I'll say:  Sir, can we agree that "only legal" relates to the Beaver County decision in this case?

MR. ZEGARELLI:  I think at this point, Your Honor, it's tough for me to comment on it.  If he -- if this can be, you know, if he -- I don't know how he's going to lead the witness.

THE COURT:  You can object if you don't agree with this leading.  That's fine.  You don't have to agree that what he says is right or proper.

MR. ZEGARELLI:  Okay.

THE COURT:  He's suggesting that he would lead the witness, and your objection to that is preserved until we hear what he has to say.

MR. ZEGARELLI:  You know, I've tried give some leeway on that testimony.

MR. NEISER:  Thank you.

THE COURT:  I appreciate that.

MR. ZEGARELLI:  All right.

MR. NEISER:  While I have everybody, if I can have just ten seconds?

THE COURT:  We can move somewhere else.  I thought this would be easier for you all to do it here.

MR. NEISER:  I don't want the court reporter to have to get up and keep moving around.

Sorry for this.  I think that covers it, Judge.  I'll put it up on the screen.  If we have an objection, we'll deal with it.

THE COURT:  I'm happy to have a sidebar.  Don't hesitate to ask for that.

MR. NEISER:  Thank you, Your Honor.  Thank you for your patience.

THE COURT:  We'll see you back here at 1:15.

(Whereupon, sidebar conference concluded.)

(Whereupon, the lunch recess was had.)

(Pause as the jury enters courtroom.)

THE COURT:  Please be seated, everyone. Mr. Neiser, are you ready to resume?

MR. NEISER:  Yes, Your Honor.

BY MR. NEISER:

Q.   Mr. Miele, before the break, you were talking about, I believe, the first half of 2015, if I remember correctly.  Do you recall signing a document called an "Equipment Purchase Agreement"?

A.   Yes.

MR. NEISER:  Could we put up Exhibit 6, please?

BY MR. NEISER:

Q.   We've seen this enough.  I'm not going to go into detail.

But, sir, were you involved in the negotiations of this agreement in any way?

A.   No.

Q.   Did you have any understanding that this agreement required you to prevent any other operators from entering Beaver County?

A.   No.

Q.   Would you ever agree to such a thing?

A.   No.

Q.   Could you ever agree to such a thing?

A.   No.

Q.   Is that -- is it your understanding that that's not what is required from you under this agreement?

A.   Correct.

Q.   If you believe that that was a requirement, would you

have ever signed it?

A.    No.

MR. NEISER:  Let's take it down, A.J.

BY MR. NEISER:

Q.    After the Equipment Purchase Agreement was signed, did you have any other interactions or discussions with either Albert Unis IV or III?

A.    I'm sure I did.

Q.    Okay.  Generally, what would those discussions involve?

A.    Mr. Unis, the father, would sometimes just show up at our office.

Q.    What do you mean?

A.    Unannounced, just show up.

Q.    For what purpose?

A.    Looking for machines or just in the neighborhood.  I think they had a cabin or something near us, supposedly.

Q.    Okay.  Understood.

A.    Yeah.

Q.    Did you talk business with them in any way, shape, or form?

A.    It's the only thing I would have to talk to him about would be business.

Q.    Okay.  Did they ever tell you that they were concerned about other operators being present in Beaver County?

A.   No.

Q.   Did they ever tell you or discuss with you that they owned the trademark?

A.   No.

Q.   Did they ever tell you that you could only use the trademark under conditions that they set?

A.   No, sir.

Q.   Did you ever receive any letters or emails, texts, fax, or otherwise from them telling you that you couldn't use their trademark until this lawsuit?

A.   Not prior to notification of the lawsuit, no.

Q.   So you're saying that was the first time you ever heard of it?

A.   Absolutely.

Q.   Is that also the first time you learned that there was an attempt to register the Pennsylvania Skill mark as a trademark with the United States Patent and Trademark Office?

A.   I think I was informed by Pace-O-Matic sometime after that.

Q.   Okay.  Sir, I have a question:  If you -- when you, meaning Miele, deliver games to operators -- here, let me ask it in a more simple way.

Let's assume you get an order from an operator for machines.  Where do you typically deliver those machines?

A.   We deliver those machines to their office.

Q.   And then do you have any control or say-so or knowledge of where they go from there?

A.   No, sir.

Q.   Let's say, for example, you delivered machines to somebody in Luzerne County, for example.  Does that mean the machines stay in Luzerne County?

A.   Absolutely not.  It doesn't mean that they're going to stay there, no.

Q.   In fact, isn't it common that they don't stay within that one county?

A.   I would say, yes.

Q.   So, for example, if somebody were to be delivered a machine, they could put it on a spaceship and put it in outer space and you wouldn't know it?

A.   Absolutely.

Q.   Sir, are you responsible for advertising of the Pennsylvania Skill brand?

A.   Yes.

Q.   In part, at least?

A.   In part, yes.

Q.   And you said that was your obligation to do so on behalf of Pace and POM and Savvy Dog, I believe you said?

A.   Yes, as a distributor.

Q.   As the distributor.  So, to be clear, you're doing this on their behalf as, what, a mutually beneficial activity?

A.    Absolutely, yep.

Q.    How important is developing that brand to everybody's collective business?  I mean everybody, I mean POM, Pace, and Miele.

A.    It's very important because when you -- when you build the brand, you're not only building it at the location, you're building with the player base, and the more popular you become with the player base, the more you become the main brand.

Q.    Understood.  Does that also involve a personal touch? For example, do you ever just go out and meet with people?

A.    Sure, yeah.

Q.    How often?

A.    I don't do it very often myself anymore, but we have staff that does it.  You mean with, like, operators or players or locations?

Q.    Any of them.

A.    Yes, we have staff that does that.

Q.    Now, you said not anymore.  Let's talk in the 2015 to 2018 time frame.  Tell us how you guys would do that.

A.    That was me.

Q.    That was you.  And what did you do?

A.    Ryan Wood and myself would jump in the car and go door to door and meet operators, you know, known operators.  We'd go to their locations and see where the machines are at, talk to bar owners and see how they liked the machines, talked to the

players.  Go stop at new operators that don't have our machines yet and try to talk them into trying our machines.

Q.    Okay.

A.    Educating -- basically educating the industry about what our machine was because our machine, at this point in time, was a legal skill game, which was a first.

Q.    Okay.  I want to make sure I'm clear on that.  If we see anything that says "first" or "only" legal skill games, can we agree that that refers to -- back to the Beaver County decision?

A.    Absolutely.

Q.    Thank you.  So that type of work and time that you spent, is that reflective -- can you capture that in a financial?  Or is that something that is more or less sweat equity, for lack of a better term?

A.    You can capture some of it in a financial, but it's a lot of sweat equity.

Q.    Okay.  So we're going to talk about some of the finances here in a moment, but are all of your market activities captured by a dollar amount and the dollar sign?

A.    No.

Q.    Do you perform any marketing or advertising for the brand Pennsylvania Skill outside of Pennsylvania?

A.    Yes.

Q.    Explain those for us, please.

A.    Trade magazines.

Q.    Okay.

A.    Which are a national magazine.

Q.    Okay.

A.    We advertise in there.  We have consistently for at least the first four years --

Q.    Okay.

A.    -- of our existence just to get the brand out so people understood who we were, understood who Pace-O-Matic was, what they were doing because we got a lot of inquiries by other states from doing that too.

Q.    Okay.  When you said for four years, can you tell us which four years so we're absolutely clear?

A.    Actually probably '15 through '20 to be exact, probably five years.

Q.    Okay.  Understood.  And on what frequency would you run these advertisements?

A.    Every month.

Q.    Every month?

A.    Every month in the national trade magazines.

Q.    Okay.

A.    In the beginning, there was two trade magazines, and then one of them dropped, went out of business.

Q.    Okay.  What were the names of those magazines?

A.    Play Meter and RePlay.  I'm not sure which one is

still in business, which one went out.

Q.    Okay.  And did you receive sales lead or contacts from others as a result of those advertisements?

A.    Absolutely, yeah.

Q.    Okay.  So would it be fair to say that those advertisements were helpful to associate the brand with your marketing activities?

A.    Yeah, they associate the brand with Miele Manufacturing and our market activities.

Q.    Thank you.

A.    They help support us.

Q.    Got it.  And, in turn, you're doing that on behalf of Pace and POM?

A.    Yes.

Q.    What I'd like to do, sir, I'd like to go through a few exhibits to show you some of the ads, and I'd like for us to, as quickly as we can, take a look at them and have you authenticate and confirm that they are true and accurate.  Okay?

A.    Sure.

Q.    I would like to do this as efficiently as possible. So if we move a little too quickly, you let me know.  Okay?

A.    Sure.

        MR. NEISER:  124A, please.

BY MR. NEISER:

Q.    Do you have water?  Are you okay?

A.   I'm good, yeah.

MR. NEISER:  Let's scroll through.  Thank you.

THE WITNESS:  You want me to describe what it is?

BY MR. NEISER:

Q.   Negative.  I want you to review it, and then we'll get to it once A.J. is down at the bottom.

MR. NEISER:  Are we at the bottom?

MR. SIMEONE:  That's the bottom.

MR. NEISER:  Thank you.

BY MR. NEISER:

Q.   Could you please identify what we're looking at.

A.   This is a sales flyer to go to our operators in Pennsylvania.

Q.   Is it a true and accurate copy of that document as of December 26, 2018?

A.   It is.

Q.   Okay.  How do you know what it is?

A.   Because I made it.

Q.   You made it?

A.   Yes.

MR. NEISER:  Offer Exhibit 124A into evidence.

MR. ZEGARELLI:  No objection.

THE COURT:  All right.  Thank you, Mr. Zegarelli. 124A is admitted.

MR. NEISER:  Thank you, Your Honor.

BY MR. NEISER:

Q.    Just to be clear, this is an email from lou@mieleinc.com to pennsylvaniaskillgames@gmail.com.

Do you see that?

A.    Yes.

Q.    Okay.  So let me ask you, sir, just because it says pennsylvaniaskillgames@gmail.com, is that -- here, let me rephrase it.  That was a horrible question by me.

Who all did you send this email to?

A.    All of our operators.

Q.    And because it's an email blast, would it be fair to say that you can select individual ones to determine who received it?

A.    Yes.

Q.    And what's the purpose of this email blast?

A.    To promote sales.

Q.    Okay.  Is it to also assist your operators in any way?

A.    Yeah, it's to get more equipment in their hands so they're successful where, in turn, we're all successful.

Q.    Okay.  And, approximately, how many people get that email?

A.    200 different operating companies.

Q.    By the way, how many operators does Miele service?

A.    About 200.

Q.    That's all of them?

A.    Yes.

Q.    124D.  Sir, what is this?

A.    We did a promotion where we actually gave away a truck to one of our operators.

Q.    Okay.

A.    And this is the gentleman that won it.

Q.    Okay.  And how do you know what it is?

A.    I remember it.

Q.    Okay.  It's true and accurate?

A.    It's true and accurate.

MR. NEISER:  Your Honor, we have a small redaction on it from earlier discussions, but we'd offer Exhibit 124D into evidence.

THE COURT:  Any objection?

MR. ZEGARELLI:  Subject only to objections made in chambers.

THE COURT:  All right.  Thank you.  Then Exhibit 124D is admitted.

MR. NEISER:  Thank you, Your Honor.

THE COURT:  And, ladies and gentlemen, again, we talked a little bit about redactions.  There is a redaction in there that you're not to concern yourself with.

MR. NEISER:  Thank you.

BY MR. NEISER:

Q.    What's the purpose of this email, sir?

A.   Just kind of an update, town hall recap, and just update on, you know, our promotion that ended.

Q.   And there's a photograph at the bottom of somebody who received a pickup truck?

A.   Yes.

Q.   Wow.

A.   One of our customers.

Q.   Outstanding.  We can take it down.  42C.  Thank you.

What are we looking at here, sir?

A.   Give me a second here.  This is our web page.

Q.   And be more specific, it's a portion of your web page?

A.   A contact -- most likely a contact page.

Q.   Do you know if -- can you confirm whether this is a true and accurate copy of the contact page on your website?

A.   Yes, it's an older version.

Q.   Understand.  Can you give us a ballpark idea how much older it is?

Would it help refresh your recollection, I draw your attention to the upper left-hand corner of the document?

A.   Oh, there you go.  Sorry.

Q.   What is the date?

A.   10/1 of '20.

MR. NEISER:  Thank you.  Your Honor, we offer Exhibit 42C into evidence.

MR. ZEGARELLI:  No objection.

THE COURT:  All right.  42C is admitted.

BY MR. NEISER:

Q.  And I note that this is the contact page for Miele Manufacturing and the Pennsylvania Skill brand is at the top. Do you see that?

A.  Yes.

Q.  Just briefly, sir, without getting into too much detail, I note that you list court rulings and your games and charitable giving at the top in the menu bar.  Can you just generally describe what we would see if we clicked those?

A.  Court rulings will have any court documents about our game.

Q.  Okay.

A.  Any legal letters that we may have gotten over the years.  Our games would show all of the ad slicks for the different models.

Q.  Yeah.

A.  Meet our staff would introduce everybody to our compliance guys and our sales team.

Q.  Okay.

A.  And maybe even inside sales team.

Q.  Okay.

A.  Charitable giving is a list of -- like, photographs with the big check.  We give away money to fire halls, nonprofits on a monthly basis.

Q.   Do you give away money under the Pennsylvania Skill brand to charities?

A.   Yes.

Q.   How much do you give away a year?

A.   A million dollars a year.

Q.   Every year?

A.   Every year.

Q.   How long have you been doing that?

A.   Probably about four years.

Q.   Okay.  Do you know if Pennsylvania Skill Games, LLC, does stuff like that?

A.   No, sir, I do not.

Q.   12 -- to what type of groups do you give to charitable giving to?

A.   Charities -- it's mostly like fire companies, you know, schools, things like that.  They have to be a charitable organization.

Q.   Okay.  12, please.  Next will be 24.  Sir, I'm showing you a document marked Exhibit 12.

     MR. NEISER:  Is that the entirety of the document, A.J.?  Two pages.

BY MR. NEISER:

Q.   Do you recognize this document?

A.   Yes, sir.

Q.   What is it?

A.    It's an ad slick for our games at that time.

Q.    What is at that time?

A.    Can I see the bottom?  I don't know if it's dated. Can I see all of the games listed?  This is probably about -- if I had to take a guess, probably two or three years old.

Q.    Can you confirm it's a true and accurate copy?

A.    Yes.

MR. NEISER:  We offer Exhibit 12 into evidence.

MR. ZEGARELLI:  No objection.

THE COURT:  All right.  Exhibit 12 is admitted.

BY MR. NEISER:

Q.    So what's the purpose of this?

A.    To promote our games, the new games.  Several of these games on here were new at the time.

Q.    Who did you send these two?

A.    Can I see the bottom again?

Q.    The second page?

A.    The second page, yeah.  This -- most likely operators, but it -- yeah.  I would think it's just operators.

Q.    Understood.  24.  Is that the entirety of the document?  Do you recognize it?

A.    Yes, sir.

Q.    How do you recognize it?

A.    It is one of the original ad slicks.

Q.    When you say original, what does that mean?

A.    Early '15, cabinets didn't have any side graphics on them.  The countertop is the very first countertop version we used.  It looked to have only the original three games.

Q.    Okay.  Is it true and accurate copy of the ad slick at that time?

A.    Yes, sir.

Q.    And how do you know that?

A.    Well, it's got Ryan Wood's phone number and my phone number.  So it's probably the first.

Q.    Okay.  Understood.

MR. NEISER:  We'd offer Exhibit 24 into evidence.

MR. ZEGARELLI:  No objection.

THE COURT:  Exhibit 24 is admitted.

BY MR. NEISER:

Q.    I just want to clarify one thing.  You said you can date it because there's no graphics on front or the side of the boxes?

A.    Yes.

Q.    Real quick, while I have your attention, do you see the countertop machine in the middle?

A.    Yes.

Q.    Do you remember in the opening statement, Pennsylvania Skill Games brought out some type of device and they plugged it in and it booted up?

A.    Yes.

Q.    What kind of machine is that?

A.    That's a Merit Megatouch.

Q.    Is that an electronic skill game, to your knowledge?

A.    It's -- yeah, yeah.  They're -- you can consider those games a skill.

Q.    Are they the same as ours?

A.    No.

Q.    Tell us how they're different.

A.    There's no cash prize awarded.

Q.    That's the main distinguishing feature?

A.    That machine probably had 50 or 60 different games on it, like Photo Hunt and things like that.

Q.    Right.

A.    And card games, like RUN 21, which is like a blackjack.  It was very popular game until -- up until about the time the iPhones and hand-held devices became popular, and then it diverted the customers' attention away from those machines.

Q.    Are you familiar with how to put a splash screen or screen on one of those machines?

A.    An ad screen?

Q.    Yes?

A.    Yes.

Q.    How?

A.    As the operator, if you have a key, you go into the "manager" button, and you go to the ad screen menu, and you can

sit there and just pull in a text bar and type in big bold letters, and it gives you several different color fonts -- fonts and colors you can change and also gives you images you can pull and drag on there.

The purpose of the ad screen on the Merit Megatouch was to allow taverns to be able to advertise wing night or karaoke. You can actually access it from the outside of the machine if you had the password. If the operator gave the location the password, their bartender could then keep the ads fresh. So it's nothing more than a video billboard.

Q. Very billboard?

A. Yeah. You can't import anything into it. You can only use the stuff that they give to use. So there's set graphics in there. Like on the example that was shown here, there's a generic dart board, there's football, a mug of beer, all cartoon-like images.

