IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF PENNSYLVANIA


        POM of PENNSYLVANIA, LLC,
        et al.,

                        Plaintiffs,    Civil Action No. 18-722
              vs.

        PENNSYLVANIA SKILL GAMES,
        LLC,

                        Defendant.

                              - - -


        Transcript of Jury Trial on February 16, 2023, United
        States District Court, Pittsburgh, Pennsylvania,
        BEFORE:  Judge Patricia L. Dodge, Magistrate Judge.


        APPEARANCES:

     For the Plaintiffs:       Julian E. Neiser: Esquire
                               Jonathan Deasy, Esquire
                               SPILMAN, THOMAS & BATTLE, PLLC
                               301 Grant Street
                               Suite 3440
                               One Oxford Centre
                               Pittsburgh, Pennsylvania 15219

     For the Defendant:        Gregg R. Zegarelli, Esquire
                               Technology & Entrepreneurial Ventures
                               Law Group
                               2585 Washington Road, Suite 134
                               Summerfield Commons Office Park
                               Pittsburgh, Pennsylvania 15241

     Court Reporter:           Sharon Siatkowski, RMR, CRR, CBC, CRI
                               700 Grant Street, Ste. 6260
                               Pittsburgh, Pennsylvania 15219


Proceedings recorded by mechanical stenography;
transcript produced by computer-aided transcription.

P R O C E E D I N G S

- - -

(Whereupon, the following discussion was held in chambers.)

THE COURT:  One of the things that we talked about yesterday was the compliance reports.  Have you resolved that issue?

MR. NEISER:  We haven't, Your Honor.

THE COURT:  Didn't I ask you to let us know earlier if you had not?

MR. NEISER:  You may have, Judge.  I'm sorry.

THE COURT:  So what's the issue?

MR. NEISER:  Nothing.  We are just going to use -- we're just going to propose having the compliance reports that we had provided in the redactions.

THE COURT:  I need to see the comparison between the two.  I think there were different redactions that Mr. Zegarelli --

MR. NEISER:  We only received one, Your Honor.  That's all.

MR. ZEGARELLI:  At this point, Your Honor --

MR. NEISER:  Let me propose -- that's my fault.  I'm going to take responsibility for it.  You know, Judge, now I remember.  I thought it was something for he and I to resolve. That doesn't matter.

Here's what I'll propose. Instead of using reports, if I can let the witness use the photographs from them, the only thing I would ask is if he could use the compliance reports to read from if he needs to refresh his recollection. That's it.

THE COURT: You can show it to him if he needs to refresh his recollection. I'm not trying to keep you from using them. I just want to make best use of our time. If the jury has to wait, if you want to use them, that's what we'll do. I just had wanted to resolve that a little bit earlier.

MR. NEISER: You're 100 percent right, Your Honor. That was an omission by me. I'm sorry. So what we'll do is we'll propose to use the photographs only.

THE COURT: That were already in evidence?

MR. NEISER: They're actually in the compliance reports themselves. And I can -- I can separate them and drop them off -- actually, these are components of what we had before that was gone through with Mr. O'Bier. I can separate all of the photographs from the compliance reports, and we can use them as a separate exhibit. We'll remove the reports entirely.

THE COURT: Okay. I assume that is already an exhibit. It's just using portions of the exhibit instead of all of it.

MR. NEISER: It is portions of the compliance report exhibits that we have produced and we had identified. What I need to do now is --- they're not in evidence.

THE COURT:  No, I know.  But it's an exhibit that's been identified in the exhibit list.

MR. NEISER:  Yes, Your Honor.

THE COURT:  Again, you can use them subject to objection if you want to talk about it.  I don't want to -- you to feel at all constrained to use the evidence that you think you need to use.  My comment was simply because this may take a little bit more time than we had allotted this morning.

MR. NEISER:  Sure.  I apologize, Judge.  I'm sorry.

THE COURT:  That's all right.

MR. ZEGARELLI:  They're all -- the pictures are Bate -- Bate-numbered.

MR. NEISER:  Oh, yeah.  Everything's been produced.

MR. ZEGARELLI:  If you want to make it just the pictures and the subexhibit or just an exhibit -- like a group exhibit of the pictures.  It's --

MR. NEISER:  That's fine.  We'll figure it out.

MR. ZEGARELLI:  All right.

THE COURT:  Are you sure?

MR. NEISER:  I'm sure, Judge.

THE COURT:  Okay.

MR. NEISER:  I take accountability if I do something like this.

THE COURT:  It's just the time issue.  It's not a dispositive issue.  So I just want to make sure that you're

comfortable proceeding that way.

MR. NEISER:  I'd rather use them.  I don't want to take up any additional time.  So my preference is to use them, but as a compromise, I'm willing to just use the photographs.  I think it will be fine.

THE COURT:  All right.

MR. NEISER:  I'll make it simple.  We'll use the photographs only.

THE COURT:  All right.  You may certainly, if the witness does not recall something, certainly provide him with a copy if he needs to refresh his recollection.

MR. NEISER:  Understood.  Thank you.

THE COURT:  Mr. Zegarelli, I wanted to ask you, I know that you have some deposition designations.  Are you still planning on reading some or all of those in?  Because if so, I know there were some objections to that that we haven't addressed yet.

MR. ZEGARELLI:  Yes, Your Honor.  If I may, we do have, though, in light of the time, a more pressing issue with regard to today's testimony and, I think, invoices that Mr. Neiser wants to introduce, I think, today.

And -- not to do it in any other order than you wanted, Your Honor --

THE COURT:  No.  That's all right.

MR. ZEGARELLI:  I have an objection to these invoices

being introduced, and I think it's your first witness, is it not?

MR. NEISER:  No.  Actually I'm going to get the third-party operators out of the way as soon as I can because they're waiting here.  You asked me to bring you a copy of these this morning.

THE COURT:  Thank you.  And this is Exhibit 140B.

MR. ZEGARELLI:  A and B.

MR. NEISER:  B.  Yes, Your Honor, that's correct.

MR. ZEGARELLI:  And 140 -- Your Honor, so --

MR. NEISER:  Is -- I'm sorry.  This is 140A, which was Mr. Zegarelli's Exhibit.  140B is what we are proposing.

MR. ZEGARELLI:  I don't recall that being my exhibit.

MR. NEISER:  Uh-huh.  Sure is.

MR. ZEGARELLI:  Then I would withdraw that exhibit.  I would definitely -- it's identified as my exhibit?

MR. NEISER:  Yeah.  Sure it is.

MR. ZEGARELLI:  Yeah, I'd have to withdraw that.  That's not Bates-numbered.  That's a statement.  It's not even an invoice.

MR. NEISER:  It was your exhibit.

MR. ZEGARELLI:  Well --

THE COURT:  What is your objection to Exhibit 140B?

MR. ZEGARELLI:  We never saw those, Your Honor.  In fact -- yeah, I -- I have to tell you, Your Honor, this document

is -- I would not use it, and in the course of identifications of invoices, this would have been a mistake.  Because this invoice, this statement, we don't even know what it is.  It's not Bates-numbered.  That came -- at the point that came in -- so I'm not going to use it definitely.

I mean, this invoice, Your Honor -- or statement, I should say -- so we never saw the invoices.  We don't know what that even relates to.  It's not Bates-stamped.  We had no ability to -- you know, and maybe there's a gotcha in the 200-some exhibits, but -- yeah, we don't even know what it's for.  We just -- until that was brought up, which was when?  I mean, last night, maybe?

MR. NEISER:  No, I gave it -- it was over a week ago.

THE COURT:  It was raised earlier than yesterday.

MR. NEISER:  And it was identified as a joint exhibit, his statement.  I was assuming he was going to use it because it's his exhibit.  It was identified as a joint exhibit, and that's why we offered those invoices for completeness.  So that's why.

MR. ZEGARELLI:  I have to say, that's a statement, and I probably just thought that it was one of the Pace -- it's not even a -- yeah.  I mean, I have to say, Your Honor, we don't -- first of all, we've never seen that.  We've never had a chance to cross-examine it or to, in fact, depose on it.  We don't even know what it's for.  And this, we don't even know what it's for.

MR. NEISER:  It's your exhibit.

MR. ZEGARELLI:  I know you keep saying that, Julian.

MR. NEISER:  I'm stating a simple fact.

MR. ZEGARELLI:  You're stating a simple fact.  I understand the simple fact.  But the point is that -- the date, in and of itself, is post-discovery when we never were provided that in a time period that we could have even discovered it, irrespective -- I mean, I understand you're trying to stick it to me, really.  But we don't know what that's from.  I mean, you keep saying it's a joint -- look.

THE COURT:  I'm assuming that it is identified as a joint exhibit.  And I see Ms. Hopkinson has the exhibit list in front of her, which she's going to hand to me.  Exhibit 140 is a joint exhibit.

What is the purpose -- thank you, Charlotte.  What is the purpose of these documents?

MR. NEISER:  Damages, breach of contract.

THE COURT:  So we're not putting them in until the second phase anyway; correct?

MR. NEISER:  I don't need to put them in until the second phase.

THE COURT:  So let's do that.

MR. NEISER:  Okay.  I can do that.

THE COURT:  And then we'll resolve the issue.  But it seems to me, if it is supportive, it's probably going to be

admissible, but I'm going to reserve ruling on that because all of the damages are bifurcated.

MR. NEISER:  No, I understand that, Your Honor.  Great point.  The purpose was simply to establish the existence of monetary damages.  That's all -- which is an essential element.

THE COURT:  Are both of these yours, Julian?

MR. NEISER:  Yes, ma'am.

THE COURT:  I want to make sure I give them back to you.

Thank you, Charlotte.

MR. ZEGARELLI:  Your Honor, with regard -- you raise a good point with regard to the bifurcation.  There are a number of witnesses -- there are third parties that are appearing today on Mr. Neiser's case.  And the information that I might otherwise elicit from them, I would just recall them either on my case-in-chief or only for the damages portion.

So I just want to understand the protocol of questioning or not questioning the witnesses today subject to recall.  In other words, if I say, "No questions at this time" or "No questions," am I effectively saying I can't raise them on my case-in-chief?  In other words, can I just say, "No further questions" or "No questions," and it's not going to be a waiver, for example, later -- next -- tomorrow or next week, I would say?

THE COURT:  No.  If they're still under subpoena and

you prefer to put them in in your case, you can do that.

MR. ZEGARELLI:  Okay.  So with regard to the subpoena -- because, you know, I got some mixed information about the subpoena.  So on the first subpoena, we subpoenaed a number of witnesses to appear on the original trial date, which got rescheduled.  So we took the position that they're still under subpoena power.  The Court changed the date.  We didn't need to re-serve subpoenas.  And I think to some extent that sort of, as a practical matter, worked out.

So we have them subpoenaed for this case being today.  We have them on call as a practical matter.  I've told them all, you may testify when Mr. Neiser calls you.  I may recall you; I may not.

So on that point, if -- they would still be under subpoena for this case, even though they remain on call for this case, subpoenaed to --

THE COURT:  Who subpoenaed them?  Both of you?

MR. ZEGARELLI:  Both.

MR. NEISER:  We did.  Both did.

THE COURT:  Okay.  So they're here.  You can certainly advise them out of court that they may be recalled.

MR. ZEGARELLI:  Okay.  But they are subject to the subpoena, continued subject to the subpoena.

THE COURT:  As far as I am concerned, they are.  If you have subpoenaed them, and Mr. Neiser subpoenaed them,

Mr. Neiser is now calling them.

MR. ZEGARELLI:  Thank you.

THE COURT:  But I would clarify certainly with them today or hereafter that you may be recalling them.

MR. ZEGARELLI:  Yes, Your Honor.  And then if -- when you ask me if I have questions or further questions, I'll simply say "subject to recall."  And they remain subject to the subpoena and on call.  I suppose I would just put that into the record.

THE COURT:  If you want to do that, you can say anything you want about it.

MR. ZEGARELLI:  Thank you, Your Honor.

THE COURT:  All right.  What else, if anything, did we want to go over today?

Mr. Neiser, I think you're now calling your third-party subpoenaed folks first.

MR. NEISER:  As many of them as I can, to get them in and out.

THE COURT:  And are Mr. Mayle -- is that one of the depositions?

MR. NEISER:  Yes, ma'am.

THE COURT:  And are you going to be reading that in?

MR. NEISER:  Yes, ma'am.

THE COURT:  Okay.

MR. NEISER:  Additionally, on the video, 30(b)(6)

designations of volumes I of both Albert Unis III and Albert Unis IV, we'll be playing those designations today.

THE COURT:  All right.

MR. NEISER:  The anticipated time is approximately 38 minutes.

THE COURT:  All right.  Could you be a little more precise?

MR. NEISER:  I actually tried to.  Give me a few minutes and we'll get down to the second.

THE COURT:  Okay.  Is Mr. Mayle a video also?

MR. NEISER:  No, ma'am.

THE COURT:  So Mr. Deasy is also going to be reading those in?

MR. NEISER:  He is.

THE COURT:  That in?  Okay.  Got it.

MR. NEISER:  He is.

THE COURT:  So we'll do the third parties.  Then we're going to have some designations or -- it doesn't matter the order.  I'm just curious.

MR. NEISER:  No, I can lay it all out, Your Honor. And it will all be contingent upon the third parties because I don't want to inconvenience them.  So as soon as I can get them in and out, I am going to do that.  If one is not here, then we will use the video clips or the Mayle, or I have Dan Jones, who is the chief financial officer for very brief testimony.

We'll have Gregory Cline for very, very brief testimony and Rick Goodling for very, very brief testimony.

THE COURT:  And he's the compliance person?

MR. NEISER:  He is indeed, Your Honor.  He also was the state trooper involved in the controlled pickup.

THE COURT:  Okay.

MR. NEISER:  With that -- in that regard, Your Honor, just to save some time in front of the jury -- I'm keeping an eye, it's quarter to 9:00 -- the trademark applications and registrations themselves, we had that discussion yesterday about the state versus the federal, I can introduce all of those. There's six applications, and then we have the returned applications.  We have the ones we submitted that had color art. So it's a better exhibit.  And then we have the return ones which are stamped from the Commonwealth of Pennsylvania.

So I have, I think, something like ten documents that are -- those.

I would ask that the Court admit those under 201.  I did not do a 902 certification or anything like that, but they have been stamped as certified and came back.  It's readily available public information that they've been received.  There is no adjudication on a state trademark.  You file it, and that's it.  So just to save some time, I'd ask it.  If not, I can do the proffer, it doesn't matter.

THE COURT:  Is there any objection to those being

admitted without a witness, which is, I assume, what you're asking?

MR. NEISER:  Yes.  I mean, Mr. Cline can testify to them.  I mean, it was -- there's not really much to tell.  They are what they are when they were submitted.

MR. ZEGARELLI:  To save time, Your Honor -- and, Julian, you're talking about the -- the ones that would be admitted would be the actual time stamp-filed ones?

MR. NEISER:  I wanted to use both because one has color artwork.  But they're both pretty much the same.  One is black and white, and one is color.  When the state sends them back, they're black and white.  It's a better-looking exhibit.

MR. ZEGARELLI:  I'm not going to make you go through the blank screen ten times --

MR. NEISER:  Thank you.

MR. ZEGARELLI:  -- to -- to do your thing before you show it to the jury.  That's fine.  And, of course, I expect I can do the same on the federal one.

MR. NEISER:  Absolutely.

MR. ZEGARELLI:  So that's fine, Your Honor.

THE COURT:  Are you intending to just introduce them or introduce them through a witness?

MR. NEISER:  I can introduce them through a witness. I just wanted to avoid the authentication rigmarole for 12 identical documents.

THE COURT: You will have the same extended to you, Mr. Zegarelli.

MR. ZEGARELLI: Thank you. To move that forward, do we have a timing because yesterday was sort of maybe the guys will show up, maybe they won't show up, we don't know.

So are we looking at you finishing your case-in-chief sometime still midafternoon, depending on time of cross?

MR. NEISER: Good Lord willing, if the river don't rise. That's my full intention, I'm going to be done at 2:00 if I can, depending on the lunch break and everything else that goes with it.

MR. ZEGARELLI: And at least as of now, we would have Mr. Rodgers this afternoon; he's sort of on call. So I think I can get that managed if, you know, to fill in some backend of time. I didn't want to start either of the Unises today because I just didn't want to break up their testimony in that way.

MR. NEISER: Sure, sure.

MR. ZEGARELLI: So it would be -- I did try to call Ms. Kendrew, she couldn't -- actually she can't do it today or tomorrow based on some custody constraints. So I suppose I would have to put her up Tuesday. But I'm not thinking -- I would think the Unises would take a day, I would think.

MR. NEISER: Okay. Well, thanks for letting me -- I did appreciate that. Thank you for letting me know. I know it's a lot of moving parts. So thank you.

THE COURT: So keep Mr. Rodgers attuned as we see how the day goes. So if at lunch time you still feel you're going to be done, let's make sure Mr. Rodgers knows he needs to be here this afternoon.

MR. ZEGARELLI: Okay.

THE COURT: All right. Anything else?

MR. NEISER: Just so I can have associates working in the background, if I can, has there been a decision on Mr. Harris yet?

MR. ZEGARELLI: In fact, last time I talked to Mr. Unis III, I understood that Mr. Harris could come up to testify. I have not talk to him since -- you know, I've lost track of time of it -- but since Monday actually when he was here.

MR. NEISER: Okay.

MR. ZEGARELLI: So I will follow up with him and see if that's been somehow solidified, because, in fact, I think he will be able to show, or at least that was the -- if not, so that leaves you with -- do you have to put him up now or would you wait on a designation?

MR. NEISER: Wait on a designation. It would be in rebuttal.

MR. ZEGARELLI: Okay.

MR. NEISER: And we'd submit a motion for leave, if need be, to designate his testimony.

THE COURT: All right. And do you have a copy of the transcript of Mr. Mayle that I can follow along with in terms of what has been designated?

MR. NEISER: Oh, absolutely, Your Honor. I'm sorry. I thought we -- we will do that.

THE COURT: I have a copy. I just -- I'm not sure I have one that's highlighted. I can probably follow along otherwise if that's going to be an issue.

MR. NEISER: No, it's not going to be an issue. We already provided designated pages to Sharon for her comfort and use, and we'll provide the same to the Court.

THE COURT: Perfect.

MR. NEISER: I think we were trying to limit email traffic to the Court because there were a lot of things going back and forth.

THE COURT: I appreciate that. And you can get that to me at some point before you are going to read that in -- which doesn't sound like it's first thing anyway.

MR. NEISER: No, Your Honor. We'll get it taken care of immediately, though.

THE COURT: Anything else?

MR. ZEGARELLI: No, Your Honor.

THE COURT: We'll see you in a few minutes.

(Whereupon, in chambers session ended.)

(Pause as the jury enters courtroom.)

THE COURT:  Good morning, ladies and gentlemen.  I hope you had a nice evening.

Good morning, counsel.

Mr. Neiser, are you prepared to proceed?

MR. NEISER:  We are, Your Honor.  We call Rick Bigrigg.

THE COURT:  All right.  Let's get Mr. Bigrigg in the courtroom.

Good morning, sir.  Please step forward to be sworn.

THE CLERK:  Please raise your right hand.

RICHARD BIGRIGG, a witness herein, having been first duly sworn, was examined and testified as follows:

THE CLERK:  Please take a seat.

THE COURT:  Mr. Bigrigg, you can feel free to pull that microphone close to you so you can speak into that.

THE WITNESS:  Can you hear me?

THE COURT:  Yes, we can.

DIRECT EXAMINATION

BY MR. NEISER:

Q.  We can, indeed.  Good morning.

A.  Good morning.

Q.  How are you doing today?

A.  Not bad.

Q.  Introduce yourself.

A.  My name is Rick or Richard Bigrigg, B-I-G-R-I-G-G,

just like big truck.

Q.   Understood.  So, Mr. Bigrigg, where do you live?

A.   Brighton Township.

Q.   Okay.  And what do you do for a living?

A.   I am -- I work vending, which is -- the amusement end of vending, which is pool tables, jukeboxes, skill games.

Q.   Understood.  Do you have a company?

A.   Yes.  It's called GMR Games, LLC.

Q.   Okay.  And for how long have you been in business?

A.   The company, GMR Games, has been around for about -- about seven years.

Q.   Okay.  How long have you been in business yourself?

A.   With amusements, probably since '81.  But at a very small scale back then.

Q.   Understood.  And it's grown to be how big?

A.   Not much bigger than where we were.

Q.   Okay.  How many employees do you have?

A.   Just myself.

Q.   Understood.  And how many locations do you serve?

A.   About 20.

Q.   Understood.  And where are those locations?

A.   Throughout Beaver County.

Q.   Understood.  So you're familiar with the Beaver County market?

A.   Yeah, I am.

Q.    And you've been familiar with the Beaver County market for a long time?

A.    Sure.

Q.    Understood.  You mentioned skill games.

A.    Yes.

Q.    Do you have any electronic skill games by Pace-O-Matic?

A.    Yes, that's the only kind that we have.

Q.    The only kind you have?

A.    Yes.

Q.    Okay.  Had you ever heard of a company called Pennsylvania Skill Games, LLC?

A.    Not prior to this.

Q.    You mean this lawsuit?

A.    Yes, since the questioning of that.

Q.    Understood.  And you were deposed in this case?

A.    I'm sorry?

Q.    You had a deposition in this case.  That's when you found out about them?

A.    Yes.

Q.    Understood.  How did you first hear about Pace-O-Matic?

A.    We received a flyer which we -- once the Pennsylvania Skill Games became legal, I received a flyer.  Didn't think much of it, the legality of it.  You get those kind of flyers.  And

then one of our customers asked for the game, which made us look into it, and called the number on the flyer and talked to Miele.

Q.   You're saying the flyer directed you to Miele Manufacturing?

A.   Yes.

Q.   Okay.

A.   The best of my recollection.  I mean, this is seven years ago.

Q.   No, I understand.

A.   And very -- not worthy of remembering that accurately.

Q.   No, I understand.  I just want to make sure that the fact that you responded to one of the Pace's advertisements was --

A.   Oh, yeah.  That's definite.

Q.   Okay.  And when did you first start buying Pace games?

A.   Whenever they kind of -- shortly after they became -- found to be legal.

Q.   Okay.

A.   Or passing a court case, whatever you would like to --

Q.   Understood.  Had you ever heard -- here.

MR. NEISER:  A.J., let's put up Exhibit 204, which has been admitted into evidence.

BY MR. NEISER:

Q.   Have you ever seen this before?

A.   Yes.

Q.    Is there a company or companies that you associate that brand with?

A.    Absolutely.

Q.    Who?

A.    Miele Manufacturing.

Q.    Thank you.

A.    Pace-O-Matic, I guess is -- we never knew how to differentiate the businesses, but the one was -- Miele is the one we most relate to.

Q.    Thank you, sir.  Had you ever heard of Albert Unis III or IV before this lawsuit?

A.    Yeah, he's always probably been a competitor in the vending amusement business.  Not much.

Q.    Had you ever heard of them using -- when I say "them," I mean Albert Unis III or IV -- using the name "Pennsylvania Skill Games" or "Pennsylvania Skill"?

A.    No.

MR. NEISER:  No further questions, Your Honor.

THE COURT:  Thank you, Mr. Neiser.

Would you like to cross-examine?

MR. ZEGARELLI:  I would just a few at this time, Your Honor.

CROSS-EXAMINATION

BY MR. ZEGARELLI:

Q.    Good morning, Mr. Bigrigg.

A.   Good morning.

Q.   Mr. Bigrigg, I think you testified you had 20 locations?

A.   Yeah, yes.

Q.   And those locations are in Beaver County?

A.   Yes.

Q.   And those locations, how many games in those 20 locations?

A.   Can you be a little more specific?  Like, you're talking pinballs, jukeboxes?

Q.   Good clarification.  How many of the Pace-O-Matic games in those 20 locations?

A.   Probably about 60.  It wouldn't be -- whenever I was asked the question how many locations do we have, not all of our locations have Pennsylvania Skill Games.

Q.   Okay.

A.   So out of that would be 17 or so.

Q.   Okay.  And I think you testified that a customer had contacted you about the Pace-O-Matic game?

A.   Yes.

Q.   Okay.  And that was some time -- when was that, if you can identify --

A.   At the beginning of this -- of our getting the machines, whenever they were found to be legal or had passed the court case.  However you guys want me to say that.

Q.   Okay.

MR. ZEGARELLI:  Your Honor, no further questions at this time, subject to a reservation of rights for PSG's case-in-chief and/or the damage phase of the case.

THE COURT:  Thank you, Mr. Zegarelli.

Mr. Bigrigg, thank you for your testimony here today. You're excused.

(Witness excused.)

MR. NEISER:  Your Honor, we call Gene Gulotta.

THE COURT:  Let's bring in Mr. Gulotta.

Mr. Gulotta, you can come up here to be sworn, if you world.

THE CLERK:  Sir, please raise your right hand.

GENE GULOTTA, a witness herein, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. NEISER:

Q.   Good morning, Mr. Gulotta.  How are you?

A.   Good morning.  Fine, thank you.

Q.   Could you state and spell your name, please?

A.   Sure.  Gene Gulotta, G-U-L-O-T-T-A.

Q.   Okay.  What do you do for a living, Mr. Gulotta?

A.   I'm part owner of a company called GMR Games, LLC.

Q.   And what is your role with that company?

A.   Strictly administrative.  My functions are just

administrative.

Q.    Understood.  How long -- have you ever been a skill game operator or a gaming operator?

A.    In the past seven years we have, yes.

Q.    Understood.  What did you do before then?

A.    I owned a company called Tri-State Vending and Sales, which was a music and amusement company, since 1981.

Q.    Where did Tri-State primarily operate?

A.    In Beaver County principally.  I mean, we had a couple of locations in Pittsburgh but simply Beaver County.

Q.    How many locations did you have in Beaver County?

A.    At that time, probably 25.

Q.    Okay.  Did that grow?

A.    It pretty much stayed the same.

Q.    Understood.  Out of curiosity, what goes into developing a location?

A.    As far as -- you mean developing a location or installing a location?

Q.    Both.  Tell us both.

A.    Okay.  You have to offer quality equipment to a customer.  Service has to be very good.  Things happen on Friday and Saturday night and their jukebox goes out and you have to be there.  That's pretty much what it took.  And we were local.  We had that going for us.  And I'm a Vietnam veteran with combat time, so we had a lot of the clubs.  We had American Legion

clubs and so on.  So that's pretty much how I developed that route.

Q.  First, thank you for your service, sir.

A.  It was an honor.

Q.  So do you have any location -- here, what is the oldest relationship you have with a location?

A.  35 years.

Q.  So would that be fair to say that you continued to serve that location over more than three decades?

A.  Yes.

Q.  What happened at Tri-State Vending?

A.  It wasn't really doing that well, and I wasn't able to operate it like I should have in that I couldn't go out -- all of those nights that they would have service calls.  I started getting to where I couldn't do them.  So I contributed some assets, Rick contributed his cash to the business, and we formed GMR probably seven to eight years ago, maybe.

