IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


POM of PENNSYLVANIA, LLC,
et al.,

                    Plaintiffs,    Civil Action No. 18-722
          vs.

PENNSYLVANIA SKILL GAMES,
LLC,

                    Defendant.

                              - - -


Transcript of Jury Trial on February 17, 2023, United States District Court, Pittsburgh, Pennsylvania, BEFORE:  Judge Patricia L. Dodge, Magistrate Judge.


APPEARANCES:

For the Plaintiffs:        Julian E. Neiser, Esquire
                           Jonathan Deasy, Esquire
                           SPILMAN, THOMAS & BATTLE, PLLC
                           301 Grant Street
                           Suite 3440
                           One Oxford Centre
                           Pittsburgh, Pennsylvania 15219

For the Defendant:         Gregg R. Zegarelli, Esquire
                           Technology & Entrepreneurial Ventures
                           Law Group
                           2585 Washington Road, Suite 134
                           Summerfield Commons Office Park
                           Pittsburgh, Pennsylvania 15241

Court Reporter:            Sharon Siatkowski, RMR, CRR, CBC, CRI
                           700 Grant Street, Ste. 6260
                           Pittsburgh, Pennsylvania 15219


Proceedings recorded by mechanical stenography; transcript produced by computer-aided transcription

P R O C E E D I N G S

- - -

(Whereupon, the following discussion was held in chambers.)

THE COURT: I think we had originally planned to meet a little bit earlier today to discuss the Pennsylvania Skill Games deposition designations.  Where are we with that?

MR. ZEGARELLI:  Yes, Your Honor.  We withdrew the designations:  Miser, Hawk, Stahl, and Boodram.

THE COURT:  And Mr. Lazar, I think, was a potential one?

MR. ZEGARELLI:  Yeah, Mr. Lazar.

THE COURT:  Sorry.

MR. ZEGARELLI:  We can withdraw -- I'm glad you mentioned it, Your Honor.  We can withdraw him as well as a designation.  We can -- I suppose I'm thinking some of that is -- unless -- unless Mr. Neiser has some issue where invoices would be prevented in the event that that's sort of a -- Mr. Lazar -- I mean, are we stipulating -- I mean, he already authenticated his invoices at the depo.  So I don't think we have any problem with invoices on a liability phase.

So, yeah, Your Honor, it's more  -- to be quite frank about it, I think that the -- at this point, when I noticed -- I told this to Ms. Hopkinson -- I did notice that the jury, when you said do you stick in or go to lunch and they sort of said

"stick in," I think at this point, the questions that are still in the case are discrete enough that we don't have to -- we don't have to sidetrack it too much with duplicative or voluminous data.  For example, Miser was MCM Elements.

THE COURT:  If you change your mind on that, we can still address it.  In other words, I know you have a series of witnesses you want to put on today.  You can certainly reserve the right to read those.  We'll just need time to deal with relevance objections and so forth.

MR. ZEGARELLI:  I appreciate that, Your Honor.

THE COURT:  I just want to make sure that you know that, you know, as long as your case is going on, if you change your mind about that because of something someone has said or whatever, we can revisit it.

MR. ZEGARELLI:  Thank you, Your Honor.

And we also have the trial deposition of Tom Deleo.

THE COURT:  Right.

MR. ZEGARELLI:  Half of that depo was -- the second half of that depo dealt with seizure questions while it waited for some clarification and order on those.

So that with, sort of, minor clips remained out of the trial.  I think that leaves Mr. Deleo with the machines in Beaver County and revenues, though, I think all in and material to the case.  But maybe we'll deal with him if we get to the liability phase, and we bring him in on that basis.

THE COURT:  The damages phase?

MR. ZEGARELLI:  I'm sorry.  The damages phase.

THE COURT:  Yeah, if you think it's a possibility, if someone can supply me with a copy of it.  If you think you may use it, then at least I can have read it and be prepared to deal with it.

MR. ZEGARELLI:  Thank you.

THE COURT:  So if you can supply me with a copy of that, I'll at least have it if I need it.

MR. ZEGARELLI:  Very good.

MR. NEISER:  Your Honor, we have no objection to a late designation with Lazar.  We mentioned that before, just to be absolutely clear, we just can't admit to admissibility of any exhibits or anything like that subject to foundation and admission.  That's all.

MR. ZEGARELLI:  As you say that, Julian, how -- I mean, for example, with --

MR. NEISER:  I'm just saying in general.  If you put through Lazar, you bring the designation and the Court says it's okay, then it's okay.  That's all I'm saying.

MR. ZEGARELLI:  Sure.

THE COURT:  Yeah, if there's a designation that includes exhibits, then we'll deal with that.  I've read it, so I'm prepared to deal with it if you need it at some point.

MR. ZEGARELLI:  Very good.

MR. NEISER:  I just wanted to make sure my nodding of the head wasn't "yes, I agree" or "yes, I disagree" or something like that.

THE COURT:  Yes, there will have to be a foundation laid if there are documents you want to get in through him, and we can address that at the appropriate time.

Are we still looking at same four witnesses that were identified yesterday?

MR. ZEGARELLI:  Three, Your Honor.  And Mr. Dutcher is still ill, although I get that through my -- through my client. It will simply be Mr. Grachanin and -- if that's the correct pronunciation.  And I've never met him.

THE COURT:  We'll find out.

MR. ZEGARELLI:  We'll find out in a half-hour.

But Mr. Grachanin, and the two Unises.

THE COURT:  And there was a Mr. David, I think.

MR. ZEGARELLI:  Not Mr. David.  So it's just going to be three witnesses today, Your Honor, and we'll just see how long that takes, and we'll take it from there.

THE COURT:  Okay.  Are you anticipating, at least right now, other witnesses?

MR. ZEGARELLI:  Not right now, Your Honor.

THE COURT:  Okay.  All right.  Well, once we get to that point and we've finalized all of that, then, Mr. Neiser, I think you indicated you may have rebuttal.  And so when you

rest, if we rest today, we'll take a short break and we can talk about whether you have a rebuttal witness, or maybe you already know that you do.

MR. NEISER:  I can answer that now, Your Honor, if you'd like?

THE COURT:  Sure.

MR. NEISER:  I don't have a rebuttal witness.  I don't -- well, I don't have, depending on how the testimony comes in, a rebuttal witness.

But what I will be offering is the designation of Marvin Harris.  Mr. Zegarelli and I talked about this earlier this morning.  You know, and subject to objections and the Court's rulings, we would offer portions of Mr. Harris' deposition designations.  And just in full candor, what I expect is the same testimony we offered at summary judgment for rebuttal, which was designated then.  So I think that's what we're going do.  We're going to carve that up.  I'm hoping to submit it to everybody today.

Would the Court like us to file that in the form of a motion for leave or just provide it to the Court in due course?

THE COURT:  There's no objection to Mr. Harris' --

MR. ZEGARELLI:  I actually haven't seen the designation.

MR. NEISER:  Sure.

THE COURT:  You're not objecting to him using it in

rebuttal?

MR. ZEGARELLI:  I'm not, Your Honor, under the circumstances.

THE COURT:  If I could get a copy of that --

MR. NEISER:  Yes, ma'am.

THE COURT:  -- so that we can address that.

MR. NEISER:  Sure.  And I think that may be -- depending on how the evidence today goes in, that may be the extent of our rebuttal, Your Honor.

THE COURT:  All right.  Yeah.  Obviously, you can reserve judgment on that, as you can with the depositions.  And we'll see where we are at a later point today.

Are you anticipating that the testimony of the three witnesses that you expect to call today is going to go over into Tuesday?

MR. ZEGARELLI:  I think it depends on cross.  My testimony -- I mean, quite frankly, Your Honor, there's been enough adducement of some general basic principles that I think it's simply time for Messrs. Unis to tell their side of the story, and I don't know if that's going to go -- I mean, we may be done.  Now, Mr. Unis III, he can roll.

MR. NEISER:  Fair.

THE COURT:  I heard that, I think, yesterday.

MR. ZEGARELLI:  So he can roll.  I'm not sure he will. But, you know, he can do it.  And even Albie Unis, the exhibits

that he would address in his -- with respect to their case, I mean, quite frankly, I'm not sure how long cross is going to take, but we could -- subject to Marvin Harris, could we be done today?

MR. NEISER:  Your Honor, just so we don't -- I don't feel like I'm going to the woodshed, I was not expecting to call a rebuttal witness today because -- there were 49 witnesses on the witness list.  So I had expected --

And Mr. Zegarelli's heroic efforts getting witnesses here because we ended so early is admirable.  I may not be up to the task as equally as Mr. Zegarelli.  So my designation may be -- if that's it, we would need to resolve today, if necessary.

THE COURT:  Well, what we will do is we'll resolve it today, and if the jury has to wait for a little while to resolve it --

MR. NEISER:  Sure.

THE COURT:  If, you know, if you already know what those are, the designations, then let's get them to everybody so we can address it -- you know, if it's 3:00 and we haven't addressed it, I don't think we're going to be able to address it and get done, but it depends on the length of the designations.

MR. NEISER:  Sure.

THE COURT:  And you may feel free to designate whatever you want.  But let's try and be prepared to do that, if

you can.

MR. NEISER:  We will.  Oh, no, no, no.  I'm surprised I don't have it in my inbox already.  We talked about it last night.  So we're --

THE COURT:  Okay.

MR. NEISER:  But, Your Honor, one other question, not to look too far into the future.  But if that is the case, then it looks -- it feels like we're on an expedited track to charge the jury.  We are fully available to the Court.  Of course, whenever, to do the charging conference and go through what we need to.

THE COURT:  Well, I think we'd have to have it on Tuesday.

MR. NEISER:  Sure.

THE COURT:  Because, obviously, I'm not going to ask Sharon to transcribe something on a court holiday.  So what I expect we would do is get something to you over the weekend so you can review it as soon as we can get it done.

And then have the charging conference first thing Tuesday morning, and depending on our discussion -- we'll have a discussion about this later today, perhaps ask the jury to come in a little bit later, depending on how long the charging conference is.  We may not need to do that.  But I want to give you sufficient time to object to anything in the final instructions that you feel you need to object to.

MR. NEISER:  Thank you.

THE COURT:  We'll deal with that as it goes along.

MR. NEISER:  Thank you.

THE COURT:  We may still have the charging conference on Monday, even -- or Tuesday, even if we bleed over in testimony into Tuesday.  And we'll decide how to handle that then.

The one thing I don't want to do is sort of break up your closing so that one is on one day and the other is on the other, you know, because I don't think that's fair to either one of you, so we'll figure it out.  I mean, as it goes along today, I think we'll have a better idea of what our timing is going to be.

MR. NEISER:  Thank you.

MR. ZEGARELLI:  Your Honor, I can say I did -- post our conference yesterday, my expert did start to press me, and so he is scheduled to appear here and be available from 9:00 to 4:30 Friday.

THE COURT:  Okay.  I think that should work because if -- I think that should work.

MR. ZEGARELLI:  So that's when he -- that was the safest period of time since he's flying in and he's going to juggle -- from what I understand, he's juggling his other -- his two other cases, apparently.  So they're all sort of converging at the same point.

In any case, to let you know, that was the confirmed date, and I think he has maybe an 8:00 flight back out to California.

THE COURT:  How's he doing, by the way?  I know he had that horrible accident.

MR. ZEGARELLI:  I understand he's doing better now.  I mean, you know.  So, I mean, that's all good.  But apparently, his schedule just all -- you know, apparently those all converged at the same time.  Although I haven't seen him.  I don't know if he still looks beat-up.

THE COURT:  That probably, you know -- having the accident probably conflated everything that he had to do as well.

All right.  Anything else?

MR. NEISER:  Not from our side, Your Honor.

MR. ZEGARELLI:  No, Your Honor.

THE COURT:  Okay.  Well, we'll be ready to go at 9:00, and we'll see how it goes today, and we can always talk at lunch if we need to.  We'll see how the day goes. Thank you

MR. NEISER:  Thank you.

(Whereupon, in chambers session ended.)

(Pause as the jury enters courtroom.)

THE COURT:  Please be seated, everyone.  Good morning. Good morning, ladies and gentlemen.

As we mentioned yesterday, POM of Pennsylvania and Savvy Dog completed their case and rested, and we are now in the case of Pennsylvania Skill Games.

So, Mr. Zegarelli, if you're ready to begin, we're ready to begin as well.

MR. ZEGARELLI:  Yes, Your Honor.  And short of an exception, Your Honor, we have one short witness and then Mr. Albert Unis and Mr. Albie Unis, which we think, reserving rights, will conclude our case.

THE COURT:  I think we have, perhaps, two witnesses sitting here, and we do have the sequestration.  So whichever witness you're not calling, let's escort him out for now.

MR. ZEGARELLI:  Yes.  Mr. Unis, would you please wait outside.  I didn't see him, Your Honor.

THE COURT:  No, that's quite all right.

MR. ZEGARELLI:  Mr. Grachanin, please come forward.

THE COURT:  Please step forward and we'll have you sworn in, sir.

THE CLERK:  Please raise your right hand.

JOHN GRACHANIN, a witness herein, having been first duly sworn, was examined and testified as follows:

THE CLERK:  Thank you.  You may be seated.

DIRECT EXAMINATION

BY MR. ZEGARELLI:

    Q.  Good morning, sir.

A.    Good morning.

Q.    I am Gregg Zegarelli, representing Pennsylvania Skill Games, LLC.

Would you state your name for the record, please, and spell it for the record.

A.    John Grachanin, G-R-A-C-H-A-N-I-N.

Q.    Okay.  Grachanin?

A.    Grachanin.

Q.    Grachanin.  Okay.  Sir, we have -- we've never talked before.  In fact, today I met you for the first time in this courtroom; isn't that right?

A.    Yes.  Yes.

Q.    Okay.  And are you familiar with a company, Pennsylvania Skill Games, LLC?

A.    Yes.

Q.    How so?

A.    I own a bar/restaurant, and they've been at my bar/restaurant as our vending company taking care of the games and the jukebox and all of that stuff since 2001.

Q.    Okay.  And I am going to place before you an exhibit that has been admitted already.

A.    Yes.

Q.    You see that, sir?

A.    Yes.

Q.    Okay.  And I'm going to scroll through the exhibit

briefly.

THE COURT:  Mr. Zegarelli, while you're doing that, can you just identify the number of the exhibit?

MR. ZEGARELLI:  Yes, Exhibit 82.

THE COURT:  Thank you.

BY MR. ZEGARELLI:

Q.  Sir, have -- do these pictures look familiar to you? Not necessarily that the machines are machines that you physically have seen, but generally being pictures of that type of machine with that type of screen?

A.  Yes.

Q.  Okay.  And how so?

A.  We had them at my establishment for many years.

Q.  Do you have an understanding of -- when you say how many years?

A.  At least -- at least 15 years.

Q.  Okay.

A.  We've had the Megatouch from them.

Q.  Okay.  And the screens on the Megatouches -- let me say it this way, the screens as presented in these pictures accurately reflect what you've seen --

A.  Yes.

Q.  -- on your Megatouches?

A.  Yes.

Q.  Okay.

MR. ZEGARELLI:  No further questions.

THE COURT:  Thank you, Mr. Zegarelli.

Mr. Neiser?

MR. NEISER:  Yes, Your Honor.

CROSS-EXAMINATION

BY MR. NEISER:

Q.  Good morning.  How are you?

A.  Good morning.

Q.  My name is Julian Neiser.  I represent the called-upon parties.  We've never met before either, have we?

A.  No.

Q.  Where is your bar?

A.  It's -- we're at 1675 Trumbull Avenue, Girard, Ohio, is the mailing address.  We're actually Liberty Township.

Q.  Okay.  So you said that you've seen that image with Pennsylvania Skill Games since about when?

A.  It was at least -- at least 2010, maybe even before that even.  It's been many years -- I've owned the bar for 23 years so --

Q.  Got it.

A.  Right.

Q.  So are the -- the image that you saw only on the Megatouch machines?

A.  Yes, that's -- because that's all I had.

Q.  Understood.

A.   Yeah.

Q.   Are there any images like that that say "Pennsylvania Skill Games" on the outside of the Megatouch machines?

A.   I don't remember --

Q.   Okay.

A.   -- if it had it on the outside, I know it was on the screen.  I don't know if it was --

Q.   Understood.  So do you still have the Megatouches in your bar?

A.   As of right now, no, I do not.  We remodeled the bar, and I didn't want them sitting on the bar top at this moment.

Q.   Congratulations.  So let me ask you, when was the last time you had those Megatouches in your bar?

A.   About a year and a half ago, two years ago, maybe. Maybe somewhere -- it was right around COVID time when we remodeled the bar.

Q.   Understood.  So that would have been 2020?

A.   '21, right near, yeah.

Q.   Understood.

MR. NEISER:  And that's all of the questions I have, Your Honor.

THE COURT:  Thank you, Mr. Neiser.

Anything further, Mr. Zegarelli?

MR. ZEGARELLI:  No, thank you.

THE COURT:  Mr. Grachanin, thank you very much for

your testimony here today.  You are excused.

THE WITNESS:  Okay.  Thank you.

(Witness excused.)

THE COURT:  You are free to leave, Mr. Grachanin. Thank you very much.

MR. ZEGARELLI:  Shall I?

THE COURT:  Yeah, that's fine, Mr. Zegarelli.

Sir, you can step forward here to be sworn.

THE CLERK:  Sir, please raise your right hand.

ALBERT UNIS III, a witness herein, having been first duly sworn, was examined and testified as follows:

THE CLERK:  Thank you.  You may be seated.

THE COURT:  Mr. Unis, you can feel free to pull that microphone somewhere that's convenient for you.

THE WITNESS:  Thank you.

DIRECT EXAMINATION

BY MR. ZEGARELLI:

Q.  Good morning, Mr. Unis.

A.  Good morning.

Q.  Would you state your name, full name for the record, please, and spell it?

A.  My name is Albert Unis III.

Q.  Spell it.

A.  A-L-B-E-R-T, U-N-I-S.

Q.  Thank you, sir.  Now, Mr. Unis, can you tell us a

little bit about your business background?

A.    Yeah.  My business background has been in the construction and in the gaming industry and the fireworks industry also.

Q.    Okay.  And as it relates to the gaming industry, how long have you been in the gaming industry?

A.    I've been in the gaming industry since 1994, '95.

Q.    Okay.

A.    Right in those two years.

Q.    When you say "in the gaming industry," what do you mean by that?

A.    I started buying jukeboxes and dart boards and pool tables and putting them out into locations.

Q.    Okay.  And do you have an understanding of the term "skill game"?

A.    Yes, I do.

Q.    Okay.  And what is your understanding?

A.    A skill game is a game that -- a game that you play that you interact with, and the skill is playing against somebody else.  So you would play the game against somebody else, and then they would accumulate so many points and somebody else would accumulate so many points, and then somebody else would play it, and they would accumulate so many points.  Well, you would you put those markings down and -- in the game, and people at first were excited about having their name up there.

Q.    Okay.   And do you understand the term "Merit," Merit game?

A.    Yeah, Merit -- Merit is a head leader in the industry of skill gaming and video countertops.

Q.    Okay.   Now, I'm going to show you -- well, before I show you the exhibit, Mr. Unis, Mr. Unis, if you can bring your gaming experience forward.   Are you familiar with a gentleman named Wayne DeLuca?

A.    Yes.

Q.    Okay.   And are you familiar with -- well, let me back up.   How did you become familiar with a gentleman named Wayne DeLuca?

A.    When I bought Amato Music Company out, which was the biggest gaming company -- when I say "gaming company," for skill games and dart boards and pool tables -- I sort of inherited Wayne DeLuca because Jimmy introduced me to him as a czar on gaming.

Q.    Okay.   And I think you mentioned the name Amato. We've heard that Amato here in testimony before.   Is the Amato you referenced an attorney?

A.    Yes, he is.

Q.    Okay.   He --

A.    But the gentleman that ran the gaming company was his father.   It wasn't him.

Q.    I see.

A.    He never ran that company.

Q.    I see.  Okay.  So you purchased machines from the father Amato?

A.    No, I bought them from Jimmy after his father died.

Q.    Okay.  I understand.  Okay.  Fair enough.  Now, approximately what year were you introduced or became familiar with Wayne DeLuca, if you can recall?

A.    1999, 2000, right in there.

Q.    And do you recall the circumstances under which you became introduced to him?

A.    Yeah.  I was -- I seen him all the time in the office, and in 2003, I hired Wayne DeLuca to help me build a brand of fireworks for my daughter Jennifer and my wife called A-Rocket Fireworks, and it's a brand that's still in business today with employees.  It's doing quite well.

Q.    Okay.  That's a Pennsylvania business?

A.    It's a Pennsylvania business.  It's insured with employees.

Q.    Okay.  Does that fireworks business enjoy any special -- is it special in some way for its timing?  I think you --

A.    Yeah, it was the first -- it was the first -- it was the first legal firework business in Pennsylvania, because that's why I hired Wayne because Wayne was with the FBI at one point in time, and then he went on to a big firm of lawyers in

Pittsburgh, and he had a reputation of, you know, knowing how to get around pretty good.

Q.   When you say knowing to get around pretty good, what do you mean by that?

A.   I mean that he knew the -- he knew people to talk to because he was protecting -- he was the -- he was the lawyer at the time for Pennsylvania Amusement Machine Association, which he, you know, liked to brag about, you know, and throw it in my face, this man and that.  You know, like he liked to brag.  He was a good bragger.  And he backed it up pretty much as much as he could, you know?  He was -- he did -- he went on to -- with the company to fight it through the legality battles of A-Rocket Fireworks went on until 20 -- probably '17 or close to '18; he worked for me during that whole period of time.

Q.   Okay.  Now, I'm going to show you a picture of some computer screens, and --

A.   Is that this?

Q.   All of a sudden, yes, it should be on your screen, and I'll scroll down through it.  Now, are you familiar --

A.   I'm very familiar with that.

THE COURT:  Exhibit 82.

MR. ZEGARELLI:  I'm sorry, Your Honor.

BY MR. ZEGARELLI:

Q.   Exhibit 82.

A.   I'm familiar with the flashback involved with, you

know, my kids, like Chelle, who -- inside those games there's ways that she liked to advertise because she wanted to -- she saw her sister build the brand of A-Rocket, and she wanted her own brand, and so she was doing that.  And, at the time, I told her she really could just work at this business, but she can't really be, you know -- and she said, What about fireworks?

And I told her, I said, I'll just have to get you into the fireworks business with your own brand of fireworks.

And she was all excited, and we started working on that, but not with Wayne.  We went to Gianni Floro to start the brand of fireworks for her.

Q.   Well, specifically, with regard to these screens that are these -- I'll say that -- do you see the word "Megatouch"?

A.   Yes.

Q.   Okay.  And are you familiar with Megatouch machines?

A.   I'm very familiar.  As soon I saw it, I knew exactly what it was.  I mean, it just -- it is -- you know, it is what we used.  It is -- it was everywhere at one time.  We had it -- it was our main earner on the route at one period of time.

Q.   All right.  Do you have an understanding of whether or not machines that -- Megatouch machines that displayed this screen, were they on your route at any time?

A.   Oh, yeah, they were -- they were at most of the locations that we had.  Probably -- it was our main earner.  So if they would let us put it on the bar, and then sometimes we

had to build casino cabinets to put them in the corner because our fight was everybody wants the spot to sit here.  We don't want this game here.  We can't see over it.  There was all of these different issues.

So we started building, like, cabinets and putting them in there, and they were, you know, similar to, like, casino cabinets but not -- but not like fancy casino cabinets, you know.  So they could stand up.

And then, at that time, they changed the game to a pay-out game that we did the tournaments and the names were on there.

And then every time we did the money, we would look at the high scores, and we would leave the money with the bar owner because everyone was waiting for it because they were excited to get the high scores.  So they played the skill games, and they had their names up there, and there was a tournament thing in there, and people were like -- were as happy as could be.

So it brought the business to another elevation, Merit did, and they had some issues while they did it, but they handled them all, you know.

They had the tournament games out for a while, and then they put them back in after they were -- whatever negotiations they did, I wasn't  -- I don't know what they did. They had -- there was all kind of papers they sent out to everybody in the whole industry through PAMMA that it was good

to run these games now.  So it was -- a lot of people relied on PAMMA.

Like every -- when we bought jukeboxes, you would get a discount if you joined PAMMA.  If you didn't join PAMMA, you paid, like, $2,000 or by the amount of locations you had.  But if you joined PAMMA, you only had to pay, like, 2 or $300 per location and changed it periodically, but I don't know what the prices were.

Every game that we put in, we had to pay something.  You know, there's like -- before you place a game, you have to go to the location, pay the police at the municipal -- each one, individually.  It wasn't like -- each municipal, you had to go in there, talk to the, like, chief of police.  They'd put the chief in charge of it.  And they'd be like, Okay, what game do you have?

You know, and you'd be like, Yeah.

They'd look at you, you know, and you'd be like, okay.  You know, you'd be like -- you don't know what they're going to say, you know?

Then they say, okay, you know, and they give you the permit, and then you'd put it in.

You know, so it went place by place, per town per town.  So we had to go to Ambridge, Aliquippa, Beaver Falls, Monaca, Rochester, Leetsdale.  Let's see.  Not Leetsdale but -- we had to go to Leetsdale.  Let's see, we had to go to

Leetsdale. And we had to go to -- every one of them almost. There was -- I don't think there was any townships that didn't collect a fee to put a game in.

And the game fees, like Coraopolis was a thousand dollars to put a Megatouch in at the time. So even -- even the pool table and the dart board was a thousand dollars. And in Aliquippa, the prices were between, like, $75 and $250, you know, just to put the game in. And you didn't know if it was going to earn or not, and they wanted the money before it was in there. And if it wasn't in there, they'd come around and take your game. Periodically, each municipal did their own enforcement on the game for their permits. So that's just how that went.

Q. Okay. Sometime around -- do you recollect if these -- if these Megatouch games with this -- is it -- with these screens, did they -- were they in the market in 2010?

A. Yeah, they were in the market in 2000 -- probably between '4 and '10, you know, they were developing their games. I mean, they were in the market a long time. They were in the market when I bought Amato's route. It was on there. There was already Megatouches on his route. He already had Megatouches with different types of play.

He had Merit games that were upright games that were called -- called -- it's been a long time -- Dodge City. And Dodge City was a game -- that was their big deal, because Dodge

City was the game that everybody could buy that was the skill game that paid out, and you were allowed to have it in the bars. And it was a gray area where you were allowed to pay out or not on it.

And, you know, I guess it went by like whoever was, you know, felt like doing whatever they wanted. Like, enforcement was in charge of themselves, as far as I know. You know, there was guys that we used to go to. Eventually, we built a rapport with enforcement through Chelle, at first, for Pennsylvania Skill Games. And then through Albie, because we were getting the games back when they were picking other stuff back, we were getting them back a long time.

So we got the games back from local police, from the state police, all the way up into probably 2017, they were still giving games back that they picked up in probably '15 because there was people you had to deal with that wouldn't give them back that was in law enforcement and then you had to go to the top, which I hired Gianni Floro to do it because I was mad they were taking Chelle's skill games, she was paying 2 and $3,000 for it, and then she -- she's like crying to me, you know, because her route's hurting.

