IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


POM of PENNSYLVANIA, LLC,
et al.,

                    Plaintiffs,    Civil Action No. 18-722
        vs.

PENNSYLVANIA SKILL GAMES,
LLC,

                    Defendant.

                                - - -


Transcript of Jury Trial on February 21, 2023, United States District Court, Pittsburgh, Pennsylvania, BEFORE:  Judge Patricia L. Dodge, Magistrate Judge.


APPEARANCES:

 For the Plaintiffs:        Julian E. Neiser, Esquire
                            Jonathan Deasy, Esquire
                            SPILMAN, THOMAS & BATTLE, PLLC
                            301 Grant Street
                            Suite 3440
                            One Oxford Centre
                            Pittsburgh, Pennsylvania 15219

 For the Defendant:         Gregg R. Zegarelli, Esquire
                            Technology & Entrepreneurial Ventures
                            Law Group
                            2585 Washington Road, Suite 134
                            Summerfield Commons Office Park
                            Pittsburgh, Pennsylvania 15241

 Court Reporter:            Sharon Siatkowski, RMR, CRR, CBC, CRI
                            700 Grant Street, Ste. 6260
                            Pittsburgh, Pennsylvania 15219


Proceedings recorded by mechanical stenography;
transcript produced by computer-aided transcription

P R O C E E D I N G S

- - -

(Whereupon, the following discussion was held in chambers.)

THE COURT:  By first order of business this morning, on Friday afternoon the POM Parties moved under Rule 50 for judgment as a matter of law pursuant to Rule 50(a)(1) of the Federal Rules of Civil Procedure.  That rule provides that if a party has been fully heard on an issue during a jury trial and the Court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for that party on that issue, the Court may, among other things, resolve the issue against the parties -- that party.

A Rule 50(a) motion for judgment as a matter of law should only be granted if, viewing the evidence in the light most favorable to the nonmoving party, there is no question of material fact for the jury and any verdict other than the one directed would be erroneous under the governing law.

Viewing the evidence here in the light most favorable to Pennsylvania Skill Games, I'm going to deny the Rule 50 motion.  I note that, among other testimony, there is evidence in the record that the words "Pennsylvania Skill" were used by the Unises in the course of their business as early as 2008 to 2010.  Notably that testimony came from Ms. Kendrew and Mr. Grachanin on -- with respect to the Megatouches, which

display electronic games of skill and that they used in their establishments as well as in the contract with the American-Italian Club.

There is also evidence, notably from Mr. Unis IV during his testimony, that trademark discussions were part of the EPA; and while this may conflict with other evidence in the record, a credibility determination as to his testimony is for the jury.

I will also note that there was some testimony provided on behalf of Pennsylvania Skill Games regarding certain marketing efforts which, from my understanding, related to visiting locations in Beaver County, either where Pennsylvania Skill Games was providing skill games or sought to provide skill games. There may also be the possibility that trademark recognition in the marketplace could be linked back to the Unises.

So with respect to the motion, as to Counts One, Two, Three, and Five, I'm denying your motion.

MR. NEISER:  Thank you, Your Honor.

THE COURT:  All right.  Next order of business is the deposition excerpts of Mr. Harris, which I appreciate the fact that counsel sent to me not only on Friday but as updated over the weekend.

I do have some objections that were provided to me in advance of our session this morning by Mr. Deasy.  Thank you for

that.

Before we proceed with those, Mr. Zegarelli, did you have any objections?

MR. ZEGARELLI:  Actually, I -- I don't have any objections, Your Honor, to their designations.  So we can -- once I understand the coloration that Mr. Deasy provided, we can address their objections.

THE COURT:  Yeah.  I think the POM Parties was yellow.  The PSG was orange, and there was some overlap with blue.

MR. DEASY:  That's correct.

MR. ZEGARELLI:  Notwithstanding those colors, the objections -- they're not different color -- that we'll just address them based on your email; is that correct?

MR. DEASY:  Yes.

MR. ZEGARELLI:  In other words, we can't just find by color the objection language.

MR. DEASY:  It will be in orange.

MR. ZEGARELLI:  Okay.  In orange.  Okay.

THE COURT:  So the first objection was on page 23, lines -- line 8 through page 24, line 5.

Mr. Neiser, do you want to give me your explanation of your objection to that testimony?

MR. NEISER:  Yes, Your Honor.  So -- let me see here.

THE COURT:  Take your time.

MR. NEISER:  Thank you, Your Honor.  So from -- it's

hearsay, one. Number two, it would fall under, I believe, 403 because it would confuse the issues and it would be unfairly misleading.

He's testifying as to what he may have heard regarding certain rights, and he couldn't even conclusively identify or establish the parameters of it. It's just that he heard something about something.

And when you put that all together, I think it's based on hearsay. I think it's unreliable testimony. I think it would be misleading.

MR. ZEGARELLI: My response to that was Mr. Neiser was fully able to explore that testimony and to determine what was told, how it was told, and in the circumstances under which he gained an understanding of the Beaver County and Lawrence rights, and he didn't do so; and that Mr. Harris gained the understanding he had, and that's what he testified to.

THE COURT: All right. I'll note that on page 23 -- and I'm focusing, at least for now, on lines 13 through 15 -- Mr. Harris basically says he heard somewhere that there was, like, supposedly exclusive rights or some trademark for that. I think that's speculative and hearsay. So that portion, from lines 8 through 15, is excluded.

The next question on line 17 asks, "So what did you hear?" And there is some testimony that appears thereafter.

That's hearsay, as I understand it. There's no other

foundation laid for the testimony starting on line 17 of page 23 over to page 24 on line 5.  So I'm going to exclude that testimony as well.

MR. NEISER:  Thank you, Your Honor.

THE COURT:  The next objection was page 24, line 14 -- lines 14 through 23.

What's your objection there, Mr. Neiser?

MR. NEISER:  It's almost identical to what we just discussed, the same thing.  The question being posed is:  Did you ever hear from anybody that Pennsylvania Skill Games or the individuals had an exclusive deal to put out games in Beaver?

And the witness says that he recalls hearing something to that effect but he can't say from where or who.  Without that, there's no exception that could be triggered for hearsay. We also think it would be speculative.

THE COURT:  All right.

Mr. Zegarelli?

MR. ZEGARELLI:  I would just repeat the same -- the same content of my last response.

THE COURT:  I do think this is hearsay.  And it also lacks foundation.  So I'm going to exclude that as well.

And the final objection, at least that I'm aware of through Mr. Deasy's communication with me, was page 31, line 24 through page 32, line 8.

What's the objection there, Mr. Neiser?

MR. NEISER:  This, again, is speculation, Your Honor. I also think it's -- it would be misleading because the question was with respect to asking Albie -- well, also 602.  You know, asking Albie what -- if he had any -- or Mr. Harris was asked whether or not he recalled anybody from Pace-O-Matic attempting to make Mr. Unis sign a contract giving up rights.  And he said he didn't recall the meeting.  Albie had said something to him. And he said, "Well, you know, they just said something about they wanted me to sign, and I wouldn't sign."

So I think that would fall -- he doesn't have firsthand knowledge.  I think it's speculative.  And it would be hearsay as well.

MR. ZEGARELLI:  Your Honor, I think it's excepted from hearsay.  Mr. Unis IV walked out of a meeting, immediately said what occurred in the meeting.  It was some form of an unusual circumstance.  And I think there was testimony on it, and the jury should be able to use that testimony as corroboration.

So in this particular case, I think there is a meaningful exception to hearsay.

THE COURT:  Okay.  What is that exception?

MR. ZEGARELLI:  The exception would be present sense impression or excited utterance, having just walked out of the meeting.

MR. NEISER:  I don't think it would be excited utterance because it doesn't -- there's no from the stress of

the event.  I think it's a little bit remote from that because it's while he's perceiving.

And as far as present sense impression, I don't think that that would qualify because he's not explaining an event or condition.  He's just recounting what he recalls from a conversation, not from an actual event or condition itself.

And on top of that, Your Honor, it's essentially speculative.

THE COURT:  I'm going to allow that testimony as an exception to hearsay, for what it's worth.

MR. NEISER:  Your Honor, there's also lines 9 and 10 that I think are part of that statement that probably should be included for fairness on page 32.

THE COURT:  Well, it is part of the answer.  So I think, just to be inclusive, it should be read, because otherwise we're cutting off the answer.  So we'll read that as well.

MR. ZEGARELLI:  Understood.

THE COURT:  Okay.  Then if there's nothing else with Mr. Harris, then you can read that in.  Are you going to do that first?

MR. NEISER:  We are, Your Honor.

THE COURT:  Okay.  All right.  I know that I received or Ms. Hopkinson received -- and she was nice enough to forward it to me -- the request for admission.  It's my understanding

that the POM Parties are seeking to read in requests for admission number 17.

You'll recall that because there were both objections and a response, I did give Mr. Zegarelli the opportunity to choose one or the other.  He has submitted an amended response.  So I'd like everybody's position on that.

MR. NEISER:  Your Honor, I think the objection itself should be stricken and the explanation should be stricken and just the substance of the answer itself.

THE COURT:  Okay.  I do note that there is still an objection, and I think I was pretty clear that either there should be an objection or an answer, and we still have the same hybrid that we had before.  So we're not going to read both an objection and an answer.

MR. ZEGARELLI:  Your Honor, the first sentence was -- if that's what you're referring to, as -- there really should not be an objection per se.  The --

THE COURT:  Well, there is an objection.  It says: "Pennsylvania Skill Games objects in that neither the timing nor the particular marks are identified in the request."

So --

MR. ZEGARELLI:  Your Honor, okay.  And as I read the rule, you do have a good faith obligation to state so much as you can admit.  If you want to withdraw the -- if you permit me to withdraw the objection.  But the objection is basically that

it is -- that there's just, you know, no timing related to that question and no specific mark related to that question.  So you know, you almost have to answer it in some form of a -- as far as we understand it.  So it's not really --

THE COURT:  Well, then, if you didn't understand it, that would be the response; right?  That we don't understand either the timing or the particular marks that are identified.  So that would be an appropriate response, that we can't answer because we don't understand what either of these mean, rather than an objection that we don't -- I mean, because I'm assuming, based on your answer, that you understood the timing and the marks to which they referred.  In other words, I don't think you can have it both ways.

MR. ZEGARELLI:  In that case, Your Honor, we can withdraw the objection.

THE COURT:  Well --

MR. ZEGARELLI:  The first sentence.

THE COURT:  Yeah, we're not going to read in the objection.

MR. NEISER:  I'm not sure I understood your position on this.  If you can clarify that for me, once we get rid of the objection.

MR. NEISER:  Once we get rid of the objection, the rest is fine, Your Honor.  Their answer is what their answer is.

THE COURT:  Okay.  So you're all right with the answer

other than that.  And you're all right with eliminating the objection?

MR. ZEGARELLI:  Yes.

THE COURT:  Okay.  All right.  Then you can read that in, if you choose to.

MR. NEISER:  Thank you.

THE COURT:  Okay.  So we have a little bit of time. So I don't know if either of you are prepared to begin discussing jury instructions, because we might as well use the time to do that.

MR. NEISER:  We can do that, Your Honor.

MR. ZEGARELLI:  Your Honor, also, I did send over an email, but when I went through the transcripts this weekend, there were three exhibits that I'd like to clarify and move them in, if --

THE COURT:  Would you discuss that, if you have it, with Mr. Neiser and just see whether you're in agreement as to those three and whether they were, in fact, used or not?

MR. NEISER:  Yeah.  I think that were -- they were used -- we still maintain our objection to the corporate registrations as not being relevant, and I still think they're irrelevant.  And I think they're misleading, substantially prejudicial and misleading, because they're legal conclusions that are being made in conjunction with them.  So if they weren't offered, you know, and we're still dealing with whether

or not they're in evidence, I would renew the objection to the extent one wasn't made.

As to the invoices, the invoices, I believe, were all used, and we wouldn't object to the introduction.

THE COURT:  And would you identify for me, Mr. Zegarelli, which are the registrations, what the exhibit numbers are on those, so I can take a look at them?  And then I'll resolve this.  But I haven't looked at them.

MR. NEISER:  Sure.

THE COURT:  And I'm not sure how they were used during your case.  So if there's anything you can tell me about that, that would be great.

MR. ZEGARELLI:  Sure, Your Honor.  I believe they are 108.

THE COURT:  Okay.

MR. ZEGARELLI:  And under 108 -- that is exhibit -- Trial Exhibit 108.  Now, if you remember, Your Honor, Trial Exhibit 108 was a significant exhibit of all of the -- the whole -- the whole corporate family.

THE COURT:  Right.

MR. ZEGARELLI:  At this point, that exhibit was limited to Savvy Dog and POM of Pennsylvania, both Wyoming.  The documents originally in 108, all of them -- none of them were certified.  The ones that were presented and used were certified.  So they -- you know, I think I said it at trial,

they're already authenticated by the governmental agency.

They were used particularly because, if you recall, there are assignment documents, particularly two documents -- and I believe those are 17 and 18 -- that have POM -- POM of Pennsylvania as a party signatory on January 1st of 2017.

The authenticated corporate records that were used indicate that POM did not exist until September of 2017.

So in and of itself, that's -- you know, that's a -- both a fact question and a legal question. But, nevertheless, that's the issue, is you have a document signed January 1, 2017, two of them, Exhibits 17 and 18. But POM did not exist on the date of the purported signature. And they are obviously relevant and important documents in the case, Your Honor.

THE COURT: Okay. So the two exhibits in 108 that you're now seeking to be admitted are the certified records of registration for Savvy Dog and POM of PA?

MR. ZEGARELLI: That's right, Your Honor.

THE COURT: Okay. And were both of them testified about?

MR. ZEGARELLI: I believe they were both testified. I know the POM of Pennsylvania was testified to. I believe Savvy Dog as well, Your Honor. I'd have to go back and look at the transcript.

THE COURT: Okay. Well, let's take a look at the transcript to see what testimony there was. And certainly I'm

happy to hear from you, Mr. Neiser.  I'm not going to make a ruling on this yet because I need to take a look at them as well.

MR. NEISER:  Sure, Your Honor.  You know, it isn't a fact question.  I don't think it's a fact question for the jury to resolve.  It's just not.  There's no -- the verdict slip that we were provided last night, there's no mention of that on the slip for a reason.  It's a question of law.  Two, it's misleading.  It doesn't matter.  I mean, look, this is a common law trademark.  It can be assigned -- they assigned theirs orally.  I mean, so we can do it any way we want.

In commercial practice, it is not an uncommon thing to set up or do a transaction for a later organized entity.  It just not uncommon.  As a matter of fact, it happens all the time, it's contemplated.

And, you know, it's -- a limited liability company is simply a creature of state law.  It functions as a partnership up until the time that it's organized.  So I don't quite think that it matters at all.  I understand the inference, and I understand, you know, on the side, Mr. Zegarelli said it was illegal.  That's just not true.

So the fact that -- the hint that this is an illegal transaction or somehow whenever there's no obligation whatsoever for us to act any differently than we did, I think is not only misleading, it's not even part of the case.

THE COURT: Okay.

MR. ZEGARELLI: Your Honor, first of all, the four documents being referenced with the signatures, if you recall two are notarized, two are unnotarized. The unnotarized ones, those were introduced by the POM Parties. So I didn't introduce them. They introduced them.

And the -- and if you recall, when they introduced them, they never went to the signature lines. They were authenticated on the intro only.

Nevertheless, it's a credibility issue. If you assign something orally, maybe you assign it orally. But if you purport to put something in writing, the writing needs to be -- needs to comport with the context.

So our position is that it's a simple fact question that you have a document. It was signed effective 1/1/17. Could not have -- could not have signed. It just -- it didn't exist to sign.

So Savvy Dog is perhaps less of an issue. But certainly POM Parties is, I think, a significant issue in the case, that there is a document purporting to have a signature when the signatory was not alive yet.

MR. NEISER: And, Judge, if we're going to put that type of argument in front of a jury without an instruction -- you know, the parties can do whatever they see fit or the legality of it or how it works under state law, whether it would

be Georgia, Wyoming, or Pennsylvania.  Now we're talking about a completely different animal.  Plus, unless I'm missing something, whether or not something is notarized isn't relevant.

Now, I understand there's this -- the theory that it's not an arm's-length transaction.  But now we're introducing to eight strangers from Western Pennsylvania the concept of an arm's-length transaction, the nuances of what may or may not need to be notarized under state law, the validity of assignments, and a number of other things that -- I mean, not only do they not make sense to me, I can't see how that's relevant and wouldn't be completely misleading to the jury.

I mean, the idea is that we're using these documents as a corporate shell game is just -- I mean, I guess if he wants to make that argument and confuse the jury further, great.  But I don't think that that would be fair to us because there's so many different layers of explanation underneath that has to be done, that I can't see how it's not misleading.

MR. ZEGARELLI:  I was just going to say, Your Honor, it's not that complicated.  It's -- it's just a simple question of common sense for a jury.  There's a signature on January 1st, '17.  The entity purporting to sign it did not exist.  It's just --

THE COURT:  I think it's a legal issue, though, isn't it?  It's not a fact issue for the jury.  It's a legal issue as to whether that is, therefore, a valid assignment, whether there

was ratification, what's required under the law.  I mean, I don't really see that as an issue for the jury.  I mean, there may be things that you could argue to the jury, but we're not going to give them a question about a legal issue.  That's the problem here.

You know, was there a valid assignment of the trademark rights to so-and-so is a legal issue, I think.

MR. ZEGARELLI:  Well, Your Honor, if you remember, there was testimony from, I believe it was from Mr. Pace, and his response to the conundrum was I have a good legal team.

MR. NEISER:  So?

MR. ZEGARELLI:  Well, I think the jury is -- you know, jury has already heard, has already seen, on your introduction of a document.  I think I'm entitled to cross-examine the merits of the document you introduced.  Part of that cross-examination is the signature.  I didn't introduce the document.  You introduced it.  So I think the question is just very basic from a question of credibility in and of itself.

You don't have to make a legal judgment on it.  You can just say that, for the weight it's worth, it's -- it's an issue that was unusual, did not comport with the notarized statements otherwise done, and it deals with the new party.

THE COURT:  But I think even the issue of notary would require a legal analysis, is all I'm saying.  I'm saying that I think some of these issues might be valid issues.  But they're

not issues for a jury to decide because the jury doesn't know notarized versus nonnotarized.  What the law requires or not with particular kinds of documents.

So to say to the jury, well, do the notarized -- I'm just making up a question -- do those documents effectively assign the rights to so-and-so?  That's a legal question.  And whether they were notarized or not and, therefore, the possible impact of that is also a legal question.

MR. ZEGARELLI:  I think they can make a judgment.  That question, I understand.  I think, though, they can make a judgment that the POM Parties were in the process of taking actions that simply don't add up factually on a very basic level.  There's a signature.  The entity didn't exist on the date purported by the document in the signature.  I mean, I don't think that's, like, very complicated.  It's, you know -- you know, the knife wasn't manufactured at the date that you're saying the knife killed somebody.  I mean, I think it's kind of a basic issue.

THE COURT:  Boy, I didn't know we had a murder going on.

MR. ZEGARELLI:  But you understand the point, Your Honor, is -- I mean, we don't have to understand a lot of technology about it.  It's just, you know, the knife wasn't manufactured yet, and you're purporting to say that this is -- this is the condition of the knife that didn't exist yet.  I

think it's a very basic question.

MR. NEISER: Judge, we're not talking about the knife. We're talking about whether or not the manufacturer had the right to manufacture the knife because he had -- didn't have an arm's-length transaction with his wife and whether or not the transaction was notarized.

And when we start -- if he's going to stand in front of the jury and start talking about whether things were notarized or not and for some reason they're continuing this grand conspiracy, I almost might want him to make that argument. Go crazy. I mean, based on how the jury reacted the first time, I hope he does it the second.

But I don't understand how we can put that in front of them without that being so unfairly prejudicial and -- it outweighs any probative value. I mean, it just doesn't -- it's just not there. And the fact that it's not in the jury instructions and the fact that it's not in the verdict slip -- we haven't completed it yet -- tells me that we may be getting into murkier waters than is necessary.

THE COURT: Well, I know there's no jury instruction on this issue. And there are facts in the record; those documents are in the record. They say what they say. So certainly those facts are there.

It's the legal implication of those facts that I'm concerned about because certainly you could say, Look, this

isn't notarized.  Here's this date; here's that date; these dates are not the same are.  You know, those are facts.

But the legal implication of those facts is a different thing.

MR. ZEGARELLI:  And, Your Honor, that's --

THE COURT:  And you can't argue that.  I'm sorry, I didn't mean to interrupt you.

MR. ZEGARELLI:  No, Your Honor.  The fact that those documents are in evidence, I think we were having a conversation because of the -- Exhibits 108.  But 108, certainly, I believe it's 108 one with regard to POM of Pennsylvania was testified to, Your Honor.  I believe both of them were.  But I do understand the point of the drawing a conclusion versus whatever those facts are, and the jury will put them together or they won't.

THE COURT:  Okay.  Well, let me look at the documents. Let me look at the testimony.  We'll resolve this issue today. But I want to look to see back at what was testified to, what document actually was testified, perhaps both of them.

Okay.

MR. ZEGARELLI:  Your Honor, I think that Mr. Cline's response was something about legal team.  So that would be the search term.

THE COURT:  Okay.

MR. ZEGARELLI:  In the transcript.

THE COURT:  Mr. Pace.

MR. ZEGARELLI:  I'm sorry, Mr. Pace.  I believe.

THE COURT:  Okay.  We'll take a look for that.

Off the record.

(Off the record.)

THE COURT:  You'll see, because we had some questions about whether certain things were appropriate, necessary, part of the case, I wanted to make sure that we understood the parties' position.  So I am happy to start on this wherever anyone has an objection or a comment.  Obviously, the initial instructions, happy to discuss them.  But they're fairly standard.

MR. NEISER:  We have nothing on the initial instructions, Your Honor, or on the burden of proof section or on the evidence section.

THE COURT:  Okay.

MR. ZEGARELLI:  And that takes us through to -- nor do we, Your Honor.

THE COURT:  Okay.

MR. ZEGARELLI:  That takes us through to where, section 4?

THE COURT:  Yeah, page 7.  And we can go page by page.  If someone has an objection, a comment, or whatever.  I don't want to foreclose that.  And we certainly may not finish this before 9:00, but we'll go back to it after that.

MR. NEISER:  Just checking any -- if I have any hidden notes here.

THE COURT:  Obviously, we'll take that footnote out. I just wanted to make sure you had some sense of the various topics that we're discussing.

MR. ZEGARELLI:  Your Honor, these -- some of this I recognize.  Although it's been a while and I haven't redlined it.  Were there sort of wholehearted deletions, or is this pretty close just from a -- from an overview?  Is this pretty close to what we submitted?

THE COURT:  We took what the parties submitted.  We have questions even with some of what the parties agreed to. Unfair competition is one that pops out at me.  You'd have to compare them.  Certainly, we did not adopt everything the parties gave us, and we revised certain things.  There was at least one place where the parties had indicated need something that we added because it wasn't there.  So, you know, you'd have to compare.

But we certainly did not take everything that the parties even agreed to.  We, at times, took something that one party had suggested or the other and, at other times, perhaps modified even the two to try and get them to be consistent.

MR. ZEGARELLI:  And, Your Honor, I do think these were submitted to you before.  There was at least one count withdrawn.  I think you mention the unfair competition, but is

that not withdrawn?

MR. NEISER:  Mine was withdrawn.  She only -- the instructions are only in your direction, not mine.

MR. ZEGARELLI:  Oh, okay.  Okay.  We'll get there.

THE COURT:  So anything anybody wants to talk about now, I'm happy to do it.  We'll certainly have more time to talk about it later.

MR. NEISER:  A, we have no issue with.  If we want to take them section by section, Your Honor.

THE COURT:  Sure.

MR. NEISER:  So we can just tick them off?

THE COURT:  Okay.  Any issues on part A that is -- starts on page 7 under trademark liability theories and policies?

MR. ZEGARELLI:  Not from PSG, Your Honor.

THE COURT:  Okay.  Then let's go to B.

MR. NEISER:  We have no issue with that, Your Honor.

