IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


POM of PENNSYLVANIA, LLC,
et al.,

              Plaintiffs,    Civil Action No. 18-722
    vs.

PENNSYLVANIA SKILL GAMES,
LLC,

              Defendant.

- - -


Transcript of Jury Trial on February 22, 2023, United States District Court, Pittsburgh, Pennsylvania, BEFORE:  Judge Patricia L. Dodge, Magistrate Judge.


APPEARANCES:

For the Plaintiffs:     Julian E. Neiser, Esquire
                    Jonathan Deasy, Esquire
                    SPILMAN, THOMAS & BATTLE, PLLC
                    301 Grant Street
                    Suite 3440
                    One Oxford Centre
                    Pittsburgh, Pennsylvania 15219

For the Defendant:     Gregg R. Zegarelli, Esquire
                    Technology & Entrepreneurial Ventures Law Group
                    2585 Washington Road, Suite 134
                    Summerfield Commons Office Park
                    Pittsburgh, Pennsylvania 15241

Court Reporter:        Sharon Siatkowski, RMR, CRR, CBC, CRI
                    700 Grant Street, Ste. 6260
                    Pittsburgh, Pennsylvania 15219


Proceedings recorded by mechanical stenography; transcript produced by computer-aided transcription

P R O C E E D I N G S

- - -

(Whereupon, the following discussion was held in chambers.)

THE COURT:  I guess the first issue on the table that I wanted to discuss relates to the discussion that we had yesterday about assignment.  I have reviewed the relevant exhibits and of course listened to what counsel indicated yesterday.  I did see that a brief was also filed on this issue last evening.

So Exhibit 19 reflects a valid assignment from Pace to Savvy Dog, which included the goodwill, as I understand it, and I can take judicial notice of the fact that Savvy Dog was in existence as of 2016.

The agreement between Savvy Dog and POM of Pennsylvania, as I review it, appears to be a use agreement, and I understand from Mr. Zegarelli that POM of Pennsylvania was formed after the date that the document was entered into.

So as an initial matter, certainly Savvy Dog would possess the rights to assert trademark claims against PSG because that was a valid assignment.

I haven't seen any case law that would preclude the parties, notwithstanding the fact that POM of Pennsylvania was formed approximately six months later, I believe, that the parties' course of dealing and conducting of business thereafter

suggests that there was, in fact, an agreement between them that POM of Pennsylvania could use the trademark. And, clearly, the parties intended that POM would use the trademark. There's no evidence that at any point Savvy Dog took the position, as Savvy Dog was the only other party to the agreement, that the use by POM of Pennsylvania was not appropriate.

So they operated pursuant to the user agreement, at least based on the evidence that I've heard, and they both brought suit in this matter. So I don't find that there's any issue with respect to the rights of both POM of Pennsylvania and Savvy Dog to pursue these claims.

And I will also note that there is no evidence of an assignment from the Unises to Pennsylvania Skill Games. So that issue is resolved as far as I'm concerned.

Are there any questions?

MR. ZEGARELLI: I don't have a question, Your Honor.

But we -- Pennsylvania Skill Games did not even know of POM of Pennsylvania until the point at which the deal was blowing up with the Cline letter. That was the first they heard of it. So I'm not sure there's any course of dealings for any period of time that wasn't subject to the dispute that ultimately occurred. So, you know, I'm -- so I'm not sure what evidence there would be since. That's is actually one of the issues that sort of blew up the arrangement.

Also --

THE COURT:  Your objection is noted.  What else?

MR. ZEGARELLI:  Other than the fact that the -- so we have Exhibits 108.1, 108.2 that was shown, was used with testimony and was shown to the jury.  I think that is evidence at this point that, whether or not I can draw a legal conclusion from it or the jury can draw a legal conclusion, the fact that those processes were occurring at the time in or around the time of the trademark filings, I think is -- without drawing legal conclusions, is simply a fact for the jury to notice.

THE COURT:  Well, I don't think that fact is now relevant to any issue.  So certainly those are in evidence, or at least I know there is an issue about what is in evidence with respect to 108.

Let me turn to that and the exhibits generally.  Three things I wanted to note for the parties.  First of all, Exhibit 86 is not in the binder.  That is a DeLuca deposition exhibit, and I'm not sure which one.  So you'll want to look into that.

MR. DEASY:  It's the Action Skill -- exclusive distribution agreement between Action Skill and Blue Sky Games.

MR. NEISER:  Okay.  Let's just get it fixed.

THE COURT:  Okay.  With respect to Exhibits 44D and 44F, I think there was some discussion -- I wasn't here for it, but I understand there was some discussion about redactions.

Has that been resolved?

MR. NEISER:  We have them, Your Honor.

THE COURT:  Okay, good.  And then with respect to 108, here's my understanding -- and please correct me if I'm wrong. So Exhibit 108 does include both a POM document and a Savvy Dog document, as I understand it.  Both were offered.  The witness only testified with respect to the POM document.

In light of our previous discussion and the fact that there was no objection to its admission, is there a continuing objection to its admission?

MR. NEISER:  Which one is 108?

MR. DEASY:  Certificate of organization for POM of PA and Savvy Dog.

MR. NEISER:  Your Honor, I just don't think it's relevant.  It's a continuing objection.  We understand its use, but I'd like to at least maintain the objection.

THE COURT:  That's fine.  Just because I don't believe -- and you can correct me if I'm wrong -- there was an objection to its admission.  I'm going to admit.

MR. NEISER:  Understood.

THE COURT:  All right.

MR. DEASY:  Your Honor, if I may?  Exhibit 86, that is the exclusive distribution agreement between Action Skill Games and Blue Sky Games.  When I was looking over the record, it's my understanding that this document was designated as attorneys' eyes only and wasn't to be displayed to the jury when we were

reading in Mr. DeLuca's transcript.

So I don't believe it was designated.  But, I mean, I just wanted to get some clarity on that.

THE COURT:  Okay.  I don't know if it was designated.  I do know that there was testimony about exclusivity.  So I think the point was made without that exhibit creating an attorneys' eyes only issue since we would have to show it to the jury.

Mr. Zegarelli, do you object if that exhibit is not shown to the jury?

MR. ZEGARELLI:  Your Honor, I think it's a proper exhibit.  It part of the testimony.  It's part of Mr. DeLuca's testimony.  And I ask the same -- actually have the same position yesterday that 86 should have been in the binder.

THE COURT:  How do you resolve the attorneys' eyes only issue, then?

MR. ZEGARELLI:  I don't think -- I mean, I think you can make a ruling on the attorneys' eyes only.  I don't think there's anything in the agreement that's properly designated attorneys' eyes only.  I mean, you can claim it, but there still needs to be a ruling on the substance of it.  I don't find anything in there that is, quite frankly, attorneys' eyes only or privileged.

THE COURT:  But the counsel for the parties are not here to -- that -- as I understand it, that exhibit was admitted

in another action, not this action with additional parties.

MR. NEISER:  And that party was represented by counsel at the time.

MR. ZEGARELLI:  And we understood that would be -- to the extent it's admitted, it would have be ruled upon based upon the content of the actual document as attorney's eyes only or not attorneys' eyes only.

THE COURT:  What I don't know is whether actually it was moved in based on the transcript.

MR. NEISER:  Your Honor, I don't know that it was. And I looked at the transcript to try and find clarity, and it is not -- it is not clear, unfortunately.

Again, it is a third-party agreement to parties not part of this litigation.  It does not involve any contract or trademark claim.  So I don't even understand why -- I mean, to be honest, it helps me because it helps -- it shows that they're double-dealing us.  But I can't find clarity in it, Your Honor.

But if the Court finds it for completeness on the transcript, we'll obviously make sure it's there.

There was Mr. Turffs, who represented Jeffrey Mayle in that action.  I cannot recall from the production who designated it as attorneys' eyes only.  We were only the intervener.

THE COURT:  All right.

MR. NEISER:  So I cannot speak to it.  And I do not have standing to raise it or to remove it.

THE COURT:  I understand.  So I'm going to admit it with the understanding that that exhibit obviously isn't going to go beyond the jury, and I don't think it's going to have any prejudicial effect on the parties to that action.

MR. NEISER:  Thank you.

THE COURT:  All right.  Then we spent several hours yesterday going over the final jury instructions.  So I want to address today only those things that were changed overnight as provided to you, both in clean copy and redline version.

So are there any objections to the changes or additions to the jury instructions?

MR. NEISER:  We didn't have any, Your Honor.

MR. ZEGARELLI:  Your Honor, the senior user was removed.

THE COURT:  It was moved.  It's still in there.

MR. ZEGARELLI:  Oh, moved.

THE COURT:  It's still in there.  It's now --

MR. NEISER:  K.

MR. ZEGARELLI:  I got ya.  Let me just go down --

THE COURT:  We thought it flowed better in a different location, so it was moved.

MR. ZEGARELLI:  Thank you, Your Honor.  Okay.  The reverse confusion, is that -- and I'm looking at right above K, in fact.

THE COURT:  It's in K.

MR. ZEGARELLI:  Okay.  It's built into K.  Okay. Thank you, Your Honor.

Okay.  Okay.  I see it.  Thank you, Your Honor.

THE COURT:  Yep.

MR. NEISER:  When the Court has a moment, we have just one comment on the verdict slip that will be inconsequential.

THE COURT:  That's fine.  We'll get to that.  I just want to make sure everybody has a chance to make any objections or suggested changes to the revisions that we made yesterday.

MR. NEISER:  Yes, ma'am.

MR. ZEGARELLI:  So I do see a reference to the Pennsylvania and the federal law.  I suppose we'll get to that. So I don't -- I mean, it is what it is.

THE COURT:  Where are you referencing?

MR. ZEGARELLI:  I'm sorry, Your Honor.

THE COURT:  That's okay.

MR. ZEGARELLI:  I'm on page, it look likes R.  And that appears to be 21, at least the way I'm paginating.

THE COURT:  Okay.  And --

MR. ZEGARELLI:  And I'm just noting that we did discuss yesterday the standards are the same, and I think we'll visit that issue in the verdict slips.  So I don't really have a concern for it other than to note that we may address it again in the verdict slip.

I did -- as I looked over the -- I'm just scrolling

through.  The one issue that I did have which was raised for the first time yesterday was on the term, and that is in section D, as in "David."

THE COURT:  On -- let me get to that first.  That's on page 24.

MR. ZEGARELLI:  24.

MR. NEISER:  Page 24.

MR. ZEGARELLI:  This is stating an instruction, Your Honor, that we just -- was just raised yesterday.  And -- indefinite period of time for which no fixed duration -- Your Honor, I think -- if that were an issue, I think it's just too late to raise that issue in a jury instruction at this stage.

THE COURT:  I think this issue was raised throughout the case about whether the contract terminated or extended into perpetuity or for some reasonable period of time.  So I don't -- I recognize that we had a change of direction with respect to breach of contract yesterday.  But I think the issue of the duration of the contract has been an issue throughout the case.

MR. ZEGARELLI:  But it's stating here issues of law which were not proposed in the stipulated.  I mean, in other words, it's saying "unless parties unequivocally express their intent to have a perpetual contract."  That appears to be a legal standard.  And we just haven't had the opportunity to figure out where that standard's coming from or what grounds it.

So my objection -- my objection remains that it's

just -- I believe this is too late of an instruction, and I understand it was precipitated by a possible withdrawal of a count, which is not a concern to me whether that count's in or out.  But this particular clause, Your Honor, I just think it's improper at this time.  It's grounded on law.  I haven't had a fair chance to review.  And it's just a new question before the jury.  I just haven't had a chance to review it or comment on it or to determine whether or not that standard is appropriate.

MR. NEISER:  The entire jury instructions are grounded on law.  They all are.  So -- and we got it last night.  We had a chance to review it.  So -- and it's a fact issue for the jury.

MR. ZEGARELLI:  I don't recall, until yesterday, this being an issue with regard to term of agreement and how that term of agreement is -- I mean, maybe it's in your pleading, and if it is, you can show it to me.  But I don't recall there being anything about whether the contract's perpetual or not perpetual or whether or not it's abandoned or not abandoned.  I mean, if you want to show me somewhere in the contract that it says there's something about a perpetual agreement, you know, I'll take notice of it.

MR. NEISER:  Your Honor, Mr. Zegarelli's the one who keeps raising this, and it's from a clause that does not at all say what he thinks it says.  And it's his interpretation that seller will provide fills as long as they're in the market, and

he's considering that to be a lifelong contract for all provisions for the entire agreement. That's his issue that he raised. His damages are on this -- on the breach of contract are conditioned expressly upon a time period. There has to be a time period. A reasonable time period.

So I think it's appropriate for the jury to raise -- make a determination of fact. That's all. It's very, very simple. Is the contract still there? I don't know. We also have a dec action. The Court can make that ruling as well. However, if we're going to go and we're going to close and we're going to put this in front of a jury and start the damages phase, to the extent we even get there, I think it's just an important issue of fact.

THE COURT: Well, the discussion yesterday, of which everyone was a participant, was whether Mr. Neiser was, on behalf of his clients, going to discontinue his breach of contract action. And Mr. Neiser, as I recall at that point, suggested that, if there was a jury finding as to the term of the contract, he would consider dropping that.

I do think, for the damages phase, it is important for the jury to conclude if the contract terminated or was abandoned at some point or not, because it does affect the damage claim.

MR. ZEGARELLI: I think then that's -- that might be a fair question for the jury in the damage phase. I don't -- as a liability issue, I don't think it's a fair question at this

stage.  If it's a damage question, we can address that in the next round as part of the damage issue.

MR. NEISER:  Your Honor, practically --

MR. ZEGARELLI:  When did it end?

MR. NEISER:  I didn't mean to cut you off, Gregg.  I'm sorry.

Practically speaking, if we were to examine that during the damages phase -- and I think we mentioned this yesterday -- then what we're trying in front of the jury is the conduct of the parties related to the agreement in the damages phase and therefore, relitigating portions of the liability phase in the damages phase.  And that is my concern.

From a timing perspective, we can't even do that because we're going to start -- we're done on February 28th.  And if they are successful for some reason and we start on Friday and we go to Monday with dueling experts and we have to relitigate and recall witnesses on the duration of the agreement, I think not only are we going to run out of time, but it would be a complete non-sequitur.  Those issues should be resolved, and the jury is focused on what happened from the damages perspective.  That's my only concern, and that's why I'm trying to limit it to one thing.

MR. ZEGARELLI:  I believe this should have been raised earlier, Your Honor.  It's not fair to raise this instruction, you know, months later on the eve of the close, after the

evidence has been introduced.  I just think it's prejudicial at this stage of the game.  It was just raised last night.  It's just -- I think it's too late to raise this issue at this point.

And the quid pro quo of a claim, that just doesn't concern me either way, Your Honor.  It's -- you know --

THE COURT:  I understand.  I think the reason why we have a charging conference when we do is because issues do get raised, issues go away.  There were issues raised by both parties yesterday, including the assignment issue, which, as far as I know, may have been discussed between the parties but was not raised until yesterday.

So the fact that we're trying to give the cleanest instructions possible to the jury, even if that means that we're adding or deleting something before it goes to the jury, gives both -- all parties notice of what's going -- the jury's going to be told.  So I'm going to allow that instruction.  And your objection, of course, is preserved.

If you have some suggested changes, this is the time to make them.  I know you said you haven't had time, but we've all had an opportunity last night to review this and this morning, and I recognize that there are other changes that everyone has also had to review.

MR. ZEGARELLI:  The -- may we leave the first two sentences or the first sentence without the last sentence?  Because I think the last sentence is -- you know, again, I think

that last sentence pushes it further than at least a jury question.

It starts -- it -- I think it -- if Your Honor's going to leave in a question, I think that it should not, at this stage, go beyond setting forth the first sentence of the second paragraph.  Or in some regard -- I mean, particularly, the "unless" clause.  The "unequivocally express their intent."  I mean, even if you put the sentence before the "unless" -- but it creates such a high standard at this stage of the game on that particular point that I think it just presses the jury to make a determination on something that was actually not raised until after the evidence closed.  I'd ask that you at least you adjust it.

THE COURT:  The facts were raised because the contract has been discussed and introduced into evidence and it has particular terms.

Would you prefer if we included some language that says, "The contract does not specifically state an end date"?

MR. ZEGARELLI:  Well, although we think it does, Your Honor --

THE COURT:  A date.

MR. ZEGARELLI:  Well, see, there you have it.  You know, I'm not sure that -- yeah.  I mean, that's the problem, Your Honor.  The contract does say, "As long as you're in the market."  I mean, that's --

THE COURT: Well, I know we have differing versions of what that means, which the parties can argue. What I'm trying to come to a decision on is what language should be added that you think would encompass everything. And what I was suggesting is there is no date. And by date, I mean, for example, today's date, February 22, 2023.

So if you're concerned about the language that -- about "indefinite," we could add something that says, "Some contracts have a specifically defined end date. Others do not, blah, blah," we could go on from there. And we need to wrap this up as soon as possible. So if you need a couple of minutes to think about that, we can get back to that.

MR. ZEGARELLI: May -- we've got -- the unless clause, Your Honor, is the clause that takes it all the way to a perpetual contract. And I would suggest if we remove the unless clause, at least it's -- it still states the rule, but it doesn't force it into some, you know, perpetuality, which I'm not quite sure that -- it's -- I'm not quite sure that would be the legal standard that it would have to be a perpetual contract.

THE COURT: But what's your position about the duration of the contract? What would you argue to the jury? That it's perpetual?

MR. ZEGARELLI: As long as they're in the market. It's as long as you're in the market.

THE COURT:  What I'd prefer to stay away from is language in the agreement itself about which the parties disagree, because you can argue to the jury what the duration is.  So what I'm trying to explain to the jury is just the law, not pulling something out of the contract for the benefit of either party.  Because if I put that language in, it suggests a duration with which the POM Parties disagree.  On the other hand, I don't want to put something in that the POM Parties think is there, factually, that is prejudicial to you.

So the point here is to just explain to the jury that some contracts have an indefinite duration and they can make their own conclusion about that based on what you argue to them.  So what I'd like to do is eliminate phrases from the contract itself that the parties disagree about what it means.

MR. ZEGARELLI:  I'd ask that you consider to remove the unless clause.

MR. NEISER:  Your Honor, I'd object to that.  It would be a misstatement of it, and I think it's a correct statement of law.  We've been hearing over and over again from Mr. Zegarelli about his client's prejudice.  What about ours?

MR. ZEGARELLI:  It's not --

MR. NEISER:  Yeah, it -- actually it is.  Because we also -- they are trying to make us liable under an interpretation of this agreement that goes into perpetuity.  That's the standard.  If we're doing Mike Tomlin, the standard

is the standard.  Let's let them see it all.

And I think that's -- I know from litigating contract cases, that's an actual statement of the law.  And I think that we rely on the Court to put in the instructions we agree with it.  I think it would be prejudicial to us to not have it in there.  And that is an issue.  That is specifically an issue.  And it's for the jury to decide the disputed fact based upon the law.

It doesn't say anything that tips the scales or spikes the punch in one party's way or another.  It's very neutral language.  It is what it is.  There's parts of this that I would like to change and other parts of the jury instructions, but it's the correct assertion of the law.  Even if I don't like it, I can't change that.  Mr. Deasy was just showing me one of them.  This is just an example of them wanting their cake and eating it too.

MR. ZEGARELLI:  No, I think it's still a correct statement of the law without the unless clause.  I still think it's a correct statement of the law.  You actually are asking for your cake and eat it too.  This clause is in from you last night, and then you want it to go forward.  I would suggest --

THE COURT:  We added.

MR. NEISER:  The Court --

THE COURT:  We added the -- yeah.

MR. ZEGARELLI:  I understand.

THE COURT:  I think it was added because we have a question on the jury verdict slip about whether the contract was still in effect.  So we have to give them the law on how they make that determination.  So this was added by the Court, not by Mr. Neiser or his clients.

MR. ZEGARELLI:  I respect that.  So my request would be to consider whether or not the unless clause is necessary to set forth the legal foundation for the question on the verdict slip.  And I'd ask that you consider that.

MR. NEISER:  We submit that it's necessary.

THE COURT:  All right.  I'll consider it, but I -- for now, your objection is overruled.  But your objection is noted.

MR. NEISER:  Thank you, Your Honor.

THE COURT:  All right?  If I make any change to that, I will advise the parties before we begin today.

MR. NEISER:  Thank you, Your Honor.

THE COURT:  I'll go back and take a look at my law.  Okay.  The verdict --

MR. ZEGARELLI:  Excuse me, Your Honor.  And by the way, just to let you know, we had the same problem with the screen that Mr. Fox had to be called for on day one.  So that's in process.  We might have to at least check it first.

THE COURT:  Yeah, that's fine.  No, we're not going to start, if people are going to display things, until that's fixed.

MR. ZEGARELLI:  Thank you, Your Honor.

THE COURT:  Don't worry about that.

MR. ZEGARELLI:  That first day still sort of rings in my ear with the -- you know.  But anyway, thank you.

THE COURT:  No, I understand.  It's stressful enough without the technology not working.

Okay.  Any objections to the verdict form?

MR. NEISER:  We have no objection to it, Your Honor. Just one question about the sequence.  We didn't know whether it would be better to have the duration question at the end or the beginning.  And I just wanted to throw it out for discussion.

We have no objection.  We don't want to change it right now.

But on the breach of contract section, where it talks about the duration, I didn't know if that should be at the end or the beginning.  That's all.  I can take it or leave it, either way.

THE COURT:  Okay.  I understand.  I mean, I think if we were to put it at the beginning, we'd have to put all of the breach of contract at the beginning, which I think is something --

MR. NEISER:  Oh, I don't mean the beginning of the slip, Your Honor.  I meant the beginning of the section itself. Let me be more precise.

Under contract claims, on number 21, that's where

the -- is the Equipment Purchase Agreement still in effect today.  And when did it end?  Actually, you know what?  I'm going to withdraw that.  Now that I look at again, it makes sense.

MR. ZEGARELLI:  I still think that's a legal question.  When did the contract end or begin?  I think that's a question of law.  It's a legal question.  How are they going to interpret the contract to determine its legal effective date?  I think it's an improper question.  Okay.

THE COURT:  Any other objections?

MR. ZEGARELLI:  I think -- yeah, I think the jury would have to make a legal determination it's not proper.  It's a factual determination as to is the contract still legally binding?  I don't know how that is a question of fact.

THE COURT:  Well, in order to -- let me move to the damages phase for a moment.  All right?  As I understand it, on your contract claim, you're seeking damages through today.

MR. ZEGARELLI:  Yes.

THE COURT:  Okay.  So wouldn't we have to have a determination as to whether the contract still exists today for your client to be able to recover?

MR. ZEGARELLI:  I don't think so, Your Honor.

THE COURT:  They absolutely would.

MR. ZEGARELLI:  Well, I think that you can be damaged from something in the past and have a continuing damage in the

future.  That's a question of science and mathematical calculation because there could still be benefits you're entitled to without the contract necessarily still being legally binding.

I don't think a jury can make a determination as to the date it ended or the binding nature of it at that point.

THE COURT:  Well, if you're seeking damages for right of first refusal, for example, and you're claiming that you have that right of first refusal through today and are seeking damages for the continuing breach of the right of first refusal, then it is an issue as to whether the contract is still in effect, because if the contract isn't still in effect and the damages sought are lost profits or whatever else is being sought for the ongoing breach, then there has to be a determination as to whether the contract is still in effect.  Doesn't there?