Q. Clip art?

A. Clip art, yes. So I couldn't, like, put Miele Manufacturing on it or anything like that.

Q. Okay.

A. I can spell it out, but I couldn't put our logo on it.

Q. You couldn't put -- okay. I understand. Is it easy to change?

A. Very.

Q. You could change it at any time and make it look like

anything you want it to.

A.    I could change it to say, "This machine was born in 1852," if I wanted to.

Q.    Outstanding.  Thank you.

MR. NEISER:  42B.  Go to the next page, A.J.  We may skip over this.  Keep going.  Actually, I'm sorry.

BY MR. NEISER:

Q.    Sir, did you see the images that just flashed on your screen?

A.    Yep.

Q.    Can you recognize this -- the group of exhibits?  Let's get to the bottom of it and go to the end.

A.    Yes.

Q.    How do you recognize it?

A.    That's a cabinet we call the "Spartan."

Q.    The entire group of documents together, please?

A.    Oh, I don't know how this is -- okay.  This is a sales promo kit.

Q.    Okay.

A.    These are all promo kits.  These are advertising tools that we made available to our operators that they could buy from us.

Q.    Can you confirm it's a true and accurate copy of those documents?

A.    Yes.

Q.   Do you have any sense of when this promo kit may have been sent out?

A.   This was early on because if you look at two machines in the bottom, they're completely black cabinets with no graphics on this.

Q.   Early on, what does that mean?

A.   2015, 2016.

Q.   And then would it be fair to say that you ran and provided these promo kits from that point forward, even to present day, to your operators?

A.   Yes.

MR. NEISER:  Your Honor, we offer Exhibit 42D.  Or is it B, A.J.?

MR. SIMEONE:  B.

THE COURT:  I believe B.

MR. NEISER:  B as in Bravo.  We offer Exhibit -- thank you, Your Honor. Exhibit 42B into evidence.

MR. ZEGARELLI:  No objection.

THE COURT:  42B is admitted.

BY MR. NEISER:

Q.   So we're going to scroll through these.  You said 42B at POM 3103 is just an image of a game, is that fair?

A.   Spartan, yes.

Q.   What's that?

A.   It's a Spartan.  We call it "Spartan."

Q.   What's on the screen now?

A.   This is a cluster of the current machines available at the time, left to right:  Napoleon, center is Cavalier, and Spartan and the Barfly is the countertop.

Q.   Next page.  What's this?

A.   It's a promo kit for locations.  It's an earlier -- it's a newer version of the one you showed me earlier.

Q.   Understood.  And a promo kit is for what?

A.   For operators to buy to hand promotional items into their locations to help promote play from their customers.

MR. NEISER:  Excuse me for one second.

Sorry, Your Honor.

BY MR. NEISER:

Q.   Next page, please.  Actually, go back for one second.

Those items that are listed, the T-shirts and the money bags, the bottle openers, do you provide those to your operators?

A.   Yes.  We have them in inventory.

Q.   You have them in inventory.  How do you get them to them?

A.   This was offered a kit, we would either give to the sales guy to deliver or ship it to them.

Q.   Do you have, like, a special box for them?

A.   Yes.

Q.   What's it look like?

A.   Looks like our brand, Pennsylvania Skill.

Q.   Next page.  And then, finally, briefly, what is this?

A.   This is an older version of the one we just looked at.

Q.   And you provide banners, door decals, yard signs, double-sided signs, decal sheets, banners.

A.   Yep.

Q.   All of those things.

A.   All of those things.

Q.   And package them up and sell them for a set amount of money?

A.   Yes, sir.

MR. NEISER:  42D.

BY MR. NEISER:

Q.   And what are we looking at, sir?

A.   This is a full-page ad in either RePlay or Play Meter, of which we split in half between Miele Manufacturing and Pace-O-Matic at the time, and the other half with MCM Elements.

Q.   What is MCM Elements?

A.   That is the route management company software.

Q.   Is that related to that Route Boost thing we talked about earlier?

A.   Yes, that -- that is Route Boost.

MR. NEISER:  Your Honor, we offer 42D into evidence.

MR. ZEGARELLI:  No objection.

THE COURT:  42D is admitted.

BY MR. NEISER:

Q.   Is this an example of one of the monthly ads that you would run in these national magazines?

A.   Yes.  These are the trade magazine ads.

MR. NEISER:  112, please.  Next page.  Don't need it. Is that on 112 as well?

MR. SIMEONE:  Yes.

MR. NEISER:  We don't need it.  124 Bravo, please.

BY MR. NEISER:

Q.   Sir, I'm showing you a document marked as 124B.  What is it?

A.   It is an announcement for a PA summit meeting for our operators in Harrisburg at the Harrisburg Hilton.

Q.   What was the purpose of the summit meeting?

A.   To educate.  Educate our operators.

Q.   Understood.  Is this a true and accurate copy of this -- I guess the best way to call it is an advertisement?

A.   Yes.

MR. NEISER:  We offer 124B into evidence.

THE COURT:  Any objection?

MR. ZEGARELLI:  No objection, Your Honor.  124B is admitted.

BY MR. NEISER:

Q.   And a couple of very specific questions about the summit meeting.  Who all would attend?

A.   The operators and their -- maybe some of their employees, staff from Miele Manufacturing, staff from Pace-O-Matic.

Q.   Is it part of, like, for example, training?

A.   It could be training, depending on what's going on with our product at that point in time.  Maybe an update, teach them how to do the update, show them what's in the update.

Q.   Okay.

A.   Any new products, any new promotional stuff, sales. Sometimes we'd run a sale to get -- to entice them to come. That was -- you had to be present.

Q.   Understood.  And I noticed the summit meeting is for Miele Manufacturing and Pace-O-Matic?

A.   Yes.

Q.   By the way, what are your dealings with POM of Pennsylvania?  Tell us how that works.

A.   POM of Pennsylvania is, for all intents and purposes, for us, Pace-O-Matic.  I mean, we -- POM didn't exist when we started dealing with Pace-O-Matic.  It's just -- POM was added as a structure for Pace.

Q.   Understood.  For Pennsylvania?

A.   For Pennsylvania.

Q.   Understood.  Thank you.

In addition to the advertising, the marketing, the brochures and things like that that we're talking about -- and

we're only going to look at two or three more -- are there any other activities, without describing what they are, that Miele and Pace engage in in Pennsylvania?

A.    Yes.

Q.    Tell us.

A.    Loyalty program for our operators.  In the early years, we had a loyalty program.

Q.    Politically, what do you do?

A.    Politically, a lot.  We have grassroots efforts.  We have meetings every week on our grassroots efforts.  We meet with our politicians and representatives.  We have a lobbyist team in Harrisburg.  Pace-O-Matic has spent a lot of money on a lobbyist team.  The operators have donated a lot of money to PAC funds to support our cause, to get out there.  We have days on the Capitol.  We go into politicians' offices and talk to them about the positive effects on small business.

Q.    What did you say?  The positive effects on small business?

A.    On small business.

Q.    Okay.  And are you also promoting the brand in that fashion?

A.    Absolutely.

Q.    Okay.  Are you involved in those efforts?

A.    Yes.

Q.    You ever see Pennsylvania Skill Games at any of those

events?

A.   Never.

Q.   They engage in those types of activities?

A.   No.

Q.   Does Mr. Unis engage in those activities?

A.   Not that I've ever seen.

Q.   How about Albert Unis III?

A.   No.

Q.   Would you know if they did?

A.   I would see them there, yes.

MR. NEISER:   92, please.

BY MR. NEISER:

Q.   What am I looking at?

A.   We did this one already.

Q.   Is it the same copy as what we talked about before?

A.   Yes.  No.  This one's a little different.

Q.   Here, just look at it for one second.  I'm not trying to rush you.  I am trying to make good use of time.

A.   Does it scroll down?

So this is a Constant Contact email blast.

Q.   Understood.

A.   The top one is not.  I don't believe it is.  Maybe it is.

Q.   Let's go back.

A.   To me, that looks like the full-page ad in the trade

magazines.

Q.   Okay.  That may be a misfire, then.

So let's look at 215.  And scroll through, please.

A.   Trade magazine ads.

Q.   Can you confirm they're true and accurate?

A.   Yes, sir.

MR. NEISER:  Your Honor, we offer 215 into evidence.

MR. ZEGARELLI:  Objection subject to chamber discussion.

THE COURT:  All right.  Exhibit 215 is admitted.

BY MR. NEISER:

Q.   Let's look at the cover first.  What is that?

A.   Play Meter is one of our trade magazines.

Q.   Is that a national publication?

A.   Yes, sir.

Q.   Let go to the next page, please.

Is that the ad that ran in Play Meter?

A.   Yes.  May of '16.

Q.   And what time period did it run?

A.   May of '16.

Q.   Would you get calls from these ads?

A.   Yes.  We -- the main calls we would get from these ads would be outside market calls like, hey, can you put machines in Indiana or -- that's a lot of the calls we'd get.

Q.   You'd get someone from the Commonwealth from

operators?

A.    Not too much because we -- Ryan Wood and I did a great job of canvassing the state and getting word out directly.

Q.    Got it.  So this is kind of belt and suspenders saturating the market?

A.    Yes.

Q.    Sir, are you familiar with the financials and books and records of Miele Manufacturing?

A.    Yes.

Q.    How so?

A.    Well, in the early years, I was -- I would be the one doing all of the recordkeeping, doing a lot of the invoicing.

Q.    In a small business, you wear a lot of different hats; right?

A.    Absolutely.

Q.    So if I were to show you some documents that are summarized financials or other data, would you be able to identify them?

A.    Yes.

Q.    Okay.  I'd like to show the witness Exhibit 206A.

Have you seen this before?

A.    Yes.

Q.    What is it?

A.    It's a summary of how many machines we've sold per year up until 2018.

Q.   So where?  In what jurisdiction?

A.   The Commonwealth of Pennsylvania.

Q.   Is it a true and accurate copy, in your understanding? The contents are correct?

A.   Yes.

Q.   And it's based upon information produced in this case?

A.   Yes.

MR. NEISER:  Your Honor, we offer Exhibit 206A as a summary pursuant to Rule of Evidence 1006.

MR. ZEGARELLI:  No objection, Your Honor.

THE COURT:  Exhibit 206A is admitted.

MR. NEISER:  Thank you, Your Honor.

BY MR. NEISER:

Q.   So let's talk about this.  Explain to the jury the significance of this summary and what it entails.

A.   This shows machine sales into the Pennsylvania Skill market in the state of Pennsylvania.

Q.   So -- go ahead.

A.   600 -- 660 machines in 2015; 1,800 in '16; 2,600 in '17; 3,961 in 2018.  Total of 9,062 machines.

Q.   From 2015 to 2018.

A.   Yes, sir.

Q.   So you went from about a handful before 2015; right? I think you guys sold some in 2013?

A.   I sold zero machines before the court ruling.

Q.   Pace-O-Matic did?

A.   Yes, sir.

Q.   Now, so that's a good point, Mr. Miele.  These just reflect what you sold?

A.   Correct.

Q.   There were other machines sold by Pace-O-Matic directly; correct?

A.   The only machines that I know that Pace-O-Matic sold directly were to AIP.

Q.   And that was Aliquippa Industrial Park, meaning Mr. Unis' company?

A.   Yes.

Q.   Okay.  So what allowed you to sell that many machines during that time period?

A.   All of our marketing effort.  Ryan Wood and I getting on the road and spending days and days on the road, meeting operators and meeting locations and promoting our brand, building a business.

Q.   The success wasn't because of the mustard seed planted by Pennsylvania Skill Games, LLC?

A.   Who, sir?

Q.   It wasn't because of them?

A.   No.

Q.   Let's look at Exhibit 208.  What am I looking at here, sir?

A.   This is an accurate record of the number of machines purchased by AIP.

Q.   And who else?

A.   PSG, per year, and Unis.  I think they -- three different names with us at this point.

Q.   I -- if you can please keep your voice up as well.

A.   I think -- I believe there's three different names. There's PSG.  AIP was the original.  And then Albert Unis and Associates is another.

Q.   Understood.  Can you confirm to us, sir, that this is a true and accurate representation of the data identified within?

A.   Yes.

MR. NEISER:  We offer Exhibit 208 into evidence, Your Honor, pursuant to Rule of Evidence 1006.

MR. ZEGARELLI:  Your Honor, we believe that the exhibit is not complete, but we can handle that on cross.

THE COURT:  All right.  Thank you very much.  Then Exhibit 208 is admitted subject to cross-examination.

BY MR. NEISER:

Q.   How many machines did they buy from 2015 to 2020?

A.   87 machines.

Q.   If you were to rank them in number of machines owned compared to the rest of your operator core, where would they fall?

A.    Bottom five percent.

Q.    So let's look at this.  In 2015, at least from the records that we have, I believe that's your testimony, you got this from somewhere, from the records that we have.  Is that fair?

A.    We submitted all -- copies of all invoices in discovery.

Q.    Okay.  So based on what you've seen, they only purchased 34 machines in 2015?

A.    Correct.

Q.    And how many in 2016?

A.    11 machines.

Q.    And how about 2017?

A.    15 machines.

Q.    I can't -- I'm going to do some lawyer math here.

A.    17.4 machines per year.

Q.    17.4 machines per year.

A.    In a five-year stretch.

Q.    And how many, approximate, machines did you see Albert Unis III have out in operation when you did that tour with him in his truck?

A.    At least a hundred.

MR. NEISER:  Show 209, please.

BY MR. NEISER:

Q.    Sir, I'm showing you a summary marked as -- for

identification purposes as Exhibit 209.  I believe there are two pages.

MR. NEISER:  Can you scroll down?

BY MR. NEISER:

Q.   Do you recognize this document?

A.   Yes.

MR. NEISER:  Scroll up, please.

Actually, Your Honor, I'm not going to take my time on this exhibit.  We'll take it down.

Let's go to Exhibit 210.

BY MR. NEISER:

Q.   What is it?

A.   Number of fills purchased by Unis AIP or PSG per year.

Q.   And those are the software plays we talked about earlier?

A.   Yes.

Q.   Is that a true and accurate representation of what you believe is correct, based on the data listed below?

A.   Yes, sir.

MR. NEISER:  Your Honor, we offer Exhibit 210 into evidence as a summary pursuant to Rule 1006.

MR. ZEGARELLI:  Subject to cross, Your Honor.

THE COURT:  Exhibit 210 is admitted.

BY MR. NEISER:

Q.   How many fills?

A.    96 fills.

Q.    Is that a lot?

A.    Not over 87 machines.  An average machine will do three to four fills per year, if operated correctly.

Q.    Help me out on the math, Mr. Miele.  If you had 87 machines and you were average rate, how many fills would that be over a five-year period?

A.    Oh, geez.

Q.    Ballpark.  You're the smart one.

A.    1,500.

Q.    Thank you.  You know not to ask your lawyer to do math; right?

A.    I'm sure Mr. Pace had the answer before I did.

Q.    I bet he did.  To the decimal points.

MR. NEISER:  Excuse me one second, Your Honor.

(Brief pause in the proceedings.)

BY MR. NEISER:

Q.    Mr. Miele, I'm showing you a document marked for identification purposes as 141 Bravo.

Do you see that?

A.    Yes, sir.

Q.    What is it?

A.    Advertising expenses.

Q.    For who?

A.    For Miele Manufacturing, direct advertising expenses.

Q.   Is that summary a true and correct rendition of the advertising expenses by year for Miele Manufacturing from 2015 to 2019?

A.   It is but --

Q.   Go ahead.

A.   There's more to it than this.  This is direct advertising expenses.

Q.   We'll get to that in one second.  But the data itself for --

A.   The data supports this, absolutely.

MR. NEISER:  Your Honor, we offer Exhibit 141B into evidence, subject to -- pursuant to Rule 1006.

MR. ZEGARELLI:  Subject to cross.

THE COURT:  Rule -- excuse me.  Exhibit 141B is admitted.

BY MR. NEISER:

Q.   So how much did you spend in advertising from 2015 to 2019?

A.   333,000.

Q.   And I assume there was more money that was spent from 2019 forward.

A.   Absolutely.

Q.   Exponentially more?

A.   Yes.

Q.   You just mentioned that not everything is reflected in

these numbers.  Why do you say that?

A.  Because with advertising -- like a national trade show, you know, the cost of the booth and the cost of displays is all advertising expenses.  But the cost of travel there and send staff there and put them up in hotel rooms, that is not contained in the advertising expense.

Q.  So would it be fair to say this is a conservative number?

A.  It is about 50 percent from the studying I did.

Q.  Okay.  So that's how much you actually spent out of pocket, meaning cash out of the business, but there are other expenses that are just not captured here because you can't find a line item for them or they belong somewhere else?

A.  Correct.

MR. NEISER:  A.J., could you put up Exhibit 112.  And could you just run through it?  Go to the last page, if you don't mind.  Keep going through.

MR. SIMEONE:  Sorry.

MR. NEISER:  There.  Okay.  Keep going.  Understood.

No further questions.

THE COURT:  Thank you, Mr. Neiser.

MR. NEISER:  Thank you, Your Honor.

THE COURT:  Cross-examination?

MR. ZEGARELLI:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. ZEGARELLI:

Q.   Mr. Miele, I'll direct your attention, please, to Exhibit 215.  This exhibit has been admitted.  I'll reference your attention to games earning an average of 250 a week for the operator, 25,000 games, that's $5 million a week.  Does that math work?