Q.  Understood.  Are you familiar with the Pace-O-Matic machines?

A.  I'm familiar with the name Pace-O-Matic.  Not necessarily the machine.

Q.  Understood.  Are you familiar with a brand called Pennsylvania Skill?

A.  Not per se.  I mean, to me it's a skill game.  We're in Pennsylvania, so it's a Pennsylvania skill game.

Q.    Understood.  Sir, have you ever heard of Albert Unis III?

A.    I've heard of Unis, the name Unis.  I would run across that probably in the '90s when I would solicit locations.  It was common to say, "Who is your vendor now?"  And they would say, "We have Unis."  So that's the extent of my hearing of Unis.

Q.    Okay.  Had you heard of a company called Pennsylvania Skill Games, LLC?

A.    No.

MR. NEISER:  No further questions.

THE COURT:  Thank you, Mr. Neiser.

Mr. Zegarelli, do you have any cross-examination?

CROSS-EXAMINATION

BY MR. ZEGARELLI:

Q.    Good morning, Mr. Gulotta.

A.    Good morning.

Q.    Mr. Gulotta, your warehouse is in Beaver County, isn't it?

A.    That's correct.

Q.    And I think you testified to 25 locations there in Beaver County as well?

A.    No.  Currently with GMR, we probably have more like 17 or 18 locations.  I was referring to Tri-State Vending when it existed with 25 locations.

Q.    Okay.  And how many locations are you aware of now?

A.    17.

Q.    And of the 17 locations, how many games would that represent?  How many Pace-O-Matic games?

A.    I have no idea.

Q.    And for these 17 locations you testified to, your -- strike that.

MR. ZEGARELLI:  No further questions at this time. I'd like to reserve rights on PSG, Pennsylvania Skill Games' case-in-chief liability phase and advise Mr. Gulotta is still under subpoena.

THE COURT:  Thank you, Mr. Zegarelli.

Mr. Gulotta, thank you for your testimony here today.

THE WITNESS:  You're welcome.

THE COURT:  You're excused.

(Witness excused.)

MR. NEISER:  Your Honor, we call Brent Mayes.

THE COURT:  Let's have Mr. Mayes brought in.

THE CLERK:  Sir, please raise your right hand.

BRENT MAYES, a witness herein, having been first duly sworn, was examined and testified as follows:

MR. ZEGARELLI:  Your Honor, may I ask for one second to tell Mr. Bigrigg that he is still under subpoena?  I omitted to say it.  It should be implied.

THE COURT:  Yes.

MR. NEISER:  I'll take one second, Your Honor, since we have a gap.

May I proceed, Your Honor?

THE COURT:  You may.

DIRECT EXAMINATION

BY MR. NEISER:

Q.  Sir, introduce yourself to the Court and jury.

A.  My name is Brent Mayes.

Q.  How are you doing today?

A.  Okay.

Q.  Nothing better than getting subpoenaed to testify in trial, right?

A.  Just what I wanted for breakfast.

Q.  It's what's for breakfast.

Thank you for your time.  I'll be as brief as I can.

What do you do for a living?

A.  I own several companies:  Pro ATM, Venture Gaming, Convenience Storage, some real estate holding companies.  That's it.

Q.  Understood.  Have you ever purchased Pace-O-Matic games?

A.  Yes.

Q.  Do you own them anymore?

A.  No.

Q.  Overall, how many locations do you service in general?

A.    You mean ATMs?

Q.    Yes.

A.    A lot.  I don't have an exact number.  It's a lot.

Q.    More than a hundred?

A.    Probably more than a thousand.

Q.    Understand.  Got it.

When you were operating Pace games, can you recall how many locations you serviced?

A.    I divested in 2019, so it's been a while.  But I may have had less than a hundred locations, something like that.

Q.    Understood.

A.    Actually, it would have been less because I only had 120 games total, yeah.

Q.    Understood.  So can you tell us the time period when you had Pace games?

A.    As far as operating, I believe we installed our first one approximately January of 2017, and we exited the business in middle -- or June of 2019, and that was it.

Q.    Understood.  How did you find out about them?  Let me ask it more specifically.  How did you first learn about the Pace-O-Matic games?

A.    Other people in the business had inquired if I owned any and that I should look into it.  And so, again, I never paid much attention to it because, I mean, again, our ATM company was doing just fine.  But then we started to see them pop up in the

Western PA area.  So at that point I made inquiries and started -- we'll call it -- did some research into the matter and -- before making my decision.

Q.    Understood.  So you're saying you saw machines out in the marketplace, and that motivated you to take --

A.    It didn't motivate me.  I mean, when I first saw them, I was obviously highly skeptical of what I was seeing.

Q.    Sure.  Yeah.

A.    So after further pursuing the matter, you know, I was just -- someone said, you know, "Hey, Brent, reach out to Miele Manufacturing and get the facts."  And they provided some documentation about the games, court cases, and, you know, other materials related to the legality of the games before we actually made a decision.

Q.    Understood.  Here's what I'm trying to find out:  So would it be fair to say that you found out about the Pace games through word of mouth and seeing them out on the street?

A.    Yeah.  That was the only way I realized they existed.

Q.    Understood.  And that led you to contact Miele after your own research?

A.    Correct.

Q.    That's fair.  Thank you.

I'm going to show you a document in evidence as Exhibit 24 -- I'm sorry -- 204.  I apologize.  Do you see that?

A.    Yes.

Q.    Is there any company or companies you think of when you see that?

A.    Miele Manufacturing.

Q.    Thank you.  How -- I want to make sure that I completely understand this.  For how long have you been operating in some form or another in Beaver County, Pennsylvania?

A.    Since I was probably 22, 23.  I owned -- I used to own 25,000 pay phones.  So we were pretty big then too.

Q.    Okay.

A.    But we've been in Beaver County since I was in my 20s.

Q.    22 or 23.  So that means it's only two years, because you're only 25; right?

A.    Yeah.

Q.    In terms of years, sir, could you please describe for how long you've been operating in Beaver County?

A.    About 30 years.

Q.    You ever heard of Albert Unis III or Albert Unis IV in your 30 years of operating in Beaver County?

A.    Yeah.  More so towards -- I don't know if it was 2019 or 2020.  Somewhere in around there, his name came up.

Q.    How so?

A.    We got a letter that said they were claiming they had a -- I don't know, some exclusivity right in Beaver County and therefore the games we had in Beaver County were essentially

his, not mine.

Q.    Ah.    Does the Giles Plaza sound familiar to you?

A.    Yes.

Q.    For how long have you had that location?

A.    Since I had a pay phone there.

Q.    So that would be --

A.    A long time.

Q.    Had you ever heard of Pennsylvania Skill Games, LLC?

A.    I believe that was the company that sent me the letter that said they were going -- that they're going to sue me.

Q.    Did they ever sue you?

A.    No.

Q.    Besides them threatening to sue you and wanting you to give up your location that you've had since pay phones, had you ever heard of them before?

A.    No.

MR. NEISER:  No further questions.

THE COURT:  Thank you, Mr. Neiser.

Is there any cross-examination?

CROSS-EXAMINATION

BY MR. ZEGARELLI:

Q.    Mr. Mayes, do you recall when was the first time you started to deal in the Pace-O-Matic games?

A.    Yeah, 2017, I believe, it is when we put our first one in.

Q.    Okay.  And can you testify as to how many games, that is games, that you had that were Pace-O-Matic games in Beaver County?

A.    In Beaver County?  I don't remember the exact -- I mean, I remember we purchased and owned approximately 120 games. But I don't remember the exact count of games.  I mean, we may have figured that out during the deposition discussion, but I can't recall off the top of my head how many that was.

MR. ZEGARELLI:  No further questions at this time, Your Honor, subject to call for PSG's case-in-chief, liability phase, and I'd like to advise the witness he's still under subpoena.

THE COURT:  Thank you for your testimony here today, Mr. Mayes.  You're excused.

THE WITNESS:  Thank you.

(Witness excused.)

MR. NEISER:  Your Honor, we call Dan Jones.

THE COURT:  Counsel, while Mr. Jones is coming in, can we have a very brief sidebar?

MR. NEISER:  Of course.

THE COURT:  Mr. Zegarelli?

MR. ZEGARELLI:  Yes.

MR. NEISER:  Actually, Your Honor, we'll go to sidebar but I'd like to call Robert McDanel instead.

THE COURT:  All right.

(Whereupon, sidebar conference held:)

THE COURT:  Mr. Neiser, is Mr. Jones being called to testify in some way about damages?

MR. NEISER:  No, Your Honor.  I'll make an offer of proof.  Mr. Jones is going to testify as to the extent and amount of advertising paid for by Pace and POM of Pennsylvania with respect to damages.  He -- his testimony, per our conference this morning, will be limited only to testifying as to the existence of damages.

THE COURT:  All right.

MR. NEISER:  Not the amount.

THE COURT:  All right.  I wanted to make sure that you had that opportunity because I wasn't sure, based on what we talked about this morning, that was clear.  You can certainly put into evidence that you have sustained damages without getting into the amount so that you fulfill the requirements of breach of contract action.  And in case there was any lack of clarity there, I wanted to make sure that that was clear.

MR. NEISER:  No, Your Honor.  Guidance was very clear and very helpful.

THE COURT:  All right.

Mr. Zegarelli?

MR. ZEGARELLI:  Okay.

THE COURT:  Anything else?

MR. NEISER:  While I have you -- sorry, Your Honor,

we're moving pretty fast -- at some point, we may ask for maybe five minutes.

THE COURT:  For the video?

MR. NEISER:  Yes.  But they're still working on it. As well I need to get you the highlighted copy, which we'll send electronically in a few moments of the Mayle designation -- not Meile, Mayes.

THE COURT:  Thank you.

(Whereupon, sidebar conference concluded.)

THE COURT:  You can step right up, sir.

THE WITNESS:  Here?

THE COURT:  Yes.  You can come right here if you'd like.

THE CLERK:  Please raise your right hand.

ROBERT McDANEL, a witness herein, having been first duly sworn, was examined and testified as follows:

THE CLERK:  You may be seated.

DIRECT EXAMINATION

BY MR. DEASY:

Q.   Good morning, sir.

A.   Good morning.

Q.   How are you today?

A.   Great.

Q.   Please state and spell your full name for the jury.

A.   Yes.  Robert McDanel, M-C-D-A-N-E-L.

Q.   And can you tell the jury what it is that you do for a living?

A.   I own and operate amusement machines.

Q.   Amusement machines?

A.   Yes.

Q.   What is your role?

A.   I'm the president of our company.

Q.   Okay.  And how long have you been doing that?

A.   Oh, close to 40 years.

Q.   I'm sorry.  You said --

A.   40.

Q.   -- 40 years?

A.   Yes.

Q.   And -- now, how many -- what is -- strike that.

     How many locations do you service in your business?

A.   How many locations?

Q.   Yes.

A.   Roughly 45.

Q.   45.  Okay.  And -- now, does your business involve skill games by any chance?

A.   Yes, some.

Q.   Okay.  And how many skill games have you purchased?

A.   About 175.

Q.   And is there a particular manufacturer that you've purchased those skill games from?

A.   Yes, Miele Manufacturing.

Q.   Okay.  When did you start purchasing machines from Miele Manufacturing?

A.   Oh, about five years ago.

Q.   Okay.  And can you tell us how you first heard about these machines from Miele?

A.   Mostly mail flyers.

Q.   Okay.

MR. DEASY:  Can you put up 204, please, A.J.?

BY MR. DEASY:

Q.   Sir, have you seen this before?

A.   Yes.

Q.   And is there a particular company you associate this brand with?

A.   Yes, Pace-O-Matic or Miele.

Q.   Okay.  Now, have you ever heard of the company called Pennsylvania Skill Games before?

A.   I'm assuming that's Miele.

Q.   You're assuming -- okay.  And -- well, let me ask you this:  Ever heard of an individual named Albert Unis?

A.   Yes.

Q.   How so?

A.   We're both in the same county.

Q.   Okay.

A.   Small county.

Q. And just to clarify, you associate this brand with Miele Manufacturing?

A. Yes.

Q. What about Albert Unis?

A. I don't know a whole lot about him, just, you know, word of mouth.

Q. Okay.

MR. DEASY: No further questions, Your Honor.

THE COURT: Thank you, Mr. Deasy.

Mr. Zegarelli, do you have cross-examination?

CROSS-EXAMINATION

BY MR. ZEGARELLI:

Q. Mr. McDanel, is your business location in Beaver County?

A. Yes.

MR. ZEGARELLI: No further questions at this time, Your Honor, subject to recall for liability or case-in-chief for PSG. And I remind the witness he will remain under subpoena.

THE COURT: Mr. McDanel, thank you for your testimony today. You're excused.

THE WITNESS: For the day?

THE COURT: Yes.

THE WITNESS: Thank you.

(Witness excused.)

MR. NEISER: Your Honor, we call Dan Jones.

THE COURT:  All right.  Let's bring in Mr. Jones.

Sir, you can step forward.

THE CLERK:  Please raise your right hand.

DAN JONES, a witness herein, having been first duly sworn, was examined and testified as follows:

MR. NEISER:  May I proceed, Your Honor?

THE COURT:  You may.

DIRECT EXAMINATION

BY MR. NEISER:

Q.    Mr. Jones, how are you?

A.    Good.

Q.    Could you state and spell your name, please?

A.    My name's Daniel Jones, D-A-N-I-E-L, J-O-N-E-S.

Q.    Where do you live, sir?

A.    I live in Bucks County, Pennsylvania.

Q.    I'm sorry for the Eagles loss.

A.    My son-in-law's even more sad.

Q.    I understand.  What do you do for a living?

A.    I'm the chief financial officer for Pace-O-Matic.

Q.    And for how long have you held that position?

A.    Approximately 2 1/2 years.

Q.    Could you please describe your educational background since high school?

A.    I have a bachelor of science in accounting, a CPA licensed in Michigan.

Q.    Licensed in what, sir?

A.    Michigan.

Q.    Understood.

A.    Yeah.

Q.    Can you briefly describe your work history since graduating from school, just briefly?

A.    I was in public accounting for approximately seven years with one of the "Big Eight" accounting firms.  I've been in chief financial officer roles with a variety of companies for about 15 years of my career.  And for 20 years I have been a consultant working with financial organizations.

Q.    Understood.  Are you familiar with the finances, books and records of Pace-O-Matic, Inc., and POM of Pennsylvania, LLC?

A.    I am.

Q.    Have you had an opportunity to review financials and other financial documents produced in this lawsuit?

A.    I have.

Q.    Okay.  I'd like to show you a document marked for identification purposes as 141A.  Do you recognize this document, sir?

A.    I do.

Q.    How so?

A.    I helped prepare the schedule.

Q.    Okay.  And is this schedule a true and accurate depiction of the underlying data that supports the numbers that

are contained therein?

A.   Yes, it is.

MR. NEISER:  Your Honor, we offer into evidence Exhibit 141A.

MR. ZEGARELLI:  No objection, Your Honor.

THE COURT:  Thank you, Mr. Zegarelli.  Exhibit 141A is admitted.

BY MR. NEISER:

Q.   What are we looking at here, sir?  Tell us what this is.

A.   You're looking at the schedule of all of the direct marketing and advertising expenses that has been spent for Pace-O-Matic and POM of PA for a five-year period.

Q.   Okay.  And I -- are there more expenditures that have occurred since the 2019 period?

A.   Yes.

Q.   Okay.  Let's look at the -- let's define the playing field here first.  What type of advertising and marketing expenses are we looking at here?

A.   So these would be direct expenses that really relate to things like advertising and promotion, trade show expenditures, and largely Pennsylvania operator, you know, incentive trips.

Q.   Okay.  Would those include -- those expenses also include advertising in magazines and the like?

A.    Advertising in magazines, print ads, flyers, promotional material.

Q.    And those advertising and marketing expenses, do they relate to national and state advertising?

A.    In this period of time, a lot of it was Pennsylvania-driven expenditures.  But some of the trade shows are definitely national trade shows.

Q.    Understood.  And the advertising in the national trade shows, that would be under the Pennsylvania Skill brand by Pace-O-Matic?

A.    That's correct.

Q.    Sir, I believe there was some testimony earlier by some of the witnesses related to what I'll call "sweat equity," meaning "shoe leather" marketing, going out to see people.

        MR. NEISER:  Can we keep that up, please?

BY MR. NEISER:

Q.    Are the salaries of those employees and the people who did that kind of work reflected in these dollars?

A.    No, they're not.

Q.    Do you have an understanding of how much more could be added to that number if salaries and the value of the work performed were included?

A.    I actually haven't tried to calculate that, but I would say it would be significant as these dollars.

Q.    Understood.  Are there any other -- without getting

into dollar amounts, any other incentives that are provided to operators in connection with advertising and marketing of the Pennsylvania Skill brand?

A.   So there's a significant discount program on our fill revenue that are provided in Pennsylvania that aren't reflected here.

Q.   And those are part of the overall marketing strategy? Is that what you're saying?

A.   That was part of the ability to track and maintain and keep operators.

Q.   Understood.  By the way, I understand you're not the marketing guy.  I just want to make sure that those expenses are attributable from a financial perspective.

A.   Right.  The marketing guys mock me.

Q.   They mock you until it's time to get paid.

A.   Exactly.

Q.   Understood.  We can take it down.

Have you had an opportunity to review any invoices or account statements issued to Pennsylvania Skill Games, LLC?

A.   I have.

Q.   Without describing dollar amounts, can you tell us whether or not there is an account receivable owed -- or at least we claim is owed by Pennsylvania Skill Games, LLC?

A.   We have accounts receivable on our books.

Q.   Okay.  And can you generally describe the subject

matter of the account receivable?  What's it for?

A.    The bulk of it is for games that we sold to them and then some additional equipment as part of that invoice.

Q.    And is it your testimony today that, based upon your review of the records, that those amounts have been unpaid and remain unpaid?

A.    That's correct.

MR. NEISER:  No further questions, Your Honor.

THE COURT:  Thank you.

MR. ZEGARELLI:  Will Mr. Neiser be kind enough to put that exhibit back on?  It's the only one I'm going to use.

MR. NEISER:  Sure.

CROSS-EXAMINATION

BY MR. ZEGARELLI:

Q.    Good morning.

A.    Good morning.

Q.    Is there a reason why POM of Pennsylvania has no advertising in the years 2015, '16, or '17?

A.    Because it didn't exist as a legal entity.

Q.    Very good.  And with regard to Pace-O-Matic, is it approximately a 300 percent increase between 2015 and 2016?

A.    What percentage?

Q.    300.  Three times?

A.    Two and a half, maybe.

Q.    Let's see.  I think it's pretty close.  But in any

case, that's okay.

Now, you indicated there's an outstanding accounts receivable.  Can you explain in detail what you're referencing?

A.   I'm not sure I follow that question.  Referencing the accounts receivable?

Q.   Accounts receivable outstanding.  According to your testimony, how long has an outstanding receivable been outstanding?

A.   Since the day -- it's been multiple years of outstanding.

MR. ZEGARELLI:  You can put the exhibit down.  Thank you.  I'm finished with it.  Thank you so much.

BY MR. ZEGARELLI:

Q.   And this accounts receivable, do you have an understanding of whether you asserted was initiated after the lawsuit or before the lawsuit -- the lawsuit being the lawsuit you are testifying in?

A.   I know that the timing of the invoices were in 2019, 2020, and early 2021.

Q.   Okay.  Do you have any understanding that counsel for -- and to be clear, the invoice -- or receivable that you're suggesting, is it Pace-O-Matic or is it POM of Pennsylvania or is it Miele Manufacturing?

A.   It would be under POM of Pennsylvania.

Q.   Okay.  And do you have any understanding whether the

accounts receivable that you assert was communicated in any way through counsel during the lawsuit?

A.   Not that I'm aware of.

MR. ZEGARELLI:  No further questions.  Thank you.

MR. NEISER:  Brief redirect, Your Honor.

THE COURT:  Yes.

REDIRECT EXAMINATION

BY MR. NEISER:

Q.   Do you have an understanding as to whether or not those invoices and statements were actually sent to Pennsylvania Skill Games, LLC?

A.   Yes, I do.

Q.   And they were timely sent to Pennsylvania Skill Games, LLC?

A.   That's correct.

Q.   And they remain unpaid?

A.   That's correct.

MR. NEISER:  No further questions, Your Honor.

THE COURT:  All right.  Mr. Jones, thank you very much for your testimony here.  You're excused.

THE WITNESS:  Thank you.

(Witness excused.)

MR. NEISER:  Your Honor, Mr. Fox is here to correct, assist with the audio that is not working.  Could we ask the Court's indulgence for maybe ten minutes to square that issue

away so we can keep moving?

THE COURT:  That's fine.

Mr. Fox, thank you for joining us to help us with our technology issue.

Ladies and gentlemen, you're going to be seeing a video, as I understand, or several video depositions.

Is that right, Mr. Neiser?

MR. NEISER:  That's correct.

THE COURT:  We need to make sure that the equipment works so you can hear it.  So we'll take a ten-minute recess, hopefully not any longer than that.  Our technical guru, Mr. Fox, assists us with that.  So we'll see you back here shortly.

THE CLERK:  All rise.  This Court is in recess.

(Pause as the jury exits courtroom.)

(Whereupon, a recess was taken.)

(Pause as the jury enters courtroom.)

THE COURT:  Please be seated, everyone.

Mr. Neiser, I understand our technology issues have been resolved, but you have another witness you want to call first?

MR. NEISER:  Yes, if you don't mind, Your Honor, just because I would like to keep then moving.

THE COURT:  That's fine.

MR. NEISER:  We call Michael Mangerie, or Mangerie.

THE COURT:  Sir, you can step forward.

THE CLERK:  Sir, please raise your right hand.

MICHAEL MANGERIE, a witness herein, having been first duly sworn, was examined and testified as follows:

THE CLERK:  Thank you.  Please be seated.

THE COURT:  Sir, you can pull that microphone in front of you a little bit closer to you.  We just want to make sure we can hear you.  Thank you.

DIRECT EXAMINATION

BY MR. NEISER:

Q.  Good morning, sir.  How are you doing?

A.  I'm well.  How are you?

Q.  I'm doing really well.  Introduce yourself to the Court and jury.

A.  Michael Mangerie.  My business is Marsico Amusement Company.

Q.  Spell Mangerie, please?

A.  M-A-N-G-E-R-I-E.

Q.  Can you hear me okay?

A.  I can.

Q.  Outstanding.  Where do you live?

A.  I live in Beaver Falls, Chippewa.

Q.  Did you grow up there?

A.  I grew up in a little town right outside of there, yeah.

Q.   Understood.  So how long have you been in business?

A.   I've been in the business 40 years in whole.  Purchased my business in '97.

Q.   Understood.  And do you have an area where you typically operate?

A.   Yeah.  Predominantly, Beaver/Lawrence County, but I do branch out into some other counties.

Q.   Understood.

A.   Yes.

Q.   So you're familiar with the Beaver County market?

A.   I am.

Q.   Great.  Can you generally describe how many locations you service?

A.   In whole, about 75.

Q.   Understood.  And could you repeat the name of your company one more time, please?

A.   Marsico, M-A-R-S-I-C-O, Amusement Company.

Q.   Thank you.  Are you familiar with machines under the Pennsylvania Skill brand?

A.   I am.

Q.   How so?

A.   I own and operate them.

Q.   Approximately how many?

A.   Close to 300.

Q.   Okay.  How did you first learn about those machines?

A.   I think a mailer or a, you know, advertisement of some sort.

Q.   Understood.

A.   Yes.

Q.   Do you recall what the advertisement looked like?

A.   It was so many years ago.  But, you know, had their logo, Pennsylvania Skill.  It came from either Miele Manufacturing or Pace-O-Matic.

Q.   Understood.

A.   Yes.

MR. NEISER:  A.J., can we put up Exhibit 204, please.

BY MR. NEISER:

Q.   Is that the logo you're talking about?

A.   That's it.  That's it.

Q.   So do you draw an association or connection between that logo and any particular company?

A.   Yes.

Q.   Tell us what that is.

A.   Miele Manufacturing and Pace-O-Matic.

Q.   Thank you.

MR. NEISER:  Take it down, A.J.

BY MR. NEISER:

Q.   Have you ever heard of Albert Unis III or Albert Unis IV?

A.   I have.

Q.   How do you know them?

A.   Just guys that did business in my area, you know, competitors.  I met them both maybe once or twice in my life.

Q.   Understood.

A.   Yeah.

MR. NEISER:  No further questions, Your Honor.

THE COURT:  Thank you.

CROSS-EXAMINATION

BY MR. ZEGARELLI:

Q.   Good morning, Mr. Mangerie.

A.   Good morning.

Q.   You indicated 300 games.  Are they all Pace-O-Matic?

A.   They are.

Q.   Okay.  And are you an operator?

A.   I am.

Q.   Okay.  And do you have a contract with regard to your operator relationship?

A.   Yes.  I have a contract with Miele Manufacturing and Pace-O-Matic, yes.  An operator contract.

MR. ZEGARELLI:  No further questions -- I'm sorry.  No further questions, Your Honor.  Mr. Mangerie is still subject to the subpoena, subject to recall on the liability or the case-in-chief of PSG.  Thank you.

THE COURT:  Mr. Mangerie, thank you for your testimony here today.  You're excused.

THE WITNESS:  You're welcome.

(Witness excused.)

MR. NEISER:  Thank you, sir.

Your Honor, at this time, we request the Court's permission to play select designations from the depositions of Albert Unis III and Albert Unis IV.

THE COURT:  All right.  And Mr. Unis III will be first?

MR. NEISER:  Yes, Your Honor.

THE COURT:  All right.  You have -- you may proceed.

Ladies and gentlemen, I mentioned to you yesterday that a deposition is sworn testimony that is taken prior to trial in which the lawyers have an opportunity to question the witness.  Sometimes that is also videoed.

And in this case, as I understand it, Mr. Neiser, we do have videos of the depositions, and certain excerpts from those are going to be played for you now.

So, Mr. Neiser, you may proceed when you're ready.

MR. NEISER:  Very well.  Your Honor, as mentioned in the pretrial or conference this morning, we have removed certain of the clips from that.  Does the Court need any of that, or are we just going to follow along on the screen?

THE COURT:  I don't need that, but thank you for asking.

MR. NEISER:  Your Honor, just so there's no objection

or issue, for the aid of the jury, we're going to have scrolling closed captioning at bottom of the video as well.

THE COURT:  Any objection to that, Mr. Zegarelli?

MR. ZEGARELLI:  No, Your Honor.

THE COURT:  All right.

(Video played of Albert Unis III in open court.)

MR. NEISER:  Your Honor, we would now like to play the video designations of Albert Unis IV, sitting as a corporate designee for Pennsylvania Skill Games, LLC.  For the Court's information, this is approximately 12 minutes long.

THE COURT:  Thank you.  You can proceed.

MR. NEISER:  Thank you, Your Honor.

(Video played of Albert Unis III in open court.)

MR. NEISER:  Stop it.  Your Honor, that was -- I think that should conclude it, the video presentation.  I'm sorry.

THE COURT:  All right.  Then where are we going next, Mr. Neiser?

MR. NEISER:  Your Honor, we call Gregg Cline.

THE COURT:  All right.  Before we do that, ladies and gentlemen, do any of you need a break?  I know we took a break a little bit earlier, and if anyone needs one, we can certainly take one now.

I'm not seeing any head nods.  So we'll proceed.  If anyone needs a break, please just let me know.