I was like, okay, I'll get them back.

I hired different people, and I went around and talked to them, and I finally got to, you know -- mostly it's one point in time when Albie really did good was when he was running skill

games when he got involved in the business because he went there.  He trained the bars to call him if they'd come to pick them up.

And then if they went to the location, like the vets would call him, he'd go running down there and talk to the police, and he'd explain to them which game was what and this and that, and he was successful at that.

And then I started getting phone calls from like John -- John -- like, this guy was from state police was calling me questioning me.  You know, I was like okay, I mean -- I get nervous because it was crazy.  You get scared when the police question you about the game sometimes.

Q.  Fair enough.  Let's stop there.  And let me direct your attention to the screen.  It has a new exhibit on it.

All right.  Now, I'm going to scroll through it.  This has not yet been introduced as an exhibit that I recall, at the moment.  I don't think so.  I'm going to scroll through it slowly, Mr. Unis.  I want to know if you --

A.  You've got to do it, again, man.  I'm sorry.  I can't read like that.  I can't do that, I'm sorry.

Q.  If you need me to make it larger, just let me know, and I can do that.

A.  Yes, please, thank you very much.  I missed the top. I'd like to start at the top of it.  I didn't get any of that yet.

Q.    Sure.  Can you read it?  Is the size large enough?

A.    It's starting to look a little familiar now.  Keep going up.  Okay.  Keep going.  Well, no, you can't do that.  You have to go back.  I can't do that.  I can't do that.

Q.    That's fine.

A.    Keep going way back.  I can't read like that.

Q.    Do you want me to start at the top again?

A.    If you can start at the top and then come down, I could read it.

Q.    Sure.  Sure.  You tell me when to scroll, and I'll do it.

A.    Thank you.

Q.    Yeah, I apologize.

A.    Scroll up now.

Q.    I'll take it to the top --

A.    Wait, you're going too fast.  I'm still trying to get the edge of this.

Q.    I apologize.

A.    Okay.  I got it.  Let me get down to the bottom now.

Q.    You want to go to the bottom?

A.    No, I'm getting down to the bottom.  I'm starting to get it.

Q.    You tell me when to stop, sir.

A.    Stop.  All right.

Q.    Next page?

A.   Not yet.  I'm almost there.  All right.  I'm good.  Is that the last page, or is there another page?

Q.   It is not.  It continues.

A.   Stop there.  I'm good.  Go up.  Is this the last page or --

Q.   No, there's a few to go.

A.   Really?  Stop there.  You could go up a little further.

Stop.  Just go down one second because I need that one sentence.  I need the rest of that one.  Stop.  Thank you.

You could scroll up a little further, page 3.  Stop. You could go up a little further, please.

Q.   I'm sorry?

A.   Could you scroll up a little further, please?  Is there another page of that?  All right.

Q.   Tell me when to stop.

A.   I need 9 and 10. Go up a little more.

Q.   You want to see 11?

A.   11 is good.

Q.   Okay.

A.   Stop, please.

Q.   Sure.

A.   Go ahead up some more.  Thank you.

Go ahead up some more.

Q.    Is that good?

A.    Well, it's good for the moment.

Q.    Okay.

A.    Is there five, six, seven?

Q.    Well, it looks like we're getting to the bottom.

A.    If you could scroll up some more.

Go up a little more.  Yeah, yeah, it all comes back. It's all there.

Q.    Okay.  You recognize the document?

A.    Yeah, I recognize it.

Q.    Your signature on the document?

A.    Yeah, that's my signature.

MR. ZEGARELLI:  I move in Exhibit 66.

MR. NEISER:  No objection, Your Honor.

THE COURT:  All right.  Exhibit 66 is admitted.

BY MR. ZEGARELLI:

Q.    All right, Mr. Unis.  Tell me what this document is about, if you know.

A.    This document is about -- we were -- I was personally working in Ohio a lot, and I had a lot of Megatouches and jukeboxes -- maybe not a real lot, but I was sporadically located through strategic areas where they would let me put them in.  As I built my business, I would go and talk to people, and I would spend my days out there in 2009, 2008, 2004, in Youngstown, Ohio, because I worked out there with, like,

cigarette machines and stuff that people used to place in different markets. And the guy with the cigarette machines, his family had bars, and they introduced me to him, and I saw one gentleman leave, that's how I actually met him, was through that reason.

Q. With regard -- is this an agreement with a particular location?

A. Yeah. That agreement is -- that agreement is one that we made because, in Ohio, they were -- they were, like, not giving the game to people -- okay? -- and we were moving the skill game that we had three or four different skill games, and we were working with skill games in Ohio with people that was, you know, doing it, and they were giving us games, and we were bringing them everywhere.

Q. All right. You'll see a name identified in the blank, written in. First line?

A. I'm lost. I see a -- you're talking about on the very top?

Q. Right.

A. Yeah, I see it. It's American Italian Club, Aliquippa.

Q. Okay. With regard to this agreement, do you have an understanding of what this agreement was regarded for --

A. Yeah, it's regarding exclusivity to place equipment, and then it has a provision in there for cranes that are skill

games that we take prizes out, because we used to -- we have to charge them -- you have to charge them to fill the cranes up with toys. And sometimes money, we would put around the toys so they want it more and things like that. So we did things that we -- we put higher-end toys, eventually, and I would go to Youngstown and buy them from a guy out there, big toys, and I would have to pay him for the toys, you know? He was an interesting guy. But I --

Q. Excuse me one second. If we can try to move through this particular document.

A. There's a lot of things in here that are -- you're asking me questions about it. But there's a lot of things in here that are about the business. There's ATM machines in there. There's VLTs that weren't even into the market yet that we put them in there because we tried to stay ahead of the game.

This -- this contract is to keep us ahead of the game before the influx of skill games that are influx in all states -- okay? -- it comes into Pennsylvania. We're trying to build a secure area to protect because, you know, going all over the place, it's a lot when you're putting young people in business, which my goal was, and you don't want them going all over the place collecting money so they get something victimized or something, so you try and keep them in a little area.

So we tried -- we signed these exclusives, basically only in Beaver County, just to keep the kids there. I mean,

they weren't just kids. They were people that were importers. Chelle was an importer. By the time 2010 came along, she already was the first woman to import fireworks in the United States that was partners with the Chinese. And she made her own brand called Sisters Brand Fireworks.

If you can excuse me, I like to brag, all right? That's what it's about. That's why I'm still talk- -- I like to brag about her because she did this. Why is there exclusive in there? To protect these people. They're animals. They come after you like animals. Once you take a game somewhere and they see it earning money, everyone's like, "We played that game at American Italian Club. We want one of those."

And then you go to the place to tell the guy, we have it for you, and next thing you know, the other vendor buys one and puts it in the spot, so you never get to put the equipment in there. You did the work for Merit. So I'm going around doing the work for Merit that we put the first TouchTunes jukeboxes in Pennsylvania, too. Us and Dale Lazar in 2019 -- 1999, okay, when TouchTunes, which is the biggest company that has everything across the United States, okay, they -- they started off with me in Pittsburgh, okay?

Dan McAllister, who started the company, was my personal friend, all right? I went -- I went to a trade show, you know. I gave -- I gave -- I didn't give it just to PAMMA. I gave it to the American Machine Association so I could get

those permits for the jukeboxes, you know?  Sometimes you get confused about these names of different associations, because I've been out of, like -- I've been living in Florida, and I'm telling you, my health isn't good.  I've been bleeding all night.  I got problems.  But I'm here.  I got to get this done.  So let's do it.

Q.   Okay.

A.   I don't want to fall on the floor here.  I've been bleeding all night.  I was bleeding yesterday, day before.  My doctor sent me in for tests.  They can't figure out what's wrong.

I got a pain that goes from here all the way down here that won't stop.  So I just need to do this and get it over with so I can go.  I apologize.  But I mean, it's really hard to sit here while it hurts like that.

THE COURT:  Mr. Unis, if at any point you need a break, please let me know that.

THE WITNESS:  I will let you know that.

THE COURT:  We will let you have a break whenever you ask for one.

THE WITNESS:  Okay.  Thank you.

BY MR. ZEGARELLI:

Q.   Mr. Unis, do you recognize the document I've placed before you on the screen?

A.   Yep.

Q.    Okay.   Let's work from this document.

MR. ZEGARELLI:   I move in Exhibit 16.

MR. NEISER:   No objection, Your Honor.

THE COURT:   Exhibit 16 is admitted.

BY MR. ZEGARELLI:

Q.    Okay.   Let's start from 2013 up --

A.    Is this the same document, or is this a different document?   Let me see it.   I can't tell.   Let me see.   Receipt for Pace-O-Matic equipment terminal.   Okay.   1st day of October, 2013, Albert Unis received from the office.   Okay.   All right. There's a receipt for Wayne DeLuca, who was my attorney for a long time.

Q.    All right.   You recognize the document.   Can you describe why you apparently received a machine on that day and for what purpose?

A.    I -- okay.   Let's talk about the day.

Q.    Excuse me.   One second, if you don't mind.

Is that your signature on the document?

A.    Yeah, that's my signature.

Q.    Okay.   Then go ahead.   Continue, please.

A.    It's just hard for me to remember days.   All right? That's all.

And it is my signature on the document.   Okay?   And it is -- it is what I signed, and it is what he handed me that day. Yeah.   He handed me that receipt from Pace-O-Matic, equipment

terminal ID, yeah.  That reflects the game that I took to AIC club, and I got them to sign an agreement so I could run it through there.  I got the agreement signed by the board, so I could run it through there, because Wayne had to protect the game and he couldn't run it through the court without a signature from the club.  So I took him down to the club, and I got Wayne a signature from the club so that he could run it through there, through the court.

I mean, like, it was -- it was really like at that period of time, we were already picking our skill games up from -- from enforcement and stuff like that.  They were giving us the skill games back that were -- that were Merit games.  So they weren't -- they weren't seizing our Merit games at that time.

And we were adding -- I was adding, let's see, before that -- let's see, when you showed me the first agreement, now you go to this agreement.  Between those two times, if you have any questions or whatever, I just want to get it over with.  Ask me them now because --

Q.   Okay.  Are you familiar with a company called Pace-O-Matic?

A.   Yeah, I'm familiar with Pace-O-Matic.

Q.   Okay.  You said you're familiar with Mr. DeLuca?

A.   Yeah, I'm familiar with Mr. DeLuca.

Q.   Okay.  On or about October 1st of 2013, what was your

relationship with Mr. DeLuca, if any?

A.    In 2013?

Q.    Yes.

A.    He was -- he was -- he was just -- he was working for me in the -- in the industry of fireworks.  I mean -- and -- and in skill games and whatever else I needed him for.  He had, like, an open blanket to charge me whatever he wanted from then to he quit sending bills.  I never fired him.

Q.    Okay.  How did you come about receiving from the offices of Wayne DeLuca Esquire a Pace-O-Matic video game?

A.    He gave -- I called him up in probably -- actually, I didn't really call him up.  I was in Jimmy's office working on things, and he was in and out of there all the time.  And he would always -- when he saw me, you know, he would always say something to me, because he was in the skill game thing.  So he used to like to -- I told him, you know, I says, Yeah, I'm running -- I'm running skill games, you know, that I buy in Ohio and from different place that pay out now, and I'm doing good.  And they're picking your games up everywhere.

And he was like, Yeah, well, you're going get in trouble.

And he would holler at me.  And I was like -- and when he would say that, I would get worried about my daughter.  So that's why I hired him, because she was already had a fireworks license at that time and if she would have got in trouble with

the government, they would pull her fireworks license that we spent like, I don't know, you know, like we spent probably $500,000 to achieve that.  I mean, it wasn't easy to get her a fireworks license.

We went -- it went -- it went on for years until, you know, until they actually finally approved my process in, like, '17, you know?  So my process to sell fireworks that I developed with Wayne didn't truly get approved until '17 or '16.

So we couldn't -- we couldn't take a chance of Chelle getting picked up and getting in trouble and losing her ATF license.  She had -- she had -- she met with the feds -- I mean, like, alcohol, tobacco and firearms -- on a monthly-type basis to report about her fireworks business and her storage of fireworks.  And she -- if she would have got in trouble, she'd be destroyed.

So I just had to do what I had to do to protect this company, so I could retire and pass it on to these young people, the next generation, okay.  That's what it was really about.

You know, I have seven kids.  So I've got to go step by step by step.  I've got Jennifer, good.  Chelle, good. Albert, good.

As soon as -- he wasn't good until he signed the paper with Pace-O-Matic.  I was like on his shit because, you know, they sent me stuff that I wouldn't like.  So I sent it to -- I sent that, I said, You better hire a lawyer.  I said, I use

Jimmy.  I said, Just go do what you can.

So he went and hired some other lawyer that worked in Jimmy's office that I talked to a couple times, but I really haven't really -- I don't know him that well.

Q.    Okay.  Before October 1st of 2013, did you have conversations at all with Mr. DeLuca with regard to Pace-O-Matic?  In other words, leading up to this document on October 1, 2013, did you have conversations with Mr. DeLuca about Pace-O-Matic?

A.    Yeah, all the time.

Q.    Okay.

A.    Not particularly, you know, about Pace-O-Matic company.  With his people that he said were -- he's supposed to come back with a game.  And then every time I saw Wayne from 2010, after he told me that, to 2011 to 2012, and he knew I was running Blue Sky Games because I sent -- I sent the paperwork to his office at some period of time between '13 and '16 or '12 and '16 that we were running these games and we're making money.  And he was like all over me.

So I sent the paperwork up there.  And I told him, I said, They want to give me an exclusive for the state.

He was like, Well, I'm not so sure that game's legal and blah, blah, blah, blah.

So he held the paperwork up there for a period of time.

Q.    Let's make sure we have the time straight.

Okay.  So if you look at the top of that receipt, it's October 1, 2013.

Do you see that in the middle?

A.    2013.

Q.    '13?

A.    October 1, 2013, right, okay.

Q.    Okay.  I'd like to go before that period of time.

So before that period of time, did you discuss Pace-O-Matic equipment or any equipment with Mr. DeLuca?

A.    Yeah.  Yeah, I discussed it -- I discussed it with him from probably 2011 to 2017.

Q.    Okay.

A.    I don't know -- you know, I discussed it with him.  I don't know, maybe even longer.  I mean, like, I can't remember if he called me after that.  I'm not the perfect date person.

Q.    No, that's okay.

I mean, can you isolate the period of time that you talked to Mr. DeLuca about Pace-O-Matic or other vendors?

A.    I talked to him all the time.  So I -- I was in Jimmy's office, and he came in, I think, maybe once or twice a week and met clients there.  And he had an office there.  And I used to talk to him -- I would never just walk past his office unless it was closed and he was in, like, some kind of mode.  You could tell when he's in the mode.  When he wasn't in the

mode, he was just like going around the office, Hey, Al, you know, What's up, Al? You know, how's the skill game business doing?

And Jimmy was always real interested because it was his dad's business, okay? And when I bought it from him, I remember sitting in the office and he told me -- and he was like a pretty arrogant guy. And he looked at me, and he said, Albert, if it was making money, we wouldn't be sitting here, okay? Because it wasn't easy to make money at that time. And his family was working there.

And I told him, I says, Well, I'll keep them working, and I'll -- I'll include the things that I'm doing that's making me successful.

And all it really was, was adding the jukeboxes and the Megatouches, which fixed his route. Because after his dad died, no one wanted to buy the stuff anymore. And that made me, like, able to be successful, because when I started putting it out against him, I was taking his spot. I assumed Mouawad's spots in Beaver County, which was -- between Amato Music and Mouawad, they fought for all the spots in Beaver County. And then at some period of time, like a couple of other vendors started, you know, sneaking around. And I kind of pushed them -- I started with probably 15 vendors in Beaver County. When I was done there was only like three, me and a couple other guys.

Q.    Do you recall those guys?

A.    Yeah, I know who they were.

Q.    Who were they?

A.    One told everyone he was Mike Marsico, but I believe his name was --

MR. NEISER:  Objection; hearsay.

THE COURT:  Overruled.

You can answer.  Go ahead.

THE WITNESS:  Okay.

He told everybody he was Mike Mangerie -- he told everybody he was Marsico, but he was Mike Mangerie.  Okay?  But I knew where he was from.  He used to work for Duffy, okay, which was the biggest guy in Pittsburgh that everybody knew of him but nobody knew him, because he would use all of these other different people to put the games everywhere.  And it was on TV everywhere.  It was the reason Jimmy Amato didn't want to keep this business is because the Pennsylvania crime commission in '91 did some major, like, shit and put people's names that didn't even do nothing wrong and everybody wanted out of that business.  So I had good timing when I bought it, you know?

It might -- I like -- '99, Jimmy knew it was time to get rid of it.  So he -- he -- it wasn't making money, and I was squeezing everybody out.  And why I was doing that -- and his dad -- while his dad was still living, while I was squeezing him out, I used to get phone calls all the time because my Uncle

Frankie -- I'm a Unis, okay?  Albert Unis is a name that's hard to live up to.

My dad had 300 trucks.  He did shipping port power plant.  Bruce Mansfield plant.  All of the state work.  He had his own -- he did it all.  And he retired when I was in high school.  And I moved to Florida.  I met everybody in Florida, and in 1980, when I went to Florida, everybody moved there from, like Cleveland and all of these places, because they were doing things different places.  So I met a lot of good people.  I got a good education down there with a bunch of people that were in the skill game business forever.

And the czars of the business, I met -- I met people like -- that ran the whole -- that owned like Bali and stuff like that.  They lived in Florida.  I used to look up to them.

And I had family in the business.  I just wanted to -- I made it grow.  I did it because, see, I had -- I had to build things for him.  Chelle was already set.  It was his turn.

After him, okay, then comes Abbie, okay?  Abbie owns Lord Green Factory, okay, which is a brand that she sells holistic products all over the country.  That's his sister, that's my daughter that paid her own way through college playing basketball, went to Webber, went to Texas, went to everywhere.  When she graduated, I bought her a condo in Florida, put in my wife and her's name.  And I put her in business with my wife and that as Lord Green Factory, and she built the trademark.  She's

building it today all across the country.  She's a super girl.

And then after, let's see, was there -- let's see, after her, Simon, okay.  Simon -- well, he doesn't own Port Rents because he's a little different than Albie and Chelle. He's a harder kid.  He's hard to deal with.  He don't listen. He don't listen.  He just -- so I have to put a women's business company for him.  His corporation that he owns, his trademark is Port Rents, okay.  Abbie, Chelle, Albie, and my wife are building that now for him.  They unload containers, you know, getting ready for the cracker plant.

We bought, like, property in Bruce Mansfield.  Abbie signed contracts with all of the unions.  She signified -- I mean, like -- you know.

I don't blame you for stopping me, whatever.  I'm just excited about my kids.  So you've got to remember, I'm going get off the subject when you talk about my kids.  I can't help it.

BY MR. ZEGARELLI:

Q.    I didn't really mean to interrupt you.  I wanted to move it along.

A.    Mike Pace knows what he signed.  Okay?  Danny Warren told me he's going to pay him.  All right?  And they're dragging this out to the end of this shit, turning --

MR. NEISER:  Objection, Your Honor.  Move to strike.

THE WITNESS:  All right.  I'm sorry.

THE COURT:  All right.

Mr. Unis, if you could stop. I don't think there's a question.

THE WITNESS: I'm sorry.

THE COURT: Ladies and gentlemen, I'm going to strike that last testimony which means that you should disregard it. Certainly Mr. Zegarelli can ask further questions to elicit that kind of testimony.

BY MR. ZEGARELLI:

Q. Mr. Unis, I think the question before you was whether the couple competitors in Beaver County -- you were pushing out the competitors. I think one you mentioned was Marsico.

A. No. I squeezed them down, and then they came back when I put all skill games in because I couldn't run the stuff they were running. They were running blatant chance games that I can't compete with. And eventually, Marvin Harris, who went around and did all things like checking on permits, noticed that they're running these games, and we gave it to Gianni Floro because we told him to just send letters to the municipals that they're running illegal games in our skill locations. And, you know, eventually in New Castle, they took all the doors games out. He lost them all. Okay?

Q. One second.

MR. ZEGARELLI: Can we do a sidebar?

MR. NEISER: Absolutely.

THE COURT: Yes.

MR. ZEGARELLI:  One second.

THE WITNESS:  I apologize if it's my testimony.

THE COURT:  Ladies and gentlemen, feel free to stand and stretch if you'd like to.

(Whereupon, sidebar conference held:)

MR. ZEGARELLI:  So I don't want to lead him, but if I don't lead him, it's -- I'm not going to --

THE COURT:  I think you can lead him.

MR. NEISER:  I was going to offer.

THE COURT:  If there is an objection to a specific leading question, you may.  But I think -- I think really we have to.

MR. NEISER:  You have to.

THE COURT:  If you need my assistance, I can step in as well.  I don't want to interfere with your questioning, but I think you need to lead him, and even then, it's probably going to be a little difficult.

MR. ZEGARELLI:  One hand, I don't want to lead him. His best story is natural.  That's when he kind of lights up and actually tells a story.  On the other hand, he does veer.  So I'm going to try to balance it.

MR. NEISER:  I'm not going to object to it.

THE COURT:  Feel free to interrupt if he's going off on a tangent that isn't responsive, and I'll start stepping in as necessary.  I just don't want to interfere with how you want

to proceed.

MR. NEISER:  Don't worry about me.  I'm not going to get in your way.

MR. ZEGARELLI:  I'm going to let him if I can.

THE COURT:  Feel free.

MR. ZEGARELLI:  Thank you, Your Honor.

(Whereupon, sidebar conference concluded.)

BY MR. ZEGARELLI:

Q.    Mr. Unis, prior to October 1, 2013, did you have a series of conversations with Wayne DeLuca about Pace-O-Matic machine -- I'm sorry.  Not even Pace-O-Matic machines --

A.    Go back to the date.  I lost you.  I'm sorry.  I wasn't ready.

Q.    All right.  So we have a receipt in front of you, Exhibit 16.  Do you see that on the screen?

A.    Yes.

Q.    Okay.  It's true, isn't it, that you received from the offices of Wayne DeLuca a Pace-O-Matic video game terminal ID142613?

A.    Yes.

Q.    Okay.

A.    Never checked -- I trusted my lawyer.  Never checked the ID or the serial number on it.  He wrote it all down.  And I trusted my lawyer, and I signed it.  I never -- I never -- I never, like -- yeah, I knew -- he said, Here's a receipt for the

machine I gave you before.

I said, All right. And I signed it. So, you know, that's how that went.

Q. All right. Now, the machine that you received, were there conversations with Mr. DeLuca that preceded receiving the machine relating to -- are you familiar with the Beaver County case?

A. Yes.

Q. Okay. So were there conversations with Mr. DeLuca leading up to the Beaver County case?

A. Yeah.

Q. Okay.

A. Yeah.

Q. Can you describe those conversations and what happened that led up to the Beaver County case?

A. Okay. The conversations went, Wayne, I need you to find me that game that you told me that someday you're going to find me. Okay? And that was in 2011. All right?

Q. What game -- excuse me. What game was that game he was going --

A. He said he was going to go --

MR. NEISER: Object to hearsay, Your Honor.

THE WITNESS: -- to PAMMA -- okay.

THE COURT: Sustained.

THE WITNESS: I don't know what "sustained" means.

I'm sorry.

THE COURT:  It just means, Mr. Unis, that that question -- that Mr. Zegarelli will have to ask another question.  The question that he asked was objected to.

THE WITNESS:  Okay.  Thank you.

BY MR. ZEGARELLI:

Q.  Okay.  With regard to not so much what Mr. DeLuca told you, what did you -- did you ask Mr. DeLuca to do anything for you?

A.  I hired Mr. DeLuca in 2010 to oversee what my daughter, my wife, and I was doing with the skill game business because I was concerned about it because we had just got her an ATF license and I wanted to keep her business so she don't get in trouble.

Q.  Okay.  Now, when you said -- now, when you first talked to Mr. DeLuca, was it about obtaining a game for Pennsylvania, or was it about obtaining a Pace-O-Matic game?

A.  I -- I basically told him to go find a game for our company, Pennsylvania Skill Games.  I didn't know much about other companies other than the ones I was dealing with.  I was dealing with a couple already that had games.  And he kept saying that he knows people.  He's the lawyer for PAMMA.  He likes to brag.  He knows this.  I'm this.  I'm that.

I said, Okay.  Go find us that game.  Okay?

So that went on from 2010 to -- he probably said he'll

find a game around 2011 or something like that and said he'll go find a game. And then, back in about 20 -- between there and '13, he came to me and he said --

MR. NEISER: Objection. Hearsay, Your Honor.

THE WITNESS: Okay.

THE COURT: Sustained.

THE WITNESS: He told me -- I'm not allowed he told me? I'm sorry.

THE COURT: Mr. Unis, an out-of-court statement by someone else is not part of your testimony here today unless there is a reason that Mr. Zegarelli has for that.

THE WITNESS: Okay.

THE COURT: So he'll ask you another question.

THE WITNESS: All right.

BY MR. ZEGARELLI:

Q.    Did you have a meeting with Mr. DeLuca where you participated in a conversation with Mr. DeLuca?

A.    Yeah, I hired Wayne DeLuca to oversee my daughter's Pennsylvania Skill Games brand that we just built for her.

Q.    Did Mr. DeLuca, at some point in time --

A.    For my wife and her.

Q.    Did Mr. DeLuca, with regard to finding this game, did Mr. DeLuca ultimately present to you a Pace-O-Matic game?

A.    He introduced me to a Pace-O-Matic game when he handed it to me on that date.

Q.   Okay.

A.   That he wrote on there.  I mean, that's -- I trust my lawyer as much as I could.  So if you can't trust your lawyer, you're really -- I don't know.  Whatever.  So I trust that that's the date, or close to it or whatever he put there.  I signed it.  So that's my answer.

Q.   Did you turn on the game when he gave it to you?

A.   When he gave me the game?

Q.   Yes.

A.   All right.  I didn't turn the game on.  I drove the game -- I drove the game to the location.

Q.   Which was?

A.   Which was the American Italian Club, and I told him that I finally -- I finally got this particular game that we're going to run through that you see -- let me go back because -- it's hard for me on these dates because I'm not good at dates. All right?  So I'm not going to be here and do dates too good. So you're going to have to hit me again on the question.

Q.   All right.  You took -- if I understand your testimony so far, you took the game to the American Italian Club?

A.   I took the game to the American Italian Club.  Right.

Q.   Okay.  Now, at that time, how many games did you have in the market, skill games?

A.   Hundreds.

Q.   Hundreds?

A.   Yeah.

Q.   Okay.  How many locations did you have at that time for those games?

A.   We put skill games in all of the locations.  We put Megatouches and Merit games in every -- our business is a skill game business.  So sometimes the questions that you ask me are pertaining to skill games, which is the basis of our business.

Q.   So how many locations in 2013 were you the operator for that had your -- that had skill games you were operating for?