THE COURT:  Take your time, too, both of you.  I mean, I want to make sure that, you know, we address any issues that anyone has.

MR. ZEGARELLI:  With regard to B, I would like to look at that particular clause against the original, if you don't mind, Your Honor?

THE COURT:  Okay.  So we'll come back to B later this morning.

MR. ZEGARELLI:  So from a timing issue, Your Honor, it appears that we will do closing arguments starting in the afternoon.

THE COURT:  It depends on whether we can get through closings, instructions, and have them start deliberating because I don't -- from your standpoint, I don't want to end with closings, for example, and have the instructions tomorrow.  And I also don't want to give instructions and have it be, like, 4:30 or 5:00 because then they're going to be leaving for the day without having done anything.  So it's, you know, it's flexible at this point.

MR. ZEGARELLI:  Okay.

THE COURT:  Just depending on how long it takes to get through these documents and when we think we would be ready to proceed.  I'll probably get lunch for them today, unless it's very clear that we're just not going to get there, and then we'll send them home with our apologies, and I'll address that with them.

MR. NEISER:  We have no issue with section C, Your Honor.

MR. ZEGARELLI:  Your honor, it does say Pennsylvania Skill Games does not have a claim for violation of the Pennsylvania Trademark Act.

THE COURT:  You don't.

MR. ZEGARELLI:  We don't; we understand that.

The issue would be whether or not there should be a statement that we -- there's a dispute over whether or not the claim for the violation of the trademark act is proper in light of PSG's position.

THE COURT:  On what?

MR. ZEGARELLI:  That their -- their filing of the Pennsylvania Trademark Act was improper.  I mean, that's -- or it's disputed, let us say.

MR. NEISER:  No evidence of it, Your Honor.

MR. ZEGARELLI:  Well, we would say that the -- that the filings, themselves, are evidence of it.

MR. NEISER:  No affirmative defense.  No evidence of it.  Those trademark applications under Section 8 are required to disclose other applications, and we did.

MR. ZEGARELLI:  And we do claim we're the owner of the mark.  So you can't file a trademark without -- unless you're owner of the mark.

MR. NEISER:  Not if I win.

MR. ZEGARELLI:  Well, therein lies the reason for the instruction.

MR. NEISER:  I object to the instruction, Your Honor.  They had time to put evidence in, and they had an affirmative defense they had to plead, and they didn't do it.

MR. ZEGARELLI:  I think we do have an affirmative defense that we own the mark.  I don't know how much more

affirmative you can get than saying you don't own the mark; we do.  And it is in the affirmative.

MR. NEISER:  You're claiming fraud in the application. That's a totally different animal.

MR. ZEGARELLI:  Well, but we have an affirmative defense, which is what you said, that we own the mark.  If we own the mark, then we dispute that you have a right to file under the Pennsylvania Trademark Act, and it should be so qualified.

MR. NEISER:  We're in a jury trial and we're at closings.  Of course everybody's opposing everybody's everything.  We don't need to have everybody's opposing everybody else's position here.

THE COURT:  Well, they do have a claim whether they have a -- whether the jury believes that that claim is sustained is a different issue, isn't it?  They have a claim.

MR. ZEGARELLI:  Yes, they do have a claim, Your Honor, and the question is whether or not it should be qualified in a manner that balances out the fact that the claim -- it's a disputed claim.

THE COURT:  Well, I think all of the claims here are disputed, aren't they?

MR. ZEGARELLI:  I think that's true, Your Honor.  But this is a statutory right that they're setting forth that we assert that statutory right shouldn't even be put before them.

MR. NEISER:  But it is.

MR. ZEGARELLI:  And I'm only saying that the instructions should indicate the qualified nature of the filing.

MR. NEISER:  We would object to any qualification.  I think it's a standard nouns and verbs instruction that identifies the claims.  If that's the case, then whenever we get to your unfair competition and other claims, that we should be free to assert objections, that it all should be qualified as well.  And I think that that would defeat the purpose of what we're trying to do here.  It indicates the jury is to the law to be applied to the facts.

MR. ZEGARELLI:  I think there's a difference if you file a trademark application, we come out of the blue, you know, it's just -- there's a context where that sort of unqualified instruction makes sense.  I don't think this is that particular context.

MR. NEISER:  But that's not the purpose of the instruction.  And I think that that would be such a deviation from what the instructions are intended to do and what these instructions actually do.

And I understand why your client may want that.  In the first version, they actually tried to assert that they had a Pennsylvania trademark claim when they clearly did not.  So I understand the motive.  But I think it is -- would be incredibly unfair because we have a claim that we asserted unchallenged,

unchallenged, unopposed, and we have the right to assert it as is and have a clear description of the elements for the jury.

MR. ZEGARELLI:  Okay.  Well, then, as we indicated in motion practice in open court, the particular statute you're relying on does not supersede common law rights which are still at issue in the case.  So perhaps a qualification that common law rights are still at issue as it relates to the statutory claim you've made.

In other words, you filed under the trademark act. The act itself says that it does not defeat a common law right. So the qualification would be fair.

MR. NEISER:  I don't think it is.

MR. ZEGARELLI:  Well, it's part of a statute.

MR. NEISER:  It doesn't matter.

MR. ZEGARELLI:  I think if you're going to say you filed under the statute, I think, you know, the qualification should say:  But the jury understands that the benefit of that statute is subject to common law rights in the dispute.

And that's -- that would be fine with us, Your Honor. Just a statement.  I don't have the actual reference, but there's an actual separate section of the Pennsylvania Trademark Act that actually says, this does not defeat the common law rights.

MR. NEISER:  The instructions says, "The elements of a claim for trademark infringement under federal law and under

Pennsylvania law are the same for purposes of assessing liability."

I'll provide additional information about each of these required elements.

I think that's sufficient.  It goes on.  It's just one piece of it.

And then the Court goes through and defines trademarks, trademark versus trade names.

MR. ZEGARELLI:  I'm looking at one before that. Paragraph before that.

MR. NEISER:  No, I understand that.  I get it.

THE COURT:  When we get together later on, if you have an actual suggestion of a statement, then you can provide that, and we'll make a decision about it.

MR. ZEGARELLI:  Thank you, Your Honor.

THE COURT:  All right.  Part D is just the definition of a trademark.  Any objection there?

MR. NEISER:  None from us, Your Honor.

MR. ZEGARELLI:  I would add the word "services." It says --

THE COURT:  Is it in the statute?

MR. ZEGARELLI:  It should be, Your Honor.  It should -- I mean, I would expect.  There's a whole volume of service marks as it relates to trademarks.  I don't know why it wouldn't be in the statute.  I believe it's goods and services.

THE COURT: If you want to take a look at the statute, and if it's in there and we're quoting from the statute, then --

All right. What about part E?

MR. NEISER: We don't have any -- we've reviewed this already, Your Honor. We have no objection to it.

MR. ZEGARELLI: That's fine, Your Honor.

THE COURT: Okay. Part F deals with senior user, and I wanted to see, first of all, if this is something the parties feel should be included. But there is also a distinction there between word and design trademarks.

MR. ZEGARELLI: I think it is important to include it. And I'll comment on -- are we looking at F, as in Frank?

THE COURT: Uh-huh.

For example in the second paragraph, it talks about trademark attached to the product or placed on it, so forth and so on. So there -- all of this talks about products. There may be a distinction between word and design. That was one of the things that we wanted to point out.

MR. ZEGARELLI: Your Honor, it probably should say identifies products or services.

THE COURT: Where are you?

MR. ZEGARELLI: I am in the second paragraph above G, which is, I think also the second paragraph in F. I'm sorry. Yes, second paragraph in F.

THE COURT: Okay.

MR. ZEGARELLI:  Third paragraph in F.

THE COURT:  Okay.  Where were you saying there should be another word in that paragraph?

MR. ZEGARELLI:  It says trademark to identify products or services.  That's all.

THE COURT:  I'm sorry.  I'm not following you.  Is this the paragraph starts with "If you find Pennsylvania Skill is inherently distinctive?"

MR. ZEGARELLI:  There --

THE COURT:  That's the third paragraph.

MR. ZEGARELLI:  Yes, Your Honor.

THE COURT:  Where are you suggesting that we add something in there?  Could you --

MR. ZEGARELLI:  On the right margin, at the word "products."  Oh, you may paginate differently.  I see, on the right margin --

THE COURT:  Read to me the part of the phrase that you want to add something, and then I'll be able to figure it out.

MR. ZEGARELLI:  Pennsylvania Skill, in all caps, as a trademark, perhaps second line, as a trademark to identify its products or services.  It could say and/or services.  And then that would follow, again, in the next line.  And the next line, actually.

THE COURT:  And in the next line?

MR. ZEGARELLI:  Yes, Your Honor.  It would --

THE COURT:  Everywhere it says "products."

MR. ZEGARELLI:  Products or services.  Thank you, Your Honor.

THE COURT:  Mr. Neiser, if you want to give that some thought, we can.  I mean, I know we're not going to get through all of this this morning.  Or right now, at least.

MR. NEISER:  No, I understand, Your Honor.  I think services is part of it.  We're confirming it right now.  I'm just not -- where is it.

MR. DEASY:  This is 1127.

MR. NEISER:  Point to me where I'm talking.  It says: To identify and distinguish his or her goods, including unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown.

And then the term service mark relates to services.

And I understand that, you know, some part -- the latter part of the case, including the instruction to the jury in the voir dire, that they wanted to insert game placement services, such -- whatever that is.  I don't even really know what that is.  But I don't think that that's appeared anywhere in the case so far.

All of a sudden, we have game placement -- unidentified game placement services that I don't believe are part of the definition in themselves.  This has always been

about products.

THE COURT:  Yeah, what services are at issue here?

MR. ZEGARELLI:  The operator.

THE COURT:  I don't understand.

MR. ZEGARELLI:  The operator services.

THE COURT:  But what does that have to do with the trademark?

MR. ZEGARELLI:  Because you can have your mark on games.  You can have your mark related to the services of games.  So -- and that's pretty basic in the trademark act, and that's why we had clarified it.

MR. NEISER:  Trademark Act but not in this case.

MR. ZEGARELLI:  Well, it is in this case.

MR. NEISER:  It's not a service mark.

MR. ZEGARELLI:  Well, you've concluded that on your own, Julian.

MR. NEISER:  I'm not going to read the English language.

MR. ZEGARELLI:  Well --

MR. NEISER:  Just because one says it's so doesn't mean that it is.  We're on -- this is the end of the trial and the evidence that's been put in.  There's been nothing mentioned about game placement services at this point.  And I don't even know -- I don't want to have keep going back to the complaint to figure out what PSG has alleged.

But, Your Honor, I think that -- that may not be the case.

THE COURT:  Okay.  I'll have to take a look at that. But I'm not aware of services being part of the testimony here.

MR. NEISER:  It has not, Your Honor.

THE COURT:  If you want to give that some thought, Mr. Zegarelli, we can do that.

How are we doing timewise?

MR. NEISER:  It's ten till, Your Honor.  Eight till.

THE COURT:  Okay.  Let's go through maybe one or two more, and then we'll stop.  I am going to mention, one of the things I did want to talk about these instructions, we've put in a number of defenses, and I'm not sure those defenses are necessarily relevant.  But they were part of your initial instructions, so you'll see them in there.  But they may or may not be relevant at this point.  So that's something I'd like to spend a little bit of time on later because we tried to be more inclusive than less.

MR. NEISER:  Yes, Your Honor.  We do have one that we would want to discuss.

THE COURT:  Okay.  Part G is just the elements and burden of proof.  Any issue there?

MR. NEISER:  We have no issue there, Your Honor.

MR. ZEGARELLI:  Subject to the other issues with regard to goods and services, no.

THE COURT:  Okay.  Meaning what?

MR. ZEGARELLI:  It says "the goods."  We would say, where it says "goods," it say "goods or services."  That's all.

THE COURT:  Let's maybe get through one more before I want to give you a chance.  And if we start a little bit later, it's fine.  I want to give you a chance to get in there and get ready.

Part H?

MR. NEISER:  We don't have an issue with -- that's under "validity."  We don't have an issue with that language, Your Honor.

MR. ZEGARELLI:  That's okay, Your Honor.

THE COURT:  All right.  We're going to go through one more, just because why not?  I'd like to -- I'd like to get through as much of this as we can, understanding we have a couple of issues already.

But what about part I?

MR. NEISER:  We have no problem with I, Your Honor.  I think it's pretty generic, nouns and verbs.

I will tell you, we have no issue with J either.

THE COURT:  Okay.  Well, let's see if we can get through I and J.

Mr. Zegarelli, subject to any comments you have.

MR. ZEGARELLI:  I and J, that's --

THE COURT:  Okay.  Then why don't we stop for now.

And, you know, we did put a couple of footnotes in about issues that we thought should be raised.

The defense is certainly something -- Mr. Zegarelli, we're going to need to know from you what your position is on the breach of contract and who the parties are to that breach of contract as I highlighted in our draft verdict form.  You don't have to say anything now.  But that's -- we need to instruct the jury about, you know, who the breach of contract claim is against.

MR. ZEGARELLI:  But, Your Honor, that still raises a conundrum.  POM of Pennsylvania has a breach of contract action against Pennsylvania Skill Games.

THE COURT:  Right.

MR. ZEGARELLI:  To the extent that contract exists, maybe that's a special verdict, Your Honor.  But to the extent that contract exists, we would counterclaim.  To the extent that contract does not exist -- I mean, we have a counterclaim on that contract from them, but our -- our other suit -- I mean, there's two suits going on.  I mean, as to that suit, we counterclaim against POM of Pennsylvania since they're -- they have a count of breach of contract.  In our suit, we have the initial claim without the counterclaim.

I'm not sure of -- you know, I don't know how to coordinate a claim of breach of contract.  I don't think my client -- because isn't that a legal question?  My client can't

waive a counterclaim as to somebody asserting a claim against them because if that claim is valid, then they have a counterclaim on that claim.  And, therefore, there's a claim against POM of Pennsylvania on the counterclaim.

But we are -- so it's sort of an alternative that we've talked about before.  But our primary case is Miele and Pace for which there's no counterclaim in the PSG case.

So again, Your Honor, it's -- we don't want to waive the counterclaim on the POM case.  So when you say who's it against -- and, you know, this has been said on the record multiple times.  Who is it against?  We assert it's against Pace and Miele.

But to the extent that POM of Pennsylvania has the legal right to bring a breach of contract claim, that presupposes that contract exists, and if that's the case, we would have a counterclaim on that basis.

Again, it's just -- I mean, you know, where is that potato?  We say it's with Pace and Miele.  But if we're wrong, then we need to preserve our rights even if in the alternative, Your Honor.

THE COURT:  Okay.

Mr Neiser, do you want to comment now?

MR. NEISER:  Very briefly.  I understand.  I mean, we raised a contract claim against them.  And our position is that POM stepped in the shoes of Pace-O-Matic.  So if -- I can

simplify this.  If he wants to raise a breach of contract claim against POM of Pennsylvania, they're not really named in the contract themselves.  I think we have a right of enforcement of the agreement, but we may not have liability.  We're not a signatory to the contract.

Savvy Dog shouldn't be part of it at all.  I mean, there's no basis for Savvy Dog to be there.

MR. ZEGARELLI:  Well, they're -- they're actually not a party to the breach of contract, the way it was pled.

MR. NEISER:  No, that's fine.  I just wanted to make it clear.  But the way it's pled, neither is POM of Pennsylvania.

THE COURT:  Okay.  But POM is seeking --

MR. NEISER:  To enforce --

THE COURT:   -- a claim under the EPA.

MR. NEISER:  Yes, Your Honor.  So I can see how we could --

THE COURT:  So it's hard to argue.

MR. NEISER:  It's hard to argue.

THE COURT:  Okay.  Is there a course of dealing between PSG and POM as it relates to the EPA?

MR. NEISER:  PSG and POM --

THE COURT:  In other words, did the parties continue to transact business under the contract after -- as between POM and PSG?

MR. NEISER:  Yeah, I think they probably did.  I mean, they -- they're as -- you know, as the successor in interest.  I mean, there were equipment -- there was equipment that was sold.  There were fills that were sold.  But that's primarily through Miele.  Whether it's directly or a fiction, it doesn't really matter.

So what I'm saying is that, if we need to have the breach of contract against POM, then I would understand why that would happen.  I just don't see how it would be Savvy Dog.  That's all.

MR. ZEGARELLI:  No, it's not -- okay.  And I --

THE COURT:  So are you -- and without binding you to this position, at least at this point in the morning, are you comfortable with a jury instruction or -- I'm sorry -- well, with a jury instruction and the verdict slip that says you're bringing a breach of contract against those three parties?

MR. ZEGARELLI:  Yes.

THE COURT:  Okay.

MR. NEISER:  That would be fine, Your Honor.

MR. ZEGARELLI:  Because it's a counterclaim in the POM case.

THE COURT:  I think even, to be fair, I think the counterclaim does include Savvy Dog.  But I don't see any basis for that, frankly.

MR. ZEGARELLI:  That may have just been a drafting

issue.

THE COURT: Well, you know, at the time drafted, you know, three or four years ago. Things change over time.

So we're in agreement that the breach is those three parties. You're asserting a claim under the EPA on behalf of POM?

MR. NEISER: Yes, Your Honor.

MR. ZEGARELLI: And there's no claim by Miele or Pace.

THE COURT: Right. Right. It's just POM on that.

MR. NEISER: Yep.

THE COURT: Okay. So we'll look at the instructions, see if there's anything we need to say there. Certainly, you can tell them, you know, the nature of your claims. I'll take a look at the instructions when we have a chance.

Why don't we get started, get through this. You can decide whether you want to call Mr. Unis. So when we're done with the rebuttal case, I'll just ask you, is there any surrebuttal? And you can tell me, and if there is, we will go forward with that.

MR. ZEGARELLI: Your Honor, should I at least -- I think there was an issue with Mr. Neiser with regard to Exhibit 108. Should I read, at least to clarify for the record, the Exhibit 275 and 276, which are the invoices?

THE COURT: I think you can do it here. I don't think we need to do it out there.

MR. ZEGARELLI:  That's fine.

THE COURT:  Okay.

MR. ZEGARELLI:  So we deem those two admitted, and we are reserving on 108?

MR. NEISER:  Yeah.  The only exhibits we had objections to are the filings from Wyoming and the certified copy.  The other ones, we went through, and it would be unfair of me to say otherwise.

THE COURT:  Okay.  One other thing, quickly, I just wanted to remind everybody of is that you're going to have to compile the exhibits that are going to the jury.  And I wouldn't hesitate to start doing that.

MR. NEISER:  Can you provide just a 15-second update?  Tell us what we did.

MR. DEASY:  So, Your Honor, what we did is we went through the transcripts from the last five days of trial testimony and compiled what seems to be a -- close to a final list, if not a final list, of exhibits here.

This is an Excel sheet.

MR. NEISER:  Do we have an extra copy for Mr. Zegarelli?

MR. DEASY:  We do.

MR. NEISER:  We also have a flash drive with the files themselves, and we are also having a printed binder compiled.

THE COURT:  Good.  Because I think, given the number

of exhibits, having them in a binder would be helpful to them rather than just giving them a big stack, which might suggest it would be difficult for them to look through those.

So we don't have to get this all resolved now, but thank you for doing that. We've been keeping, all three of us on our end, a list. So we'll compare that with ours. I doubt if there will be much of an issue. I think we just have to resolve the Exhibit 108 and see what the testimony was there.

MR. NEISER: Your Honor, that binder should be here, I expect --

MR. DEASY: Hopefully now.

MR. NEISER: -- hopefully now. And we can deliver -- we'll bring it into the courtroom, and Mr. Zegarelli can review, and we can all work -- roll up our sleeves.

THE COURT: That's fine. I mean, we'll obviously be taking a break, and we'll get that wrapped up.

But I think, first order of business, let's get all our instructions finalized. We'll do that as soon as we're done with the testimony.

And then certainly you'll have plenty of time to take a look through the exhibits to make sure that we're all on the same page with respect to those.

MR. ZEGARELLI: Did you pull some of the cover letters? Just curious. We'll check --

MR. NEISER: That, I don't know.

MR. ZEGARELLI:  -- the exhibits in the heat of the moment.

MR. DEASY:  I did pull one cover page.

MR. ZEGARELLI:  Okay.

THE COURT:  Well, let's get everybody settled.  We'll check in with you to make sure everyone's ready, and then we'll get started.

(Whereupon, in chambers session ended.)

(Pause as the jury enters courtroom.)

THE COURT:  Good morning, ladies and gentlemen.  I hope you had a good weekend, and nice to see you here this morning.

Mr. Neiser, are you prepared to proceed with your rebuttal case?

MR. NEISER:  Yes, Your Honor.  Very, very, very short rebuttal.  And, first, we would like to read in the deposition designation of Marvin Harris.

THE COURT:  All right.  And I understand Mr. Deasy is going to be Mr. Harris for this morning.  All right, Mr. Deasy.

Ladies and gentlemen, just as a reminder, this deposition was taken during discovery.  The witness is not available to testify.  So we will be reading in the questions and the answers exactly as they appear in the deposition transcript.

MR. NEISER:  May I proceed, Your Honor?

THE COURT:  Yes.

(Deposition read in.)

"Question:  Mr. Harris, this is Julian Neiser.  I'm an attorney with Spilman Thomas & Battle, and I represent Pace-O-Matic Inc., Miele Manufacturing Inc., POM of Pennsylvania, and Savvy Dog Systems.

"I'm joined today with Greg Cline, who is the general counsel of Pace-O-Matic, Inc.

"Answer:  Okay.

"Question:  Okay.  So tell me what you did for him.

"Answer:  Well, the main thing as far as with this here, I was pretty much hired just for reputation purposes really.  Because he as far as compliance, he had already did everything he could do as far as getting the machines or get his PA Skill games that had compliance with the rules and regulations.  So I was there, you know, with my background, with my, you know, law enforcement background, military.  I was there just to enhance, you know, his business.

"Question:  And what was his business?

"Answer:  Well, the Unis family is known throughout Lawrence County, Beaver County, and probably some more counties as far as pool tables, dart games, Mega games, you know, all of the games, you know, fireworks, everything.  So they are well-known, the Unis family is well-known.

"Question:  Okay.  So when you said you worked for

Albert, did you work for a company of his, or did you work for him directly?

"Answer:  I really, as far as the company, we were pretty much was told to me as far as the PA Skill games that he's trying to promote.  As far as the company, I couldn't tell you about a company.  I really don't know about a company.

"Question:  Okay.  So did he pay you?

"Answer:  No, no, no.  I received no moneys.  We ate pretty good, you know, a few times, we ate good, very well.  And this was, like, from the -- from the grassroots level, ground roots, and I'm doing this hopefully, you know, to once again kick off or did well, that, you know, that he could remember me back since I was retired and all.

"Question:  Here, so let me get this straight.  You working for Mr. Unis, for Albert Unis, you never received a pay check itself?

"Answer:  Correct.

"Question:  And you're saying this is in, what, the 2000, 2009 time frame?

"Answer:  From what I recall, sir, I mean, the beginning, yes, sir, somewhere around there.

"Question:  Do you remember any time that Albie Unis, his son, became involved in the business?

"Answer:  Yes, sir.  Yes, sir.

"Question:  Do you remember approximately when that

was.

"Answer:  I know it was a few years later.  I would totally be guessing.  '13, I mean, 2013, '14, somewhere around there.

"Question:  So are you familiar with a company called Pace-O-Matic?

"Answer:  Yes, sir.  Yes, I am.

"Question:  How so?

"Answer:  Well, I met Albie down in Georgia one time. I was working down there, and somebody had asked, did I mind meeting him there?  So I met him down there somewhere, Norcross, maybe.

"Question:  This is when you went to the Pace-O-Matic offices in Georgia?

"Answer:  Yes, sir.  Yes, sir.

"Question:  So I want to get back to that meeting with Pace, but were you aware that there was a business called Pennsylvania Skill Games?

"Answer:  A business?

"Question:  Yes.  A company called that or a business.

"Answer:  I don't know if it was a company or something.  They were just trying to get the PA Skill games put on the machines.  It's like a case law.  I don't know if it was a company.

"Question:  So are you familiar with what's called a

controlled pickup for a gaming machine?

"Answer:  A controlled pickup, no, sir.