MR. ZEGARELLI:  Your Honor, the expert's calculation of damages is not -- I don't think it's necessarily tied to the current effectiveness of the agreement.

THE COURT:  How could it be anything else?  I just want to make sure I understand.  You're seeking --

MR. ZEGARELLI:  I'm not an expert.

THE COURT:  I don't think this is an expert issue.  I think it is:  Are the damages that you're seeking damages for breach of the contract as we sit here today and going back in time as far as you claim the breach occurred?

MR. ZEGARELLI:  I do think that the -- that the parties are responsible through today to have provided the hardware and the rights of refusal pursuant to the agreement today.

THE COURT:  And you're seeking lost profits through today for a continuing breach of the contract, which would mean the contract would still have to be in existence today in order for you to recover through today or going forward.

MR. ZEGARELLI:  That answer, I can't tell you because I'm not the expert to determine how that is -- that determination is made.

THE COURT:  Well, how did your expert determine it?

MR. ZEGARELLI:  Well, first of all, is the expert didn't have the latest financial data.  But through the -- they calculated the revenues and the profits and the financials for up through the date that data was provided to us.

MR. NEISER:  Your Honor, it's actual damages based upon the amount of terminals that they claim were in Beaver County based upon the delivery address, period.  And that can be tracked by invoices.  This is not a --

MR. ZEGARELLI:  That's not true, but go ahead.

MR. NEISER:  Well, it's not true because it's a guess by his expert.  But the reality is they don't have like a damage to business, lost profits going forward, weighted average cost of capital valuation going forward like you see in a commercial

case where there's injury to a business, there's interference and lost opportunity going forward.  There's none of that.

They're looking at the actual sales -- if I remember correctly, and I have his expert report right here, so it's based upon that we sold so many machines.  They were allegedly in Beaver County, which we don't have any evidence of this week, except for a couple locations.  And it isn't like we lost an opportunity going forward and based upon expectations and past performance, we're projecting a loss going forward -- a true lost profits analysis in the future.  And we all know how difficult those are to prove.  That's not what his report does.  That is not what it does.

And -- either way, we still need to have a determination of the duration of the agreement.

THE COURT:  Well, let me ask this, going back to a comment you made earlier, Mr. Zegarelli.  You said that the contract is in effect as long as -- is it your client is still in the market?

MR. ZEGARELLI:  No, their client.  Our position is as long as --

THE COURT:  Are they still in the market?

MR. ZEGARELLI:  I think that's -- yes, certainly.

THE COURT:  So the contract, from your perspective, is continuing through today because one or more of the POM Parties is in the market?

MR. ZEGARELLI:  That is true.

THE COURT:  Okay.  So wouldn't the jury have to determine whether the contract is still in effect or not, whether it ended, in order to make a determination going forward about your damages?

MR. ZEGARELLI:  Well, again, if it's a damage question, it's a damage question on liability.  I think they need to determine is there a breach?

THE COURT:  But wouldn't there have to be the same evidence introduced in the damage phase that was introduced in the liability phase to make that determination?  And isn't that why we bifurcated, so we could get through the liability issues?  Because if the contract terminated at some point -- and I don't know whether it did or not, but if it did, then that is a liability question.

MR. ZEGARELLI:  There -- I think the jury's only trying to determine if there was a breach under what they understand to be the right of first refusal and anything else, let's say, in the agreement.  They're determining breaches.  I don't think they're determining things that aren't breaches, and I'm not sure when the agreement ends or doesn't end affects the question of whether or not a party breached.

MR. NEISER:  Your Honor, may I?  Can I read something to you?  This is from his report on the machines.  Lost --

MR. ZEGARELLI:  Is this a liability report?

MR. NEISER:  Gregg, you know there's no liability report in this case, right?

MR. ZEGARELLI:  No, I'm saying are you reading the expert report?

MR. NEISER:  It's a damages report.

MR. ZEGARELLI:  Okay.  That's a damage question.

MR. NEISER:  You've been nitpicking me on everything in this case, so --

MR. ZEGARELLI:  No, no.  That's a damage --

THE COURT:  Stop, everyone.  Let's -- I know it's stressful.  There's a lot going on.  We can't have you back and forth arguing with each other over the table.

So what is it that you wanted to read in?

MR. NEISER:  This is from Section 4 of Mr. Zegarelli's client's expert report.  "The calculation of lost profits is based upon the assumption that liability is found.  In the context of the case, lost profits may be defined as the profit PSG could have earned had defendants adhered to the right of first refusal.  Quantifying these damages can be achieved by summing the earnings of each relevant skill game."

Okay.  And it goes on to discuss how they calculated fill quantities.  And these fill quantities are based upon invoices by date, by different vendors, who purchased machines that were delivered to a Beaver County delivery address, I believe.

But it's based upon the number of actual machines by date.  So, if a jury, for example -- it goes all the way to 2020, for example, two years after the lawsuit was filed.  If the jury determines, as Mr. Krieger -- that's his position -- that the contract is over in 2018, their damages are significantly lower because the growth of the business went on, and they're trying to claim profits for everything, all of the trademark, all of the -- not belaboring it.  But their own expert report and our expert report is contingent upon number of machines over time.  Therefore, even by their own expert report, they need something like that, too.

MR. ZEGARELLI:  I think it's a damage question, Your Honor.  And I can address it in evidence in damages.  And that particular issue, Your Honor, if the jury says, yeah, they breached the agreement, we found liability at that point.

Go to the damage phase.  Now we can introduce evidence of that, and then as part of the damage calculation from the jury, they can say, we're -- you know, this is when we're capping it or not capping it.

My position, Your Honor, is it's a damage question.  That question can wait for damages.  It doesn't really affect the question of breach.  It's something different than did they breach.  All we want to know right now is, did they breach?  And once they answer that, we're into the second phase.  This is sort of -- this is squeezing them in a way that gets them to

kind of back off the breach question because they don't understand it and get confused by it.

If they find a breach, the next phase, we can clean up -- you know, we can -- we'll put in the invoices. We'll, you know, make all that sort of timing clear in that phase. It doesn't -- we don't need to cook the books in the liability section. We can just present it in a controlled manner. All of the invoices you just referenced, that's all part of the -- sorry -- that's all part of the damage phase.

So I'd ask, Your Honor, the question's not going to be removed from the jury. I would suggest that question is just we can do it properly in damages.

THE COURT: Okay. I'd like everyone to stay here for a moment. I want to talk to Ms. Hopkinson for a moment. So if you'll just stay put. And we'll also look into the technology issue to see if we're on track.

MR. NEISER: Thank you, Your Honor.

MR. ZEGARELLI: Thank you, Your Honor.

(Whereupon, a recess was taken.)

THE COURT: On the record.

I have confirmed that the description of term, the legal instruction about term, comes directly from Pennsylvania case law. So I don't think there is any issue with that language including the unless clause because I believe there is at least an argument that the contract is perpetual as long as

the POM Parties are in the market.

So I don't think there's anything wrong with the way that we have stated the law. That comes directly from case law.

With respect to the issue on the verdict slip regarding contract claims, I am going to leave that in. As I understand it, this is a breach of contract action, but there is also a claim that each delivery of equipment by another vendor or operator into Beaver County represents a separate breach every time that terminal is placed.

So the parties disagree on what the contract means in terms of its duration, which makes that contract ambiguous. Therefore, what it means is a jury question. And I think that does relate to liability because you can't have a breach without a contract. So therefore, determining the duration of the contract is a liability issue. So I am going to allow those questions on the verdict slip.

Is there anything else on the verdict slip?

MR. NEISER: No objection -- there's no issue with us using it during our closings, I assume.

THE COURT: The verdict slip? No. Because it will be reviewed with the jury by me, so if either party wants to use it and provide your own explanation, that's fine. I mean, obviously you're not going to get into instructing them about the law. But certainly, they're each going to get a copy of the jury instructions and the verdict slip.

MR. NEISER:  Thank you, Your Honor.

THE COURT:  Anything else on the verdict slip?

MR. ZEGARELLI:  No, Your Honor.

THE COURT:  Okay.  Then we'll check into the status of technology.  We'll finalize these to make sure that we have copies for the jury.  You can assume the copies you have you can certainly use because they're not going to be changed in any way.  So I think we're ready to go with closings.

You're closing first.

MR. ZEGARELLI:  Your Honor, I did preserve the objection of record on the verdict slip.

THE COURT:  Your objection is absolutely preserved.

MR. ZEGARELLI:  Thank you, Your Honor.

MR. NEISER:  If rebuttal is necessary, is it possible -- I'm not saying that it will -- I just want to make sure we understand the Court's preference before we go back out there.

THE COURT:  If both parties want to rebut, I'm going to allow that.  If one -- because we have two separate claims here.  If you want to do rebuttal, I'm going to allow you to do surrebuttal, if that's the appropriate term for it.  It's probably just rebuttal because each of you have claims.  So yes.  But please remember timing.  I'm not limiting your time but just remember timing.

With that, I think we're concluded.  We'll find out

what the scoop is with respect to technology and certainly we're not going to start until we're ready to go on that.

MR. NEISER:  Thank you, Your Honor.

MR. ZEGARELLI:  Thank you.

(Whereupon, in chambers session ended.)

(Whereupon, a recess was taken.)

(Pause as the jury enters courtroom.)

THE COURT:  Please be seated, everyone.

Good morning.  Ladies and gentlemen, good morning.

Technology is wonderful when it works.  You will remember at the beginning of the trial we had a little technology issue, and we did this morning, as well.  I appreciate your patience while Mr. Fox, our technology guru, came up and fixed it.

At this point, we're ready to proceed with closing arguments.

Mr. Neiser?

MR. NEISER:  May it please the Court, opposing counsel, members of the jury.  As the judge was saying, thank you.

Believe it or not, over a week ago I stood in front of you, and I told you what we believed our evidence and the testimony would show you.  And this is our promise to you.  This is what we told you we would prove to you, and we did.

One, that Pace created the trademark Pennsylvania

Skill in all of its forms, the word and the design, and gave those rights to POM of Pennsylvania and Savvy Dog.

Number two, that the defendant infringed on those marks by claiming it as its own through a United States Patent and Trademark Office filing; saying it's theirs; using our artwork; using documents that, as we saw during the trial, had some questionable dates on them.

And number three, that it's them, they, who are in breach of contract, not us, due to their failure to perform.

Now, it was very interesting at the beginning of the case. It's one of these strange things in litigation where there are really no coincidences, but they happen all the time. At the end of our opening we told you this is a case of reaping what you sow. Reaping what you sow means two things; it has a double meaning. It means you get out of things what you put into them. If you don't put any effort into it, you can't expect to get anything out of it. Reap what you sow means there are consequences if you are a bad actor. And both of those things apply here to them.

Now, it was ironic that their theme was just the parable of the mustard seed. From the smallest of seeds, the greatest things can grow. And their theory, as they're trying to explain to you, but not proving through evidence, that Albert Unis III, his father, put out one game in a bar that nobody knew about and, from that, all of the success in Pennsylvania flowed

from it.

The parable of the mustard seed is that, from the greatest -- the smallest of seeds, the greatest things come from it.  For the birds to perch on and for life to happen.

That's not their mustard seed.  Their mustard seed is a vine.  It's an invasive species, and it's designed to choke out competition or, as Mr. Unis said, squeeze out the competition.

And the apple does not fall far from the tree.

In our case, we brought you 17 witnesses, including a competitor, Jeff Mayle, from Blue Sky Games, whose deposition testimony we read in.  68 exhibits.  Three and a half days of testimony.  Witnesses who sat here and actually answered the questions.  Actually answered them.  Including Michael Pace, and Lou Miele, sitting here today.  Employees who don't really work with the company anymore.  We brought you operators, people in the field.  They're not employees of ours.  They're vendors.  We're vendors to them.  We serve them.

We brought you exhibits that needed little explanation.  And we provided the testimony of the evidence from the people who were there, from the programmers on up.

As Mr. Rodgers, the attorney for Mr. Unis, said, when you negotiate a contract or you do a deal, you can see artifacts, breadcrumbs along the way to determine what the parties intended, what they meant, and what they were doing at

the time.  We'll get to that later.  But what you see from our documents and from our evidence is a crystal clear picture of what happened.  It has the simplicity of unassailable fact.

Their case, they brought in five witnesses, two of which are father and son; 17 exhibits; and no documents confirming their arguments.  There wasn't a single record, a single piece of testimony, other than from father and son, to support this fantastical suggestion that Albert Unis III was the kingpin, the person who came up with the idea to bring the game into Pennsylvania, that he jointly developed the game with Michael Pace, that it was his idea and it was their trademark and name, and, therefore, they get to take it all from us.

Their proof was using their business name only in two locations.  That's all they brought you.  Pamela Kendrew from a bar in Beaver County, who told you that she saw the name "Pennsylvania Skill Games" -- not "Pennsylvania Skill" -- "Pennsylvania Skill Games" on Megatouch machines and that stopped sometime in 2015 or 2016.  That's it.  She testified that she doesn't know where else they could have been using it, even though she's from Beaver, because she doesn't go anywhere other than her own bar.

And then we heard from a John Grachanin, who apparently owns a bar in Ohio, and he remembers seeing a Megatouch machine with the name on it.  That's it.  That's all we got.

And mind you, that name, Pennsylvania Skill Games, even though it's just their business name, wasn't on the outside of the machine.  It wasn't advertised.  It wasn't anything.  It was on the machine when it was being played.  And as we saw during this demonstration that we saw in the opening when they decided to plug it in, while you're sitting here and running through the boot-up of the machine -- looked like an old DOS machine -- and they had to open up the back, and, poof, it showed Pennsylvania Skill Games here.  And sitting behind it was our machine, branded from top to bottom, with the design mark. The Liberty Bell.  The Declaration of Independence. Pennsylvania Skill.

The differences in the case couldn't be more stark, but the use of the trademark definitely couldn't be more stark. It is night and day.

They have offered a conjecture, argument, conspiracies, and innuendo.  If they don't like a fact, ah, it's a verbal agreement.  Ah, we had a chance to depose Wayne DeLuca twice, but, you know what, we didn't ask him anything about a flood and records, but I'm going to blurt it out here in trial. No proof.

Conspiracies of corporations being organized and put together at certain points in time.  Notarized, not notarized. And that was designed to -- as some kind of bad act to hide from them or do something bad to them.  It makes no sense whatsoever.

This is really an airing of grievances.  It's not proof.  This is a trial.  This is a courtroom.  Facts matter.  Credibility of witnesses matter.  Truth matters.  Evidence matters.

This case has been alive for five years.  They had to do better, and they did not.

They rely on technicalities and strained arguments.  What's a controlled pickup?  What's a friendly pickup?  What's the official term?  We go back and forth over things that have nothing do with the case.  Why?  To confuse you, to make you think there is something happening in the background that isn't.

And they torture and twist language.  And as we get to the contract to discuss, they're going to tell you that there are words that mean things that -- maybe it does to them, but we submit probably isn't correct, and it sure isn't normal usage of the English language.

So they want to claim what they did not create.  They want to take what they did not earn.  They want to squeeze out the competition.  They want to take our ball and go home.  And if you listened to the Mayle testimony from Action Skill Games, he talked about the fact that he, from -- which is a competitive company -- arranged for an exclusive deal with his father all at the same time they were demanding an exclusive deal from us.

Let me put it another way.  They wanted to draw a circle around Beaver County and prevent anyone else from going

in.

The contract does not say that.  The evidence does not support it.

And their entire goal, even if they did nothing, no effort, no sales, no marketing, no activity, they wanted to take it for their own and keep everyone else out.  And that is their deal that Mr. Unis says he was screwed out of, despite the fact that he didn't put any effort in the market or to sell machines.

That's what this is, ladies and gentlemen.  This is an attempt to draw a circle around one county, keep everyone out, and hold it hostage.

Now, I talked enough about them.  Let's talk about us.

The Court is going to talk to you about burdens of proof.  Each party comes in here, and we have a difference of opinion on who owns this trademark.  Difference of opinion on what the contract means.  And it's your decision, as the Court will instruct you, as to what all that means.

So how do you make your decision?  Through evidence and testimony.  So the evidence is pretty clear.  Michael Pace had planned and prepared in the late 2000s to enter the Pennsylvania market.  There is no evidence that Albert Unis III was involved in any of the discussions.  You didn't hear that from Rick Goodling, who was a Pennsylvania state trooper at the time.  You didn't hear it from Wayne DeLuca, who was deposed twice, by me and opposing counsel.  You didn't hear it from any

of the other employees who were involved in the transaction.

Most of all, you didn't hear it from Michael Pace. Michael Pace is the man with the six patents who got a GED and pulled himself up by his own bootstraps.  He didn't have the benefit of being able to go to a nice prep school and having a business handed to him by his father.  There is no evidence that anyone other than Pace was involved.

And Albert Unis IV definitely wasn't involved.  By his own admission and his testimony, he was still in high school when the controlled pickup was happening.  He was still in high school and wasn't even involved in the business in any way until the union wouldn't accept him or he couldn't get into the program and his dad handed him a business.

Their theory is that Albert Unis III kept calling Wayne DeLuca to get someone to bring a skill game to Pennsylvania, and then when it finally did, they were trying to take credit for it.  Okay.  For five years, I had asked our building, where our law firm is located, for a Starbucks in the lobby.  They finally put one in.  Does that mean I brought the Starbucks Corporation to One Oxford Centre?  Absolutely not.

Pennsylvania Skill Games, LLC, wasn't even created until May of 2015.  It wasn't even in existence.  It was never disclosed to us.  They dropped it on us on the last minute and, a few years later, tried to weaponize it.

We have showed clear and concise proof regarding the

timeline in this case and what happened.  Let's take a look at some of the things that we saw.

An email from 8/28/2012 with the random names.  Now, mind you, I'm going to be fair on this.  And the judge will instruct you on the law.  But internal documents showing the use of the name, that doesn't mean you have a trademark.  I acknowledge that.  But it shows you what we were doing, and it shows where we went from beginning to end.  So I'm not suggesting this is our trademark.  I'm just suggesting this is how you can track what is the truth.

August 28, 2012, they're already talking about names for the skill games going into Pennsylvania.  This means they had options.  May not have been very good ones.  Hey, I still love Pacesylvania Skill.  I think that's fabulous.  And I saw Cheesesteak Skill.  I don't like that because that's Philadelphia.  But these are still viable options.

So logically, if they were trying to say, Hey, we have Pennsylvania Skill, and we're allowing you to use it -- which there is zero evidence of -- why would they?  Why would Michael Pace use somebody else's name when he had other options and he already has been in so many different markets?  He knows how to run a business and name it and brand it.  The answer is he wouldn't because he didn't have to.  It never happened.  It's a lie.

December 19, 2012, clearly stating, we'll be renaming

the PA build to Pennsylvania Skill.  Their timeline doesn't even jive.  They're saying that, sometime before this, Albert Unis had talked -- III had talked with them about a name and bringing the game in.  Why on earth, before that even could have possibly happened, are we doing -- having this discussion?  Just to make it up for a potential lawsuit maybe ten years later?

Glen Carter, who is one of the programmers, he sat here; he's the gentleman with the beard and the spectacles.  He told us about the 500,000 lines of code that he programmed to create the game.  He made it clear that nobody outside of Pace was involved in the programming, design, input, anything to the game.

More importantly, you see those two circles and the arrows?  Remember his testimony was that it establishes, at the very latest, February 7, 2013, Pennsylvania Skill appeared on the game screen, and that's what was shipped in interstate commerce, and that would be the word mark.

And that's what the game looked like.  And it is uncontroverted evidence, beyond dispute, that that is what the game looked like in the summer of 2013, at which point we sold games in interstate commerce featuring that name.

And this is prior to the receipt that Albert Unis III signed when he picked up the game from Wayne DeLuca.

See, you can't get away from proof like this.  The documents are the documents, and the timeline is the timeline.

Now, mind you, Albert Unis III testified that there was discussions about bringing the game in and he -- I really didn't quite follow it. But Wayne DeLuca, a licensed attorney, retired attorney, a former FBI agent, and, again, who was deposed twice in this case, said nothing of the sort. His testimony very clearly was Albert was a guy who picked up a game and put in the bar.

And as Albert Unis III admitted himself, he never even turned the thing on. He never looked at it. He didn't care. Why? He's a courier. He's a delivery guy. I've been a delivery guy. I pick up a thing, I take it to a place. I go away. And that's all he was there for.

Our efforts in Pennsylvania, while we're waiting for the Beaver County decision, Ryan Wood and Lou Miele, they testified that they went door to door. They testified how they did it. They testified the information they provided, and they used the PAMMA organization, the trade organization, for a directory of other operators, and they went all over the state. They weren't waiting for Beaver County. They were using the entire state. They had an entire state to open, not one place.

Mr. Wood also testified that he used the advertising under Pennsylvania Skill for the design that we had created.

And DeLuca's testimony that Albert Unis III had no involvement in the case or anything else after the controlled pickup. Period.

Interestingly, before the decision in Beaver County, on December 23, 2014, even before then, we had created that logo. With nobody else's help. And the date from the screenshot, which also is uncontradicted, is December 15th of 2014.

Then we get the decision from the judge a week later. Interestingly, the opinion from the court references "Pennsylvania Skill." It doesn't reference "Pennsylvania Skill Games," the company, or anyone named Unis.

In re: Pace-O-Matic Inc. Equipment, Pace-O-Matic Inc. is the party to the lawsuit. Nobody else. Mr. Unis III sat here and said, Oh, I don't even think any witnesses testified. Wow.

Mr. Pace confirmed that he testified, that we hired an expert, that we paid for an expert witness.

That's what you have to do in a case like that. And there was a trial. Like this. And Mr. Wood testified he was at the trial the entire time and never saw hide nor hair of either of these guys.

And then the order, it specifically says "Pennsylvania Skill." Not "Pennsylvania Skill Games." "Pennsylvania Skill" -- because they weren't created at that time and they had nothing to do with it.

Now, they may try and confuse you with this email to say this is Ryan Wood. If you recall, Ryan Wood got a call from

Wayne DeLuca.  Wayne said, "Hey, this guy put the game up for you" -- because we didn't know who did.  "Give him a break on some pricing.  He's a potential customer."

Try and twist and turn this language about right of first refusals, and I submit to you, it doesn't matter because this is just an email.  If you recall -- we'll talk about it -- there was a second agreement and then a third, and the third is the one that matters because it changed along the way.

But what they don't want you to pay attention to is that Ryan Wood, as of 1/14/2015, included some attachments to that email.  And one of them was this.  You would think, if Albert Unis III actually was serious and telling the truth, he would say, "Hey, great job with the name that you created for us.  Thank you.  I'm so glad I could bring you into the Commonwealth of Pennsylvania and jointly develop this game with you."

But they didn't.  And there's a reason why.  That never happened.

Mr. Pace, sitting here, used the word that you don't hear very often in a courtroom:  Lie.  Lie.  It's a lie.  Ryan Wood sent an email, February 2, 2015, introducing the Unises to Michael Pace and Danny Warren.  That is further proof that they never met before.  It is an introductory email.

And then we get to the website.  First, there's this photograph at the bottom.  I think you guys recall that.

Mr. Pace standing next to Mr. Unis.  Mr. Unis was a few months out of graduating from high school.  And they are trying to say that they're celebrating the complete -- successful completion of the Pennsylvania Skill Games, like they had something to do with it.  And as Mr. Pace testified, they had nothing do with it.  It was just a picture of a kid with Mr. Pace in the lobby of his building.  The game was completed.