A.   I don't know.

Q.   Okay.  Now, with regard to -- I think you testified to the Megatouch and some things about some canned art that you use or you talked about how you get a logo on dart boards and that sort of thing out of a Megatouch.  Do you recall that testimony?

A.   Yes.

Q.   Okay.  And, you know, the "in Congress," the stars, the bells, all of that, is that not also canned art?

A.   No, sir.

Q.   Okay.  And so you're saying basically the "in Congress," that was all hand-drafted?

A.   Yes.

Q.   Okay.  And who drafted that?

A.   Pace-O-Matic graphic artist.

Q.   Okay.  And how do you know it wasn't canned art?

A.   Well, I guess -- canned art is something -- is art that's presented to you to use.

Q.   Well, it's -- I will define it as art you purchase to use.

A.    I guess your question should be directed at Pace-O-Matic, not me.

Q.    Okay.  Fair enough.  Now, to get back to what's really at issue, do you recall you signing an Equipment Purchase Agreement?

A.    Yes.

Q.    Okay.  Now, do you recall giving Mr. Warren permission to sign your name on a document that was identified as Exhibit 5?

A.    Could you show me the exhibit?

Q.    Sure.  Do you recall seeing this document?

A.    I do.

Q.    Okay.  And you saw the document on or about January 29, 2015?

A.    No, I don't -- I can't recall the date I saw this document.

Q.    Do you recall whether or not Mr. Warren had forwarded you a copy of it?

A.    I don't recall.

Q.    Okay.

A.    Sorry.

Q.    But did Mr. Warren have authority to sign on your behalf?

A.    Yes.

Q.    Okay.  And did he tell you what he signed on your

behalf?

A.    I assume that he did because it has pricing here that I would have to facilitate.

Q.    Okay.

A.    But I don't recall the conversation.

Q.    Okay.

A.    But it would make sense that he did.

Q.    All right.  Now, with regard to the Equipment Purchase Agreement, that's your signature, is it not?

A.    That is my signature.

Q.    Okay.  And isn't it true that you agreed to a right of first refusal for Pennsylvania Skill Games, LLC?

A.    It is true that I agreed to a right of first refusal.

Q.    Okay.  And what wasn't clear from your testimony is I think you testified that you would sell fills to Pennsylvania Skill Games, LLC; is that true?

A.    We do currently sell fills.

Q.    Okay.  Do you currently sell hardware?

A.    No.

Q.    Okay.  When did you stop selling hardware?

A.    I would refer to Pace on that.

Q.    Okay.  Would it be on or about the time that the lawsuit began?

A.    I don't know.

Q.    Okay.  When was the last time, if you can recall, you

have any invoices for hardware for Pennsylvania Skill Games, LLC?

A.    I don't know.

Q.    Okay.  Now, I think you testified there were 100 machines that Pennsylvania Skill Games or the Unises had at the time.  I think you said you drove around -- maybe it was Beaver County, maybe not?

A.    I'm not sure if it was all Beaver County, but I had witnessed over a hundred machines in these locations that we were shown.

Q.    Okay.  And none of those machines were Pace-O-Matic machines at the time?

A.    Not one.

Q.    Do you have any understanding that any of the Unises or Pennsylvania Skill Games agreed to terminate those hundred machines in order to buy Pace machines?

A.    We were told that they were going to buy hundreds of Pace machines.

Q.    Okay.  And did they test the Pace machines?

A.    Test them?  Could you explain what you mean by that?

Q.    Sure.  I think you were here for Mr. Warren's testimony.  When you assert that they said they were going to buy hundreds of machines, was it whether they were good machines or bad machines or could -- what if your machines didn't work, would they still have to buy machines?

A.    They placed the machine in the Italian American Club for the friendly; so they had exposure to the machine.  And that was prior to them telling me they were going to buy a hundred machines.  So, at that point, I assumed that they were satisfied.

Q.    Okay.  And you assumed that.  Do you have any knowledge that they actually turned the machine on?

A.    Why wouldn't they turn it on?

Q.    I'm not asking that.  Do you have any personal knowledge that they turned the machine on?

A.    I have no knowledge that they turned it on or did not turn it on.

Q.    Okay.  And did you attend at all American Italian Club to help coordinate placement of that machine?

A.    No, sir.

Q.    Okay.  Was that done through Attorney DeLuca?

A.    Yes.

Q.    Okay.  You called it a "friendly pickup."  Why do you call it a friendly pickup?

A.    As has been testified in this case several times, a friendly pickup is when -- it is just a way of getting the machine to the court system and no one is going to get punished, you know, arrested, fined, penalized for that machine.

Q.    Okay.  Isn't it also called, to your knowledge, a "controlled pickup" as the formal terminology?

A.    I don't know if it's formal.  It's all slang.  I don't know that there's a formal name for it.  I was not involved with this process at the time.  This was prior to 2015.

Q.    Okay.  So you were not involved at that particular time.  Okay.  And do you have an understanding of why a bar or a location would allow a machine to be put into their establishment to have the state police seize it?

A.    Yes.

Q.    Okay.  What is that understanding?

A.    Could you repeat that real quick?

Q.    Yeah.  Do you have an understanding of why a location would have any incentive or would allow the state police to seize a machine out of their venue?

A.    Thank you.  The incentive would be you would play off of the operator's relationship with the location.  And the operator was asked to help facilitate this pickup.  So the operator assumingly went to a location they were friendly with and asked for them to help in this and guaranteed them, most likely -- I wasn't part of the process -- but most likely guaranteed them that nothing will become of this against your license, against your facility, or your manager, so there's zero risk to you as the location.

Q.    Okay.

A.    But that is an assumption on my part because, again, I was not involved.

Q. Fair enough. Now, I am going to show you -- let me back up. Have you ever offered Pennsylvania Skill Games, LLC, the option to take a location opportunity based on the right of first refusal?

A. No.

Q. Okay. And why not?

A. I never had the opportunity to offer them that.

Q. Okay. I will show you some invoices that I would like you to authenticate. In fact, they've been authenticated. I like you to testify to them.

A. Sure.

Q. Mr. Miele, you see an invoice date the 4/17/2016?

A. I do.

Q. Would that surprise you that it is 20 days after a company called Savvy Dog was formed in the state of Wyoming by Mr. Pace?

A. Not at all.

Q. Now, do you see the name Rick Bigrigg?

A. Yes.

Q. Okay. And do you see Beaver, PA?

A. Yes.

Q. And we're looking at invoice number 1736. So 20 days after, Savvy Dog was formed in the state of Wyoming by Mr. Pace, by his signature. 20 days later, there is a sale to GMR Games in Beaver, PA. And that sale -- did you handle that sale

personally?

A.   Could you scroll to the top?  Most likely, I did not handle this personally.

Q.   Okay.

A.   At that point in time.

Q.   And this sale would have been, if you know, handled by whom at your office?

A.   One of my employees.  A salesperson, most likely.

THE COURT:  Mr. Zegarelli, are these the exhibits from Exhibit 275?

MR. ZEGARELLI:  I believe they are from 275, Your Honor.

THE COURT:  Thank you.

BY MR. ZEGARELLI:

Q.   Do you see approximately a few weeks later in May of 2016, do you see an invoice to a Bob McDanel again?  Do you see Beaver Falls there?

A.   I see Beaver Falls.  And this is the first one you've shown me with Bob McDanel on it.

Q.   And it's invoice number 1923?

A.   Correct.

Q.   We've got Savvy Dog formed in March.  We've got a sale in Beaver County in April.  We've got a sale into Beaver County in May.  You see invoice number 4245?

Do you also see another Beaver County -- sorry --

Beaver Falls, PA, in Beaver County, invoice to Marsico Amusements?

A.   Is Beaver Falls in Beaver County?

Q.   Are you --

A.   No, I'm not.  I'm not local.

Q.   I want to ask the question.  Do you make any determination whatsoever of whether or not a vendor intends or does place games into Beaver County?

A.   No, sir.  Why would I do that?

Q.   Do you see invoice number 19156?

A.   I do.

Q.   That's to James McDanel.  Do you see that?

A.   Yes, sir.

Q.   7/17/2018.  Do you see that's Beaver Falls, PA?

A.   Yes.

Q.   Okay.  All right.  So those invoices -- and we will have testimony from these vendors that are in Beaver County.  So if I understand your testimony, you did not make any determination or inquiry as to whether or not those vendors placed or intended to place games into Beaver County?

A.   I had no reason to make that determination.  No, I did not.

Q.   All right.  So in Section 4 of the EPA -- now, let me bring up an email.

          (Brief pause.)

Okay. We're looking at Exhibit 26. You were a party to this email; is that correct?

A. It appears to be correct.

Q. Okay. And you see the language, if a location or operator calls us about machines, I will call you first to make you -- to make sure you have the inventory to service that account or plan to buy it or take care of that account.

Do you see that language?

A. I do see that language.

Q. Okay. Do you have some understanding that that would create an obligation for you to provide an opportunity for Pennsylvania Skill Games to refuse an opportunity to place a game into Beaver County?

MR. NEISER: Objection; vague.

THE COURT: Overruled.

THE WITNESS: I do not have that understanding.

BY MR. ZEGARELLI:

Q. So what did the right of first refusal mean to you that you signed in the agreement in Section 5?

A. The right of first refusal meant if I received -- as has been testified in this case -- if I were to receive a sales lead, that I would turn it over to Albert Unis and he would have the right of first refusal on that newfound location.

What it doesn't mean to me -- let me explain that to you. It doesn't mean that I have the right to tortiously

interfere in a contract between an operator and a location that they may have operated in for 30 years, no more than Mr. Unis would want someone to go into his location and throw him out because I signed an agreement with somebody else.

I don't have the right to do that.  So therefore, I cannot do.  I can only give him the first right of refusal on any sale leads that I receive.  And I received zero sales leads in Beaver County.

Q.    So are you saying that you are legally not permitted to ask a vendor who has not placed -- who intends to place a game into Beaver County, if someone calls -- let me say it this way: Are you familiar -- I'll turn this off and ask you to authenticate your latest operating agreement.

Now, I'll start by showing you -- do you recall this exhibit, Mr. Miele, Exhibit 103, 103A?

A.    An envelope.

Q.    I asked you if you recall the exhibit?

A.    Yes, yes.  I do now.

Q.    Okay.  And it's a package, is it not, that was sent after the lawsuit with Pennsylvania Skill Games?

A.    It was sent to Pennsylvania Skill Games; correct.

Q.    Right.  It was after date of the lawsuit; isn't that right?

A.    I don't know that.

Q.    Okay.  I'll direct your attention to page 7 of 10

indicated at the top.  Do you see the date there?

A.  Yes, 3/24.

Q.  No, 6 -- I'm sorry.  It says version, 06/07/18.  Does that help refresh your recollection as to -- on or about the date you sent this package?

A.  That's probably correct, yeah.

Q.  Okay.  And you see the words, "Terms and conditions on authorizations"?

A.  Yes.

Q.  Okay.  You see how you have Section 5, the first Pennsylvania, quote/unquote, skill operator who installs a device at a location will be given the right to be the sole operator of that location.

Do you see that?

MR. NEISER:  Your Honor, I'm going to object to relevance.  The operator terms and conditions are not at issue in this case.  PSG never signed them.  So we're objecting to relevance.  It's also cumulative and probably form to 403 for confusion.

THE COURT:  What's your response, Mr. Zegarelli?

MR. ZEGARELLI:  My response is it indicates that some of the terms and conditions and capabilities of Miele Manufacturing and the POM Parties.  They do have the capability to track some of these locations.  And there will be various questions on the issue of their ability to track locations if

they chose.  In fact, they have chosen.

MR. NEISER:  The same objection, Your Honor.  I stand by the objection.  It's just not relevant.  Doesn't relate to anything that we've been talking about.  They weren't part of the case.  It's not a contract at issue.

THE COURT:  As I understand it, this contract was never signed between the parties; correct?

MR. NEISER:  That is correct, Your Honor.

THE COURT:  So let's ask questions unrelated to this document that imply that this was an agreement between them.

MR. ZEGARELLI:  This is not an agreement between them, Your Honor.

THE COURT:  I understand.

MR. NEISER:  Thank you, Your Honor.

BY MR. ZEGARELLI:

Q.   Mr. Miele, can you see, "Pennsylvania Operator Agreement," on your screen?

A.   Yes, sir.

Q.   Okay.  And I would identify it as Exhibit 96.  And it's true, isn't it, that this is your standard Pennsylvania operator agreement as -- as of on or about March 24th, '21?

A.   I'd have to see the whole thing.  But I can assume it's not altered.

Q.   Can you authenticate that that is your --

A.   If you're showing it to me to read, I can't read that

fast.  But I'm going to assume this is our operator agreement.

Q.  Okay.

MR. ZEGARELLI:  And move it in?

MR. NEISER:  I object to relevance but probably harmless.

THE COURT:  I'm going to admit it for the purpose of asking questions, understanding that there is no such agreement between the parties in this case.

MR. ZEGARELLI:  Certainly, Your Honor.

BY MR. ZEGARELLI:

Q.  So this is the current Pennsylvania operator agreement form for Miele Manufacturing, Inc., as you'll see in the second line, with its operators.  Is that not correct?

A.  I believe so.

Q.  Okay.  And you'll note that it's ten pages.  That's your standard template as of today; isn't that right?

A.  I believe so.

Q.  Okay.  And your testimony is that, in light of the significance of that agreement -- or I don't mean to mischaracterize it -- you are not able to simply insert a simple question, where do you intend to place machines, or to identify that you're going to place machines into Beaver County, understanding that somebody might not comply.  But your testimony, if I understand it, is you're legally not permitted to ask?

A.    I never said I wasn't legally permitted to ask.    I said I'm not allowed to interfere with a contractual agreement to a location and an operator by ordering them to remove their machines.  So Mr. Unis can put his in.  If there's already an existing relationship there, then no one has the right of first refusal in that.  I cannot interject into that relationship.

Q.    All right.  But wait a minute.  Nobody's really asking you to tell people to remove equipment.  Did I ask you that?

I'm only asking you if an operator comes to you, that you ask them, you want to buy machines?  Are those machines intended to go into Beaver County?  They'll say yes or no.  If they say "No," it's a nonissue.  If they say "Yes," then you can handle that issue and perhaps they can't buy those machines or those machines must be offered to Pennsylvania Skill Games.  It's got nothing to do whatsoever with removing machines?

MR. NEISER:  Are we having a speech?  Or are we asking a question?

THE COURT:  I'm going to sustain an objection.  That's a compound question.

MR. ZEGARELLI:  Okay.

BY MR. ZEGARELLI:

Q.    And, Mr. Miele, why do you have an impression or -- is it your testimony that because someone asks you for an order -- somebody wants to place an order and you ask them, "Do you intend to place this game into Beaver County," that it also

means that you have to reject their current games from the location?

A.    So what you're asking me is just "Do you want to place these machines in Beaver County," and if I got an answer to that, what would I then do with that answer?

Q.    You'd comply with the right of first refusal and let Pennsylvania Skill Games have that opportunity.

A.    I don't know what the opportunity is.

Q.    The opportunity --

A.    Just they're going somewhere in Beaver County.

THE COURT:  Just a minute.  Let's let each other respond.

THE WITNESS:  You're asking me if I ask a customer that's going to buy machines from me if they're going in Beaver County.  If they were to say "Yes," would I call Mr. Unis and say, "Someone's going to put machines in Beaver County?"  What good does that do him?

BY MR. ZEGARELLI:

Q.    You'd ask them where the machines are going to go.

A.    You didn't say that, sir.

Q.    Okay.

A.    Then I would be interfering in a location in a operator's business relationship, and that is not my place.  And that is my testimony.

Q.    All right.  Your testimony is you wouldn't interfere

by asking them the question.  You don't even ask the question, if I understand your testimony.

A.    I don't have a reason to ask the question.

Q.    Okay.  That's your testimony?

A.    That is my testimony.

Q.    So if I understand it, the only way, according to your testimony, that that right of first refusal would apply is if someone calls you up with a, what, a specific location?

A.    If a location or operator or operator/location -- because sometimes they can be one and the same -- were to call me to buy machines to put in their location, that would be my obligation, and that's where it would stop.

Q.    How many times did that happen over the last seven years?

A.    That happened zero times.

Q.    Fair enough.  Thank you.

Now, how many Pace machines were in the marketplace in -- on January 1st of 2015?

A.    2015.  January 1st, 2015?

Q.    Yes.  That would have been approximately a week after the Beaver County decision.

A.    Can you be clear on what you mean, "in the marketplace"?

Q.    Sure.  How many Pace-O-Matic machines, let's say with Pennsylvania Skill Games, were in the Pennsylvania market on

January 1st of 2015?

A. There were machines in the Commonwealth, but there were not machines in the Commonwealth up and running.

Q. How many of those machines were in the Commonwealth but not up and running?

A. That was before me, so I really don't want to testify to something I don't have knowledge of.

Q. Okay. When was not before you? What was the date?

A. I got involved on the 23rd of December, 2014, when I got the phone call.

Q. Okay. So 2015 is after 2014, isn't it?

A. It is, but the machines I'm talking to you about that were --

Q. Were prior to that?

A. Were prior to that date.

Q. Okay. And they weren't used in commerce?

A. They were not used in commerce.

Q. Okay. Did you participate in anything that related to when they went into commerce, or did they even go into commerce?

A. They did eventually go into commerce.

Q. How do you know?

A. Because the operator that originally bought those machines went around and started selling them to other operators, and I had to clean up that mess.

Q. Okay. Now, do you use your equipment to deliver

machines?