THE CLERK:  Sir, please raise your right hand.

GREG CLINE, a witness herein, having been first duly sworn, was examined and testified as follows:

THE CLERK:  Thank you.  You may be seated.

THE COURT:  Ladies and gentlemen, the witness you're about to hear from is an attorney.  You may hear him decline to answer certain questions based on what is called the "attorney-client privilege."  Sometimes this is in conjunction with an objection.  I may be asked to rule on the propriety of Mr. Cline asserting the privilege or set boundaries for a qualified answer from him.

To the extent that I rule that a question can't be answered without revealing the attorney-client privilege, you should proceed with the understanding that that privilege is a privilege recognized in federal law to encourage full and frank communications between lawyers and their clients.

If Mr. Cline invokes the attorney-client privilege while testifying or an objection by counsel is made, you shouldn't draw any conclusion adverse to either party simply because a witness has invoked the attorney-client privilege. Nor should you speculate on what Mr. Cline might have testified to if the privilege had not been raised.  Please confine your deliberations to the testimony that you will hear and the documents that are in evidence.

With that, Mr. Neiser, you can proceed.

MR. NEISER:  Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. NEISER:

Q.    Mr. Cline, how are you today?

A.    I'm doing well.  Thank you for asking.

Q.    Please state and spell your name for the jury and the Court.

A.    My full name is Bentley Gregg Cline, G-R-E-G, last time is C-L-I-N-E.  I go by Gregg, which is my middle name.

Q.    Understood.  Where do you live?

A.    I live in Atlanta, Georgia, Suwanee, Georgia, suburb of Atlanta.

Q.    Understood.  What do you do for a living?

A.    I'm an attorney.

Q.    Do you work for anybody?

A.    I work for my company, Georgia Business Law Group.

Q.    Understood.  Are you familiar with a company called Pace-O-Matic, Inc.?

A.    I am.

Q.    How so?

A.    They became my client when I was -- had my firm, Georgia Business Law Group, in 2015.

Q.    Okay.

A.    They were a client of mine.  And then sometime around in 2016, they asked me to come on board full-time.  I was happy to do so and became general counsel of the company from around

2016 to about 2021.  And then since 2021 I've remained -- they've remain my client through my firm, so I've kind of gone back to my practice.

Q.   Understood, sir.

MR. NEISER:  Your Honor, we offer into evidence Exhibit 21A through L, which were the state trademark applications.

THE COURT:  All right.  I take it there's no objection to that, based on our previous discussions.

MR. ZEGARELLI:  No, Your Honor.

BY MR. NEISER:

Q.   Sir, can you confirm to me -- I'm going to show you -- let's pull up -- that's fine.  Are you familiar with a document like this one?

A.   I am.

Q.   Are you familiar with a state -- Pennsylvania state trademark filing for the words "Pennsylvania Skill" and for the stylized logo with the Constitution and the Liberty Bell?

A.   Yes, I am.

Q.   Okay.  Did you authorize the filing of these trademark applications on behalf of Pace-O-Matic?

A.   I did.

Q.   Okay.  And those did indeed come after the lawsuit that was filed in this case?

A.   They were; correct.

MR. NEISER:  We can take it down.

THE COURT:  All right.  Ladies and gentlemen, I want to advise you, with respect to that trademark application, that any application or registration with the Pennsylvania Department of State do not get any legal presumption of ownership for the mark.  You may consider the applications and any registration with the Pennsylvania Department of State as you would any other evidence in this case.

MR. NEISER:  Thank you, Your Honor.

Could you put up 21L, please?

BY MR. NEISER:

Q.   Now, sir, I'll make -- I believe that all of the applications themselves have the same return date, meaning they've been processed by the Commonwealth of Pennsylvania.  Can you see that date on the application, sir, in the upper right-hand corner?

A.   Yes, I do.

Q.   And what is that date?

A.   November 28, 2018.

Q.   And does that appear to be accurate and correct to the best of your knowledge?

A.   Yes, to the best of my knowledge, it is correct.

Q.   Thank you.

MR. NEISER:  You can take it down.

BY MR. NEISER:

Q.    Sir, at what point, if any, did Pace-O-Matic become aware that Pennsylvania Skill Games, LLC, was asserting a trademark claim?

A.    I don't remember the specific date.  I think there was a -- they sent a complaint from Beaver County that was unfiled.  And I do recall that, and I do recall us looking at their website.  We were quite shocked that they were -- we saw that they were -- seemed to be claiming that they were -- had helped create the product and had the name.  I don't recall the specific date, but it was around that time.

Q.    Was it at or around the time that the lawsuit by POM of Pennsylvania, trading and doing business as Pace-O-Matic and Savvy Dog, filed this lawsuit?

A.    Yes, it precipitated it.  That's why we filed it.

Q.    Okay.  And do you also recall -- I believe you weren't in the courtroom, but there was a praecipe for a writ of summons that was filed in Beaver County state court on Pace-O-Matic's behalf.  Do you recall that?

A.    I do recall that, yes.

Q.    Okay.  Was there any action taken on that writ?

A.    No, was not.

MR. NEISER:  No other questions, Your Honor.

CROSS-EXAMINATION

BY MR. ZEGARELLI:

Q.    Mr. Cline, good morning.

A.    Good morning.

Q.    Mr. Cline, you just testified, I believe, to Exhibit 21L.  Do you recall that testimony?

A.    Just now?

Q.    Yes.

A.    Yes, I do.

Q.    Okay.  And who is the applicant in this particular document?

A.    Savvy Dog Systems, LLC, does business as Pace-O-Matic, Inc.

Q.    Okay.  So you have an LLC doing business as a corporation?

A.    Yes.

Q.    Okay.  So which is it?  Who is the applicant?  Is it the LLC or the corporation?

A.    It's Savvy Dog -- it is what it says it is, Savvy Dog Systems, LLC, d/b/a Pace-O-Matic, Inc.

Q.    It's your understanding that an LLC can do business as a corporation?

MR. NEISER:  Objection; legal conclusion.

THE COURT:  Sustained.

MR. ZEGARELLI:  He's a lawyer, Your Honor, if he doesn't assert the privilege.

MR. NEISER:  Still a legal conclusion, Judge.  It's pretty clear in the case law.

THE COURT:  Sustained.

BY MR. ZEGARELLI:

Q.   Now, Mr. Cline, in this particular application, do you see Section 6 and Section 7?

A.   I do.

Q.   Okay.  And what date is identified in Section 6 and Section 7?

A.   November 19, 2013.

Q.   Now, the description is -- is it accurate to say that the description that appears in the application is for the -- that bell stylized mark?

A.   I think it is what it says it is.

Q.   Okay.  This is your document.  But you -- I think by now we all sort of recognize what the mark is.  Do you agree that it's the blackout is where the bell is, with the stars, that's the designation that's been at issue quite a bit in this litigation?

A.   Yeah, I would say so.  Yeah, it appears to be our mark.

Q.   Okay.  What you're saying in the application, if I understand it, is if that particular image was used since 2013; is that right?

A.   Yes, that's what the application says.  And I believe that's correct.

Q.   Okay.  In what way was it used?

A.    Oh, it was used on machines, in our advertising, in promoting the product, generally what we do in the states that we put our product out.

Q.    Okay.  And your testimony is that was previous to the lawsuit?

A.    Previous to what lawsuit?

Q.    Beaver County lawsuit.

A.    I'd have to -- I don't know the date of the lawsuit. But I do think we were using the name, certainly, early on.  I'd have to know the dates.  I don't have them in front of me.

Q.    Okay.  And that's earlier than December 24, 2014, is it not?

A.    I'm sorry.  What's earlier than December 14th?

Q.    November 19, 2019?

A.    Yes, that date is earlier than December.

Q.    Mr. Cline, do you see a document on your screen which has been marked previously as Exhibit Number 10?

A.    I do.

Q.    Do you recognize the letterhead?

A.    Yes.

Q.    And do you recognize the signature?

A.    Yes.

Q.    Do you recognize the document?

A.    I do.

MR. ZEGARELLI:  I'd move in Exhibit 10.

MR. NEISER:  No objection, Your Honor.

THE COURT:  Exhibit 10 is admitted.

BY MR. ZEGARELLI:

Q.    Mr. Cline, do you have a recollection of why you sent this letter?

A.    I sent the letter -- I think it's pretty clear in the letter why -- why I sent it.

Q.    Okay.  Do you recall why you sent it?

A.    There was a dispute about a location or two locations, I believe, in Beaver County and whether Mr. Brent Mayes, Pro ATM, should be there or -- and I understand there maybe was a dispute that Mr. Unis seemed to want to go on this location and it was really basically a location dispute.

Q.    Okay.  And I'll note the date is February 14, 2018.

Do you see that?

A.    I do.

Q.    Now, if I could direct your attention to the first sentence.  Do you see the highlighted language?

A.    I do.

THE COURT:  Mr. Zegarelli, I don't think this document is up for the jury's benefit.

MR. ZEGARELLI:  Thank you for that, Your Honor.

Just take it back.  Okay.

BY MR. ZEGARELLI:

Q.    So back to the first sentence.  Now, you've identified

yourself as, if I'm reading it correctly, POM of Pennsylvania d/b/a Pace-O-Matic; is that -- is that correct?

A.    That is correct.

Q.    Okay.  And you say there the successor in the interest of Pace-O-Matic Inc.; is that right?

A.    Correct.

Q.    Okay.  So I just wanted to understand my entities. First of all, so we have POM of Pennsylvania.  And is it correct to say POM of Pennsylvania, LLC?

A.    Yes.  It is a limited liability corporation.

Q.    It's true, isn't it, that POM of Pennsylvania, LLC, is a Wyoming company, not a Pennsylvania company?

A.    It's registered to do business in Wyoming, but it's also registered to do business in Pennsylvania, I believe.  So it is a Wyoming-originated company that is also licensed to do business in Pennsylvania.

Q.    And is Savvy Dog -- it's true, isn't it, that Savvy Dog is not registered in Pennsylvania; isn't that right?

A.    I believe that's correct.  I'd have to look at my notes, but I think that's correct.  But I don't know.

Q.    All right.  And you say, "successor in interest to Pace-O-Matic, Inc."  Pace-O-Matic, Inc., is different than POM of Pennsylvania trading and doing business as Pace-O-Matic. Isn't that right?

A.    It's a different legal entity; correct.

Q.    Okay.  Now, at times does Pace-O-Matic do business as Pace-O-Matic without the "Inc."?  Does it identify itself occasionally as Pace-O-Matic without the "Inc."?

A.    I don't know if I understand your question.

Q.    On occasion, do you have any recollection of Pace-O-Matic doing business as -- Pace-O-Matic, Inc., doing business simply as Pace-O-Matic without Inc.?

MR. NEISER:  Objection; relevance.

THE COURT:  Overruled.

THE WITNESS:  I'm sorry.  Repeat the question to me. I'm sorry, sir, about that.

BY MR. ZEGARELLI:

Q.    Do you have any recollection that Pace-O-Matic, Inc., has done business simply as Pace-O-Matic?

A.    Ever?  Any time?

Q.    Sure.

A.    Yeah, I'm aware of that.

Q.    All right.  Now, you say "the successor in interest to Pace-O-Matic, Inc."  Now, did you ever notify, in any tangible form, to Pennsylvania Skill Games, LLC, the fact that Pace-O-Matic, Inc., became a successor in interest to Pace -- I'm sorry -- POM of Pennsylvania, doing business as Pace-O-Matic, became successor in interest to Pace-O-Matic, Inc.?

A.    In this letter, they are being notified of that.

Q.   Is that the first time, to your recollection?

A.   I would assume so.  I don't know that offhand, but they're certainly being notified here.

Q.   And you already testified that the cause of this letter was a dispute that arose around Pro ATM, and we see that here in this language.

Now, I'd like to ask you a few questions about the language that you wrote here.  You say any right of first refusal that your client may have with Pace-O-Matic has either been abandoned or already defined due to the prior marketing inactivity, or ended due to the substantial amount of arrearage that your client owes to my client.

Do you see that language?

A.   I do.

Q.   Now, there's a lot of "mays" and "ors" and "either," and I'm not quite sure from your letter what your position is, because there's a lot of "ors."

So, first of all, there is a right of first refusal, is there not?

A.   Right of first refusal in what?  In the letter, yes, where I say.

Q.   You say, any right of refusal, quote/unquote, that your client may have with Pace-O-Matic.

There was, in fact -- it's not a "may"; isn't that right?  It's a "There was a right of first refusal"; isn't that

right?

A.    You're talking about in the Equipment Purchase Agreement?

Q.    Yes, sir.

A.    There was stated a right of first refusal in the Equipment Purchase Agreement; correct.

Q.    Okay.  Now, you say it has either been abandoned or already defined.  What do you mean?  Because, you know, with the "either," "ors," I don't really know what your position is.  So has it been abandoned?  Is that your position?

MR. NEISER:  Object to privilege.

THE WITNESS:  That would go --

THE COURT:  Just a moment.  Are you asserting the privilege on behalf of your client?

MR. NEISER:  Yes, I am, Your Honor.

THE COURT:  Would you give me a little bit more explanation of that?  Are you saying that information there came from --

MR. NEISER:  Yes.

THE COURT:  -- or was discussed with the client?

MR. NEISER:  Yes, Your Honor.

THE COURT:  All right.  Sustained.

MR. ZEGARELLI:  Okay.  And will the -- may I ask is the privilege asserted with regard to the additional language, with the additional "or" language, or ended due to the

substantial arrearages?

MR. NEISER:  I'm asserting the privilege to all of it, Your Honor.

MR. ZEGARELLI:  Okay.

BY MR. ZEGARELLI:

Q.    When you say --

THE COURT:  Could you define what "all of it" means, Mr. Neiser?

MR. NEISER:  Both highlighted portions referenced by Mr. Zegarelli.

THE COURT:  Thank you.

MR. ZEGARELLI:  Okay.  I'll move to the next paragraph.

BY MR. ZEGARELLI:

Q.    Now, you admit, don't you, that the parties did agree to an Equipment Purchase Agreement on May 20, 2015, which did contain a right of first refusal to place Pace-O-Matic's Pennsylvania Skill terminals in Beaver County.  Do you see that language?

A.    Yes.

Q.    Okay.  Now, you go on to say the right of first refusal is based on an implicit promise that Pennsylvania Skill Games would be the lead distributor.  Do you see that language?

A.    I do.

Q.    Now, you say that Pennsylvania Skill Games has failed

to live up to that promise.

All right.  Now, do you have any -- can you testify to any documents where that conclusion, being that Pennsylvania Skill Games has failed to live up to that promise that they're a lead distributor, the lead distributor -- do you have any documents that support that?

MR. NEISER:  Your Honor, I'm again going to reassert the privilege.  I'm terribly sorry.  This is the difficulty with an attorney letter.  I guess he can testify to the existence of the documents, but I'm asserting privilege for any discussion on work product or legal consultation with the client that would trigger and invoke the attorney-client privilege.  And I apologize for the interruptions.

THE COURT:  I understand.

Mr. Cline, you can testify about the existence of documents, including documents that may not be between you and your client, and let's start with that.

THE WITNESS:  I can't offhand identify any documents, not with my client, that would -- that I'd use to base that on.  These are all discussions and documents I had received from my client and were in that parameter of my client.  So...

BY MR. ZEGARELLI:

Q.   Okay.  So the answer to the question is, no, you don't have any documents that you can testify to that were distributed to Pennsylvania Skill Games?

A.    Well, that's not quite my testimony.  My testimony is I don't have any documents outside of the discussions with my client.

MR. ZEGARELLI:  Well, it's not -- Your Honor, it wouldn't be attorney-client privilege if it was something sent to my client.

THE COURT:  As I understand Mr. Cline's testimony, he's saying he's not aware of any such documents that were shared with Pennsylvania Skill Games.

THE WITNESS:  That's correct, Your Honor.

MR. ZEGARELLI:  Thank you, Your Honor.

BY MR. ZEGARELLI:

Q.    Thank you, Mr. Cline.

Now, you say here, as discussed with your client on several occasions.

Now, you don't identify those occasions, do you, Mr. Cline?

A.    Other than there had been other discussions, no I do not.

Q.    Okay.  And, again, this is February 14th of 2018.  We're approaching May Day.

And do you have any documents that you provided to Pennsylvania Skill Games that support this sentence: "Pace-O-Matic has been disappointed by PSG's failure to become the lead distributor in Beaver County and has been diligent in

placing Pennsylvania Skill terminals in locations since PSG was given this opportunity in 2015."

Do you have any documents that were distributed to PSG that support that point?

A.    Other than what's been filed in discovery in this case, I don't personally have any documents that do that.

Q.    Okay.

A.    This would go into the discussions with my client, obviously, which I can't comment on.

Q.    Certainly.  Okay.  And I'll tell you, we don't have those documents, but your attorneys will have the opportunity to --

MR. NEISER:  Objection.  Another sidebar argument.

THE COURT:  Yeah, let's ask the next question, if you would, Mr. Zegarelli.

MR. ZEGARELLI:  All right.

BY MR. ZEGARELLI:

Q.    Now, this -- I think this language -- now, I'm going to try -- let me see if I can state what you're asserting.

So you -- and I'll try to read verbatim:  "We have investigated whether this particular location (Giles Plaza News) was the site that did not have any skill games in place before Pro ATM, LLC, solicited their business."

All right.  If I understand that sentence, you're saying you checked and Pro ATM was the first company to put a

Pennsylvania Skill Games game into Giles Plaza News; is that right?

A.    Correct.

Q.    Okay.  Then we go on -- I'm sorry -- you go on:  "We have determined that your client did not have any terminals at the Aliquippa location before Pro ATM placed the terminals at issue in your letter over a year ago.  As a result, this location was obviously a place where your client opted not to place the terminals at, even though it had the opportunity to do so for many years."

Okay.

THE COURT:  "For several years," I believe it says.

MR. ZEGARELLI:  I'm sorry, Your Honor.  Several years.  Thank you, Your Honor.

BY MR. ZEGARELLI:

Q.    "Therefore, under the letter of the right of first refusal, Pro ATM placement at that location is proper because PSG had given up the Aliquippa location."

That's what you said; correct?

A.    Correct.

Q.    So if I understand it, your position is that because Pennsylvania Skill Games -- I'm going to try to say it slow -- because Pennsylvania Skill Games did not have the location that you would otherwise offer it, it wouldn't get the opportunity to refuse it?

MR. NEISER:  Your Honor, vague, misleading.  And, again, if it's going to rely upon conversations with the client that are reported in the letter, we would again invoke the privilege.  And, again, I'm sorry for the objection.

THE COURT:  Mr. Cline, if you understand the question and you can answer it without divulging any client communications, you may do so.

If you don't understand the question, Mr. Zegarelli can ask you another question.

THE WITNESS:  Yeah, I'm sorry.  I didn't follow the question.

BY MR. ZEGARELLI:

Q.   Okay.  Is it not a right of first refusal that you have the option to take a location that you don't have?  I mean, you don't need a right of first refusal for a location that you already have; isn't that right?

MR. NEISER:  Object to legal conclusion.

THE COURT:  Overruled.

THE WITNESS:  Which right -- are you talking about just generically right of first refusal?  Or are you talking about --

BY MR. ZEGARELLI:

Q.   Generally.

Right of first refusal, don't you get to refuse something that you don't otherwise have?

MR. NEISER:  Your Honor, if it's going to relate to the Equipment Purchase Agreement and the Court's going to overrule the objection, that's one thing.  But if we're going to talk about hypotheticals, I would object to relevance.

THE COURT:  Yeah.  I think, in general, what a right of first refusal may be not connected with this particular one is not relevant.  So I'll sustain that objection.

BY MR. ZEGARELLI:

Q.  And you're familiar with the Equipment Purchase Agreement?

A.  I am, yes.

Q.  Right.  And you quoted it, if I understand it?

A.  Yes.

Q.  Now --

THE WITNESS:  I apologize to the Court.

THE COURT:  Thank you.

BY MR. ZEGARELLI:

Q.  Now, is it your position that because -- let me state it a different way.  Is it your position that Pennsylvania Skill Games was not given a right of first refusal for -- I think it was Giles.  There it is, Giles Plaza News.  You didn't give Pennsylvania Skill Games a right of first refusal or the -- I'll say the option to place games in Giles Plaza News; isn't that right?

A.  I wouldn't -- this was a location that they certainly

had the opportunity, as stated in the letter for many years, to go into that location. Giles, to my knowledge, that Brent Mayes never said they were going to go in there; so we'd have no opportunity to give them that. But, in any event, they had many years to go in there and chose not to do it.

Q. You're saying -- but isn't that the same as saying -- well, do you know how many -- how many locations in Beaver County do you know do not have Pennsylvania Skill Games games?

A. I don't know offhand, no.

Q. Okay. And isn't a right of first refusal to place a new game somewhere, isn't it presupposed that there isn't a game there already?

MR. NEISER: Object to legal conclusion.

THE COURT: Sustained.

MR. ZEGARELLI: Okay.

BY MR. ZEGARELLI:

Q. Now, you mention some outstanding invoice -- outstanding amounts due.

Do you recall that?

A. Yes, in the letter; correct.

Q. And you say, Your client has failed to pay $8,000.

Do you see that?

A. Yes, I do.

Q. Now, in your letter, you don't reference any invoices, any numbers, any -- you don't provide any detail to that either,

do you?

A.    The letter does not attach invoices, no.

Q.    Okay.  Now, do you recall that that amount of money was paid and under protest?

A.    I do not recall that, no.

Q.    I want to show you, Mr. Cline, a document identified as -- previously identified as Exhibit 119G.  And are you familiar with the circumstances that are addressed in that email, and are you familiar with that email?

A.    I am familiar with the email.

Q.    Okay.

MR. ZEGARELLI:  I move it in.

MR. NEISER:  No objection, Your Honor.

THE COURT:  All right.  Exhibit 119G is admitted.

BY MR. ZEGARELLI:

Q.    Now, isn't it true that Pennsylvania Skill Games demanded an email from Danny Warren to state that the account was clean in satisfying the amount that -- even though the invoices weren't provided, to satisfy that -- the claim of the $8,000 debt?

Do you see that?

A.    Do -- I'm sorry.  Repeat your question.

Q.    Yes.  Isn't it true that Pennsylvania Skill Games demand a letter from Danny Warren -- or an email from Danny Warren to confirm the account was clean since no invoices had

been provided or backup provided for the claim that they owed money?

A.    I'm not aware of that, no.

Q.    Okay.  Least you're aware that, as of today, being April 17, 2018, the account was clean?

MR. NEISER:  Objection.  It's misleading as to what the email says.  But he doesn't know that that's a fact.

THE COURT:  Overruled.  He can testify about what he knows or doesn't know.

THE WITNESS:  No, I -- I'm not aware of the account being clean.  And to discuss the context of this email here would require me to disclose discussions I had with my client and Mr. Warren about what was going on with this particular email.

BY MR. ZEGARELLI:

Q.    Very good.  Now, I am going to show you Exhibit 119B, as in "Bravo."  You wrote this letter -- I'm sorry -- this email.  Can you -- do you recall it?

A.    I do recall this email.

MR. ZEGARELLI:  I move it in.

MR. NEISER:  Your Honor, this was stricken from the case.  We had an exact type of exhibit just like this yesterday that was dismissed at summary judgment.  It's not relevant.  403.  We object.

THE COURT:  Sustained.

MR. ZEGARELLI:  Your Honor, may I say that -- may I?

THE COURT:  Of course.

MR. NEISER:  If we're going to discuss the contents, I ask to do it at sidebar, but I don't want to take up any more time than we need to.  I don't want to have a colloquy in front of the jury about something that has been sustained and should not be admitted.

THE COURT:  Are you requesting a sidebar?

MR. ZEGARELLI:  I don't think we need a sidebar, Your Honor.  I'm not going to talk about the contents of the document.

Your Honor, this document was used in support of certain circumstances, but it does not lose its significance as a item of relevant evidence with regard to the case generally. And I think it's proper to admit it in the redacted form in which it's presented.

THE COURT:  Would you scroll up to the top of it for me, please?

MR. ZEGARELLI:  Thank you, Your Honor.

THE COURT:  I believe I understand your position, Mr. Zegarelli, but due to the content, that information has been excluded based on a ruling that I made yesterday.

If you want to ask some question that doesn't relate to the subject matter, and -- otherwise, you're free to do so.

MR. ZEGARELLI:  Thank you, Your Honor.

BY MR. ZEGARELLI:

Q.    Mr. Cline, do you recall any -- do you recall a point in time where you raised -- "you" being Pace-O-Matic -- and Miele Manufacturing raised the price of fills for Pennsylvania Skill Games?

MR. NEISER:  Your Honor, this is intentional.  He -- I object.  It's not relevant.  It's unfairly prejudicial.  And he's been told twice not to do this.

So I object, Your Honor.

THE COURT:  Your objection is sustained.

MR. ZEGARELLI:  I'm sorry, Your Honor.  I actually thought you allowed me to ask the question as distinguished from the document.  I apologize to the Court.

I have no further questions for Mr. Cline.

Thank you, sir.

MR. NEISER:  No redirect, Your Honor.

THE COURT:  All right.  Mr. Cline, thank you very much for your appearance here today.  You're excused.

THE WITNESS:  Thank you, Your Honor.

(Witness excused.)

THE COURT:  Mr. Neiser?

MR. NEISER:  Your Honor, can I make one request for timing?  I think I can get done before the lunch hour if I can have maybe a brief recess.  Because of the discussion this morning on the one exhibit, breaking out exhibits, we're moving

a little fast.  If I can clarify that with Mr. Simeone, make sure my other witness is up here, I just need ten minutes to sort that out because we also have to do the deposition designation reading.

THE COURT:  Understood.

MR. NEISER:  If the Court would indulge us for ten minutes, I think we can finish before the lunch hour.

THE COURT:  All right.  Then let's take a ten-minute recess at this point, ladies and gentlemen.

(Pause as the jury exits courtroom.)

(Whereupon, a recess was taken.)

THE COURT:  Please be seated, everyone.

Mr. Neiser, are we ready?

MR. NEISER:  We are, Your Honor.  Thank you for indulging us.

We'd like to now read in the deposition designation excerpts of Jeffrey Mayle.

THE COURT:  All right.  Ladies and gentlemen, as we've talked about a few times, this is a deposition that was taken during the discovery in this case, and we will be reading everything, both the questions and the answers, exactly as they were transcribed by a court reporter with the witness under oath.

Are you doing the honors again, Mr. Deasy?

MR. DEASY:  I will, Your Honor.

THE COURT:  All right.

MR. ZEGARELLI:  Excuse me, Your Honor.

THE COURT:  Yes.

MR. ZEGARELLI:  Clarification.  This case or a different case for Mr. Mayle's testimony?

THE COURT:  It was taken in the other case.

MR. ZEGARELLI:  Other case, thank you.

THE COURT:  That's my understanding; is that correct, Mr. Neiser?

MR. NEISER:  That is correct, Your Honor.

MR. ZEGARELLI:  Thank you, Your Honor.

THE COURT:  Of course.

All right.  Mr. Neiser, whenever you're ready, I am ready as well.  Thank you for giving me the time to find that.

MR. NEISER:  Of course, Your Honor, thank you.