A.   Chelle was running the business, I'd say probably, 50, 100.  I'd say between 50 and 60.  We moved them around.

Q.   Sorry.  How many?

A.   Sometimes they changed because one month you'd have 60 locations.  The next month, you'd have 70.  The next month after that, you'd have 65 again because it was a give-or-take thing.  You'd have to get a location to keep your locations.  It was always -- it was competitive like that.

I mean, that's why we started getting these agreements with exclusives and everything else signed because it was turned into, you know, like, guys would come in your spot and say, Hey, we got better games and make more money.  We'll give you $10,000 to put the games in there.

Then you're a victim.  Okay?  If you have a piece of paper, you don't have that problem.

I don't know if I answered the question. So that's -- I have a problem with going around. You have to -- you have -- you have to help me out. Shut me down or something.

Q. Is it fair to say approximately 60, give or take, at that time?

A. 60, give or take.

Q. Fair enough. Okay. Now, is there a reason that you picked the American Italian Club as -- you know, out of a 60 whatever number of locations, why did you pick the American Italian Club?

A. I picked the American Italian Club because I went -- I went there, and when I asked him -- and I already knew, growing up as a kid, the American Italian Club is -- the SOI club is the -- they all house in the same building. SOI club, the Sons of Columbus, and periodically, the Musical Political Italian Club would have meetings there, and they'd have the fundraisers there. They would pick between the two Italian clubs where they were going to have the fundraiser, and they were having most at AIC club.

And I just knew that if I put it there, that there would be no reason for somebody to say a skill game is illegal. It didn't make any sense to say the skill game was illegal. So it was like something that wasn't that, like, big of a deal other than they needed to keep it there and it didn't make money, all right, and they kept taking it off the bar. And it

was just a little bit of an issue.

Q.    Let me ask it this way:  Was there a certain clientele of the American Italian Club that was part of the reason that you put it in the American Italian Club?

A.    Yeah.  It was --

Q.    What kind of people?

A.    It was -- there was 20 members of -- there was 20 owners of the American Italian Club that were -- the Palombos were the presidents of 2011 union, and their family was in charge of it.  And then there was the other people that was in charge of the club, they were all in charge of the club.  And then everybody was there to have fundraisers, and it was the best place, respectively, to put it in because it was the most respectable club.

If there's people having political fundraisers there and I see this and I'm going there and everybody's happy with that club, they never have any violations, it's just the most pleasant best place where everybody in Beaver County likes to go to Aliquippa because of old Italian heritage and what they have there is like called -- they have something called San Rocco, you know?  And everyone come from all over the whole county and goes there, and they love that place.

So I knew when I put -- I knew when I put the tent in front of there, which I did right after they did that with games in it, and I put my son in there and he had a booth out front

right after it was legal, and we advertised it to everybody.

But -- but at that particular time, the game that we were using from Pace-O-Matic didn't play.  It played differently than -- played -- it played differently a little bit.  You know, because he kept changing it because he was trying to keep up with the games that I was running, Pace-O-Matic.

I mean, I was running games -- I was running games that were better than his because the game that he built -- he just went over top of the whole thing.  He picked out -- okay, cranes, he's an industry brain, okay?  This guy's an industry brain, I mean, for real.  He's been through the industry, studied the law through all of these states.  He pulled out what wins -- what wins in court?

Okay.  Well, I worked with -- I worked with the crane industry.  In the crane industry, we had to make the games win every time, okay?  Or we couldn't have them for a period of time.  So we'd make the games win every time.  We just make them win less often.  Okay.

Well, in the Pace game, particularly, what they did was, they put a timer in it -- okay? -- and the timer controls the skill.  So how it worked was, there's a timer in the skill game.  All right?  And it counts down, and you can change the timer to control the skill.  And it goes from skill, then it goes to chance, okay, because when there's no time, then you're just hitting it, and then you got something that comes up, and

then you can read the winner and just push it.  Okay?

So basically, it starts like that.  It starts with a number of -- of time.  Okay.  You have more time to play the skill game.  You're playing the skill game against the game now.  You're not playing the game against people, other people, except for you're playing it against the game, all right?  You're not putting other people's name up on the screen no more.

Some of these skill games changed the way they did business, see?  So they could make it differently so people wanted to play it more.  They didn't want their names up there and get paid for one thing.  Nobody wants their name on top of the screen to say what they got paid.  After -- after you could pay -- after -- after the skill game was accepted and you could -- and you could put it in the industry, nobody wants their name up there to say I got paid $100, I got paid 800, so someone could bum money off of you in the bar.

Q.   Okay.  So -- okay.  So the point -- okay.  You're familiar with the point of which that there was a ruling that declared 402.44 version of the game as a legal skill game.  Are you familiar with that?

A.   I'm familiar with that.

Q.   And you purchased a number of games from Pace-O-Matic after that ruling; right?

A.   Yes, I did.

Q.   Okay.  Now, you alluded to it.  But how did those

games play when you first installed them into your locations?

A.   The locations?

(Court reporter clarification.)

A.   Who called me up?  The American Italian Club called me first.  Where I put it, the AIC Club.  AIC Club called me up and told me to take the game out; it wasn't making money.

Q.   Okay.  When you say it's not making money, just briefly, how does the operator -- very briefly, if you don't mind.  How does the operator, the manufacturer, and the location -- the operator and the manufacturer make money?

A.   It makes money -- it makes money off of the split.  So the money goes into the bill accepter, and then the people pay out on the game.  And then it keeps track of it, and that's how you make your money.  So it pays out, and then it keeps track of what it paid out.  And then you split the money.

Q.   Okay.  Now, was the -- I think you testified that the American Italian Club was always the first that called you about it's not making money?

A.   Right.

Q.   Is your recollection that it didn't make money because people weren't interested to play it or it wasn't making money because the -- the probability of a payout was wrong?

A.   No, it wasn't making money because it was taking too long.  It would drag you out with a win every time.  Then it would give you little wins for 12 cents and 40 cents.  And

people want to play it if they win real money.  People that played those kind of games don't want to win 14 cents and 30 cents in the way it was designed.

I saved one of those games for you, if you want it. I'll bring it in here and show you what it does to make my testimony straight.  I'll bring it here, and I'll show you how they play it.  I'll bring you the other game and show you how it played.  And then I'll show you -- you can see yourself, because it's hard to explain something when you could see it's not, you know, it's not doing it properly.  It just -- you do this, you do that, okay.

So that during that period of time, Wayne DeLuca was calling me all the time and he was telling me, "I don't know why you're buying those games.  My client's" --

MR. NEISER:  Objection.  Hearsay.

THE WITNESS:  -- "ain't making nothing."

THE COURT:  Just a minute.

THE WITNESS:  That's how I knew it wasn't making money.  It's an answer to my question.

THE COURT:  Mr. Unis, if you can stop just for a moment because there's an objection.

THE WITNESS:  All right.

THE COURT:  Do you have --

MR. ZEGARELLI:  We can move on.

THE COURT:  Why don't we take our morning break at

this point, if this is a good point for you, Mr. Zegarelli?

MR. ZEGARELLI:  I think it is, Your Honor.

THE COURT:  Ladies and gentlemen, we're going to take a 15-minute break.  We'll see you back here at 10:30.

THE CLERK:  All rise.  This Court is in recess.

(Pause as the jury exits courtroom.)

(Whereupon, a recess was taken.)

(Pause as the jury enters courtroom.)

THE CLERK:  This Court is back in session.

THE COURT:  Please be seated everyone.

BY MR. ZEGARELLI:

Q.    Mr. Unis, I put on your screen Exhibit 6.  It's already been admitted by the Court.  Are you familiar with this document?  And I can scroll through it if you need.

Give me a second here.  I'm trying to make it larger for you, Mr. Unis.  First, let me go through it once briefly, just so you can get the scoping of it.

Are you familiar with this document?

A.    Not really.

Q.    Not really?

A.    No, I never really read it before.  That's the first time I've ever read it.

Q.    Okay.  Let me back up.  Do you have an understanding that at some point in time, you had an agreement with Pace-O-Matic and Mr. Miele with regard to a right -- something

called a, quote, right of first refusal?

A.    Who me?

Q.    Yeah.

A.    With Miele?

Q.    And Pace.

A.    And Pace?  I -- I actually -- I actually made my agreement with Ryan, Ryan Wood, for that.

Q.    Okay.  Let's talk about agreement with Ryan Wood. We'll deal with how that is factored into everything.

A.    Okay.

Q.    Let's just talk about Ryan Wood.  What do you believe you made an agreement with, with Ryan Wood?

        MR. NEISER:  Your Honor, I'm going to object to relevance.

        THE COURT:  Overruled for now.  Let's see where it goes.

        MR. NEISER:  Thank you, Your Honor.

BY MR. ZEGARELLI:

Q.    Let me ask this.  Did you have an understanding that Ryan Wood worked for Pace-O-Matic?

A.    Yes.

Q.    Okay.  Continue.

A.    Sometime in 2012 or so, '11, I can't remember the exact date, Wayne called me up and said he found a company that's -- that wants to make a game for Pennsylvania Skill

Games.

And I went to his office.  And he told me that he had a company, and he mentioned Pace-O-Matic, and he said that they could make a game, and he knew somebody from the company he's been talking to.  And he had me -- I told him I'd call him on the phone because I told Danny -- I told Wayne DeLuca that I wanted an exclusive at that time because I'm not going to bring a game into Pennsylvania on my side of the state and I don't have an exclusive for my own company; that's Pennsylvania Skill Games.  They need to build the game for us.

Ryan Wood went back and forth.  And he says, Yeah.  He says, If you'll do it, I'll give you an exclusive.

I said, Are you sure you got that, Wayne?  You got me, Wayne?  I need that exclusive.

He said, Yeah.  He said, I got you.

MR. NEISER:  Objection.  Hearsay, Your Honor.  Move to strike.

THE COURT:  Sustained.

Ladies and gentlemen, you are to disregard the testimony regarding what Mr. DeLuca may have said.

BY MR. ZEGARELLI:

Q.   All right. So back to right of first refusal in quotes, I think you started to use some language, "exclusive."

Did you have an understanding of -- did you have an understanding of what -- were there any special terms with

regard to your relationship with Pace-O-Matic with regard to selling Pace-O-Matic machines in Beaver County?

A.    At what time?  At what date?  I mean, what time?  I mean, ever?

Q.    At the point -- let's say the first -- let's say on or about January of 2015, did you have an understanding with Pace-O-Matic --

A.    Could you scroll it up, please, for me, please.

Q.    Sure.

A.    Yeah, I never seen this agreement that's in front of me before.

Q.    All right.

A.    Before -- before that period of time, I never seen it. After that period of time, unless they put it in front of me and said, Yeah, you know that?

I said, No.  I heard about it.  I never seen it before.  I never read it.  Never read the agreement.

I knew that -- that agreement that you put in front of me, I knew that Albie went to a lawyer and negotiated his own agreement with Pace after I took him down there so --

Q.    All right.  Let's --

A.    It had nothing to do with me.  I was out of that one. Other than the piece of paper that you showed me, I passed it over to the lawyer through Albie, and he took care of it with his own lawyer for his own company that he started with Gianni

Floro. I'm pretty sure that was the lawyer that he used.

Because we had a lawyer for different -- everything. We had Jimmy Amato for liquor license. We had Wayne DeLuca for skill games and fireworks. We had other lawyers for real estate. I mean, we just had -- like, unfortunately, we had to deal with a lot of different lawyers because this lawyer didn't know about that and this lawyer did that and this one did this.

Q. Okay. So I put before you and admitted Exhibit Number 5. I'm going to scroll down first quickly. Okay. Do you recognize the signature?

A. Yeah.

Q. Is that your signature?

A. Yeah.

Q. Okay. Are you familiar with this agreement?

A. I read it.

Q. Okay. You sign it?

A. I signed it, but didn't give it back to Danny Warren. I gave to my son and told him, Go get your own agreement.

And I took him to Pace-O-Matic's yard and shop to meet him. I said, You need to meet somebody you're going to make an agreement with. Go talk to them and do it yourself.

Q. Okay. Is it your understanding that this document was not distributed to Pace-O-Matic?

A. I don't -- I can't tell you what somebody else did other than what Danny Warren, if he gave it to Pace-O-Matic, it

probably didn't have my signature on it.  I mean, because I gave it to the lawyer.  I didn't send it to back to him because there was terms and things on there that I knew Pennsylvania Skill Games wouldn't agree to.

But I knew that maybe, like, after he signed his agreement, I could use that for marketing strategies and other -- other parts of state.  Maybe if I ever decided to come back and do things, that I would be able to take that agreement to maybe, like, Starlight, where we opened the fireworks store for Sisters Brand and go all over, you know, wherever I felt like it, and then be creative with the way I did business.

Q.   Let me ask you this, Mr. Unis.  Do you see the fourth bullet point, the last bullet?  It's also on your screen.  I was pointing to the overhead.  Do you see it on your screen, the fourth bullet, last bullet?

A.   It's hard for me to tell the fourth -- oh, the last bullet.  Okay.  I won't read it out loud.  Okay.

Q.   Do you have some understanding of that language or condition?

A.   Yeah.  That part of the agreement, I -- I felt that Albert would handle himself on that.  If he didn't come to anything, I was going to have to deal with whatever they put on there, you know?  If he didn't come into an agreement, I kind of held that as a trump card in my office because he signed it, and I wasn't truly in agreement with all of that because that wasn't

the deal I made.

My deal was for an exclusivity, and he was trying to change the words. And I was like -- he's telling me, Yeah, that's an exclusive.

And I'm telling him, Well -- I said, You're going to have to talk to Albie's lawyer because I don't own Pennsylvania Skill Games. He owns it. I said, You sent me this. I said, I'm going to keep it here.

And he's going to go meet with whatever he needs to do because he needed to have a better agreement than this because there wasn't enough signatures on there to be acceptable to anybody who's going to do business as Pennsylvania Skill Games. So he had to do his own business agreement. So I wasn't into his shit. Excuse my terminology.

Q. Did you ever tell anybody at Pace-O-Matic that you would buy 200 terminals?

A. No.

Q. Okay. Now, Mr. Pace testified a few days ago that he came to Pittsburgh to help you place games, and the games weren't producing because apparently you didn't place them correctly into the locations. I don't want to mischaracterize testimony. But I think he said you -- he had to sort of help you.

A. I mean, I don't understand what you're saying. I'm confused completely.

Q. Okay. Do you recall Mr. Pace, Michael Pace, coming to Aliquippa?

A. Yeah, because I put him up at the Embassy Suites and he -- yeah, I was used to doing that because when Pace-O-Matic came to town, I'd give them a car. They'd stay at my house. I mean, during the whole process all the way up until '17 or '16, sometimes Danny Warren stayed at my house whenever he felt like it, went back and forth to Ohio, because I was in a closer part of the state to Youngstown where he was doing business. And he went this way and that way and did whatever he was doing. He stayed at my house, and he worked with me. He was trying to -- he was trying to enter into a contract with Pennsylvania Skill so he could own and finance the company with his own financing ability in his company.

Q. Let's talk about Michael Pace.

Do you recall meetings with Michael Pace?

A. Not very many. I mean, like -- like I went to -- the meetings with Michael Pace was limited to me going to his office and listening to him talk, which I knew at that period of time Albie was going to have to do his own stuff because I wasn't going to get -- I don't -- one thing that I do is, Jennifer Unis, my daughter, she runs her own A-Rocket business. Chelle runs her own Sisters Brand. Albie has to run his own business. If I do it for him, he's never going do to. So you can see, he does his own stuff. I don't do nothing for him hardly.

Q.   Okay.  But just with regard to Michael Pace, do you recall any meetings with Michael Pace?

A.   Yeah.  I met Michael Pace at his office --

Q.   No, no.  In Aliquippa.

A.   I can't remember -- I can't really remember meeting -- I talked to people from Pace's office on the phone.  If I remember, they might even had who knows on the phone.  I mean, I don't really know.  When he said "Pace," I refer that to him only because the large figure that he is, that I met over at the trade shows where he was there on a booth, you know, from when I bought Amato Music until whatever.  He's just an interesting person that you would see there.

So when you say "Pace," it referred to me, it refers to him.  Okay?  So that's -- you know, it's actually meeting him.  I met him at his office.  Is that what you want to know when I met him?  And my interaction with Michael Pace?  Here's my interaction with Michael Pace.

Q.   Go ahead.  Tell me when you met with Mike Pace.

A.   I went to Mike Pace's office.  I listened to him talk.  It was interesting.  I sat in his office.  I was with my son.  I didn't say very much about business.  I just listened to him talk.  Then, he sat -- in that conversation, he said that he was working in different markets and he didn't have time to go to Pennsylvania and do anything, because his market in Ohio was booming.  And he's concentrating on that, filling in the

locations.  And he's trying to go to New York.  And it was just -- he was just doing that.

He was too busy, like, and he was just, like -- but he was rattling on about different things about how he expected things to happen, and I'm not going to lie.  My mind was wandering because he was doing all of the listening because it wasn't -- I wasn't -- I didn't plan on going forward, me personally, a lot, with Michael Pace, because the other games I was using was earning four times the money that were skill games.

Q.  Four times the money of what?

A.  Four times the money that the Pace game was earning. I mean, if you put a game that -- the locations -- you're at the mercy of a location to some degree.  All right?  Because first off, 60 percent of locations don't like to sign agreements. Okay?  So it's hard to get them to sign that to begin with.  And the locations that love you and they sign the agreement, it's not problem.  Basically there's a lot of threat involved in this.  Am I off the question, please hit me.

Q.  No, you can answer that one.  Go ahead.

A.  Okay.  Ask the question one more time so I make sure I stay with it.

Q.  You said there were some threats.

MR. NEISER:  Objection to relevance.

THE COURT:  Before you answer, Mr. Unis.

MR. ZEGARELLI:  Mr. Unis, I think is answering the question about four times as much earnings which is --

THE WITNESS:  Okay, yeah.  All right.  Back to that.

MR. NEISER:  That goes to relevance, Your Honor.  It's not part of the case.  The earnings, performance, any of those things, it's not relevant to the case?

THE WITNESS:  Really?

MR. ZEGARELLI:  I think Mr. Pace presented testimony, and he's meeting that testimony.

THE COURT:  You can answer the question, Mr. Unis.

THE WITNESS:  The Pace game that we were using at the time was not earning hardly anything as -- as, you know, and it was my experience, okay, and my experience when Mike Pace came to town, I showed him that physically took him to locations, showed him the earnings.  All right?  As a response, he said he has other games that are legal in Pennsylvania that are way better.  And he start -- and he said, I'll hook you up because -- I showed him the other games I was using, like the Blue Sky games and all this other stuff.

And he got like real, like, aggressively competitive, and he said, I got games better than that.  I'll give you no chance.  I'll give you next play.  I'll give you this.  I'll give you that.

I said, as long as it's legal, give it to me, okay?

At that point in time, he -- I had a piece of paper

somewhere in my life that said he was going to give me legal terminals. So I figured, well, I'm going to hold him to that the best I could. And I just, like, did what I could do. And I accepted his machine, because at that period of time, I had the ability -- we were putting Pennsylvania Skill Games on everything, three, four, five different kind of programs, and we were getting them all back at that period of time from the police. So it wasn't even an issue to get a skill game back when we did the controlled pickup. It was very easy.

A skill game is legal. So when you go in front of the court and say, "We have a skill game at AIC club," all right, and the judge looks at it. All right. He don't even need any testimony other than -- other than, okay, it's a skill game and here -- here's paper to prove it. Okay. It's a skill game. He -- there's no reason to say it's illegal. Skill games are always been legal in Pennsylvania. It's not like we changed the law or something.

BY MR. ZEGARELLI:

Q. Do you have any understanding that the term "Pennsylvania Skill Game" on machines, as initially released in Pennsylvania, assisted with expanding the market?

A. I don't understand that question at all.

Q. In other words, do you believe that because "Pennsylvania Skill Games" was on the games, that it helped, you know, get -- expand the market with the games?

A.    Pennsylvania Skill Games that we did, we single-handedly opened the market in Pennsylvania.  I don't know of any other letters from district attorneys in cases that were won other than the ones he was involved with, my son, and Pennsylvania Skill Games, our company, okay?  So I don't know of any other places that got the legal -- that got the acceptance from the district attorney, from the local townships, from everywhere he went.  He went to Bridgeville; he got it there.  He went to New Castle in Lawrence County; he got it there.  That's three different counties.  He got it in Allegheny County, Beaver County, and Lawrence County all at same time in 2016.  Okay?

Albert Unis, right there, the owner of Pennsylvania Skill company with the signature that you showed me had Mike Pace's name, Danny Warren's name, Miele's name.  It had everybody who had an egg in the basket.  They knew who he was.  Only after -- they couldn't purchase this company, only after --

MR. NEISER:  Objection, Your Honor.

THE COURT:  Just a moment, Mr. Unis.

MR. NEISER:  Move to strike.

THE COURT:  If you could stop just for a moment.

What is your objection?

MR. NEISER:  Hearsay, relevance.

THE WITNESS:  It's not hearsay.

MR. NEISER:  Legal conclusion.

THE WITNESS:  It's not a legal conclusion.

THE COURT:  Excuse me, Mr. Unis?

THE WITNESS:  I'm sorry.  I'll be quiet.

THE COURT:  It's all right.  But while we're having the lawyers discuss objections, I'd ask you --

THE WITNESS:  Yes, I'm sorry.

THE COURT:  That's all right.

MR. NEISER:  And he asked -- the question was asked was about marketing, and he's making claims that have no evidentiary foundation, assumes facts not in evidence, and as far as I know, doesn't exist.

MR. ZEGARELLI:  Well, his testimony is the evidence that he's giving but --

MR. NEISER:  He's reporting -- he's trying to say that there's opinions and decisions and letters and things that are not before the Court and, as far as I know, do not exist.

THE COURT:  All right.  Let's move on to another question, if we could, Mr. Zegarelli.  Objection sustained.

BY MR. ZEGARELLI:

Q.   I don't have any further questions for you, Mr. Unis.

MR. NEISER:  May I proceed, Your Honor?

THE COURT:  You may.

                    CROSS-EXAMINATION

BY MR. NEISER:

Q.   Are you okay to proceed, Mr. Unis?

A.    Sure.

Q.    Good to go?

A.    Yes, sir.  Thank you very much.

Q.    So as I'm understanding your testimony, you're taking credit for all of Pace's success in Pennsylvania?

A.    No, that's not true.

Q.    Well, sir, let me ask you this.

You're taking credit for the opinion that occurred in Beaver County, from the controlled pickup?

A.    Yeah, I could do that.

Q.    You can take credit for that?

A.    Yeah, pretty much.  I could take the credit with -- with Pace-O-Matic and Wayne DeLuca for the pickup there and the AIC club that gave us a contract so that Wayne could pick it up. Under my contract that I had signed with them, they issued a contract after a meeting with the club.

Q.    Well, we have testimony from Wayne DeLuca that says you were just a guy who picked up a game and put it in a bar.

A.    That's right.  I picked the game up and put it in the bar.

Q.    And didn't pay for part of the lawsuit.

A.    I paid for every bill he gave me from between 2010 and 2017.

Q.    Okay.

A.    Pertaining to everything.

Q.   Your testimony is that you paid for the lawsuit involving Pace-O-Matic, getting that game legalized from the controlled pickup?  That's your testimony?

A.   I'm telling you that I paid to put -- I paid Aliquippa to put the game in the club, which was a permit fee.  I'm telling you that I paid Wayne DeLuca, all right, to seek out and find me a person from his Pennsylvania amusement machine association, okay, that he shared all of the marketing strategies with, as I did this, which is -- which every vendor in the State of Pennsylvania belongs to.  And that's why I kept the exclusive for Beaver County, so they don't come down and jump on my head like they did -- I had it down to two vendors. Now there's ten there.

Q.   Sir, I understand.

I'd like for you to answer just the questions, if you don't mind.  Okay?

A.   I thought it was the question.  I thought I answered it.

Q.   Well, I'm trying to get you to answer the question.

A.   Yes, sir.

Q.   Okay.

A.   Anything.  I'll try to narrow it.  I'm going to narrow it close as I could.

Q.   We really appreciate it.  I know you're not feeling well.

A.   No, it has nothing to do with that.  I'm not good at testifying because I never did this -- only like to you.

Q.   I understand.  Let's just --

THE COURT:  Gentlemen, if you could each allow the other to finish what you're saying so that our court reporter can record that accurately.  I would appreciate it.

MR. NEISER:  Okay.  Thank you, Your Honor.  I apologize for that.

BY MR. NEISER:

Q.   But, sir, you did not testify in that case, did you?

A.   I'm not sure what case you're talking about.

Q.   The Beaver County case where the first Pace-O-Matic game was legalized.

A.   I don't think anybody testified, as far as I know.  Who was the testimony person?  I guess I don't ask you questions.

But I'd say as far as I know, nobody testified other than my lawyer, Wayne DeLuca.

Q.   Ah, so that's all you know.

You sure didn't, did you?

A.   No.

Q.   Okay.  And you didn't pay for any expert witness fees for that case?

A.   They didn't use expert testimony, as far as I know.

Q.   Well, your memory is incorrect.  But I'm asking you

whether or not you paid for any.

A.    I didn't attend the case.

Q.    You didn't attend the case?

A.    So I didn't attend the case.

Q.    So your testimony is that you feel as if the Pace Pennsylvania game is yours because you asked Wayne DeLuca for a game for your company?

MR. ZEGARELLI:  Objection.  I don't think that characterizes the testimony.

THE COURT:  I'll overrule it.  But Mr. Unis can explain whether that was his testimony or not.

THE WITNESS:  I don't even know what he said.  I can't understand what he said.  So I need you to repeat it.

BY MR. NEISER:

Q.    You're claiming --

A.    Repeat the question, please; not what I said.

Q.    Sir, you're claiming that Pace created the Pennsylvania Skill game that was in the Beaver County case for you?

A.    I'm claiming that Pace made the Pace-O-Matic game with his logo on it -- all right? -- that he gave me, that has his logo on every invoice that he gave me and he created that -- okay? -- and he put our name on it.  Okay?  That's where our part was.  He put our name, our brand name that we are using for years -- okay? -- he put it on there only because of Wayne

DeLuca told him that's the name of our company and -- and -- and, AIC club, we have a contract with them with that company, and we had to get the AIC club to sign a paper for Wayne because he can't go into court for the AIC club without our approvals. So how could he go in for -- how could he go in for that?  I don't -- I'm not maybe not supposed to say this but --

MR. NEISER:  No, Your Honor, I'd like interrupt the witness.  Nonresponsive.

THE WITNESS:  All right.  I'm sorry.

THE COURT:  All right.  Please ask another question.

MR. NEISER:  Well, actually, Your Honor I'd like to get an answer to that one.

THE WITNESS:  What is the question, sir?

THE COURT:  Ask your question.

MR. NEISER:  Yes, Your Honor, thank you.