"Question:  Are you aware that a Pace-O-Matic machine was placed in the American Italian Club in Beaver County to be picked up by the state police?

"Answer:  No, sir.

"Question:  Are you aware that there was a court case in Beaver County that held that the Pace-O-Matic game that was picked up in that controlled pickup was a legal game of skill?

"Answer:  No, sir.

"Question:  Okay.  Do you have any knowledge of Albert Unis's involvement, if at all, in that controlled pickup?

"Answer:  No, sir.

"Question:  So I'm looking at a website right now, and I don't need you to look at it.  I just have a couple of questions for you.

"Answer:  All right.

"Question:  Are you aware that you are listed as vice president for compliance of Pennsylvania Skill Games on an Internet site?

"Answer:  I believe I was president of compliance, yes, sir.

"Question:  Are you still doing work for Pennsylvania Skill Games?

"Answer:  I'm unemployed now, sir.  I mean, if I had

to talk to someone to -- if they knew me in the area or someone still knows me in the area, I would do that.  But I never receive a call.  So -- but no.

"Question:  So the reason why I'm asking is it's a current website, and you're listed as -- and it may just be old. I'm not sure.  I'm only asking you this because we need to clear up a few things in the lawsuit.  And it has a picture of you, and it says, 'Marvin Harris has been working with Pennsylvania Skill Games since 2010.'  It describes your --

"So let me ask you a couple of questions from what's written on this page, and you can tell me if you agree with them or not and give me any commentary you'd like.

"It states that, 'Marvin Harris and the president of Pennsylvania Skill Games, which is currently based in Beaver and Lawrence County, Pennsylvania, have researched how this company impacts the community and its constituents.'

"Can you tell me about the research on how the company impacts the community and its constituents?

"Answer:  You'd have to refer that back to Albert.

"Question:  So you don't know what that means?

"Answer:  No.  Refer that back to Albert, sir.

"Question:  Okay.  It says that they have -- that means Marvin Harris and the president of Pennsylvania Skill Games -- have solicited the county's district attorney, chief of police, and the Pennsylvania State Police to ensure that the

Pennsylvania Skill Games company is in compliance and is welcomed and supported.

"Can you tell me what that means, sir?

"Answer:  Yes.  I did -- myself and Albert, we did meet with the chief of police in Lawrence County and also -- we met him at his office.  I do recall that.

"Question:  Okay.

"Answer:  And I think the DA also.

"Question:  Okay.

"Answer:  Yes.

"Question:  And what was the purpose?

"Answer:  What's that?  I'm sorry.  Go ahead, sir.

"Question:  No, you go ahead.  I'm sorry.

"Answer:  Like I said, we did meet with the chief of police.  One that I specifically recall, the one in Lawrence County, the DA there.  We met with other law enforcement in Beaver County also.  I can't give you the dates or the names, but, yes, we did.  I talked to them, talked to them about the PA Skill Games and them being legal and showing them the case law on the games.

"Question:  So what did you talk to them about?  Tell me generally what you were speaking to them about.

"Answer:  I was referring back to case law that was provided, showing that it had been proved that the skill games were legal in Pennsylvania.  That's pretty much it.

"Question:  And who provided you with that case law?

"Answer:  Albert.

"Question:  Albert senior or junior?

"Answer:  Senior.

"Question:  So what exactly was required of you as the vice president of compliance for Pennsylvania Skill Games?

"Answer:  I was the face.

"Question:  You were what?

"Answer:  I was pretty much a face, you know, trying to -- as far as the reputation because everyone knew me in both Beaver County and the area.  So reputation purposes.

"Question:  But tell me just because -- and the only reason I ask is, you were there back then -- and I have some questions about some other things -- but only you can tell me what that means and what that -- and give me some context.

"So I'm not trying to trick you or anything like that. I'm just trying to understand.  When you say 'a face' and you say you're there for reputation purposes, what does that mean?

"Answer:  If we would go out and try to solicit a place, you know -- see, just to justify, you know, people go on your parents, people go on your resume.

"Question:  Okay.

"Answer:  And we went and visited some places, and if there was any questions, if they had any questions, they would, you know, contact me or contact Albert, and we would, you

know -- because then there would be evidence that we had.

"Question:  Okay.

"Answer:  I never, never got contacted.  After our initial contact, I don't know if they -- you know, people would say, Well, I'll get back with you.  I never really followed back on that.  You'll have to ask Al Senior in regards to that.

"Question:  Let me ask you, when you say 'nobody' -- you mentioned this a couple of times actually, that nobody contacted you, what do you mean?  Who would be contacting you?

"Answer:  If there was some compliance issues, if someone wasn't happy with or someone had questions.

"Question:  I see.

"Answer:  About the legality, I guess.

"Question:  Got it.  So nobody ever contacted you about compliance issues?

"Answer:  Correct.

"Question:  Real quick, do you know a company called Miele Manufacturing?

"Answer:  Not offhand, no, sir.  No, sir.

"Question:  How about a company called POM of Pennsylvania, LLC?

"Answer:  Not that I recall, sir.

"Question:  Do you remember a gentleman named Ray Rapco?

"Answer:  I'm old, sir.  I have no clue.

"Question:  Do you recall anybody from Pace-O-Matic making promises to anybody that either of the Unises or Pennsylvania Skill would have an exclusive deal anywhere?

"Answer:  The only contact I had with Pace-O-Matic -- I don't know.  There was two gentlemen there, and Albie and the one gentleman, they were on the other side of the office, I guess, discussing what they were discussing, and me and the other guy, we were just BS'ing a little bit.  But to your question again, have I -- did I ever hear anyone ever promise anything?

"Question:  Yes.

"Answer:  Not that I recall, sir.  No, sir.

"Question:  And I mean anywhere, regarding Beaver County or Lawrence County?

"Answer:  Not that I recall.

"Question:  Okay.  Did you ever do any sales work for Albert or Albie Unis or Pennsylvania Skill Games?

"Answer:  Sales?

"Question:  Sales.  Like did you ever go out to locations and try and get locations to agree to put the game out?

"Answer:  Yes, sir.  Yes, sir.

"Question:  Do you remember when you did that?

"Answer:  That was in the -- I guess the beginning phases.

"Question:  Okay.  If you can try and remember, and I know it's a long time ago, but the dates are kind of important.  And, again, you were there, and I was not.

"Here, let's start with this.  Tell me what you did with respect to talking to locations to see if they would be willing to put the games out.

"Answer:  Pretty much like with any other piece of, I guess, amusement equipment.  I think it's based on, I want to say a percentage.

"Question:  Okay.

"Answer:  Just after going over the case law, just pretty much asking them would they be interested, you know, putting the game in their location.

"Question:  Okay.

"Answer:  I wasn't really a whole -- you know, nothing in depth.  Just presenting because most places knew what they wanted anyway.

"Question:  Here, let me back up for one second.  When you say put a machine or game out -- I can't remember what words you used -- were we talking about the game that was legal because of the Court opinion, or was it some other type of game?

"Answer:  The Unises, they had all kinds of games.  Like I say, pool tables, dart games.  Like I said, a lot of times, I was just there with Albie, Albert Sr., you know, with him.

"Question:  Was Albie with you, or are you talking about being out with Albert only?

"Answer:  I'm trying to recall.  If they was, it was a time or time with Albie Jr., you know.  But the big part, I dealt with Al Sr.

"Question:  How many locations do you think you went into total?

"Answer:  It's hard to say.  10, 15.

"Question:  Would it be more than 15?

"Answer:  I couldn't -- it's close to that.  Closer to that.  I couldn't --

"Question:  Here, let me ask you this --

"Answer:  As far as myself?

"Question:  No, I understand.  More than 25 or less than 25?

"Answer:  Me, personally?

"Question:  Yes.

"Answer:  Probably -- me, personally, probably a little less than 25.  Me, personally.

"Question:  What about anybody else, location?

"Answer:  As far as what?

"Question:  The number of locations, let's say, that Albert went to, if you know?

"Answer:  I have no clue.  No clue at all.

"Question:  Did you ever give -- so here, let me ask

in this way.  How did you know what locations to go to?

"Answer:  Because I'm familiar with the area.

"Question:  Okay.  And give me an example.  What types of locations would you go to?  What types of businesses?

"Answer:  As far as restaurant -- restaurants/bars.

"Question: And did you ever see the games or the machines that would be put into these locations?

"Answer:  Yes, sir.

"Question: What did they look like?

"Answer:  They're regular machines where you could take the game you wanted to play, it's in a cabinet, and that's pretty much it, I mean.

"Question:  Do you recall if there was a graphic or a logo on those machines?

"Answer:  Well, all of the games was supposed to have the PA Skill Games logo on it.  I mean, they would be -- it wasn't one precise one.  I mean, so I guess it was just on the PA Skill Games.  They were different colors, from what I recall.

"Question:  Were those the Pace-O-Matic games, the ones that were legalized by that decision?

"Answer:  I have no clue, sir.

"Question:  Got it.  Did you ever -- when you met with the location, did you ever give them any marketing or advertising brochures?

"Answer:  I think you got to ask Albert.  I don't

recall.

"Question:  Do you recall ever trying to visit a location and place games in that location but you couldn't do it because there was another operator there already?

"Answer:  I believe a time or two, yes, sir.

"Question:  More than once or twice?

"Answer:  A couple of times.  A few times.

"Question:  So tell me about those two times.

"Answer:  I said a few times.

"Question:  A few times?

"Answer:  Correct.  In fact, it was myself and Albert would go in there and the owner of the establishment or whatever would just say that they have a vendor.  I believe that's what they -- a vendor.  And they were happy with their vendor right now.  And that's when I stopped and that was it.

"Question:  Do you recall, during that visit to Georgia or at any time that somebody from Pace-O-Matic tried to make Albie sign a contract that would result in him giving up rights to the name of his business?

"Answer:  I don't recall meeting.  When we exited the building, I believe he said that he wanted to sign something, but I didn't go into the meeting with him, Albie.  He just said something they wanted me to sign, and I wouldn't sign.  And I said, okay, well, I don't know what -- I said, are you okay?  We both were apart.

THE COURT:  Before we go on, I think there was a word that was misstated.  The word "wanted" should be "wouldn't."

So could you read that answer again, Mr. Deasy?

MR. DEASY:  I'm sorry, Your Honor.

THE COURT:  That's all right.

"Answer:  I don't recall meeting.  When we exited the building, I believe he said that he wouldn't sign something, but I didn't go into it with him, Albie.  But he just said something about they wanted me to sign, and I wouldn't sign.  And I said okay, well, I don't know what -- I said, Are you okay?  We both were apart.

"Question:  Would you say there's a lot of locations in Beaver County where you can place games?

"Answer:  There's a lot of bars in Beaver County, yes.

"Question:  But of all of the bars that are out there and restaurants and other locations, just to make sure I understand, your testimony is you visited fewer than 25 of them?

"Answer:  Myself?

"Question:  Yes.

"Answer:  Myself, yes.

"Question:  Are you aware of how many other -- and of those 25 that you went to, or fewer than 25, you said that there were a few where there was another operator already servicing those locations.  Is that fair?

"Answer:  Yes, sir.

"Question:  When you say a few, is it more than five or fewer than five?

"Answer:  I would say -- I mean, I would say more than five.  I mean, I don't know.  You know, it's more than five, though.

"Question:  More than ten?

"Answer:  I mean, once you start getting into that, I don't recall.  I don't recall.

"Question:  Would it be fair to say it would be just a guess by you, you're not sure exactly however many?

"Answer:  Exactly.  Yes, sir.

"Question:  That's fair enough.  When you went to these locations, were you also trying to place, let's say, other coin-operated machines that Albert Unis had?  Or were they all --

"Answer:  We had mentioned, I think, dart boards, pool tables, stuff like that.

"Question:  Okay.  When you went out to these locations, you were trying also to sell, or you were trying to place any number of different games or -- yeah, any number of different games in these locations?

"Answer:  Whatever that -- if they needed anything.  Basically, they pretty much also let you know anyway.

"Question:  Got it.  Did you ever meet Michael Pace?

"Answer:  Not to my knowledge.

"Question:  Mr. Harris, a quick question.  Do you recall Albert or Albie ever saying that they developed a skill game with anybody from Pace-O-Matic?

"Answer:  It's been so long.  I don't recall.

"Question:  Okay.  Do you remember Albert or Albie telling you how they got involved with Pace-O-Matic?

"Answer:  No.  No, I don't.  No, sir."

MR. NEISER:  Your Honor, thus concludes the deposition designations from the deposition of Marvin Harris, dated January 20, 2021.

THE COURT:  All right.  Thank you, Mr. Neiser.  Thank you, Mr. Deasy.

THE COURT:  You may call your next witness.

MR. NEISER:  Lou Miele, please.

THE CLERK:  Sir, please raise your right hand.

LOUIS MIELE, a witness herein, having been first duly sworn, was examined and testified as follows:

THE CLERK:  Thank you.

MR. NEISER:  May I proceed, Your Honor.

THE COURT:  Yes, Mr. Neiser.

DIRECT EXAMINATION

BY MR. NEISER:

Q.  Mr. Miele, good morning.  How are you?

A.  Good.  Good morning.

Q.  Good to see you again.

A.    Yes.

Q.    Sir, we just want to briefly touch on some statements that were made during Pennsylvania Skill Games' case-in-chief last week.

I believe there was testimony from Mr. Unis IV that the Unises were the only operators operating the Pennsylvania Skill Games in early 2015.  Is that a true statement?

A.    No, sir.

Q.    Could you please explain why it is not.

A.    Well, in 2015, we had sold 660 machines, so there's no way possible they were the only operators.  And in the beginning, I know we sold our first sale -- my first sale was to a company in Lewistown for, I think, 20 machines.

Q.    Understood.  Were there activities -- sales marketing activities for the Pennsylvania Skill Games with the Pace software happening throughout the Commonwealth of Pennsylvania, even at the earliest stages of 2015?

A.    Yes.  I would send out a lot of email flyers to all of the operators.  PAMMA meetings, I'd be talking to all the operators at the PAMMA meetings.  I was on the board at the time; so I talked to them about it.  And then I do a lot of door-to-door, shaking hands, and going with the operator to a location and talking to the location about it and answering their questions they would have about the project because this was a brand-new product.  And people didn't understand how this

was legal.

Q.    Okay.  So I believe the testimony -- at least the suggestion is that the success of the Pennsylvania market for Pace and Miele and later for POM of Pennsylvania, was dependent upon the Unises.  Is that true or false?

A.    That's false.

Q.    Tell us why.

A.    They had absolutely no involvement with any of our efforts to promote the product and educate the operators and locations, zero.

Q.    And how important is it to put games out for branding the machines and increasing sales?

A.    It's very important because you -- you need to -- when you're putting something new into our market, you need to teach the patrons at the location.  They need to see it.  They need to see it repetitively at different locations.  So you need to get that branding out there so they recognize it.  And they may not touch it in the first place they go to.  They see it somewhere else, they're going to recognize it, they're going to start getting curious about it.  So you build curiosity of a product and eventually, they'll come to you.

Q.    Were you in conjunction with Pace at the time engaging in those efforts throughout the Commonwealth of Pennsylvania?

A.    Yes, sir.

Q.    Not just Beaver County?

A.    Not just Beaver County.

Q.    Were you dependent upon Beaver County to enlarge, expand, and build your sales base in Pennsylvania?

A.    No, not at all.

MR. NEISER:  No further questions, Your Honor.

THE COURT:  Thank you.  Mr. Zegarelli?

MR. ZEGARELLI:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. ZEGARELLI:

Q.    Mr. Miele, in the year 2015, other than with the Unises, Pennsylvania Skill Games, when is the first invoice for a sale into Beaver County?

A.    There wasn't one.  Zero.

Q.    Thank you.

MR. NEISER:  Brief redirect?

THE COURT:  Yes.

REDIRECT EXAMINATION

BY MR. NEISER:

Q.    Sir, there was some invoices that demonstrated sales to operators with a delivery address in Beaver County.  Are you aware of those?

A.    Yes.

Q.    Just because a machine is sold to a delivery address in Beaver County, does that mean the game is actually located in Beaver County?

A.    Not at all.

Q.    Explain that, please.

A.    We deliver them to the operators' location, but we have no -- going back to my other testimony, we have no idea where they choose to operate these and who they choose to operate them with.

Q.    Okay.  Are you aware of delivery of machines to Mr. Unis IV to his home?

A.    To Albert --

Q.    Unis IV?

A.    The IV.  Yes, his home as well, yes.  Correct.

Q.    Do you know whether or not all of those machines are located in Beaver County?

A.    I have no idea where those machines got installed at all.

Q.    Understood.

      MR. NEISER:  Thank you.  Nothing further, Your Honor.

      THE COURT:  All right.

      Mr. Zegarelli, anything further?

                    RECROSS-EXAMINATION

BY MR. ZEGARELLI:

Q.    Mr. Miele, do you recall receiving a cease and desist letter with regard to Mac Vending?

A.    I don't recall it clearly.

Q.    Do you recall it at all?

A.    I'd have to say no, I don't.

Q.    Okay.  Do you recall receiving a cease and desist letter with regard to Pro ATM?

A.    I don't recall any cease and desist letters.

MR. ZEGARELLI:  No further questions.

THE COURT:  All right.

Mr. Miele, thank you very much.  You can step down.

THE WITNESS:  Thank you.

(Witness excused.)

THE COURT:  Anything further, Mr. Neiser?

MR. NEISER:  Nothing further, Your Honor.

THE COURT:  All right.  There's nothing you wanted to read into the record, then?

MR. NEISER:  Your Honor, actually, we wanted to read the answer to requests for admission 17.

THE COURT:  All right.  Ladies and gentlemen, there is something in the Federal Rules of Civil Procedure called requests for admissions.  That is a written statement that you serve upon the opposing party, and you ask them to admit or deny the truth of that statement.  Certain requests for admissions were served by Mr. Neiser's clients upon Mr. Zegarelli's client, Pennsylvania Skill Games.  These are under oath.

And it's my understanding, Mr. Neiser, that you wish to read one of those requests and the answer to that request by Pennsylvania Skill Games into the record?

MR. NEISER:  Yes, Your Honor.

THE COURT:  All right.  You can proceed when you are ready to do so.

MR. NEISER:  Thank you, Your Honor.

"Admit that you use the word mark, Pennsylvania Skill, or the stylized mark, Pennsylvania Skill, on electronic gaming machines that do not run or operate on Pace softer software.

"Pennsylvania Skill Games admits that it has lawfully used the terms containing 'Pennsylvania Skill' as its own trademark in both a word and stylized form since at least as early as 2010 and prior to 2015, when Pace-O-Matic software was released into the Pennsylvania market, in conjunction with electronic gaming machines that it operates and some of which do not run Pace-O-Matic software."

THE COURT:  I believe it says "run or operate."

MR. NEISER:  I'm sorry.  I thought that's what I said, Your Honor.

THE COURT:  That's all right.

MR. NEISER:  "Do not run or operate Pace-O-Matic software."

THE COURT:  Thank you, Mr. Neiser.

MR. NEISER:  That's it for us, Your Honor.

THE COURT:  So, Mr. Neiser, you have concluded your rebuttal case.

Mr. Zegarelli, do you have any surrebuttal that you

wish to present?

MR. ZEGARELLI:  We do not, Your Honor.  Thank you.

THE COURT:  Then, ladies and gentlemen, we are done with all of the testimony in this phase of the trial.  As I mentioned earlier, there are two phases, and we are about to conclude phase I.

We have some matters that we need to address with the attorneys that relate to the instructions that you will be given and the verdict slip that you will be given.  Those instructions will be provided to you after both counsel have an opportunity to deliver a closing statement to you.

Because these relate to certain legal issues that we have to address now, we're going to take a break to do that.  We certainly respect your time.  We will see how far we can get with that, and I will be back in touch with you about timing.  But we're going to take a break at this point.  And as soon as we know what the status is of the discussions about these legal matters, I will advise you of that, and we'll see where we're going today.

With that, we're going to take a recess at this point, and as soon as I have a better sense of the timing, I'll certainly let you know all -- all of you know that.  All right.  Thank you.

THE CLERK:  All rise.  This Court is in recess.

(Pause as the jury exits courtroom.)

(Whereupon, the following discussion was held in chambers.)

THE COURT: I wanted to mention to everyone that Ms. Hopkinson has the jury instructions to which the parties agreed, and where the parties have agreed, we're going to use that instruction without parsing through various language. So if the parties previously agreed on an instruction, it seems to me that unless the case has changed in some way, that we're going to use that same instruction, subject obviously to your input on that.

I don't know, Charlotte, whether there's already been something that the parties agreed to that --

THE CLERK: There's section D on page 9. The definition of trademark was taken from the parties' proposal, and they both agreed upon it.

MR. NEISER: Can we pause for just one second? We have one additional comment on the senior user, which was F, that I think --

THE COURT: Why don't we deal with D first, and then we'll go to F.

MR. NEISER: I'm sorry. We thought we were already -- I'm sorry. I misunderstood.

THE COURT: That's okay.

MR. NEISER: Go ahead. I'm sorry.

THE COURT: We're going to use the definition that's there because that's what the parties agreed to unless there's

some reason to deviate from that that anyone wants to explain to me.

MR. NEISER:  No from us, Your Honor.

MR. ZEGARELLI:  No, Your Honor.

THE COURT:  No?  Okay.  All right.  Then let's go to senior user, which is section F.

MR. NEISER:  Your Honor, the only thing that we want to add -- and I'm going to let Mr. Deasy take the laboring oar on this.  I think that we need to have, as part of the instruction, I believe, at the end of the second paragraph, reference to the definition of "use," because use is different from ownership.

Go ahead and explain the rationale to the Court.

MR. DEASY:  Thanks, Julian.

My understanding is that when we're looking at use in the Third Circuit, is you have priority of use, and then you have market penetration, and those two components make up ownership of the mark.

And in -- now, we have for, I believe, priority here, because that's, you know, the general -- the "first in time, first in right" standard.  But the market penetration element or component is kind of missing from the instruction, and those are the four factors that were first announced in -- it's Natural Footwear Limited v. Hart Schnaffer & Marx.  And that's 760 F.2d 1383 (3d Cir. 1985).

And those factors, there's -- and I'm quoting from Lucent Information Management that's quoting Natural Footwear. They said they measure use by the four-factor test of Natural Footwear, and those factors are:  the volume of sales of the trademark product; the gross trends, both positive and negative in the area; the number of persons actually purchasing the product in relation to the potential number of customers; and the amount of product advertised in the area.

THE COURT:  So what are you suggesting would be changed or added to this instruction?

MR. DEASY:  I think for, at the end of the second paragraph, where the instruction says, "If the trademark is used, was transported in interstate commerce," you could add something along the lines of saying, in determining use, you could -- consider the -- those four factors as set forth.

THE COURT:  Okay.

MR. ZEGARELLI:  We object, Your Honor.  I haven't had time to go do legal research on this new issue, and apparently it's legally based.  It also, I think, is prejudicial in the sense that it starts to skew the assessment of reverse infringement.  And I think that if that's going to be an issue, it's a complicated issue of reverse infringement, because our position is the -- I mean, I think it's sort of obvious what's trying to be done, and that's to try to prejudice the jury's mind as to the question before them by the use that would -- we

would claim is a reverse confusion use.

And I don't think, at this point, I have time to field that, and I prefer to stay on what we've already agreed to and what you've indicated, to just keep the instruction as it is.

THE COURT:  Well, I don't think what we have here is precisely what the parties agreed on.  So --

MR. ZEGARELLI:  We could --

THE CLERK:  This comes from the POM Parties' proposed instructions.

THE COURT:  Okay.  And I don't know where there's been any real suggested instruction on reverse confusion.  Are you suggesting that there should be one?

MR. ZEGARELLI:  I --

THE COURT:  Because I don't believe there is.  There is a slight reference to the words somewhere, but there is no instruction on reverse confusion.  So --

MR. ZEGARELLI:  So, well, I mean, if we qualify it, I think it would need to be qualified by -- you know, an infringer or a claimed infringer can't rely upon a use that is derived from their infringement.  Because a use -- I mean, you know, at least in my 35 years of doing it, I mean, you know, a use doesn't have to be significant.  It has to be legitimate.