And you know what's critical about this?  We can date when that logo was finished and completed and put on a machine.  That was then.  These are machines that were sold to them and to others and shipped from Georgia in interstate commerce.

But the way they try and say it, the way they try and say it is that it's a celebration.  It was a thing that they did.  Look at what we built.  Look at the language in their website, that they selected to do business with us.  That once Pennsylvania Skill Games were designed, Albert opened the market for legal skill games.

Really?  I was here all five days.  I heard no evidence to support that.

It wasn't easy, but after the court's ruled in his favor, Unis prevailed and put the first legalized skill game in the American Italian Club in Aliquippa, PA.  Not only is that false, it's -- at the -- the timeline doesn't even work.  The game was put in.  Then it was legalized.  It's just a mishmash of words.  It's a sales pitch.  But this is how they're trying

to say that they're right and they have rights.  And by doing that, they harm us because they're taking credit for something they did not create.  And twice he mentions that he's a leader in the legalized skill game industry.  Says who?

So let's talk about some of the elements.  Let's talk about some of the things that you get to do in applying the law to the facts.  I'm going to be very cautious here because the Court will instruct you on the law.  But you need to determine validity, ownership, perhaps likelihood of confusion, whether there were sales in interstate commerce.  And we would submit that their alleged use of "Pennsylvania Skill Games" was limited, and it's certainly not enough to meet the standard, especially when you look at critical dates.

The Court will instruct you that there is -- and there will be an instruction -- a verdict slip.  I'm going to go through that with you at the end.  It's a little bit long.  It's a little bit convoluted, but I think it will make sense.  I don't mean convoluted in the sense it's hard to understand.  It's just there's a lot there.  That's all I mean.  There's a lot there.  And there's names and parties and trademarks and they have similar names, and it's -- sometimes it's hard to navigate.  We'll do our best.

But there's a difference between a word mark and a design mark.  The word mark is the words, "Pennsylvania Skill."  The design mark is the -- you could probably close your eyes and

see it at this point.  For them to win on the word mark, they need to establish secondary meaning at the time that we started using it.  That means they would have to establish -- and we're going to discuss this -- secondary meaning created at the time that we started using it in the summer of 2013.

There's no use and there's no testimony from them that they used "Pennsylvania Skill," the word mark, in interstate commerce or had developed a secondary meaning -- we'll get to that in one minute -- other than on Megatouch machines years ago.  Megatouch machine is not the same as the machine that we're talking about here.  It's just not.  It's not the same thing.

They have some proof of using a business name.  They have no advertising.  There wasn't a scrap of evidence from them that they advertised this machine other than putting it in two locations.

And they only have "Pennsylvania Skill Games," not "Pennsylvania Skill."  The design mark -- this -- you will see on the instruction, the question of whether it's inherently distinctive.  That means by all of the things together, the collective of all of the artwork and the words, is distinctive and it's associated with our product.  If you see a Nike swoosh, you don't need to see Nike.  If you see the Marlboro -- for those who are smokers, the red, you don't need to see Marlboro.  It's a design that speaks for itself and it's associated.  Here,

we have both: The words and the design, collectively, in one trademark.

It is inherently distinctive. We don't even need to establish secondary meaning, we suggest, because on its face, it is distinctive and it relates to our product. They don't have a product. They have machines they buy from other people. They put some logos on them. They put -- some don't. Some look one way. Some look another way. Some are from one manufacturer. Some is from another. They don't have a product.

We have a product. There is no proof they use it, that, in interstate commerce. Only we used it in interstate commerce. And there's no proof that they achieved secondary meaning.

So, they have to prove that the design mark achieves secondary meaning at the time before we used it. That's impossible. We made it. They never used it. And based on the evidence, we're not aware of them using it until 2018, when they filed their trademark application.

There is no evidence. Now, they may say that there's one Megatouch or a couple Megatouch machines that were put in a bar across the Ohio border. I'm not even sure what to say about that. But there was zero evidence that they used that design mark in interstate commerce. They cannot win on that claim.

There's no testimony that that design mark is connected to any PSG product except for the adulterated

versions, the manipulated versions that they used.

And consider their inconsistent use.

You don't see inconsistent use from us.  It's the same thing on the machines you saw in this case.  It's the same design mark you saw on the machine sitting here.

But they need to prove that they commissioned us to create it and that they can take credit for our work:  Our artists, our intellectual capital and thinking of it, putting it together, approving it, designing it, printing it, putting it on a machine, all of those things.  There was no evidence that they had any involvement in that.

Okay.  Secondary meaning.  The judge will instruct you on the law.  But consider the market penetration.  We talked about 20,000 machines that are out there.  We talked about the sales efforts.  Customer association.  This is fatal to their claim.

Sitting here, remember there was one day, there was a gentleman who came in, he had a mohawk.  He's how we started the day.  And there was a litany of other operators who came in and testified.  They all said the same thing:  We associate that brand with Pace.  Nobody else.  Folks who had been operators for decades in Beaver County, never even heard of these guys.  And certainly never heard of Pennsylvania Skill Games, LLC.  They needed to do better, and they didn't because they can't.

Consider the size of the company.  The testimony from

Mr. Miele, more than 100 employees.  I believe Mr. O'Bier testified Pace has 180 employees.  They didn't offer any testimony about the size of their company at all, other than Mr. Unis.

The extent of sales.  I just mentioned it.  He bought and has 125 games, total, versus the 20,000 that we've sold.  But of course, they're going to take credit for it because if it wasn't for the mustard seed, we never would've been able to sell those 20,000.

Length and exclusivity of use.  We have continued to use that mark, the design mark, and the word mark for as long as we've been selling skill games in the Pennsylvania market, which is since the court decision.

Advertising and trade journals.  Interesting.  Not a single shred of proof from them that they advertised the mark at all.

Total machine sales.  Now we have this limited to 2018 because we believe that is where the infringement occurred.  That's when they filed their trademark application.  That's, to our knowledge, when they started putting machines out under the manipulated brand, meaning other products under Pennsylvania Skill brand.  9,062.

Advertising and marketing expenses, totaled more than $2 million.  And as Mr. Miele and Mr. Jones testified, that is a conservative estimate.  It doesn't include shoe leather express

or sweat equity or whatever you want to call it, knocking on doors and talking to people. It's a conservative estimate. These are just line items of very specific expenses.

Here's your advertising. Pieces of it, not all of it. There's a lot more. There was more entered into evidence. But these are just some of the pictures. And these are in national, regional, and local publications. Where's theirs?

Now, what they're going to try and tell you is we're pushing them out of the market. And by us pushing them out of the market, they're a junior user -- or senior user and we're a junior user, and because we're bigger, we were able to push them out of the market. Okay. Here's the problem with that: They still have to first establish that they own the mark in the first place, that it was used in interstate commerce, all of the things that the judge will instruct you.

So what they're trying to say is they can take credit for all of our work and effort on the technicality that Albert Unis III may have had a contract with one bar in Beaver County under Pennsylvania Skill Games, which nobody ever heard of besides them, and that bar and a couple Megatouch machines.

It's not enough. There's no connection. And it's based upon the false, false premise that they authorized us to use their mark.

If not, when they saw us put out 20,000 machines and we're selling machines to them and we're selling them to other

operators that they're claiming is a breach of this contract, why didn't they say something?  There's no mention in this case of trademark, except for page 3 of Bill Rodgers' file that had one handwritten note that said, "Trademark, question mark," until they threatened to sue us after already filing a trademark application to take our mark from us.  No mention of it.  And as Mr. Unis IV testified, Michael Pace may be brilliant, but he's no mind reader.

Testimonials.  Third-party operators testified as to brand association.  When I see that mark, I associate it with Pace.  The dots are connected.

Competitor said the same.  None of them had knowledge of Pennsylvania Skill Games.  They never saw Pennsylvania Skill Games before.  And there's complete market penetration by us.

Ownership.  Prior use, consider how we used the mark versus how they used it.  And there is a difference between a trade name and a trademark.  We'll touch on briefly.  And the Court has an instruction, and we'll explain it to you.

But there's a difference.  They can be -- a trade name can be a trademark.  A business name can be a trademark.  But you have to establish secondary meaning, and you have to establish it before the other side uses the mark.  That means they would have to establish the secondary meaning before we entered the marketplace.  And they can't.  Because they didn't have it.

So the big dates are September 23rd, when we started bringing the games into Pennsylvania and we sold them to other operators, and then January 2013 for them. And the 2015, for them, means that they would have to establish the design mark had a secondary meaning in commerce. And I'm sorry to confuse the issue -- they just can't because they didn't use the design mark until we gave it to them. And they used it on our machines up until the point where they started sticking them on other products. That's as simple as I can make it.

And then March 2018 is the day for us. We have to establish that we established secondary meaning as of March 2018 when they filed the trademark application, which is the earliest time that we have knowledge that they actually were claiming it as their own. And by March of 2018, all of those ads, all of the sales that you saw, all of the marketing expenses, they were already done. We proved that. They did not.

I'm going to blow through this quickly, but the biggest admission in this case was a video from Albert Unis III that said, "It wasn't a trademark; it was a trade name to identify our business." I don't know what else to say. They admit that it's not a trademark.

They didn't admit it was a trademark or claimed it was a trademark until we had success in the market, and they could call a technicality. These are folks who want to win the Super Bowl on false start penalties. "I saw him move. I saw him

move.  Hey, didn't we use that name?  Can't we use it to get money out of these guys?  Can't we use it to claim something we don't own?"

And remember, that name, Pennsylvania Skill Games, I believe Mr. Unis testified, "Well, if they had an issue with it, why didn't they object to us using the name on the contract?"  As the testimony explained, they didn't use it until the final version of the contract.

And we consulted.  Mr. Warren testified to that.  Mr. Miele testified to it.  Because it was a business name, it wasn't a big deal, and they weren't using the mark.  And plus, as Mr. Pace testified, he had done business with a company called "Ohio Skill Games" in Ohio when they were running a game called Ohio Skill.  It just works out that way.  Trade name is not the same as a trademark.  Unless you try and manipulate it.

Interesting, Mr. Miele recounted, after the visit to Wayne DeLuca's office in early 2015, a visit with Mr. Unis.  They went on the road.  They looked at all of Mr. Unis' locations, and he testified that of the hundreds of games he saw, he saw no usage of Pennsylvania Skill or Pennsylvania Skill Games.  Nothing.  They could have offered competing testimony; they did not.  They could have cross-examined him on it; they did not.  That means it doesn't exist.

So here's their use.  Remember this?  From the Megatouch that sat here?  Here's the other use.  Reserve your

game today.  Pennsylvania Skill Games and a phone number.  Call us.  This is not the same as that.  That appears on the outside of the game, (indicating).  That appears around the game.  This appears when the game is on, (indicating).  Now, what they may try and do and what they did try to do is manipulate the document and manipulate the artwork and say, "Oh, if you take 'games' off, they kind of look the same.  It's a bubbly serif font.  It is a canned art refresh."

That is nonsense.  Because you can't decide, after years, and after a lawsuit, and after a trademark filing that "Hey, the thing we're relying on, I'm going to carve out a piece of it, put it side by side, and make some argument about bubbly serif fonts."  That's what it looks like.  Not that.

But that's the lengths to which they will go to try and confuse you.

Now, let's talk about infringement.  They knowingly manipulated the mark to add the word "games."  They filed a trademark application without any rights.  They put competing software on our -- on machines with the mark above it.  They took our artwork.  They admitted they took our artwork and claimed it as their own.  They had no involvement.  They admitted they had no involvement in the artwork itself.

They wanted to destroy what we built.  Make no mistake.  That's the purpose of this thing because they were screwed out of my deal.  I didn't get what I wanted.  I didn't

get the thing that I thought that I was supposed to get.

What did you do to get it?

And they knowingly misappropriated our goodwill. Which means all of the goodwill that goes with the mark and the work that we do in the community, the work that we do with the legislature -- all of those things, they're trying to take it from us so they can put on competing products and make money off of it, off of his 125 games that he's bought.

Infringement.  It's unauthorized use of our trademark. It's willful.

It's not an infringement, "Oh, I didn't know."

It's "I'm going to go out, and I'm going to do this. I'm going to file this trademark application, hire a lawyer, and submit documents in support, and this is my claim.  I am knowingly doing this."

Chris O'Bier testified that the mechanics of changing a header on one of these machines, it's not an accident.  You're not going to bump into it and poof, the label changes.  You've got to disassemble it.  You've got to print something.  You have to take something out and put something in.

Mr. Goodling testified to a number of locations throughout Western Pennsylvania or Eastern, too, where he found machines with a mark similar to ours on machines that don't run our software.  Also begs the question, what are they doing all over the state if they had such a great deal in Beaver County?

It's because they didn't work at it, folks.  They're not focused on success or consistency, discipline, hard work, like Mr. Pace is.  It's "Give me now.  Give me now.  Get rich quick, and if I can't get rich quick, I'm going to call a technicality on you and make you pay me on the back end."

You know, and that's one other thing that we don't know is we had Mr. O'Bier go through -- it was a bit torture, and I apologize for that, but it's one of the things we've got do.  He went through a list of games, photographs, that allegedly represented all of their machines.  They had an obligation to provide us photographs of all of their machines and the screens, so we could tell what software was running on which machine.

We only counted 92 in those photographs.  He sat on the stand and said he had 125.  Where are the others?  I don't know.  But we're going to stick with what we have.

This is what a game should look like.  This is one of their games -- to their credit, one of, I believe, 16 -- properly granted, properly included Pace -- including Pace software under the right brand.

But we also found this where they crudely stuck "games" underneath Pennsylvania Skill and even put our software number from the Beaver County ruling, which has significance.  Legal significance.  It means something.  That's the software version that the Beaver County court ruled on, 402.44.  It's in

the Nick Farley report.  It's in the exhibits that you'll see. That was the software version that was testified to, and we were successful with in Beaver County.

So not only are they putting our name on there, they're putting our software version to double-down on the misrepresentation.  And on the screen is software that is not ours.  Testified to, not cross-examined on, and not contradicted.

And again, here's another version.  The same thing. Different software.

Now something completely different.  Our brand, that looks actually correct, our different software.  No games on it. No 402.44.  Different usage.  Sometimes they do; sometimes they don't.

And then, this one, which I love, is just goes to show the intentionality here or the willfulness of it.  It's misbranded, games, our software version, competing software on the machine, and then there's that little graphic on the top that says "Pennsylvania Skill Games."  As if one wasn't enough. Not our software.

So there's at least 16 examples of infringement that we know of -- because we didn't get all of the pictures.

Intentional because of effort involved, because they used our software version, because they stuck the word "games" on it, and they blatantly mislabeled the products.

As Mr. Pace said, "This is like putting Hunt's label on a bottle of Heinz ketchup."

Their trademark applications, they submitted, we submit, false information.  They can explain it all they want.  But we'll get to that in a second.  But they used the application as a weapon.  They filed the application.  They sent a nastygram from a law firm to file a lawsuit in Beaver County, which any lawyer knows is going to end up in federal court anyway, because they want home-field advantage.  Remember, Albert Unis III said, Hey, I put the game out in the American Italian Club because that's where the judges and the lawyers go.

So they sent it to us.  There were reasons why we filed the lawsuit first, which they're not in evidence, and I won't go into details on it.  But the suggestion that we misled them in some way, not true.

But they gave us no notice.  They admitted to using our artwork in the application, and this is the date of their infringement.  Remember this?  This is one of the ads that they submitted in support of their trademark application to demonstrate use in commerce.  It has a date of 5/1/15 with an email address of albert@pennsylvaniaskillgames.com.  Interestingly, Mr. Unis admitted he didn't have that email address until a year later.  It has false information in it.  And if it has false information and you submit it in conjunction with a trademark filing and you realize it's wrong, you might

want to fix it.  He didn't bother.

Now, we're going to get to the contract.  Now, I'm going to try and do this as quickly as I can because this gets a little bit convoluted.  But their claim is that they have an exclusive for all of Beaver County, which means nobody else can enter the market.

Put another way, they had an opportunity for preferred pricing and a right of first refusal that the witnesses testified was a sales lead.  You go out.  You put a bunch of games out.  You advertise.  Locations may call us.  If they call us, we'll refer the sales lead to you.  That's a tremendous advantage, especially for a young man just getting started, with a pricing discount.  Their view is, they don't need to do anything in Beaver County.  They have an exclusive; nobody else can come in the market besides them, and they can kick any other operator out.

The operators told you, these are family businesses, folks.  These are their family businesses that they created for decades.

And they want to tell you, based upon their version of the facts, that they can throw these people out of their livelihood in Beaver County.  They can interfere with the relationships with these locations.  And not only that, we have to be their henchmen.  We have to go out and kick our own operators out of the market.  Based on some claim that Danny

Warren would stop fills and he was the guy who the games went through.

Mr. Warren sat on the stand. I didn't hear them ask him a single question about it. Not a one. Not until Albert Unis IV blurted it out on the stand, was that even raised.

But let's look at this. Remember Ryan Wood sent an email; there was a meeting. As a result of that, Ryan Wood sent another email. Danny Warren put this agreement together, and there are four bullet points. Top two bullet points -- let's see if we get it. Go back. For pricing discounts for help in legal matters, which he testified and Danny Warren testified, too, related to Wayne DeLuca's request. The first two bullet points, Wayne's request. Give them preferred pricing, because they were the guys who put out the first game.

The second two bullet points are the result of Albert Unis III saying, "Hey, I'm going to put out hundreds of games, hundreds, if not more, games." So that's why we had some language in there that looked like this: "POM agrees to not sell terminals in Beaver County unless they refuse."

Pretty strong language. It also came with a performance requirement, to keep buying games. And they needed to buy ten games a month for as long as they wanted that. And that's with Albert Unis Affiliates, not Pennsylvania Skill Games, Albert Unis Affiliates, and this is dated January 29, 2015.

But this is replaced.  Here's a draft.  Mr. Rodgers testified that he did the drafting of that particular agreement based on the previous one.  And this is the penultimate draft, which means this is the second to the last thing before it's signed and executed.  So the Court has instructed us that we can explain but not contradict the terms of the agreement.  How do we explain?  You look at how the parties conducted themselves in negotiations, and you consider some of the drafts and the comments.  Not just what went into the agreement but what didn't make it.  The things on the cutting room floor.  The things that make up two-hour movie, a -- a four-hour movie a two-hour movie.

And one of the clauses here was, "Seller expressly agrees not to sell any other terminals, compliant or otherwise, or fills in Beaver County, Pennsylvania."  Again, pretty strong language.

This is, of course, their lawyer writing this.  This is a request.

And those handwritten no sale of fills provide in Beaver County other than Unis.

But here's the thing, during the drafting, the handwritten language went away.  That certainly didn't make it.  And the highlighted language didn't make it.  And that's April/May of 2015.  Oh, and by the way, that equipment purchase agreement in the second to last draft is with Aliquippa Industrial Park.  I know Mr. Unis tried to explain, and he said

it was Pennsylvania Skill Games even though Pennsylvania Skill Games doesn't appear on the contract. But that's who it's -- that's their entire representation during the entire negotiation.

And that's replaced with this; this is the final agreement. This is what the lawsuit is about. The Pennsylvania Skill Games, LLC. And that is the final language. All of the other things about refusing to place terminals or what they claim to be an exclusive, or whatever they want to call it, that all fell by the wayside and was replaced with this, "If buyer opts," meaning them, "they choose not to place a compliant terminal in certain Beaver County locations."

What is a certain Beaver County location? We submit this is why they needed the sales lead. If a location called because they wanted a game, we would refer the sales lead to them.

It doesn't mean no other operators can come into the county. We will kick other operators out of the county. We will be your henchmen. We will be your police force.

And it says, "Seller, through another vendor, may place the above-described compliant terminals in those locations." We submit to you the evidence clearly suggests that this is a very optional thing. It is not nearly as forceful as they want, and it certainly does not put a perimeter fence around Beaver County.

Remember Mr. Unis' testimony?  He was talking about squeezing out Mac Vending, squeeze out competitors.  They want to read that to allow them to squeeze out the competitors, put a vine, the invasive vine, around Beaver County and prevent anyone else from coming in without having to do anything else for life.

Now, let's track this.  This is from the January agreement.  "POM agrees not to sell terminals in Beaver County unless they refuse."  And it references "location."  Not operators.  Location.  It doesn't mean an operator can't be there.  It means that it relates to a location, not an operator.  Remember location's a bar.  Operator's a company that puts the games out.

That language died.

They went to this in a draft, agree not to sell any terminals in Beaver County.  Pretty strong language.  That died.  The handwritten text, that died.  And it's replaced by that.

And that, ladies and gentlemen, the only way it could work -- because we do not know where the games go -- and as the testimony clearly indicated, there's -- this is a "no" question.  We don't know where the games go.  Operators don't tell us.  There's no GPS; there's no tracking; there's no way to know.  And just because an operator takes delivery at their warehouse, that doesn't mean they have them in Beaver County.  Warehouse in Beaver County doesn't mean they go into Beaver County.

Mr. Unis himself testified that we delivered games to

his house in Beaver County.  But as we heard from the testimony, they're all over the Commonwealth of Pennsylvania.  And if I knew where they were, I'd have pictures of the remaining games that he didn't provide to us.  What they want us to do is change our entire business model, change our trademarks, change our contracts.  Oh, we have operator agreements.  We have agreements with other operators.  Why didn't we put language in there to protect them?  What for?

That's the audacity of their claim.  They are so arrogant that they believe we should change our complete business model for somebody who has a total of 125 games out because of a technicality that they used "Pennsylvania Skill Games" in a bar, one bar in Beaver County, and they're using just enough of a thread to hold us hostage.  And that's why we're here.

There's no performance requirement so no exclusive. Mr. Pace testified.  He didn't hide from the fact.  They wanted an exclusive.

We said, You have to buy so many games.

And they said, Nope.

Remember, Mr. Unis' testimony?  They had no credit at the time.  He couldn't even apply for a loan on his own.  He had to go through this parents to do it and finance through Firestone, which is common.  It happens in the business.  It's expensive stuff.

But the sales leads only occur if locations call.  And they would have called if they would have done their job, they would have gone out and sold the product, and if they would have placed all of the machines they said they would.

By Mr. Unis saying that he had hundreds of games to put out, that means he had hundreds of locations already taken.  This is their argument of you've got to have something before you get something, which is not true.  I don't even understand it.  But Mr. Unis III had something.  He told us he was going to buy something.  He didn't get something.  And he didn't put our games out.  That would have created market demand, which would have led to sales calls, which would have led to them having great success.

And also remember, they received discounted pricing.  Better discounted pricing in the Equipment Purchase Agreement.  So instead of them getting this exclusive and have to purchase so many games from us, they received better pricing over time.  And that's fair.

Just to close this out on the contract, this will show you how far out afield they are.  There's this language that says "Seller agrees not to sell the other vendor compliant terminals," and we'd suggest that the "other vendor" relates to the right of first refusal.  The right of first refusal is, if they opt not to place the terminals, then we can have another vendor place them in Beaver County.  Once we give them the sales

lead, if they turn the sales lead down.

Then it says "Seller agrees not to sell the other vendor the terminals at better pricing."  It just means, if somebody else gets the lead because they don't want it, they just can't buy it for better prices than them.

His testimony, and their position, is that gives them better pricing than anyone in the Commonwealth.  Nobody else.  And that doesn't make any sense because it all relates to another vendor in Beaver County.