A.    Yes.

Q.    Okay.  And do you ever deliver machines into Beaver County?

A.    Yes.

Q.    And does that give you any cause to believe that machines are going to be distributed into Beaver County?

A.    Only time I delivered machines into Beaver County was to Mr. Unis' house.

Q.    Okay.  What about other machines that you know when a vendor is in Beaver County?  Does that assist you in deciding whether or not any machines are in Beaver County?

A.    It doesn't because regardless of where they're delivered to their office, doesn't mean that's where they're going to be placed.

Q.    We understand.  We understand you've testified that you don't ask them where they're going to be placed either.

A.    That's correct.

Q.    That's correct.

Do you recall how many machines you testified to that Pennsylvania Skill Games purchased in 2015?

A.    I believe it was 15 machines.

Q.    Did that account for 25 hardware boards that were not part of a box?

A.    Those would not have been invoiced from my company, so

I'm not -- I don't think those 25 that you're referring to are accounted for in that because that would not have been invoiced from me.

Q.    That would have been a Pace invoice?

A.    That would have been a Pace invoice.

Q.    Thank you.  Now, isn't it true that -- I think you said you have to do, what is it, three fills a year for --

A.    No, I didn't say that.

Q.    Did you testify that a standard operator has three fills a year per machine?

A.    No, sir.

Q.    What did you testify to with regard to -- I think you were discussing quality of operators.

A.    I testified that a well-run machine will do three to four fills a year.

Q.    Would it surprise you that the machines that Tom Deleo, Thomas Deleo, testified to were not filled in over a year?

A.    I wasn't part of his testimony.

Q.    Okay.

A.    So I can't --

Q.    And that testimony will be presented later.

And if you stopped selling hardware, doesn't it necessarily follow that you would purchase less fills?

A.    You would need to continue to purchase fills to

support the hardware that you've purchased.

Q.   But if you couldn't buy new hardware, you would buy less fills; isn't that right?

A.   No, sir.

Q.   How could you buy more fills if you don't have computers to fill?

A.   You have hardware you bought the first -- up front. You still have the hardware.  It doesn't dissolve.

Q.   That's not what I'm I asking.

A.   Okay.

Q.   I'm asking, if you can't buy hardware, does that not affect the number of fills you would buy since you're unable to buy more hardware?

MR. NEISER:  I object to being vague and misleading.

THE COURT:  Do you understand the question?

THE WITNESS:  No, ma'am, I do not.

THE COURT:  All right.  Let's ask another question or repeat that question.

BY MR. ZEGARELLI:

Q.   Doesn't it necessarily follow that if you have more hardware machines, that you need -- you would fill more hardware machines and buy more fills to fill more machines?

A.   If you would increase the purchases on game terminals, you would necessarily have to increase your purchases on fills to support those game terminals.

Q.   Okay.  Did you testify that you have not sold machines to Pennsylvania Skill Games for approximately five years?

MR. NEISER:  Objection.  That's a mischaracterization.

THE COURT:  You can answer the question.

THE WITNESS:  I think -- I think it might be four years.  I'm not sure, though.

BY MR. ZEGARELLI:

Q.   Okay.  Now, with regard to the trademark, you've said a few times "our brand."  Do you recall that testimony with regard to the Pennsylvania Skill --

A.   Sure.

Q.   That logo?

Okay.  When you say "our," who is "our"?

A.   Well, I work closely with Pace-O-Matic.

Q.   Okay.  Now, do you claim that you own the brand, Pennsylvania Skill Games, with the bell logo?

A.   No, sir.

Q.   Okay.  So you are not an owner?

A.   No, sir.

Q.   Okay.  Okay.  And it's true, isn't it, that you do not -- Miele Manufacturing does not have a claim in this litigation?

A.   I'm -- I'm not positive of that.

Q.   Do you -- you're not aware of whether you have a claim or not a claim?  Are you a plaintiff --

A.    I don't think I'm a plaintiff of -- no, I don't think I'm a plaintiff.  Sorry.

Q.    And are you a claimant on a counterclaim in any case?

A.    I don't -- I don't know well enough to answer.  I'm sorry.

THE COURT:  Mr. Zegarelli, I don't want to interrupt your cross-examination, but it looks like it's about time for our afternoon break unless you are very close to being done.

MR. ZEGARELLI:  No, we can take a break right now.

THE COURT:  Ladies and gentlemen, we'll see you back here at 3:00.

THE CLERK:  All rise.  This Court is in recess.

(Pause as the jury exits courtroom.)

(Whereupon, a recess was taken.)

(Pause as the jury enters courtroom.)

THE COURT:  Please be seated, everyone.

Mr. Zegarelli, you may continue when you're ready.

MR. ZEGARELLI:  Thank you, Your Honor.

BY MR. ZEGARELLI:

Q.    Mr. Miele, I think you indicated earlier that Mr. Warren had authority to sign the January agreement on behalf of you; is that right?

A.    Correct.

Q.    Okay.  And I'm going to point out, again, the email that was -- you were carbon-copied on or cc'd on.  And I'll

direct your attention to the highlighted language that says, "Meaning if a location or an operator calls us about machines, I will call you first to make sure you have the inventory to service the account or plan to take care of that account."

Do you see anything about, you know, if the machine lands somewhere else?  Any of that language in there?

A.  No, I don't see any language "if the machine lands somewhere else."

Q.  Just simply "the location or an operator calls us about machines, I will call you first to make sure you have the inventory to service that account or plan to buy it to take care of that account."

Now, wasn't there a time, Mr. Miele, that -- I'm sorry.  One second.

Mr. Miele, I'm going to place before you a document marked as Exhibit 43.  You see it on your screen, sir?

A.  No, sir.

Q.  And now?

A.  No.  Now I do.

MR. NEISER:  Your Honor, I know we haven't offered it yet, but just to be cautious, we're going to have a hearsay objection on this one.

THE COURT:  Thank you.  Let's have it identified first, and then we'll deal with the objection.

BY MR. ZEGARELLI:

Q.    Can you identify this document?  Do you recall receiving it?

A.    I -- I assume I received it because I'm copied on the bottom.

MR. ZEGARELLI:  I move it in.

THE COURT:  I understand there is an objection.

MR. NEISER:  Yeah.  Hearsay, Your Honor.

THE COURT:  What is your response?

MR. ZEGARELLI:  Notification.

MR. NEISER:  It doesn't -- no exception under the hearsay rule for notification.  It's out-of-court statement offered for its truth at trial.  We don't have the declarant present, and there's no exception.

THE COURT:  Is there an exception to hearsay that you want to cite?  Otherwise, I will sustain the objection.

MR. ZEGARELLI:  Our position, Your Honor, is it was sent.  Mr. Miele has a copy of it and has testified as such. It's not -- it may or may not be true or may or may not be false, but he did receive it.  If he can acknowledge receiving it, it has a notice in it.

THE COURT:  The objection is sustained.

BY MR. ZEGARELLI:

Q.    And I will also show you, Mr. Miele, a document that was marked as Exhibit 8.  Do you recall receiving this document?

A.    Could you go back to the bottom, please?

Q.   Sure.

A.   The bottom.  I don't recall receiving this document, and I'm not cc'd on it.

Q.   Okay.

A.   Was it addressed to me at the top?

Q.   It was not.

A.   Okay.  Then I don't believe I ever received this document.

Q.   Okay.  Do you recall ever receiving notice from Pennsylvania Skill Games that Robert McDanel was selling games in Beaver County?

A.   No.

Q.   Do you ever recall receiving notice that Pro ATM was operating machines in Beaver County?

A.   Operating machines in Beaver County?

Q.   Yes.

A.   I think that was the notice to Pro ATM, and I was not copied on that document.

Q.   That's not what I asked you.  For Pro ATM, do you recall receiving notice from -- with regard to Pro ATM placing machines in Beaver County?

A.   I do not recall.

Q.   Okay.  Would it surprise you that Brent Mayes had indicated that --

MR. NEISER:  Objection; hearsay.

THE COURT: You can finish your question, and then we'll hear the objection.

MR. NEISER: Sorry.

BY MR. ZEGARELLI:

Q. Would it surprise you that Brent Mayes, who will testify here, had indicated that he did give you notice that there was a dispute as to his location?

MR. NEISER: Objection. Hearsay.

THE COURT: Sustained.

MR. NEISER: Striking, Your Honor.

THE COURT: Ladies and gentlemen, the question which included some facts within it is stricken from the record, and I'm instructing you not to consider that further.

BY MR. ZEGARELLI:

Q. Mr. Miele, you were shown a number of advertisements. Are you able to testify, with regard to each of those advertisements, the date when those advertisements were placed into the market?

A. To the best of my ability.

Q. Okay. Let me back up.

Mr. Miele, are you familiar with an organization called MCM Elements?

A. Yes.

Q. Okay. It's true, isn't it, that MCM Elements is a business and a software product that you created?

A.    No.    I helped promote it and enhance it, but I didn't create the initial product.

Q.    Was it part of a company you were an owner of or partial owner of?

A.    Yes.

Q.    Okay.    So when you said you didn't help create it, if I understood your testimony, is that because you didn't -- you weren't the programmer for it?

A.    It was created already, and when I got involved, I enhanced it.    I helped the programmer enhance it.

Q.    Okay.    And MCM Elements was sold, if I understand it, to Pace-O-Matic?

A.    Correct.

Q.    Okay.    And, either way, MCM Elements, can you describe what MCM Elements does?

A.    MCM Elements is the route software program that I testified earlier.    It helps an operator manage their routes.

Q.    Okay.    And how does it do that?    What information does it elicit from people who use MCM Elements?

A.    It depends on how the operator sets it up.    It's completely up to them how much information they put it or don't put in.    But, you know, if I operate in Joe's Bar and I have a pool table in there and I have to have a number on the pool table that identifies it and I -- I assign that pool table to that location.    If I have a jukebox there, I do the same thing.

And then when I go in to do collections, all that shows up on my app, and I can do the collections, and I can say I counted $80 out of the pool table, I put the $80 in there, and it will split the revenue as I've told it to split that revenue in the back-end setup.

Q.    Isn't it true that there are fields of data in MCM Elements that elicits the location of the machines?

A.    Yeah, the locations are entered -- the machines are entered into MCM Elements first in the warehouse and, then they are assigned to a location.

Q.    Okay.  So MCM Elements, is it safe to say, in some ways it's a database?

A.    It is a database.

Q.    Okay.  And some of the fields of that database are location information about where machines exist?

A.    Yes.

Q.    Okay.  And is there -- do you understand the term "TRT"?

A.    Very well.  I named it.

Q.    Okay.  So what is a TRT?

A.    Ticket redemption terminal.

Q.    Okay.  And, at any time, are TRTs connected to the Internet?

A.    TRTs are connected to the Internet.

Q.    And the Internet uses proxies, does it not?

A.   Not -- I'm not an IT person, sir, so --

Q.   Okay.  Mr. Miele, at times when operators are transferring their locations from one operator to another, are there times when operators transfer their locations from one operator to another?

A.   There's times in the competitive market where an operator will go in and knock another operator out of the location, sure.

Q.   Okay.  And what if -- and do you get notice of that, or have you, in your experience, received notice of that?

A.   Are you referring directly to the fact of the Pennsylvania Skill game?

Q.   We should, yes.

A.   Do I get -- in an adversarial way?

MR. NEISER:  Excuse me.

Your Honor, I'm going to make an objection without getting into too much detail.  I want to make sure that we're not going to cross over into certain of the -- the compliance report issue, for lack of a better term.

THE COURT:  I assume we're not going in that direction?

MR. ZEGARELLI:  We're not going in that direction.

MR. NEISER:  I can't control the witness, and I want to make sure --

THE COURT:  I understand.  Thank you for raising that.

And Mr. Zegarelli has assured us that we're not.

MR. NEISER:  Thank you, Your Honor.

THE WITNESS:  If an operator were to lose an account to another operator, I would not get notice of that.

BY MR. ZEGARELLI:

Q.  Is there not something called a location guarantee that you offer?

A.  No, sir.  I don't have any jurisdiction over pool tables, jukeboxes, pinball machines.  If a location decides to stop doing business with an operator, again, that is their business.  I cannot force a location to do business with an operator.

Q.  I didn't ask you that, though.  All I asked you was, do you receive notice if there are -- of locations when there are disputes between operators?

A.  Could you define that question?

Q.  Sure.  If one operator has a dispute with another operator with regard to any particular location.

A.  What type of dispute, sir?  I can't --

Q.  Two operators that are trying to get the same location and one operator trying to oust another operator.  Isn't it true that you get notice of those?

MR. NEISER:  Relevance.

THE COURT:  What is the relevance?

MR. ZEGARELLI:  It indicates location.

THE COURT:  I think he said repeatedly he's not aware of the location, but he can certainly reiterate his understanding based on your question.

THE WITNESS:  I am definitely not aware of location of a terminal unless it is reported to me for some reason.  I do not get notification of a competitive marketplace where one operator ousts another operator or a location owner ousts an operator in favor of another one.  That is not my business, and no one needs to notify me.

BY MR. ZEGARELLI:

Q.  You raised the price on Pennsylvania Skill Games for fills, isn't that right, sometime about a year ago?

MR. NEISER:  Objection; relevance.

THE COURT:  Sustained.

MR. ZEGARELLI:  No further questions.

THE COURT:  Thank you, Mr. Zegarelli.

Is there any redirect?

MR. NEISER:  Very briefly, Your Honor.

THE COURT:  Did you want to use the podium?

MR. NEISER:  I can stay here, Your Honor.  Whatever is comfortable for everybody.

THE COURT:  We're trapping Mr. Zegarelli again.

MR. NEISER:  Change of scenery.

MR. ZEGARELLI:  I would be glad.  He said it was very briefly.

THE COURT:  All right.  That's fine.

MR. NEISER:  I like to look directly at Mr. Miele, anyway.  It's much more humane and civilized; right?

REDIRECT EXAMINATION

BY MR. NEISER:

Q.  Let's talk about MCM Elements.  You control what data go into MCM Elements?

A.  I have sold that company.  I have no control over it.

Q.  Is there any control -- well, who did you sell it to?

A.  Pace-O-Matic.

Q.  Does Pace-O-Matic have any control over the data that is entered into the software database you talked about?

A.  No.  It's simply a template for the operator to set it up as detailed or as not detailed as they want to.

Q.  If they put 1313 Mockingbird Lane down and that's not where they had a machine, you wouldn't know either way?

A.  I wouldn't know.

Q.  And is that information, even if accurate, is it shared outside of the database itself?

A.  No.

Q.  Okay.  Is it anyone's business what's in the route boost software in the database?

A.  No.  Of all the years that I owned that database, I did not look at anyone's information.  In fact, I didn't have permission to look at anybody's information because I didn't

want anybody to accuse me of looking at their information.

Q. Would it be true that the only reason why it was looked at recently was because of discovery in this lawsuit?

A. I suppose.

MR. NEISER: I'd like to pull up 96, please.

BY MR. NEISER:

Q. Sir, I'm going to show you a document that's been entered into evidence as Exhibit 96. Do you remember talking about this? It's the operator agreement.

A. Oh, yes.

Q. When did you start using an operator agreement?

A. This operator agreement probably started around '17, '18.

Q. Okay. Is it mandatory?

A. It is not.

Q. So not all operators have signed it?

A. Correct.

Q. In fact, Pennsylvania Skill Games, they haven't signed it either, have they?

A. They have never signed.

Q. Okay. I'd like to show you, on page 4 of 10 of Exhibit 96, I believe it's 3.6B.

Do you see that there, sir?

A. Yes.

Q. So you're pointing out to your operators, or at least

those who sign it, that you're making a claim to that mark, aren't you?

A.    Yes, sir.

Q.    To Pennsylvania Skill, right?

A.    Yes.

MR. NEISER:  You can take it down.  275.  I'll just ask the question.

BY MR. NEISER:

Q.    We looked at a series of invoices to GMR Games, Rick Bigrigg, those guys; right?

A.    Yes, as I recall.

Q.    Do you remember the contents of the invoices?

A.    Yes.

Q.    Now, the address that's listed for the operator, is that a location or an operator address?

A.    That should be an operator's address.

Q.    Okay.  So that would be like a warehouse, for example?

A.    Sure, their place of business.

Q.    And then the operators take the games once they're delivered to the warehouse, and they put them out wherever they're going to put them?

A.    Correct.

Q.    So just because the invoice has a Beaver County address, does that mean you're actually placing a game in Beaver County?

A.    No, not at all.

Q.    Let's get to Exhibit 26.  Is there's a -- is this a signed agreement?

A.    Not that I see.

Q.    Would it fair to say that the language that Mr. Wood used in this email changed over time up to and including the Equipment Purchase Agreement?

A.    I would agree with that.

Q.    And the right of first refusal language indicated there, changed from that point until it was signed in the Equipment Purchase Agreement in May of 2015?

A.    Yes.

Q.    Thank you.

MR. NEISER:  You can take it down.

BY MR. NEISER:

Q.    Was Savvy Dog created for the purposes of hiding things from the Unises?

A.    Not that I think.  No, not that I know of.

Q.    Okay.  You mentioned during your travels with Albert Unis III on his route where you saw the hundreds of machines. Do you recall doing that?

A.    Yes.

Q.    Did you see a single instance of Mr. Unis using the words "Pennsylvania Skill Games" on any of those machines?

A.    Not a one.

Q.    How about on a flyer?

A.    Nothing.

Q.    An advertisement?

A.    Nothing.

Q.    Megatouch machines?

A.    Nothing.

MR. NEISER:  No further questions.