(Whereupon, the testimony of Jeffrey Mayle was read into the record:)

"Question:  Good morning, is it correct to say Mayle or Mayle?

"Answer:  It's Mayle.

"Question:  Mayle.  Okay.

"Answer:  Yeah, Mayle.

"Question:  Okay.  And would you spell your state and spell your name for the record, please.

"Answer:  M-A-Y-L-E.

"Question:  And your first name.

"Answer:  Jeffrey, J-E-F-F-E-R-Y.

"Question:  All right.  And are you represented here today by Mr. Turffs?

"Answer:  Yes, sir.

"Question:  Okay.  Now, Mr. Mayle, are you the president of Blue Sky Games, LLC?

"Answer:  I am.

"Question:  Okay.  And you're here testifying on behalf of Blue Sky Games, LLC?

"Answer:  I am.

"Question:  Tell me a little bit about what Blue Sky Games does as a business.

"Answer:  We make software for gaming equipment, skill.

"Question:  Okay.  Now, with regard to skill games, do you have particular names of games that you manufacture?

"Answer:  We -- I do.  And, to be honest with you, I don't really know -- I mean, Lou Minutello could tell you better what those games are.  There's, like, eight on a set of -- on our set of software under different names.  But it -- everybody just goes by Blue Sky Games, because we only have one set of games right now, and we alter those same sets of games to be either skill or no chance or sweepstakes or raffle.  So it's all the same games.  We just alter the way it's played to fit within

the law.

"Question:  I get it.  What are the names of some of the games that you manufacture?

"Answer:  Dog n' Diamonds, Full Moon Fever, Key West, that's all that comes to mind at this point in time.

"Question:  Okay.  That's Dog n' Diamonds, Full Moon --

"Answer:  Fever.

"Question:  -- Fever and Key West?

"Answer:  Key West, yeah.  We just came out with a new one called Cherry Master.

"Question:  Okay.  Now, when you say Lou Minutello, who is Lou Minutello?

"Answer:  He's our distributor in Pennsylvania.

"Question:  Is he your only distributor in Pennsylvania?

"Answer:  Yes.  Well, no.  Sorry.  I made a mistake. AIP is also a distributor.  We did a -- we did do a -- they -- Lou Minutello is our exclusive distributor, except for AIP, because AIP came on board before them.  AIP was a customer of mine before Lou Minutello.

"Question:  And AI -- now do you -- AIP has an exclusive in Beaver County; isn't that right?

"Answer:  Yes, verbal, a verbal exclusive.  I never signed anything, but I -- I abide by it as best as I can anyway.

Someone may have went in there without our knowledge, but --

"Question:  Now, do you have a written agreement with AIP?

"Answer:  No.

"Question:  Do you have a written agreement with Mr. Minutello or any company that he's --

"Answer:  We did, but it's -- it's null and void now. It's outdated.  It never got renewed or anything.  But we did have one.

"Question:  And do you have a recollection of the term of the agreement that was not renewed?

"Answer:  Yeah.  It was like -- it was supposed to be renewed each year, but we never renewed it ever.  But we've always abided by it.

"Question:  Do you remember when that agreement expired?

"Answer:  Maybe in 2000 -- it -- certainly by 2018. 2019, at least.  I mean, it was a while ago, like, two, three years ago at least.

"Question:  Okay.  So what is -- what is the differential in volume?

"Answer:  Between AIP and Lou Minutello?

"Question:  Well, let's just start with the 475.  What sort of -- what was the volume for a pricing of 475?

"Answer:  100 -- 100 machines, let's say, and this

is -- this is me.  This is not being exact because I don't recall.  This is a very long time ago, and we do it differently in every state.  But that's a good representation.  100 machines, and then you pay 475 a fill.

"Question:  Now, do you know a gentleman named Wayne DeLuca?

"Answer:  Yes.

"Question:  Okay.  And how so?

"Answer:  I mean, I -- I know him.  He was an attorney that represented Albert, and he also represented Lou Minutello for a short period of time.  And he also represented, I believe, the -- your other people that are here listening.  So Savvy Dog and whoever those companies are.

"Question:  Did he ever -- did he ever represent Blue Sky?

"Answer:  No.  I talked to him several times, but we were, I believe -- if I believe correctly, we disagreed on what was a legal skill game and what wasn't, and what was a -- didn't have to be a skill game.  I have -- I believe that there's software that you don't even need skill in Pennsylvania, and he didn't believe that, and I thought he was working more for Pace-O-Matic than anybody else.

"Question:  Now, Mr. Mayle, do you recall a time, somewhere early 2018, where a dispute arose between Blue Sky Games -- I'm sorry -- between Action Skill Games and

Pennsylvania Skill Games?

"Answer:  Yes.

"Question:  Okay.  And what do you recall?

"Answer:  Well, it had to start -- I guess it was -- you say it was 2018.  I guess it was that year.  I was at the Vegas show for this type of gaming equipment.  I guess that AMOA -- and I actually was told by Mr. Miele that he was going to sue Action Skill Games if they didn't quit using that name.

"Well, then it wasn't shortly after that Albert said he had the rights to the name 'Pennsylvania Skill,' and kind of all hell broke loose between everybody claiming who had the rights to it.  And Lou Minutello, who is my big distributor, which was really doing good as you can tell by my previous number -- and I wanted them to stay in business rather than be in trouble with Albert Unis.  So I helped them to talk to one another and thought that they would work it out and we would all go on making money happily ever after."

MR. NEISER:  Your Honor, one second.  Should we have an instruction to the jury about why we're mentioning these parties and the reference that this is from another lawsuit?

THE COURT:  You can make that representation if you'd like to, Mr. Neiser.

MR. NEISER:  May I do so now, Your Honor?

Ladies and gentlemen, we're reading a deposition transcript of Jeffrey Mayle, who is not a party to this lawsuit.

The deposition was taken in another case that was captioned as Pennsylvania Skill Games, LLC, versus Action Skill Games.  It was an unrelated suit.  POM of Pennsylvania and Savvy Dog intervened in that lawsuit, and this is a deposition in that case involving a dispute between Pennsylvania Skill Games and Action Skill Games.  So the reference to Action Skill Games in that discussion is based upon their contract with them.

Is that sufficient, Your Honor?

THE COURT:  That's fine.

Mr. Zegarelli, did you want to add anything to that description?

MR. ZEGARELLI:  Not at this time, Your Honor.

THE COURT:  Thank you.

"Question:  So tell me, if you could, with a little more detail.  Thank you.  Can you tell me with a little more detail exactly how those conversations between or among you, Action Skill, and Pennsylvania Skill Games occurred?

"Answer:  Albert would -- would call me and tell me that, you know, that he has the rights to this game and that he has the rights to, you know, the name, I guess, Pennsylvania Skill -- a copyright.  Which I've never seen or -- you know, I've never seen it or anything, but he says he had it.

"And I explained to him, Well, you know, Miele says he has it, and that would be -- be the conversation.

"Well, if you really got -- if you really got it, then

you're really pissed that Lou -- I want you guys to get along because you're my customers.  Miele's not my customer.  So I'd rather my two customers get along.  But if you're going to have a fight, have a fight with Miele about it, you know what I mean?

"And he'd say, Yeah, yeah, okay, okay.

"So eventually he actually said that he was going to agree with Lou Minutello -- if they would meet, they would work out something.  And so I even had a mediator, which was named -- which was Armand Nannicola, which was partnered at the time with Albert in some way or another.  But he also was a customer of mine in Ohio.  So I had Armand Nannicola be the mediator, and Lou and Albert went to Armand Nannicola's warehouse in Ohio and met to work it out.  That's what I know about it.

"Question:  All right.  But at least just from a -- a logistics perspective, the Vegas show occurred before you assisted with a, quote/unquote, brokering?

"Answer:  Yes, yes.

"Question:  Okay.

"Answer:  Definitely.  I didn't even know that Albert claimed to have that trademark until after Miele had threatened to sue.  And then I may have even told Albert that Miele was going to -- saying he was going to sue and that Miele says he has it, you know.  And then everything started with Albert after, you know, after that time frame.

"Question:  And did you -- did you explain to Action

Skill and Pennsylvania Skill Games about Miele?

"Answer:  Yes.

"Question:  Okay.

"Answer:  And I believe Action Skill Games quit doing whatever they were doing at the time after it.

"Question:  Okay.

"Answer:  They quit -- they quit using a certain sticker or something that Miele had a problem with.

"Question:  And that Pennsylvania Skill Games, LLC, also had a problem with; correct?

"Answer:  Pennsylvania Skill Games, LL -- who is that?

"Question:  The plaintiff, Albie Unis.

"Answer:  I've never heard of that company.  The company I deal with is AIP.

"Question:  All right.  AIP.

"Answer:  I'm just telling you, that's the company.  I don't -- I didn't know that he changed his name.

"Question:  All right.  So the issue, though, that you were assisting with was between AIP and Action Skill?

"Answer:  Yes.

"Question:  So, Mr. Mayle, I have a question for you: How long have you been in the skill game industry?

"Answer:  Since 2005, maybe '06, 2006.

"Question:  Okay, okay.  Now, what does the phrase "Pennsylvania Skill Game" mean to you?"

MR. NEISER:  Objection to form by Mr. Zegarelli.

"Answer:  If it means skill games in Pennsylvania.

"Question:  Okay.

"Answer:  It means skill games in Pennsylvania.

"Question:  Okay.  Did you ever have -- did you ever have an understanding of anybody having the exclusive right to use that phrase in connection with their machines during your time in the industry?

"Answer:  Well, no.  What -- let me give you a little background.  What happened was my first involvement in skill games was with a company called Ohio Skill Games, which I assume Pennsylvania Skill Games copied the form, you know.  Ohio Skill Games, Pennsylvania Skill Games.  But Pace-O-Matic was instrumental in Ohio Skill Games five years earlier than Pennsylvania Skill Games existed.  So I always assumed that -- that Pace-O-Matic was behind the name 'Pennsylvania Skill' because they were behind the name 'Ohio Skill.'

"And so when Miele threatened to sue, I took it serious because I assumed that it was Pace-O-Matic and Miele Distributing that had those rights.  Then, I was told by Albert that he had those rights.  So I listened to Albert more than normal because he was my customer and Pace-O-Matic and Miele Distributing was my competition.  But who actually has the rights, I have no idea.

"Question:  So you weren't aware that -- that the

Unises were claiming ownership of Pennsylvania Skill Games until that time period that you said the dispute arised; correct?

"Answer:  Yes.

"Question:  What was the nature of that dispute?

"Answer:  The -- the nature was Albert was not following the contract that he had gotten Lou to sign.  That was it.

"Can you guys hear me?

"Question:  Yeah, yeah.

"Okay.  So when you mentioned there was a resolution or something about ASG or -- I'm sorry -- Action Skill Games changing out a sticker, do you remember that part of your testimony?

"Answer:  He signed the paper with Albert, and they agreed to -- that Albert was going to help him get business and was going to give him stickers and that every machine that he put the sticker on, I believe, Albert was going to get a $100 of -- Albert was going to get $100 of each fill for the games that he gave Lou Minutello locations.  And the sticker for -- and he was going to -- they were going to work together to get multiple locations -- you know, as many as possible.  And they were going to work together.

"And Albert believed he was not doing that, and Lou believed that Albert was not helping him get any locations or giving him any stickers.  So the contract just fell apart.

"Question: Yes, well, I'm asking about the dispute where Mr. Unis and Mr. Minutello initially met or with Mr. Nannicola, N-A-N-N-I-C-O-L-A. That particular dispute, you had mentioned that you had thought that --

"Answer: That was not a dispute.

"Question: That was resolved?

"Answer: That was not a dispute. That was when they -- they met to sign the contract. Lou Minutello had already met with Albert, I believe, before that. But I -- I don't know that.

"Question: Okay.

"Answer: There was no dispute when Albert and Armand Nannicola and Lou Minutello's meeting. As far as I'm concerned, they were going there to sign a contract and work together.

"Question: Okay.

"Answer: The conflict had happened previously, that they were arguing, and it wasn't a conflict. It was just one saying one's doing something, the other saying they're not, you know.

"Question: So the conflict that you just mentioned, that was prior to the agreement being entered into?

"Answer: Yes. That is the only conflict I knew of until this lawsuit.

"Question: Okay. And what conflict was that?

"Answer: That Albert believed that he had owned the

right to Pennsylvania Skill and that anybody using it was in violation of his copyright.

"Question:  Okay.

"Answer:  And that Lou Minutello needed to pay him money to keep operating in Pennsylvania, pretty much thinking that he had a monopoly.

"Question:  Okay.  You said that Action Skill Games changed its sticker as a result of that dispute?

"Answer:  I was told that.  I don't know that for a fact.  But I was told by -- I know it was before that even Lou said he changed the sticker after Lou Miele had threatened in Vegas to sue them, which was before the agreement with Albert.

"Question:  Okay.

"Answer:  So they changed the sticker because of Lou Miele's threat, not because of Albert's -- Albert's conflict.

"Question:  Did you ever discuss the name 'Pennsylvania Skill Games' with Mr. DeLuca?

"Answer:  No.

"Question:  That trade show in Vegas that you had mentioned, do you recall the name of that trade show?

"Answer:  I believe it's the AMOA trade show.  Every year they have one in Vegas.

"Question:  Okay.  And you believe that was in 2018?

"Answer:  It was either 2018 or 2017.

"Question:  Okay.  Do you regularly go to that trade

show?

"Answer:  It might even have been 2017.

"Question:  Okay.  Do you regularly go to that trade show?

"Answer:  Yes.

"Question:  Have you ever seen Albert or Albie Unis at that trade show before?

"Answer:  No.

"Question:  Do you go to other trade shows in the industry?

"Answer:  Yes.

"Question:  Do you ever see either of the Unises at any other trade shows?

"Answer:  No.

"Question:  Okay.  Do you have any particular company that you associate with the name 'Pennsylvania Skill'?

"Answer:  Well, I mean, it's kind of tainted.  I would say originally it was -- I did have -- Pace-O-Matic was the association I gave it.  But, you know, since then, all of this, this stuff going back and forth, it's been in my mind that there's a conflict over it, you know, for five years now.  So the association that I have now is just an argument.

"Question:  Okay.  But you're saying that originally, the association was with Pace-O-Matic?

"Answer:  Yeah, because they also owned Ohio Skill

Games when I dealt with them there.  So I assumed it was them.

"Question:  Got it.  And then the conflict that you're mentioning, you're talking about what?

"Answer:  The only conflict I'm mentioning is that Albert believed he had the rights to -- to the -- to the copyright and that he was thinking that Action Skill Games -- which is another one of my distributors -- was violating his trademark.

"Question:  Okay.  Did you ever see them use it?

"Answer:  No, I've never seen the paperwork or anything.

"Question:  Okay.  And you mentioned that AI -- there was a mention of an AIP as a customer of yours.  Who is AIP?

"Answer:  That's Albert Unis.

"Question:  Okay.  Aliquippa Industrial Park, does that ring a bell?

"Answer:  Yeah, but the address.

"Question:  Got it.

"Answer:  And I think probably -- I don't know exactly, but Aliquippa, that just really jumps out at me.

"Question:  Got you.  And did Albert -- well, the father Albert -- we call the father 'Albert' and the son 'Albie.'  Is that okay with you?

"Answer:  Yes.  That's how I go by it, too.

"Question:  Okay.  What else did you talk about with

Albie?

"Answer:  Just getting more business.  He tried to -- you know, me and him tried to do something with fireworks one time as he distributes fireworks.  And I was going to sell them in Atlanta, and, you know, he -- he dabbles in a lot of things, you know?  We talked some about some CBD cigarettes, hemp cigarettes.  I talked to Albert about a lot of things.

"Question:  Did you ever talk to Albert and Albie about developing a game with Pace-O-Matic?

"Answer:  No.

"Question:  Okay.  Do you know if Albert or Albie even have the capacity to develop an electronic skill game?

"Answer:  I know that they don't.  I mean, you have to have an engineer to do that.

"Question:  Right.  What did they tell you?

"Answer:  They said that -- they said they had the exclusive rights for the -- for the game, the Pace-O-Matic skill game that won the court case in Beaver County and that Pace screwed them over for Miele Distributing, who is just bigger and had more money.  So they -- and so they started distributing the games to Miele.

"Question:  Okay.  When did they tell you that?

"Answer:  Early on when I -- when -- when they became my customer.  They were not happy with Pace-O-Matic, and that allowed me to get into the Pennsylvania market.  Albert called

me to see if I could give him games, and that -- and, at the time, we didn't have him as a customer or anything. But I knew who he was because he was part of the court case that Pace had fought in Pennsylvania. And he wanted me to sell them some games and he placed some games. He put out probably 20 or 30, and that got us started.

"Question: Okay. So let me go back for a second. Do you recall when that was?

"Answer: I mean, I don't. I mean, it would have been right after their -- I don't think they got along very well for a very long time -- for a very long time, Pace and Albie. It was right after they had a -- had a conflict.

"Question: Okay. I mean, is this 2018, 2017?

"Answer: I mean, when was the court case? I don't -- I don't know.

"Question: December of 2014 was the court case. It was decided in December of 2014.

"Answer: Okay. So this -- this was probably 2015 or 2016.

"Question: Okay. And you mentioned that -- and I don't want to mischaracterize it -- but who told you that any, either of the Unises, had any involvement in that court case?

"Answer: Albert told me.

"Question: What did Albert tell you?

"Answer: That it was his court case and that he was

the -- the man that made it happen, got it.  The games were picked up, and he fought it.  And I assumed he never told me this, but because of my experience with Pace-O-Matic, they always paid for the attorneys and stuff for the court case.  So I assume Pace-O-Matic backed him and paid for everything and fought the court case because they did it for me in Ohio.  I was the -- I was the Albert Unis of Ohio five years prior.

"Question:  Okay.  Did Albert tell you that it was his court case?

"Answer:  Yes.

"Question:  Okay.  Do you know if Albie Unis was putting out Blue Sky Games in Beaver County?

"Answer:  I assume so, yes.

"Question:  Do you know when, first off -- wait.  Why do you say 'assume so'?

"Answer:  Albie and Albert is the same person.  They're just father and son.  That's like you asking me if my kid's doing something, I don't know -- know about.  There's -- if Albert's doing it, Albie's doing it.  It's -- it's one and the same.

"Question:  Why do you say that?

"Answer:  That's just how -- that's how -- that's how business works.  I mean, you don't have a family business and have your kid doing something you don't know about.  You won't be in business very long."

MR. NEISER:  Let's hold for one second.  I may skip over a portion.  Based on the Court's prior rulings I'd like to skip over a portion of the designated testimony.

THE COURT:  What portion are you skipping over?

MR. NEISER:  I'm skipping over page 82, lines 23, through 83, lines 18.

THE COURT:  All right.

MR. NEISER:  I'm also skipping over page 84, line 2 through line 10.

Your Honor, we're also going to skip page 89, line 7 through 19.  Page 90, lines 10 through 16.  Page 90, lines 21, through page 91, line 3.  Page 92, lines 22 to 24.  Continuing on at page 94, line 5.

"Question:  Is there a way of tracking the location of the games?

"Answer:  No, not the location.  But if the distributor gives us the location, we know.  But if they don't, there's no way of tracking it at this time.

"Question:  Okay.  What if the machine is moved?  Is there any way to, using a computer system, GPS, or something like that?

"Answer:  No."

MR. NEISER:  Your Honor, that is the conclusion of the deposition designations of Jeffrey Mayle in the Action Skill Game -- or Pennsylvania Skill Games, LLC, versus Action Skill

Games lawsuit.

THE COURT:  All right.

MR. NEISER:  And, Your Honor, if I may, it's a couple minutes before noon.  I can finish my last witness, or I can wait until after lunch.  I leave it to the Court.

THE COURT:  Let me ask the jurors.

How long is your anticipated testimony, Mr. Neiser?

MR. NEISER:  If past is prologue from this morning, ten minutes.

THE COURT:  Ladies and gentlemen, we can take our lunch break now, or we can move forward and get this witness done.  What's everyone think?  Do the witness?

All right.  Then we'll do the witness.  Thank you.

MR. NEISER:  Your Honor, we call Rick Goodling.

THE COURT:  Mr. Goodling, you can step forward to be sworn, please.

THE CLERK:  Sir, please raise your right hand.

RICK GOODLING, a witness herein, having been first duly sworn, was examined and testified as follows:

THE CLERK:  Thank you.  Please be seated.

DIRECT EXAMINATION

BY MR. NEISER:

Q.   Mr. Goodling, how are you?

A.   I'm doing fine, thank you.

Q.   Could you please introduce yourself to the Court and

the jury.

A.    Yes.  My name is Rick Goodling.  I'm the national director of compliance for Pace-O-Matic.

Q.    Understood.  How long have you been working there?

A.    Approximately five years.

Q.    What did you do before then?

A.    Prior to Pace-O-Matic, I served 27 years as a Pennsylvania state trooper.

Q.    What did you do as a state trooper?

A.    A variety of details from patrol to criminal investigation.  My last 15 years, I was -- I ran a specialized unit called the CAGE unit, the compliance, auditing, and gambling enforcement unit.

Q.    Okay.  What was the mission of that unit?

A.    The majority of it was illegal gambling investigations.

Q.    Understood.  What did you do before you were a state trooper?

A.    I served four years with the United States Marine Corps.

Q.    Semper Fi, sir.

A.    Semper Fi.

Q.    What did you do in the Marine Corps?

A.    I was a heavy equipment operator.

Q.    Understood.  So can you please tell us the first time

you were introduced to Pace-O-Matic, Inc.?

A.    Yes, approximately between 2013, 2014, representatives from Pace-O-Matic had brought their game to me when I was a Pennsylvania state trooper to look at it and give them a determination as to whether I thought it was a game of chance or a game of skill, like many other software companies did to me in that time frame.

Q.    Okay.  What was your reaction to the game?

A.    My reaction was that this was -- and I told them this, this is the first game that I actually was presented with that I actually felt was -- as I do believe still today -- is a true game of skill.

Q.    Okay.  Do you recall having a meeting or meetings with Pace-O-Matic?

A.    I do.

Q.    Who was there?

A.    To the best of my knowledge, Ryan Wood, Michael Pace, and possibly Lou Miele.  There is a couple meetings, Bob Hawk, I believe, was possibly at one of them.  There were several meetings.  They're about the four that I can remember.

Q.    Understood.  What's a controlled pickup?

A.    So what we did for this is I -- explained it to you, what happened was I explained to them that, although if someone brought me a game that I thought was illegal, I would tell them, "I don't think it's a game of skill.  I think it's a game of

chance.  Therefore, if you place it, we would seize it."

When this game was put in front of me I told them, Although I think it's a true game of skill, I don't get to make that determination.  Only the man or woman in the black robe actually get to make that decision.

So with -- after conferring with my -- my command staff at the time, it was decided that we would do a controlled pickup where they would put the game out, we would seize it for litigation, and we won't cite anybody or arrest anybody while doing this.

Q.   Was there any legal risk whatsoever to the operator or location involved in the controlled pickup in the Pace-O-Matic matter?

A.   Absolutely not, and they were well aware of that because I told them no one would be cited or arrested for that.

Q.   In fact, no repercussions, harm, or citations occurred to either the operator or the location?

A.   That is correct.

Q.   Did the controlled pickup happen?

A.   Yes, it did.

Q.   Were you involved in the controlled pickup?

A.   I orchestrated it.  I was not there personally, but I had one of the liquor enforcement officers from the Bureau of Liquor Patrol and Enforcement, Pennsylvania State Police, Pittsburgh District Office seize the game.

Q.    Okay.  Do you know who Albert Unis III is?

A.    I do now, yes.

Q.    Do you know who Albert Unis IV is?

A.    I do not.  Not to the best of my knowledge.

Q.    Were either of them involved in the controlled pickup in any way?

A.    I do not believe so, no.

Q.    Were either one of them involved in the meetings that you had with Ryan Wood, Michael Pace when you first auditioned the machine?

A.    Not to my knowledge, no.

Q.    Okay.  Did you have any involvement in the Beaver County litigation after the controlled pickup?

A.    I did.

Q.    Tell us what that was.

A.    I spoke with the district attorney several times, went out and explained the game to him, certain aspects and characteristics of the game.

Q.    Okay.  Any other involvement?

A.    No.

Q.    Why did you start working for Pace?

A.    So when I retired, I did a lot of trout fishing for a while.  And then the representatives from Pace-O-Matic called me and asked me if I would -- you know, since I'm retired, if I would come work for them.  Since they were one of only two true

skill games I ever found legal in Pennsylvania, I decided to take that route.

Q.    Understood.  Now, without describing their duties, do you have any folks working for you?

A.    Yes, sir.

Q.    Approximately how many?

A.    Approximately 21.

Q.    How many of them operate within the Commonwealth of Pennsylvania?

A.    Six.

Q.    At any time, do those -- I'll call them employees, if that's okay with you, sir?

A.    Absolutely.

Q.    Those employees, do they visit locations in the Commonwealth of Pennsylvania?

A.    Yes, they do.

Q.    And do they have the opportunity to report certain observations that they may make from time to time?

A.    Yes, they do.

Q.    Okay.  Are you aware of any instances where your employees were able to observe machines owned or operated by Albert Unis III, Albert Unis IV, or Pennsylvania Skill Games, LLC?

A.    Yes, I was.

Q.    If I were to show you a series of photographs, would

you be able to identify and authenticate them?

A.   More likely, yes.

Q.   Okay.  And I'd like to do this as quickly -- actually, here's what I'd like to do.

MR. NEISER:  A.J., I'd like to do Exhibits A through F in succession, if you don't mind.

BY MR. NEISER:

Q.   Sir, I'm going show you documents marked for identification purposes as Exhibits A through F, and I just want you to review -- just watch along on the screen as we put them up.  Okay?

A.   Yes.  I see one now.

Q.   Keep going.

Sir, do you recognize those photographs?

A.   I do.

Q.   Were they taken by your employees?

A.   They were.

Q.   Are you familiar with the contents, and you can acknowledge that they are true and accurate?

A.   Yes.

Q.   They were made in the ordinary course and scope of business?

A.   Yes.

Q.   And you would be a custodian of these records, would you not?

A.   Correct.

MR. NEISER:  Your Honor, we offer these Exhibits 44A through F in evidence.

MR. ZEGARELLI:  No objection.

THE COURT:  All right.  44A through F are admitted.

MR. NEISER:  Thank you, Your Honor.

Let's put up A.

BY MR. NEISER:

Q.   Sir, what are we looking at here?

A.   It looks to be some type of gaming terminal.

Q.   Can you confirm for us whether or not this is one of the terminals observed by your employees?

A.   It was.

Q.   Without commenting on the software or what's inside of it, can you tell us whether or not that is Pace software on that machine?

A.   That is not Pace-O-Matic software.

Q.   Do you know where that terminal was identified?

A.   I believe that's in Whitehall, Pennsylvania.

Q.   Thank you, sir.

MR. NEISER:  Let's see B, please.  Is this B, A.J.?

MR. SIMEONE:  44B, yes.

BY MR. NEISER:

Q.   The same question, sir.  Is this Pace software on the photograph?

A.    It is not.

Q.    Do you know where that was identified?

A.    I do not.

Q.    If I showed you a copy of a document created by your clients, would that help refresh your recollection as to where you saw it?