BY MR. NEISER:

Q.   Is it your testimony that Pace-O-Matic created the Pace-O-Matic game that was in the Beaver County case for you?

A.   They created it -- supposed to create it for me.  I wasn't in the conversations with Wayne DeLuca until I went in to talk to Danny Warren.  And I was concerned about Beaver County. I wasn't concerned about the whole state.  I was concerned about Beaver County because what happens is I had a contract for a game that did better for the whole state, and I gave it to Wayne DeLuca to do the contract for me already.  He had it in his

office.

Q. Do you have any documents where Pace-O-Matic agreed to build a game for you?

A. No.

Q. Do you have any documents that -- maybe perhaps a letter, fax, email to Michael Pace saying, Hey, Michael thank you for building this game for me, and I'm glad we could work together?

A. I don't do emails. I'm sorry.

Q. I understand that you don't do emails.

A. I never did it. I don't know how.

Q. So would it be fair to say that the representations you're making here today are based on oral conversations?

A. I didn't say that. You said that.

Q. I'm asking you, sir.

A. I don't understand your question.

Q. Well, you're saying that Pace-O-Matic -- you're taking credit for the Pace-O-Matic game in the Beaver County case and all the success that came from it --

A. I didn't say that. You said that.

I told you that we joint effortly did it with my lawyer, his Pace-O-Matic game with his Pace-O-Matic logo on it, and our brand that we have been selling and trying to build for two almost years already -- or three years. And it was established as a company that was legal because we already got

the games back from everybody for the -- for the -- everybody knew that we ran legal games, because we -- we started with legal -- I had Jimmy Amato's name -- okay? -- who was respected. I can't run stuff like that.

Q.   Sir, stop.

A.   All right.  Go ahead.  You want to know why.  I'm explaining why.  That's all.  You want me to not answer the question.

Q.   No.  I'm trying to get you to actually answer the question.  That's all, sir.

A.   You want me to answer one word?

Q.   No.  I'm not trying to get that.

A.   All right.  Go ahead.

Q.   Let's take a second.

You mentioned your business name.  Is it fair to say -- isn't it fair to say that you don't have any letter or other document that says Michael Pace or Pace-O-Matic agrees to use your name?  Can we at least agree on that?

A.   I have -- I have an agreement with the AIC club that Wayne DeLuca got signed that defines the process.  Okay?  So why don't you get it from him?

Q.   Sir, we've already gone through plenty of documents, and all of the documents we have are all we have.

A.   How could he go to court for the AIC club without that document?  Is it legal to go to court for somebody else you

don't -- you don't represent?

Q.    Well, it must have been because he won the case.

A.    All right.  Okay.  Would you go into -- would you go in for the AIC club --

THE COURT:  Just a moment, Mr. Unis.

THE WITNESS:  -- without agreement --

THE COURT:  Mr. Unis.

THE WITNESS:  Okay.  Thank you, sir.

THE COURT:  Mr. Neiser will ask you questions and then you can give an answer.

THE WITNESS:  Yes, I'm sorry.

THE COURT:  That's all right.  You don't need to apologize.

BY MR. NEISER:

Q.    Isn't it true that you have said that Pennsylvania Skill Games was a name of your business and not a trademark?

A.    It was a name.  I didn't call it a trademark because it wasn't a trademark.  It was a brand -- it was a brand that we were building.  And I wasn't some trademark czar.  We're building brands, and it's up to the person who gets the name and the brand to take it to the development stage that they want it.  It was given to him.  It's up to him.

Just like it was given to Chelle.  The brand that she received, Sisters Brand Fireworks, she ran it herself.  She did all activities of it.  When I went to China with her, I sat

there like this and pretended I didn't know nothing.  I let her do -- all of the dealings was the hardest for a woman to deal with a Chinese man and got it done.  And I'm telling you, it was tough.  She did it.  She's a strong girl.  She ran this business, Pennsylvania Skill Games.  She got contracts signed -- okay? -- as you can see, through what went on here.

And what do you want from me, sir?  What's the question?

Q.    I want the truth, sir.

A.    What truth do you want?  Ask me again.

Q.    I'm asking you a very simple question, sir.  Do you have any written document or communication between yourself and Pace-O-Matic or anybody else that says you can use our business name or trade name or whatever you want to call?

A.    At what period of time?

Q.    Any.

A.    To use their trade name?  We have -- we have a piece of paper, apparently, that has -- that they gave me that was on here.  It had Pace-O-Matic's logo on the top with his name on the bottom of it.

You're the lawyer.  You decide.  I am not -- you have to go by what the paper says, sir.  That's what you need to abide by the agreement, not me.  I don't have anything to do with the agreement you're talking about.

Q.    Would it be fair to say, then, if -- I can rely upon

the agreements that we have in this case for any record where a trademark is referenced?

A.    The trademark is referenced on the game and on the top of Pace's invoice, and it's called Pace-O-Matic.  That's their invoice.  That's their trademark right there.  Pennsylvania Skill Games is right there.  He has a trademark, and it's established.  Okay?  And why does he have it?  Because you have to -- he told me one time he says, We have to run this game for years before they'll give us a trademark.  They just don't give you a trademark when you apply.  He had to buy insurance in 2015 or '16, and he had to keep it going with employees to do this. So that's why it happened because he was an insured business --

THE COURT:  All right.

THE WITNESS:  -- in Pennsylvania.

THE COURT:  Mr. Unis, I don't think you're responding to the question.

THE WITNESS:  I'm sorry.  I apologize.  Which part of the question didn't I answer?

BY MR. NEISER:

Q.    None of it.

A.    Okay.  I don't understand the question at all, sir, I'm sorry.

Q.    Sir, you're in here making claims that our client needs -- owes you their brand and the work that they've --

A.    Never said that.

Q.    -- done?

A.    Never said they owe me the Pace-O-Matic brand.  That's not true.

Q.    Pennsylvania Skill.

A.    They never had that brand.  It was his brand the whole time.  They came after the fact in '17, '18, '19, tried to steal his brand off of him because he wouldn't sell them the business. Okay?  So now -- every big software company came after him.  Not just Pace.  Everyone before he ever did this, they were all after him.

Q.    Really?

A.    Yeah, really.

Q.    Wow.

A.    Yeah.

Q.    Well, sir, I'm asking you a very simple question, whether or not you, because you made the representation --

A.    Are you talking about Pennsylvania Skill Games or me personally?

Q.    I'm talking -- well, sir, at some point in time, Pennsylvania Skill Games was not a company.  And that's why I'm asking you.

A.    In my period of time -- okay? -- Pace-O-Matic sent over to me through Danny Warren what they wanted me to agree to for Pennsylvania Skill Games.  All right?  At that -- at that period of time, Pennsylvania Skill Games was already doing

business, and I wasn't running the company anymore.  So when he sent the paper through the fax to me, I gave the -- I sat it on the desk.  I looked at Danny Warren's signature, and I blatantly just started to sign it, and I said, This is no good.

I called Jimmy Amato.  He told me -- he said, Hey, your son needs a lawyer.  I got one for him.

MR. NEISER:  Objection; hearsay.

THE COURT:  Mr. Unis, you should restrict your testimony to what you said, not what someone else said.

THE WITNESS:  Oh, all right.

MR. NEISER:  You know, I can move on.

BY MR. NEISER:

Q.   Sir, would it be fair to say that the Pennsylvania Skill Games name wasn't related to a specific product but was your overall service in the business?

A.   No, it was -- it was related to the products that we chose to put our name on.

Q.   Okay.

A.   And they were from four to six different manufacturers, and we protected the games as legal skill games while everyone else in the industry had other stuff.  So --

Q.   Sir, do you remember giving a deposition in this case?

A.   Yeah.

Q.   Two of them; right?

A.   Maybe.

Q.    Yeah.

A.    Okay.

Q.    You were represented by counsel at the time?

A.    Not much, but, I mean, I was here, so I gave a deposition.  Whatever it was.

Q.    But you have -- I believe the first deposition was by Mr. Zeszutek from the Dinsmore firm, and the second one was --

A.    No, it wasn't.  He didn't represent me.  Never in my life.

Q.    And the second deposition --

A.    He represented Pennsylvania Skill Games, which is him over there.  You got the wrong guy now.

Q.    Sir, do you remember giving a deposition in this case?

A.    I gave a deposition, but you're changing -- you're testifying over there.  And I'm not the person testifying because you said those words -- all right? -- and they're not true.  You said --

Q.    Do you remember --

A.    -- that Zeszutek represented me there.  Zeszutek represented his corporation that he owns himself, that I'm not anywhere on his piece of papers.  Okay?  Not on his corporate documents, not on his -- not on his signatures, not on his business after -- after he signed that paper.

MR. NEISER:  Your Honor.

THE WITNESS:  I went back to -- what -- building other

kid's stuff because he did it himself because I didn't stand over him because he had plenty of guidance.

THE COURT:  Mr. Unis, the question was about whether you gave depositions.  And I realize --

THE WITNESS:  I gave -- yeah, but he said --

THE COURT:  Just a moment.

THE WITNESS:  He said it was my lawyer --

THE COURT:  Mr. Unis, I won't interrupt you --

THE WITNESS:  All right.  I'm sorry.

THE COURT:  -- unless you're saying something that isn't permitted in court --

THE WITNESS:  Yes.

THE COURT:  -- and I would just ask you to wait for all of us to finish.  We'll give you an opportunity to speak.  All right.

THE WITNESS:  Thank you very much.

THE COURT:  So I think the question was about the deposition.

THE WITNESS:  I'm sorry.

THE COURT:  You don't have to be sorry.

THE WITNESS:  All right.  Go ahead.

THE COURT:  I know that you don't know the rules of court.  It's fine.

BY MR. NEISER:

Q.    And, sir, whether or not Mr. Zeszutek was your lawyer,

a lawyer was available to make objections to the testimony and the questions I asked you.

A.    All right.  I was there and I gave a deposition and there was people there asking questions and I answered them.  I had no -- I had no true relationship with these people like I have with you.  It's the same thing.

Q.    Okay.  And during that deposition, there was a court reporter, just like Sharon, here, who took down everything that you said.  Do you recall that?

A.    I remember there was a girl there, writing stuff down, and there might have been a camera.  I'm not really sure.

Q.    Yes, sir, there was, and it videotaped what you were saying as you said it.  Do you recall that?

A.    Good.

Q.    And before you gave that testimony, you gave an oath to tell the truth, did you not?

A.    Yes.

Q.    Just like the oath you took here today?

A.    Yeah.

Q.    And at that time, you were asked, would it be fair to say, that the Pennsylvania Skill Games name wasn't related to a specific product, but was your overall service of the business.

MR. NEISER:  Can we show 4123 to 423?

MR. SIMEONE:  Video clip or just the transcript?

MR. NEISER:  Video, please.

MR. SIMEONE:  I would just need one moment.

MR. NEISER:  Sure.

MR. SIMEONE:  Can you give me page and line.

MR. NEISER:  4123, and this is from the first deposition, to 423.

"Question:  So would it be fair to say that the Pennsylvania Skill Games name -- and correct me if I'm wrong here -- wasn't related to a specific product but was your overall service of this business?

"Answer:  Yes."

BY MR. NEISER:

Q.    So isn't it true you did not create a graphic for Pennsylvania Skill Games and instead you used just the words?

A.    My daughter -- oh, we used the word, "Pennsylvania Skill Games," and the graphics were -- the graphics were from, like, fonts -- okay? -- you could -- we would change the fonts periodically on our skill game.  So basically, we would put them on there, and it said "Pennsylvania Skill Games," and we would change different -- like, sometimes they would put a star, whatever was related to Pennsylvania.  Sometimes we'd put a state on there.  Sometimes we'd put a star, a flag.  Something to do with Pennsylvania was pretty much on our name and brand all the time.  So we kind of did stuff like that.

Q.    Okay.

MR. NEISER:  Could we show Exhibit 204, please.

BY MR. NEISER:

Q.   Do you recognize that, sir?

A.   Yeah, I recognize that.

Q.   And can we agree that you had no involvement in creating that graphic?

A.   It has the Pennsylvania Skill name that we use on it. And people put different things on it and made games for us.  So we had builders build games for us, like three of them that put our name on it at that time.

Q.   Did you have any involvement creating that graphic that's on the screen in front of you?

A.   Not me, personally.  No, I didn't.

Q.   No.  You don't know who did, do you?

A.   Not really.  I didn't really care.  I mean, it was someone from Pace-O-Matic, probably, or somebody from -- from Blue Sky Games.  I mean, I really don't know.  They moved the stuff around.  I really don't -- I have no idea who created that.  I just recognize my name on there.

Q.   You recognize your name but you -- here?

A.   I don't make that.  I didn't make this piece of plastic or paper, whatever that was.  I didn't physically make that.  Okay?  No.

MR. NEISER:  Your Honor, I don't have any other questions for Mr. Unis.

THE COURT:  Thank you, Mr. Neiser.

Do you have redirect, Mr. Zegarelli.

MR. ZEGARELLI:  I do not, Your Honor.

THE COURT:  All right.  Thank you, Mr. Zegarelli.

Mr. Unis, thank you for your testimony.  You're excused from the witness stand.

THE WITNESS:  Thank you very much.

THE COURT:  You're welcome.

(Witness excused.)

MR. ZEGARELLI:  I'd like to call Albert Unis IV.

THE COURT:  All right.

Mr. Unis, step forward to be sworn in, please.

MR. ZEGARELLI:  From a timing perspective, Your Honor, we do think that, short of that unusual exception, this would be our final witness for our case.

THE COURT:  All right.

THE CLERK:  Sir, please raise your right hand.

ALBERT UNIS IV, a witness herein, having been first duly sworn, was examined and testified as follows:

THE CLERK:  Thank you.  Please be seated.

THE COURT:  Mr. Unis, feel free to pull that microphone closer to you so everyone can hear you.

DIRECT EXAMINATION

BY MR. ZEGARELLI:

Q.   Good morning, Mr. Unis.

Mr. Unis, would you state your name for the record and

spell it, please?

A.   Albert Michael Unis IV.

Q.   And, Mr. Unis, you are the president of Pennsylvania Skill Games; is that right?

A.   I am.

Q.   Okay.  Mr. Unis, how old are you, as you sit here today?

A.   I'm 27 years old.

Q.   Okay.  Mr. Unis, when you formed Pennsylvania Skill Games, if you recall, how old were you?  Pennsylvania Skill Games, LLC?

A.   I had to be 18, 19.  Some -- I think it's 19.

Q.   All right.  And where did you go to school?

A.   I went to Moon Township high school, Our Lady of Sacred Heart, and I also went Kiski Prep.

Q.   Do you have any higher education?

A.   No.

Q.   You're currently involved in the skill game business?

A.   I am.

Q.   And you have an understanding of skill game after the testimony that's --

A.   I understand the definition.

Q.   Okay.  And how would you -- how would you describe a skill game?

A.   A game that implements player -- player implementation

that is more than 50 percent of -- more than 50 percent skill rather than chance. So it could be 51 percent skill, and it still is a skill game even though you have 49 percent chance.

Q. Is that another way of saying predominantly skill?

A. Yeah. That's a term that's regularly used in the skill game business, predominantly chance -- I mean, predominantly skill. I'm sorry.

Q. Now, Mr. Unis, I've placed before you Trial Exhibit Number 5. Are you familiar with this document?

A. Yes, I am.

Q. Okay. And how so?

A. It is a -- it is the Pace-O-Matic contract that was given to us in January 29, 2015, for our help in legal matters in the Beaver County case.

Q. Okay. Now do you recognize the signature at bottom? What I mean is Albert Unis and affiliates?

A. Yes, I see that.

Q. Do you know whose signature that is?

A. That -- me and my father have pretty -- we have the same name. Sometimes he signs something, and it looks, you know -- they're similar. I believe that's my dad's signature.

Q. Okay. I see some notations to the right.

A. I don't see a notation to the right.

Q. Okay. Let's say this. Do you have an understanding that this document was supplied through to Pace-O-Matic? In

other words, in signed form?

A.   Yeah.  I actually believe -- well, since it's on a Pace-O-Matic header, of course it would be supplied to Pace-O-Matic.  You know, I mean, they would have drafted it.

Q.   No, I didn't ask that.  I asked, do you have an understanding that this document, the signatures was presented to Pace-O-Matic?

A.   No.  I don't have an understanding that the signatures were presented to Pace-O-Matic.  I understand that the signature that Danny Warren gave to us was presented to us and not given back to them.  You know, so -- you know, I -- I don't have an understanding that my dad signed it and then sent it back.  I don't know that.

Q.   Okay.  Now, I put on the screen before you a trial exhibit that's admitted Trial Exhibit 6.  Do you recognize this document?  And I'll scroll down.

A.   Yeah, I recognize it.

Q.   What's -- is that your signature?

A.   That is my signature on the bottom.

Q.   Okay.  What's your understanding of this document?

A.   That it was to give me an exclusive for Beaver County.

Q.   Okay.  Is that all it did, or did it do other things?

A.   Special pricing.  I was supposed to pay the same or less than other operators in the state.

Q.   I'll direct your attention to Section 4.  Is there

language that supports what you've just testified to?

A.   Yes.

Q.   Okay.  Where -- and if you touch the screen, it's going to make a mark, for better or worse.  What section -- where are you referring to with your response?

A.   It starts at "Seller agrees not to sell the other vendor compliant terminals at prices lower than the buyer pays."

Q.   Okay.  Is this the language that I highlighted?

A.   Yes.

Q.   I see you highlighted it too, okay.  Very good.  Now, with regard to the right of first refusal that's in quotations, do you have an understanding of what the highlighted language means?

A.   Yeah.

Q.   Okay.  Can you tell us what your understanding is?

A.   That we would have first right to place any terminal within Beaver County.

Q.   Okay.  How many years -- well, let me ask it this way.  Have you ever been presented with an opportunity to refuse the placement of a game in Beaver County?

A.   I've never -- I've never refused a placement in Beaver County.

Q.   Okay.

A.   Never once.

Q.   Have you ever been presented with the opportunity to

refuse?

A.    I've never been presented with the opportunity to refuse.

Q.    Okay.  Now, you were here for testimony which something of the nature of the opportunity's not presented to you because Pace-O-Matic or Miele Manufacturing don't know the location of -- ultimate location of the games.  Do you recall hearing some of that testimony over the past few days?

A.    Yeah.

Q.    Okay.

A.    I have.

Q.    And do you have an opinion or a response or perspective on that testimony?

A.    That it's blatantly obvious that they understand where these terminals are going if they have an invoice on them that says Beaver, PA, and Beaver Falls, Pennsylvania.

Q.    Okay.  And how do you know that you can't drop off a game in Beaver County and maybe some of those games go somewhere else out of Beaver County?

A.    Please ask the question again.

Q.    Yeah, I mean, I think Pace was saying that, you know, they might drop it off in Beaver County to a lot of vendors in Beaver County but it might travel somewhere else, ultimately.  Do you have an opinion on that?

A.    Yeah.  We found multiple locations to have

Pace-O-Matic equipment. One of them being Talerico's Bar in Ambridge, Pennsylvania. And we sent a cease and desist in February of 2017 to Pace-O-Matic. And we asked them to correct the issue, and they would not.

It is, to my knowledge, that they do have the ability to make those games move out of that location. And the reason I know that they have the ability to do that is because these games have software licenses on them, and a software license gives you $10,000 in profit play on the machine. As soon as I make Pace-O-Matic aware of that terminal going into Ambridge, specifically Talerico's Bar, they have the ability to not sell those terminals' licenses. So I specifically, I gave them the TIDs.

Q.   The terminal ID numbers?

A.   The terminal identification numbers for these games, and all they had to do was they -- all they had to do was look up the TID, and it would tell them who owns that game and -- and who they sold to. And they would see that invoice. And they would say, okay, well, Albert is telling us that this game is in Ambridge, Pennsylvania, in Beaver County.

And all they had to do is say, okay, call up Mac Vending and say, hey, until you move that terminal, we're not going to sell you any more licenses.

And then Mac Vending would move that game because it would be out of the fill and it would be unable to be played.

It would -- you physically can't play it.  Once the machine runs out of the software play, you cannot play it anymore because an error message pops up on the screen and it says "no more plays available."

So he would physically have to move it.  And it's to my understanding that they -- they used that ability that I just told you about to enforce other contracts on operators.

Q.   Now, was there ever a time -- was there ever a time when you reported a problem with regard to a competitor game in Beaver County when they actually did move the games?

A.   Yeah, there was one -- one occasion.  It was a very early occasion.  I believe it was -- it might have been March of 2016.  I actually think it was March of 2016.  And there was a skill game parlor which had all Pace-O-Matic games in the skill game parlor.  A parlor is a specialized business that has more than five games in it, ten games.  It could have 20 games in it.  And you know, that's what I'm calling a skill game parlor.  And the business was called Jack Pot Fever.  And it went into Center Township, Pennsylvania, Beaver County, Pennsylvania.

And I told Danny Warren about it, and he -- he said he called the Pace-O-Matic compliance team and had -- and had them look into it and about a month later, they hauled those games out of there.  So they did enforce my agreement one time.  And after that, they -- they never wanted to do it again.

Q.   All right.  Now, do you recall some testimony

yesterday from Bill Rodgers?  You were here for that testimony?

A.    Yes.

Q.    And do you recall seeing a particular page in his file where it had the word "trademark, question mark"?

A.    Yeah, yeah, I seen that.

Q.    Now, do you recall the timing of that particular page, and can you relate it to any circumstances that you're aware of?

A.    Yeah.  I seen other operators using other equipment in these bars in Beaver County and Lawrence.  And I was trying to protect my trademark.  So I called my attorney, and my attorney was Bill Rodgers.  And at that time, I was younger, and I didn't understand that not all attorneys had trademark understandings of the law.  You know, Bill Rodgers is not really a trademark attorney.  You have to get a special attorney for that.  So there's, like, not a lot of those guys around, if you went searching for them.

Q.    So now, what was the timing on that, if you can recall?  I'd like to place that timing in perspective to the Equipment Purchase Agreement.  And just to refresh you, the Equipment Purchase Agreement is May of 2015.

So do you have an understanding of the timing on that trademark question mark in Bill Rodgers' file?

A.    Yeah.

Q.    So, basically there was some testimony earlier where the question was raised as to no conversations about the word

"trademark" perhaps for an early period of time in the relationship and that -- and that seems to be the first time the word appears in the relationship.

Can you testify as to why those words -- that word "trademark" is nowhere else until that particular time?

A.   You're asking why the word "trademark" was in Bill Rodgers' notes?

Q.   Well, if you know.

A.   Yeah, because I called him up trying to protect my trademark.

Q.   Okay.  And the timing on that, if you remember?

A.   It wasn't even a year into my dealing, like, into me placing Pace-O-Matic machines after the Beaver County ruling.

Q.   Was there anything that caused you to call him in that instance that caused you to bring it to an issue to call him about the trademark?

A.   Repeat that.

Q.   Yeah.

Was there some circumstance in the marketplace that was the cause for you to all of a sudden call about a trademark?

A.   Yeah, other -- other vendors, operators were putting my -- my name on -- on these games.  And they put them all over Lawrence and Beaver.

Q.   Are we talking about Pace-O-Matic games in Beaver or are we talking about some other?

A.   No, these are -- these are different games.  These are not Pace-O-Matic games that I'm talking about.

Q.   Okay.  There was some testimony earlier about no conversation about using the word "trademark" and other than -- let me just back up.

Earlier in the relationship, did you talk about the word "trademark"?  If so, how?  And if not, why not?

A.   Yeah, yeah.  We talked about the trademark, and it wasn't even -- like, the trademark, it wasn't even like a big deal, you know, in the beginning.  We're trying to place equipment in Beaver County, Lawrence, Allegheny.  We're trying to put these game terminals in all of these bars, and, you know, no one's eyes are on the trademark.  You know, it's a nonissue.

I signed -- I signed the agreement as Pennsylvania Skill Games.  Pace-O-Matic signed as Pace-O-Matic.  And Lou Miele signed as Miele Manufacturing.  It was -- it was not until later on, when they started to screw me out of my deal, that, you know --

Q.   Say it a different way.  Later on until?

A.   It wasn't until later on, you know, that they -- they started to steal the name.  You know, they started to steal -- after they got done stealing the deal, they stole the name.

Q.   Okay.  Let me see if I understand.

Are you saying it wasn't raised along the way because there was no dispute to make it raised along the way?

A.    It was -- this -- this agreement even talks about marketing.  Okay?  And the marketing goes to the trademark.

Q.    All right.  Where?

A.    If you go all the way to the bottom.

THE WITNESS:  Excuse me.  How do you wipe that?

THE COURT:  There's a button that you can push.

THE WITNESS:  Is it --

THE COURT:  Yes.

MR. SIMEONE:  It might need be done from his.

THE COURT:  There we go.  Thank you.

BY MR. ZEGARELLI:

Q.    Okay.  You're referring to where?  I think you said go to the bottom.

A.    Yep, go to the bottom.  In Provision 6, Pace-O-Matic will support Pennsylvania Skill Games with previously agreed marketing efforts.

Q.    All right.  What did you understand to be "previously agreed marketing efforts"?

A.    To -- to market the name in the market.  It's to advertise the name in the market and get these games out there. This is -- this is the very beginning of what came to be a $200 million market.  You know?

Q.    Okay.  So let's go back.  So then let's go back -- at this point in time.

Do you have an understanding of how many other

operators there were in May of 2015 for Pace-O-Matic in the marketplace?

A.    Please ask that again.

Q.    Okay.  Do you have an understanding -- as of May 15th. I'm sorry.

As of May -- as of May 20th, 2015, do you have an understanding of how many other operators there were for Pace-O-Matic equipment in Pennsylvania?

A.    There was absolutely none.  There was no -- no other operators in Pennsylvania other than the Unises.

Q.    All right.  Now, you heard some testimony from Mr. Miele, I think, or maybe it was Mr. Wood, who had indicated there were some operators on hold or something like that.

Do you recall that testimony?

A.    I don't -- I don't -- I think he may have said that. I don't know.  I think he -- I think I recall that.

Q.    Do you have a recollection of anybody else who is actually in the marketplace at the time when you signed this agreement?

A.    No, none.  There -- they couldn't even fulfill my orders, you know?  I had orders, and they couldn't even build cabinets fast enough.  We had to buy boards to put them in cabinets.  We bought 25 boards and took them to Ohio to Nannicola Bingo, which was like Playtronics, and that's like a subdivision, I guess, there.  And they make games, and they do

games for Ohio. And we took them the boards, the 25 boards, and we had them build cabinets, and those cabinets are called Jerry Bishop cabinets, and he's a very well-known cabinetmaker in Ohio.

Q.    All right. So in the beginning -- let's just go back to May of 2015.

Did Miele Manufacturing have a role, as you recall?

A.    Did Miele Manufacturing have a role in May 2015?

Q.    Right.

A.    I'm going to say we ordered off him and he -- he just could not fulfill our orders. You know, Danny Warren said that he -- that we have a cabinetmaker and we're not prepared in Georgia to build all of these cabinets. So that's why we got this guy in Williamsport to build cabinets for us.