It's -- if there is facts and circumstances in that case, it would be tied, I think -- the principles may be, you know, set forth, but I think I'd have to study that case.  But,

you know, the uses don't necessarily have to be more than the lowest level of what the law requires for use.

So I'd have to look up that case.  I mean, we can talk about what was proposed earlier.

THE COURT:  Was there some instruction from PSG on this issue?

THE CLERK:  There was.

THE COURT:  Would you mind reading.

THE CLERK:  PSG's proposed instruction says:  "You will need to determine who used the mark Pennsylvania Skill first.  An internal use is not a public commercial use, and for purposes of determining the first to use for trademark purposes, a standard to apply is who used the mark first.

"A use for services is when the mark is used in conjunction with the services, including advertising materials. A use for product is when applied with or in conjunction with the goods or packing used with the goods.

"For purposes of establishing seniority, you may not consider use of the mark in question during the period that the mark is claimed to be infringing because an infringer is creating a market illegally.  Seniority is determined by the earliest use in interstate commerce.  The user who first appropriates the mark obtains an enforceable right to exclude others from using it as long as the initial appropriation and use are accompanied by an intention to continue exploiting the

mark commercially.

"In addition to its claim to a trademark, PSG asserts that the EPA governs the use of the term 'Pennsylvania Skill' as part of the agreed marketing requirements."

THE COURT:  Thank you, Charlotte.

MR. NEISER:  I think their instruction is confusing. I can see why the Court rejected it and went to the other one.

If -- we only reference it simply because the Third Circuit mentioned it in these cases in conjunction with the senior user, because use has other factors to determine it.  We talk about what it is but not how the jury can weigh it.

So if you look at the second paragraph, it describes what it is, and I think that definition is correct.

But the factors to consider the use are what Mr. Deasy had just referenced, and it's just a matter of context more than anything else.  That's simply it.

And if the Court is not inclined to do so, I mean we can -- it's not fatal by any means, but we just thought we should at least mention it.

THE COURT:  What's the citation of the case?

MR. NEISER:  I'll put this on.  The citation for the case from which we've gathered the authority is Lucent at 186 F.3d 311.  And I believe this is at -- the reference is to the four-factor test of Natural Footwear Limited, 760 F.2d 1383, 1398 to 99.  That's Third Circuit, 1985.

MR. ZEGARELLI:  You said the four-factor test.  The four-factor test is for?

MR. NEISER:  It goes to -- it says the volume of sales of the trademark product --

MR. ZEGARELLI:  Excuse me.  I'm sorry.  It's not what the test is, but what is the testing for?

MR. NEISER:  "A party asserting trademark ownership in a trading area must show clear entitlement to protection of its trademark in a particular market."

That refers back to Natural Footwear at 1397.

In other words, that party must introduce evidence to show its trademark, quote, has achieved market penetration that is significant enough to pose the real likelihood of confusion among consumers in that area.

And it goes on to say -- and this will be very short -- "Natural Footwear adopted a four-factor test to determine whether the market penetration of a trademark in an area is sufficient to warrant protection:  One, the volume of sales of the trademark product; two, the growth trends, both positive and negative, in the area; number three, the number of persons actually purchasing the product in relation to the potential number of customers; and, four, the amount of product advertising in the area."

THE COURT:  And as I understand it, when previously we talked about priority, i.e., senior user and market penetration,

this really doesn't relate to senior user.  It relates to the issue of market penetration.  Am I right about that?

MR. NEISER:  I think it relates to use.

MR. DEASY:  Which relates to ownership and senior user.  It's all -- they're all kind of intertwined with each other.

THE COURT:  Okay.  Let me take a look at the case. Your objection is reserved.  And I'll let everyone know once I've had a chance to do it.  I think the Lucent case was cited by one of you last week during the Rule 50 argument.

Okay.  So let's put that issue aside.  We'll come back to it.

I think we had gotten through heading J before we commenced the trial proceedings this morning.  Is that what everyone else reflects?

MR. NEISER:  Yes, Your Honor.

THE COURT:  Okay.  Then let's look at K.

MR. NEISER:  We have no issue with this one, Your Honor.

MR. ZEGARELLI:  Okay, Your Honor.

THE COURT:  Okay.  Next is item L, which relates to willfulness.

MR. NEISER:  No issue.

MR. ZEGARELLI:  No issue.

THE COURT:  Okay.  M, infringement defenses.

MR. ZEGARELLI:  Other than the Savvy Dog -- oh, Savvy Dog is in.  Okay.

MR. NEISER:  We have no issue with this one, Your Honor.

THE COURT:  Okay.  Mr. Zegarelli?

MR. ZEGARELLI:  I mean, assuming that Savvy Dog and POM have rights, then the rule itself is acceptable.

THE COURT:  So you're all right with M?

MR. ZEGARELLI:  On that basis, yes, Your Honor.  Thank you.

THE COURT:  Okay.  All right.

Fair use, you'll note that we put two alternatives in here.  I'm happy to discuss whether one or the other or neither are acceptable to the parties.

MR. NEISER:  We have a preference for alternative 1, Your Honor.

MR. ZEGARELLI:  I'm trying, Your Honor, as I read this, to look at the portion that is different between the two.  And it looks like the "fair use" language is the same in both cases.  Oh, it's not really the same.

THE COURT:  Yeah, it's generic in the second one.

MR. ZEGARELLI:  Right.

THE COURT:  And the alternative because, right above that, we've said "You must consider POM and Savvy Dog's defenses of fair use and abandonment," that's why alternative 1 is

specific, because we've just referenced the -- their defenses. And I don't believe that defense was raised by Pennsylvania Skill Games.  If I'm wrong about that, please let me know.

MR. ZEGARELLI:  Whether we did raise that we're owner of the mark -- I would take the second one, Your Honor, because I think the first one doesn't -- I think the first one gets into each party, and we would consider those fair use affirmative defenses to be balanced either way.

THE COURT:  Did you assert the affirmative defense of fair use?

MR. ZEGARELLI:  I'd have to look at the pleading to see if we did assert that affirmative defense, Your Honor.  But I think the instruction of fair use, if it's not implied by ownership -- I would say, irrespectively, Your Honor, I think fair use is necessarily implied by claiming and -- as an affirmative defense ownership, that you're owner of the mark and they're not.

THE COURT:  Any further comments from you on this?

MR. NEISER:  No, Your Honor.

THE COURT:  All right.  I'll take a look at that and let you know.

All right.  Abandonment, which is under heading O.

MR. ZEGARELLI:  No problem.

MR. NEISER:  We have no issue, Your Honor.

THE COURT:  Okay.  Then let's talk about laches.

MR. NEISER:  Oh, in abandonment, there's a three-year presumption in that, Your Honor.

THE COURT:  I think that was somewhere in --

THE CLERK:  The POM party's proposed text insert, and PSG objected to that as inapplicable.

THE COURT:  Okay.  Is there case law that says there's a three-year presumption?

MR. DEASY:  I --

MR. ZEGARELLI:  I don't think --

MR. DEASY:  It's in the statute that there's a three-year presumption.

MR. NEISER:  Can you point it to the Court -- for the Court, and perhaps we can keep going while Mr. Deasy is looking for that.

THE COURT:  That's fine.  Okay.  Can we talk about laches?  Is that a defense -- I'm happy to include it if one or either of you believes it is an appropriate one, and then we can look at the language.  My first pass was I wasn't sure.  But if either of you wants to include it, we can.

MR. NEISER:  I would actually like it, Your Honor. You know, part of our theory is, you know, they watched us use this mark, put it on 20,000 machines over a period of time, and then unilaterally just said, Hey, you can't use it anymore, and we're going to register the trademark.  And I think this is a perfect example of how laches should be raised.

MR. ZEGARELLI:  Sure.  Leave it in.

THE COURT:  Okay.  All right.  The next section -- and we'll get back -- Mr. Deasy, take your time, because we're going through other ones, we'll get back to that.

But let's talk about the Pennsylvania Trademark Act. And my question on the next two -- and that is Pennsylvania Trademark Act and unfair competition -- is that you'll note, at least in the verdict slip that we gave you, that since the elements are the same on -- on these -- at least let me start with Pennsylvania Trademark Act -- do we need that instruction?

MR. NEISER:  On the Pennsylvania Trademark Act, Your Honor?

THE COURT:  Right.

MR. NEISER:  I think we do because I don't think the jury's going to understand that they -- they may be -- they may not understand that they can check that box.

THE COURT:  Okay.  The way the verdict slip currently reads, we would then have to separate out Lanham Act versus Pennsylvania Trademark Act, which it is not currently.

MR. NEISER:  Oh, then --

THE COURT:  The verdict slip we haven't gone over yet. So everybody's rights are reserved there.

But when we looked at the standards, the standards appear to be the same.  So it's as if you want or either party wants a separate jury decision on whether the Lanham Act was

violated, the Pennsylvania Trademark Act was violated, the common law trademark was violated.  You know, if that matters here, then we'll have to do a regroup.

MR. NEISER:  I think for the Pennsylvania Trademark Act, we would.  Because there are damages that are available that can be set by the Court.  If that's something we don't need the jury to do that, I don't really need to rejigger things around.

THE COURT:  Well, it's all right.  I mean, we'll change what we need to change.

MR. NEISER:  Sure.  I think we need a separate finding on the Pennsylvania Trademark Act.  Because of our registration, we're entitled to three times the amount of our fees up to, and -- you know, and the award of attorneys' fees.

So I'm not quite sure how we can't have a separate finding on the Pennsylvania Trademark Act.  I mean, the instruction is -- you know, it follows the same case law, and it follows the same standard.  I think that's appropriate.  But we may just need to have the instruction broken up.

MR. ZEGARELLI:  Your Honor, so the first issue is the qualification, that nothing in the statute overrides the common law, which is in dispute.

Secondly, perhaps there should be an instruction that the registration at the federal level is a review process and, at the state level, is a must-file filing.  In other words,

there's no review by the clerk at the Pennsylvania state trademark office as there is at the federal level.

So we'd ask for the qualification.

THE COURT:  I'm not sure what qualification you're asking about.

MR. ZEGARELLI:  So the first qualification would be that the Pennsylvania -- whether or not Pennsylvania -- I'm sorry.  The POM Parties, which is, I think, Savvy Dog, trading and doing business as -- well, whether the POM Parties are entitled to anything under the state trademark act should be qualified as an instruction by the fact that their -- the propriety of that filing is at issue for the jury.

MR. NEISER:  Your Honor, we're getting into something that I don't think would be appropriate at all.  All we're asking is we have a separate count that says -- that for a separate claim that we filed and it falls under the same legal standard.

So I think that if they find that we are the owners of the mark and that we filed the trademark applications, which we did, and they infringe, I think that that should just be the end of it.  I don't know that there's any other discussion.  And if I'm missing something because we have to -- you mentioned something about regrouping them, I'm happy to reconsider how we do this.  But it seems to me that we probably -- I have the verdict slip up in front of me -- you know, we probably could

stick a new paragraph 17 under Pennsylvania Trademark Act.  You know, has Savvy Dog Systems established by a preponderance of the evidence that it has a state trademark?  And then did, you know -- the next one is, did they infringe on that state trademark?  And it could be that simple.  And the process of how a bill becomes a law I don't think is something that should be put in front of the jury.  It's not -- it's not germane.

THE COURT:  Well, I think, with respect to applications, registrations, and everything else, we told the jury these are not dispositive of whether or not a party has established its right to a trademark.

MR. NEISER:  Right.

MR. ZEGARELLI:  And as long as the instruction is clear on that point as well, that's all I'm asking for, is because there's an instruction with regard to rights under a statute, that it would confuse the jury to -- in my view -- that there is not some qualification that says, look, that statute still rests on the common law, nonstatutory ownership by its express provisions.  That's all.  Just the qualification.

MR. NEISER:  Your Honor, just a -- may complicate it but in the spirit of making it simplified, we have a claim for declaratory judgment.  Is it possible, because it's a statutory claim and because we are able and if the language of the statute for damages expressly says the Court may award -- I don't think that the jury could award any damages, this is -- and because

we're not seeking any other monetary damages on the trademark claims, that we don't need to even have that instruction, that we would permit the Court to make a ruling whether or not the state trademark law was violated based on the factual finding of the jury in the predicate that we have ownership, assuming that they find that way.

So we may not even need that.  But I want to make sure that, before we pull the plug on it, that there's agreement or some ruling by the Court that that is something that you can do after the trial based upon the findings of fact from the jury. It almost could be like having an advisory jury to some regard. Not quite, but the same.

THE COURT:  What would you propose that they would be asked if we're talking about an advisory jury?

MR. NEISER: Did the Savvy Dog Systems, by a preponderance of the evidence, establish that they have submitted a registration with the Pennsylvania corporations department for a state trademark, period.

THE COURT:  Well, that is in evidence, isn't it?

MR. NEISER:  It is.

THE COURT:  Okay.  So --

MR. NEISER:  But that's not the finding from the jury. And then, if they did -- and I don't even know that we need -- that's what I'm saying.

What I'm struggling with is I don't know that we need

that.  I think that the Court has -- if there's evidence of record, it may be a matter of law for the Court to accept whether or not it's valid, and as part of our request for declaratory relief, that you could enter an order, because when we're done, we're going to come back to the Court and ask for it, assuming that we win.

And I'm just -- I don't know -- that may be an inelegant way of doing it, but I'm just proposing it to simplify the instructions and for the slip.

THE COURT:  So, in other words, we would ask who, if anyone, infringed on the trademark.  And then what you're proposing is that legal issues related to the declaratory judgment action, the meaning of the supplemental registration, what has to be done and so forth, is a legal matter that I would determine later.  Is that essentially what you're suggesting?

MR. NEISER:  Yes, Your Honor.  And included within that calculus would be a determination whether or not there is a violation -- or there's -- that we're entitled to any relief under the Pennsylvania Trademark Act.  That would be a ruling by the Court as opposed to a finding of fact by the jury.

MR. ZEGARELLI:  That was a mouthful, Your Honor.  So I think -- my position is pretty straightforward.  It's if the instruction goes to the jury to make a determination under the statute, that it should just simply be qualified by the fact that any rights under that statute still rest on a determination

of ownership in the first place.  That's all.

MR. NEISER:  You could say if you find -- if that is the case, Your Honor, and the Court doesn't want to extract it, you could say, if you find that the POM Parties -- or POM of Pennsylvania and Savvy Dog System have established ownership, do you also find that Pennsylvania Skill Games, LLC, infringed on their Pennsylvania state trademark?  I don't even know if that's complete either.  It may be two instructions.

MR. ZEGARELLI:  Maybe it's a question of law.  I mean, at the end of the day, you're simply --

MR. NEISER:  That's what I mean, yeah.

MR. ZEGARELLI:  I mean, whether -- whether an act falls within legal scope of a registration or filing --

MR. NEISER:  But we can -- see, the thing is, like, if there was a bad faith -- I'll take an example of insurance bad faith.  You know, if we're -- let's say I -- I have it backwards because I'm tired.  In state court, you don't have a right of a jury trial on a bad faith statute for insurance coverage purposes in the 8371 and claim, but in federal court, you do, if I remember correctly.

So in Pennsylvania, I don't even know that there would be a right of a jury trial question on the state trademark act where I think in federal court, you do.

So I think that we could maybe sidestep this if that's a question of law for the Court to reserve afterwards.  One less

question for the jury.  And I would have no problem doing that because the damages that are attached to it also have to come back to the Court.  I just don't know that we necessarily need a finding of fact from the jury that there was a violation of the Pennsylvania Trademark Act.

THE COURT:  Can we remove this instruction and agree that this is a legal issue?  Or do you want this instruction but anything else is going to be up to the Court at a later time, depending on how the jury rules?  I'm just trying to make sure I understand where everyone's going with this.

MR. NEISER:  Our suggestion, Your Honor, subject to Mr. Deasy kicking me under the table, I would suggest that we yank it, meaning we pull it from the instruction, because if we were to be unsuccessful, to Mr. Zegarelli's point on the Lanham Act or common law, then those, I don't necessarily know this would matter for the jury.

The only way this would apply -- and this is where I'm having a little concern -- is there is a possibility that a jury could find that neither one of us have the trademark.

THE COURT:  Right.

MR. NEISER:  There is a possibility that the jury could find that neither one of us have a common law trademark.  But they also sure could find that I've done a registration under the Pennsylvania act.  And that's the last remaining claim.

So unless I know that the Court can and will be able to rule on this as a matter of law afterward, I don't want to pull it because there is a chance that we have a, you know, a moment where there is -- there is no award on the  -- however remote it may be, you know, we're stuck with the jury.

MR. ZEGARELLI:  I don't think -- I don't think it gets to that -- I think we've got the ownership question.  If it's a damage issue, it could be part of the second phase.

MR. NEISER:  Clearly.

MR. ZEGARELLI:  Okay.  And if it's not a damage issue, it sounds like that particular instruction would not be required.

MR. NEISER:  But if the jury -- let's just play this out.  If the jury finds that neither side own the trademark, if neither side have established secondary meaning, if they find that there is no Lanham Act violation, and they find that neither one of us have established a right to a common law trademark, we still, by virtue of our state filing, have a backstop.

MR. ZEGARELLI:  I'm not sure that's true.

MR. NEISER:  I'm not sure that it's not.  That's the thing.

MR. ZEGARELLI:  I don't think that's true.  Because if you don't -- if you don't have a trademark, I don't know what you registered.  You can't register a non-trademark because

you're registering a thing that otherwise exists.  You're not --
it's not like a patent, the registration embodies the thing.
It's a trademark.  You're registering -- it's more like a deed,
where you register it or you don't, but you own it with or
without the deed being registered, unlike a patent.

So I think if -- if the jury comes back and says
nobody owns a trademark or something of that nature, I don't --
I think your registration as a matter of law goes away.

MR. NEISER:  I think that may not be the case because,
to your point earlier, and I understand it and I appreciate it,
and under patent and trademark, USPTO, that there is a review
process and there's an examiner and all of the things that go
with it.

State is not.  It is punching the clock.  It is just
like filing a complaint.  And there is no opposition to it.  I
don't even know that it's possible to have an opposition.

So what I'm looking at here, though the possibility is
remote because we are on the last day and we're going to --
we're here and getting close to closing to a jury, unless that
is something that can be ruled upon by the Court as a matter of
law to include the sufficiency, the application itself, I have a
hard time pulling the instruction from the jury.

THE COURT:  Well, let me ask this, just as a thought.
Are the parties willing to remove this claim from their request
for a jury trial?

MR. NEISER:  I would be happy to do that, Your Honor.

MR. ZEGARELLI:  I don't think that relates to me, does it, Your Honor?

THE COURT:  It does.  I mean, you would have to consent to that as well.

MR. ZEGARELLI:  Consent to him removing his claim?  I mean, I don't have a state trademark claim.

THE COURT:  The question would be can the Court decide this issue as opposed to the jury?  And both parties have to consent to what would essentially be a bench trial or a bench ruling on the Pennsylvania Trademark Act claim.  That's my question.

MR. ZEGARELLI:  Okay.  Your Honor, I'm not sure I follow the question.

THE COURT:  Okay.  Let me -- let me just try and explain it in a different way.  All parties here have requested the right to a jury trial.  This claim could be extracted from the parties' right to a jury trial if both parties consent that this particular issue would be resolved by the Court rather than by the jury.  No one has to agree to that.  You have an absolute right to a jury trial.  You've asked for it on everything.

My suggestion is could we extract the Pennsylvania Trademark Act claim and resolve it after the jury reaches its verdicts in a bench proceeding?  I'm going to call it a "bench trial."  I think most of the evidence is already in, but you

could submit other evidence if you wanted to.

MR. ZEGARELLI:  I'd have to think about that, if that's much ado about nothing because -- the Court -- if I understand it, the Court would rely upon a finding of fact by the jury, either way.  So if the jury says, for example, there's great common law rights in either party, when it gets to you, you are going to take that fact.

If the jury says, there are no common law rights in any party, then you would do whatever the law requires in light of the fact that the jury said nobody owns common law rights.

If that's the case, I'm not sure that I fully understand the distinction, although I understand both parties are entitled to a jury trial.  But if we're not removing the fact question from the jury and it's only a legal question, unless you tell me something otherwise, because a bench trial would normally handle legal and factual.

THE COURT:  Right.

MR. ZEGARELLI:  In this case, the underpinning factual issue, if we're not giving that to you and it remains in the jury, then I'm -- then we're left with you as a legal question, which isn't that where we sort of are anyway?

THE COURT:  Yes, I understand Mr. Neiser's argument. He's saying in order to preserve his rights, he would need to have an instruction on the Pennsylvania Trademark Act because it's somewhat of a different animal than the other two, common

law and Lanham Act.  And therefore, he would need a ruling from the jury on the factual issues unless that issue is removed from the jury so that there is no Pennsylvania Trademark Act claim in this case that would be resolved by the jury.  And it would instead be resolved by me, based on the facts and the law.

MR. ZEGARELLI:  I'm still trying to get over how -- how there could not end up some incongruity of fact.  If the facts are remaining in the jury because I think the law of the Pennsylvania statute revolves around, rests on, or in some regard, is a condition, requires a trademark to be owned, because you can't register a nonexisting thing, so -- you can't register --

MR. NEISER:  Okay -- go ahead.

MR. ZEGARELLI:  You can't register something that's not a trademark.  So -- because you're registering the claim of a trademark.  So I -- Your Honor, it sounds to me -- unless I don't understand some other piece of it, it sounds to me, again, that doesn't make a difference because you would be ruling on the legal side, and the jury would be deciding the essential question of ownership of a trademark.  If there's no incongruity in fact finding, which I'm not quite sure there could be, but if -- then okay.

MR. NEISER:  Judge, I'm trying to -- I don't have any -- here we go.  I'm getting connected to the interweb right now.  I don't know that that's necessarily true that you need to

have a valid trademark to register it.  I mean, this falls under, you know, Judge Strassburger's guidance so long ago.  He said, you know, you can file a fish sandwich if you choose.

MR. ZEGARELLI:  No.

MR. NEISER:  I mean.

MR. ZEGARELLI:  Just no.  Your Honor, you can research it.  You can't register a non-trademark.  And that's for the Court to determine.  But you can't register a non- trademark.

MR. NEISER:  I can register it.  The question is whether or not I can enforce it.  That's what I'm saying.

MR. ZEGARELLI:  Well --

MR. NEISER:  And that's -- it's a filing system.  Just like I can file anything I want with the corporations bureau as long as it doesn't conflict with an existing name.  The same --

MR. ZEGARELLI:  Even that's a legal decision.  Did you file according to the law?

MR. NEISER:  That's where I guess where I'm going with this.  That I don't need to have a jury to do that.  And I think that that would be something that the Court could rule upon and we don't need a jury to have a fact finding.  That's what I'm coming back to.  I'm giving credit to what you said earlier about, you know, if there's no trademark, how can you have a state trademark act?

I think in practicality, I'm not disagreeing with you, but we're trying to just solve a very administerial problem, and

the administerial problem relates to whether or not we want the Court to make that finding after the jury is heard on the other issues or whether or not we need the jury to make a ruling.

And it seems like an elegant solution that we have the Court do so.

MR. ZEGARELLI:  On everything that's been said, Your Honor, I don't -- I don't have an objection to you ruling on the legal issues associated with the Pennsylvania Trademark Act, whether it's appropriateness of filing or, you know --

THE COURT:  It's a fact, anything like that.

MR. NEISER:  Fact and law.  Sure.

MR. ZEGARELLI:  Wait, you say fact and law.  Let's go back to fact.  The fact that you filed in accordance with law is different than the fact that is there a trademark.

MR. NEISER:  I'm going to make it really simple so we don't get into continuums and things.  We consent to remove that issue from the trial by jury and would have the Court try it.

MR. ZEGARELLI:  Okay.  The words "the Court try it" is different than the Court making legal rulings with regard to it. So if the word "have the Court try it," that's a different question than have the Court make the legal rulings associated with the statutory enforcement filing processes and all of those things.  Try it is different.

So again, if the jury's making the determination of fact as to whether or not there's a trademark right, then we

don't -- PSG doesn't have a concern for the Court to make the appropriate legal rulings, did you file correctly, all of those kinds of things.