Now, here's one of the last parts, and this is the killer.  "Seller will support buyer with previously agreed marketing efforts."  They're claiming that that is them giving us permission to use their trademark.

Now, Mr. Rodgers turned us on to a nice trick with holding "control" and pulling the mouse back and it lets you zoom in and out of a PDF.  Very cool.  Something I learned for the day.  There's also a thing called "control F" where you can search a document.

We've done it.  You'll have the exhibit in the exhibit binder, you can look for it.  That word "trademark" doesn't appear in that agreement.  And to say that previously agreed marketing efforts, here on the stand, is a trademark, is entirely consistent with what Mr. Unis said in his deposition.  They're claiming that this is a trademark clause, that they decide at any time they can end, they can pull the plug from us,

and we have to stop using that trademark.

Play it.

But this is what he said before, what agreed-upon marketing efforts meant.  This is -- notice the difference in demeanor there as opposed to trial.

"Question:  Agreed-upon marketing efforts that you recall?

"Answer:  So my dad discussed Danny Warren helping me finance my -- my business.

"Question:  Okay.

"Answer:  And helping me grow my business.

"Question:  Okay.

"Answer:  And that's why he came down and helped me with my financials and help me with Firestone loans.

"Question:  Okay.  What about -- it says marketing, though.  It my mind, marketing is different than finance.  Maybe it's not in yours.  But --

"Answer:  Through financing my company, we market the product.

"Question:  Okay.  Anything else?"

"Answer:  No."

Anything else?  No.  But here, that's the trademark.

Let's talk about the end of the contract because you're going to see on the verdict slip that that's going to be one of the questions for you.  They believe this is a lifetime

contract because it says, Seller agrees to provide buyers with fills for as long as they're in the market.  We are.  We have.

But we claimed the contract was terminated or abandoned.  More specifically, the Equipment Purchase Agreement was -- I'm sorry -- the right of first refusal was terminated or abandoned because they didn't do anything.  They sat on the market, and they didn't put out the game that they said that they would.  And it's due to inactivity in the market.  So they didn't claim other locations.  That's them opting to not put machines in locations.  "Opting not" means, I sit here.  I don't do anything for two years.  There's nothing there.  I'm opting not to do it, whether that's through intention, conduct, or activity.

If you remember Attorney Cline, Greg Cline, sat on the stand, and there was a letter that was discussed.  And it was dated February 14, 2018, incredibly five years ago.  It said that we believed that it ended due to marketing -- market inactivity or has been abandoned -- meaning abandoned, they didn't do what they needed to do so they gave up on the rights.  That's when we say the contract ended.  That's our position.  Their position, it keeps going forever that we're in the business.

So it's either -- from our position, it's either February 14, 2018, or in May of 2018, whenever we filed the lawsuit.  I think filing the lawsuit's a clear statement that we

don't want to do business with them anymore.  But you decide.

I want to talk very briefly about affirmative defenses.  These are critical because there is a chance that you may find, despite the overwhelming evidence in our favor and their failure to even put in a case, that they own the trademark.  You may rule that.  But we don't think that there is -- and on the contract.  You may believe we're liable under the contract and we breached it.  We don't think we did, and we don't think they proved their case.  But some of the defenses you may hear about are important.

One is fraudulent inducement.  And that is they made statements to us that induced us into entering into the contract.  And but for their statements, we never would have done so.  That is Albert Unis III telling Lou Miele, Ryan Wood, Michael Pace, everybody who would hear them -- because, as he testified, he likes to brag -- that he's going to buy hundreds of games.  And he induced us into entering into the contract.  That means the contract, we may not have liability for because they induced us.  We never would have entered into it in the first place.

Abandonment.  This is interesting.  If they didn't show usage or intent to use that Pennsylvania Skill Games, you can determine that they abandoned usage.  There's no testimony from anybody at all that they're still using the Pennsylvania Skill Games Megatouch thing right now.  There was testimony from

John Grachanin and, in his one location, that after he got his bars refinished, they took the games out.  That's 2020.

So you can claim that -- even they may be claiming the rights to the trademark, they abandoned it because they started using ours.  They started using our design.  They stopped using theirs, and they started using ours.  And, at that point, they've abandoned it.  That means they have no rights in it.

Fair use is another instruction.  Meaning we, through our activities in the market, are fairly using the Pennsylvania Skill words and the design.  It's fair use.  It's something that we can do, and it's something that is permissible.  And it eviscerates their trademark claim.

"Waiver" means that you sit back and you don't take action.  This is the same as estoppel and laches.  I'm not going to explain these two in detail.  The judge's instructions are excellent.  But essentially because they sat on their hands and they didn't do anything while they watched us put all of these games out and they didn't do anything in the marketplace and say to us, "Hey, you're in breach of your exclusive deal" -- there's no evidence of that until, I think, late 2017, when their lawyers sent letters to other operators.  They didn't send them to us.  They sent them to other operators and just so happened to copy Mr. Miele.  They sat on the rights, they waited until we did all this work, and now they are trying to take advantage of all of the effort that we put into it.

There are other claims that we engaged in false advertising. I don't know how that is possible considering that they didn't produce any evidence that we mislabeled or we advertised falsely the Pennsylvania Skill brand. I'm not even -- know what to tell you about that because they sure didn't put any evidence in. Every time we used the mark, based upon the evidence, it was in conjunction with our games, and there's nothing false about that.

And unfair competition, that we unfairly competed with them, how is that even possible? They're a minor operator. As Mr. Miele testified, they're at lowest of the low percentile. How are we unfairly competing with them when we're selling our own product through legitimate channels?

But remember, they're the aggressor. We're only here because of them. They threatened us. Mr. Unis admitted, we never threatened them before they threatened to sue us and filed the trademark application. They're trying to hold us hostage with zero basic facts, and when they can't justify their actions, they blame us. Everything is everybody else's fault. Everything is a conspiracy. Everything is connected in some web of deceit.

All we tried to do was help them. Start a business and grow a business.

Okay. Very briefly. And I'm wrapping up here. Thank you for your patience so far. But they admitted that the

marketing efforts was financing.  Now they changed their tune. They admit they never saw the logo before.  They admit they were never involved in the brand creation, creating the game.  They admitted it's not a trademark but a trade name.  They admit that they had no market penetration.  No secondary meaning.  No advertising.  No buyer association.  No -- none of those things. It's none of those things.  And they can't say, "Well, you did it.  You're the big company; so we're going to take it -- ride on your coattails."  That is not the case.  And they have produced no evidence to support that.

They claim records were destroyed.  Again, this is the "third gunman, second gunman" argument.  Anything that they want that they don't have proof of, they claim a verbal agreement. They claim they're the origin for the game.  They claim rights that don't appear in any contracts.  The words don't appear in the agreements.  No documents, no evidence, no nothing.

What did they do to earn what they claim, and what did we do to prevent them from succeeding?  Marvin Harris's testimony yesterday, little piece of testimony, he was their sales guy, he was the guy who was their face, as he testified. He said he only went to 20 or 25 locations and there were only maybe a handful that had other operators in it.  That's the extent of it.  That's what they did.  They didn't bother.  Even their own sales guy admits that the number of locations they tried to sell to and the number of competitors out there was

nil.  That was -- they had an incredible opportunity out there, and they squandered it.

Okay.  They're going to claim, from the seed theory, that it started in Beaver County, and it probably went like this.  But as Mr. Miele and Mr. Wood testified, it really went like that.  It was all over the state.  The market demand came in throughout the entire state, and they -- now, Mr. Miele testified, they cover every county in Pennsylvania.

So the judge is going to instruct you on burdens of proof, some of which, on the affirmative defenses, have to be clear and convincing evidence.  Pretty standard.  You have to be clear in your mind.  We think we met that burden.  But for the most part, you're going to hear what's called the "preponderance of the evidence."  And the preponderance of the evidence means it has to be more likely than not.  Think of the scales of justice, equally weighted, even.  If there's one grain of sand on one side that tilts in that favor, that is preponderance of the evidence.  You must find in that side's favor.  So if it's more likely than not, means one grain of sand has landed on that side.

Is it more likely than not that we, not Albert Unis III, were the creators of the brand and the software and the idea and the program?  Is it more likely than not that we, not the Unises, opened the market?  That we created the name and the brand and created secondary meaning in the minds of the

market? That their claim to Pennsylvania Skill is nothing but an attempt to gain leverage? Or is it more likely than not that this is just a tall tale, told by a father to son, that grew over time in hands of lawyers, just like the parables that are passed on.

Now, you may not able to see this very well, but I'm going to go through this very briefly. This is the verdict slip. This is the piece of paper that matters. And after your deliberations are over, you'll be able to select what you believe to be true, based on the evidence, testimony, and the credibility of the witnesses. And the first question is: Has any party established by the preponderance of the evidence that the trademark is valid? The answer should be "yes," we submit. The word mark has developed secondary meaning in the marketplace. Design mark, we created. It's valid. It is a valid and sustaining trademark.

Who has established it? Click "POM of Pennsylvania and Savvy Dog Systems, LLC." We established it. We proved that to you.

Have we established by a preponderance of the evidence that they infringed on our trademark? Yes. Think of the games and the pictures and the testimony where they stuck a misbranded, adulterated logo on competing software. That is an infringement.

Was it willful? Yes. That's one, two, three, and

four.  Yes, yes, yes, yes.

And it tells you, if you say "yes" there, to go on to question 9.  And it goes -- now, that relates to the word trademark.  The words "Pennsylvania Skill."  And remember, for them to establish secondary meaning, it had to have been done before we started using the brand.  And they can't do that. They just can't do it.

Design trademark.  Is it inherently distinctive, or has it acquired a secondary meaning?  Yes.  Advertising, market penetration, buyer association, length of use.  Fact of copying by them.  They're copying our mark.  That's one of the elements we can prove.  They've proved none of those things.

Is it inherently distinctive or acquired secondary meaning and through our efforts?  Yes.

Have they -- we established that they infringed on it? Yes.

Was it willful?  Yes.

So that's on the word mark, and that second section was the design mark.  For POM of Pennsylvania, LLC, and Savvy Dog Systems.

Next, we get to unfair competition.  Has Pennsylvania Skill Games by it -- is it more likely than not that we engaged in unfair competition?  No.  We did not engage in unfair competition.  We did our business.  They're the aggressor.

Next, on false advertising, did we engage in false

advertising?  No.  We advertised our product under our brand. There is no proof of that whatsoever.  They've offered no evidence for it.

On the contract claim.  Is the contract still in effect today?  The answer should be no.  We've made it very clear that we believed it was terminated or abandoned -- and then at the very latest, in May of 2018, when we filed suit, that is, I believe, the most effective of termination notices.

So you should -- we would submit that you can say no, that the agreement is not in effect today, and the date on number 22, you have to fill in when it's over with.  That's your decision.  That's your call.

And have they established, by a preponderance of the evidence, that Pace-O-Matic, Miele Manufacturing, and POM of Pennsylvania breached the Equipment Purchase Agreement?  The answer to that should be no.  We gave them equipment.  We sold them equipment.  We stopped selling them equipment.  We weren't obligated to sell them equipment for forever by the terms of the agreement.  And we didn't breach the Equipment Purchase Agreement.  It's a sales lead mechanism.  It is not an exclusive right to keep everybody else out of the market.

And, folks, that would be the end of it.  Anywhere you see POM of Pennsylvania and Savvy Dog System meeting their burden, say "yes."  Anywhere you see Pennsylvania Skill Games, LLC, meeting their burden, the answer is no.

Now, when this case is over, when we're done, I'll go on to my other cases, my other trials. The Court has no shortage of cases that are brought before her. Mr. Zegarelli will go on to his clients as well.

But the parties are left with your decision. They're left with your decision. They're the ones that have to deal with it from this point forward. And that's why it's so critical when you reflect on this and you deliberate, you think of what was actually put in front of you.

Who put it in the time? Who put the effort in? Who put in the work? Who brought the witnesses? Who brought the evidence? Which story is more likely? That the company that built, created, put the money into, developed, and actually succeeded is right? Or the company that didn't do anything until they could, watching success of that other company, claim things that they didn't create for their own to hold them hostage? We ask that you find in our favor.

We thank you for your time. We thank you for your service.

THE COURT: Thank you, Mr. Neiser.

Mr. Zegarelli, we could take our morning break here. Or you can proceed, as long as the ladies and gentlemen of the jury don't need a break. What would be your preference?

MR. ZEGARELLI: I think the preference would be, Your Honor, to take a break now.

Second issue, Your Honor, I understand that the POM party -- or I should say POM of Pennsylvania, removed its breach of contract claim, and I just wanted to make sure that was of record before I begin.

THE COURT:  It is of record.

And we'll take our morning break at this point.

Ladies and gentlemen, we'll see you back here in 15 minutes.

(Pause as the jury exits courtroom.)

(Whereupon, a recess was taken.)

(Whereupon, the following discussion was held in chambers.)

THE COURT:  My understanding, Mr. Neiser, you had requested the opportunity for a sidebar.

Just for the record, we're conducting this out of the presence of the jury in my conference room.

MR. NEISER:  Yes, Your Honor.  Two things.  One, I don't know if a curative instruction or some instruction to the jury about -- saying in front of the jury about us withdrawing a breach of contract claim, which I think was improper, wondering if that's appropriate.  Number two, I have a concern that Mr. Zegarelli, in his closing, is going to use financial information.

MR. ZEGARELLI:  Why do you have that concern, the second one?

MR. NEISER:  Because your screen was up and the people

in the gallery could see it.

MR. ZEGARELLI:  What screen was up?

MR. NEISER:  Something about $5 million of revenue per week.

MR. ZEGARELLI:  Well, okay.  Now, wait a minute. There is -- there's evidence of $5 million per week presented to the jury, and I can revisit that.  It went to the jury without objection.  It's not talking about damages.  It's talking about the revenue.  And it's by your own advertisement.

MR. NEISER:  Where did it say $5 million per week in an advertisement?

MR. ZEGARELLI:  We did the math right in front of the jury.  5 million a week, 250 per operator, 20,000 machines, 5 million a week.  That was already in front of the jury.  I don't know why I can't use what has already been in front of the jury without objection.

THE COURT:  There was evidence to that effect, if I recall.

MR. ZEGARELLI:  Yes.

MR. NEISER:  Okay.  I understand.

THE COURT:  I think the caution here is not to talk about damages.

MR. ZEGARELLI:  I'm not going to talk about damages.

THE COURT:  If you want to talk about something that was in evidence, you may.

MR. ZEGARELLI:  Thank you, Your Honor.

THE COURT:  Let's talk about a curative instruction.  What did you suggest?

MR. NEISER:  I really don't know, Your Honor.  I mean, if you don't see a need for it or if there's no problem based on what was said in front of the jury, which I'd --

THE COURT:  Well, I'd like your position on it.

MR. NEISER:  My position is it shouldn't have happened.  It makes it confusing.  And it makes it look like we believe that there is some basis, factually, for us to withdraw the thing.  And it makes it -- it's just a strange non-sequitur before we even charge the jury and instruct them.

MR. ZEGARELLI:  Your Honor, I was going to say, I actually did not recall, though perhaps it occurred, I know we went over the jury slips and all of that, and I remember saying this morning, you know, I don't care about a quid pro quo.  I don't really remember, and I accept responsibility if I'm in error, which apparently I am, that that was formally withdrawn.

So I was really just trying to understand what I would have otherwise talked to the jury about in my opening because it would have been a count.  The fact that the count was removed after the evidence was in, I still think is proper to say to the jury that a count was removed.

So I don't think the true fact of a count being removed this morning is really a -- something that's --

THE COURT:  Let me suggest what I could say for everyone's thoughts.  Something along the lines of, "For reasons that don't concern you, the POM Parties" -- I'll identify who -- "have made a determination not to proceed with their breach of contract claim.  So you will not be considering that claim."

MR. NEISER:  That's fine, Your Honor.  And it was done before the closing.

THE COURT:  Is that curative instruction acceptable to both of you, something along those lines?

MR. NEISER:  Fine.

MR. ZEGARELLI:  Your Honor, I don't think there needs to be one, but if that's what you feel is appropriate under the circumstances.

THE COURT:  Honestly, I just feel it's to make sure they understand.  They may not have understood your reference, even though we did.

MR. ZEGARELLI:  Fair enough.

THE COURT:  I think it's merely so we can put that issue aside and they understand that POM of Pennsylvania and --

MR. ZEGARELLI:  I think just POM.

THE COURT:  POM of Pennsylvania -- only POM of Pennsylvania.  Okay.

MR. ZEGARELLI:  It was the only one with a claim, if that needs verified.

THE COURT:  And again, I'm just going to say that

they -- before trial started today, POM of Pennsylvania made a decision that, for reasons they don't need to be concerned with, it is not pursuing the breach of contract claim. And I think that's probably not a bad idea anyway because you did talk about it in your opening.

And just to close the loop so that they're not wondering what happened, that's probably the right way to proceed with it, as long as counsel are both okay with that.

MR. NEISER: I'm fine with that, Judge. I just wanted to make sure.

MR. ZEGARELLI: I defer to you, Your Honor.

THE COURT: I think, again, it's just to really minimize any jury confusion. We don't want them coming back at some point and saying, "Hey, I thought there was a breach of contract claim" when there is no longer one.

MR. ZEGARELLI: Yeah. And that doesn't sound impugning to me in any regard. I appreciate that. Thank you.

THE COURT: If anyone objects after I've said what I said, we can certainly address that. And I'll try and stick as close as I can to what I just said so that, you know, there's no confusion on the jury's part.

MR. ZEGARELLI: Thank you.

MR. NEISER: That's fine. Sorry for the interruption. I just wanted to address things so we didn't have to interrupt the closing.

THE COURT:  No, I appreciate that.  Please, feel free to take a few minutes before you begin.  We're still photocopying -- or, you know, multiple copies of the jury instructions.  We're not sure that's done yet.  But when that's done, we'll get started again.

(Whereupon, in chambers session ended.)

(Pause as the jury enters courtroom.)

THE COURT:  Ladies and gentlemen, before Mr. Zegarelli delivers his closing statement to you, I wanted to advise you that prior to today's proceeding and for reasons that you don't need to be concerned with, POM of Pennsylvania decided that it is no longer proceeding with its breach of contract claim against Pennsylvania Skill Games.

With that, Mr. Zegarelli, are you prepared to proceed?

MR. ZEGARELLI:  Thank you, Your Honor.  May it please the Court, Counsel, ladies and gentlemen of the jury.

My client has said to me that my theatrics could be better.  I apologize for that.  I'll try to move through the slides efficiently, effectively, point them out to you.  Where I could, I tried to identify the exhibit for your notes so that you can go back to the jury room and look at the document that supports what I'm suggesting to you.

Now, you probably heard, don't make a federal case out of it.  And you may start to see why that's the case with this case.  But it's important for you, as a jury and I know this was

very important to my client to have a jury, because the jury gets to perceive subtlety.  My client was here every single day of the trial.  That's not true for the POM Parties.  You may recall it.

Now, there's two basic issues that are being addressed.  One, is the right of refusal under the EPA, the Equipment Purchase Agreement.  And one is the trademark issue.

Now, with regard to the right of first refusal, I'll take you through the testimony and the language.  You may recall certain documents sort of go up sometimes rather fast, and I'll try to take at least some time to go through those.

With regard to the mark, there is one concept that's really important from a trademark perspective, and it's called "reverse confusion."  And you're going to hear an instruction on that.  Reverse confusion is, I'll suggest, exactly what's happening here.  It's where the tail wags the dog.  And what I mean by that is, imagine you're the first user, but you're not a big guy.  You're a mom-and-pop, but you're a user, and you're first.  In comes somebody and, irrespective of the cause, make a lot of money.  And in that, all of a sudden they present to you all sorts of advertising, and you're like, wow, you know, look at all of that advertising.  I mean, there's all of that money in the advertising.  It all came later, but keep in mind, from a trademark perspective, it works in reverse because the mom-and-pop are the ones that are senior user, but the evidence

confuses you into thinking that the person that put all of this money in, who is actually junior, is the senior by the mere fact that they put all of the money into it.  And you have to just keep the dates straight.

We've got the May -- yeah, there's sort of two May dates.  There's the May date of the Equipment Purchase Agreement in 2015, and then there's the May date of the letter that went from the Dinsmore firm by order of court, that was by testimony only, went to the Dinsmore firm as a result of what was going on at the time.

So what I'll do is I'll walk through the slide show.

I will say at the onset, that, you know, if you enter into an agreement and there's 20,000 machines and not one option, not one lead, not -- not one, you know, you can work backwards from there.  It's just something's got to not be right there.  20,000 machines and not one option under the right of first refusal.

No offer was ever rejected because no offer was ever presented.  That's not locking up a market because the market -- I mean, in a market with a right of first refusal, you can't lock up a market, right?  It just doesn't even make any sense. Do you want the opportunity?  Well, no, I don't.  Okay.  I'm going to do the opportunity.  It's not locked up.  Do you want the opportunity?  Yes, I do.  It's not locked up.  Either way the market's going to expand.  It's simply a question of does

that person take the option?  But it's not locking it up.

First things first.  The parties.  You know there's two cases.  I'll suggest to you that the case by POM and Savvy Dog are not the same parties that shook hands on the Equipment Purchase Agreement.  This jury can find, you know, that can influence you or not influence.  I can tell you that there is a match in the case of Pennsylvania Skill Games against the two parties that it signed a deal with.  It did not sign the deal in -- the Equipment Purchase Agreement is not signed by POM of Pennsylvania or Savvy Dog.

Now, I took some notes, quite frankly, while Mr. Neiser was talking, so this -- I'll just try to address them briefly.

Please consider what exists, what really exists before May 20, 2015, or even at that point.  Like, what was there then?  Again, it's so easy, you know.  You look at, you know, some companies that really grow and you look at them as they exist, and it's hard to see that it was -- you know, "no man's a prophet in his own home" sort of thing, not to bring up more, but the point is it's hard to tell where it started.

What -- you heard me ask the question, "Okay.  How many operators did you have early with the Equipment Purchase Agreement?"

"Oh, I don't remember.  I don't know, you know?"  But reality is you're not going to find evidence in that exhibit

binder that shows that there were other operators at the time the EPA was entered into.

So, you know -- and the advertising, right?  You can look at $5 million of advertising that came forward, but that's after 20,000 machines.  That's not back when it was fledgling, and we'll get there.

All right.  They say never heard of operators.  Now, you probably remember Dan Warren saying to you, "We were a small company.  We were a small company.  We were a small company." He said it multiple times.  20,000 games today.  Not then. Today.  Just to keep -- the dates are hard, but it's easy to roll off of them and get persuaded off of them.

Advertising when.  When you look at the ads, you know, so you're seeing the bell logo, right?  But the question is when was that bell logo out?  When do you have evidence that that bell logo was released?  Not early on in 2013 or any of that. We'll get there.

Okay.  You know, the Cline letter is something we're going to go over, and Mr. Cline, the attorney, he asserted privilege in a number of places.  But that letter is important because that's the letter that said to my client, after two certified letters -- and, you know, I don't think the POM parties testified they remembered the letters, but let's put that aside.

After two certified letters, all of a sudden he's not

getting calls back, and there's two certified letters.  What's a guy to do?  He gets a letter from Cline.  What's a guy to do?  What do you do?  You call your attorney.  Not me at the time.  That attorney basically thought that Mr. Unis could not sustain to this point.