THE COURT:  Thank you.

Mr. Miele, you can step down.  Thank you for your testimony.  You are excused.

THE WITNESS:  Thank you, Your Honor.

(Witness excused.)

MR. NEISER:  Your Honor, I think, subject to approval from Mr. Zegarelli regarding the exhibits, we're prepared to read in the deposition designations of Attorney Wayne DeLuca.

THE COURT:  Mr. Zegarelli, are we ready to do that?

MR. ZEGARELLI:  Yes, Your Honor.

THE COURT:  All right.  Then, ladies and gentlemen, let me just explain to you, as I mentioned at the beginning of this case, a deposition is sworn testimony that is taken before trial.  The witness is placed under oath and swears to tell the truth, and the lawyers for the parties can ask them questions. A court reporter, like Ms. Siatkowski, is there to record everything.

There is a deposition -- actually two depositions of

Wayne DeLuca, one that was taken on July 10th of 2020, and a second that was taken on May 24th, of 2021.  Those two depositions, or portions of those two depositions, based upon what the attorneys have agreed to, are going to be read to you. That will be done by Mr. Neiser asking the questions, exactly as they were asked during the deposition, and his colleague, Mr. Deasy, reading the responses of Mr. DeLuca exactly as those responses were given.

I want to mention that the reason that we're doing that is that a rule of federal civil procedure allows a deposition to be read when a witness is unavailable due to illness.  And because Mr. DeLuca is unavailable, his deposition is going to be read for you here today.

All right, Mr. Deasy.  You can step forward.

MR. NEISER:  Your Honor, may I proceed?

THE COURT:  Give me just one moment, Mr. Neiser, to make sure I have pulled up the depositions, and then we can get started.

MR. NEISER:  Thank you, Your Honor.  I'm going to consult with A.J. for one moment.

THE COURT:  Mr. Neiser, you can proceed when you're ready.

MR. NEISER:  Thank you, Your Honor.

(Whereupon, the testimony of Wayne Deluca was read into the record:)

"Question:  Would you state your name for the record?

"Answer:  Wayne DeLuca.  D-E-L-U-C-U-A.

"Question:  And you're still a licensed attorney, if I understand it.

"Answer:  Active license."

MR. NEISER:  And I want to make it clear, this is me speaking at the deposition.

"MR. NEISER:  Well, that's what I was about to do. First, I want to introduce myself.  My name is Julian Neiser, I am counsel for Pace-O-Matic, POM of Pennsylvania, Savvy Dog Systems, and Miele Manufacturing, and I'm sorry I said it that fast.

"I have asked to enter an appearance and represent Mr. DeLuca today as Mr. DeLuca was our past counsel, and there may be matters, often attorney-client privilege and work product, that we may need to raise throughout the deposition. And I am happy to do that representation of Mr. DeLuca or accept that representation of Mr. DeLuca."

MR. NEISER:  Resuming the questioning --

Your Honor, do you want me to indicate which lawyer is questioning or not?

THE COURT:  I don't believe we need to do that unless, Mr. Zegarelli, you feel differently.

MR. ZEGARELLI:  I don't think we do.

MR. NEISER:  Just to be clear.  Thank you, Your Honor.

Resuming questioning.

"Question:  And this is all -- that whole file is with regard to the Beaver case?

"Answer:  Beaver, Beaver, Beaver.  There's a receipt in here from Albert when he picked up the game.  He picked up the game that later went to -- this is all litigation.

"Question:  Now, Mr. DeLuca, we have marked for identification Exhibit C" --

MR. NEISER:  Which, for this record, is Exhibit 216.

"Question:  -- it is a letter dated December 2nd, 2011.  And for the record, can you testify as to the date on which you actually wrote that letter and signed that letter?

"Answer:  This letter would have probably been written December 2nd, 2011, and it was a retention letter with Pace-O-Matic.  It was addressed to Mark Jefferson, who at that time, was their attorney."

MR. NEISER:  Your Honor we're going to display in sequence.

THE COURT:  Thank you.

"Question:  Can you testify that your signature was placed on there on or about December 2nd, 2011?

"Answer:  Yeah.

"Question:  Okay.

"Answer:  Well, yeah, yeah.  And then it was countersigned and returned."

MR. NEISER:  Resuming questioning.

"Question:  Mr. DeLuca, are you currently employed?

"Answer:  I retired.

"Question:  When did you retire?

"Answer:  December 31st.

"Question:  Of 2019?

"Answer:  Yes.

"Question:  And does that mean you're not currently employed?

"Answer:  I'm not currently employed.

"Question:  Now, do you still provide professional services, although not an employee?

"Answer:  Occasionally, I'll get a call from a client. If the file is not in storage -- if the file is in storage, I'll get it, and I'll maybe give them some advice as to strategies or next step.  But most of the cases have been referred out to other lawyers.

"Question:  Are you currently providing any professional services today, as of today, for any of the parties in this litigation without compensation?

"Answer:  No.

"Question:  And when I say that, I don't mean obviously this minute.  I mean, from time to time, do any of the parties call you for advice?

"Answer:  No.

"Question:  When was the last time with or without compensation that you provided advice in any regard to any of the parties?  So they are Pace-O-Matic?

"Answer:  Yeah, I think there was a letter.  Let me see.

"I communicated the with Pace-O-Matic in July of 2018. July 27, 2018.

"Question:  July 27, 2018?

"Answer:  That's correct.

"Question:  And when you say you communicated with them, to the extent not privileged, what -- and I haven't seen the -- you appear to be looking at a document -- to the extent it's not privileged, what was the nature of the communication?

"Answer:  Concerning a right of first refusal agreement with Albert Unis.

"Question:  We may be getting them right now.  In fact, let's see.  POM 7 was redacted.  POM 8 was redacted.  And it looks like there's a separate interposed page after POM 8 that is probably POM 9, but because it's entirely redacted, the Bates number is not showing:

"Here.

"Thank you, sir.

"We're going to mark for identification Exhibit D, which are documents we just discussed, which is an exhibit. We'll make it a group exhibit of 12 pages.

Exhibit D was marked for identification, which is 128C.

Back on the record.

"Question:  Okay.  Exhibit D is a document of 12 pages.

"Mr. DeLuca, when you say that you spoke or communicated with at least -- with Pace-O-Matic -- sorry -- at least with Pace-O-Matic, on or about July 27, 2017 -- you referenced some pages, and we've made copies of what appears to be a fax from you.  Does this embody the documents related to the conversations that you referenced?

"Answer:  Yeah.  Yes.

"Question:  Now, before we go through these documents, I'd like to at least go through your background a bit and some terms of representation.  If we go back to 2010, and I'm just picking from your engage letter the year 2011, so I'm going to go on slightly before that date.

"Can you, for the record, indicate where you were employed -- and perhaps it's one or more places as of 1/1 -- January 1, 2010 -- and then bring it forward to current, if you don't mind?

"Answer:  Well, we had an unincorporated association, Eddy, DeLuca, Gravina, & Townsend.  That's where I was located. We were in the Manor Building, 564 Forbes Avenue, down in downtown Pittsburgh.

"Question:  And if you can bring that forward, We're going to start -- if that's true as of 1/1/2010, I'd like you to go forward to current and tell me when that situation changed. So you had an unincorporated association?

"Answer:  Yeah.

"Question:  You were an employer or a partner?

"Answer:  No.  No.  It's an unincorporated association.  We all are members.

"Question:  Okay.

"Answer:  Okay.  We all had our own practice.

"Question:  I understand.

"Answer:  And then, in December, I had a night -- I had a night office in Sewickley.  And in December of -- December 19th, I moved there -- no.  I'm sorry.  It was a year or two before that I moved to Sewickley full time and then just did some night stuff.  And then December 31st, I was out.

"Question:  Okay.  So if you don't mind stopping there.  We started with 1/1/2010.  You testified you were with the unincorporated association group of Eddy, DeLuca, Gravina & Townsend.  And was that the -- as of 1/1/2010, was that the only place you were --

"Answer:  Yeah.

"Question:  -- you were associated to practice law?

"Answer:  Yeah.  I was there for -- I was there over 20 years.

"Question:  And just for the record, we're talking about you have been a lawyer for years, and you were practicing --

"Answer:  47.

"Question:  47 years, congratulations.  So you were an attorney of as of 1/1/2010 with a law firm -- I'll call it Eddy and DeLuca.  And did you also have the night office in Sewickley at that time or --

"Answer:  Yeah.

"Question:  And did that start a little later?

"Answer:  No, I had a night office in Sewickley.

"Question:  Okay.  So even as of 1/1/2010, you were performing legal service in the Manor Building penthouse, downtown with Eddy & DeLuca, and you also had a night office in Sewickley?

"Answer:  That's correct.

"Question:  The night office in Sewickley, did that have a different designation for legal services?

"Answer:  No.

"Question:  If you were rendering services from the Sewickley office, would you still be using Eddy DeLuca letterhead?

"Answer:  Yes.

"Question:  Now, is there a point in time moving forward to current that that particular scenario changed?

"Answer:  Yeah.  I'm trying to remember.  It was -- I can't remember the exact date, but at some point in time when -- I think it was maybe December of 2019 where I went to Wayne V. DeLuca, Attorney At Law.  I was done with the downtown office. I think that was the date.

"Question:  So your testimony, if I understand it, is sometime around December of 2019, you began doing business as a Wayne B. DeLuca?

"Answer:  V.

"Question:  V.  I'm sorry.  V as in "victor"?

"Answer:  Correct.

"Question:  And that is what the V stands for? Victor?

"Answer:  Vincent.

"Question:  Vincent.  Wayne Vincent DeLuca.  So Wayne V. DeLuca stopped practice at the downtown Manor Building penthouse with the firm of Eddy & DeLuca, and you were still practicing at that time in Sewickley?

"Answer:  Yeah.  Now, that wasn't a firm.  It was an unincorporated association.

"Question:  Okay.

"Answer:  But I was there.

"Question:  But at least when you say -- you say it's not a firm, and maybe that's a conclusion of some sort, but is there a letterhead -- strike -- is there a letterhead that says

Eddy, DeLuca, Gravina, and Townsend?

"Answer:  Yeah.  It also says an incorporated corporation.

"Question:  Yes, yes, yes.  Whether it's a law firm or not, I think, is a little bit of a different issue.

"Answer:  Okay.

"Question:  Okay.  So as of December 2019, and you can't recall the exact date at the time?

"Answer:  No, I can't.

"Question:  And you began doing business as Wayne V. DeLuca, and did that change at some point in time?

"Answer:  No.

"Question:  So then, as of today, you still practice law as Wayne V. DeLuca?

"Answer:  Well, I'm retired, but I'm not -- I'm not really practicing.  I'm not active.  I have an active license, but I notified all of my clients December 1, 2019, that, you know, I was going -- terminating my -- closing my office and terminating my practice.

"Question:  Now, did you represent any entity that you understand is an affiliate of Pace-O-Matic during the period of time from December 2, 2011, through December 1, 2019?

"Answer:  I represented Pace-O-Matic and I think Pace-O-Matic of Pennsylvania.  I don't know whether -- I don't -- I don't know if I was their lawyer, Pace-O-Matic of

Pennsylvania, but I represented Pace-O-Matic.  They were out of Atlanta at that -- at the time.

"Question:  And was there a scope of representation that -- just to be clear, you represented Pace-O-Matic Inc., and Pace-O-Matic of Pennsylvania, from a period of time December 2, 2011 -- and I don't know the exact date that Pace-O-Matic of Pennsylvania was formed, by the way.

"Answer:  Yeah.

"Question:  But you represented them generally consistently through the period of time of December 2, 2011, through December 1, 2019.

"Answer:  Right.

"Question:  Did you sign a separate engagement letter for Pace-O-Matic of Pennsylvania when you began any representation of them?

"Answer:  Not that I recall.

"Question:  Now, did you ever represent an entity with Miele as the first word, such as "Miele Manufacturing," "Miele Inc.," any of those entities?

"Answer:  Yes.

"Question:  So do you recall the entity itself that you represented?

"Answer:   Think it was Miele Amusement Inc.

"Question:  And did you continue to represent Miele Amusement Inc. through the term of approximately 2009 through

December 1, 2019?

"Answer:  No.  They retained other counsel about, I'm going to say, three or four years ago.  And the work that I did for them was sporadic.

"Question:  Okay.  Do you recall the last time you performed any services for a Miele entity?

"Answer:  I really can't remember.  I mean, on a retaining basis, no.  Mostly it's just phone calls.

"Question:  Okay.  So you can't --

"Answer:  I don't even charge them for that stuff, you know.

"Question:  So if you had -- if you could make an educated recollection of the last time you actually charged for services for one of the Miele entities, do you recall?

"Answer:  Probably would be 2010.

"Question:  And apart for that, it's a call here and there?  You don't really charge?

"Answer:  A call here and there.  Lou is also very active in PAMMA, Pennsylvania Music Vendors Association, and he was the president for a while, and he would call me about different PAMMA matters.

"Question:  Okay.  And for the record, PAMMA, which is spelled, all caps, P-A-M-M-A, is?

"Answer:  Pennsylvania Music Vendors Association of Pennsylvania.  And I represent them -- I did represent them.

"Question:  And you said that Lou was the son.  Is there a father Lou and a son Lou?

"Answer:  Yeah.  Lou Sr., who is now deceased.

"Question:  So Lou Sr. is deceased.  Lou Jr. is --

"Answer:  That's correct.

"Question:  So, again, for the record, when you mentioned Lou would call you from time to time, that was junior?

"Answer:  That was the junior.

"Question:  Were there any other practices that you had other than the Eddie relationship downtown in the Manor Building and the night office, which you've identified as a night office in Sewickley.  Any other services?"

MR. NEISER:  Read it out loud, please.

"Answer:   Witness shaking head.

"Question:  Those are the two offices?

"Answer:  None.

"Question:  Now, in the Sewickley office, was that a discrete office that you maintained, or was it an office share arrangement of some sort?

"Answer:  No, it was -- I rented space from the Amato firm.

"Question:  Okay.  And the Amato firm, is there a more discrete or more precise name for the Amato firm?

"Answer:  Amato & Start.

"Question:  Are you familiar with the person William

Rodgers, an attorney?

"Answer:  Yes.

"Question:  And do you have any recollection of what firm he was with?

"Answer:  He was with Amato & Start.  No longer there.

"Question:  Okay.  So if I use the term "skill games," do you have a familiarity with that term?

"Answer:  Yes.

"Question:  And what is your familiarity with that term?

"Answer:  My familiarity was when I got involved in the gaming business, we would defend these machines, indicating they were games of skill and not chance, that the outcome was determined predominantly by skill and not chance.  And that was the argument we made to Judge Knafelc in Beaver County successfully.

"Question:  Now, I'm going to mark Exhibit E, which for the record is Trial Exhibit 128D.

"Now, Mr. DeLuca, I've marked for identification an Exhibit E, which I can represent to you we printed that today. And if you look at the lower right-hand corner -- I'm sorry -- the lower left corner, you'll see a designation, https://www.mielemfg.com/legal-team.  We'll pulled this document from that website being -- I'll call it mielemanufacturing.com.

"Now, it appears to be your picture in the middle of

that exhibit.  Can you confirm that?

"Answer:  That is my picture.

"Question:  Are you part of, today, the legal team? Or do you have an understanding of who is the entity of which you're part of the legal team today?

"Answer:  I am not a legal team.

"Question:  Okay.

"Answer:  I am not on the legal team.  In fact, I've never seen this document until right now.

"Question:  Okay.  So as you've testified here today, are you not on the legal team of Pace-O-Matic Inc.?

"Answer:  I am not.

"Question:  Have you ever seen the pictorial representation, the upper left-hand corner, such as it is, on the exhibit of the word "Pennsylvania Skill".

"Answer:  Yeah, I've seen this several times.

"Question:  Okay.  Now, do you have an understanding of, at any point, where either Miele Manufacturing -- actually, any entity that begins with Miele -- and a Pace-O-Matic or POM entity began calling themselves, as a nickname, "Pennsylvania Skill" or "Pennsylvania Skill Games"?

"Answer:  They have been -- I think Miele and Pace-O-Matic have been used in Pennsylvania Skill for a long time.  I just can't --

"Question:  As a company name?

"Answer:  Not as a company name.  Just as a tag, so to speak.  But I can't remember when that happened.

"Question:  Okay.

"Answer:  Obviously, it would have been sometime after the Knafelc decision in Beaver County, which was in 2014.

"Question:  Okay.  So if we go to the first, I'll say, the second physical page of Exhibit D, Trial Exhibit 128C, can you identify the document and describe what its purpose is or was?

"Answer:  This was a receipt for a piece of Pace-O-Matic equipment, terminal ID 42613.  That was in my office, and it was picked up by Albert Unis on October 1, 2013.

"Question:  Okay.  Can you, for the record -- do you recall the circumstances surrounding?

"Answer:  Yes.

"Question:  Or you can just call him the Third."  So we'll call him Albert for now.  Unless otherwise designated, "Albert" means "Albert III."

"Answer:  So the -- after the fact, the second page was a receipt for a piece of equipment that was in my office and was picked up by Albert -- by Albert for some reasons that I discussed with the state police to see if we could get a determination to see if the piece of equipment was legal.

"Question:  Okay.

"Answer:  That was an agreement that I worked out with

the Pennsylvania State Police Vice Department in Harrisburg. There was some question as to the legality. So the vice commander, I said, "Well, why don't we just give me the piece of equipment? I'll put it out on a location." And Albert Unis put it out on location for me.