A.    It certainly would.

MR. NEISER:  May I approach the witness, Your Honor?

THE COURT:  Yes.

BY MR. NEISER:

Q.    Sir, I'm going to show you a document -- actually, I'm just going to show you a document that is an internal report from Pace-O-Matic.  Would you please review it and look up when you're done.

A.    Okay.

Q.    Did that refresh your recollection?

A.    Yes.

Q.    May I take it back, please?

So what is the location of 44B?

A.    MDO'S Pizza in Harrisburg, Pennsylvania.

Q.    And it's your testimony that this is a -- is not a Pace game?

A.    That is correct.

MR. NEISER:  Is there another image there, A.J.?

MR. SIMEONE:  That's it for B.

MR. NEISER:  44C, please.

BY MR. NEISER:

Q.  For at least the machines where there isn't a rental expired or a blank screen, can you tell us whether or not it's Pace software on those machines?

A.  I -- Bombs and Bombshells -- to be honest with you, I'm not 100 percent sure of that game.  I do not believe it is.

Q.  Do you know where that's located?

A.  I do not.

MR. NEISER:  May I approach, Your Honor?

THE COURT:  Yes.

BY MR. NEISER:

Q.  Same exercise, sir.  I'm showing you an internal report.  Let me know when you're done reading it.  And let me know when you're done.

A.  Okay.

Q.  Does that refresh your recollection?

A.  It did.

Q.  Thank you.  May I?

A.  Yep.

Q.  Where was that -- those machines, where were they observed?

A.  Rivertown bar in Parker, PA.

Q.  Where is Parker, PA?

A.  Somewhere out west.

MR. NEISER:  Let's look at 44 delta.  Now, stop on that screen.

BY MR. NEISER:

Q.   Is that Pace software?

A.   Yes, that appears to be Pace software.

Q.   The next one.  Is that?

A.   That does not appear to be Pace software.

Q.   The next one?

A.   That does not appear to be Pace software.  That does not appear to be Pace software.

Q.   Next one.  Okay.  Do you know where that was located?

A.   I do not.

MR. NEISER:  May I approach, Your Honor?

THE COURT:  Yes.

BY MR. NEISER:

Q.   44 Delta, if you could please review that document. Let me know when you're done.

A.   Okay.

Q.   Does that refresh your recollection?

A.   It does.

Q.   Where were those machines observed?

A.   The Knotty Pines bar in Leeper, PA.

Q.   Do you know where Leeper is?

A.   Somewhere out west.

Q.   Do you know if it's in Beaver County?

A.   I do not.

Q.   44E.  Pace software?

A.   No, it does not appear to be.

Q.   The next one?

A.   That -- there's a terminal identifier there.  So I would imagine that's possibly Pace software.

Q.   Let's go back up again and take a look at that.

A.   I'm sorry.  Yes, that is Pace software.  Yeah, sorry.

Q.   Okay.  Scroll down.  Scroll down.  Scroll down.
Pace software?

A.   Yes.  Yes, they appear to be Pace software.

Q.   Keep going.
Pace?

A.   Yes.  Yes to that, yes.

MR. NEISER:  We can skip over the next one.  It's not material.  Is that the end?  Keep going?

MR. SIMEONE:  That's it.

MR. NEISER:  We can skip over that one.

BY MR. NEISER:

Q.   And for the last one, 44F?

A.   That does not appear to be Pace software.

Q.   Yeah.  It's interesting.  Huh.  Huh.
Do you know what kind of software that is?

A.   I cannot even see it, no.

Q.   Do you know where that was located?

A.    Not offhand, no.

MR. NEISER:  May I approach, Your Honor?

THE COURT:  Yes.

BY MR. NEISER:

Q.    Sir, can you look over that report, and let me know when you are done reviewing it for the location.

A.    Okay.

Q.    Did that refresh your recollection?

A.    It did.

Q.    Thank you.  Where are these machines found?

A.    In a location in Bridgeville, PA.

MR. NEISER:  You can take it down.

BY MR. NEISER:

Q.    Sir, are you involved in the legislative or political activities of Pace-O-Matic, POM of Pennsylvania, in Pennsylvania?

A.    Yes.

Q.    Without describing exactly what you -- the contents of them, can you tell us what you do?

MR. ZEGARELLI:  Relevance, Your Honor.

MR. NEISER:  Your Honor, it goes to increasing market awareness, market brand, advertising, and developing the brand within the Commonwealth of Pennsylvania, which are necessary elements related to our secondary meaning claim.

THE COURT:  Overruled.

MR. NEISER:  Thank you.

THE WITNESS:  I usually venture with lobbyists to go talk with senators, representatives, and discuss the legality and our product.

BY MR. NEISER:

Q.    Understood.  Mr. Goodling, thank you, sir.

MR. NEISER:  Your Honor, no further questions.

THE COURT:  Thank you, Mr. Neiser.

Mr. Zegarelli, do you have questions for Mr. Goodling?

MR. ZEGARELLI:  I expect to, Your Honor.  But I think best that I have at least a chance to talk with my client during lunch, if that's acceptable to the Court.

THE COURT:  About Mr. Goodling and his testimony?

MR. ZEGARELLI:  About the exhibit that was presented today.  It had changed.  And I would like to at least have the opportunity to discuss it with my client if possible.

THE COURT:  All right.  Would we be able to do that during a short recess, or do you need additional time beyond five or ten minutes to do that?

MR. ZEGARELLI:  No, Your Honor.  I mean, if you want five or ten minutes, that's fine.

THE COURT:  I'm just concerned about the jurors and lunchtime.  So in lieu of perhaps waiting another ten minutes, and then certainly you may question this witness as long as you want, why don't we take the lunch break now.

We'll be back here at 1:30, ladies and gentlemen.  So you are excused.  I would like to meet with counsel just very briefly at sidebar while the jury is going back to the jury room.  So court is adjourned.  Thank you very much, ladies and gentlemen.

THE CLERK:  All rise.  This court is in recess.)

(Whereupon, sidebar conference held:)

THE COURT:  First of all, I'm not clear which of those exhibits were actually A through F.  So if you could assist over the lunch hour just so Mr. Zegarelli knows which one is which.

MR. NEISER:  Absolutely.

THE COURT:  I know that this was done quickly.  I appreciate that.  I just want to make sure when he's referring to it, we're all talking about the same exhibit.

MR. NEISER:  We broke them out and Mr. Zegarelli --

MR. DEASY:  I have it on a flash drive.

THE COURT:  I want to make sure you know which is which.

MR. ZEGARELLI:  I was trying to track some of the Bates numbers, but they're really small ones.

THE COURT:  It was a little bit difficult to tell.  That's fine.  I just want to make sure when Mr. Zegarelli gets to his part of the case.

MR. NEISER:  Absolutely.  We have them broken out, Your Honor.  The only modifications we did were the -- because

they were part of the compliance report mentioned, legal compliance report, so we lopped it off and we stuck to the photograph.

THE COURT:  All right.  Mr. Zegarelli, I wanted to check with you to see who you are going to be presenting as witnesses when Mr. Goodling is completed.

MR. ZEGARELLI:  I have to say, Your Honor, that we do have one witness at 2:30, which would be Mr. Rodgers.  We don't have -- he's scheduled for a 2:30.  I might be able to get him earlier.  Sorry.  What time is lunch?

THE COURT:  We're starting in at 1:30.  I expect you to have enough witnesses to go through the afternoon, as we've talked about today and yesterday.  If that means you have to read in some depositions, you have designated some of them or want to call one of your clients, but we're not going to have one witness and then stop for the day.

MR. ZEGARELLI:  Okay, Your Honor.  Thank you.

THE COURT:  Would you let Mr. Neiser know once you know how you're going to proceed other than with Mr. Rodgers?

MR. ZEGARELLI:  Thank you.  What time are we back?

THE COURT:  1:30.

(Whereupon, sidebar conference concluded.)

(Whereupon, the lunch recess was had.)

THE COURT:  Please be seated, everyone.  Good afternoon.

All right.  Mr. Zegarelli, are you ready to proceed?

MR. ZEGARELLI:  I am.

CROSS-EXAMINATION

BY MR. ZEGARELLI:

Q.    Good afternoon, Mr. Goodling.

A.    Good afternoon.

Q.    Mr. Goodling, are you familiar with a document called Equipment Purchase Agreement that is at issue in this litigation?

A.    Equipment Purchase Agreement?

Q.    Yes.

A.    I am not.

Q.    Okay.  And, accordingly, is it, therefore, not correct that the testimony you gave earlier is not a judgment or an opinion on the Equipment Purchase Agreement?

A.    Correct.

MR. ZEGARELLI:  No further questions.

THE COURT:  Thank you.

Anything further, Mr. Neiser?

MR. NEISER:  Your Honor, can I just ask one clarifying question, Your Honor?

THE COURT:  Yes.

MR. NEISER:  It may be a little bit outside the scope of cross.

THE COURT:  Do you have an objection?

MR. NEISER:  It's just to ask about the dates.

MR. ZEGARELLI:  No.

REDIRECT EXAMINATION

BY MR. NEISER:

Q.    Sir, can you generally give us the time periods in which the photographs 44A through F were taken?

A.    I believe from 2018 up to sometime to the present.

Q.    Thank you, sir.

MR. NEISER:  No further questions.

MR. ZEGARELLI:  On that issue, Your Honor, we should probably take a moment and look at the pictures, and I'll walk the witness through and ask him to just identify the time of each of the pictures.

THE COURT:  All right.

RECROSS-EXAMINATION

BY MR. ZEGARELLI:

Q.    Mr. Goodling, with regards to Exhibit 44A, for the record, can you set forth the time in which this picture was taken?

A.    No.

Q.    Okay.  With regard to Exhibit 44B, as in "Bravo," can you identify the date and time this picture was taken?

A.    No, not without the report that's attached to it.

MR. NEISER:  Your Honor, we can give him the full report, and he can review that and answer if it would be

helpful.

THE COURT:  I think that's up to Mr. Zegarelli whether he wants to do that or not.

MR. ZEGARELLI:  Your Honor, we can just go from memory, if he can testify to it.

BY MR. ZEGARELLI:

Q.    Mr. Goodling, with regard to 44C, as in "Charlie"?

A.    I would say sometime between 2018 to the present.

Q.    With regards to 44D?

A.    Which one is that?  The small one to the left?

Q.    Is this not one single location?

A.    Oh, there's two pictures.  I'm not sure which pictures we're talking about.

Q.    I'm sorry.  Are not all of these -- were not all of these pictures on this Exhibit 44D taken at same time at the same location?  Same date, time, and location?

A.    Sometimes, I would assume somewhere between 2018 and present, yes.

Q.    So just -- just so it's clear, so some of these pictures were not -- all of the pictures on 44D were not taken at the --

A.    I don't know without the report.

Q.    Okay.

MR. ZEGARELLI:  Why don't we give the witness the report.  Can we --

MR. NEISER:  Sure.

MR. ZEGARELLI:  I don't have that document.

THE COURT:  Perhaps take that down, at least the bottom of that.

MR. NEISER:  Could we -- A.J. could do those exhibits for Mr. Zegarelli because I don't know that they have all of the redactions.  So if you direct Mr. Simeone, he'll do it for you.

MR. ZEGARELLI:  That's fine.  We can start with A again.  That's fine, thank you.

MR. NEISER:  We are here to help.

MR. ZEGARELLI:  A.J., are you able to take over the screen?

MR. SIMEONE:  Yes.

MR. ZEGARELLI:  And if you could put up 44A, please.

BY MR. ZEGARELLI:

Q.    So the question before you, Mr. Goodling, is for each of the exhibits, to identify the date and time --

A.    Yes.

Q.    -- taken?

A.    So according to the report, this was taken on June 13, 2019, at the Whitehall Mini Mart.

Q.    Okay.

MR. ZEGARELLI:  If you can put up B, as in "Bravo," please.

BY MR. ZEGARELLI:

Q.   You can hold on to that, sir.  Oh, I see.

A.   Okay.  That appears to be taken on 7/23/2019, at the MDO's Pizza in Paxton Street, Harrisburg.

Q.   And 44C, please.

A.   Yes, this appears to be taken on January 21, 2020, at the Riverstone bar in Parker, PA.

Q.   And D, as in "David"?

A.   We're on D; correct?

Q.   I believe that's correct.

MR. ZEGARELLI:  May I, Your Honor?

THE COURT:  Yes.

THE WITNESS:  According to the report, yes, this was taken September 17, 2019, at the Knotty Pines Inn in Leeper, PA.

MR. ZEGARELLI:  Can we have E?  Thank you, sir.

THE WITNESS:  E, did you say?

BY MR. ZEGARELLI:

Q.   Yes.

A.   Well, I think this -- this one's not marked E.

Q.   Put that down, if you don't mind, sir.

A.   Okay.  So this appears --

MR. NEISER:  I don't --

THE WITNESS:  That picture appears to be taken 2/26/2020, in Pottstown, PA.

BY MR. ZEGARELLI:

Q.   Okay.  And that's E?

A.   I -- no.  I do not believe that's E.  No.

Q.   What exhibit --

MR. NEISER:  For the clarity, Your Honor, I think E was skipped over, and it's just F we have.  We had to skip over that for a couple of reasons.

THE COURT:  All right.  So there is no 44E.

MR. ZEGARELLI:  Oh, okay.  Thank you.

THE COURT:  Is that what you're saying, Mr. Neiser?

MR. NEISER:  That's precisely it, Your Honor.

MR. ZEGARELLI:  So then F, please.

So I understand for the record, I was given 44E, but that --

MR. NEISER:  I would strike that.

MR. ZEGARELLI:  Okay.

THE WITNESS:  This appears to be taken on 8/30 -- 8/3/2019, in Bridgeville, PA.

BY MR. ZEGARELLI:

Q.   Okay.  So the only one that needs to be addressed, if I understand it --

MR. ZEGARELLI:  Could you put up 44E, please.  Thank you, sir.

THE COURT:  That's not in evidence yet, as I understood it.

MR. ZEGARELLI:  I misunderstood.  I thought it was already moved into evidence.

MR. NEISER:  The photographs were, Your Honor.

THE COURT:  The photographs of E were?

MR. NEISER:  Oh, no, Your Honor.  It's just 44A through D and F, Your Honor.

THE COURT:  All right.

MR. ZEGARELLI:  Very good.

You can take that down now, thank you.

THE COURT:  Thank you.

MR. NEISER:  Thank you, Your Honor.  They are in evidence, Your Honor?  I believe they are.  They were.

THE COURT:  They are in evidence, as far as I understand.

MR. NEISER:  Yes, Your Honor.  Thank you.

MR. ZEGARELLI:  If I understand, A through D and F?

MR. NEISER:  Yes, sir.

MR. ZEGARELLI:  Very good.

BY MR. ZEGARELLI:

    Q.   Thank you, Mr. Goodling.

    A.   Thank you.

MR. ZEGARELLI:  Oh, I'm sorry, that's -- in fact, that's -- I have no further questions for Mr. Goodling.

THE COURT:  All right.  Thank you very much.

Nothing further, Mr. Neiser?

MR. NEISER:  No, Your Honor.  Is the witness excused?

THE COURT:  He is.

Mr. Goodling, thank you for your testimony here today, you are excused.

THE WITNESS:  Thank you.

(Witness excused.)

THE COURT:  Mr. Neiser, before you proceed, I believe there was an exhibit that you showed earlier, Exhibit 204.

MR. NEISER:  Yes, Your Honor.

THE COURT:  I don't believe that has been introduced into evidence, and I don't know whether you intended to do so.

MR. NEISER:  We certainly did, Your Honor.

THE COURT:  All right.  That was, as I understand it, the logo.

MR. NEISER:  Yes, Your Honor.  I apologize.  I thought there a tender on that.  Thank you.

THE COURT:  Any objections to that?

MR. ZEGARELLI:  No, Your Honor.

THE COURT:  And, Mr. Zegarelli, I think yesterday there may have been an exhibit that was misidentified.  We talked about Exhibit 275.

MR. ZEGARELLI:  275, Your Honor, if I recall, is an exhibit of five or six invoices, two of which I believe are Pace-O-Matic, and the balance are Miele Manufacturing.  I think, when I showed it to Miele Manufacturing, the two Pace invoices were not in the document actually shown to Mr. Miele.  So I think it's a -- an inconsequential issue because he did not

testify to the Pace invoices.

THE COURT:  All right.  So you're saying what was identified as 275 is, in fact, 275?

MR. ZEGARELLI:  Yes, Your Honor.

THE COURT:  Okay.  All right.  Thank you.  I just wanted to clear that up.

MR. ZEGARELLI:  I believe so.  I believe it's five or six pages to Pace and the balance for Miele.

THE COURT:  All right.  We'll make sure we get that cleared up at some point.

MR. ZEGARELLI:  Next witness?

THE COURT:  Mr. Neiser, do you have any other witnesses?

MR. NEISER:  We rest, Your Honor.

THE COURT:  All right.  Then are you ready to proceed?

MR. ZEGARELLI:  I am, Your Honor.  We'd like to call our first witness, William Rodgers.

THE COURT:  All right.

Mr. Rodgers, would you step forward to be sworn, please.

THE CLERK:  Please raise your right hand.

WILLIAM RODGERS, a witness herein, having been first duly sworn, was examined and testified as follows:

THE CLERK:  Thank you.  You may be seated.

THE COURT:  All right.  Ladies and gentlemen, we're

now proceeding with the case of Pennsylvania Skill Games.  This is their first witness, Mr. Rodgers.

DIRECT EXAMINATION

BY MR. ZEGARELLI:

Q.    And would you state your name for the record, please?

A.    May it please the Court, William Rodgers III.

Q.    And, Mr. Rodgers, you are an attorney; correct?

A.    Yes, sir.  I'm an attorney licensed to practice law in Pennsylvania and as well as Georgia and before this tribunal here.  I've been licensed in Pennsylvania since 2012 and recently in Georgia.  So I've been practicing for over ten years.

THE COURT:  Mr. Rodgers, if it's more comfortable for you, you can move that microphone around to where it's best for you.

THE WITNESS:  Is my projection well enough?

THE COURT:  It's absolutely fine.

BY MR. ZEGARELLI:

Q.    Now, we'd like to state for the record, Mr. Rodgers, do you --

MR. ZEGARELLI:  First of all, we would say that Pennsylvania Skill Games has released any attorney-client privilege with regard to the testimony.  Mr. Rodgers has represented Pennsylvania Skill Games, and we just want to make it clear that we do release that privilege of record.

THE COURT:  All right.

Mr. Neiser, any objection?

MR. NEISER:  No, Your Honor.  We can take them as they come.

BY MR. ZEGARELLI:

Q.   Okay.  Mr. Rodgers, are you familiar with a company called Pennsylvania Skill Games?

A.   I am.

Q.   And how so?

A.   They used to be a former client of mine.  I believe Mr. Unis, sitting right there, Albie Unis, was my client.

Q.   Okay.  And are you familiar with Albert Unis III?

A.   Is that Albie's father?

Q.   It is.

A.   Yes, I'm very familiar with him as well.

Q.   Okay.  And when was the first time you can recall becoming familiar with either of the Unises?

A.   Well, probably back in 2012.  I believe they were clients of Mr. Amato's, the lawyer I had worked for when I first started practicing, and they were client -- they were clients of the firm, and I handled matters for them periodically.

Q.   Okay.  And at some point, were you introduced to the -- apart from you working at the Amato firm, were you introduced to one or either of the Unises?

A.   Yeah.  Periodically I would meet Albie's father, I

think Albert Unis III.  Subsequently I was introduced, then, to Albie and, I believe, some other siblings.

Q.   Okay.  And did -- did you perform legal services for them at some time?

A.   Yes.

Q.   Okay.  And if I take you back to around the time of 2014, are you familiar with a Beaver County case?

A.   I am.

Q.   With regard to determining a particular skill game being legal in Beaver County?

A.   Yes.  I'm vaguely familiar.  I came into this matter after that case was adjudicated.

Q.   Okay.  When you say you came into the case after, was there somebody that preceded you with representation?

A.   I believe so.  I wasn't involved in any litigation.

My involvement with Pennsylvania Skill Games was that, after the case had been adjudicated in Beaver County, at some point -- and I don't recall specifically if it was Mr. Albert Unis III or IV -- one of them contacted me about being involved in moving terminals into Beaver County, which we can get into subsequently.

Q.   Okay. Now, if I understand it, you've had the opportunity -- let me back up.  You no longer work for the Amato firm at this point, is that right?

A.   That's correct.  I can't recall exactly when I left.

I'd like to say I worked there approximately 4 1/2, maybe 5 years. I went downtown with another gentleman to practice law downtown as his partner for three years or so, and now I'm back out in the suburbs. I work for Edward J. Krug & Associates, and that's out in Moon Township.

Q. Now, we have obtained your file for -- with regard to the Unises and Pennsylvania Skill Games, LLC. And I understand that you've also received a copy of your file, understanding that you were going to testify here today; is that right?

A. Yes, that's correct. I requested a copy from Mr. Amato. He kept a copy at the office, and I obtained a copy and I've reviewed it.

Q. We've got an electronic copy of the file, and you have not yet seen the electronic copy of the file?

A. Right. I've not physically reviewed the file that was at Mr. Amato's office. I was given copies of whatever documents were given to me. So I don't know whether it's a complete file or not. If there's any additional information, the electronic file, you know, I can tell you what I know.

Q. So what I'm going to do is I'm going to disclose to you, for purposes of authentication, the electronic version of the file. And if anything looks like something that is in one and not the other or vice versa, if you can point that out. Now, I'll scroll through it for you slowly, and you can stop me if you like.

I understand you brought a paper copy of the documents?

A.   Yes.

Q.   If you need to review them as we go to see if it is a match, unless there's some objection, you can do that.  I just want to make sure that the documents that I'm showing you are what you believe to be the same file that you've obtained to review.  Okay?

THE COURT:  All right.  Let's take down -- thank you.

MR. ZEGARELLI:  This is, for the record, Exhibit 100.

THE WITNESS:  Page 15.  If you could scroll up a little bit so I could briefly review this.  Okay.  Hang on one second.

I don't particularly recognize this document.  I don't recognize the handwriting.  It appears that it would have been from one of the Unises.  But I don't recognize that particular document.

BY MR. ZEGARELLI:

Q.   Okay.  For purposes of reference, I will -- we understand, for the record, that the PDF exhibit page 15, you cannot authenticate.  I will not remove it, only because I don't want the pagination to be changed.

A.   Gregg, you can go faster.

Q.   Mr. Rodgers, and I'll note there appears to be some handwritten notes, and I would just ask at this time to be

cognizant of the fact that I will be asking you whether or not the notes are yours or notes that you don't recognize.

A.    Sure.  Page 30, it looks like it's a fax from somebody who preceded me after I had left the firm.  And these faxes would have been -- I would have no particular knowledge about them.

Q.    All right.  And that's page 30.

A.    Yeah, beginning at page 30.  And anything with a fax cover head after 2018 wouldn't be something I'm familiar with.

Q.    Well, let's just go through it, and you tell me.

A.    Okay.

Q.    So page 30, 31, 32?

A.    Yes, that's correct.  The emails that have my name on them, of course, are mine.

May I see -- scroll up for a second, Gregg.  Okay, yeah, I recognize this as well.

Q.    You do recognize it?

A.    Yes.

Q.    Page 40?

A.    Uh-huh.

Q.    Does that appear to be with the exception of --

A.    Yeah, with the exception of -- I'm sorry.

Q.    With the exception of page 15 and 30 through 32?

A.    That sounds right.  The rest of the documents, I recognize.

Q.    Now, I will direct your attention to page 60.  Do you see page 60?

A.    Yes, sir.

THE COURT:  Before we do that, I don't believe this has been moved into evidence.  If you're intending to do that, what portions you're intending to move in, and we'll give Mr. Neiser an opportunity to respond.

MR. ZEGARELLI:  Right.  Your Honor, what I was going to do is try to extract out before the jury -- before the jury would see it and to have it individually authenticated.

THE COURT:  Thank you.  That's great.

MR. ZEGARELLI:  As best we could do.  Again, Your Honor, I haven't tried to coordinate his physical file and this document in any way before today.

THE COURT:  I understand.  I think we'll deal with specific documents.  You'll let us know that.  Mr. Neiser can object if he has any objection to any of them.

MR. NEISER:  Yes.  I'm not trying to get into the way of admissibility.  I just want the caveat that those couple of things that Mr. Zegarelli mentioned, you may need to pull them out before they are given to the jury or published before the jury.

MR. ZEGARELLI:  Yes, Your Honor.  Again, the only reason why I'm not pulling it out first is because then I think that's going to throw off the exhibit pagination.

THE COURT:  I understand.

BY MR. ZEGARELLI:

Q.   Mr. Rodgers, with regard to page 60, do you recognize that document and the notes on that document?

A.   Yes.

Q.   Okay.  And are the notes on that document your notes?

A.   They are.  The handwriting is mine.  I believe I also made -- appears that there's a series of, like, marks next to the various points that are set forth in this document.  I believe those are my marks.

Q.   Okay.  So your marks are those -- there's some Xs and some --

A.   Yes.

Q.   Okay.  All right.

A.   Or check marks, as some of them are.  So some of those are check marks; some of those are Xs.  It's not easy to discern, you know, what either one is.  I didn't fully expect my file would be introduced into evidence.  So...

Q.   Right.  I understand.

Now, with regard to page 57, do you see a document entitled "Equipment Purchase Agreement"?

A.   Yeah.  This appears to be the or one of the versions of the Equipment Purchase Agreement that the parties negotiated.

Q.   Okay.  And on page 58, do you see the --

A.   Yes.

Q.    -- the notes and --

A.    Yes, sir.  Those are my notes.  That's my handwriting.

Q.    And that's 57 through 59?

A.    I haven't seen 59.  It's 57, 58.  Can you show me 59? Yep, that's my signature as well.

Q.    Your signature being the witness signature as it appears?

A.    Yes.

Q.    Now, I direct your attention to page 44.  Do you see that email?

A.    Yes.

Q.    You are the drafter of that email?

A.    I believe I am.

Q.    Okay.  And with that email, it references revised version with your changes.  Do you see that language?

A.    Yes.  Would it be helpful if I read it into the record?

Q.    Okay.  Let's just take a moment.

Now, there was -- can you -- can you indicate whether or not the Equipment Purchase Agreement attached to that email is the document that's attached from 45 to 47?

A.    I -- I don't know.

Q.    Okay.  With regard to page 41, there are some notes, and they look like they're in different hands.  Do you recognize any notes that you took directly in relation to any other notes?

A.   Yes.  May I explain?

Q.   Sure.

A.   So this is -- it looks like a version of the Equipment Purchase Agreement.  There are notes.  It looks like -- some of the handwriting I recognize as Wayne DeLuca's, and some of the handwriting I recognize as my own.  My recollection is that it looks like Wayne had edited this particular version and I had added additional language.

Q.   Okay.

A.   Or proposed additional language.  Maybe not added it yet.

Q.   And that's pages 41 through -- 41 through 43?

A.   Yeah.

Q.   And it looks like we should keep in page 40 as well. It appears to be a cover page.  Would that be accurate?

A.   Yes.  It appears to be a fax from Wayne DeLuca to myself.

Q.   Okay.  The email at 39 is yours?

A.   Yes.

Q.   The email at 33?

A.   Yes.

Q.   With the attachment?

A.   I don't know whether 35, 36 are attachments to that email.  It's difficult to tell from the physical file.  Because typically the electronic file would have -- you'd be able to

pull it up.  But I don't have any reason to doubt that I didn't attach something, if that's what I've said in the email.