Q.    Okay. And I have a document on your screen.

Can you identify this document? Is it known to you?

MR. ZEGARELLI:  I do see, Your Honor, a check number, for purposes of today. Should we just allow it and then redact it?

THE COURT:  I think it's fine to allow it unless Mr. Neiser has any objection.

MR. NEISER:  The check doesn't bother me, Your Honor.

MR. ZEGARELLI:  Okay.

BY MR. ZEGARELLI:

Q.    Mr. Unis, can you identify the document?

A.   Yeah.

MR. ZEGARELLI:  Okay.  I move in Exhibit 88.

MR. NEISER:  I'm going to object.  This is for Aliquippa Industrial Park and Armand Nannicola and Playtronics.

THE COURT:  I'm going to overrule your objection.

Exhibit 88 is admitted.

BY MR. ZEGARELLI:

Q.   So you testified about cabinets not being able to be made at this particular time early in the -- in the early around the time of the Equipment Purchase Agreement.

Can you describe this invoice, the date and what it is?

A.   Yeah.  As you can see, the date is February 20th, 2015.  This is the day that the games are prepared, okay?  So we even brought them boards before this to get put in the cabinets. So it wasn't until February 20th, 2015, that they had the games prepared, put the boards into the cabinets, and then we put them into the market.  And this -- this -- if I go on to describe the invoice, these are cabinets that we bought and some other games, too.

Q.   Okay.  So if I understand it, these are -- this invoice includes cabinets that needed to be made for Pace-O-Matic boards that Miele Manufacturing was unable to manufacture?

A.   That's correct.

Q.   Okay.   The document on your screen is Exhibit 43, already admitted.

Are you familiar with this document?

A.   Yes, I am.

Q.   Okay.   What was going on?

A.   I had contacted -- okay.   Prior to the cease and desist, I had called Pace-O-Matic to, once again, honor my agreement in Beaver County and get these games out of the county.

And they -- they said, Okay, let me look into it, okay?

And they wouldn't call us back on it.   So my dad suggested that I send a cease and desist to Pace-O-Matic.

And I had called -- I had called Bill Rogers, my attorney, to write up a cease and desist and tell and describe what happened, what I saw.   And I saw three Pace-O-Matic games going to Ambridge, Pennsylvania -- Ambridge, Pennsylvania, location that's in Beaver County, Pennsylvania.   And I had already known what, you know -- I already knew what they would be looking for, and those are the TIDs.

So that's why the TIDs, the terminal identification numbers, if you see down below, it says Mac Vending Co. and are marked as terminal numbers 158625.   Those are terminal ID numbers.   And I provided those to Pace-O-Matic so that they would quit filling those games.

And we had sent the cease and desist.

And they -- Danny Warren called me back up and said, What's this about a attorney's letter coming to our office?

And I told -- I told Danny, I said, Well, you weren't answering our calls, so we had to send you a cease and desist.

He said, Well, let me -- let me get to the bottom of it.  I want to see you in my office in Georgia.

So I went down to Georgia after the cease and desist. And I met with Danny Warren, who was the CFO of Pace-O-Matic.

And I went down there, and I talked to him.

And he said, How's -- How's your dad?  How's your brothers?  Hey, I need you -- I need you to -- I need you to sign this.

And he got a piece of paper, and he slid it to me, okay?  I'm in his office.  I'm at the desk.  And he slid it to me.  And the piece of paper -- I'm reading the piece of paper, and he switches subjects on me, and he's -- he's talking about other stuff, like, Corvettes or whatever.  And I'm reading the paper, and it says -- it says, Your past deal is null and void. You're under new terms.

And I slid it back to him, and I said, I'm sorry, I can't sign anything without my attorney present.

And he said, No, that's fine.  That's all right.  Me and the guys at Pace-O-Matic -- me, Lou, Michael, okay, decided to give you 50 percent of the Beaver County commissions, okay?

And I thought to myself, okay, this guy, he just tried to cheat me by sliding me this paper.  I know he plays word games --

MR. NEISER:  Your Honor, I'm going object to move to strike as argumentative.

THE COURT:  Overruled.

THE WITNESS:  I know he plays word games because he's a very smart guy.  And he said, commission.  The word "commission."  I had no understanding what the word "commission" was.  So that was a second strike.  Okay.

The third strike was, wasn't I owed all of it per my agreement?  So I told him that.  I said, what -- I said, Danny, I said, Wasn't I owed all of the Beaver County commissions?

And he said, No, that's fine.  We'll talk about this at a later date.  We'll go to lunch, okay?

And we went to lunch.  We talked -- we talked, and we just left it at that.  And then we left.

I went -- I went back to Pennsylvania from driving all the way -- from Pennsylvania to Georgia and back.  And they -- you know, at that time we were working on the Lawrence County deal, and we -- and we -- it was kind of like push and pull a little bit, because I wanted -- you know he had agreed to give me a Lawrence County deal --

MR. NEISER:  Objection, Your Honor.  Move to strike. Relevance.

THE COURT:  All right.  Let's stick with Beaver County, if we could.

THE WITNESS:  Okay.

He -- he -- he -- it's hard not to talk about that because it's -- it's -- like, it's the reason we're not suing each other --

MR. NEISER:  Objection, Your Honor.  Move to strike.

THE COURT:  All right.

MR. NEISER:  It's not relevant.

MR. ZEGARELLI:  Your Honor, the course and conduct between the parties is not -- there's not a claim for breach of contract relating to Lawrence County.  However, the conversations relating to Lawrence County bear on Beaver County's -- what happened in Beaver County.  So I think there's that distinction to be made.

THE COURT:  I'm going to sustain the objection.  If you want to lay a foundation for why that might be, you can attempt to do that.

BY MR. ZEGARELLI:

Q.   Okay.  And for the moment, Mr. Unis, to your knowledge, did any -- did those Mac Vending terminals get turned off or removed?

A.   They were never removed, and they -- and they kept selling fills to those machines.

Q.   Okay.  I'm just going to catch you up, Mr. Unis, and

bring you forward -- we are approaching May Day here.

February 6, 2018, this is Exhibit 8, already admitted. Are you familiar with this document?

A.   Yes.

Q.   Okay.  And tell me what's going on here.

A.   At the time, Bill Rodgers went to work for another firm.  I hired my dad's -- my dad has another -- like -- he's like a family attorney, and his name's Gianni Floro, and I contacted him to help me enforce my exclusive in Beaver County.

And this is -- this is a -- pretty much a year later from the -- the first cease and desist that I sent with Bill Rodgers.  And there's this location that had -- they had, I believe, three Pace-O-Matic terminals, and it's called Giles Plaza News.  And we -- we saw that they had the Pace-O-Matic games.  So we had to try -- I asked -- I asked Gianni.  I said, How do we enforce this agreement?

And he said, Well, let's send a cease and desist.

And we sent a cease and desist, and we notified both parties this time, the vendor and the location, and -- and we got pushback on it.  You know, they wouldn't -- they would not, you know, remove the games or give us an exclusive that we had, you know, honor the deal that we had.

THE COURT:  Mr. Zegarelli, before you go on, I don't believe Exhibit 8 was ever admitted into evidence.  Are you moving it into evidence?

MR. ZEGARELLI:  I will move it in.  I apologize, Your Honor, I thought it was.

THE COURT:  That's all right.

Any objection, Mr. Neiser?

MR. NEISER:  No, Your Honor.

THE COURT:  All right.  It is admitted.  I just want to make sure we took care of that.

MR. ZEGARELLI:  Thank you.

BY MR. ZEGARELLI:

Q.   Mr. Unis, I put on what I believe is an admitted Exhibit 10.  Are you familiar with this document?

A.   Yes.

Q.   Okay.  And how are you familiar with this document?

A.   This is the letter that they sent back to me after I sent the cease and desist.  So they -- you know, once I sent the cease and desist with Gianni, my family attorney, he sent back -- Pace-O-Matic sent back a letter saying all kinds of stuff to make excuses for the -- for not honoring the right of first refusal.  And this is the first time I've ever even heard of Pace-O-Matic of Pennsylvania.  My agreement is with Pace-O-Matic and Miele Manufacturing.  I am -- this is my first time ever hearing of Pace-O-Matic of Pennsylvania.

Q.   Well, just to correct you.  Do you mean POM of Pennsylvania doing business as Pace-O-Matic?

A.   Yeah, POM of Pennsylvania.  I assumed that was

Pace-O-Matic, you know.  It says POM.

Q.   Okay.  Did they ever send you a notice in any way that said we want to transfer or move rights?

A.   No.  I've never received one letter, email, or a text message saying, Hey, Albert, you know, we want to move the rights or assign the rights, you know, or assign the agreement over to another company that we made.

You know, they just did it.  And then they, I guess, told us about it in their letter saying -- you know, giving excuses of why they don't want to honor it.

Q.   Now, before I get there, is there a reason why -- I think you testified Mac Vending, those terminals remain.  Is there a reason why you did not contact Danny Warren or Pace-O-Matic or Miele Manufacturing with regard to the Giles News Pro ATM issue?

A.   Ask that again.

Q.   Yeah.  Why did you send the cease and desist to the location and the operator and not contact Pace-O-Matic or Miele Manufacturing?

A.   No, I -- I sent a cease and desist to the vendor and Pace-O-Matic.  I sent this letter to the vendor and Pace-O-Matic this time.

Q.   Okay.

A.   Actually, both times actually had the vendor on it. The previous one from February of '17 had "Mac Vending" on it.

If you actually look at bottom of that document, it's a certified mail receipt that Mac Vending signed. And Wayne DeLuca and Miele Manufacturing were also CC'd on the February of 2017 cease and desist. We are now looking at the -- I think this is February of '18 also. Not also. But a year later from February of '17.

Q. And Wayne DeLuca was no longer representing the Unises generally at this point. He was representing Pace-O-Matic exclusively?

A. After -- after I had met with the district attorney of Lawrence County and I told him, he asked me, Where do you want this letter sent?

MR. NEISER: Objection. Hearsay.

THE COURT: Sustained.

THE WITNESS: Read the question back, please.

BY MR. ZEGARELLI:

Q. Let me just -- let me ask this: So you received the letter from Mr. Cline. Again, this is -- you heard Mr. Cline's testimony. You were here for it?

A. Yes.

Q. Okay. Now, you'll note again, this language, says "Any right of first refusal that your client may have with Pace-O-Matic has either been abandoned or already defined due to prior marketing inactivity."

Now, do you have any understanding of what that means?

A.    I have no understanding of what that means.

Q.    Okay.  And then it goes on to say --

A.    The reason I have no understanding of what that means is because I'm continuing to do business with Pace-O-Matic. Every -- every week, every month I'm buying fills, and I'm continuing, you know, to even include them in on my negotiations with other counties.

Q.    And then it says "Or ended due to a substantial amount of arrearage that your client owes."  Did you have an understanding of what that meant when you received the letter?

A.    No.  I -- I believe this was a fraudulent invoice that was sent to me that was -- that was even talked about in the letter.

Q.    At some point in time, did you get an email from Dan Warren saying the account is clean?

A.    Yes.

Q.    I can get that on the screen if you don't recall it.

A.    I'd like to see the letter.

Q.    And you'd like to see it?  Give me one second.

MR. ZEGARELLI:  And I'm showing the witness Exhibit 119G.

BY MR. ZEGARELLI:

Q.    Do you have an understanding of why this communication occurred from Mr. Warren to you?

A.    Yes.  I -- I had believed that they were sending me

fraudulent invoices.  So I made sure -- you know, I told my dad that I -- I said, I can't -- I can't do this.  I want you to go down to Georgia and make sure that we owe nothing.  You know, please -- please go down to Georgia and talk to Danny and tell him to give me a clean bill of health for my account before things blow up and I look bad in court.

Q.   Now, if I direct your attention down a little -- further down, now, it says "The parties did agree" -- unlike perhaps the earlier provision -- "The parties did agree to an Equipment Purchase Agreement for first right to refuse terminals in Beaver County."

Do you see that language?

A.   Yes.

Q.   All right.  Now, it goes on to say -- so just to be clear, you don't remember, up above, with the substantial amount of arrearage.  You did pay an amount of money, if you recall?

A.   They claimed I owed money.  Gianni, which was my family attorney, told me, Hey, pay --

MR. NEISER:  Objection.  Hearsay.

BY MR. NEISER:

Q.   What did you do?

A.   I can tell you what I did; right?

Q.   What did you do?

A.   Well, I -- they claimed that I owed them money.  I was notified that it would look better if I were to pay that

invoice.  Okay?  So I paid -- I paid -- even though it was under -- under scrutiny, even though I was saying it was fraudulent, I paid it anyway so that none -- none of my account activities were -- were scrutinized.  You know, I wanted to become, you know -- you know, have a clean bill of health for my account before things blew up.

Q.  Okay.  So apparently at this point, when you read this letter or you received this letter, you thought it was getting to a point where things are --

A.  Of course, of course.  They're not returning my calls. They're trying to screw me sneakily out of my deal by sliding me papers across the desk saying words like "commission," trying give me 50 percent of what I was owed, and just not honoring anything, you know.

Q.  All right.  Now, it goes on to say, "However, the right of first refusal is based on the implicit promise that PSG would be the lead distributor in Beaver County."  Do you have an understanding of that?

A.  Yes, I have a very good understanding of that.

Q.  All right.  Please explain.  What's your understanding?

A.  If I have the right of first refusal, I -- I would be the only distributor in Beaver County unless I refuse an account.  So -- and if I -- you know, I would be if they kept to the deal.  If they -- if they would have asked me, Hey, we have

Mac Vending calling us, he wants ten games. Okay? And are you going to fulfill that account? Are you going to sell Mac Vending games? Okay? And gave me the option to offer that to Mac Vending. You know, if I would have refused, we wouldn't be here. You know, they never even give me the option to refuse.

Q.   Now, did they ever send you a notice before this letter from Greg Cline where it's now POM of Pennsylvania doing business as Pace-O-Matic? Did you ever get a letter saying, you know, Hey, you owe us some money or, Hey, you failed to live up to a promise or you better do more or differently or --

A.   No. There's not one piece of correspondence that ever indicated that I was in arrearage, I was in noncompliance with my deal until this letter came, until I sent a cease and desist to them. There's -- there's no problem with me up until I am threatening to sue them. Then they came up with all kinds of stuff after -- all kinds of, you know, just lies and whatnot to get out of the exclusive right of first refusal.

Q.   All right. So there's some language down below, and, you know, whenever I try to paraphrase it, it tends not to make sense, but I think that's because I try to paraphrase what the essence of that clause is saying.

What do you -- do you have an understanding of what that clause is saying? Let me blow it up a bit.

A.   Can you back it up?

Q.    Back it up once.

A.    Okay.

Q.    Maybe it's better if I dehighlight it on that screen. It sounds to me like they are saying they're not giving the offer of the location because you didn't already have the location they're supposed to offer you.

MR. NEISER:  Objection.  Is there a question?

THE COURT:  Was that a question, Mr. Zegarelli?

MR. ZEGARELLI:  I apologize, Your Honor.  That was not a question.

THE COURT:  I think you asked him before what his understanding was.  So perhaps he can answer that question.

THE WITNESS:  Yeah, it's nonsensical.  The whole -- the whole bottom paragraph is nonsensical from "we have determined" to "Aliquippa location."  That is -- the whole paragraph is nonsensical because if -- if the games -- like, how -- how do I know about the deal?  You know, if I have the right of first refusal, I have to know about -- someone has to know about the deal to give me the right of first refusal.  So someone knew about the deal.  And that would have been the vendor.  The vendor would have known about the deal.  And they contacted Pace, and they -- they placed the games in -- in Giles News Plaza.

Q.    But they're saying you -- if I understand it, they're saying you didn't get the opportunity because you didn't already

have Giles News Plaza.  Is that your understanding?

A.    If -- why -- why would I need a right of first refusal if I already had the thing that you were going to offer me?  You know.  If -- if you -- if you had to -- you know, Pace-O-Matic has a -- has to tell me about the right of first refusal.  And if I -- if I -- you know, they're saying it's so nonsensical -- you know, it's so nonsensical that I'm having trouble even, you know, following it, you know?  So -- or explaining it to the Court.

They're saying that, because I didn't already put games in Giles News Plaza, that I don't get the right of first refusal.  That makes no sense whatsoever.

Q.    Okay.  And I'm going to ask you to look at the document on the screen, Trial Exhibit 79.

THE COURT:  Before we move to that, Mr. Zegarelli, would this be a good breaking point since we're moving to another exhibit --

MR. ZEGARELLI:  Yes, Your Honor.

THE COURT:  -- for our lunch recess?

MR. ZEGARELLI:  Yes, Your Honor, sure.

THE COURT:  Ladies and gentlemen, we're going to take our lunch recess.  That means we will be back here at 1:30.  And we're adjourned at this point.  I'd like to see counsel very briefly in my chambers, if you could.

(Pause as the jury exits courtroom.)

(Whereupon, the following discussion was held in chambers.)

THE COURT:  I don't want to keep you.  I know you're both busy over the lunch hour.  I just want to talk a little bit about timing.

Can you give me a rough sense of how much longer you have with Mr. Unis?

MR. ZEGARELLI:  Not more than an hour.  Not more than -- yeah.

THE COURT:  That's fine.  I just want to get -- you know, you take the time that you need.

Any sense about how much time you're going to need?  In other words, are we going to finish with him today.

MR. NEISER:  Oh, we'll finish with him today.

THE COURT:  Okay.  Are you prepared to go forward with your rebuttal deposition excerpt?

MR. NEISER:  I gave a copy to Mr. Zegarelli.  He hasn't had a chance to look at it yet because he's doing his thing.  But we have -- I can submit to the Court what we have.  I can send it to you right now.

THE COURT:  I would appreciate that.

MR. NEISER:  Sure.

THE COURT:  And we'll take a break if we need to to resolve any objections that you might have, Mr. Zegarelli, so you have a chance to look at it.  Is that it, then?

MR. NEISER:  I believe so, Your Honor.  I do need to clear my head over the lunch break.  If there's anything else, I'll let you know.

THE COURT:  That's fine.  I mean, you don't have to make a final decision now.  I just want to get a sense are we going to be done at 1:45, or are we moving forward?  So I think we should be able to cover a lot of the day.  If there's something else that you want to do on rebuttal, certainly, you're entitled to proceed with that.

MR. NEISER:  Yeah.  I think -- that would be it for you?

MR. ZEGARELLI:  That's it for me.  I mean -- what can I do at this point that the jury isn't already tuned into ruling on, I think?  Everything else is -- would be one of these kind of things.

MR. NEISER:  I just want to know where I start and stop, that's all.

THE COURT:  And then we will talk at the end of however the testimony goes today about what we're going to do next week because I certainly am not going to get any further today if everybody wraps up.

Whatever time everybody wraps up, we'll come back in here and talk about how we're going to go forward with the charge conference.

Okay.  I don't want to keep you.  Just wanted to make

sure I knew where we were going.  Thank you.

(Whereupon, in chambers session ended.)

(Whereupon, a recess was taken.)

(Pause as the jury enters courtroom.)

THE CLERK:  This Court is back in session.

THE COURT:  Please be seated, everyone.  Good afternoon.

MR. ZEGARELLI:  Thank you, Your Honor.

BY MR. ZEGARELLI:

Q.   Mr. Unis, I've placed before you Trial Exhibit 79. I'll scroll through it.  I'd like you to indicate whether or not you can identify this document.

A.   Yes, I recognize the document.

MR. ZEGARELLI:  I move in Exhibit 79.

MR. NEISER:  Your Honor, we have no objection to the document itself, but some of the allegations in there kind of conflict it with some of the Court's prior rulings, and I'd like to -- maybe we can have a sidebar on this, if you have a second?

THE COURT:  Yeah, we can have a sidebar.

MR. NEISER:  It will only take a second.  Thank you.

(Whereupon, sidebar conference held:)

MR. NEISER:  Your Honor, right in the middle of the first page, it talks about illegal games and compliant terminals.  And that's the essence and the nature of it.  I don't have an issue with the -- my issue is whenever we start to

getting into and making allegations, especially this late in the game, it's just getting confusing.

MR. ZEGARELLI:  I do understand that point.

MR. NEISER:  The only reason why I approached it without a redaction is the public filings in this case and that document and the cover letter, they all are of public record at this point.  Irrespective of it not being by ruling in the case, it's -- it's not disclosing anything that isn't already in the public record.

THE COURT:  But what's in the public record isn't necessarily what has been presented at trial.  I think that's the issue.  So I understand that if someone were to go look at the docket, for example, they would see that there were certain allegations that have been made.  I don't think the letter is in the public domain, unless maybe is it and I'm not aware of it.

MR. NEISER:  Nor is the complaint.  There may be a facsimile that eventually -- I understand maybe he can testify he had a lawyer write a letter and they sent it to us.  The actual content falls under 403.

THE COURT:  Are you able to ask him about it without introducing it into evidence?  Could you ask him, "Did his lawyer send a letter?"  And then if he doesn't know, show him the letter to refresh his recollection.

MR. ZEGARELLI:  At least leave it on the screen.

THE COURT:  Leave it on his screen.

MR. NEISER:  Sorry for the interruption.

THE COURT:  That way, you can get in what you want, and we'll avoid that language.

MR. NEISER:  Thank you.

(Whereupon, sidebar conference concluded.)

BY MR. ZEGARELLI:

Q.  Mr. Unis, there's a letter that you've identified, and I'll ask you some questions about it, if you can answer those questions.  And we don't necessarily -- we're not going publish this document to the jury, but I'll ask you some questions about it.

On or about May 2, 2018, did your attorney -- let me just ask you, can you describe the letter without talking about the specific claims made in the letter?

A.  On May 2, 2018, I had a law firm that's called the Dinsmore law firm, send a complaint to Pace-O-Matic, and the complaint goes on to say, you know, how -- how we were -- how we are going to breach -- not breach.  How we are going to sue Pace-O-Matic for breaching their written equipment -- our written Equipment Purchase Agreement with Pace-O-Matic and allowing unfair competition with other vendors and further use of our trademark.

Q.  Okay.  And what court was that proposed to be filed in?

A.  The Court of Common Pleas of Beaver County.

Q.    Okay.  Did you receive any response to this letter?

A.    No.  No, we -- we -- well, so we sent it over.

And Pace-O-Matic's counsel said, Hey, please give us, like, a week or two to handle this.  We don't want you filing this complaint against us.  Give us a week or two to handle the situation.  We are very -- we are very optimistic about getting something worked out.

And -- so we obliged.  And when we did that, that gave them the opportunity to write their own complaint against us and file a complaint against us in federal court.

Q.    Okay.  Now, Mr. Unis, what is the primary mechanism by which you advertise your services as an operator?

A.    Websites, advertisements, passed to the bars.  Usually, when, you know, when we try to get an account, we go in and talk to somebody directly, and -- because if you just send in mailers, it's -- you really don't get a response back, you know?  It's -- it's more of like an in-person thing that you've got to go and work out.

Q.    Now, I've put on your screen a document.  Do you recognize this document?

A.    Yeah, I recognize it.

MR. ZEGARELLI:  All right. I'll move in Exhibit 109.

MR. NEISER:  No objection, Your Honor, subject to any instruction the Court may have.

THE COURT:  Yes, as soon as it's identified, I will do

so.

MR. ZEGARELLI:  It is Exhibit 109.  Trial Exhibit 109.

BY MR. ZEGARELLI:

Q.   Please identify it.

A.   It -- it is my United States patent trade office registration for Pennsylvania Skill.  I have received the registration for Pennsylvania Skill Games trademark.

THE COURT:  All right.  Ladies and gentlemen, I want to give you an instruction at this point about this exhibit.

A supplemental registration from the United States Patent and Trademark Office does not give any legal presumption of ownership for the mark.  You may consider the supplemental registration of the United States Patent and Trademark Office as you would any other evidence in this case.

MR. ZEGARELLI:  Is it allowed in, Your Honor?

THE COURT:  Yes.

MR. ZEGARELLI:  Thank you.

BY MR. ZEGARELLI:

Q.   Mr. Unis, I just want to direct your attention to the date.  And specifically, the date filed.  And I'll direct your attention to this particular line.

For the record, would you state the date upon which you filed for this trademark registration?

A.   It says March 30th of 2018.

Q.   Okay.

MR. ZEGARELLI:  No further questions.

THE COURT:  Thank you, Mr. Zegarelli.

MR. ZEGARELLI:  Thank you, Your Honor.

THE COURT:  Mr. Neiser?

MR. NEISER:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. NEISER:

Q.   Sir, that exhibit, 109, that we just looked at, you filed that with the United States Patent and Trademark Office through a lawyer, did you not?

A.   I did.

Q.   You didn't send a copy of that to Pace-O-Matic, did you?

A.   No.  Why would I?  No, I can't ask questions.  Go ahead if you want to ask a question.

Q.   Well, thank you.  Indeed, I might.  To be clear, you did not provide any notice of that filing to us?

A.   We did not give you a notice of the filing.  We gave you a notice that we were going to sue Pace-O-Matic in court.

Q.   A month later?

A.   I guess that would be a month later.  I think -- I think that does -- I think that is the date.

Q.   As a matter of fact, and you're saying counsel from Pace called your previous lawyers to tell them that we were optimistic to work things out.  Is that what you're saying?

A.    That is what they said, yeah.

Q.    Do you know that was me?

A.    Yes, yes, I read the letter.

Q.    Ah.  There's a letter?

A.    Yeah.

Q.    That I said I was optimistic that we were going to work things out?

A.    Correspondence with Zeszutek.

Q.    Ah.  I see.  Mr. Zeszutek isn't here, is he?

A.    No, Jim Zeszutek is not here.

Q.    No.  As a matter of fact, sir, there was no threat whatsoever from Pace-O-Matic, Miele, POM, or Savvy Dog, anybody, to sue you prior to the time that you threatened to sue us, isn't that true?

A.    Pace-O-Matic never threatened to sue us, no.

Q.    No, we did not, until we received that notice from you.  Is that correct?

A.    That's correct, yeah.

Q.    Okay.  And you heard testimony, you've been here the entire time, where I believe the Pace parties testified they never had any idea that you were even claiming a trademark up until the time you filed something with the Patent and Trademark Office.  Are they liars?

A.    I would say they are lying, yes.

Q.    They're liars?

A.    Yes.

Q.    Okay.  Let's be very, very clear about this.  You and, I believe, your father are claiming that all of the success of Pace and Miele and POM and Savvy Dog in Pennsylvania is the result of you guys?

A.    I'm not claiming all of the success of Pace-O-Matic.  What -- defending my trademark has nothing to do with claiming the success of Pace-O-Matic.

Q.    Wait a minute, sir.  You said there was no other operators that were selling equipment in 2015 except for the Unises, isn't that right?

A.    We put out the very first Pace-O-Matic games in Pennsylvania.

Q.    So?

A.    Is that a question?

Q.    Yeah.

A.    I'm not sure how to answer that, Julian.

Q.    Okay.  How about this, Mr. Unis: I want to be very clear, because you are the one who threatened the lawsuit and brought -- got this ball rolling.  So we need to make sure we actually understand what you are talking about.  You're trying to say that Pace made this game for your company?