So when Mr. Neiser says try it by the Court, it's a little different than just the Court making the legal rulings associated, because there's fact issues, there's legal issues in trying it. We're okay with the legal side of it. And, in fact, I'm not sure why the Court would need to determine factual sides of it that just went to the jury. But that's my difficulty.

If you want to say the legal -- all of the legal issues, that's fine. And let the jury decide factual issues of is there a trademark, which is appropriate for the jury. That's the jury trial.

MR. NEISER: But can't the Court take the findings from the jury on the common law and the remaining issues and the evidence that's already presented and make a ruling whether or not, thumbs up or thumbs down, we have a claim under the Pennsylvania Trademark Act?

MR. ZEGARELLI: I think if it's a legal ruling, based on the Court's fact finding, then I think the answer, it's a legal ruling based on the Court's fact -- the jury's fact finding.

I -- it only throws me off with the statement is when we go from a conversation about legal rulings to try the case as a bench trial, which then implicates fact finding. So that's

the issue.

I'm fine with Judge Dodge handling the legal questions associated with the Pennsylvania act.

MR. NEISER:  Then don't we need a finding of fact from -- I'm not trying to overcomplicate this.  But don't we, then, need a finding of fact from the jury?  I mean -- or can we just use the ones from the common law --

THE COURT:  Well, that's the question.

MR. ZEGARELLI:  That's the question.

THE COURT:  Can those -- if whatever the jury finds on the other claims, can that be applied to the Pennsylvania Trademark Act without there being a separate factual finding by the jury as it relates to the Pennsylvania Trademark Act?

MR. ZEGARELLI:  Your Honor, as we discuss it here, I actually think that's probably the way it should work, quite frankly, because that Pennsylvania statute is a statutory animal.

But I will suggest to the Court that it relies on a question of fact, which is, is there a trademark in the first place.

THE COURT:  Okay.  Well, then, what I'm hearing -- but Mr. Neiser, it's going to be your call because I don't want to prejudice your rights.  If you think there's a specific fact on the Pennsylvania Trademark Act that needs to be decided by the jury, we need to decide that.

If you are comfortable with the findings that we will put in the verdict slip that don't specifically reference that, we can rely on those findings for me to later make legal determinations, depending on the outcome of the jury's verdict.

And you shouldn't feel -- we can include anything that either party feels is necessary. Do you want to give it a little bit of thought, and we'll move on and come back to it?

MR. NEISER: If you don't mind, Your Honor. And on top of that, I may need to get permission from the client on something like that as well.

THE COURT: I understand.

MR. NEISER: Your point's well taken. I think it may not matter. But we're going to revisit that one, if you don't mind, Your Honor.

THE COURT: All right. Then let's move on to unfair competition. Do we need that instruction, I guess, is the question?

MR. ZEGARELLI: I'll say generally, Your Honor, that these instructions were really heavy, in my view, as a general rule. They were very heavy. I'm not going to -- I'm not going to blame the POM Parties, but they were -- they were very, very heavy for a jury to absorb all of this in the first place, quite frankly.

THE COURT: We're trying to streamline that as much as we can.

MR. ZEGARELLI:  I understand.  That's right.

THE COURT:  On this instruction, do we need it?

MR. NEISER:  We have no claim in that regard, Your Honor.  So it's -- I have no dog in that hunt.

THE COURT:  Mr. Zegarelli?

MR. ZEGARELLI:  Your Honor, I'd like to just hold that until -- and I'd like to at least have a minute to go grab my -- maybe I can get it here.

(Off-the-record discussion.)

THE COURT:  We had an off-the-record conversation about whether the jury should be excused for the day so that we can complete all of the jury instructions and the verdict slip and be ready to go at 9:00 a.m. tomorrow morning with closings.

After discussion, the parties agreed that it would be a better use of the parties' time and the jury's time that we excuse them for the day with an explanation and they return tomorrow at 9:00 a.m.

Any issues with that?

MR. NEISER:  None from us, Your Honor.

THE COURT:  Take five minutes.  And what I might suggest, too, since we're going to have the whole day, is that if anyone needs some time to make sure you've reviewed everything so that we can move through it, I'd rather take that time now.  Then, as we're reviewing it, I want you all to be comfortable with it.  My suggestion is we take, then, a break

for about an hour.

MR. NEISER:  Great.

THE COURT:  And that gives everyone a time to do any research, look at anything, look back at what you did before, and that way we can make sure we get done today with everything we need to do.  Okay?

I realize that cuts into your lunch hour, but we've probably all forgone lunch at some point in our lives.  If somebody wants to bring something to eat in here, you can.

MR. NEISER:  Thank you.

MR. ZEGARELLI:  Thank you, Your Honor.

MR. NEISER:   Back at noon?

THE COURT:  What time is it?

MR. NEISER:  10:57.

THE COURT:  Yeah, I think -- does noon give everyone enough time?

MR. ZEGARELLI:  I think so.

MR. NEISER:  My clients are here, so I can do whatever I need to do with them.

THE COURT:  And like I said, if anyone needs a break because you need to eat, I respect that.  We can always do that. But let see what we can do to get this done.

(Whereupon, in chambers session ended.)

(Pause as the jury enters courtroom.)

THE COURT:  Ladies and gentlemen, thank you for your

patience while I talked with counsel about some issues that we have to resolve before they're able to make their closing arguments to you.

The things that we're addressing could not begin to be addressed until all of the evidence was presented to you.  And there was certain evidence presented today which actually took a little bit less time than we thought it might.

Because we're respectful of your time and because we believe we will need more time to complete the instructions so that the parties can deliver their closing arguments to you in the most efficient way possible, we're going to excuse you for the day, and we're going to resume tomorrow morning.

We certainly appreciate your patience, and we are very respectful of your time.  But we don't want you to have to wait for us for a significant amount of time while we resolve issues that we have to resolve.

So we will begin first thing tomorrow morning with the parties' closing arguments, followed by my instructions, and then followed by your deliberations.  So I can assure you, there will be no delay tomorrow, and we certainly appreciate your understanding while we address these important issues so that the parties can present their arguments to you in the best way possible.

So we're going to excuse you for the day.  Thank you very much for being here this morning.  And we will see you here

bright and early tomorrow morning at 9:00 a.m.  Thank you.

THE CLERK:  All rise.  This Court is adjourned.

(Pause as the jury exits courtroom.)

(Whereupon, a recess was taken.)

(Whereupon, the following discussion was held in chambers.)

THE COURT:  My suggestion is that we pick up where we left off, with the instructions, and then we can come back and circle back to those that everyone wanted to study or had questions on.

I think the place to start is with unfair competition, Pennsylvania common law, which in our current draft is under R.

MR. ZEGARELLI:  Your Honor, if you don't mind, I did, as a preliminary note, because I think we're going to hit it again -- I do see that some sections were removed when I compared with what PSG had in the document for licensing.  And it also relates to the four documents -- 17, 18, 19 and 20 -- the two notarized, two unnotarized.

There are, in the 722 case, ECF 30, which is the amended -- I believe the amended answer, there are numerous sections that address the POM party's pleading the assignment and denial of those facts.  And I can read them:  paragraph 4, 9, 12, 37, and 60 of ECF 30.

So just -- we may hit that issue again because when I started to compare, I do see that the licensing issue is not in the instructions as proposed.  So --

THE COURT:  Okay.

MR. ZEGARELLI:  Whether we get to that later --

THE COURT:  We will get to that, no question about it.

Okay.  In unfair competition, I want to just note for everybody's benefit that the instructions that were given to us, proposed instructions, were contradictory.  One of them said there's no difference, and the other one said there are differences, not quoting.  So we weren't really sure where the parties were going with that.

But based -- and I will say unfair competition under Pennsylvania law is a bit murky.  But based on our analysis of it, we concluded that the elements were the same except for those under a federal law claim except regarding interstate commerce.

It doesn't mean the parties have to agree with our conclusion.  But I will say that the jury instructions that we got from the parties had contradictory elements in one paragraph versus another.

MR. ZEGARELLI:  You no longer have unfair competition, if I recall.

MR. NEISER:  That's why I think we got rid it.

THE COURT:  That's why it says:  "Pennsylvania Skill Games also contends that the POM Parties" -- so --

MR. ZEGARELLI:  So we would leave ours in, and ours remains.  My understanding of why it was removed was because it

raised commingling issues, as it relates to the POM Parties, that they -- they were changing their tack?

MR. NEISER:  Huh-huh.  Because it's duplicative of federal --

THE COURT:  I don't know what yours is.  I don't have yours in front of me.

MR. ZEGARELLI:  When you say "yours," Your Honor, I'm looking at Count Five on the unfair competition claim --

THE COURT:  I'm talking about your jury instructions.

MR. ZEGARELLI:  Oh.  Should I look at the jury --

THE COURT:  Charlotte?

THE CLERK:  So the two unfair competition instructions provided were both proposed and agreed upon by both sets of parties.  It was just they were in contradiction with each other.

THE COURT:  Okay.  So that's the problem here, is that you both submitted the same thing, but there's an inherent contradiction in those two instructions.

MR. DEASY:  If I may, is that with respect to the Unfair Trade Practices Act?

THE COURT:  No.

MR. DEASY:  Okay.

THE COURT:  Charlotte has -- if you don't have copies of what you had submitted, you can take a look at them.  We certainly have our copy.

THE CLERK:  I believe it's section U and V.

MR. DEASY:  Okay.  I have it here.

MR. ZEGARELLI:  I'm looking at section T.  No?  I want to make sure --

THE CLERK:  Section T is the Pennsylvania Unfair Trade Practices and Consumer Protection Law, which was withdrawn.

THE COURT:  Yeah, this is the unfair competition one.

Our problem with reading what the parties have submitted is it says two different things.  And our resolution of that was to say the elements are the same except for the one distinction that we made.

MR. NEISER:  We have no issue with the instruction as is, Your Honor, or do we?

MR. DEASY:  No, we're fine.

MR. ZEGARELLI:  For you -- all right.  So we have a number of sub-elements.  So we don't have any changes to you, although it should be set forth that it's a PSG claim.

THE COURT:  Right.  Except my question is, are you comfortable with what we have done?  Before we get back to the contradiction in what the parties submitted.

So that's our proposed instructions, which basically just says the elements are the same as under federal law, which I think just makes it a little bit simpler.  It may not be -- it may be subject to some objection, but we thought it accurately stated our view of Pennsylvania law.

MR. ZEGARELLI:  You know, with all that you sent me, I'm seeing it under R, not under U.

THE COURT:  Is it under R?

MR. ZEGARELLI:  Oh, I apologize.

THE COURT:  That's all right.  Yeah, I think U was in your proposed jury instruction of the parties -- U and V.

MR. ZEGARELLI:  That's fine, Your Honor.  Sorry for all that --

THE COURT:  That's okay.  It's fine.  There's a lot of stuff to look at.

Okay.  Let's move to S, which is the instruction relating to false advertising.

MR. NEISER:  Judge, one thing I want to point out, I thought that we had also alleged, within Count One, false advertising.

THE COURT:  You did not.

MR. NEISER:  We thought it was subsumed within that. If you find that it isn't, then we'll just move on.

THE COURT:  I don't think it is.

MR. NEISER:  Okay.  We'll move on.

THE COURT:  You can -- if you object, I'm happy to hear you on that, but there was no false advertising claim asserted.

MR. NEISER:  Well, under the statute, there's A and B. The caption is false designation of origin.

THE COURT:  Right.  Which is your Count One, right?

MR. NEISER:  Which is our Count One.  But within that, we had several paragraphs that specifically raised the advertising issue.  I can reference that:  Number 32, 35, and 40.  Our view of the filing was simply that false designation of origin or at least Count One included both.

MR. ZEGARELLI:  And at least from our perspective, Your Honor, we don't have a change to that section.

THE COURT:  Okay.  Thank you, Mr. Zegarelli.

Do you have a reference to Section 125 -- 1125(b) in our pleading?

MR. NEISER:  Well, it's 1125 at --

THE COURT:  No, I'm talking about in the body, not in the title.

MR. NEISER:  Let me see, Your Honor.

THE COURT:  I'm looking at paragraph 40 of your -- I believe this is the first amended complaint.

MR. NEISER:  I don't believe that we do, Your Honor.

THE COURT:  I'm just not seeing a false advertising claim in there.

MR. NEISER:  I understand.  I understand.

THE COURT:  Okay.  All right.  And you were fine with the false advertising claim?

MR. ZEGARELLI:  Yes.

THE COURT:  Okay.  Let's move to breach of contract.

I think we've resolved -- our footnote talks about the identification of parties, but I think we've agreed about the three parties you're asserting a breach of contract claim against; correct?  I think we went over that this morning.

MR. ZEGARELLI:  Yes.

THE COURT:  Okay.  So we will make sure that we identify that in appropriate places.  I'm not sure it's necessary here, but I'll take a look at that.

MR. ZEGARELLI:  Your Honor, the system is, we're going to go through this, and then we are going to print it and sort of sit around the table and review a draft, or we're going from here to tomorrow morning?

THE COURT:  Well, what we'll do is we'll go through everything.  We'll go back over those things that we still have issues about.  We will create a final version based upon all of that and get it to you.

MR. ZEGARELLI:  Okay.

THE COURT:  And then if there is any further issues, for example, if somehow we misstated something that everybody agreed on, we can talk about that first thing.

MR. ZEGARELLI:  Okay.  Very good.

THE COURT:  But we will get everybody a draft. Depending on the timing and what we need revised, we may be able to get it to you while you're still here, but we still have to go through the verdict slip, too.  But I will make sure you have

a copy in advance and have a chance to look at it.

MR. ZEGARELLI:  Thank you, Your Honor.

THE COURT:  Okay.  Anything about the nature of the claims under breach of contract?  That's part A.

MR. NEISER:  No, Your Honor.

MR. ZEGARELLI:  No, no.  No comment.

THE COURT:  How about B, duty of good faith and fair dealing?

MR. NEISER:  Nothing for us on B.

MR. ZEGARELLI:  I'm just trying to sync up, Your Honor.  Breach of contract, nature of the claims is A.

THE COURT:  We're on B now.

MR. ZEGARELLI:  I understand.  And as submitted, it was B was contract-definition.

THE COURT:  Right.  This is my version, not necessarily the version that the parties gave to me.  So I realize it might not always sync up or we might not have included everything, which certainly the parties can interpose objections as they feel appropriate.

MR. ZEGARELLI:  Okay.

THE COURT:  Okay?

MR. ZEGARELLI:  That's what I was trying to synchronize.

THE COURT:  Yeah, it doesn't sync up.

MR. ZEGARELLI:  Okay.  Okay.  Right.

THE COURT:  It definitely does not.  So put that out of your mind.

MR. ZEGARELLI:  All right.  Good.  Because there were a lot of details in the first version that we submitted, I understand.  Okay.

THE COURT:  Yes.

MR. ZEGARELLI:  Yeah, that's fine, Your Honor.

THE COURT:  Okay.  And then we have part C that just talks about what a breach of contract is.

MR. NEISER:  Your Honor, I wanted to raise -- I don't know if this is the right section for it.  But we had included a consideration instruction, and I also believe we need some finding from the jury on the duration of the contract, because there are competing time periods.

THE COURT:  Okay.  Let me deal with the consideration.  I think, on summary judgment, I found that there was consideration.

MR. NEISER:  Okay.

THE COURT:  So I think that's why we didn't include that.

MR. NEISER:  Oh, I understand.  Got it.

THE COURT:  On the other issue, what kind of instruction would you want?

MR. NEISER:  If you find that there was a breach of the agreement, has it been terminated, or --

THE COURT:  You're not saying that that would be in the verdict slip, are you?

MR. NEISER:  I'm not sure.  See, that's the thing.  As I thought about it, I couldn't think if there was a way to do it or whether we even need that.  I think that might be a question on the damages side.  But if we have --

THE COURT:  What are the dates of the breaches that you're asserting?

MR. NEISER:  We're asserting that, if we are found in breach of the agreement --

THE COURT:  No, I mean your breaches, your breach of contract.  Up through 21?

MR. NEISER:  Yeah, through 21.  But I'm not even really concerned about with ours.  I'm concerned about ours.  If in the event -- if we're found to be in breach, that we have an argument that the agreement was terminated at a certain time period.  And I didn't know if that was a fact issue for the jury or whether that's something that happens during the damages phase, because if they're determining breach, and let's say they find breach, if you do find a breach, you know, did the contract terminate, and, if so, when?  Or did it end?  If so, when?

THE COURT:  I don't know what evidence has been submitted on that issue.

MR. NEISER:  Mr. Cline's record on February 2018.

THE COURT:  Okay.  But aren't you asserting a breach

of contract claim under the EPA after the date of Mr. Cline's letter? I think -- and you would know better than me, but I think the invoices that we talked about a few days back were dated after the date of Mr. Cline's letter. I might be wrong about that.

MR. NEISER: We are. But we're talking about -- I think Mr. Cline's -- I don't even know if this is something that's even -- well.

THE COURT: That's sort of my issue with it. I understand what you're saying, but I think, if you're going to take the position that the contract terminated as a result of Mr. Cline's letter, then I don't know how you assert a breach of contract claim under the EPA for events that happened after that.

MR. NEISER: Can I see our complaint?

THE COURT: It does say breach of the EPA, I think. Well, I think.

MR. NEISER: Let me just double-check it.

MR. ZEGARELLI: Right, for POM.

THE COURT: And I think, obviously, there were later purchases after what's in your complaint. Because I think what's in your complaint relates to an invoice dated in 2017 for about $4,000.

MR. NEISER: Yeah, that's right. Okay. I understand, Your Honor.

THE COURT:  So I don't want to foreclose the issue.  I just don't think we can have sort of a contradictory, well, it terminated but we're also seeking a claim under it.  If I'm mischaracterizing your claim, feel free to let me know that.

MR. ZEGARELLI:  We have no problem with C, Your Honor, or D.  Although we have a small change or question on D.

THE COURT:  Okay.

MR. ZEGARELLI:  Subject to Mr. Neiser.

THE COURT:  Mr. Neiser, do you want to come back to this in our next round?

MR. NEISER:  I might at that because I may withdraw the claim.

THE COURT:  Okay.  You can think about that.  Let me know.

Okay.  Mr. Zegarelli, I think, on D, did you have something you wanted to suggest?

MR. ZEGARELLI:  I think it's a minor -- should the word "and" be an "or"?  That's all.  And/or even an "and/or"?  That's all.

THE COURT:  If you find that both POM Parties and/or Pennsylvania Skill Games?

MR. ZEGARELLI:  If the waiver of strict performance is running to them individually, then I think it should be a disjunction.  If it's something that they would be collectively, then I understand the "and."  But I think I understand that

waiver of performance to be a disjoined issue.

THE COURT:  Would it be better to take out the word "both" and then say "and/or"?

MR. ZEGARELLI:  Maybe, yeah.

Julian?

MR. NEISER:  Where are we at?

THE COURT:  This is D, and the suggestion is making the "and" between POM Parties and Pennsylvania Skill Games and "and/or."

MR. ZEGARELLI:  And remove the word "both."

THE COURT:  If we did that, we would have to remove the word "both" because, otherwise, it's inconsistent.

MR. NEISER:  That's fine.

THE COURT:  Okay.  Then that's what we'll do on that.

Okay.  The next section is on material and immaterial breaches.

MR. NEISER:  We're fine with it, Judge.

THE COURT:  Okay.

MR. ZEGARELLI:  Yes, Your Honor.

THE COURT:  Okay.

All right.  Next, fraudulent inducement.  Is this a defense that somebody's asserting here?

MR. NEISER:  We are.

THE COURT:  Okay.

MR. NEISER:  I've read it before.  I thought it looked

fine.  Let me take another quick look at it.

THE COURT:  Sure.  There's no rush.  Take your time, both of you.

And while you're looking, I think we mentioned this before, but all of these headings are going to come out, other than the roman numeral headings that, you know, here's the introduction, and here's what you know about evidence and so forth.

But they're here for now so that it makes it a little clearer what we're talking about.

MR. NEISER:  Understood.

MR. ZEGARELLI:  That's fine, Your Honor.  Thank you.

THE COURT:  Okay.  Sure.  Next is the issue of waiver, and this relates to the right of first refusal.  I know that -- I think both sides had submitted more facts on this.  We felt it was better not to get into discussing facts because I think the parties can explain what facts they think support their positions on the right of first refusal.

MR. NEISER:  We're okay with it, Your Honor.

MR. ZEGARELLI:  Let me see what we have first.  It's fine.

THE COURT:  All right.  And then I think the last one before we talk about additional ones or going back over is the estoppel defense, which we put in.  I believe both parties have asserted that.  Let me know whether you think you're comfortable

with what we've put in.

And then you'll note, at the very end of that, I have added a paragraph just talking about the two phases, and I just want to make sure everybody is comfortable with what I've said.

MR. ZEGARELLI:  I think that's okay, Your Honor.

MR. NEISER:  We're fine with it, Judge.

THE COURT:  Okay.  Then, Mr. Zegarelli, I know you have some additions.  Let me suggest, before we get there, let's go back.

MR. ZEGARELLI:  Okay.

THE COURT:  And if there's something that you feel is in addition that should be inserted in a particular spot, let me know that, and then we can discuss that.

So I'm going to go -- I'm sorry, Mr. Neiser.

MR. NEISER:  I'm sorry.  I was just breathing.

THE COURT:  I'm sorry.  No breathing.  That's just going to prolong everything.  If we stop breathing, we'll have a lot shorter session.

MR. NEISER:  We certainly would, Your Honor.  It probably would be benefitting everybody.

THE COURT:  Okay.

MR. NEISER:  We do have one addition.

THE COURT:  Sure.

MR. NEISER:  The statute of frauds, I thought we had raised because there's some questions about these agreements and

that there -- they've made assertions about bringing the Pennsylvania project to fruition and statements by Mr. Unis about what led to Wayne DeLuca contacting Pace and that's there's some contract or other rights there.  And we contend that that relates to sale of goods in excess of $500, and it's under the statute of frauds.

MR. ZEGARELLI:  I don't see it in their affirmative defenses, Your Honor.

MR. NEISER:  Oh, it's in my affirmative defense.

MR. ZEGARELLI:  Is it?

MR. NEISER:  Oh, yeah.  We can tell you exactly which one.  It's 22.

MR. ZEGARELLI:  Of the?

MR. DEASY:  ECF 97.

MR. ZEGARELLI:  Okay.  So that is a PSG case or a POM case?

THE COURT:  It's in the POM case.

MR. ZEGARELLI:  Okay.  POM case.

THE COURT:  I'm sorry.  Which one was it, Mr. Neiser?

MR. NEISER:  22, Your Honor.

MR. ZEGARELLI:  And that's not in the PSG case?

THE COURT:  You mean, did you assert it?  Is that what you're asking?

MR. ZEGARELLI:  No, did Pace or Miele assert it, or is it only in the POM case?

THE COURT:  It's asserted by all.

MR. NEISER:  All of them.

THE COURT:  It's the answer in affirmative defenses on behalf of all of them.

MR. ZEGARELLI:  But there's two cases, right?

THE COURT:  Well, everything was consolidated.

MR. ZEGARELLI:  It was consolidated at that point.

THE COURT:  You can take a look at mine if you want to.  It's, I think, affirmative defense 22.

MR. ZEGARELLI:  Okay.

THE COURT:  Do you want to see that?

MR. ZEGARELLI:  No, not at this point.

THE COURT:  What's your position on the statute of frauds?

MR. ZEGARELLI:  The statute of frauds --

THE COURT:  You want to give it some thought for a few minutes?

MR. ZEGARELLI:  Yes, Your Honor.

THE COURT:  Okay.  We'll get back to that.

MR. NEISER:  Thank you, Your Honor.

THE COURT:  Let's go back to the law of the case.  And I think in part B, under trademark, Mr. Zegarelli, I think you wanted to take a look at part B and part C.

And part C, Mr. Neiser, I have a suggestion on the Pennsylvania Trademark Act issue, which we'll get to when we get

to it.

MR. NEISER:  Yes, ma'am.

THE COURT:  So, Mr. Zegarelli, if you can look at B, let us know what your position is on that, and then we'll move forward to C when -- after you've done that.

MR. ZEGARELLI:  Your Honor, what -- that was what number, again, Your Honor?  I'm sorry.