But what do you do?  You have to call your attorney.  The attorney sent a letter, boom, lawsuit.  Yeah.  Yeah, he did send a letter first.  We admit it.  Nobody's hiding it or -- we admit we sent a letter and Cline responded, and then we sent over a letter from the Dinsmore firm saying, you know, "Look, here's a county case, not a federal case, but here's a county case," and then they file.

Now, that September 23rd, '13, date when they talk about using the mark, that's an interesting date because the first time I ever heard of this warehouse theory was in court.  Never before.  Because the question is who's using the mark first in commerce?  And the issue is, well, the first time, they heard it from me probably, as well, you know, if -- you can't be interested in a legality ruling if you're selling the machines before the legality ruling.  So they were sort of trapped up at that point.

If you think you're the one that's interested in the legality ruling, what are you doing selling machines in Pennsylvania without a legality ruling?  So what do they say?  First time I ever heard it:  "Oh, we put it in a warehouse.

They weren't used."  So that wouldn't support the date.

Okay.  You keep -- you keep the counts straight.  In the case from Pennsylvania Skill Games versus Miele Manufacturing and Pace-O-Matic being the same parties under the Equipment Purchase Agreement, they have no counterclaim.  There's no claim back.  Everything that's a claim against Pennsylvania Skill Games is from the POM of Pennsylvania, Savvy Dog companies.  There is no claim, and you'll see that on the verdict forms.

Now, it's a little hard to see.  But we now know that Pace-O-Matic letterhead, we've got -- we've got Pace-O-Matic, Inc., using it.  That's number one.  Number two is we've got POM of Pennsylvania trading and doing business as Pace-O-Matic on the same letterhead because you saw the Cline letter, and on the trademark application, which is to the right, we have Savvy Dog Systems, LLC, trading and doing business as Pace-O-Matic, Inc.  These are just facts.  I mean, I'm not pointing fingers and accusing.  That's just the facts.

Oh, by the way, if you're taking notes, those are the exhibit numbers to support what I'm indicating.

All right.  I'm going to start backwards with the Cline letter, if you don't mind, because the Cline letter is, quite frankly, when the case gets started.  So while a lot of fingers are pointed, you know, you did this, two certified letters, no response, not asking, not responding to phone calls.

So we get a Cline letter.

Now, this letter, you remember the testimony, was in response to the Pro ATM cease and desist. So in other words, the first time my client saw Mac Vending, who testified briefly, first time he sees Mac Vending, what's going on? There is a guy in Beaver County. Later, the same people, wait a minute, now there's a Pro ATM in Beaver County. Something's going on. They're not returning my calls. They're not fixing the problem anymore. What do you do?

So they send a letter to the company who contacted the POM parties, and you have the Cline letter.

Now the Cline letter is dated February 14 of 2018. And we're getting to May, the lawsuit. Okay? He says, "For the first time my client ever heard the name POM of Pennsylvania," he said, "I'm general counsel, POM of Pennsylvania, DBA Pace-O-Matic, the successor in interest to Pace-O-Matic, Inc."

That's just news to my client. They never sent a letter over and say, "Hey, you know, we're moving it around." Boom. Different party. You know, so what's a guy to think? What do you think? You know.

All right. Now, next issue. Now, again, a jury trial is important for certain reasons, and this is one of those reasons. How do you interpret a letter that said you did something wrong but it says "any right." It doesn't say "your right." "Any right." If any, could say right, if any. Right?

"that your client may have," okay, "has either been abandoned or already defined" -- he wouldn't testify to that, if I recall -- "due to the prior marketing inactivity by your client."  Right?  So that's another one; now we're at three, two.  "Or a substantial amount of money, your client" -- "substantial amount of arrearages that your client owes to my client."  With no invoices attached.

What's a guy to do?  Which is it?  Please just be straight.  Which is it?  Did I abandon?  Did I not pay my bill?  Did I -- whatever "already defined," whatever that means?  Just tell me what I did because this is the first time my client heard of a problem.

And it precipitated -- I know I put up wiggle-outs, you know, that's just -- all right.  There you have it anyway.  I used that term.

Okay.  Now that's a little hard to read.  But, the true timing -- now it's a little tricky if you don't pay attention.  It says -- and I apologize.  That blue doesn't work well with the screen.

It says, "We have determined that your client did not," you heard the testimony already, but, "We have determined that your client did not have any terminals at the location before Pro ATM."  There was a cease and desist, and they, Pro ATM "placed the terminals at issue in your letter over a year ago."  Okay?  "As a result, this location was obviously a

place where your client opted not to place terminals at even though it had the opportunity to do so."

Okay.  So you're not going to give PSG an opportunity because you're saying it doesn't already have the thing that if would be allowed to refuse.  It just -- even when I say it, it doesn't make sense.  If I write it down, it doesn't make sense.  And it doesn't make sense because when I say it or write it, it doesn't make sense.  It just -- you don't give someone an option, and then say, "You don't get the option because you don't have the thing that you had the option to get."  It doesn't make any sense.

Therefore, under the letter of the right of first refusal, Pro ATM placement at that location is proper because you gave up the location.

Now, I'm not accusing anybody, but what I'm saying here is this is what was written.  You're a jury.  What would you say if you got this letter?  You'd be like, it just doesn't make any sense.

All right.  Now, the tricky part, though, is the date.  The date is 2/14/18.  All right?  You're thinking, 2/14/18.  Maybe he did something wrong before 2/14.  No, it's a year earlier.  Remember, what Cline is saying is, "If you did something wrong, we made the decision a year ago to put" -- "to allow that location in there and to sell that property."  You see what I mean?  It's not 2/14/18 that is the real date at

issue.  The real date at issue goes back a year, because that's when they would have had to make the decision, "Oh, there's a problem.  We're going to sell in to Beaver County."  That takes you all the way back to 2017, early 2017.  It's not 2018.  And now we're getting back to '16 and all of those initial invoices and when companies got formed that don't match.  Okay.

It says, "What good is the right of first refusal if you don't have the thing you would be entitled to refuse?"  There you have it.

But please do consider keeping in mind the fact that there is a subtle timing issue that's easy to overlook in the fog of war.

Now, Cline goes on.  Now he sort of changes his tone.  He says, "The parties did agree to an Equipment Purchase Agreement," which did.  Now he doesn't say "any"; now he actually says it's really that.  Now he's an attorney; keep that in mind.  "That did contain a right of first refusal to place Pace-O-Matic terminals in Beaver County."  Okay?  Doesn't -- doesn't say more than that.  You have a right of first refusal, it's in quotes in the document, to place terminals in Beaver County.  However, that right of first refusals was based on the implicit promise you would be the lead distributor.  Admission.  Lead distributor.  That's what he said.  I'm not using my client's language.  I'm using their language.  That's what he said.

So you get -- again, think of your PSG.  You get a letter, and it's got all of this in it.  And it's like, "Wait, they're saying I was a lead distributor."  First, he admits there is a right of first refusal.  He does not limit the right of first refusal to anything.  He doesn't say, like, to do it here, under these circumstances, and these conditions didn't occur.  He doesn't say any of that stuff.  He says, "You have a right of first refusal."  He never says anything about a problem with the brand.  He never says a word about the brand.  There's no problem with brand mentioned in that letter.  And this is 2018, before the lawsuit.

And admits Pennsylvania Skill Games would be the lead distributor.  How do you get out of it?  I mean, he says it.

Now, he never says anything about not knowing the locations, right?  We all know by now, that's the argument.  Oh, we don't -- you know, somewhere in your life you saw the monkey do this thing, see no evil, you know that?  Okay.  That's the argument, right?  We don't know where the locations are.  We've got genius guys, genius programmers, but we can't figure out -- we remember all sorts of certain stuff, but we can't figure out how to just ask, Are you going to put games in Beaver County?

He never says, "We don't know where the games are going."  Right?  That's not what he says.  He doesn't say it. If that were the case, he would have said, "We don't know where the games are going."

Convenient excuse during litigation. And it came post-litigation.

Now, let's look a little bit -- I can't blow it up as well. All right. The Cline letter is Exhibit 10. Now, Michael Pace testified -- and I'll read it if you can't see that far, maybe some of you can -- "Okay. Was Pennsylvania Skill Games ever your distributor in Beaver County?"

"No."

He goes on below, Mr. Pace says, "He was a fireworks guy. He did have a route of games, but what he had, there's no way we could have considered him to be a distributor for Pennsylvania at all."

And I said, "To be clear, he was never a distributor for Pace-O-Matic; is that correct?"

"No, he was not."

"Or of POM of Pennsylvania?"

"Or of POM of Pennsylvania."

Even though Cline says he was supposed to be the lead distributor.

Again, I'm not just pointing fingers. This is the evidence. And it's just me. I don't have a team. Okay?

Here's the evidence. Then you get to the PA distributor doc, Exhibit 119A. Okay? 119A, that document that they sent is called the PA distributorship -- the PA distributor agreement.doc. You know, if you are going to call something a

carriage, call it a carriage.  If you're going to call it a car, call it a car.  But if you're calling a PA distributor agreement.doc, it's probably a PA distributor agreement doc.

And you'll notice, as of the date of this email, January 30th of 2015 -- keep in mind, remember the 2013 date and the warehouses -- "Games are starting assembly next week." That's the highlighted language.  And, again, this is Exhibit 119A.  "Games are starting assembly next week."  And we're at 1/30/2015.  Again, I'm not giving you conjecture.  This is what the facts are.

Michael Pace admits again, Michael Pace did not -- okay.  So my question:  "So your argument, your testimony, as I understand it, right of first refusal doesn't trigger the obligation even though it has the word 'option.'"

Mr. Neiser objects.  The Court overrules, says, "You can answer."

Mr. Pace says, "This says if buyer opts not to place compliant terminals in certain Beaver locations, then the sellers of another vendor may place the above-described compliant terminals.

"The seller is us, and we didn't place the terminal in that location.  And I'm not even aware if there's other operators who ever placed games in Beaver County."

Again, it's sort of I don't want to know.

Now, next slide.  Mr. Pace admits, he could ask.

"Question:  Okay.  But can't you simply, in agreement, say that you're not permitted to put into Beaver County?"

This is on the left.

"We could have done that."

So I said, "Okay.  So before we took the break, I think you testified you'd never given the opportunity to Pennsylvania Skill Games as it relates to placing a terminal in locations.  And I think your testimony, Mr. Pace, that you don't control where the operators place games; is that right?"

"Answer:  We do not control where operators place games."

"Okay.  Are you saying you are unable to know where the operators place game?"

"Yeah."

Okay.  Brilliant.

"Yeah, we -- yeah, operators are secretive about where they place their games and generally no one knows where they are."

"Okay.  But isn't it true you can simply ask?"

"Oh, I'm sure we could ask."

"Okay.  Isn't it true you could actually require it as a term of purchasing your software?"

"Speculation, Judge."

"Overruled."

He answers, "We could."

That's the last line at the bottom.  "We could.  We could put it in the agreement."

They don't put in the agreement.

It's not accidental.  And it's not by constraint of anything other than they don't want to.

Now, let me say for a moment, you're allowed to draw inferences, thank goodness, as a jury.  Now, play this out in your head from the facts you know.  There's a right of first refusal.  You heard the snowball effect; right?  The snowball -- you know, two times two times two, right?  It's exponential growth.  Snowball effect.

Now, I know that all of Pace's operators and all of the witnesses that are somehow affiliated with Pace said, Oh, well, we found this out by a flyer.  We know that.

But think of it a little different from the fact that these machines were getting placed in Beaver County by PSG.

Competitor calls up Pace and says, Hey, we saw these games, and we want to place the games.

Now, let's assume, No, you've got to put them through PSG.

What's the competitor say?  Competitor says, We're not putting them through PSG.  That's our competitor.  Nowhere -- but that was the deal.  That was supposed to be the way it worked to give them the advantage of it.  We're not going to put it through PSG.  And we'll make your life miserable in Beaver

County if you force us to work with our competitor.

Okay.  That's the way people are.  Right?  We're not -- we'll make your life miserable if you try to make us work with our competitor.  But I have a good order for you right now.

Mr. Pace admits -- "Now, Mr. Pace, do you see any performance requirements in the Equipment Purchase Agreement?  Is it stated anywhere?

"I don't see any, no.

"And you signed this document; isn't that correct?

"Yes, sir."

Now, if you remember this whole thing about the branding.  Mr. Pace says, keep in mind, internal uses are not a commercial use.  You have to put the name on the game.  So where they show you a bunch of stuff in the computers, you know, it's not on a game in commerce.  You won't find evidence in that big fat binder.  You're not going to find any evidence of pictures of the game in commerce.

He says, "Oh, it was a placeholder.

"You didn't find anything better, did you?

"Evidently, we never changed it.  I know we had some lists of some stuff that we talked about, but I don't think anything on the lists ever had a gotcha kind of thing.  We just moved on with the generic name.  It was getting used, that's what happened."

All right.  Now, Danny Warren.  Some of these are --

"Do you have any recollection of Mr. Pace, for example, going out before the lawsuit to find a place to put a game?

"No.

"Okay.  Did you?

"No.

"What about Ryan Wood?

"No.

"Anybody from your office?

"No."

It may be a mustard seed, but I'm sticking by it.  You can ridicule it.  You can scorn it.  You can condemn it.  It's still the truth.

"Do you have any recollection of Mr. Pace, for example, going out --"

Okay.

Danny Warren admits, "Do you have any knowledge of concerns brought by either of the Unises" -- you heard Mr. Unis talk about assistance with games.

Now, hyperbole is hyperbole or gross exaggeration.  Okay?  I don't think you heard my client say, "We're trying to own everything that they ever did."  I mean, that keeps being put in front of you.

But I think you know that's not what's going on here.  There's a right of first refusal in an agreement.  There was a brand that was being used before, which Mr. Unis said already

had credibility with police officers because those games were at issue.

So, yeah, there is some conversation about him helping Michael Pace. Now, you heard -- I think it was Mr. O'Bier said, Mr. Pace never once, never once, after 17 years, never once told me to put something in the game.

You'll believe it or you won't.

All right. So Dan Warren, he admits -- he says, "Okay. Fair enough." Now, he says --

I said to him, "Do you have any knowledge of concerns brought by either of the Unises with regard to the game not earning or not being sufficiently interesting to satisfactorily earn?"

And he says, "I'm aware of that concept in all markets with Pace-O-Matic, including Pennsylvania.

"And including with Pennsylvania Skill Games, LLC?

"Yes."

Operators get involved. It doesn't mean he's saying that I own your software. Right? It just doesn't mean that. It keeps being presented like that, but that's not what the testimony is. All he's saying is, We had an important contribution at a seminal early point in this process.

And it was valuable at that time. At that time. I mean, you know, you sort of use it up and cast it away. But it was important then. That's why the agreement got signed.

Michael Pace admits, guaranteed.  You'll see his testimony.  Now you see his testimony.

We say, "Do you see the words 'make sure'?  Ensure. Guarantee."

In that Equipment Purchase Agreement, there's words "make sure."  There's words about make sure about inventory. That's not a lead.  Okay?  They're making sure about inventory. Either way, they're going to get a sale.  They're just going to comply -- they're going to grow the market either way.  It's just do we honor the first refusal or we don't.

"We're going to make sure.  You see that; right?

"That's correct.

"So if I understand you, to your knowledge, Pace-O-Matic never implemented a policy of simply asking operators, did you intend, plan, or are you distributing into Beaver County?

"Correct.

"Okay.  And when you say 'correct,' that means you never did, right?  Or Pace-O-Matic never did?

"Yes.

"Thank you."

They never implemented a plan.

Now, with regard to the hardware, you might remember, I had some difficulty getting what I think is a pretty easy question/answer.  And it's just, you know, are you still selling

hardware?  Because POM likes to say, or POM parties like to say, Oh, you know, we'll place fills.

The problem is, they stopped selling hardware.  So -- and I think you might remember me saying, Well, you know, isn't it, if you don't sell the hardware, it's a function of you wouldn't sell more fills because you'd be filling more hardware?  And there was -- there was -- you know, testimony in that regard.  But the bottom line is it should just be an easy common sense issue, right?  The more hardware you sell, the more fills you need, and the more money PSG would make.  So, yeah.  I mean, you're going -- you see in the binder, you'll see, Oh, we gave $5 million to this.  That was later.  My client would love to give $5 million donations to people.  But my client was denied the rights that they should have had to earn money.

"And what -- wasn't it clear from your testimony, as I think you testified, you would sell fills to Pennsylvania?

"Yes, we currently sell fills.

"Do you sell hardware?

"No.

"When did you stop selling hardware?

"You know, I refer to Pace on that.

"Okay.  When, around the time the lawsuit began?

"I don't know."

He doesn't recall getting certified letters, doesn't recall when stopped selling hardware.  These are important

things.  Certified letters, signatures to agreement, don't remember any of that.  Remember certain things but not any of that.  No coordination.  Okay.

"I'm not asking -- I'm not asking that.  Do you have any personal knowledge that they turned the machine on?

"I have no knowledge they turned it on or did not turn it on.

"Okay.  Did you attend at all the American Italian Club to help coordinate placement of the machine?

"No."

Now, to the AIC agreement, just so it doesn't escape your review, this is the agreement for AIC, the Italian American Club where Mr. Unis said he specifically selected it.  You're going to see -- and this is exhibit, again -- I'm trying to give you exhibits -- Exhibit 66 signed by Pennsylvania Skill Games.  All through that document you're going to see PA Skill Games.  That's how they did business.  That's how people recognized them.  That's how they had a reputation for legal games.

And keep in mind, by the way, with regard to legal games, there's a distinct between -- remember, you're innocent until you're proven guilty.  Okay?  That's the rule.  Right?  Innocent until proven guilty.  Games are legal unless they're deemed illegal.  So it's not like it's an illegal game that has to be adjudicated to be legal to be legal.  It's legal until somebody says it's illegal.

So when you say, you know, the first or only legal game, that's a little bit, you know -- what was being bargained for was confirmation of legality. That's different. That's different than legality. The Beaver County case confirmed the legality because it was challenged. But that doesn't mean all the other games in the market were illegal. Just to keep that straight.

This document is dated 2010. That's a long time.

They were doing business and earning a reputation in the market a long time.

All right. Now Miele just simply, I said, "Have you ever offered Pennsylvania Skill Games, LLC, the option to take a location opportunity based on the right of first refusal?

"No."

Now, the end of the question about we didn't know -- all right? -- now, Mr. McDanel testified -- and this is his testimony -- 45 locations and 175 games. Okay? About 175. That's one operator. Okay? How do you miss it? How do you miss it? If you miss it, it's because you wanted to miss it. You didn't -- it's tough to miss 175 games in 45 locations. Yeah, he's an operator for Pace; so he's not friendly to me, per se. But that was his testimony.

We've got Savvy Dog formed in March. We've got a sale in Beaver in April. We've got a sale in Beaver County in May. You see invoice 4245. And this is, I believe, from exhibit --

if you want to go to the exhibit, it's 275. It's at the end of the binder. I believe it's 275. It may be 276. 275 or 276.

"Do you also see another Beaver -- sorry -- Beaver Falls, Beaver County invoice to Marsico?

"Is Beaver Falls in Beaver County?

"Are you --

"I'm not local."

You have five years -- seven years from 2015.

Now, with regard to the EPA, you know, this thing didn't just, like, happen out of the blue. Okay? Here's Danny Warren's email. Michael, Albert, and I, Danny Warren, went to the draft last week in Ohio. Exhibit 3.

The EPA, there you have it. Okay? And that EPA, you're going to see in Section 3, it's got the red block around it, this is Exhibit 6. You're going to see the red block around it. It says, "Seller will use all reasonable efforts to make sure" -- please think about and consider the "make sure" -- "that buyer has access to software plays and compliant terminals and hardware, as long as seller is in the market." I don't think there's any dispute Pace is still in the market.

And then you're going to see it on the second side, again, Exhibit 6. "To make sure." It's not like an incidental little thing. I mean, they're saying we're going to make sure. Make sure.

Now, we'll get to the, "Seller will support buyer," in

a minute, because I think the email helps understand that particular provision.

Okay. Let's see. We've got Mr. DeLuca's testimony. Now, Mr. DeLuca is an attorney, and you may remember the testimony from Mr. Unis when he said something like, "If you can't trust your attorney," sort of thing. Mr. DeLuca was Mr. Unis' attorney at the time of the pickup. He was doing a lot of the fireworks, if you remember the testimony. So at that point, Mr. DeLuca -- now, he's not here because he was excused by illness, by the Court order, excusing him by illness. So he's not here to testify.

But -- unless I find the page quickly here, I'll just go to the screen and read it. Mr. DeLuca testified, and it was read into the record. The language at the bottom says "Yeah, it was Albert Unis wanted exclusivity in Beaver County." That was read into the record. Mr. Unis wanted Beaver County. That's what he wanted out of this -- these deals.

Yeah, I mean, you can have the whole state. Nobody's complaining about it. It's a big state. Take the whole state.

All I want is Beaver County. That's where my kid lives, that's where I live. You know, that's where we do business.

I think he said he didn't want his kid driving around and, you know, I don't know if it's still in a break-your-legs-kind-of-industry, but it's -- you know, that industry is the

kind of industry you want to be careful in, and that's what he -- he didn't said it in those words.  I think you probably got that gist.

But that's Mr. DeLuca's testimony.  All right.

Now, Rodgers -- let me address Rodgers.  Oh, the reason why it's not in my stack there is because this was raised by counsel in his opening.  Rodgers, and remember, the exhibit is 100, but the page number, because there's a lot of pages, is 48.  Just to note it.

So 48, you'll see in this draft, it says "To sell 25 or more, 25 or more," okay?  25 was the magic number.  And they bought that.  They bought well over that with 150,000 of initial purchases.  Again, that's Exhibit 275 or 276.  The competitor invoices and the -- their initial invoices are 275, 276.

25 was the magic number.  Not 200.  I mean -- you know.  All right.  They had already satisfied.  They bought way more than 25.

All right.  We talked about as long as in the market, Exhibit 6.  And they are still in the market.

All right.  Ryan Wood email, Exhibit 26.  Now, keep in mind, this email goes to that early of January agreement.  Now, there's a number of things he says in there that sort of let you know what's going on.

"Right of first refusal in Beaver County meaning if a location or operator" -- see that, in the red?  This is

Exhibit 26 -- "or operator calls about machines.  I'll call you first to make sure you have the inventory to service the account or plan to buy it to take care of that account."

He goes on, down below, finally, "I want to mention, I've not offered such a deal as yours to anyone in the state and do not plan to."  Sort of exclusive, right?  And it also says, "These prices show the past reference with the machine."

Now, here's the interesting part.  Here are the attachments.  Now, you earlier saw, in the opening statement of the POM parties, you saw them show you the one on the right.  They didn't show you the other three.  You know why that's interesting in Exhibit 26?  Because you don't see the bell logo anywhere.  And this is 1/14 to 2015.  No bell.  Not on those three machines that are attached to his email.  And the thing on the right, not only does it not have the bell, but it's a placard of some sort.  It's not even on the games.  That's the full truth.  Okay?  The complete email.

All right.  More.  Michael Pace admits, this is Exhibit 36.  Look at this language.  And this is leading up to the EPA.  "No sales into Beaver County."  It's not qualified.  It's not limited.  It's not none of the -- you know, see no evil, hear no -- you know.  "Unless Albert Unis or affiliates refuse to place machines," that's the right of first refusal.  Nice and simple.  That's the truth.  That's what people understood it was.