"And then it was -- you know, then it was -- he called and he said, We're going to seize it.

"No arrest. They seized the equipment. I filed a petition for return of seized property, and that's how we ended up in front of Judge Knafelc.

"Question: How did you communicate with Mr. Unis -- I'll call him Mr. Unis, Albert Unis III -- to accomplish this pickup for which the second physical page is a receipt?

"Answer: Either we met in Sewickley or a phone call.

"Question: And do you have an understanding of why it was Albert Unis III who received it and not any other person in the world who received that?

"Answer: Well, here was his signature right here on the receipt. I know I was there when he picked it up.

"Question: Right. So we know he picked it up. Do you know why that he picked it up?

"Answer: Why?

"Question: Why?

"Answer: Because he was going to place it in a bar for eventual seizure so we could get it into court.

"Question:  Okay.  So how did you communicate, if you recall, with Albert Unis?  Was it one meeting?

"Answer:  No.  We met -- we met a couple of times.

"Question:  Okay.

"Answer:  And talked on the phone.

"Question:  Okay.

"Answer:  Coordinating where the equipment is, where it should go, and when the state police were going to pick it up.

"Question:  How did Albert, if you know -- how did Albert Unis know to pick up the equipment?  Or what was the conversation you had?

"Answer:  I either called him or met him in Sewickley.

"Question:  Okay.  If you know, why was he involved?  What was in it for him, do you know?

"Answer:  There was really nothing in it for him.  I needed to place the equipment in Beaver County because I wanted to have it seized by the state police so we could get an opinion.  Albert was a vendor, an operator in Beaver County, and because I had known him in the past, we communicated.  And he said, "Yeah, I'll pick it up, and I'll place it in a bar."

"Question:  Okay.

"Answer:  Once he placed it in the bar, I notified the state police.  I went out with the state police, they seized it, and that culminated in the litigation.

"Question:  Okay.  Now, at the time of this receipt on October 1, 2013, did you represent or were you the attorney for Albert Unis or any company that he was affiliated with?

"Answer:  I represented Albert Unis years ago in the fireworks case.  He was the first licensed person to get a license to sell fireworks in Pennsylvania.  He was the very first one.  And we were successful in getting him that license. And he said, you know -- did a setup, a store.  So I represented him on that, and we would talk occasionally.

"But I can't remember representing him on much other than that, other than, you know, he would call me and we would see each other every once in a while.

"Question:  Now, did you call Mr. Unis with regard to the pickup or contact him first or he contacted you first?

"Answer:  I contacted him.

"Question:  And why did you contact him, or did you contact anyone other than him?

"Answer:  No, I contacted him.

"Question:  Only him?

"Answer:  Only him.

"Question:  And why did you contact only him?

"Answer:  Well, I explained to Albert that this would be a test case.  I had assurances from the state police that no one was going to get arrested.  It was just going to be a controlled buy, so to speak.  And Albert said, because I knew

him -- I said, "Albert, the piece of equipment is here.  Just come pick it up."

"He signed a receipt.  I said, 'Where are you going to put it?'  And I think it was the Italian Club.  I'm not sure.

And then the state police called me, and they said, 'Where is it?'

"I said, 'It's in the Italian Club.  Leave it in there for a couple of days.'  I said, 'I'd like to see if there's any play on the piece of equipment.'

"Question:  And why did you call only Albert Unis?  In fact, when you and I spoke on the phone to schedule this particular deposition, I think you had indicated to me that you called multiple vendors.  Was I -- was I misunderstood?

"Answer:  I called some vendors in other jurisdictions, but Albert was the only vendor I called in Beaver County.

"Question:  Okay.  And is there is a reason you contacted him other than -- you know, why did you call Albert for Beaver County?

"Answer:  Because I knew him, and I knew he was an operator in Beaver County.  And I knew that he would do the right thing, pick the equipment up and place it for me, and he wasn't involved after that.

"Question:  And were you aware at the time that Albert Unis was doing business with a designation of Pennsylvania

Skill?

"Answer:  I did not at the time.

"Question:  And are you aware that there's a contract with the American Italian Club with an entity, being Mr. Unis', called "Pennsylvania Skill"?

"Answer:  No.  You mean the location agreement?

"Question:  The location agreement.

"Answer:  No, I've never seen any location agreements.

"Question:  Now, are you aware -- and you can look at the documents that you provided.  Are you aware that some -- at some point later, after the controlled pickup, that there was a written document to be entered into by Pace-O-Matic, Miele Manufacturing, and the Unises with regard to operating Pace-O-Matic machines in Beaver County?

"Answer:  Yeah.  There was a -- there was a document prepared, I think, by Bill Rodgers.

"Question:  If you take a look at the physical pages that are included in the exhibit you just sent, can you authenticate those documents as being a party to those communications?

"Answer:  I'll refer to the email date of February 10th to Danny Warren of Pace-O-Matic.  Yeah, that was my email, but this was an agreement that was being circulated between Pace-O-Matic and Albert Unis.  And some language was questioned on the language.

"Question:  And this is an email from you to Danny Warren at Pace-O-Matic, copying Lou Miele.

"Answer:  Right.

"Question:  And the next document?

"Answer:  The next document was from Bill Rodgers to me.  Bill Rodgers was the attorney in Jimmy Amato's office, and this was the agreement that Bill Rodgers prepared, and he had sent it to me so Albert could review it.

"Question:  Okay.  And when you say that your recollection is that Bill Rodgers prepared it, are you saying that he prepared the very first initial draft?  Are you saying that he prepared the document in the sense of that document represented an iteration of -- or a revised version?

"Answer:  No.  He prepared it.  I made a few changes and then go deeper in, this is -- I think the final agreement.

"Question:  Let's be a little more clear about it. Are you saying -- when you say Bill Rodgers prepared it, are you saying that Bill Rodgers prepared one of the many versions of this agreement?  Or are you saying he prepared the first one that ultimately got revised from time to time after his first draft of it?

"Answer:  Well, at that point in time, Bill Rodgers was representing the Unises.  I was not.  I -- there was -- I felt uncomfortable representing the Unises and representing Pace-O-Matic.  Pace-O-Matic has been a longstanding client.  So

at that point in time, I contacted Bill Rodgers, and I asked him if he would be interested in representing Albert Unis in this, and that's how Bill Rodgers got into this.

"Question:  Okay.

"Answer:  Because I wanted total separation between myself and the Unises.  I wanted to -- so any conflict, that's -- that's why I did it.

"Question:  Okay.  So you're representing Pace-O-Matic.  He is representing the Unises?

"Answer:  Right.

"Question:  But the question still gets back to is, is it your understanding that Bill Rodgers created the very first draft of the agreement that ultimately got signed?  Or are you saying that he just prepared the document that was that particular iteration on March 11, 2015?

"Answer:  He prepared this original document.

"Question:  So I understand your testimony, he's the one, according to you, that prepared the very first draft of the document that ultimately got revised and ultimately signed?

"Answer:  Yes.  To my recollection, let me just look at this quickly.

"Question:  Sure.

MR. NEISER:  Whereupon a brief recess was held. DeLuca Exhibit G was marked for identification.

For the record, this is Trial Exhibit 217.

"Question:  So having looked through those --
documents and, in fact, I will show you -- I'll mark as -- for
identification, I'll mark as Exhibit G, a document.  It was
provided to us in Pennsylvania Skill Games by William Rodgers.

"I'll state for the record that there are some
redacted impressions, and, again, we'll produce this, and, with
the objection of privilege, there are some notations on some of
the typed text that we believe are Mr. Rodgers's.  I was unable
to redact those minor notations.  But there is some text at the
upper right-hand corner of Exhibit G, and I will include this in
the list for your review, Mr. DeLuca, so you can review that as
well.

And while Mr. DeLuca is looking at the documents, the
last question was whether or not Mr. Rodgers created the very
first draft of the document.  And I will direct his attention to
Exhibit G forward or some point after .9, if that helps refresh
his recollection.

"Answer:  I'm reading it.  The only thing I can
surmise is perhaps they had a form document that they set up,
but what I'm looking at, Exhibit D, this kind of refreshes my
recollection, this series of emails.

"At this point in time, Albert was being represented
by Bill Rodgers, and there was an email on the third page of the
document from me to Danny Warren indicating Albert Unis
contacted me and wanted the following changes to the attached

argument.  If acceptable, will sign and send back.  I will get Albert Unis to sign -- I'll get Albert Unis to sign.  That was February 10th.

"Then I get an email from Bill Rodgers dated March 11th, right after that.  Let me know your thoughts before you transmit to your client.  So I guess Bill Rodgers must have sent me some suggested changes.

"Question:  And so we still have the question that you're currently refreshing your recollection regarding who created the very first draft.

"Answer:  The only thing I could say is when I look at that last email, this was from Danny Warren to Bill Rodgers or I was just CC'd that they were going to sign the agreement and forward it.  So I'm sure I had some input, but I believe that the argument was drafted by Bill Rodgers and then modified by Bill Rodgers.

"Question:  So do you have an understanding of, in Exhibit G, what was intended or meant with the statement, "Wayne, we will draft an argument from shells we have at Pace"?

"Answer:  It looks like Pace had a shell argument that they used around the country.  That's what that means.  I assume that's what it means.

"Question:  Okay.  And isn't it true that document itself, it became the first draft?

"Answer:  I'm not sure.

"Question:  The question that was placed before him was whether or not he recalls whether there was one draft or any of the drafts had performance requirements in it.

"Answer:  I don't recall.

"Question:  And I'm going to mark a document of four pages, which is Exhibit H -- Trial Exhibit 218.

"And so the question is, do you recall any drafts with performance standards that were part of a draft?

"Answer:  I don't recall anything other than what's in this agreement that's attached to Exhibit H.

"Question:  Do you recall and can you authenticate the email that's dated March 12, 2015, which is identified at least as billrodgers@sewickleylaw.com to Wayne DeLuca, RE: Pace-O-Matic agreement?

"Answer:  Yeah.

"Question:  Now, do you recall a term and condition, do you recall that, at some point in time, Pace-O-Matic Inc., Miele Manufacturing, and Pennsylvania Skill Games, LLC, entered into an agreement for -- also known as a purchase agreement or the purchase -- Equipment Purchase Agreement?

"Answer:  Yeah, placement agreement.  Yeah, there was an agreement.

"Question:  And do you recall at that time that there was a term and condition regarding -- I'll mark Exhibit J, PSG29 and 30.

MR. NEISER:  DeLuca Exhibit J was marked for identification.  Trial Exhibit 6.

"Question:  Okay.  I've looked at Exhibit 6 -- from the transcript is Exhibit J, Trial Exhibit 6 -- it's titled "Equipment Purchase Agreement" signed by Pace-O-Matic, Miele Manufacturing, and Pennsylvania Skill Games, LLC.

"So in front of you, Mr. DeLuca, is Exhibit J -- Trial Exhibit 6 -- which, if you look at the top, has Equipment Purchasing Agreement identified.  You have seen this agreement before?

"Answer:  Yes.

"Question:  And I'll direct your attention to the second page.  And Exhibit J -- Trial Exhibit 6 -- for the record, is a two-page exhibit.  And you'll see exhibit -- I'm sorry.  Number 4.

"Answer:  Right.

"Question:  And you'll see reference to seller grants to buyer a right of first refusal.  Do you see that sentence?

"Answer:  Yes.

MR. NEISER:  DeLuca Exhibit K was marked for identification.  That is exhibit -- Trial Exhibit 5.

"Question:  Mr. DeLuca, do you recall seeing this document before?

"Answer:  No.  I don't believe I've ever saw this document.

"Question:  And do you have any understanding of the substance of an agreement on or about January 29, 2015, with regard to the placement of terminals in the Beaver County, Pennsylvania, by Albert Unis and, quote, affiliates, end quote?

"Answer:  No, I've never seen this document.  No.

"Question:  Nor do you have an understanding of the content of it?

"Answer:  No.

MR. NEISER:  DeLuca Exhibit M -- this is Trial Exhibit 74 -- was marked for identification.

"Question:  Can you identify that document?

"Answer:  Yes.  This is a report prepared by Nick Farley & Associates addressed to me, dated March 25, 2014, wherein we had requested an opinion from him on PA Skill game 402.44pen, P-E-N, Pennsylvania.

"Question:  So the report at this point in Exhibit M -- Trial Exhibit 74 -- is POM 676 through POM 701.  Now, I'd like you to confirm, if you can, if that report is the final version of the report that you used in the Beaver County case.

"Answer:  I believe it is.

"Question:  And the Beaver County case is the Beaver County case we've indicated earlier that there's a memorandum opinion and order dated December 23, 2014.  You called that the "Beaver County case".  Is that acceptable?

"Answer:  Sure.  Wait, what was the date of this?

December 23, 2014.

"Question:  Is that your final -- I'm sorry.  Is that the final?

"Answer:  Yep.

"Question:  Now, that particular report, if I understand it, is applicable for a particular version of the software; is that correct?

"Answer:  That's correct.

"Question:  And what version of the -- is the -- I'm sorry -- and what version of the software is that for.

"Answer:  402.44pen.  That's for Pennsylvania.

"Question:  Now, is it your understanding that that case and that report were applicable purpose -- I'll state it in a different way -- the ruling upon which -- the ruling that was based upon the report that was only for that particular version of the software, or was it intended to include other versions of the software?

"Answer:  I have to look at the opinion, because I think he refers to that in there, before I give you the answer on it.  He doesn't make reference to the software number in his -- in Judge Knafelc's opinion.  So I really can't answer that question.

"Question:  Okay.

"Answer:  But the dates would indicate that I had this opinion prior to go into court.

"Question:  You had the, I'll call it, the Nick Farley opinion prior to go into court?

"Answer:  Yeah, that's correct.

"Question:  Or at least prior to the order?

"Answer:  Yes, yes.

"Question:  And I'd have to look at it, but I think that court case was prior to the expert report, the Nick Farley report, but it precedes the order?

"Answer:  Yeah.  I think the report -- I think I put it into evidence.  I don't think I had anyone from Farley's office up, you know.  Mike Pace from Pace-O-Matic was my witness.

"Question:  Now, were you the only attorney for Pace-O-Matic?

"Answer:  At the hearing?

"Question:  At the hearing.

"Answer:  Yes.

"Question:  On or about that date?

"Answer:  Yes.

"Question:  Now, in your term as counsel for Pace-O-Matic, was the Beaver case, as we've identified it, applicable for, for example, to software versions 49, 52, 54, 57, 59?  That is, what was originally version 44 in the court case, that there have been a number of versions thereafter?

"Answer:  I can answer it this way.  There was only

one software package in front of Judge Knafelc, just one, and that was the one that he decided, just that one software package.

"Question:  And that was .44?

"Answer:  You know, I can't say for sure, but my guess is it probably was.

"Question:  Okay.

"Answer:  Because if you look at his opinion, the date of his opinion and if you look at the date of the report, this report was sometime before.

"Question:  So the first issue is, do you have an understanding whether the opinion itself references -- and I think you testified it doesn't -- but for clarity, the opinion itself, does it reference a specific version?

"Answer:  No.

"Question:  44 or 49?

"Answer:  No, it doesn't.

"Question:  All right.  There was an expert report. That expert report, if I'm understanding it, only deals with a .44 version.

"Answer:  That's correct.

"Question:  And that was the expert report that you entered in the case?

"Answer:  I believe so.

"Question:  Now, are you familiar with the term

"compliance officers"?

"Answer:  Yes.

"Question:  Now, when you represented Pace-O-Matic, were there certain specific people that you worked with commonly?

"Answer:  Ryan Wood.

"Question:  Okay.  He was, as a general rule, your primary contact?

"Answer:  Yes.  He was Pace-O-Matic's man in Pennsylvania and other states.

"Question:  And do you have an understanding of his title?

"Answer:  He was like marketing; some sort of a marketing title, I think he had.  I'm not absolutely sure.

"Question:  Did you work with Michael Pace at any time?

"Answer:  I worked with Michael Pace because he was my lead witness in the Beaver County case, and we had several conversations about the litigation, trial preparation, testimony, things like that.

"Question:  After that, after the Beaver County case?

"Answer:  Before, and we may have had a couple conversations after -- after.  Nothing substantial.  But most of the stuff was all pretrial.

"Question:  And what about Daniel Warren?

"Answer:  I've talked to Danny Warren several times. Many times.

"Question:  And about equal with Ryan Wood or less or more, generally speaking.

"Answer:  No, most of my communication was with Ryan Wood.

"Question:  Mr. DeLuca, I just have a couple quick questions for you.  Were you ever an employee of Pace-O-Matic?

"Answer:  No.

"Question:  And tell me the extent to which, if at all, either Albert or Albie Unis was involved in the litigation -- we'll call it the "Beaver County litigation," that Judge Knafelc -- Knafelc.

"Answer:  Knafelc.

"Question:  Issued the opinion on.

"Answer:  Albert's sole role was to get the machine moved from my office to one his locations.  Other than that, he didn't play a role it in.

"Question:  He had no involvement in the litigation whatsoever?

"Answer:  No.

"Question:  Did he ever consult with you or did you consult with him about the litigation.

"Answer:  No.  I only consulted with the technicians that developed the game, Mike Pace and the guys that did the

algorithms on the outcomes.

"Question:  And you said that Albert Unis had no involvement.  Would the same be true for Albie Unis?

"Answer:  Right.

"Question:  And do you recall at any time Albert or Albie Unis providing you any documents for your consideration in the litigation?

"Answer:  I do not.