Q.    Okay.  Let's go to page 24.  Do you recognize this document?

A.    Yes.

Q.    I'm sorry.  Did I say 34?  I meant 24.

A.    You said 24.

Q.    And 25, an email?

A.    Yep.

Q.    And 23?

A.    Yes.

Q.    And the notes, do you recognize those notes?

A.    Yes.  If you will scroll down, those appear to be exclusively my handwriting.  Never mind, at the bottom of the page, I recognize Wayne DeLuca's handwriting.

Q.    Where exactly?

A.    On the -- we're looking at Exhibit 100, page 23, or subpart 23, on the bottom left-hand margin, it says -- I think it might say "WVD" -- as in Wayne V. DeLuca -- not sell fills. I'm not sure what that abbreviation -- would not sell fills, perhaps.  And then where it says, "Albert Unis and affiliates" -- oops -- "AIP Inc.," that's Wayne DeLuca's handwriting, as is the thing, handwriting to the right-hand side which says, "If pull" --

THE COURT:  Mr. Rodgers, if you could just identify by

location where the handwriting is.  This exhibit isn't in evidence yet.  So reading what they say is a little bit premature.

THE WITNESS:  Yes, Your Honor.

The handwriting is located in the bottom right-hand of that page, Exhibit 100, subpart 23.

BY MR. ZEGARELLI:

Q.    Okay.  And you are familiar with the handwriting that you've identified, whether it's yours or someone else's?

A.    Yes.

Q.    Okay.  And that's page 23.  And 22 looks very similar?

A.    May I see the top of 22?

Q.    Sure.  Let's just make sure we look at 22 and 23.  So 22, I think you testified to.

And 23, some different notes, and I think you've --

A.    I believe I testified to 23.

22 is a different version of that same document without my handwriting.

Q.    Okay.

A.    22 does not have my handwriting, it appears.  I don't have control over the screen; so I couldn't --

Q.    Where would you like me to go?

A.    Just scroll up to the top of 22.

Yeah, that appears to be an earlier version of the agreement.  It does not have my handwriting on it yet.  It does

bear Wayne DeLuca's handwriting at the bottom of the page. That's Exhibit 22.

If you go to Exhibit 23, that is the same document, it appears, with my handwriting added to the document.

Q.   Okay.  Thank you.  And 19 and 20 are your emails.  Do you recognize those?

A.   Yes.

Q.   And 18 appears to be what we've previously shown as a January 29, 2015, agreement signed?

A.   I agree with that assessment.

Q.   Okay.  Is there -- do you recognize 17?

A.   Yeah.  I think these were in my files.  I don't really know a whole lot about them.  These are invoices, I believe, related to the purchase of compliant terminals, perhaps.  But I don't have any specific knowledge about them.

Q.   Okay.  And that's two invoices on 16 and 17?

A.   Let me see 17, please.  Yes, that's correct.  That's 16 and 17.

Q.   14 seems to be the last page.  I'm not quite sure how to address this.  Part of it is redacted.

A.   Actually, I think what's going on with -- if you go back to 11, I can explain.

Q.   Okay.

A.   Carole Lowanski (phonetic) was a secretary of mine prior to me leaving the firm.  Can you go back up to the top of

the page, please?

Q.   Sure.

A.   On 11.  It appears that she has printed this document. She -- I must have accessed my email and added it to the file subsequently.  But I don't believe this is redacted.  If you go down to the bottom of 11, keep scrolling.

Q.   I see it.

A.   Right there.  This is a photograph.  So when you printed the document -- when whoever at my previous firm printed document, the photograph got displayed over multiple pages. Whatever this is a photograph of, it's spread out over multiple pages, it appears.

Q.   Okay.  And I'm not sure.  It appears to have been sent to you, and I'm not sure it's so clear -- let me just state it another way.  You really -- you're not able to testify as to what is contained on pages 11 through 13?

A.   Not really.  It appears to be a picture.  I don't know what it's a picture of.  It looks like one of the machines.

Q.   Right. Okay.  There is a document at page 8.  Are you familiar with -- there's some typed and then some handwritten notes.

A.   That's not -- that's not my handwriting at the top of that page.  It's dated 11/18/16 and says, Bill Rogers's notes regarding phone conference with Albert on 11/18.

They spelled my name wrong.

Q.    You know it's not yours?

A.    I know it's not me.

Q.    What about the typed text?

A.    Let me just read this.  I don't know what this is.  It looks like an incomplete note.  It is in the style of which I would write a note, with ellipsis at the end of training thoughts.  But I -- I don't know what it is.

Q.    Okay.  And you don't recognize it, then?

A.    Not particularly.

Q.    Okay.  There is -- there is an email that was apparently sent to you, and I'm not sure -- it doesn't appear you're the author of it.

A.    No.  If you could scroll up to the top, just -- of this number 7.  This is an email from Pennsylvania Skill Games.  I believe this is Albie emailing me something.

Q.    Okay.  It appeared -- okay.  So there's a subject line.  Does that help you identify it?

A.    Yeah.  I believe there was an issue --

THE COURT:  All right.  Let's not talk about what the issue was yet.

Excuse me, Mr. Rodgers, let's make sure we are just identifying what the exhibits are.  Thank you.

THE WITNESS:  Sure.

BY MR. ZEGARELLI:

Q.    Okay.  And you'll see page 6.

A.    Yes.

Q.    And there's a page that precedes it.  Do you have an understanding of those two pages, if they go together?

A.    May I see 6 again, please?

Q.    Sure.

A.    Okay.  May I see 5, please?

Yes, I believe those two items do go together.

Q.    And page 4 appears to be a letter, perhaps, to -- it's in your file, but it appears to be to Mr. DeLuca.

Are you familiar with it?

A.    I -- I am vaguely.  And this is -- when was this sent?  2016.  So it's been six years since I've, you know, potentially seen this document.  Mr. -- Attorney DeLuca would have likely shared this with me.  So that's why it would be in the file.

Q.    Okay.  So I don't think we're going to authenticate that one.  Maybe we'll use that one to refresh your recollection at some point.  But what about page 3?

A.    Yes, I recognize that.

Q.    And the notes are yours?

A.    The notes are mine.

Q.    Page 2, the notes are yours?

A.    Yes.

Q.    And page 1, notes are yours?

A.    Yes.

Q.    Okay.  So, for the record, I have pages 1, 2, 3, 5, 6,

8, 16, 17, 19 to 20, 22, 23 to 25, 33, 39, 40 to 43, 60, and 57 to 59 being pages that appear, as you can authenticate, as part of your note-taking at some point in time, which we can discuss?

A.   If that's what we just previously discussed, because I wasn't taking notes, that sounds right to me, Gregg.

Q.   Okay.  Very good.

MR. ZEGARELLI:  I would move in those pages.

MR. NEISER:  We have -- sorry we have to do this here, Your Honor -- page 4 of 60 -- if he can authenticate them, I'll take him at his word.  But on relevance grounds, we object to page 4 of 60, 6 of 60 -- I'm sorry.  4 of 60, 5 of 60, 6 of 60, 7 of 60, and page 15.  That is 4, 5, 6, 7, 15.

MR. ZEGARELLI:  Okay.  Your Honor, I'll just take a moment, if you don't mind, and I'll try to look at those pages.

THE WITNESS:  Do you want to just go through them individually?

MR. ZEGARELLI:  Well, I mean, page number 15 appears to be a document that's -- the witness doesn't recognize.

THE WITNESS:  I don't recognize it.

MR. ZEGARELLI:  That page itself just is not even included.

MR. NEISER:  Well, I understand it.  I'm just going in order to make it as efficient as possible.

MR. ZEGARELLI:  Okay.  So 15, I think we all agree that's not in.

4 through -- 4, 5, 6, 7, that all appears to be a subject matter which we can hold that for the moment, Mr. Neiser. We don't have to move that in.

We can take those on abeyance for the moment, Your Honor.

THE COURT: All right. So as I understand it, with respect to the objections posed by Mr. Neiser, pages 4, 5, 6, and 7 are not admitted as of now nor is page 15. And if you intend to use those at some later point, we'll have to renew the objection at that point.

MR. NEISER: Thank you, Your Honor.

MR. ZEGARELLI: Right. Thank you, Your Honor. Now, I can remove those pages before it gets published so we don't have an accident. But that --

THE COURT: I don't think you need to remove them. Just don't show them.

MR. ZEGARELLI: Okay. I'll do my best not to scroll.

THE COURT: I'll remind you.

MR. ZEGARELLI: Thank you.

MR. NEISER: As was I, Your Honor.

BY MR. ZEGARELLI:

Q. Okay. Now, let me just back up for a moment, Mr. Rodgers. Can you describe the physical environment within which you worked at the Amato firm as it relates to Mr. DeLuca?

A. Sure. The building that the firm was housed in is a

long rectangle.  Sort of like the counsel table right here.  It was three stories.  On the first story, there was a renter.  On the second story was myself and one of the partners.  So I was an associate attorney there, and then they made me a nonequity partner, a named partner, but that's a different issue.  So it was myself and a partner on that second floor.  And on the third floor was Mr. Amato.

Just so you understand, you come in through the front of the building, to the front of the rectangle, and there was -- as you entered, there's a elevator on the left-hand side.  That elevator would give you access to -- so it was on the first floor; it would give you access to the second and third floor if you had a key.

Mr. DeLuca rented an extra office on the third floor.  So -- but on the second floor is where we housed all of the files and where I had my private office and where Attorney Rick Start had his private office.  And that's the best explanation I can give.

But there's a long hallway on all of the floors where you -- that's how you got through the building.  It was like a long rectangle, best way to describe it.

Q.   Okay.  And did Mr. DeLuca have occasion at times to -- first of all, Mr. DeLuca was in a different law firm, if I understand it?

A.   Right.  He was, I believe, a member, partner at Eddy

DeLuca Gravina & Townsend at the time. So he would rent a night office from Mr. Amato who had probably known him for close to 50 years. He rented a night office, that third floor office.

As a regular part of our practice, we would handle municipal meetings and municipal work. So we would be in the office sometimes pretty late into the evening, even though it was a suburban law firm. Occasionally, Mr. DeLuca would come -- he would usually go straight up to the third floor or come to the second floor say, Hey, Bill, hey, Rick, I'm here, and then head up to his office upstairs. He wouldn't rifle through our files. And he didn't really keep anything in that third floor office. It was just a nice setup so he could see clients in the evening who couldn't make it downtown to Pittsburgh because he had an office over at the -- I'm trying to think of the name. It's next to the city county building. Well, anyway, he had an office down in the city, but it wasn't convenient for a lot of clients. So he maintained that night office. But there wasn't really anything in there. It was just a desk and chair and some books for display.

Q. And I asked you that question because were there times that the physical proximity of you and Mr. DeLuca accommodated perhaps a physical trading of documents?

A. Quite frankly, Gregg, one of these documents that I see here I'm certain Mr. DeLuca would have handed to me. I'd have no other reason to have it. It looks like it's an email.

But he would have handed that to me.  I assume that answers your question.

Q.   Yes.  Okay.  So I will -- let me back up.  So we have -- are you familiar with -- I'll direct your attention down to what we've shown from time to time as the January agreement.  Now, let me just begin by displaying for you page 21.

A.   Okay.

Q.   Do you see that, Mr. Rodgers?

A.   Yes.

Q.   Okay.  Now, are you familiar with the fact that there is a document signed by parties in January and a document signed by parties in May?

A.   On review of my file, I am.

Q.   Okay.  Now, with regard to page 21, these notes, they're your notes?

A.   So I can't see the full page, but this is not my handwriting.  If I may?  My handwriting begins right -- sorry.  Can you --

Q.   Up or down?

A.   Just hold still for a second.

Q.   Sure.

A.   My handwriting begins with this word.  This is all me.  This -- these items at the top, that is not my handwriting.

Q.   Now, do you -- do you know whose handwriting those notes are?

A.    Let me just read it:  Pace-O-Matic will pay all legal matters arising, use of software.  Pace-O-Matic will supply software.  If Pace-O-Matic decides not to support programs provided by Pace-O-Matic --

I don't believe it's Mr. DeLuca's.

Can you scroll down a little bit?

Q.    Sure.

A.    I'm not familiar with whose handwriting that is.  I don't believe it's Mr. DeLuca's.  It appears likely that it would be -- well, I'm not sure whose handwriting it is.

Q.    Okay.

A.    From the context of the document, it almost looks like it might be Mr. Unis', but I'm not sure.

Q.    Okay.  All right.  And you'll see some language that looks like it's in a bit of a darker pen.  It says, "if no longer supported"?

A.    Right.

Q.    And that looks like that's in your handwriting.

A.    That is correct.

Q.    Okay.  So your handwriting is next to something, AVA master key numbers.  But that's where your hand --

A.    Yeah.  From the yellow line down, which is approximately the middle of the page.

Q.    Okay.

A.    Of Exhibit 100, subpart 21.

Q.   Now, there's a number of bullet points.  Are you able to testify as to what those bullet points are indicating in your notes?

A.   Some of them.  Some of them.

Q.   Okay.

A.   Shall I?

Q.   Sure.

A.   So it looks like we really begin here:  "Pace-O-Matic will provide AVA --

MR. NEISER:  Your Honor, I object.  Foundation as to what language this refers to and which agreement it refers to, so as to avoid misleading the jury and confusing the issues.

THE COURT:  I think that's a valid objection.  Why don't we develop a little foundation about the context of these particular notes.

MR. ZEGARELLI:  Okay.

BY MR. ZEGARELLI:

Q.   So can you give -- so, again, we've got the January document, and we've got the May document.  Are you able to identify whether or not these documents -- this particular document is addressing terms and conditions in the May document or the January document?

A.   If you give me a second to review, I might be able to answer that question.

Q.   Okay.

A.    Can you show me the January agreement?

Q.    Sure.

A.    It's on Pace-O-Matic letterhead.

I apologize, Gregg.  I have that document.  We just probably need to identify it so there's clarity as to what I'm talking about.  22, please.

Q.    Sure.

A.    And 23 and 24, please.

And then what was the document number you were just showing me?

Q.    I was showing you 22.  I'm sorry --

A.    It was 21.  Can you scroll down?  Okay.  Let me just look at these notes.

Okay.  Stop there for a second.  I suspect that the time frame for this document, 21, is probably subsequent to my seeing this January version of the -- what will ultimately become the Equipment Purchase Agreement.  So you've got this January agreement.  Then I believe -- I believe these notes are after that.

Q.    Okay.  Very good.  Okay.  So with that said, can you more clearly testify as to the bullet points and their meaning?

A.    I'll try.  It's been -- it's been six years.  So we are buying legal machines, 25 of them, Harry Knafelc.  I'm not sure if that's a reference to Judge Knafelc.  I think he may have authored the opinion that came out of Beaver County that

essentially said some of these games were games of skill rather than gambling games and therefore they're legal.

So when I'm saying we're buying legal machines, what I'm writing there is these games are going to comply with that judge's orders, that judge's order.  And that order, in essence, says that the particular software and code that is in this game is a game of skill and not a game of chance.  And because it's a game of skill, my understanding is that those were legal per the order.

So my note here is that we're going to make sure that the agreement specifies that the games are the legal version of the game.  "Only 25," I assume that was 25 terminals.  I don't know for sure.  And then it says, "No prepay.  Pay" -- I'm right here -- "Pay as you pick up or delivered."  I think that was in reference to the terminal.

So we weren't going to prepay for the terminals.  We were going to only pay as we picked them up or as they were delivered.  So it's like somebody drops off a machine; you pay them there.  That's, I think, what that note indicates.

Any additional -- and that word is lit, litigation.  Any additional litigation or prosecution on legal software will be indemnified by POM.

That's Pace-O-Matic.  That's the abbreviation.

The thought here, that was if the software changed -- so if you change a line in the code from what is adjudicated to

be a legal game, then perhaps it's no longer a legal game.  And what this line here was that we were going to ask for Pace-O-Matic to -- I don't know if you want me to explain what indemnification is.

Q.    I don't necessarily think you need to go that far into the indemnification provision.

A.    Right.  But anyway, if there was additional litigation or prosecution because the software had changed somehow, this note was going to indicate that we wanted Pace-O-Matic to pay those costs.

Q.    Thank you.

A.    That's the best simple explanation.

Q.    Now, if I direct your attention to the next page, which is page 22.

A.    Gregg, can you hold down the control key and use the mouse wheel to scroll back so I can see the whole document at once?

Q.    Sure.  You want me to keep going up?

A.    No.  If you hold down the control key and scroll, it should pull us back from the document so I can see more of it at once.

Q.    You want it larger?

A.    Yes.  It will be smaller print, but I'll be able to see the whole thing at once.

Q.    Oh, I understand.

A.    There we go.  Perfect.

Q.    Okay.  So you see the whole document at one?

A.    Yes.

Q.    May I enlarge it?

A.    Can we keep it like this?

Q.    For a moment?

A.    Yeah.

Q.    Okay.  So you recognize the writing on the left of the margin?

A.    Yeah.  That's Wayne DeLuca's writing.

Q.    What does it say?  Or what does it --

A.    I'm guessing here.  It looks like it says, "Would not sell fills."

Q.    Okay.  Do you have an understanding of what that means?

A.    Not particularly.  Not at this time.  Fills are -- I'm a little iffy on the subject.  But I believe fills are these, like, software plays that you put into these compliant terminals.  I'm not sure I really understand.  But --

Q.    That's enough for your purpose, I think, to just say -- you're adding play to a machine, let's say.

A.    Yeah.

Q.    Now, in this particular version, you'll note that it appears to be one signature and some edits on the right.  Are you familiar with the edits on the right, and are you -- do you

have an understanding of why there's one signature, not two, with edits at the same time?

A.   Again, this all looks like Wayne DeLuca's handwriting. One is signed by Danny Warren.  Was there -- I'm sorry, Gregg, what's your question?

Q.   So you -- on the right, do you see -- it appears to me that it says, "If pulls out, no fills" --

A.   "Need following items."  And then there's a colon, and there would be a list, but there's no list.  But -- what I understand that to mean, although I didn't write the note, is that if Pace-O-Matic were to pull out of Beaver County, there would be no need for fills, I suppose.  But this isn't my note, so I'm not sure.

Q.   Okay.  Now, with regard to this January agreement, I think you've already noted, it's on Pace-O-Matic letterhead.  Is there a reason why these drafts are continuing to be on Pace-O-Matic letterhead and not with -- and not to be without the letterhead?

A.   So, to the best of my recollection, based on my recent review of the file and so forth, if you look at this page -- this is Exhibit 122.  If you can go to Exhibit 123, you can see that --

Q.   And excuse me.  Just so we don't confuse our exhibit numbers.  Well, why don't we just call it Exhibit 100, either page 23 or dot 23 or something within the 100.

A.    Okay.  Exhibit.

Q.    The record will get a bit confusing.

A.    Exhibit 100, page 23, you'll note that there's some additional handwriting in the upper right-hand corner.  That's my handwriting.  So you've seen now a version of this agreement, an initial version, and now you see me starting to put in edits.  And what these edits are is -- in re Pace-O-Matic Inc., equipment terminal ID number -- that's identifying the terminal that was the subject, I believe, of the litigation in Beaver County.

And I can't -- I wrote M-something there, but I believe that's the docket number for that case.  And that, I believe -- December 23rd, I believe, is the date that the -- of the judge's opinion.

So what I believe is happening here, based on my review of my notes and to the best of my recollection, is I'm starting to make notation on this initial version of the Equipment Purchase Agreement for the purposes of identifying what a compliant terminal is.

So I think in the subsequent versions of the Equipment Purchase Agreement, you're going to notice that there's a -- there's details about, like, what is a compliant terminal?  And that's where I start adding these notes.

So based -- best I could say is I think this is a early version of the contract that was provided to me.  I didn't

draft this, obviously, because I wasn't the lawyer for Pace-O-Matic. But this looks like it's the beginnings of the contract.

Q.    Okay.

A.    Because you'll see this language then added into what subsequently was a Word document later on and then filled out with more details.

Q.    Okay. So it's your testimony that this document ended up effectively --

A.    It's the baseline --

Q.    -- the word "migrating," but it ended up becoming the Equipment Purchase Agreement?

A.    Right. And, if I can explain, Mr. DeLuca is a very good lawyer. He's not -- he's not so great with the computer. I do know that he knows how to use a computer decently well, but he's not much of a typist. So it was incumbent upon me, once we started this process of negotiating this agreement, to write out the terms once we had started negotiating them.

But this first version of this contract is obviously -- this is not from me. It's on Pace-O-Matic's letterhead.

Q.    Okay.

A.    Again, I was counsel for Mr. Unis at Pennsylvania Skill Games, not Pace-O-Matic.

Q.    Now, do you have an understanding -- did you have an

understanding at the time whether Mr. DeLuca had, at least in the past at that time, represented the Unises?

A. I believe that he had in the past represented the Unises. I couldn't say for sure, and I wouldn't opine as to, you know, that situation.

Q. Okay.

A. I don't feel comfortable with that.

Q. Okay. And you'll notice that it says -- that "Albert Unis and Affiliates" appears to be crossed out with AIP Inc. above it?

A. Yes.

Q. Those are Mr. DeLuca's notes?

A. I believe they're Mr. DeLuca's notes. And I -- perhaps that's just to clarify who the other party to this initial agreement's going to be.

Q. Now, I'll direct your attention to -- and you don't have to testify to it, other than to show it to you as a baseline. I'm going to show you a document that we've identified, I believe, as Exhibit 6, trial Exhibit 6, and it is known as the Equipment Purchase Agreement, fully executed.

Do you recognize that document?

A. Yes, generally. But this -- this facsimile transmission of this document was after I had left Mr. Amato's firm, I believe. But, yeah, this appears to be the Equipment Purchase Agreement that we've -- I believe you probably have

discussed ad nauseam.

Q.   All right.  Let me take you down to -- I'm going to show you two different sections, and I don't really know which one comes first, and maybe you can decipher it.  So the first section is trial Exhibit 100.41, page 41.  Might have to flip these a couple of times.  But the next document is page 57.

A.   Bear with me, Gregg.

Q.   Sure.

A.   Okay.  Okay.  So go to --

THE COURT:  I don't think there was a question yet, was there?

MR. ZEGARELLI:  No, I was just saying -- I was just asking him to compare two different page numbers.

THE WITNESS:  May I see 57, please?

BY MR. ZEGARELLI:

Q.   Sure.  57 would be the document, for lack of a better way to say it, with the squiggly lines.

A.   Gregg, I think I have these documents in front of me, both versions.

Q.   What I'm going to ask you in a moment is which one comes first.  It's tough for me to know which of the three is first, just to have you testify as to the progression of notes.

A.   Okay.  So -- the one with the handwriting, I believe, would come first, yes, because --

Q.   Is it this one, Mr. Rodgers?

A.    Scroll up, please.  No.  Go to -- what's our other number?

Q.    Hold on a second.

A.    I had a note on it.  Go to 41, please.  This would be the first version of that, because in the subsequent versions you can see that some of my handwriting has been added into the subsequent version.  So this -- I'm pretty sure this is the first.

Q.    The record should basically show -- it appears you're holding up what is -- the section page 41?

A.    Yes, that's correct.

Q.    Okay.  So 41 is first?

A.    Yes, I believe so.

Q.    All right.  And then let me go down, then, to 57.  And you believe 57 is second.  And 57 is on the screen.

A.    Yes, I believe 57 is second.

Q.    And then just one more to get this progression handled.  This one might be easy for you to identify.  It would be page 60.

A.    Page 60.

Q.    Yeah, 60.

A.    Well -- give me one second.  Okay.  So I'm not entirely sure, but I think that -- what page?  This is 60?

Q.    60.

A.    I think the proper order is probably 41, beginning

with the handwritten notes.  Then I believe this was handed to me by Mr. DeLuca at some point.

Q.    That's 60?

A.    That's 60.

Q.    Then that leaves us with 57?

A.    And I think that's what led to 57, I think.  And I'm basing that on -- if you go back to 60, please -- not an independent recollection, but if you go down to point nine -- scroll down, please -- With consent not unreasonably withheld. If you look at point nine, that follows in 58, point nine where -- I know it's a little -- yeah, give me one second.

Q.    And maybe it ultimately won't really make a difference.  I was just trying to put them into sequence, if possible.

A.    Let's look at point five.  Okay.  That's -- okay. Point five, I've drawn an X through.  That's an X that I -- it says "no."  And I put an X through it.

          And then on page 58, I believe, if you pull up 58, yeah, I've crossed out five.  Okay.

Q.    Okay.  So at least that tells us that the notes on 60 appear to be conjoined with --

A.    57.

Q.    -- Document 58 and 59?

A.    Yeah.

Q.    In other words, these notes on 60 are relating to 58

and 59 -- actually, you're right, 57, 58, and 59?

A.   Right.  That sounds right to me.

THE COURT:  All right.  Now that we have that order set out, would this be a good time to take our afternoon recess?

MR. ZEGARELLI:  It would, Your Honor.

THE COURT:  All right.

Then, ladies and gentlemen, we're going to take a 15-minute recess.  We will see you back here at about five or ten minutes after 3:00.

MR. ZEGARELLI:  Thank you.

THE CLERK:  All rise.  This Court is in recess.

(Pause as the jury exits courtroom.)

(Whereupon, a recess was taken.)

(Pause as the jury enters courtroom.)

THE COURT:  Please be seated, everyone.

MR. ZEGARELLI:  Thank you, Your Honor.

BY MR. ZEGARELLI:

Q.   So, Mr. Rodgers, as we -- immediately before we took the break, I think you had identified the sequence.  Page 41.  Then page 57 to 59, and 60 relates to 57, 59, if I understand it; is that right?

A.   Yes.

Q.   Okay.  So will you look at page 41.  So if you don't mind -- and I think you've already testified that -- tell me if you didn't testify to it -- the darker language is Mr. DeLuca's?

A.    That's correct.

Q.    And the lighter language would be -- is yours?

A.    Yes.

Q.    Okay.  So if you don't mind -- and I'll scroll where you need me to scroll -- can you sort of walk through the notations as you understand them?

A.    Yeah.  So I believe this document came about as a result of me previously looking at whatever this one is.

Q.    You might refer to what is Trial Exhibit 6?

A.    Sure.  Yeah.  Trial Exhibit 6.

Q.    Or January agreement?

A.    The January agreement.  That sounds fine.  So going back to 41, this would have been a -- so it's called the Equipment Purchase Agreement.  It looks like what I've done is taken this January agreement and scribed some of the terms or most of the terms into this Equipment Purchase Agreement.  And going through it, This Equipment Service Agreement -- so Wayne change the word "service" to "purchase" -- is entered into this in blank day of blank 2015.

That note at the top of 41, if you'll go back for a second, "assignability language needed," that's just a note to myself at the top of that.  But at the end of the agreement, I'm going to give some party the right to assign this contract somehow.  I don't know -- we'll see subsequently what I've written but --

Q.    Now, you said you scribed in.  Are you saying that you took the January agreement and sort of used that as a base?  What did you mean by that?