A.    Yes, they made the game for us to put out in Beaver County.

Q.    Specifically for you?

A.   They were not in Pennsylvania prior to us.

Q.   That's not what I'm asking you.  I'm asking --

A.   Please repeat the question.

Q.   -- a very specific question.

As I'm understanding your testimony, your counsel's opening, and the claims made in this case is that you're saying, Pace-O-Matic created a game specifically for you, your father, or your companies for Pennsylvania, custom-made for you.

A.   My father had to negotiate with Wayne to bring Pace-O-Matic to Pennsylvania, yes.

Q.   Well, Wayne DeLuca was deposed twice in this case.  We heard his testimony.  I didn't hear anything like that from him.

A.   I would describe him as a hired gun for Pace-O-Matic.

Q.   Oh, so if you don't agree with him and the testimony's missing, he's a hired gun.

MR. ZEGARELLI:  Objection, Your Honor.  Argumentative.

THE COURT:  Sustained.

BY MR. NEISER:

Q.   Is it like if you don't like an invoice, it's a fraudulent invoice?

A.   No, if I never received the goods, it's a fraudulent invoice.

Q.   So you're trying to say that former FBI agent and retired attorney Wayne DeLuca hid something related to a deal that your dad made with Michael Pace for them to work together

to create a game specifically for your dad's business.  That's what you're saying?

A.    I'm saying my dad, with -- with Wayne brought Pace-O-Matic to Pennsylvania, and we put out the very first games.

Q.    Your dad brought Pace-O-Matic to Pennsylvania?

A.    That is correct.

Q.    I assume that you have a wealth of documents to support that claim.

A.    My dad does not do email, and Wayne DeLuca's file was flooded apparently in his basement, and he has no records pertaining to Albert Unis, apparently.

Q.    Oh, he had no records pertaining to Albert Unis.  You mean unlike the three file folders that we went through during his deposition on the table at your lawyer's office?  Those ones that were missing?

A.    He -- he did not have any of Albert Unis's documents for -- for Albert Unis's file for his law firm.  He claimed to have -- the files were flooded in his basement, and he threw them out.

Q.    AH.  So you're saying that your dad is the mastermind of the Pace software for Pennsylvania?

A.    That's not what I'm saying.

MR. ZEGARELLI:  Your Honor.  The testimony keeps getting recharacterized.  And I did endure it for a while, but

it seems to be continuing.

THE COURT:  Well, I certainly -- Mr. Unis, if you don't agree with the characterization in the question, you may certainly respond appropriately.

Do you understand what I've said?

THE WITNESS:  I don't.

THE COURT:  If you don't agree with Mr. Neiser's characterization, you can tell him that.

THE WITNESS:  Okay.

THE COURT:  But he's going to ask you the questions that he feels are appropriate, subject to objections, and you may answer how you determine is the best way to answer.

THE WITNESS:  Okay.  I should say, I do not agree with your --

THE COURT:  I'm not suggesting you have to say a particular thing.  Your lawyer is objecting that Mr. Neiser is mischaracterizing, and if you feel he is, you can tell him that.

THE WITNESS:  Okay.

BY MR. NEISER:

Q.   Your dad wasn't at any of the meetings in Harrisburg with Rick Goodling or Ryan Wood, was he?

A.   What time are you mentioning?

Q.   At any.

A.   They didn't invite them.  They -- they, being Pace-O-Matic, would not invite my dad to those -- to the

marketing meetings that they had in Harrisburg, Pittsburgh, Philly, none of them.  In fact, I learned about one of them being in Pittsburgh through another vendor, and I showed up to it without getting notice from Pace-O-Matic.

Q.   Sir, did you hear testimony from Ryan Wood, Rick Goodling, Michael Pace all talking about a meeting before the controlled pickup ever happened?  Do you remember hearing that?

A.   Please -- please repeat the question.

Q.   Do you remember testimony in this case where Ryan Wood, Michael Pace, Rick Goodling, all separately -- and even the deposition designation of Wayne DeLuca -- talked about the meeting in Harrisburg before the controlled pickup?  Do you remember that?

A.   Okay.

Q.   There was no mention of your dad in any of those things, in those meetings.

Is that also a conspiracy to keep him hidden from our knowledge?

A.   No, he just didn't -- he didn't involve himself in those meetings.

Q.   Could it be he wasn't involved in the meetings because he wasn't involved at all?

A.   No, that's -- no, I would say no, that's incorrect because how -- he -- you can't say that because he was directly involved with the controlled pickup.  How -- you can't say that.

Q.   Well, I'm not.  I'm going by what all of the other witnesses said.  And as a matter of fact, sir, so you're disagreeing with Mr. DeLuca's testimony that we read in, that your father's only involvement in -- I can read it verbatim for you, if you'd like, I've read it once already -- that his only involvement was putting the game in the bar and nothing else.

A.   I'd like to see the testimony, if you can.

Q.   No.

A.   Okay.  I didn't know if you're offering that.

Q.   Well, if you -- if you'd like to.  Mr. Deasy will pull it out, and I'll move on to something else in the meantime.

Before we get to that, just to confirm, you're not here today with any documents or records or text messages, faxes, I don't know, teletype, something, to confirm in writing anything that you just said about your dad's involvement with Pace, other than saying that Mr. DeLuca's files were destroyed somehow.

A.   Are you saying --

Q.   And I'm asking you if you have any documents to support your contentions that you're bringing in front of the Court right now?

A.   Please clarify the question.

Q.   Do you have any documents -- you have not brought any documents here today or discussed with your lawyer any documents to support your position that -- your argument where you say

your father was involved with Pace in developing this game for Pennsylvania?

A.    Yes.  In fact, you brought them.

Q.    So -- let's close this off here.

So if it hasn't been in evidence so far, we don't have it.

A.    It's in the production, and you do have it in your evidence.  It was brought up during my testimony here.  It is the -- the -- the Wayne DeLuca sheet that he signed off on putting the game in AIC.

Q.    Oh, could we see the receipt, Wayne DeLuca, October 1, 2013?

That?

A.    That is certainly evidence of my dad bringing Pace-O-Matic to Pennsylvania to open up the Pennsylvania market for them.

Q.    Great.  Now we're getting somewhere.

This is your evidence that your father brought Pace-O-Matic to Pennsylvania to open the Pennsylvania market?

A.    Yes.

Q.    Thank you.

That is the evidence, that's the extent of your written evidence in this case so far, and you're saying that's enough?

A.    What evidence besides the -- the evidence that would

be in Wayne's file that was flooded in his basement -- and, you know -- and of course, he's still working for Pace-O-Matic. So this -- this is the only -- besides the court case itself says AIC on it, it wouldn't -- it wouldn't even be placed into the AIC without my dad.

Q. Is that the extent of your answer?

A. I'm not sure what you're asking me.

Q. And is that all you have to say on the subject, sir? I just want to make sure we completely understand --

A. On the subject of what evidence is there that --

Q. No.

Here. Let's try it this way. You're claiming Wayne DeLuca is lying too?

A. It's -- yes, I'm -- I'm cert --

Q. You're certain that he is lying?

A. I am certain he's lying. And it's very coincidental that he has no records for Albert, Albert Unis, my dad.

Q. Unfortunately, sir, we have plenty of them, but we don't have them here today.

A. That is not what Wayne said.

Q. So let's talk about the extent to which you --

MR. NEISER: Did we find that testimony, Mr. Deasy?

MR. SIMEONE: I have it loaded.

MR. NEISER: Load it up.

Let's take it down. Let's keep going. All right.

BY MR. NEISER:

Q.    All right.  Let's get back to some of the things you talked about earlier, and I'm sure in a few minutes we'll find the other testimony.

So in 2015, you had just graduated high school; right?

A.    No.

Q.    When did you graduate?

A.    2014.

Q.    Ah, okay.

And in January of 2015 you had graduated high school a few months earlier, six months earlier?

A.    What was the question?

Q.    When did you graduate high school?

A.    2014.

Q.    June, May?

A.    I'd say June, something like that, yeah.  June.

Q.    This isn't rocket science.  We're just trying to get close.

Okay.  So within seven months of that, there is the decision in the Beaver County decision.  Would that be fair, at least?

A.    Yeah, December 23rd, 2014.

Q.    And you, sir, did not have any involvement in the controlled pickup, did you?

A.    My father did.

Q.   I'm asking about you.

A.   I did not, no.

Q.   So that would be October, November of 2013.

How old were you then?

A.   Of the date of the controlled pickup?

Q.   Yeah.

A.   Not control -- the case you're asking.

Q.   And I asked about the controlled pickup.  I'll slow my pace down to make sure I'm not talking --

A.   2013?

Q.   Yeah.

A.   I would still be in high school.

Q.   How old was that?

A.   I was 18.

Q.   In 2013?

A.   Oh, no.  I was -- yeah.  No, I was 18.  Yeah, I was 17, 18, yeah.

Q.   Okay.  Was that when you were at Kiski prep?

A.   13, I was at Kiski prep, yes.

Q.   And my understanding around 2015 because you couldn't get a job with the union, you decided to get involved in the skill game business with your father; is that fair?

A.   Yeah, he's a heavy equipment operator of Union 66, and he wanted me to, you know, get involved with Union 66, and I tried, and the apprenticeship wasn't -- you know, they

weren't -- they told me they weren't taking any more people.

Q.   Okay.  So you and your father go down to Pace in February of 2015.

Do you remember that?

A.   Directly after the Beaver County decision.

Q.   Yes, sir, that's February of 2015.

A.   Yep.

Q.   And do you remember taking a picture -- we talked about it.  We showed it on the website.  It was a picture of you and Michael Pace in the lobby.

Do you remember that?

A.   Yeah, yeah.  We were -- you know, we were very happy at that point, and we took a picture in front of a Pace-O-Matic machine.

Q.   A completed Pace-O-Matic machine; right?

A.   Actually, no.  That -- that machine that we took a picture in front of was actually not a Pennsylvania software.

Q.   Sir, that machine that you took a picture in front of had that Pennsylvania Skill logo at the top; right?

A.   It does, yeah.

Q.   Okay.  I don't really care what software's in front of it.

I'm asking you -- here, it had the branding on it; right?

A.   It had -- it had the logo on it, yeah.

Q.   Okay.  And isn't it true that the first time you saw that logo is when Pace-O-Matic showed it you?

A.   Yeah.

Q.   And Pace-O-Matic created that logo?

A.   That is correct, yeah.

Q.   And then -- so in 2015, right around this time, you're 18 1/2 years old, 19 1/2 years old, in February of 2015?

A.   I wasn't -- okay.  Ask that again.

Q.   In February of 2015, where you were standing in front of the machine with Michael Pace down at Pace-O-Matic, you're about, what, 19 years old then?

A.   Yeah.

Q.   Okay.  And it's your testimony here today that, from that point forward in '15, that the Unises were the only operators in Pennsylvania?

A.   That is not my testimony.  There are plenty of operators within Pennsylvania, and -- and -- you know, Beaver County -- Wayne's not even from Beaver County.  Wayne is an Allegheny County attorney.

Q.   Did you understand my question, sir?  Your testimony was that you -- the Unises were the only operators of the Pace machines in Pennsylvania.  Is that your testimony, or is it not?

A.   I never said that.  I never said the Unises were the only vendor in Pennsylvania.

Q.   Huh.  Do you at least acknowledge here, sir, that in

2015, Pace and Miele were working as operators in the Commonwealth of Pennsylvania?

A.    Okay.  I want to make this very clear.  Okay?  You are playing a word game on me.

And what I did say was we were the only Pace-O-Matic operators in 2015.

As a general understanding, with cranes, Megatouches, jukeboxes, there's plenty of operators throughout the state.

Q.    Sir, I just asked you about selling games with Pace software on it, and that's what I want to make sure I understand.  Your testimony is that you believe that the Unises were the only -- how did you say it?  -- operators placing Pace software in Pennsylvania for the entire year?

A.    In 2015?

Q.    Yes.

A.    In -- yes.  In the beginning of 2015, yes.

Q.    Ah.

A.    We were the very first.

Q.    You heard Mr. Miele and Mr. Wood say the exact opposite, didn't you?

A.    And they didn't -- they did not say that we were not the first.

Q.    Not say you were not the first.  Are they liars, too?

A.    If they're -- I would have to see the specific thing that they said for me to call them a liar, yes.

Q.    I see.  Okay.  How many games did Pennsylvania Skill Games, LLC, buy in 2015 from Pace or Miele?

A.    59 terminals, which are -- that probably equates to $160,000 in purchases.

Q.    How many boards?

A.    Not including fills.

Q.    How many boards?

A.    25 boards in 2015, and we had to put -- we had to put the boards in cabinets to get it into the market in Pennsylvania.

Q.    Isn't it true that you bought the boards because you didn't have any money and you could not afford to buy full cabinets?

A.    That is not true, no.

Q.    So isn't it true that you had to have financing from Firestone to get your machines?

A.    Finance -- that is a regular thing in the vending industry to get finance from a third party.  I'm not sure why that's looked down upon.

Q.    I'm not looking down upon anything.  I finance things all the time.  But I'm just making sure we all understand --

A.    The way you're characterizing it, it sure does seem like that.

Q.    Well, I'm terribly sorry, sir.

But the reason why you had to get -- well, one of the

reasons why AIP and your parents still were involved is because, as you said on the video yesterday, you had no credit in 2015.

A.   Pennsylvania Skill Games had no credit.  AIP had a lot of credit.

Q.   Okay.  So AIP applied for the financing for you?

A.   That is correct.

Q.   Now, do you remember seeing that term sheet, the January 29, 2015, agreement with Albert Unis and affiliates.  Do you remember that?

A.   Please explain what the sheet says.

Q.   Exhibit 5, please.  Is that your signature or not?

A.   It looks like my signature.  It might be my dad's.  I don't know.

Q.   Okay.  Did you negotiate -- isn't it true that you did not negotiate any part of this document with Danny Warren?

A.   I went into Bill Rodgers's office, and he had papers for me to sign in May, and I signed them.  So whatever he put in front of me, I signed.

Q.   Wait a second.

A.   Whatever is in Bill Rodgers's case file is the correct document.  So --

Q.   Let's back up for one second.

MR. NEISER:  Could you zoom out, A.J.?  Can you enlarge the first paragraph?

BY MR. NEISER:

Q.   As of January 29, 2015, you weren't involved in the negotiations of this document, were you?

A.   No.

Q.   Okay.

MR. NEISER:  You can take it down.

BY MR. NEISER:

Q.   But you just said that you did indeed sign an agreement in May 2015 that Bill Rodgers put in front of you?

A.   Yes.

Q.   Who -- did you negotiate that contract or did your father?

A.   My father long, long ago negotiated that contract before the placement in AIC.

Q.   Wait a second.

A.   And that's why -- let me continue --

Q.   Wait.

A.   And that is why, when you see Ryan Wood's email, it says, "Our deal to you, Albert."  And when you see the January agreement, it also says, "For help in legal matters."

Q.   I understand.  However -- wait, wait, wait.  I want to make sure we're getting this one right.  You're trying to tell me that the Equipment Purchase Agreement --

MR. NEISER:  Can we put up Exhibit 6?

BY MR. NEISER:

Q.   Are you trying to tell us that this agreement was

negotiated before your dad picked up the machine for the controlled pickup?

A.   No.   You put the January document in front of me, and that is the -- that is the agreement that was negotiated prior to the controlled pickup.

Q.   You're saying there was an agreement that was negotiated prior to the controlled pickup?

A.   Yes.   Verbally, yes, with Danny Warren.

Q.   Verbally?

A.   With Ryan Wood, actually.

Q.   Verbally.

A.   Yeah.   Yeah.   Yes.   That's why -- that's why Ryan Wood's letter -- when you look at Ryan Wood's email, it says -- it says -- you know, I'd like to see the email.   It says, For your help.   This is the deal to you.   This is our deal to you, Albert.

Q.   And subsequent that, there was that Exhibit 5 that was signed, and then there was this that was signed.   Huh, interesting.

Now, isn't it true, sir, that all of this verbal agreement that you're claiming and the terms are finally reflected in that Equipment Purchase Agreement in May of 2015?  Meaning, that Equipment Purchase Agreement catches all of the agreements that you just mentioned and includes them all?

A.   No.

MR. NEISER:  Could I have the supplemental interrogatories to response to interrogatory, first set?  Their supplemental responses to POM of Pennsylvania, LLC's first set of interrogatories.

My I approach the witness, Your Honor?

THE COURT:  Yes.

BY MR. NEISER:

Q.   Here you are, Mr. Unis.  Thank you.  Do you need a water?

A.   I'm good.

Q.   There you go.  And, sir, I'm showing you a document that's identified as Pennsylvania Skill Games' supplemental responses to POM of Pennsylvania, LLC's first set of interrogatories.  Do you see that there?

A.   I see it on the screen in front of me.

Q.   Can you turn to the last page, please?  Tell me when you get there.  Is that your signature?

MR. NEISER:  Can I see the last page up on my screen, A.J.?

THE WITNESS:  That is my signature, yes.

BY MR. NEISER:

Q.   Okay.  And you signed that pursuant 28 USC 1746, declaring under penalty of perjury that the foregoing supplemental answers are true and correct to the best of your knowledge, information, and belief?

A.    Yes.

Q.    Just like similar to the oath you took here today?

A.    Yep.

Q.    Okay.  Let's go to your supplemental answer to interrogatory number 1.

THE COURT:  Mr. Neiser, may I give the jury an instruction regarding interrogatories?

MR. NEISER:  Yes, ma'am.  I was just going to ask you.  Thank you.

THE COURT:  Ladies and gentlemen, throughout the lawsuit, there are written questions that may be posed to the other side called interrogatories.  The written answers are given in writing and under oath.  You can consider those written responses in the same way that you would consider evidence that is presented here in this courtroom.

BY MR. NEISER:

Q.    Sir, I'd like you to read along silently as I read aloud.  "One, question, identify the terms of the alleged oral contract identified in paragraph 16 of your answer and counterclaim to include the consideration, duration, scope, and any details that compose the contractual obligations."

Supplemental response including the objection:  "To the extent the request seeks a legal conclusion, Pennsylvania Skill Games objects.  The duration of agreement was as long as Pace-O-Matic was in the Pennsylvania market.  The details of the

agreement are set forth in the written agreement produced at PSG Bates 29 to 30."

Did I read that correctly, sir?

A.   Yeah.

Q.   Thank you.

MR. NEISER:  May I approach, Your Honor?

THE COURT:  Yes.

BY MR. NEISER:

Q.   May I?  Thank you.

MR. NEISER:  Could you put up Exhibit 6, please?  Can we enlarge the lower right-hand corner of this document?

BY MR. NEISER:

Q.   And unfortunately, sir, we all know what a Bates number is now; right?  That is PSG29, and the next page is PSG30.  Can we agree on that?

A.   That's what it says in the bottom right, yes.

Q.   Thank you very much.  Okay.  So let's talk about this for a second.

MR. NEISER:  Your Honor, can I steal one of the jurors' waters?

THE COURT:  I might have one right here.  You can steal mine instead.

MR. NEISER:  Thank you, Your Honor.  Judicial water. Thank you.

BY MR. NEISER:

Q.   All right.  Let's go to the last page.  That's your signature, yes?

A.   On the very bottom, yes.

Q.   And that's Bill Rodgers's signature on the left?

A.   Yes, and he signed for Pennsylvania Skill Games, me. You know, that's my company.

Q.   We know.

A.   And there's Miele Manufacturing and Pace-O-Matic on the top of that.

Q.   Great.  Thank you.

A.   Yeah.

Q.   Okay.  Let's go up to the top.  So first thing, this is call an "Equipment Purchase Agreement," isn't it?

A.   That's what it says at the top, yes.

Q.   It sure does.  Then, let's look at the third paragraph.  It says "seller."  Seller is Pace-O-Matic and Miele. Can we agree on that?

A.   Yes.

Q.   Seller has successfully litigated the legality of the Pennsylvania skill game.  Not seller and buyer.  It just says "Seller."

A.   If you look at the January agreement, it says, For your help in legal matters.  This is why we gave you this contract.

Q.   Oh, that's right.  Do you recall Mr. Wood saying that

Mr. DeLuca asked him to give him pricing discounts -- give your dad pricing discounts in exchange for the legal help?  Do you remember?

A.   Not just pricing discounts but the exclusivity for Beaver County.

Q.   Okay.  So we're going to get to your exclusivity in just one second.  Okay?  So -- but it says here, "seller"; not seller and buyer.

And your signature's at the bottom of the document in which that appears.  Yes?

A.   Yes.

Q.   Good.

MR. NEISER:  Okay.  Let's take that down.

BY MR. NEISER:

Q.   And, in fact, sir --

MR. NEISER:  If we could enlarge paragraph 1.

BY MR. NEISER:

Q.   -- you have a pricing discount, didn't you?

A.   I received many benefits, and pricing was one of them.

Q.   I see.  We're just talking about pricing, and we can define what you call "many benefits" sometime later.  But for right now, we're just talking about pricing.  That's correct, you got a pricing discount?

A.   That is the pricing discount that they -- that Pace-O-Matic ultimately did not honor throughout its dealings

and with me.

Q.    Sir, I know you feel the need to add things to the questions, but I'm asking you a very simple question:  You received a pricing discount as part of this agreement, did you not?

A.    Is that the same question?

Q.    Well, I'd like an answer to the first one.

A.    I gave an answer.

Q.    Is it yes or no?

A.    That is the pricing discount that I ultimately received for help in legal matters.

MR. NEISER:  Could we pull up Exhibit 5, please.  And let's pull up the pricing on the equipment on that agreement, please.

BY MR. NEISER:

Q.    So here your pricing was $2,600 for the terminals for Flex I and 2400 for Spartan cabinets.  Can we at least agree on that?

A.    That's what it says.

Q.    Okay.

MR. NEISER:  Let's go back to Exhibit 6.

BY MR. NEISER:

Q.    And the Flex there is 2495.  So you actually got better pricing in this agreement as time went on.  Would that be at least fair?

A.    They both said Flex I?

Q.    Yeah.

A.    Yes.

Q.    Okay.

      MR. NEISER:  Take it down.  Reduce the enlargement.

BY MR. NEISER:

Q.    Now, here's what I -- I want to make sure that we're understanding your position.  I'm not going to belabor this, sir.

      Real quick, I want to go back to one thing.  You said that you bought 59 games in 2015 -- or terminals, in 2015.  Is that the right way to say it?

A.    I bought 59 games in the whole year of 2015, and 53 games from January to May.  So between those two agreements, I bought a lot of games between January and May.

Q.    What you call a lot of games.  I'm just asking for the numbers.  It's up to the -- everybody else to figure out if that's a lot.  I'm just asking how many.

A.    Again, 59 machines in the whole year of 2015.

Q.    How about 2016?

A.    I don't know that.

Q.    How about 2017?

A.    I -- I don't know that statistic.

Q.    How about 2018?

A.    I have -- I have the documents that I could pull up,

and I -- I don't know offhand.

Q.   How many do you have in operation right now?

A.   125 minus the ones that broke over the years and Pace-O-Matic would not sell me any -- any new games after 20 -- after I sued them in 2018.  They would not sell me any new games.  Pace-O-Matic and Miele.  Okay?

Q.   Sir, I just asked how many games.  I know you want to keep adding things on to the end of your answers.

A.   I'm going to answer how I answer.

Q.   I understand.  I'm trying to find out information from you, sir, so the jury can make a decision.

Okay.  So you said you have about 120-some games?

A.   125 games that I bought through Pace-O-Matic and Miele, I believe, that throughout the whole time that I was allowed to buy those games.

Q.   Now, let's go to paragraph 4.  This is that right of first refusal.  I'm going to ask you some very simple questions, okay?

Can we agree that what you believe to be an exclusive in Beaver County, what you're claiming, appears in the first two sentences of that paragraph?

A.   This provision is the exclusive.  I -- if you want me to --

Q.   I just want you to tell me what you're calling "the exclusive" appears in the first two sentences of the paragraph.

That's how I understand it. I'm just asking you to confirm it.

A. Yes, it's an exclusive deal, yeah.

Q. That's what you call an exclusive deal?

A. It's an exclusive if I -- it's -- it's an exclusive until the day I refuse.

Q. I see. And then you're saying that the last two sentences guarantees you the best pricing out of any other operator in the entire Commonwealth of Pennsylvania?

A. Can you highlight the --

Q. Happy to.

MR. NEISER: A.J.

A. What is your question?

BY MR. NEISER:

Q. Just so we understand, it's your testimony, as I understand it, that you're contending these two sentences obligate Pace and Miele to give you better pricing than any other operator in the entire Commonwealth of Pennsylvania, even outside of Beaver County?

A. It says not to sell the other vendor. Okay?

So are you claiming that people from Blair County don't place games in Beaver County? Is that what you're claiming?

Q. Sir, the way this works is I ask you questions, and if you don't understand, let me know, and I'll ask you another one.

A. It is, to my understanding, that Pace-O-Matic's

position is that people all over the state place games in Beaver County.  So why wouldn't -- why wouldn't that provision apply to people that are outside the county doing business in Beaver County?

Q.  Sir, I'm asking you very simply, because I was very confused by your testimony, and it's a very simple question.  Do you believe those two sentences give you a right from Pace-O-Matic and Miele to enjoy better pricing than any other operator in the Commonwealth of Pennsylvania, regardless of location?

A.  At the same price or lower, that's what it says, yes.

Q.  Anybody.  So if we -- just play this out.  If we sell machines to another operator in York County and they only have machines in York County, you still have to get better pricing than they do?

A.  If another vendor is doing business in Beaver County and they're located outside the county, yes.

Q.  What if they're not doing business in Beaver County? Do you still have to get better pricing than them?

A.  Yes.

Q.  So you have to -- this is what I'm trying to figure out because this --

A.  It doesn't say --

THE COURT:  Mr. Unis, wait for Mr. Neiser to ask you the question, please.

BY MR. NEISER:

Q.    Here, are you trying to tell this jury that you're supposed to, by contract, get better pricing than anybody else in the Commonwealth of Pennsylvania, period?

A.    If you are agreeing to not sell the other vendor at prices lower than the buyer pays, meaning me, then, yes.

Q.    So this would apply outside of Beaver County and in Beaver County?

A.    Yes.

Q.    Anywhere in the Commonwealth?

A.    Yes.

Q.    Thank you.  Piece of cake.

MR. NEISER:  Zoom back out.

BY MR. NEISER:

Q.    Now let's look at the agreed-upon marketing efforts. I want to make sure I get this one as well.  You're claiming that previously agreed marketing efforts means -- and tell me if I'm wrong -- that you agreed to give Pace-O-Matic and Miele the right to use your trademark for as long as you deem appropriate?

A.    As long as they honor the deal, we'll have no problem. The seller will support buyer with previously agreed-upon marketing efforts.  The seller will support buyer.  Okay? The -- Pace-O-Matic's the seller, we're the buyers, and we market the game in Pennsylvania.  We started the whole market in Pennsylvania.