THE COURT:  That was under the law of the case, and this is part B, which is trademark infringement-nature of claims.

MR. ZEGARELLI:  I got ya.  Sorry.  Thank you, Your Honor.  Okay.  So it's B, trademark infringement-nature of claims.

THE COURT:  Right.  While I'm thinking about it, just so everybody knows, I'm going to make the captions on the verdict form and the jury instructions, since they're going to get both, consistent so the caption will reference the fact that there's a counterclaim and that there's a consolidated case, like we do on the verdict form, just so there is consistency and nobody's confused about that.

MR. ZEGARELLI:  Okay.  So the language that is removed, we had suggested some language that exposed the assignment that has been pleaded at the citations that I gave earlier.  So I think our suggestion had conversely PSG claims a predecessor company, and we -- and there's some language in that

regard, Your Honor.

Now, whether or not we need it there or somewhere else to be most efficient, perhaps we could come back to it.  I don't -- so I don't have a problem with B.

THE COURT:  Okay.

MR. ZEGARELLI:  Other than the fact that we still have a looming issue with regard to the licensing issue.

THE COURT:  We'll get to that, I promise you.  But -- okay.  This is more just very briefly so they understand the nature of the claims.

So let's move to C.  I think, Mr. Zegarelli, you wanted to take a look at that.  And of course, also in this one, we do reference the Pennsylvania Trademark Act.

So, Mr. Zegarelli, when you're done and you know, other than that portion, you're okay with it or not, then I'll mention our suggestion on the Pennsylvania Trademark Act.

MR. ZEGARELLI:  I will say, Your Honor, that I did look up the law of the state trademark, and this is -- based on the pleading, this is basically the cancellation of the registered mark in Pennsylvania that's cited by the Pennsylvania statute.

And if I can get that section for you.  I believe it's stated in Section 1116 of the Pennsylvania Trademark Act.

THE COURT:  What does it say?

MR. ZEGARELLI:  It --

THE COURT:  In essence.

MR. ZEGARELLI:  In essence, you don't have a trademark registration to the extent that it gets canceled because it goes to court.  In other words, it's still subject to challenge and review based on ownership of the trademark itself.

THE COURT:  So if a jury were to find that none of the POM Parties have a trademark, then obviously that registration is canceled out.  Is that what you're saying?

MR. ZEGARELLI:  Yes.

THE COURT:  And if the jury were to find they do --

MR. ZEGARELLI:  Then at least that -- as to that question, that would at least supply the basis of a mark, a substantive right to register.  Now, there may be other flaws in the process, but at least with regard to a substantive trademark right to register, it would satisfy that issue.

THE COURT:  Okay.  I know you were going to think about what you might want to do on that, and before I make any suggestions, what are your thoughts about it?

MR. NEISER:  We were just going to suggest that we'd be okay with the Court just making the ruling as a question of law based upon the facts adduced by the jury.  I mean, I think that would be the easiest way to do it, but I would love to hear the Court's suggestion if there's another way.

THE COURT:  Well, this is something that we could do very easily.  It may or may not satisfy everybody's concern.  I

don't know if everybody has the verdict slip available, but I'll just read what I would propose as a change to paragraph 3 of the verdict form.  And if you can bear with me, I'll just read you, and I'll tell you what the addition is.

"Have POM of Pennsylvania, LLC, and Savvy Dog Systems, LLC, established by a preponderance of the evidence that Pennsylvania Skill Games, LLC, infringed the Pennsylvania Skill quote/unquote, word trademark."

Here's the addition:  "Under federal law (Lanham Act), the Pennsylvania Trademark Act, and the Pennsylvania common law, after POM of Pennsylvania, LLC, and Savvy Dog Systems, LLC, establish a secondary meaning in the marketplace."

MR. NEISER:  We'd like that.  That's great, Your Honor.

THE COURT:  And in other words, we're encompassing all three of them.

MR. NEISER:  Love it.

MR. ZEGARELLI:  I think there's a hidden premise there, Your Honor, that the -- that any establishment of a market is able to be acquired by them without infringing or based on any right that moves through the EPA.

In other words, that question is loaded with a fact that precedes it that they are able to develop those rights. And you have to get over the fact that they may not be an infringer and/or that it doesn't flow through a license right

that would make those rights and you're back to PSG.

If -- if the right to use is based upon the relationship or a permissive right, then those rights will inure back to PSG, and that has to be determined before you get to a question that presupposes they could even violate that issue. In other words, that has a fact built into it that hasn't been established.

THE COURT:  This is just reading one portion of the verdict form.

MR. ZEGARELLI:  Okay.  Then maybe I can't --

THE COURT:  When we get to that, you know, we'll see whether you think what precedes it is sufficient or not.

I think my point was just rather than leaving out trademark act and -- Pennsylvania Trademark Act and dealing with it at some later time, which I think there was a difference of opinion about, if we encompassed the infringement under any body of law, in other words, federal, Pennsylvania, or common law, would that satisfy everyone's concerns?

MR. NEISER:  We were fine with that as you read it, Your Honor.  I think it's an elegant solution.

THE COURT:  All right.  Well, we'll get back to the verdict slip.  But I think it's probably better to put something in the verdict slip and have it resolved than to have some sort of weird hybrid, where, you know, three months from now, we'll all go, "What was it that we agreed to or not?"

So that way, we can address it in the verdict slip with the jury.  If there are legal issues later about declaratory relief or whatever, then we will have the jury, having made the factual determinations that we need to have them make.  Okay with everyone?

MR. ZEGARELLI:  Well, it sounds like a punt until we get there, if I understand it.

THE COURT:  Well, I think what we've decided is, we're going to address the Pennsylvania Trademark Act in the instructions and in the verdict form in some way or another.  If there are issues about how we do it, we'll get do that.

MR. ZEGARELLI:  Okay.

THE COURT:  Okay?  That way, we don't have to worry about some hybrid mechanism.

I think I interrupted you, Mr. Zegarelli, from looking at part C.  But if you can take a look at that and then let me know if you have any issues with it.

MR. ZEGARELLI:  And you're saying C, as in trademark infringement and unfair competition elements?

THE COURT:  Yes, elements and burden of proof.

MR. ZEGARELLI:  The difficulty, Your Honor, is the instruction.  And the instruction -- the problem is that Pennsylvania corporation bureau rubber-stamps the filing.  Once that rubber stamp occurs, then you get into a sort of -- well, you can't -- you can't file because the other guy filed and so

we're sort of stopped from proceeding.  So you kind of get a free punch and you can't defend against it.  So the fact that that instruction is in there is baiting a -- in my view, that sort of baits an answer.  But it's sort of --

THE COURT:  What part of it are you talking about?

MR. ZEGARELLI:  In addition, POM of Pennsylvania and Savvy have a claim for violation of the trademark act, and Pennsylvania Skill Games does not have a claim for violation of the trademark act.  But that context is sort of like a free punch because that particular claim is in dispute as to the proprietary of that claim.

So my concern and my qualification would be to somehow qualify it just to let the jury know that there's -- that they are not baited into that -- that that act gives -- you know, it sort of baits them to say, oh, you have a registration.  You must own something.  It's the same thing with the supplement.  Just somehow to qualify.  You can do it for both equally.  It's just it shouldn't be -- I think that baits it in a prejudicial way.

THE COURT:  Well, could we include a similar instruction as to what we instructed the jury when exhibits were introduced, like the registration applications, that sort of thing?

MR. ZEGARELLI:  I think that's at least a solution.  As long as it balances it out, it doesn't bait an -- necessarily

an untrained perspective of, oh, they have that registration and they forget -- we're disputing that registration.

THE COURT:  Well, I mean, this language really only says there's a claim for a violation.  I mean, it doesn't really say anything else about they're basing this on a registration, et cetera, et cetera.

MR. ZEGARELLI:  I understand.

THE COURT:  So I'm not sure that I see the real harm there.

However, if the parties agreed, we could repeat the instruction that we had when the evidence came in on both sides on this issue.  I mean, we'd have to think about the right place to put it.

MR. NEISER:  I don't see a need for it, but I'll do whatever the Court would like to do.  It's just saying one party has the claim, one party does not.

THE COURT:  Yeah, I don't see this language as being -- each party has its own claims.  Would you prefer that I take out that you don't?  Would that make it better for you?

MR. ZEGARELLI:  That you don't?  Oh --

THE COURT:  I mean, so is it that it's prejudicial because it's somehow implying they have a superior right because you didn't assert the same claim?  Because we could simply take the second sentence out that you have not asserted one.  Because I don't think this goes into anything other than saying that a

specific party has a claim, which we're saying throughout.  So saying somebody has a claim, I think, is sort of, you know, everybody has claims.

MR. ZEGARELLI:  As you say that, Your Honor, I'm actually not sure that the prefatory language or the language above that particular paragraph needs to be isolated for federal and state.  I think it could be abstract.  I think that language -- I think that language is equally applicable -- that substantive language.

THE COURT:  Yeah, we say that at the bottom, I think at the very end.  The elements are the same.

MR. ZEGARELLI:  Right.  In fact, I'm not even sure, therefore, you need a distinction between the two.  And it just needs to say the substantive principle and doesn't necessarily need to break that off as an instruction.

THE COURT:  Do you mean getting rid of under federal law?

MR. ZEGARELLI:  Right.  In other words, if you just say, this is the standard for a trademark, because it's federal or state, so it's -- you don't need to necessarily break it out because it's applicable to both.  It's the breaking it out that I think is the bait-in.

MR. NEISER:  I don't understand the bait-in.  I don't understand this.  We're just saying what the parties have filed.  There's no baiting.  I mean, this is a very simple instruction.

I mean, I'm not sure what -- because this is the slippery slope we keep getting into with everything.  We start putting water in the cracks, and then all of a sudden we're talking about licenses and assignments and oral agreements and all of these other things that aren't in the case.

MR. ZEGARELLI:  Wait a minute.  You pled assignment. Please don't say it's not in the case.  It's in your pleading in multiple paragraphs.  So, you know...

MR. NEISER:  So what.

MR. ZEGARELLI:  Oh, now it's a "so what," Julian.

MR. NEISER:  No, it always --

MR. ZEGARELLI:  You're saying it's not in the case. It is in the case.

MR. NEISER:  It's always been a "so what."

MR. ZEGARELLI:  You pled it.  So we're off point --

THE COURT:  Before we get to assignment, let's deal with this.  I don't really see the harm of saying that POM of Pennsylvania and Savvy Dog have brought a claim for violation of the Pennsylvania Trademark Act.  I don't really see an issue with that because all we're saying is that they brought a claim. And so -- and then we say the elements of a claim for trademark infringement are the same under federal or state law.

MR. ZEGARELLI:  So, from my perspective, I would say don't need to separate it because it's immaterial to the question.  If you did separate it, then I would say remove the

statement about Pennsylvania Skill Games since I think that is the distinguishing characteristic that, I think, makes it look like -- I'd rather leave that sentence out than leave it in.

THE COURT:  Then let's take that sentence out.  You can take a final look at it.  But I think with that, I don't think it's saying anything more than that there's a federal claim that the parties have and then POM also has a trademark act claim, because we've already referenced both unfair competition and trademark infringement at the beginning.  So why don't we take that sentence out, and everyone can take a final look at it.

All right.  I don't think there was anything until we got to senior user, which is in F.  But if I'm wrong about that, please let me know.  We have the definition of trademark.  We have trademarks versus trade names that precede that.  And then we had a series of discussions and issues about senior user and reverse confusion.

MR. NEISER:  I don't think we have anything to add to that, Your Honor.

THE COURT:  Okay.  You had talking about the Lucent case and then the case that was cited by --

MR. NEISER:  The use.  That's what we're talking about.  That's right.

THE COURT:  You do have something.

MR. NEISER:  I do have something, Judge.  I'm sorry.

MR. ZEGARELLI:  When I looked at the Lucent case, that case was not a senior user case.  And, in fact, they talked about reverse confusion.  So I think that might be a case -- oh, the Court has it.

THE COURT:  I do happen to have it.  I got the sense -- and, of course, I've only really skimmed this case, Mr. Deasy, and I know you know it better.  But I think when we first talked about this, you mentioned priority, which, I think, does relate to senior user.  And then you also mentioned market penetration and the four elements that you look at there.

I sort of see those as different, and I know we talked about this a little bit before.  But why don't we start with the concept of priority, i.e., senior user, and then let's talk about how that can flow into potentially market penetration.

I think, in the Lucent case, they did have a fairly concise description of reverse confusion, and I guess I'm asking whether the parties want an instruction about reverse confusion, which I don't believe was suggested in your proposed jury instructions.

MR. ZEGARELLI:  I think it would be appropriate, Your Honor, because, in fact, that is exactly the issue that's going to get confused if it's not sorted out.

THE COURT:  And I will say that succinct -- and I'm looking at the summary which, to me, is very succinct -- does talk about market penetration.  So if you wanted to add

something there about market penetration and the factors, that seems to flow from senior user to reverse confusion and market penetration.

If we work on something that sort of incorporates all of that, are the parties okay with the general concept of working it that way?

MR. ZEGARELLI:  I think I'm okay with that, Your Honor.  I think senior user is the first user, assuming it's not abandoned and there's not -- you know, actually the case talks about -- and that's a pretty discrete issue.  Other issues are other issues.  So I'm okay with that progression.

MR. NEISER:  Yeah, I'm not familiar with the summary, Your Honor, reverse confusion --

THE COURT:  No, that's okay.  I can at least show you -- this is that one --

MR. NEISER:  Can I see that for one second, Your Honor?

THE COURT:  Yeah, you're welcome to.

MR. NEISER:  Thank you.

THE COURT:  And everyone doesn't have to be okay with that.  I'm just trying to come up with something that covers all of the bases here, and it may well be we don't need it.  I don't know yet.  But we can certainly work on some language and show it to everybody.

MR. NEISER:  I don't even think we need a reverse

confusion instruction at all.

MR. ZEGARELLI:  Well, that's the big point, Your Honor, in the sense of, you know, it is very easy for a jury to get confused that, you know, $5 million gifts to fire halls or all -- you know, that -- the issue is my client might have that $5 million if the EPA wasn't breached.  So that's the whole reverse confusion thing.  The infringer ends up having the market, and it's very confusing to a fact finder without some form of instruction.

MR. NEISER:  I'm just thinking about the evidence that we just heard over the past five days, and I'm not quite sure where on earth that comes from but --

THE COURT:  Let's do this.  You don't think it's necessary.

MR. NEISER:  I do not.

THE COURT:  You do.

MR. ZEGARELLI:  Yes.

THE COURT:  Let us take a look at it.  We will put something together in this section, and everyone can look at it and interpose any objections.  If there's something about it that you don't like or if we can fix it, we'll do that.  Okay?

MR. ZEGARELLI:  Thank you, Your Honor.

MR. NEISER:  Thank you.

THE COURT:  Okay.  Anything else in that section?

MR. NEISER:  I don't think so, Your Honor.

MR. ZEGARELLI:  I don't think so either, Your Honor.

THE COURT:  My notes -- the next thing I have in my notes, subject to anything anyone else wants to raise before that, is when we were talking about fair use.  And we had two alternatives.  And, again, this goes back to the paragraph before that says, "You must consider the defenses raised by POM and Savvy Dog," and both of those defenses were in the affirmative defenses.  I did not see either one in the affirmative defenses of PSG.

MR. ZEGARELLI:  Right.  I would say it's not claimed as fair use, but if you claim you're the owner, how do you not have a fair use implied in that?  I mean, if you're the owner and you say they're not the owner, I don't know how that isn't a fair use.  It subsumes it, in my view.

THE COURT:  Excuse me.  Go ahead.

MR. ZEGARELLI:  I was going to say, so if the fair use defense is abstract --

MR. NEISER:  It's pleaded.

THE COURT:  I think more the issue here is that it's pleaded as an affirmative defense by the POM parties, not pleaded as an affirmative defense by PSG.  And I think that's also true with respect to abandonment, which is why this is laid out the way it is.

MR. ZEGARELLI:  Right.  And abandonment, Your Honor -- I think that one doesn't so much concern me as a -- I mean,

that's sort of on its own.

Fair use is really built into, if I think I own it, that's -- I think that implicates fair use, even if not stated as such.  I think the substance of the defense -- you're not the owner of the mark; I am -- assumes fair use.

THE COURT:  Well, I think in the prior paragraph, we've said if POM hasn't proven their case, then you have to find for Pennsylvania Skill Games.  So that takes care of if POM hasn't -- the jury doesn't believe that POM has established a trademark, then we go to, okay, they have found for Pennsylvania Skill Games.  So what is the defense or what are the defenses to -- if Pennsylvania Skill Games has proven the elements of trademark infringement?

And so we're already looking at PSG having proven those elements and what are the defenses that POM could consider.  One is fair use, and one is abandonment.

MR. ZEGARELLI:  Could it not go the other way, Your Honor?

THE COURT:  Not if not pled.

MR. ZEGARELLI:  But there is a claim, infringement, if I understand it, against PSG.  So if that claim is upheld, then is there not a defense that the use was based on an understanding that it owned the mark or that it was permitted --

THE COURT:  That's not fair use, though; right?  Fair use is using it for some other use, not as a trademark.  Not as

an infringer.

MR. ZEGARELLI:  Okay.  Let me see how that's worded, then.

THE COURT:  Yeah, take your time and take a look at it.  I think it would not apply to what you've said.

MR. ZEGARELLI:  Other than as a trademark.

MR. NEISER:  Your Honor, while Mr. Zegarelli's doing that, I may be able to clarify what we're going to do with the contract claim, if I can step out for just a minute and talk to the client, if that's okay with you.

THE COURT:  We can certainly take a break if everybody needs one.

MR. NEISER:  We're going on an hour.  That might be good if we can have 10 minutes.

THE COURT:  Anybody is welcome to stay in here if you want to.

MR. ZEGARELLI:  I'll stay in here, if you don't mind, Your Honor.

THE COURT:  That's absolutely fine.

(Whereupon, a recess was taken.)

THE COURT:  I want to go back to something while we have the opportunity, because I think it might better resolve or give you a higher comfort level, Mr. Zegarelli, on C.  And this is trademark infringement and unfair competition elements and burden of proof.

So I think, if you compare that with section Q, which has the same thing with respect to the Pennsylvania Trademark Act, the elements and burden of proof, we could eliminate in C everything beyond the two numbered paragraphs. Because in Q, we have decide -- we have talked about whether Pennsylvania Skill Games engaged in trademark infringement under Pennsylvania state law, and we say the standards are the same, which is exactly what we say in C.

So it seems to me that it's cleaner just to cut off -- because we've already talked about trademark infringement and unfair competition under federal law and said what the elements are. Later on, in a good order, we talk about the elements of the Pennsylvania Trademark Act, and that way, we eliminate any issue that you might have there, Mr. Zegarelli.

And then what I would suggest is, after Q, we add something about common law trademark infringement just to sort of close the loop on it.

MR. ZEGARELLI: It all sounds abstract, as you present it, Your Honor, so I think that's a good solution.

THE COURT: I think it's going to be fine as long as everybody's okay with that. We'll add something about Pennsylvania common law that basically says it's the same thing as everybody else's. And, of course, you can take a look at that. But that will come after we've talked about the burden of proof on the Pennsylvania Trademark Act. It will either come

right before or right after.  But we'll work on that.  Okay?

MR. ZEGARELLI:  Thank you, Your Honor.

And the fair use, I think it was throwing me off a bit.  It looks to be a typo on -- at the very top of page 17.  Maybe not.  I thought there was a three repeated twice.  Maybe I'm in the wrong section.  And perhaps bleary-eyed.

So, if I understand it, we've got two different alternatives, infringement defense and fair use.  The first one discusses the POM parties -- they're pretty close to each other, quite frankly, Your Honor, and I'm not sure I have a strong preference for one or the other.

THE COURT:  All right.  Then let's go with the first alternative.

MR. ZEGARELLI:  Okay.

THE COURT:  Mr. Neiser, you were going to check with your client about an issue.  Have you done that?

MR. NEISER:  I have, Your Honor.

THE COURT:  Do you have anything that you wanted to mention on that score?

MR. NEISER:  Yes, Your Honor.  On the contract claim, I think it's more important to get an instruction from the jury as to duration.

And we want to withdraw our contract claim.  Not going to seek or enforce anything past February of 2018.  The pleading's only alleged up to 2017.  We believe the contract is

terminated or had been abandoned as of February 14, 2018.  So we're going to withdraw any claim from thereafter.

THE COURT:  So no breach of contract claim at all?

MR. NEISER:  We're going to pull the whole thing, Your Honor.

THE COURT:  Okay.

MR. NEISER:  As long as we can -- we would like in exchange -- to the extent I can negotiate with the Court and we can get things, the purpose of it is to at least explore having a factual determination as to the duration of the contract.  And I think that would be fair, because we need a fact finding for the damages element if -- to the extent that we'd lose.

THE COURT:  Okay.  So you're suggesting that you would drop your breach of contract claim in its entirety and ask the jury to determine the fact of whether the contract is still in effect or terminated at some point?

MR. NEISER:  Yes, Your Honor.

THE COURT:  Okay.  We'll get to that in the verdict slip.  But I understand that we'll eliminate "breach of contract" from the verdict slip.

MR. NEISER:  Yes.

THE COURT:  And we'll make the necessary revisions in here.

MR. ZEGARELLI:  May I ask just as a preliminary?  Is it withdrawn at this point irrespective of verdict slip, or is

it withdrawn only if there is something that occurs in the verdict slip?

MR. NEISER:  Right now, it's an "only if."

MR. ZEGARELLI:  It's an only if.  Okay.  Just so I understand.

MR. NEISER:  But that could change.  Our intention is to withdraw it and get clarity for the duration.  That is my stated intention.  But if I'm not going to get anything out of it, then I may keep it in.

MR. ZEGARELLI:  Just thinking about it, Your Honor. Okay.

THE COURT:  We're all thinking.  We're all thinking. Okay.  When we get to the verdict slip, we can certainly go back over this again and make a final determination.  But I understand your preliminary request, and we'll deal with that.

MR. NEISER:  Thank you, Your Honor.

THE COURT:  Okay.  Abandonment, there was some reference to a three-year presumption?

MR. NEISER:  I don't think we're going to do that, Your Honor, simply because there's a split of authority on this. There is a split of authority.  There is a presumption of three years.  And I don't think that -- as we were sitting here this morning, I was skeptical, and as I looked at cases over the break, we are even more so.

THE COURT:  All right.  Then we'll leave that out.  So

I think otherwise, that instruction, I don't think there's any other issue on that.

I'm not sure if we have anything else, but please check your notes.

MR. NEISER:  There was one --

THE COURT:  We might -- and we will get to your issue about the -- you know, I haven't forgotten about that.

MR. NEISER:  I'm sorry, Your Honor.  Page -- this is not -- I want this very clear on the record, this is not me correcting the Court or the typographical error in any way, shape, or form.  It is just I can see you trying to read this and realizing it wasn't going to help.

Page 25 --

THE COURT:  I'm always happy to have typographical errors corrected.

MR. ZEGARELLI:  It might have been ours, Your Honor.

THE COURT:  Thank you for suggesting that.

MR. ZEGARELLI:  The "both and" was actually our language.

THE COURT:  I'm confident that this is going to be the parties' typo.  But just in the rare event, where are we looking at?

MR. NEISER:  We're certainly at fault for anything. On page 25, above the first enumerated paragraph, first sentence that says "To succeed on this defense, the relevant must prove."

THE COURT:  I'm sorry.  Okay.  Yeah.

MR. NEISER:  And I'm not even sure what that would be --

MR. ZEGARELLI:  You said PDF page 25?

MR. NEISER:  Yes, sir.

THE COURT:  Yeah.

MR. NEISER:  Look at the blue circle.

THE CLERK:  Should it be "relevant party must choose"?

THE COURT:  Yeah, I think "relevant party" works. Yep.  Thank you.

All right.  Did we have other issues?  I'm looking through my notes.  Okay.  We'll deal with breach of contract and whether there's going to be a change there when we get to the verdict slip.

I don't have anything else in my notes, but if anyone has anything else.  And just so you know, when we make changes to this, other than, say, correcting a typo if Pennsylvania is spelled wrong or something, we'll redline them so everyone will be able to see what the changes are made.  Of course those redlines will be taken out before we give it to the jury.  But that way you can see what we changed, added, deleted, so forth.