Keep in mind, you know, quite frankly, it's the first time I ever heard it myself, since Mr. Rodgers was up there, and he said it was, in quotes, the right of first refusal, because it was a little bit different.  Then he says -- this is the interesting part, when you get into that language on who's supporting whom -- "Miele Manufacturing and POM will commit to marketing efforts coordinating through Albert."  Coordinating through him.  It was his gig to advertise in Beaver County.  That was his location.  He knew it.  He had games in it.  And he could market into that area.  That was the deal.

Oh, lest that we forget, "Just make it work" in bold.  Just make it work.  Fledgling in those days.  They didn't have 20,000 machines.  Just make it work.  We need this sale.  We need the 150K.

Now, get into Rodgers' notes.  100.60, if you can't see that.  Now, this is -- this is great stuff.  It says, "Albert will be left with useless machines."  That's the note.  That's the problem.  See, you go back.  They have 20,000 machines, where, you know, look, look how great.  At that point, Albert was concerned that they would either pull out of the market or their machines would go bust.  That's the truth.  He was concerned.  He had already a reputation, already had machines.  Pace was coming in saying, "Hey, we got this new machine," and he wasn't sure it would work.  He was concerned about it being left with useless machines.

All right.  And the same exhibit, so 100.23, it says, "If" -- in the lower right-hand corner, it says "If pulls out". If pulls out.  "No fills," and then there's some language.  The issue, again, they were -- at that time, in that fledgling time, in the mustard seed time, there was a concern about the viability of that new product.  You can't look at it after 20,000 machines when it's got, you know, all that sort of market reverse confusion penetration.  The other part is just the part that says for help in legal matters.

And by the way, according to the left box, it says, "Would not sell fills."

Okay.  The 25 machines.  I'm just going point out to you, if you look at Exhibit 100.21, it says, "Only 25." And Mr. Unis, I mean, they were bought.  I mean $150,000, it's more than 25 machines.  I think Mr. Unis, Albie, testified to it.

And then it talks about prepay, that sort of thing. And then, again, you see the language up above, it says, "If no longer supported."  That was the issue.  That was the problem.

All right.  Now, we get to McDanel.  Exhibit 100.2 and 3.  It's also Exhibit 43.  It's a cease and desist.  And Exhibit 276 are the invoices.  Okay?  So you can look them up in the binder.

Now, there's a lot of testimony or a lot of argument, I should say, maybe better said.  There's a lot of argument

about, "Oh, well, you know, the -- you know, why didn't -- why weren't there all of this, you know, contention early on with the logo and the relationship?"

The issue was Albie was rolling out those games and saw no problem with the logo, whether you call it refreshed or whatever. It just wasn't an issue. It was -- they were -- he was looking at it, this is my corporate partner. There's no issue. It's aligned; so there's no problem. When it started to become disaligned or unaligned, whatever the right word is, that's when it triggered.

That -- and we're getting now, November of 2016, now we're getting to that '17 period, now, all of a sudden, and again, Mr. Rodgers had indicated that it took him a little too long to follow through because that actually does take you into the 2017.

But now, he's starting to say, what's going on? There's a problem. I'm seeing the mark, and it ain't me. And I'm going to try to figure out what's going on. But doesn't get results from McDanel. Doesn't get any results with Pro ATM. It only came up when he found it. It didn't -- they didn't tell him they were doing anything or give him a right of first refusal. He just found it on his own.

You see the words "Imposter machines."

Now, I'm not permitted to suggest you should draw legal conclusions from this particular exhibit or these two

particular exhibits.  I will simply tell you it's a fact, it was brought out in evidence, that POM of Pennsylvania, LLC, was created on 9/7/2017, but the agreement at Exhibit 17 was signed, or purportedly signed, on January 1, 2017.  That's just a fact.

Now, with regard to the -- we're getting there.  With regard to the Pace testimony regarding timing, I say in the note that, "There's absolute any no documents demonstrating commercial use of any -- with any logo form, prior to the release by and with Pennsylvania Skill Games on the first orders in Beaver County ruling."  You're not going to see that -- the only evidence is our evidence of the use of the mark.

And Mr. Pace says, at -- on 2/16, page 29, 19 to line 9 on page 30, so I say to you -- so I said to him, he says, "Oh, there was 16 operators."  Now, keep in mind, there's no paper evidence of this.  But he says that.

So I said to him, "Do you think there were 16?  And the 16, did they have a bell branded designation?"

"No, they hadn't.  Our art department hadn't developed it yet."  That's his testimony.

Now, the Savvy Dog trademark was filed, if you see the date, these are Exhibit 21.  They put in a lot of exhibits.  Okay?  As if volume matters.  But Exhibit 21, you'll see that the date on that is 11/28- -- so, again, Exhibit 21.  11/28/2018.  That's, like, four months after the litigation started.

Now, you'll also see that they say they used that logo in commerce on November 19th of 2013. That's what they -- by the way, of course, the name on the application is Savvy Dog, trading and doing business as Pace-O-Matic Inc. But they use November 19th of 2013. But the testimony is it hadn't even been developed yet. Certainly, if it might have been developed at some level on their computers, it wasn't in commerce.

This is all uncontested. Early in the relationship, Miele could not fulfill the order. That check for $15,000 came from that Firestone loan that was for the initial purchase. This was part of a purchase that Pennsylvania Skill Games had to do because Miele couldn't fulfill at that point those games to get the manufacturing. And that's uncontested, Exhibit 88.

Just again, let you know how fledgling it was at that point. They couldn't even produce the games. He was getting the games built.

Now, your account is clean. Maybe that doesn't -- now that the -- this is in there, because there was a claim to a breach of contract and this was in response to that issue, which is no longer an issue. "Your account is clean," that was demanded. I think you heard Mr. Unis say, "Show me the shipping labels. I want to see that it's shipped because I didn't get it."

Now, 402.44, you heard some testimony about 402.44. Mr. O'Bier says -- let me just go up. So Mr. O'Bier -- now,

keep in mind, I say to him in line 10, this is Mr. O'Bier on 2/15, "Isn't it true" -- line 13, "Okay.  Okay.  Isn't it true -- isn't it? -- that the splash screens on the current builds still indicate, when you turn on the computer, based on 402.44?"  "Yes."

Even today, Pace is getting to that 20,000 because they're saying it's based on 402.44.  That was the Beaver lawsuit.  They're still claiming it.

Now, you might wonder, it's interesting, isn't it, after how many years are we talking about?  We're talking about 2013 to 20 -- give or take ten years.  Still on 402 version. The version has not changed.

MR. NEISER:  Objection, Your Honor.  This goes to versioning.

MR. ZEGARELLI:  I'll move on.

THE COURT:  All right.  Ladies and gentlemen, the version at issue here is .44.

MR. ZEGARELLI:  Okay.  Okay.  It still refers back to -- it still says 402.44 on the current version because all that growth is still saying, "Oh, this is still the same version, you know, ten years ago, or it's still based on that, from a legality perspective."

Again, it's the mustard seed because that truly is what happened.  That still has value today.  And you heard some testimony about 402.44, the uncontra -- you know,

uncontradicted.  We have two 402.44s.

MR. NEISER:  Same objection, Your Honor.

MR. ZEGARELLI:  This is another version.

THE COURT:  Come to sidebar, please.

(Whereupon, sidebar conference held:)

MR. NEISER:  It's the same issue.  He's trying to say that it is 402.44, but the software is not 402.44 because the versioning --

THE COURT:  You're not going to say that, are you?

MR. ZEGARELLI:  Two versions of 402.44, and that's -- but that's in evidence, Your Honor.  It's in the evidence binder.

THE COURT:  Keep your voice down.  I don't think it is in evidence.

MR. NEISER:  I don't think it is either.  On top of that, it's irrelevant.  It has nothing to do with the case. It's mischaracterizing and going to versioning.  You mentioned legality which shouldn't even have been mentioned.  And that is improper.  The Court's been very clear that versioning has nothing to do with the case.

MR. ZEGARELLI:  Can we verify to see if it is in Exhibit 212?  I believe it is.  I showed the witness, and he said he didn't recognize that version, but it's in the evidence.

MR. NEISER:  But it doesn't matter if we're talking about different versioning.

MR. ZEGARELLI:  I won't go much further.

THE COURT:  Let's move on.

(Whereupon, sidebar conference concluded.)

MR. ZEGARELLI:  So these are the games, modest though they may be.  Modest that they exist.  They were used.  They were in the market at the time.  It's Exhibit 82.  And it's 2010.

Yeah, in those days it was a little tougher to build games with, you know, fancy graphics in it.  You're talking 2010.  In fact, that's the reason why some of the -- you know, the Pace games came along.  But that's the way it was presented.

And, yeah, I mean, there's an argument to be made. Yeah, you have to turn this game on to see it versus on the side of the electronic box.  I think that's stretching to make that argument with, you have to turn it on.

Now, the word versus logo.  You heard a little bit about the word versus the logo.  And the exhibits you can reference are Exhibits 82, 6, and -- 82, 6, and 66, used since 2010.

Now, the word mark, you saw the AIC agreement.  You saw the name being used itself in the Equipment Purchase Agreement.  And you see the name on the screen.  Now, the word, word logos -- sorry.  Word marks subsume logo marks because word marks are abstract.  In other words, you're going to see that a word trademark subsumes all different forms of that mark because

it's a word mark. So how you put that mark in the -- into a form, a word mark subsumes it. A logo mark is only with regard to the actual implementation and artwork of that logo.

So, basically stated, a word mark is much more valuable than a logo mark because a logo mark is tied to the logo. A word mark subsumes all the stylized forms of it. So it's a much more important and better trademark. And much more difficult, quite frankly, to build up through registration.

PSG is the first in commerce. You've got two examples of it to support the fact that it was in use. You have the use. You heard the testimony on the use.

I put them side by side so you could see them, because at this level, I mean, there's a million different ways to do a font. And to me, the bubbly font, to me, looks pretty darn -- the coloration's different. But it still has that basic similarity.

And this was after the relationship.

Okay. This is just a note again, the Ryan Wood email does not have any -- I don't think you're going to find -- you won't find anywhere in the exhibit binder an earlier use. This is what was as of 1/14/15 by Ryan Wood.

You saw the supplemental registry registration. I pointed out at trial, if you recall, the date of 3/30/2018. That date coincides exactly with the truth of what was going on. He's doing business. All of a sudden he starts sending out

certified letters.  You're not getting calls back.  You know, you go and you figure out how to protect your right.  It wasn't -- in fact, it was Pace that filed in 2018 of November.  They filed the state trademarks later.

They knew about this when they filed those -- their state trademark applications.  This was already in process.

Now, there was some testimony, if you recall, Marvin Harris.  And you recall that Albie had testified that Danny Warren sort of slid a paper and said, "Hey, you know, sign off on this because we want you to take a different commission structure sort of thing," which impliedly acknowledges that they were trying to get out of the obligation.

Well, Marvin Harris corroborates it.  And that went into evidence yesterday.  And it says, Marvin Harris, in his deposition, "Do you recall that during that visit to Georgia or at any time that somebody from Pace-O-Matic" -- this is Mr. Neiser's question -- "Do you recall during that visit to Georgia or any time that somebody from Pace-O-Matic tried to make Albie sign a contract that would result in him giving up rights to the name of his business?

"I don't recall meeting.  When we exited the building I believe he said he wouldn't sign something, but I didn't go into it with him, Albie.  But he just said something about they wanted me to sign, and I wouldn't sign.  And I said, 'Okay.  I don't know what.'  I said, 'Are you okay?'  We were both apart

of it."  It's corroborated.

You might have heard of what's called a captive operator.  You know, it happens in insurance.  It happens in real estate.  It's when you are captive to a certain company.  Pennsylvania Skill Games was never captive.  Now, Pace, when the tail wags the dog, Pace is saying, "Well, you know, we make the machines, and we put the logo on it," so you know, he's kind of a captive operator.  Their current operators are captive.  Because in that big, long -- I have to look at the -- Exhibit 96.  Exhibit 96, big, long document, makes the current operators captive.  But that's after the litigation with -- in this case.  The captive operator concept.

He was not -- they were not -- Pennsylvania Skill Games was not a captive operator.  You heard it.  What if these games go bad.  Right?  What if you pull out of the market?  And you heard Mr. Unis testify to it, "I have hundreds of games.  I can't" -- "if I were a captive operator and you're telling me I've got to give up all of the games at the same time I'm thinking you're a fledgling and you might not make it or leave me high and dry, you don't do that kind of transaction."  He would refuse to be captive operator.

It's tricky business when you start saying, "They're using our mark because they're putting the thought in your head that" -- it's called a hidden premise -- "It's our mark.  It's our mark."  You start to think that way.

No.  He was never a captive operator.  Pennsylvania Skill Games was always an uncaptive operator having multiple competitive machines.

All right.  Here's what Mr. Unis said.  This is Albert Unis III; his testimony was videoed in, if you remember.  That right margin he says, "My son went out and met with state police when they were picking up games and we retained our games and we set the standard and we sent all of the information to Pace verbally, and everything we told them about each episode, and we worked hard to build a legal name for my son basically and Pace-O-Matic."

And he goes on down below, and he says -- by the way, this is at page 127, line 8 to 128, line 23, of the testimony.  Down below he says, "I had an exclusive for Beaver County, but they didn't have an exclusivity over what games I was running because I was already running skill games for ten years before that, so there was no way they could get me some contract that said it was specifically for Pace-O-Matic games.  You'll never see that anywhere in my contracts."

He is not captive, refused to be captive, and it doesn't even make sense why he would be captive.

I love that line, I've used it on my kids many times, "All things are difficult for the unwilling," and it's so true.  It's basically human nature.  When you want to do something, you get it done.  When you don't want to do it, you don't get it

done.  All you have to do is -- it's so common sense.  It's a federal case out of this.  He did sustain.

Do you intend to put the games in Beaver County?  That's it.  That's all you have to do is ask.  Do you intend to put the games in Beaver County?  The question has no impact.  You know, you heard this thing about, well, if we ask that question, we're going to blow up all of these relationships.  It doesn't even make any sense.

"Do you intend to put the games in Beaver County?"  This question has no impact on current installations by the vendor, nor does the answer.  Either way, I mean, the vendors -- you say -- the vendor says, "I want to buy a game."

"Do you intend to put it in Beaver County?"

Well, "Yes, I do.

"Okay.  Go see Al.

"No, I don't.

"Okay.  Here's your game."

The right of first refusal does not lock up Beaver County.  It simply gives the option for Pennsylvania Skill Games to take that deal.  It doesn't lock it up.  Either way -- either way, Beaver grows.  Either way, the state grows.

You heard about the jury slips.  Certainly, we would like you to adjudicate the facts of this case in favor of Pennsylvania Skill Games.  We ask you to find for Pennsylvania Skill Games on the verdict slips.

We ask you to find against POM and Savvy Dog on that second case, and we ask you to find for Pennsylvania Skill Games against Pace-O-Matic and Miele on the PSG case.

Thank you.

THE COURT:  Thank you, Mr. Zegarelli.

Counsel, I have indicated previously that each would have a brief period for any rebuttal.  I'm going to limit you to no more than ten minutes.

MR. NEISER:  I won't need that, Your Honor.  I'm going to go much faster than that.

Ladies and gentlemen, I'll be very, very brief.  You know, I just heard Mr. Zegarelli not only mischaracterize the evidence but basically defend the case without explaining what they actually proved to you.  Because they didn't.

These are word games.  These are technicalities, things that don't even matter, what he's relying on and what he put in front of you.  Some of the contracts.  For example, the lawyer notes.  Those are notes I keep for my clients.  They stay in my office.  Nobody hears about them.  My wife, no.  My kids, no.  Between me and my client.

Tree falls in the woods.  Does it make a noise?  Sure.  But not in law.  Not in business.  If you don't hear it and it's not communicated to somebody, we have no idea what you're talking about.  Just like we have no idea what they're talking about.

You know, they're trying to say that what's the harm? Why couldn't you ask your operators where they're going to put the games? That wasn't what we agreed to. All of these claims that they're making, there's no exclusivity in the contract. He may have wanted exclusivity. Everybody wants something, but it wasn't agreed to, and that's why we showed you the drafts and the agreement. That's -- he keeps saying, what was the deal? That was the deal. The Equipment Purchase Agreement is the deal.

Lawyers making up words and saying things is not what matters. It's what's in the contract.

So, they are, and he admitted, repeatedly, what their intentions are. Their mark? Take it. Exclusive in Beaver? Take it.

And they tried to claim that they're a distributor. Now, that may have been a typo for Mr. Cline. I'm not sure why he used that word. Nobody really asked him about it. But they're claiming their client was to be a distributor because a file name said "distributor.doc." The file name could have said "I'mgoingtoshootyoutothemoon.doc." That doesn't mean we're going to shoot somebody to the moon. I send emails with the attachments that say, "Use this one. Final. Delete. Delete. Delete." That doesn't mean it's the final.

He didn't show you the actual attachment itself, which was one of the other agreements that never said "distributor."

See, that's the kind of word games they're playing because they want to distract you.  This is like the Brady Bunch moment where Mr. Brady slides the briefcase over and makes the guy turn his head, if you ever saw that episode.  It's just a distraction.

Using words like "captive" -- they're not captive.  Being captive isn't part of the case.  We just ask our operators, if they choose to do business with us, to follow certain guidelines.  It's our company.  They spent millions of dollars building the thing.  We can set our own ground rules.  Why not?  If they don't want to, they can go elsewhere.  They can do business with other competitors.

So this idea of there is no -- that there's a captive something, it doesn't make any sense.  We're not even here for that.  You're not going to hear it in the jury instructions.  It's not part of the lawsuit.  Again, to try and confuse you.

Questions about corroborating.  Have Danny Warren signing a document.  Marvin Harris said, "I wasn't there.  I didn't hear it."  And he mentioned that he slid a paper across the table and he wouldn't sign it.  For all we knew he was going to give him a new car.  I don't know.  There's no testimony.  It doesn't corroborate anything.  It's just another story.

So, mention about the state trademark registration.  That was done as belt and suspenders.  It's a business.  I mean, if it was improper, the judge wouldn't have let us put it in the case, okay?  Just like the incorporation thing that we keep

hearing about, one company incorporated on one date.  And the notarization thing -- I still don't understand.  If it was improper, the judge wouldn't have allowed it to come into the case.  If there was a problem, she wouldn't have let us even bring the case this morning and talk about it.

This is just argument about stuff that doesn't matter in the background.

How can we say that there's an issue with the brand?  Like, he's picking on Greg Cline's letter.  It was a two-page letter.  It's a lawyer letter saying, "Hey, we got a problem here.  We've got a letter from your lawyer, and we're responding.  He wanted us to talk about operators getting locations and disclosing things and branding.  We didn't even know that they had tried to steal our brand until a month later, or maybe a few weeks later."

So this idea of just nitpicking on little language, nitpick, nitpick, nitpick, it doesn't matter when they haven't put a single piece of evidence in to show that they actually did anything from the time they signed the contract up until the time they started complaining about other operators being in town.

That they don't have a right to kick them out anyway.

And it's interesting how they didn't know about it, considering that Albert Unis said he had every location in Beaver County.  Why didn't they know?  Because they didn't do

the work.

The thing about Ryan Wood's email and not having the bell mark, as he calls it, on his other -- the different flyers, those are just -- they're just materials. We just met them. We wanted to show them what one of the machines looked like because he had no idea what the machines looked like because they had no idea what they were doing. And that flyer that was on that, the red Pennsylvania Skill, that was proof, and Ryan Wood testified to it how they advertised that information and in that mark in the Commonwealth of Pennsylvania.

We didn't raise the issue of branding with them because we didn't know they had stolen it yet. The bigger issue is why didn't they raise the issue of branding with us if they're claiming they owned it? And they didn't. Because they don't.

That Rodgers -- for those who are following along at home, the exhibit he cited to is wrong. It's incorrect. He cited to the 40th page of that big, long document. It's actually the 57th page. That's the right one to look at. Not the one they put on the screen.

And I'm glad he did because he admitted our case. When he's talking about the 25 games and all of those -- and there's a lot of information, but all of these things that he's pointing out about the draft agreements and the little points, they didn't make it into the final one because nobody agreed to

it.  If nobody agreed to it, it's not an issue in the case. It's just chatter in the background.  You can put you want a Cadillac every single day from somebody.  That doesn't mean you agreed to provide it.

So essentially he admitted our entire case by not establishing proof of anything that they did to support their claims.  They have a burden of proof, too.

Look, the contract says what it says.  It doesn't include exclusivity.  It doesn't include any of the things they are chattering about.  And it doesn't include any of the things they're demanding now after the fact.  It just doesn't exist.

So this is a very telling statement that they were denied rights to earn money.  No, they weren't.  They were given a better head start than anybody else in the county where we just got a decision for a legal game.  And they blew it.  And they sat on their heels, they didn't do the work, they didn't spend the money, and they blew an opportunity.  Now they see an opportunity to take from us.  They file a trademark registration and make all of these claims.

Folks, he's talking about the deal.  We know what the deal is.  It's in the documents.  And then what I find is fascinating is he kept saying, Well, what's a guy to do?  I guess, if we're out there, we're selling to other operators that don't tell us where they put the games, and we just don't know where they go, what's a guy to do?

Well, what's a guy to do?  You're supposed to go to work like Michael Pace did, like Lou Miele did.  You're supposed to pull up your boots and go out and put effort into what you do.  You don't go out and steal other people's trademarks, misuse the system and try and hold another company hostage just because you don't do what you were supposed to do.

Thank you.

THE COURT:  Thank you, Mr. Neiser.

Mr. Zegarelli, anything further?  Again, limit of ten minutes.

MR. ZEGARELLI:  I'd just want to indicate that every contract implies a covenant of good faith.  Nothing further.  Thank you.

THE COURT:  Thank you very much.

Ladies and gentlemen, I believe that your lunch may have arrived.  It has arrived.  So we're going to take our lunch break so you can have a break.

After that break and you've had your lunch, we're going to come back so that I can give you your final instructions and review the verdict form with you.  So we'll take an hour, and we'll see you back here at 20 minutes after 1:00.  Thank you very much for your attention.  We'll see you then.

THE CLERK:  All rise.  This court is in recess.

(Whereupon, a luncheon recess was taken.)

(Pause as the jury enters courtroom.)

THE COURT:  Good afternoon.  All right.  Ladies and gentlemen, as I mentioned to you before we took a break, we're at the point where I'm going to give you my final instructions.  Ms. Kim is going to give each of you a copy of those instructions so that you can follow along as I'm reviewing them with you.

If at any time someone can't hear me, please let me know that because I certainly want you to be able to hear me while I'm going through this.

All right.  Now that you've heard all of the evidence, it is my duty to instruct you about the applicable law.  You will have a copy of these instructions with you when you deliberate.

In deciding the issues of fact submitted to you, it is your duty, ladies and gentlemen, to follow these instructions.  In doing so, you must take into consideration all of the instructions that I've given you and not pick out any particular instruction and disregard the other one.  You are not to be concerned with the wisdom of any rule of law stated by me.  Regardless of any opinion that you may have as to what the law is or ought to be, it would be a violation of your sworn duty to base a verdict upon any view of the law other than what is given in these instructions.

Your duty is to determine the facts from the evidence

that has been produced in court.  You are to apply the facts as you find them to the law that I'm giving you and neither sympathy nor prejudice should influence you in any way.  The law does not permit jurors to be governed by sympathy, prejudice, or public opinion.  All of the parties in this case and the public expect that you will carefully and impartially consider all of the evidence in the case, follow the law as stated by me, and reach a just verdict regardless of the consequences.