"Question:  So if anybody made the assertion that the Unises, either one of them, or the entity Pennsylvania Skill Games, LLC, had any role or involvement in the litigation whatsoever, that would be a misstatement?

"Answer:  I believe that would be -- well, his involvement was he was the vendor that was willing to take the equipment and put it on location.  After that, there was no involvement.  My involvement was with the technicians that designed the game, Mike Pace himself.  I'm not aware of him having any involvement.

"Question:  Then we discussed Exhibit J, which is an equipment purchase agreement.  Are you aware of any other agreements that were made between Albert Unis, Albie Unis, or Pennsylvania Skill Games and Pace-O-Matic?

"Answer:  None.

"Question:  And are you aware of any other oral agreements or oral agreements -- arrangements between Albert

Unis, Albie Unis, Pennsylvania Skill Games, and Miele Manufacturing?

"Answer:  No.

"Question:  When did you first hear the name "Pennsylvania Skill"?

"Answer:  I heard of Pennsylvania Skill before Albert Unis got involved.  When we -- that was when we first -- when this game was first marketed, you know, PA Legal, PA Skill Game, that's a very generic term in the gaming industry.

"Question:  Did you hear about it from Albert Unis or Albie Unis or Pennsylvania Skill, or did you hear about it from some other source?

"Answer:  I don't know when I first heard it.  My guess is it probably came from Pace-O-Matic.

"Question:  I want to read something to you, and tell me if this is a true statement or not:  Pace-O-Matic, with the assistance of Pennsylvania Skill Games, successfully litigated the legality of electronic video game machines in the Beaver County criminal case and obtained a return of the electronic video game machine.

"Answer:  I've already answered that.  Unis' involvement was picking the game up from my office, placing it in one of the locations.  Other than that, it was just myself. Al Torrence was the DA that prosecuted the case, and the Unises, they weren't witnesses.  It was the technical people, Mike Pace.

"And the Commonwealth produced an expert witness regarding the game, but he worked with the PA lottery commission, and he had absolutely no knowledge of the tabletop game like this.

"Question:  Was there any discussion with Mr. Rodgers about a trademark or allowing Pace-O-Matic to use a trademark that allegedly was owned by either the Unises or Pennsylvania Skill Games, LLC?

"Answer:  I have no recollection of that conversation."

MR. NEISER:  Thus concludes that transcript, Your Honor.

THE COURT:  Now we're moving to the second one, May 24, 2001?

MR. NEISER:  Yes, Your Honor.

Mr. Deasy, do you need to take a drink?

MR. DEASY:  I'm good.

"Question:  In fact, in the meantime, Mr. DeLuca, could you state and spell your name for the record as well as your home address for the record, please?

"Answer:  Wayne DeLuca, W-A-Y-N-E, D-E-L-U-C-U-A; 1129 Bay Hill Drive, Gibsonia, PA 15044.

"Question:  And you mentioned representing, I think you mentioned representing skill game manufacturers throughout the Commonwealth.  Do you recall that?

"Answer:  Skill game vendors, yes.

"Question:  Skill game vendors, okay.  A skill game vendor, does that also include manufacturers of skill games.

"Answer:  Well, I represented -- Gregg, I represented a manufacturer.  That would be Pace-O-Matic.  Then I represented distributor of Pace-O-Matic in Pennsylvania.  And then I represented vendors that placed the equipment in bars throughout -- most of my clients were in Western Pennsylvania.  I didn't get out to Harrisburg.  There were other lawyers that did them out there.

"Question:  So if we can go back a bit because over the some of the time period -- in 2016, were you representing any manufacturers.

"Answer:  2016, I may have been represented Pace-O-Matic.

"Question:  Any distributors?

"Answer:  Miele Distributing in Williamsport.

"Question:  Now you know, don't you, that Pennsylvania Skill Games, LLC, is owned by -- or is related to Albert Unis?

"Answer:  I've been told that, yes.

"Question:  Who told you that?

"Answer:  I just -- I don't know who told me, but I had heard that.  Maybe Albert told me.  I'm not sure.

"Question:  Albert IV or Albert III?

"Answer:  Albert III.  I never met with Albert IV, I

don't believe, who is known as Albie, right?

"Question: Now, with regard to Action Skill, is January 21, 2016, when you began representation of Action Skill Games?

"Answer: I would think so. I probably had some communications or conversations prior that, but that's the engagement letter.

"Question: Okay. So let's go down now to an email that appears to have been printed, and you can correct me if I'm wrong, Mr. DeLuca, but it appears to be printed on May 12, 2017, in the lower right-hand corner, and it appears to have been somewhat informalized. But it carries --

"Answer: Okay.

"Question: So do you see in 89 the word "termination" at the upper left-hand corner?

"Answer: Yes.

"Question: Can you describe what's going on with this letter?

"Answer: Well, Lou Minutello terminated my service and asked that I send everything to Paul Namey at Flaherty & O'Hara, which I did.

"Question: Is this when you terminated representation of Action Skill.

"Answer: It looks like they terminated me.

"Question: Okay. Let me say differently. Is it your

recollection that this is when the representation of Action Skill terminated?

"Answer:  Yes, 5/12/2017.

"Question:  Do you recall why they terminated you?

"Answer:  I don't recall.  I think there was -- I think they requested an opinion on a piece of equipment that I could not give because I did not think it was legal.  But that -- I had pieces of equipment delivered to my office all the time asking for opinions, and I would give an opinion -- look, I played the game.  I had my engineer look at it.  It's legal.  It would be okay in Pennsylvania, or it would be okay in Kentucky or whatever.

"And I think what happened here was the opinion was that it wouldn't be legal in Pennsylvania.  That's my recollection.  And I don't think that that was the opinion that they wanted, and they terminated my services.

"Question:  And was that a Blue Sky game?

"Answer:  I don't remember.  It was a game that Lou brought to my office, I know that.

"Question:  Was it a Pace-O-Matic game?

"Answer:  It was not a Pace-O-Matic game.  Pace-O-Matic was declared legal in Beaver County, and it's the game for -- game of preference now.

"Question:  So can you describe this document -- this related to trial Exhibit 86 -- and we're talking about Bates

number 37 through 59."

THE COURT:  Mr. Neiser, could you stop for a minute. I don't believe that was part of the designated testimony.

MR. NEISER:  I was wondering that, Your Honor.  I paused.  I think I understand what happened here.

THE COURT:  I think we agreed to start on page 53.

MR. NEISER:  Yes, Your Honor.  I'm terribly sorry.

THE COURT:  That's all right.

MR. NEISER:  I paused for one second, and I kept going.  I'm sorry.

"Question:  Now, I'm going to direct your attention down to the Section 1, the first section identified as Exclusive Distributorship.  And this is between -- or drafted to be between Action Skill Games and Blue Sky Games, LLC?

"Answer:  Right.

"Question:  And now, it says, with the sole exception -- and I'm referring to Section 1, Exclusive Distributorship, it says, "With the sole exception of Beaver County, Pennsylvania."  Do you see that?

"Answer:  Where is that.

"Question:  Section 1, Exclusive Distributorship.

"Answer:  Yeah.  Yeah, with the sole exception of Beaver County, okay.

"Question:  So do you have an understanding of why there was a sole exception in Beaver County?

"Answer:  Yeah.  Albert Unis's firm was going to be the sole distributor in Beaver County.

"Question:  Now, at this time, were you representing Pennsylvania Skill Games, LLC?

"Answer:  Yeah, I believe so.

"Question:  So this is in 2016?

"Answer:  Wait a minute.  Let me look at something here.  Hold on, Gregg.  Go down to the signature page.  Okay. All right.  Okay.

"Question:  Now, do you have a recollection of why there was -- other than the fact that it was -- I think you testified to -- did you testify that it was Unis or Pennsylvania Skill Games?  Is that a meaningful distinction in any case?

"Answer:  Yeah, it was Albert Unis wanted that exclusivity in Beaver County."

MR. ZEGARELLI:  Excuse me, Your Honor.  Oh, I see.

"Question:  Couple questions to start.  When did you start working in the skill gaming business or providing, I guess, legal services in that business?

"Answer:  Oh, it's been a long time.  I'm going to say maybe 15 or 20 years ago.

"Question:  15 or 20 years, okay.

"Answer:  I can't remember the exact date.

"Question:  Okay.  When was the first time you heard the term Pennsylvania Skill Games or a variation therefore?

"Answer:  I heard it first from Pace-O-Matic.  I can't remember the exact date.  But I heard it from Pace-O-Matic.

"Question:  Okay.  And when I saw it -- and I saw it on some of their equipment.  We were at a trade show, and I was a speaker, and I saw Pace-O-Matic Games with PA Legal or PA Skill on them."

MR. NEISER:  I'm sorry.  I switched roles.  Okay.  Pick up at line 11.

THE COURT:  All right, Mr. Deasy.

"Answer:  And I saw it on some of their equipment.  We were at a trade show, and I was a speaker, and saw Pace-O-Matic Games with PA Legal or PA Skill on them.

"Question:  Are you aware of the Unises or Pennsylvania Skill Games, LLC, using the phrase "Pennsylvania Skill Games"?

"Answer:  Yes.

"Question:  In what context are you aware of them using that phrase.

"Answer:  I think they used to put a placard on their equipment saying "PA Skill" or "PA Legal" or something like that.

"Question:  Are you aware of them ever using that sticker outside of Beaver County, Pennsylvania?

"Answer:  I'm not aware of that.

"Question:  Do you know if they ever controlled

anybody else using that name outside of -- or controlled by the use of others using that name outside of Beaver County, Pennsylvania?

"Answer:  I don't know.

"Question:  During your representation of the Unises or Pennsylvania Skill Games, LLC, were you ever aware that they were claiming ownership of the mark "Pennsylvania Skill Games" or formatives thereof?

"Answer:  Not until the litigation surfaced.  That's when it first came up to me because I always thought PA Skill was Pace-O-Matic's tag.

"Question:  Mr. DeLuca, we talked a little bit today about manufacturers, distributors, and vendors.  Is there a difference between a distributor and a vendor?

"Answer:  Yeah.  A distributor normally does not put games in locations.  He distributes the games to the vendors, the various machine vendors around the state, and the vendor has the contact with the bar or the club.

"Question:  And then just the distributor, is that typically a distinct entity from the manufacturer as well?

"Answer:  Yes.  At least in my, experience, it is.

"Question:  Mr. DeLuca, this is Julian Neiser.  You may remember me.  I'm counsel for -- in this litigation for POM of Pennsylvania, LLC, and Savvy Dog Systems, LLC, and I also represent Pace-O-Matic, Inc.

"You mentioned seeing the Pennsylvania Skill name or mark in conjunction with the electronic skill games at a trade show.  Do you recall saying that?

"Answer:  Yes.

"Question:  Do you recall when that trade show was?

"Answer:  No.  I don't have any recollection of that. But I remember the game was there, and if it had "Pennsylvania Skill" or "Approved Legal of Pennsylvania Skill," something like that.

"Question:  Sure.

"Answer:  I can't remember the exact, but it was early on, that was on that.

"Question:  And when you say "early on," what do you mean by that?

"Answer:  I think it was before, when Albert said that he was the one that started that.

"Question:  Repeat that again for me, please.

"Answer:  I believe that that PA Skill was put on that game before Albert Unis said that that was his idea to put it on.

"Question:  Is that what you saw on the machine that you just referenced?

"Answer:  Yeah.  It was -- it kind of looked like that.  I'm not saying that it exactly, but it said "PA Skill." I remember "PA Skill" or "PA Legal," but it was something like

that.  That was a placard on the front of the games.

"Question:  Got it.  And to the best of your recollection, that placard was on the front of the games that came from Pace-O-Matic?

"Answer:  Yes.

"Question:  And to make it even more specific, that placard that was on the front of the games did not come from any of the Unises or Pennsylvania Skill, LLC?

"Answer:  No.  It came from Pace-O-Matic.

"Question:  Got it.  Hey, I have a question for you just to put -- I'm just trying -- trying to figure out the timing on the trade show.

"Do you remember the controlled pickup of the game that led to the Beaver County litigation?

"Answer:  Yes.

"Question:  And to be clear, the Beaver County litigation was the litigation in which you submitted the memorandum of law that we previously discussed as an exhibit in this deposition today.

"Answer:  That's correct.

"Question:  Would it be fair to say that Albert Unis, the father, picked up the game from you and placed it in a location for the controlled pickup?

"Answer:  Right.  He came to my office, picked this after I had an agreement with the state police.

"Question:  Yep.

"Answer:  He picked up the game, took it to an Italian Club, I believe in Aliquippa or Ambridge.

And then they -- the enforcement agency called me, and I said, "Well, let it in for a couple of days.  I want to see if this game is profitable or not so I can tell the manufacturer."

"Question:  Yep.

"Answer:  And I met them there.  They picked -- they seized the game, and that was the game where I filed the petition for the return of seized property.

"Question:  Got it.  And that was the game in which you were referring to it as the "Pennsylvania Skill Game" in your papers?

"Answer:  Yeah.  Yes.

"Question:  Do you remember -- do you recall any discussions between any of the Unises, Albert or Albie, with Pace-O-Matic prior to that time that you provided Mr. Unis with the game for the controlled pickup?

"Answer:  I can't specifically remember, but I'm sure there were conversations about where the piece of equipment would be, how it would be picked up, because the vendors were concerned if they got involved, they would be arrested.  And I assured them that they would not be arrested.  And it was -- and Albert Unis, when I gave him that assurance, he came and picked the game up.

"Question:  Okay.  Do you recall any conversations around that time between any of the Unises, either Albert or Albie, and Pace-O-Matic related to trademarks?

"Answer:  I do not."

MR. NEISER:  Your Honor, thus concludes the second deposition transcript.

I would like to note, however, on page 89, I believe that there was supposed to be an Exhibit 9 that needed to be cross-referenced with a trial exhibit.  We don't presently have that marked here.  We apologize for the omission.  I'd like to be able to clear it up, and perhaps we can put it on the record tomorrow if it's convenient for the Court.

THE COURT:  That's fine.  You can talk about that with Mr. Zegarelli, and I'm sure you can clean that up.

MR. NEISER:  Thank you.

THE COURT:  Thank you, Mr. Deasy.

All right.  I notice it's 4:15, almost 4:20.  I think we've done as much as we can do today, ladies and gentlemen. Again, on behalf of the parties and myself, I thank you for your time and attention today.  We're going to adjourn at this point. Please remember my instructions not to discuss this case among yourselves or with anyone else until I've given you final instructions.  Thank you very much.  See you at 8:45 here tomorrow.

THE CLERK:  All rise.  This Court is adjourned.

(Pause as the jury exits courtroom.)

(Whereupon, the following discussion was held in chambers.)

THE COURT:  Before we get to anything else, I wanted to raise an issue that Sharon just raised with me so that we can address it.

Sharon advised me that Mr. Unis IV indicated to her that he wanted real time on his computer.  She had some discussion with him about that and told him he needed to pull up an app.  Later on, there was additional discussion, at which point Mr. Unis IV said somebody else will be looking at this, and Sharon advised him that real time is only for the individuals in the courtroom.

So I wanted to raise this because I -- Mr. Zegarelli, I don't know why Mr. Unis would want real time for someone outside the courtroom.  But I'm going to ask you to look into it.

MR. ZEGARELLI:  I do know the circumstances.

THE COURT:  Okay.  Good.

MR. ZEGARELLI:  And it's for one of his other attorneys, Gianni Floro.  So he's not of record.  He's an attorney.  That doesn't excuse an outside of the courthouse, which I did you hear you tell him --

THE COURT:  Outside of the courtroom, I believe.

MR. ZEGARELLI:  Oh, okay.  Outside of the courtroom. So no problem certainly.  But it was for -- just so you know, it

was for an attorney.

THE COURT:  And where is Mr. Floro located?  Is he somewhere here in the building?

MR. ZEGARELLI:  No.

THE COURT:  Okay.

MR. ZEGARELLI:  He's still outside of the building.

THE COURT:  So he is not with any of the witnesses.

MR. ZEGARELLI:  Oh, certainly not.

THE COURT:  All right.  I just wanted to confirm that.  And if there's any other follow-up that -- any questions anyone has or anything else that we need to do.  I just want to make sure that it's clear that witnesses may not see the transcript, be advised of what is going on, real time or otherwise.

MR. ZEGARELLI:  Absolutely.  And just so you know, it was limited to Mr. Floro, an attorney, his attorney, or one of his attorneys, and it's not going to any non -- that was the only person.

THE COURT:  Okay.

MR. ZEGARELLI:  Although I do acknowledge he was out of the office.  That's why I think he wanted the link, but it was for Gianni Floro.

THE COURT:  Okay.  I'm going to suggest, if Mr. Floro wants to know what's going on in the trial, he can come in and sit.  I think he was here for a little bit.

MR. ZEGARELLI:  He was.  Right.

THE COURT:  Otherwise, I know that he -- I think everyone's getting dailies, so you can certainly provide a daily to him if he needs something.

MR. ZEGARELLI:  Thank you, Your Honor.

THE COURT:  Sharon, thank you for bringing that to my attention.

MR. ZEGARELLI:  Excuse me.  Just so I know, I signed the receipt, and maybe I just didn't read it closely enough. I'm going to assume it said all that in there --

THE REPORTER:  You know what?  I don't remember exactly.  It just says you're just getting real time.  You're not supposed to be quoting or anything.  It's just real time.

MR. ZEGARELLI:  Yeah.  Okay.  I just apologize certainly if it was in there because I think I thought of it a little more administratively.  Maybe I should have read it more.

THE COURT:  Where are we headed tomorrow, Mr. Neiser?