A.    Yeah, that's my recollection of what -- how this -- how this Equipment Purchase Agreement document -- Exhibit 100, Document 41, came into existence was this January agreement was, in essence, converted to various versions of this Equipment Purchase Agreement.

Q.    Okay.

A.    These are Wayne's notes.  It's all Wayne.  Yep, these are all Wayne's notes.

Q.    Anything else to add to --

A.    Yeah, I'm a little surprised there's not an integration clause, neither Mr. DeLuca nor myself has added it.  The integration clause is basically a clause that says this document is the entire contract.  And that's not in here.  So I'm not sure why.  I don't remember.

Q.    Okay.  And that takes us down -- shall we start at 60 and work backward?  Or shall we start at 57 and work to that page 60?

A.    Well, I think what we ought to do is we ought to look at 41 and compare it to the first page of 57.  And it looks like -- pardon me one moment.

Q.    Do you prefer I have a certain page on the screen?

A.    No.

Okay. Beginning on page -- good, we're on 41. It looks like all of the changes that I'm indicating in yellow -- oops -- were made --

Q. I'm so sorry. I didn't see that. Go ahead.

A. -- were made except for where it's designated "assignee." The reason that's likely not been changed is because we haven't identified, ultimately, who the buyer is. And that's not atypical. What happens in these situations is sometimes a new business is formed, ultimately, to sign the contract. But, anyway, it looks like these changes were made, and you'll see them reflected on page 57. On Exhibit 100, page 57.

If you go to page 42 -- and it looks like we're going to cross-reference page 42 with 58. So we can track these changes. Okay. Yeah, that's going to work. You can leave this -- please leave 58 up.

Okay. So it looks like, in the prior version, this word was previously, like, "sign" or "signing." It was changed to "execution." So that change was adopted.

This note of mine is incomplete, provided I don't know what I was going to add there, but that's incomplete.

Typically, when I make changes to a contract, most modern law practices that you redline them through a Word document so that everybody can subsequently see the changes. As you can see, with the handwritten notes, my recollection is

Mr. DeLuca wasn't so great with the computer; so we did a lot of things by hand whereas, nowadays, you wouldn't see that as much.

Number five, In the event seller discontinues business in Pennsylvania -- okay.  So it looks like -- this is interesting.  If you go to page 42, please.  Looking at paragraph 5 -- look at paragraph 5.  "In the event seller discontinues business in PA or no longer provides fills."

Now, please go to 58.  You'll see that that language is written in here.  It is written in here.  And then, subsequently, I've drawn these, indicating that I don't want that in the agreement.  I don't remember why, but that's -- that's what's happening here.

And this is another incomplete thought.  You know, typically, this would be done on a computer nowadays.  So if Pace is -- so that's what happened with paragraph 5.

Paragraph 6, looks like I've added the word -- this phrase "compliant or otherwise."  I have incorporated Mr. DeLuca's change there, as well as the word "if," "opts," and "so on."  It looks like I've incorporated his changes, and -- okay.  It appears I've integrated his changes into number six, and then I've added this, "No sale of fills provided in Beaver County other than Unis," that's the word, Unis.  But other than to Mr. Unis.  So what that note is, is that Pace-O-Matic is not to provide fills to anyone else in Beaver County, so they're not going to be providing fills to play these machines to anybody

except for Mr. Unis.  I proposed that language.  I don't know if it made it into the final version.  But that's what that is.

Mr. DeLuca has changes on number seven.  It says "Any fills, equipment" -- it looks like I've -- this is another incomplete thought.  It is what it is.  This is --

Q.   I'm sorry.  What do you refer --

A.   Number seven at the end, I've written "This exclusively is" -- and then it's -- my Ms are not very good, but it says "limited."  That's what that next word is going to be. "This is exclusively limited to" -- I don't know.  This is --

Q.   Now, what you've just testified to with regard to these various provisions, does page 60 relate to those changes, or is page 60 just sort of on its own somehow?

A.   So page 60, I -- we can go through it, but it looks like -- so I know for -- five is that language that I did the loop-de-loop through; right?  So this is a note -- what is this? This is an email from Danny Warren to Mr. DeLuca.  And the reason this is in my file, again, Mr. DeLuca handed this to me. I don't have access to Mr. DeLuca's file.  He would have handed this document to me at some point when he had come to visit my physical office to go into his office on the third floor. Again, he doesn't keep files in that office.  You know, when you would walk by to see Mr. Amato, you could look in and see the office was empty.  So this document would have been handed to me.

And it looks like these are -- okay.  I think that these are Mr. Warren's notes about one of the drafts.  And it's not totally clear to me where these relate specifically to the contract.  By point five, he wrote out "no."

So let's look at -- let me get some clarity here.

Q.    Point five happens to the paragraph up above with the loop-de-loop.

A.    Yes, it does.  I'm trying to figure out -- oh.  Okay.  It looks like I've added -- okay.  So paragraph 5, here's what it says, it says -- can you pull that up?

Q.    Sure.

A.    I would have added this provision.  I'll start reading it while it's up on the screen.  "In the event seller discontinues business in Pennsylvania or no longer provides fills to buyer, then seller shall immediately provide buyer with access codes, master key numbers, and any other information needed for buyer to operate compliant terminals."

I added that language into the contract because we were concerned that, if Pace-O-Matic pulled out of Beaver County, we'd be left with very expensive machines that were fundamentally useless.

And if you'll go back to page 60 now.

Q.    Okay.  So let me -- okay.  Just so I'm getting clear.  So it appears that the document -- 57 through 59 is a draft to which Mr. Warren sent -- emailed bullet points to which then you

were entering sort of a combination of your notes and his notes?

A.   That's an accurate description of what's going on here.  It is rather convoluted, but that is what's going on.  This is an editing process.

Q.   Okay.  So then back to the combination of 57 to 59 as it relates to 60.  So if you could take it through --

A.   I think those are all of the changes that Mr. DeLuca really noted.  And then my note here, "Concerned if Pace pulls out of market, Albert will be left with useless machines."

I think I've articulated that, but the concern is that you end up with these gam -- they're not gambling machines.  They were games of chance.  But if Pace-O-Matic pulls out of the market, we've got all of these expensive terminals you can't use for anything if Pace no longer provides support.

And then obviously there's a note as to whether these are tabletop games or stand-up games, which are varying styles of machines that you would see at bars and stuff.

Q.   Now, do you have an understanding of the bottom, "Wayne, dot dot dot"?  Do you see that?  You do see the line?

A.   Yeah, I'm reviewing it.  Okay.  I am unsure what that means.  "We will continue to work with Albert in a positive way while we work to get documented."  Obviously, that either refers to Mr. Unis, who is sitting here in the courtroom, or his father.  "Quick and dirty meeting -- for your meeting with AU" -- I assume is Albert Unis -- "tomorrow morning."  That's

probably what that means.  I'm not sure what this initial statement here means.

Q.    Initial statement being "Wayne, dot dot dot"?

A.    "Wayne, dot dot dot, we will" -- this.  "Wayne, dot dot dot, we will draft an agreement from shells we have at Pace."  I don't -- oh, actually -- the word "shells" may refer to terminals, gaming terminals that don't have any, like, hardware in them.  I'm not sure.  But that might be what he means by the word "shells."

Q.    And I don't want to characterize it for you.  It seemed to me that the email might have gone to Mr. DeLuca from Mr. Warren --

A.    I believe I've testified to that point.

Q.    Right.  In fact, that's what happened.  You're right.

A.    And these are changes, and Mr. DeLuca handed them to me to use my computer skills to continue editing this Word document that eventually became the Equipment Purchase Agreement.

Q.    Okay.  Now, do you have any further understanding of the Section 6 I put on the screen and the note "no sale fills" --

A.    Yeah, let me read this.  Yeah, this eventually became the right of first refusal.  So what's going on here is Mr. Unis was going to be given exclusivity by Pace to put games into Beaver County.  And this looks like it's a draft of trying to

articulate that fact.

So basically Mr. Unis -- if somebody wanted to put games into Beaver County, they would have to go through Mr. Unis, or Mr. Unis would have to say, "Look, I don't want to put games in this particular spot." And at that point, Pace-O-Matic would be authorized to then sell the game or to a different -- through a different vendor or install the game. That's what this is.

I think this, in a subsequent version of the Equipment Purchase Agreement, is referred to as a right of first refusal. And it's articulated a little more clearly in subsequent versions. But that is the gist, I believe, of what's going on here.

So, for example, if Pace wanted to put -- if somebody at bar XYZ in Beaver County wanted to install a machine, the intent here is that they -- and they wanted to install a Pace-O-Matic machine, because these machines are compliant, so they're special. They're special because they're not -- they're not illegal. They're not going to be presumably seized, and they're games of chance.

So, first, X wants to put a couple games in bar XYZ, which happens to be located in Beaver County. The intention is then, therefore, that Pace-O-Matic would say, "Look, we have a guy in Beaver County. Let me talk to this guy first and see if he wants to put a game in." Hence, the right of first refusal.

Albert would then have the opportunity to decide whether he puts a game in.  If not, then subsequently Pace could sell the game to that person to install at that bar in Beaver County.

But this is the beginnings of that right of first refusal, which I don't know if you've already talked about it, but it's Exhibit 6, so I'm guessing you probably have.

Q.    I believe it might be Exhibit 5.

A.    Exhibit 5.

MR. ZEGARELLI:  Exhibit 6?  6.  Thank you.

THE COURT:  6.

BY MR. ZEGARELLI:

Q.    All right.  Thank you.  I think it switches gears a bit in terms of time and subject, but I'll direct your attention to page 2.

A.    Can I see the whole note, because I can --

Q.    Sure.  Do you have an understanding -- I mean, you already testified you recognize the note?

A.    Right.  Right.  I can articulate what this is about.

Q.    Thank you.

A.    So at some point, I had started writing -- Mr. Amato and Mr. Start kept hard files at their office.  Nowadays most lawyers' files are digitized; at least mine are.  Because we were all still paper, I would occasionally write these handwritten notes and tried to be consistent about things that were going on.

So this is a note that would have been prepared contemporaneous with speaking with Mr. Unis.  So it says here: "Albie" -- Mr. Unis -- "is going to take pictures of imposter machines which bear the company name.  He will provide names of the operators of those machines and contact information so that we can write cease-and-desist letters."

So based on this note and my kind of vague recollection after all these years, Mr. Unis observed that there were various games bearing the name "Pennsylvania Skill Games." And on observing that, he recognized that these weren't games that he had installed.  He was concerned about it.  So he called me presumably to talk about the issue, and this is the note that I prepared for my file.

So I was going to write cease-and-desist letters.  As a matter of fact, I believe I prepared at least one cease-and-desist letter to Talerico's in Ambridge, I believe.  I don't remember what it said, but I believe that's what happened.

Q.    Very good.  One second please.

Mr. Rodgers, do you recognize -- and I'll scroll through it before we publish it to the jury.  Do you recognize this particular document?

A.    I do recognize this document.

Q.    Okay.  It's been identified as Exhibit 43.  I'd like to move it in.

MR. NEISER:  No objection.

THE COURT:  Exhibit 43 is admitted.

BY MR. ZEGARELLI:

Q.    And your recollection appears to be correct.

Now, should I -- I'll scroll all the way through once for you.

A.    Yep.  Okay.

Q.    Would you rather have it large or the whole thing --

A.    I'd like to see the whole thing at once.

Q.    Very good.  Are you still reviewing?

A.    No, I'm ready.

Q.    Okay.  Can you -- do you recall the circumstances causing you to draw up this letter?

A.    Yes.  Mr. Unis would have observed -- based on this letter, I can see that he observed three video games at Talerico's bar in Ambridge.  He would have provided me with these terminal numbers, but I'm trying to be specific here.  So I've identified the terminal numbers.

And it looks like this -- these terminals, they run a particular software version of the game.  There is the version, that magic version that was litigated as being a game of skill versus a game of chance.  So that is the version that's running in these machines.  And my correspondence to Robert McDanel, who is, I guess, runs Mac Vending -- I believe Mac Vending installed the games and probably put -- I would presume, put their name on the terminals.

So in light of the fact that this is in Beaver County and nobody had contacted Mr. Unis about installing games at Talerico's, that's why I sent this correspondence.

You'll note that I ask that they have legal counsel reach out to me.  I'm not saying this is -- I want to know more -- I wanted to discuss candidly the situation with whoever their lawyer is.  I'm not saying, you know, we're going to sue you.  But this is an indication that, to us, that Pace-O-Matic or somebody or something is happening where the right of first refusal is not being honored.  I don't know exactly what's going on at this point, or at least the letter doesn't indicate it. But that's the situation.

Q.  Okay.  And I see that it was copied at the bottom.  Am I correct?  Pennsylvania Skill Games, LLC; Wayne DeLuca, Esquire; and Miele Manufacturing?

A.  Right.  The purpose of copying them was to put them on notice of the fact that we've now got some kind of anomaly. Something's happening.  There's a terminal that Mr. Unis didn't authorize being installed in Beaver County.  We don't know how it got there.  And so I'm putting everybody on notice at that point.

Q.  Do you recall -- let me back up.  Right before I changed documents, from a timing perspective, this note -- does this note in the file relate to this letter, give or take?  It looks like 45 --

A.    Yeah, so that's November 28, 2016.  This is approximately three months later.  Well, maybe I'm not the fastest writer, but you know, that's probably what this relates to.

Q.    Okay.

A.    But that's not a great turnaround, but that appears to be the case.

Q.    Okay.  But -- nevertheless, okay.  So you do think they're related?

A.    I do.  Because one of the other things, if you note in my note to the file, is that I'm waiting for information about the specific terminals.  When those terminal numbers were given to me, I don't know.  But then in my letter, you'll see I actually referenced the specific terminals.  I want to be specific here, you know, in the event that we end up in a courtroom someday talking about terminals.

Q.    Thank you for that.  Okay.

Now, do you recall if there was any communication back to you from Miele Manufacturing or Mr. DeLuca or Pace-O-Matic?

A.    No, I don't have any specific recollection.

Q.    Okay.

A.    Mr. DeLuca and I would regularly communicate by phone.  But as to a specific recollection of a phone call discussing this issue, I don't recall.  I would postulate that that probably did happen.  I don't remember it, though.  Not at all.

Q.    And we don't have any record of anything.

A.    Okay.

Q.    And when was your -- just so we can frame it, when was your last day of employment with the Amato firm?

A.    Boy.  I kind of -- I believe it might have been April 2017.  I don't know, off the top of my head.  It's sometime in April perhaps.  At which point, you know, Mr. Unis would have been informed of my leaving or Mr. Amato would have informed him of my leaving.  I left on amicable terms to go with another gentleman and practice law downtown doing primarily plaintiff's litigation.

Q.    The only reason I asked that was because I think you testified that the Equipment Purchase Agreement was finally entered into.  It's in the file, but perhaps you weren't there to see it at that point.

A.    Let me -- you know, my LinkedIn profile would tell you the exact date that I left.  But as I sit here today, I don't know exactly when I left the firm.  If you can show me what is, I believe, exhibit -- oh, never mind.

Q.    And if it's too much trouble, I'm not sure it makes a difference.

A.    It looks like the Equipment Purchase Agreement was entered into on the 20th day of May, 2015.  I think I would have still been at Mr. Amato's firm at that point because I started practicing law in 2012, passed the bar, got licensed.  So that

would have only been three years.

Q.    You know what, Mr. Rodgers?  Now that you mentioned it, I think you actually have an email where you were saying that it was entered into.

A.    Yeah.  Okay, yeah.

Q.    I think I answered the question for you.

A.    There you go.  Thanks.

Q.    Having said that, I think you've accomplished what I was looking for you to accomplish with regard to these documents.  And I have no further questions at this time.  Thank you.

THE COURT:  Thank you, Mr. Zegarelli.

MR. ZEGARELLI:  Did you want to come here?

MR. NEISER:  I can go there.  Thank you.  If that's okay?

MR. ZEGARELLI:  Sure.

Are you going to plug in?

MR. NEISER:  No, I don't trust myself.

CROSS-EXAMINATION

BY MR. NEISER:

Q.    Mr. Rodgers, how are you?

A.    I'm doing well, Mr. Neiser.  How are you?

Q.    We don't need to be introduced, do we?

A.    No.

Q.    We have a little air of familiarity because you and I

know each other; right?

A.   Yes.  We're acquaintances, friends.

Q.   I'm also a LinkedIn -- we are connected first-level LinkedIn, which is the highest honor of LinkedIn.  And I will -- from reading from your LinkedIn page, which would ask the Court to take judicial notice of under Rule 201 -- I think that your last day at Amato, Start & Rodgers as a nonequity partner was April 2017.

A.   So it sounds like my recollection was correct.

Q.   Yes.  So, Mr. Rodgers, is it your testimony that you drafted the first version of the EPA?

A.   No.

Q.   You did not?

A.   No.  I've testified that the first version of the EPA was on Pace-O-Matic letterhead.

Q.   Okay.  So can we put up Exhibit 5, please?

MR. NEISER:   You have to switch.

BY MR. NEISER:

Q.   So you're calling this the first version of the EPA?

A.   Yeah, I believe that would be the first version.  If you look at the date --

Q.   No, I'm just curious about this because your -- I want to understand your testimony.  You're calling this the first version of the EPA?

A.   Yes, I believe it is.

Q.   Okay.

MR. NEISER:   Can I see Exhibit 6, please.

BY MR. NEISER:

Q.   I will tell you, sir, that in this case -- this is a document identified as the Equipment Purchase Agreement.   Who drafted the first form of the text here?   Did you write that, the first version of that?

A.   I'm not sure I understand your question.   Can you rephrase?

Q.   Did you -- did you model -- did you use that Exhibit 5 that we just looked at and convert that into this?

A.   This version --

Q.   Yeah.

A.   -- that you're seeing in front of you --

Q.   Yeah.

A.   -- is -- some of the language from that initial document is in this document.

Q.   I understand that.   What I'm trying to figure out is, if you're saying -- if your testimony is that Exhibit 5 was the model that became this, who drafted the first -- Exhibit 5 has a Pace-O-Matic letterhead, can we agree?

A.   Right.

Q.   Okay.   Exhibit 6 does not.

A.   Correct.

Q.   Who is the first person to put it in that form?

A.    That would have been me.

Q.    Okay.  Thank you.  Now, you were involved in contract negotiations with Attorney DeLuca?

A.    Yes, I do recall that vaguely.

Q.    Okay.  And can we agree that changes in a contract reflect the parties' and counsels' changes to an agreement over time?

A.    Generally, yes.  But you'll see that some of my notes were incomplete and some of them don't always make it into the final version, but as a general concept, yes.

Q.    So just an explanation for everybody, not that it's a state secret, but as you make revisions to a contract, you can track, in the various changes, what happened with that document from A to B.

A.    On a computer, you can certainly do that.

Q.    You can also do it with handwritten changes, can't you?

A.    It's more difficult, and we don't have copies of, like -- I'd like to see the ink colors.  Do we have originals perhaps?

Q.    Sir, I didn't subpoena you.  So I can't help you.

A.    I don't have them either, so.

Q.    Well, what I'm saying to you is that, if you're looking at the actual changes that go back and forth between the parties, they're like artifacts that are left behind to show you

what was agreed to and what wasn't agree to.

A.    That's a fair characterization.

Q.    They are like breadcrumbs.  You can follow them like --

A.    Sure.

Q.    So would it be fair to say that, during negotiations, if a term is discussed but it doesn't make it into the final agreement, that means it was jettisoned at some point?

A.    Yes.

Q.    And would it be fair to say that these additions and subtractions show the parties' intentions as they go?

A.    Well, I don't know about that.  I don't think the intent of the parties is clear until you get to the final document.

Q.    Ah, that is correct.  So we can agree that the final document represents the final intention of the parties.

A.    I would say so.  But, you know, there is no integration clause in this contract.  So you have to go on the parol evidence as part of the parties' intent.

Q.    Well, I can clarify for you, the Court has said that we can introduce evidence to explain but not contradict the terms of the agreement due to the absence of an integration clause.

A.    Okay.

Q.    So my question is to you, sir, is that, if it's not in

that final agreement, the signed agreement, it's not in the signed agreement?

A.   Yeah, that's -- that statement is self-explanatory.

Q.   Sure.  So let's take a look at the final Equipment Purchase Agreement.  You're familiar with that, are you not?

A.   Generally.  I haven't reviewed it in detail.

Q.   Okay.  So let's pull up Exhibit 6.  Does the word "exclusive" appear in this document?

A.   Well, can you tell me without me reading the entire document?

Q.   Sir, I will represent to you that the word "exclusive" does not appear in that document.  Does that surprise you?

A.   It does surprise me a little bit, yeah.

Q.   Okay.  So --

A.   What does appear, the right of first refusal.

Q.   Oh, we're well aware of that.  We'll get to that in one second, sir.

A.   Good, good.

Q.   I want to make -- now that you mention that --

MR. NEISER:  Let's go to Exhibit 100, and let's look at page 57.

BY MR. NEISER:

Q.   Now, here's the part that I can't follow whenever you and Mr. Zegarelli were going back and forth.

A.   Sure.

Q.    If I am understanding your testimony, this is one of the last versions of the Equipment Purchase Agreement before it was executed?

A.    That sounds right.  So you're on 57?

Q.    Yes, sir.

A.    I'm just trying --

Q.    I'm sorry we don't have Bates numbers and those other things --

A.    Yeah, I've got it here.  57, I think we talked about Exhibit 100 and page 60 -- going to this, yes.  So this is perhaps the penultimate draft.

Q.    And it looks that way to me, but I want to make sure it looks that way to you.

A.    I believe that was my testimony.

Q.    I believe it was, too.  But it's late in the day, fourth day of trial, so I just want to make sure.

A.    Okay.

Q.    I believe -- can we agree that this is perhaps the penultimate draft?

A.    Based on the file that I've seen, I've not seen any additional documents beyond, you know, the file, but yeah, I would say that this appears to be the penultimate draft.

Q.    Thank you.  So let's go to section 6, which is, I believe, on the next page.

A.    Yep.

Q.   And let's look at that language.  And that is the language that was in the penultimate draft?

A.   Right.

Q.   Now, let's pull up Exhibit 6.

MR. NEISER:  Actually, can we compare that same language from Exhibit 6 and put them side by side on the agreement, please?  Or on the screen.  I'm sorry.

THE WITNESS:  Enlarge that, please.

BY MR. NEISER:

Q.   We'll get to it.  I'm not doing this.  I have a professional.

A.   I can tell.

Q.   Yeah.  Can you clear the yellow from the screen, Bill?

A.   Sure.

Q.   Thank you.  I don't want to keep calling you Mr. Rodgers.

A.   You can call me Bill.  I'll call you Julian.

Q.   Thank you.

A.   Fair enough.

Q.   If you put on a sweater and tennis shoes, then we can call you Mr. Rodgers.

A.   I'd be in good company if I were related to him.

Q.   Wouldn't we all.

So let's compare and contrast the language.

A.   Sure.

Q.    So the bottom, we can agree, is page 59 from Exhibit 100.  And the language above is Section 4 of Exhibit 6. And can we agree that -- I'll make the representation to you, sir, that Exhibit 6 is the final version of the Equipment Purchase Agreement executed by the parties at issue in this case.

A.    Right.  I have no reason to contest that.

Q.    I would never mislead you, sir.  So let's look at the bottom is how it started, and the top is where we ended?

A.    Uh-huh.

Q.    The first sentence from paragraph 6 states "Seller expressly agrees not to sell any other terminals, compliant or otherwise, or fills in Beaver County, Pennsylvania."  Strong language, would you agree?

A.    Yes.

Q.    Did that make it into the top paragraph?

A.    No, not in that way.  And let's --

Q.    Well, not in any way.

A.    Well, that's --

Q.    The text does not appear in that paragraph, does it?

A.    Hang on.  "Seller grants to buyer right of first refusal related to the placement of compliant terminals or hardware components and selling sets of software plays in Beaver County, Pennsylvania."

Q.    Um-um.

A.   So let's break that down; right?

Q.   No.  I'm asking you if that language in the first sentence on paragraph 6 below made it in the paragraph above.

A.   That specific language is not in there.

Q.   Okay.  And then, below that, there's handwritten language that says "No sale of fills provide in Beaver County other than Unis."

Do you see that?

A.   Yes.  That's my handwriting.

Q.   That doesn't make it in the top paragraph either, does it?

A.   Not written as that, but I would never write something like that -- it's not even proper English.

Q.   Oh, it most certainly is not.

A.   Yeah, those are notations I've taken and placed next there.  That's not language that would be added to a contract specifically.  I would have refined that language to be more appropriate for a contract.

Q.   Understood.  But can we agree that that language does not appear in paragraph 4?

A.   Yes, Julian.  The words "no sale of fills provide in Beaver County other than Unis" does not appear in paragraph 4.

Q.   Understood.  So is it fair to say that the only language that survives from the penultimate draft -- the second to the last draft -- that made it from your draft into the final

agreement is "If buyer opts not to place terminals in certain Beaver County locations, then seller, through another vendor, may place the above-described terminals in those locations"? Can we agree that that is the only actual language that made it into the final agreement?

A.    Is the only quoted language that made it from that -- from the penultimate version into the final version.  However, those other ideas are articulated in the other words that are placed in paragraph 4.

Q.    Well, sir, I can only go by -- we're allowed to read the document, and I'm just going by what I'm reading, sir. Okay?

A.    Yeah, but I was there during the negotiations, and I can speak to it.

Q.    Well, I've got a question for you.

MR. NEISER:  Let's take that down.

BY MR. NEISER:

Q.    Since you were there in the negotiations, how come, in none of the drafts that we see or that final agreement, the word "trademark" appears anywhere?

A.    I don't know.

Q.    In fact, if we reviewed your file, which I think is fascinating, by the way.  Let's go to -- because it's old school.  We're dealing with Wayne Rodgers.  Older lawyers do things totally different; right?

A.   It's true.

Q.   You know, until you wake up one morning and realize you are the older lawyer, which is depressing.

MR. NEISER:  Can we please pull up 100, please.  Okay. Let's go to the next page.  Actually, to be more clear, one moment.

THE WITNESS:  No problem.

MR. NEISER:  Three, please.

BY MR. NEISER:

Q.   Now, this is interesting to me.

A.   Yes.

Q.   So this is an email from pennsylvaniaskillgames@gmail.com.

A.   Okay.

Q.   Dated November 18, 2016.

Do you see that?

A.   Yes.

Q.   And I believe this all -- this entire email may relate to Lawrence County?

A.   Right.  So this looks like it's an email from my client to me, and it's just giving me contact information.  And I've taken some notes.  My recollection of these notes, Pennsylvania Skill Games -- this is may be the substance of the phone call I've had with my client.  "PA Skill Games on machines in bar contain illegal games on machine."  And I think it's like

Cedar's at Addis Avenue in Lawrence County, wherever that is.

Q. Yep.

A. Okay. "Deal needs to include exclusivity trademark on PA Skill Games?"

Q. And that relates to something other than Beaver County case, I believe?

A. Yeah. I recall a situation, Beaver County. I don't have a specific recollection. And the trademark on PA Skill Games, I think what happened in this particular situation is that Mr. Unis observed some machines that had "Pennsylvania Skill Games" on them. He made a phone call to me -- or he sent this email to me. I probably called him in response. I am guessing on that point. But my notes would have been, as a result of the phone call and trademark on PA Skill Games, that was just probably an open question that I don't think ever got resolved.