Q.    You started it all?

A.    We started it all, and it was from Beaver County.

Q.    And -- but for you, Pace and Miele and POM of Pennsylvania and Savvy Dog, they'd be -- they'd be a shell of themselves, wouldn't they?

MR. ZEGARELLI:  Argumentative and speculative.

THE WITNESS:  They wouldn't even be in Pennsylvania.

THE COURT:  Just a moment, Mr. Unis, because your attorney has interposed an objection.

I'm going to sustain that objection.

BY MR. NEISER:

Q.    So just to make sure I understand, when we look at these one, two, three, four, five, six, seven, eight -- nine words, it's your testimony here that that means you have a trademark right, that Pace and Miele have agreed to use your trademark, and that after they put 20,000 machines out under that mark, you can say, hey, stop the presses, I want you to stop doing it?

A.    At that time, they did not have 20,000 machines in the state.

Q.    We're here today.

A.    Yes.  It became a very big market.

Q.    And you're saying that agreed-upon marketing efforts means trademark rights?

A.    Yes.

Q.   Do you remember giving testimony previously in this case?

A.   Twice.

Q.   Twice, that's right.  You were represented by counsel.  Can we at least agree on that one?

A.   I was -- I believe the first time I was 23 at the time.

Q.   Sir, I asked if you were represented by counsel.  I didn't ask you how old you are.

A.   I was represented by counsel.

Q.   Very good.  Thank you.

A.   At the time, yes.

Q.   And the second time, you were represented by counsel, weren't you?  In the second deposition?

A.   Yes.

Q.   And we took a deposition.

A.   We took a depo, yes.

Q.   And it was under oath?

A.   Yep.

Q.   And the court reporter wrote down everything that you said.

A.   Yep.

Q.   And at the end of that deposition, you were given an opportunity to read it and correct any inaccuracies; isn't that correct?

A.    That's to my understanding, yes.

Q.    Okay.  And it's your testimony, today, that the previously agreed marketing efforts included trademark; is that correct?

A.    That's what I said, yeah.

MR. NEISER:  Can we play 123, lines 2 through 15?

"Question: What are the agreed-upon marketing efforts that you recall?

"Answer:  So my dad discussed Danny Warren helping me finance my -- my business.

"Question:  Okay.

"Answer:  And helping me grow my business.

"Question:  Okay.

"Answer:  And that's why he came down and helped me with my financials and helped me with the Firestone loans.

"Question:  What about it says "Marketing," though. In my mind, marketing is different than finance.  Maybe it's not in yours, but --

"Answer:  Through financing, my company, we market the product.

"Question:  Okay.  Anything else?

"Answer:  No."

BY MR. NEISER:

Q.    And during the negotiations of Exhibit 6, the Equipment Purchase Agreement, you were represented by Attorney

Rogers; is that fair?

A.   At the time of what?

Q.   Exhibit 6, please.

A.   Bill Rodgers, yes.  Bill Rodgers represented me at that time.

Q.   A good lawyer, isn't he?

A.   He seems to be, yeah.  He's a really good guy.

Q.   He's a great guy.  A fantastic guy?

A.   Outstanding guy.

Q.   Believe me.  Last thing I want to do is cross-examine Mr. Rodgers.  But the point is, you had aid of competent counsel at the time that you signed this agreement, didn't you?

A.   Yes.

MR. NEISER:  You can take it down.

BY MR. NEISER:

Q.   Sir, when you get -- you have, I believe, a delivery address to your warehouse for any machines delivered by Miele; isn't that fair?

A.   Please -- please repeat the question.

Q.   And when Miele delivered machines to Pennsylvania Skill Games, LLC, they were delivered to your -- a warehouse or some other place for you to put them out on locations?

A.   No, they were not.

Q.   They weren't?

A.   No.  They were delivered to my house.

Q.   Okay.  So they went to your house.  And then what did -- you would then take them off to locations?

A.   Yes.

Q.   Okay.  It wasn't to your warehouse?

A.   It wasn't to my warehouse, no.

Q.   Do you have a warehouse?

A.   Yes.

Q.   Is that for the fireworks business?

A.   It's a 15-mile -- the piece of property we have has three facilities on it, and I think it's like more than 15 miles of land that we own there.

Q.   Fantastic.

So -- and you have machines that are in and outside of Beaver County?

A.   Not 15 miles.  It's not 15 --

Q.   We don't care.

A.   It's not -- it's -- I'm sorry.  15 acres.  15 acres is what I meant.

Q.   Sir, its dimensions are impressive enough.

A.   Not 15 miles.

Q.   We thank you for that important clarification.

But back to the matter at hand.  Do you have games in and out of Beaver County?

A.   Yes.  Yep.

Q.   And those games outside of Beaver County are first

delivered to your house?

A.   Not always.  No.  We go pick them up from Pace-O-Matic or Miele.

Q.   Okay.  But sometimes they go to your house, and then you take them outside of Beaver County?

A.   Yes.

Q.   Okay.  You mentioned Mr. Warren did something.  He slid a piece of paper across the table and made you want to sign the piece of paper.  And you said, "No," and you walked away from it.

A.   That is not what I did.

Q.   You didn't take a picture of it, and you don't have a copy of it?

A.   I walked into Mr. Warren's office, and Ryan Wood walked out, me and -- me and Danny Warren talked.

He said, How's your dad?  How's your brothers?

Q.   I just asked if you had a picture of it or a copy of it.

A.   You didn't ask that, I don't think.

Q.   I sure did.

A.   So Mr. Warren slid me the copy, and once I told him that I -- I need to have an attorney present before I sign anything, after reading "your past deal is null and void and you're under new terms."  I slid it back to him, and I said that.  I said -- I said, I don't -- I can't sign anything

without my attorney present.

Q. All I asked is if you had a copy of it or a picture or something.

A. I did not take a picture of it. And I slid it back to him. So it's in his possession.

Q. And notably, Mr. Warren testified here today, in this case, just a couple days ago. It feels like a month ago, but it was just a couple days ago.

A. Yes.

Q. Nobody asked him any questions about a piece of paper slid across the table. You had ample opportunity for your counsel to ask him questions.

A. And at the advice of counsel, we did not.

Q. I see.

Now, there was some reference about some documents that were present or not present in Mr. Rodgers' file. So we went through that, I think, pretty extensively yesterday.

But can we agree, sir, that besides your trademark application that you filed and the threatened lawsuit that you sent our client, the only mention of the word "trademark" in any of the documents we've seen in this case, from your side, is a handwritten note on Mr. Rodgers' file on page 3?

A. If there was no problem -- because it was -- there was an understanding that I am Pennsylvania Skill Games. If there was a problem, Pace-O-Matic would have sued me in all of these

years in dealing with them.

Q. Ah. That's your logic.

So Michael Pace, you said on your website is a brilliant game designer, is he not?

A. Yes, my website says that.

Q. He's a brilliant guy; right?

A. Yeah, he is.

Q. Can he read minds?

A. I would say no, he can't. I don't think he can.

Q. So the way that you avoid having to read people's minds is you communicate with them, which brought me to my last question to you, sir, that you, again, did not answer and offered me a bunch of other things.

Can we agree that absent -- besides your trademark application and besides the lawsuit you threatened our clients with, the only other reference to any other document introduced in your case was page 3 of Mr. Rodgers' file that had the word "trademark" written in handwriting?

A. Because we are focused on putting games into the market. Who cares about a trademark when you're getting a business started? It wasn't even started in Pennsylvania.

THE COURT: Mr. Unis, did you understand the question?

THE WITNESS: Please read it back. Please reask it.

BY MR. NEISER:

Q. I think I can double-track it and ask it the same way

again.

But, Sharon, would it be too much trouble for you to -- I don't want to screw you up, though.

(Previous question was read back.)

THE WITNESS:  That's not correct.  My contract says "Pennsylvania Skill Games" on it.  And they are not allowed to use my name since I -- I have the name.

BY MR. NEISER:

Q.    Okay.  Sir, did you not understand my question?

A.    I said it wasn't true.

Q.    Besides the contract and your interpretation of the contract, can we agree --

A.    I wasn't interpreting the contract.

Q.    Huh.

Can we agree that you never sent a letter to Pace-O-Matic saying, "Hey, you can't use our trademark" until you sent the threatening letter to sue?

A.    I did, and I sent the letter to sue.

Q.    That was it.  Nothing before then?

A.    No, because we were corporate partners.  We were all three going after the same thing.

Q.    Corporate partners?

A.    Yes.

Q.    Do we have any documents to establish the meeting of the corporate partners that you just announced?

A.   The contract itself.

Q.   So it's all back to the contract?

A.   That is correct, yes.

Q.   Okay.  Let's go back to this.

So the contract doesn't say "exclusive," but you say it has an exclusive.  It doesn't have the word "exclusive"?

A.   It's an exclusive, yes.

Q.   So it doesn't have the word "exclusive," but you say it's an exclusive.

A.   Wayne calls it an exclusive.

Q.   Unfortunately, he didn't.

But I'm asking you a simple question:  Does the word "exclusive" appear in the agreement?

A.   There is no word "exclusive" in the agreement.

Q.   Thank you.

Does the word "trademark" exist in the agreement?

A.   No, there's no word "trademark" in the agreement.

Q.   Great.

Does the word "partnership" appear in the agreement?

A.   There's no -- there's no -- there's no -- represents the partnership, though.

Q.   Really?

A.   If they are to collect a percentage of my revenues of what I earn.

Q.   Percentage of revenue appears in that agreement, too?

A.    Per the fills.

Q.    Sir, just like any other operator in Pennsylvania.

A.    I don't understand what you're asking.  It wouldn't say legal matters -- for help in legal matters if we weren't corporate partners.

MR. NEISER:  Pull up Exhibit 6.  Pull up Exhibit 6.

BY MR. NEISER:

Q.    Where does "legal matters" appear in there?

A.    It does not show up in the May agreement, but it does slow up in the January agreement.

Q.    And from January to May, as we discussed with Mr. Rodgers yesterday, the terms of that agreement were negotiated and adjusted over time, were they not?

A.    If that is what Bill Rodgers said, yes.

Q.    I think that's what the drafts would suggest.

MR. NEISER:  Could we have Exhibit 100 from yesterday, please.  And I'd like to go to page -- going by memory -- not a good thing on a Friday afternoon -- page 57.

BY MR. NEISER:

Q.    Now, I believe Mr. Rodgers testified yesterday -- I'm sorry.  Bill testified yesterday that this was the penultimate version of the Equipment Purchase Agreement, the second to last one.  That means this is the last version before it was signed.  And let's look at the first paragraph.  And it says --

A.    Second to last?

Q.    This is the second to last draft.

A.    I don't know that.

Q.    Well, I'm just going by his testimony.  You can answer this question: In the first paragraph, who is the buyer?

A.    The buyer is Pennsylvania Skill Games.  Aliquippa Industrial Park.

Q.    It says "Pennsylvania Skill Games"?

A.    So what I'm confused on is this -- you're saying this is the penultimate, which is prior to the May agreement; correct?  Well, if it is, I don't know why it would say "Aliquippa Industrial Park" because the May agreement says "Pennsylvania Skill Games" on it.

Q.    Sir, that is precisely my point.

A.    Okay.

Q.    Who's the buyer?

A.    It says Aliquippa Industrial Park doing business as Pennsylvania Skill Games.

Q.    Are there any other words you would like to read into that that don't appear on the page?

A.    There -- there -- there isn't any other words on the document, no.

Q.    There are not, sir?

A.    No.

Q.    I'm asking you a very simple question.

The buyer on the second to last draft is Aliquippa

Industrial Park Inc., is it not?

A.   Yeah.

Q.   Thank you.

MR. NEISER:  You can take it down.

BY MR. NEISER:

Q.   And you also claim that there was an obligation by Pace and Miele to not just give you an exclusive but throw any other operators out of Beaver County or shut off their fills if they operate in Beaver County.  Isn't that your testimony?

A.   They have done that in the past.

Q.   Again --

A.   March 2016, Center Township, Beaver County, Jack Pot Fever, I think it had 20 -- 22, 23 terminals in it.  I have pictures to support that.

Q.   We understand that, sir.  You can talk about all of the things that you haven't brought into the lawsuit.

But,  sir, the fact of the matter is, isn't it true that that Jack Pot Fever was removed because they were running games that Pace didn't want to be associated with it and was a gaming parlor?

A.   Absolutely not.  All of those games were Pace-O-Matic games.

Q.   Okay.  So another question: Mr. Warren was sitting here earlier this week.  Nobody asked him about that.

A.   I have -- I have video evidence of all of those games

being Pace-O-Matic machines.

Q.   Sir, we're on day five of the trial, and I haven't seen it.

A.   I produced it.

Q.   So --

A.   You should --

Q.   Do you remember having a domain name registered for pennsylvaniaskillgames.com?

A.   Yeah.

Q.   And would it be fair to say that the pennsylvaniaskillgames.com domain wasn't registered until about eight months after you created your LLC?

A.   What was -- do you know the date?

Q.   I believe it's March of 2016.

MR. NEISER:   Can we see Exhibit 22?

BY MR. NEISER:

Q.   I'm going to show you a document marked for identification purposes as Exhibit 22.  Do you recognize it?

Take it off the screen.  This is not in evidence, sir.

A.   Yeah.

Q.   Okay.  Do you have any reason to disbelieve that document?

A.   No.

Q.   Okay.  Can we agree that you didn't register the domain name, pennsylvaniaskillgames.com until March 2nd of 2016?

A.   Again, my dad is not an internet, email, or electronic guy.  So the only person that could have done it is me.

Q.   That's why I'm asking you.

A.   I'm -- I'm authenticating this, WHOIS or proxy LLC document, yes.

Q.   That's all I'm asking.

Does that look to be correct, to the best of your knowledge?

A.   That's -- yeah, yeah.  I have no reason to think that it isn't correct.

MR. NEISER:  Your Honor, we offer Exhibit 22 in evidence.

MR. ZEGARELLI:  Yes.

THE COURT:  All right.  Exhibit 22 is admitted.

Thank you, Mr. Zegarelli.

BY MR. NEISER:

Q.   So you register the domain on March 2, 2016.  And that's when you can start using the email address, pennsylvaniaskillgames.com?

A.   That's correct, yes.

Q.   And your email address for pennsylvaniaskill.com is what?  Pennsylvaniaskillgames.com is what?

A.   My email address?

Q.   Yeah.

A.   Albert@pennsylvaniaskillgames.com.

MR. NEISER:  69.  Yeah, let's take this down.

THE WITNESS:  I also had another email, which was pennsylvaniaskillgames@gmail.com, which was prior to that.

BY MR. NEISER:

Q.    That's tremendous, thank you.  So I'm going to show you a document marked for identification purposes as Exhibit 69. Do you see that?  Do you recognize it?

A.    Yeah.  That's a document we sent out all over the place.

Q.    And, in fact, sir, you included this in your trademark applications, did you not?

A.    Yes.

Q.    To demonstrate your use of the mark in commerce?

A.    Yes.

Q.    Okay.

MR. NEISER:  We offer Exhibit 69 into evidence.

MR. ZEGARELLI:  No objection.

THE COURT:  Exhibit 69 is admitted.

BY MR. NEISER:

Q.    Okay.  So what you're saying is you submitted this document in conjunction with your trademark application as evidence, under oath, of use in commerce as of a certain date, did you not?

A.    Yes.

Q.    And then you also, to be very clear on your trademark

application, used that artwork that says "Pennsylvania Skill" across.  That's what you submitted to the trademark office, didn't you?

A.    Yes, that's an advertisement I sent all over the place.

Q.    Right.  So here's what's interesting to me.

MR. NEISER:  Let's highlight the text in the upper left-hand corner.

BY MR. NEISER:

Q.    So you're saying, according to this document, which you submitted in support of your trademark application and had to sign for it, that you were using this advertisement in commerce with a date of 5/1/15; correct?

A.    That's not what I'm saying.  That -- that document is updated to have my email in it.  It was -- it was updated, and then I put it -- I took it and I distributed it throughout Beaver County and Lawrence and Allegheny.

Q.    It has a date of 5/1/15 here, does it not?

A.    That date was not updated.

Q.    Sir, it has a date of 5/1/15 on it, doesn't it?

A.    It does, yes.

Q.    And the email address that is associated with the 5/1/15 date is albert@pennsylvaniaskillgames.com?

A.    Yes.  That's correct.

Q.    Okay.  And we just looked at your -- who is the domain

registration.  And that email address listed right there wasn't in existence until March of 2016.

A.    And I updated the document to have my email in it.

Q.    You didn't update the document that you submitted to the United States Patent and Trademark Office, though --

A.    At that time --

THE COURT:  Just a moment.  Let him finish the question.

BY MR. NEISER:

Q.    You didn't update the document --

MR. NEISER:  I'm sorry, Your Honor.

THE COURT:  That's all right.  Go ahead.

BY MR. NEISER:

Q.    You didn't update the document that you submitted to the Patent and Trademark Office in support of your trademark claim.

A.    I'm not sure what you're asking.

Q.    Sir, you submitted a document that has an incorrect date that the United States Patent and Trademark Office would be relying on.

A.    That is not correct.  As of May 1, 2015, I was already doing business with Pace-O-Matic.

Q.    Not under that email address you weren't.

A.    Under that banner, I was.

Q.    Ah.  The banner.

MR. NEISER:  Here, let's take that down, A.J.

BY MR. NEISER:

Q.   That banner?

A.   Yes.

Q.   That is the banner that you also submitted in support of your trademark application, didn't you?

A.   Yes.

Q.   And that came from Pace-O-Matic, didn't it?

A.   Yes.  Pace-O-Matic created that.  Yes.

Q.   Yeah.  And I believe your testimony is, make sure --

A.   Pace-O-Matic created --

THE COURT:  Just a moment.  Let him finish.  Look, both of you --

THE WITNESS:  I wasn't done answering.

THE COURT:  Mr. Unis, just a moment.  Both of you have to wait for the other one to finish whatever it is that you're saying.  And that way, our court reporter can take it down accurately, which we all want to make sure gets done here.  All right?

THE WITNESS:  All right.

THE COURT:  And I'm saying that to both of you.

MR. NEISER:  Your Honor, I apologize.

THE COURT:  No need to apologize.

MR. NEISER:  I know better.

THE COURT:  Let's keep this as orderly as we can.

BY MR. NEISER:

Q.   I think your testimony --

A.   Wait.  Who goes -- who goes first?  I wasn't done.

Q.   Oh.

A.   But go ahead.

Q.   Please continue.

A.   No, you go ahead.

Q.   This is a magnánimo I cannot express.

A.   I would like you to ask the last question back because I wasn't done answering it.

Q.   I don't really remember what it was.

A.   We have a record of it.

Q.   It's fine.  We can keep going.

The question for you, sir, is:  That artwork that's on the screen right there is what -- something very similar to that is what you submitted in your trademark application, did you not?

A.   Yeah, that is the mark that I submitted in my trademark application, yes.

Q.   And I believe your testimony is, the first time that you saw it was when Danny Warren gave you a folder with some marketing materials in it.  Am I -- or am I misremembering that?

A.   I submitted two trademark documents, and one's for the word "Pennsylvania Skill," and pen -- actually three, I think, "Pennsylvania Skill", "Pennsylvania Skill Games," and

"Pennsylvania Skill Banner."

Q.   The question is -- again, is:  The first time that you saw that, I believe you testified -- and I'm talking about that banner -- is when Mr. Warren showed it to you and it was included within a folder, a white folder.

A.   That wouldn't be correct because I'm standing next to Michael Pace in your photo, and that's the time I would have saw it.

Q.   Okay.  So it's your testimony that the first time you saw it was standing next to Michael Pace in the lobby of Pace-O-Matic?

A.   I'd say so, yeah.

Q.   Okay.  And we can agree that you had -- you did not have any role in the creation of what -- that banner right there?

A.   No, I -- besides them using my name.

MR. NEISER:  So, Your Honor, I may be moving into another line.  I probably doesn't have too much left.  Is now a good time for the afternoon break?

THE COURT:  I think let's take a break at this point.

MR. NEISER:  Well, thank you.

THE COURT:  Ladies and gentlemen, we'll take our afternoon break at this point.  We will see you at about 3:15.

THE CLERK:  All rise.  This court is in recess.

( Jury exits.)

(Whereupon, a recess was taken.)

(Jury returns.)

THE CLERK:  This Court is back in session.

THE COURT:  Please be seated, everyone.

MR. NEISER:  May I proceed, Your Honor?

THE COURT:  You may.

BY MR. NEISER:

Q.  Mr. Unis, yesterday, we read in some testimony from a Jeffrey Mayle.  Do you know who Jeffrey Mayle is?

A.  He is the owner of another software company that puts games all across the United States.

Q.  And that software company is Blue Sky Games?

A.  Yeah.  I think he has another name.  I don't -- it might be Mayle Bingo.  I don't know.

Q.  Okay.  But that software company is indeed a competitor of Pace-O-Matic and POM of Pennsylvania?

A.  It makes games for -- for use in Pennsylvania.

Q.  So that testimony that we read yesterday, that we identified, involved a lawsuit that Pennsylvania Skill Games brought against Action Skill Games; isn't that correct?

A.  That is correct, yep.

Q.  And the nature of that lawsuit was that you were claiming -- that you had licensed the Pennsylvania Skill trademark to Action Skill Games?

A.  Yes.

Q.   And Action Skill Games does not distribute Pace-O-Matic games, do they?

A.   Action Skill Games distributes all kinds of different games.

Q.   But they also distribute games from manufacturers other than Pace?

A.   Yes.

Q.   And you entered into a deal with them so they could use the "Pennsylvania Skill" name on those competing products?

A.   I entered into a deal with them, and they -- they did not end up paying me.  I had to sue them, and they did end up paying me in the end.

Q.   And, as a matter of fact, Pace-O-Matic intervened in that lawsuit, did we not?

A.   Yes.

Q.   And we intervened because we disagreed with your ability to license the trademark.  Do you remember that?

A.   I don't know why that's -- I don't know why you intervened.  You were not a party to that agreement.

Q.   No, we weren't.  But that isn't the first time that you worked with a competitor of Pace, isn't it?

A.   Please ask the question again.

Q.   Isn't it true that, while you were claiming an exclusive for Beaver County, that your father was obtaining an exclusive for Beaver County with a competing software company?

A.   Yes.  We -- we always want the edge in the market.  So we want exclusives with different companies.

Q.   So while you're claiming -- you're claiming an exclusive from Pace, you're also working with a competitor in the exact same market claiming an exclusive with them?

A.   Yes.

Q.   And that isn't the only time that you've worked with a competitor during the time that you were working with Pace?

A.   I work with many people.

Q.   You work with many people.  And you have no loyalty or allegiance to anybody but yourself?

MR. ZEGARELLI:  Objection, Your Honor.  I'm not sure what loyalty is.

MR. NEISER:  I'll withdraw it.

THE COURT:  All right.  Let's ask a different question, Mr. Neiser.

BY MR. NEISER:

Q.   In fact, sir, didn't you hire -- here, I'll ask it a better way.  Didn't you attempt to legalize a different version of software called "Encore gaming systems"?

A.   No.

Q.   You did not?  It's your testimony here today that you did not have a lawyer submit an expert report to a district attorney to obtain legalization of a software program called "Encore games"?

A.   I -- I sent that game into the district attorney's office to get approvals from the district attorney.  I'm not so sure that's regarding legalizing.  You know, he's authorizing.

Q.   Okay.  So we'll use your terminology instead of basic terminology.  You're calling it authorizing versus legalizing. The fact of the matter is, sir, you, through one of your lawyers, submitted to a district attorney a competing software program for authorization in that jurisdiction?

A.   I'd like to point out, that was after the lawsuit where you -- or Pace-O-Matic would not sell me games.

Q.   Can you answer whether it happened or not?

A.   Yeah.  I -- like I said before, I sent that game into the district attorney's office to get an authorization.

MR. NEISER:  Can I have one second, Your Honor?

THE COURT:  Yes, sure.

BY MR. NEISER:

Q.   And, in fact, sir, had you been successful -- actually, wait a minute.  Sir, I'm going it show you a document that's been marked for identification purposes as Exhibit 34. I'd like for you to take a look at it.  Tell me if you recognize it.

Yeah, is that it?

A.   Yeah, it is.

Q.   Do you recognize it?

A.   This -- this is a -- this is a testing lab report that

I sent in for a game that was given to me by Playtronics, and Playtronics did not have a testing report done for this game. So I needed to have it.

Q.   Okay.  But my only question is very simple, sir.  Is this a true and accurate copy of that document?

A.   Yep.

Q.   And this is the document that you intended to be sent by counsel to the district attorney -- a district attorney?

A.   I don't know when that was, but we -- we prepared this testing lab report that does not give legal authorization for the use of this game.

Q.   And, sir, I'm asking if this is an accurate copy of the document that you had through counsel submitted to a district attorney for authorization?

A.   Yes.

Q.   Okay.

MR. NEISER:   Your Honor, we offer Exhibit 34 into evidence.

THE COURT:  Any objection?

MR. ZEGARELLI:  Your Honor, I would object on relevance.  It's not clear to me where -- it looks like it's for the Commonwealth, and I'm not sure the relevance it has to this particular case.

MR. NEISER:  I'll make an offer of proof, Your Honor.

THE COURT:  Please.

MR. NEISER:  This goes to our good faith and fair dealings breach of contract claim.  It also goes to the unfair competition element of count one.  And it goes to show competition and bad faith -- lack of good faith and fair dealings with us.

THE COURT:  I'm going to admit that.  Let's see where the questions go.

And, Mr. Zegarelli, if you feel it ventures into something that is not relevant, you may certainly reserve the right to object.

MR. ZEGARELLI:  Thank you.

MR. NEISER:  It will be a very narrow inquiry.

BY MR. NEISER:

Q.   What's the date on it, sir?

A.   February 23, 2018, far after I sent the cease and desist to Pace-O-Matic, Miele Manufacturing, and Wayne DeLuca in February 2017.  So this is directly a year later that I'm sending testing lab reports in to get -- testing lab reports in to get a lab report done so that I could send it in.

Q.   Sir, I just asked you the date on the thing.

A.   February 23, 2018.

Q.   Because you just testified that this was after the lawsuit was filed.  And it, in fact, is not, is it?

A.   It is rather close to the lawsuit being filed.

Q.   But before the lawsuit's being filed; correct?

A.    It is before, yes.

Q.    And before your lawyer sent us the threatening letter with the attached complaint and saying that you had a trademark.

A.    It is not before that we -- it is not before we had a problem with Pace-O-Matic.

Q.    Sir, do you not understand my question?

A.    Please reread the question.

Q.    Isn't it true that that this is before you had your lawyers send us the threatening letter and telling us about your trademark registration?

A.    Yes.

Q.    Thank you.  No further questions, Your Honor.

THE COURT:  Thank you, Mr. Neiser.

Mr. Zegarelli, do you have any redirect examination?

MR. ZEGARELLI:  Just a couple, Your Honor.