MR. NEISER:  I have nothing else to add, Your Honor.

THE COURT:  Okay.

MR. ZEGARELLI:  The two, as you mentioned, Your Honor, we have the licensing issue, and I -- and I did recall seeing a

supplemental registry instruction, but maybe it was in there, and I didn't see it.

THE COURT:  It is not in there.  But if the parties want me to add something that is comparable to what we said during the trial, we can do that.

MR. NEISER:  I don't see a need for it, and I think it confuses things because it really has no validity or any import. It was more to temper the evidence as presented at trial and to give clarity.

As far as an instruction of law, I don't think that it really applies.

MR. ZEGARELLI:  So, Your Honor, that leaves the licensing itself.

THE COURT:  Okay.  So --

MR. ZEGARELLI:  Which is license, assignment.  The whole issue -- the whole issue of why the POM Parties are in there's case -- not the POM Parties, but Savvy Dog and POM.  And it was alleged in the PSG case, of course, multiple times, as I've indicated.  So it is relevant.  It is pleaded.  It is denied.  So the question is how does that get before the jury with regard to the denial of -- an instruction before the jury with regard to PSG denying the fact that Savvy Dog and POM are proper owners of any rights?

THE COURT:  Because of the difference in the dates of the documents or is this --

MR. ZEGARELLI:  No, no.  I think there's -- that's a fact question that challenges the evidence that was introduced by the POM parties.  But this is just simply the POM parties have asserted their successors in interest as a fact, which we -- which PSG has denied in multiple -- many paragraphs.

And so the question is, how is that question -- I think you mentioned last time, or one of the times we were here, maybe it's part fact, part law.  But how does that get resolved?  Because to the extent it's a fact question, if the rights are not properly in POM or Savvy Dog, I mean, that whole PSG -- I'm sorry -- that whole POM case effectively -- we still have claims but that whole case -- that whole case goes away.  So it's an important point.  It's a fundamental point.

THE COURT:  And so what are you suggesting?

MR. ZEGARELLI:  I think there should be an instruction that indicates that the jury should make a factual determination as to whether or not the POM parties and/or -- Savvy Dog and/or POM of Pennsylvania trading and doing business as Pace-O-Matic have properly acquired rights to bring the action under this -- in the case.

MR. NEISER:  Having heard no evidence on it and providing them with contracts for them to interpret to determine whether or not an assignment occurred, I think that's -- that that's completely outside the purview of the jury.  It's a legal issue.

And I understand that Mr. Zegarelli wants to take the position that there was an entity that was created later, but there's nothing wrong with that.

MR. ZEGARELLI:  Well, that's a conclusion.

MR. NEISER:  Of what.

MR. ZEGARELLI:  Of law.

MR. NEISER:  Yes, precisely.

MR. ZEGARELLI:  I'm not saying whether it's right or wrong.  I'm saying --

THE COURT:  Don't all talk at once.

MR. ZEGARELLI:  You're giving a legal opinion as to the propriety of it all.  I'm saying is maybe it's right, maybe it's wrong, but the fact that -- in fact -- I mean, it's not even like a legal -- you don't even need a legal conclusion. The signer of the document was not alive to sign the document. You don't need a lawyer to figure that out.

MR. NEISER:  Gregg, that's not the way this works. Anybody that's been around a transaction knows that's not the way it works, and that's not correct and --

MR. ZEGARELLI:  I've been around it for 35 years, and I consider that a significant issue.

MR. NEISER:  Why didn't you file summary judgment on it?  The documents were in your possession three years ago.

MR. ZEGARELLI:  That's not a question right now.

MR. NEISER:  Sure it is.

MR. ZEGARELLI:  The question right now --

MR. NEISER:  You don't have a standing affirmative defense?  That's one.  Number two --

MR. ZEGARELLI:  There's a cause of action --

MR. NEISER:  You don't have standing.  You don't have standing.  You did not raise it as an affirmative defense.

Number two, even if you were to take a whack at POM of Pennsylvania under that theory, which I think would fail immediately, there is no such argument about Savvy Dog.

MR. ZEGARELLI:  No, I don't --

MR. NEISER:  Savvy Dog --

MR. ZEGARELLI:  Savvy Dog was formed in the end of 2016.

MR. NEISER:  It sure was.

MR. ZEGARELLI:  Yeah, I understand.

MR. NEISER:  So there is no claim that one or both -- and we've pled both -- have those rights under the state and the federal law, and I think it would be wholly improper to put in front of a jury assignment agreements, contracts, and have them make a decision as to whether or not a proper assignment occurred under the law.  I just can't see how you could ask a jury to do that.

So regardless of the facts or disagreements on what we think is proper or not, I don't think that is a proper jury question.

MR. ZEGARELLI:  Unless it comes in through the EPA.

MR. NEISER:  What are you talking about?

MR. ZEGARELLI:  Whether it's allowed to be assigned or not assigned.

MR. NEISER:  See, that, Your Honor, is under one paragraph that says that the buyer can assign, and there's no prohibition about the seller assigning it.  And that also relates to their alleged oral contract that a trademark right came through the Equipment Purchase Agreement, which doesn't appear in the Equipment Purchase Agreement, though there was testimony on it.  But what they're talking about is -- and it's so remote.

I mean, this isn't a hypothetical anymore.  We've gone through five days of testimony.  So I don't even think it's a good faith argument to make it because there really isn't any evidence on this.  There really isn't.  That there somehow is a trademark right that was either oral, which we haven't seen any evidence on other than your client's testimony, that it flowed through the Equipment Purchase Agreement, which there was no testimony other than your client saying that, and somehow it relates to and results in a written agreement where it isn't even contemplated or referenced because there is no prohibition against our clients assigning the contract.

So, therefore, we need to put four agreements from 2017 in front of eight lay jurors and have them make a

determination as to whether an assignment is appropriate, without them pleading an affirmative defense for standing.

I'm skeptical. I just don't understand how we can do that.

THE COURT: Well, I don't think a jury can look at documents and ascribe legal significance to what it means. I think if the parties want to argue the legal significance of how the evidence came in with the agreements, the dates on them, later dates, you can do that. And I'll make a legal decision about it. But I don't think you're going to put documents in front of the jury and have them decide whether there was an effective assignment, whether -- if a party doesn't exist that precludes the assignment. I think those are all legal issues.

If the parties want to make those arguments, you can make them to me now, tomorrow morning. I'll reach a decision on it, and we can go from there. But I don't believe that that is a jury question. I think that's a question for me.

MR. ZEGARELLI: Okay. Thank you, Your Honor.

THE COURT: And if anyone wants to make argument about why there is no issue with it, that's fine. If you want to make an argument there is an issue with it, that's fine. But we'll get that resolved before the case goes to the jury.

MR. ZEGARELLI: So the facts -- the facts as adduced at trial are the facts. The legal conclusion is a matter that, at least as we sit here now, we need to bring to you for a

decision?

THE COURT:  Right.  I haven't seen any case law.  I don't know whether there is case law on the issue of the dates or who did what or anything else.  But if there is any case law anyone wants to bring to my attention, feel free to do so.

MR. ZEGARELLI:  Okay.  Thank you, Your Honor.

THE COURT:  But I think the jury can't decide whether the assignment was effective based on the documents that were put into evidence.  So that's not going to be an issue that goes to them.

MR. ZEGARELLI:  Thank you, Your Honor.

THE COURT:  Anything further anybody wants to say about it now?

MR. NEISER:  No, Your Honor.

THE COURT:  Okay.  All right.  So was there another issue regarding license or assignment?

MR. ZEGARELLI:  Really those are all related concepts in that the question is, you know, the propriety or impropriety of POM and Savvy Dog acquiring rights that they would be legally permitted to assert.  So I think --

THE COURT:  Okay.

MR. ZEGARELLI:  Whether you call it a license, whether you call it an assignment, any of that, the successor in interest, you have to become a successor through some mechanism. And if I understand it, that's a legal question.

THE COURT: Okay. So that was all of the issues about license, assignment, anything that you wanted in the instructions?

MR. ZEGARELLI: Yes.

THE COURT: Okay. Were you going to say something?

MR. NEISER: No, Your Honor. We'll get you some cases.

THE COURT: Okay.

MR. NEISER: I mean -- is there any shape or form that you would like? I mean, we -- I mean, our argument on this is pretty straightforward. We have written assignments that were put into evidence.

THE COURT: Understood. I think as I understand the issue that Mr. Zegarelli is raising, is the timing of corporate formation versus assignment.

MR. NEISER: I understand that, Your Honor. I understand.

THE COURT: And I'm happy to hear argument now on it. I just want to give everybody the opportunity if there's some case law you want direct me to on that issue, that's fine. I'm happy to give you that opportunity. I think I understand the issue. It's just a timing issue, and it's whether it's, effective, regardless of the timing.

MR. NEISER: Sure, sure.

THE COURT: Okay. Anything anybody wants to say about

it now in addition to what they've already said?

MR. NEISER:  Well, just to lay it out, Your Honor. What we have is the only question that I think has been raised is that POM of Pennsylvania, LLC, has, you know, because it may not have been incorporated at the time that it signed the assignment agreement, it still is incorporated, I think, a few months later, which was still done before the lawsuit.

So even if it catches up at that point and then it goes into effect at the time that the entity was created, it's still before we even filed the lawsuit.  And Savvy Dog System and both of the parties have raised the claims, certainly had their assignment that was done before January -- or it was incorporated prior to the assignment agreement.

THE COURT:  Okay.  So the only issue, in your mind, is -- relates to POM, not Savvy Dog?

MR. NEISER:  Yeah, I don't think -- I really don't think there is an issue, but I don't think --

THE COURT:  I'm not suggesting.

MR. NEISER:  Absolutely not.  So the only question is whether or not -- and I don't even know -- I guess we can direct some cases to Your Honor.  But --

THE COURT:  I don't know if there are any cases.

MR. NEISER:  Yeah, we may not have them.

THE COURT:  I'm just suggesting that if there's anything else that anyone wants to argue, you can give it some

thought.

MR. NEISER:  Sure.

THE COURT:  And we can take it up again.

MR. NEISER:  That's -- that's pretty much it.  I can't even understand why we're having the argument.  That's, I guess, where I am.  Especially because they didn't raise a standing as an affirmative defense.

MR. ZEGARELLI:  I think Your Honor's trying to get to tomorrow morning, actually.

THE COURT:  Well, I want to think about it.  If I have a decision about it today, I'll let you know that, because it may impact something you might want to say or not say.  I'm not trying to put it off, but I want to think about it, too.  I need to go back and look at the documents.  You probably have better memory of them than I do, although I do remember the points that you made about it.

MR. NEISER:  Right.  And Michael Pace did testify, because we are dealing with common law and we're not dealing with registered marks, that he -- his intention was to assign and transfer over and may have done so verbally, too.  So I think -- when you put that all together with an unregistered mark, that need for this formal assignment, like Mr. Zegarelli is suggesting, I think we're covered in all four corners.

THE COURT:  I'll take a look at it.  I'll give you something today, or you'll know first thing in the morning.  It

doesn't sound like anybody has anything else.  If you do, feel free to give it to us before then, that's all.

MR. ZEGARELLI:  And, Your Honor, with regard to the legal conclusion associated with it, I understand it.  There -- the documents were entered.  There are factual issues.  And I think there are factual issues that are legal issues.  And the legal issues, I understand are not for the jury.

THE COURT:  Okay.  Before we move to the verdict slip, because I think we're pretty much done with anything we can discuss right now on the jury instructions, I want to get back to the statute of frauds, Mr. Neiser, because I'm not seeing a statute of frauds defense here.

I think what we had ruled before the case started was that the parties could introduce that the EPA is not a fully integrated document.  The parties could introduce evidence to explain but not contradict its terms, and therefore that evidence was admitted for that purpose.  I don't see why the statute of frauds would apply here.

I'm happy to hear from you on that, but I don't think there was testimony about prior oral contracts, or if there was, that would be subsumed into the explanation of what the terms in the contract mean.

MR. NEISER:  Your Honor, I think that was the -- I think that there was.  I think that there was -- I mean, that was the significant part of their claim that both Unises

testified to that there was some oral agreement that predated everything.

THE COURT:  But those -- the final agreement of the parties is -- as in the EPA and what was explained in the EPA.

MR. NEISER:  I agree.  Agreed.

MR. ZEGARELLI:  I think we said there would -- that's what's -- I think I actually remember it in open court -- that's what's going to the jury.  And in any case, it's still evidence in writing.  I mean, the statute of frauds question.  It's still -- the transaction we're talking about is still evidenced in writing.

THE COURT:  I think Mr. Neiser's talking about testimony that folks may have given about what they said to Mr. DeLuca or -- you know, you probably can give better examples than that.  But not necessarily things that were in writing but things that were oral.

MR. NEISER:  Yeah, things that were in oral that embodied their entire agreement that led to -- if the written -- I agree, the EPA is the written agreement.  Everything has funneled into that.  I still have a question in my mind whether or not there going to be, you know, argument of oral agreements to do other things.  And --

THE COURT:  Well, I think if there was such reference, that would not be appropriate because we don't have oral contracts here.

MR. NEISER:  Right.

THE COURT:  We have an EPA and whatever the EPA means, as described by the parties, including contradictory evidence about what previous marketing efforts are.  But whatever the testimony was about what that means is what the jury's going to hear, not, oh, well, there was an oral contract or we had an oral agreement about such and such.

MR. NEISER:  If that's the case, Your Honor, then we don't see a need for a statute of frauds instruction.

THE COURT:  Okay.

MR. NEISER:  If there is, then we do.

MR. ZEGARELLI:  As I understand it, I don't think we do, Your Honor.  I think the evidence -- the trial evidence is the trial evidence.  And I'm not seeing the issue of the statute of frauds.

THE COURT:  Because I don't think you're arguing oral contracts.  You're arguing that the EPA was explained by both sides and what they believe that it means.

MR. ZEGARELLI:  That's true, Your Honor.

THE COURT:  Okay.  Then I don't think we're going to include that defense.  But I'll take a final look at it.

MR. NEISER:  Understood, Your Honor.  With that understanding, that's fine.

THE COURT:  Let's look at the verdict slip, if we could.

MR. NEISER:  I'm there, Your Honor.

THE COURT:  Everybody have it in front of them?

MR. ZEGARELLI:  Uh-huh.

THE COURT:  Fire away.  I mean, we started out with the word trademark followed by the design trademark and the first question relates to whether the word trademark is valid and has acquired a secondary meaning.  And if they answer yes, they then say who established that.  And then the questions go from there.

You know, I will take pains to explain to the jury where they go from question to question because that's going to be the most confusing part to them.  You know, if the answer is "yes," go to question such and such.  So I'm going to review this in whatever final form it's in in its entirety.

MR. ZEGARELLI:  In number four, Your Honor, is there an "if" clause on the "please proceed"?

THE COURT:  I'm sorry.  Ask me again.

MR. ZEGARELLI:  Number four, is there -- for the "please proceed to question nine," should there be an "if" clause there?  It just says number four.  Then it says yes or no.  And then it says, "Please proceed to question nine."

THE COURT:  Right.  If you go back to two, it says, okay, who has established that?  And if it's Pennsylvania Skill Games, they go all the way to five.

MR. ZEGARELLI:  Oh, I see.

THE COURT:  If it's POM, they wouldn't answer five through -- they'd go right to nine.  And nine is the beginning of the design trademark.  So this is just separating out:  If it's POM, answer these questions; if it's PSG, answer these questions.

And we felt it was probably the better practice to separate out the parties, although if there isn't an issue there, we don't have to.  So we sort of have it both ways in here when you get to some of the later stuff.  So I wanted to get a sense whether that is important or not to either party.

It seemed to us, for example, Miele being a completely separate entity, might not want to be lumped in with POM of Pennsylvania.  If that doesn't matter to either party, we could eliminate some of these questions because then -- but of course, then, the jury, depending on who they find for, is going to have a damage award and whether it matters who that damage award is against, if I'm making sense.

MR. ZEGARELLI:  I understand, Your Honor.  It's --

THE COURT:  So we sort of have it both ways.  We've gone back and forth about what would be the more appropriate way to do it and certainly defer to the parties.

It seems to me it's cleaner to have them answer with respect to each party separately.  But you may not feel that's necessary.  And take your time to look at this.  We definitely have the time do it.

MR. ZEGARELLI:  In number ten, Your Honor, it does stick in my mind as it relates to the jury instruction that, you know, POM and Savvy Dog, to the extent there is a reverse infringement question -- I'm just trying to think through the -- sorry.  Reverse confusion.  I'm trying to think through how that impacts the questions.

THE COURT:  We'll get there.

Do you, Mr. Neiser, have a position on whether when we get to infringement, if there is a finding that any of the POM parties infringed on the Pennsylvania Skill word or design mark?  It doesn't matter which.  About whether we lay out and allow them to say, yes, Pace, no, POM, whatever.

MR. NEISER:  I don't think it matters, Judge.  I really don't.  I think that the way it's written, as the group, probably is the right one, if I'm understanding your question correctly.

THE COURT:  I guess my question is do we need to -- and it's to both of you.  Do we need to separate out which parties infringed when we're talking about the possibility that the POM parties, lumped as a group, infringed?  So in other words, do we need --

MR. NEISER:  I see, Your Honor.

THE COURT:  Do we need to separate out that it was yes to some and no to others?

MR. NEISER:  If we look at, like, number 14, for

example, and maybe I'm look at this the wrong way.  But we say which of the following parties have infringed on the design trademark?  We have each individual one.

THE COURT:  6 and 14 are the same.

MR. NEISER:  6 and 14.  Right.  I think the way that's done is fine.

THE COURT:  You would prefer to have it separated?

MR. NEISER:  Like that, I think, is fine.

THE COURT:  It seems to make sense to me.

MR. NEISER:  It does.

THE COURT:  Because an individual party, you know, if they're not liable, then they're not liable for the damages either.  So okay.

MR. ZEGARELLI:  And, Your Honor, I think you almost have to do it in some way like that in this particular case.

THE COURT:  Okay.  Before we go on, so I had suggested on 3 -- and there would be some others too -- that we add in, after the word -- after, quote, word trademark, in the third line -- under federal law, Pennsylvania Trademark Act, and Pennsylvania common law.  Otherwise, I think we would have to have a separate one for each.

Since the elements are the same and the burden is the same, it seems to me that adding that language sort of just -- okay, we don't have to go through each one of them, and it does explain that it's -- they're making that finding regardless of

the theory of liability, whether it's the Pennsylvania Trademark Act, the Lanham Act, or Pennsylvania common law.

MR. ZEGARELLI:  Your Honor, it still seems as if they have to draw a conclusion as to applicability of law to facts. And I think it's just more basic for a jury to say, yeah, I mean, the underpinning substantive question and then the applicable law would apply to the extent there's a claim for that applicable law.  I'm not sure I see the jury understanding -- you know, assuming they get to a point where they say, okay, it's POM's trademark or it's PSG's trademark -- I don't know how they start to draw conclusions as to -- it's going to be the same either way, I think.

I mean, there are filing technicalities, but those are legal questions, because I don't think they can figure that out. And then there are legal questions with regard to the difference in the law.  I don't think they can figure that out either.  The only thing they can say is, you know, did somebody use the mark with the intention to own it, or is it distinguishing for them? Those sort of substantive issues.

THE COURT:  I'm just thinking back to our discussion about Pennsylvania Trademark Act and whether we need to carve at least that out.

MR. ZEGARELLI:  But how does a jury even address it? If the law is the same in both, what is the jury doing differently?  I mean, if there were different elements, I'd

understand it a little better because there would be different elements.  I'm not even sure in that case you would say, you know, did they violate Pennsylvania law?  I think you'd say, did you hit that element?  But the elements are the same.

So I'm still at a loss for how the jury is going to actually -- I think they're all going to look at each other and not really know how to answer the question because you're asking them about a law.

THE COURT:  Are you suggesting the way it is right now is preferable to including stuff about the law?

MR. ZEGARELLI:  I think that with the instruction, they would be able to answer some of these verdict questions because there's an instruction related to it.  But once you start saying is -- do you -- you know, particularly when federal law and the same -- it's already been determined, federal and state are the same basis.  I think you're just asking them the basic fundamental trademark question, and I don't think you need to get into the law because I think that will confuse more than it won't.

MR. NEISER:  I'm not sure that I follow, to be quite honest.

MR. ZEGARELLI:  You're specifying the law, two different laws.  First, the two laws have the same legal basis, the same elemental basis, other than maybe they're different filing requirements.  But, again, the jury can't really figure

out the propriety of filing requirements.

So you have two laws based on the same substantive questions. So if you answer the substantive questions, starting to talk about does it violate federal law or state law, I think that just -- you know, what does that mean?

THE COURT: In other words, do we leave it as is, in the way it is in paragraph 3, although folks can certainly feel free to object the way it's currently worded, or do we add the references to what laws apply?

MR. NEISER: I think we leave it as is, Your Honor.

THE COURT: I think that's what you're saying too.

MR. ZEGARELLI: Right.

THE COURT: Does that create any issue with respect to the Pennsylvania Trademark Act if we do that?

MR. NEISER: I don't think it does.

MR. ZEGARELLI: I thought we were leaving that -- I thought that was going to be within your purview, Your Honor. In other words, once they answer that question, if you're reserving the right to handle the legal portion of that factual determination, I think that's for you.

THE COURT: Okay. All right. Then the word trademark questions and the design trademark questions are comparable, I think, to each other.

MR. NEISER: They are.

THE COURT: And I want to think about something, but

my question now is, with unfair competition and false advertising, which are current-numbered paragraphs 17 and 18, do we need there to separate out who?  So for --

MR. ZEGARELLI:  Yes, I think you do, just in fairness to the parties in question, because they can check a -- for all I know, they'll check POM and POM of Pennsylvania and Miele.

MR. NEISER:  I would agree.

THE COURT:  Then we'll add the same kind of thing that you see up in 16, for example, to each of those.

MR. ZEGARELLI:  Right.  Because otherwise, then you've -- they'll think that if one did it, they all did it. And maybe that's true.  But I'm not sure that's the legal --

THE COURT:  Yeah.  I mean, I think we should be consistent.  If we're going to ask about it for one, we should probably ask about it for all.

Okay.  We're at breach of contract.

So, Mr. Neiser, I think you wanted to reserve judgment on breach of contract --

MR. NEISER:  I do, Your Honor.

THE COURT:  -- and whether you take that out or not. So let's talk about that.  Refresh my memory about what the issue is there.

MR. NEISER:  I think that the issue that the Court mentioned earlier is that if we want to determine, as a matter of fact, the duration of the agreement based on the claim that

the contract has been abandoned or terminated, that that wouldn't be appropriate if we're going to seek breach of contract damages later than the date that we claim it was terminated.

THE COURT:  Which was February 14, 2018?

MR. NEISER:  Yes, Your Honor.  That's correct.

THE COURT:  And is that the date of Mr. Cline's letter?

MR. NEISER:  It is, Your Honor.

THE COURT:  So what would you propose would be a question there, if any?

MR. NEISER:  Do you find that the Equipment Purchase Agreement was terminated or abandoned?  Yes.  If so, when.

MR. ZEGARELLI:  Terminated versus breached.  I just -- abandoned, I sort of -- I got that concept.  But terminated versus breached.  And it sounds like your concern is that there is a breach without a termination.

MR. NEISER:  No.  What I'm saying is that I think the position --

MR. ZEGARELLI:  Excuse me.  And I'm just distinguishing in my mind the concept of a natural expiration because I don't think there's a natural expiration in that document stated.

MR. NEISER:  Yeah, that's part of the problem. There's no term.

MR. ZEGARELLI:  Well, there is a term.  As long as you're in the market.

MR. NEISER:  No.  You're claiming the one clause has a term.  But that doesn't mean the rest of the contract has a term.

MR. ZEGARELLI:   Well, that's more fact questions.  But nevertheless --

MR. NEISER:  I understand that, and that's what I'm trying to get to, because you're taking one phrase and you're giving a contract a perpetual life span based on that one phrase.  And I understand.  We disagree with -- you have a completely different reading of this than we do.  I acknowledge that, and that's for a jury to decide.