As stated earlier, it is your duty to determine the facts, and, in so doing, you must only consider the evidence I have admitted in this case.  The term "evidence" means and includes the sworn testimony of the witnesses and the exhibits that are admitted into the record.

Remember that any statements, objections, or arguments made by the lawyers are not evidence in this case.  The function of the lawyers is to point out those things that are most significant or most helpful to their side of the case and, in so doing, call your attention to certain facts or inferences that might otherwise escape your notice.  Also any statement I may have made about the facts should have no bearing at all on your own factual determinations.

In the final analysis, it is your recollection and your interpretation of the evidence that controls this case.  In addition, just because you wrote it down does not make it so.  Your independent recollection always takes preference over your

notes.  Remember, if you elected to take notes during the trial, they should only be used as memory aids.  You should not give your notes greater weight than your independent recollection of the evidence.  You should rely upon your own independent recollection of the evidence or lack of evidence, and you should not be unduly influenced by the notes of other jurors.  Notes are not entitled to any more weight than the memory or impression of each juror.

The first matter that I want to instruct you about is the burden of proof that applies to this case.  The burden of proof is a concept which you must understand to give this case proper consideration because a verdict cannot be based upon speculation, guess, or conjecture.  In a civil case, like this one, the party asserting the claim has the burden of proof of establishing the facts they present or advocate by what is called a preponderance of the evidence.

To establish a claim by the preponderance of evidence means to prove that the claim is more likely so than not so.  In other words, a preponderance of the evidence means such evidence, as when considered and compared with the evidence opposed to it, has more convincing force and produces, in your minds, a belief that what is sought to be proved is more likely true than not true.

Picture in your minds a scale -- the party or parties asserting a claim must put forth enough evidence that, when

weighed against the evidence put forth by the other side, the scale tips in the first party's favor.  If you find the scales have tipped in favor of the party of the -- of the party who brought the claim, even though slightly, then that party will have met its burden of proof, and you must return a verdict in its or their favor.  If, however, at the conclusion of all of the evidence you find that the scales have not tilted in favor of the party who has brought the claim, then that party, or parties, have failed to meet their burden of proof.  If, at the conclusion of all of the evidence, you find that the scales are evenly balanced, as they are at the present time, then, again, the party asserting the claim will have failed to meet his burden of proof.

Similarly, the party against whom a claim is brought has a burden of establishing or proving certain affirmative defenses by the fair weight or preponderance of the evidence. There are some issues in this case that require you to apply a different standard of proof.  On certain affirmative defenses, which I will instruct you on later, and on these affirmative defenses alone, the party asserting the defense has the burden to prove its defense by what is called clear and convincing evidence.

Clear and convincing evidence is evidence that produces, in your mind, a firm belief or conviction that a claim or fact sought to be proved by the evidence is true.  Clear and

convincing evidence involves a higher degree of persuasion than is necessary to meet the preponderance of the evidence standard.

Again, other than on certain affirmative defenses that I will instruct you about later, all other parts of the case require you to apply the preponderance of evidence standard. You will determine whether that party has carried this burden in the same manner that I have just instructed you.

You may have heard the term "proof beyond a reasonable doubt." That is a stricter standard of proof and only applies to criminal cases. It does not apply in civil cases such as this one, so you should put it out of your mind.

I next want to talk to you about evidence. The evidence in this case is of two different types. On one hand, there is direct evidence, which is testimony by a witness from his own personal knowledge, something he saw or heard himself.

The other type of evidence is circumstantial evidence, which comes from testimony concerning facts which logically point to the existence of other facts also in question. For example, you may wake up in the morning and see that the sidewalks are wet. You did not observe that it rained, but the fact that the sidewalks are wet is circumstantial evidence that it did.

Both types of evidence are equally admissible and competent. Whether or not circumstantial evidence is proof of other facts in question depends largely on the application of

your common sense.  So while you should consider only the evidence in this case, you are permitted to draw such reasonable inferences from the testimony and exhibits as you feel are justified in light of common experience.

Remember, circumstantial evidence is more than speculation, opinions, or belief.  Unlike speculation, opinions, or beliefs, circumstantial evidence is based on facts that logically and reasonably lead to the existence of other facts in question.  The law makes no distinction between the weight to be given either direct or circumstantial evidence.  One is not necessarily more or less valuable than the other.

Now, I've said that you must consider all of the evidence.  That does not mean you must accept all of the evidence as true or accurate.

You, and you alone, are the sole judges of the credibility or believability of each witness and the weight to be given to his testimony.  In weighing the testimony of a witness, you should consider his relationship to the parties; his interest, if any, in the outcome of the case; his manner of testifying; his opportunity to observe or acquire knowledge concerning the facts about which he testified; his candor, fairness, and intelligence; and the extent to which he has been supported or contradicted by other credible evidence.  You may, in short, accept or reject the testimony of any witness in whole or in part.

In deciding whether to believe a witness, you may specifically note any evidence of hostility or affection which the witness may have towards one of the parties. Likewise, you may consider evidence of any other interest or motive that the witness may have.

A witness may be discredited or impeached by contradictory evidence, by showing he testified falsely concerning a material matter, or by evidence that, at some other time, the witness has said or done something or failed to say or do something which is inconsistent with the witness's present testimony. If you find that a witness has lied to you in any material portion of his or her testimony, you may disregard that witness's testimony in its entirety. I say that you may regard such testimony, not that you must. You should consider whether the untrue part of the testimony was the result of a mistake or inadvertence or was, instead, willful and stated with a design or intent to deceive.

Inconsistencies or discrepancies in the testimony of a witness or between the testimonies of different witnesses may or may not cause you to discredit such testimony. Two or more persons witnessing an incident may see or hear it differently. An innocent misrecollection, like failure of recollection, is not an uncommon experience. In weighing the effect of a discrepancy, always consider whether it pertains to a matter of importance or an unimportant detail and whether the discrepancy

results from innocent error or intentional falsehood.

The weight of the evidence is not necessarily determined by the number of witnesses testifying to the existence or nonexistence of any fact. You may find that the testimony of a small number of witnesses, or just one witness, as to any fact is more credible than the testimony of a larger number of witnesses to the contrary. You are not required to accept any testimony, even though the testimony is uncontradicted and the witness is not impeached. You may decide, because of the witness' bearing and demeanor, because of the inherent improbability of his or her testimony, or because of other reasons sufficient to you that such testimony is not worthy of belief.

Ladies and gentlemen, I'm now going to turn to the law that is specifically applicable to the claims in this case.

And, first, I want to talk about trademark liability. The trademark laws balance three often conflicting goals:

First, protecting the public from being misled about the nature and source of goods and services so that the consumer is not confused or misled in the market.

Second, protecting the rights of a business to identify itself to the public and its reputation for offering goods and services to public.

And, three, protecting the public interest in fair competition in the market.

The balance of these policy objectives varies from case to case because they may often conflict.  Accordingly, each case must be decided by examining its specific facts and circumstances of which you are to judge.

In these instructions, I will identify types of facts you are to consider in deciding if a party is liable to the other for violating the trademark laws.  These facts are relevant to whether a party can be liable for:

Infringing a party's trademark rights by using a trademark in a manner likely to cause confusion among consumers;

Unfairly competing, by using a trademark in a manner likely to cause confusion as to the origin or quality of a party's goods;

Infringing a party's trade name by using similar corporate business or professional names in a manner likely to cause confusion about the source of products in the minds of consumers; and

False advertising by making a false statement that was material and that tended to deceive consumers, injuring a party in the market.

One part of this case involves words and graphics identified as, "Pennsylvania Skill."

POM of Pennsylvania and Savvy Dog claim they owned both the word "trademark" and the "design" trademark, "Pennsylvania Skill."  Pennsylvania Skill Games filed a

counterclaim and a separate lawsuit, claiming that it owns both the word "trademark" and the "design" trademark.  Both sides have denied liability to the other.  You have to decide if any party owns the trademark.  If you decide that a party owns a trademark, you must decide whether the other side violated its trademark rights.

I will now instruct you on the law that you will apply to make this decision.

A trademark is a word, symbol, or combination of words or symbols used by the owner of that trademark to identify its product, to distinguish its product from those manufactured or sold by others, and to indicate the source of the product.  The purpose of trademark law is to prevent confusion about the source of products or services.  Trademark rights are earned in part by using the asserted trademark before the defendant's accused use of the trademark.

A trademark can sometimes be different from a trade name.  A trade name is the name of a business.  A trademark differentiates goods created by the trademark holder from competitors.

To prevail on claims of trademark infringement and unfair competition under federal law, the party or parties asserting these claims must prove the following elements by a preponderance of the evidence:

One, they own a valid and legally protected trademark

for Pennsylvania Skill; and

Two, the opposing party or parties used Pennsylvania Skill in a manner that is likely to cause confusion as to the source, sponsorship, affiliation, or approval of source of its products.

A trademark is any word, name, symbol, device, or other combination thereof used by a person to identify and distinguish that person's goods from those of others and to indicate the source of the goods, even if that source is generally unknown.

A person who uses the trademark of another without their permission may be liable for damages.

Trademarks and trade names are technically distinct. A trade name is any word or words, symbol, or combination thereof used to identify a business and to distinguish it from the business of others.  A trade name symbolizes the reputation of a business as a whole and applies not to vendible goods but to the business and its goodwill.  In contrast, trademarks are designed to identify and distinguish goods.

The major legal distinction between trademarks and trade names is that trade names cannot be registered.

As a practical matter, however, courts are rarely called upon to distinguish between trade names and trademarks. Trade names often function as trademarks as well.  Because of this functional overlap, the same broad standards of protection

apply to trademarks and trade names.  For example, in cases like this one, a party's use of a corporate name as a trademark on goods may be characterized as infringement or unfair competition.  Conversely, a party's use of a trademark as part of its corporate title and name can be viewed as trademark infringement.  In short, a trade name can be used as a trademark.  That is, they are not mutually exclusive.  For example, Best Buy may be both a trade name and a trademark.

For the federal claim of trademark infringement, you, the jury, must find by a preponderance of the evidence that:

One, the Pennsylvania Skill marks are valid, protectable trademarks;

Two, which party owns the Pennsylvania Skill marks as trademarks;

And, three, the other party's use of the Pennsylvania Skill marks was without the consent of the owner in a manner that is likely to cause confusion among ordinary consumers as to the source, sponsorship, affiliation, or approval of the goods.

The party claiming infringement must prove by a preponderance of the evidence that Pennsylvania Skill word or design mark is valid.

A valid trademark is a word, name, symbol, device or any combination thereof that is either, one, inherently distinctive or, two, descriptive but has acquired a secondary meaning.

142

The Court previously determined, before this trial, that the Pennsylvania Skill word mark is not inherently distinctive and is instead descriptive. You must consider the recognition that the word mark has among prospective consumers in order to determine whether it is valid and protectable, even though it is descriptive. This market recognition is called the trademark's "secondary meaning." Thus, to prove that Pennsylvania Skill "word" mark is valid and protectable, the parties must prove that it has acquired a secondary meaning.

In contrast, for the Pennsylvania Skill "design" mark, you must first consider whether it is inherently distinctive. Only if you determine that the Pennsylvania Skill "design" mark is not inherently distinctive, should you consider whether it is descriptive but has acquired a secondary meaning.

The following instruction applies only to the Pennsylvania Skill design mark.

An inherently distinctive trademark is a word, symbol, or device or combination of them which intrinsically identifies a particular source of a good in the market. The law assumes that an inherently distinctive trademark is one that almost automatically tells a consumer that it refers to a brand or source for a product and that customers will be predisposed to equate the trademark with the source of the product. Inherently distinctive trademarks include all marks that are suggestive, arbitrary or fanciful, and does not include trademarks that are

either generic or merely descriptive.

If you determine that the Pennsylvania Skill "design" mark is not inherently distinctive but descriptive, you must consider the recognition that the "design" mark and the "word" mark have among prospective consumers in order to determine whether it is valid and protectable even though it is descriptive.  This market recognition is called the trademark's secondary meaning.

A word or name acquires secondary meaning when it has been used in such a way that its primary significance in the minds of prospective consumers is not the product itself but the identification of the product with a single source regardless of whether consumers know who or what that source is.  It is sufficient to show that a significant number of the consuming public associate the Pennsylvania Skill "word" or "design" mark with a single source.  The party claiming ownership need not prove that all or even a majority of the consuming public understands this meaning; only a significant number of the consuming public.  It is for you to decide how many constitutes a significant number.

When you are determining whether the Pennsylvania Skill "design" mark or the "word" mark has a secondary meaning, consider the following factors:

The extent of sales and advertising leading to buyer association;

The length of use;

The exclusivity of use;

The fact of copying;

Customer surveys;

Customer testimony;

The use of the mark in trade journals;

The size of the company;

The number of sales;

The number of customers, and;

Actual confusion.

The presence or absence of any particular factor should not necessarily resolve whether the Pennsylvania Skill skill "design" mark or word "mark" has secondary meaning, and you should only consider those factors to the extent that they are relevant.

After determining which party, if any, owns a valid trademark for the Pennsylvania Skill "design" mark or word "mark," you must consider whether the other party's use of the trademark is likely to cause confusion about the source of the owner's goods.

I will suggest some factors you should consider in deciding this. The presence or absence of any particular factor that I suggest should not necessarily resolve whether there was a likelihood of confusion because you must consider all of the relevant evidence in determining this issue.

As you consider the likelihood of confusion, you should examine the following:

The degree of similarity between the owner's mark and the alleged infringing mark;

The strength of the owner's mark;

The price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;

The length of time the alleged infringer has used the mark without evidence of actual confusion arising;

The intent of the alleged infringer in adopting the mark;

The evidence of actual confusion;

Whether the goods, competing or not competing, are marketed through the same channels of trade and advertised through the same media;

The extent to which the targets of the parties' sales efforts are the same;

The relationship of the goods in the minds of consumers, whether because of the near identity of their products, the similarity of function, or other factors; and

Other facts suggesting that the consuming public might expect the prior owner to manufacture both products or expect the prior owner to manufacture a product in the defendant's market or expect that the prior owner is likely to expand into

the defendant's market.

This is a qualitative inquiry and not all factors may be relevant.  The different factors may properly be afforded different weights, depending on the facts.

The law entitles the trademark owner to exclude others from using that trademark.  A party acquires the right to exclude others from using a trademark by being the first to lawfully use it in the marketplace or by lawfully using it before the alleged infringer.  A party also acquires the right to exclude others from using a trademark if industry or public usage creates for a majority of relevant consumers an association between the party and the mark prior to the alleged infringer's use.  This party may be referred to as the "senior user."

A trademark is "used" for purposes of this instruction when it is transported or sold in interstate commerce and the trademark is attached to the product or placed on its label or container, or, if that is not practical, placed on documents associated with the goods or their sale.

With respect to the Pennsylvania Skill "design" mark, if you find that it is inherently distinctive, you must consider whether the senior user used Pennsylvania Skill "design" mark to identify its products before the alleged infringer began to use Pennsylvania Skill to market its products in the area where the senior user sells its products.

On the other hand, if you find that Pennsylvania Skill "design" mark is not inherently distinctive but shown to be descriptive and has acquired secondary meaning, the senior user has the burden of showing by a preponderance of the evidence that the Pennsylvania Skill "design" mark had gained secondary meaning before the alleged infringer first began to use the Pennsylvania Skill "design" mark.

With respect to the Pennsylvania Skill word "mark", if you find that it has acquired secondary meaning, the senior user has the burden of showing by a preponderance of the evidence that the Pennsylvania Skill word "mark" had gained secondary meaning before the alleged infringer first began to use the Pennsylvania Skill word "mark."

Reverse confusion exists when a junior user uses its size and market penetration to overwhelm the senior but smaller user.  The senior user is the first to adopt and use a mark, whereas the junior user is the second user.  Reverse confusion protects the senior user's control of its mark and the goodwill created by the mark from a junior user's employment of the mark and protects the public from being deceived into believing that the senior user's product emanates from, is connected to, or is sponsored by the junior user.

While a defendant's actions need not be intentional or willful to be infringing, you will need to consider whether one of the parties acted intentionally or willfully.  This

encompasses a number of culpable mental states, including an intent of promoting confusion and appropriating the prior user's goodwill, or reckless infringement.  Intentional or willful infringement can be inferred by the fact that a party continued to use the infringing behavior after being given notice.

For reverse confusion, in addition to these showings, it may also be satisfied by a showing that the party acted with deliberate intent to push the party out of the market or other culpable conduct.

Next, I will discuss defenses to trademark infringement.  If you find that Pennsylvania Skill Games has proved that the POM parties infringed on the trademarks, you must then consider the POM parties' defenses against Pennsylvania Skill Games, which are fair use; and abandonment. Both parties have also claimed laches, which is another defense.

Turning first to the defense of fair use.  The owner of a trademark cannot exclude others from making a fair use of that trademark if there is a legally protectable right for the use.  A party makes fair use of a mark when that party uses it as other than a trademark to accurately describe its own product in good faith and not as an infringer.

If you find that Pennsylvania Skill Games is the owner of a valid trademark, the POM parties contend that they fairly used the trademark to describe its products.  The POM parties will then have the burden of proving its fair use of the mark by

a preponderance of the evidence.

The POM parties make fair use of a trademark when it:

Used the mark other than a trademark;

Used the mark fairly and in good faith; and

Used the mark only to describe the POM parties' goods as those of the POM parties and not at all to describe Pennsylvania Skill Games' product.

You may also consider the extent of confusion in determining whether the use was fair or not.

I'd like to talk next about the defense of abandonment.  The owner of a trademark cannot exclude others from using the mark if the owner intentionally abandoned the trademark.  The POM parties contend that, even if Pennsylvania Skill Games can show that it is the senior user of the Pennsylvania Skill mark, Pennsylvania Skill Games abandoned any trademark rights in Pennsylvania Skill.  The POM parties have the burden of proving abandonment by clear and convincing evidence.

In determining whether Pennsylvania Skill Games abandoned the right to exclusive use of Pennsylvania Skill, you must determine whether Pennsylvania Skill Games:

Discontinued its use of the trademark in the ordinary course of trade with the intent not to resume usage; or acted or failed to act in a way that the trademark's primary significance to all appreciable segments of prospective purchasers has become

the product itself and not the origin of the product.

To establish the defense of abandonment, it is necessary to show not only acts that indicate a practical abandonment but an actual intent to abandon.  Acts which unexplained would be sufficient to establish an abandonment may be answered by showing that there never was an intention to give up and relinquish the right claimed.

A trademark owner may find its trademark abandoned where it fails to take legal action against infringers of its trademark.  If such infringement becomes sufficiently widespread and so many others are using the mark that an appreciable segment of the public no longer primarily associates the mark with a single source of goods or services, the mark will be considered abandoned.

Both parties have claimed laches as a defense.  Laches is based on the theory that a party who has slept on its rights for an unreasonably long period of time should not be permitted to bring suit where the delay has prejudiced the other party.

In order to prove laches, the party must prove by a preponderance of the evidence that:

The party delayed in bringing its claim for an unreasonable length of time after it knew or should have known of its cause of action; and

That this delay resulted in prejudice.

The length of time which may be considered

unreasonable depends on the circumstances but nonetheless is measured from when the party first knew of or reasonably should have known of the allegedly infringing activities to when the party first filed its claim.

In examining whether a party suffered prejudice, you must determine whether a party suffered either evidentiary or economic prejudice.

Evidentiary prejudice may arise by reason of a party's inability to present a full and fair defense on the merits due to the loss of records, the death of a witness, or the unreliability of memories of long past events.  On the other hand, economic prejudice may arise if you find that one of the parties incurred costs and expenses above and beyond the promoting and advertising of the infringing product which likely would have been prevented by an earlier suit.

Now, there's also a claim under the Pennsylvania Trademark Act.  You must decide whether Pennsylvania Skill Games engaged in trademark infringement under Pennsylvania state law in addition to the federal claims.  The standards for trademark infringement under the Pennsylvania Trademark Act and federal law are the same and extend to all activity in the United States.

Therefore, if you find infringement for federal trademark infringement, you must also find infringement for the Pennsylvania Trademark Act.  Similarly, if you do not find any

federal trademark infringement, you must not find infringement based upon the Pennsylvania Trademark Act.

There is also a claim under Pennsylvania common law for infringement. You must decide whether a party engaged in trademark infringement under Pennsylvania common law in addition to the other claims. The standards for trademark infringement under Pennsylvania common law and federal law are the same.

Therefore, if you find infringement for federal trademark infringement, you must also find infringement for Pennsylvania common law trademark infringement. Similarly, if you do not find any federal trademark infringement, you must not find Pennsylvania common law trademark infringement.

Pennsylvania Skill Games also contends that the party's unauthorized use -- sorry -- that the POM parties' unauthorized use of the Pennsylvania Skill mark constitutes unfair competition under Pennsylvania common law. The elements for an unfair competition claim under Pennsylvania common law are identical to those establishing a claim under federal law except for the requirement that the goods traveled through interstate commerce.

Thus, if you find infringement for a federal trademark infringement, you must also find unfair competition under the Pennsylvania common law. Similarly, if you do not find any federal trademark infringement, you must not find unfair competition under the common law.

In addition to claims for trademark infringement and unfair competition, Pennsylvania Skill Games claims that Pace-O-Matic, POM of Pennsylvania, Savvy Dog Systems, or Miele Manufacturing engaged in false advertising.  To succeed on this claim, Pennsylvania Skill Games must prove the following by a preponderance of the evidence:

That Pace-O-Matic, POM of Pennsylvania, Savvy Dog Systems or Miele Manufacturing made a false or misleading statement of fact in a commercial advertisement about the nature, quality, characteristic, or geographic origin as to its own product or the other party's product;

Next, the statement actually deceived or had the tendency to deceive a substantial segment of the intended audience;

Again, the deception was likely to influence purchasing decisions of consumers;

In addition, the other party caused the false statement to enter interstate commerce;

And that Pennsylvania Skill Games has been, or is likely to be, injured as a result of the false statement. Injury includes direct diversion of sales from itself to the other party and/or a loss of goodwill associated with its products.

For purposes of the first element with respect to a false or misleading statement, Pennsylvania Skill Games may

establish that Pace-O-Matic, POM of Pennsylvania, Savvy Dog Systems, or Miele Manufacturing had made a false or misleading statement by proving that they have made a statement that left the intended audience with a false impression.  A statement that is true on its face can be misleading.  In determining whether a statement is misleading, you should consider both the statement itself and the context in which it was made.

For purposes of the fourth element relating to interstate commerce, a false statement enters interstate commerce if a party's products are transferred, advertised, and/or sold across state lines, or if the products are transferred, advertised, and/or sold across state lines and the activities have a substantial effect on that party's business.

If you find that Pennsylvania Skill Games has proved each of these things, then you must find for Pennsylvania Skill Games.  If, on the other hand, you find that Pennsylvania Skill Games has failed to prove any one of these things, then you must find for Pace-O-Matic, POM of Pennsylvania, Savvy Dog Systems, and Miele Manufacturing.

I'd next like to turn to the breach of contract claim. As I mentioned at the start of my instructions, Pennsylvania Skill Games, LLC, asserts a breach of contract claim against Pace-O-Matic, POM of Pennsylvania, and Miele Manufacturing involving a document called the Equipment Purchase Agreement, which I will refer to simply as the "EPA."