MR. NEISER:  To conclusion.

MR. ZEGARELLI:  There's a smile.

MR. NEISER:  Quick as a cat.

THE COURT:  Mr. Zegarelli is excited about that too because he hasn't really got a chance to put his case on yet.

MR. NEISER:  We're quick as cats.

THE COURT:  Who is the lineup for tomorrow?

MR. NEISER:  Dan Jones.  He's the CFO for Pace-O-Matic.  He will be about three minutes.

THE COURT:  Okay.

MR. NEISER:  Greg Cline.  Rick Goodling.  Now -- and we have third-party operators, Your Honor.  And if you let me check my phone for one second -- I don't want to be rude.  I haven't had a chance to look at it -- well, well, well.  I'll just read this out loud: Mr. Bigrigg -- and I love that name, by the way -- 9:00 a.m.  I can start these guys first.  Mayes, 9:30.  Mangerie, shortly thereafter.  McDanel and Gulotta have not returned any of his calls so far.

THE COURT:  Who was the second person you just mentioned?  McDanel and --

MR. NEISER:  Bob McDanel and, I think, Gene Gulotta, G-U-L-O-T-T-A.

MR. ZEGARELLI:  Mangerie, he's -- he didn't get back to you.

MR. NEISER:  He did.  Mangerie at 9:45.

MR. ZEGARELLI:  15 minutes?  That's what you're --

MR. NEISER:  No, that's when he's going to be there.  He's going to have to sit.  That's all there is to it.  Here, one second.

So we're hoping they'll all be there tomorrow.  If not, we'll go with what we got.  I'll rest on what we have.  I'm going to conclude with Mr. Jones, Mr. Cline, and Mr. Goodling, and we are done, Your Honor.  I'm not going to call any of Mr. Zegarelli's witnesses during my case-in-chief.

And admittedly, I need to make a decision between now and when we meet tomorrow as to whether or not we're going to play any video depositions designations from the 30(b)(6) parties, and I haven't made that decision yet.  So I appreciate the Court's indulgence to give me until tomorrow.

THE COURT:  That's fine.  You can consult with Mr. Zegarelli once you know the answer to that, but I know they've been on your designation list for a while.

MR. NEISER:  They have.

THE COURT:  I don't know whether we will be completed before the end of the day.

But, Mr. Zegarelli, you should prepared to start just in case.  In other words, if we're done at 3:00, I don't want to waste that court time.

MR. ZEGARELLI:  Okay.

THE COURT:  So just be thinking about having a witness available, if necessary.

MR. ZEGARELLI:  Right.

MR. NEISER:  Can I ask who that might be?

MR. ZEGARELLI:  Well, I'm not sure I was quite expecting to put somebody up tomorrow to distinguish from Friday.  But I have to think about it, if I wanted to put up somebody.  That might be a couple of hours.  Would it fill in a gap?  So I might have to address it -- well --

THE COURT:  Let Mr. Neiser know today if you're not

able to do that right now.  Just let him know so that he can be prepared in the event that we get there.  We may not, but I want to make sure we keep moving.

MR. NEISER:  Your Honor, I will tell you, in all candor -- you know, this is the bad lawyer saying they have one more question.  Unless something goes completely sideways, I will be done by midafternoon tomorrow.

THE COURT:  All right.  Then Mr. Zegarelli knows he's got to think about who he may want to start with.  I know you were both kind enough to prepare something about the attorney-client privilege.  My thought would be that I read that instruction before Mr. Cline starts his testimony, unless there is some different way that both of you thought that that would be handled.  I mean, we could wait until he's asked a question for which a privilege is asserted.

MR. NEISER:  I'd be fine with that.  That may never even happen.

THE COURT:  All right.  So shall we wait until he asserts a privilege?

MR. NEISER:  I think that's fine.

MR. ZEGARELLI:  It's up to you.  I have no problem with you reading it in advance so it doesn't --

MR. NEISER:  How long is the instruction?  Is it short --

THE COURT:  It's a paragraph.

MR. NEISER:  We can do it before then.  I just don't want to take a second away.

THE COURT:  All right with you?

MR. ZEGARELLI:  Sure.  Thank you, Your Honor.

THE COURT:  That way, you know, I'll remind them, if need be, when that comes up.  At least they'll understand he's an attorney and there may be such a question.

I mentioned earlier, or perhaps yesterday, about an instruction about state registration.  We have an instruction about applications and supplemental registration.  Anything I have isn't quite complete.  So I'm going to work on something that I'll let you know about tomorrow, just to make sure that everybody is on the same page with that instruction.  It's going to be very similar.  I assume registrations, applications go to the Department of State.

MR. NEISER:  They do.

THE COURT:  So I'll reference the Department of State, and it will be almost identical to the instruction I have prepared for those other things.  So I'll make sure everybody is comfortable with knowing what I'm going to say in advance.

MR. NEISER:  Sure.

THE COURT:  We'll do that just before the trial starts tomorrow.

I want to talk just for a moment about timing because, as everybody knows, we do have a certain amount of hours

allotted.  We're well under that number.

Mr. Neiser, I'm not sure where you are at last count. Hey, someone knows that.

THE CLERK:  Not including the DeLuca deposition, which we have to talk about dividing, the POM Parties are at --

THE COURT:  We'll give you an approximate.

THE CLERK:  You have 18 hours and 23 minutes left.

MR. ZEGARELLI:  So we're not --

MR. NEISER:  I think we're okay.

MR. ZEGARELLI:  Yeah, we are --

THE CLERK:  You have 20 hours and 20 minutes.

MR. ZEGARELLI:  So we're not even --

THE COURT:  Okay.  My only concern I wanted to raise is that, of course, since we are bifurcated, we need to have enough time for you to close, instructions, jury deliberation, and then moving to the second phase.  So I want to keep an eye on that because we did make a commitment to them about February 28th.

I will tell you -- and I'm not telling the jury this -- that if we had to bleed over, I can do that.  But to the extent we can keep our promise to the jury, I want to be able to do that.

So please just be thinking about, while, you know, you have a lot of time left, we certainly want to try and get to the point that, you know, we're going to have sufficient time

through the 28th.

MR. ZEGARELLI:  I think we have plenty of time. Although my expert is -- based on that whole tick-tock thing, my expert is trying to lock me into a day.  And, I mean, from a conservative perspective, it may be Friday, because you're not available, if I understand, Thursday.

THE COURT:  Unfortunately not.

MR. ZEGARELLI:  So that's Tuesday, Wednesday.

THE COURT:  Well, your expert would be on damages.  So that's part II.  Now, I don't think we can present him before we've done the liability phase.

MR. ZEGARELLI:  Certainly.  So I think that, even if Friday -- so if he finishes tomorrow, I don't have that many witnesses either on my side.

THE COURT:  You've done a lot of them already.

MR. ZEGARELLI:  Right.  Mr. Unis -- Messrs. Unis. I've got a couple of third parties, which are, I think, going to be reasonably quick, too.  So, from my end, I mean, I don't know if we would finish Friday.  But it's very likely we would finish on Tuesday.

THE COURT:  Perfect.

MR. ZEGARELLI:  So if the jury left on Tuesday, let's say afternoon --

MR. NEISER:  Are you talking about the 21st?

THE COURT:  Yeah, that's Tuesday.

MR. NEISER:  I want to make sure.  I just want to make sure.

MR. ZEGARELLI:  Okay.  Let's say we push it, and they go out on the Wednesday, come back on the Wednesday, Thursday.  So I still -- maybe I tell my expert Friday.  And if something goes awry, you know, first of all, if we're not successful where we need our expert for some reason, that's one thing.  But if -- I think that -- because if I tell my expert to come in on Wednesday, I think that's probably too tight.

THE COURT:  I think so.  I think so.  Just because, you know, we're going to have to have a charging conference.  We'll try and get our instructions to you as soon as we can so that you can start looking at them, and depending on when we're done, you know, we'll get that done even if we have to send the jury home that day that so we have enough time to do that.

I just want to make sure I'm giving you the time that you need and we're giving the jury sort of a good schedule.  I did not receive a call from another judge, just so you know.  I know that you --

MR. ZEGARELLI:  He's starting to work it out -- I think he started -- then he started -- I did tell him.  I said, you know, the judge made an accommodation already.  Don't mess with it.

THE COURT:  No, no.  I'm happy to work with him and you as much as we can.  I think it's always tricky for witnesses

who are supposed to be at two places at the same time.

MR. ZEGARELLI:  He's sort of pressing me to be clear next week or give him, and -- so I think what I'm going to say is, because what he would probably do is fly in on Thursday, I would think.

THE COURT:  Okay.

MR. ZEGARELLI:  And that seems to be a reasonably good schedule.

THE COURT:  Will each of you give me your preliminary sense of, in phase II, assuming everything's going into phase II, approximate time, how much time are you going to need?

MR. NEISER:  A day.  Maybe a day and a half, at the very most.

THE COURT:  Okay.

MR. ZEGARELLI:  For?

MR. NEISER:  For anything.

THE COURT:  Damages.

MR. NEISER:  Let's see, if we win, I don't have a damages cal -- I have punitives, that's it.  So if I win, it's an hour.  You know, I don't even need to put a witness up.  We just --

THE COURT:  Breach of contract damages?

MR. NEISER:  We can do that with -- I mean, I can put a witness -- well, I'm saying, all in, it's -- actually, I could do it all within an hour, either way.

THE COURT: Okay. And then you would have Mr. Krieger on rebuttal after Mr. Anderson testified.

MR. NEISER: Yeah, if he goes, sure.

THE COURT: I'm assuming everything goes through.

Give me your sense, Mr. Zegarelli. You'll have Mr. Anderson.

Are you going to have any of your witnesses talk about damages other than your expert? It's fine if you do. I'm just trying to get a timing sense.

MR. ZEGARELLI: I think, from a timing sense, Your Honor, most of our damages would be wrapped up into Mr. Anderson.

THE COURT: Okay.

MR. NEISER: And if we needed to come after Mr. Anderson in rebuttal, we'd have Mr. Krieger, I'd probably have Mr. Jones, and I'd probably have Mr. Miele. And they have to address the expenses and the cost and those types of things.

THE COURT: Okay.

MR. NEISER: And that relates to a lot of different damages from his report.

THE COURT: Okay.

MR. NEISER: But if we were affirmative, we win, they don't win, I need an hour.

If they win, I'm going to need a day and a half in response.

THE COURT:  Okay.  I just wanted to get a general sense so we know where we're headed.  Off the record for a moment.

MR. NEISER:  Because Mr. Jones will be discussing the financials and the breach of contract, we still need a call from the judge on the invoices that we provided.

THE COURT:  Remind me.

MR. NEISER:  Yes, Your Honor.  There were five invoices that we provided.  We filed a motion for leave to amend existing Exhibit 140, which is a defense exhibit.  And that's a statement from Pace-O-Matic to the Unises in the amount of 40,000 -- $47,000 and change.

The underlying invoices we originally had thought were part of that, they weren't.  And I -- to be in all candor to the Court, they were not produced in discovery.  I believe they were sent to Mr. Unis, but not produced.  I have no Bates number on them.  So because it's a late production, it is only offered to support the $47,000 statement that PSG already has put on.  So I'm offering it for its completeness.

MR. ZEGARELLI:  I have to talk to my client about it.

THE COURT:  All right.  Then, can you two communicate about that --

MR. NEISER:  Happy to.

THE COURT:  -- before we get together tomorrow?

MR. NEISER:  Sure.

THE COURT: Because I want to make sure you know whatever my ruling is before you put him up.

MR. NEISER: Sure. He can testify from the statement. I mean, he can testify. We have a statement in that amount and he can -- we'll verbally talk about it.

THE COURT: Okay.

MR. NEISER: Then, number two, the compliance reports. We have dueling redactions. And if the Court had ruled and I just didn't catch it, I apologize, but I'm not quite sure we've resolved that issue. And those are the -- they were ones -- we brought the black redactions, Mr. Zegarelli proposed white ones, and I don't know that we have a final ruling on that one.

THE COURT: I believe, certainly, the darker redactions, I indicated, were fine.

MR. NEISER: Yes.

THE COURT: Are there words that are still out there?

MR. NEISER: I don't think so. I mean, we submitted --

THE COURT: Is it dark versus light?

MR. NEISER: I think Mr. Zegarelli had a more fundamental objection to it.

MR. ZEGARELLI: Right. I feel that they're inherently prejudicial just by form. I do think there is still some punitive words or impugning words. Violation, I think I saw in some of them still. So -- but I don't want to get caught in

the -- you know, I just don't -- the form itself is --

MR. NEISER:  Can I make a compromise, suggestion?

THE COURT:  Of course.

MR. NEISER:  What if we don't use them at all, with the understanding that Mr. Goodling can testify as to his recollection.  I mean, these are true business records.  I mean, they are kept in the ordinary course.  He would be a custodian. I can satisfy all the 8036 requirements.

Now that we're in the trial and things have come in, I don't really have an interest in belaboring this.  So we have misbranding issue and misbranding only.  You know, I'll take a look this evening, and perhaps we can just go off of the photographs that are attached.

MR. ZEGARELLI:  Well, at least that eliminates quite a bit of my objection.

THE COURT:  Yeah.  Why don't you look at that.  We'll talk about it in the morning.  You can make an offer of proof as to what he would say, if Mr. Zegarelli would like you to.  And if we don't need to get into the compliance reports, great. Otherwise, would you bring your competing versions -- I probably have them but just --

MR. NEISER:  No, I'll bring them, Judge.

THE COURT:  So that I can see what language might still be offensive language or objectionable language, and we can deal with that as necessary.

MR. NEISER:  Not to be rude, Your Honor.  If I don't do this now, you know what I'm going to do:  I'm going to forget.

THE COURT:  Off the record.

MR. ZEGARELLI:  I understand that the black shows the redaction, distinguished from -- you can't see it effectively.  But I thought the jury, to the extent you're redacting, they don't necessarily -- do they necessarily know there's -- need to know there's a redaction?  And I'm not sure I know the answer to that.

MR. NEISER:  I think I can avoid the entire shebang --

THE COURT:  Okay.

MR. NEISER:  -- as a term of art.

THE COURT:  All right.  Those were your issues.

MR. NEISER:  Those were my only issues, Your Honor.

THE COURT:  Are there any issues you wanted to raise?

MR. ZEGARELLI:  No, Your Honor, I think --

THE COURT:  There's one thing I wanted to mention, and I may have misled you when you were showing the three numbered invoices to Mr. Miele, and that was I asked you if that was Exhibit 275.  It is not Exhibit 275, as I started looking at it.  So --

MR. ZEGARELLI:  You are right.  It's a subset, which I actually didn't catch myself.  Those invoices are in -- are still in 275.  If that's material --

MR. NEISER:  A.J. couldn't find them either.  So that's why -- I'm glad you mentioned this.

THE COURT:  Let me mention that if you look back at your exhibit list -- and I didn't have time to verify this -- those invoices may be somewhere else in your exhibit list.  And if you want to correct the record, we can do it in chambers.  I don't think we have to do it in front of the jury.  If you want those exhibits in, I don't think there was any objection to them being in.  But let's make sure we know which ones they are.  If they're part of that, that's fine.  I'm not sure they are.  So we can all check on that.  And we can put something on the record tomorrow.

MR. ZEGARELLI:  Thank you, Your Honor.

THE COURT:  Okay.  All right.  I always hate to bring you in early if there's no reason for it, but we do have a couple of things to talk about.  So do we think we can talk about everything in 15, 20 minutes tomorrow?

MR. NEISER:  Yes, Your Honor.

MR. ZEGARELLI:  You know, Your Honor, I could do it either way.  I'm going to probably be here at your service, whether we do 8:00 or 8:30.  So I'm good either way.

MR. NEISER:  I defer to everybody.

THE COURT:  Well, it doesn't sound like there's a significant amount of things that we have to go over.  If you learn that the compliance reports, you are going to want to put

those in and we have to look at redactions, I would suggest you just show up earlier, but we'll let Sharon know because, at some point, we can look at it all -- you can come in at 8:30.  We can look at the -- at least look at the reports and make a determination about it.  If you don't need to come in early, it's fine, I'll just see you at 8:30.  Because I think, otherwise, the things we have to talk about are insignificant in the whole scheme of things in terms of time, at least.

MR. ZEGARELLI:  Okay.

THE COURT:  Okay?  All right.  Gentlemen, thank you.  See you tomorrow.

(Proceedings concluded at 4:48 p.m.)

- - -

**I N D E X**

**PLAINTIFF  WITNESSES:**                                          **Page**

**Chris O'Bier**

   Direct Examination Continued By Mr. Neiser          39
   Cross-Examination By Mr. Zegarelli                  41
**Daniel Warren**
   Direct Examination By Mr. Neiser                    43
   Cross-Examination By Mr. Zegarelli                  84
**Louis Mieli**
   Direct Examination By Mr. Neiser                   100
   Cross-Examination By Mr. Zegarelli                 170
   Redirect Examination By Mr. Neiser                 203
**Deposition of Wayne V. Deluca, July 10, 2020**
**(Read-in)**
   Direct Examination By Mr. Neiser                   208
**Deposition of Wayne V. Deluca, May 24, 2021**
**(Read-in)**
   Direct Examination By Mr. Zegarelli                243
   Cross-Examination By Mr. Neiser                    250

C E R T I F I C A T E


        I, SHARON SIATKOWSKI, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

s/Sharon Siatkowski
SHARON SIATKOWSKI, RMR, CRR, CBC, CRI
Official Court Reporter