Q. Okay. Would it surprise you that --

A. An open question between my client and I.

Q. I understand that, as we have those. But would it surprise you that the word "trademark" on any -- in your entire file, that's the only appearance of that word in your entire file?

A. It would not surprise me that that is the case because, when you register a business in Pennsylvania, my understanding is that nobody else is allowed to use the business

name.

Q.    No, I understand that.  But I'm just curious -- curious about that particular mention of trademark on PA Skill Games as of that date on November 18, 2016.

A.    My client and I conversed about it.

MR. NEISER:  Let's pull up Exhibit 43.

BY MR. NEISER:

Q.    Question for you.

A.    Yes.

Q.    Why did you say here that your client had an exclusive in Beaver County?

A.    Because the right of first refusal is an exclusive.

Q.    You call it an exclusive?

A.    Yes, that's what it means.

Q.    That's what you say it means.

A.    Yes.  I drafted the contract with Mr. DeLuca and negotiated the contract.  That's what it means.

Q.    So when you drafted that contract, it doesn't include any language that Pace-O-Matic has an obligation to kick other operators out of Beaver County, does it?

A.    No, it speaks for itself.  It's a contract.

Q.    Well, you're telling me what your interpretation of the contract is.

A.    Okay.

Q.    I'm wondering why it's not in there.

A.    So if you look at the contract, which is Exhibit 6, and you look at the words "right to first refusal," you'll notice they're in quotations.  Okay.  The right to first refusal is typically something that arises in a land contract --

Q.    Excuse me, sir.  I'm going to object.  Legal conclusion.  I'm only talking about how it relates to the Equipment Purchase Agreement.

A.    But I'm a lawyer, and I can give a legal opinion.

Q.    No, you cannot.

A.    Okay.

Q.    Well, actually, the judge has the say.

A.    Yeah, we're sitting here arguing.

THE COURT:  We're not asking anyone here today to give a legal opinion.

THE WITNESS:  Yes, Your Honor.

BY MR. NEISER:

Q.    We can agree this is not a land contract; right?

A.    It is not a land contract, which is why that word was in quotations, but the implied phrase -- the phrase means that Albert would have the first option to do -- to place terminals.  That's what it means.  In Beaver County.

Q.    And my question to you more specifically is this: Your final agreement, that Equipment Purchase Agreement, does not contain any language creating an express obligation by Pace-O-Matic or Miele to kick out another operator from Beaver

County that is operating Pennsylvania Skill Games.  That's all I'm asking.

A.    It doesn't say that.

Q.    Okay.

MR. NEISER:  Your Honor, I don't have any other questions for Mr. Rodgers.

THE COURT:  All right.  Anything further, Mr. Zegarelli?

MR. ZEGARELLI:  No, thank you very much.

THE COURT:  Mr. Rodgers, thank you very much for your testimony here today.  You're excused.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  Thank you.

(Witness excused.)

MR. ZEGARELLI:  Your Honor, I'll check on the next witness.

THE COURT:  Thank you.

You can just step forward here, and you'll be sworn in.

THE CLERK:  Please raise your right hand.

PAMELA KENDREW, a witness herein, having been first duly sworn, was examined and testified as follows:

THE CLERK:  Thank you.  Please be seated.

THE COURT:  You can feel free to pull that microphone a little bit closer to you.  There you go.  Thank you.

DIRECT EXAMINATION

BY MR. ZEGARELLI:

Q.   Can you state your name for the record, please.

A.   Pamela D. Kendrew.

Q.   Ms. Kendrew, first of all, thank you for coming here on short notice.  I'm Gregg Zegarelli.  I represent Pennsylvania Skill Games, LLC.

Ms. Kendrew, what do you do for a living?

A.   I own a restaurant.

Q.   And for how long have you owned a restaurant?

A.   34 years.

Q.   Okay.  And are you familiar with either of the Albert Unises, father or son?

A.   Yes, both.

Q.   Okay.  And how so?

A.   Just through them having the machines, pool tables, jukebox in the bar.

Q.   And do you have a recollection of when you were first introduced to them?

A.   We had Amato Music first, and then I think Unises bought Amato out, and we just stayed with them.  So maybe 15 years ago.  I'm not exactly sure when it switched because nothing really changed.

Q.   Okay.  And if I take you back to, give or take, around -- well, let me back up.  You said you were with Amato?

A.    Yes.

Q.    And could you explain that?  What do you mean you were with Amato?

A.    They owned the pool tables, the jukebox, the dart machine, the -- whatever games we had in the bar.

Q.    Okay.  Now, at some point in time, you said that you recollect that the Unises took over for Amato.  Do you recall exactly what time?  Was it 15 years ago?

A.    I think so.  I'm not exactly positive.  Amato retired, so then Unises bought him out or whatever.  And they actually kept on the same guy that was counting the money.  So nothing really changed on our end.

Q.    Okay.  And does that take us sometime back around 2008 or '9, something like that?

A.    Yeah.  Probably, 2010, 2008.  Around there, I would say.

Q.    And at that time, did you have any Megatouch machines?

A.    Yes.

Q.    Okay.  And on those machines, I'm going to show you a picture.  And you were deposed in this case, if I recall?

A.    Yes.

Q.    Okay.  And this document has been identified as Exhibit 82.

THE COURT:  Would you take that down.

MR. ZEGARELLI:  Oh, I'm sorry.

THE COURT:  That's all right.

BY MR. ZEGARELLI:

Q.  Do you recognize this document?  Or let me say it a different way.  I'm sorry.

I'm going to scroll through a few pictures, if you don't mind.  Now, do these pictures accurately reflect the Megatouch machines -- these don't necessarily have to be the exact Megatouch machines in your establishment, but do they reflect Megatouch machines such as they were in your establishment on or about 2010, including with the screens for the games?

A.  Yes.

Q.  Okay.  And --

MR. ZEGARELLI:  I move to admit.

MR. NEISER:  No objection, Your Honor.

THE COURT:  Exhibit 82 is admitted.

BY MR. ZEGARELLI:

Q.  Ms. Kendrew, can you testify that these games were in your establishment on or about -- how far back could you go?  2010, 2011, earlier, later?

A.  I honestly don't know.  I would say -- it probably was around 2010.  I'm not really sure.  I didn't really -- I didn't play them or anything.  I just walked past them.

Q.  Okay.  Are you sure at a certain point that it's within range --

A.   I know these games were in there because the phone number on there is Albert Unis, because I know he has all 7s.

Q.   Okay.  So from a timing perspective, is there a range that you're sure it's within?

A.   I would say 2008.

Q.   To?

A.   Probably now.  There's -- they're still in.  Yeah, we still have them.

Q.   Okay.  Very good.

MR. ZEGARELLI:  No further questions.  Thank you.

CROSS-EXAMINATION

BY MR. NEISER:

Q.   Hello, Ms. Kendrew.  How are you?

A.   Good.

Q.   You may remember me.  I'm Julian Neiser.  I took your deposition some time ago.  Thank you for coming down for the case.

I want to be -- if I remember correctly, you didn't take these photographs, did you?

A.   No.

Q.   Okay.  They were provided to you by Albert Unis IV?

A.   Yes.

Q.   Okay.  You're friends with Albert Unis IV?

A.   No.  Just through business, like --

Q.   Through business?

A.    Yeah.  Like, I don't call him up and say, "What's going on?"

Q.    I understand.  I understand.  But if I remember correctly, he had you sign an affidavit that you recall seeing those games; isn't that correct?

A.    Yes.

Q.    And he provided the affidavit to you along with the photographs and said he would like you to sign that?

A.    Yes.

Q.    And you did?

A.    Yes.

Q.    Okay.  So -- and if I remember correctly -- and it's a long time ago; so we're not trying to nail this down to an exact date -- you said that -- at least your affidavit said that you recall seeing them in your bar sometime from 2011 on; is that correct?  Ish?

A.    Yes, ish.  I honestly don't remember if it was 2009, 2007.  I know we had them.

Q.    I understand.  I get it.  And you're saying that you see those -- those similar types of machines featuring the same images to this day?

A.    Yes.  A little different.

Q.    And tell me what you mean by "a little different."

A.    The "Pennsylvania Skill Games" on them, it's the same, but the font's a little bit different.

Q.   So if I showed you exhibit -- I'm sorry.  Let me switch over.  Exhibit 204.  Is that what you're talking about now?

A.   Yes.

Q.   And those are machines in your bar now?

A.   Yes.

Q.   For how long have those been in your bar?

A.   I don't know.  I know they've been in there a long time.

Q.   Okay.  But -- so did you start seeing these and stop seeing the other ones, the ones that say Pennsylvania Skill Games on the Megatouch?  I mean, was there a point where one disappeared and one started?

A.   I would say, yeah, it had to be because the other ones are older.

Q.   Right.

A.   And these are newer.

Q.   Right.  Do you remember, just ballpark range, when that might have happened?

A.   No.

Q.   I understand.

Now, if I remember correctly from your testimony, that Pennsylvania Skill Games graphic with the pool balls and the darts and whatnot -- those only appear on the game when the machine was turned on?  Like, there's no graphic outside of the

machine?

A. No.

Q. There's no graphic outside the machine?

A. I don't think so. I think it's just on the screen.

Q. And I believe you said there was some other information like a sticker with a phone number in case --

A. It was on the inside of the machine. There was a sticker and phone number.

Q. Right. And that was so you could identify the business and call them if you needed something?

A. Yes.

Q. Now, also, if I remember your testimony correctly, this is your bar; right?

A. Yes.

Q. And I think your testimony was that you don't really go anywhere except for your bar.

A. No. I go home and to the bar. That's it.

Q. I understand. So would it be fair to say -- is it your recollection that you can't testify that you saw that Pennsylvania Skill Games with the pool balls and the dart boards, those images, anywhere else other than your location?

A. No.

Q. You can't recall seeing that?

A. No.

Q. Okay. Ma'am, thank you so much, and I appreciate your

time.

MR. NEISER:  No other questions, Your Honor.

THE COURT:  Thank you.  Anything further?

REDIRECT EXAMINATION

BY MR. ZEGARELLI:

Q.   Miss Kendrew, I think there was some testimony regarding an affidavit.  You filled in blanks; isn't that right?

A.   Yes.

MR. ZEGARELLI:  Okay.  No further questions.

THE COURT:  Ms. Kendrew, thank you very much for your testimony here today.  You are excused as a witness.

THE WITNESS:  Thank you.

(Witness excused.)

THE COURT:  All right.  Ladies and gentlemen, it's 4:15.  So I suggest we break for the day.  Thank you very much for your attention throughout the day today, and we will see you here tomorrow, and we'll start right at 9:00.  Thank you very much.

THE CLERK:  All rise.  This Court is now adjourned.)

THE COURT:  Counsel, may I see you briefly in chambers.

(Pause as the jury exits courtroom.)

(Whereupon, the following discussion was held in chambers.)

THE COURT:  Where are we headed tomorrow?

MR. ZEGARELLI:  Okay.  I've got a Daniel David.  I've got John -- I don't have my witness list with me -- John, I think it's Grachanin.  It's an unusual name.  He's on the may call.  I'll have to look on the witness list, actually.  But it's like a G-R-A-C-H-A-N, and then I think Mr. Unis Sr.'s going.

THE COURT:  Okay.

MR. ZEGARELLI:  And, you know, if we -- you know -- now, I have to say, Mr. Unis, the father, he can -- he can testify.  I mean, he can -- you could ask him a question and he'll roll.  We're under the 24 hours.

THE COURT:  He wouldn't be the first.

MR. ZEGARELLI:  We're under the 24 all the way around, but, yeah, I mean, if you were, like, squeezing your hours, you could get in trouble with him, I think.

MR. NEISER:  Can I ask who -- because he was not somebody who was deposed or anything like that.  So who is this guy?

MR. ZEGARELLI:  He's been on our list.

THE COURT:  This John, last name starts with G.

MR. NEISER:  Grachanin or something like that.

MR. ZEGARELLI:  Mr. Grachanin, yeah.  He's an operator -- sorry.  He's a venue much like Ms. Kendrew in Ohio.

MR. NEISER:  In Ohio.

MR. ZEGARELLI:  Or from Ohio.

MR. NEISER:  Okay.  Yeah, I got it.

THE COURT:  And who is Mr. David?

MR. ZEGARELLI:  Mr. David is the gentleman -- and you deposed him -- it was before my time, but I think you deposed him.

MR. NEISER:  His name sounds familiar.  Was he one of the guys from one of the bars that had the location agreement with the dad?

MR. ZEGARELLI:  I think so, yeah.

MR. NEISER:  Yeah.  That's right.  Okay.

MR. ZEGARELLI:  So we've got those two.  Then we would do -- just because of the story, we'll take it logically; I think it's easier to absorb.  We'll do the father.  Then we'll do the son.  And I'm not sure that I would not be able to close tomorrow because we -- we don't have many -- unlike, you know, you've got a big group.  We don't really have that many witnesses.  So we'll see where we are.

THE COURT:  All right.

MR. NEISER:  You're thinking you might be done tomorrow?

MR. ZEGARELLI:  I might be.  I don't have many witnesses.  I mean, the two Unises, right, are the primary witnesses.  Then we've got -- we've got basically a small group of side issues; right?  So we've got the guy who is at the AIC.  We've got a guy from Ohio that's like Kendrew.  And there's,

frankly, not -- I mean, quite frankly, the reason why we moved so fast is so much came out of Warren, because the case got whittled so much.

MR. NEISER:  As it does.

MR. ZEGARELLI:  A lot came out of Warren.  A lot came out of the Goodling.  So, at end of the day, it really did --

THE COURT:  Well, you know --

MR. ZEGARELLI:  -- become streamlined.

THE COURT:  You cross-examined a lot of those folks, and you would have otherwise had to call them.  So are you thinking that you need to call back any of the witnesses that testified today?  That's the only other thing that I think remains open.  Obviously, you can notify them they have to come back.

MR. ZEGARELLI:  You know, the probability is I don't think I'm going to need them to come back.  I may need them to come back on liability -- I'm sorry -- on damages at some point, depending on how we might address some damage questions, if we're successful on the liability side.  But I don't really think it's probable I would need to call them for liability again.

THE COURT:  Okay.  And are you expecting any rebuttal?

MR. NEISER:  Yes, Your Honor.

THE COURT:  Okay.

MR. NEISER:  In the form of a deposition designation.

THE COURT:  All right.  I mean, we'll talk about that further.  Are you going to use any of the depositions that you designated?  Because I know we have outstanding some objections to that.

MR. ZEGARELLI:  I do have a reader on call.  If they're allowed, tell me -- if you don't mind telling me what -- you know, what is in or not in, and I'll get my reader, and we'll do it.

THE COURT:  Okay.  Well, I think I've got those out on the bench.  Can we do those tomorrow morning?

MR. ZEGARELLI:  Yes.

THE COURT:  Because I assume you would probably read those in after both Unises.

MR. ZEGARELLI:  Yes.

THE COURT:  So we'll have a chance to do that.

If I recall, Mr. Neiser, many of your objections were not to specific designations but just relevance or --

MR. NEISER:  Yes, Your Honor.

THE COURT:  -- other things.  So I think we can get through that and talk about that tomorrow morning.  And I don't think it will take particularly long to do that.

The -- I think we have Miser, Stahl, Hawk --

MR. ZEGARELLI:  And Boodram.

THE COURT:  -- and Boodram.  I mean, Boodram, I think, is just a couple lines.  Mr. Stahl's, I believe is the longest

one.  So everyone might want to take a look at that one in particular, just to make sure that we can get through all that, if we need to read them tomorrow.

MR. ZEGARELLI:  And, Your Honor, by the way, a little side note, I'm not sure I moved in the Rodgers file because we sort of -- we sort of identified it, and then we sort of pulled out a few.

THE COURT:  I think you did.

MR. ZEGARELLI:  Did I move it?  With the exceptions of your objections.

THE COURT:  And there was one page that I don't believe he talked about, and that was page 21.  So you might want to take a look at that to see what that is.  I -- in my notes, and I believe in Ms. Hopkinson's, we didn't see any reference to 21.

MR. ZEGARELLI:  Okay.

THE COURT:  So let's just take a look at that.  And then -- but I'm confident it's in.  As confident as I can be. But I know I wrote it down in my exhibits that are in list, which means that you must have moved it in.

Mr. Neiser, you only objected to those four or five pages.

MR. NEISER:  That's correct, Your Honor.

THE COURT:  So no concern there.  It's in.

MR. NEISER:  As long as we can yank those things out

early so we don't forget about it and we can piece it back together.

THE COURT: Okay. So it's perhaps unlikely that we're going to get done tomorrow. We might get done tomorrow. Let's just talk about that possibility. Then we'll need to have a charging conference on Tuesday. And if we know we're going to be done Friday, then we're going have the charging conference first thing on Monday morning, and I'll ask the jurors to come in later.

MR. NEISER: Monday is Presidents' Day.

THE COURT: Tuesday. Excuse me. You don't have to come in on Monday.

MR. NEISER: We will if you'd like us to.

THE COURT: Well, we'll talk about that tomorrow. But we will need some time for that, obviously. I don't want to rush that process. We're finalizing it as best we can. Until all of the evidence comes in, we can't finalize it. But if we're done tomorrow, we will get something to you so we can discuss it on Tuesday.

MR. ZEGARELLI: Okay.

THE COURT: You may not have it on Friday, but you'll have it sometime over the weekend in sufficient time to take a look at it. If we're not done, we'll figure out what to do tomorrow and how much time, all of those sort of things.

Another thing we could do is, let's just say we have

half a day on Tuesday, maybe we send the jury home, and we do the charging conference that afternoon. But let's just play it by ear. I just wanted to give everybody a heads-up that we're headed there. When we're going to get there, I'm not sure yet. And the verdict slip, we'll have to go over that as well.

MR. ZEGARELLI: Okay.

MR. NEISER: I actually have a mechanical, because I just want to make sure we're going to follow the Court's preferences. As I understand it, we -- once Mr. Zegarelli rests, in the event that we have any rebuttal -- let's assume we don't, just for hypothetical, to make it easy -- we then do closings on the liability phase. We're going to do closing arguments.

I have one request I meant to mention earlier, I think this may be a case -- and Mr. Zegarelli and I actually talked about this sometime ago -- can we do the charge before the closing?

THE COURT: That's not the way I do it.

MR. NEISER: I understand. I did not know that, Your Honor. I just asked.

THE COURT: That's okay. You'll have it, though. So you're going to know what I'm going to say.

MR. NEISER: I understand. I just thought I'd ask.

THE COURT: And they'll get copies of it, each one of them, as I'm reviewing it.

MR. NEISER: Okay.

THE COURT: And they will get a copy of the verdict slip so we can go through the questions with them.

MR. NEISER: Understood. I've never done it that way where we did the charge before the closing. Wayne DeLuca, of all people, he tried two cases in his last year before he retired, and he told me that's how he did it. I'm like, interesting.

THE COURT: It varies. I think different judges do it different ways.

MR. NEISER: I've never done it that way. I thought it was interesting.

So we'll close, charge, verdict, and then we start all over again for the damages phase.

THE COURT: Right.

MR. NEISER: Okay. I just wanted to make sure I didn't screw that up.

THE COURT: Right. No. That's exactly right. And we'll keep track of timing here to see where we are at particular times. If the jury comes back with a verdict at 3:00 on a particular day, we're not going to start right in then. We'll give them a break. We'll start fresh the next morning.

MR. NEISER: I understand, Your Honor. Thank you.

THE COURT: And if either of you need more time and we're at 3:00, I mean, I certainly would want to give you the

time -- since we don't know what the verdict's going to be until the verdict, and obviously you'll be prepared to put in all of your damages, what witnesses there are, and so forth.

We may need a little break to talk about, like, given the verdict, where we're going, who's going to present what. But we'll figure all that out after we get the verdict.

MR. NEISER:  Okay.  And one other thing, Your Honor, we have -- because along the way, part of this has been building the plane as it's flying with some of the exhibits, and we've broke them out.  We've been keeping those off to the side and maintaining -- A.J.'s been doing that for us and gives us a spreadsheet with everything.  They may be at variance of the exhibit binders themselves.  We're prepared to reconcile that with Ms. Hopkinson or whoever -- way we want to do it.  I just don't want to forget about it because that does take some time and it does take some -- you know, I mean, if Mr. Zegarelli's comfortable with the process as well.

THE COURT:  Yeah, we'll need to have the two of you, and whoever else needs to help, meet with Charlotte, talk about what exhibits are going to go out with the jury.

MR. NEISER:  Sure.

THE COURT:  And so we just want to make sure everybody's on the same page about what those are and what version it is.  Because I know there were some things that were changed, and maybe it's the right version, maybe it's not.

MR. NEISER:  Sure.  I think we --

MR. ZEGARELLI:  There's cover letters.  There's cover letters, there's some of it's off exhibits of pleading, there's a cover sheet.

MR. NEISER:  We've been running -- he does a pretty good job of that.  I've done this with him in the past at trial, and he's very good.  I just want to make sure you get it in time, and it's easy to do.

THE COURT:  We all have lists.  I've been keeping a list.  Charlotte's been keeping a list.  The courtroom deputy has a list.  So we've been comparing ours each day.  So I'm confident we'll be able to do that.

But that will take a little bit of time because you have to pull things out of binders.  That's probably the best way to do it, given the number of exhibits.  I don't know how many number we're on.  But sometimes we pull them out of the binders, but, you know, we'll just take any cover sheet that is off on the binder off so that we just have the tabs with what numbers they are because I don't think you marked them.  You just have tabs.

MR. NEISER:  No.  The exhibits are actually marked.

THE COURT:  Oh, are they?

MR. ZEGARELLI:  Yeah, they are.

THE COURT:  Oh, well, thank you for doing that.

MR. NEISER:  Absolutely.

THE COURT:  So we can see the volume and decide, you want to pull them out; you want to leave them in a binder. Honestly, I don't think it matters.  It's whatever is easiest for you guys to do.

MR. NEISER:  Yes, ma'am.

THE COURT:  Okay.

Mr. Neiser, was there anything else that you wanted to raise?

MR. NEISER:  No, ma'am.

THE COURT:  All right.  Mr. Zegarelli?

MR. ZEGARELLI:  No, ma'am.  And 8:00 tomorrow?

THE COURT:  I think 8:00 is probably better, just so that we can go over the depositions in case you need a filler or you want to throw those in somewhere.

MR. ZEGARELLI:  Okay.

THE COURT:  And that way we'll be done with it.  If we don't get to it, we'll still be done with it.  So if 8:00 works for the two of you, that certainly will work for me.

MR. ZEGARELLI:  Very good.

THE COURT:  And I do appreciate you --

MR. ZEGARELLI:  I was going to say, Judge, you scared the bejesus out of me when you said -- you said I expect you --

MR. NEISER:  I didn't realize I was going to go that fast.

MR. ZEGARELLI:  I didn't either, though.  That's what

threw me off, too.  I just didn't expect that much of the case to get cut away.  But, of course, again, Warren and Goodling, it was a lot pulled out of what -- in depositions, not only with regard to whittling the case, in depositions, it was much broader.

THE COURT:  And how is your expert timing?  Any update on that?

MR. ZEGARELLI:  The best I can tell you is, I did text him and say -- because he was pressuring me again about the dates, you know.  And I said, likely to be Friday.  But in light of today -- and that's only because, you know, we're missing Thursday, so then now we're squeezing the Tuesday and the Wednesday pretty tightly, and we didn't know today was -- so -- but I didn't commit to it.  Because he's still trying to get his other case whittled in to there.  But I still think Friday.

THE COURT:  You can feel free to tell him anything you want to tell him about my position.  So if you want to tell him I expect him to keep his schedule free next week because he's on call, you can tell him I said that.

MR. ZEGARELLI:  Okay.

THE COURT:  If it takes you off the hook for that. You can certainly blame me for any timing issues.  I'm happy to be blamed for that so you can -- just tell me what you've told him so I know, you know, we've got the right cover there.  And all kidding aside, if you need to tell him, like, we expect him

to be available next week, we'll certainly make some accommodation if we have to.

MR. ZEGARELLI: So -- okay. So if we play that out -- all right, let's assume if we did get done tomorrow or even -- or even Tuesday morning, then we would probably start the bifurcated damage on Wednesday.

THE COURT: It could be Wednesday.

MR. ZEGARELLI: Probably the soonest.

THE COURT: Yeah. I think the soonest would be Wednesday. I can't imagine it would be sooner than that.

MR. ZEGARELLI: So it seems, all things considered, the safest thing for me to do is just to say book Friday. Because he'll be coming in from California. So I think he -- you know, particularly if you're not here on Thursday, that would just seem to be the best time to come in. Because I think he was trying to get me to commit -- or they wanted him to commit to the Tuesday or the Wednesday. So I thought that kind of worked out. So I think that's what I'll end up doing. I'll just say book Friday.

(Off-the-record discussion.)

(Whereupon, in chambers session ended.)

(Proceedings concluded at 4:34 p.m.)

- - -

```
                           I N D E X
```

**PLAINTIFF  WITNESSES**:                              **Page**

**Richard Bigrigg**

 Direct Examination By Mr. Neiser                        18
 Cross-Examination By Mr. Zegarelli                      22
**Gene Gulotta**
 Direct Examination By Mr. Neiser                        24
 Cross-Examination By Mr. Zegarelli                      27
**Brent Mayes**
 Direct Examination By Mr. Neiser                        29
 Cross-Examination By Mr. Zegarelli                      33
**Robert McDANEL**
 Direct Examination By Mr. Deasy                         36
 Cross-Examination  By Mr. Zegarelli                     39
**Dan Jones**
 Direct Examination By Mr. Neiser                        40
 Cross-Examination By Mr. Zegarelli                      45
 Redirect Examination By Mr. Neiser                      47
**Michael Mangerie**
 Direct Examination By Mr. Neiser                        49
 Cross-Examination By Mr. Zegarelli                      52
**Video Designations of Albert Unis Iii**
**Video Designations of Albert Unis Iv**
**Greg Cline**
 Direct Examination By Mr. Neiser                        56
 Cross-Examination By Mr. Zegarelli                      59
**Deposition of Jeffrey Mayle,  June 2, 2021**
**(Read-in)**
**Rick Goodling**
 Direct Examination  By Mr. Neiser                      100
 Cross-Examination By Mr. Zegarelli                     116
 Redirect Examination By Mr. Neiser                     117
 Recross-Examination By Mr. Zegarelli                   117


   **DEFENSE  WITNESSES**:                             **Page**
   **William Rodgers**
     Direct Examination By Mr. Zegarelli                125
     Cross-Examination By Mr. Neiser                    175
   **Pamela Kendrew**
     Direct Examination By Mr. Zegarelli                191
     Cross-Examination  By Mr. Neiser                   194
     Redirect Examination By Mr. Zegarelli              198

C E R T I F I C A T E

I, SHARON SIATKOWSKI, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

s/Sharon Siatkowski
SHARON SIATKOWSKI, RMR, CRR, CBC, CRI
Official Court Reporter