<u>REDIRECT EXAMINATION</u>

BY MR. ZEGARELLI:

Q.    Just so it's not lost in the shuffle, do you recognize this letter?

A.    Yes.

Q.    Okay.  And it's the letter you testified to as to Greg Cline?

A.    Yes, this is my cease and desist.

Q.    Do you mean in response to --

A.    Oh, yeah, this is -- this is Greg Cline's response to

my cease and desist that I sent with Gianni Floro in 2018 about a Giles News Plaza in Aliquippa location.

Q.    Okay.  And the date on this letter is, if you would read it into the record?

A.    February 14, 2018.

Q.    Okay.  Now, in 2015, specifically May 20th of 2015, the date of the Equipment Purchase Agreement -- let me back up.

As of the date of January and the January agreement, did not what ultimately became Pennsylvania Skill Games have a number of competitive games in the marketplace?

A.    Yes.  We have always had competitor games in the marketplace to Pace-O-Matic.  Now, that is normal business in the vending industry to have a Merit Megatouch and Incredible Technologies golf game, a Blue Sky game next to a Pace-O-Matic game.  You know, it's -- there was nothing regulating me, restricting me, or stopping me from placing Pace-O-Matic games next to other skill games.

Q.    So just to be clear so I don't get confused with the name and the manufacturer, are you saying that Pennsylvania Skill Games had always used that designation with multiple competitive manufacturer games?

A.    Yes, that is what I'm saying.

MR. ZEGARELLI:  No further questions.

THE COURT:  Thank you, Mr. Zegarelli.

Mr. Unis, you may step down, you're excused.

(Witness excused.)

Mr. Zegarelli, do you have any additional testimony or evidence?

MR. ZEGARELLI:  Thank you, Your Honor.  And as suggested this morning, we close.

THE COURT:  All right.  You're resting at this point?

MR. ZEGARELLI:  Yes.

THE COURT:  All right.

Mr. Neiser, how do you wish to proceed?

MR. NEISER:  Outside the presence of the jury, Your Honor.  I have a motion.

THE COURT:  All right.  Ladies and gentlemen, we're going to take up a legal matter now that may take some time.  So while I'm sure you're very disappointed to hear that we're going to let you go early today, we are going to let you go a little bit early.

On behalf of everyone here, I want to thank you for your attention all week.  I know it's difficult to sit for a week and listen to testimony.  But believe me, everyone appreciates your attendance and your diligence.  So we're going to give you a few minutes to take your leave.

I want to remind you that it's a long weekend.  We have a court holiday on Monday.  So we will see you here on Tuesday, and we'll get started right at 9:00 a.m.

So we're going to take a very short recess so that you

can gather your belongings.  I hope you have a wonderful weekend.

Just as a reminder, do not discuss this case among yourself or with anyone else until I've given you my final instructions.  So thank you so much.  We'll see you on Tuesday.

THE CLERK:  All rise.

(Pause as the jury exits courtroom.)

(Whereupon, a recess was taken.)

THE COURT:  Please be seated, everyone.

Mr. Neiser?

MR. NEISER:  May it please the Court, Your Honor.  Upon conclusion of Pennsylvania Skill Games' case, we move this Court, pursuant to federal rule of civil procedure, for a judgment as a matter of law for failure to meet their burden of proof on Counts One, Two, Three, and Five of ECF O1 in 2:18-CV-941, and ECF 30 counterclaim 2018-CV-722, all consolidated into the present matter.

After even resolving all inferences and considering all evidence in favor of the nonmoving party, they have failed to meet their burden by a preponderance of the evidence.  And we recognize that the standard is akin to that of Rule 56, that they have missed elements on the false designation of origin element.  One, there is no -- before I proceed, can you hear me well enough, Sharon, for me to -- thank you.

On the validity, there are specific factors that have

not been met, including extent of sales and advertising leading to buyer association, fact of copying, neither party submitted a consumer survey, use of the mark in trade, no demonstration of international or interstate commerce, the size of the company, or the number of customers.

They have failed to establish secondary meaning or inherent distinctiveness in either the word or design mark. There is an utter lack of evidence regarding sales or advertising leading to buyer association or establishing ownership other than the prior artwork for the trade name as opposed to the trademark.

And the distinction between the trade name and the trademark is stark. Their contention is devoid of any evidence other than argument and conclusion. And they failed to show specific market penetration to their product. And I realize that they included game placement services. But that, we would submit, is a mere fiction. It's an ancillary by-product to the activities of an operator.

There also is no confusion established in the marketplace. Their Pennsylvania Skill Games trade name, as established by their one or two exhibits -- actually, one exhibit, and the contract goes specifically to the use and advertisement of a business. We have admissions from Albert Unis that it was never a trademark; it was a trade name. Mr. Unis IV testified that he didn't care about trademarks. And

even if that were their contention, their failure to establish continuous use other than the very isolated instances they gave fails to meet their burden for those elements.

Yet the use of Pennsylvania Skill Games does not create some impression or penetration within the market. Count Two for false advertising, the elements were not made. False or misleading statements of fact in a commercial advertisement from Pace-O-Matic, statements that actually deceive or had a tendency to deceive on behalf of our clients. Deception likely to influence the purchasing decisions of consumers, also no evidence.  And injury as a result of the false statements, also no evidence, which is why the Court constrained in the pretrial rulings to the case that we put on this week.

So it was almost a fait accompli when they submitted their expert report in the way they established their pleadings and the case was built up that there's just no connection or allegation that connects injury to a false statement.  So therefore, Count Two should go.

Number three is a common law trademark.  That would be for the same.  We believe that that should be subject to Rule 50 as well for the same reasons under the same standards, Your Honor.

And finally, Count Five relates to common law, unfair competition.  That would go to the same reasons as Count One and

Count Two.

So what we have, Your Honor, is just -- the amount of evidence that was offered in their case just quite simply does not get anywhere close to the required elements to submit this to a jury.

Now, we're not trying compare it to our claim. I'm talking just about theirs, and I understand the limitations of the motion. However, a reasonable jury could not find, based upon the evidence presented, in favor of Pennsylvania Skill Games, LLC, on Counts One, Two, Three and Five.

Thank you, Your Honor.

THE COURT: One question I have on Count One. Is your motion with respect to both the word mark and the design mark?

MR. NEISER: Yes, Your Honor, they are.

THE COURT: All right. Thank you, Mr. Neiser.

MR. NEISER: Thank you, Your Honor.

THE COURT: Mr. Zegarelli?

MR. ZEGARELLI: Your Honor, first of all, I don't have the transcript to refer to for the significance of the motion being made at this time. And I'd request at least the time to review the transcript that relates to the motion.

If I understand the motion, it's for 941 case, not the 722 case?

MR. NEISER: It's for both, Your Honor.

MR. ZEGARELLI: Okay.

THE COURT:  I believe in that regard, the counterclaims and the claims in the case filed by Pennsylvania Skill Games are the same.  Correct?

MR. ZEGARELLI:  I think they are close.  Parties are different.

THE COURT:  Understood.

MR. ZEGARELLI:  And I'm not sure that -- and I think if he's -- or the parties are suggesting One, Two, Three, Four Five.  And I'm not sure  --

THE COURT:  One, Two, Three, Five.

MR. ZEGARELLI:  I have One through Five.

MR. NEISER:  No.

THE COURT:  No, Count Four's the breach of contract. I don't believe there was a motion made on the breach of contract.

MR. ZEGARELLI:  Okay.  And I think there is sufficient -- there is sufficient -- I can say now, I think there is certainly sufficient common law trademark and it was a significant amount of testimony with regard to the common law trademark.

Neither of the parties did do a survey with regard to market reputation.  We did produce Mr. Grachanin, who is an Ohio business that is interstate.  So as far as I can tell in the motion, Your Honor, there are sufficient facts to go to the jury -- in fact, questions to go to the jury.

And it is part of our case, Your Honor, that the Equipment Purchase Agreement embodies -- embodies -- contractual, I think it would have to be determined first before you could get to other issues that may rest on the fulcrum of the Equipment Purchase Agreement.

So I think that the motion would not be ripe even now, because I think that the contract action has to be determined to make any other determination since Pennsylvania Skill Games would claim the usage of its licensee, whether it's Savvy, POM, Pace, or Miele. And, in fact, I think many of the POM parties' own witnesses didn't even associate the mark with Pace but with Miele, who doesn't even claim to be an owner of the mark.

So I think there are sufficient fact matters, Your Honor, to present it to the jury and have the jury render an award or a judgment.

THE COURT: You mentioned sufficient evidence on the common law trademark, I think, as part of your argument. Is that the same evidence that would apply to the Lanham Act claim?

MR. ZEGARELLI: Well, the common law -- the common law rights would simply be -- you know, Your Honor, I think I'd have to compare and contrast the statutory right with the common law right. But I think the common law right is more simply a recognizable designation that would be protectable without necessarily an applicable statute, just as a matter of --

THE COURT: I'm just talking about the evidence. I

realize there may be a statute and then common law.  I just wanted to clarify what your position was on that.

MR. ZEGARELLI:  Your Honor, I don't necessarily see, at this time as we stand here, a distinction in the evidence to be presented since neither of the parties submitted a survey and both parties, I think, introduced evidence of recognition of the mark in commerce.  So I'm not seeing that distinction for purposes of the fact question.

THE COURT:  All right.  Is there anything else that you wanted to argue here today?

MR. ZEGARELLI:  Not at this moment, Your Honor.

THE COURT:  This is, just so you know, the moment.  I understand that none of us has a transcript available to us.  But the motion is being made now.  So I'm happy to give you as much time as you need to further argue it.

MR. ZEGARELLI:  I don't have further argument at the moment, Your Honor.

THE COURT:  Mr. Neiser, just a question for you.  Would it be possible to separate out the word mark from the design mark in connection with your motion?  Or are you making the motion with respect to both?

MR. NEISER:  I think, Your Honor, it would be -- I'm not trying to parse words, but I believe it would be applicable to both.  But I think that a court could rule on one, both, or another.

I think that our arguments both track the same.  And I can answer your question about the common law and Lanham Act, by the way.

THE COURT:  That's fine.

MR. NEISER:  The claims or the elements -- it's well established that the claims are the same elements for both.  One is statutory.  One is common law.

I'm sorry.  I skipped away from the question that you were asking me.  I apologize.

I think that our motion applies to both.  I think that the Court's prior rulings on the word mark itself are dispositive here, and I think they're informative because the Court's ruling before was that they're merely descriptive, the word mark, and not capable of any legal or preclusive effect as a result.

So I think that one's baked in, to be quite honest with you, Your Honor, considering your prior rulings, and the evidence that we heard and didn't hear here.  It's especially true with the design mark.

And we have -- there is no shortage of case law establishing variation on the theme on a design mark still results in infringement because the basis for the claim, the original association of the brand to a product -- whether it's through a distributor or a manufacturer, such as Miele -- the manufacturer and distributor relationship really has no basis

for it because Miele is operating on behalf of Pace or POM. There's a legal -- there's a distinction between the factual association and the legal association.  And I think in the end, that calculus is irrelevant because it always tracks back to who has the rights.

So without giving too much legal mumbo jumbo, I think we can split them, but I still think they're the exact same.

I can't see a circumstance in which, practically speaking, to afford final and full relief under our DEC action and a request for injunctive relief that we could, for example, be granted a trademark and the word mark but not the design mark and vice versa, because it -- how it would play in the marketplace, we'd be right back here in another lawsuit.

So, I think the Court could rule that the word mark is not capable of any design -- any secondary meaning and it's just merely descriptive.

But the design mark used in commerce in conjunction with -- and this is the critical element, Your Honor -- that particular class of goods, because we're not talking about a Megatouch.  We're talking about here's an electronic skill game that pays money to the player.  It's an entirely different class.  They were both registered under a class that would be distinct from a Megatouch or a foosball game or a dart board, for that matter.

So I hope that answers the Court's question in some

respect.

THE COURT:  It does.

MR. NEISER:  Or did I make it worse?

THE COURT:  No.

MR. NEISER:  One good thing I've done today, then.

THE COURT:  Mr. Zegarelli, I'm happy to hear from you as well.

MR. ZEGARELLI:  Thank you, Your Honor.  Well, there is a supplemental registry registration.  And while that doesn't give a presumption of ownership, it does indicate that the mark is at least prima facie capable of registration and capable of supporting a secondary meaning.

So if you a supplemental, I mean, that at least gives you evidence that it is capable of secondary meaning, which it may have.  And to the extent that that question is resolved, that -- you can't have an infringer develop a market.  I mean, so you can't -- you know, you can have a licensee develop a market for a licensor, but you can't have an infringer, you know, put in a lot of advertising and say, when there's a claim of infringement as a seminal question and then say, well, we've spent millions of advertising.

There's a plethora of evidence, Your Honor, that that mark began in a certain form in a certain commerce, including interstate from Mr. Grachanin.  And effectively the claim is that Pace-O-Matic, Miele, POM Parties went beyond their rights

under the EPA.  And to the extent that they are an infringer or a claimed infringer being kind of the seminal question, I don't think they can enjoy relief from their own bad acts.  And it actually would be a reverse confusion where either market survey, you have an infringer creating this monster market.  And this market became, as you heard the evidence -- it exploded from nothing.  And that would, quite frankly, give, if I understand the relief side, it would give a windfall award, in fact, de facto or not, to parties who are accused of being infringers on what was originally a word mark and design mark, and I think the that that question, how close are those designs, and I think that's for the jury to determine.

I mean, the jury may come back and say, Hey, you know, the fonted logos are really close, or -- and really it's the same with some incidental canned art, or they may come back and say, Hey, that's a completely different brand, brand-new, and it did not relate to the name.  So I'm not sure what the jury's going to find as a fact.

THE COURT:  If we all knew that.

MR. ZEGARELLI:  And therein lies the rub, Your Honor. And I think that facts needs to be determined by the jury.  You know, if -- you know, I think the jury's determination determines the facts that the trial was intended to determine. And I think -- you know, any judgment short of that would be to say that the basic fact that needs to be determined by the jury

is somehow determined as a matter of law, and I would suggest that that should not occur.

THE COURT:  I didn't have the opportunity to look at all of Exhibit 109, which I think was the supplemental registration.  Does that have the design mark in it?

MR. ZEGARELLI:  The supplemental registry register -- I actually have to look if that's the word mark or logo mark.

MR. NEISER:  It's just the word mark.

MR. ZEGARELLI:  It's the word mark.

THE COURT:  What is the design mark that Pennsylvania Skill Games is claiming that they either created or used in some way?

MR. ZEGARELLI:  Well, I mean that begs the question, Your Honor, of the facts set forth to the jury in the trial.  I mean, as I said in the opening statement, you have the Pennsylvania Skill logo that went across state lines, that had -- I'll call it the bubbly font.  And then you had what I think is a fact question, and we can disagree, but there's kind of I bubbly font with the, I'll call it "refreshed logo," but now instead of having some dart boards around it, it does have the stars and stripes and the bell.

Whether or not the stars and the stripes and the bell creates independent significance apart from the word, because I think if the trademark office were assessing them, the words become -- it's like an equivalence, and the words itself -- when

the words are part of a logo -- in fact, Your Honor, in fact, the Pace-O-Matic got refusals on the brands, before the case was instituted, because of the similarity.  But that doesn't actually answer the question of the original mark as used.  But nevertheless, that's still a fact question, Your Honor, and I don't think the Court can just say, those marks are so different that we will not allow a jury to decide if they're factually different.

THE COURT:  I understand that.  I just want to make sure.

So your position is what we saw in the Megatouch screen that we saw from a couple of witnesses with the dart board and the -- something else, pool table, maybe, that's the original, or that's what you claim is the original design mark?

MR. ZEGARELLI:  Well, we claim, Your Honor, is that -- put the word aside.  The word is the word.  It's abstract.  It embodies all formatives.

What we put into evidence is that bubbly font, and the dart board I think is incidental to the mark.  And that -- we did put it side to side.  If you put that bubbly font next to the Pennsylvania Skill as it relates to then you have the bell, which it's not always in that same -- but we think they are close enough that a jury would say that's the same mark.

Now, if a jury comes back and says that's -- you know, even though the words, you know, they share what some people

would call in the parlance the "dominant portion of the mark," being Pennsylvania Skill, maybe the jury will come back and say it's, you know, a brand-new mark, notwithstanding that the words are in there.

I think it's a fact question. And I think it's a jury fact question.

THE COURT: But from your perspective, it doesn't matter who created the second one, if I can call it that? The one that was displayed multiple times by the POM Parties, the one with the Liberty Bell and Constitution in the background? I'm not suggesting it matters or not. I'd just like to know what your position is on that.

MR. ZEGARELLI: Your Honor, our position is that -- and I think the testimony grounds this, is that this -- the original mark -- there was not a conversation about trademarks per se, because the parties were working together and it just wasn't -- again, I'll call it a refresh mark. The refresh mark, there was no reason to challenge that in the context of the EPA because, as Mr. Unis testified, everybody was in the same goal together in the EPA.

It was only later on when there started to be breaches of what we would assert, what PSG would assert, are breaches of the EPA, "don't ask, don't tell" breaches -- we'll call it -- on the right of first refusal, that those issues came to light. And then it was like, well, you know, we better register the

trademark, and that's when those things came up.

But it was -- but it was a permissive use or some form of a consensual use in the period that preceded the disputes that arose with the cease and desist filing first on McDanel.

THE COURT:  All right.  Thank you.  I appreciate that.

Mr. Neiser, anything further?

MR. NEISER:  Just a brief response, Your Honor.

So, we're back to an argument that was made in chambers, and we've discussed several times about the oral contract.  So as I understand -- we're not talking about weight.  We're talking about sufficiencies or sufficient evidence that's been proposed by them to get across the finish line on this and let the jury take it.  It's establishment of proof.  Proof in elements.

So Mr. Zegarelli's argument, well, I appreciate it and I understand it now.  We've sat through five days of trial, and we put on all of the evidence, and everybody's seen each other.  We're not in hypotheticals at this point.

His entire argument presupposes this -- this reality that they have that there was an agreement and that agreement included a trademark license and rights that were agreed upon by the parties, and then once one party goes astray, they can have it yanked out of them, away from them.  Okay?  So that's what their argument is.

Okay.  So if there were, I would concede

Mr. Zegarelli's argument, and I wouldn't be bringing this motion if there was a scienter -- I love using that word. I don't use it very often.

THE COURT: Scintilla.

MR. NEISER: Scintilla. Is it scienter or scintilla?

THE COURT: Scientia is knowledge.

MR. NEISER: Thank you.

THE COURT: At least maybe that definition. But I think you meant scintilla. If you didn't, I apologize for interrupting.

MR. NEISER: No, I love it.

A scintilla of evidence that there was any, like, fact to support that conclusion. It's pure argument. I mean, it's not in the contract. The Court said we could explain but not contradict the agreement.

And as the Court is aware, in their breach of contract count, which we acknowledge they probably have enough in front of the jury to take it on the contract. It would be bad faith for me to say the contract claim should go away.

But it doesn't include any of the things that they're talking about. It doesn't include a right to use or anything like that. This is a race to see who owns the mark. It isn't based in contract. It's based on use in commerce, secondary meaning, ownership and validity.

What Mr. Zegarelli's arguing is factor three

regarding -- excuse me -- likelihood of confusion without getting to elements one and two, which is validity and ownership.

You know, we have argument -- this is in our trial brief, Your Honor, which we tried to keep as narrow as possible to help the Court. The Third Circuit has held that a plaintiff can only establish ownership of an unregistered mark if it shows prior use of the mark in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark. The citation to that is Lucent Information Management vs. Lucent Technologies, 186 F.3d 311, 315, Third Circuit 1999.

And that also cites to the Kars4Kids case, which is also cited in there.

So, you know, the reliance on the oral contract, I mean, there are so many hurdles, it's almost like a Rube Goldberg; you have to get all the way through the thing for it to make sense.

But for the fact finder to -- to find that there was an association, there would have to be some -- that is based upon any activities that we took, there would have to be proof of an agreement to use it and we were creating the association for Pennsylvania Skill Games, LLC. Much like Miele, through its advertising activities, can -- the benefits to that can inure to POM and Pace. That's how they agreed to do business together.

And what we're talking about here isn't that.  We're talking about have they established any evidence outside of Kendrew's pub or this guy in Ohio, on a Megatouch machine where the machine only displays the name when the game's played.  No advertisements outside.  There was no evidence of advertising outside.  There was no evidence of advertisements other than what we provided to them.

The only evidence in that regard was Mr. Unis himself admitted that the first time he saw this stylized mark with the Declaration of Independence and the Liberty Bell, all of those things, was when we showed it to him.  It was brand-new to them.  They have no evidence or testimony connecting the dot between that one usage in Kendrew's and perhaps Mr. Grachanin in Ohio, and that doesn't even satisfy the Interstate Commerce Act because they're not selling a product.  They're placing a video game that may or may not display the name.

So there's no public -- public -- association that establishes validity and in the mind of the consumer or in the public in association with the brand.

I don't want to weigh our evidence with theirs, but I would take exception to one of the comments made about whether, you know, how would these people -- these competitors have association and how would these other operators have association.  They all said the same thing.  They said the same thing.  They associated with us, they always have, based upon

our advertising, marketing, and the machines themselves because the machines themselves are a part of the sales package.

They have not brought anything even remotely close to that.  They haven't established the secondary meaning.  I think the mark -- the design mark is valid.

And then this argument about the canned art and the bubbly fonts and a refresh, I guess that's a great argument for the jury, and they may buy it or they may not buy it.  But other than a few discussions of that in cross-examination, there was no proof of it.  No proof of canned art or bubbly fonts or any of those other things.  We're just taking the images as they are, as they were used, and where they were used for how long, how wide, what are the dimensions, and have they met their burden.

I didn't see it, Your Honor.  And we submit that they have so many elements that they are missing, it just cannot go to the jury.

Now, that doesn't mean we don't have to still go in front of the jury and have them say that ours is valid and we own it.  Maybe it's still a question for them, unless the Court rules otherwise.  But they sure can't.  And I don't -- respectfully, I don't believe they can.

THE COURT:  Thank you.

Mr. Zegarelli, anything further?

MR. ZEGARELLI:  Your Honor, I think Mr. Neiser, he

cites to law that, quite frankly, I think supports -- argues against his own motion.

You know, turning on the game? I mean, you know, being on the side versus a splash screen? You know, a game is meant to be turned on. It's intended to be turned on. It's not even -- if you don't turn it on, it's not even a thing. So the splash screen, you know, Mr. Unis also testified that logo being on numerous Megatouches -- I think a couple hundred games, 60-ish locations.

The bottom line, Your Honor, is -- and, again, a claimed infringer can't benefit from the infringement. In my view, Your Honor, there is a scintilla, if that's the standard. More than a scintilla. And I think it's a proper trial. It's a proper jury question. They may believe or not believe, you know, Mr. Grachanin.

THE COURT: No one knows.

MR. NEISER: Mr. G.

MR. ZEGARELLI: You know, they may or may not believe them. And I think that's the entitlement of the jury. I think that's for the jury to decide. Who do they believe for the week of -- for the week of the trial?

THE COURT: I don't know the answer to this. I just am curious about it. So if no one on Mr. Neiser's side of things had ever seen Pennsylvania Skill Games on the Megatouch or were aware of the name, does that matter at all?

MR. ZEGARELLI:  I don't think for a trademark, Your Honor.  It does for copyright.  Because under copyright law, you must copy.  And as a matter of evidence, if you can't prove with a smoking gun a copy, you can do it based on access and substantial similarity.  But, theoretically, if two people sit in two separate rooms and write "Gone With the Wind," you know, it's still not a violation of copyright even though they're the same or substantially the same.

Trademark, it doesn't matter whether somebody sees anything from the other or not.  And I think that's still a fact question as to the proximity of the parties, whether or not that has occurred.

THE COURT:  Thank you.

MR. ZEGARELLI:  Thank you, Your Honor.

THE COURT:  I'm happy to let anyone say anything further they want to say on this motion.  Going once.  Going twice.

Mr. Neiser, anything further?

MR. NEISER:  Nothing further.  Thank you for your patience.

THE COURT:  Of course.

Mr. Zegarelli?

MR. ZEGARELLI:  No, Your Honor.

THE COURT:  All right.  I'm going to consider the motion.

Mr. Neiser, I would ask you to be prepared because I haven't decided the motion yet --

MR. NEISER:  Of course.

THE COURT:  -- for any rebuttal.  I would like to meet with counsel to go over the deposition designations in the event that we need them.  And suggest that we do that at 8:00 on Tuesday morning.  As I mentioned to you earlier today, I do expect to have at least drafts of a verdict slip and instructions sometime either on Tuesday or before Tuesday.  I'm not sure about the verdict slip yet, obviously.  But the instructions, I do hope to have to you.  We may need to modify them.  So we'll certainly plan on discussing that on Tuesday as well.

MR. ZEGARELLI:  May I speak on that, Your Honor?

THE COURT:  Of course.

MR. ZEGARELLI:  Your Honor, on the verdict slip, I would just point out, just to bring it to your attention, that if you look at the distinction between the PSG version and the POM version, in the PSG version, I tried to be careful that an initial question was regarding the assignment question.  And the reason why it's presented logically that way is because, if you ask questions in a progression and you start with, did the POM -- did Savvy Dog and POM of Pennsylvania do X, Y, Z and you don't precede it with have you determined that they got the rights --

THE COURT:  Isn't that a legal question, though, assignment --

MR. ZEGARELLI:  Well, if it is, it is, Your Honor. And that's for you to decide.

I'm only pointing out that there is sort of a baked-in hidden premise that if you ask any questions with regard to -- some questions will presuppose the answer to the assignment question.  And just with that notation, I just wanted to make that notation, Your Honor.

THE COURT:  Okay.  Thank you very much.  Anything else that anyone wanted to address?

MR. NEISER:  Thank you, Your Honor.  I hope everybody has a nice weekend.

MR. ZEGARELLI:  Thank you, Your Honor.

THE COURT:  I want to thank all counsel and assistants, very good assistants, for your efforts this week.  I know it was a long week.  And everybody did what they needed to do this week and came in early and showed up late, and I certainly appreciate everyone's efforts this week and look forward to seeing you all next week.

MR. ZEGARELLI:  Thank you.

THE COURT:  Have a good weekend.

(Proceedings concluded at 4:21 p.m.)

- - -

**I N D E X**

**DEFENSE WITNESSES:**                                    **Page**
**John Grachanin**
  Direct Examination By Mr. Zegarelli                       12
  Cross-Examination By Mr. Neiser                           15
**Albert Unis III**
  Direct Examination By Mr. Zegarelli                       17
  Cross-Examination By Mr. Neiser                           72
**Albert Unis IV**
  Direct Examination By Mr. Zegarelli                       90
  Cross-Examination By Mr. Neiser                          126
  Redirect Examination By Mr. Zegarelli                    183


**Proceeding**                                            **Page**


   Motion for Judgment and Counterclaim                    186


C E R T I F I C A T E


        I, SHARON SIATKOWSKI, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

s/Sharon Siatkowski
SHARON SIATKOWSKI, RMR, CRR, CBC, CRI
Official Court Reporter