However, I don't believe that contract does live forever.  I believe that we at least stated our intention, and the right of first refusal really is the only component of the contract that's at issue, and I think it could be severed.  I think the Equipment Purchase -- the right of first refusal itself can rise and fall on its own.  And there are portions of it -- well, I think the entire agreement itself, a jury could decide whether it was terminated and/or abandoned based upon the facts in the case.

I struggle to see how in a damages phase that we would be able to do that.  I guess we could.  But if we don't -- because I'm thinking practically, do we litigate in the damages

phase, to the extent we even get there, the conduct of the party that would lead to the damages being capped?  I mean, the termination period.  And, I think, in the liability phase, that's where they need to make that decision.  Because if not, we're re-hoeing the same field.

THE COURT:  I suppose they could conclude that it was breached; right?

MR. NEISER:  Sure.

THE COURT:  And then the damages flowing from that would depend upon if, at some point, you know, what's the nature of the breach?  For instance, when did the breach occur?  And did the breach occur before or after a possible termination?  I feel like I'm talking in circles on that one.

MR. NEISER:  No, I understand, Your Honor.

THE COURT:  So I'm trying to think about whether you could have a breach without getting into if or when the contract terminated.  And I'm not sure you can separate those two on a liability phase.  I don't know.

MR. NEISER:  I don't know that we could either, Your Honor.  But I think that their breach -- well, this is the problem with a poorly drafted agreement.  There is no term. There is no way for us to tell when it ends.  I don't think it was intended to be a lifetime agreement.  Maybe it was; maybe it wasn't.  Who am I to say at this point?  But I know that we did communicate to them that the right of first refusal, we believe,

was either abandoned or terminated due to marketing activity.

And I think that if the jury is going to hear that -- I mean, it takes two to tango. We are not obligated to continue to provide rights under an agreement if there's no clause in there that says the agreement is for a period of years. I mean, typically we have a period of years. We have a term, and you have a notice provision. You give notice. 30 days passes and you're out.

Here, we don't have that. And because we don't have that, you know, I think we can argue to the jury that we didn't intend to the part -- to the contract to be a lifetime agreement. I don't even think there was any evidence about that, but it would be a pure argument. But when does it end?

The damages calculus will depend on when it ends, assuming we get there.

MR. ZEGARELLI: I'm not sure that's right. I think that the damage calculation is the damage calculation.

MR. NEISER: Well, we know it goes by machine by machine by location by location, because if there's no proof that those machines are in specific locations, then there is no lost profit analysis.

MR. ZEGARELLI: Well, that's not true either. You know, the world isn't that exact, Julian. There's science and methodology applied to assumptions based on certain statistics, and I think that's what the experts do.

I mean, I don't think you can breach an agreement and sort of with unclean hands kind of get out of jail by saying you move -- you know, every single machine has been, you know -- 20,000 machines or even 5,000 machines, everybody's chasing them around. I think you have to apply some science and rules to it, and that's the only way you could do it.

MR. NEISER: But at the same time, that is the lost profits analysis. It's based upon number of machines sold to these other operators that allegedly were in Beaver -- this is assuming they even get there -- that allegedly made it into Beaver County, you know. And so it isn't -- the flip side of that, it has to be with some, you know, some mathematical precision.

It's not exactitude, and I recognize that. But it's got to be something a little bit more than, "Hey, you sold 20,000 machines. We want all your profits for all 20,000 machines."

MR. ZEGARELLI: You've got an expert report. We're going to get to there. If we get to my expert's calculation, that's fair game. But we're still back to your question. I mean, the agreement says as long as you're in the market, and that's our position. The agreement is as long as you're in the market.

MR. NEISER: It says we'll provide fills to your client as long as we're in the market. That's the only thing it

says.

MR. ZEGARELLI:  Well, it says what it says.  But irrespective --

MR. NEISER:  That's all that it says.

MR. ZEGARELLI:  If that's the position that you're going to supply fills as long as you're in the market, that's what -- I mean, I don't have it up in front of me, but if that's what it says, that's what it says.

So you're asking a jury to do what?  Say the agreement in and of itself, as a matter of law, is terminated?

MR. NEISER:  As a matter of fact was abandoned or terminated.

MR. ZEGARELLI:  Is it?

MR. NEISER:  I think that it's appropriate for a jury to make that decision unless that's a legal conclusion, and then the Court can do it, and we don't even have to discuss it.

But I know for a fact we have a letter from Mr. Cline, and it's dated, and it expressly says that.  We have in our pleadings, we have alleged that the agreement has been terminated or abandoned.

MR. ZEGARELLI:  But your client's letter doesn't necessarily say all of that.  You're characterizing it in a way favorable to your argument, but I'm not sure it says what you just said.

MR. NEISER:  Okay.  But I know our pleadings are much

more clearer than that, and they were -- you know, they came in later. So I'm just asking, if we're going to have the jury make a finding of fact, whether or not they can make a finding of fact as to the duration of the agreement.

MR. ZEGARELLI: Maybe that's a damage question in and of itself.

MR. NEISER: It may be.

MR. ZEGARELLI: Maybe that's the punt for the moment because I'm not sure that question really goes to anything -- if it goes to something, does it -- does that go to liability apart from what you've already said? I'm not sure.

THE COURT: In many ways, it would go to damages because if -- let's just assume for the sake of discussion that the Cline letter resulted in the contract being terminated or it was abandoned as of that date, then, arguably, that would cap both parties' damages, arguably.

MR. ZEGARELLI: If it's a natural expiration or -- yeah, maybe -- maybe there's some underpinning fact to that, Your Honor. It's not -- I don't -- I think we're all clear it's not a natural expiration.

THE COURT: Right, because there's no duration stated.

MR. ZEGARELLI: They're still in the market. I'd say it differently. I'd say they're still in the market. So, therefore, we'd argue there's not a natural expiration.

THE COURT: Okay. Understood.

MR. ZEGARELLI:  And there was a stopping of the selling of the hardware when the case was filed, give or take. So my client hasn't been able to buy hardware.

Yeah, so I'm -- I'm not seeing the need for the question to the jury.  I'm just not seeing the need.  Because I'm not sure what -- what I'm doing with that answer.

THE COURT:  I think from -- as I understand it from the POM parties' position, it's determinative.  If there is not that question, then you're going to continue to seek a breach of contract claim?

MR. ZEGARELLI:  And I'm not overly concerned if they want to continue a breach of contract claim.

MR. NEISER:  I don't blame you.

THE COURT:  That's -- and if I'm mischaracterizing what you said --

MR. NEISER:  You're not.

THE COURT:  Okay.  I think, you know, the question is, is there an appropriate fact question that can or should be asked to the jury during the liability phase about the contract? And I think where it skirts the line of legality is, you know, was it terminated, you know, based upon Mr. Cline's letter?  And I don't know whether that's a fact determination or whether it was abandoned, whether that is a fact determination or a legal determination.  That's where I'm hung up.

MR. NEISER:  I understand.  I think abandonment

probably would be but termination may not be.

THE COURT:  I suppose the jury could conclude that Mr. Cline's letter -- I'm not saying it was -- but was self-serving or it had no effect or the parties kept working together and, therefore, that could suggest the contract was still in place.  So I think that's in -- my recollection of the principal evidence about potential contract termination is his letter.

Is there anything else that anyone thinks of that is in the record about termination, abandonment, that sort of thing, not legal argument but just facts?  I can't think of anything, but you probably have a better sense of that.

MR. NEISER:  Only that, you know, there are -- it would relate back to the Cline letter, just marketing activity and not placing machines out in locations and taking them for their own.

And -- essentially their argument is that they had the opportunity to keep Beaver County locked up without anybody else entering the market at all regardless of what they did.

And, you know, our position is that isn't -- that is not -- that's not good faith.  I mean, you can't just -- this was not to squeeze people out.  This was not to ensure that this is your territory, you don't have to do anything.  You needed to do something.  And that's our argument.

So by them not -- and them not offering any evidence

whatsoever of what they actually did in Beaver, which they did not do, then I think that, you know, the argument could be made to the jury, by them not introducing any evidence of any sales activities, other than the Marvin Harris information and some of the mention by Mr. Unis, there was no evidence offered about how many machines they actually have in Beaver County right now. Not a single one.

And I think that that -- the failure to put that evidence in opens -- at least paves the way for us to make the argument that they didn't do anything and that they're essentially taking the position that that right of first refusal gives them a complete right to keep everybody else out of Beaver County regardless of what happens.

MR. ZEGARELLI:  I think that's -- that was a mouthful that I just don't think is supported.

MR. NEISER:  I was there on Friday.  I didn't hear anything other than that.

MR. ZEGARELLI:  Well, I mean, keeping people out is not a right of first refusal.  Nor -- that's all I need to say on that.

THE COURT:  I'm not sure what the right answer is here.  I'm not sure your suggested "do you find that the EPA was abandoned" is a fact question.  It might be.  I'm going to have to think about it.  And I recognize that that puts you in a bind because you're trying to decide whether to go forward with that

claim or not.  But I'm going to have to think about whether, you know, there is language that we could propose that would be factual as opposed to drawing some legal conclusion.

MR. NEISER:  Understood.  And I appreciate the conundrum.

THE COURT:  All right.  We'll think about it.  That's all I can tell you.

Is there anything else on the verdict slip, other than, obviously, the couple of issues that we've talked about?  We will add all of the POM Parties to 17 and 18.

We'll add the three parties on number 20, Mr. Zegarelli, I believe the three parties that you're claiming breach for, Miele, Pace, POM.

MR. ZEGARELLI:  That's number 19?

THE COURT:  That's 20.

MR. ZEGARELLI:  Right.

THE COURT:  Okay.  I'm still pondering whether we should have something separate on the trademark issue, Pennsylvania Trademark Act.  If the parties agree that, as it's stated right now, they think that covers whatever issue might come later, I'm probably okay with that, too.

MR. NEISER:  And I think we're okay either way, Your Honor, to be honest with you.

MR. ZEGARELLI:  And my only caveat is, again, with the reverse confusion, which I think you're going to consider or --

THE COURT:  In the instructions, yeah.  I don't think we'd have anything in the verdict slip.

MR. ZEGARELLI:  Okay.  Yeah.

THE COURT:  Let me think about it.  If I think I want to add something, again, we'll redline.  We'll try and get these to you today.  Obviously, I can't promise what time yet.  But we'll work first on the jury instructions, send you a redline version of that.  I have to think about the contract issue on the verdict slip.  I'm just not sure what to do about that.

MR. NEISER:  Sure.

THE COURT:  So I want to give that some thought.  But you'll have that as well.

We need to finalize the exhibits.  We've gone through and confirmed from our list, I think with one exception, I think it was either Exhibit 86 or 96 that I don't think that was actually introduced into evidence.  It was from the deposition of Mr. Miele, I believe.

MR. DEASY:  DeLuca.

THE COURT:  DeLuca.  I was close.  And I'm not sure those exhibits were admitted into evidence.  I don't know that it's a particularly troublesome issue.  One was the agreement between Action Skill and --

MR. ZEGARELLI:  Blue Sky.

THE COURT:  Thank you.  And the other one, I don't recall what it is off the top of my head.

MR. DEASY:  I think it was a photo.  I think it was --
it wasn't a number, but it was a photo, the design mark.  It's
the same thing as 204.

THE COURT:  Same thing.  So I don't think we have to
worry about that.  It's more, if you can come to an agreement
about whether the other exhibit comes in or not.  I don't think
it's particularly critical that it come in since it's an
agreement between two other parties.

MR. NEISER:  I don't either.

MR. ZEGARELLI:  I'd like it to come in, Your Honor,
only because I thought what we said was if -- you know, if you
remember the baby and the bath water example.

THE COURT:  I do.

MR. ZEGARELLI:  If the termination -- sorry -- if the
designation was in, the exhibit will come in with the
designation.  So my understanding was that's in.  And from our
perspective, it's important because it actually has language
that supports the issue that --

THE COURT:  Is that the exclusive language?

MR. ZEGARELLI:  Right.

MR. DEASY:  I remember we were reading and we got
stopped right at that point when we brought up that --

MR. NEISER:  I think that's why we stopped.  And just
because there's an exclusive between them doesn't mean that it
binds -- it's even relevant to the right of first refusal in

this case.

THE COURT:  Understood.  I think the key is looking at the transcript to see if there was actually testimony about it. If there was, I think it would come.  If there wasn't, it won't.

MR. ZEGARELLI:  Although my understanding was that the designation -- that designation was there and should have come in because it was designated to come in.  So I'm not sure why it wouldn't have come in.

THE COURT:  I think we're not sure whether that part was designated or not.  I don't think anybody can reliably sit here and know.

MR. ZEGARELLI:  I think it's reliably in, Your Honor.

THE COURT:  Well, you all have transcripts so you can go back and take a look to see whether it was or not.

MR. ZEGARELLI:  Well, I think I would go back to perhaps the conference where the designations were made and stipulated to.  So if something got omitted --

THE COURT:  Well --

MR. NEISER:  Those were my designations.

MR. ZEGARELLI:  Right.

MR. NEISER:  There were no objections to them.  And I think I stopped at a certain point because we were starting to get into territory that was a little bit -- it was going to run afoul with what the Court's prior rulings were.

MR. ZEGARELLI:  Wait a minute.  Wait a minute.  If

you're telling me that you made a designation and we sat here in conference, went through the designations, and you didn't read in a line for some reason that was designated because I would have designated the line but you designated a line --

MR. NEISER:  You didn't designate any of it.

MR. ZEGARELLI:  Well, I'm saying, I expected that the designation that we stipulated was coming in as stipulated.

I mean, are you telling me, Julian, just so I understand --

MR. NEISER:  I don't recall what happened.

MR. ZEGARELLI:  It's an important little not recall.

MR. NEISER:  No, it actually isn't.  I made a designation.  You made no objection to it, and several times last week on our designations, there was no response.  We withdrew certain parts of them.  So that is up to me whether I want to or not.

MR. ZEGARELLI:  Well, Julian, if you omitted something that should have been read in based on our conversations, if that's what you did and if that's permissible by Judge Dodge ruling, that's the ruling.

MR. NEISER:  Well, that's --

MR. ZEGARELLI:  Okay.

MR. NEISER:  -- obvious.  I just don't remember.

MR. ZEGARELLI:  Okay.  It is obvious.  All right.

THE COURT:  Let's first take a look and see if we can

satisfy ourselves about what the record says.

MR. ZEGARELLI:  Okay.

THE COURT:  And if we have to address it further, we will.

I think the important thing now about the exhibit is, let's make sure folks stick around to look through the book to make sure that what is going out to the jury is, in fact, the exhibit that was admitted.  So, for example, I think you had a lot of the registrations for many of the POM --

MR. ZEGARELLI:  I think they introduced those, Your Honor.

THE COURT:  Okay.  I think there was an exhibit that you had that had multiple Pace subsidiaries.

MR. ZEGARELLI:  Yeah, that was 108, Your Honor. That's all sort of out with the exception of the two.

THE COURT:  Right.  But it's still in the exhibit book.  So that's the kind of thing we have to make sure, okay, it's just this and not the other X number of pages, things that were redacted, whether the redacted version went in or the unredacted version went in, things like that that currently we may have multiple copies of something because it was either redacted or not.  So we just need to go over that.

So Charlotte is here and can help with that.  What I suggest is that counsel first review it and see if you come to an agreement on what should come in or out, and then you can

report back to us about it.  And you can do that right in here if you'd like to.

MR. ZEGARELLI:  Thank you, Your Honor.

Is it possible to print out those three exhibits from this morning?  The three that I sent in an email?

THE CLERK:  Yeah.

MR. ZEGARELLI:  Because those would be at least my suggested insertions into those three areas.

THE CLERK:  I think -- Mr. Deasy, is 275 already in there?

MR. ZEGARELLI:  275.  276.

MR. DEASY:  I don't have a 276.

MR. ZEGARELLI:  276 was -- well, we talked about it this morning.  Those are those invoices, I think there's five of those invoices.

THE COURT:  They were testified about, but they were mistakenly identified by -- as Exhibit 275.  And they should have been identified as 276.  And I think I misled Mr. Zegarelli by asking him if that was 275 and it wasn't.

MR. DEASY:  I think the original was 136A and 136B. Those are the Pace invoices and the Miele invoices.  Might be able to clear the whole thing up.

MR. ZEGARELLI:  I don't know that.  Although I do know that there were those specific invoices and maybe it will match; maybe it won't.  We can figure it out.

THE COURT:  Why don't you all take the time to look through.  Charlotte and I will be around.  But we're going to start working on revising some of these things.  So when you're ready, just give a holler, and we'll hear you, and Charlotte can come in and make sure that, you know, we have agreement.  And if we don't have agreement on something, we can figure it out.

MR. NEISER:  I just wanted to add, if I can move onto a slightly different subject?

THE COURT:  Sure.

MR. NEISER:  Going back to the assignment issue to the extent that the Court may or may not receive anything later from the parties.  One thing we did pull from McCarthy on trademarks, and I don't have the cite on me, but 1125, the Lanham Act, gives rise to a cause of action by any person who believes that he or she is likely to be damaged by such act.  It isn't dependent upon an assignment.  It isn't dependent upon a right.  It isn't dependent upon anything.  It is by any person who believes he or she is likely to be damaged by such act.

And I remember whenever this assignment question first came up and Jonathan provided me that from McCarthy, it was, like, okay, then this really doesn't make any difference because it's not -- we believe the assignments are fine and there's a proper party.  But in addition to that, it's any party who believes that they are damaged by such an act.

And the standing is very low.  The standard is very,

very low.  And there are cases where there are foreign countries or foreign companies who have raised claims in the United States.  But it's any party -- and it's in subsection (a)(1) -- can bring a claim if they believe they are likely to be damaged.  It's that simple.

THE COURT:  All right.  Thank you.

MR. ZEGARELLI:  Your Honor, and I'm not sure that on that point you raised the issue of the assignment.

But back to the jury instructions, I think we did have an instruction with regard to the in gross versus the appurtenant assignment.  To assign a trademark, you have to assign the goodwill associated with the trademark.  And I'm not sure that has occurred as a matter of law.

MR. NEISER:  What?

MR. ZEGARELLI:  You can't assign a trademark in and of itself.  You must assign it with the business and the goodwill of the business because it's reputational.  You can't just move trademarks around.  You have to move it with the business.

MR. NEISER:  That's only if it's verbally done.

MR. ZEGARELLI:  I don't think that's right.  I think we had an instruction with regard to appurtenant-- we had it in -- Your Honor, you asked me about that particular issue.  That was in -- I'm trying to find it.  That was in the assignment language as well, Your Honor.  So the assignment -- so legal documents is one thing.  But there is a substantive

provision in the law where we had a suggested instruction --

MR. NEISER:  That's for a license.

MR. ZEGARELLI:  No.  "The trademark may be only assigned appurtenant or with the goodwill of the business related" --

THE COURT:  Slow down a little bit just for Sharon's benefit.

MR. ZEGARELLI:  "The trademark may only be assigned a trademark may be only assigned appurtenant or with the goodwill of the business relate or with the goodwill of the business related to the business.  Trademarks have no independent" --

MR. NEISER:  It's dicta --

MR. ZEGARELLI:  -- "of the article, service, or business in connection to which the mark is used."  There is a citation, Presley Estate v. Russen.  So that's a different issue than the documents themselves.  That's a substantive legal question.

MR. NEISER:  That's dicta in that ruling.  It's dicta. The rest of it relates to licensors.

MR. ZEGARELLI:  I can tell you that that -- if there's not 100 cases saying it.  I can probably Google it right now and find another 100 cases saying the same thing.

MR. NEISER:  Accordingly nonregistered trademarks can be transferred via oral contract.  Okay.  If there is no document or evidence of a transfer, it may be proven by clear

and uncontradicted oral testimony of a person in position of actual knowledge, which Michael Pace did.

MR. ZEGARELLI:  Julian, that's not responsive.  The issue is whether or not you can transfer a trademark without transferring the business and the goodwill related to the trademark.  That's different -- a different question.

MR. NEISER:  It's not registered, it's common law.

MR. ZEGARELLI:  No, it's just that's the way it works.  Your Honor, easy question to answer.  You could search, can you transfer a trademark apart from the goodwill?  And it's -- the language is appurtenant or in gross, and you have to transfer a trademarking appurtenant to the business.

You are not permitted to transfer -- it's a substantive rule.  You are not permitted to transfer a trademark in gross.  You just can't sort of transfer trademarks, because they relate to a separate or a business, and they have to move with appurtenant with the business.  So that was within the licensing section.  It's different than oral written, you know --

MR. NEISER:  It's about licenses.

MR. ZEGARELLI:  No.

MR. NEISER:  This is from Doeblers' Pennsylvania, 442 F.3d 812.  While a trademark license is typically written and contains expressed terms, the Lanham Act only requires that assignments of federally registered marks be in writing.

MR. ZEGARELLI:  That's irresponsive.

MR. NEISER:  Accordingly, nonregistered trademarks, so-called common law trademarks, can be transferred via oral contracts.

MR. ZEGARELLI:  We're not talking about that, Julian. It's a different issue.  I'm talking about a substantive rule of law in transfers in gross versus appurtenant.  And it's -- it's a basic rule of law.  It's so pervasive.  If that case doesn't say it, 50 cases will say it.  It's -- I can probably look it up in ten minutes and send it over.  It's just a basic rule.

MR. NEISER:  So you're saying --

MR. ZEGARELLI:  Because you can't transfer a trademark without transferring the goodwill associated with the business. You can't do it.  It's based on the business related to the trademark.  That's why it's a substantive rule.

MR. NEISER:  I don't -- I disagree with that because in that circumstance, there is no way for anybody to transfer or assign rights in a common law trademark that they may have, unless they are transferring all of their assets.

MR. ZEGARELLI:  There's -- well, part of what you -- there is a significant body of law that says something like or exactly like that.

MR. DEASY:  For registered trademarks.

MR. NEISER:  For registered trademarks.

MR. ZEGARELLI:  No, not for the trademarks.  You can't

just go out and broker around trademarks.  You can't do that.  That's called a transfer in gross.  You can look it up.  It's not hard.  It a really basic -- it's a really basic issue.  It's called transfer in gross, transfer appurtenant.

MR. NEISER:  Interesting that we're hearing about this day before closings.

MR. ZEGARELLI:  It was in the jury instruction draft.  The only reason is -- now I didn't have my compare up is -- perhaps as well as I should have, and there is the document issue, but there is also the instruction request with regard to the appurtenance of the transfer.

MR. NEISER:  And regardless of that, which we disagree with, I don't think he's correct.  But the Lanham Act flatly says that anybody who believes that they have an injury can raise a claim and the standing level is very low.  And we do have written assignments.  I don't understand this.

THE COURT:  All right.  I'll take a look at these issues.

Why don't we break for now.  You can look through the exhibits.  The book is right there.  Let's see if you can come to an agreement and then let Charlotte know.  And we'll then have those ready for the jury for tomorrow when they go out.  We'll still have a little bit of time tomorrow, obviously.  But I'd rather get the exhibits put to bed today.

MR. ZEGARELLI:  Thank you.

THE COURT:  Thank you.  I'll see you here at 8:00 tomorrow.  We will get you everything that we can as soon as we can on the things that we've changed and talked about.

I'll consider your contract issue.  I'm not really sure, at this point, how to articulate something that would be a fact issue, but we will give it some thought.

MR. NEISER:  Thank you, Your Honor.

MR. ZEGARELLI:  Thank you, Your Honor.

(Proceedings concluded at 2:57 p.m.)

- - -

**I N D E X**

**Proceeding**                                          **Page**

 Ruling on Rule 50(a) motion for judgment          1
 as a matter of law

**PLAINTIFF WITNESSES:**                               **Page**

**Deposition of Marvin Harris,** January 20, 2021      44
(Read-in)
**Louis Miele**
  Direct Examination By Mr. Neiser                  59
  Cross-Examination By Mr. Zegarelli                62
  Redirect Examination By Mr. Neiser                62
  Recross-Examination By Mr. Zegarelli              63

**C E R T I F I C A T E**


         I, SHARON SIATKOWSKI, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

s/Sharon Siatkowski
SHARON SIATKOWSKI, RMR, CRR, CBC, CRI
Official Court Reporter