Pace-O-Matic, POM of Pennsylvania, and Miele Manufacturing deny that they breached the EPA.

I will now instruct you on the law that you are to apply to make this decision.

The duty of good faith and fair dealing is implied in every contract.

This implied duty of good faith and fair dealing applies only to discretionary obligations under the contract. It does not create new obligations or obligations inconsistent with a specific terms in the contract.

Duties or obligations are discretionary when a party has some degree of choice in how to perform its obligations under the contract.

A party should not do anything to destroy or injure the other party's rights -- the other party's right to receive the benefits of the contract.  Therefore, even discretionary duties and obligations must be performed in a reasonable manner consistent with the contract's purposes.

Pennsylvania Skill Games claims that the other side did not do what it agreed to do under the contract.  We call this "breach of contract."  Pennsylvania Skill Games claims that Pace-O-Matic, POM of Pennsylvania, and Miele Manufacturing's breach caused it harm for which they should pay money damages. Pennsylvania Skill Games must therefore prove the following by a preponderance of the evidence:

The existence of a contract, including its essential terms; and

Pace-O-Matic, POM of Pennsylvania, and Miele Manufacturing breach of a duty created by the contract.

You should also -- you must also consider whether the contract was in effect at the time of the breach.  A contract for an indefinite period of time is a contract for which there is no fixed duration.  A contract for an indefinite period of time is construed either as a contract for a reasonable time or terminable at will unless the parties unequivocally express their intent to have a perpetual contract.

If you find that Pennsylvania Skill Games acquiesced to a performance different than contained in the contract, strict performance of the contract will be considered waived.

If you decide there was a breach of contract, you must decide whether Pace-O-Matic, POM of Pennsylvania, and Miele Manufacturing's breach was "material" or "immaterial."

A "material" breach of contract is important enough to allow a party to treat the contract as broken and ended.  In that situation, the injured party has no more duties under the contract.

An "immaterial" breach does not end a contract. Pennsylvania Skill Games must still perform its duties and obligations under the contract even though they still have a claim for damages for any losses as a result of that breach.

To decide if a breach is "material" or "immaterial," you should consider the following:

At the time of the breach, whether Pennsylvania Skill Games was deprived of the benefit it reasonably expected when the contract was made;

Whether Pace-O-Matic, POM of Pennsylvania, and Miele Manufacturing offered to correct the breach and the likelihood they would have corrected it taking into account all of the circumstances;

Which party will suffer a greater hardship if the contract is deemed broken and ended;

To what extent can Pennsylvania Skill Games be adequately compensated for any harm caused by Pace-O-Matic, POM of Pennsylvania, and Miele Manufacturing's breach;

And whether Pace-O-Matic, POM of Pennsylvania, and Miele Manufacturing acted within standards of good faith and fair dealing.

A party may defeat a claim for breach of contract by proving that it was induced to sign the contract due to the other party's fraud regarding the existence of a past fact at the time of contract formation.  This is known as fraud in the inducement and is an affirmative defense raised by Pace-O-Matic, POM of Pennsylvania, and Miele Manufacturing that must be proved by clear and convincing evidence.

When a defendant has agreed to a contract because a

plaintiff made misrepresentations, then, in some cases, the contract is voidable and may not be enforced against the defendant.  That means that the plaintiff cannot make the defendant perform what the contract required or make the defendant pay the plaintiff money damages for failing to do what the contract required.

To meet this defense, Pace-O-Matic, POM of Pennsylvania, and Miele Manufacturing must prove by clear and convincing evidence that:

Pennsylvania Skill Games made a misrepresentation material to the transaction;

Pennsylvania Skill Games either knew its reputation of a past fact was false or recklessly disregarded whether it was true or false;

Pennsylvania Skill Games intended Pace-O-Matic, POM of Pennsylvania, and Miele Manufacturing to rely on its misrepresentation of a past fact;

Pace-O-Matic, POM of Pennsylvania, and Miele Manufacturing justifiably relied on that misrepresentation of a past fact; and Pace-O-Matic, POM of Pennsylvania, and Miele Manufacturing's injury was proximately caused by its reliance.

Whether reliance on an alleged misrepresentation is justified depends on whether Pace-O-Matic, POM of Pennsylvania, and Miele Manufacturing knew that the information supplied was false.  Fraudulent inducement is not a breach of contract but a

statement regarding a past or existing fact, and it must be proved by Pace-O-Matic, POM of Pennsylvania, and Miele Manufacturing by clear and convincing evidence.

The parties dispute whether Pace-O-Matic, POM of Pennsylvania, and Miele Manufacturing breached the right of first refusal term in the EPA. Pace-O-Matic, POM of Pennsylvania, and Miele Manufacturing claim that Pennsylvania Skill Games waived its rights.

To succeed on this waiver defense, Pace-O-Matic, POM of Pennsylvania, and Miele Manufacturing must prove the following by clear and convincing evidence:

First, Pennsylvania Skill Games knew it had a right of first refusal, to the extent one existed; and

Pennsylvania Skill Games freely and knowingly gave up its right to have Pace-O-Matic, POM of Pennsylvania, and Miele Manufacturing perform their obligations under the EPA.

A waiver may be oral or written and may arise from conduct that shows that Pennsylvania Skill Games gave up that right. Continuing to do business and trying to work out differences after a breach of contract is not necessarily a waiver of the breach.

Thus, if you find that Pace-O-Matic, POM of Pennsylvania, and Miele Manufacturing have proven by clear and convincing evidence that Pennsylvania Skill Games voluntarily abandoned or relinquished its right of first refusal, you may

find that Pace-O-Matic, POM of Pennsylvania, and Miele Manufacturing are not liable to Pennsylvania Skill Games on its breach of contract claim in whole or in part.

The doctrine of estoppel prevents a party from assuming a position or asserting a right to another's disadvantage that is inconsistent with the position previously taken by that party.  Stated differently, it prevents a party from doing an act differently than the manner in which the other party was induced by word or deed to expect.

The two essential elements of equitable estoppel are inducement and justifiable reliance on that inducement.  To succeed on this defense, Pace-O-Matic, POM of Pennsylvania, and Miele Manufacturing must prove by clear and convincing evidence that:

Pennsylvania Skill Games excused Pace-O-Matic, POM of Pennsylvania, and Miele Manufacturing, raising the defense of estoppel, from performing under the EPA by words and conduct;

And that Pace-O-Matic, POM of Pennsylvania, and Miele Manufacturing, raising that defense of estoppel, justifiably relied on Pennsylvania Skill Games' words or conduct when it stopped performing under the contract;

And Pace-O-Matic, POM of Pennsylvania, and Miele Manufacturing would have continued performing under the contract if Pennsylvania Skill Games did not excuse its performance.

If you find that Pace-O-Matic, POM of Pennsylvania,

and Miele Manufacturing have proven both inducement by Pennsylvania Skill Games and justifiable reliance by Pace-O-Matic, POM of Pennsylvania, and Miele Manufacturing to their detriment, you may find Pace-O-Matic, POM of Pennsylvania, and Miele Manufacturing not liable to Pennsylvania Skill Games on its breach of contract claim in whole or in part.

As I told you during my instructions at the beginning of the trial, this trial is in two phases.  This phase has been limited to liability with respect to the parties' claims relating to trademarks and Pennsylvania Skill Games's claim for breach of contract.  The second phase will address the issue of damages as relevant, and we will proceed promptly with evidence, argument, and your deliberations.  You must render your verdict on the liability phase fairly based on the evidence and the law, and you may not discuss or speculate about damages or reach judgment for any reason other than what I have explained to you in these instructions.

Ladies and gentlemen, we're now going to hand out the verdict form that you heard a little bit about earlier today, and I'm going to review that with you.  If you'd like to take a stretch break, since we've been talking for a little bit, you are welcome to do that while Ms. Kim is passing them out.

All right.  Now that everyone has the verdict form in front of you, I'm going to review it with you.  You all have a copy right now.  I want to mention that only one form will be

filled out by the jury in which you -- after you deliberate and you reach your verdict. But you all have a form now so you can follow along with me. And you'll note, as we go through this, there are a series of instructions telling you what to do next. I'm going to go over that with you to make sure that you understand how the form works.

So you'll note the first question asks whether any party has established by a preponderance of the evidence that Pennsylvania Skill word "trademark" is valid and has acquired a meaning in the marketplace through that party's efforts. You will answer that question "Yes" or "No."

You'll see in the italics that appear just below that that it tells you which question to go to next. So as you'll see in those italics, if you answered "Yes," you would go to question 2. If you answered "No," you would go all the way to question 9, which we'll get to a little bit later.

If the answer was "Yes," it directs you to question 2, which asks who has established that the Pennsylvania Skill "word" trademark is valid and has acquired a secondary meaning in the marketplace. And here, you would either place an X beside POM of Pennsylvania and Savvy Dog Systems or Pennsylvania Skill Games.

Turn to the second page. Again, in the italics, this gives you instructions based upon your answer to question 2.

If you answer question 2 by saying "POM of

Pennsylvania and Savvy Dog," you would proceed to question 3. If you answered "Pennsylvania Skill Games" to question 2, you would go to question 5.  So the next two questions, questions 3 and 4, are only answered if you answered "POM of Pennsylvania and Savvy Dog" to question 2.

Question 3 then reads:  Have POM of Pennsylvania and Savvy Dog established by a preponderance of the evidence that Pennsylvania Skill Games infringed the Pennsylvania Skill "word" trademark under federal law, Pennsylvania trademark -- the Pennsylvania Trademark Act, and Pennsylvania common law?  You will answer "Yes" or "No" to that question.  If you answer "Yes," you go to question 4.  If you answer "No," you go to question 9.

If you answered "Yes" to question 3, you would proceed to question 4, which says:  Have POM of Pennsylvania and Savvy Dog Systems established by a preponderance of the evidence that Pennsylvania Skill Games willfully infringed on the Pennsylvania Skill word trademark.  Again, you answer "Yes" or "No," and regardless of your answer, you would then proceed to question 9, which we'll get to in a little bit.

Again, going back to the top of the page, remember that if you answered "Pennsylvania Skill Games" to question 2, then you go directly to question 5.

Questions 5 and 6 are similar to questions 3 and 4. But instead of the "POM Parties," it asks, "Has Pennsylvania

Skill Games, in question 5, established by a preponderance of the evidence that POM of Pennsylvania, Savvy Dog Systems, Pace-O-Matic, or Miele Manufacturing infringed the Pennsylvania Skill word trademark"?  Again, you answer that "Yes" or "No." If you answer "Yes," you proceed to the next question.  If you answer "No," you proceed to question 9.

In question 6, assuming that you answered "Yes," that question asks you which party or parties have infringed on the Pennsylvania Skill word trademark.  You may mark an X beside any party or parties that you believe have infringed by placing an X on the line that you see.

If you go to the top of page 3 of the verdict form, that then tells you, go to question 7.  Question 7 says:  With respect to the party or parties who you found in question 6 to infringed the "word" trademark, has Pennsylvania Skill Games met its burden by a preponderance of the evidence that any party or parties willfully infringed?  And again, willfully infringed as opposed to what we asked you before.  Again, you answer that question "Yes" or "No."

If you answered "Yes," question 8 is the next question you will answer, and that asks you to identify which party or parties willfully infringed on the "word" trademark, and you can place an X beside any or all of those depending on your findings.

Question 7 notes that if you answered "No," you go to

question 9.

Starting with question 9, this deals with the "design" trademark as opposed to the "word" trademark. Again, it is similar questions. Question 9 asking if any party has established by a preponderance of the evidence that the Pennsylvania Skill "design" trademark is valid and is either inherently distinctive or has acquired a secondary meaning in the marketplace through their efforts. The answer there is "Yes" or "No." If you answer "Yes" to that question, you proceed to question 10. If you answer "No," you go all the way over to question 17, and you don't answer any of the remaining questions.

If you answered "Yes," you proceed to question 10 that asks: Who has established by a preponderance of the evidence that the Pennsylvania Skill "design" trademark is valid and is either inherently distinctive or has acquired a secondary meaning in the marketplace through their efforts. Here, again, like we saw earlier, you would select either POM of Pennsylvania and Savvy Dog Systems or Pennsylvania Skill Games.

If you go to the top of page 4, that then directs you which question to answer based upon your answer to the previous question, question 10. If you answered "POM of Pennsylvania and Savvy Dog Systems" to question 10, you go right to the next question, question 11. If you answered "Pennsylvania Skill Games" to question 10, you go directly to question 13.

If you answered "POM of Pennsylvania and Savvy Dog Systems" to question 10, you will proceed to question 11, that asks you to determine have POM of Pennsylvania and Savvy Dog Systems established by a preponderance of the evidence that Pennsylvania Skill Games infringed the Pennsylvania Skill "design" trademark under federal law, the Pennsylvania Trademark Act, and Pennsylvania common law. Again, you place an X beside either yes or no. If you answer "Yes," you proceed to the next question, question 12. If you answer "No," you go all the way to question 17.

If you answered "Yes" to question 11, you go to question 12, which, again, asks about willful infringement, whether POM of Pennsylvania and Savvy Dog have established by a preponderance of the evidence that Pennsylvania Skill Games willfully infringed on the "design" trademark. Again, answer "Yes" or "No," that will then direct you, again, to question 17.

On the other hand, if you answered question 10, as you look at the top of the page, by saying "Pennsylvania Skill Games," you go to question 13.

Those next several questions have the same types of questions that we reviewed previously, question 13 asking whether Pennsylvania Skill Games has established by a preponderance of the evidence that Pace-O-Matic, POM of Pennsylvania, Savvy Dog Systems, or Miele Manufacturing infringed on the "design" trademark under federal law and

Pennsylvania common law.  You'll answer that question "Yes" or "No."

If you answer "Yes," you go directly to question 14. We have the name of all of the parties here, and you would place an X beside any party that you find have infringed on the "design" trademark.  If you answered "No" to question 13, then you go to question 17.

Now, if you went to question 14, it asks you to proceed to question 15.  That states, "With respect to any party or parties who you found in question 14 to have infringed on the 'design' trademark, has Pennsylvania Skill Games met its burden by a preponderance of the evidence that any party or parties willfully infringed on the Pennsylvania Skill 'design' trademark?"  If you answer "Yes," you go directly to question 16.  If you answer "No," you go to question 17.

If you answered "Yes," you would then go to 16, which asks which party or parties willfully infringed on the "design" trademark, and you would place an X beside any party or parties that you have concluded willfully infringed.

Regardless, we're now at paragraph 17.  Paragraph 17 deals with the unfair competition claim of Pennsylvania Skill Games.  That question in 17 asks whether Pennsylvania Skill Games established by a preponderance of the evidence that POM of Pennsylvania, Savvy Dog Systems, Pace-O-Matic, or Miele Manufacturing engaged in unfair competition.  If your answer is

"Yes," you go directly to the next question, question 18.  If your answer is "No," you will go to question 19.

Question 18, if you answered "Yes," again, which asks which party or parties engaged in unfair competition, and, again, you would place an X on the line beside any party or parties that you find did so.

Question 19 and 20 deals with the false advertising claim of Pennsylvania Skill Games.  In 19, it asks whether Pennsylvania Skill Games established by a preponderance of the evidence that POM of Pennsylvania, Savvy Dog Systems, Pace-O-Matic, or Miele Manufacturing engaged in false advertising.  If you answer "Yes," you will go directly to the next question, question 20, which again, asks you which party or parties engaged in false advertising, and you would place an X beside any or all of the parties that you conclude did so.

If you answered "No" to 19, you would go directly to question 21.  Question 21 and the remainder of the questions ask about contract claims, and this is the contract claim of Pennsylvania Skill Games.  The first question is, "Is the Equipment Purchase Agreement still in effect today?"  You either answer that "Yes" or "No."

If you answer "Yes" to question 21, you will be asked in question 22 to state the date on which the Equipment Purchase Agreement ended.

If you answer "No" to question 21, you would proceed

to question 23.  And question 23 must be answered, regardless of any conclusion you reach in questions 21 and 22.

Question 23 asks whether Pennsylvania Skill Games has established by a preponderance of the evidence that Pace-O-Matic, Miele Manufacturing, or POM of Pennsylvania breached the Equipment Purchase Agreement.

If you answer "Yes," you proceed to question 24.  If you answer "No," then your deliberations are complete, and you go down to that bolded part that is immediately below question 24.

If you answered "Yes" to question 23, you will answer question 24 and, again, will identify which party or parties breached the Equipment Purchase Agreement.

Once you are done with your deliberations and you have completed this form, your deliberations are completed.  I'll ask you at that point that all jurors must sign the verdict form in the spaces that are provided, place the date on it, and notify Ms. Kim that you have reached a verdict.  Whoever is elected as the foreperson -- and I'll get back to that in just a moment -- will retain a copy of the verdict slip and bring it to court when we resume to hear your verdict.

Does anyone have any questions about how the verdict form operates?

I think, ladies and gentlemen, if you follow the instructions, it will guide you to which question to go to next

based upon your answer to the previous question.  So I hope no one has any questions.  This is a good time if anyone does.

All right.  Then let me give you some final instruction before you retire to deliberate.  I want to remind you that during deliberations, you must not communicate with or provide any information about this case to anyone outside the jury room by any means.  You may not use any electronic media or device, such as a telephone, cell phone, Smartphone, iPhone, BlackBerry -- I think we can eliminate BlackBerry at this point, ladies and gentlemen -- computer, any Internet service or text messaging.

You may not go on any Internet site, including a chat room, blog, or website such as Facebook, YouTube, Twitter to communicate with anyone any information about the case or to conduct any research about this case until I accept your verdict.  Relying on any information you obtain outside of this courtroom is not only in violation of the rules, it's also unfair because the parties would not have an opportunity to refute it, explain it, or correct it.

While these rules might seem unduly restrictive, you must carefully follow them.  The whole point of a trial is to ensure the facts on which jurors base their decisions have been fully and carefully attested by opposing parties.  So limiting the evidence you consider in reaching a verdict with what the parties have been allowed to test and debate in this courtroom

is the only way that you can protect their right to receive a fair trial.

If you break any of these rules, I may need to order an entirely new trial before another jury that would cost the parties and the court system a significant amount of time and money as well as cause an embarrassment to you.

Your verdict must represent the considered judgment of each juror.  In order to return a verdict, it is necessary that each juror agree to that verdict.  In other words, your verdict must be unanimous.  It is your duty as jurors to consult with one another and to deliberate with a view to reaching an agreement if you can do so without violence to your individual judgment.

Each of you must decide the case for yourself but only after an impartial consideration of all of the evidence in the case with your fellow jurors.

In the course of your deliberations, do not hesitate to re-examine your own views and change your opinion if convinced it is erroneous, but do not surrender your honest conviction as to the weight or effect of the evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict.

Upon retiring to the jury room, you should first select one of your number to act as your foreperson who will preside over your deliberations and will be your spokesperson

here in court.

I mentioned the verdict form, which I have already reviewed with you. You will take that verdict form to the jury room -- let me say that again. You will take the verdict form to the jury room, and when you have reached a unanimous agreement as to your verdict, you'll have the foreperson fill it in, date it, and everyone will sign it as I mentioned before. You'll then signal Ms. Kim that you are prepared to return to the courtroom, and then we will return you to the courtroom to render your verdict.

If during your deliberations you should desire to communicate with the Court, please reduce your message or question to writing, have it signed by the foreperson, and give the note to Ms. Kim, who will then bring it to my attention. I will then respond as promptly as I can, either in writing or by having you return to the courtroom so that I can address you orally.

I caution you, however, that with respect to any message or question you might send, you should never state or specify your numerical division regarding the verdict at that time.

Again, I want to remind you, you cannot return a verdict unless you unanimously agree that it is the right verdict.

Once again, I want to remind you that nothing about my

instructions and nothing in the verdict form is meant to suggest or convey in any way or manner as to what I think your verdict should be.  It is your sole and exclusive duty and responsibility to determine the verdict.

You will note from the oath about to be taken by Ms. Kim that she, too, as well as all persons, are forbidden to communicate in any way or manner with any member of the jury on any subject touching on the merits of the case.

Ms. Kim, I'd now like to administer an oath to you.

(Bailiff sworn.)

THE COURT:  Thank you, Ms. Kim.  At this point, you may escort the jury to the jury room to deliberate.

Ladies and gentlemen, thank you very much for your attention during these instructions.

(At 2:35 p.m., the jury retired to jury room to begin deliberations.)

THE COURT:  I would ask counsel to remain somewhere in the building, at least for a while.  If we don't have your cell phone numbers -- Ms. Hopkinson is way ahead of me, as usual.  We'll call you if either there's a question or a verdict.  And certainly, if you have to leave for some reason, please just be able to return promptly to the courtroom.

We'll see where things are around our normal quitting time, and at that point, we'll see whether the jury wants to continue or whether we will bring them back on Friday,

remembering that we do not have a session tomorrow, unfortunately, due to the other matter that I discussed with counsel.

I want to thank all of you and we'll be in touch as soon as we receive any word from the jury.

MR. NEISER:  Thank you, Your Honor.

MR. ZEGARELLI:  Thank you.

(In open court, jury not present.)

THE COURT:  Thank you for coming back on short notice.

I wanted to let counsel know, before the jury comes in, that we received two notes from them, neither of which related to the merits of the case:

The first, at approximately 4:30, asked if they could notify family that they are staying late by using their telephone, and we indicated that they could.

The second note we got about five minutes after 5:00, and I'm just going to quote it.  "We would like to continue deliberating the case on Friday due to time of day and transportation timing."

So I'm going to excuse them now.  I wanted to make sure that you knew the exact content of these notes that I received.  So I'm going to call them in now and just excuse them for the day and ask them to come back Friday at 9:00.

Laura, before you let them in, any questions or anything anyone wants to indicate?

MR. NEISER:  Nothing from us, Your Honor.

MR. ZEGARELLI:  No, Your Honor.

THE COURT:  Thank you.

(Pause as the jury enters courtroom.)

THE COURT:  Please be seated, ladies and gentlemen. Ladies and gentlemen, we received your note about wanting to continue your deliberations on Friday due to the time and transportation issues.  So thank you for your patience while we brought everyone back to the courtroom.

That is certainly fine.  We don't want you to be inconvenienced and understand that you are not completed with your deliberations.

So I'm excusing you at this time.  I want to remind you that you're not to discuss your deliberations or anything about the substance or merits of this case with anyone outside of this courtroom and until you come back here on Friday to deliberate.

So I'm going to ask you to again to be back so you can get started with your deliberations at 9:00 a.m., and I'll make sure counsel and Sharon are somewhere in the vicinity so when you have reached a verdict, whenever that is, we'll bring everyone back here as soon as we can.

So with that, I thank you again for your patience and your attention to this matter.  We will see you on Friday at 9:00 a.m.  Thank you.  You're excused.

(Proceedings concluded at 5:29 p.m.)

- - -

**I N D E X**

| **Proceeding** | **Page** |
|---|---|
| Closing Argument by Mr. Neiser | 31 |
| Closing Argument by Mr. Zegarelli | 83 |
| Rebuttal by Mr. Neiser | 123 |
| Rebuttal by Mr. Zegarelli | 129 |
| Court's Jury Instructions | 130 |
| Jury Notes | 174 |

**C E R T I F I C A T E**

I, SHARON SIATKOWSKI, CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

S/SHARON SIATKOWSKI
SHARON SIATKOWSKI, RMR, CRR, CBC, CRI
OFFICIAL COURT REPORTER